**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HERMÈS INTERNATIONAL and HERMÈS OF PARIS, INC., | CIVIL ACTION NO. |
| Plaintiffs, | 22 CV _____ |
| -against- | |
| MASON ROTHSCHILD, | **COMPLAINT** |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiffs Hermès International and Hermès of Paris, Inc. ("Hermès"), through its attorneys Baker & Hostetler LLP, for its Complaint against Defendant Mason Rothschild ("Defendant") alleges and states as follows:

## NATURE OF THE CASE

1.      As Defendant stated in a recent interview with Yahoo Finance: "There's nothing more iconic than the Hermès Birkin bag."  Defendant is a digital speculator who is seeking to get rich quick by appropriating the brand METABIRKINS for use in creating, marketing, selling, and facilitating the exchange of digital assets known as non-fungible tokens ("NFTs").  Defendant's METABIRKINS brand simply rips off Hermès' famous BIRKIN trademark by adding the generic prefix "meta" to the famous trademark BIRKIN.  "Meta" and "metaverse" refer to virtual worlds and economies where digital assets such as NFTs can be sold and traded.

2.      Defendant has openly revealed his METABIRKINS business plan. He seeks to make his fortune by swapping out Hermès' "real life" rights for "virtual rights".  As he has explained, Defendant is trying to "create the same kind of illusion that [the Birkin] has in real life as a digital commodity." The "digital commodities" upon which Defendant is building his business, NFTs, are unique and non-fungible (i.e., non-interchangeable) units of data stored on a blockchain just as

cryptocurrencies (which are fungible) are stored on a blockchain. NFTs can be created to transfer ownership of any physical thing or digital media, including an actual handbag or the image of a handbag.   NFTs can also be freely bought and sold like any other commodity. As with cryptocurrencies, a highly speculative market has emerged around the trading of NFTs.

3.       Defendant has openly acknowledged that he elected to sell his NFTs as METABIRKINS because a BIRKIN handbag is a highly valuable asset in the physical world. Defendant has executed on his plan for replicating the physical world success of the BIRKIN bag in the "metaverse" through pervasive use of the mark METABIRKINS to brand all of his "metaverse" business activities. He identifies his collection of NFTs using the METABIRKINS trademark. He operates e-commerce stores for the sale of NFTs under the METABIRKINS trademark.  He has adopted METABIRKINS for his Twitter handle, Instagram account name, and Discord channel and blanketed social media with the "#MetaBirkins" hash tag.  He operates a "MetaBirkins.com" website that advertises and promotes the sale of his METABIRKINS NFTs.  He encourages others to create "MetaBirkins" with his "Build-a-MetaBirkin" contest which further damages and dilutes the BIRKIN Mark.  He has announced to his followers his plans to develop his own "decentralized NFT exchange" under the METABIRKINS brand.   In furtherance of Defendant's stated plan for replicating the experience of the BIRKIN handbag in the "metaverse", the NFTs for sale under the METABIRKINS brand currently consist of blurry images of the trade dress of the famous BIRKIN handbag.

4.       Defendant's adoption of the METABIRKINS trademark has brought him great financial success in a matter of weeks. There can be no doubt that this success arises from his confusing and dilutive use of Hermès' famous trademarks. As one commentator, among many, noted

in response to recent media coverage: "If this . . . wasn't called '[B]irkin' would it be getting any attention?"

5.       Defendant seeks to immunize himself from the legal consequences of his appropriation of Hermès' famous trademarks by proclaiming that he is solely an artist. Although a digital image connected to an NFT may reflect some artistic creativity, just as a t-shirt or a greeting card may reflect some artistic creativity, the title of "artist" does not confer a license to use an equivalent to the famous BIRKIN trademark in a manner calculated to mislead consumers and undermine the ability of that mark to identify Hermès as the unique source of goods sold under the BIRKIN mark. Defendant's ruse must not be sanctioned:  He is stealing the goodwill in Hermès' famous intellectual property to create and sell his own line of products.

6.       The fact that Defendant has adopted and is using METABIRKINS as a trademark is evident from the proprietary rights that he is claiming in the METABIRKINS brand.  It is not surprising that other digital speculators, seeing how easily Defendant has made money off the METABIRKINS brand, are now also issuing NFTs that they call METABIRKINS.  Defendant has repeatedly complained of "counterfeited" METABIRKINS on NFT marketplaces.  The day before his infringing collection of METABIRKINS NFTs released, Defendant reported they were being "counterfeited" and that he saw "more and more fake MetaBirkins sold every hour."   In fact, Defendant's infringing use of the METABIRKINS trademark has spurred others to create hundreds more NFTs claiming to be METABIRKINS NFTs or offshoots of the METABIIRKIN NFTs, all of which infringe on and dilute the BIRKIN Mark.

7.       On December 16, 2021, Hermès notified both Defendant and the NFT platform OpenSea of the blatant violation of Hermès' intellectual property by his use of the METABIRKINS trademark.   Shortly after receiving this notice, OpenSea removed the infringements from its

platform.  Defendant, however, was not deterred, and reinvigorated his advertising on Discord and his infringing NFTs quickly appeared on the Rarible platform.

8.      Defendant's widespread use of the METABIRKINS mark constitutes trademark infringement and dilution of the famous BIRKIN Mark.   The METABIRKINS NFTs feature the distinctive design of the BIRKIN handbag, which in conjunction with the use of the METABIRKINS Mark, adds to the likelihood of confusion and dilution.  While Hermès has not yet minted and sold its own NFTs, this is a new and burgeoning marketplace.  Consumers see a wide variety of brands, including luxury fashion brands exploiting the NFT space and would expect that NFTs featuring famous brands are affiliated with those brands, or wonder why the famous brands are permitting such dilutive use of their valuable assets and think less highly of them.

9.      Unless enjoined by this Court, Defendant will continue to advertise and sell NFTs under the METABIRKINS brand, build a company offering a range of virtual products and services under the METABIRKINS brand, and ultimately preempt Hermès' ability to offer products and services in virtual marketplaces that are uniquely associated with Hermès and meet Hermès' quality standards.

## JURISDICTION AND VENUE

10.     These claims arise under the Trademark Act of 1946, 15 U.S.C. § 1051, *et seq*., particularly under 15 U.S.C. § 1114(1).  This Court has subject matter jurisdiction over the claims in this action which relate to trademark infringement, dilution, cybersquatting and false designations of origin and false descriptions pursuant to the provisions of 28 U.S.C. §§ 1331 and 1338 and 15 U.S.C. § 1121.

11.     This Court has supplemental jurisdiction over the claims in this Complaint which arise under state statutory and common law pursuant to 28 U.S.C. § 1367(a), since the state law

claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

12.     Personal jurisdiction over Defendant is proper pursuant to N.Y. C.P.L.R. § 302(a). Upon information and belief, Defendant created the METABIRKINS Website, https://metabirkins.com, which is accessible to consumers in New York and bears unauthorized and infringing uses of the BIRKIN Mark.  Upon information and belief, Defendant targeted New York consumers by operating the METABIRKINS website and setting up storefronts to advertise, sell and offer for sale the METABIRKINS NFTs using "smart" contracts on four different NFT marketplaces.  Upon information and belief, the Defendant used or uses the following NFT marketplaces to facilitate the promotion and sale of the METABIRKINS NFTs to New York consumers: https://opensea.io ("OpenSea"); https://rarible.com ("Rarible"); https://looksrare.org/ ("LooksRare"); and https://zora.co/ ("Zora").  OpenSea, an assumed name of Ozone Networks Inc., is a Delaware corporation registered to do business in New York, with a principal place of business in the City and State of New York.

