**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HERMÈS INTERNATIONAL and HERMÈS OF PARIS, INC., <br><br> Plaintiffs, <br><br> -against- <br><br> MASON ROTHSCHILD, <br><br> Defendant. | CIVIL ACTION NO. <br><br> 22-CV-00384 (AJN) <br><br><br> **AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Hermès International and Hermès of Paris, Inc. ("Hermès"), through its attorneys Baker & Hostetler LLP, for its Amended Complaint against Defendant Mason Rothschild ("Defendant") allege and state as follows:

<u>**NATURE OF THE CASE**</u>

1.      As Defendant stated in a recent interview with Yahoo Finance: "There's nothing more iconic than the Hermès Birkin bag."  Defendant, upon information and belief, is actually named Sonny Alexander Estival and is a self-described "marketing strategist."  He is also a digital speculator seeking to get rich quick by appropriating the trademark METABIRKINS to identify a business that creates, markets, sells, and facilitates the exchange of investable, digital assets known as non-fungible tokens ("NFTs"), including a collection of NFTs called METABIRKINS.  Through pervasive use of the METABIRKINS trademark, Defendant has actively promoted a market for the buying and selling of the METABIRKINS collection of NFTs, and other NFTs, where, upon information and belief, Defendant earns a fee on every sale and resale.

2.      Defendant's use of METABIRKINS as the trade name for his business and a collection of NFTs simply rips off Hermès' famous BIRKIN trademark by adding the generic prefix "meta" to the famous trademark BIRKIN.  "Meta" and "metaverse" refer to virtual worlds and

economies where digital assets such as NFTs can be sold and traded. METABIRKINS simply means "BIRKINS in the metaverse." Defendant adopted METABIRKINS as a trademark and promoted his METABIRKINS business in conjunction with the use of other Hermès trademarks in a calculated attempt to explicitly mislead the general public into believing Hermès authorized his METABIRKINS business, including his METABIRKINS collection of NFTs.

3.     Defendant's marketing strategy succeeded. Defendant's adoption and use of METABIRKINS explicitly misled the general public as to whether Hermès authorized Defendant's METABIRKINS business and collection of NFTs. After the launch of the METABIRKINS collection of NFTs, *Elle* magazine, the *New York Post*, and *L'Officiel* reported that Hermès launched the METABIRKINS collection of NFTs. Many consumers have made comments on Defendant's METABIRKINS social media channels that, upon information and belief, demonstrate actual confusion regarding Hermès' authorization or sponsorship of the METABIRKINS collection of NFTs.

4.     Defendant publicly revealed his METABIRKINS marketing strategy at the outset of his launch of the METABIRKINS collection of NFTs. As he explained in an interview given to Yahoo Finance discussing the release of the METABIRKINS collection of NFTs, Defendant seeks to make his fortune by swapping out Hermès' "real life" rights for "virtual rights". As he further explained, Defendant is trying to "create the same kind of illusion that [the Birkin] has in real life as a digital commodity." The "digital commodities" upon which Defendant is building his business, NFTs, are unique and non-fungible (i.e., non-interchangeable) units of data stored on a blockchain just as cryptocurrencies (which are fungible) are stored on a blockchain. NFTs can be created to transfer ownership of any physical thing or digital media, including an actual handbag or the image

of a handbag.  NFTs can also be freely bought and sold like any other commodity or investable asset.  As with cryptocurrencies, a highly speculative market has emerged around the trading of NFTs.

5.      Defendant has openly acknowledged that he elected to sell his collection of NFTs as METABIRKINS because a BIRKIN handbag is a highly valuable and investable asset in the physical world.  Defendant has executed on his marketing strategy for replicating the physical world success of the BIRKIN bag in the "metaverse" through pervasive use of the word trademark METABIRKINS to brand all of his "metaverse" business activities.

6.      Defendant's trademark uses of METABIRKINS include the following activities.  Defendant identified his first collection of NFTs using the METABIRKINS trademark.  He operates e-commerce stores for the sale of NFTs under the METABIRKINS trademark, where, upon information and belief, he receives fees for the sale and resale of these NFTs.  He has adopted METABIRKINS for his Twitter handle, Instagram account name, and Discord channel and blanketed social media with the "#MetaBirkins" hash tag and uses these accounts and hash tags to promote the sale and resale of his METABIRKINS collection of NFTs.  He operates a "MetaBirkins.com" website that advertises and promotes the sale of the NFTs in his METABIRKINS collection.  He advertises his NFTs using advertising slogans incorporating his METABIRKINS trademark and the BIRKIN trademark: NOT YOUR MOTHER'S BIRKIN, MintAMetaBirkinHoldAMetaBirkin, and MetaBirkinsGonnaMaketIt.  He describes the group of investors in his NFTs as the METABIRKINS community and each investor as a METABIRKINS Genesis Holder.  He has also announced to his METABIRKINS community and social media followers the next step in his marketing strategy: to develop his own "decentralized NFT exchange" under the METABIRKINS brand.

7.      After launching his METABIRKINS collection of NFTs, Defendant commenced developing and promoting a new collection of NFTs that did not point to images of blurry BIRKIN bags but to other images.   Nonetheless, Defendant has continued to use the METABIRKINS trademark to promote sales of this new collection of NFTs.  He sponsored a "Build-a-MetaBirkin" contest that encourages others to create digital images of BIRKIN handbags that he also identified with the METABIRKINS trademark.  Defendant placed winners of this contest, selected by him, on a "whitelist" giving them preferred rights to purchase NFTs from his new collections.  Defendant also promotes his new NFT collections through use of his METABIRKINS social media channels and METABIRKINS hashtags.

8.      Defendant's adoption of the METABIRKINS trademark has brought him great financial success in a matter of weeks.  There can be no doubt that this success arises from his confusing and dilutive use of the BIRKIN word mark in association with other famous Hermès trademarks.  The 100 NFTs in the METABIRKINS collection have sold for prices comparable to real world BIRKIN handbags.  Defendant is a marketing strategist who, upon information and belief, had no reputation as an artist and no prior experience launching successful NFT collections before he appropriated the BIRKIN Mark.  The money he has since made directly results from his strategic use of the BIRKIN trademark.  As one commentator, among many, noted in response to recent media coverage: "If this . . . wasn't called '[B]irkin' would it be getting any attention?"

9.      Despite identifying himself as a "marketing strategist" on LinkedIn and doing business as METABIRKINS, Defendant seeks to immunize himself from the legal consequences of his appropriation of the BIRKIN word mark and Hermès' famous trademarks to build his NFT business by proclaiming that he is solely an artist.  Although a digital image connected to an NFT may reflect some artistic creativity, just as a t-shirt or a greeting card may reflect some artistic

creativity, the title of "artist" does not confer a license to use an equivalent to the famous BIRKIN trademark in a manner calculated to explicitly mislead consumers and undermine the ability of that mark to identify Hermès as the unique source of goods sold under the BIRKIN mark.

10.     Further, Defendant does not use the METABIRKINS name to refer to a particular work of art.  Instead, Defendant uses METABIRKINS to refer to his NFT business and a certain collection of NFTs.  Each NFT in the METABIRKINS collection is titled with a number from 0 to 99 and not the METABIRKINS name.  Upon information and belief, Defendant identifies the visually similar images associated with the each NFT in the METABIRKINS collection by sequential number because he seeks to create a METABIRKINS marketplace where nearly indistinguishable METABIRKINS NFTs are bought and sold for a recognized market price, just like a cryptocurrency marketplace.

11.     Calling this marketing strategy "art" is a ruse and must not be sanctioned:  Defendant is stealing the goodwill in Hermès' famous intellectual property to create and sell his own collection of NFT products and run a business that promotes speculation in NFTs.

12.     The fact that Defendant has adopted and is using METABIRKINS as a trademark is evident not only from his pervasive use of METABIRKINS as his brand and trade name for his NFT projects but also from the proprietary rights that he is claiming in the METABIRKINS brand.  It is not surprising that other digital speculators, seeing how easily Defendant has made money off the METABIRKINS brand, are now also issuing NFTs that they call METABIRKINS.  Defendant has repeatedly complained of "counterfeited" METABIRKINS on NFT marketplaces.  The day before his infringing METABIRKINS collection of NFTs released, Defendant reported they were being "counterfeited" and that he saw "more and more fake MetaBirkins sold every hour."  In fact, Defendant's infringing use of the METABIRKINS trademark has spurred others to create hundreds

more NFTs claiming to be NFTs from the METABIRKINS collection or offshoots of the METABIRKINS collection of NFTs, all of which infringe on and dilute the BIRKIN Mark.

13. On December 16, 2021, Hermès notified both Defendant and the NFT platform OpenSea of the blatant violation of Hermès' intellectual property by his use of the METABIRKINS trademark. Shortly after receiving this notice, OpenSea removed the infringements from its platform. Defendant, however, was not deterred, and reinvigorated his advertising on Discord and his infringing NFTs quickly appeared on the Rarible platform and later on the Zora and LooksRare platforms. On January 14, 2022, Hermès instituted this lawsuit seeking relief from Defendant's unauthorized use of Hermès' federally registered trademarks. Rarible and Zora have since removed the METABIRKINS collection of NFTs.

14. Defendant's widespread use of the METABIRKINS mark constitutes trademark infringement and dilution of the famous BIRKIN Mark. The METABIRKINS collection of NFTs point to images that reflect the distinctive design of the BIRKIN handbag, which in conjunction with the use of the METABIRKINS Mark and the HERMÈS mark, aggravates the likelihood of confusion and dilution. While Hermès has not yet minted and sold its own NFTs, this is a new and burgeoning marketplace, and Hermès has the right to do so at the time and manner of its choosing. Consumers see a wide variety of brands, including luxury fashion brands, exploiting the NFT space and would expect that NFTs featuring famous brands are affiliated with those brands, or wonder why the famous brands are permitting such dilutive use of their valuable assets and think less highly of them.

