**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

HERMÈS INTERNATIONAL and
HERMÈS OF PARIS, INC.,

              Plaintiffs,

              v.

MASON ROTHSCHILD,

              Defendant.

No. 22-cv-00384-AJN-GWG

ECF Case

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MASON ROTHSCHILD'S**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

March 21, 2022

Rebecca Tushnet
Mark P. McKenna
Rhett O. Millsaps II
Christopher J. Sprigman
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY  10151
Tel:  (646) 898-2055
Email:  rhett@lex-lumina.com

*Attorneys for Defendant Mason Rothschild*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES…………………………………………………….................... iv

PRELIMINARY STATEMENT…………………………………………………………... 1

FACTUAL BACKGROUND...……………………….……………….……………... 2

ARGUMENT……………………………………………………………………..……... 4

    I.        THE STANDARD FOR A MOTION TO DISMISS……………………… 4

    II.      HERMÈS' TRADEMARK INFRINGEMENT CLAIMS MUST BE
           DISMISSED UNDER THE SECOND CIRCUIT'S HOLDING IN
           *ROGERS v. GRIMALDI*……………………………………………..….…... 4

          A.     Rothschild's Depictions of Birkin Bags and Use of the
              "MetaBirkins" Name are Artistically Relevant…...……..……... 7

          B.     Rothschild's Use is not Explicitly Misleading.…………………… 13

               1.     Explicitly Means Explicitly……………….…………... 13

               2.     Explicit Misleadingness is Not a Function of Confusion.…. 16

          C.     Rothschild's Sale of His Art Does Not Reduce its First
              Amendment Protection.……………………………………… 18

    III.    EVEN IF *ROGERS* DID NOT APPLY, *DASTAR* WOULD BAR
           HERMÈS' INFRINGEMENT CLAIMS HERE…………………..…… 20

    IV.    HERMÈS' TRADEMARK DILUTION CLAIMS MUST BE
           DISMISSED……………………………………………………….. 22

          A.     *Rogers* Applies to Hermès' Dilution Claims.………………… 22

          B.     Noncommercial Uses Do Not Dilute.…………………………... 22

          C.     Referential Uses Do Not Dilute.…………………………….... 23

    V.      HERMÈS' OTHER CLAIMS HAVE THE SAME FATAL FLAWS……. 24

CONCLUSION........................................................................................   25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AM General LLC v. Activision Blizzard, Inc.,*
　　450 F. Supp. 3d 467 (S.D.N.Y. 2020)…………………………………………..5, 7, 21, 22

*Ashcroft v. Iqbal,*
　　556 U.S. 662 (2009)…………………………………………………………………………….4

*Bolger v. Youngs Drug Prod's Corp.,*
　　463 U.S. 60 (1983)…………………………………………………………..……..……6

*Brown v. Elec. Arts, Inc.,*
　　724 F.3d 1235 (9th Cir. 2013)…………………………………………….…………...6, 8, 14, 17

*Brown v. Ent. Merch. Ass'n,*
　　564 U.S. 786 (2011)……………………………………………………...……….16, 19

*Brown v. Showtime Networks, Inc.,*
　　394 F. Supp. 3d 418 (S.D.N.Y. 2019)……………………………………………………15

*Chambers v. Time Warner, Inc.,*
　　282 F.3d 147 (2d Cir. 2002)………………………………………………..…………4

*City of Lakewood v. Plain Dealer Publ'g Co.,*
　　486 U.S. 750 (1988)………………………………………………………...……19

*Cliffs Notes v. Bantam Doubleday Dell Publ. Group,*
　　886 F.2d 490 (2d Cir. 1989)……………………………………………………………5, 16

*Cohen v. California,*
　　403 U.S. 15 (1971)…………………………………………………………...…6

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
　　539 U.S. 23 (2003)……………………………………………………………………20, 21

*DiFolco v. MSNBC Cable LLC,*
　　622 F.3d 104 (2d Cir. 2010)…………………………………………………………….4

*Dr. Seuss Enters., L.P. v. Comicmix LLC,*
　　983 F.3d 443 (9th Cir. 2020)……………………………………………...…14

*Ebony Media Operations, LLC v. Univision Commc'ns Inc.,*
　　No. 18-cv-11434-AKH, 2019 WL 8405265 (S.D.N.Y. June 3, 2019)…………………25

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
547 F.3d 1095 (9th Cir. 2008)……………………………………………………6, 8, 14

*ETW Corp. v. Jireh Publ'g, Inc.*,
332 F.3d 915 (6th Cir. 2003)…………………………………………………...6, 20

*Everdry Marketing and Management, Inc. v. Delves & Giufre Enterprises, Inc.*,
319 F. Supp. 3d 626 (W.D.N.Y. 2018)……………………………………………3

*Jackson v. Netflix, Inc.*,
506 F. Supp. 3d 1007 (C.D. Cal. 2020)……………………………………………22, 25

*Lamparello v. Falwell*,
420 F.3d 309 (4th Cir. 2005)………………………………………………...…24, 25

*L.L. Bean, Inc. v. Drake Publishers, Inc.*,
811 F.2d 26 (1st Cir. 1987)………………………………………………………23

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,
156 F. Supp. 3d 425 (S.D.N.Y. 2016)………...…………………………………...9, 23

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,
674 Fed.Appx. 16 (2d Cir. 2016)…………………………………………………9

*Louis Vuitton Malletier S.A. v. Warner Bros. Entm't*,
868 F. Supp. 2d 172 (S.D.N.Y. 2012)…………………………………………..*passim*

*Mattel, Inc. v. MCA Records, Inc.*,
296 F.3d 894 (9th Cir. 2002)…………………………………………………*passim*

*Mattel, Inc. v. Walking Mountain Prods.*,
353 F.3d 792 (9th Cir. 2003)………………………………………………6, 11, 20

*Move Press, LLC v. Peloton Interactive*,
No. LA CV18-01686 JAK (RAOx), 2019 WL 4570018 (C.D. Cal. Sept. 5, 2019)……...18

*Parks LLC v. Tyson Foods, Inc.*,
863 F.3d 220 (3d Cir. 2017)………………………………………………………25

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Rel.*,
413 U.S. 376 (1973)……………...……………………………………………19

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)………........……………………………………………16

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988)……………………………………………………….…5

*Rogers v. Grimaldi*,
    695 F. Supp. 112 (S.D.N.Y. 1988)…………………………………………..25

*Rogers v. Grimaldi*,
    875 F.2d 994 (2d Cir. 1989)…………………………………………………*passim*

*Smith v. California*,
    361 U.S. 147 (1959)……………………………………………………...19

*Smith-Kline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
    No. 1 Civ. 2775 (DAB), 2001 WL 588846 (S.D.N.Y. June 1, 2001)……………………..14

