**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

HERMÈS INTERNATIONAL and
HERMÈS OF PARIS, INC.,

              Plaintiffs,

              v.

MASON ROTHSCHILD,

              Defendant.

No. 22-cv-00384-JSR

ECF Case

---

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MASON ROTHSCHILD'S**</u>
<u>**MOTION TO CERTIFY AN INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b)**</u>

June 6, 2022

Rebecca Tushnet
Mark P. McKenna (*pro hac vice*)
Rhett O. Millsaps II
Christopher J. Sprigman
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY  10151
Tel:  (646) 898-2055
Email:  rhett@lex-lumina.com

*Attorneys for Defendant Mason Rothschild*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

ARGUMENT ....................................................................................................... 3

I.    THE PROPER APPLICATION OF THE SECOND CIRCUIT'S TEST IN *ROGERS V. GRIMALDI* AND THE SUPREME COURT'S HOLDING IN *DASTAR CORP. V. TWENTIETH CENTURY FOX FILM CORP.* ARE CONTROLLING QUESTIONS OF LAW THAT CAN RESOLVE THIS LITIGATION ........................................................ 3

II.   THERE ARE, AT A MINIMUM, SUBSTANTIAL GROUNDS FOR DIFFERENCE OF OPINION ABOUT THE APPLICATION OF BOTH *ROGERS* AND *DASTAR* ...... 4

      A.    The Order Misapplies *Rogers* and Its Progeny ....................................... 5

      B.    The Order Misconstrues and Misapplies *Dastar* ................................. 12

III.  AN IMMEDIATE APPEAL WILL ADVANCE THE ULTIMATE TERMINATION OF THE LITIGATION AND RESOLVE UNCERTAINTY REGARDING THE SCOPE OF ARTISTS' FIRST AMENDMENT FREEDOMS ...................................... 14

CONCLUSION .................................................................................................... 16

## TABLE OF AUTHORITIES

**Cases**

*Bleistein v. Donaldson Lithographing Co.*,
188 U.S. 239 (1903) ........................................................................................................ 5

*Brown v. Elec. Arts, Inc.*,
724 F.3d 1235 (9th Cir. 2013) ..................................................................................... 8, 12

*Brown v. Showtime Networks, Inc.*,
394 F. Supp. 3d 418 (S.D.N.Y. 2019) ............................................................................. 9

*Capitol Records, LLC v. Vimeo, LLC*,
972 F. Supp. 2d 537 (S.D.N.Y. 2013) ........................................................................... 16

*Champion v. Moda Operandi, Inc.*,
561 F. Supp. 3d 419 (S.D.N.Y. 2021) ............................................................................. 9

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003) ............................................................................... 1, 2, 4, 13, 14

*Dr. Seuss Enters., L.P. v. Comicmix LLC*,
983 F.3d 443 (9th Cir. 2020) ......................................................................................... 12

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
547 F.3d 1095 (9th Cir. 2008) ....................................................................................... 12

*Ebony Media Operations, LLC v. Univision Commc'ns Inc.*,
No. 18-cv-11434-AKH, 2019 WL 8405265 (S.D.N.Y. June 3, 2019) ........................ 4

*Farah v. Esquire Magazine*,
736 F.3d 528 (D.C. Cir. 2013) ...................................................................................... 14

*Guilford Transp. Indus., Inc. v. Wilner*,
760 A.2d 580 (D.C. Cir. 2000) ...................................................................................... 14

*Herbert v. Lando*,
441 U.S. 153 (1979) ........................................................................................................ 14

*In re Duplan Corp.*,
591 F.2d 139 (2d Cir. 1978) ........................................................................................... 15

*Jackson v. Netflix, Inc.*,
506 F. Supp. 3d 1007 (C.D. Cal. 2020) ........................................................................... 4

*Klinghoffer v. S.N.C. Achille Lauro*,
921 F.2d 21 (2d Cir. 1990) ......................................................................................... 1, 4

*Koehler v. Bank of Bermuda Ltd.*,
  101 F.3d 863 (2d Cir. 1996) ................................................................................ 16

*Lamparello v. Falwell*,
  420 F.3d 309 (4th Cir. 2005) ................................................................................ 3

*Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.*,
  868 F. Supp. 2d 172 (S.D.N.Y. 2012) ........................................................... 5, 7, 9

*Mattel, Inc. v. MCA Records, Inc.*,
  296 F.3d 894 (9th Cir. 2002) ............................................................................... 12

*Medina v. Dash Films, Inc.*,
  No. 15-cv-2551-KBF, 2016 WL 3906714 (S.D.N.Y. July 14, 2016) ..................... 9

*Mohawk Indus., Inc. v. Carpenter*,
  558 U.S. 100 (2009) .............................................................................................. 1

