**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

HERMÈS INTERNATIONAL and
HERMÈS OF PARIS, INC.,

        Plaintiffs,

        v.

MASON ROTHSCHILD,

        Defendant.

No. 22-cv-00384-JSR

ECF Case

---

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MASON ROTHSCHILD'S MOTION FOR SUMMARY JUDGMENT</u>

October 7, 2022

Rhett O. Millsaps II
Christopher J. Sprigman
Mark P. McKenna (*pro hac vice*)
Rebecca Tushnet
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
Tel: (646) 898-2055
Email: rhett@lex-lumina.com

*Attorneys for Defendant Mason Rothschild*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES……………………………………………………………...ii

INTRODUCTION……………..…………..…………………………………………...1

FACTUAL BACKGROUND………………………………………………...……….....2

ARGUMENT………………………………………………………………………...4

I.      THE STANDARD FOR A MOTION FOR SUMMARY JUDGMENT…...……………4

II.     THIS COURT SHOULD GRANT SUMMARY JUDGMENT TO ROTHSCHILD ON
        HERMÈS' TRADEMARK CLAIMS ……...………………………….…………….....5

        A.      Discovery Has Confirmed, and Hermès Has Offered No Facts to Dispute,
                That *MetaBirkins* Are Artworks Protected by the First Amendment..…..……....5

        B.      The Content and Name of the *MetaBirkins* Artworks Are Artistically Relevant
                to the *MetaBirkins* Art Project……………………………………………….…9

        C.      Rothschild Did Not Explicitly Mislead Regarding the Source of the
                *MetaBirkins* Artworks or the *MetaBirkins* Art Project…...………………….....13

        D.      Hermès Cannot Even Show Ordinary Consumer Confusion……………………16

III.    ALL OF HERMÈS' OTHER CLAIMS MUST BE DISMISSED…………..…….……23

        A.      Noncommercial Uses Do Not Dilute…………………………...………...……...23

        B.      Hermès' Other Claims Have the Same Fatal Flaws………………………...24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AM General LLC v. Activision Blizzard, Inc.*,
    450 F. Supp. 3d 467 (S.D.N.Y. 2020)……………………...……………………….passim

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986)…………………………………………………...……………….5

*Bleistein v. Donaldson Lithographing Co.*,
    188 U.S. 239 (1903)………………………………………………………………..23

*Brown v. Elec. Arts, Inc.*,
    724 F.3d 1235 (9th Cir. 2013)…………………………………...……...9, 14, 17

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.*,
    886 F.2d 490 (2d Cir. 1989)………………………………………………...……17

*Consumers Union of United States, Inc., v. General Signal Corp.*,
    724 F.2d 1044 (2d Cir. 1983)…………………………………………………….23

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
    539 U.S. 23 (2003)……………………………………………………………......9

*Dr. Seuss Enters., L.P. v. Comicmix LLC*,
    983 F.3d 443 (9th Cir. 2020)………………………………………………….14

*Ebony Media Operations, LLC v. Univision Commc'ns Inc.*,
    No. 18-cv-11434-AKH, 2019 WL 8405265 (S.D.N.Y. Jun. 3, 2019)…………………………25

*Girl Scouts of U.S. v. Bantam Doubleday Dell Publ'g Grp., Inc.*,
    808 F. Supp. 1112 (S.D.N.Y. 1992)…………………………………………...18

*Girl Scouts of U.S. v. Bantam Doubleday Dell Publ'g Grp., Inc.*,
    996 F.2d 1477 (2d Cir. 1993)…………………………………………….....18

*Jim Beam Brands Co., Inc. v. Beamish & Crawford, Ltd.*,
    852 F. Supp. 196 (S.D.N.Y. 1994)……………………………………...……18

*Lamparello v. Falwell*,
    420 F.3d 309 (4th Cir. 2005)……………………………………………….…….24, 25

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
   507 F.3d 252 (4th Cir. 2007)……………………………………………………..18

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,
   156 F. Supp. 3d 425 (S.D.N.Y. 2016)…………………………………………...6

*Louis Vuitton Malletier S.A. v. Warner Bros. Enter. Inc.*,
   868 F. Supp. 2d 172 (S.D.N.Y. 2012)...……………………………………..…9, 12, 24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)……………………………………………….………………..5

*Mattel, Inc. v. MCA Records, Inc.*,
   296 F.3d 894 (9th Cir. 2002)………………………………...………………10, 14, 24

*Mattel, Inc. v. Walking Mountain Prods.*,
   353 F.3d 792 (9th Cir. 2003)………………………………………………...………10

*Medina v. Dash Films, Inc.*,
   No. 15-CV-2551, 2016 WL 3906714 (S.D.N.Y. July 14, 2016)………………………………22

*Monbo v. Nathan*,
   No. 18-CV-5930 (MKB), 2022 WL 4591905 (E.D.N.Y. Aug. 26, 2022)…………………17, 22

*Monbo v. Nathan*,
   No. 18-CV-5930 (MKB), 2022 WL 4134455 (E.D.N.Y. Sept. 11, 2022)……………………17

*Parks LLC v. Tyson Foods, Inc.*,
   863 F.3d 220 (3d Cir. 2017)……………………………………………………..25

*Polaroid Corp. v. Polarad Elecs. Corp.*,
   287 F.2d 492 (2d Cir. 1961)…………………………………………………………16

*Rogers v. Grimaldi*,
   695 F. Supp. 112 (S.D.N.Y. 1988)………………………………………...……..25

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989)…………………………………………………..passim

*Scotto v. Almenas*,
   143 F.3d 105 (2d Cir. 1998)………………………………………………….....5

*Tenenbaum v. Williams*,
   193 F.3d 581 (2d Cir. 1999)……………………………………………….....4

*Tiffany & Co. v. Costco Wholesale Corp.*,
   971 F.3d 74 (2d Cir. 2020)……………………………………...……………………………..23

*Tiffany (NJ) Inc. v. eBay Inc.*,
   600 F.3d 93 (2d Cir. 2010)………………………………………………………………....24

*Twentieth Century Fox Television v. Empire Distrib., Inc.*,
   875 F.3d 1192 (9th Cir. 2017)……………………………………………………………...7

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
   996 F.2d 1366 (2d Cir. 1993)…………………………………………………...1, 16, 17

*VIP Products LLC v. Jack Daniel's Properties Inc.*,
   No. CV-14-02057-PHX-SMM, 2021 WL 5710730 (D. Ariz. Oct. 8, 2021)…………………..10

*VIP Products LLC v. Jack Daniel's Properties Inc.*,
   No. 21-16969, 2022 WL 1654040 (9th Cir. Mar. 18, 2022)………….……………………10

*Yankee Pub. Inc. v. News America Pub. Inc.*,
   809 F. Supp. 267 (S.D.N.Y. 1992)………….……………………………………...6, 18, 24

**Statutes**

15 U.S.C. § 1125(c)(3)(C)……………………………………………………………………23

15 U.S.C. § 1125(d)(1)(A)(i)…………………………………………………………………25

15 U.S.C. § 1125(d)(1)(B)(i)(IV)…………………………………………..…………………24

**Rules**

Fed. R. Civ. P. 56(a)…………………………………………………………………………4

**Treatises**

4 McCarthy on Trademarks and Unfair Competition (5th ed. 2022) § 23:9………………….....20

4 McCarthy on Trademarks and Unfair Competition (5th ed. 2022) § 23:96……………..…….23

4 McCarthy on Trademarks and Unfair Competition (5th ed. 2022) § 23:97…………………..23

4 McCarthy on Trademarks and Unfair Competition (5th ed. 2022) § 32:188……………..……20

## INTRODUCTION

Five months of intensive discovery and thousands of hours billed have only confirmed what Defendant Mason Rothschild has maintained from the beginning: Plaintiffs Hermès International and Hermès of Paris, Inc. (together, "Hermès") never had a case. Rothschild is entitled to summary judgment.

