# Exhibit 8

1
2
3
4
5

**UNITED STATES DISTRICT COURT**

6

**SOUTHERN DISTRICT OF NEW YORK**

7
8

HERMÈS INTERNATIONAL and

CASE NO. 1:22-cv-00384-JSR

9

HERMÈS OF PARIS, INC.,

10

Plaintiffs,

11

v.

**EXPERT REPORT SUBMITTED BY**

12

**DR. BRUCE ISAACSON MEASURING THE**

MASON ROTHSCHILD,

**LIKELIHOOD OF CONFUSION BETWEEN**

13

**METABIRKINS AND BIRKIN HANDBAGS**

14

Defendant.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**TABLE OF CONTENTS**

2

3    Overview of My Likelihood of Confusion Surveys ........................................................................ 1

4    My Qualifications ................................................................................. 16

5    Materials Reviewed and Compensation ........................................................................ 19

6    Methodology for the Survey of NFT Purchasers ........................................................................ 20

7    Findings From the Survey of NFT Purchasers ............................................................. 24

8    Methodology and Findings for the Survey of Handbag Purchasers ............................................ 35

9    Summary and Conclusions for the Survey of NFT Purchasers ...................................................... 38

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibits**

Exhibit 1: Dr. Bruce Isaacson CV and Testimony Experience

Exhibit 2: Test and Control Images Displayed in the Surveys

Exhibit 3: Recruiting Methods and Panel Description for the Surveys

Exhibit 4: Quality Control Measures for the Surveys

Exhibit 5: Codes for Analyzing Verbatim Responses for the Surveys

Exhibit 6: Questionnaire for Interviews Conducted Among NFT Purchasers

Exhibit 7: Terminations and Removals for Interviews Conducted Among NFT Purchasers

Exhibit 8: Cross Tabulation Tables for Interviews Conducted Among NFT Purchaserss

Exhibit 9: Questionnaire for Interviews Conducted Among Handbag Purchasers

Exhibit 10: Terminations and Removals for Interviews Conducted Among Handbag Purchasers

Exhibit 11: Cross Tabulation Tables for Interviews Conducted Among Handbag Purchasers

Exhibit 12: All Responses for All Interviews Conducted Among NFT Purchasers

Exhibit 13: All Responses for All Interviews Conducted Among Handbag Purchasers

1.      I have been retained by attorneys representing the Plaintiff in this matter, Hermès International and Hermès of Paris, Inc. ("Hermès").  This report provides the results of surveys I conducted measuring the likelihood of confusion between Birkin bags from Hermès and MetaBirkins NFTs, which are sold by the Defendant, Mason Rothschild.

2.      The opinions expressed in this report are based on materials I reviewed, research I conducted, and my experience.  All aspects of my surveys were designed and carried out by me personally or under my direct supervision.  I reserve the right to supplement this report in light of ongoing discovery in this matter.

**Overview of My Likelihood of Confusion Surveys**

3.      Hermès alleges that Mr. Rothschild "is stealing the goodwill in Hermès' famous intellectual property to create and sell his own collection of NFT products and run a business that promotes speculation in NFTs."[1]  Mr. Rothschild sells digital products in the form of non-fungible tokens ("NFTs")[2] that he calls METABIRKINS, and that Hermès alleges include "nearly indistinguishable blurry images of BIRKIN handbags with minor differences in style and color."[3]

4.      Hermès also asserts that the NFTs from Mr. Rothschild "simply rips off Hermès' famous BIRKIN trademark by adding the generic prefix 'meta' to the famous trademark BIRKIN,"[4] and that confusion is likely because the NFTs "point to images that reflect  the distinctive design of the BIRKIN handbag."[5]  Hermès alleges that Mr. Rothschild is trying to "create the same kind of

---

[1] Amended Complaint, dated March 2, 2022, ¶ 11.

[2] NFTs are digital files whose ownership and/or transaction records are stored in a decentralized manner using a public ledger called the blockchain.  On the blockchain, records of ownership are clear, even if the item is digital rather than tangible, so tokens like those Mr. Rothschild sells are "non-fungible"—that is, not interchangeable.  Vanier, Rachel. "Blockchain explained to your grandparents." *Medium*, September 17, 2018, https://medium.com/station-f/blockchain-explained-to-your-grandparents-c7fe71a9a339, last accessed July 19, 2022. *See also* Amended Complaint, ¶ 4: "NFTs can be created to transfer ownership of any physical thing or digital media, including an actual handbag or the image of a handbag."

[3] Amended Complaint, ¶ 78.

[4] Amended Complaint, ¶ 2.

[5] Amended Complaint, ¶ 14.

illusion that [the BIRKIN handbag] has in real life as a digital commodity,"[6] swapping "'real life' rights for 'virtual rights',"[7] which will "ultimately preempt Hermès' ability to offer products and services in virtual marketplaces that are uniquely associated with Hermès and meet Hermès' quality standards."[8]

5.     My surveys measured the likelihood of confusion, if any, between the MetaBirkins NFTs, sold by Mr. Rothschild, and Hermès, including the Birkin handbag.  Specifically, my surveys measured the likelihood of confusion associated with the NFTs using elements related to Hermès' marks, including "the famous BIRKIN Mark and HERMÈS Mark," and the "mark for the BIRKIN handbag's distinctive design."[9]

6.     As described in this report, I measured likelihood of confusion using the Eveready format, which is a well-accepted format for measuring likelihood of confusion.[10]  For example, *McCarthy on Trademarks and Unfair Competition* refers to Eveready as a "now-standard survey format."[11]  The Eveready format is commonly used, particularly with regard to well-known marks.  In this matter, Hermès asserts that the name and likeness of its Birkin handbag is "famous"[12] and "iconic,"[13] and also that the "distinctive shape and notoriety of the BIRKIN handbag has been judicially recognized around the world."[14]

---

[6] Amended Complaint, ¶ 77.

[7] Amended Complaint, ¶ 4.

[8] Amended Complaint, ¶ 15.

[9] Amended Complaint, ¶ 55.

[10] Swann, Jerre B.  "Likelihood of Confusion."  *Trademark and Deceptive Advertising Surveys:  Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann, ABA Publishing, 2012, pp. 62-64.

[11] McCarthy, J. Thomas.  §32:174 "Survey Formats—Eveready confusion format."  *McCarthy on Trademarks and Unfair Competition*, 4th ed., Thomson Reuters, 2009, p. 1.

[12] Amended Complaint, ¶¶ 2, 8, 9, 11, 14, 27, 33, 55, 73, 76, 94, 99, 176.

[13] Amended Complaint, ¶ 36.

[14] Amended Complaint, ¶ 53.

7.      My surveys measured likelihood of confusion relative to the MetaBirkins webpage, which is located at www.metabirkins.com.  This webpage advertises MetaBirkins NFTs, shows pictures and text relating to the NFTs, and provides links to online marketplaces where consumers can purchase the NFTs.[15]  My surveys showed this webpage to respondents and then asked questions to measure the likelihood of confusion with Hermès and Birkin handbags.

8.      The surveys measured two versions of the MetaBirkins webpage.  The "test version" measured the MetaBirkins webpage as consumers would encounter this page in the real world.  Figure 1 below shows the test webpage, which prominently displays images of 17 MetaBirkins handbags and also describes the MetaBirkins NFTs.

9.      The surveys measured the webpage in a desktop format, which showed the webpage as a consumer would see it on a device such as a desktop or laptop computer, and a mobile version, which showed the webpage as a consumer would see it on a device such as a cell phone.

10.     Figure 1 shows the desktop format of the MetaBirkins webpage.  In this format, when a user scrolls over a MetaBirkins handbag, words appear superimposed over the handbag in a manner that reads "NOT YOUR MOTHER'S BIRKIN" across each row of handbags.  My surveys replicated this feature.  Figure 2 shows MetaBirkins handbags from the webpage, with and without these words superimposed over the handbags.  Exhibit 2 shows the test webpage and test handbags displayed in the surveys, in both desktop and mobile versions.

---

[15] Amended Complaint, ¶¶ 6, 18, 24.

**Figure 1:**
**Test Version of the MetaBirkins Webpage Measured in the Confusion Surveys (1 of 2)[16]**





---

[16] Due to space constraints, the MetaBirkins webpage is reproduced across multiple pages of this report. In the actual surveys, consumers saw the webpage as a single image, in a size and format similar to what they would encounter in the real world.

**Figure 1:**
**Test Version of the MetaBirkins Webpage Measured in the Confusion Surveys (2 of 2)**



Expert Report of Dr. Bruce Isaacson
CASE NO. 1:22-CV-00384-JSR

**Figure 2:**
**Examples of Test Versions of MetaBirkins Handbags**
**With and Without Superimposed Words (1 of 2)**

| Handbag Without Words | Handbag With Words |
|---|---|

 

 

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Figure 2:**
**Examples of Test Versions of MetaBirkins Handbags**
**With and Without Superimposed Words (2 of 2)**

**Handbag Without Words**                    **Handbag With Words**







Expert Report of Dr. Bruce Isaacson
CASE NO. 1:22-CV-00384-JSR

11.     My surveys also measured an altered or "control" version of the MetaBirkins webpage. The measures from any survey can be affected by variables other than those the survey is intended to measure.  For example, survey measures may be affected by pre-existing attitudes among respondents, by respondents who are hurried or inattentive, or by other types of "general background noise."[17]  A control provides a means to adjust the survey measures for the effect of such extraneous influences and to isolate the effect associated with certain elements,[18] which here are the elements of Mr. Rothschild's webpage and NFTs to which Hermès objects.

