**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

HERMÈS INTERNATIONAL and
HERMÈS OF PARIS, INC.,

          Plaintiffs,

          v.

MASON ROTHSCHILD,

          Defendant.

No. 22-cv-00384-JSR

ECF Case

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

October 21, 2022

Rhett O. Millsaps II
Christopher J. Sprigman
Mark P. McKenna (*pro hac vice*)
Rebecca Tushnet
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY  10151
Tel:  (646) 898-2055
Email:  rhett@lex-lumina.com

*Attorneys for Defendant Mason Rothschild*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES…………………………………………………………………...ii

INTRODUCTION…………….....……….…..……………………………………………...1

ARGUMENT………………………………………………………………………...4

I.    *ROGERS* APPLIES TO HERMÈS' CLAIMS IN THIS CASE…....…………………….4

    A.    Hermès Cannot Escape *Rogers* by Attempting to Sever the *MetaBirkins* NFTs from the *MetaBirkins* Artworks They Point to and Authenticate…...…...……......5

    B.    Undisputed Evidence in the Record Establishes that the *MetaBirkins* Name is Artistically Relevant to the *MetaBirkins* Images, and to Every Element of Rothschild's *MetaBirkins* Art Project ………………………………………...11

    C.    Hermès Has Produced No Evidence of any Explicitly Misleading Statement..…14

II.    HERMÈS' ARGUMENTS DO NOT GO TO ANY FACT MATERIAL TO *ROGERS*..18

    A.    Even If There Were a Dispute over Authorship of *MetaBirkins* and Choice of the *MetaBirkins* Title, that Would Be Irrelevant to the Material Legal Issues of Artistic Relevance and Explicit Misleadingness………………………….......18

    B.    The Court Should Reject Hermès' Insinuations That Because Rothschild Vigorously Promoted and Sold His *MetaBirkins* Artworks He Is Not An Artist…………………………………………………………………………..21

    C.    Hermès' Arguments About "Wearability" and "Utility" Do Not Show that Material Issues of Fact Remain……………………………………………….23

CONCLUSION…………………………………………………………………………..25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. WhenU.Com, Inc.*,
  414 F.3d 400 (2d Cir. 2005)………………………...………………….……………………..16

*AM General LLC v. Activision Blizzard, Inc.*,
  450 F. Supp. 3d 467 (S.D.N.Y. 2020)…………………………...…………….…………………21

*Betty's Foundation for Elimination of Alzheimer's Disease v. Trinity Christian
Center of Santa Ana, Inc.*,
  Case No. SACV 20-02146-CJC (ADSx), 2021 WL 3046889 (C.D. Cal. Apr. 7, 2021)……..13

*Caiz v. Roberts*,
  382 F. Supp. 3d 942 (C.D. Cal. 2019)…………………………………………………………..13

*Cohen v. Koenig*,
  25 F.3d 1168 (2d Cir. 1994) …………………………………………………………………16

*Design Resources, Inc. v. Leather Indus. of Am.*,
  789 F.3d 495 (4th Cir. 2014) ………………………………………………………………....16

*Deus ex Machina Motorcycles Pty. Ltd. v. Metro-Goldwyn-Mayer Inc*,
  Case No.: CV 20-4822-PLA, 2020 WL 6875178 (C.D. Cal. Oct. 23, 2020)...…… .…..…..13

*Eastman Chemical Co. v. Plastipure, Inc.*,
  775 F.3d 230, 235 (5th Cir. 2014)…………..……………………………………………..16

*ETW Corp. v. Jireh Pub., Inc.*,
  332 F.3d 915 (6th Cir. 2003)………………….………………………………………………13

*Guglielmi v. Spelling Goldman Prods.*,
  25 Cal. 3d 860 (1979)…………………………………………………………………………...13

*Lang v. Retirement Living Pub. Co.*,
  949 F.2d 576 (2d Cir. 1991)…………………….………………………………………………16

*Louis Vuitton Malletier S.A. v. Warner Bros. Enter. Inc.*,
  868 F. Supp. 2d 172 (S.D.N.Y. 2012)...…………………………………………….…………21

*Lutheran Ass'n of Missionaries and Pilots, Inc. v. Lutheran Ass'n of Missionaries and Pilots, Inc.*,
    No. Civ.03–6173 PAM/RLE, 2005 WL 629605 (D. Minn. 2005) ……………….…………16

*Randa Corp. v. Mulberry Thai Silk, Inc.*,
    58 U.S.P.Q.2d 1718, 2000 WL 1741680 (S.D.N.Y. 2000)…………………………………..16

*Rogers v. Grimaldi*,
    695 F. Supp. 112 (S.D.N.Y. 1988)……………………………………………………...*passim*

*Twentieth Century Fox Television v. Empire Distrib., Inc.*,
    875 F.3d 1192 (9th Cir. 2017)…………………………………………………...13, 21

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
    996 F.2d 1366 (2d Cir. 1993)……………………………………………….………18

## **INTRODUCTION**

Hermès' summary judgment papers show that Hermès cannot genuinely dispute that Defendant Mason Rothschild's *Metabirkins* images and NFT art project are expressive activity protected by the First Amendment, that the *MetaBirkins* title is artistically relevant to those images and to the entire NFT project, and that Rothschild's use of the *MetaBirkins* name was not explicitly misleading. It thus now is abundantly clear that Rothschild is entitled to summary judgment under *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989).

From the beginning of this litigation, Hermès has asserted that Rothschild's sale of fanciful, fur-covered images of Birkin handbags, along with his decision to title those images *MetaBirkins*, violated the Lanham Act. Hermès' own filings in this case make clear that Hermès' theory of the case was always about the images and the title Rothschild chose for them:

- Hermès filled its complaint with images of Mason Rothschild's *MetaBirkins* artworks. *See* Compl. at ¶ 79 & Fig. 5, ¶ 83 & Fig. 6, ¶ 84 & Fig. 7, ¶ 94 & Fig. 9, ¶ 95 & Fig. 10, ¶ 96 & Fig. 11, ¶ 104 & Fig. 13, ¶ 123 & Fig. 14, ¶ 125 & Fig. 15, ¶ 126 & Fig. 16, ¶ 133 & Fig. 19, ¶ 138 & Fig. 20, and ¶ 139 & Fig. 21.

- Hermès' memorandum opposing Rothschild's motion to dismiss characterized the *MetaBirkins* images as "virtual handbags" that were infringing "digital commodities." *See* Hermès' Memorandum of Law in Opposition to Motion to Dismiss at 3 ("Now Defendant is selling virtual handbags (that appear to be blurry digital copies of actual Hermès BIRKIN handbags) under the confusingly similar METABIRKINS brand."); *id.* ("If Defendant used the BIRKIN trademark to sell physical handbags, it's unclear what First Amendment protection he would be seeking. There is no reason to treat his

1

sales of virtual handbags, which Defendant concedes are digital commodities, any

differently.").

