UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HERMÈS INTERNATIONAL and HERMÈS OF PARIS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MASON ROTHSCHILD, <br><br> Defendant. | No. 22-cv-00384-JSR <br><br> ECF Case <br><br> **DECLARATION OF DR. BLAKE GOPNIK** |

I, Blake Gopnik, hereby declare as follows:

1. I am an art historian, a regular contributor of art criticism to *The New York Times* and the author of *Warhol*, a comprehensive biography of Andy Warhol published in 2020. For ten years I was the chief art critic for *The Washington Post*. I was retained by Defendant Mason Rothschild as an expert in the above-captioned case. I submit this declaration in support of Mr. Rothschild's opposition to Plaintiffs' Motion for Summary Judgment and in support of Mr. Rothchild's Motion for Summary Judgment. I have firsthand knowledge of the matters stated herein.

2. I submitted an Expert Report in this case on September 1, 2022. A true and correct copy of my Report is attached to the Declaration of Rhett O. Millsaps II [Doc. No. 65] submitted in support of Mr. Rothschild's Motion for Summary Judgment.

3. I wish to state that, in Plaintiffs' Motion for Summary Judgment, the presentation of my positions on several topics relating to Mr. Rothschild's "MetaBirkins" not only distorts my clearly stated views on those topics, but seems to knowingly present versions that fully

contradict the views that I actually hold, and that I expressed clearly, and at great length, in the sworn testimony of my deposition.

4.      My expert report, as quoted by Plaintiffs, notes that "the cultural disturbance caused by Mason Rothschild's 'METABIRKINS'— including to the Hermès company — indicates that they are exploring similar terrain." Let me state clearly that in the original context of that report, the "they" in my sentence very evidently refers to the "MetaBirkins" themselves, which, as I explain, are exploring similar terrain to the avant-garde artworks involved in Business Art, which I had invoked two sentences earlier. Plaintiffs incorrectly suggest instead that I meant that Mr. Rothschild's "MetaBirkins" and the Hermès *company* are exploring similar terrain; this could hardly be further from the truth, since Hermès is involved in the production and sale of luxury goods while Mr. Rothschild's "MetaBirkins" are works of Business Art that comment on such production and sale. (And let me note Plaintiffs' alteration of my original quote, capitalizing all the letters in the word "MetaBirkins" that I had merely put between quotation marks, as one would with any artwork's title. Plaintiffs no doubt deployed the all-capped form METABIRKINS to make that title look more like a trademark as used in commerce, in support of their claims on that topic which my evidence otherwise undermines.)

5.      Plaintiffs present an even more egregious distortion of my position in the following assertion: "Dr. Gopnik admits that ' "NFT art" simply does not exist.' He explains that the image contained in a video file associated with any NFT, including the METABIRKINS NFTs is not art." In my *New York Times* article from which Plaintiffs have extracted the direct quote in that assertion, the whole point is that the digital entities we normally refer to as "NFT art" don't deserve that name specifically because they are so very obviously the same kind of digital art that we have known for decades. That is, if they are not "NFT art" it is by virtue of

their being precisely the same as digital art that doesn't bear the title "NFT"— contra Plaintiffs, my position is that NFTs, as commonly understood, are very much art, of a relatively traditional kind. This is because most image-based NFTs (those are the ones the public normally has in mind in discussions of art) have almost no meaning at all apart from the quite traditional digital images to which they are attached. I made my views on the artistic status of NFTs, and their images, very clear when I was questioned at length on the topic by Plaintiffs' counsel during my sworn deposition; those views were grossly distorted in Plaintiffs' Motion.

