# Exhibit 141

Page 1

1   IN THE UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   ---------------------------------------X

4   HERMES INTERNATIONAL and

5   HERMES OF PARIS, INC.,

6                      Plaintiffs,

7            - against -

8   MASON ROTHSCHILD,

9                      Defendant.

10  Civil Action No.:  22-CV-00384

11  ---------------------------------------X

12

13

14               REMOTE PROCEEDINGS

15                DAVID  NEAL, PhD

16          WEDNESDAY, SEPTEMBER 21, 2022

17                  4:45 P.M.

18

19

20

21

22

23  Reference No.: NY 5462232

24  Reported By:  Rita Persichetty

25

Page 7

```
 1        Veritext.
 2             I'm not related to any party in this
 3        action nor am I financially interested in
 4        the outcome.
 5             Any objections to proceeding please
 6        state them at the time of your appearance.
 7             Counsel and all present, everyone
 8        attending remotely, can now state their
 9        appearance and affiliation for the record
10        beginning with the noticing attorney.
11             MS. WILCOX:  This is Deborah Wilcox of
12        the law firm of Baker and Hostetler
13        representing the plaintiffs Hermes
14        International and Hermes of Paris.  I have
15        with me Lisa Gehman from our Philadelphia
16        office.
17             MR. MILLSAPS:  And this is Rhett
18        Millsaps with Lex Lumina PLLC representing
19        defendant, Mason Rothschild.  I have with
20        me my colleague Chris Sprigman.
21             THE VIDEOGRAPHER:  Good.  And if I
22        could ask the court reporter to please
23        swear in the witness and we can proceed.
24   D A V I D   N E A L, PHD,
25        called as a witness, having been sworn
```

```
                                            Page 8
 1        by the Notary Public, was examined and

 2        testified as follows:

 3   EXAMINATION BY

 4   MS. WILCOX:

 5        Q.    Thank you.

 6              Good morning your time, Dr. Neal.

 7              Could you please state your full name

 8   for the record?

 9        A.    Certainly.  It's David Thomas Neal,

10   N-E-A-L.

11        Q.    What is your home address.

12        A.    It's 615 Vilabella Avenue, Vilabella

13   is one word, V-I-L-A-B-E-L-L-A, Avenue, Coral

14   Gables 33146, that's in Florida.

15        Q.    What is your work address?

16        A.    That's the same.

17        Q.    Where are you located today?

18        A.    Let me just turn off my Bluetooth.

19              Okay.  You can still hear me?

20        Q.    Yes.

21        A.    Okay.  My computer tried to connect to

22   my Bluetooth speakers.

23              Could you repeat the question?

24        Q.    Where are you located today?

25        A.    I'm in Australia.  I'm in a hotel in
```

Page 28

1    deposition, and then obviously the preparation

2    for this deposition and the deposition itself.

3         Q.    What do you intend to charge for that

4    work?

5         A.    That being?

6         Q.    What you just described that you

7    haven't yet billed.

8         A.    Okay.  In -- in combination all of

9    those things?

10        Q.    Yes.

11        A.    Well, assuming that I use the flat

12   rate, I would estimate that might be another --

13   let me just think.  Maybe somewhere in the order

14   of $9,000.

15        Q.    I believe we have just received a copy

16   of the invoice that you sent to Lex Lumina.

17             MS. WILCOX:  Ms. Gehman, could you

18        pull that up.

19             And is this going to be Exhibit 146?

20             MS. GEHMAN:  Yes.  Bringing it up

21        right now.  Thank you for bearing with me.

22             MS. WILCOX:  Thank you.

23             (Exhibit 146, Invoice to Lex Lumina,

24   marked for identification.)