13.     These NFT marketplaces operate interactive sites which are viewable to and have been accessed by consumers within the United States, including consumers within the State and City New York.  Defendant's decision to set up storefronts on these interactive marketplaces evidences a conscious plan to advertise and ultimately sell the METABIRKINS NFTs in New York.  At least one consumer living in the State and City of New York purchased a METABIRKINS NFT from one of these marketplaces.  Defendant has personally derived substantial revenue and should reasonably expect to continue receiving substantial revenue from the sale of the METABIRKIN NFTs through the NFT marketplaces by purchasers throughout the United States, including purchases by New York consumers.

14.     Defendant's conduct causes direct and indirect financial loss to Hermès in New York where Plaintiff Hermès of Paris maintains its principal place of business for Hermès' sales operations for the United States.  Defendant's conduct also is likely to engender confusion and dilution of Hermès' federally registered trademark rights in New York leading to the diminution of the value of and goodwill associated with these rights.

15.     Venue is proper in this Judicial District under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Hermès' claims has occurred within this Judicial District and a substantial part of the harm caused by Defendant has occurred in this Judicial District.

## THE PARTIES

16.     Plaintiff Hermès International is a corporation, organized and existing under the laws of France, having its principal place of business located at 24, rue du Faubourg Saint-Honoré, Paris, France.  Hermès does business in the United States, including New York, through its wholly-owned subsidiary Hermès of Paris, Inc.

17.     Plaintiff Hermès of Paris, Inc. is a corporation, organized and existing under the laws New York, having its principal place of business located at 55 East 59th Street, New York, New York 10022.  Hermès of Paris, Inc. is the sole authorized distributor of the BIRKIN handbags in the United States and has the exclusive right to sell BIRKIN handbags under the HERMÈS trademark in the United States.

18.     Defendant Mason Rothschild is an individual who is engaged in the manufacture, distribution, sale, and advertisement of the METABIRKINS NFTs. Upon information and belief, Rothschild is a resident and citizen of California.  Upon information and belief, Rothschild is the owner and operator of https://metabirkins.com (the "MetaBirkins Website").

## FACTUAL ALLEGATIONS

### I.      Hermès And Its Famous BIRKIN Handbag

#### A.   Hermès' Decades Old Luxury Fashion Business

19.      Hermès is a world-famous designer and producer of high-quality merchandise including, *inter alia*, handbags, apparel, scarves, jewelry, fashion accessories, and home furnishings.

20.      For decades, Hermès has developed its reputation and distinctive image.

21.      Hermès' origins date back to 1837, when it began designing and manufacturing high-quality harnesses for horses.  During the twentieth century, Hermès expanded its business to include handbags, personal leather goods, and apparel.

22.      Hermès has registered the HERMÈS word mark with the U.S. Trademark and Patent Office in connection with a wide array of goods and services (the "HERMÈS Marks").  A list of the HERMÈS Marks registrations is attached as Exhibit A.

23.      Hermès sells some of its products directly to consumers through Hermès-owned retail stores and its website www.Hermes.com, which receives substantial views from consumers in New York. Hermès currently operates stores in 45 countries, including the United States, where it has stores in several States, including New York, with four stores in this Judicial District.

24.      Hermès is the exclusive distributor or licensor in the United States of its merchandise, all of which bear one or more of Hermès' Federally Registered Trademarks (as defined herein).

#### B.   The Origin & Fame of Hermès' BIRKIN Handbag

##### i.   *Hermès' Over 35 Years of Use of the BIRKIN Mark & Its Federal Registration*

25.      In addition to being known for high-quality merchandise, Hermès is well known for its famous BIRKIN handbag, an exclusive Hermès design that was created in 1984 and first sold in commerce in the U.S. in 1986.  The BIRKIN handbag was the outcome of a chance encounter

between the late President and Artistic Director of Hermès, Jean-Louis Dumas, and the actress Jane

Birkin on a Paris to London flight.   Ms. Birkin complained to Dumas that she could not find a bag

suitable for her needs as a young mother, so Dumas sketched the design of a spacious rectangular

hold all with a burnished flap and saddle stitching.  This bag is universally known as the BIRKIN

handbag.  An image of the BIRKIN handbag is depicted below as Figure 1 and attached hereto as

Exhibit B.



*Figure 1.*

26.     Hermès owns the BIRKIN trademark which is registered on the Principal Register of

the U.S. Trademark and Patent Office under Registration No. 2991927.  It is in full force and effect

and incontestable (the "BIRKIN Mark").  A copy of the Certificate of Registration for the BIRKIN

Mark is attached as Exhibit C.

27.     Hermès owns the trade dress rights in the BIRKIN handbag design which is registered

on the Principal Register of the U.S. Trademark and Patent Office under Registration No. 3936105.

It is in full force and effect and incontestable (the "BIRKIN Trade Dress").  A copy of the Certificate

of Registration for the BIRKIN Trade Dress is attached as Exhibit D and below as Figure 2 is an

image of this registered trade dress.



*Figure 2.*

28.    In addition to being registered in the U.S., Hermès has registered the BIRKIN word mark and trade dress worldwide to identify its iconic handbag and has continuously used the BIRKIN Mark and BIRKIN Trade Dress since the BIRKIN handbag was first introduced in U.S. commerce in 1986.

ii.  *Extensive and Widespread Worldwide and U.S. Sales Under the BIRKIN Mark*

29.    Each BIRKIN handbag is handcrafted from the finest leather by experienced artisans in France.  The manufacturing of a single BIRKIN handbag requires more than seventeen hours of an artisan's time.  The intensive labor and craftmanship and high-quality leathers required makes the BIRKIN handbag difficult to produce and expensive.  The price of a BIRKIN handbag from thousands of dollars to over one hundred thousand dollars.  Demand for BIRKIN handbags is such that Hermès cannot satisfy all requests.

30.    As Defendant himself has acknowledged, "[The BIRKIN handbag's] mysterious waitlist, intimidating price tags and extreme scarcity have made it a highly covetable 'holy grail' handbag that doubles as an investment or store of value."  A copy of the METABIRKINS OpenSea page is attached hereto as Exhibit E.

31.     Hermès has sold millions of dollars' worth of BIRKIN handbags in significant quantities since its inception in 1986.  Such sales have occurred in the United States, France, and throughout the world.

32.     "The desirability of an Hermès Birkin handbag - - a symbol of rarefied wealth - - is such that not even a global pandemic can dull demand for it."  *See* Exhibit F.  In the second quarter of 2021, Hermès' sales for the leather and saddlery division, which includes the Birkin handbags, more than doubled from a year ago and rose by 24% from their pre-pandemic June 2019 levels.  *See* Exhibit G.

33.     Despite the price and exclusivity, the BIRKIN handbag has become a household name and well known by the general public, both in name and by its distinctive design.

   *iii. Extensive and Widespread Worldwide and U.S. Advertising & Publicity of the BIRKIN Mark*

34.     The BIRKIN handbag and BIRKIN Mark have received unsolicited publicity and praise among consumers and in the media.  The BIRKIN handbag and BIRKIN Mark have been prominently featured in fashion publications, the media, and popular culture since 1986, and particularly over the past two decades.