15. Unless enjoined by this Court, Defendant will continue to advertise and sell NFTs under the METABIRKINS brand, build a company offering a range of virtual products and services under the METABIRKINS brand, and ultimately preempt Hermès' ability to offer products and

services in virtual marketplaces that are uniquely associated with Hermès and meet Hermès' quality standards.

## JURISDICTION AND VENUE

16.     These claims arise under the Trademark Act of 1946, 15 U.S.C. § 1051, *et seq*., particularly under 15 U.S.C. § 1114(1).  This Court has subject matter jurisdiction over the claims in this action which relate to trademark infringement, dilution, cybersquatting, false designations of origin and false descriptions pursuant to the provisions of 28 U.S.C. §§ 1331 and 1338 and 15 U.S.C. § 1121.

17.     This Court has supplemental jurisdiction over the claims in this Amended Complaint which arise under state statutory and common law pursuant to 28 U.S.C. § 1367(a), since the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

18.     Personal jurisdiction over Defendant is proper pursuant to N.Y. C.P.L.R. § 302(a). Upon information and belief, Defendant created the METABIRKINS Website, https://metabirkins.com, which is accessible to consumers in New York and bears unauthorized and infringing uses of the BIRKIN Mark.  Upon information and belief, Defendant targeted New York consumers by operating the METABIRKINS website and setting up storefronts to advertise, sell and offer for sale the METABIRKINS collection of NFTs using "smart" contracts on four different NFT marketplaces.  Upon information and belief, the Defendant used or uses the following NFT marketplaces to facilitate the promotion and sale of the METABIRKINS collection of NFTs to New York consumers:  https://opensea.io ("OpenSea"); https://rarible.com ("Rarible"); https://looksrare.org/ ("LooksRare"); and https://zora.co/ ("Zora").  OpenSea, an assumed name of

Ozone Networks Inc., is a Delaware corporation registered to do business in New York, with a principal place of business in the City and State of New York.

19.     These NFT marketplaces operate interactive sites which are viewable to and have been accessed by consumers within the United States, including consumers within the State and City New York.  Defendant's decision to set up storefronts on these interactive marketplaces evidences a conscious plan to advertise and ultimately sell the METABIRKINS collection of NFTs in New York.  At least one consumer living in the State and City of New York purchased a NFT from the METABIRKINS collection from one of these marketplaces.  Defendant has personally derived substantial revenue and should reasonably expect to continue receiving substantial revenue from the sale of the NFTs in the METABIRKINS collection through the NFT marketplaces by purchasers throughout the United States, including purchases by New York consumers.

20.     Defendant's conduct causes direct and indirect financial loss to Hermès in New York where Plaintiff Hermès of Paris maintains its principal place of business for Hermès' sales operations for the United States.  Defendant's conduct also is likely to engender confusion and dilution of Hermès' federally registered trademark rights in New York leading to the diminution of the value of and goodwill associated with these rights.

21.     Venue is proper in this Judicial District under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Hermès' claims has occurred within this Judicial District and a substantial part of the harm caused by Defendant has occurred in this Judicial District.

## **THE PARTIES**

22.     Plaintiff Hermès International is a corporation, organized and existing under the laws of France, having its principal place of business located at 24, rue du Faubourg Saint-Honoré, Paris,

France.  Hermès does business in the United States, including New York, through its wholly-owned subsidiary Hermès of Paris, Inc.

23.     Plaintiff Hermès of Paris, Inc. is a corporation, organized and existing under the laws New York, having its principal place of business located at 55 East 59th Street, New York, New York 10022.  Hermès of Paris, Inc. is the sole authorized distributor of the BIRKIN handbags in the United States and has the exclusive right to sell BIRKIN handbags under the HERMÈS trademark in the United States.

24.     Defendant Mason Rothschild is an individual who is engaged in the manufacture, distribution, sale, and advertisement of the METABIRKINS collection of NFTs.  Upon information and belief, Mason Rothschild is a pseudonym of Sonny Alexander Estival who lives in Los Angeles, California.   Upon  information  and  belief,  Defendant  is  the  owner  and  operator  of https://metabirkins.com (the "MetaBirkins Website").

25.     Defendant holds himself out as a "Marketing Strategist" and the "Marketing Director" of Terminal 27, a Los Angeles-based apparel company.  A screenshot of Defendant's LinkedIn profile is attached as Exhibit A.

26.     Upon information and belief, Defendant does business as METABIRKINS on Twitter, Instagram, and Discord.  Defendant has also done or does business as METABIRKINS on NFT marketplaces including OpenSea, Rarible, Zora, and LooksRare.

### FACTUAL ALLEGATIONS

### I.     Hermès And Its Famous BIRKIN Handbag

#### A.   Hermès' Decades Old Luxury Fashion Business

27.     Hermès is a world-famous designer and producer of high-quality merchandise including, *inter alia*, handbags, apparel, scarves, jewelry, fashion accessories, and home furnishings.

28.     For decades, Hermès has developed its reputation and distinctive image.

29.     Hermès' origins date back to 1837, when it began designing and manufacturing high-quality harnesses for horses.  During the twentieth century, Hermès expanded its business to include handbags, personal leather goods, and apparel.

30.     Hermès has registered the HERMÈS word mark with the U.S. Trademark and Patent Office in connection with a wide array of goods and services (the "HERMÈS Marks").  A list of the HERMÈS Marks registrations is attached as Exhibit B.

31.     Hermès sells some of its products directly to consumers through Hermès-owned retail stores and its website www.Hermes.com, which receives substantial views from consumers in New York. Hermès currently operates stores in 45 countries, including the United States, where it has stores in several States, including New York, with four stores in this Judicial District.

32.     Hermès is the exclusive distributor or licensor in the United States of its merchandise, all of which bear one or more of Hermès' Federally Registered Trademarks (as defined herein).

B.   The Origin & Fame of Hermès' BIRKIN Handbag

   i.  *Hermès' Over 35 Years of Use of the BIRKIN Mark & Its Federal Registration*

33.     In addition to being known for high-quality merchandise, Hermès is well known for its famous BIRKIN handbag, an exclusive Hermès design that was created in 1984 and first sold in commerce in the U.S. in 1986.  The BIRKIN handbag was the outcome of a chance encounter between the late President and Artistic Director of Hermès, Jean-Louis Dumas, and the actress Jane Birkin on a Paris to London flight.   Ms. Birkin complained to Dumas that she could not find a bag suitable for her needs as a young mother, so Dumas sketched the design of a spacious rectangular hold all with a burnished flap and saddle stitching.  This bag is universally known as the BIRKIN

handbag.  An image of the BIRKIN handbag is depicted below as Figure 1 and attached hereto as Exhibit C.



*Figure 1.*

34.     Hermès owns the BIRKIN trademark which is registered on the Principal Register of the U.S. Trademark and Patent Office under Registration No. 2991927.  It is in full force and effect and incontestable (the "BIRKIN Mark").  A copy of the Certificate of Registration for the BIRKIN Mark is attached as Exhibit D.

35.     Hermès owns the trade dress rights in the BIRKIN handbag design which is registered on the Principal Register of the U.S. Trademark and Patent Office under Registration No. 3936105.  It is in full force and effect and incontestable (the "BIRKIN Trade Dress").  A copy of the Certificate of Registration for the BIRKIN Trade Dress is attached as Exhibit E and below as Figure 2 is an image of this registered trade dress.



*Figure 2.*

36.     In addition to being registered in the U.S., Hermès has registered the BIRKIN word mark and trade dress worldwide to identify its iconic handbag and has continuously used the BIRKIN Mark and BIRKIN Trade Dress since the BIRKIN handbag was first introduced in U.S. commerce in 1986.

ii.   *Extensive and Widespread Worldwide and U.S. Sales Under the BIRKIN Mark*

37.     Each BIRKIN handbag is handcrafted from the finest leather by experienced artisans in France.  The manufacturing of a single BIRKIN handbag requires more than seventeen hours of an artisan's time.  The intensive labor and craftmanship and high-quality leathers required makes the BIRKIN handbag difficult to produce and expensive.  The price of a BIRKIN handbag from thousands of dollars to over one hundred thousand dollars.  Demand for BIRKIN handbags is such that Hermès cannot satisfy all requests.

38.     As Defendant himself has acknowledged, "[The BIRKIN handbag's] mysterious waitlist, intimidating price tags and extreme scarcity have made it a highly covetable 'holy grail' handbag that doubles as an investment or store of value."  A copy of the METABIRKINS OpenSea page is attached hereto as Exhibit F.

39.     Hermès has sold millions of dollars' worth of BIRKIN handbags in significant quantities since its inception in 1986.  Such sales have occurred in the United States, France, and throughout the world.

40.     "The desirability of an Hermès Birkin handbag - - a symbol of rarefied wealth - - is such that not even a global pandemic can dull demand for it."  A copy of a *CNN* article on BIRKIN bag prices is attached as Exhibit G.  In the second quarter of 2021, Hermès' sales for the leather and saddlery division, which includes the Birkin handbags, more than doubled from a year ago and rose by 24% from their pre-pandemic June 2019 levels.  A copy of a *Reuters* article on BIRKIN sales is attached as Exhibit H.

41.     Despite the price and exclusivity, the BIRKIN handbag has become a household name and well known by the general public, both in name and by its distinctive design.

### iii. Extensive and Widespread Worldwide and U.S. Advertising & Publicity of the BIRKIN Mark

42.     The BIRKIN handbag and BIRKIN Mark have received unsolicited publicity and praise among consumers and in the media.  The BIRKIN handbag and BIRKIN Mark have been prominently featured in fashion publications, the media, and popular culture since 1986, and particularly over the past two decades.