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
    736 F.3d 198 (2d Cir. 2013)………………………………………………23

*Tiffany (NJ) Inc. v. eBay Inc.*,
    600 F.3d 93 (2d Cir. 2010)………………………………………………23

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
    497 F.3d 144 (2d Cir. 2007)………………………………………………14

*Twentieth Century Fox Television v. Empire Dist. Inc.*,
    875 F.3d 1192 (9th Cir. 2017)……………………………………………...6, 11, 12

*Twin Peaks Productions, Inc. v. Publ'ns Intern., Ltd.*,
    996 F.2d 1366 (2d Cir. 1993)……………………………………..………16, 17, 21

*Univ. of Alabama Bd. of Tr. v. New Life Art, Inc.*,
    683 F.3d 1266 (11th Cir. 2012)……………………………………………...6, 17

*VIP Products LLC v. Jack Daniel's Properties, Inc.*,
    953 F.3d 1170 (9th Cir. 2020)………………………………………………...6

*Yankee Publ'g Inc. v. News America Publ'g Inc.*,
    809 F. Supp. 267 (S.D.N.Y. 1992)………………………………………16, 22

**Statutes**

15 U.S.C. § 1125(c)(2)(B)…………………………………………………………23

15 U.S.C. § 1125(c)(3)(C)…………………………………………………………22

15 U.S.C. § 1125(d)(1)(A)(i)……………………………………………………………24

15 U.S.C. § 1125(d)(1)(B)(i)(IV)……………………………………………………...24

**Rules**

Fed. R. Civ. P. 12(b)(6)……………………...……………………………………1, 4, 25

**Treatises & Other**

Alex Kozinski, *Trademarks Unplugged*,
 68 N.Y.U. L. Rᴇᴠ. 960 (1993)…………………………………………..………9

Stacey L. Dogan & Mark A. Lemley, *Parody as Brand*,
 47 U.C. Dᴀᴠɪs L. Rᴇᴠ. 473 (2013)…………………………………………….……..9

William McGeveran, *The Imaginary Trademark Parody Crisis (and the Real One)*,
 90 Wᴀsʜ L. Rᴇᴠ. 713 (2015)……………………………………………………..18

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Mason Rothschild submits this memorandum in support of his motion to dismiss the amended complaint of Plaintiffs Hermès International and Hermès of Paris, Inc. ("Hermès") in its entirety for failure to state a claim.

## PRELIMINARY STATEMENT

Mason Rothschild is an artist who has created a series of digital artworks that depict and comment on Hermès' "Birkin" handbags. Each of the 100 works in Rothschild's "MetaBirkins" series is a unique, fanciful interpretation of a Birkin bag. Rothschild's art is made with pixels, but the bags are depicted as fur covered. This aspect of Rothschild's art comments on the animal cruelty inherent in Hermès' manufacture of its ultra-expensive leather handbags. These images, and the NFTs that authenticate them, are not handbags; they carry nothing but meaning.

Knowing that well-settled Second Circuit law protects Rothschild's ability to make and sell his digital artwork, *see Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), Hermès insists that Rothschild's art project doesn't count as art because he markets the digital artworks by name and sells those artworks by way of non-fungible tokens (NFTs), which can then be re-sold by their owners. But none of those facts makes a difference.

Under *Rogers*, Rothschild has the right to make and sell art that depicts branded products, and he has the right to identify his depictions of Birkin bags as "MetaBirkins"—a name that both refers to the context in which he makes the art available (*i.e.*, the online, virtual environment popularly dubbed the "Metaverse") and alludes to his artwork's "meta" commentary on the Birkin bag and the fashion industry more generally.

Rothschild's art does not lose its First Amendment protection just because he sells it: almost every case in which courts have applied *Rogers*—including *Rogers* itself—has involved

speech that was sold. Nor does it matter that Rothschild sells each digital artwork with an NFT, the technological means by which Rothschild authenticates his artworks: Rothschild's First Amendment rights do not depend on *how* he sells his art any more than they depend on *whether* he sells it.

Hermès wants to stop Rothschild from creating fanciful pictures that comment on its handbags, from calling those artworks "MetaBirkins," and from promoting those artworks. But trademark law does not give Hermès control over Rothschild's art. Nor can it. The First Amendment guarantees Rothschild's right to respond in the marketplace of ideas to the inescapable corporate brand messages by which we are bombarded every day, virtually everywhere we look. Hermès' claims should be dismissed.

## FACTUAL BACKGROUND

Hermès is a designer, producer, and international purveyor of luxury goods, including handbags, apparel, scarves, jewelry, fashion accessories, and home furnishings. Amended Complaint (Dkt. No. 24) ("Compl.") ¶¶ 27-32.[1] Hermès sells "Birkin" handbags at prices that range from "from thousands of dollars to over one hundred thousand dollars." *Id*. ¶ 37. Hermès boasts that its Birkin handbag has become a "symbol of rarefied wealth" and has "withstood trends and WEATHERED SEASONS to become an INDELIBLE PART of the CULTURE." *Id*. ¶¶ 40, 43 & Exs. G, I (emphasis in original). Hermès owns trademark rights in the Hermès and Birkin marks and trade dress rights in the Birkin handbag design. *Id*. ¶¶ 34-36.

Rothschild is an artist who resides in California. In or around May 2021, Rothschild created and sold a digital artwork that he called "Baby Birkin," a digital image depicting a 40-

---

[1] Solely for the purposes of this motion to dismiss, Rothschild does not dispute facts alleged in the Complaint.

week-old fetus gestating inside of a transparent Birkin handbag. *Id*. ¶¶ 70-71, Fig. 4. Rothschild

sold the "Baby Birkin" artwork as a digital image online connected to a digital non-fungible

token (NFT); the work initially sold for $23,500 and then resold for $47,000. *Id*. ¶ 72.

      NFTs are "unique and non-fungible (i.e., non-interchangeable) units of data stored on a

blockchain just as cryptocurrencies (which are fungible) are stored on a blockchain." *Id*. ¶ 4.

NFTs "can be created to transfer ownership of any physical thing or digital media, including an

actual handbag or the image of a handbag." *Id*. Merriam-Webster defines an NFT as "a unique

digital identifier that cannot be copied, substituted, or subdivided, that is recorded in a

blockchain, and that is used to certify authenticity and ownership (as of a specific digital asset

and specific rights relating to it)," and also as "the asset that is represented by a non-fungible

token."[2]

      In or around December 2021, Rothschild created and sold a series of digital artworks that

he called "MetaBirkins." Compl. ¶¶ 76, 79, Fig. 5 & Ex. Z. Each of the 100 images in

Rothschild's "MetaBirkins" series is a unique, fanciful interpretation of a Birkin bag. While

Rothschild's art is made with pixels and exists only online, the images he creates depict the bags

as fur covered—in contrast to actual Birkin handbags, which are made from the tanned hides of

slaughtered animals. *Id*. ¶¶ 37, 76, 79, Fig. 5 & Ex. Z. As with "Baby Birkin," Rothschild sold

his "MetaBirkins" artworks using NFTs. *Id*. ¶¶ 79-80. Thus, the NFTs at issue here signify

ownership of an image of a handbag. *Id.* Notably, Hermès does not allege that Rothschild has

ever made, offered, or distributed any physical handbags using the Birkin name or trade dress.