*Nunes v. Lizza*,
  No. 20-cv-4003-CJW, 2020 WL 6938825 (N.D. Iowa Jul. 23, 2020) ................... 14

*Pan Am Systems, Inc. v. Hardenbergh*,
  No. 2:11–cv–00339–NT, 2012 WL 4855205 (D. Me. Oct. 12, 2012) ..................... 14

*Parks LLC v. Tyson Foods, Inc.*,
  863 F.3d 220 (3d Cir. 2017) ................................................................................ 4

*Phoenix Entm't Partners, LLC v. Rumsey*,
  829 F.3d 817, 829 (7th Cir. 2016) ........................................................................ 13

*Phoenix Entm't Partners v. J-V Successors, Inc.*,
  305 F. Supp. 3d 540 (S.D.N.Y. 2018) ................................................................. 13

*Pulse Entm't Corp. v. David*,
  No. CV 14-4732 (C.D. Cal. Sept. 17, 2014) Dkt. #19 .......................................... 13

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989) ...................................................................... *Passim*

*Rogers v. Grimaldi*,
  695 F. Supp. 112 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 994 (2d Cir. 1989) ................... 3

*Transp. Workers Union of Am., Local 100 v. New York City Transit Auth.*,
  358 F. Supp. 2d 347 (S.D.N.Y. 2005) ................................................................. 15

*Twin Peaks Productions, Inc. v. Publ'ns Intern., Ltd.*,
  996 F.2d 1366 (2d Cir. 1993) ............................................................................... 8

*Weyrich v. New Republic, Inc.*,
   235 F.3d 617 (D.C. Cir. 2001) ............................................................... 14

**Statutes**

15 U.S.C. § 1125 .......................................................................................... 3

28 U.S.C. § 1292 .................................................................................. 14, 16

**Other Authorities**

Elizabeth L. Rosenblatt, *Rethinking the Parameters of Trademark Use in Entertainment*,
   61 FLA. L. REV. 1011 (2009) ........................................................... 16

Glynn Lunney, *Trademark's Judicial De-Evolution: Why Courts Get Trademark Cases Wrong Repeatedly*, 106 CAL. L. REV. 1195 (2018) ............................ 16

William McGeveran, *The Imaginary Trademark Parody Crisis (and the Real One)*,
   90 WASH. L. REV. 713 (2015) ....................................................... 16

William McGeveran, *The Trademark Fair Use Reform Act*,
   90 B.U. L. REV. 2267 (2010) ......................................................... 16

## INTRODUCTION

As the Supreme Court has explained, "district courts should not hesitate to certify an interlocutory appeal" if the relevant criteria are satisfied and a decision "involves a new legal question or is of special consequence." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 110-11 (2009); *see Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990) (stating that "exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment" (alteration in original)).

This case presents exactly the type of circumstances that warrant immediate interlocutory appeal. The Order addresses an issue being closely watched by the press because it is of special consequence to society at large and art markets in particular: whether artists are free under the First Amendment to depict or refer to trademarks in their art, and to describe what they have depicted, without fear of trademark liability. The Second Circuit adopted in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), a test meant to give artists significant latitude to refer to trademarks and to branded products without risking liability under trademark law. The appeals court did so, as this Court recognized, to protect artists' First Amendment interests, and to restrict Lanham Act claims to instances where the use of a trademark either has *no artistic relevance whatsoever* to the artwork in question, or where the use is *explicitly misleading* and not simply potentially (or even actually) confusing. But if *Rogers* is applied in a way that requires full-blown litigation of trademark claims directed at suppressing artwork, as the Order requires, then the Second Circuit's efforts to protect artistic freedom in this context will be, in a practical sense, nullified. Thus there is, as discussed below, substantial ground for difference of opinion regarding the Order's application of the *Rogers* test.

There also is substantial ground for difference of opinion regarding the Order's handling of the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539

U.S. 23 (2003), which the Order dismisses in a footnote. In *Dastar*, the Supreme Court held that only misrepresentations of the origin of *tangible goods* are actionable under the Lanham Act. 539 U.S. at 37. Other sorts of misrepresentations, including but not limited to misrepresentations of the origin of creative content like Mr. Rothschild's *MetaBirkins* artworks, are not actionable. *See id*. (holding that "origin of goods" as used in the Lanham Act refers only to "the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods"). Like the Second Circuit's *Rogers* test, the effect of the Supreme Court's holding in *Dastar* is to prevent trademark law from interfering unduly in artists' exercise of their artistic freedoms. The Order characterizes *Dastar* as holding only "that Section 43(a) of the Lanham Act does not prevent the unaccredited copying of an uncopyrighted work." Order at 18-19 n.7. But that is inconsistent with the plain language of the Supreme Court's opinion, which is predicated on a construction of the terms of the Lanham Act. As discussed below, there is, at minimum, substantial grounds for difference of opinion regarding the Order's construal of *Dastar*.