In particular, discovery has confirmed the following dispositive facts that Hermès either does not or cannot genuinely dispute:

*First*, that Rothschild's *MetaBirkins* are creative expression protected by the First Amendment—*i.e.*, that each of the *MetaBirkins* images individually, and the *MetaBirkins* project as a whole, are art.

*Second*, that the title "MetaBirkins" is artistically relevant to the artworks and to the project at issue—not least because that title indisputably describes the artworks' content.

*Third*, that Rothschild has done nothing to explicitly mislead regarding the source of the *MetaBirkins* artworks. Hermès' corporate representative pointed to the *MetaBirkins* name, the use of the "Hermès" and "Birkin" marks, and the visual content of the artworks as "evidence" of explicit misleadingness, but none of these are explicit misstatements; rather, each requires the audience to draw an inference, which is plainly insufficient to establish explicit misleadingness under *Rogers*. Hermès has never been able to identify any *explicitly* misleading statement, because there have never been any.

*Fourth*, that Hermès has failed not only to establish explicit misleadingness, but has failed to show any significant likelihood of consumer confusion. Courts that analyze explicit misleadingness under *Rogers* by using a "quick-look" version of the *Polaroid* factors require a "particularly compelling" showing of confusion to impose liability on art. *Twin Peaks Prods.,*

1

*Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993) ("[T]he finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest recognized in *Rogers*."). Hermès' own surveys showed no confusion among handbag buyers and—even accepting Hermès' flawed NFT purchaser survey at face value—only a low purported confusion level among NFT buyers. If the artworks or their titles were *explicitly* misleading, one would expect many more people to be confused.

Rothschild is entitled to summary judgment on all of Hermès' claims.

## FACTUAL BACKGROUND

Hermès is a luxury fashion business known for, among other products, its Birkin handbag, which Hermès sells for anywhere from thousands of dollars to over one hundred thousand dollars. The Birkin bag has become a cultural symbol of rarefied wealth through prolific references in media and pop culture. Amended Complaint ("Complaint" or "Compl.") ¶¶ 27, 29, 33, 37, 40-45.

Rothschild, born Sonny Estival, is an artist as well as an entrepreneur and business owner. Rothschild Rule 56.1 Statement of Undisputed Facts ("SUF") ¶ 1 (Rothschild Decl. ¶¶ 1, 4-5; Gopnik Rep. ¶¶ 10, 15; T. Sacks Dep. (Sept. 15, 2022) 32:2-11; D. Cohen Dep. (Sept. 22, 2022) 61:25-62:10; K. Loo Dep. (Sept. 7, 2022) 155:5-156:1; Compl. ¶¶ 1, 8-9, 25).

In one early art project in 2015, Rothschild created and sold a collection of t-shirts titled *The Art School Dropout* as a commentary on the "ugly" designs on merchandise sold by venerated art schools at the time. SUF ¶ 3 (Rothschild Decl. ¶ 6; M. Rothschild Dep. (Aug. 4, 2022) 48:23-53:4, Ex. 6); B. Gopnik Dep. (Sept. 23, 2022) 160:21-167:7). One of those schools liked Rothschild's work so much that it hired him to design merchandise for the school. SUF ¶ 4 (Rothschild Decl. ¶ 6).

In early 2021, Rothschild created his first art project involving non-fungible tokens (NFTs). Rothschild produced a digital image of a chair linked to an NFT, which sold for the equivalent (at the time) of approximately $4,000. SUF ¶ 5 (Rothschild Decl. ¶ 7; M. Rothschild Dep. (Aug. 4, 2022) 118:19-119:23).

NFTs are units of data stored on a blockchain that are created to transfer and authenticate ownership of either physical things or digital media. SUF ¶ 6 (Compl. ¶ 4). When NFTs are created, or "minted," they are listed on an NFT marketplace where NFTs can be sold or traded in accordance with "smart contracts" that govern the transfers. SUF ¶ 7 (Compl. ¶¶ 61, 63). When an NFT is linked to digital media, the NFT and corresponding smart contract are stored on the blockchain and are linked to digital media files (*e.g.*, JPEG images, .mp4 video files, or .mp3 music files) to create a uniquely identifiable digital media file. SUF ¶ 8 (Compl. ¶ 60). NFTs and smart contracts are stored on the blockchain (so that they can be traced), but the digital media files to which the NFTs point are stored separately. SUF ¶ 9 (Compl. ¶ 62).

In or around May 2021, Rothschild produced a digital animation, *Baby Birkin*, depicting a 40-week-old fetus gestating inside a transparent Birkin handbag. SUF ¶ 10 (Rothschild Decl. ¶ 8; Compl. ¶¶ 70-71). The *Baby Birkin* was linked to an NFT. *Id.* Rothschild sold *Baby Birkin* for the equivalent (at the time) of $23,500; *Baby Birkin* later resold for the equivalent (at the time) of $47,000. SUF ¶ 11 (Rothschild Decl. ¶ 8; Compl. ¶ 72).

The response to *Baby Birkin* inspired Rothschild's follow-up art project, which he came to title *MetaBirkins*. SUF ¶ 12 (Rothschild Decl. ¶ 9). In or around December 2021, Rothschild produced and sold a collection of 100 digital images titled *MetaBirkins* and linked to NFTs; the *MetaBirkins* artworks depict imaginary Birkin handbags entirely covered in cartoonish fur, with some of the images also incorporating other artistic elements, such as the *Mona Lisa* (*La*

*Joconde*) and van Gogh's *The Starry Night*. Compl. ¶¶ 76, 79, Fig. 5 and Ex. Z; SUF ¶ 14 (Rothschild Decl. ¶ 9; N. Martin Dep. (Aug. 30, 2022) 48:3-11; 60:5-14, 51:4-52:13, 52:14-53:18). The *MetaBirkins* images linked to the corresponding NFTs are two-dimensional, static digital images, SUF ¶ 15, and are a form of creative expression; they are renderings of imaginary Birkin bags entirely covered in "goofy, garish fake fur" that "flags the absurdist, parodic intent of [the] project" and are both a fanciful tribute to the Birkin bag, which has become a cultural object signifying extreme wealth, and a reference to the fashion industry's fur-free initiatives. SUF ¶ 16 (Gopnik Rep. ¶ 38; (M. Rothschild Dep. (Aug. 4, 2022) 189:21-190:5); Rothschild Decl. ¶ 10.