12.     The control version of the webpage measured in my surveys is similar to the test webpage, but the control alters elements on the MetaBirkins webpage that Hermès claims are likely to cause confusion with Hermès and/or the Birkin handbag.  Specifically, the control webpage alters the following elements:

  i.   Names: For the control, the word "Birkin" was changed to "Handbag" everywhere it occurred.  For example, "NOT YOUR MOTHER'S BIRKIN" on the test reads "NOT YOUR MOTHER'S HANDBAG" on the control.  Similarly, "MetaBirkins" was changed to "MetaHandbags."  Also, on the control, "Hermès" was changed to a fictitious control name, "Darcy."

  ii.  Shape of the Handbag: For the control, the shape of the handbags was changed to a shape that is more square, with less tapered sides and a flatter top.

  iii. Features on the Handbag: The control removed the padlock on the front of each handbag.  Also, where vertical metallic lines were visible on the test handbags, the control handbags removed those lines from the front of the handbags.

[17] McCarthy, J. Thomas. § 32:187 "The need for a survey control." *McCarthy on Trademarks and Unfair Competition,* 5th ed., Thomson Reuters, 2021, p. 32-552.

[18] Diamond, Shari Seidman. "Reference Guide on Survey Research." *Reference Manual on Scientific Evidence,* 3rd ed., National Academies Press, 2011, p. 398.

13.     Figure 3 below shows the control version of the MetaBirkins webpage measured in my surveys, in desktop format.  In this format, when a user scrolls over a MetaHandbags handbag, words appear superimposed over the handbag in a manner that reads "NOT YOUR MOTHER'S HANDBAG" across each row of handbags.  My control replicated this feature.  Figure 4 shows MetaHandbags handbags from the control webpage, with and without these words superimposed over the handbags.  Exhibit 2 shows the control webpage and control handbags displayed in the surveys, in both desktop and mobile versions.

**Figure 3:**

**Control Version of the MetaBirkins Webpage Measured in the Confusion Surveys (1 of 2)[19]**





---

[19] Due to space constraints, the control webpage is reproduced across multiple pages of this report.  In the actual survey, consumers saw the webpage as a single image, in a size and format similar to what they would encounter in the real world.

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:22-CV-00384-JSR

**Figure 3:**
**Control Version of the MetaBirkins Webpage Measured in the Confusion Surveys (2 of 2)**



**Figure 4:**
**Examples of Control Versions of MetaBirkins Handbags**
**With and Without Superimposed Words (1 of 2)**

| Handbag Without Words | Handbag With Words |
|---|---|







Expert Report of Dr. Bruce Isaacson
CASE NO. 1:22-CV-00384-JSR

**Figure 4:**
**Examples of Control Versions of MetaBirkins Handbags**
**With and Without Superimposed Words (2 of 2)**



| Handbag Without Words | Handbag With Words |
|---|---|

 

 

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:22-CV-00384-JSR

14.     My surveys were conducted online.  As described later in this report, I conducted two surveys, involving interviews among two different audiences.

15.     The confusion survey conducted among NFT purchasers reflects 201 interviews with respondents 18 years or older who, among other qualification criteria, answered that they are likely to purchase an NFT for either digital artwork or fashion apparel or accessories in the next 12 months, and would be willing to spend $2,500 or more on that NFT.

16.     The confusion survey conducted among handbag purchasers reflects 164 interviews with respondents 18 years or older who, among other qualification criteria, answered that they are likely to purchase a handbag in the next 12 months, and would be willing to spend $10,000 or more on that handbag.  As described later in this report, the opinions that I express in this report are based on the survey I conducted among NFT purchasers.[20]

17.     After qualification, respondents in both surveys were randomly assigned to see either the test webpage or the control webpage, but not both webpages.  After seeing their assigned webpage, respondents answered questions that measured whether they believed that the items shown on the webpage were made or provided by, or sponsored, authorized, or approved by Hermès or Birkin.  As is typical for Eveready surveys, respondents in my surveys were never shown any item from Hermès.  They were counted as confused only if, in response to the test or control version of the MetaBirkins webpage they were shown, they mentioned Hermès or Birkin in response to any of the questions that measured confusion.  Providing such a response would require that they make a connection in their mind between the MetaBirkins webpage they were shown and Hermès or Birkin.[21]

18.     The following survey questions measured the likelihood of confusion:

---

[20] This report and the Exhibits to this report discuss both surveys, and provide analysis of the data from both surveys.  My opinions are based only on the survey conducted among purchasers of NFTs, because that audience corresponds to the commonly accepted audience for a survey measuring forward likelihood of confusion.  *See* Swann, Jerre B.  "Likelihood of Confusion."  *Trademark and Deceptive Advertising Surveys:  Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann, ABA Publishing, 2012, p. 63.

[21] Swann, Jerre B.  "Likelihood of Confusion."  *Trademark and Deceptive Advertising Surveys:  Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann, ABA Publishing, 2012, p. 53.

i.  Question 1 asked, "What company, companies, person, or people do you think makes or provides the items shown on the webpage?"

ii. Question 3 asked, "Are you aware of any other brands or products made or provided by whoever makes or provides the items shown on the webpage?" For those answering yes, Question 4 asked, "What other brands or products do you think are made or provided by whoever makes or provides the items shown on the webpage?"

iii. Question 6 asked respondents whether they think that whoever makes or provides the items shown on the webpage they viewed is or is not sponsored, authorized, or approved by another company, person or brand. For those who answered in the affirmative, Question 7 asked, "What other company, person, or brand do you believe sponsors, authorizes, or approves whoever makes or provides the items shown on the webpage?"

19.   Questions, 2, 5, and 8 asked respondents to explain their answers, asking, "What makes you think that? Please be as specific as possible."

20.   For the confusion survey conducted among NFT purchasers, the database includes 201 interviews, with 97 interviews involving test items and 104 involving control items. Across Questions 1, 4, and 7, which measured confusion as to source and confusion as to sponsorship, authorization, or approval, 21 respondents (21.6%) shown the test version of the webpage provided a response that referred to either Hermès or Birkin. Three respondents (2.9%) shown the control webpage provided a response that referred to either Hermès or Birkin.

21.   The net percentage, which is calculated as the test measure minus the control measure, is 18.7%, which is calculated as 21.6% minus 2.9%.

22.   In my experience, the measures from the survey conducted among NFT purchasers would typically be viewed as indicating a substantial likelihood of confusion between the MetaBirkins webpage and Hermès or Birkin.

23.   After providing background information, I will discuss both surveys in more detail.

- 15 -

**My Qualifications**

24.     I am the President of MMR Strategy Group ("MMR"), a marketing research and consulting firm, and am experienced in research, surveys, and marketing.  During my career, I have designed, conducted, and analyzed many hundreds of research studies, including many surveys for matters involving intellectual property and false advertising litigation.  I have provided testimony, by written report and/or deposition, regarding surveys that I or others conducted in approximately 100 matters.

25.     I have testified about surveys in matters before the National Advertising Division of the Better Business Bureau, federal courts, state courts, the Trademark Trial and Appeal Board (TTAB), the U.S. International Trade Commission, the U.S. Court of Federal Claims, and other venues and authorities.  Also, I have been retained in at least 22 matters by government agencies, including the U.S. Federal Trade Commission, the U.S. Department of Justice, and the U.S. Patent and Trademark Office.

26.     For more than 46 years, MMR Strategy Group has provided marketing research and consulting, consisting primarily of the design, execution, and analysis of thousands of surveys, as well as expertise related to marketing and strategy.  I have been President of MMR for more than 16 years.  During that time, I have provided marketing research and consulting for such well-known organizations as Farmers Insurance Group, Allstate Insurance, Goodyear Tire & Rubber Company, Nestlé USA, Inc., RE/MAX, Kaplan Test Prep, and other organizations.

27.     I have provided these and other companies with advice on topics such as marketing products and services, managing and growing brands, sizing and segmenting markets, measuring and improving customer experiences, identifying and analyzing new markets, evaluating and launching new products, satisfying and retaining customers, pricing products and services, and other topics relating to marketing, consumer behavior, and strategy.

28.     I received a Bachelor of Science degree in engineering from the Technological Institute at Northwestern University in 1985, and Master of Business Administration and Doctor of Business Administration degrees from the Harvard Graduate School of Business Administration in 1991 and 1995, respectively.  At Harvard, I received my MBA with highest

distinction as a Baker Scholar and was a Dean's Doctoral Fellow, writing publications on marketing and strategy, including best-selling teaching materials.  I have won awards for research I conducted from institutions including The Institute for the Study of Business Markets at Penn State University and Harvard University.  My education included masters-level and doctoral-level coursework in marketing, research design, statistics, buyer behavior, strategy, and other topics.