- Hermès then commissioned a likelihood of confusion survey that was premised on the

  same theory of the case—*i.e.*, that the images, and Rothschild's use of the name

  *MetaBirkins* to title them, were infringing. Hermès' survey expert, Dr. Bruce

  Isaacson, showed subjects images of *MetaBirkins* artworks as they appeared on

  Rothschild's metabirkins.com website and asked subjects who they thought made

  those "items." Isaacson Decl. ¶ 2, Ex. 1 ¶ 18. Though that question was inherently

  ambiguous, Isaacson intended the question to refer to the images and to measure

  confusion regarding the source of the images. *See* Declaration of Rhett O. Millsaps II

  in Suppor of Rothschild's Opposition to Plaintiffs' Motion for Summary Judgment

  dated October 20, 2022 ("Millsaps Opp. Decl.") ¶ 14, Ex. 13 (B. Isaacson Dep. (Sept.

  20, 2022) 95:19-96:4 ("Q: *What is the item that's shown on the web page?* A: *The*

  *web page shows a number of items, but most of those items are variants of Hermès*

  *bags. There's also some text on the web page, there's a bunch of other things on the*

  *web page, but most of what's on that web page are variants of Hermès bags or*

  *counterfeits of Hermes bags or some kind of mutation of an [sic] Hermès bag*.")).[1]

And yet, Hermès has now filed a motion for summary judgment in which it seeks to

avoid application of the controlling *Rogers* framework by insisting that Hermès' case has always

been about Rothschild's use of the *MetaBirkins* name *solely with respect to NFTs*, and not the

---

[1] In his description of the "items" on the web page, Isaacson never referred to NFTs. And no
reasonable respondent would have understood that question to be asking about the source of the
NFTs. The page Isaacson showed respondents showed digital images of handbags. There was no
reference to NFTs.

*MetaBirkins* images that have always been attached to the NFTs. *See* Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("Memorandum" or "Mem.") at 2 ("Although Rothschild's unlawful use of Hermès's trade dress and imagery is an aggravating factor, it was Rothschild's unauthorized use of the BIRKIN ***name*** for NFTs that he initially sold…that gave rise to this action.") (emphasis in original); *id.*. at 5 (insisting that Hermès' claims are only "about the NFTs, not necessarily the images associated with them").

Hermès' turnabout is understandable: discovery has confirmed that the *MetaBirkins* name is artistically relevant to Rothschild's *MetaBirkins* images and entire NFT art project, and that Rothschild's use of the *MetaBirkins* name was not explicitly misleading. Unable to produce any evidence to the contrary, Hermès has retreated to the indefensible position that Rothschild infringed by using the *MetaBirkins* name for *NFTs*, separate and apart from the *MetaBirkins* images. *See* Mem. at 5. According to Hermès, the NFTs are separable from the artworks they authenticate because, for less than 24 hours during the initial minting process for the NFTs, Rothschild associated the NFTs with an image of a shroud-covered object on a pedestal. Mem. at 8; *id*. at 2 (arguing that Rothschild initially sold the NFTs "when they were not associated with the images he claims are art…").

Hermès' new theory is contradicted by the record, which unequivocally shows that *MetaBirkins* purchasers understood that they were purchasing digital artworks—and in fact were able to view those artworks before purchase, even if they did not know prior to the minting of the NFTs which particular *MetaBirkins* artwork would be associated with the NFT they purchased. *See* § I(A), below.

Undisputed evidence demonstrates that the name *MetaBirkins* identifies the *MetaBirkins* digital artworks. Undisputed evidence also demonstrates that the *MetaBirkins* title identifies the

entire artistic project as a whole, including the NFTs that purchasers understood would be linked to the fanciful depictions of Birkin handbags—as they indisputably always have been since minting was completed. *See* § I.A., below; *see also* Memorandum of Law in Support of Defendant Mason Rothchild's Motion for Summary Judgment ("Rothschild Mem.") (Doc. 62) at 7-8, citing Millsaps Decl. [Doc. 65] ¶ 2, Ex. 1 (Gopnik Rep.) ¶ 34 (art historian and critic Dr. Blake Gopnik opining that the NFTs associated with the *MetaBirkins* images are themselves part of Rothschild's artistic project: "The particular combination of Rothschild's production of NFTs, and the way they reference the Birkin bags of Hermès, allows Rothschild to make an important artistic point about the way that our society—including the art world—is dominated by high status goods.").

The artistic relevance of the *MetaBirkins* title to the *MetaBirkins* images thus is established beyond peradventure. *See* § I.B, below. And Hermès has failed to identify any evidence of explicit misstatements regarding the source of the *MetaBirkins* images. *See* § I.C, below. Rothschild is entitled to summary judgment because the undisputed evidence shows that the NFTs at issue were always associated with the *MetaBirkins* images and art project. Hermès cannot rebut that evidence by speculating as to the ways NFTs could be used in some hypothetical case. Nor can Hermès rescue its case by attempting to tar Rothschild with disparaging red herrings, as much of Hermès' brief attempts to do. *See* § II, below. This Court should deny Hermès' motion for summary judgment and grant Rothschild's motion.

## ARGUMENT

### I.  *ROGERS* APPLIES TO HERMÈS' CLAIMS IN THIS CASE

Undisputed evidence produced in discovery confirms that Rothschild's *MetaBirkins* images are art. *See* Rothschild Mem. (Doc. 62) at 5-9. Undisputed evidence also confirms that

the "MetaBirkins" title is artistically relevant to the *MetaBirkins* images. *See id.* at 9-13.

Discovery has made clear that Hermès had no evidence of explicit misstatements regarding the

source of the *MetaBirkins* images when it filed its complaint. See *id.* at 13-16. And despite its

speech-suppressing, scorched-earth discovery efforts, Hermès has still failed to produce any

evidence of explicit misstatement—because there weren't any.

### A. Hermès Cannot Escape *Rogers* by Attempting to Sever the *MetaBirkins* NFTs from the *MetaBirkins* Artworks They Point to and Authenticate.

Contrary to the story it told in its complaint, Hermès now claims that it's not the

*MetaBirkins* artworks that infringe. Instead, Hermès alleges, it was Rothschild's association of

the term "MetaBirkins" with NFTs that was the problem. *See* Mem. at 2 ("[a]lthough

Rothschild's unlawful use of Hermès's trade dress and imagery is an aggravating factor, it was

Rothschild's unauthorized use of the BIRKIN ***name*** for NFTs that he initially sold…that gave

rise to this action.") (emphasis in original). To be clear, Hermès does not contest that

Rothschild's use of the *MetaBirkins* name for the *MetaBirkins* artworks is artistically relevant.