6. Plaintiffs' suggestion that Mr. Rothschild should be conceived as trading in NFTs that exist independently of their images is simply meaningless and incoherent. Specifically image-based NFTs such as Mr. Rothschild's get most of their meaning and identity, and their monetary value (if any) from the digital images which they certify and to which they point—any "utilities" that they also carry are normally added to increase the initial interest generated by those images, not to render the images irrelevant. Just as the deed to a house, or the certificate of ownership for a painting, would be essentially meaningless and valueless if the house or painting were destroyed or fundamentally altered, so an image-based NFT without its image would have almost no meaning or worth. It acquires meaning and worth by virtue of the specific image to which it is attached. To give just one example, the value (cultural and monetary) that a buyer attaches to the most famous of all NFTs, the so-called "Bored Apes," varies very much depending on the appeal of any particular Ape image to that buyer. (Of course, just as in traditional fine art, other factors—of scarcity, provenance, date of production, potential contact or friendship with the maker—also affect a buyer's judgments of value.)

7. And again contra Plaintiffs, I certainly do not believe, and have never stated, that the digital images with which NFTs are associated are not art. For several decades I have been

well known as one of the more ardent supporters of digital artworks, of many kinds—that is, of artworks in the same media as the images with which NFTs are most commonly associated. Whether or not such digital artworks come associated with NFTs does not affect their status as works of art or my opinion of them as such. (Although I have, of course, criticized bad examples of digital art, of which there are probably no more — but also no less — than there are bad examples of painting and sculpture.) Plaintiffs simply made up my rejection of digital art to suit the convenience of Plaintiffs' argument.

8. The following sentence from Plaintiffs' motion further implies that I am denying the artistic status of Mr. Rotshchild's "MetaBirkins": "Dr. Gopnik described the METABIRKINS NFTs as an 'elite metaversal commodity. . . the kind of deluxe Hermès bag a MetaKardashian might carry, in the virtual reality we will all inhabit.' " In fact, the sentence of mine that Plaintiffs quoted is meant to underline the artistic status of the "MetaBirkins," by making clear the imaginative work that they do. The very next sentence in my report, conveniently omitted by Plaintiffs, makes that very clear: "That lends a speculative quality to Mr. Rothschild's work that aligns it with certain kinds of literary science fiction, where current cultural trends and goods are extrapolated into the future."

9. Plaintiffs also seem to imply that because the NFTs for Mr. Rothschild's images come with certain "utilities" attached, that somehow detracts from his status as an artist and from the artistic status of his creations. Yet the kinds of opportunities offered by those utilities — to be a member of a social community built around "MetaBirkins"; to have early access to subsequent artistic projects by Mr. Rothschild; to participate in special events organized by him (although, contra Plaintiffs, evidence suggests he never did hold properly "gated" events for his "MetaBirkins") — all of these are perfectly normal aspects of traditional artistic practices. It is

absolutely standard, for instance, for collectors of an early project by a painter to be given privileged access to subsequent bodies of work. (You might easily call that an unstated but understood "utility" that comes with the purchase of that artist's work.) And it is almost a cliché that collectors buy an artist's works partly for the social access that gives them to the artist and his or her circle — for the specifically social "utility" that comes with the purchase. (In private, artists have often complained to me about the social duties that come with sales.) The selling and buying of works of art has always involved "utilities," of one kind or another, that have little to do, in any immediate way, with the properly artistic qualities of those works. In being sold with explicit "utilities" associated with them, Mr. Rothschild's NFT'd images are not much different from more traditional works whose associated "utilities" are left implied.

10. The concerns that Plaintiffs have expressed concerning the titling of Mr. Rothschild's "MetaBirkins" are also misplaced. When Mr. Rothschild sought input from others in choosing his title, he was acting as any fine artist might, involving his social circle in his acts of creation. Like many, many artists over the last 500 years, Andy Warhol himself is well known to have openly asked those around him for suggestions on all aspects of his art, and to have used their suggestions with enthusiasm — and without thereby diminishing his own artistic status. In particular, there is good evidence that one of Warhol's most famous creations, the loft where he gathered his famous crew of Superstars, was only given its title, "The Factory," in consultation with his assistants and friends.