25        Q.    Dr. Neal, is this your invoice to Lex

```
                                      Page 29
 1    Lumina?
 2         A.   Yes, it is.
 3         Q.   Thank you.
 4              What was the understanding of your
 5    assignment in this case?
 6         A.   I would characterize it as reviewing
 7    the scientific validity and reliability of
 8    the -- the surveys that Dr. Isaacson conducted
 9    and his report in its totality.
10              Also reviewing the nature of the
11    conclusions that he drew from the data that he
12    collected and reaching an opinion based upon
13    that review as to whether his studies were
14    scientifically proper and whether his
15    conclusions validly and logically flow from the
16    data that he collected.  And then articulating
17    that -- the results of that analysis in a
18    rebuttal report.
19         Q.   Did you consider conducting any
20    surveys of your own?
21         A.   Briefly I did consider that.
22         Q.   What did you consider?
23         A.   Well, I -- I considered the scope to
24    run an Eveready survey as a rebuttal survey.
25         Q.   What do you mean the scope?
```

1      A.   Well, I -- I briefly considered, I did
2   not pursue it very far after conversations with
3   counsel, but I -- I briefly considered whether
4   there was time and what the broad outline of an
5   Eveready survey might be in this particular
6   case.
7      Q.   And what were the reasons for choosing
8   not to do a survey of your own?
9      A.   Two primary factors.  One is that my
10  understanding is that the defendant did not have
11  the funds to pay for a survey.  Obviously
12  surveys are expensive.  And so my understanding
13  is there just wasn't enough money to fund a
14  survey?
15           And secondly, my understanding --
16  obviously I'm not an attorney, but my
17  understanding is that the burden falls on the
18  plaintiff to prove confusion.  And having
19  reviewed Dr. Isaacson's survey and reaching a
20  conclusion that that burden scientifically had
21  not been met, in my view, a survey was
22  unnecessary.
23      Q.   You have run surveys for defendants
24  accused of intellectual property infringement in
25  the past; is that correct?

1      A.   I certainly have done that in the past
2   that's right, yes, when the budgets allowed for
3   it.
4      Q.   In fact, you did one for Walmart.
5   Does that ring a bell?
6      A.   Yes.  And Walmart -- Walmart is
7   obviously a very well funded entity.
8      Q.   And you also did a survey for Evofem
9   Biosciences; is that correct?
10      A.   I -- I did.  I need to confirm if they
11   were the defendant.  And they, again, are a
12   large pharmaceutical firm.
13      Q.   Well, your survey was in the nature of
14   a rebuttal likelihood of confusion survey?
15      A.   I'd need to check, but it's -- it's
16   certainly possible, yes.
17      Q.   And you also did a survey for a case
18   that was Solid 21 versus Richemont and
19   MontBlanc; is that correct?
20      A.   That is correct.
21      Q.   And another one for the case Solid 21
22   versus Breitling, and that one you represented
23   Breitling; is that correct?
24      A.   That's correct.
25      Q.   And the same -- I forgot to ask you

                                          Page 32

1    about Richemont and MontBlanc.  You represented
2    those parties in that case; is that correct?
3         A.   Yes.  Again, all -- all very large
4    international multinational firms.
5         Q.   How much time would you want to have
6    to conduct an Eveready survey for this case?
7         A.   Well, how much time I would want to
8    have would typically be a minimum of six weeks,
9    sometimes that's not possible and it can be done
10   faster, but that would be a -- a -- a
11   comfortable minimum, in my view.
12        Q.   What is the shortest period of time in
13   which you have ever conducted an Eveready
14   survey?
15        A.   I don't -- I wouldn't be able to
16   recall that with accuracy.  It's -- it's I think
17   faster than six weeks but I -- I wouldn't be
18   able to give you an accurate answer to that.
19        Q.   Beyond receiving Dr. Isaacson's report
20   and the pleadings you mentioned in this case,
21   did you request any additional materials from
22   Lex Lumina?
23        A.   Well, I'm not sure that your question
24   encompasses this, but obviously I requested
25   certain data sets that were admitted from

```
                                        Page 56
 1       A.    Correct.
 2       Q.    Okay, thank you.
 3             Actually, let's look at your testimony
 4  from that case.
 5             MS. WILCOX:  Ms. Gehman, if you could
 6       pull up the PODS Enterprises versus U-Haul
 7       International testimony.  We'll need to
 8       mark this as an exhibit.
 9             MS. GEHMAN:  One moment.
10             (Exhibit 147, Testimony of defendant's
11  expert witness David Neal, PhD, marked for
12  identification.)
13       Q.    Do you recall providing testimony in
14  the PODS versus U-Haul case in the Middle
15  District of Florida?
16       A.    Yes, I do.
17       Q.    It's dated September 18, 2014?
18       A.    That seems about right.
19       Q.    We're showing you Exhibit 147.
20  Testimony of defendant's expert witness David
21  Neal, PhD.
22             MS. WILCOX:  And if you could please
23       scroll to the next page.
24       Q.    Do you keep copies of your transcripts
25  from trial testimony?
```

1      A.    Not -- not typically.

2      Q.    Have you ever seen your trial

3   testimony in this case?