35.     By way of example, the March 2021 edition of Harper's Bazaar contained an editorial dedicated to the BIRKIN handbag titled, "The Mighty, MIGHTY Birkin."  The article discusses "[h]ow the [BIRKIN handbag] withstood trends and WEATHERED SEASONS to become an INDELIBLE PART of the CULTURE."  A copy of the article is attached hereto as Exhibit H.  Examples of additional fashion publication editorials and articles on the BIRKIN handbag are attached hereto as Exhibit I.

36.     The BIRKIN handbag is a favorite among celebrities who are routinely featured in news and magazine articles carrying the BIRKIN handbag.  There are entire articles dedicated to identifying the celebrities that love and own BIRKIN handbags.

37.     The BIRKIN handbag has also been showcased in U.S. television and film.  Most notably, the BIRKIN handbag was a major plot point in the 2001 *Sex and the City* episode "Coulda, Woulda, Shoulda".  The fictional episode mirrored the exclusivity and prestige associated with the BIRKIN handbag in real life and documented one of the character's difficulties in acquiring a BIRKIN handbag.  The BIRKIN handbag has also been featured in other television shows, including episodes of *Gilmore Girls*, *Gossip Girl*, *Will & Grace*, and *How I Met Your Mother*, and in films, such as *The Devil Wears Prada*, *Sex and The City 2*, *The Royal Tenenbaums*, and *Don't Look Up*. Articles discussing some of these features are attached hereto as Exhibit J.

38.     Since as early as 2000, Hermès has expended millions of dollars in the United States advertising the BIRKIN Mark and BIRKIN Trade Dress.  Such advertising has been placed in publications based out of the State and City of New York: *The New York Times*, *Elle*, and *Vogue*.

39.     As a result of such advertising, since 2000, Hermès has sold thousands of BIRKIN handbags featuring the BIRKIN Mark and BIRKIN Trade Dress in the United States.

        *iv.  Widespread and Extensive Worldwide and U.S. Actual Recognition of the BIRKIN Mark*

40.     The BIRKIN Mark is recognized throughout the world and U.S.  By way of example only, a September 2021 Vanity Fair article noted that, "There is a kind of fashion object so long-lasting, so tirelessly wanted that its name becomes recognizable, a metonym for the brand that made it: the Air Jordan, the Love bracelet. Few brands, successful though they may be, attain that kind of saturation. Hermès has done it twice: the Birkin and, arguably the first of the household-name phenomena, the Kelly."  A copy of the Vanity Fair article is attached hereto as Exhibit K.

11

41.     The BIRKIN Mark is so well-known that one of the very first BIRKIN handbags was placed on display at an art exhibition in the Victoria & Albert Museum in London, England from April 2020 through January 2021.  A copy of an article on the exhibition from *Contemporain(S)* and photographs of the exhibition are attached hereto as Exhibit L.

42.     The BIRKIN handbag has been recognized as one of the best investments any person can make with its increasing value beating returns from the stock market and even gold.  Copies of articles discussing this recognition as an investment item are attached hereto as Exhibit M.

43.     In 2016, *Time* called the BIRKIN handbag "a Better Investment Than Gold." *See Id.* at 1.  The article explained "that the annual return on a Birkin [handbag] was 14.2% compared to the S&P [500] average of 8.7% a year and gold's -1.5%." *Id.*

44.     In 2019, the BIRKIN handbag was recognized for "its 17% rate of return which outperforms other more traditional forms of investment" and included in an index of other art and luxury goods for investment purposes. *See Id.* at 5.  In the 30 plus years since it was introduced, the BIRKIN handbag "has appreciated in value by 500%." *See Id.* at 4.

45.     The distinctive shape and notoriety of the BIRKIN handbag has been judicially recognized around the world.  Copies of a few of those decisions are attached hereto as Exhibit N.

C.   Hermès' Trademarks Are Symbols of Luxury & Quality

46.     Throughout its history and expanding product lines in both domestic and international markets, Hermès has maintained its reputation for the manufacture of high-quality goods and its trademarks have become the symbols of modern luxury.

47.     Hermès is the owner of not just the famous BIRKIN Mark and HERMÈS Mark, but numerous trademark registrations with the United States Patent & Trademark Office, including but not limited to the three-dimensional design mark for the BIRKIN handbag's distinctive design and

the registrations listed on Exhibit O attached hereto (hereinafter collectively referred to as "Hermès' Federally Registered Trademarks").

48.    Hermès' Federally Registered Trademarks are in full force and effect and many have become incontestable pursuant to 15 U.S.C. § 1065.

49.    Hermès has used Hermès' Federally Registered Trademarks for many years, and in some instances decades, on, and in connection with, the advertising and sale of Hermès' products, in interstate and intrastate commerce, including commerce in New York, and in this Judicial District.

50.    Hermès has gone to, and continues to go to, great lengths to enforce Hermès' Federally Registered Trademarks and protect their valuable goodwill.

51.    As a result of their widespread and constant use, Hermès' Federally Registered Trademarks have come to be known as source identifiers for Hermès and for renowned high-quality luxury goods.

## II. Defendant's Infringing METABIRKINS Commercial Venture

### A. Defendant Launches 100 Digital Collectibles Under the METABIRKINS Mark

52.    According to the METABIRKINS Website, "Rothschild began working on MetaBirkins shortly after the success of Baby Birkin…In response to the community demand, Rothschild developed a new series…": the METABIRKINS NFTs.   A screenshot of the METABIRKINS Website is attached hereto as Exhibit P.

53.    The Baby Birkin was a single NFT consisting of an animation of Hermès' BIRKIN handbag. It featured a 40-week-old fetus on top of a transparent version of a BIRKIN bag (the "Baby Birkin NFT").  A screenshot of the Baby Birkin appears below as Figure 3 and attached hereto as Exhibit Q.



*Figure 3.*

54.     The one-off Baby Birkin NFT was auctioned on the Basic Space platform in May

2021 and sold for $23,500.  It was then resold for $47,000.  The Baby Birkin NFT auction listing

and ownership history on Basic Space is attached hereto as Exhibit R.

55.     The Baby Birkin NFT appeared to many, including Hermès, to be a one-off and

bizarre concoction, and Defendant had appeared to cease his activities, until now.

56.     The NFTs currently sold under the METABIRKINS are a line of 100 digital

collectibles created on the Ethereum blockchain, which feature Hermès' BIRKIN handbag design

covered in fur and offered for sale under the METABIRKINS trademark (herein referred to as the

"METABIRKINS NFTs").  Examples of the METABIRKINS NFTs being sold by Defendant and

depicted below as Figure 4 and attached hereto as Exhibit S.



*Figure 4.*

57.     Defendant first began advertising the METABIRKINS NFTs under the METABIRKINS trademark on December 2, 2021, at Art Basel in Miami, Florida and offered them for sale under the METABIRKINS trademark to user directly via a "smart" contract and on the OpenSea NFT marketplace until OpenSea agreed with Hermès and removed the infringing sales from its platform.  *See* Exhibit E, a screenshot of the METABIRKINS NFTs page on OpenSea.