43.     By way of example, the March 2021 edition of Harper's Bazaar contained an editorial dedicated to the BIRKIN handbag titled, "The Mighty, MIGHTY Birkin."  The article discuses "[h]ow the [BIRKIN handbag] withstood trends and WEATHERED SEASONS to become an INDELIBLE PART of the CULTURE."  A copy of the article is attached hereto as Exhibit I. Examples of additional fashion publication editorials and articles on the BIRKIN handbag are attached hereto as Exhibit J.

44.     The BIRKIN handbag is a favorite among celebrities who are routinely featured in news and magazine articles carrying the BIRKIN handbag.  There are entire articles dedicated to identifying the celebrities that love and own BIRKIN handbags.

45.     The BIRKIN handbag has also been showcased in U.S. television and film.  Most notably, the BIRKIN handbag was a major plot point in the 2001 *Sex and the City* episode "Coulda, Woulda, Shoulda".  The fictional episode mirrored the exclusivity and prestige associated with the BIRKIN handbag in real life and documented one of the character's difficulties in acquiring a BIRKIN handbag.  The BIRKIN handbag has also been featured in other television shows, including episodes of *Gilmore Girls*, *Gossip Girl*, *Will & Grace*, and *How I Met Your Mother*, and in films, such as *The Devil Wears Prada*, *Sex and The City 2*, *The Royal Tenenbaums*, and *Don't Look Up*. Articles discussing some of these features are attached hereto as Exhibit K.

46.     Since as early as 2000, Hermès has expended millions of dollars in the United States advertising the BIRKIN Mark and BIRKIN Trade Dress.  Such advertising has been placed in publications based out of the State and City of New York: *The New York Times*, *Elle*, and *Vogue*.

47.     As a result of such advertising, since 2000, Hermès has sold thousands of BIRKIN handbags featuring the BIRKIN Mark and BIRKIN Trade Dress in the United States.

*iv.  Widespread and Extensive Worldwide and U.S. Actual Recognition of the BIRKIN Mark*

48.     The BIRKIN Mark is recognized throughout the world and U.S.  By way of example only, a September 2021 Vanity Fair article noted that, "There is a kind of fashion object so long-lasting, so tirelessly wanted that its name becomes recognizable, a metonym for the brand that made it: the Air Jordan, the Love bracelet. Few brands, successful though they may be, attain that kind of saturation. Hermès has done it twice: the Birkin and, arguably the first of the household-name phenomena, the Kelly."  A copy of the Vanity Fair article is attached hereto as Exhibit L.

49.     The BIRKIN Mark is so well-known that one of the very first BIRKIN handbags was placed on display at an art exhibition in the Victoria & Albert Museum in London, England from April 2020 through January 2021.  A copy of an article on the exhibition from *Contemporain(S)* and photographs of the exhibition are attached hereto as Exhibit M.

50.     The BIRKIN handbag has been recognized as one of the best investments any person can make with its increasing value beating returns from the stock market and even gold.  Copies of articles discussing this recognition as an investment item are attached hereto as Exhibit N.

51.     In 2016, *Time* called the BIRKIN handbag "a Better Investment Than Gold." *See Id.* at 1.  The article explained "that the annual return on a Birkin [handbag] was 14.2% compared to the S&P [500] average of 8.7% a year and gold's -1.5%." *Id.*

52.     In 2019, the BIRKIN handbag was recognized for "its 17% rate of return which outperforms other more traditional forms of investment" and included in an index of other art and luxury goods for investment purposes. *See Id.* at 5.  In the 30 plus years since it was introduced, the BIRKIN handbag "has appreciated in value by 500%." *See Id.* at 4.

53.     The distinctive shape and notoriety of the BIRKIN handbag has been judicially recognized around the world.  Copies of a few of those decisions are attached hereto as Exhibit O.

C.  Hermès' Trademarks Are Symbols of Luxury & Quality

54.     Throughout its history and expanding product lines in both domestic and international markets, Hermès has maintained its reputation for the manufacture of high-quality goods and its trademarks have become the symbols of modern luxury.

55.     Hermès is the owner of not just the famous BIRKIN Mark and HERMÈS Mark, but numerous trademark registrations with the United States Patent & Trademark Office, including but not limited to the three-dimensional design mark for the BIRKIN handbag's distinctive design and

the registrations listed on Exhibit P attached hereto (hereinafter collectively referred to as "Hermès' Federally Registered Trademarks").

56.     Hermès' Federally Registered Trademarks are in full force and effect and many have become incontestable pursuant to 15 U.S.C. § 1065.

57.     Hermès has used Hermès' Federally Registered Trademarks for many years, and in some instances decades, on, and in connection with, the advertising and sale of Hermès' products, in interstate and intrastate commerce, including commerce in New York, and in this Judicial District.

58.     Hermès has gone to, and continues to go to, great lengths to enforce Hermès' Federally Registered Trademarks and protect their valuable goodwill.

59.     As a result of their widespread and constant use, Hermès' Federally Registered Trademarks have come to be known as source identifiers for Hermès and for renowned high-quality luxury goods.

## II.  NFTs, NFT Marketplaces, & the NFT Fashion Industry

60.     Non-fungible tokens, commonly known as NFTs, are digital tokens which exist on a blockchain and are linked to digital media files such an image, video, or music, to create a uniquely identifiable digital media file.  An illustration showing the connection between NFTs and digital media is below as Figure 3.



*Figure 3.*

61.     Many NFTs, like the NFTs in the METABIRKINS collection, are created or "minted" on the Ethereum blockchain which is one of several different blockchain technologies.  NFTs are created and governed by smart contracts which facilitate the creation, transfer, and storage of NFTs. Smart contracts create the terms of the agreement between the NFT creator and buyers of the NFTs while controlling the functions of NFTs, including the payment of royalties as a result of sales of the NFTs.

62.     While the smart contracts and the NFTs associated with them are stored on the blockchain, the digital media files to which the NFTs point are stored separately.  The digital media files are generally stored either in a central location (e.g., a single server) or on a decentralized network known as the Interplanetary File System (the "IPFS").  The IPFS stores pieces of the digital media files across multiple locations on its decentralized network making it nearly impossible to track down each piece and destroy the original digital media files.

63.     Once minted, NFTs are typically listed on an NFT marketplace just like a company's stock is listed on an exchange so the stock, or here NFTs, can be sold, traded, transferred, and/or exchanged.  Popular NFT marketplaces include OpenSea and Rarible which both listed the METABIRKINS collection of NFTs.  According to published reports, the New York Stock Exchange is taking steps to establish an NFT trading platform.  A copy of one such published report is attached hereto as Exhibit Q.

64.     To generate hype about NFTs that are about to "drop" into the marketplace, an NFT creator can start an NFT "whitelist" for members of the public to join and be waitlisted.  Whitelist membership provides discounted pricing to those on the list who will then mint the NFTs and offer them for sale on various NFT marketplaces.

65.     Once listed on an NFT marketplace, NFT creators earn money on the initial sales of the NFTs and can earn money on subsequent sales.  All transactions involving the NFTs are recorded on the blockchain.  If the smart contract included a provision for royalties to be paid on subsequent transfers and sales of the NFTs, then the creator will receive a set royalty for any subsequent transfers or sales.  In some instances, an NFT marketplace may require the creator to authenticate or verify him or herself before it pays out royalties to the creator.  If the smart contract does not provide for a royalty, the creators can still receive royalty payments by entering into agreements with individual NFT marketplaces which will collect royalties from NFT transactions, taking a portion of the sale amount for itself, and paying the royalties to the creators.

66.     Once purchased from an NFT marketplace, some NFTs can be used in connection with the metaverse.  NFTs can link to digital media like virtual fashion items that can be worn in virtual worlds online.  Fashion brands are already embedded in the metaverse: "There are digital-only fashion brands – more than 100 . . . . There is also a growing number of ready-to-wear brands testing out virtual versions of their collections on various virtual platforms and creating metaverse business units staffed by fashion school graduates trained in virtual," as reported in a recent *New York Times* article.  Even high fashion brands are entering the metaverse with branded digital worlds, digital wardrobes available to consumers in the metaverse, and metaverse fashion weeks with virtual models and digital apparel.  A copy of this *New York Times* article is attached hereto as Exhibit R.

67.     Fashion brands are also partnering with artists and other designers to create co-branded products and collaborations.  For example, in November 2020, Trevor Andrew (a/k/a Gucci Ghost) launched a series of NFTs pointing to images of ghosts bearing Gucci's double G trademark.  Mr. Andrew has since partnered with Gucci to create more products.  A copy of an *Ocean Drive* article on the Gucci Ghost collaboration is attached as Exhibit S.

68.     Upon information and belief, Defendant is trying to force a similar collaboration with Hermès, and his statements on social media indicate as much: ". . . it is your [Hermès'] role as a fashion powerhouse to amplify young creatives and artists . . . .  Your actions can help determine the future of art in the Metaverse.  You can be part of an incredible movement."  A screenshot of one such statement on social media is attached as Exhibit T.

69.     Because NFTs can easily be sold and resold while the transaction history is recorded on the blockchain, NFTs are viewed as investable assets which can store value and increase even increase in value over time, just like Hermès' BIRKIN handbags.

### III. Defendant's Infringing METABIRKINS Commercial Venture

A. Defendant Launches His METABIRKINS Business with 100 Nearly Indistinguishable Digital Collectibles Under the METABIRKINS Mark

70.     According to the METABIRKINS Website, "Rothschild began working on MetaBirkins shortly after the success of Baby Birkin…In response to the community demand, Rothschild developed a new series…": the METABIRKINS collection of NFTs.  A screenshot of the METABIRKINS Website is attached hereto as Exhibit U.