---

[2] "Non-fungible token." *Merriam-Webster.com Dictionary*, Merriam-Webster,
https://www.merriam-webster.com/dictionary/non-fungible%20token. Accessed March 20, 2022.
*See Everdry Marketing and Management, Inc. v. Delves & Giufre Enterprises, Inc*., 319 F. Supp.
3d 626, 632 n.1 (W.D.N.Y. 2018) (taking judicial notice of dictionary definitions).

## ARGUMENT

## I.    THE STANDARD FOR A MOTION TO DISMISS

When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all well-pleaded facts alleged in the complaint that "plausibly give rise to an entitlement for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss. *Id.* at 678.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

## II.    HERMÈS' TRADEMARK INFRINGEMENT CLAIMS MUST BE DISMISSED UNDER THE SECOND CIRCUIT'S HOLDING IN *ROGERS v. GRIMALDI*

Rothschild's fanciful depictions of fur-covered Birkin bags and his identification of his artworks as "MetaBirkins" are artistically relevant and do not explicitly mislead about their source or content. Hermès' claims therefore must be dismissed under *Rogers v. Grimaldi*.

In *Rogers*, the Second Circuit rejected a claim by legendary actress and dancer Ginger Rogers that the use of her name in the title of the motion picture *Ginger and Fred* infringed her rights in her name. 875 F.2d 994. The Second Circuit held that where the defendant's product is artistic or expressive, the Lanham Act must be interpreted "narrowly in order to avoid suppressing protected speech under the First Amendment." *Id*. at 998; *see also id*. ("Titles, like the artistic works they identify, are of a hybrid nature, combining artistic expression and commercial promotion. The title of a movie may be both an integral element of the film-maker's

expression as well as a significant means of marketing the film to the public. The artistic and commercial elements of titles are inextricably intertwined.").

The *Rogers* rule is a clear one: use of a trademark in noncommercial speech[3] is not actionable unless it "*has no artistic relevance to the underlying work whatsoever*, or if it has some artistic relevance, unless [the use of the trademark] *explicitly misleads* as to the source or content of the work." *Id.* (emphasis added).

While *Rogers* focused specifically on the use of a celebrity's name in the title of a film, the content of the film at issue also made substantial use of Rogers' name, and the content of the movie was the reason the title was artistically relevant. *Id.* at 1001. Understandably, the Second Circuit has since held that the *Rogers* test applies not only to titles but "is generally applicable to Lanham Act claims against works of artistic expression." *Cliffs Notes v. Bantam Doubleday Dell Publ. Group*, 886 F.2d 490, 495 (2d Cir. 1989) (reversing as a matter of law district court injunction against "Spy Notes" parody of "Cliffs Notes"); *see also AM General LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 477 (S.D.N.Y. 2020) (applying *Rogers* to appearance of distinctive vehicle in videogame and granting summary judgment to defendant); *Louis Vuitton Malletier S.A. v. Warner Bros. Entm't*, 868 F. Supp. 2d 172 (S.D.N.Y. 2012) (applying *Rogers* to use of fake Louis Vuitton bag in a movie, and to character's reference to that bag as a "Lewis Vuitton," and granting defendant's motion to dismiss).

*Rogers* has been widely adopted in other circuits to cover all uses of trademarks in noncommercial speech—that is, speech that, while sold for profit, does more than simply

---

[3] Whenever the commercial aspects of a work are intertwined with artistic content, the First Amendment dictates that the trademark-using speech must be treated as noncommercial. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) ("[W]e do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech").

propose a commercial transaction. *Bolger v. Youngs Drug Prod's Corp.*, 463 U.S. 60, 66 (1983). *See, e.g., VIP Products LLC v. Jack Daniel's Properties, Inc.*, 953 F.3d 1170 (9th Cir. 2020) (applying *Rogers* to for-profit parody dog toys designed to look like Jack Daniel's bottles); *Twentieth Century Fox Television v. Empire Dist. Inc.*, 875 F.3d 1192, 1198 (9th Cir. 2017) (same for name of for-profit television series and related merchandise); *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1241-42 (9th Cir. 2013) (same for use of plaintiff's likeness in for-profit video games); *Univ. of Ala. Bd. of Tr. v. New Life Art, Inc.*, 683 F.3d 1266, 1278 (11th Cir. 2012) (same for paintings, prints, and calendars that depicted a university's football uniforms and were sold for profit); *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 796 (9th Cir. 2003) (same for use of "Barbie" trademark and trade dress in title and content of photograph series sold for profit); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 928 (6th Cir. 2003) (same for use of trademark in for-profit artwork, packaging, and narrative accompanying artwork); *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008) (same for for-profit video game: *Rogers* "also appl[ies] to the use of a trademark in the body of the work"); *MCA*, 296 F.3d at 902 (rejecting trademark claims based on use of "Barbie" trademark in for-profit song title and content).

Courts' use of *Rogers* to assess trademark claims relating to the content of expressive works in addition to their titles is only logical. Compared to titles, consumers are even less likely to be misled regarding source or sponsorship by the expressive content of a work, diminishing the consumer protection interest at stake. On the other side of the balance, the artist's First Amendment interest in choosing relevant aspects of the world to depict in the substance of a work is at least as weighty as the interest in choosing a title. *Cf. Cohen v. California*, 403 U.S.

15, 26 (1971) ("[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process.")

Nothing about the use of NFTs to authenticate Rothchild's MetaBirkins artworks changes the applicability of *Rogers*. While NFTs could, in theory, be used to authenticate the ownership of anything—including cars or coins or other assets having nothing to do with Hermès—here Hermès pleads that these NFTs are attached to images of MetaBirkins, which are artistic renderings of Birkin bags.[4]

*Rogers* thus applies to Hermès' claims regarding Rothschild's digital artwork depicting and commenting on Birkin bags, his use of "MetaBirkins" as the name of his art project, and his use of that name to refer to his artworks and art projects on Instagram, Twitter, and elsewhere. Under *Rogers*, all of Rothschild's uses are protected: they are artistically relevant and not explicitly misleading.