Finally, it is critical to the effective protection of artists' First Amendment interests that the protections in *Rogers* and *Dastar* be applied in a way that permits early dismissal of trademark claims—otherwise brand owners will be incentivized to use the expense of litigation as a weapon to enforce even the most dubious Lanham Act claims. This Court's decision on these important issues implicating the scope of First Amendment artistic freedom thus should be certified for interlocutory appeal.

## ARGUMENT

**I.      THE PROPER APPLICATION OF THE SECOND CIRCUIT'S TEST IN**
**_ROGERS V. GRIMALDI_ AND THE SUPREME COURT'S DECISION IN**
**_DASTAR CORP. V. TWENTIETH CENTURY FOX FILM CORP._ ARE**
**CONTROLLING QUESTIONS OF LAW THAT CAN RESOLVE THIS**
**LITIGATION**

The Order decided two controlling questions of law:

(1) whether the Second Circuit's test adopted in _Rogers_, 875 F.2d 994, requires fact

finding in this case to determine whether Mr. Rothschild's fanciful digital images of fur-

covered Birkin bags and his naming of those images as "MetaBirkins" are "artistically

relevant" and requires consideration of the _Polaroid_ factors to determine whether Mr.

Rothchild's use is "explicitly misleading" (or, alternatively, that Hermès has plausibly pled

"explicit misleadingness" under _Rogers_), and

(2) whether the Supreme Court's decision in _Dastar_, 539 U.S. 23, bars Hermès' claims

because the Amended Complaint ("Complaint" or "Compl.") alleges confusion about the origin

of intangible expressive works and not tangible goods.

As the Court's Order acknowledges, if Mr. Rothschild's position on either question

were to prevail, Hermès' lawsuit would be dismissed in its entirety. _See_ Order at 7-8, 19-20.

Every one of Hermès' claims—federal trademark infringement, false designation of origin and

false descriptions and representations, federal trademark dilution, cybersquatting, state dilution

and injury to business reputation, common law trademark infringement, and state law

misappropriation and unfair competition—focuses on the same speech that is protected under

_Rogers_, which rejects the underlying premise of each of Hermès' claims: that artistically

relevant depictions of trademarks can be wrongful even in the absence of explicit falsity.[1]

---

[1] For example, cybersquatting requires use of a domain name with a bad faith intent to profit. 15
U.S.C. § 1125(d)(1)(A)(i). Rothschild's use of a domain name that is the title of his art project

Likewise, if Mr. Rothschild's position on the meaning of *Dastar* were to prevail, all of

Hermès' federal and state law claims would be dismissed. As the Order acknowledges, the

scope of New York State trademark and unfair competition law—the latter of which requires a

showing of bad faith by the infringer—is defined by substantially the same language found in

the Lanham Act. *See* Order at 7-8. That language, the Supreme Court held in *Dastar,* applies

only to misrepresentations of the origin of *tangible goods*, and not intangible creative content

like Mr. Rothschild's *MetaBirkins* artworks. *See Dastar*, 539 U.S. at 37; Order at 7-8.

Accordingly, because "reversal of the . . . order would terminate the action," it is "clear

that [the] question of law is controlling" within the meaning of § 1292(b). *See Klinghoffer*, 921

F.2d at 24 (internal quotation omitted).

## II.   THERE ARE, AT A MINIMUM, SUBSTANTIAL GROUNDS FOR DIFFERENCE OF OPINION ABOUT THE APPLICATION OF BOTH *ROGERS* AND *DASTAR*

There is at least substantial ground for difference of opinion regarding the proper

resolution of each of these two controlling questions of law.

---

cannot be bad faith because that title is artistically relevant and not explicitly misleading. When *Rogers* applies to insulate the title of artwork, it must also apply to bar Hermès' claims based on use of that title as a domain name for a site about the artwork. *See Lamparello v. Falwell*, 420 F.3d 309, 316 (4th Cir. 2005) ("a court must evaluate an allegedly infringing domain name in conjunction with the content of the website identified by the domain name"); *id*. at 316 n.4 ("[I]t has long been established that even when alleged infringers use the *very marks at issue* in titles, courts look to the underlying content to determine whether the titles create a likelihood of confusion as to source" (emphasis in original)) (citing, *inter alia*, *Rogers*, 875 F.2d at 1000-01). The same is true for other attempts by Hermès to relabel its claims. *See*, *e.g.*, *Rogers v. Grimaldi*, 695 F. Supp. 112, 117 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 994 (2d Cir. 1989) (noting that Rogers' §1125(a) claim was styled false designation of origin); *cf. Parks LLC v. Tyson Foods, Inc*., 863 F.3d 220, 227 (3d Cir. 2017) (rejecting false advertising claim that "depend[ed] upon the purported false association between [defendant's] brand and [plaintiff's] mark"); *Jackson v. Netflix, Inc*., 506 F. Supp. 3d 1007, 1013 (C.D. Cal. 2020) (applying *Rogers* to infringement, false designation, and dilution claims); *Ebony Media Operations, LLC v. Univision Commc'ns Inc*., No. 18-cv-11434-AKH, 2019 WL 8405265, at *6 (S.D.N.Y. June 3, 2019) (rejecting false advertising claim based on allegedly misleading use of plaintiff's trademark in news reporting).