Moreover, the *MetaBirkins* project as a whole, including its promotion and sales in connection with NFTs, is a "Business Art" project in the vein of Warhol, Duchamp, and other such artists who have deliberately engaged with the intersection of art and commerce; the project was at least in part an artistic experiment to explore how the culture would respond to simple images of imaginary Birkin bags and where the value lies in the Birkin bag (*i.e.*, in the handcrafted physical object or in the image it projects?). SUF ¶ 19 (Gopnik Rep. ¶¶ 18-35, 37-40); Rothschild Decl. ¶ 11.

## ARGUMENT

## I.   THE STANDARD FOR A MOTION FOR SUMMARY JUDGMENT

On a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). An

issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

A party opposing a properly supported motion for summary judgment may not rest upon conclusory allegations or unsubstantiated speculation, *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), but must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.     THIS COURT SHOULD GRANT SUMMARY JUDGMENT TO ROTHSCHILD ON HERMÈS' TRADEMARK CLAIMS

### A.     Discovery Has Confirmed, and Hermès Has Offered No Facts to Dispute, That *MetaBirkins* Are Artworks Protected by the First Amendment.

In his Motion to Dismiss the Amended Complaint, Rothschild argued that well-settled Second Circuit law protects Rothschild's ability to make and sell his digital artwork, and to title those works *MetaBirkins*. *See* Memorandum of Law in Support of Defendant Mason Rothschild's Motion to Dismiss the Amended Complaint [Doc. 27] at 1-2, 4-20; *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). This Court agreed that *Rogers* applies to Rothschild's works:

> Because trademark claims therefore implicate First Amendment interests, accounting for these different interests requires a separate test, as the Court laid out in <u>Rogers</u>, and it is that test that applies here. Because Rothschild is selling digital images of handbags that could constitute a form of artistic expression, balancing the First Amendment concerns with Lanham Act protection requires applying the <u>Rogers</u> test.

Memorandum Order [Doc. 50] ("Order") at 11 (internal citation omitted).

This Court's ruling that *Rogers* applies has now been confirmed by uncontradicted facts and testimony. In particular, discovery has confirmed that the *MetaBirkins* images, their associated NFTs, and the *MetaBirkins* name are indisputably artistic expression. SUF ¶¶ 16, 17.

That conclusion is summed up in the opening paragraph of the unrebutted expert report of Dr.

Blake Gopnik:

> In the following report, I show how the images and NFTs produced and sold by Mason Rothschild find their natural and obvious home among the artistic experiments carried out by modern artists over the last century. Like several important predecessors, Rothschild seeks to probe the nature of art, and of commerce, by blurring the distinction between the two categories. In engaging with the commercial world of Hermès Birkin bags, his art turns commerce itself into an art supply.

Millsaps Decl. ¶ 2, Ex. 1 (Gopnik Rep. ¶ 1). Indeed, Dr. Gopnik, a noted art historian, critic, and

author of *Warhol*—the 976-page, definitive biography of Andy Warhol published in 2020—has

recognized Rothschild as an artistic "heir" to Marcel Duchamp and Andy Warhol based on his

analysis of Rothschild's *MetaBirkins* art project. SUF ¶ 2 (Gopnik Rep. ¶¶ 10, 15).

Dr. Gopnik's unrebutted testimony reinforces this Court's prior ruling that *Rogers*

applies. As Dr. Gopnik explained, the *MetaBirkins* images are renderings of imaginary Birkin

bags entirely covered in "goofy, garish fake fur" that "flags the absurdist, parodic intent of [the]

project." SUF ¶ 16 (Gopnik Rep. ¶ 38). And as Rothschild has explained, the cartoonishly furry

*MetaBirkins* images are both a fanciful tribute to the Birkin bag, which has become a cultural

object signifying extreme wealth, and a reference to the fashion industry's fur-free initiative. *Id*.

¶¶ 14, 16 (Rothschild Decl. ¶ 9-10; M. Rothschild Dep. (Aug. 4, 2022) 189:21-190:5).

Commentary need not be parodic or blatant, however, to qualify for *Rogers*: it suffices

that Rothschild had something to say about luxury and that he picked a relevant example. *See*

*Yankee Pub. Inc. v. News America Pub. Inc.*, 809 F. Supp. 267, 279-80 (S.D.N.Y. 1992) (Leval,

J.); *cf. Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425, 437 (S.D.N.Y.

2016) (commentary on luxury may legitimately select an exemplar of the category).

As this Court recognized in its prior ruling, it does not matter that Rothschild sells his *MetaBirkins* artworks, or that he does so by way of NFT. *See* Order at 12. It is well settled that the commercial exploitation of art, including in mass media, does not strip it of its status as art. *See*, *e.g.*, *Rogers*, 875 F.2d at 998 ("the artistic and commercial elements of titles are inextricably intertwined"); *AM General LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 477 (S.D.N.Y. 2020) (applying *Rogers* to commercially-distributed videogames); *Twentieth Century Fox Television v. Empire Distrib., Inc.*, 875 F.3d 1192, 1196 (9th Cir. 2017) (applying *Rogers* to Fox's use of the Empire mark as the title of a show and "as an umbrella brand to promote and sell music and other commercial products").

It is especially clear that Rothschild's use of NFTs does not affect the status of his *MetaBirkins* images and art project as art, because the NFTs themselves have an artistic function. As Dr. Gopnik demonstrates, the NFTs associated with the *MetaBirkins* images—and the manner in which those NFTs were promoted, sold, and traded—have an artistic function within the practice of "Business Art," a recognized discipline within conceptual art practiced by Andy Warhol and carried into the 21ˢᵗ Century by Rothschild (and others):

> As I argued in a lengthy recent treatment of NFTs, commissioned from me by the New York Times, these blockchain tokens themselves don't have any real aesthetic value, since they are nothing more than certificates of authenticity that can be attached to any kind of art object at all, regardless of its appearance. Where they do truly take their place in art history, I explained, is within the Business Art tradition, where the fact that they get traded, and what that trading means, are vital to their cultural power.

Millsaps Decl. ¶ 2, Ex. 1 (Gopnik Rep. ¶ 32 (internal citation omitted)). Dr. Gopnik further elaborates:

> Birkin bags are bought by a rarefied class of people who can afford such conspicuous moments of consumption. Rothschild's NFT'd 'MetaBirkins' are meant to mimic this economic aspect of the real-world bags they depict—in much the same way, in fact, that a more traditional artistic depiction points to something

of interest by mimicking its appearance. As Rothschild put it in an interview, since Birkin bags are fundamentally about 'showing off' extreme wealth, NFTs that fetch 'crazy amounts of money' have a similar status. The particular combination of Rothschild's production of NFTs, and the way they reference the Birkin bags of Hermès, allows Rothschild to make an important artistic point about the way that our society—including the art world—is dominated by high-status goods.