29.     I have taught marketing and strategy for executive groups and executive MBA programs.  Since 1994, I have been on the editorial board of the *Journal of Business-to-Business Marketing*, which publishes peer-reviewed research on business marketing.  Since 2010, I have been a member of *The Trademark Reporter* Committee of the International Trademark Association; TMR publishes peer-reviewed research on trademarks.  I am also a member of the American Marketing Association and the Insights Association (a merger of the former Marketing Research Association and the former Council of American Survey Research Organizations).  My firm is a member of the International Trademark Association.

30.     I regularly consult with clients regarding marketing, research, and strategy, and also address conferences and groups on these issues.  My public speaking includes addressing law firms and bar associations on the use of surveys in litigation, and related topics.  For example:

     i.    I am co-author of an article that discusses how to measure likelihood of confusion and was published in the May-June 2021 edition of *The Trademark Reporter,* a peer-reviewed journal that publishes research on trademarks.

     ii.    In March of 2020, I was a speaker at a seminar held at a law firm to discuss the use of consumer perception surveys in litigation matters.

     iii.    In May of 2018, at the annual conference of the International Trademark Association, I was a speaker on a panel discussing, among other topics, conducting surveys to support claims on packaging and advertising for litigation matters.

     iv.    In 2018, 2016, 2013, and 2010, I led roundtable discussions on litigation surveys at the annual conference of the International Trademark Association.

v.    In October of 2015, I was co-presenter for a Continuing Legal Education seminar on litigation surveys sponsored by the Bar Association of San Francisco.

vi.   In March of 2015, I presented to the U.S. Department of Justice, Civil Division, Commercial Litigation Branch on the topic of using surveys to measure attitudes and behaviors.

vii.  In October of 2013, I was a speaker at the Corporate Researchers Conference hosted by the Marketing Research Association.

31.    In terms of professional experience, I have been a marketing and strategy consultant at The Boston Consulting Group, a global consulting firm; Senior Vice President at a publicly traded data processing company that is now a division of Intuit; Division President at a media-services company that is now a division of News Corporation; and Vice President responsible for marketing and strategy at a financial services company.  I also served as the West Coast Practice Leader of an executive-education practice at a strategy-consulting firm, where I developed and taught educational programs for marketing and strategy.

32.    I have authored or co-authored more than 18 publications on the subjects of marketing, surveys, and business strategy, for publications including *The Trademark Reporter*; the *Intellectual Property Law Newsletter* of the American Bar Association's Section of Intellectual Property Law; *Intellectual Property Today*; *Intellectual Property Magazine*; *Quirk's Marketing Research Review*; and others.  My publications have included book chapters as well as teaching materials on marketing, consumer behavior, and other topics published by Harvard Business Publishing and used for business school curricula.

33.    Exhibit 1 shows my curriculum vitae and testimony experience, including but not limited to matters in which I have testified as an expert during the previous four years.

**Materials Reviewed and Compensation**

34.     For purposes of this report, I have gathered and/or reviewed a wide variety of

materials, including the following:

      i.     The Complaint, dated January 14, 2022, and Amended Complaint, dated March

           2, 2022, as well as related Exhibits.

      ii.    A Memorandum Order from the Court, dated May 18, 2022.

      iii.   Data on the demographics of Hermès buyers, provided by counsel.

      iv.   Visits to websites for MetaBirkins, at https://metabirkins.com, and Hermès, at

           www.hermes.com.

      v.     Visits to digital marketplaces where NFTs are sold, including OpenSea at

           https://opensea.io, LooksRare at https://looksrare.org, and Rarible at

           https://rarible.com.

      vi.   Review of other materials that discuss MetaBirkins, including an article[22] and a

           music video.[23]  Also, other materials that discuss NFTs and cryptocurrencies,

           including a discussion held June 27, 2022 with Professor Scott Duke Kominers,

           Professor of Business Administration at Harvard Business School and other

           materials.[24].

35.     In addition, I consulted published literature, cases, and popular or industry press

articles relevant to the issues and theories in this matter, the most relevant of which are cited

in this report.  I also rely on my knowledge in fields such as surveys, consumer behavior, and

marketing.

---

[22] Northman, Tora.  "The MetaBirkin vs. Hermès Saga Continues."  *High Snobiety*, February 10, 2022, https://www.highsnobiety.com/p/hermes-metabirkin-nft/, last accessed August 1, 2022.

[23] "MetaBirkin."  *YouTube*, uploaded by DeeHouse MF - Topic, December 5, 2021, https://www.youtube.com/watch?v=HwktgfEKakI, last accessed July 19, 2022.

[24] For example, Goldman, Matt, "Non-Fungible Tokens: Copyright Implications in the Wild West of Blockchain Technology" (2021). AELJ Blog. 281. https://larc.cardozo.yu.edu/aelj-blog/281. *See also* Musiala, et al. "Introduction to Non-Fungible Tokens-Part 1." July 22, 2022, https://www.bakerlaw.com/webfiles/Privacy/2022/1-Introduction-to-Non-Fungible-Tokens.pdf, last accessed August 4, 2022.

36.     For all activities and research described in this report, my firm billed $130,000.  After this report, my time is billed at $900 per hour, with a daily rate of $7,000 per day for testimony at trial or deposition.  My compensation is not dependent on the outcome of this matter.

37.     The next section describes the methodology for my survey of NFT purchasers.


**Methodology for the Survey of NFT Purchasers**

38.     Exhibit 6 shows the questions used to qualify prospective NFT purchasers for this survey, as well as the questions that measured confusion in these interviews.[25]

39.     For this survey, the demographic distribution of the survey database across gender, age, and geography reflects likely purchasers of NFTs for digital artwork, fashion apparel, or fashion accessories.  These questions qualified prospective respondents for this survey:

      i.    <u>Gender</u>: Question A asked respondents their gender.  The database of respondents is 65.2% male, and 34.8% female.

      ii.    <u>Age</u>: Question B asked respondents their age.  The survey database reflects three age groups, including 18 to 34 years old (47.8% of respondents), 35 to 54 years old (47.8%), and 55 years old or older (4.5%).

      iii.    <u>Geography</u>: Question C asked respondents for the ZIP code of their home address.  The database reflects the four regions of the U.S., including Midwest (18.9% of respondents), Northeast (16.9%), South (43.8%), and West (20.4%).[26]

      iv.    <u>Future purchase of a fashion or artwork NFT</u>: Question D asked respondents whether they were likely to purchase certain items in the next 12 months, including a non-fungible token/NFT, a virtual private network (VPN) subscription, a virtual reality headset, and a website domain name (URL).  Among those who answered that they were likely to purchase an NFT, Question

---

[25] Exhibit 6 contains programming instructions that were not visible to respondents.

[26] These regions are established by the US Census Bureau.  "Census Regions and Divisions of the United States." *U.S. Census Bureau*, U.S. Department of Commerce, https://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf, last accessed August 1, 2022.

1    E asked whether they were likely to purchase certain types of NFTs.

2    Respondents qualified on Question E if they answered that they were likely to

3    purchase "An NFT for digital artwork" and/or "An NFT for fashion apparel or

4    fashion accessories."

5    v.    Amount willing to spend to purchase an NFT: Question F asked respondents

6    which price range reflected the most they would be willing to spend to purchase

7    an NFT.  Respondents qualified if they selected "$2,500 - $4,999" or "$5,000 or

8    more."

9    vi.   Payment method for online purchase:  Question G asked respondents which

10    payment method they would consider using for an online purchase.

11    Respondents qualified if they answered cryptocurrency and/or credit card.

12   40.    Prospective respondents also were screened on other criteria, such as not working for

13   certain types of companies where they could have gained unusual knowledge,[27] not

14   participating in any other surveys about NFTs in the past month, and taking the survey on a

15   desktop computer, laptop computer, tablet, or smartphone.

16   41.    After qualifying for the survey, NFT purchasers were instructed as follows:

17   As a reminder, if you need eyeglasses or contact lenses to see the screen clearly,
18   please put them on now.

19   Below is a webpage that you may or may not have seen before.  Please look at
20   the webpage as you typically would if you came across this page online.

21   Because this is a picture of a webpage, the links in the picture are not active.

22   You may need to scroll to see all of the webpage.

23   When you are ready to proceed, click or tap the "Next" button, which will appear
24   below the webpage after a brief pause.

25

26

27   [27] The types of companies included an advertising or public relations agency, a marketing research
28   agency, and a company that creates or mints NFTs.

- 21 -

42. This survey next displayed either the test or control version of the MetaBirkins webpage. After viewing the webpage, respondents were asked whether they could see the webpage clearly. Respondents who answered that they could were then instructed as follows:

> Now you will be asked a few questions about the webpage you just viewed. The webpage will appear below each question if you would like to view it again.

> As before, please do not guess. If you do not know the answer to a question or do not have an opinion, please indicate that you do not know.