Hermès' claim now depends entirely on Hermès' attempt to recharacterize the NFTs that always

pointed to and authenticated Rothschild's *MetaBirkins* artworks as distinct from those artworks.

To make that new argument, Hermès mischaracterizes undisputed facts in the record. In

particular, Hermès focuses on the fact that, "when the METABIRKINS NFTs were initially sold,

the files associated with each METABIRKINS NFT depicted the image of a shroud covered

unidentified object," and that the images attached to the NFTs were soon after changed to the

*MetaBirkins* artwork images. *Id*. at 8; *see also* Mentzer Decl., Ex. 1 at 17-19 (reporting that the

*MetaBirkins* NFTs were attached to the shroud-covered image for less than 24 hours during the

initial minting process, until the "unveiling" occurred upon conclusion of minting, at which point

"each NFT received their unique [*MetaBirkins*] image"); Rothschild's Counterstatement to

Plaintiffs' Rule 56.1 Statement of Material Facts ("CSF") ¶¶ 45-47. Those facts, Hermès wrongly implies, mean that purchasers of the NFTs did not know prior to and during the sale that they were buying NFTs that would be linked to the *MetaBirkins* artworks. Thus, according to Hermès, "[t]he shroud images did not drive the sales of these NFTs—the name of the project, METABIRKINS NFTs, did." Mem. at 12.

But Hermès' own evidence submitted with its motion demonstrates that the *MetaBirkins* NFT project was *always* associated with Rothschild's fanciful *MetaBirkins* artworks. Hermès submitted in support of its motion a screenshot from the *MetaBirkins* website as accessed on December 1, 2021, the day before the *MetaBirkins* NFTs were released to be minted. That screenshot shows many of the *MetaBirkins* images:





Declaration of Megan Corrigan dated October 7, 2022 ("Corrigan Decl.") ¶ 6, Ex. 6; Mem. at 12.

Additionally, Hermès submitted evidence showing that Rothschild publicly previewed the

MetaBirkins artwork as early as October 29, 2021. *See* CSF ¶ 89; Corrigan Decl., Ex. 46.

Hermès' own evidence shows that purchasers saw and could not reasonably have

misunderstood that they were buying *MetaBirkins* artworks, even though they did not know

which particular *MetaBirkins* artwork they would receive until after the minting the NFTs. That

evidence is consistent with Rothschild's uncontradicted deposition testimony:

> *Q: So how would somebody know what they were purchasing?*
>
> *A: Because the 100* [MetaBirkins *artworks*] *were shown in previews. You just didn't know which one you were going to get*."

CSF ¶ 45  (M. Rothschild Dep. (August 4, 2022) 226:18-228:10). Thus, minters of *MetaBirkins*

NFTs were *always aware* that they would receive an NFT linked to one of the 100 *MetaBirkins*

artworks.

Hermès offers no evidence contradicting Rothschild's testimony or creating uncertainty

about what is shown plainly in the screenshot that Hermès submitted as part of its own motion.

All Hermès can do is point to the picture of a shrouded object and say that no one bought the

*MetaBirkin*s NFT to get that image. But Rothschild's initial use of the placeholder image of a

shrouded object on a pedestal during minting was a further indication of the project's artistic

intent, rather than detracting from that intent, as Hermès baselessly suggests. *See* Mem. at 8.



When art historian and art critic Dr. Blake Gopnik was asked in his deposition to opine on the significance of Rothschild's initial distribution of shrouded images and subsequent unveiling of each purchaser's *MetaBirkin* artwork, he testified that those facts, if anything, strengthened his view that *MetaBirkins* are and were intended to be art:

> Q: Do you have an opinion whether based on those facts this NFT is a work of art?
>
> A. […]It seems to be one of the other *MetaBirkins* covered with a sheet, which would actually indicate to me more rather than less that it's participating in a larger artistic project. It seems to be riffing on other items from the *MetaBirkins* repertoire. And the pedestal with the draped object on top of it very much refers to statuary in the history of art. The act of unveiling a statue is something that exists in the history of art. So it seems very much to be part of that discourse. So yes, the answer is I would say yes, it does seem to be understood in an artistic context.

Millsaps Opp. Decl. ¶ 3, Ex. 2 (B. Gopnik Dep. (September 23, 2022) 207:4-208:7).

The connection between the *MetaBirkins* NFTs and the *MetaBirkins* artworks does not depend on which particular image was associated with a particular NFT. The *MetaBirkins* artworks were publicly shown prior to sale, and it is readily apparent that all of the artworks are fanciful renderings of Birkin bags. That is, of course, why the entire art project had the *MetaBirkins* name. *See* Corrigan Decl., Exs. 6, 46; CSF ¶ 45 (M. Rothschild Dep. (August 4, 2022) 226:18-228:10). It is therefore irrelevant that purchasers of *MetaBirkins* NFTs didn't know which specific *MetaBirkins* image would be associated with their NFT until after the NFTs were minted. Saying that the *MetaBirkins* NFTs were not marketed in connection with the *MetaBirkins* artworks just because purchasers didn't know which of the 100 publicly-available artworks they would receive would be like saying that marketing of Warhol's *Campbell's Soup Cans* had no connection to art if it did not identify the specific can of soup.

Hermès additionally selectively quotes and misrepresents Dr. Gopnik's views on whether creative works attached to NFTs are art. For example, Hermès claims that "Dr. Gopnik admits that ' "NFT art" simply does not exist.'" Mem. at 14. Hermès claims further that Dr. Gopnik "explains that the image contained in a video file associated with any NFT, including the METABIRKINS NFTs is not art." Mem. at 14. But as Dr. Gopnik explains in his declaration, Hermès has entirely misstated his views:

> In my *New York Times* article from which Plaintiffs have extracted the direct quote in that assertion, the whole point is that the digital entities we normally refer to as "NFT art" don't deserve that name specifically because they are so very obviously the same kind of digital art that we have known for decades. That is, if they are not "NFT art" it is by virtue of their being precisely the same as digital art that doesn't bear the title "NFT"—contra Plaintiffs, my position is that NFTs, as commonly understood, are very much art, of a relatively traditional kind. This is because most image-based NFTs have almost no meaning at all apart from the quite traditional digital images to which they are attached.

CSF ¶ 82 (Gopnik Decl. ¶ 5). Dr. Gopnik further states unequivocally:

> And again contra Plaintiffs, I certainly do not believe, and have never stated, that the digital images with which NFTs are associated are not art. For several decades I have been well known as one of the more ardent supporters of digital artworks, of many kinds—that is, of artworks in the same media as the images with which NFTs are commonly associated. Whether or not such digital artworks come associated with NFTs does not affect their status as works of art or my opinion of them as such. (Although I have, of course, criticized bad examples of digital art, of which there are probably no more — but also no less — than there are bad examples of painting and sculpture.) Plaintiff simply made up my rejection of digital art to suit the convenience of Plaintiffs' argument.