11. In fact, like most artists in history, Warhol left the vast majority of his other works without formal titles; the ones that we now use were given by dealers or collectors or later art historians, and in fact exist in multiple, conflicting versions for certain works. In general, the public (and, apparently, Plaintiffs' counsel) vastly overestimates the significance of the titles

they see attached to artworks; those, like the titles of Warhol's pictures, often have little or no links to the artists themselves. In my decades of close contact with artists, I have found that when they do choose to title a work (they very often prefer the contentless title, "Untitled") many of them do so quite casually, at the last minute before an exhibition or sale, merely so that the work can be told apart from others in reviews or on a price list.

12.     And I note that, in the case of Mr. Rothschild, of all the titles available or proffered by others, the one that he did choose to use is properly minimal, in the heart of the tradition of titles in fine art: It merely designates the content of Mr. Rothschild's images (that they are a riff on the famous Birkin bag) and adds a further and apposite descriptor ("meta") to make that designation more accurate, while also helping to distinguish his artworks from the commercial product commonly known as a Birkin.

13.     If anything, the fact that Mr. Rothschild did draw his social circle's attention to his desire to title his work — as he surely did not have to do, given the minimal title he eventually chose — indicates his interest in situating his "MetaBirkins" in a social context, as is typical or even necessary for a fine work of Business Art. The genre itself is all about the interactions that occur between artists, their work, and a larger public; Business Art, that is, has always had a notably performative element (it is "relational," to use the term of art), and Mr. Rothschild's visible and enthusiastic interactions with his public, including in the act of titling his work, should be seen as one of his art supplies. Andy Warhol, Mr. Rothschild's most significant predecessor, behaved in notably similar ways; art historians regard that behavior — Warhol's engaging of a wide social circle in the creation and dissemination of his works and ideas — as one of his most important contributions to modern art.

14. Plaintiffs' concerns about the technical assistance rendered to Mr. Rothschild by Mark Berden are as misplaced as their concerns about Mr. Rothschild's titling, and for similar reasons. As I made very plain to Plaintiffs' counsel during my deposition, my study of the relevant communications between Mr. Rothschild and Mr. Berden revealed that, in the creation of Mr. Rothschild's "Metabirkins," the two men were filling the standard roles of creator and skilled digital technician, having precisely the interactions one would expect between such figures. It is beyond commonplace for contemporary artists to engage a team of specialist fabricators, programmers and skilled assistants to complete all but their least ambitious projects; no one creator could have all the skills required in today's technically complex art world — and especially when digital imagery, such as Mr. Rothschild's, is involved. Indeed, such teamwork was already standard from the time of Renaissance master Raphael, with his vast and varied creative staff, right up to the assistant-filled studio of Andy Warhol. In all these cases, old and new, the artist at the head of a project would ask and pay for input and advice from the professionals he or she had hired, as they came to engage with the subject matter and imagery at issue and with its technical realization. It would in fact be bizarre for an artist to ignore the input of such skilled collaborators — just as it would be bizarre for judges to ignore the input of their clerks, or for lawyers to reject the thoughts of their paralegals, although such input from subordinates would not indicate any diminished responsibility for the final decision-making in a trial or lawsuit. In seeking assistance, input and advice from Mr. Berden, Mr. Rothschild was not relinquishing his role as creative artist; he was fulfilling it in the most standard and indeed responsible way.

15. I note that such interaction is very much revealed in Mr. Berden and Mr. Rothschild's discussion of their (rather comic and clever, I think) planning for a possible image

of a fur-covered "horse charm" to add to their image of the fur-covered Birkin, thereby mimicking the (rather silly and cheesy, I think) association of actual Birkin bags with Hermès's own "horse charms," provided by the company to clients most of whom have never been within a bridle's length of a horse. Working with Mr. Berden as his technician/consultant, Mr. Rothschild considers completing his satirical depiction of Birkin bags, as deluxe commodities, by imagining a kind of fictional situation in which the fur on his "MetaBirkins" seems to spread, almost contagiously, even to the horse charms that might come with them.  The more elements Mr. Rothschild appropriates from the Hermès repertoire, the more effective and complete his artistic comment on the brand, and all such branding, would be. (Had I been engaged as an art-critical consultant on the "MetaBirkins" project, I would have suggested that Mr. Rothschild also create a furry version of the $700 Rocabar "horse blanket" (so-called) that Hermès has made almost as famous as its Birkin bags. Had Mr. Rothschild accepted my suggestion, he would not thereby have relinquished his role as the true artist of the "Metabirkins" project.)