4      A.    I don't believe so.  It's -- it's

5   possible that I saw it many years ago, but I

6   don't have any recollection.

7            MS. WILCOX:  And if you can look at

8        page 3 of that.  There where it says near

9        the bottom, "That's right."

10            Yes, thank you.

11      Q.    And so you were -- you were testing to

12   create a real world naturalistic scenario.  And

13   if you recall, you told people you'd be looking

14   at a web page, and you showed them an actual web

15   page from U-Haul; is that correct?

16      A.    That's correct.

17            MS. WILCOX:  And if you can turn to

18        page 5 of the testimony.

19      Q.    We're in the top quarter of the page.

20   When I asked you about whether your goal was to

21   ask about the overall impression from looking at

22   the website, you said you didn't remember that,

23   but I'm going to point you to this testimony you

24   gave.  And you see the question:

25            "So you asked -- when viewing this web

Page 58

1    page, did you consider asking something more

2    specific like, look for the word 'pod' and tell

3    me what you think?

4              "Answer:  I did consider that but that

5    would have been, again, inappropriate.  That's

6    not the -- that would have moved people into a

7    style of thinking about a website that you don't

8    normally engage in.  When we open a web page we

9    look at the whole web page.  Our eye scans where

10   it naturally scans.  There is not something that

11   makes us zoom into one particular word.  So our

12   goal here was to ask a question about what the

13   overall impression from looking at the website

14   is."

15             Does that refresh your recollection

16   about the testimony that you gave?

17        A.   Yes, but I'm -- I'm not giving a --

18   that -- in that sentence there I'm not

19   describing the -- the judgment that I asked

20   people subsequently to make, which is an

21   association -- the specific construct that I was

22   measuring in that survey was association.

23             I'm making the point here that when I

24   was showing people the website I didn't want to

25   direct their attention anywhere in particular I

                                        Page 59

1    wanted them just to have whatever overall --
2    natural overall impression they normally would
3    have.
4         Q.   And Dr. Isaacson did the same thing in
5    his survey with his test, isn't that right,
6    showing the MetaBirkins.com web page?
7         A.   That's not the -- the problem.  He did
8    do that but he failed to use different
9    versions -- he -- he could have very simply
10   solved this problem and kept what you are
11   rightly pointing out is the goal of a
12   naturalistic survey.
13            He could, for example, have created
14   multiple conditions, one where he just changed
15   "not your mother's Birkin" to "not your mother's
16   handbag," but he kept Hermes and he kept the
17   trade dress.  He could have -- that would have
18   been even more naturalistic, to use your term,
19   than the control which removed everything.
20            Secondly, he could have created
21   another condition where he just removed Hermes
22   and he kept Birkin, MetaBirkin and the trade
23   dress.  He could have created a version where he
24   just changed the trade dress.  Those would have
25   been different conditions.  They all would have

1      Q.   So you're saying with respondent

2   ID 65, even though they identified Birkin as a

3   product put out by the same person that puts out

4   what was viewed in the test stimulus they should

5   not be counted as confused?

6           MR. MILLSAPS:  Objection.

7      A.   They -- well, you're assuming that

8   they're identifying a good there, a Birkin bag,

9   rather than just repeating back the name -- the

10  name or the mark that they saw on the page.  You

11  know, if the person had said, Hermes at Q1 and

12  then had said Birkin bag, then they would have

13  clearly identified the plaintiff and the

14  plaintiff's goods?

15          I think what you're trying to do which

16  is, respectfully, not proper, is say, well, one

17  answer can satisfy both of those goals.

18     Q.   What was -- let me just take you to a

19  related question.