B.  <u>Defendant Advertises the METABIRKINS Commercial Venture Using Hermès' Federally Registered Trademarks Without Permission</u>

58.     Since December 2, 2021, Defendant has advertised the METABIRKINS NFTs under the METABIRKINS trademark and using the Hermès Federally Registered Trademarks without Hermès' permission and in violation of Hermès' trademark rights.

59.     Defendant advertises and sells the METABIRKINS NFTs on the following channels: through the METABIRKINS Website, the sole purpose of which is to advertise the METABIRKINS NFTs and link to the latest point of sale; through NFT marketplaces like OpenSea, Rarible,

LooksRare, and Zora; on a Discord channel under the METABIRKINS trademark; and on Twitter and Instagram under handles featuring the METABIRKINS trademark.

60.     As of January 10, 2022, Defendant's METABIRKINS Twitter account is followed by almost 7,000 users, Defendant's METABIRKINS Instagram account is followed by over 16,000 users, and Defendant's METABIRKINS Discord channel is followed by over 16,000 users.

61.     Upon information and belief, Defendant is creating his own "decentralized" marketplace under the METABIRKINS trademark to sell the METABIRKINS NFTs.

       *i.    The METABIRKINS Website*

62.     On information and belief, Defendant first registered the METABIRKINS Website domain name (the "Infringing Domain") on November 7, 2021.

63.     The URL for the Infringing Domain consists of the entire BIRKIN Mark and the generic prefix "Meta" (referring to the "metaverse").

64.     Upon information and belief, Defendant first posted on the METABIRKINS Website as early as December 1, 2021, the day before the METABIRKINS NFTs launched.  *See* Exhibit P, a screenshot of the METABIRKINS Website, as it appeared as of December 1, 2021, and depicted below as Figure 5.



*Figure 5.*

65.     Defendant's use of the Infringing Domain and the METABIRKINS Website is commercial and to advertise the METABIRKINS NFTs and identify the latest point of sale. As of December 1, 2021, the METABIRKINS Website featured the brand METABIRKINS at the top, where consumers would look to identify the source of the products.  Defendant included a direct link to the collection of METABIRKINS NFTs on the OpenSea NFT marketplace.

66.     In addition to the METABIRKINS trademark, the METABIRKINS Website prominently features the BIRKIN Mark, the HERMÈS Mark, and the advertising slogan "NOT YOUR MOTHER'S BIRKIN."  This advertising slogan, prominently featuring the BIRKIN Mark, appears over some of the images of the METABIRKINS NFTs when a consumer hovers over the images.  A screenshot of the "NOT YOUR MOTHER'S BIRKIN" is depicted below as Figure 6 and attached hereto as Exhibit T.



*Figure 6.*

67.     However, the "NOT YOUR MOTHER'S" portion of the slogan does not always appear and at times only the BIRKIN Mark is prominently displayed.  A screenshot of just the BIRKIN Mark seen on the METABIRKINS Website is depicted below as Figure 7 and attached hereto as Exhibit U.



*Figure 7.*

68.     In addition to using the BIRKIN Mark on the METABIRKINS Website, Defendant uses the HERMÈS Marks.

69.     As early as December 1, 2021, the METABIRKINS Website advertised the METABIRKINS NFTs to invoke the HERMÈS word mark: "MetaBirkins are a tribute to Hermes' most famous handbag, the Birkin, one of the most exclusive, well-made luxury accessories." *See* Exhibit P.

70.     On or about December 12, 2021, the METABIRKINS store on the OpenSea marketplace also advertised the METABIRKINS NFTS to invoke the HERMÈS word mark: "MetaBirkins are a tribute to Hermes' most famous handbag, the Birkin, one of the most exclusive, well-made luxury accessories."  *See* Exhibit E.

71.     On or about December 20, 2021 and following receipt of Hermès' letter, the METABIRKINS Website was updated to add a disclaimer that excessively uses the HERMÈS Mark three times.  The disclaimer states "We are not affiliated, associated, authorized, endorsed by, or in any way officially connected with the HERMES, or any of its subsidiaries or its affiliates. The official HERMES website can be found at https://www.hermes.com/."  A screenshot of the METABIRKINS Website, as it appeared on or about December 20, 2021, is depicted below as Figure 8 and attached hereto as Exhibit V.



*Figure 8.*

72.     Defendant's disclaimer unnecessarily links to Hermès' website and capitalizes the HERMÈS Mark.  Defendant's uses of the HERMÈS Mark in conjunction with his use of the BIRKIN Mark, and the display of the METABIRKINS bags, serves only to create a confusing impression among consumers as to Hermès' sponsorship of the METABIRKIN NFTs and the METABIRKINS Website.

73.     The METABIRKINS Website is the only advertising channel on which Defendant includes this disclaimer.  The disclaimer is notably absent from Rarible, the current point of sale for the METABIRKINS NFTs.  The disclaimer is also absent from Defendant's METABIRKINS social media accounts and Discord channel, where the METABIRKINS NFTs are prominently advertised.

74.     As of early December 2021, the METABIRKINS Website still prominently advertised the sale of the METABIRKIN NFTs on OpenSea: "Buy on Opensea."  *See* Figure 8 and Exhibit V.

75.    On or about December 16, 2021, OpenSea removed the infringing METABIRKIN

NTFs upon receipt of notice from Hermès.   Upon information and belief, shortly thereafter,

Defendant moved, or caused to have moved, the METABIRKIN NFTs from OpenSea to the Rarible

NFT marketplace with full knowledge of Hermès' rights in the BIRKIN Mark and the BIRKIN

Trade Dress.

76.    As of January 8, 2022, the METABIRKINS Website still prominently advertises the

sale of the METABIRKIN NFTs but on Rarible.com: "Buy on Rarible."   A screenshot of the

METABIRKINS Website, as it appeared on or about January 8, 2022, is depicted below as Figure 9

and attached hereto as Exhibit W.



*Figure 9.*

### ii.  The Four NFT Marketplaces

77.    The METABIRKINS Website links to the point of sale on the NFT marketplaces for

the METABIRKINS NFTs.   Upon information and belief, Defendant first linked to and sold the

METABIRKINS NFTs on the OpenSea NFT marketplace (the "METABIRKINS OpenSea Store").

*See* Exhibit E, a screenshot of the METABIRKINS OpenSea Store, as it appeared on or about December 12, 2021, and depicted below as Figure 10.



*Figure 10.*

78.     In December 2021, the METABIRKINS OpenSea Store prominently displayed the METABIRKINS trademark at the top of the page, where any consumer would look for a source identifier.  The METABIRKINS OpenSea Store marketplace also advertised the METABIRKINS NFTS to invoke the HERMÈS word mark: "MetaBirkins are a tribute to Hermes' most famous handbag, the Birkin, one of the most exclusive, well-made luxury accessories."  *See* Exhibit E.

79.     OpenSea later removed the infringing METABIRKINS NFTs from sale on its platform upon receipt of a notice of Hermès' claims.  Upon information and belief, undeterred, Defendant listed, or caused to have listed, the METABIRKIN NFTs for sale through a store on the Rarible NFT marketplace under the METABIRKINS trademark at https://rarible.com/metabirkinsnft (the "METABIRKINS Rarible Store").

80.     The METABIRKINS Rarible Store prominently displays the METABIRKINS trademark at the top, where any consumer would look for a source identifier.     A screenshot of Defendant's METABIRKINS Rarible Store is below as Figure 11 and attached hereto as Exhibit X.