71.     The Baby Birkin was a single NFT consisting of an animation of Hermès' BIRKIN handbag.  It featured a 40-week-old fetus inside a transparent version of a BIRKIN bag (the "Baby Birkin NFT").  A screenshot of the Baby Birkin appears below as Figure 4 and attached hereto as Exhibit V.



*Figure 4.*

72.     The one-off Baby Birkin NFT was auctioned on the Basic Space platform in May 2021 and sold for $23,500.  It was then resold for $47,000.  The Baby Birkin NFT auction listing and ownership history on Basic Space is attached hereto as Exhibit W.

73.     At all relevant times, Defendant knew of the BIRKIN handbag, the BIRKIN mark, and their well-known and famous status among consumers.

74.     In an interview with HighSnobiety regarding the creation of the Baby Birkin NFT, Defendant stated "The Birkin Bag by Hermès is such a status symbol across the globe."  A copy of the article is attached hereto as Exhibit X.

75.     The Baby Birkin NFT appeared to many, including Hermès, to be a one-off and bizarre concoction, and Defendant had appeared to cease his activities, until now.

76.     On or about December 2, 2021, Defendant launched his METABIRKINS business with the release of his METABIRKINS collection of NFTs.  In a December 6, 2021, interview with Yahoo Finance, Defendant stated that for him, "There's nothing more iconic than the Hermès Birkin bag."  A copy of this interview is attached as Exhibit Y.  The description on the METABIRKINS Website and in his initial METABIRKINS storefront acknowledged the BIRKIN handbag's famous

status, calling the BIRKIN handbag "Hermès' most famous handbag" and "one of the most, exclusive, well-made luxury accessories. Its mysterious waitlist, intimidating price tags, and extreme scarcity have made it a highly covetable 'holy grail' handbag that doubles as an investment or store of value." *See* Exhibit U.

77.     Defendant admittedly created the METABIRKINS collection of NFTs as an "experiment to see if [he] could create the same kind of illusion that [the BIRKIN handbag] has in real life as a digital commodity."  And Defendant believes he has "accomplished [his experiment]" and has "put together the kind of digital commodity [the METABIRKINS NFT] everybody loves . . . ." *See* Exhibit Y.

78.     The METABIRKINS trademark does not refer to a particular work within the collection but the collection as a whole.  Each NFT in the METABIRKINS collection is titled with a number and not the METABIRKINS name (e.g., "1", not "METABIRKINS").  The images pointed to by each NFT in the METABIRKINS collection are nearly indistinguishable blurry images of BIRKIN handbags with minor differences in style and color.  Upon information and belief, Defendant has designed this nearly indistinguishable series of images, identified by sequential numbers, in order to facilitate the creation of a METABIRKINS exchange in which METABIRKINS NFTs will have a uniform market price, like a cryptocurrency, and in which he can earn a fee on each resale of METABIRKINS NFTs in this secondary marketplace.

79.     The METABIRKINS collection of NFTs was created on the Ethereum blockchain via a "smart" contract, which feature Hermès' BIRKIN handbag design covered in fur and offered for sale under the METABIRKINS trademark.  Examples of the images to which the NFTs in the METABIRKINS point are depicted below as Figure 5 and attached hereto as Exhibit Z.



*Figure 5.*

80.     Upon information and belief, Defendant made arrangements with each NFT platform on which NFTs from the METABIRKINS collection have been sold under which Defendant earns fees on all sales and resales of the NFTs in the METABIRKINS collection.

B.   Defendant's Advertising of the METABIRKINS Business Explicitly Misled and Confused Consumers

81.     The METABIRKINS trademark explicitly misleads consumers to believe Hermès authorized, sponsored, or were affiliated with Defendant's METABIRKINS business when they are not.   Defendant has been advertising his NFTs business using the explicitly misleading METABIRKINS trademark since as early as November 17, 2021.

i.   *The METABIRKINS Social Media Accounts*

82.     On or about November 17, 2021, Defendant tweeted an image of handbag similar in appearance to a BIRKIN handbag from a Twitter account using the METABIRKINS trademark as its handle (the "METABIRKINS Twitter").   Upon information and belief, Defendant owns and

manages this METABIRKINS Twitter account.  A screenshot of this tweet is attached as Exhibit AA.

83.     Upon information and belief, Defendant owns and manages a METABIRKINS account on Instagram, with a handle that features the METABIRKINS trademark: @metabirkins (the "METABIRKINS Instagram").  The METABIRKINS Instagram advertises the METABIRKINS collection of NFTs and includes a direct link to the METABIRKINS LooksRare Store.  A screenshot of the METABIRKINS Instagram is depicted below as Figure 6 and attached hereto as Exhibit AB.



*Figure 6.*

84.     The METABIRKINS Instagram uses the entirety of the BIRKIN Mark in hashtags, including #MetaBirkins and #NotYourMothersBirkin.   A screenshot of a post featuring both hashtags is depicted below as Figure 7 and attached hereto as Exhibit AC.



*Figure 7.*

85.     On or about November 18, 2021, Defendant posted three images of handbags similar in appearance to a BIRKIN handbag with the hashtag #MetaBirkins to the METABIRKINS Instagram.   A screenshot of this post is attached as Exhibit AD.

86.     The METABIRKINS Instagram lacks any disclaimer that it is not affiliated with or sponsored by Hermès.  *See* Figure 6 and Exhibit AB.

87.     The METABIRKINS Twitter also advertises the METABIRKINS collection of NFTs and includes a direct link to the METABIRKINS LooksRare Store.   A screenshot of the METABIRKINS Twitter is depicted below as Figure 8 and attached hereto as Exhibit AE.



*Figure 8.*

88.     The METABIRKINS Twitter uses the entirety of the BIRKIN Mark in hashtags,

including #MetaBirkins, #NotYourMothersBirkin, and #MintaMetaBirkinHoldAMetaBirkin.  *See*

Exhibit AE, a screenshot of a post featuring both hashtags and depicted above in Figure 8.

89.     Defendant further advertises the METABIRKINS collection of NFTs and uses the

BIRKIN Mark on www.discord.com ("Discord") under the METABIRKINS trademark.   Discord is

an online platform where users can join groups called channels and communicate with others within the channel.  In order to post or view content on Discord, a user must register and verify a valid email address.  Through this Discord channel, Defendant communicates with consumers about new METABIRKINS collections of NFTs and conducts targeted advertising of the first METABIRKINS collection NFTs.

### ii.  The METABIRKINS Website

90.     On information and belief, Defendant first registered the METABIRKINS Website domain name (the "Infringing Domain") on November 7, 2021.

91.     The URL for the Infringing Domain consists of the entire BIRKIN Mark and the generic prefix "Meta" (referring to the "metaverse").

92.     Upon information and belief, Defendant first posted on the METABIRKINS Website as early as December 1, 2021, the day before the METABIRKINS collection of NFTs launched.

93.     Defendant's use of the Infringing Domain and the METABIRKINS Website is commercial and to advertise the METABIRKINS collection of NFTs and identify the latest point of sale.  As of December 1, 2021, the METABIRKINS Website featured the brand METABIRKINS at the top, where consumers would look to identify the source of the products.  Defendant included a direct link to the METABIRKINS collection of NFTs on the OpenSea NFT marketplace.

94.     As early as December 1, 2021, Defendant described his METABIRKINS collection on his METABIRKINS.com website as "a collection of 100 unique Birkin NFTs created with faux fur in a range of contemporary color and graphic executions.  MetaBirkins are a tribute to Hermes' most famous handbag, the Birkin, one of the most exclusive, well-made luxury accessories.  Its mysterious waitlist, intimidating price tags, and extreme scarcity have made it a highly covetable 'holy grail' handbag that doubles as an investment or store of value."  *See* Exhibit U, a screenshot of

the METABIRKINS Website, as it appeared as of December 1, 2021, and depicted below as Figure 9.



*Figure 9.*

95.     In addition to the METABIRKINS trademark, the METABIRKINS Website prominently features the BIRKIN Mark, the HERMÈS Mark, and the advertising slogan "NOT YOUR MOTHER'S BIRKIN."  This advertising slogan, prominently featuring the BIRKIN Mark, appears over some of the images of the fuzz handbags when a consumer hovers over the images.  A screenshot of the "NOT YOUR MOTHER'S BIRKIN" is depicted below as Figure 10 and attached hereto as Exhibit AF.



*Figure 10.*

96.    Although Defendant claims that he intends consumers to see the "NOT YOUR MOTHER'S BIRKIN" slogan in its entirety, consumers might encounter only the BIRKIN Mark. Each image of a METABIRKIN has a separate "hover effect" to display one of the words from the slogan.   Consumers will only see the entire slogan if they hover their cursor over each of the four images.   Therefore, upon information and belief, consumers have used their cursor on the METABIRKINS Website in a manner so that only the BIRKIN Mark appears.   A screenshot of just the BIRKIN Mark seen on the METABIRKINS Website is depicted below as Figure 11 and attached hereto as Exhibit AG.



*Figure 11.*

97.     In addition to using the BIRKIN Mark on the METABIRKINS Website, Defendant uses the HERMÈS Marks.

98.     As early as December 1, 2021, the METABIRKINS Website advertised the METABIRKINS collection of NFTs to invoke the HERMÈS word mark: "MetaBirkins are a tribute to Hermes' most famous handbag, the Birkin, one of the most exclusive, well-made luxury accessories." *See* Exhibit U.