### A. Rothschild's Depictions of Birkin Bags and Use of the "MetaBirkins" Name are Artistically Relevant.

Under the first prong of the *Rogers* test, "courts must determine whether the use of the trademark has any artistic relevance whatsoever." *AM General*, 450 F. Supp. 3d at 477 (quoting *Rogers*, 875 F.2d at 999). As courts in this Circuit have repeatedly noted, the requirement of minimal artistic relevance "is not unduly rigorous out of the understanding that the 'overextension of Lanham Act restrictions … might intrude on First Amendment values.'" *Id.* (quoting *Rogers*, 875 F.2d at 998); *see also Rogers*, 875 F.2d at 999 (describing the

---

[4] Hermès alleges that, "[o]nce purchased from an NFT marketplace, some NFTs can be used in connection with the metaverse. NFTs can link to digital media like virtual fashion items that can be worn in virtual worlds online." Compl. ¶ 66. But whether that is true generally has no bearing on this case. Hermès does not and cannot allege that *these MetaBirkins* can be worn or used in virtual worlds.

"appropriately low threshold of minimal artistic relevance"); *Louis Vuitton*, 868 F. Supp. 2d at 178 (describing the artistic relevance threshold as "purposely low"). According to the Ninth Circuit, which adopted *Rogers* and has applied it to a wide range of noncommercial speech, artistic relevance must simply be "more than zero." *See, e.g.*, *E.S.S.*, 547 F.3d 1095. *See also Brown*, 724 F.3d at 1245 ("This black-and-white rule has the benefit of limiting [a court's need] to engage in artistic analysis in this context.").

There can be no doubt that Rothschild's depictions of Birkin bags in his artwork, and the use of the "MetaBirkins" name to explain what he has depicted, easily exceed this low threshold of artistic relevance.[5] Artists generally are free to choose the topics they address and to depict objects that exist in the world as they see them. Rothschild's fanciful "MetaBirkins" depict furry Birkin bags, reflecting his comment on the fashion industry's animal cruelty and the movement to find leather alternatives. The digital images invite viewers to consider the difference between the material objects—made of animal skins in reality—and the fantasized, immaterial images with their faux fur. Rothschild's images show luxury with no function but communication, luxury emptied of anything but its own image, calling into question what it is that luxury lovers actually pay for. Rothschild is not attacking the Birkin, but inviting consideration of its meaning as an image, rather than as a handbag.

Well-known brands have long been the subject of such artistic reflection and commentary. Andy Warhol famously depicted iconic brands, including Campbell's Soup and Coca-Cola, in stylized but plainly recognizable form.

---

[5] Hermès itself concedes that "a digital image connected to an NFT may reflect some artistic creativity…" Compl. ¶ 9.



In recent years, the significance of branding to popular culture has only grown, making brands even larger parts of our common cultural vocabulary. As Judge Furman recognized in evaluating a parody of Louis Vuitton's well-known handbags, the message of invoking a well-known luxury brand derives from "the features of the [product] itself, society's larger obsession with status symbols, *and* the meticulously promoted image of expensive taste (or showy status) that [those luxury products] have, to many, come to symbolize." *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425, 436 (S.D.N.Y. 2016), *aff'd*, 674 Fed.Appx. 16 (2d Cir. 2016) (emphasis in original).

An artist's choice of which brands to depict is itself a reflection of that artist's view of the world, and art reproducing brands can illuminate how much power brands have over people in our society. *See MCA*, 296 F.3d at 900 (recognizing the importance of brand references in modern social discourse); Stacey L. Dogan & Mark A. Lemley, *Parody as Brand*, 47 U.C. DAVIS L. REV. 473, 486 (2013) (speech about brands is "a valuable form of social commentary" that "invites critical reflection on the role of brands in society and the extent to which we define ourselves by them") (footnotes omitted); Alex Kozinski, *Trademarks Unplugged*, 68 N.Y.U. L. REV. 960, 973 (1993) ("Trademarks are often selected for their effervescent qualities, and then injected into the stream of communication with the pressure of a firehose by means of mass

media campaigns. Where trademarks come to carry so much communicative freight, allowing the trademark holder to restrict their use implicates our collective interest in free and open communication.").

As controlling case law in this Circuit makes clear, the artist's choice of subject matter determines artistic relevance. In *Rogers,* the Second Circuit held the title "Ginger and Fred" artistically relevant because the central characters in the film were nicknamed "Ginger" and "Fred." 875 F.2d at 1001. Importantly, the film was not about Ginger Rogers and Fred Astaire— the characters were fictional and the filmmaker could have chosen different names, but the names were "not arbitrarily chosen just to exploit the publicity value of their real-life counterparts but instead ha[d] genuine relevance to the film's story." *Id.*; *see also id.* at 998 ("Filmmakers and authors frequently rely on word-play, ambiguity, irony, and allusion in titling their works. Furthermore, their interest in freedom of artistic expression is shared by their audience. The subtleties of a title can enrich a reader's or viewer's understanding of a work."). Indeed, because use of Ginger Rogers' name was clearly artistically relevant and did not explicitly mislead, the court rejected her claim despite survey and anecdotal evidence of consumer confusion. *Id.* at 1001; *see also id.* at 997 (discussing publicists' initial confusion about the movie).

Similarly, in *Louis Vuitton*, the court considered the use of a knock-off Louis Vuitton bag coupled with a character's humorous mispronunciation of the brand in the movie *The Hangover: Part II*. 868 F. Supp. 2d at 178. In concluding that the use met the "low threshold" of artistic relevance, the court noted that the brief scene was able to effectively portray the character as "snobbish" and "socially inept and comically misinformed" precisely "because the public signifies Louis Vuitton . . . with luxury and a high society lifestyle." *Id.*; *see also Walking*

10

*Mountain*, 353 F.3d at 807 (finding "Food Chain Barbie" series title and titles of specific works referencing Barbie artistically relevant because they referred to artist's photographs, which depicted Barbie).

Hermès attempts to avoid *Rogers* by alleging that Rothschild's identification of his art project by the MetaBirkins name and his use of that name for social media and online accounts dedicated to the art project constitutes "trademark use" of the Birkins mark. *See* Compl. ¶ 6. But there is no "trademark use" exclusion from *Rogers*. The doctrine applies to claims against the name or content of expressive works, and every single one of the uses Hermès identifies refers to the MetaBirkins digital artworks. It bears repeating that Hermès does not and cannot allege any uses unrelated to the artworks. Hermès alleges only that Rothschild markets his art by name and uses the obvious modern authentication and promotional tools to do so.[6]

*Ginger and Fred* was widely marketed by its title, using the marketing channels available at the time, and *Rogers* specifically considered both the marketing functions of titles and the steps that the defendant took to promote the film. *Rogers*, 875 F.2d 998; *id.* at 1005 (Griesa, J., concurring) (noting that Rogers devoted significant effort to challenging defendants' acts in "promoting and advertising the Film," not just to its title). That marketing now involves authentication using an associated NFT and promotion via social media changes nothing. *See Empire*, 875 F.3d at 1196 (*Rogers* protected various methods of promoting TV show, including "appearances by cast members in other media, radio play, online advertising, live events, and the sale or licensing of [promotional merchandise]"); *Louis Vuitton*, 868 F. Supp. 2d at 175

---

[6] Hermès also suggests that *Rogers* doesn't apply because Rothschild used the MetaBirkins name for the collection of digital artworks rather than individual artworks. *See* Compl. ¶ 10. This too is a distinction without a difference. *See Walking Mountain*, 353 F.3d at 807 (applying *Rogers* to series title); *New Life*, 683 F.3d at 1278 (same for use to identify multiple artworks).