## A.      The Order Misapplies *Rogers* and Its Progeny

The Order adopts a reading of *Rogers* that cannot be squared either with the plain language of that Second Circuit decision or with the logic of this Court's own Order. The Order correctly acknowledges that the *MetaBirkins* artworks are, indeed, artworks, and that therefore *Rogers* applies in this case. *See* Order at 11-12. That conclusion rejects Hermès' contention that the *MetaBirkins* images are "commodities" unprotected by the First Amendment. *See id*. at 12. Indeed, that the *MetaBirkins* images are artworks and not "commodities" is obvious from the face of Hermès' Complaint. Hermès repeatedly refers to the *MetaBirkins* as "images," which is incontrovertibly what they are. Moreover, and as the Order notes, "[e]ven the amended complaint's allegations acknowledge the artistic aspect of some of the digital images sold through the NFTs." *See*, *e.g.*, Compl. ¶ 9 (stating that "a digital image connected to an NFT may reflect some artistic creativity."); Order at 10. *See also*, *e.g.*, *Bleistein v. Donaldson Lithographing Co*., 188 U.S. 239, 249, 251 (1903) (Holmes, J.) (proclaiming that it would be a "dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations" and observing that an illustration of something "drawn from the life"—like Rothchild's *MetaBirkins*—"is the personal reaction of an individual upon nature. Personality always contains something unique.").[2]

Despite its acknowledgment that *Rogers* applies, however, the Order misapplies *Rogers* in two ways. *First*, the Order errs in finding that additional factual development is required to determine that the title *MetaBirkins* is artistically relevant to the *MetaBirkins* images. As the Order notes, "[t]he threshold for 'artistic relevance' is intended to be low and will be satisfied

---

[2] *Bleistein* was a copyright case, but Justice Holmes' statements there about the danger of judges passing on whether a particular illustration is "artistic" enough to merit copyright protection applies with even greater force here in light of *Rogers*.

unless the use 'has no artistic relevance to the underlying work whatsoever.'" Order at 13

(quoting *Rogers*, 875 F.2d at 999). But then the Order focuses on Rothschild's *intent*, quoting

*Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc*., 868 F.Supp.2d 172, 178 (S.D.N.Y. 2012),

in ruling that the Complaint sufficiently alleges the absence of artistic relevance based on

Hermès' allegations that Rothschild "entirely intended to associate the 'MetaBirkins' mark with

the popularity and goodwill of Hermès' Birkin mark, rather than intending an artistic

association." Order at 13-14.

       This is a misapplication of both *Rogers* and *Louis Vuitton*. Under *Rogers*, the use of the

*MetaBirkins* name is, as the Order acknowledges, artistically relevant unless that title "has *no*

artistic relevance to the underlying work *whatsoever*." *Rogers*, 875 F.2d at 999 (emphasis

added). As the Complaint alleges and the Order acknowledges, the *MetaBirkins* images are

fanciful depictions of *Birkin bags*. *See* Compl. ¶¶ 37, 76, 79, Fig. 5 and Ex. Z; Order at 4. As

such, the *MetaBirkins* title is artistically relevant because it is *plainly descriptive of the images

that it titles*. This is perhaps the most straightforward possible form of artistic relevance; indeed,

it is precisely the sort of artistic relevance found in *Rogers* itself, where the title "Ginger and

Fred" was deemed artistically relevant because "[t]he central characters in the film are

nicknamed 'Ginger' and 'Fred,' and these names are not arbitrarily chosen just to exploit the

publicity value of their real life counterparts but instead have genuine relevance to the film's

story." *Rogers*, 875 F.2d at 1001. Critically, *Rogers* did not require the defendants to justify their

choice to base a story on characters nicknamed Ginger and Fred—it accepted the artists' decision

about the content of their work, and it evaluated artistic relevance in relation to the work the

artists chose to make. So too here. The name "MetaBirkins" has incontrovertible and genuine

relevance to what the *MetaBirkins* images depict: fanciful Birkin bags.