*Id*. (Gopnik Rep. ¶ 34 (internal citation omitted)). *See also* Millsaps Decl. ¶ 4, Ex. 3 (B. Gopnik Dep. (Sept. 23, 2022) at 118:3-12 ("Business Art is art that engages directly and powerfully—for want of a better word—with business, with commerce, with a wide range of activities that on the face of it normally might seem as being essentially about finances and commodities but in fact when introduced into the discourse of art seem to have a richer set of resonances. It's a way of using art to look at the world of finance and business by participating in it to a certain extent."); Rothschild Decl. ¶ 11 ("My *MetaBirkins* project as a whole was an artistic experiment to explore where the value in the Birkin handbag actually lies—in the handcrafted physical object, or in the image it projects? I used NFTs to sell and distribute the artworks to see what kind of value the culture would ascribe to playful representations of imaginary Birkin bags.")).

These facts and testimony confirm that the *MetaBirkins* images and NFTs, and indeed the project as a whole, are artworks protected by the First Amendment. Hermès has produced no evidence that rebuts this evidence, and Hermès's mere assertions that the *MetaBirkins* are "commodities" or "digital knockoffs" do not create a genuine issue of material fact. *See* Memorandum of Law in Opposition to Mason Rothschild's Motion to Dismiss [Doc. 31] at 18.

The unrebutted expert identification of *MetaBirkins* as art has determinative effect in this case. As this Court recognized in its Order, under *Rogers*, Rothchild's marketing and sale of *MetaBirkins* is not actionable if the content and name of the *MetaBirkins* works have some artistic relevance and do not explicitly mislead as to the source of the work. *See* Order at 13;

*Rogers*, 875 F.2d at 998. Discovery now has confirmed that Hermès' allegations with regard to both elements of the *Rogers* test are unsupported by facts.[1]

**B.      The Content and Name of the *MetaBirkins* Artworks Are Artistically Relevant to the *MetaBirkins* Art Project.**

Under the first prong of the *Rogers* test, "courts must determine whether the use of the trademark has any artistic relevance whatsoever." *AM General*, 450 F. Supp. 3d at 477 (quoting *Rogers*, 875 F.2d at 999). This Court already correctly noted that *Rogers* sets an "admittedly low bar of artistic relevance." Order at 14. As other courts in this Circuit have repeatedly stated, the requirement of minimal artistic relevance "is not unduly rigorous out of the understanding that the 'overextension of Lanham Act restrictions … might intrude on First Amendment values.'" *Id*. (quoting *Rogers*, 875 F.2d at 998); *see also Rogers*, 875 F.2d at 999 (describing the "appropriately low threshold of minimal artistic relevance"); *Louis Vuitton Malletier S.A. v. Warner Bros. Enter. Inc.*, 868 F. Supp. 2d 172, 178 (S.D.N.Y. 2012) (describing the artistic relevance threshold as "purposely low"). According to the Ninth Circuit, which adopted *Rogers* and has applied it to a wide range of noncommercial speech, artistic relevance must simply be "above zero." *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1243 (9th Cir. 2013) ("This black-and-white rule has the benefit of limiting [a court's need] to engage in artistic analysis in this context.").

---

[1] Rothschild also preserves his argument that Hermès' claims are barred under the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), which held that "origin of goods," as used in the Lanham Act, refers only to the producer of tangible products. *Id.* at 37. Lanham Act claims are available only when there is plausible confusion regarding "the producer of the tangible goods that are offered for sale, and not … the author of any idea, concept, or communication embodied in those goods." *Id.* at 37. Discovery has made clear that the gravamen of Hermès' claim is that consumers will be confused because of the subject matter of the artworks, not that they are confused about the physical origin of the *MetaBirkins* NFTs or the server on which the *MetaBirkins* images are stored.

Under *Rogers*, artists are entitled to choose their subjects, and it is those choices that produce artistic relevance. *See, e.g.*, *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 807 (9th Cir. 2003) (artistic relevance existed because the name described the artwork, which depicted Barbie); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 899-90, 902 (9th Cir. 2002) (fame invites "unwanted attention"; when marks "transcend their identifying purpose" and "enter public discourse and become an integral part of our vocabulary," they "assume a role outside the bounds of trademark law," and use of mark in song was artistically relevant because song was "about Barbie and the values Aqua claims she represents") (cleaned up); *AM General*, 450 F. Supp. 3d at 479 (noting that "[i]t was *metaphysically* possible for Defendants to have produced video games without the presence of Humvees, just as it was *technically* possible for the film in *Rogers* to have had a different title or for the film in *Louis Vuitton* to have deleted the scene with the knockoff bag," but that those features were nevertheless artistically relevant) (emphasis in original); *VIP Products LLC v. Jack Daniel's Properties Inc.*, No. CV-14-02057-PHX-SMM, 2021 WL 5710730, at *5 (D. Ariz. Oct. 8, 2021) (artist's choice of subject determines artistic relevance, not nature of artist's message), *aff'd*, 2022 WL 1654040 (9th Cir. Mar. 18, 2022).

Discovery has only confirmed that artistic relevance is indisputable in this case. Even Hermès' own Rule 30(b)(6) witness, Nicolas Martin, was obliged to admit—however reluctantly—that the title is descriptive of the content of the *MetaBirkins* images. *See* SUF ¶ 18 (N. Martin Dep. (Aug. 30, 2022) 85-86 ("*There is some link between the title [MetaBirkins] and what I see*."). If there were any doubt, Dr. Gopnik explained the straightforward role of the *MetaBirkins* name:

> At its most basic, the title "MetaBirkins" does what titles in art most commonly do: It indicates the subject of the artwork. In fact, when curators and art historians come across a work that hasn't been titled by its artist—few Old Master paintings ever were—they give it a title that is simply a description of what is shown in it:

10

"Girl with a Pearl Earring" or "The Virgin of the Rocks." Most often, an artistic title has no bigger aim than to let us pick out one work of art from all others, by naming its subject. Given that Mason Rothschild's "MetaBirkins" depict, well, Birkins, it would have been almost bizarre for him not to have indicated that in his title.

SUF ¶ 18 (Gopnik Rep. ¶ 36). *See also* Rothschild Decl. ¶ 12.

The *MetaBirkins* title also is artistically relevant to the project at a deeper level. As Dr. Gopnik explained, the use of the prefix "Meta" with "Birkin" sends a signal to the audience that the *MetaBirkins* images are not just renderings of Birkin bags, but artistic comment on Birkin bags and the world of luxury they represent:

Rothschild's full title, "MetaBirkins," adds to the Birkins that it describes as his subject, just as his artwork goes beyond a simple realist depiction of the Hermès bags. Rothschild himself has said that one thing he has in mind, in his artistic experimentation, is to transfer the Birkin bag, with all its real-world cultural baggage, into a digital world where virtuality reigns—that is, into what is often called the 'metaverse.'

[T]he prefix "meta-" in Rothschild's title also fulfills another, possibly more important function. It tells an informed viewer that the interest we are supposed to take in the Birkin that Rothschild has labelled 'meta' comes from a larger comment it makes, rather than from its mere virtues as a depiction of a fancy purse.