43. Next, the survey among NFT purchasers asked questions to measure confusion, starting with confusion as to source. Question 1 asked, "What company, companies, person, or people do you think makes or provides the items shown on the webpage? Please be as specific as possible. If you don't know, please select 'I don't know.'" Question 2 asked, "What makes you think that? Please be as specific as possible. If you don't know, please select 'I don't know.'" Both Question 1 and Question 2 were open-ended, with respondents answering in their own words or checking a box labeled "I don't know."

44. Question 3 asked, "Are you aware of any other brands or products made or provided by whoever makes or provides the items shown on the webpage? Please answer yes, no, or you don't know."[28] Respondents who answered affirmatively were asked Questions 4 and 5. Question 4 asked, "What other brands or products do you think are made or provided by whoever makes or provides the items shown on the webpage? Please be as specific as possible. If you don't know, please select 'I don't know.'" Question 5 asked, "What makes you think that? Please be as specific as possible. If you don't know, please select 'I don't know.'" Questions 4 and 5 were open-ended questions.

45. The next three questions measured confusion as to sponsorship, authorization, or approval. Question 6 asked, "Do you think that whoever makes or provides the items shown on the webpage…" The response options included:

---

[28] The order of "yes" and "no" in Question 3 and its answer options was rotated randomly.

- ▪ "<u>Is</u> sponsored, authorized, or approved by another company, person, or brand"

- ▪ "<u>Is not</u> sponsored, authorized, or approved by another company, person, or brand"

- ▪ "I don't know"

46.     Respondents who chose "<u>Is</u> sponsored…" were asked Question 7 and Question 8. Question 7 asked, "What other company, person or brand do you believe sponsors, authorizes, or approves whoever makes or provides the items shown on the webpage?  Please be as specific as possible. If you don't know, please select 'I don't know.'"  Question 8 asked, "What makes you think that? Please be as specific as possible. If you don't know, please select 'I don't know.'"  Question 7 and Question 8 were open-ended questions.

47.     The survey of NFT purchasers was conducted online in a self-administered manner, meaning that respondents entered their own answers to questions, without any human interviewer.  The survey was programmed by Simple Opinions, a provider of services to marketing research companies.[29]

48.     Prospective respondents for the survey were recruited through an online panel from Prodege, a leading marketing research sample provider that operates panels with more than 60 million panelists globally.  Prodege uses a variety of quality control processes relating to panelists and responses.[30]  Exhibit 3 provides additional information on the recruiting methods for the survey, including additional description of the panel from Prodege.

49.     Respondents invited to participate in either the NFT survey or the handbag survey could not participate in the other survey.

---

[29] Information about Simple Opinions is available at https://www.simpleopinions.com/.  The staff at Simple Opinions has decades of experience at marketing research companies that include J.D. Power and Associates, Nielsen Entertainment, and others.  I and other staff at MMR checked the survey program extensively to confirm that it matched the questionnaire and programming instructions provided to Simple Opinions.  Staff at Simple Opinions were never aware of the sponsor or purpose of the survey.

[30] Online panels are used frequently for surveys conducted in both litigation and commercial contexts. Panel companies such as the one used for this survey operate professionally managed panels, with databases of people who have indicated their willingness to take surveys from time to time.  For example, Prodege uses quality control measures that include double opt-in registration, digital fingerprinting, physical address verification, device verification, CAPTCHA software, and third-party validation methods.

50.     Exhibit 4 describes the quality control measures that were used during and after data gathering, including procedures to validate respondents.

51.     The survey among NFT purchasers was conducted from July 8 to July 13, 2022, resulting in a database of 221 completed interviews.  Of these, 20 respondents (9.0%) were removed during quality control or validation, leaving 201 NFT purchasers in the final database.  This database is of more than sufficient size to be reliable.[31]

52.     Exhibit 7 provides a summary indicating how many prospective respondents were screened out or removed from this survey, including the reasons for termination.

53.     The next section describes my findings from this survey.


**Findings From the Survey of NFT Purchasers**

54.     Respondents answered the questions that measured confusion in their own words.  To analyze the data from these questions, I assigned codes to each verbatim response that reflected the themes that were indicated by the response.[32]  Exhibit 5 lists these codes.

55.     I coded a response as referring to Hermès or Birkin if it mentioned Hermès, Birkin handbags, or any name or product that likely referred to Hermès or Birkin handbags, in any spelling.  I counted these responses as confused, because they mentioned Hermès or Birkin when shown the MetaBirkins webpage.  I coded responses as referring to MetaBirkins or Mr. Rothschild if they referred to MetaBirkins or Mason Rothschild, in any spelling.

---

[31] For surveys such as this one, statistics can provide general indicators of reliability.  (*See* Diamond, Shari Seidman.  "Reference Guide on Survey Research."  *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011, pp. 382-383.) (The margin of error at the 95% level of confidence is approximately (SE × 1.96), where SE refers to the survey's standard error.)  See also Moore, David S., et al. "Chapter 8: Inference for Proportions." Introduction to the Practice of Statistics, 6th ed., W.H. Freeman and Company, 2009, pp. 487–524.)  For example, the survey's test measure of 21.6%, at a sample size of 97 respondents, has a margin of error of approximately +/- 8.2%.

[32] For the survey, MMR staff working at my direction assisted with coding.  I have personally reviewed or assigned every code for every survey response from the survey.

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:22-CV-00384-JSR

56.      Exhibit 8 provides cross tabulation tables, which show an analysis of all questions asked

of NFT purchasers.  Exhibit 12 shows all responses from all NFT purchasers, including a data

map indicating which responses correspond to each variable in the database.

57.      This section summarizes key results from the survey conducted among NFT purchasers,

including results for confusion as to source (Questions 1 and 4) and for confusion as to

sponsorship, authorization, or approval (Question 7).

58.      Question 1 asked respondents who they think makes or provides the items on the

webpage they were shown.  Table A summarizes the results from Question 1.

**Table A:**
**Survey of NFT Purchasers,**
**Summary of Results From Question 1**

| Q.1 Who do you think makes or provides the items shown on the webpage? | Test Webpage | Control Webpage |
|---|---|---|
| Sample size | 97 | 104 |
| **Hermès or Birkin** | 17.5% | 1.9% |
| MetaBirkins or Rothschild | 51.5% | 17.3% |
| Another clothing company, media company, or retailer[33] | 13.4% | 10.6% |
| Another technology company[34] | 12.4% | 23.1% |
| MetaHandbags[35] | 0.0% | 23.1% |
| Other | 8.2% | 14.4% |
| I don't know | 10.3% | 16.3% |

---

[33] Includes responses that referenced another clothing company, media company, or retailer, such as Gucci, Chanel, Vogue, Elle, Forbes, Walmart, Target, or others.

[34] Includes responses that referenced another technology company, such as Facebook, Meta, Microsoft, or others.

[35] Among other changes, the control changed "MetaBirkins" to "MetaHandbags."

59.     Table A shows that in response to Question 1, 17.5% of NFT purchasers shown the test version of the MetaBirkins webpage provided a response that reflected Hermès and/or Birkin, compared with 1.9% among those shown the control version.  Table A also shows that 51.5% of NFT purchasers shown the test webpage, and 17.3% of NFT purchasers shown the control webpage, mentioned MetaBirkins or Rothschild.  The table shows that these respondents also mentioned clothing companies, media companies, retailers, and technology companies in response to Question 1.

60.     Examples of verbatim responses that reflect Hermès and/or Birkin from NFT purchasers shown the test webpage include the following:

     i.    <u>ID #2</u>: "Birkins is the company that makes these NFT"

     ii.   <u>ID #14</u>: "looksrare and hermes"

     iii.  <u>ID #18</u>: "Based on descriptions disclaimer it's Hermès Birkin bags, or MetaBirkins"

     iv.  <u>ID #71</u>: "birkins"

     v.   <u>ID #83</u>: "The company is Birkin, you can see the brand clearly"

     vi.  <u>ID #141</u>: "Birkin"

     vii. <u>ID #169</u>: "MetaBirkin, Hermes, Forbes, Vogue"

     viii. <u>ID # 209</u>: "HERMES.COM"

61.     Question 2 asked, "What makes you think that?"  Table B below shows the results from Question 2.

**Table B:**
**Survey of NFT Purchasers,**
**Summary of Results From Question 2**

| Q.2 What makes you think that? | Test Webpage | Control Webpage |
|---|---|---|
| Sample size | 97 | 104 |
| The look or appearance[36] | 11.3% | 8.7% |
| Personal experience or general knowledge[37] | 11.3% | 8.7% |
| It says so[38] | 46.4% | 43.3% |
| Other | 19.6% | 18.3% |
| I don't know | 4.1% | 7.7% |

62.     Table B shows that the theme most commonly reflected by responses to Question 2 was "It says so," which was mentioned by 46.4% of NFT purchasers shown the test webpage and 43.3% of those shown the control webpage.