Gopnik Decl. ¶ 7.

Hermès quotes Dr. Gopnik as "describ[ing] the METABIRKINS NFTs as an 'elite metaversal commodity. . . the kind of deluxe Hermès bag a MetaKardashian might carry, in the virtual reality we will all inhabit.' " Mem. at 4. Not only does Hermès' own formulation acknowledge the inherent link between the *MetaBirkins* images and their associated NFTs, it wrongly suggests that Dr. Gopnik denied the artistic status of Mr. Rothschild's *MetaBirkins*. But

this selective quotation from Dr. Gopnik's report in this case is part of an explanation of the

ways in which these representations are artistic:

> In fact, the sentence of mine that Plaintiff quoted is meant to underline the artistic status of the "MetaBirkins," by making clear the imaginative work that they do. The very next sentence in my report, conveniently omitted by Plaintiff, makes that very clear: "That lends a speculative quality to Rothschild's work that aligns it with certain kinds of literary science fiction, where current cultural trends and goods are extrapolated into the future."

CSF ¶ 96 (Gopnik Decl. ¶ 8).

Discovery has confirmed that the *MetaBirkins* images, their associated NFTs, and the

*MetaBirkins* name all function as part of a single artistic project. See Rothschild's Rule 56.1

Statement of Undisputed Facts in Support of His Motion for Summary Judgment (Doc. 63)

("Rothschild SUF") ¶¶ 16, 17. As Dr. Gopnik's unrebutted expert testimony makes clear, the

*MetaBirkins* project as a whole—including the way in which the NFTs were promoted, sold, and

traded—is "Business Art" in the vein of Duchamp and Warhol:

> In the following report, I show how the images and NFTs produced and sold by Mason Rothschild find their natural and obvious home among the artistic experiments carried out by modern artists over the last century. Like several important predecessors, Rothschild seeks to probe the nature of art, and of commerce, by blurring the distinction between the two categories. In engaging with the commercial world of Hermès Birkin bags, his art turns commerce itself into an art supply.

Rothschild SUF ¶ 17 (Gopnik Rep. ¶¶ 1, 18-35, 37-40). [2] *See also* Millsaps Decl. (Doc. 65) ¶ 4,

Ex. 3 (B. Gopnik Dep. (Sept. 23, 2022) at 118:3-12 ("Business Art is art that engages directly

and powerfully—for want of a better word—with business, with commerce, with a wide range of

activities that on the face of it normally might seem as being essentially about finances and

---

[2] As detailed below, the rest of Hermès' Memorandum misstates uncontroverted record evidence, including by pulling quotes out of context from the unequivocal and unrebutted expert testimony of Dr. Blake Gopnik, as just discussed.

commodities but in fact when introduced into the discourse of art seem to have a richer set of resonances. It's a way of using art to look at the world of finance and business by participating in it to a certain extent.")); Rothschild SUF ¶ 17 (Rothschild Decl. ¶ 11 ("My MetaBirkins project as a whole was an artistic experiment to explore where the value in the Birkin handbag actually lies—in the handcrafted physical object, or in the image it projects? I used NFTs to sell and distribute the artworks to see what kind of value the culture would ascribe to playful representations of imaginary Birkin bags.")).

This uncontradicted testimony should end this case. Hermès has re-focused away from the *MetaBirkins* images because those images, and the use of the *MetaBirkins* term to title them, are indisputably protected by *Rogers.* This Court should reject Hermès' motion for summary judgment, and grant Rothschild's motion.

**B. Undisputed Evidence in the Record Establishes that the *MetaBirkins* Name is Artistically Relevant to the *MetaBirkins* Images, and to Every Element of Rothschild's *MetaBirkins* Art Project.**

Dr. Gopnik's unrebutted testimony reinforces this Court's prior ruling that *Rogers* applies. *See* Memorandum Order [Doc. 50] ("Order") at 11 ("Because trademark claims … implicate First Amendment interests, accounting for these different interests requires a separate test, as the Court laid out in *Rogers*, and it is that test that applies here. Because Rothschild is selling digital images of handbags that could constitute a form of artistic expression, balancing the First Amendment concerns with Lanham Act protection requires applying the *Rogers* test.") (internal citation omitted). As Dr. Gopnik explained, the *MetaBirkins* images are renderings of imaginary Birkin bags entirely covered in "goofy, garish fake fur" that "flags the absurdist, parodic intent of [the] project." Rothschild SUF ¶ 16 (Gopnik Rep. ¶ 38). And as Rothschild has explained, the cartoonishly furry *MetaBirkins* images are both a fanciful tribute to the Birkin bag,

which has become a cultural object signifying extreme wealth, and a reference to the fashion

industry's fur-free initiative. *Id*. ¶¶ 14, 16 (Rothschild Decl. (Doc. 66) ¶ 9-10; M. Rothschild

Dep. (Aug. 4, 2022) 189:21-190:5).

While Rothschild's initial marketing didn't contain an interpretive essay on the precise

connection between the *MetaBirkins* name and the specific *MetaBirkins* artworks to which each

specific NFT was attached, that does not mean the NFTs can somehow be distinguished from the

images to which they are attached, or from the larger art project of which they are a part. Hermès

seeks to slice the NFTs apart from the *MetaBirkins* images to which they are linked and which

they authenticate, but that distinction is not consistent with *Rogers*. *Rogers* itself noted that the

name of the film, which circulated before the film was released, as is customary in motion

picture distribution, temporarily confused industry insiders. 875 F.2d at 997; *see also id.* at 1005

(Griesa, J., concurring) (noting that Rogers challenged both the title and the "advertising and

promotion" of the film, not the content of the film itself). The temporal difference between

circulation of the title and release of the film did not change the fact that the title was

inextricably artistically intertwined with the actual film that was released. *Id.* at 998.

Cases since *Rogers* have likewise found marketing materials for *Rogers*-protected works

to be equally protected, whether separated temporally, physically, or both, from the art. As the

Ninth Circuit explained,

> Although it is true that these promotional efforts technically fall outside the title or body
> of an expressive work, it requires only a minor logical extension of the reasoning of
> *Rogers* to hold that works protected under its test may be advertised and marketed by
> name, and we so hold. Indeed, the *Rogers* case itself concerned both a movie with an
> allegedly infringing title and its advertising and promotion, although the majority opinion
> did not deal separately with the latter aspect. *See Rogers*, 875 F.2d at 1005 (Griesa, J.,
> concurring in the judgment). The balance of First Amendment interests struck in *Rogers*
> … could be destabilized if the titles of expressive works were protected but could not be
> used to promote those works.