16.     Plaintiffs have suggested that, merely by deploying a realistic reference to the Birkin handbag in his artistic comment on it, Mr. Rothschild has somehow created confusion with the actual, physical handbag. In so suggesting, Plaintiffs make the unlikely, almost unbelievable assertion that the "wearable" real-world handbag made by Hermes — from the finest of real-world hides and textiles, as the company likes to insist  — might, or would probably, be confused with the entirely imaginary (and fur-covered) "MetaBirkins" handbag that could, in some wearer's imagination, be "worn" and "used" in the metaverse. Having written an entire Oxford PhD that was centrally concerned with the philosophy and psychology of pictorial representation, I am pleased to reassure Plaintiffs that viewers of such representations are reliably skilled at distinguishing real and represented worlds — in fact, it is only because of that

8

distinction that pictorial representations achieve their full meaning and function. Their function is to reference reality, that is, not to replace it; if I may be permitted to wax philosophical for a moment, that is in fact what it means for something to represent. Of necessity, every successful representation thus shares certain features with the subject it represents, and could thereby function as a stand-in for that subject, at least in the imagination of at least one observer. That does not mean that no representations ought to be permitted, lest confusion reign between objects and their depictions. No one tries to walk into Vermeer's "View of Delft," much as that great painting might seem to invite it; no one (I hope) tries to caress the "flesh" of Michelangelo's David. And no sane observer will attempt to use Mr. Rothschild's digital representations of absurdist, fur-covered "MetaBirkins" in any of the ways that a real Birkin bag might be used, either as a useful carrier for a wallet and keys or as a bearer of social status.

17. I would also like to state that much of the material presented in Plaintiffs' Rule 56.1 Statement of Material Facts, in which Mr. Rothschild is shown discussing how he might sell and profit from his "MetaBirkins" artworks—by trying to engage the interest of "whales," for instance, or by "sweeping the floor" and getting influential buyers to "shill" for him—indicates that Mr. Rothschild was acting as a perfectly normal emerging artist trying to maximize income, in the knowledge that it might very well evaporate later, as so often happens. It is worth mentioning that the mercantile aggression evident in some of Mr. Rothschild's communications, which Plaintiffs seem to portray as egregious and in some way "un-artistic," is normal in the very rough-and-tumble culture of NFTs, where the politesse that prevails in galleries and auction houses — or at least in their public spaces — is deliberately avoided, and where evidently financial ambitions and concerns are expressed openly, despite the artistic values that are also very clearly in play.

18. Even after they had long-since "emerged" as artists, Rembrandt, Edvard Munch and of course Andy Warhol were all aggressive profit-seekers at the same time as they made great art — and some aspects of their great art, and of its greatness, relate directly to their commercial ambitions. In particular, a Business Art practice in the Warhol tradition, such as Mr. Rothschild's, *requires* its maker to actively and very visibly engage in real business activities in order for that maker's commentary on business and art, and the business *of* art, to be most potent and convincing — and to be perplexing and even confusing as well, in the great tradition of modern art.

19. In closing, let me say that I have read Plaintiffs' summary judgment papers, and none of the arguments and claims in them makes me any less certain that Mason Rothschild's "MetaBirkins" images, in tandem with the NFTs to which they are associated, make up a clearly artistic project, in the established tradition of Andy Warhol's Business Art.

20. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is accurate to the best of my knowledge.

Dated: October 21, 2022

_B Gopnik_

_____
Blake Gopnik