20          Does the Q7 response impact the coding

21  that you did?  Or let me ask you this:  Did you

22  take into account the responses in Q7 when you

23  changed the coding from what Dr. Isaacson had to

24  your recoding?

25     A.   I did take that into account.  So if

1  someone -- I'm trying to find one here.  I can't
2  see one on this page, but if someone had said
3  nothing in Q1 or said Forbes, but then had said
4  satchel -- like let's look at Q15.  If someone
5  had said -- sorry, not Q15, respondent ID 15.
6          If that person had said nothing for Q1
7  but then said satchel and Hermes -- Hermes, I
8  would have classified that person as confused,
9  and -- and indeed you'll see I did classify them
10  as confused.
11      Q.   Did -- okay.  So is Q4 related to Q7
12  or is Q4 only related to Q1, in your opinion?
13          MR. MILLSAPS:  Objection.
14      A.   Well, it depends what you mean by
15  related.  But Q4 was a follow-up to Q1.  I gave
16  Dr. Isaacson the benefit of the doubt, so if
17  someone -- like in the example I had given, if
18  someone said satchel at Q4 and then said Hermes
19  at Q7 I would have given him the benefit of the
20  doubt and classified that person as confused.
21      Q.   Let's go to the next page and look at
22  a few more examples.
23          So respondent ID 108, explain why you
24  recoded that one as not confused?
25      A.   Well, again, the person has not

Page 109

```
 1   identified any goods put out by the plaintiff,
 2   all they've done is playback the name Hermes and
 3   the name MetaBirkins.
 4        Q.   Although in Q7 they say Hermes, in Q4
 5   they say Hermes.
 6        A.   Correct.  But where -- where do they
 7   identify any goods put out by the plaintiff?
 8        Q.   Well, Q7 the question is:  What other
 9   company, person or brand do you believe
10   sponsors, authorizes or approves whoever makes
11   or provides the items shown on the web page?
12        A.   Yes.
13        Q.   And so when the person answers Hermes
14   there in respondent 108, that's not sufficient
15   to be coded as confused?
16        A.   No, for the -- for the reason that
17   I've been explaining, because in these
18   circumstances, like the original Eveready, it's
19   not enough to just read back the senior user's
20   name because that actually was affirmatively put
21   in front of the respondent, right.  It wasn't --
22   because the junior user and the senior user are
23   using the same name, you've essentially shown
24   them the senior user's name, you -- not
25   essentially you have, therefore, you -- you need
```

Page 110

```
 1   additional evidence that comes in the form of Q4
 2   that the person is affirmatively thinking of
 3   Hermes.  And the way you know that is that they
 4   mention at least some goods or services put out
 5   by the senior user.  Person 108 has not done
 6   that.
 7        Q.   Is it your opinion that if a
 8   respondent used the term "MetaBirkins" that that
 9   shows no confusion?
10        A.   Well, it's not -- it doesn't -- it's
11   not a good -- MetaBirkin, as I understand it, is
12   not a good put out by Hermes.  You can correct
13   me if I'm wrong about that, but that's my
14   understanding.
15        Q.   That, of course, is one of the
16   questions in the case is whether people are
17   confused when they see MetaBirkins.
18             So are you -- you give it -- if you
19   recall, Dr. Isaacson scores MetaBirkins as not
20   the same as someone answering Birkin, but he
21   still gives them a code that counts towards some
22   level of confusion, and you're saying that
23   should be given absolutely no weight?
24             MR. MILLSAPS:  Objection.
25        A.   I think if someone just repeated
```

Page 111

1  MetaBirkins and said nothing else related to
2  Hermes, that would not be -- even setting aside
3  this issue of the other products, that would not
4  be sufficient evidence that the person was
5  confused and thinking of Hermes.
6       Q.   Have you seen any court require this
7  follow-on question that you are describing in
8  this section of your report?
9       A.   Well, depends on what you mean by
10 require.  I -- I mean the original Eveready
11 survey, which I think was -- I think the
12 plaintiff lost that at the district level and
13 then the circuit court, if memory serves,
14 overturned that and affirmed the survey.  So
15 that obviously is -- is one.
16          I -- I am not aware, although I
17 wouldn't be because I don't track these legal
18 dimensions of things, I would not necessarily be
19 aware of a court rejecting this one way or the
20 other.  You know, rejecting someone who failed
21 to do this.  I don't know that, but I haven't
22 investigated that, I haven't researched that.
23          I know that whenever I encounter this
24 issue, including with, you know, very prominent
25 law firms who run a lot of surveys like this,