*Figure 11.*

81.     Each METABIRKINS NFT listing identifies the collection using the METABIRKINS trademark.  A screenshot of a METABIRKINS NFT listing is depicted below as Figure 12 and attached hereto as Exhibit Y.



*Figure 12.*

82.     Upon information and belief, on or about January 10, 2022, Defendant opened, or caused to have opened, a new store and point of sale for the METABIRKINS NFTs on the LooksRare marketplace under the METABIRKINS trademark.  Defendant announced the launch on Twitter: "MetaBirkins is LIVE on @LooksRareNFT, the community-first marketplace that actively rewards traders, collectors and creators. Buy and sell your MetaBirkin today or HODL for your free @ILYYWNFT mint!" A screenshot of this tweet is attached hereto as Exhibit Z.

83.     The METABIRKINS LooksRare store prominently displays the METABIRKINS trademark at the top left, where any consumer would look for a source identifier.  A screenshot of Defendant's METABIRKINS LooksRare store is below as Figure 13 and attached hereto as Exhibit AA.



*Figure 13.*

84.     Upon information and belief, on or about January 11, 2022, Defendant opened, or caused to have opened, a new store and point of sale for the METABIRKINS NFTs on the Zora marketplace under the METABIRKINS trademark.  The METABIRKINS Zora store prominently displays the METABIRKINS trademark at the top, where any consumer would look for a source identifier.  A screenshot of Defendant's METABIRKINS Zora store is below as Figure 14 and attached hereto as Exhibit AB.



*Figure 14.*

85.    As of January 14, 2022, the METABIRKINS Website prominently features links to each of the active METABIRKINS NFT stores on Rarible, LooksRare, and Zora.  A screenshot of the METABIRKINS Website, as it appeared on or about January 8, 2022, is depicted below as Figure 15 and attached hereto as Exhibit AC.



*Figure 15.*

86.     The first METABIRKINS NFT sold on or about December 3, 2021 for a cost of 10 Ether or over $42,000 USD, calculated at the exchange rate for Ether as of December 3, 2021.

87.     As of January 6, 2022, total volume of sales for the METABIRKINS NFTs surpassed $1.1 million, with a floor price of $15,200, and the highest sale at $45,100.  *See* Exhibit X.

*iii.  The METABIRKINS Discord Channel*

88.     Defendant further advertises the METABIRKINS NFTs and uses the BIRKIN Mark on www.discord.com ("Discord") under the METABIRKINS trademark.   Discord is an online platform where users can join groups called channels and communicate with others within the channel.  In order to post or view content on Discord, a user must register and verify a valid email address.   Through this Discord channel, Defendant communicates with consumers about new METABIRKINS NFTs and conducts targeted advertising of the METABIRKINS NFTs.

89.     For example, one of Defendant's advertising campaign was called "Build-A-MetaBirkin" on the METABIRKINS Discord channel.   The "Build-A-MetaBirkin Challenge" encouraged followers of the METABIRKINS channel to "Build a MetaBirkin using household materials" and to submit their designs on a separate Discord channel, where Defendant would then select two or "maybe more" winners.   A screenshot of Defendant's post regarding the Build-A-MetaBirkin Challenge is attached hereto as Exhibit AD.  Defendant would then publish the most popular submissions within the METABIRKINS Discord channel.

*iv.  The METABIRKINS Social Media Accounts*

90.     Defendant also publicly advertises the METABIRKINS NFTs on numerous social media platforms, including Instagram and Twitter.

91.     Defendant operates a METABIRKINS account on Instagram, with a handle that features the METABIRKINS trademark: @metabirkins (the "METABIRKINS Instagram").   The

METABIRKINS Instagram advertises the METABIRKINS NFTs and includes a direct link to the METABIRKINS Rarible Store.  A screenshot of the METABIRKINS Instagram is depicted below as Figure 16 and attached hereto as Exhibit AE.



*Figure 16.*

92.     The METABIRKINS Instagram uses the entirety of the BIRKIN Mark in hashtags, including #MetaBirkins and #NotYourMothersBirkin.   A screenshot of a post featuring both hashtags is depicted below as Figure 17 and attached hereto as Exhibit AF.



*Figure 17.*

93.     The METABIRKINS Instagram also lacks any disclaimer that it not affiliated with or sponsored by Hermès.  *See* Figure 16 and Exhibit AE.

94.     Defendant also operates a Twitter under a handle featuring the METABIRKINS trademarks: @MetaBirkins (the "METABIRKINS Twitter").  The METABIRKINS Twitter also advertises the METABIRKINS NFTs and includes a direct link to the METABIRKINS Rarible Store.  A screenshot of the METABIRKINS Twitter is depicted below as Figure 18 and attached hereto as Exhibit AG.



*Figure 18.*

95.    The METABIRKINS Twitter uses the entirety of the BIRKIN Mark in hashtags, including #MetaBirkins, #NotYourMothersBirkin, and #MintaMetaBirkinHoldAMetaBirkin.  *See* Exhibit AG, a screenshot of a post featuring both hashtags and depicted above in Figure 18.

<em>v.   The METABIRKINS Marketplace</em>

96.     Through all of these activities, Defendant is using the METABIRKINS trademark to build a market for the resale, trade, and exchange of his METABIRKINS NFTs, a market referred to by Defendant as the METABIRKINS "community."   Upon information and belief, in NFT marketplaces where the METABIRKINS NFTs are currently available, Defendant receives a "royalty" paid in the ether (ETH) cryptocurrency when METABIRKINS NFTs are resold.

97.     Defendant has also announced he is creating a "decentralized METABIRKINS exchange" to sell the METABIRKINS NFTs without the need for NFT marketplaces like OpenSea, Rarible, LooksRare, or Zora.   Defendant announced this plan to expand his METABIRKINS commercial venture on the METABIRKINS Discord channel after the METABIRKINS NFTs were removed from OpenSea pursuant to Hermès' request to OpenSea to remove the unauthorized use of METABIRKINS from its marketplace.   A screenshot of Defendant's post on Discord is attached hereto as Exhibit AH.

98.     Upon information and belief, the sole purpose of such a decentralized exchange would be for consumers to trade the METABIRKINS NFTs with increased royalties to Mr. Rothschild.  Many third party NFT marketplaces, such as OpenSea, charge a "service fee" and limit the percentage of royalty payments made to NFT creators and sellers.  Upon information and belief, these limitations would not apply on the decentralized exchange being developed by Defendant. Upon information and belief, such an exchange will prominently feature the METABIRKINS trademark.

C.     Defendant Acknowledges the BIRKIN Handbag's Famous Status

99.     At all relevant times, Defendant knew of the BIRKIN handbag and BIRKIN Mark and their well-known status among consumers.

31

100.    In an interview with HighSnobiety regarding the creation of the Baby Birkin NFT, Defendant stated "The Birkin Bag by Hermès is such a status symbol across the globe."  A copy of the article is attached hereto as Exhibit AI.

101.    In a December 6, 2021 interview with Yahoo Finance, Defendant stated that for him, "There's nothing more iconic than the Hermès Birkin bag."  *See* Exhibit AJ.

102.    The description on the METABIRKINS OpenSea page even acknowledged the BIRKIN handbag's famous status, calling the BIRKIN handbag "Hermès' most famous handbag" and "one of the most, exclusive, well-made luxury accessories. Its mysterious waitlist, intimidating price tags, and extreme scarcity have made it a highly covetable 'holy grail' handbag that doubles as an investment or store of value."  *See* Exhibit E.