99.     Defendant posted a similar and equally as misleading description on the OpenSea marketplace where he was selling the METABIRKINS collection of NFTs: "MetaBirkins is a collection of 100 unique NFTs created with faux fur in a range of contemporary color and graphic executions.  MetaBirkins are a tribute to Hermes' most famous handbag, the Birkin, one of the most exclusive, well-made luxury accessories.   Its mysterious waitlist, intimidating price tags, and extreme scarcity have made it a highly covetable 'holy grail' handbag that doubles as an investment or store of value." *See* Exhibit F.

100.    With his website advertising, Defendant first implies that the METABIRKINS collection of NFTs are actually "Birkin NFTs."  Defendant further confuses readers by claiming on

his website and at point of sale that the METABIRKINS collection of NFTs are "a tribute" to the BIRKIN handbag. Defendant's description explicitly misleads consumers that Hermès was the source of or authorized the METABIRKINS collection of NFTs when they did not.

101.    The METABIRKINS Website links to the point of sale on the NFT marketplaces for the METABIRKINS collection of NFTs where Defendants profited from the initial sale and profits from resales of the NFTs in the METABIRKINS collection.   Upon information and belief, Defendant first linked to and sold the METABIRKINS collection of NFTs on the OpenSea NFT marketplace (the "METABIRKINS OpenSea Store").   *See* Exhibit F, a screenshot of the METABIRKINS OpenSea Store, as it appeared on or about December 12, 2021, and depicted below as Figure 12.



*Figure 12.*

102.    In December 2021, the METABIRKINS OpenSea Store prominently displayed the METABIRKINS trademark at the top of the page, where any consumer would look for a source identifier.  The METABIRKINS OpenSea Store also advertised the METABIRKINS collection of

NFTs to invoke the HERMÈS word mark: "MetaBirkins are a tribute to Hermes' most famous handbag, the Birkin, one of the most exclusive, well-made luxury accessories." *See* Exhibit F.

103.    On or about December 12, 2021, the METABIRKINS store on the OpenSea marketplace also advertised the METABIRKINS collection of NFTs to invoke the HERMÈS word mark: "MetaBirkins are a tribute to Hermes' most famous handbag, the Birkin, one of the most exclusive, well-made luxury accessories." *See* Exhibit F.

104.    On or about December 20, 2021 and following receipt of Hermès' letter, the METABIRKINS Website was updated to add a disclaimer that excessively uses the HERMÈS Mark three times.  The disclaimer states "We are not affiliated, associated, authorized, endorsed by, or in any way officially connected with the HERMES, or any of its subsidiaries or its affiliates. The official HERMES website can be found at https://www.hermes.com/."  A screenshot of the METABIRKINS Website, as it appeared on or about December 20, 2021, is depicted below as Figure 13 and attached hereto as Exhibit AH.



*Figure 13.*

105.    Defendant's disclaimer unnecessarily links to Hermès' website and capitalizes the HERMÈS Mark.  Defendant's uses of the HERMÈS Mark in conjunction with his use of the BIRKIN Mark, and the display of the METABIRKINS bags, serves only to create a confusing impression among consumers as to Hermès' sponsorship of the METABIRKIN collection of NFTs and the METABIRKINS Website.

106.    The METABIRKINS Website is the only advertising channel on which Defendant includes this disclaimer.  The disclaimer is notably absent from the only NFT marketplace now featuring the METABIRKINS collection of NFTs.  The disclaimer is also absent from Defendant's METABIRKINS social media accounts and Discord channel, where the METABIRKINS collection of NFTs is prominently advertised.

107.    As of early December 2021, the METABIRKINS Website still prominently advertised the sale of the METABIRKIN collection of NFTs on OpenSea: "Buy on Opensea."  *See* Figure 13 and Exhibit AH.

108.    Upon information and belief, Defendant's conduct inspired other digital speculators to seek to trade off Hermès' goodwill in the BIRKIN Mark.  On December 1, 2021, the day before Defendant's infringing METABIRKINS collection of NFTs launched, Defendant claimed they were being "counterfeited" and that he saw "more and more fake MetaBirkins sold every hour."  A copy of this tweet is attached as Exhibit AI.

109.    On or about December 2, 2021, Defendant advertised the METABIRKINS collection of NFTs at Art Basel art fair in Miami, Florida.

110.    On December 6, 2021, in an interview with Yahoo Finance, Defendant stated that "before [his] collection dropped, there was a bunch of like counterfeit NFTs that weren't from my collection. We're in the process of like verifying mine on OpenSea. But we had like $35,000,

$40,000 in volume of people buying fake versions of my MetaBirkin. So yeah, like counterfeits are definitely there." *See* Exhibit Y.

111.    The existence of "fake" or "counterfeit" METABIRKINS NFTs indicates that METABIRKINS is a trademark and used by Defendant as an indicator of source.  The activities of Defendant complained of herein constitute willful and intentional infringement of the BIRKIN Mark and HERMÈS Marks, are in total disregard of Hermès' rights, and were commenced and have continued in spite of Defendant's knowledge that the use of the BIRKIN Mark and any of Hermès' Federally Registered Trademarks, or copies or colorable imitations thereof, was and is in direct contravention of Hermès' rights.

> iii. *Defendant's Adoption of the METABIRKINS Trademark Explicitly Misled the General Public and Resulted in Actual Confusion*

112.    On or about December 3, 2021, the first NFT sold from the METABIRKINS collection for 10 Ether or over $42,000 USD, calculated at the exchange rate for Ether as of December 3, 2021.

113.    In and around December 2021, Hermès received multiple inquiries from the press, who, upon information and belief, were confused regarding Hermès' affiliation with the METABIKRINS collection of NFTs.

114.    Also in or around December 2021, upon information and belief, consumers and the general public commenting on Defendant's METABIRKINS social media channels were confused as to the relationship between the METABIRKINS collection of NFTs and authentic BIRKIN handbags.  Multiple Instagram users have commented on METABIRKINS Instagram posts expressing their confusion:

- "[a]re these actual bags? [I']m confused"
- "I'm confused is this a digital copy of a Birkin? Not a real physical bag?"
- "Are they real bags? (Not hip to NFTS just yet),"

- "Wait, so these aren't physical bags I can purchase? I want one in real life."
- "Will people ever be able to actually purchase these as handbags?"
- "So these aren't real bags you can carry? What do you do with them?"
- "I don't get it. Are these bags real?"
- "I thought they were using nfts to sell actual bags."
- "Where is my purse!  You guys scammed me!"

Screenshots of the Instagram comments are attached hereto as Exhibit AJ.

115.   Upon information and belief, consumers and the general public express confusion regarding whether Hermès authorized or sponsored the METABIRKINS collection of NFTs:

- "[W]hat do you think about Birkins (and fashion generally) entering the metaverse"
- "If you can't get a fur Birkin in real life, get a NFT"
- "All [I] want for [C]hristmas is a Birkin NFT"
- "[T]he only thing more valuable than a [B]irkin is a nft [B]irkin"
- "Birkin bag NFT's? The world's gone cuckoo & I feel like I have no choice but to join in…"
- "Can't wait to own a [B]irkin"
- "Need me a [B]irkin"
- "A Birkin I can afford for my wife!"
- "I fumbled the bag on not getting a [B]irkin nft"
- "OK, I have a couple Birkins, but NFTs? This is too awesome!!!"
- "There is a Birkin NFT selling for $76 THOUSAND. [K]inda want to invest"
- "WL ME PLEASE. LET ME OWN MY FRIST BIRKIN."
- "But are these even official Birkins @Hermes_Paris"

An exemplar of such Instagram comments and Tweets are attached hereto as Exhibit AK.

116.   Even a lawyer highly familiar with the metaverse and the fashion industry was confused and explicitly misled by Defendant's use of Hermès' trademarks.  On or about December 9, 2021, an attorney presenting at intellectual property conference in Paris, France wrongly stated that Hermès collaborated with Defendant on the introduction of the METABIRKINS collection of NFTs.

117.   After the release of the METABIRKINS collection of NFTs, *Elle* fashion magazine published an article titled, "Hermès Goes Virtual With Launch of Birkin Bags as NFTs," which upon information and belief, reported that Hermès authorized the METABIRKINS collection of NFTs.

Although *Elle* subsequently corrected the corrected the article, the original headline is viewable when searching for the article on the internet.  A screenshot of a Google search showing the original title is attached as Exhibit AL.

118.    On December 15, 2021, *L'Officiel* magazine published an article also reporting that "[Basic.Space] partnered with Hermès and [Defendant] Rothschild on the [MetaBirkins] project . . . ."  The article also refers to Defendant's METABIRKINS collection of NFTs as a "new line of Birkin bags" and "another collection of Birkin NFTs."  A copy of this article is attached as Exhibit AM.

119.    On January 8, 2022, the *New York Post* published an article entitled "MetaVerse clothing, travel, plastic surgery: Experts predict life in 2030," which reported that the METABIRKINS collection of NFTs was unveiled by Hermès stating:

> Even Hermès, the company responsible for the ridiculously expensive Birkin bag, has entered the metaverse.  On Dec. 17, the company unveiled the MetaBirkin–a VR version of its signature bag, created by LA artist Mason Rothschild, and "made" just 100 of them.  With such a limited supply, prices have "skyrocketed to near real-Birkin levels–with some selling for as much as the crypto equivalent of £40,00 [British pounds]," Elle reported.

A copy of this article is attached as Exhibit AN.

120.    As of January 2022, total volume of sales for the METABIRKINS collection of NFTs surpassed $1.1 million, with a floor price of $15,200, and the highest sale at $45,100.  A copy of the Rarible METABIRKINS store showing these figures is attached as Exhibit AO.

121.    Given these prices and the marketplace confusion, consumers view the METABIRKINS collection of NFTs as BIRKINS in the metaverse.  Upon information and belief, it was the use of Hermès' BIRKIN trademark that drove the high prices and popularity, not Defendant's alleged art associated with the NFTs.