(dismissing Louis Vuitton's claims against a movie despite its claim that its harm was "exacerbated by the prominent use of the aforementioned scenes and the LVM Marks in commercials and advertisements for the [F]ilm," and that the "Lewis Vuitton" line has "become an oft-repeated and hallmark quote from the movie"). In short, Hermès cannot avoid *Rogers* just because Rothschild markets his art any more than it can avoid *Rogers* by repeating the fact that Rothschild sells the art.

Hermès also alleges that Rothschild uses the MetaBirkins name as a trademark for his NFT projects because he invited MetaBirkins fans to submit MetaBirkin designs on the MetaBirkin Discord channel and because of a few references to new collaborations on the MetaBirkins Instagram page and the page of a collaborator. *See* Compl. ¶¶ 134-143. The allegations regarding the "Build-A-MetaBirkin" concept relate to an extension of the project—an invitation to design new MetaBirkin artworks. The allegations regarding "I Like You You're Weird" are no better. Those referential Instagram comments and the postings by his collaborator are analogous to a statement that a new movie was "brought to you by the producers of Ginger and Fred." *Cf. Empire*, 875 F.3d at 1196-97 (rejecting plaintiff's claims regarding Twentieth Century Fox's use of the Empire mark "as an umbrella brand to promote and sell music and other commercial products"; those promotional activities "including those that generate[d] revenue, [were] auxiliary to the television show and music releases, which [laid] at the heart of its 'Empire' brand").[7]

---

[7] The fact that Rothschild objected to counterfeit MetaBirkins also does not convert the MetaBirkins project into commercial speech that falls outside of *Rogers*. *See* Compl. ¶ 12. Ginger Rogers wouldn't have had a better claim against the producers of *Ginger and Fred* if they had objected to infringing copies of the film.

**B.      Rothschild's Use is not Explicitly Misleading.**

**1.    Explicitly Means Explicitly.**

Where the use of a trademark has some artistic relevance, as it does here, *Rogers*

provides that the Lanham Act can be applied only if the use of the trademark "explicitly misleads

as to the source of the work." 875 F.2d at 999. But where the "artistic relevance" test set a low

bar, this exception sets a high bar. Specifically, for the Lanham Act to apply to an expressive

work, the use must be *explicitly* misleading; implicit suggestions are not enough.

In *Rogers*, the Second Circuit gave examples that illustrate the narrowness of the concept

of "explicitly misleading." Explicitly misleading titles would be "Nimmer on Copyright" for a

treatise that was not authored by Nimmer, or "Jane Fonda's Workout Book" for a book Jane

Fonda had nothing to do with. *Id.* Likewise, titles containing references that falsely and explicitly

claimed endorsement—*e.g.*,"an authorized biography"—might be actionable. *Id*.

The *Rogers* court contrasted those explicitly misleading uses with the "many titles" that

"include a well-known name without any overt indication of authorship or endorsement—for

example, the hit song 'Bette Davis Eyes,' and the film 'Come back to the Five and Dime, Jimmy

Dean, Jimmy Dean.'" *Id*. "To some people, th[o]se titles might implicitly suggest that the named

celebrity had endorsed the work or had a role in producing it." *Id*. at 999-1000. But "the slight

risk that such use of a celebrity's name might implicitly suggest endorsement or sponsorship to

some people is outweighed by the danger of restricting artistic expression, and the Lanham Act is

not applicable." *Id*. at 1000. As the Ninth Circuit has explained:

> If we see a painting titled 'Campbell's Chicken Noodle Soup,' we're unlikely to believe
> that Campbell's has branched into the art business. Nor, upon hearing Janis Joplin croon
> "Oh Lord, won't you buy me a Mercedes–Benz?," would we suspect that she and the
> carmaker had entered into a joint venture. A title tells us something about the underlying
> work but seldom speaks to its origin.

*MCA*, 296 F.3d at 902.

These examples make clear that explicit misleadingness cannot be established by use of the mark alone. Indeed, "if the use of a mark alone were sufficient 'it would render *Rogers* a nullity.'" *Brown*, 724 F.3d at 1245 (quoting *MCA*, 296 F.3d at 902); *see also E.S.S.*, 547 F.3d at 1100 ("[T]he mere use of a trademark alone cannot suffice to make such use explicitly misleading."); *Dr. Seuss Enters., L.P. v. Comicmix LLC*, 983 F.3d 443, 462-63 (9th Cir. 2020) (concluding that the copying of distinctive elements of Dr. Seuss books was not explicitly misleading where the actual creator was disclosed).

For these reasons, Rothschild's titling of his artwork as "MetaBirkins" cannot, in itself, be "explicitly misleading," even if some people might take the name to implicitly suggest that Hermès had "endorsed the work or had a role in producing it." *Rogers*, 875 F.2d at 999-1000. *Rogers* specifically held that, where there is a "mixture of meanings, with the possibly misleading meaning not the result of explicit misstatement," there is no claim. *Id*. at 1001.

In sum, *Rogers* "insulates from restriction titles [and works] with at least minimal artistic relevance that are ambiguous or only implicitly misleading." *Id*. at 1000. And even when the artist is referring to the trademark claimant (as in *Rogers* itself), a use is not explicitly misleading when it requires the reader to draw an inference that there is a sponsorship or endorsement relationship between the parties, rather than making that assertion explicitly and directly.[8]

---

[8] Courts' treatment of this distinction between explicit and implicit claims in Lanham Act § 43(a)(1)(B) false advertising cases is consistent with the treatment of ambiguity in *Rogers* and can further guide the analysis here. *Cf. Time Warner Cable, Inc. v. DIRECTV, Inc*., 497 F.3d 144, 158 (2d Cir. 2007) ("[O]nly an unambiguous message can be explicitly false. Therefore, if the language or graphic is susceptible to more than one reasonable interpretation, the[n it] . . . cannot be literally false."); *Smith-Kline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharms. Co*., No. 1 Civ. 2775 (DAB), 2001 WL 588846, at *8 (S.D.N.Y. June 1, 2001) (ads with "several plausible meanings" cannot be explicitly false).