The Order errs in relying on *Louis Vuitton* to rule that Hermès' allegations regarding Mr. Rothschild's intent in using the *Metabirkins* title for his images creates a genuine issue of fact regarding artistic relevance. The *Louis Vuitton* court expressly rejected the plaintiff's argument in that case that discovery was needed "to determine whether Warner Bros. intended to use an authentic Louis Vuitton bag or Diophy's knock-off bag" in the film at issue, ruling that the use was artistically relevant because "the significance of the airport scene relies on Alan's bag— authentic or not—looking like a Louis Vuitton bag." 868 F.Supp.2d at 178. As in *Rogers*, the *Louis Vuitton* court did not require the producers of the film to justify their choice to write the scene in a way that focused on the authenticity of a Louis Vuitton bag; that court accepted the artists' choice and evaluated artistic relevance in light of that choice. So too here with Mr. Rothschild's *MetaBirkins*: the meaning of the images relies on their connection to Birkin bags, which they undisputedly depict. Indeed, Hermès has never cited—and Mr. Rothschild has been unable to find—a single case in this Circuit or elsewhere in which a court applying *Rogers* found an issue of fact as to artistic relevance requiring discovery into the artist's intentions. Presumably this is because *Rogers* sets such a low threshold for artistic relevance, which tends to be obvious from viewing the work (as here). The Order's failure to find artistic relevance thus is legal error.

*Second*, the Order errs in its treatment of the *Rogers* evaluation of "explicit misleadingness," erroneously ruling both that the determination of explicit misleadingness requires application of the *Polaroid* factors, and that Hermès has made allegations in its Complaint that plausibly plead explicit misleadingness even under *Rogers*. First, as the Order itself notes, the Second Circuit in *Rogers* did not apply the *Polaroid* factors to assess explicit misleadingness (or for any other purpose). *See* Order at 15. Indeed, the plaintiffs in that case offered survey evidence of confusion, with fourteen percent of survey respondents who were

shown the title "Ginger and Fred" indicating that they believed from the title that Ginger Rogers was involved in making the film. *The Second Circuit explicitly refused to consider this evidence of consumer confusion*:

> The survey evidence, even if its validity is assumed, indicates at most that some members of the public would draw the incorrect inference that Rogers had some involvement with the film. But that risk of misunderstanding, not engendered by any overt claim in the title, is so outweighed by the interests in artistic expression as to preclude application of the Lanham Act. We therefore hold that the sponsorship and endorsement aspects of Rogers' Lanham Act claim raise no "genuine" issue that requires submission to a jury.

*Rogers*, 875 F.2d at 1001. *Cf. Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1245-46 (9th Cir. 2013) (holding that survey evidence showing that the majority of consumers believe that identifying marks cannot be included in games without permission "changes nothing" in the *Rogers* analysis in the absence of an explicitly misleading affirmative claim).

The Order cites *Twin Peaks Productions, Inc. v. Publ'ns Intern., Ltd.*, 996 F.2d 1366 (2d Cir. 1993), for the proposition that explicit misleadingness must be assessed, in the first instance, by way of the *Polaroid* factors. But considered in light of the very purpose of the *Rogers* test— the narrow construction of the Lanham Act the Second Circuit believed was necessary to avoid conflict with First Amendment values, *see* 875 F.2d at 998—that statement in *Twin Peaks* must be understood to refer only to the special category of title-vs.-title conflicts, which *Rogers* itself identified as warranting different treatment. *See Rogers*, 875 F.2d at 999 n.5 ("[t]his limiting construction [the test adopted to evaluate the title 'Ginger and Fred'] would not apply to misleading titles that are confusingly similar to other titles. The public interest in sparing consumers this type of confusion outweighs the slight public interest in permitting authors to use such titles.").

*Twin Peaks* involved precisely the sort of title-vs.-title conflict that *Rogers* expressly

exempted from the framework it developed: plaintiff's work was the television program "Twin Peaks," and defendant's work was a book titled "Welcome to Twin Peaks: A Complete Guide to Who's Who and What's What." 996 F.2d at 1371. The district court in that case had framed the issue very clearly as a title-vs.-title conflict, finding that "a substantial number of reasonably prudent purchasers, on seeing the name Twin Peaks as part of the title of the Book would be led to believe that plaintiff was the source of the goods." *Id*. at 1378. Thus, *Twin Peaks* is inapposite here and entirely consistent with the Second Circuit's direction in *Rogers* that the *Rogers* test does not apply in full to title-vs.-title conflicts.

Moreover, full consideration of the *Polaroid* factors is not appropriate even under the *Twin Peaks* approach. The Second Circuit in *Twin Peaks* remanded with instructions to the district court to apply a version of the *Polaroid* test that is tilted in favor of the defendant: "[T]he finding of likelihood of confusion," the Second Circuit stated, "must be particularly compelling to outweigh the First Amendment interest recognized in *Rogers*." 996 F.2d at 1379.