The name 'MetaBirkins' therefore tells us, among other things, that we should read the image it comes attached to as an attempt to make a larger comment on the nature of the Birkin bag—and therefore on the nature of elite commodity culture. The combination of the prefix 'meta-' with the brand name 'Birkin' tells us that we're dealing with more than the latest fancy object labeled 'Birkin,' such as the Hermès company might release on its own behalf. It tells us to take a step back and contemplate what Birkin-ness really means to our society.

SUF ¶ 19 (Gopnik Rep. ¶¶ 37, 39, 40). *See also* Rothschild Decl. ¶ 12.

To the extent that Hermès claims that Rothschild's *MetaBirkins* infringe Hermès' trade dress rights in the appearance of the Birkin handbag, Dr. Gopnik makes clear that Rothchild's use in his *MetaBirkins* artworks of a sub-set of the Birkin bag's visual elements is itself artistically relevant to Rothshild's art:

> The function of the "MetaBirkins" would … dissolve—Rothschild's artistic
> expression would be stymied—if they had to represent generic handbags of no
> particular cultural interest or distinction. NFT'd images made to mimic a purse
> sold at Walmart would be sure to get little artistic traction in our Hermès-mad
> culture.

Millsaps Decl. ¶ 2, Ex. 1 (Gopnik Rep. ¶ 35). *See AM General*, 450 F. Supp. 3d at 479 (uses are

protected when they are "integral elements of artistic expression," and "an integral element is

one that communicate[s] ideas—and even social messages"); *see also Louis Vuitton*, 868 F.

Supp. 2d at 178 (emphasizing the cultural significance of the Louis Vuitton bag as important to

its artistic relevance).

Dr. Gopnik also makes clear that *MetaBirkins* do not literally copy the Birkin bags, and

the *MetaBirkins* images' distance from the actual Birkin bags signals to the audience that

*MetaBirkins* are offering artistic commentary:

> As Rothschild explained in an interview, he wanted to transfer the real-world aura
> of the physical Birkin into the virtual domain, meaning that the difference
> between a Hermès Birkin and a Rothschild "MetaBirkin"—one physical, the other
> virtual and electronic—was at least as important as any visual similarity there
> might be between the two objects. (And the visual similarity is weaker than
> Rothschild might have made it: His images portray "MetaBirkins" that come
> covered in goofy, garish fake fur that goes quite against the "classy" image that
> Hermès cultivates for its real-world purses; Rothschild's ridiculous fur flags the
> absurdist, parodic intent of his project. It is almost impossible to imagine that
> Hermès would have chosen to create similarly fur-covered purses …. The sheer
> absurdity of that fur helps to make clear the artistic nature of Rothschild's project.

*Id*.  (Gopnik Rep. ¶ 38). *See also* Rothschild Decl. ¶ 9.

Given the obvious artistic relevance of depictions of Birkin bags in the context of art

commenting on the world of luxury objects and the admittedly clear connection between the

*MetaBirkins* name and the artworks and art project as a whole, both of which were confirmed by

unrebutted expert evidence, both the images and the *MetaBirkins* name easily exceed the low

threshold for artistic relevance.

**C. Rothschild Did Not Explicitly Mislead Regarding the Source of the *MetaBirkins* Artworks or the *MetaBirkins* Art Project.**

Where the use of a trademark has some artistic relevance, as it does here, *Rogers* prohibits application of the Lanham Act unless the defendant's use "explicitly misleads as to the source of the work." 875 F.2d at 999. But where the "artistic relevance" test set a low bar, this exception sets a high bar. Specifically, for the Lanham Act to apply to an expressive work, the use must be *explicitly* misleading; implicit suggestions are not enough.

In *Rogers*, the Second Circuit gave examples that illustrate the narrowness of the concept of "explicitly misleading." Explicitly misleading titles would be "Nimmer on Copyright" for a treatise that was not authored by Nimmer, or "Jane Fonda's Workout Book" for a book Jane Fonda had nothing to do with. *Id.* Likewise, titles containing references that falsely and explicitly claimed endorsement—*e.g.*, "an authorized biography"—might be actionable. *Id.*

The *Rogers* court contrasted those explicitly misleading uses with the "many titles" that "include a well-known name without any overt indication of authorship or endorsement—for example, the hit song 'Bette Davis Eyes,' and the film 'Come back to the Five and Dime, Jimmy Dean, Jimmy Dean.'" *Id.* "To some people, th[o]se titles might implicitly suggest that the named celebrity had endorsed the work or had a role in producing it." *Id.* at 999-1000. But "the slight risk that such use of a celebrity's name might implicitly suggest endorsement or sponsorship to some people is outweighed by the danger of restricting artistic expression, and the Lanham Act is not applicable." *Id.* at 1000.

These examples from *Rogers* provide substantial guidance. A title like "MetaBirkins by Hermès" would be analogous to the titles identified by the *Rogers* court as explicitly misleading, because, like those titles, it makes a direct claim about source that does not require the audience to draw an inference. In contrast, the title "MetaBirkins" does not make a direct claim about

source and therefore cannot be explicitly misleading. Indeed, courts applying *Rogers* have routinely said that explicit misleadingness cannot be established by use of the mark alone. *Brown*, 724 F.3d at 1245 ("if the use of a mark alone were sufficient 'it would render *Rogers* a nullity'") (quoting *MCA*, 296 F.3d at 902); *see also Dr. Seuss Enters., L.P. v. Comicmix LLC*, 983 F.3d 443, 462-63 (9th Cir. 2020) (concluding that the copying of distinctive elements of Dr. Seuss books was not explicitly misleading where the actual creator was disclosed).

In its Complaint, Hermès did not allege any explicit misleadingness other than Rothschild's depictions of imaginary Birkin bags and use of the *MetaBirkins* name and "Hermès" and "Birkin" marks, unaccompanied by any explicit misstatement regarding source. *See* Compl. ¶¶ 81-133. And discovery has confirmed that Hermès has never been able to identify anything else that might be explicitly misleading.

When Hermès' Rule 30(b)(6) witness, Nicolas Martin, the General Counsel of Hermès Group—the most senior lawyer in the entire constellation of Hermès entities—was asked if Hermès had evidence of any attempts by Rothschild to explicitly mislead others to believe that *MetaBirkins* is associated with Hermès, Mr. Martin could point only to the use of the "Hermès" and "Birkin" marks and the claimed Birkin trade dress, and not to any *explicit* claim that Hermès was the source of the *MetaBirkins* artworks and associated NFTs, or that Hermès had sponsored or endorsed the *MetaBirkins* artworks and associated NFTs:

> Q:  Does Hermès have evidence of any attempts by Mr. Rothschild to explicitly mislead others to believe that *MetaBirkins* have an association with Hermès?
>
> A:  Yes.
>
> Q:  And what is that evidence?
>
> A:  I would say the use of the word Birkin. I don't remember all the -- all the details, but I remember at the beginning, Birkin was used alone. And I remember that one could think that it was Hermès. I don't have a -- I don't remember all the

details, but the use of the Birkin, the use of the Birkin trade dress, the way the communication has been made, and it could be considered explicitly misleading.

Q:  Are you aware of any other evidence of that?