63.     Examples of Question 2 responses reflecting this theme from NFT purchasers shown the test version of the MetaBirkins webpage include the following:

      i.    ID #8: "Ive read the description"

      ii.    ID #35: "because they mention it at the beginning of the catalog"

      iii.    ID #58: "I read this"

      iv.    ID #71: "because of the name birkins"

      v.    ID #73: "It's at the top of the page"

64.     Table B also shows that verbatim responses from 11.3% of those shown the test webpage and 8.7% of those shown the control webpage reflected the theme of personal experience or general knowledge.  Examples of Question 2 responses from NFT purchasers shown the test webpage that reflect this theme include the following:

---

[36] Includes responses that referenced the look, the appearance, colors, or style of the handbags on the webpage.

[37] Includes responses that referenced seeing the bags before, reading about the topics elsewhere, or having some previous knowledge of the subject matter.

[38] Includes responses that referenced reading the information on the webpage.

1    i. ID #15: "Hermes bags are known or famous for their Birkin bags"

2    ii. ID #45: "I have heard this from Yahoo finance news."

3    iii. ID #101: "Because I have a little background knowledge about the Burlington

4      bag"

5    iv. ID #115: "BECAUSE HAVE SIMILAR PRODUCT"

6    v. ID #202: "I see a lot of purse and I know what Birkins are."

7 65. Next, Question 3 asked NFT purchasers whether they are aware of any other brands or

8 products made or provided by whoever makes or provides the items shown on the webpage.

9 Table C below summarizes the results for Question 3.

**Table C:**
**Survey of NFT Purchasers,**
**Summary of Results From Question 3**

| Q.3 Are you aware of any other brands or products made or provided by whoever makes or provides the items shown on the webpage? | Test Webpage | Control Webpage |
|---|---|---|
| Sample size | 97 | 104 |
| Yes, I am aware of other brands or products made or provided by whoever makes or provides these items | 51.5% | 46.2% |
| No, I am not aware of other brands or products made or provided by whoever makes or provides these items | 41.2% | 50.0% |
| I don't know | 7.2% | 3.8% |

20 66. As shown in Table C, 51.5% of NFT purchasers shown the test webpage, and 46.2% of

21 those shown the control webpage, answered affirmatively to Question 3.

22 67. Question 4 asked respondents who answered yes to Question 3 what other brands or

23 products they think are made or provided by whoever makes or provides the items shown on

24 the webpage.  Table D below summarizes the results from Question 4.  The results are provided

25 on an unduplicated basis, meaning that NFT purchasers who mentioned a theme in response to

26 Question 1 are not counted again in the results for the same theme in Question 4.

1

2

**Table D:**

**Survey of NFT Purchasers,**

**Summary of Results From Question 4 (Unduplicated)[39]**

| Q.4 What other brands or products do you think are made or provided by whoever makes or provides the items shown on the webpage? | Test Webpage | Control Webpage |
|---|---|---|
| Sample size | 97 | 104 |
| **Hermès or Birkin** | **4.1%** | **1.0%** |
| MetaBirkins or Rothschild | 4.1% | 1.9% |
| Another clothing company, media company, or retailer[40] | 3.1% | 1.0% |
| Another technology company[41] | 4.1% | 5.8% |
| MetaHandbags[42] | 0.0% | 1.0% |
| Other | 8.2% | 17.3% |
| I don't know | 8.2% | 5.8% |

68.     As shown in Table D, an additional 4.1% of NFT purchasers shown the test version of the webpage provided a response that mentioned Hermès and/or Birkin, compared with an additional 1.0% of those shown the control version.  Among those shown the test webpage, an additional 4.1% provided a response reflecting MetaBirkins or Rothschild, compared to an additional 1.9% of those shown the control webpage.

69.     Question 5 asked, "What makes you think that?"  Table E below shows the results from Question 5.  The results are provided on an unduplicated basis, meaning that NFT purchasers who mentioned a theme in response to Question 2 are not counted again in the results for the same theme in Question 5.

---

[39] This table reflects respondents who did not mention the same theme in response to Question 1.

[40] Includes responses that referenced another clothing company, media company, or retailer, such as Gucci, Chanel, Vogue, Elle, Forbes, Walmart, Target, or others.

[41] Includes responses that referenced another technology company, such as Facebook, Meta, Microsoft, or others.

[42] Among other changes, the control changed "MetaBirkins" to "MetaHandbags."

**Table E:**

**Survey of NFT Purchasers,**

**Summary of Results From Question 5 (Unduplicated)[43]**

| Q.5 What makes you think that? | Test Webpage | Control Webpage |
|---|---|---|
| Sample size | 97 | 104 |
| The look or appearance[44] | 6.2% | 1.9% |
| Personal experience or general knowledge[45] | 6.2% | 6.7% |
| It says so[46] | 0.0% | 2.9% |
| Other | 3.1% | 4.8% |
| I don't know | 8.2% | 1.9% |

70.    Table E shows that an additional 6.2% of NFT purchasers shown the test webpage provided a response that reflected personal experience or general knowledge, compared with an additional 6.7% of those shown the control webpage.

71.    The next series of questions measured confusion as to sponsorship, authorization, or approval.  Question 6 asked NFT purchasers whether they think that whoever makes or provides the items shown on the webpage is sponsored, authorized, or approved by another company, person, or brand.  Table F below summarizes the results from Question 6.

---

[43] This table reflects respondents who did not mention the same theme in response to Question 2.

[44] Includes responses that referenced the look, the appearance, colors, or style of the handbags on the webpage.

[45] Includes responses that referenced seeing the bags before, reading about the topics elsewhere, or having some previous knowledge of the subject matter.

[46] Includes responses that referenced reading the information on the webpage.

1
2

**Table F:**
**Survey of NFT Purchasers,**
**Summary of Results From Question 6**

3

| Q.6 Do you think that whoever makes or provides the items shown on the webpage…? | Test Webpage | Control Webpage |
|---|---|---|
| Sample size | 97 | 104 |
| <u>Is</u> sponsored, authorized, or approved by another company, person or brand | 60.8% | 56.7% |
| <u>Is not</u> sponsored, authorized, or approved by another company, person or brand | 25.8% | 30.8% |
| I don't know | 13.4% | 12.5% |

4
5
6
7
8
9

10   72.      As shown in Table F, 60.8% of NFT purchasers shown the test webpage answered

11   affirmatively to Question 6, compared with 56.7% of those shown the control webpage.

12   73.      Question 7 asked respondents who answered affirmatively to Question 6 what

13   company, person, or brand they believe sponsors, authorizes, or approves whoever makes or

14   provides the items shown on the webpage.  Table G below summarizes the results on an

15   unduplicated basis, meaning that respondents who mentioned a theme in response to

16   Questions 1 or 4 are not counted again for the same theme in Question 7.

17
18
19
20
21
22
23
24
25
26
27
28

**Table G:**

**Survey of NFT Purchasers,**

**Summary of Results From Question 7 (Unduplicated)[47]**

| Q.7 What other company, person, or brand do you believe sponsors, authorizes, or approves whoever makes or provides the items shown on the webpage? | Test Webpage | Control Webpage |
|---|---|---|
| Sample size | 97 | 104 |
| **Hermès or Birkin** | **0.0%** | **0.0%** |
| MetaBirkins or Rothschild | 1.0% | 2.9% |
| Another clothing company, media company, or retailer[48] | 3.1% | 5.8% |
| Another technology company[49] | 6.2% | 9.6% |
| MetaHandbags[50] | 0.0% | 2.9% |
| Other | 6.2% | 5.8% |
| I don't know | 17.5% | 9.6% |

74.     As shown in Table G, no (0.0%) additional NFT purchasers shown the test or control webpages provided a response to Question 7 that reflected Hermès and/or Birkin.  Table G also shows that an additional 1.0% of respondents shown the test webpage provided a response that reflected MetaBirkins or Rothschild, compared with an additional 2.9% of those shown the control webpage.

75.     Table H below shows the results from Question 8, which asked, "What makes you think that?"  Table H below summarizes the results on an unduplicated basis, meaning that respondents who mentioned a theme in response to Questions 2 or 5 are not counted again for the same theme in Question 8.

---

[47] This table reflects respondents who did not mention the same theme in response to Questions 1 or 4.

[48] Includes responses that referenced another clothing company, media company, or retailer, such as Gucci, Chanel, Vogue, Elle, Forbes, Walmart, Target, or others.

[49] Includes responses that referenced another technology company, such as Facebook, Meta, Microsoft, or others.

[50] Among other changes, the control changed "MetaBirkins" to "MetaHandbags."

**Table H:**

**Survey of NFT Purchasers,**

**Summary of Results From Question 8 (Unduplicated)[51]**

| Q.8 What makes you think that? | Test Webpage | Control Webpage |
|---|---|---|
| Sample size | 97 | 104 |
| The look or appearance[52] | 0.0% | 0.0% |
| Personal experience or general knowledge[53] | 2.1% | 2.9% |
| It says so[54] | 3.1% | 5.8% |
| Other | 2.1% | 5.8% |
| I don't know | 4.1% | 3.8% |

76.     Table H shows that an additional 3.1% of NFT purchasers shown the test webpage provided a response reflecting "It says so," compared with an additional 5.8% of those shown the control version of the webpage.