*Twentieth Century Fox Television v. Empire Distribution, Inc.*, 875 F.3d 1192, 1196-97 (9th Cir. 2017). *See also ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 918-19, 920-21, 937 (6th Cir. 2003) (defendants' materials describing and accompanying artwork were protected, given protection of underlying artwork); *Betty's Foundation for Elimination of Alzheimer's Disease v. Trinity Christian Center of Santa Ana, Inc.*, Case No. SACV 20-02146-CJC (ADSx), 2021 WL 3046889, at *2 (C.D. Cal. Apr. 7, 2021) ("Defendants' advertisements and merchandise sales related to its television show, 'Remember the Music,' are protected as part of an expressive work."); *Deus ex Machina Motorcycles Pty. Ltd. v. Metro-Goldwyn-Mayer Inc.*, Case No.: CV 20-4822-PLA, 2020 WL 6875178, at *3 (C.D. Cal. Oct. 23, 2020) ("Although plaintiff argues that the *Rogers* test is inapplicable to the Film's trailer and to the promotional appearance by one of its stars in which he allegedly wore plaintiff's clothing, this argument is unavailing because, as the Ninth Circuit has recognized, efforts to advertise, promote, and market an expressive work are merely extensions of the use of a mark in the original expressive work.") (citations omitted); *Caiz v. Roberts*, 382 F. Supp. 3d 942, 952 (C.D. Cal. 2019) (defendant's use of plaintiff's mark in tour promotions and promotional appearances for album whose title allegedly infringed plaintiff's mark was subject to *Rogers* because those promotional efforts were merely extensions of defendant's use of mark on album); *cf. Guglielmi v. Spelling Goldman Prods.*, 25 Cal. 3d 860, 873 (1979) (en banc) (Bird, C.J., concurring) ("It would be illogical to allow respondents to exhibit the film but effectively preclude any advance discussion or promotion of their lawful enterprise."). This protection is necessary because marketing materials necessarily refer to—but often do not fully reproduce—the protected artwork.

Hermès cannot manufacture a genuine issue of material fact by speculating that Rothschild could have marketed the NFTs in a way that was unconnected to the *MetaBirkins*

images or that Rothschild could theoretically associate the NFTs with different images that would render the name artistically irrelevant. *See* Mem. at 2. It is undisputed and indisputable that Rothschild's *MetaBirkins* NFTs have always actually been associated with his *MetaBirkins* images. *See* CSF ¶ 100. Hermès cannot sue Rothschild for uses he has never made.

### C. Hermès Has Produced No Evidence of any Explicitly Misleading Statement.

Hermès has also failed to offer any evidence that would support a finding of explicit misleadingness. Hermès states in its brief that "[a]s discussed in further detail infra at Section II.C.2.e, Rothschild made various explicit statements that misled the public and the press into believing his METABIRKINS NFTs were associated with Hermès, when they were not." See Mem. at 18.

Section II.C.2.e of Hermès' brief is titled "Evidence of Actual Confusion." Hermès does not identify a single explicit misstatement in either of its two paragraphs, or anywhere else.[3] Those paragraphs lay out Hermès' scant evidence of actual confusion—a few mistaken press reports, some tweets and online comments by unknown persons who may or may not have been confused,[4] and the response of a single French lawyer who in her deposition admitted that she

---

[3] Much of Hermès' purported evidence of actual confusion comes from the survey conducted by Dr. Bruce Isaacson. But as Rothschild explained in detail in his brief in support of his own motion for summary judgment, *see* Rothschild Mem. [Doc. 62] at 19-22, that survey is fundamentally flawed for many reasons. One important reason is that the survey cannot differentiate any confusion that is related to the *MetaBirkins* name, the use of the Hermès or Birkin marks in the disclaimer, or the purported Birkin trade dress—*i.e.*, the images of the *MetaBirkins* that Hermès, attempting to wriggle free of *Rogers*, now says are not the basis for its claims. Isaacson used a stimulus that included all of those elements and he did not attempt to test the effect of any of them. As he admitted in his deposition, that means he cannot offer any opinion on any confusion related specifically to the name. *See* Millsaps Opp. Decl. ¶ 14, Ex. 13 (B. Isaacson Dep. (Sept. 20, 2022) 154:8-156:14); *see id.* at 156:11-14 ("Like I said, I don't have an opinion on the confusion caused by individual elements.· I only have an opinion on the confusion caused by the group.").

[4] Most of the tweets and online comments Hermès offers as evidence of confusion are equivocal: it is not clear if any of the authors' uses of the Birkin or Hermès marks, standing alone, suggests

knows nothing about American law and simply inferred, based on her impressions of French law, that any use of an Hermès trademark must mean that the item came from Hermès.[5]

Those paragraphs provide no evidence of any explicit misstatement. And that is in no way surprising: discovery has shown that Mr. Rothschild wished to be credited as the artist behind *MetaBirkins*, and that he took care to inform consumers that he, and not Hermès, created those artworks. When a few press outlets mistakenly attributed *MetaBirkins* to Hermès shortly after the launch of the project, Mr. Rothschild or his representative reached out promptly to point out that Hermès was not affiliated with *MetaBirkins* and to ask for a correction. Rothschild SUF (Doc. 63) ¶ 23. Additionally, Rothschild added the following disclaimer to the *MetaBirkins* website: "We are not affiliated, associated, authorized, endorsed by, or in any way officially connected with the HERMÈS, or any of its subsidiaries or its affiliates. The official HERMÈS website can be found at https://www.Hermès.com/." *Id*. ¶¶ 24-25 (Compl. ¶ 104, Fig. 13 and Ex. AH; Rothschild Decl. ¶ 14).

At several points in its brief, Hermès focuses on communications with people who helped Mr. Rothschild with marketing or with technical tasks like minting the NFTs or rendering the

---

that the authors believed that the *MetaBirkins* images were associated with Hermès or, rather, that the images were merely *depicting or commenting on* Hermès' Birkin bag. *See, e.g.*, CSF ¶¶ 130-151.

[5] *See* CSF ¶¶ 152, 154 (B. Guimberteu Dep. (Sept. 14, 2022) 27:25-29:12 ("Q. I *believe earlier you testified that you believed that Baby Birkin was necessarily authorized by Hermés because it's related to a Hermés product; is that right?* A. *Yes.* […] Q. *Do you know if the law in the United States requires an artist to get a brand's permission before that artist depicts one of the brand's products?* […] A. *I don't have knowledge of U.S. law, so I cannot answer*. Q. […] *Is there anything else on which you based your conclusion that Baby Birkin was authorized by Hermés than what you've said today?* […] A. *Well, no. I think I explained the reasons*. […] Q. *Other than what you've testified here today, is there anything else on which you based your conclusion that MetaBirkins was authorized by Hermés?* A. *Well, beside it has the trademark Birkin and the shape of the product, I think -- and what I already explained, I think that would be the reason why*. Q. Okay. *And there is no other reason?* A. *No.*").