Page 112

```
 1   this issue always comes up, and -- in
 2   circumstances like this, and this is the
 3   standard approach that I have consistently seen.
 4   And I have never -- I have never seen someone
 5   ask this question and then -- in circumstances
 6   like this, and then fail to use the data in the
 7   manner that I'm saying is logically appropriate,
 8   supported by authoritatively treatises and was
 9   used in the original Eveready itself.
10        Q.   Although you have been critiqued for
11   doing that very thing at least in the Growmark
12   case.  Have you been --
13        A.   But as -- as we saw, the -- the expert
14   there was clearly wrong in her interpretation of
15   what Jerre Swann discussed.  I -- I have -- you
16   asked me initially, have you discussed this
17   issue with Jerre Swann, and I said no.  I have
18   discussed this issue in the past at great length
19   with -- with his longest term collaborator who's
20   published multiple times with him, and I know
21   that what I'm saying is consistent with the way
22   that Jerre Swann thinks about this issue, at
23   least as understood by his longest term protege
24   and co-author.
25        Q.   Who is?
```

1      A.    That's correct.

2      Q.    And if we could -- you say that that

3  is -- it's a bottom sentence there of that

4  section 3.3.14, "A net level of 9.3 percent

5  confusion fails" -- or I'm sorry, I can't read

6  that -- "falls comfortably" --

7           MS. WILCOX:  Thank you.  My eyes are

8      getting more tired as --

9           THE WITNESS:  You're adopting my

10      Australian accent as the deposition

11      continues, so ...

12           MS. WILCOX:  Well, it will be bad if I

13      go to my Wisconsin accent.

14           THE WITNESS:  Oh, wow.  We'll been in

15      big trouble.

16           MS. WILCOX:  Yeah.

17      Q.    All right.  So you say that, "It falls

18  comfortably below commonly accepted thresholds

19  for establishing a likelihood of confusion in

20  Lanham Act matters."

21           And your footnote that you use here

22  cites to Matthew Ezell and AnnaBelle Sartore,

23  and they also published in this same volume that

24  you've been referencing throughout the

25  deposition and your report?

```
                                        Page 117
 1       A.    Correct.
 2       Q.    Okay.  So are those people that you
 3  rely upon for reliable -- or do you consider
 4  them to be reliable sources on survey
 5  percentages and Lanham Act matters?
 6       A.    I mean, that -- that particular
 7  chapter is, you know, I -- I think -- how can I
 8  put this?  It's -- it gives broad ranges.  It's
 9  kind of the inheritance, if that's the right
10  term, of Jerry Ford who wrote the earlier
11  version of that same chapter.  And Matt Ezell
12  and AnnaBelle Sartore worked with Jerry Ford, as
13  you -- you might know.
14            And so that chapter is useful in the
15  sense that it provides broad ranges.  It
16  doesn't, it doesn't provide exact thresholds,
17  and -- but it provides broad ranges.  And, you
18  know, I'm not aware of -- you know, typically
19  the number that people throw around obviously
20  is -- is 15 percent.  You know, if you get a
21  confusion number above 15 percent that --
22  15 percent or higher, that might -- might be
23  considered evidence of likelihood of confusion.
24  If it's a less than 15 percent that might be
25  considered evidence against confusion.
```

1          You know, I -- I don't have a strong
2    position on that one way or the other, except to
3    say that I'm not aware of any -- anyone who
4    would say that a net level of 9.3 represents
5    evidence of a likelihood of confusion.  I
6    think --
7        Q.   Well, let's look at their publication.
8    You reference pages 317 to 334 and you kindly
9    provided those to us.
10           MS. WILCOX:  And, Ms. Gehman, could
11       you please find those in your documents and
12       let us know what exhibit number that would
13       be.
14           MS. GEHMAN:  It is Exhibit 142.  This
15       is what you're looking for, right?
16           MS. WILCOX:  Yes, thank you.
17           (Exhibit 142, Chapter of a book, marked
18    for identification.)
19        Q.   Dr. Neal, does this look like your
20    copy you sent to us of the chapter?
21        A.   It does.
22           MS. WILCOX:  Okay.  Can we please turn
23       to the Bates number 32.  Thank you.
24           Okay.  And actually, the -- it's the
25       sentence that's at the very top so we need

Page 128

1   Dr. Neal.

2           MS. WILCOX:  And Ms. Gehman is

3       scrolling as fast as she can to paragraph

4       43.