103.    Defendant admittedly created the METABIRKINS as an "experiment to see if [he] could create the same kind of illusion that [the BIRKIN handbag] has in real life as a digital commodity." And Defendant believes he has "accomplished [his experiment]" and has "put together the kind of digital commodity [the METABIRKINS NFT] everybody loves. . ."  *See* Exhibit AJ.

D.    Defendant's Willful Infringing Activity

104.    On December 16, 2021, Hermès' attorneys sent a cease-and-desist letter to Defendant, putting him on notice that the sale of the METABIRKINS NFTs infringed on the BIRKIN Mark and demanding he cease such infringing activity.  A copy of the December 16, 2021 letter is attached hereto as Exhibit AK.

105.    In addition to notifying Defendant of his infringing activities, on December 16, 2021, Hermès' attorneys notified OpenSea.  A copy of the December 16, 2021 email is attached hereto as Exhibit AL.  Shortly thereafter, OpenSea removed the METABIRKINS NFTs from its platform.

106.     Defendant flatly refuses to stop selling the METABIRKINS NFTs.  When OpenSea denied him continued access to its platform, Defendant moved the METABIRKINS NFTs to the METABIRKINS Rarible Store and further commenced plans to create his own decentralized exchange for the METABIRKINS NFTs.

107.     Defendant advertised the change in marketplaces on the private METABIRKINS Discord channel, the METABIRKINS Website, and the METABIRKINS social media accounts.  *See* Exhibit AH.

E.     Defendant's Admission that METABIRKINS Is a Trademark

108.     Defendant has repeatedly claimed trademark rights in the infringing METABIRKINS trademark by complaining of "counterfeited" METABIRKINS NFTs on NFT marketplaces.

109.     The day before Defendant's infringing collection of METABIRKINS NFTs launched, Defendant claimed they were being "counterfeited" and that he saw "more and more fake MetaBirkins sold every hour."  *See* Exhibit AM.

110.     In an interview with Yahoo Finance, Defendant stated that "before [his] collection dropped, there was a bunch of like counterfeit NFTs that weren't from my collection. We're in the process of like verifying mine on OpenSea. But we had like $35,000, $40,000 in volume of people buying fake versions of my MetaBirkin. So yeah, like counterfeits are definitely there."  *See* Exhibit AJ.

111.     As of January 8, 2021, the OpenSea and Rarible marketplaces featured at least seven different collections, collectively selling 404 NFTs, prominently using variations of the METABIRKINS trademark to sell identical METABIRKINS NFTs.

112.     The existence of "fake" or "counterfeit" METABIRKINS NFTs indicates that METABIRKINS is a trademark as an indicator as source.  The activities of Defendant complained of

herein constitute willful and intentional infringement of the BIRKIN Mark and HERMÈS Marks, are in total disregard of Hermès' rights, and were commenced and have continued in spite of Defendant's knowledge that the use of the BIRKIN Mark and any of Hermès' Federally Registered Trademarks, or copies or colorable imitations thereof, was and is in direct contravention of Hermès' rights.

113.     Defendant has infringed, continues to infringe, and threatens to further infringe the BIRKIN Mark by manufacturing, distributing and selling the unauthorized METABIRKINS NFTs. Defendant's infringing activities constitute unauthorized public display and distribution of products in connection with the BIRKIN Mark and HERMÈS Marks.

114.     Use by Defendant of the BIRKIN Mark and HERMÈS Marks has been without Hermès' consent, is likely to cause confusion and mistake in the minds of the purchasing public, and, in particular, tends to and does falsely create the impression that the goods sold by Defendant are authorized, sponsored, or approved by Hermès when, in fact, they are not.

**FIRST CAUSE OF ACTION**
**TRADEMARK INFRINGEMENT**
**15 U.S.C. § 1114**

115.     Hermès repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

116.     The BIRKIN Mark is fanciful and arbitrary and associated in the mind of the public with Hermès.

117.     Based on Hermès' extensive advertising, sales and the wide popularity of Hermès' products, including the BIRKIN handbag, the BIRKIN Mark is strong and has acquired secondary meaning so that any product and advertisement bearing the BIRKIN Mark is immediately associated by purchasers and the public as being a product of or affiliated with Hermès.

118.     Defendant uses the BIRKIN Mark in connection with Defendant's sale, distribution and advertising of its METABIRKINS NFTs.

119.     Defendant's activities as aforesaid constitute Defendant's use in commerce of the BIRKIN Mark.

120.     Defendant has used the BIRKIN Mark without Hermès' consent or authorization. Defendant's use, including the sale and distribution of the METABIRKINS NFTs in interstate commerce, is likely to cause confusion and mistake in the minds of the public, leading the public to believe that the METABIRKINS NFTs emanate or originate from Hermès, or that Hermès has approved, sponsored or otherwise associated itself with Defendant, which is untrue.

121.     Defendant's conduct is intended to exploit the goodwill and reputation associated with the BIRKIN Mark.

122.     Defendant's activities as aforesaid create the false and misleading impression that Defendant is sanctioned, assigned or authorized by Hermès to use the BIRKIN Mark to advertise, manufacture, distribute, appraise, offer for sale or sell infringing products bearing the BIRKIN Mark when Defendant is not so authorized.

123.     Defendant's unauthorized use of the BIRKIN Mark as set forth above has resulted in Defendant unfairly benefiting from Hermès' advertising and promotion and profiting from Hermès' reputation and the BIRKIN Mark, to the substantial and irreparable injury of the public, Hermès and the BIRKIN Mark and the substantial goodwill represented thereby.

124.     Defendant's aforesaid acts constitute trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. §1114.

125.    Defendant's acts have caused, and will continue to cause, great and irreparable injury to Hermès, and unless such acts are restrained by this Court, he will continue, thereby causing Hermès to continue to suffer great and irreparable injury. Hermès has no adequate remedy at law.

126.    Hermès is informed and believes and thereon alleges that Defendant's infringement is both intentional and egregious.

127.    Hermès has no adequate remedy at law and are suffering irreparable harm and damage as a result of the aforesaid acts of Defendant in an amount thus far not determined.

128.    Upon information and belief, Defendant has obtained gains, profits and advantages as a result of his wrongful acts and will continue to do so in an amount thus far not determined.

## SECOND CAUSE OF ACTION
## FALSE DESIGNATIONS OF ORIGIN,
## FALSE DESCRIPTIONS AND REPRESENTATIONS
## 15 U.S.C. § 1125(a)

129.    Hermès repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

130.    Defendant has, in connection with his goods, used in commerce, and continues to use in commerce, the BIRKIN Mark, the federally registered HERMÈS word mark, and the federally registered BIRKIN Trade Dress which tend falsely to describe the origin, sponsorship, association or approval by Hermès of the METABIRKINS NFTs sold by Defendant, despite repeated requests from Hermès stop such use.

131.    Defendants uses the METABIRKINS trademark, the federally registered HERMÈS word mark, and the federally registered BIRKIN Trade Dress with full knowledge of the falsity of such designations of origin, descriptions and representations, all to the detriment of Hermès.