    *iv. Defendant Created Additional METABIRKINS Stores on Three New NFT Marketplaces To Avoid Hermès' Enforcement Efforts and Maximize Profits from Sales of the NFTs in the Infringing METABIRKINS Collection*

122.    On or about December 16, 2021, OpenSea removed the infringing METABIRKIN collection of NFTs upon receipt of notice from Hermès.  Upon information and belief, shortly thereafter, Defendant moved, or caused to have moved, the METABIRKINS collection of NFTs from OpenSea to the Rarible NFT marketplace with full knowledge of Hermès' rights in the BIRKIN Mark and the BIRKIN Trade Dress.

123.    As of January 8, 2022, the METABIRKINS Website still prominently advertised the sale of the METABIRKIN collection of NFTs but on Rarible.com: "Buy on Rarible."  A screenshot of the METABIRKINS Website, as it appeared on or about January 8, 2022, is depicted below as Figure 14 and attached hereto as Exhibit AP.



*Figure 14.*

124.    Upon information and belief, undeterred, Defendant listed, or caused to have listed, the METABIRKINS collection of NFTs for sale through a store on the Rarible NFT marketplace

under the METABIRKINS trademark at https://rarible.com/metabirkinsnft (the "METABIRKINS Rarible Store").

125.    The METABIRKINS Rarible Store prominently displayed the METABIRKINS trademark at the top, where any consumer would look for a source identifier.  *See* Exhibit AO, a screenshot of Defendant's METABIRKINS Rarible Store as it appeared on December 22, 2021, and depicted below as Figure 15.



*Figure 15.*

126.    Each listing for an NFT in the METABIRKINS collection identified the collection using the METABIRKINS trademark.  A screenshot of a METABIRKINS NFT listing is depicted below as Figure 16 and attached hereto as Exhibit AQ.




*Figure 16.*

127.    Rarible has since removed the infringing METABIRKINS collection of NFTs from sale on its platform.

128.    Defendant remained determined to not rely on a single platform to sell the infringing METABIRKINS collection of NFTs.  So he opened, or caused to have opened, two new stores on the LooksRare and Zora NFT marketplaces even before Rarible removed the METABIRKINS collection of NFTs from its platform.  Upon information and belief, while the METABIRKINS collection of NFTs was listed on these NFT marketplaces, Defendant had an arrangement with these NFT marketplaces to earn royalties on all resales of the NFTs in the METABIRKINS collection.

129.    Upon information and belief, on or about January 10, 2022, Defendant opened, or caused to have opened, a new store and point of sale for the METABIRKINS collection of NFTs on the LooksRare marketplace under the METABIRKINS trademark.  Upon information and belief, Defendant has an arrangement with LooksRare to earn royalties on all resales of the NFTs in the

METABIRKINS collection listed there.  Defendant announced the launch on Twitter: "MetaBirkins is LIVE on @LooksRareNFT, the community-first marketplace that actively rewards traders, collectors and creators. Buy and sell your MetaBirkin today or HODL for your free @ILYYWNFT mint!" A screenshot of this tweet is attached hereto as Exhibit AR.

130.    The METABIRKINS LooksRare store prominently displays the METABIRKINS trademark at the top left, where any consumer would look for a source identifier.  A screenshot of Defendant's METABIRKINS LooksRare store as it appeared on or about January 11, 2022, is below as Figure 17 and attached hereto as Exhibit AS.



*Figure 17.*

131.    Upon information and belief, on or about January 11, 2022, Defendant opened, or caused to have opened, a new store and point of sale for the METABIRKINS collection of NFTs on the Zora marketplace under the METABIRKINS trademark.  Upon information and belief, Defendant has an arrangement with Zora to earn royalties on all resales of the NFTs in the

METABIRKINS collection listed there.  The METABIRKINS Zora store prominently displayed the METABIRKINS trademark at the top, where any consumer would look for a source identifier.  A screenshot of Defendant's METABIRKINS Zora store as it appeared on or about January 11, 2022, is below as Figure 18 and attached hereto as Exhibit AT.



*Figure 18.*

132.     Zora has since removed the infringing METABIRKINS collection of NFTs from sale on its platform.

133.     As of January 14, 2022, the METABIRKINS Website prominently featured links to each of the then active NFT stores offering the METABIRKINS collection on Rarible, LooksRare, and Zora.  A screenshot of the METABIRKINS Website, as it appeared on or about January 8, 2022, is depicted below as Figure 19 and attached hereto as Exhibit AU.



*Figure 19.*

    *v.   Defendant Deploys the METABIRKINS Trademark to Promote Other NFTs Using his METABIRKINS Business*

134.   Since introducing the METABIRKIN collection of NFTs, Defendant has expanded his use of the METABIRKIN trademark to promote his other NFT ventures. For example, one of Defendant's advertising campaign was called "Build-A- MetaBirkin" on the METABIRKINS Discord channel.   The "Build-A-MetaBirkin Challenge" encouraged followers of the METABIRKINS channel to "Build a MetaBirkin using household materials" and to submit their designs on a separate Discord channel, where Defendant would then select two or "maybe more" winners.   A screenshot of Defendant's post regarding the Build-A-MetaBirkin Challenge is attached hereto as Exhibit AV.   Defendant would then publish the most popular submissions within the METABIRKINS Discord channel and, upon information and belief, some winners would receive whitelist spots for NFTs projects affiliated with Defendant's METABIRKINS business.

135.    Further, Defendant's use of METABIRKINS in the name of this contest is not a reference to his alleged art but to his trade name METABIRKINS and generally refer to any image of a handbag derived from the federally registered Birkin Trade Dress.

136.    Defendant also used his METABIRKINS Discord community to advertise and promote the launch of the different collection of NFTs called "I Like You You're Weird".

137.    Defendant uses a METABIRKINS-branded online community on the Discord platform to advertise and promote the launch of a different collection of NFTs called "I Like You You're Weird" ("ILYYW"), a collaboration between Defendant and an individual named Amber Park, who upon information and belief, is a coworker of Defendant at Terminal 27.

138.    On January 8, 2022, Defendant posted five images of METABIRKINS with the caption "Maybe some @ilikeyouyoureweird MetaBirkins?" on the METABIRKINS Instagram account.  A screenshot of this post is depicted below as Figure 20 and attached hereto as Exhibit AW.



*Figure 20.*

139.    Shortly thereafter, on January 15, 2022, Defendant posted another three images of METABIRKINS NFTs on the METABIRKINS Instagram account, simply tagging @ilikeyouyoureweird and @amberpark in the caption.  A screenshot of this post is depicted below as Figure 21 and attached hereto as Exhibit AX.



*Figure 21.*

140.    On January 15, 2022, the co-creator of the ILYYW collection, Amber Park, working in concert with Defendant, also posted ten images of METABIRKINS on her personal Instagram account with the caption "@ilikeyouyoureweird x @metabirkins," suggesting that the ILYYW collection is a collaboration with the METABIRKINS brand.  This promotion of the ILYYW collection using the METABIRKINS trademark creates the perception in consumers' minds that METABIRKINS is a brand.

141.    Defendant also uses the METABIRKINS Mark in yet another advertising slogan adapted from the ILYYW collection.  From the outset of the ILYYW collection, Defendant has used the hashtag "#WeirdosGonnaMakeIt" in his social media accounts for ILYYW.  Defendant now uses

the METABIRKINS Mark in a mirrored advertising slogan, tweeting on February 9, 2022, "#MetaBirkinsGonnaMakeIt." A screenshot of the tweet is attached hereto as Exhibit AY.

142. Defendant continues to expand his uses of the METABIRKINS trademark. Defendant now refers to the investors of the original METABIRKINS collection of NFTs as "METABIRKIN Genesis Holders" who receive special privileges, including priority access to other NFT collections. Defendant has given priority whitelist access to ILYYW NFTs to METABIRKINS Genesis Holders.

143. On February 6, 2020, Defendant posted on the ILYYW Discord page offering special priority to "MetaBirkin Genesis Holders" for yet another NFT collection called "Muri." A screenshot of this post on the ILYYW Discord page is attached hereto as Exhibit AZ.

vi. The METABIRKINS Marketplace

144. Through all of these activities, Defendant is using the METABIRKINS trademark to build a market for the resale, trade, and exchange of his METABIRKINS collection of NFTs, a market referred to by Defendant as the METABIRKINS "community." Upon information and belief, in NFT marketplaces where the METABIRKINS collection of NFTs is currently available, Defendant receives a "royalty" paid in the ether (ETH) cryptocurrency when NFTs in the METABIRKINS collection are resold.

145. Defendant has also announced he is creating a "decentralized METABIRKINS exchange" to sell the METABIRKINS NFTs without the need for NFT marketplaces like OpenSea, Rarible, LooksRare, or Zora. Defendant announced this plan to expand his METABIRKINS commercial venture on the METABIRKINS Discord channel after the METABIRKINS collection of NFTs was removed from OpenSea pursuant to Hermès' request to OpenSea to remove the

unauthorized use of METABIRKINS from its marketplace.  A screenshot of Defendant's post on Discord is attached hereto as Exhibit BA.

146.    Upon information and belief, the sole purpose of such a decentralized exchange would be for consumers to trade METABIRKINS NFTs with increased fees to Defendant.  Many third party NFT marketplaces, such as OpenSea, charge a "service fee" and limit the percentage of royalty payments made to NFT creators and sellers.  Upon information and belief, these limitations would not apply on the decentralized exchange being developed by Defendant.  Upon information and belief, such an exchange will prominently feature the METABIRKINS trademark.