There is nothing explicitly misleading about Rothschild's depictions of Birkin bags or his use of the "MetaBirkins" name as the title of his art project. Nor is Rothschild's use of the term on his website, his Instagram page, or his Twitter feed explicitly misleading. Indeed, as the screenshot below shows, the landing page of the MetaBirkins website clearly identifies MetaBirkins as Mason Rothschild's art project, in partnership with Basic.Space (not Hermès), and it describes the MetaBirkins as "inspired by the acceleration of fashion's 'fur free' initiatives and embrace of alternative textiles."



Compl. ¶ 94, Fig. 9 & Ex. U.

Reaching to characterize the website as something other than what it obviously is—a site dedicated to Rothschild's MetaBirkins art project—Hermès argues that the fact that the animated "Not Your Mother's Birkin" text does not all appear at the same time means that some hypothetical website user could have hovered over the website in a way that would not have revealed the entire phrase. *See* Compl. ¶ 96. But this speculation falls far short of pleading any explicitly misleading statements.[9] There also is nothing explicitly misleading about the social

---

[9] The court can consider the website itself for assessing plausibility. *See*, *e.g.*, *Brown v. Showtime Networks, Inc.*, 394 F.Supp.3d 418, 436 (S.D.N.Y. 2019) (content of film integral to

media accounts for the MetaBirkins art project, which clearly disclose their creator, Mason Rothschild. *See* Compl. ¶¶ 83, 87, Figs. 6, 8, & Exs. AB, AE. No matter how many times Hermès identifies the Birkin component of the MetaBirkins name, it does not and cannot identify a single explicitly misleading statement.

The incoherence of Hermès' allegations of explicit misleadingness is perhaps best captured by the fact that Hermès claims simultaneously that Rothschild's *use* of a disclaimer on the MetaBirkins website is explicitly misleading because it identifies Hermès by name and points to the official Hermès website, *see* Compl. ¶¶ 104-105, and that his *failure* to use a disclaimer on the MetaBirkins Instagram page is explicitly misleading. *See id*. ¶ 86.

Hermès' real objection is to the art project; the name "MetaBirkins" itself makes no explicit claims about the source of the art. Any inference a consumer might draw about the relationship between the "MetaBirkins" artworks and Hermès is not due to anything "explicitly misleading" in Rothschild's uses of the "MetaBirkins" title, and, as a consequence, Rothschild's First Amendment speech rights must take precedence over Hermès' trademark complaints.[10]

## 2.  Explicit Misleadingness is Not a Function of Confusion.

Whether the defendant's use of the mark is explicitly misleading is not a function of the amount of possible confusion. Some lower courts in this Circuit have cited *Twin Peaks Productions, Inc. v. Publ'ns Intern., Ltd.*, 996 F.2d 1366 (2d Cir. 1993), for the proposition that

---

infringement complaint; "The Court will consider the film itself—not the parties' characterizations of what it shows.").

[10] Even if *Rogers* did not apply, the First Amendment would require a remedy other than suppression of speech, such as a disclaimer. Noncommercial speech can be regulated only if the government's interest is compelling and the regulation is the least restrictive means of addressing that interest. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011); *Reed v. Town of Gilbert*, 576 U.S. 155, 155-56 (2015). Thus, the First Amendment protects similar titles against confusion claims where the speaker provides means to distinguish the works. *See Cliffs Notes*, 886 F.2d at 496; *Yankee Publ'g Inc. v. News America Publ'g Inc.*, 809 F. Supp. 267, 279-80 (S.D.N.Y. 1992).

explicit misleadingness must be assessed, in the first instance, by way of the *Polaroid* factors. *See, e.g., Louis Vuitton*, 868 F. Supp. 2d at 179. But *Twin Peaks* involved a situation that *Rogers* itself clearly exempted from the *Rogers* rule: title-versus-title conflicts. The *Twin Peaks* "quick look" *Polaroid* approach applies, by its own terms, when the plaintiff claims rights in the title of an artistic work, not a consumer good like a handbag. *Rogers* itself did not perform even a "quick look" *Polaroid* analysis. Instead, the Second Circuit rejected Rogers' claim despite survey evidence showing that a not insubstantial percentage of the public misunderstood Rogers' involvement in the film, because that misunderstanding was "not engendered by any overt claim." 875 F.2d at 1001; *cf. Brown*, 724 F.3d at 1245 (holding that survey evidence showing that the majority of consumers believe that identifying marks cannot be included in games without permission "changes nothing" in the *Rogers* analysis in the absence of an explicitly misleading affirmative claim).[11]

As the Ninth Circuit said, "[t]he [*Rogers*] test requires that the use be explicitly misleading to consumers. To be relevant, evidence must relate to the nature of the behavior of the identifying material's user, not the impact of the use." *Brown*, 724 F.3d at 1245-46; *Twentieth Century Fox*, 875 F.3d at 1199 ("We must ask not only about the likelihood of consumer confusion but also whether there was an explicit indication, overt claim, or explicit misstatement that caused such consumer confusion.") (cleaned up); *Univ. of Ala. Bd. of Trustees*, 683 F.3d at 1279 (similar).

Hermès makes much of the fact that a handful of comments on the MetaBirkins Instagram page appear to reflect confusion about what NFTs are. *See* Compl. ¶¶ 114-115. But

---

[11] Even when courts have performed a "quick look" *Polaroid* analysis, they have been clear that the likelihood of confusion must be "particularly compelling" to outweigh the First Amendment interests in artistic expression. *See Twin Peaks*, 996 F.2d at 1379.

these are merely anecdotes, which are hardly surprising in the context of an innovation like an NFT. And they are irrelevant anyway: the cases applying *Rogers* are clear that explicit misleadingness is not judged by whether there is some confusion, but instead by whether that confusion is engendered by *explicitly misleading* statements. *See, e.g.*, *Louis Vuitton*, 868 F. Supp. 2d at 175 ("Louis Vuitton attaches to the complaint, as Exhibit E, what it claims are "[r]epresentative Internet references and blog excerpts" demonstrating that consumers mistakenly believe that the Diophy bag is a genuine Louis Vuitton bag"); *cf. Move Press, LLC v. Peloton Interactive*, Case No. LA CV18-01686 JAK (RAOx), 2019 WL 4570018, at *13 (C.D. Cal. Sept. 5, 2019) (dismissing the significance of anecdotal online comments, including one from intellectual property law professor Orly Lobel).

The First Amendment foundations of *Rogers* explains why the rule here must be strong: noncommercial speech is vulnerable to chilling effects. If the rule required extensive factfinding before upholding artistic freedom, then a trademark owner would be able to deter speech by the threat of a lawsuit, even an unsuccessful one. *See* William McGeveran, *The Imaginary Trademark Parody Crisis (and the Real One)*, 90 WASH L. REV. 713 (2015) (describing the prohibitive costs of going through litigation on likelihood of confusion, even when the defendant is likely to prevail).