This understanding of *Twin Peaks* fits the facts in that case and aligns it with the Second Circuit's earlier holding in *Rogers*, rather than creating an intra-Circuit conflict between the two decisions. Requiring consideration of the *Polaroid* factors in every case involving use of trademarks in connection with artistic works would eviscerate the protective purpose of the holding in *Rogers*—to allow courts to resolve these kinds of cases early as a matter of law to avoid chilling artists' First Amendment rights. Numerous cases in this Circuit have recognized that important purpose of *Rogers* and have decided cases involving expressive works on motions to dismiss. *See, e.g.*, *Champion v. Moda Operandi, Inc.*, 561 F. Supp. 3d 419, 436 (S.D.N.Y. 2021); *Brown v. Showtime Networks, Inc.*, 394 F. Supp. 3d 418, 444 (S.D.N.Y. 2019); *Medina v. Dash Films, Inc.*, No. 15-cv-2551-KBF, 2016 WL 3906714, at *6 (S.D.N.Y. July 14, 2016);

*Louis Vuitton*, 868 F. Supp. 2d at 183-84.

The Order also erroneously rules that the Complaint must survive dismissal even if the *Polaroid* analysis is not relevant to assessing explicit misleadingness, as Hermès has alleged that Mr. Rothschild made statements that are "plausibly interpreted as explicitly [sic] misstatements and that this engendered the confusion on the part of consumers." Order at 18. In so ruling, the Order cites paragraph 94 and Exhibit Y of Hermès' Complaint. Here is the entirety of paragraph 94 of the Complaint:

94.    Defendant also operates a Twitter under a handle featuring the METABIRKINS trademarks: @MetaBirkins (the "METABIRKINS Twitter"). The METABIRKINS Twitter also advertises the METABIRKINS NFTs and includes a direct link to the METABIRKINS Rarible Store. A screenshot of the METABIRKINS Twitter is depicted below as Figure 18 and attached hereto as Exhibit AG.



*Figure 18.*

This allegation does not plausibly allege *explicit* misleadingness as narrowly defined by *Rogers* (*e.g.*, "Nimmer on Copyright" for a treatise that was not authored by Nimmer, or "Jane Fonda's Workout Book" for a book Jane Fonda had nothing to do with). 875 F.2d at 999. Paragraph 94 merely alleges *use* of the term *MetaBirkins* in association with Rothschild's artworks, the NFTs used to authenticate them, and two of the various marketing vehicles (Twitter and the "Rarible" auction platform) used to market them. All of these are uses to which *Rogers* applies, as the Order elsewhere concludes—*see* Order at 11-12—and none of these uses can plausibly qualify as *explicitly* misleading under *Rogers*. Indeed, not only does the screenshot from the *MetaBirkins* Twitter account not explicitly mislead; it explicitly identifies Mr. Rothschild as the source of the *MetaBirkins* artworks, stating that *MetaBirkins* are "Made by @MasonRothschild".

The same is true of Exhibit Y, which is the second allegation that the Order cites in ruling that Hermès has plausibly alleged explicit misleadingness. Exhibit Y, *see* Compl. ¶ 81, is a screenshot showing a *MetaBirkins* auction on Rarible:




Nowhere in this exhibit does Mr. Rothschild make any *explicit* claim of association with Hermès. All that Exhibit Y shows is use of the "MetaBirkins" term to title a *MetaBirkins* artwork. That cannot count as an explicitly misleading use under *Rogers*, for "if the use of a mark alone were sufficient 'it would render *Rogers* a nullity.'" *Elec. Arts, Inc.*, 724 F.3d at 1245 (quoting *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002)); *see also E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1100 (9th Cir. 2008) ("[T]he mere use of a trademark alone cannot suffice to make such use explicitly misleading"); *Dr. Seuss Enters., L.P. v. Comicmix LLC*, 983 F.3d 443, 462-63 (9th Cir. 2020) (concluding that the copying of distinctive elements of Dr. Seuss books was not explicitly misleading where the actual creator was disclosed).

Accordingly, the Court's ruling that Hermès has plausibly alleged explicit misleadingness based on paragraph 94 and Exhibit Y of the Complaint is legal error under *Rogers* and its progeny.

## B.     The Order Misconstrues and Misapplies *Dastar*

With respect to *Dastar*, 539 U.S. 23, the Order's cursory treatment in a footnote is inconsistent with the content of the Supreme Court's opinion. The Order characterizes *Dastar* as holding only "that Section 43(a) of the Lanham Act does not prevent the unaccredited copying of an uncopyrighted work." Order at 18 n.7. But that ignores the actual holding of *Dastar* and the Supreme Court's construction of the Lanham Act on which that holding was based.