A:  I – I don't have any more in mind, so –

SUF ¶ 20 (N. Martin Dep. (Aug. 30, 2022) 114:9-115:16). In response to further questioning, Mr. Martin stated that "[f]or me, *MetaBirkins* is explicitly misleading." *Id*. at 118:13-14. That name was explicitly misleading, Mr. Martin stated, "[b]ecause people will get confused and think it's from Hermès." *Id*. at 118:17-18.

Mr. Martin confirmed, in other words, that as far as Hermès is concerned, any use that might cause confusion is explicitly misleading. But *Rogers* is unequivocal that the standard is *explicitly* misleading; confusion attributable to some inference is not sufficient. *See* 875 F.2d at 1001 n.8 (finding that survey evidence showing that 38% of respondents mistakenly believed that Ginger Rogers was involved with the film at issue was insufficient to be actionable). If *Rogers* insulated uses only when there was no risk of confusion, the solicitude purportedly extended to noncommercial speech would mean nothing. Uses that don't cause confusion are *never* actionable under the Lanham Act, regardless of whether they involve protected speech. That is why courts have been so consistently clear that mere use of the trademark cannot be enough to be explicitly misleading.

The complete lack of evidence of explicit misleadingness is in no way surprising, for discovery has shown that Mr. Rothschild wished to be credited as the artist behind *MetaBirkins*, and that he took care to inform consumers that he, and not Hermès, created those artworks. When a few press outlets mistakenly attributed *MetaBirkins* to Hermès shortly after the launch of the project, Mr. Rothschild or his representative reached out promptly to point out that Hermès was not affiliated with *MetaBirkins* and to ask for a correction. SUF ¶ 23 (Rothschild Decl. ¶ 13;

Millsaps Decl. ¶ 13, Ex. 12). Additionally, Rothschild added the following disclaimer to the *MetaBirkins* website: "We are not affiliated, associated, authorized, endorsed by, or in any way officially connected with the HERMÈS, or any of its subsidiaries or its affiliates. The official HERMÈS website can be found at https://www.Hermès.com/." SUF ¶ 24-25 (Compl. ¶ 104, Fig. 13 and Ex. AH; Rothschild Decl. ¶ 14).

> **D.    Hermès Cannot Even Show Ordinary Consumer Confusion.**

As noted above, the Second Circuit did not consider the *Polaroid* factors at all in *Rogers*.[2] Instead, the court worked from its examples and rejected Ginger Rogers' claim despite survey evidence showing that "38 percent [of survey respondents] responded 'yes' to the question: 'Do you think that the actress, Ginger Rogers, had anything to do with this film, or not?'." *Rogers*, 875 F.2d at 1001 n.8. The court believed that the survey evidence "indicate[d] at most that some members of the public would draw the incorrect inference that Rogers had some involvement with the film. But that risk of misunderstanding, not engendered by any overt claim in the title, [was] so outweighed by the interests in artistic expression as to preclude application of the Lanham Act." *Id.*; *see also id.* at 1000 (the First Amendment "insulates from restriction titles [and works] with at least minimal artistic relevance that are ambiguous or only implicitly misleading.").

In situations involving "the scope of trademark protection for literary titles," *Twin Peaks* at 1370, courts in this Circuit have used a "quick look" *Polaroid* approach in conjunction with *Rogers*. They have done so in order to account for the special risks of title-versus-title confusion.

---

[2] The *Polaroid* factors are: (1) the strength of the senior mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap"; (5) actual confusion; (6) the defendant's good faith (or bad faith) in adopting its own mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).

*See*, *e.g.*, *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.*, 886 F.2d 490, 494 (2d Cir. 1989).

Even under that approach, confusion evidence must be "particularly compelling" to outweigh an artistic defendant's First Amendment interest. *Twin Peaks*, 996 F.2d at 1379. Evidence of likely confusion that would satisfy an ordinary *Polaroid* analysis is not "particularly compelling." *Id.*; *AM General*, 450 F. Supp. 3d at 478; *see also Monbo v. Nathan*, No. 18-CV-5930 (MKB), 2022 WL 4591905 at *37 (E.D.N.Y. Aug. 26, 2022), *reconsideration denied*, 2022 WL 4134455 (E.D.N.Y. Sept. 11, 2022) (granting summary judgment to defendant documentary producers on plaintiff documentary producer's Lanham Act claim based on similarity of titles and subjects for want of "particularly compelling" likelihood of confusion, which demonstrated lack of explicit misleadingness). As this Court explained in *AM General*, "no amount of evidence showing *only* consumer confusion can satisfy the 'explicitly misleading' prong of the *Rogers* test because such evidence goes only to the 'impact of the use' on a consumer." 450 F. Supp. 3d at 480 (emphasis in original); *see also Brown*, 724 F.3d at 1245 (holding that survey evidence showing that the *majority* of consumers believe that identifying marks cannot be included in games without permission "changes nothing" in the *Rogers* analysis in the absence of an explicitly misleading affirmative claim).

Discovery in this case has made clear that Hermès cannot even meet the ordinary standards for showing a likelihood of confusion, much less a "particularly compelling" standard that might support an argument that a use was explicitly misleading.

1.   ***Strength of the Plaintiff's Mark***.  The iconic status of the Birkin bag is precisely why Rothschild's reference to that bag and the name *MetaBirkins* are artistically relevant, *see* Millsaps Decl. ¶ 2, Ex. 1 (Gopnik Rep. ¶ 35)—and why handbag purchasers were not confused

in Hermès' own survey. *See* SUF ¶¶ 26-28. Rather than being evidence of confusion, the strength of the mark in this case makes it more likely that Rothschild's *MetaBirkins* will be recognizable by consumers as art and not be attributed by consumers to Hermès. *See, e.g.*, *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 259 (4th Cir. 2007); *Yankee Publishing*, 809 F. Supp. at 273, 279-80; *cf. Girl Scouts of U.S. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 808 F. Supp. 1112, 1124 (S.D.N.Y. 1992) (consumers can recognize small differences when dealing with extremely strong marks, in context of book series), *aff'd*, 996 F.2d 1477 (2d Cir. 1993); *Jim Beam Brands Co., Inc. v. Beamish & Crawford, Ltd.*, 852 F. Supp. 196, 199 (S.D.N.Y. 1994) ("it is precisely this strength [of Jim Beam for whiskey] that makes it unlikely to be confused with an Irish stout product").

2. **_Similarity of the Marks_**. Though the *MetaBirkins* obviously and necessarily evoke the Birkin bag, the *MetaBirkins* images are conspicuously not merely reproductions of Birkin bags; they are fanciful depictions. SUF ¶ 16 (Gopnik Rep. ¶ 38; Rothschild Decl. ¶ 9). The *MetaBirkins* name is not the same as Birkin, and the Meta prefix has artistic relevance itself. *See* section II(B), *supra*. *Cf. AM General*, 450 F. Supp. 3d at 481 (noting that, when the marks are used for different purposes, the marks are not similar; noting that the purportedly similar purpose of selling products for profit was "far too abstract to argue reasonable confusion").