77.     Table I summarizes this survey's confusion measures across Questions 1, 4, and 7, providing the percentage of NFT purchasers who provided responses to any of these questions that mentioned Hermès and/or Birkin.

---

[51] This table reflects respondents who did not mention the same theme in response to Questions 2 or 5.

[52] Includes responses that referenced the look, the appearance, colors, or style of the handbags on the webpage.

[53] Includes responses that referenced seeing the bags before, reading about the topics elsewhere, or having some previous knowledge of the subject matter.

[54] Includes responses that referenced reading the information on the webpage.

**Table I:**

**Survey of NFT Purchasers,**

**Summary of Confusion Measures Across Questions 1, 4, and 7 (Unduplicated)[55]**

| Mentions of Hermès and/or Birkin | Test Webpage | Control Webpage | Net[56] |
|---|---|---|---|
| Sample size | 97 | 104 | |
| Confusion as to source (Q.1) | 17.5% | 1.9% | 15.6% |
| Confusion as to other brands or products (Q.4) | 4.1% | 1.0% | 3.1% |
| Confusion as to sponsorship, authorization, or approval (Q.7) | 0.0% | 0.0% | 0.0% |
| **Likelihood of confusion** (Q.1, 4, and 7) | **21.6%** | **2.9%** | **18.7%** |

78.     As shown in Table I, for NFT purchasers, across Questions 1, 4, and 7, the likelihood of confusion measure is 21.6% for the test version of the webpage and 2.9% for the control version of the webpage.  The net likelihood of confusion measure is 18.7%, which is calculated as 21.6% minus 2.9%.

---

[55] Unduplicated means that if a respondent mentioned or referenced a theme in one question, they were not counted as confused more than once, even if they mentioned the same theme in subsequent questions.

[56] Net is calculated as test minus control.

1    **Methodology and Findings for the Survey of Handbag Purchasers**

2    79.     As described earlier, I also conducted a survey among respondents qualified as

3    purchasing handbags.

4    80.     Exhibit 9 shows the questions used to qualify prospective respondents for the survey of

5    handbag purchasers, as well as the questions that measured confusion in this survey.[57]

6    81.     As with the survey of NFT purchasers, prospective respondents for the survey of

7    handbag purchasers were first asked Questions A, B, and C, which asked about gender, age, and

8    geography.  For the survey of handbag purchasers, the demographic distribution of the survey

9    database across gender, age, and geography reflects likely purchasers of handbags.

10   82.     Next, Question D asked prospective respondents for this survey whether they were

11   likely to purchase certain items in the next 12 months, including a handbag, a belt, a pair of

12   shoes, a wallet, and a watch.

13   83.     Among those who answered that they were likely to purchase a handbag, Question E

14   asked prospective respondents for this survey to select the price range that best reflects the

15   most they would be willing to spend to purchase a handbag.  Handbag purchasers qualified on

16   Question E if they answered that they were likely to purchase at a price range of $10,000 or

17   more.  The survey qualified on this price point because it is the lowest price at which I was able

18   to locate the Birkin bag for sale.[58]

19

20

21

22   [57] Exhibit 9 contains programming instructions that were not visible to respondents.

23   [58] My research shows that Birkin bags are in high demand, typically sell in new condition for at least
     $10,000, and are available on the resale market for approximately $6,000 to $60,000, depending on the

24   bag and its condition.  *See* Sargon, Sara.  "The 2021 & 2022 Hermes Birkin Bag Price List."  *Bagover*,
     https://bagover.com/hermes-birkin-bag-price-list/, last accessed August 1, 2022.  *See also* Marinelli,

25   Gina.  "Hermes Birkin bags are famously expensive and difficult to buy — so we asked an expert how to
     find them and what makes them so elusive."  *Business Insider*,

26   https://www.insider.com/guides/style/how-to-buy-a-birkin-bag, last accessed August 1, 2022.  *See also*
     "Search: 3145 results found for 'Birkin' – Rebag."  *Rebag*, https://shop.rebag.com/search?sort=price-

27   ascending&q=Birkin&pf_st_availability_hidden=true&_=pf&pf_t_categories=bc-filter-Bags, last accessed

28   August 1, 2022.

84.     Question F asked prospective respondents for this survey which types of content they typically read online.  Respondents who answered that they typically read content online about fashion and/or artwork qualified on Question F.

85.     Similar to the survey of NFT purchasers, prospective respondents for the survey of handbag purchasers also qualified on other criteria, such as not working for certain types of companies where they could have gained unusual knowledge,[59] not participating in any other surveys about handbags in the past month, and taking the survey on a desktop computer, laptop computer, tablet, or smartphone.

86.     After respondents qualified for the survey of handbag purchasers, they were shown the same images that were shown in the survey of NFT purchasers, and then were asked the same questions that were used to measure confusion in the survey of NFT purchasers.  I analyzed the responses from the survey of handbag purchasers using the same codes that I used to analyze responses from the survey of NFT purchasers.  For the data from handbag purchasers, I assigned codes to each verbatim response according to the themes that were reflected by the response, using the codes from Exhibit 5 and the analysis methods described earlier for NFT purchasers.[60]

87.     As with the survey of NFT purchasers, the survey of handbag purchasers was conducted online in a self-administered manner, using an online survey programmed by Simple Opinions.  Also, as with the survey of NFT purchasers, respondents for the survey of handbag purchasers were recruited from a panel provided by Prodege, using the recruiting methods described in Exhibit 3 and the quality control methods described in Exhibit 4.  Respondents invited to participate in the NFT survey or the handbag survey could not participate in the other survey.

---

[59] The types of companies included an advertising or public relations agency, a marketing research agency, and a company manufactures handbags.

[60] For the survey, MMR staff working at my direction assisted with coding.  I have personally reviewed or assigned every code for every survey response from the survey.

1    88.    Interviews for the survey of handbag purchasers were conducted from July 8 to July 17,

2    2022, resulting in a database of 185 completed interviews.  Of these, 21 respondents (11.4%)

3    were removed during quality control or validation, leaving 164 handbag purchasers in the final

4    database.

5    89.    Exhibit 10 provides a summary indicating how many prospective respondents were

6    screened out or removed from the survey of handbag purchasers, including the reasons for

7    termination.

8    90.    Exhibit 11 provides cross tabulation tables for the survey of handbag purchasers.

9    Exhibit 13 shows all responses from all handbag purchasers, including a data map indicating

10   which responses correspond to each variable in the database.

11   91.    My opinions in this matter are based on the survey of NFT purchasers rather than the

12   survey of handbag purchasers because Hermès has made allegations in this matter that are

13   consistent with forward confusion.  For example, Hermès alleges that the Defendant's actions

14   are "likely to cause confusion and mistake in the minds of the public, leading the public to

15   believe that the METABIRKINS NFTs emanate or originate from Hermès, or that Hermès has

16   approved, sponsored or otherwise associated itself with Defendant, which is untrue."[61]  The

17   traditional audience for a survey measuring forward likelihood of confusion is the junior user's

18   audience, which in this matter is purchasers of the Defendant's goods and services.[62]

19

20

21

22

23

24

25

26

---

[61] Amended Complaint, ¶ 155.

27

[62] Swann, Jerre B.  "Likelihood of Confusion."  *Trademark and Deceptive Advertising Surveys:  Law,*

28   *Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann, ABA Publishing, 2012, p. 63.

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:22-CV-00384-JSR

**Summary and Conclusions for the Survey of NFT Purchasers**

92.     As described in this report, my survey of NFT purchasers measured whether the MetaBirkins webpage is likely to be confused with Hermès and/or with Birkin handbags.  This survey measured the MetaBirkins webpage as it appears in the marketplace, and also measured a control webpage, which was modified to remove or alter features that relate to marks Hermès has asserted in this matter, including the Birkin trade dress and name.  The test and control webpages were similar in all other aspects.

93.     After showing respondents either the test webpage or the control webpage, the survey of NFT purchasers asked questions to measure the likelihood of confusion as to source and as to sponsorship, authorization, or approval.  Across those questions, the measures were 21.6% for the test webpage and 2.9% for the control webpage, for a net measure of 18.7%.

94.     The MetaBirkins webpage includes elements that Hermès alleges infringe its intellectual property; the changes to the control webpage removed or modified those elements. Therefore, the net confusion measure reflects only the elements Hermès alleges infringe its intellectual property, and not any other influences.

95.     The 18.7% net measure from the survey of NFT purchasers is at or above measures that are typically interpreted as indicating a substantial likelihood of confusion.[63]  Based on these results, this survey indicates a likelihood of confusion between the MetaBirkins webpage at www.metabirkins.com, and Hermès or Birkin handbags.

---

[63] "An 'appreciable' number is not necessarily a majority, and in fact can be much less than a majority… one court indicated that even 11% of a national market of millions of consumers constitutes a very large number of confused consumers."  McCarthy, J. Thomas.  "§ 82:185 Likelihood of confusion – Evaluating the significance of survey results – An 'appreciable' number." ·*McCarthy on Trademarks and Unfair Competition*, 5th ed., Thomson Reuters, 2021, pp. 32-546 to 32-547.