*MetaBirkins* artworks. For example, Hermès notes that Rothschild told Mark Berden about the possibility of collaboration with Hermès. Mem. at 6.  But statements of possibility are inherently ambiguous and unreliable; they are routinely deemed to be mere puffery.[6] Those statements would be irrelevant to consumer confusion even if, counterfactually, they were unambiguous, because none of them were directed at consumers, potential consumers, intermediaries for consumers, or even members of the public. *See 1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 409 (2d Cir. 2005) ("A company's internal utilization of a trademark in a way that does not communicate it to the public is analogous to an individual's private thoughts about a trademark. Such conduct simply does not violate the Lanham Act, which is concerned with the use of trademarks in connection with the sale of goods or services in a manner likely to lead to consumer confusion as to the source of such goods or services."); *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 584 (2d Cir. 1991) (the ultimate question is whether "reasonably prudent purchasers" would likely be confused).

This failure to show *any* explicit misstatement is reflected in the deposition testimony of Hermès' Rule 30(b)(6) witness, Nicolas Martin, the General Counsel of Hermès Group—the most senior lawyer in the entire constellation of Hermès entities. At his deposition, Mr. Martin

---

[6] *See, e.g.*, *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) ("[S]tatements will not form the basis of a fraud claim when they are mere 'puffery' or opinions as to future events."); *Design Resources, Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 505 (4th Cir. 2014) (Lanham Act courts have recognized that "a prediction, or statement about the future … is essentially an expression of opinion that is not actionable") (cleaned up); *Eastman Chemical Co. v. Plastipure, Inc.*, 775 F.3d 230, 235 (5th Cir. 2014) ("Predictions of future events are … non-actionable expressions of opinion" under the Lanham Act); *Lutheran Ass'n of Missionaries and Pilots, Inc. v. Lutheran Ass'n of Missionaries and Pilots, Inc.*, No. Civ.03–6173 PAM/RLE, 2005 WL 629605 (D. Minn. 2005) (dismissing Lanham Act claim where statements reflected opinion of circumstances surrounding the parties' disaffiliation and intentions to operate in the future); *Randa Corp. v. Mulberry Thai Silk, Inc.*, 58 U.S.P.Q.2d 1718, 2000 WL 1741680, at *3 (S.D.N.Y. 2000) (opinions about possible future events are nonactionable).

was asked if Hermès had evidence of any attempts by Rothschild to explicitly mislead others to believe that *MetaBirkins* is associated with Hermès. Mr. Martin could point only to the use of the "Hermès" and "Birkin" marks and the claimed Birkin trade dress,[7] and not to any explicit claim that Hermès was the source of the *MetaBirkins* NFT artworks, or that Hermès had sponsored or endorsed the *MetaBirkins* NFT artworks and associated:

> Q: Does Hermès have evidence of any attempts by Mr. Rothschild to explicitly mislead others to believe that *MetaBirkins* have an association with Hermès?
>
> A: Yes.
>
> Q: And what is that evidence?
>
> A: I would say the use of the word Birkin. I don't remember all the -- all the details, but I remember at the beginning, Birkin was used alone. And I remember that one could think that it was Hermès. I don't have a -- I don't remember all the details, but the use of the Birkin, the use of the Birkin trade dress, the way the communication has been made, and it could be considered explicitly misleading.
>
> Q: Are you aware of any other evidence of that?
>
> A: I – I don't have any more in mind, so –

Rothschild SUF (Doc. 63) ¶ 20 (N. Martin Dep. (Aug. 30, 2022) 114:9-115:16). In response to further questioning, Mr. Martin stated that "[f]or me, MetaBirkins is explicitly misleading." *Id*. at 118:13-14. That name was explicitly misleading, Mr. Martin stated, "[b]ecause people will get confused and think it's from Hermès." *Id*. at 118:17-18.

Mr. Martin confirmed, in other words, that as far as Hermès is concerned, any use of Hermès' marks that might cause confusion is explicitly misleading. Hermès' entire argument is based on mistaken *inferences* Hermès suggests could be drawn, primarily from Rothchild's use of the *MetaBirkins* name itself. But that suggestion fails to come to terms with what *Rogers*

---

[7] Hermès now insists that its claim is not about the images, so Mr. Martin's references to the trade dress are irrelevant.

requires: an *explicit* misstatement about source. *See Rogers*, 875 F.2d at 1000 (the First

Amendment "insulates from restriction titles with at least minimal artistic relevance that are

ambiguous or only implicitly misleading"). An explicitly misleading statement does not require

the audience to draw an inference, unlike an implicitly misleading statement, which does. *See Id.*

at 1001 n.8 (finding that survey evidence showing that 38% of respondents mistakenly believed

that Ginger Rogers was involved with the film at issue insufficient to be actionable).[8]

Hermès has failed to establish any explicitly misleading statement. This Court must deny

Hermès' motion for summary judgment and grant summary judgment to Rothschild.

## II.   **HERMÈS' ARGUMENTS DO NOT GO TO ANY FACT MATERIAL TO *ROGERS***

### A.  **Even If There Were a Dispute over Authorship of *MetaBirkins* and Choice of the *MetaBirkins* Title, that Would Be Irrelevant to the Material Legal Issues of Artistic Relevance and Explicit Misleadingness.**

Hermès states in its brief that "[d]espite Rothschild's claim to be an artist here, [Mark]

Berden generated every image associated with the METABIRKIN NFTs." Mem. at 6. But the

assertion that Mr. Rothschild is not an artist because he employed Mr. Berden as a studio

assistant to help him generate the *MetaBirkins* digital images is both legally irrelevant and

directly contrary to undisputed facts in the record. *See* CSF ¶¶ 54, 239.

As a matter of law, it does not matter who created or named the art. *Rogers* involved a

lawsuit against the distributor of a film made by Fellini, and the Court made no distinction

between different entities' involvement in the production, choice of subject matter, or choice of

---

[8] Hermès offers this evidence as evidence of actual confusion. As Rothschild has explained in his memorandum supporting his motion for summary judgment, *see* Rothschild Mem. at 16, Hermès' evidence of actual confusion does not come anywhere close to the "particularly compelling" evidence of confusion that is required to outweigh an artistic defendant's First Amendment interest. *Twin Peaks*, 996 F.2d 1366, 1379 (2d Cir. 1993).

name. *See* 975 F.2d at 996. Hermès has not identified any legal principle that would limit *Rogers*' protection to the person responsible for the physical creation of artwork, nor would any such limitation be consistent with the First Amendment, which regularly and aggressively protects distributors. *See, e.g.*, *Smith v. California*, 361 U.S. 147 (1959) (First Amendment protects bookstores' choice of what speech to distribute). This is simply not a material dispute.