5           MS. GEHMAN:  I haven't found a faster

6       way.

7           MS. WILCOX:  I know.  Okay, thank you.

8       Q.   Okay.  So as Dr. Isaacson says in 43,

9   "Next, the survey among NFT purchasers asked

10  questions to measure confusion, starting with

11  confusion as to source.  Question one asked,

12  what company, companies, person or people do you

13  think makes or provides the items shown on the

14  web page.  Be specific -- sorry, be as specific

15  as possible.  If you don't know, please select I

16  don't know."

17          And you take issue with his use of the

18  word "items" to refer to the MetaBirkins NFTs;

19  is that right?

20      A.   Correct.

21      Q.   What word would you have chosen if you

22  were conducting the survey?

23      A.   I haven't reflected on that deeply.  I

24  didn't need to do that obviously for my

25  rebuttal, and I was -- since I wasn't designing

Page 129

1    my own survey.  I think that he needed to use

2    some language that made it clear whether he was

3    referring to the NFT or to the real world

4    physical object depicted in the NFT, which I

5    understand the plaintiff alleges is a Birkin

6    bag.

7            So any language I think that would

8    successfully do that, it might -- potentially,

9    I'd have to reflect on it some more, but it

10   might be something like provides the NFT shown

11   on the web page.  That would help

12   disambiguate -- that would help clarify for

13   respondents that they were being asked not about

14   the real world item that might be depicted but

15   the actual NFT itself.

16       Q.   But you didn't do anything to actually

17   test that selection of verbiage for question

18   one; is that right?

19       A.   Well, as I explained, the defendant

20   didn't have -- doesn't have the money, as I

21   understand it, to -- for a survey, and because

22   the burden falls on the plaintiff there wasn't

23   really scope to do that.

24            But I don't need to do a survey to

25   know that using the language "items" is

```
                                    Page 130
1    ambiguous, and that if I show you a picture of
2    something and I say what is the item shown, a
3    reasonable speaker of English might think oh,
4    it's whatever is depicted in the picture or they
5    might think it's a reference to the picture
6    itself.  That doesn't require a survey that's
7    good survey design using language that doesn't
8    have multiple ambiguous interpretations.
9         Q.   Well, if I told you Dr. Isaacson used
10   the term "items" so as not to lead the
11   respondents, would that change your opinion?
12        A.   How would it be leading to use
13   language that correctly calls out the object
14   that he's asking people to offer an opinion
15   about?
16        Q.   So you're saying you don't agree with
17   that, that wouldn't change your opinion?
18        A.   I'm saying I don't see how an
19   alternative would be -- an alternative that
20   correctly identifies the object would be
21   leading.
22        Q.   Did -- did Lex Lumina provide you with
23   the expert report that plaintiffs submitted in
24   this case from Dr Scott Kominers (phonetic)?
25        A.   No.
```

Page 178

```
 1
 2
 3                C E R T I F I C A T E
 4
 5   STATE OF New York)
                            :ss
 6   COUNTY OF RICHMOND)
 7
 8       I, RITA M. PERSICHETTY, a Notary Public within
 9   and for the State of New York, do hereby certify:
10       That DAVID NEAL, PhD, the witness whose
11   deposition is hereinbefore set forth, was duly sworn
12   by me and that such deposition is a true record of
13   the testimony given by such witness to the best of
14   my ability.
15       I further certify that I am not related to any
16   of the parties to this action by blood or marriage;
17   and that I am in no way interested in the outcome of
18   this matter.
19       IN WITNESS WHEREOF, I have hereunto set my hand
20   this 26th day of September, 2022.
21
22
              RITA M. PERSICHETTY
23
24
25
```