132.    Defendant's use of the METABIRKINS trademark, the federally registered HERMÈS word mark, and the federally registered BIRKIN Trade Dress in connection with the sale and

advertising of the infringing METABIRKINS NFTs constitutes false descriptions and representations tending to falsely describe or represent Defendant and METABIRKINS NFTs as being authorized, sponsored, affiliated or associated with Hermès.

133.    Defendant's use of the METABIRKINS trademark, the federally registered HERMÈS word mark, and the federally registered BIRKIN Trade Dress in connection with the sale and advertising of the infringing METABIRKINS NFTs misleads the purchasing public and is intended to trade upon the high-quality reputation of Hermès and to improperly appropriate to himself the valuable trademark rights of Hermès.

134.    Defendant's aforesaid acts constitute the use in commerce of false designations of origin and false and/or misleading descriptions or representations, tending to falsely or misleadingly describe and/or represent the METABIRKINS NFTs as those of Hermès in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

135.    Defendant's wrongful acts will continue unless enjoined by this Court.

136.    Hermès has no adequate remedy at law and is suffering irreparable harm and damage as a result of the aforesaid acts of Defendant in an amount thus far not determined.

137.    Upon information and belief, Defendant has obtained gains, profits and advantages as a result of his wrongful acts in an amount thus far not determined.

### THIRD CAUSE OF ACTION
### FEDERAL TRADEMARK DILUTION
### 15 U.S.C. § 1125(c)

138.    Hermès repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

139.    Hermès is the exclusive owner of the BIRKIN Mark as seen in Exhibit X.

140.    Defendant's use of the METABIRKINS trademark in connection with the sale and advertising of the infringing METABIRKINS NFTs constitutes Defendant's use in commerce of the BIRKIN Mark.

141.    The BIRKIN Mark has been used for decades, and is so globally recognized and associated with Hermès as the source of BIRKIN handbags that the BIRKIN mark is entitled to be recognized as famous and distinctive under 15 U.S.C. §1125(c).

142.    The BIRKIN Mark has come to have a secondary meaning indicative of origin, relationship, sponsorship and/or association with Hermès and its distinctive reputation for high quality.   The purchasing public is likely to attribute to Hermès, Defendant's use of the METABIRKINS mark as a source of origin, authorization and/or sponsorship for the METABIRKINS NFTs Defendant sells and further, purchase Defendant's METABIRKINS NFTs in the erroneous belief that Defendant is associated with, sponsored by or affiliated with Hermès, when Defendant is not.

143.    Hermès has not authorized or licensed the use of the BIRKIN Mark to Defendant.

144.    Defendant's unauthorized use of the METABIRKINS trademark in his marketing, sale and distribution of the METABIRKINS NFTs dilutes the distinctive quality of the BIRKIN Mark and the goodwill associated with it in violation of Section 43(a) of the Lanham Act, 15 U.S.C § 1125(c).

145.    Such conduct has injured Hermès and said injury will continue unless the Court enjoins Defendant from committing further wrongful acts.

146.    Upon information and belief, Defendant intentionally and willfully utilized the BIRKIN Mark to trade on Hermès' reputation and goodwill.

147.    Hermès has no adequate remedy at law and is suffering irreparable harm and damage as a result of the aforesaid acts of Defendant in an amount thus far not determined.

148.    Upon information and belief, Defendant has obtained gains, profits and advantages as a result of their wrongful acts in an amount thus far not determined.

### FOURTH CAUSE OF ACTION
### CYBERSQUATTING UNDER THE ANTI-CYBERSQUATTING CONSUMER PROTECTION ACT
### 15 U.S.C. § 1125(d)

149.    Hermès repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

150.    The BIRKIN Mark is distinctive and achieved distinctiveness prior to Defendant's registering the Infringing Domain and prior to Defendant undertaking his infringing acts.

151.    The Infringing Domain name is confusingly similar to the BIRKIN Mark.

152.    Defendant registered and uses the Infringing Domain to profit from the BIRKIN Mark by advertising the infringing METABIRKINS NFTs through the Infringing Domain and creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of Defendant's website and the METABIRKINS NFTs by Hermès.

153.    Defendant's registration and use of the Infringing Domain is intended primarily to capitalize on the goodwill associated with the BIRKIN Mark.

154.    Defendant registered, trafficked in or used the Infringing Domain with bad faith intent to profit from the BIRKIN Mark and the associated goodwill of the BIRKIN Mark.

155.    The likely confusion resulting from Defendant's use of the Infringing Domain has harmed and continues to harm and dilute the distinctiveness of the BIRKIN Mark.

156.     Defendant's registration and use of the Infringing Domain cause consumers to falsely believe that the METABIRKINS Webiste and the infringing METABIRKINS NFTs sold under and in connection with said website are affiliated with, endorsed or approved by Hermès.

157.     Hermès has no adequate remedy at law and is suffering irreparable harm and damage as a result of the aforesaid acts of Defendant in an amount thus far not determined.

158.     Upon information and belief, Defendant has obtained gains, profits and advantages as a result of his wrongful acts in an amount thus far not determined.

### FIFTH CAUSE OF ACTION
### INJURY TO BUSINESS REPUTATION AND DILUTION
### NEW YORK GENERAL BUSINESS LAW § 360-1

159.     Hermès repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

160.     Hermès, on behalf of the general public, as well as for itself seek recovery from Defendant for violation of New York General Business Law § 360-1, et seq.

161.     By virtue of Defendant's unauthorized use of the METABIRKINS trademark, such use trading on the good will associated with Hermès and its BIRKIN Mark, Defendant has misled and will continue to mislead the public into assuming a connection between Hermès and Defendant's METABIRKINS NFTs.

162.     By falsely suggesting a connection with or sponsorship by Hermès, Defendant is likely to cause public confusion constituting unfair competition within the meaning of New York Business Law § 360-1.

163.     If such action on the part of Defendant continues, Hermès will suffer irreparable harm of a continuing nature for which there is no adequate remedy at law.

164.    Hermès has no adequate remedy at law and is suffering irreparable harm and damage as a result of the aforesaid acts of Defendant in an amount thus far not determined.

165.    Upon information and belief, Defendant has obtained gains, profits and advantages as a result of his wrongful acts in an amount thus far not determined.

## SIXTH CAUSE OF ACTION
## COMMON LAW TRADEMARK INFRINGEMENT

166.    Hermès repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

167.    Defendant's acts previously alleged herein constitute common law trademark infringement.

168.    Hermès is without adequate remedy at law, as Defendant's acts have caused Hermès irreparable harm to its business reputation, good will and stature in the business community.

169.    Hermès is informed and believes and thereon alleges that Defendant committed the above alleged acts oppressively, fraudulently, maliciously and in conscious disregard of Hermès' rights, and Hermès is therefore entitled to exemplary and punitive damages pursuant to the common law of the State of New York in an amount sufficient to punish, deter and make an example of Defendant.

170.    The manufacture, distribution and sale of the unauthorized and infringing METABIRKINS NFTs by Defendant are without any permission, license or other authorization from Hermès. The said unauthorized METABIRKINS NFTs are being distributed and sold in interstate commerce.

171.    Hermès has no adequate remedy at law and is suffering irreparable harm and damage as a result of the aforesaid acts of Defendant in an amount thus far not determined.

172.     Upon information and belief, Defendant has obtained gains, profits and advantages as a result of his wrongful acts in an amount thus far not determined.