147.    As of March 2, 2022, Defendant's METABIRKINS Twitter account is followed by almost 7,000 users, Defendant's METABIRKINS Instagram account is followed by over 20,000 users, and Defendant's METABIRKINS Discord channel is followed by over 6,500 users.

148.    Use by Defendant of the BIRKIN Mark and HERMÈS Marks has been without Hermès' consent, has caused and is likely to continue to cause confusion and mistake in the minds of the purchasing public, and as evidenced by the *Elle*, *New York Post*, and *L'Officiel* articles, tends to and does falsely create the impression that the goods sold by Defendant are authorized, sponsored, or approved by Hermès when, in fact, they are not.

149.    Defendant has infringed, continues to infringe, and threatens to further infringe the BIRKIN Mark by manufacturing, distributing and selling the unauthorized METABIRKINS collection of NFTs. Defendant's infringing activities constitute unauthorized public display and distribution of products in connection with the BIRKIN Mark and HERMÈS Marks.

**FIRST CAUSE OF ACTION**
**TRADEMARK INFRINGEMENT**
**15 U.S.C. § 1114**

150.    Hermès repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

151.    The BIRKIN Mark is fanciful and arbitrary and associated in the mind of the public with Hermès.

152.    Based on Hermès' extensive advertising, sales and the wide popularity of Hermès' products, including the BIRKIN handbag, the BIRKIN Mark is strong and has acquired secondary meaning so that any product and advertisement bearing the BIRKIN Mark is immediately associated by purchasers and the public as being a product of or affiliated with Hermès.

153.    Defendant uses the BIRKIN Mark in connection with Defendant's sale, distribution and advertising of its METABIRKINS NFTs.

154.    Defendant's activities as aforesaid constitute Defendant's use in commerce of the BIRKIN Mark.

155.    Defendant has used the BIRKIN Mark without Hermès' consent or authorization. Defendant's use, including the sale and distribution of the METABIRKINS NFTs in interstate commerce, is likely to cause confusion and mistake in the minds of the public, leading the public to believe that the METABIRKINS NFTs emanate or originate from Hermès, or that Hermès has approved, sponsored or otherwise associated itself with Defendant, which is untrue.

156.    Defendant's conduct is intended to exploit the goodwill and reputation associated with the BIRKIN Mark.

157.    Defendant's activities as aforesaid create the false and misleading impression that Defendant is sanctioned, assigned or authorized by Hermès to use the BIRKIN Mark to advertise, manufacture, distribute, appraise, offer for sale or sell infringing products bearing the BIRKIN Mark when Defendant is not so authorized.

158.    Defendant's unauthorized use of the BIRKIN Mark as set forth above has resulted in Defendant unfairly benefiting from Hermès' advertising and promotion and profiting from Hermès'

reputation and the BIRKIN Mark, to the substantial and irreparable injury of the public, Hermès and the BIRKIN Mark and the substantial goodwill represented thereby.

159.    Defendant's aforesaid acts constitute trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. §1114.

160.    Defendant's acts have caused, and will continue to cause, great and irreparable injury to Hermès, and unless such acts are restrained by this Court, he will continue, thereby causing Hermès to continue to suffer great and irreparable injury. Hermès has no adequate remedy at law.

161.    Hermès is informed and believes and thereon alleges that Defendant's infringement is both intentional and egregious.

162.    Hermès has no adequate remedy at law and are suffering irreparable harm and damage as a result of the aforesaid acts of Defendant in an amount thus far not determined.

163.    Upon information and belief, Defendant has obtained gains, profits and advantages as a result of his wrongful acts and will continue to do so in an amount thus far not determined.

**SECOND CAUSE OF ACTION**
**FALSE DESIGNATIONS OF ORIGIN,**
**FALSE DESCRIPTIONS AND REPRESENTATIONS**
**15 U.S.C. § 1125(a)**

164.    Hermès repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

165.    Defendant has, in connection with his goods, used in commerce, and continues to use in commerce, the BIRKIN Mark, the federally registered HERMÈS word mark, and the federally registered BIRKIN Trade Dress which tend falsely to describe the origin, sponsorship, association or approval by Hermès of the METABIRKINS NFTs sold by Defendant, despite repeated requests from Hermès stop such use.

166.     Defendants uses the METABIRKINS trademark, the federally registered HERMÈS word mark, and the federally registered BIRKIN Trade Dress with full knowledge of the falsity of such designations of origin, descriptions and representations, all to the detriment of Hermès.

167.     Defendant's use of the METABIRKINS trademark, the federally registered HERMÈS word mark, and the federally registered BIRKIN Trade Dress in connection with the sale and advertising of the infringing METABIRKINS NFTs constitutes false descriptions and representations tending to falsely describe or represent Defendant and METABIRKINS NFTs as being authorized, sponsored, affiliated or associated with Hermès.

168.     Defendant's use of the METABIRKINS trademark, the federally registered HERMÈS word mark, and the federally registered BIRKIN Trade Dress in connection with the sale and advertising of the infringing METABIRKINS NFTs misleads the purchasing public and is intended to trade upon the high-quality reputation of Hermès and to improperly appropriate to himself the valuable trademark rights of Hermès.

169.     Defendant's aforesaid acts constitute the use in commerce of false designations of origin and false and/or misleading descriptions or representations, tending to falsely or misleadingly describe and/or represent the METABIRKINS NFTs as those of Hermès in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

170.     Defendant's wrongful acts will continue unless enjoined by this Court.

171.     Hermès has no adequate remedy at law and is suffering irreparable harm and damage as a result of the aforesaid acts of Defendant in an amount thus far not determined.

172.     Upon information and belief, Defendant has obtained gains, profits and advantages as a result of his wrongful acts in an amount thus far not determined.

**THIRD CAUSE OF ACTION**
**FEDERAL TRADEMARK DILUTION**
**15 U.S.C. § 1125(c)**

173.    Hermès repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

174.    Hermès is the exclusive owner of the BIRKIN Mark as seen in Exhibit D.

175.    Defendant's use of the METABIRKINS trademark in connection with the sale and advertising of the infringing METABIRKINS NFTs constitutes Defendant's use in commerce of the BIRKIN Mark.

176.    The BIRKIN Mark has been used for decades, and is so globally recognized and associated with Hermès as the source of BIRKIN handbags that the BIRKIN mark is entitled to be recognized as famous and distinctive under 15 U.S.C. §1125(c).

177.    The BIRKIN Mark has come to have a secondary meaning indicative of origin, relationship, sponsorship and/or association with Hermès and its distinctive reputation for high quality.   The purchasing public is likely to attribute to Hermès, Defendant's use of the METABIRKINS mark as a source of origin, authorization and/or sponsorship for the METABIRKINS NFTs Defendant sells and further, purchase Defendant's METABIRKINS NFTs in the erroneous belief that Defendant is associated with, sponsored by or affiliated with Hermès, when Defendant is not.

178.    Hermès has not authorized or licensed the use of the BIRKIN Mark to Defendant.

179.    Defendant's unauthorized use of the METABIRKINS trademark in his marketing, sale and distribution of the METABIRKINS NFTs dilutes the distinctive quality of the BIRKIN Mark and the goodwill associated with it in violation of Section 43(a) of the Lanham Act, 15 U.S.C § 1125(c).

180.    Such conduct has injured Hermès and said injury will continue unless the Court enjoins Defendant from committing further wrongful acts.

181.    Upon information and belief, Defendant intentionally and willfully utilized the BIRKIN Mark to trade on Hermès' reputation and goodwill.

182.    Hermès has no adequate remedy at law and is suffering irreparable harm and damage as a result of the aforesaid acts of Defendant in an amount thus far not determined.

183.    Upon information and belief, Defendant has obtained gains, profits and advantages as a result of their wrongful acts in an amount thus far not determined.

**FOURTH CAUSE OF ACTION**
**CYBERSQUATTING UNDER THE ANTI-CYBERSQUATTING CONSUMER**
**PROTECTION ACT**
**15 U.S.C. § 1125(d)**

184.    Hermès repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

185.    The BIRKIN Mark is distinctive and achieved distinctiveness prior to Defendant's registering the Infringing Domain and prior to Defendant undertaking his infringing acts.

186.    The Infringing Domain name is confusingly similar to the BIRKIN Mark.

187.    Defendant registered and uses the Infringing Domain to profit from the BIRKIN Mark by advertising the infringing METABIRKINS NFTs through the Infringing Domain and creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of Defendant's website and the METABIRKINS NFTs by Hermès.

188.    Defendant's registration and use of the Infringing Domain is intended primarily to capitalize on the goodwill associated with the BIRKIN Mark.

189.    Defendant registered, trafficked in or used the Infringing Domain with bad faith intent to profit from the BIRKIN Mark and the associated goodwill of the BIRKIN Mark.

190.    The likely confusion resulting from Defendant's use of the Infringing Domain has harmed and continues to harm and dilute the distinctiveness of the BIRKIN Mark.

191.    Defendant's registration and use of the Infringing Domain cause consumers to falsely believe that the METABIRKINS Website and the infringing METABIRKINS NFTs sold under and in connection with said website are affiliated with, endorsed or approved by Hermès.

192.    Hermès has no adequate remedy at law and is suffering irreparable harm and damage as a result of the aforesaid acts of Defendant in an amount thus far not determined.

193.    Upon information and belief, Defendant has obtained gains, profits and advantages as a result of his wrongful acts in an amount thus far not determined.

### FIFTH CAUSE OF ACTION
### INJURY TO BUSINESS REPUTATION AND DILUTION
### NEW YORK GENERAL BUSINESS LAW § 360-1

194.    Hermès repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

195.    Hermès, on behalf of the general public, as well as for itself seek recovery from Defendant for violation of New York General Business Law § 360-1, et seq.