### C.    Rothschild's Sale of His Art Via NFTs Does Not Reduce its First Amendment Protection.

The fact that Rothschild sells his art is utterly unremarkable and legally irrelevant. In *Rogers*, the movie studio defendant sold the motion picture at issue.[12] The motion picture at issue

---

[12] A fact *Rogers* recognized when it distinguished fully First Amendment-protected speech sold in the market from ordinary, non-speech commercial products. 875 F.2d at 998 ("the expressive element of titles requires more protection than the labeling of ordinary commercial products").

in *Louis Vuitton*, *The Hangover Part II*, had grossed "roughly $580 million globally as of the date of the complaint." *See* 868 F. Supp. 2d at 174. Indeed, in *every single case* in which courts in the Second Circuit have applied *Rogers*, the defendant was selling its work. Other circuits have also applied *Rogers* in cases involving millions of dollars, or more, in revenue. *See*, *e.g.*, *MCA*, 296 F.3d 894; *Twentieth Century Fox*, 875 F.3d 1192.

The First Amendment limits the reach of the Lanham Act in all these cases because the expression is what is being sold—the expression itself is what makes these things valuable to audiences—rather than merely being advertising for a separate product.[13] So too here: Rothschild is selling digital artworks, not physical handbags, just as Andy Warhol sold the 32 paintings in his "Campbell's Soup Cans" series, not physical cans of soup. Rothschild's digital "MetaBirkins" artworks, like Warhol's "Campbell's Soup Cans," attract audiences because of the creative expression they contain, not because they are useful for carrying lipstick or can be eaten for lunch.

Nor does the fact that Rothschild is using a new technological mechanism to authenticate his art change the fact that he's selling art. As Hermès' complaint inconsistently acknowledges, the NFT is not the digital artwork; it is code that points to a place where the associated digital image can be found and that authenticates that image. *See* p. 3, *supra*.[14] Using an NFT to

---

[13] As the Supreme Court has noted, noncommercial speech is often sold for profit. *See, e.g.*, *Brown*, 564 U.S. at 790 (video games); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1988) (citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Rel.*, 413 U.S. 376, 385 (1973)) ("Of course, the degree of First Amendment protection is not diminished merely because the newspaper or speech is sold rather than given away."); *Smith v. California*, 361 U.S. 147, 150 (1959) ("It is of course no matter that the dissemination [of books] takes place under commercial auspices.").

[14] Of course, if the NFTs *did* contain the images, then they would be directly analogous to the film in *Rogers*, and Hermès' claims just as straightforwardly defective.

authenticate an artwork no more makes the artwork a "commodity" unprotected by the First Amendment, *see* Compl. ¶ 4, than does selling numbered copies of physical paintings make those paintings commodities for purposes of *Rogers*. *See*, *e.g.*, *Walking Mountain*, 353 F.3d 792; *cf. ETW*, 332 F.3d at 937 (*Rogers* applied to art where associated promotional material described the content of the work using the trademarked name "Tiger Woods").

Likewise, the fact that buyers may later transfer ownership of a "MetaBirkins" artwork by reselling the NFT associated with it changes nothing. *See* Compl. ¶ 69. If a museum sold exclusive viewing access to a painting by requiring physical tokens in order to enter the room where the painting was located, those tokens might become "commodities" in the sense of being transferable for money, just as CDs of "Barbie Girl" or DVDs of *Ginger and Fred* are transferable for money. *See MCA*, 296 F.3d 894; *Rogers*, 875 F.2d 994. The transferability of access to a work has no effect on the First Amendment protection of the artwork itself. That NFTs *could* be associated with actual handbags, *see* Compl. ¶ 4, does not make *Rothschild's* NFTs non-artistic any more than the existence of other types of authentication documents means that art, handbags, and real estate are the same for constitutional purposes. Hermès does not allege that the relevant NFTs are linked to anything other than Rothschild's artwork.

Hermès has not pleaded any facts about the technology of NFTs that changes the well-settled law governing expressive works.

## III.   EVEN IF *ROGERS* DID NOT APPLY, *DASTAR* WOULD BAR HERMÈS' INFRINGEMENT CLAIMS HERE

Even if *Rogers* were not directly on point and dispositive in this case—which it is—the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), would be fatal to Hermès' claims here. Hermès' fundamental complaint is that consumers will believe Rothschild's MetaBirkins artworks are sponsored by or affiliated with

Hermès. Specifically, Hermès complains that, because Rothchild depicts Birkin bags and calls his art MetaBirkins, consumers will believe that Hermès is the origin of the artwork, or that Hermès has some relationship with the art project.

That claim is barred by *Dastar*, which unambiguously holds that only misrepresentations of the origin of *physical* goods are actionable under the Lanham Act. 539 U.S. at 37. Other sorts of misrepresentations, including but not limited to misrepresentations of the origin of creative content, are not actionable. *See id.* (holding that "origin of goods" as used in the Lanham Act refers only to "the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods"). The MetaBirkins artworks are communicative goods that *Dastar* places outside the scope of the Lanham Act. To the extent that they have physical existence, Hermès does not allege that the NFTs and the associated URLs identifying where the MetaBirkins images are hosted misrepresent their own physical origin. Hermès' allegation that the MetaBirkins name will cause confusion about "the origin, sponsorship, association or approval by Hermès of the METABIRKINS NFTs" is simply sleight of hand: any such alleged confusion comes only from the content and title of the intangible MetaBirkins artworks, or references to the name of that art project.

*Dastar* was decided in 2003, after the Second Circuit's decision in *Rogers* and several subsequent decisions applying *Rogers* more broadly to artistic works. But many of the cases resolved under the *Rogers* framework in this Circuit also implicate *Dastar* in that they involved allegations that consumers would be confused about the origin or sponsorship of creative content, rather than about who physically produced the goods at issue. *See, e.g.*, *Rogers*, 875 F.2d at 997*; Twin Peaks*, 996 F.2d at 1378*; AM General*, 450 F. Supp. 3d at 482*; Louis Vuitton*, 868 F. Supp. 2d at 175.

21

The same is true here. Even without *Rogers*, the rule of *Dastar* is equally clear: confusion as to the origin of intangible creative content is not actionable under the Lanham Act.

## IV.   HERMÈS' TRADEMARK DILUTION CLAIMS MUST BE DISMISSED

### A.   *Rogers* Applies to Hermès' Dilution Claims.

Rothschild's First Amendment rights under *Rogers* preclude Hermès' dilution claims as well, especially given that dilution implicates no countervailing interest in consumer protection. *See AM General*, 450 F. Supp. 3d at 488 (dismissing AM General's federal and state dilution claims as barred by *Rogers*); *Louis Vuitton*, 868 F. Supp. 2d at 184 (dismissing Louis Vuitton's New York anti-dilution claim and common law unfair competition claim because those claims were based on the same permissible conduct as the Lanham Act claim); *see also, e.g.*, *Jackson v. Netflix, Inc.*, 506 F. Supp. 3d 1007, 1014 (C.D. Cal. 2020) (applying *Rogers* to all Lanham Act claims, including dilution).