Specifically, the Supreme Court held that the Lanham Act makes actionable only misrepresentations of the origin of *tangible goods*. 539 U.S. at 37. Other sorts of misrepresentations, including but not limited to misrepresentations of the origin of creative content like Rothschild's *MetaBirkins* artworks, are not within the scope of the Lanham Act's

12

definition of "origin of goods" and are not actionable. The Supreme Court was very clear that it

was construing the scope of Section 43(a) of the Lanham Act: "At bottom," Justice Scalia wrote,

"we must decide what § 43(a)(1)(A) of the Lanham Act means by the 'origin' of 'goods.'" 539

U.S. at 31. The Court then explicitly decided that the phrase "origin of goods" as it appears in

Section 43(a) refers to "tangible goods," as opposed to intangible expressive works:

> In sum, reading the phrase 'origin of goods' in the Lanham Act in accordance with
> the Act's common-law foundations (which were not designed to protect originality
> or creativity), and in light of the copyright and patent laws (which were), we
> conclude that the phrase refers to the producer of the tangible goods that are offered
> for sale, and not to the author of any idea, concept, or communication embodied in
> those goods.

*Id*. at 37.

Other courts have routinely recognized that *Dastar* bars claims that do not allege

confusion about the origin of tangible goods. *See*, *e.g.*, *Phoenix Entm't Partners, LLC v.

Rumsey*, 829 F.3d 817, 829 (7th Cir. 2016) (rejecting plaintiff's claim of confusion over

origin of digital copies of karaoke tracks based on use of plaintiff's registered mark in the

content of the copies; any confusion was "not about the source of the tangible good sold in

the marketplace"); *see also Phoenix Entm't Partners v. J-V Successors, Inc*., 305 F. Supp.

3d 540 (S.D.N.Y. 2018) (adopting the reasoning of *Rumsey*); *Pulse Entm't Corp. v. David*,

No. CV 14-4732 (C.D. Cal. Sept. 17, 2014) Dkt. #19 (*Dastar* barred false designation of

origin claim based on explicit misattribution to wrong creator; hologram was creative work,

like a cartoon).

Applied to this case, *Dastar* directs that Lanham Act claims cannot be based on

allegations of confusion regarding the origin of intangible works, whether those are the "World

War II Campaigns in Europe" video series at issue in *Dastar* or the *MetaBirkins* visual artworks

here. The Order therefore errs in dismissing the relevance of *Dastar* by attempting to limit it to

an inappropriately narrow statement of that case's holding. The import of *Dastar* is far broader. Like the Second Circuit's *Rogers* test, the effect of the Supreme Court's holding in *Dastar* is to limit the scope of trademark law in a way calculated to restrain it from interfering unduly in artists' exercise of their artistic freedoms.

## III.   AN IMMEDIATE APPEAL WILL ADVANCE THE ULTIMATE TERMINATION OF THE LITIGATION AND RESOLVE UNCERTAINTY REGARDING THE SCOPE OF ARTISTS' FIRST AMENDMENT FREEDOMS

Certifying this matter for interlocutory appeal "may materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), and resolve uncertainty that risks suppressing artistic speech by exposing artists who depict trademarks in their art or use marks in the titles of their works to prolonged and expensive litigation. If the Court of Appeals were to agree with Mr. Rothchild's position on the proper application of either *Rogers* or *Dastar*, that would put an end to this lawsuit, thereby avoiding costly and burdensome litigation for the parties and the Court should the Court grant a stay of discovery pending appeal.[3]

---

[3] If the Second Circuit takes up Mr. Rothschild's interlocutory appeal, Mr. Rothschild intends to move this Court for a stay of discovery pending appeal. Courts widely have recognized that a stay of discovery is appropriate in cases involving First Amendment rights, as here, because "if a suit entails long and expensive litigation, then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails." *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (cleaned up) (affirming lower court that dismissed complaint after granting discovery stay, *see* 863 F. Supp. 2d 29, 35 n.7 (D. D.C. 2012)). *See Herbert v. Lando*, 441 U.S. 153, 178 (1979) (Powell, J., concurring) (observing that trial courts have a duty to consider defendants' First Amendment rights in addition to the private interests of the plaintiff when supervising discovery); *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 628 (D.C. Cir. 2001) ("We are mindful that trial courts are understandably wary of allowing unnecessary discovery where First Amendment values might be threatened."); *Nunes v. Lizza*, No. 20-cv-4003-CJW, 2020 WL 6938825, at *2 (N.D. Iowa Jul. 23, 2020) ("The possibility of prejudice, hardship, or inequity weighs in favor of granting the stay. Defendants have pointed to the chilling effect of expensive discovery on their First Amendment rights. Plaintiffs have not identified any real prejudice or other consequence they might suffer as a result of a stay at this stage of the litigation."); *Pan Am Systems, Inc. v. Hardenbergh*, No. 2:11–cv–00339–NT, 2012 WL 4855205, at *2 (D. Me. Oct. 12, 2012) (staying litigation pending resolution of insurance dispute: "The Court is sensitive to the potential chilling effect on the press—particularly in a case where the Defendants are an individual and a small publication—caused by the prospect of having to defend prolonged and