3. **_Proximity of the Products_**. Despite Hermès' attempts to characterize the *MetaBirkins* artworks as "digital knockoffs," there is no such thing as a "digital knockoff" of a physical handbag. The *MetaBirkins* artworks are not handbags—nor are they any more "proximate" to handbags than a painted image of a pipe is to a pipe. *See AM General* at 481

(noting that the "competitive proximity inquiry focuses on a user's 'central purpose' and 'focus' rather than a 'sporadic and marginal aspect of the user's purpose'").[3]

    **4.**    ***Likelihood of Bridging the Gap.*** Whether or not Hermès ever plans to get into the NFT market or the market for so-called digital goods, it is not entitled to control the market for artistic references. Courts in this Circuit have repeatedly insulated artistic expression from liability notwithstanding evidence that the mark owner licensed to competitors of the defendant. *See Rogers*, 875 F.2d at 1001-02 (insulating use of Ginger Rogers' name even though she routinely appeared in competing films); *AM General*, 450 F. Supp. 3d at 475 (dismissing plaintiff's claim based on use of Humvee marks in videogame despite plaintiff's evidence that it granted licenses for a wide variety of products, including toys and video games); *see also id*. at 482 ("When First Amendment considerations figure strongly in a case … the weight of [the likelihood of bridging the gap factor] must be minimal.").

    **5.**    ***Actual Confusion.*** We expect that Hermès will seek to rely on an unreliable survey that is not relevant evidence of confusion. *See* Millsaps Decl. ¶ 9, Ex. 8 (Isaacson Rep. (August 4, 2002)). As the report of defendant's rebuttal expert Dr. David Neal shows, the survey designed by Dr. Isaacson was systemically biased in Hermès' favor. Millsaps Decl. ¶ 10, Ex. 9 (Neal Rep. ¶¶ 3.4-3.4.5). In addition, Dr. Isaacson's study contains a coding error that, once corrected, materially reduces his measured instance of confusion below a level that courts consider probative of the likelihood of confusion. *Id.* (Neal Rep. ¶¶ 3.3-3.3.15.2).

---

[3] In a study that Hermès' proffered expert Dr. Bruce Isaacson conducted but chose not to rely on in his report, Dr. Isaacson found that only 3.6% of purchasers or potential purchasers of luxury handbags were confused about the source of the *MetaBirkins*. Although that survey did not focus on consumers or likely consumers of *MetaBirkins*, it offers evidence of meaningful differences in the parties' products—those who buy Hermes' products are demonstrably not confused by Rothschild's *MetaBirkins*. Millsaps Decl. ¶ 10, Ex. 9 (Neal Rep. ¶¶ 3.5-3.5.7.2).

Crucially, even if Dr. Isaacson's survey were fully credited, it actually proves that Hermès' claims must fail. The survey purports to show only 18.7% confusion. Millsaps Decl. ¶ 9, Ex. 8 (Isaacson Rep. ¶ 21). Some courts find that level of confusion insufficient even in ordinary confusion cases; others find it barely sufficient. *See* 4 McCarthy on Trademarks and Unfair Competition (5th ed. 2022) ("McCarthy") § 32:188 ("In the author's view, survey confusion numbers that go below 20% need to be carefully viewed against the background of other evidence weighing for and against a conclusion of likely confusion."). Here the standard is much higher—Hermès must provide "particularly compelling" evidence of confusion. It cannot remotely meet that standard. *See AM General*, 450 F. Supp. 3d at 482 (finding "no evidence of actual confusion" despite plaintiff's survey showing 16% confusion as to AM General's association with the Call of Duty videogame, noting that "less than 20 percent confusion regarding association … does not hurdle" the requirement that evidence of confusion be particularly compelling).

But the court should not give Hermès credit even for that much. First, Dr. Isaacson admitted that the survey was in fact not a survey of *confusion* at all; he testified that his survey was testing not for confusion but for mere mental association between *MetaBirkins* and Hermès. SUF ¶ 30 (B. Isaacson Dep. (Sept. 20, 2022) 95:10-18, 102:3-9, 108:15-110:12, 120:2-8, 124:3-13). That is why he counted as "confused" respondents who, when asked about the source of the products on the webpage that Isaacson used as a stimulus, read back to him the *disclaimer* on the page, which explicitly stated that *MetaBirkins* had no connection with Hermès. SUF ¶ 31 (B. Isaacson Dep. (Sept. 20, 2022) 118:25-120:8; Neal Rep. ¶¶ 3.3-3.3.15.2). *See* McCarthy § 23:9 ("'Confusion' means more than that the junior user's mark merely 'calls to mind' the senior

user's mark."). For this reason alone, Isaacson's survey should be disregarded as evidence of confusion.

In the same vein, Dr. Isaacson correctly included a follow-up question to rule out the possibility that respondents who named Hermès were not actually "confused" but were simply "reading back" the Hermès marks because those marks were shown to them in the stimulus. Millsaps Decl. ¶ 10, Ex. 9 (Neal Rep. ¶¶ 3.3.2-3.3.8). But Dr. Isaacson improperly ignored the data from this question, thereby materially inflating the level of confusion he purports to find. *See id.* (Neal Rep. ¶¶ 3.3.9-3.3.15.2).

Even taking it at face value despite these fundamental flaws, Dr. Isaacson's survey purports to show only 18.7% confusion. Once corrected for the failure to control for mere association and "reading back," Dr. Neal found that the level of confusion in Dr. Isaacson's survey falls to 9.3%, *id.* (Neal Rep. ¶ 3.3.14), which is below what nearly any court would find to be probative of confusion in an ordinary infringement case not involving artistic expression.

But the problems with Dr. Isaacson's survey go even deeper. As Dr. Neal's report demonstrates, Dr. Isaacson's key confusion questions are worded in a way that cooks the books in favor of Hermès. Specifically, Dr. Isaacson asked "What company, companies, person, or people do you think makes or provides the *items shown on the webpage* [that was used as the stimulus]?" (emphasis added). He also asked a follow-up question with the same phrasing. Millsaps Decl. ¶ 9, Ex. 8 (Isaacson Rep. ¶ 18).

The survey was purportedly about NFTs, and the respondents were purportedly purchasers of NFTs; it would thus have been natural and logical to ask who makes or provides the *NFTs*. Instead, the survey used the phrasing "the items shown on the webpage," which is inherently ambiguous since respondents could easily interpret that phrase to refer to the artworks

themselves *or* the real-world handbags the artworks visually reference. To the extent that respondents interpreted the questions to refer to the latter, their answer would not reflect confusion about who puts out the *MetaBirkins* artworks; it would reflect an *accurate* understanding of who puts out the physical object visually referenced in the *MetaBirkins* artworks. Millsaps Decl. ¶ 10, Ex. 9 (Neal Rep. ¶¶ 3.4-3.4.5). This problem underscores the wisdom of *Rogers'* teaching that surveys purporting to find confusion from ambiguously labeled artworks should be ignored.

To the extent the Isaacson survey has any probative value, it is to show that the *MetaBirkins* name and images are *not* explicitly misleading. It is implausible that an explicitly misleading use would produce such a low level of confusion. *Cf. Rogers*, 875 F.2d at 1001 n.8 (implicitly misleading title produced 38% confusion, which the court found insufficient).