—

1   I declare under penalty of perjury under the laws of the United States that the foregoing is true

2   and correct to the best of my belief.

3

4   Executed in Encino, California, on August 4, 2022.

5

6

7

8   _____

    Dr. Bruce Isaacson

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:22-CV-00384-JSR

**Exhibit 2:**
**Test and Control Images Displayed in the Surveys**


This exhibit provides the following images:

1. The test and control webpages displayed in the surveys, in versions for desktop or laptop computers, and for mobile devices.

2. The test and control versions of the MetaBirkins handbags displayed in the surveys, with and without superimposed words.

The images in this exhibit extend across multiple pages.  In the surveys, each image was shown to respondents as one continuous webpage, similar to how they would view it online.

Also, this exhibit provides titles and labels, such as "Test Webpage" or "Control Webpage," that were not shown in the surveys.

**Test Version of Webpage (1 of 3)**
**(Desktop or Laptop)**



Exhibit 2 - Isaacson Expert Report                                                                                       Page 1

**Test Version of Webpage (2 of 3)**
**(Desktop or Laptop)**



Exhibit 2 - Isaacson Expert Report                                                                          Page 2

**Test Version of Webpage (3 of 3)**
**(Desktop or Laptop)**



Exhibit 2 - Isaacson Expert Report

**Test Versions of MetaBirkins Handbags, With and Without Superimposed Words (1 of 5)**

 

Exhibit 2 - Isaacson Expert Report

**Test Versions of MetaBirkins Handbags, With and Without Superimposed Words (2 of 5)**



Exhibit 2 - Isaacson Expert Report                                                                                    Page 5

**Test Versions of MetaBirkins Handbags, With and Without Superimposed Words (3 of 5)**



Exhibit 2 - Isaacson Expert Report

**Test Versions of MetaBirkins Handbags, With and Without Superimposed Words (4 of 5)**



Exhibit 2 - Isaacson Expert Report

**Test Versions of MetaBirkins Handbags, With and Without Superimposed Words (5 of 5)**



Exhibit 2 - Isaacson Expert Report

**Control Version of Webpage (1 of 3)**
**(Desktop or Laptop)**



Exhibit 2 - Isaacson Expert Report                                                                              Page 9

**Control Version of Webpage (2 of 3)**
**(Desktop or Laptop)**



Exhibit 2 - Isaacson Expert Report

Page 10

**Control Version of Webpage (3 of 3)**
**(Desktop or Laptop)**



Exhibit 2 - Isaacson Expert Report                                                                 Page 11

**Control Versions of MetaBirkins Handbags, With and Without Superimposed Words (1 of 5)**

 

Exhibit 2 - Isaacson Expert Report                                                                      Page 12

**Control Versions of MetaBirkins Handbags, With and Without Superimposed Words (2 of 5)**



Exhibit 2 - Isaacson Expert Report                                                                                       Page 13

**Control Versions of MetaBirkins Handbags, With and Without Superimposed Words (3 of 5)**



Exhibit 2 - Isaacson Expert Report                                                                 Page 14

**Control Versions of MetaBirkins Handbags, With and Without Superimposed Words (4 of 5)**



Exhibit 2 - Isaacson Expert Report

**Control Versions of MetaBirkins Handbags, With and Without Superimposed Words (5 of 5)**



Exhibit 2 - Isaacson Expert Report                                                                                                 Page 16

**Exhibit 6:**
**Questionnaire for Interviews Conducted Among NFT Purchasers**

**Online Survey M**

**Qualifying Questions:**

**[DO NOT TARGET OR PRE-SCREEN, EXCEPT TO MEET DEMOGRAPHIC QUOTAS.]**
**[DO NOT ALLOW RESPONDENTS TO GO BACK TO ANY PREVIOUS QUESTION.]**

Thank you for agreeing to participate in this survey.  If you need eyeglasses or contact lenses to see the screen clearly, please wear them to complete the survey.  Answer every question honestly and to the best of your ability.  There are no right or wrong answers; we are only interested in your opinions.

On any question, if you don't know how to answer, it is all right to indicate that you don't know or you are not sure.  Do not guess and do not consult any other person or source, such as the Internet, while you complete this survey.

Once you start the survey, please complete it in one session without interruption.  Also, do not use your browser's Back button to try to return to a prior question, as this will terminate your survey.

Click or tap "Next" to begin the survey.

A.      What is your gender? **(SELECT ONE RESPONSE)**

        Female
        Male
        Non-binary or other
        Prefer not to answer

**[IF "PREFER NOT TO ANSWER" OR QUOTA FILLED, TERMINATE.  IF "MALE" OR "FEMALE" SELECTED, AND RESPONSE DOES NOT MATCH PANEL DATA, COUNT AS "GENDER MISMATCH," TERMINATE. OTHERWISE, CONTINUE.]**

B.      What is your age?  **(SELECT ONE RESPONSE)**

        17 years old or younger
        18 to 34 years old
        35 to 54 years old
        55 years old or older
        Prefer not to answer

**[IF "17 YEARS OLD OR YOUNGER," "PREFER NOT TO ANSWER," OR QUOTA FILLED, TERMINATE.  IF RESPONSE DOES NOT MATCH PANEL DATA, COUNT AS "AGE MISMATCH," TERMINATE.  OTHERWISE, CONTINUE.]**

Exhibit 6 - Isaacson Expert Report                                                                                          Page 1

C.      Please enter the ZIP code of your home address.

[_____]
**[5-DIGIT NUMERIC RESPONSE]**

**[ASSIGN ZIP CODE TO GEOGRAPHY.  IF QUOTA FILLED, TERMINATE.  OTHERWISE, CONTINUE.]**


D.      Which, if any, of the following types of items are you likely to purchase in the next 12 months?
        For each type of item, please answer **[ROTATE:** yes, no,**]** or you don't know.  **(SELECT ONE
        RESPONSE FOR EACH TYPE OF ITEM)**

        <u>RESPONSES</u>
        **[MATCH ORDER TO Q.D.  ANCHOR "I DON'T KNOW" LAST.]**
        Yes, I <u>am</u> likely to purchase this type of item in the next 12 months
        No, I <u>am not</u> likely to purchase this type of item in the next 12 months
        I don't know

        <u>TYPES OF ITEMS</u>
        **[RANDOMIZE ORDER.]**
        A Non-Fungible Token, or NFT
        A Virtual Private Network subscription, or VPN subscription
        A Virtual Reality headset, or VR headset
        A website domain, or URL

**[IF "YES" TO "NFT," CONTINUE.  OTHERWISE, TERMINATE.]**


E.      Which, if any, of the following types of Non-Fungible Tokens (NFTs) are you likely to purchase in
        the next 12 months?  **(SELECT ALL THAT APPLY)**

        **[RANDOMIZE ORDER.  ANCHOR "NFT FOR SOMETHING ELSE" AND "I DON'T KNOW" LAST.]**
        An NFT for digital artwork
        An NFT for fashion apparel or fashion accessories
        An NFT for music
        An NFT for a video game item or video game asset
        An NFT for sports memorabilia
        An NFT for something else not listed above
        I don't know **[EXCLUSIVE]**

**[IF "ARTWORK," AND/OR "FASHION" SELECTED, CONTINUE.  OTHERWISE, TERMINATE.]**

Exhibit 6 - Isaacson Expert Report                                                                                    Page 2

F.     Which, if any, of the following ranges best reflects the <u>most</u> you would be willing to spend to purchase an NFT?  **(SELECT ONE RESPONSE)**

**[REVERSE ORDER.  ANCHOR "I DON'T KNOW" LAST]**
Less than $1,000
$1,000 - $2,499
$2,500 - $4,999
$5,000 or more
I don't know

**[IF "$2,500-$4,999" OR "$5,000 OR MORE" SELECTED, CONTINUE.  OTHERWISE, TERMINATE.]**

G.     If you purchased something online, which, if any, of the following payment methods would you consider using?  **(SELECT ALL THAT APPLY)**

**[RANDOMIZE ORDER.  ANCHOR "SOMETHING ELSE" AND "I DON'T KNOW" LAST.]**
Cryptocurrency
Credit card
Check
Something else not listed above
I don't know

**[IF "CRYPTOCURRENCY" AND/OR "CREDIT CARD" SELECTED, CONTINUE.  OTHERWISE, TERMINATE.]**

H.     Do you or does any member of your household work for any of the following types of companies?  For each type of company, please answer **[MATCH ORDER TO Q.D**: yes, no,**]** or you don't know.  **(SELECT ONE RESPONSE FOR EACH TYPE OF COMPANY)**

<u>**RESPONSES**</u>
**[MATCH ORDER TO Q.D.  ANCHOR "I DON'T KNOW" LAST.]**
Yes, <u>someone</u> in my household works for this type of company
No, <u>no one</u> in my household works for this type of company
I don't know

<u>**TYPES OF COMPANIES**</u>
**[RANDOMIZE.]**
An advertising or public relations agency
A marketing research agency
A company that creates or mints NFTs