On its own terms, Hermès' argument also fails. First, Mark Berden was not Rothschild's "designer." The undisputed record evidence shows that Mr. Berden functioned as a high-level studio assistant who assisted Mr. Rothschild in the creation of the *MetaBirkins* artworks. At all times, Mr. Berden worked at Mr. Rothschild's direction, and Mr. Rothschild had final approval over his work, including all of the *MetaBirkins* artworks. *See* CSF ¶ 54; Gopnik Decl. ¶ 14.

Additionally, Dr. Gopnik testified that, when preparing his report, he had reviewed correspondence between Mr. Rothschild and Mark Berden (referred to sometimes as "Mark Design"), and that in his view Mr. Berden was functioning as Mr. Rothschild's studio assistant:

> Q: And do you have an understanding of the role of Mark Design in creating the Metabirkin images associated with Metabirkin NFTs? …
>
> A: Yes, his role in the production of them, I'd say.
>
> Q: And what was his role in production?
>
> A: Well, I'd have to look at them in detail.  He seemed to play several different roles.  He was in a rich, collaborative relationship.  He was functioning as a high-level studio assistant. That's what studio assistants do.

CSF ¶ 54 (Gopnik Dep. (Sept. 23, 2022) 244:7-245:5). In fact, as Dr. Gopnik states, artists commonly use studio assistants, and have since at least the days of Rembrandt and Raphael:

> As I made very plain to Plaintiffs' counsel during my deposition, my study of the relevant communications between Mr. Rothschild and Mr. Berden revealed that, in the creation of Mr. Rothschild's "Metabirkins," the two men were filling the standard roles of creator and skilled digital technician, having precisely the interactions one would expect between such figures. It is beyond commonplace for contemporary artists to engage a team of

> specialist fabricators, programmers and skilled assistants to complete all but their least ambitious projects; no one creator could have all the skills required in today's technically complex art world — and especially when digital imagery, such as Mr. Rothschild's, is involved. Indeed, such teamwork was already standard from the time of Renaissance master Raphael, with his vast and varied creative staff, right up to the assistant-filled studio of Andy Warhol. In all these cases, old and new, the artist at the head of a project would ask and pay for input and advice from the professionals he or she had hired, as they came to engage with the subject matter and imagery at issue and with its technical realization…. In seeking assistance, input and advice from Mr. Berden, Mr. Rothschild was not relinquishing his role as creative artist; he was fulfilling it in the most standard and indeed responsible way.

Gopnik Decl. ¶ 14. *See also* Millsaps Opp. Decl. ¶ 3, Ex. 2 (B. Gopnik Dep. (Sept. 23, 2022)

158:13-23 (discussing Rembrandt's studio and his use of assistants)).

Much the same is true of Hermès' assertion that "Rothschild did not even create the name 'METABIRKINS.' Rather, Rothschild ran a 'contest,' promising a 'Birkin' NFT to the winner. Rothschild adopted the mark and failed to 'pay' the winner." Mem. at 2. Hermès' version of events is inconsistent with Rothschild's deposition testimony. In his deposition, Rothschild explained that he already had considered the *MetaBirkins* name as a possibility when he ran this contest. After the contest participant suggested that name and reached out directly to Rothschild, he sent her his phone number and spoke with her to explain that fact. *See* CSF ¶ 254.

But the larger point is that even if what Hermès is suggesting here were true—that Rothschild didn't come up on his own with the title *MetaBirkins* and that he failed to deliver on promises he made to the person who had suggested the title—that would not change any of the facts that *Rogers* directs are salient in this case: (1) that the *MetaBirkins* images and NFT project are art, (2) that the *MetaBirkins* title describes the content of that art and art project and is otherwise artistically relevant, and (3) that Rothschild has never made any explicit misstatement regarding the source of *MetaBirkins*. It is undisputed that Rothschild had ultimate authority to name his project, and *Rogers* does not require an inquiry into the origin of the title. Dr. Gopnik

has made clear that Hermès' assertions are irrelevant to the question of whether the name is

artistically relevant:

> The concerns that Plaintiffs have expressed concerning the titling of Mr. Rothschild's
> "MetaBirkins" are also misplaced. When Mr. Rothschild sought input from others in
> choosing his title, he was acting as any fine artist might, involving his social circle in his
> acts of creation. Like many, many artists over the last 500 years, Andy Warhol himself is
> well known to have openly asked those around him for suggestions on all aspects of his
> art, and to have used their suggestions with enthusiasm — and without thereby
> diminishing his own artistic status.

Gopnik Decl. ¶ 10.

### B. The Court Should Reject Hermès' Insinuations That Because Rothschild Vigorously Promoted and Sold His *MetaBirkins* Artworks He Is Not An Artist.

Rothschild is an artist,[9] and he engaged in the vigorous promotion and sale of his art.

Hermès' suggestions that these two propositions cannot both be true is flatly inconsistent with

caselaw applying *Rogers*, nearly all of which involves commercially significant works that were

actively marketed. *Rogers* itself is about an aggressively marketed motion picture. *See Rogers*,

875 F.2d 998; *see also Empire*,  875 F.3d 1196-97 (*Rogers* applied to use of Empire as "umbrella

brand" to sell music and other commercial products); *AM General LLC v. Activision Blizzard,

Inc.*, 450 F. Supp. 3d 467, 475 (S.D.N.Y. 2020) (applying *Rogers* to use of Humvee design in

Call of Duty videogame, "one of the most popular and well-known video game franchises in the

world with over 130 million units sold") (internal quotation marks omitted); *Louis Vuitton

Malletier, S.A. v. v. Warner Bros. Enter. Inc.*, 868 F. Supp. 2d 172, 174 (S.D.N.Y. 2012)

(applying *Rogers* to use of "Lewis Vuitton" bag in the movie Hangover: Part II, which "grossed

---

[9] Mr. Rothschild is the first artist signed for agency representation by Creative Artists Agency
(CAA) in their web3 department. CAA is one of the largest and most influential talent agencies
in the United States. *See*, *e.g.*, https://en.wikipedia.org/wiki/Creative_Artists_Agency.
Rothschild also is represented as an artist by Electric Feel, a global entertainment company that
is "home to an A-list roster of musical icons and rising superstar artists, producers, songwriters,
brands, and partners." https://www.electricfeelent.com/about. *See* Rothschild Decl. ¶ 8.

roughly $580 million globally as of the date of the Complaint"). Hermès' argument also ignores the reality that artists are in the business of selling their work, in a crowded, competitive marketplace where many creators are bidding for attention. In his declaration, Dr. Gopnik makes short work of Hermès' insinuations that by engaging in commerce, Mr. Rothschild has somehow forfeited his status as an artist:

> I would also like to state that much of the material presented in Plaintiff's Rule 56.1 Statement of Material Facts, in which Mr. Rothschild is shown discussing how he might sell and profit from his "MetaBirkins" artworks—by trying to engage the interest of "whales," for instance, or by "sweeping the floor" and getting influential buyers to "shill" for him — indicates that Mr. Rothschild was acting as a perfectly normal emerging artist trying to maximize income, in the knowledge that it might very well evaporate later, as so often happens. (It is worth mentioning that the mercantile aggression evident in some of Mr. Rothschild's communications, which Plaintiff seems to portray as egregious and in some way "un-artistic," is normal in the very rough-and-tumble culture of NFTs, where the politesse that prevails in galleries and auction houses— or at least in their public spaces — is deliberately avoided, and where evidently financial ambitions and concerns are expressed openly, despite the artistic values that are also very clearly in play.)