## SEVENTH CAUSE OF ACTION
## MISAPPROPRIATION AND UNFAIR COMPETITION
## UNDER NEW YORK COMMON LAW

173.     Hermès repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

174.     Hermès owns protectable common law trademark rights in New York, in and to the BIRKIN Mark.

175.     Upon information and belief, Defendant intended to misappropriate the BIRKIN Mark when adopting the METABIRKINS trademark to create the association in the minds of consumers that the METABIRKINS NFTs are associated with Hermès' and its BIRKIN handbags.

176.     Defendant's misappropriation and use of the METABIRKINS trademark without Hermès' consent or authorization to sell and distribute the METABIRKINS NFTs in New York is likely to cause confusion and mistake in the minds of the public, leading the public to believe that the METABIRKINS NFTs emanate or originate from Hermès, or that Hermès has approved, sponsored or otherwise associated itself with Defendant, which is untrue.

177.     Defendant's aforesaid acts constitute misappropriation and infringement of Hermès' property rights, goodwill and reputation and unfair competition under the common law of the State of New York.

## **PRAYER FOR RELIEF**

WHEREFORE, Hermès demands judgment against Defendant as follows:

1.     Entering a judgment declaring that:

A.      Hermès' Federally Registered Trademarks have been and continue to be infringed by Defendant in violation of 15 U.S.C. §1114(1);

B.      Defendant's use of the METABIRKINS mark constitutes federal unfair competition in violation of 15 U.S.C. §1125(a);

C.      Defendant's use of the METABIRKINS mark constitutes dilution by blurring in violation of 15 U.S.C. §1125(c);

D.      Defendant had a bad faith intent to profit from the BIRKIN Mark and Defendant's use of the Infringing Domain constitutes cybersquatting in violation of 15 U.S.C. §1125(d);

E.      Defendant's use of the METABIRKINS mark violates New York General Business Law § 360-1, New York common law trademark infringement, and New York unfair competition laws;

2.      That a permanent injunction be issued enjoining and restraining Defendant and his agents, servants, employees and attorneys and all those in active concert or participation with him, from:

A.      Using any reproduction, copy, counterfeit, or colorable imitation of Hermès' Federally Registered Trademarks to identify any goods or the rendering of any services not authorized by Hermès;

B.      Engaging in any course of conduct likely to cause confusion, deception or mistake, or to injure Hermès' business reputation or dilute the distinctive quality of Hermès' name and Hermès' Federally Registered Trademarks;

C.      Using a false description or representation including words or other symbols tending to falsely describe or represent Defendant's unauthorized goods as

being those of Hermès or sponsored by or associated with Hermès and from offering such goods into commerce;

D.    Further infringing Hermès' Federally Registered Trademarks by manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, renting, displaying or otherwise disposing of any products not authorized by Hermès bearing any simulation, reproduction, counterfeit, copy or colorable imitation of Hermès' Federally Registered Trademarks;

E.    Using any simulation, reproduction, counterfeit, copy or colorable imitation of Hermès' Federally Registered Trademarks in connection with the rental, promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of any unauthorized products in such fashion as to relate or connect, or tend to relate or connect, such products in any way to Hermès, or to any goods sold, manufactured, sponsored or approved by, or connected with Hermès, including but not limited to publishing links to www.hermes.com;

F.    Making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which can or is likely to lead the trade or public, or individual members thereof, to believe that any products manufactured, distributed, sold or rented by Defendant are in any manner associated or connected with Hermès, or is sold, manufactured, licensed, sponsored, approved or authorized by Hermès;

G. Constituting an infringement of any of Hermès' Federally Registered Trademarks or of Hermès' rights in, or to use or to exploit, said Registered Trademarks, or constituting any dilution of Hermès' name, reputation or goodwill;

H. Secreting, destroying, altering, removing, or otherwise dealing with the unauthorized products or any books or records which contain any information relating to the importing, manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, renting or displaying of all unauthorized products which infringe Hermès' Federally Registered Trademarks;

I. Selling, offering for sale, or advertising any merchandise bearing Hermès' Federally Registered Trademarks on the Internet or in e-commerce, including but not limited to all forms of social media; and

J. Effecting assignments or transfers, forming new entities or associations or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (A) through (I).

3. Directing that Defendant deliver up for destruction to Hermès all unauthorized products and advertisements in his possession or under his control bearing any of Hermès' Federally Registered Trademarks or any simulation, reproduction, counterfeit, copy or colorable imitation thereof pursuant to 15 U.S.C. §1118.

4. Directing Defendant to transfer the Infringing Domain name to Hermès.

5. Directing Defendant to refrain from registering, using, or trafficking in any domain names or social media or NFT platform user names or handles that are identical or confusingly

similar to Hermès' Federally Registered Trademarks, including but not limited to names containing Hermès' Federally Registered Trademarks and domain names containing misspellings of Hermès' Federally Registered Trademarks.

6.      Directing such other relief as the Court may deem appropriate to prevent the trade and public from deriving any erroneous impression that any products manufactured, sold or otherwise circulated or promoted by Defendant are authorized by Hermès or related in any way to Hermès' products.

7.      Directing Defendant, within thirty (30) days after the service of judgment upon it, with notice of entry thereof, to file with the Court, and serve upon Hermès, a written report under oath setting forth in detail the manner in which Defendant has complied with paragraphs I through IV above.

8.      Awarding to Hermès Defendant's profits from his unlawful acts herein alleged as Defendant's total sales of the METABIRKINS NFTs less any elements of cost or deductions proved by Defendant and allowed by law.

9.      Awarding to Hermès the damages from Defendant's unlawful acts herein alleged.

10.     Awarding to Hermès statutory damages of $100,000 for Defendant's violation of 15 U.S.C. § 1125(d)(1) pursuant to 15 U.S.C. § 1117(d).

11.     Pursuant to 15 U.S.C. § 1117(a), directing Defendant to pay Hermès all of the profits assessed pursuant to paragraph VI, *supra*, together with three times the amount of damages assessed pursuant to paragraph VII, *supra*, with prejudgment interest on the foregoing sums.

12.     Ordering that Hermès recover the costs of this action together with reasonable attorneys' and investigators' fees and prejudgment interest in accordance with 15 U.S.C. § 1117.

13.     Directing that this Court retain jurisdiction of this action for the purpose of enabling Hermès to apply to the Court at any time for such further orders and interpretation or execution of any order entered in this action, for the modification of any such order, for the enforcement or compliance therewith and for the punishment of any violations thereof.

14.     Awarding to Hermès such other and further relief as the Court may deem just and proper, together with the costs and disbursements which Hermès has incurred in connection with this action.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

Dated: January 14, 2022                                    Respectfully submitted,
       New York, New York

                                          **BAKER & HOSTETLER LLP**

Of Counsel:                                                   By:     /s/ *Gerald J. Ferguson*
                                            Gerald J. Ferguson, Esq.
**BAKER & HOSTETLER LLP**                        Oren Warshavsky, Esq.
Deborah Wilcox, Esq. (*pro hac vice pending*)    Kevin M. Wallace, Esq.
Key Tower                                                     45 Rockefeller Plaza
127 Public Square                                          14th Floor
Suite 2000                                                    New York, NY  10111
Cleveland, OH 44114                                     Telephone:   212.589.4200
Telephone: 216.621.0200                               Facsimile:    212.589.4201

                                            *Attorneys for Plaintiffs*