196.    By virtue of Defendant's unauthorized use of the METABIRKINS trademark, such use trading on the good will associated with Hermès and its BIRKIN Mark, Defendant has misled and will continue to mislead the public into assuming a connection between Hermès and Defendant's METABIRKINS NFTs.

197.    By falsely suggesting a connection with or sponsorship by Hermès, Defendant is likely to cause public confusion constituting unfair competition within the meaning of New York Business Law § 360-1.

198.     If such action on the part of Defendant continues, Hermès will suffer irreparable harm of a continuing nature for which there is no adequate remedy at law.

199.     Hermès has no adequate remedy at law and is suffering irreparable harm and damage as a result of the aforesaid acts of Defendant in an amount thus far not determined.

200.     Upon information and belief, Defendant has obtained gains, profits and advantages as a result of his wrongful acts in an amount thus far not determined.

**SIXTH CAUSE OF ACTION**
**COMMON LAW TRADEMARK INFRINGEMENT**

201.     Hermès repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

202.     Defendant's acts previously alleged herein constitute common law trademark infringement.

203.     Hermès is without adequate remedy at law, as Defendant's acts have caused Hermès irreparable harm to its business reputation, good will and stature in the business community.

204.     Hermès is informed and believes and thereon alleges that Defendant committed the above alleged acts oppressively, fraudulently, maliciously and in conscious disregard of Hermès' rights, and Hermès is therefore entitled to exemplary and punitive damages pursuant to the common law of the State of New York in an amount sufficient to punish, deter and make an example of Defendant.

205.     The manufacture, distribution and sale of the unauthorized and infringing METABIRKINS NFTs by Defendant are without any permission, license or other authorization from Hermès. The said unauthorized METABIRKINS NFTs are being distributed and sold in interstate commerce.

206.    Hermès has no adequate remedy at law and is suffering irreparable harm and damage as a result of the aforesaid acts of Defendant in an amount thus far not determined.

207.    Upon information and belief, Defendant has obtained gains, profits and advantages as a result of his wrongful acts in an amount thus far not determined.

### SEVENTH CAUSE OF ACTION
### MISAPPROPRIATION AND UNFAIR COMPETITION
### UNDER NEW YORK COMMON LAW

208.    Hermès repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

209.    Hermès owns protectable common law trademark rights in New York, in and to the BIRKIN Mark.

210.    Upon information and belief, Defendant intended to misappropriate the BIRKIN Mark when adopting the METABIRKINS trademark to create the association in the minds of consumers that the METABIRKINS NFTs are associated with Hermès' and its BIRKIN handbags.

211.    Defendant's misappropriation and use of the METABIRKINS trademark without Hermès' consent or authorization to sell and distribute the METABIRKINS NFTs in New York is likely to cause confusion and mistake in the minds of the public, leading the public to believe that the METABIRKINS NFTs emanate or originate from Hermès, or that Hermès has approved, sponsored or otherwise associated itself with Defendant, which is untrue.

212.    Defendant's aforesaid acts constitute misappropriation and infringement of Hermès' property rights, goodwill and reputation and unfair competition under the common law of the State of New York.

## PRAYER FOR RELIEF

WHEREFORE, Hermès demands judgment against Defendant as follows:

1.      Entering a judgment declaring that:

      A.      Hermès' Federally Registered Trademarks have been and continue to be infringed by Defendant in violation of 15 U.S.C. §1114(1);

      B.      Defendant's uses of the METABIRKINS mark constitutes federal unfair competition in violation of 15 U.S.C. §1125(a);

      C.      Defendant's uses of the METABIRKINS mark constitutes dilution by blurring in violation of 15 U.S.C. §1125(c);

      D.      Defendant had a bad faith intent to profit from the BIRKIN Mark and Defendant's use of the Infringing Domain constitutes cybersquatting in violation of 15 U.S.C. §1125(d);

      E.      Defendant's use of the METABIRKINS mark violates New York General Business Law § 360-1, New York common law trademark infringement, and New York unfair competition laws;

2.      That a permanent injunction be issued enjoining and restraining Defendant and his agents, servants, employees and attorneys and all those in active concert or participation with him, from:

      A.      Using any reproduction, copy, counterfeit, or colorable imitation of Hermès' Federally Registered Trademarks to identify any goods or the rendering of any services not authorized by Hermès;

B.  Engaging in any course of conduct likely to cause confusion, deception or mistake, or to injure Hermès' business reputation or dilute the distinctive quality of Hermès' name and Hermès' Federally Registered Trademarks;

C.  Using a false description or representation including words or other symbols tending to falsely describe or represent Defendant's unauthorized goods as being those of Hermès or sponsored by or associated with Hermès and from offering such goods into commerce;

D.  Further infringing Hermès' Federally Registered Trademarks by manufacturing, minting, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, renting, displaying or otherwise disposing of any products not authorized by Hermès bearing any simulation, reproduction, counterfeit, copy or colorable imitation of Hermès' Federally Registered Trademarks;

E.  Using any simulation, reproduction, counterfeit, copy or colorable imitation of Hermès' Federally Registered Trademarks in connection with the rental, promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of any unauthorized products in such fashion as to relate or connect, or tend to relate or connect, such products in any way to Hermès, or to any goods sold, manufactured, sponsored or approved by, or connected with Hermès, including but not limited to publishing links to www.hermes.com;

F.  Making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which can or

55

is likely to lead the trade or public, or individual members thereof, to believe that any products minted, manufactured, distributed, or sold by Defendant are in any manner associated or connected with Hermès, or is sold, manufactured, licensed, sponsored, approved or authorized by Hermès;

G.     Constituting an infringement of any of Hermès' Federally Registered Trademarks or of Hermès' rights in, or to use or to exploit, said Registered Trademarks, or constituting any dilution of Hermès' name, reputation or goodwill;

H.     Secreting, destroying, altering, removing, or otherwise dealing with the unauthorized products or any books or records which contain any information relating to the importing, manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, renting or displaying of all unauthorized products which infringe Hermès' Federally Registered Trademarks;

I.     Transferring, selling, offering for sale, or advertising any merchandise or NFTs under Hermès' Federally Registered Trademarks on the Internet or in e-commerce, including but not limited to all forms of social media;

J.     Using any reproduction, copy, counterfeit, or colorable imitation of Hermès' Federally Registered Trademarks as a trade name or a trademark to promote any product or business; and

K.     Effecting assignments or transfers, forming new entities or associations or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (A) through (I).

3.      Directing Defendant to transfer control of the smart contract which minted the METABIRKINS NFTs to Hermès or to a non-functional address on the Ethereum blockchain.

4.      Directing Defendant to modify the smart contract which minted the METABIRKINS NFTs to no longer point to the images currently associated with the METABIRKINS NFTs;

5.      Directing Defendant and all those in active concert or participation with him to burn the METABIRKINS NFTs in their possession custody or control.

6.      Directing Defendant to transfer the Infringing Domain name to Hermès.

7.      Directing Defendant to refrain from registering, using, or trafficking in any domain names or social media or NFT platform user names or handles that are identical or confusingly similar to Hermès' Federally Registered Trademarks, including but not limited to names containing Hermès' Federally Registered Trademarks and domain names containing misspellings of Hermès' Federally Registered Trademarks.

8.      Directing such other relief as the Court may deem appropriate to prevent the trade and public from deriving any erroneous impression that any products manufactured, sold or otherwise circulated or promoted by Defendant are authorized by Hermès or related in any way to Hermès' products.

9.      Directing Defendant, within thirty (30) days after the service of judgment upon it, with notice of entry thereof, to file with the Court, and serve upon Hermès, a written report under oath setting forth in detail the manner in which Defendant has complied with paragraphs I through IV above.

10.     Awarding to Hermès Defendant's profits from his unlawful acts herein alleged as Defendant's total sales of the METABIRKINS NFTs less any elements of cost or deductions proved by Defendant and allowed by law.

11.    Awarding to Hermès the damages from Defendant's unlawful acts herein alleged.

12.    Awarding to Hermès statutory damages of $100,000 for Defendant's violation of 15 U.S.C. § 1125(d)(1) pursuant to 15 U.S.C. § 1117(d).

13.    Pursuant to 15 U.S.C. § 1117(a), directing Defendant to pay Hermès all of the profits assessed pursuant to paragraph VI, *supra*, together with three times the amount of damages assessed pursuant to paragraph VII, *supra*, with prejudgment interest on the foregoing sums.

14.    Ordering that Hermès recover the costs of this action together with reasonable attorneys' and investigators' fees and prejudgment interest in accordance with 15 U.S.C. § 1117.

15.    Directing that this Court retain jurisdiction of this action for the purpose of enabling Hermès to apply to the Court at any time for such further orders and interpretation or execution of any order entered in this action, for the modification of any such order, for the enforcement or compliance therewith and for the punishment of any violations thereof.

16.    Awarding to Hermès such other and further relief as the Court may deem just and proper, together with the costs and disbursements which Hermès has incurred in connection with this action.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a trial by jury on all claims and issues so triable.

Dated: March 2, 2022                          Respectfully submitted,
       New York, New York


                                      **BAKER & HOSTETLER LLP**

Of Counsel:                                   By:   /s/ *Gerald J. Ferguson*
                                        Gerald J. Ferguson, Esq.
**BAKER & HOSTETLER LLP**                              Oren Warshavsky, Esq.
Deborah Wilcox, Esq. (*pro hac vice*)                  Kevin M. Wallace, Esq.
Key Tower                                              45 Rockefeller Plaza
127 Public Square                                      14th Floor
Suite 2000                                             New York, NY  10111
Cleveland, OH 44114                                    Telephone:   212.589.4200
Telephone: 216.621.0200                                Facsimile:   212.589.4201

                                        *Attorneys for Plaintiffs*