### B.   Noncommercial Uses Do Not Dilute.

Even beyond *Rogers* and the First Amendment, the federal dilution statute, 15 U.S.C. § 1125(c)(3)(C) (2018), expressly excludes all "noncommercial" uses. In doing so, the statute relies on the First Amendment's definition of noncommercial speech, which extends to all expression that does more than simply propose a transaction, including the digital art at issue here. *See* section II(A), *supra*; *MCA*, 296 F.3d at 905-06 (interpreting statutory language that, while since reformulated, retains the "noncommercial" exemption unchanged and explaining that for-profit speech which is itself the product being sold is noncommercial).

State law dilution claims have the same limit, possibly as a matter of constitutional avoidance. *See Louis Vuitton*, 868 F. Supp. 2d at 184 (dismissing New York dilution and unfair competition claims against a fictional film where *Rogers* protected the film); *Yankee Publ'g*, 809

F. Supp. at 282 ("[T]he same First Amendment considerations that limit a cause of action under the Lanham Act apply also to a cause of action under New York law."); *see also L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 32 (1st Cir. 1987) ("It offends the Constitution . . . to invoke the [Maine] anti-dilution statute as a basis for enjoining the noncommercial use of a trademark by a defendant engaged in a protected form of expression.").

### C.   Referential Uses Do Not Dilute.

Definitionally, dilution does not cover Rothschild's use of "MetaBirkins" because his use is referential, rather than being commercial use as a separate mark for an unrelated good or service, as the Lanham Act requires. The Act defines dilution by blurring as the "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B) (2018).[15]

The analysis "must ultimately focus on whether an association, arising from the similarity between the subject marks, impairs the distinctiveness of the famous mark—that is, the ability of the famous mark to serve as a unique identifier." *Louis Vuitton*, 156 F. Supp. 3d at 434 (citing *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198, 204 (2d Cir. 2013)) (cleaned up). When the defendant invokes a famous mark in reference to the products identified by the mark, this only tends to reinforce, rather than weaken, the distinctiveness of a mark, and there is no blurring. For example, where eBay used "Tiffany" without Tiffany's permission to advertise that it sold Tiffany products, the referential use meant there would be no blurring of the connection between the mark and Tiffany & Co., even if some products on eBay were counterfeit. *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 111-12 (2d Cir. 2010). Rothschild's uses are clearly

---

[15] The statute therefore makes clear that use of "a mark or trade name" is not the core of dilution. A local ice cream store that advertised its own "Oreo ice cream" would not create a new meaning for Oreos; the meaning would remain linked to that of Oreos.

referential. Rothschild uses the "MetaBirkins" name to refer to an artistic illustration of a *Birkin bag*. Far from being "dilutive," Rothschild's referential uses further *reinforce* the distinctiveness of Hermès' marks.

## V.   HERMÈS' OTHER CLAIMS HAVE THE SAME FATAL FLAWS

*Rogers* also bars all of Hermès' other causes of action, however denominated. If using an image of the Birkin bag is protected by the First Amendment when a claim is styled as trademark infringement, then merely changing the label on the cause of action cannot be enough to circumvent the First Amendment. As the Fourth Circuit has explained:

> Congress left little doubt that it did not intend for trademark laws to impinge the First Amendment rights of critics and commentators. … Congress directed that in determining whether an individual has engaged in cybersquatting, the courts may consider whether the person's use of the mark is a "bona fide noncommercial or fair use." 15 U.S.C. § 1125(d)(1)(B)(i)(IV). The legislature believed this provision necessary to "protect[ ] the rights of Internet users and the interests of all Americans in free speech and protected uses of trademarked names for such things as parody, comment, criticism, comparative advertising, news reporting, etc."

*Lamparello v. Falwell*, 420 F.3d 309, 313-14 (4th Cir. 2005).

Here, every one of Hermès' claims—federal trademark infringement, false designation of origin and false descriptions and representations, federal trademark dilution, cybersquatting, state dilution and injury to business reputation, common law trademark infringement, and state law misappropriation and unfair competition—focuses on the same speech that is protected under *Rogers*, which rejects the underlying premise of each of Hermès'claims:  that artistically relevant depictions of trademarks can be wrongful in the absence of explicit falsity.

For example, cybersquatting requires use of a domain name with a bad faith intent to profit. 15 U.S.C. § 1125(d)(1)(A)(i). Rothschild's use of a domain name that is the title of his art project cannot be bad faith because that title is artistically relevant and not explicitly misleading. When *Rogers* applies to insulate the title of artwork, it must also apply to bar Hermès' claims

24

based on use of that title as a domain name for a site about the artwork. *See Lamparello*, 420 F.3d at 316 ("a court must evaluate an allegedly infringing domain name in conjunction with the content of the website identified by the domain name"); *id.* at 316 n.4 ("[I]t has long been established that even when alleged infringers use the very marks at issue in titles, courts look to the underlying content to determine whether the titles create a likelihood of confusion as to source") (citing, *inter alia, Rogers*, 875 F.2d at 1000-01).

The same is true for other attempts by Hermès to relabel the claim here. *See, e.g., Rogers v. Grimaldi*, 695 F. Supp. 112, 117 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 994 (2d Cir. 1989) (noting that Rogers' §1125(a) claim was styled false designation of origin); *cf. Parks LLC v. Tyson Foods, Inc*., 863 F.3d 220, 227 (3d Cir. 2017) (rejecting false advertising claim that "depend[ed] upon the purported false association between [defendant's] brand and [plaintiff's] mark"); *Jackson*, 506 F. Supp. 3d at 1013 (applying *Rogers* to infringement, false designation, and dilution claims); *Ebony Media Operations, LLC v. Univision Commc'ns Inc*., No. 18-cv-11434-AKH, 2019 WL 8405265 (S.D.N.Y. June 3, 2019) (rejecting false advertising claim based on allegedly misleading use of plaintiff's trademark in news reporting).

## <u>CONCLUSION</u>

For the foregoing reasons, Rothschild respectfully requests that the Court grant his motion to dismiss Hermès' complaint in its entirety with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

Dated: March 21, 2022

Respectfully Submitted,

/s/ *Rhett O. Millsaps II*

Rebecca Tushnet
Mark P. McKenna
Rhett O. Millsaps II
Christopher J. Sprigman
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY  10151
(646) 898-2055
rhett@lex-lumina.com

*Attorneys for Defendant Mason Rothschild*