Moreover, interlocutory review is particularly appropriate here because the issue is of special consequence; it involves the First Amendment right to freedom of expression, as a recent article in the magazine *Wired* points out:

> If the court were to determine that the brand's monopoly extends to images like Rothschild's, it would be a major loss for artists and all who value freedom of expression, a signal that the metaverse is likely to be treated less as a new frontier for human creativity and more as an annex-in-waiting for established business concerns.

Jessica Rizzo, "The Future of NFTs Lies With the Courts," WIRED (Apr. 3, 2022), *available at* https://www.wired.com/story/nfts-cryptocurrency-law-copyright/ (visited June 6, 2022). A *Reuters* article more recently noted that this "case is being watched for its potential to clarify how trademark law will be applied to NFTs, newly popular digital assets that can be used to verify an artwork's authenticity." Blake Brittain, "Hermes lawsuit over 'MetaBirkins' NFTs can move ahead, judge rules," REUTERS (May 6, 2022), *available at* https://www.reuters.com/legal/litigation/hermes-lawsuit-over-metabirkins-nfts-can-move-ahead-judge-rules-2022-05-05/ (visited June 6, 2022).

Indeed, this case is of particularly special consequence because the First Amendment right of artistic expression is at substantial risk of being chilled by trademark litigation, *even if the artist ultimately prevails*. *See* William McGeveran, *The Imaginary Trademark Parody Crisis (and the Real One)*, 90 WASH. L. REV. 713, 745-53 (2015) (emphasizing the importance of clear rules that can be applied early in litigation in order to protect speech); William McGeveran, *The Trademark Fair Use Reform Act*, 90 B.U. L. REV. 2267 (2010) (proposing those clear speech-protecting rules); Elizabeth L. Rosenblatt, *Rethinking the Parameters of Trademark Use in*

---

expensive litigation."); *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 592, n. 10 (D.C. Cir. 2000) (summary proceedings are essential in First Amendment cases particularly where plaintiffs sue "an individual who might be expected to have limited resources")).

*Entertainment*, 61 FLA. L. REV. 1011 (2009) (discussing harms of applying multi-factor test to noncommercial expression); *cf.* Glynn Lunney, *Trademark's Judicial De-Evolution: Why Courts Get Trademark Cases Wrong Repeatedly*, 106 CAL. L. REV. 1195 (2018) (explaining that the costs of litigation mean that complex tests for liability in trademark law will inevitably suppress legitimate uses even if those uses would be protected after full-scale litigation).

If the Second Circuit applies either *Rogers* or *Dastar* as Mr. Rothschild believes it should, that will materially advance the litigation by completely ending it. The material advancement prong of § 1292(b) is satisfied when a decision by the appeals court would resolve all, or even "most" of, a plaintiff's claims. *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 554 (S.D.N.Y. 2013); *see also, e.g.*, *In re Duplan Corp.*, 591 F.2d 139, 148 n.11 (2d Cir. 1978) (material advancement prong satisfied if appeal has "the potential for substantially accelerating the disposition of the litigation"); *Transp. Workers Union of Am., Local 100 v. New York City Transit Auth.*, 358 F. Supp. 2d 347, 352-53 (S.D.N.Y. 2005) (certifying order because "[i]f the Court of Appeals reverses . . . the litigation will end"). Accordingly, certification is an appropriate use of judicial resources to materially advance this litigation.

## <u>CONCLUSION</u>

Because an interlocutory appeal will advance the ultimate termination of this lawsuit and resolve an issue of special consequence, and because there are substantial grounds for difference of opinion regarding the interpretation and application of controlling questions of law under the *Rogers* and *Dastar* decisions, the Order presents the "rare exception to the final judgment rule that generally prohibits piecemeal appeals," *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996), and warrants certification for interlocutory appeal.

Accordingly, Mr. Rothschild respectfully requests that this Court certify the Order for

interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Within ten days of such certification, Mr.

Rothschild will ask the Second Circuit for permission to take an appeal from the Order. *See id*.

Dated: June 6, 2022

<div style="margin-left:40%">

Respectfully Submitted,

/s/ *Rhett O. Millsaps II*
Rebecca Tushnet
Mark P. McKenna (*pro hac vice*)
Rhett O. Millsaps II
Christopher J. Sprigman
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
(646) 898-2055
rhett@lex-lumina.com

*Attorneys for Defendant Mason Rothschild*

</div>

17