**6.** ***Good Faith.*** Rothschild made clear who was the source of the *MetaBirkins*: he was. His website and social media pages identified Rothschild as the creator of *MetaBirkins*. *See, e.g.*, Compl. ¶¶ 87, 94, Figs. 8, 9, Exs. AE, U. He made prompt efforts to correct mistaken journalists. SUF ¶ 23. He additionally added a disclaimer to the *MetaBirkins* website, which further demonstrated his explicit disclosure of source, reinforcing Rothschild's intent to make art rather than to confuse. SUF ¶ 24. *See Monbo*, 2022 WL 4591905 at *37 ("[E]ven if a significant number of consumers would not pay attention to the end credits of the 2013 Documentary, the end credits, as well as the promotional materials …, clearly indicate that the producers of the 2013 Documentary are not the individuals who produced Plaintiffs' films"); *Medina v. Dash Films, Inc.*, No. 15-CV-2551, 2016 WL 3906714, at *5 (S.D.N.Y. July 14, 2016) (noting that "[c]onsumers expect a title to communicate a message about the ... movie, but they do not expect it to identify the publisher or producer," and that "[t]his is particularly true where '[the]

defendants employed their own source designations elsewhere on the product' " and "materials promoting the film prominently informed the reader" who the producers were)" (cleaned up); *see also Consumers Union of United States, Inc., v. General Signal Corp.*, 724 F.2d 1044, 1053 (2d Cir. 1983) (injunction not available "where there is any possibility that an explanation or disclaimer will suffice").

      **7.**    ***Quality.*** Given courts' general unwillingness to engage in aesthetic discrimination, this factor does not apply here. *Cf. Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 251 (1903) (Holmes, J.) ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits.").

      **8.**    ***Consumer Sophistication.*** It is black-letter law that consumers exercise more care when buying expensive goods; consumers generally exercise greater care when purchasing products for thousands or tens of thousands of dollars, reducing the likelihood of actual confusion. *See, e.g.*, *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 90-91 (2d Cir. 2020) (finding consumers likely to be highly discriminating in purchasing $2500 rings: "The greater the value of an article, the more careful the typical consumer can be expected to be."); McCarthy §§ 23:96, 23:97. Given the market prices of the parties' products, reasonable consumers would carefully consider the entire description of *MetaBirkins* before purchase (a circumstance that also distinguishes reality from the artificial environment in Hermès' survey).

## III.    ALL OF HERMÈS' OTHER CLAIMS MUST BE DISMISSED

### A.    Noncommercial Uses Do Not Dilute.

    The federal dilution statute, 15 U.S.C. § 1125(c)(3)(C) (2018), expressly excludes all "noncommercial" uses. The statute relies on the First Amendment's definition of noncommercial

speech, which extends to all expression that does more than simply propose a transaction, including the digital art at issue here. *See MCA*, 296 F.3d at 905-06 (explaining that for-profit speech which is itself the product being sold is noncommercial). State law dilution claims have the same limit. *Louis Vuitton*, 868 F. Supp. 2d at 184; *Yankee Publ'g*, 809 F. Supp. at 282 (New York dilution and unjust enrichment claims).[4]

## B.   Hermès' Other Claims Have the Same Fatal Flaws.

Rothschild's First Amendment rights under *Rogers* preclude Hermès' dilution claims as well, especially given that dilution implicates no countervailing interest in consumer protection. *See AM General*, 450 F. Supp. 3d at 488 (dismissing federal and state dilution claims as barred by *Rogers*); *Louis Vuitton*, 868 F. Supp. 2d at 184 (dismissing New York anti-dilution claim and common law unfair competition claim).

Indeed, *Rogers* bars all of Hermès' other causes of action, however denominated. Merely changing the label on the cause of action cannot be enough to circumvent the First Amendment. As the Fourth Circuit has explained:

> Congress left little doubt that it did not intend for trademark laws to impinge the First Amendment rights of critics and commentators. … Congress directed that in determining whether an individual has engaged in cybersquatting, the courts may consider whether the person's use of the mark is a "bona fide noncommercial or fair use." 15 U.S.C. § 1125(d)(1)(B)(i)(IV). The legislature believed this provision necessary to "protect[ ] the rights of Internet users and the interests of all Americans in free speech and protected uses of trademarked names for such things as parody, comment, criticism, comparative advertising, news reporting, etc."

---

[4] Definitionally, dilution does not cover Rothschild's use of "MetaBirkins" because his use is referential, rather than being commercial use as a separate mark for an unrelated good or service. When the defendant invokes a famous mark in reference to the products identified by the mark, this only tends to reinforce, rather than weaken, the distinctiveness of a mark, and there is no blurring. *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 111-12 (2d Cir. 2010). Rothschild's use of the "MetaBirkins" name to refer to an artistic illustration of a Birkin bag further *reinforces* the distinctiveness of Hermès' marks.

*Lamparello v. Falwell*, 420 F.3d 309, 313-14 (4th Cir. 2005).

Here, every one of Hermès' claims—trademark infringement, false designation of origin and false descriptions and representations, federal trademark dilution, cybersquatting, state dilution and injury to business reputation, and state law misappropriation and unfair competition—focuses on the same speech that is protected under *Rogers*, which rejects the underlying premise of each of Hermès' claims: that artistically relevant depictions of trademarks can be wrongful in the absence of explicit falsity.

For example, cybersquatting requires use of a domain name with a bad faith intent to profit. 15 U.S.C. § 1125(d)(1)(A)(i). Rothschild's use of a domain name that is the title of his art project cannot be bad faith because that title is artistically relevant and not explicitly misleading. *See Lamparello*, 420 F.3d at 316 ("a court must evaluate an allegedly infringing domain name in conjunction with the content of the website identified by the domain name"); *id.* at 316 n.4 ("[I]t has long been established that even when alleged infringers use the very marks at issue in titles, courts look to the underlying content to determine whether the titles create a likelihood of confusion as to source") (citing, *inter alia, Rogers*, 875 F.2d at 1000-01).

The same is true for other attempts by Hermès to relabel the claim here. *See, e.g.*, *Rogers v. Grimaldi*, 695 F. Supp. 112, 117 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 994 (2d Cir. 1989) (rejecting Rogers' false designation of origin claim); *cf. Parks LLC v. Tyson Foods, Inc*., 863 F.3d 220, 227 (3d Cir. 2017) (rejecting false advertising claim that "depend[ed] upon the purported false association between [defendant's] brand and [plaintiff's] mark"); *Ebony Media Operations, LLC v. Univision Commc'ns Inc*., No. 18-cv-11434-AKH, 2019 WL 8405265 (S.D.N.Y. Jun. 3, 2019) (rejecting false advertising claim based on allegedly misleading use of plaintiff's trademark in news reporting).

Dated:  October 7, 2022

Respectfully Submitted,

/s/ *Rhett O. Millsaps II*
Rhett O. Millsaps II
Christopher J. Sprigman
Mark P. McKenna (*pro hac vice*)
Rebecca Tushnet
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY  10151
(646) 898-2055
rhett@lex-lumina.com

*Attorneys for Defendant Mason Rothschild*