**[IF "NO" TO ALL, CONTINUE.  OTHERWISE, TERMINATE.]**

Exhibit 6 - Isaacson Expert Report                                                                   Page 3

I.      How many surveys about Non-Fungible Tokens (NFTs) have you completed in the past month? **(SELECT ONE RESPONSE)**

**[MATCH REVERSE ORDER TO Q.F.  ANCHOR "I DON'T KNOW" LAST.]**
None
1 to 2
3 or more
I don't know

**[IF "NONE," CONTINUE.  OTHERWISE, TERMINATE.]**


J.      For quality control purposes, please select the number seven from the list below.  **(SELECT ONE RESPONSE)**

1
3
5
7
9

**[IF "7," CONTINUE.  OTHERWISE, TERMINATE.]**


K.      Please indicate the type of device you are using to take this survey.  **(SELECT ONE RESPONSE)**

**[RANDOMIZE ORDER.  ANCHOR "OTHER" AND "I DON'T KNOW" LAST.]**
Desktop computer
Laptop computer
Tablet
Smartphone
Some other type of device not listed above
I don't know

**[IF "OTHER" OR "I DON'T KNOW," OR IF SMARTPHONE QUOTA FILLED, TERMINATE.  OTHERWISE, CONTINUE.]**


**[CELL ASSIGNMENT:  ASSIGN QUALIFIED RESPONDENTS TO LEAST FULL CELL.]**

Exhibit 6 - Isaacson Expert Report                                                                    Page 4

**Main Questionnaire:**

L.    As a reminder, if you need eyeglasses or contact lenses to see the screen clearly, please put them on now.

Below is a webpage that you may or may not have seen before.  Please look at the webpage as you typically would if you came across this page online.

Because this is a picture of a webpage, the links in the picture are not active.

You may need to scroll to see all of the webpage.

When you are ready to proceed, click or tap the "Next" button, which will appear below the webpage after a brief pause.

**[SHOW ASSIGNED WEBPAGE.  DISPLAY "NEXT" BUTTON BELOW THE WEBPAGE AFTER A 15-SECOND PAUSE.]**

M.    Did you see the webpage clearly?  **(SELECT ONE RESPONSE)**

**RESPONSES**
**[MATCH ORDER TO Q.D.  ANCHOR "I DON'T KNOW" LAST.]**
Yes, I <u>did</u> see the webpage clearly
No, I <u>did not</u> see the webpage clearly
I don't know

**[IF "YES" CONTINUE.  OTHERWISE, TERMINATE.]**

N.    Now you will be asked a few questions about the webpage you just viewed.  The webpage will appear below each question if you would like to view it again.

As before, please do not guess.  If you do not know the answer to a question or do not have an opinion, please indicate that you do not know.

**[FOR QUESTIONS 1 THROUGH 8, SHOW THE ASSIGNED WEBPAGE BELOW EACH QUESTION AND ALSO BELOW THE "NEXT" BUTTON. ]**

Exhibit 6 - Isaacson Expert Report                                                    Page 5

1.      What company, companies, person, or people do you think makes or provides the items shown on the webpage?  Please be as specific as possible. If you don't know, please select "I don't know."

        [                                                                                    ]

        ❑  I don't know.  **[EXCLUSIVE]**

**[RESPONDENT MUST PROVIDE A VERBATIM OR SELECT "I DON'T KNOW."  OTHERWISE, PROVIDE THIS MESSAGE,** "You must provide an answer or select 'I don't know.'"  **IF "DON'T KNOW" IS SELECTED, SKIP TO Q.3. OTHERWISE, CONTINUE.]**

2.      What makes you think that?  Please be as specific as possible.  If you don't know, please select "I don't know."

        [                                                                                    ]

        ❑  I don't know.  **[EXCLUSIVE]**

**[IF ASKED, RESPONDENT MUST PROVIDE A VERBATIM OR SELECT "I DON'T KNOW."  OTHERWISE, PROVIDE THIS MESSAGE,** "You must provide an answer or select 'I don't know.'"**]**

3.      Are you aware of any other brands or products made or provided by whoever makes or provides the items shown on the webpage?  Please answer **[MATCH ORDER TO Q.D:**  yes, no,**]** or you don't know.  **(SELECT ONE RESPONSE)**

        <u>RESPONSES</u>
        **[MATCH ORDER TO Q.D.  ANCHOR "I DON'T KNOW" LAST.]**
        Yes, I <u>am</u> aware of other brands or products made or provided by whoever makes or provides these items
        No, I <u>am not</u> aware of other brands or products made or provided by whoever makes or provides these items
        I don't know

**[IF "YES," CONTINUE.  OTHERWISE, SKIP TO Q.6.]**

Exhibit 6 - Isaacson Expert Report                                          Page 6

4.      What other brands or products do you think are made or provided by whoever makes or provides the items shown on the webpage?  Please be as specific as possible. If you don't know, please select "I don't know."

_____

❑  I don't know.  **[EXCLUSIVE]**

**[IF ASKED, RESPONDENT MUST PROVIDE A VERBATIM OR SELECT "I DON'T KNOW."  OTHERWISE, PROVIDE THIS MESSAGE,** "You must provide an answer or select 'I don't know.'  **IF "DON'T KNOW" IS SELECTED, SKIP TO Q.6. OTHERWISE, CONTINUE.]**

5.      What makes you think that?  Please be as specific as possible.  If you don't know, please select "I don't know."

_____

❑  I don't know.  **[EXCLUSIVE]**

**[IF ASKED, RESPONDENT MUST PROVIDE A VERBATIM OR SELECT "I DON'T KNOW."  OTHERWISE, PROVIDE THIS MESSAGE,** "You must provide an answer or select 'I don't know.'"**]**

6.      Do you think that whoever makes or provides the items shown on the webpage… **(SELECT ONE RESPONSE)**

**RESPONSES**
**[MATCH ORDER TO Q.D. ANCHOR "DON'T KNOW" LAST.]**
<u>Is</u> sponsored, authorized, or approved by another company, person or brand
<u>Is not</u> sponsored, authorized, or approved by another company, person or brand
I don't know

**[IF "<u>IS</u>," CONTINUE.  OTHERWISE, SKIP TO Q.9.]**

Exhibit 6 - Isaacson Expert Report                                                    Page 7

7.      What other company, person or brand do you believe sponsors, authorizes, or approves
        whoever makes or provides the items shown on the webpage?  Please be as specific as possible.
        If you don't know, please select "I don't know."

```
┌─────────────────────────────────────────────────────────────────────────┐
│                                                                           │
│                                                                           │
│                                                                           │
│                                                                           │
└─────────────────────────────────────────────────────────────────────────┘
```

        ❑  I don't know.  **[EXCLUSIVE]**

**[IF ASKED, RESPONDENT MUST PROVIDE A VERBATIM OR SELECT "I DON'T KNOW."  OTHERWISE,
PROVIDE THIS MESSAGE,** "You must provide an answer or select 'I don't know.'"  **IF "DON'T KNOW" IS
SELECTED, SKIP TO Q.9. OTHERWISE, CONTINUE.]**

8.      What makes you think that?  Please be as specific as possible.  If you don't know, please select
        "I don't know."

```
┌─────────────────────────────────────────────────────────────────────────┐
│                                                                           │
│                                                                           │
│                                                                           │
│                                                                           │
└─────────────────────────────────────────────────────────────────────────┘
```

        ❑  I don't know.  **[EXCLUSIVE]**

**[IF ASKED, RESPONDENT MUST PROVIDE A VERBATIM OR SELECT "I DON'T KNOW."  OTHERWISE,
PROVIDE THIS MESSAGE,** "You must provide an answer or select 'I don't know.'"**]**

9.      Please re-enter the ZIP code of your home address.

        [_____]
        **[5-DIGIT NUMERIC RESPONSE]**

**[IF ZIP CODE DOES NOT MATCH Q.C, CONTINUE.  OTHERWISE, SKIP TO Q.11]**

10.     To verify, please re-enter the ZIP code of your home address.

        [_____]
        **[5-DIGIT NUMERIC RESPONSE]**

**[IF ZIP CODE MATCHES Q.C, CONTINUE.  OTHERWISE, TERMINATE.]**

Exhibit 6 - Isaacson Expert Report                                                    Page 8

11.     Please read the statement that follows and select either "I agree" or "I disagree."  If any portion
        of the statement is not true, please select "I disagree."

        **STATEMENT**
        I am the person who was invited to participate in this survey.  I completed this survey myself,
        without assistance or advice from any other person or source, and in accordance with the
        instructions provided in the survey.  The answers I have provided are truthful expressions of my
        situation and opinions.



        Your response to the above statement will not affect your rewards for completing the survey.

**[IF "I DISAGREE," COUNT RESPONDENT AS TERMINATED.  DO NOT COUNT AS A COMPLETED
INTERVIEW AND DO NOT COUNT TOWARD QUOTAS.  REGARDLESS OF ANSWER, CONTINUE AND
REWARD RESPONDENT FOR COMPLETION.  DISPLAY Q.12.]**

12.     Thank you for completing our survey.

Exhibit 6 - Isaacson Expert Report                                                                    Page 9