Gopnik Decl. ¶ 17. Dr. Gopnik notes, moreover, that in aggressively marketing his art within the norms and practices of the business culture in which he is artistically engaged, Mr. Rothschild is carrying forward traditions both of Business Art as well as some famous artistic predecessors outside of that category of artistic production:

> Even after they had long-since "emerged" as artists, Rembrandt, Edvard Munch and of course Andy Warhol were all aggressive profit-seekers at the same time as they made great art — and some aspects of their great art, and of its greatness, relate directly to their commercial ambitions. In particular, a Business Art practice in the Warhol tradition, such as Mr. Rothschild's, requires its maker to actively and very visibly engage in real business activities in order for that maker's commentary on business and art, and the business of art, to be most potent and convincing—and to be perplexing and even confusing as well, in the great tradition of modern art.

*Id.* ¶ 18.

### C.  Hermès' Arguments About "Wearability" and "Utility" Do Not Show that *Material* Issues of Fact Remain.

There are other mischaracterizations and irrelevancies in Hermès' brief, but none create material issues of fact. For example, Hermès attempts to argue that *MetaBirkins* images are "wearable" in the metaverse. They quite obviously are not—*MetaBirkins* admittedly are two-dimensional, static images. *See* CSF ¶ 95; Compl. ¶¶ 76, 79, Fig. 5 and Ex. Z. The Court has previously found that Hermès' Amended Complaint "does not contain sufficient factual allegations that Rothschild uses, or will in the immediate foreseeable future use, the [Birkin] mark to sell non-speech commercial products, *i.e.*, virtually wearable Birkin bags." Order at 12 n. 3. And Hermès provided no such evidence in discovery. Instead, it attempts to redefine the word "wear". Hermès asserts that the *MetaBirkins* images are "wearable" in virtual worlds, s*ee* Mem. at 8, based on the deposition testimony of its Rule 30(b)(6) witness, Nicolas Martin:

Q: Are MetaBirkins wearable in virtual world -- worlds?

A.  I think they are.

Q. And what's your basis for saying that?

A. I think "wearable" means a lot of things, including in particular in the metaverse, and I think you can wear the MetaBirkin on your internet account. You can wear it in profile picture – so for me it's a wearable handbag. […]

Q. I'm really just trying to get at your definition of what it means to wear something. And correct me if I'm wrong, I think you've just told me that using a picture of a MetaBirkin as a Twitter profile image, you would consider that to be wearing the MetaBirkin in a virtual world. Is that -- Am I getting you correct?

A. I think it could be a form of wearing a handbag.

Q. Okay. So, if I then make the Mona Lisa my Twitter profile picture, would I be wearing the Mona Lisa?

A. For me, it's two different situation.

Q. Why is that?

A. Because you talk about a painting, and we talk about a handbag.

Q. Aren't we talking about a picture of a woman and a picture of a handbag?

A. Mona Lisa is a painting, so the handbag is a handbag. And what I believe, it is that you can wear a handbag, not a painting. By placing it on your profile, by placing it on your Twitter account by placing it in a -- in a TikTok account, and it's a form of wearing it.

CSF ¶ 95 (Martin Dep. at 60:16-61:3; 65:23-67:10).

*MetaBirkins* are not "handbags" any more than the Mona Lisa is a woman. And one who uses a *MetaBirkin* as a social media profile picture does not "wear" it any more than using an image of the Mona Lisa means the user is "wearing" that painting. *See* Oxford English Dictionary, https://www.oed.com/view/Entry/226606?rskey=u3619G&result=2#eid ("To carry or bear on one's body or on some member of it, for covering, warmth, ornament, etc.; to be dressed in; to be covered or decked with; to have on.").

Much the same can be said of Hermès' argument that the *MetaBirkins* are not art because Mr. Rothschild associated them with certain "utilities," such as participation in an online community. This is a mere reworking of the legally invalid distinction between *Rogers*-protected art and promotional activities related to *Rogers*-protected art, detailed in section I(B), *supra*. Forming communities around art and other so-called "utitilities" are classically artistic, for reasons Dr. Gopnik has detailed:

> Plaintiffs also seems to imply that because the NFTs for Mr. Rothschild's images come with certain "utilities" attached, that somehow detracts from his status as an artist and from the artistic status of his creations. Yet the kinds of opportunities offered by those utilities — to be a member of a social community built around "MetaBirkins"; to have early access to subsequent artistic projects by Mr. Rothschild; to participate in special events organized by him (although, contra Plaintiffs, evidence suggests he never did hold properly "gated" events for his "MetaBirkins") — all of these are perfectly normal aspects of traditional artistic practices. It is absolutely standard, for instance, for collectors of an early project by a painter to be given privileged access to subsequent bodies of work. (You might easily call that an unstated but understood "utility" that

comes with the purchase of that artist's work.) And it is almost a cliché that collectors buy an artist's works partly for the social access that gives them to the artist and his or her circle — for the specifically social "utility" that comes with the purchase. (In private, artists have often complained to me about the social duties that come with sales.) The selling and buying of works of art has always involved "utilities," of one kind or another, that have little to do, in any immediate way, with the properly artistic qualities of those works. In being sold with explicit "utilities" associated with them, Mr. Rothschild's NFT'd images are not much different from more traditional works whose associated "utilities" are left implied.

Gopnik Decl. ¶ 9.

**<u>CONCLUSION</u>**

The bottom line is that Hermès has used this litigation process for the purpose of suppressing Mr. Rothschild's artistic expression and deterring the creation of art about Hermès. The Court should not oblige Hermès any longer. It should grant Mr. Rothschild's Motion for Summary Judgment.

Dated:  October 21, 2022

Respectfully Submitted,

<u>/s/ *Rhett O. Millsaps II*</u>
Rhett O. Millsaps II
Christopher J. Sprigman
Mark P. McKenna (*pro hac vice*)
Rebecca Tushnet
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY  10151
(646) 898-2055
rhett@lex-lumina.com

*Attorneys for Defendant Mason Rothschild*