**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

HERMÈS INTERNATIONAL and
HERMÈS OF PARIS, INC.,

                      Plaintiffs,

      -against-

MASON ROTHSCHILD,

                      Defendant.

CIVIL ACTION NO.

22-CV-00384 (JSR)

## REDACTED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**BAKER & HOSTETLER LLP**

Gerald J. Ferguson, Esq.
Oren J. Warshavsky, Esq.
Kevin M. Wallace, Esq.
Megan A. Corrigan, Esq.
45 Rockefeller Plaza
New York, NY 10111
Telephone:   212.589.4200
Facsimile:   212.589.4201

Deborah A. Wilcox, Esq. (*pro hac vice*)
Key Tower
127 Public Square
Cleveland, OH 44114
Telephone:   216.621.0200

Lisa Bollinger Gehman, Esq. (*pro hac vice*)
1735 Market Street
Philadelphia, PA 19103
Telephone:   215.568.3100

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................1

STANDARD OF REVIEW ................................................................................2

ARGUMENT ....................................................................................................2

I.    POINT ONE: THE METABIRKINS NFTS ARE NOT ARTISTIC
EXPRESSION AND *ROGERS V. GRIMALDI* SHOULD NOT APPLY ..........................2

    A.    The *Rogers* Test Only Applies to Works of Artistic Expression............................2

    B.    The Entries on the Ethereum Blockchain Referred to as METABIRKINS
NFTs Are Not Works of Artistic Expression.........................................3

    C.    Rothschild Meant the METABIRKINS NFTs To Be a Digital Brand ...................3

    D.    Rothschild Intended the METABIRKINS NFTs as a Business for Profit,
Not Expression........................................................................5

    E.    Rothschild Made the METABIRKINS Metaverse Ready ......................................6

    F.    Rothschild's Expert Opined that METABIRKINS Are Not Traditional
Art: Rather Rothschild Created "Business Art" with METABIRKINS
NFTs ..................................................................................6

II.    POINT TWO: EVEN IF THE METABIRKINS NFTS ARE "ART," *ROGERS*
DOES NOT APPLY BECAUSE THE NAME WAS ADOPTED FOR
COMMERCIAL PURPOSES, NOT ARTISTICALLY RELEVANT PURPOSES..........7

    A.    *Rogers* Does Not Protect Against the Use of Source Identifying Names or
Names Without Artistic Relevance.........................................7

    B.    Rothschild Adopted the METABIRKINS Name with a Bad Faith Intention
of Trading Off of Hermès's Goodwill and Not for Artistically Relevant
Reasons ..............................................................................9

III.    POINT THREE: *ROGERS* DOES NOT APPLY BECAUSE THE
METABIRKINS NAME IS EXPLICITLY MISLEADING ...............................................13

    A.    Rothschild Explicitly Mislead Consumers, the Media, Potential Investors,
and Paid Promoters ..............................................................13

    B.    Rothschild Adopted the METABIRKINS Mark to Trade Off of Hermès's
Goodwill and Caused Actual Confusion...........................................14

      C.     Rothschild's Additional Arguments Concerning Explicit Misleadingness and *Rogers* Fair No Better ...................................................................17

IV.    POINT FOUR: THE TRADITIONAL *POLAROID* FACTORS DEMONSTRATE A LIKELIHOOD OF CONFUSION EXISTS...................................................20

      A.     Strength of the BIRKIN Mark ...............................................................20

      B.     Similarity of the BIRKIN Mark and METABIRKINS Mark ...............................20

      C.     Proximity of Products .............................................................................21

      D.     Likelihood of Hermès Bridging the Gap ................................................22

      E.     Evidence of Actual Confusion ................................................................22

      F.     Rothschild's Bad Faith Adoption of METABIRKINS .........................................22

      G.     Quality of Products .................................................................................23

      H.     Sophistication of Consumers ..................................................................23

      I.     Conclusion of Factors ............................................................................24

V.    ALL OTHER CLAIMS SHOULD NOT BE DISMISSED....................................24

      A.     Rothschild's Use of the METABIRKINS NFTs Is Likely To Cause Dilution ..................................................................................................24

      B.     Hermès's Other Claims Should Not Be Dismissed ...............................24

CONCLUSION...................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akiro LLC v. House of Cheatham, Inc.*,
  946 F. Supp. 2d 324 (S.D.N.Y. 2013)......................................................16

*AM General LLC v. Activision Blizzard, Inc.*,
  450 F. Supp. 3d 467 (S.D.N.Y. 2020)..............................................21, 22

*Anderson v. Liberty Lobby*,
  477 U.S. 242 (1986)..........................................................................2

*Bleistein v. Donaldson Lithographing Co.*,
  188 U.S. 239 (1903)........................................................................23

*Brown v. Elec. Arts, Inc.*,
  724 F.3d 1235 (9th Cir. 2013) ........................................................18

*Brown v. Showtime Networks, Inc.*,
  394 F. Supp. 3d 418 (S.D.N.Y. 2019)...............................................8

*Champion v. Moda Operandi, Inc.*,
  561 F. Supp. 3d 419 (S.D.N.Y. 2021)...............................................8

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*,
  886 F.2d 490 (2d Cir. 1989)........................................................7, 13

*Coty Inc. v. Excell Brands, LLC*,
  277 F. Supp. 3d 425 (S.D.N.Y. 2017)...............................................12

*De Venustas v. Venustas Int'l, LLC.*,
  No. 07 CIV. 4530 LTS/THK, 2007 WL 2597122 (S.D.N.Y. Sept. 11, 2007) ......................23

*Energybrands, Inc. v. Beverage Marketing USA, Inc.*,
  No. 02 CIV. 3227(JSR), 2002 WL 826814 (S.D.N.Y. May 1, 2002)....................................14

*Flanigan v. Gen. Elec. Co.*,
  242 F.3d 78 (2d Cir. 2001)..............................................................2

*Gordon v. Drape Creative, Inc.*,
  909 F.3d 257 (9th Cir. 2018) ..........................................................18

*Harley Davidson, Inc. v. Grottanelli*,
  164 F.3d 806 (2d Cir. 1999)............................................................12

*Hermès Int'l v. Rothschild*,
    No. 22-CV-384 (JSR), 2022 WL 1564597 (S.D.N.Y. May 18, 2022) ....................2, 8, 13, 17

*Juicy Couture, Inc. v. Bella Int'l Ltd.*,
    930 F. Supp. 2d 489 (S.D.N.Y. 2013)......................................................................................20

*Lon Tai Shing Co. v. Koch+ Lowy*,
    No. 90 CIV. 4464 (DNE), 1991 WL 170734 (S.D.N.Y. 1991) ..............................................15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..................................................................................................................2

*McDonald's. Corp. v. McBagel's, Inc.*,
    649 F. Supp. 1268 (S.D.N.Y. 1986)........................................................................................15

*Miller v. Astucci U.S. Ltd.*,
    No. 04 CIV. 2201 (RMB), 2007 WL 102092 (S.D.N.Y. Jan. 16, 2007) ...................................2

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961)....................................................................................................20

*RJR Foods, Inc. V. White Rock Corp.*,
    603 F.2d 1058 (2d Cir. 1979)..................................................................................................14

*Rogers v. Grimaldi*,
    875 F.2d 994 (2d Cir. 1989)............................................................................................ *passim*

*Rojas v. Roman Catholic Diocese of Rochester*,
    660 F.3d 98 (2d Cir. 2011)........................................................................................................2

*Schering Corp. v. Pfizer Inc.*,
    189 F.3d 218 (2d Cir. 1999), *as amended on reh'g* (Sept. 29, 1999) .....................................15

*Tiffany (NJ) Inc. v. eBay Inc.*,
    600 F.3d 93 (2d Cir. 2010)......................................................................................................24

*Twentieth Century Fox Television v. Empire Distrib., Inc.*,
    875 F.3d 1192 (9th Cir. 2017) ..................................................................................................8

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
    996 F.2d 1366 (2d Cir. 1993)..................................................................................................13

*Yankee Pub. Inc. v. News America Pub. Inc.*,
    809 F. Supp. 267 (S.D.N.Y. 1992) ............................................................................................7

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................................................2

iv

**Other Authorities**

Jerre B. Swan, *Confusion Factor Analysis—A Cognitive Update*, 101
    TRADEMARK REP, vol. 101, 1123, 1225 (2011) .......................................................................16

Plaintiffs Hermès International and Hermès of Paris, Inc. (collectively, "Hermès") respectfully submit this memorandum of law in opposition to the motion for summary judgment brought by Defendant Mason Rothschild ("Rothschild").

## PRELIMINARY STATEMENT

Hermès's submissions on its motion for summary judgment (ECF Nos. 59, 67-77) set forth Hermès's theory of the case: Rothschild blatantly and intentionally infringed Hermès's intellectual property to profit from the very substantial goodwill in Hermès's BIRKIN trademark and trade dress. Rothschild does not seriously challenge the evidence supporting Hermès's claims, but instead seeks to carve out a safe harbor by labeling his infringement "art." Rothschild's argument is factually incorrect and legally erroneous.

As a factual matter, NFTs are not art: they are code which *may* be associated with art. The METABIRKINS branded NFTs are not required to be accompanied by an image. The image associated with those NFTs has changed, but now includes images created to emulate the BIRKIN trade dress. Rothschild chose the METABIRKINS name because of Hermès's "iconic" BIRKIN handbags, used the METABIRKINS name as a brand, and hoped to profit from consumer confusion. This had nothing to do with art.

As a legal matter, this Court has twice explained that even if the METABIRKINS NFTs are art, there is no safe harbor for explicitly misleading conduct which results in trademark infringement. This Court further explained that if the facts alleged in Hermès's complaint were true, Rothschild's activity would qualify as explicitly misleading. Hermès has produced evidence showing those facts (and more). Nonetheless, Rothschild again argues for a different test and that his conduct was not explicitly misleading. He should fare no better than he has in the past.

The Court has also explained that *Rogers v. Grimaldi*, offers no immunity if Rothschild adopted the METABIRKINS trademark for commercial purposes and not for artistically relevant

purposes. Discovery has overwhelmingly confirmed that is precisely what he has done. For the same reasons Hermès's motion should be granted, Rothschild's should be denied.

## STANDARD OF REVIEW

The standard for summary judgment is well known—summary judgment may be granted only if a movant demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). On a summary judgment motion, the court resolves all ambiguities and draws all reasonable inferences against the moving party. *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). When parties cross move for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Miller v. Astucci U.S. Ltd.*, No. 04 CIV. 2201 (RMB), 2007 WL 102092, at *5 (S.D.N.Y. Jan. 16, 2007) (citation omitted).

## ARGUMENT

### I.   POINT ONE: THE METABIRKINS NFTS ARE NOT ARTISTIC EXPRESSION AND *ROGERS V. GRIMALDI* SHOULD NOT APPLY

#### A.   The *Rogers* Test Only Applies to Works of Artistic Expression

*Rogers v. Grimaldi* only applies to works of artistic expression. 875 F.2d 994, 1000 (2d Cir. 1989). *Rogers* prohibits use of another's trademark in "works of artistic expression" (1) if the trademark has "no artistic relevance" to the accused work or (2) if there is artistic relevance, the accused work's use of the mark "explicitly misleads as to the source or the content of the work." *Hermès Int'l v. Rothschild*, No. 22-CV-384 (JSR), 2022 WL 1564597, at *4 (S.D.N.Y. May 18, 2022). The first inquiry, then, is whether the METABIRKINS NFTs are works of

artistic expression. They are not; they are digital code, not indelibly tied to any artwork at all. As such, *Rogers* does not apply here.

**B.**   **The Entries on the Ethereum Blockchain Referred to as METABIRKINS NFTs Are Not Works of Artistic Expression**

It is important to understand the very significant distinction between METABIRKINS NFTs on the one hand and the images Rothschild currently associates with them on the other hand. This analysis begins with understanding the nature of the METABIRKINS NFTs.

The METABIRKINS NFTs are data recorded on the Ethereum blockchain. (Hermès's Response to Defendant's Rule 56.1 Statement of Undisputed Material Facts and Statement of Additional Material Facts in Opposition ("Opp. SOMF") ¶ 54.) That data lives forever on the blockchain and is governed by a smart contract which is immutable. (*Id.*) Under the METABIRKINS NFTs smart contract ████████████████████ these NFTs are permanently branded METABIRKINS. (*Id.* ¶ 55.) When the METABIRKINS NFTs were first minted and sold, they were each associated with the identical image of a single object covered by a shroud. (*Id.* ¶ 59.) That means initial purchasers bought rights to own METABIRKINS branded NFTs, all associated with the same image of a shrouded object. (*Id.* ¶ 59.) The METABIRKINS NFTs contract permits a controller to modify or change the images associated with the METABIRKINS NFTs at any time. (*Id.* ¶ 56.) Rothschild is that controller, and he later replaced the shrouded object with various depictions of BIRKIN handbags. (*Id.* ¶¶ 56, 61-62.)

**C.**   **Rothschild Meant the METABIRKINS NFTs To Be a Digital Brand**

Dr. Kominers identified sub-markets within the larger NFT market, including: (1) "'art-only' NFTs, which serve just to convey ownership of (often digital) artworks, imagery, collectibles or similar—without any other utility or other direct holder benefits;" and (2) "'digital brand' NFTs, which use digital assets such as art, imagery, or collectibles as a springboard for

establishing a broader product ecosystem, holder community, and brand." (*Id.* ¶ 73.) In a recent interview, Rothschild identified similar "art driven" and "utility driven" NFT markets. (*Id.* ¶ 75.)

Unlike "art-only" NFTs, "digital brand" NFTs launch with a brand asset, followed by various forms of rewards for NFT holders, typically called "utilities," including additional brand assets. (*Id.* ¶ 74.) Creating "utilities" for digital brand NFTs is to enhance the NFT's value and promote sales and resales. (*Id.*) These utilities can enrich the owner of the smart contract, who can collect income on sales and resales. (*Id.*) Rothschild said brands should embrace "digital brand" or "utility driven" NFTs and avoid "art-only" NFTs. (*Id.* ¶ 76.) He criticized Gucci's launch of "purely art" NFTs that had "no real like utility" because "it doesn't do anything" and "just dilute[s] their brand in Web3 to like not really have much behind it." (*Id.* ¶ 77.)

Rothschild used METABIRKINS as a brand; the METABIRKINS NFTs have the attributes of a "digital brand" NFT, which Rothschild calls "utility driven" NFTs. (*Id.* ¶ 79.) Rothschild touted the METABIRKINS NFTs—not the images—as the key to unlocking all of his future projects. (*Id.* ¶ 80.) Rothschild promised purchasers of the METABIRKINS NFTs other digital assets, including a virtual horse charm (a close copy of Hermès's Rodeo horse charm) to accompany their virtual handbags. (*Id.* ¶ 81.) Rothschild gave purchasers exclusive whitelist access to his next NFT projects. (*Id.* ¶ 82.) He also advertised exclusive access to future real-world parties for purchasers of the METABIRKINS NFTs. (*Id.* ¶ 84.) Rothschild even created a METABIRKINS "community" on Discord. (*Id.* ¶ 85.) That community had approximately 36,000 members—meaning at least 35,900 members of the METABIRKINS community did not own METABIRKINS NFTs—the purpose of which was promoting Rothschild's other NFT projects. (*Id.*) In fact, in a November 22, 2021, blog post (which Rothschild did not produce in discovery), Rothschild promised that the first 1,000 members of the METABIRKINS Discord community would be provided "white list" spots for an upcoming,

4

undisclosed, and unrelated NFT project. (*Id.*) He also cross-promoted the METABIRKINS NFTs with other NFT projects, including his I Like You You're Weird ("ILYYW") NFTs. (*Id.* ¶ 86.) Rothschild intended to create a successful digital branded NFT collection, drawing parallels with the most successful ones—the Bored Ape Yacht Club and Doodles. (*Id.* ¶ 87.)

Dr. Blake Gopnik, Rothschild's art expert, agrees that the METABIRKINS NFTs are "digital brand" or "utility driven" NFTs. He explained that "Rothschild deliberately rejects the restricted world of 'art-only' NFTs (I have argued in the Times that its artistic potential is close to non-existent) and instead ventures into the world of 'digital brand' NFTs that seems to have real leverage on our current reality." (*Id.* ¶ 78.)

### D.     Rothschild Intended the METABIRKINS NFTs as a Business for Profit, Not Expression

Rothschild referred to the METABIRKINS NFTs as profitable investments, calling the METABIRKINS NFTs digital commodities and ██████████████████████████████

████████████████████████████ (*Id.* ¶¶ 91, 92.) To promote investment, Rothschild promised to provide additional utilities to METABIRKINS NFTs holders. (*Id.* ¶ 83.) Rothschild promised that "the top 10 longest MetaBirkins Holders (at the time of generative project minting) will be gifted an item from the generative project collection." (*Id.*)

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████ (*Id.* ¶ 93.) Rothschild described the approach he takes to profiting from NFTs in an October 11, 2022 tweet: "NFTs in a nutshell: Overpromise, underdeliver = PUMP[;] Underpromise, overdeliver = DUMP." (*Id.* ¶ 103.)

5

### E.      Rothschild Made the METABIRKINS Metaverse Ready

Rothschild swapped the shrouded object images attached to the METABIRKINS NFTs to



(*Id.* ¶ 62.) These digital images attached to the METABIRKINS NFTs are

"handbags" in the digital world and "metaverse ready" in any metaverse capable of pulling

image information from the METABIRKINS smart contract. (*Id.* ¶ 67.)

(*Id.* ¶ 72.)

is not required to create static, two-dimensional images. (*Id.* ¶ 71.)

Houdini is used to create three-dimensional images that can be used and worn in "gaming or

avatar environments." (*Id.*) Rothschild can replace the files associated with the METABIRKINS

NFTs with a 3D file compatible with any metaverse platform at any time. (*Id.* ¶ 68.) Social

media users can "wear [the METABIRKINS] in profile picture[s]." (*Id.* ¶ 69.) As Dr. Gopnik

reported, the METABIRKINS NFTs are "an elite metaversal commodity. . . the kind of deluxe

Hermès bag a MetaKardashian might carry, in the virtual reality we will all inhabit." (*Id.* ¶ 70.)

### F.      Rothschild's Expert Opined that METABIRKINS Are Not Traditional Art: Rather Rothschild Created "Business Art" with METABIRKINS NFTs

Dr. Gopnik confirms that METABIRKINS NFTs are commercial goods that he classifies

"business art." (*Id.* ¶ 109.) Dr. Gopnik's definition of "business art" includes investing money in

the stock market, creating a corporation, the public sale of works at auction, opening a restaurant,

adopting the trademark of another company, making money, and, activity geared toward

provoking a lawsuit. (*Id.*) This expansive definition of "art" was repeated by Rothschild, who

(*Id.* ¶ 142.) According to Dr. Gopnik, creating confusion

concerning whether goods are authorized by a trademark owner is also "business art," and, in certain "business art" cases, the NFT itself can "play[] an artistic role." (*Id.* ¶ 110.)

Dr. Gopnik testified that understanding "business art," requires "knowledge of the history of business art . . . [and having] knowledge of other examples of business art. You would need to understand those cues in order to understand what you're confronting." (*Id.* ¶ 111.) Dr. Gopnik explained that to determine what constitutes art, judges should not be "art critics," but should "poll a number of art critics" and weigh the opinions. (*Id.* ¶ 113.) But while suggesting that the Court should poll critics, curators and others with specialist knowledge, he admitted that he is not aware of any other art professional who considers METABIRKINS NFTs art. (*Id.* ¶ 114.) In urging that "business art" be used to create a safe harbor, Rothschild stretches *Rogers* beyond a workable framework.

## II.     POINT TWO: EVEN IF THE METABIRKINS NFTS ARE "ART," ***ROGERS*** DOES NOT APPLY BECAUSE THE NAME WAS ADOPTED FOR COMMERCIAL PURPOSES, NOT ARTISTICALLY RELEVANT PURPOSES

### A.     *Rogers* Does Not Protect Against the Use of Source Identifying Names or Names Without Artistic Relevance

The *Rogers* test only protects expressive works "with at least minimal artistic relevance that are ambiguous or only implicitly misleading." *Rogers*, 875 F.2d at 1000; *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 886 F.2d 490, 495 (2d Cir. 1989). This test "leaves vulnerable to claims of deception [works] . . . that have no artistic relevance at all." *Id. Rogers* and its progeny prohibit the unauthorized use of trademarks expressive works which are "chosen just to exploit the publicity value of their real life counterparts." *Id.* at 1001. If trademarks are "used without permission for the purpose of source identification, the trademark law generally prevails over the First Amendment. Free speech rights do not extend to labelling or advertising products in a manner that conflicts with the trademark rights of others." *Yankee Pub. Inc. v.*

*News America Pub. Inc.*, 809 F. Supp. 267, 276 (S.D.N.Y. 1992) (citing *Rogers*, 875 F.2d at 999).

As this Court recently explained, the artistic relevance prong of *Rogers* "'ensures that the defendant intended an artistic—i.e., noncommercial-association with the plaintiff's mark, as opposed to one in which the defendant intends to associate with the mark to exploit the mark's popularity and good will.'" *Hermès Int'l*, 2022 WL 1564597 at *6 (quotation omitted); *see also Champion v. Moda Operandi, Inc.*, 561 F. Supp. 3d 419, 435 (S.D.N.Y. 2021); *Brown v. Showtime Networks, Inc.*, 394 F. Supp. 3d 418, 442 (S.D.N.Y. 2019). Further, marks such as BIRKIN with only a "source-identifying function [are] more likely to be used in a way that has 'no artistic relevance to the underlying work whatsoever' because the work may be 'merely borrow[ing] another's property to get attention." *Twentieth Century Fox Television v. Empire Distrib., Inc.*, 875 F.3d 1192, 1196 (9th Cir. 2017) (internal citation omitted). Hermès's BIRKIN Marks[1] have no meaning other than as an indicator that Hermès is the source of goods branded BIRKIN or configured using the BIRKIN Trade Dress. Here, Rothschild admits to using the BIRKIN Mark and the BIRKIN Trade Dress to create attention for his METABIRKINS NFTs brand. (Opp. SOMF ¶¶ 116, 136, 139.)

Considering and synthesizing this law and these concepts, in denying Rothschild's motion to dismiss, this Court explained that if Rothschild "intended to associate the 'MetaBirkins' mark with the popularity and goodwill of Hermès's Birkin mark, rather than intending an artistic association" *Rogers* would not provide a defense. *Hermès Int'l*, 2022 WL 1564597 at *5. That conclusion still applies on this record.

---

[1] Hermès owns U.S. trademark registration No. 2991927 covering "BIRKIN" (the "BIRKIN Mark") and No. 3936105 covering the trade dress of the BIRKIN handbag (the "BIRKIN Trade Dress"), (Opp. SOMF ¶¶ 32-36) and a pending trademark application for BIRKIN NFTs. (*Id.* ¶ 47.)

8

**B.**   **Rothschild Adopted the METABIRKINS Name with a Bad Faith Intention of Trading Off of Hermès's Goodwill and Not for Artistically Relevant Reasons**

Rothschild intended to trade off of the goodwill of the BIRKIN Mark. When announcing the launch of this NFT project, Rothschild referred to the NFTs "one of a kind, Birkins" to garner interest. (Opp. SOMF ¶ 120.) ████████████████████████████████████

████████████████████████ (*Id.* ¶ 118.) When promoting the NFT project on his METABIRKINS.com website, Rothschild referred to the NFTs as "Birkin NFTs." (*Id.* ¶ 121.) To advertise the METABIRKINS NFTs he adopted slogans using Hermès's trademarks: "Mint a MetaBirkin," "Hold a MetaBirkin" and "NOT YOUR MOTHER'S BIRKIN." (*Id.* ¶ 122.) Rothschild promoted the METABIRKINS NFTs as a "tribute to Herm[è]s' most famous handbag, the Birkin" on: his METABIRKINS website; on OpenSea where these NFTs were offered for sale; and in interviews. (*Id.* ¶ 116.) Indeed, Dr. Kominers's statistical analysis of NFT trading data determined that Rothschild's use of the BIRKIN Mark in METABIRKINS drove sales of the METABIRKINS NFTs, even before the shrouded images were replaced. (*Id.* ¶ 60.)

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ (*Id.* ¶ 130.) ████████████████████

████████████████████████████████████████ (*Id.* ¶ 131.)

████████████████████████████████████████████

████████████████████████████████ (*Id.* ¶ 132.) ████████

████████████████████████████████████████

████████████████████ (*Id.* ¶ 133.) None of this was true.

Rothschild claims he intended the METABIRKINS NFTs to be "a tribute to Herm[è]s'[s] most famous handbag, the Birkin"; he also "wanted to see as an experiment if [he] could create the same kind of illusion that [the BIRKIN handbag] has in real life as a digital commodity." (*Id.* ¶¶ 116-118) Rothschild repeatedly and intentionally sought publicity. (*Id.* ¶¶ 137, 139.) ███

████████████████████████████████████████████████████ (*Id.* ¶

139.) ████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████ (*Id.* ¶ 163.)

Hermès has proffered several undisputed facts showing Rothschild's motive in adopting the "METABIRKINS" name to unlawfully exploit Hermès's famous BIRKIN Mark for profit. (*Id.* ¶ 53.) As discussed below, this is evidenced by Rothschild causing and welcoming the actual confusion among consumers, the press, and sophisticated commentators.

Arguing he acted in "good faith," Rothschild claims he promptly sought to correct mistaken journalists. (Def. Br. at 22.) However, only two such efforts were made. ████████

████████████████████████████████████████ *Id.* ¶ 151.) ████████

████████████████████████████████████████ and were far from sufficient to dispel the rampant confusion caused by the METABIRKINS NFTs. (*Id.*) Rothschild fails to disclose that neither he ████████ reached out to any other journalists to correct their reporting, including the *New York Post* and *Challenges*. (*Id.* ¶¶ 157-58.)

████████████████████████████████████████████████████

██████████████████ (*Id.* ¶ 159.) ████████████████████

████████████████████████████████████████████████████

██████████████ (*Id.*) This followed Rothschild's statements to *Yahoo! Finance* that there were counterfeit METABIRKINS NFTs being sold—an admission that he thought he created a

brand that could be counterfeited. (*Id.* ¶ 117.) Rothschild compared counterfeiting of

METABIRKINS NFTs to the counterfeiting of Hermès's BIRKIN handbags. (*Id.* ¶ 117.)

Regardless of whether the counterfeiting allegations were true—and Rothschild proffered no

evidence of counterfeits—Rothschild was trying to either protect or promote a METABIRKINS

brand. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████ (*Id.* ¶ 160.) Rothschild eschewed the opportunity to distinguish

himself from Hermès and prevent further consumer confusion.

Additionally, Rothschild made no efforts to rectify consumer confusion. On the Twitter

and Instagram accounts Rothschild uses to market the METABIRKINS NFTs, consumers clearly

expressed confusion concerning affiliation between the METABIRKINS NFTs and Hermès. (*Id.*

¶ 161.) Rothschild stayed silent and instead, sowed confusion by failing to identify himself as the

creator of the METABIRKINS NFTs on the various media platforms. For example, Rothschild's

initial storefront on OpenSea did not have a single reference to Rothschild. (*Id.* ¶ 124.) When the

METABIRKINS NFTs were sold on Zora, there was no mention of Rothschild as creator. (*Id.* ¶

125.) To this day, there is still no mention of Rothschild on his LooksRare METABIRKINS

storefront. (*Id.* ¶ 126.) Nor was it made clear on the METABIRKINS Instagram account, which

had nearly 17,000 followers. (*Id.* ¶ 127.) The account merely included a tag to Rothschild's

personal account in the biography without any signal or context. (*Id.*) The account was updated

only after Hermès acted against Rothschild. (*Id.*)

Rothschild counters that he added a disclaimer to the METABIRKINS website, and cites

cases where disclaimers were prominent and made with an initial release. (Def. Br. at 22-23.)

Those cases are inapposite. Rothschild's disclaimer was placed only on his own website, and

only after the METABIRKINS NFTs were minted and sold. (Opp. SOMF ¶ 128.) Rothschild's

disclaimer is especially ineffective because it only appeared on his METABIRKINS website—

not on social media or any NFT marketplaces—in small font while HERMÈS was capitalized.

(*Id.* ¶¶ 128-129.) Confusion had already permeated the marketplace when he added the

disclaimer, which was ineffective. *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 448

(S.D.N.Y. 2017) ("[C]ourts have held that disclaimers are not only ineffective, but actually cut

against the allegedly infringing party."); *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 813

(2d Cir. 1999) ("courts have ordinarily found the use of disclaimers insufficient to avoid liability

for infringement.") (citation omitted).

In arguing for summary judgment, Rothschild claims the METABIRKINS NFTs are an

"experiment to explore where the value in the Birkin handbag actually lies—in the handcrafted

physical object, or in the image it projects?" (Opp. SOMF ¶ 118.) But the value in the "image"

Birkin handbags project is the goodwill Hermès spent decades developing in the now famous

BIRKIN Mark and trade dress. This is classic trademark infringement. Even before this litigation

commenced, Rothschild admitted to trying to "create that same kind of illusion that [the Birkin

handbag] has in real life as a digital commodity." (*Id.* ¶ 117.)

As stated above, ███████████████████████████████████

████████████████████████████     ████████████████████████████

████████████████████████████████████████

███████     There can be no question that Rothschild was intending in bad faith to make the

METABIRKINS NFTs a replica of BIRKIN handbags and sell them to unsuspecting customers.

III.   **POINT THREE: *ROGERS* DOES NOT APPLY BECAUSE THE METABIRKINS NAME IS EXPLICITLY MISLEADING**

A.   **Rothschild Explicitly Mislead Consumers, the Media, Potential Investors, and Paid Promoters**

Even if the METABIRKINS NFTs are artistic expression and the METABIRKINS name is artistically relevant, *Rogers* still requires a showing that METABIRKINS is not explicitly misleading, a showing Rothschild cannot make. As this Court explained, "in considering explicit misleadingness under the *Rogers* balancing test, the Court should consider the *Polaroid* factors to determine whether the likelihood of confusion is sufficiently compelling to outweigh the public interest in free expression." *Hermès Int'l*, 2022 WL 1564597, at *5 (citing *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993)). Rothschild's assertion that Hermès must show "particularly compelling" likelihood of confusion is inaccurate. (Def. Br. at 17.) This Court explained that the *Rogers* test goes beyond title-v-title confusion and "is generally applicable to Lanham Act claims against works of artistic expression." *Hermès Int'l*, 2022 WL 1564597 at *4 (quoting *Cliffs Notes, Inc.*, 886 F.2d at 495).

This Court also explained that Rothschild's public statements, alleged in the Complaint, were plausibly interpreted as explicitly misleading. *Hermès Int'l*, 2022 WL 1564597 at *6. These statements include Rothschild promoting the METABIRKINS NFTs as "tributes" to Hermès and that he intended to see if his METABIRKINS NFTs would have the same value as Hermès's BIRKIN handbags. *Id.* Such explicit misleadingness is also shown by "the impact of the use on consumers, the media, and the public." *Id.* These same public statements—now introduced as facts—only further supports that Rothschild's statements and use of the METABIRKINS Mark was explicitly misleading. (Opp. SOMF ¶¶ 116-117, 150, 154-55, 157-161.)

The *Polaroid* factors, discussed in Section IV, *infra*, all weigh only in Hermès's favor.

13

**B.**     **Rothschild Adopted the METABIRKINS Mark to Trade Off of Hermès's Goodwill and Caused Actual Confusion**

As detailed in Section II.B, *supra*, Rothschild adopted the METABIRKINS Mark in bad faith, with the attempt to trade off of Hermès's goodwill. Rothschild succeeded, as he caused actual consumer confusion. █████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████ (Opp. SOMF ¶ 143.) The magazines *Elle*, *L'Officiel*, and *Challenges*, as well as the *New York Post* all mistakenly reported that the METABIRKINS NFTs originated from Hermès. (*Id.* ¶¶ 152-158.) Months after this lawsuit was filed, *Challenges* reported that Hermès "unveil[ed] virtual bags under the name 'MetaBirkin.'" (*Id.* ¶ 158.) ███████████████████████████████████████████████. (*Id.* ¶ 144.) Even an intellectual property attorney, who was presenting on NFTs at the end of 2021, believed that the METABIRKINS NFTs were from Hermès or promoted with Hermès's authorization. (*Id.* ¶ 161.) Not surprisingly, consumers were equally at loss, commenting on the METABIRKINS social media page mistakenly believing that there was a Hermès affiliation. (*Id.*)

Faced with this evidence, Rothschild only attacks Dr. Isaacson's expert report, which also found confusion. (Def. Br. 19-22.). Dr. Isaacson's NFT survey shows 18.7% net confusion. (Opp. SOMF ¶ 164.) Rothschild claims this amount is "low" when, in fact, the NFT survey indicates a substantial likelihood of confusion, especially when considering the evidence of actual confusion. *See, e.g.*, *RJR Foods, Inc. V. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (affirming 15-20% confusion, together with two actual confused witnesses, corroborates a finding of likely confusion); *Energybrands, Inc. v. Beverage Marketing USA, Inc.,* No. 02 CIV.

3227(JSR), 2002 WL 826814 at *2 (S.D.N.Y. May 1, 2002) (17% confusion, along with seven confused consumers and retailers, is sufficient to support a finding of likelihood of confusion); *Lon Tai Shing Co. v. Koch+ Lowy*, No. 90 CIV. 4464 (DNE), 1991 WL 170734 at *22 (S.D.N.Y. 1991) (18% "is within the range of cognizable confusion"). Even Rothschild's expert, Dr. Neal, was forced to admit that 18.7 % was above the confusion threshold: "a confusion number above 15 percent . . . might be considered evidence of likelihood of confusion. If it's a less than 15 percent that might be considered evidence against confusion." (Opp. SOMF ¶ 166.)

Without any basis and instead of conducting his own survey, Dr. Neal contrives "flaws" with Dr. Isaacson's NFT survey, while ignoring accepted practice for surveys. (*Id.* ¶¶ 169-174.) First, Rothschild argues that the Isaacson survey did not measure confusion, but instead measured "mere mental association between MetaBirkins and Hermès." (Def. Br. at 20.) This is diversionary. Dr. Isaacson explains that his NFT survey measured "the likelihood of confusion between Birkin bags from Hermès and MetaBirkins NFTs, which are sold by [Rothschild]." (*Id.* ¶ 164.) Dr. Neal admits that the stimulus a survey expert shows respondents needs to recreate the real world. (*Id.* ¶ 165.) Dr. Isaacson therefore showed respondents the metabirkins.com website, which is where Rothschild advertised the METABIRKINS NFTs, and measured confusion by determining whether respondents associated the site with Hermès. (*Id.* ¶ 166.)

Moreover, a confusion survey *is* a survey of association. "Surveys are … routinely admitted in trademark and false advertising cases to show actual confusion, . . . which depend[s] on establishing that certain associations have been drawn in the public mind." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 225 (2d Cir. 1999), *as amended on reh'g* (Sept. 29, 1999); *see also McDonald's. Corp. v. McBagel's, Inc.*, 649 F. Supp. 1268, 1278 (S.D.N.Y. 1986) (likelihood of confusion question sought to determine "whether an association with [the senior mark] was triggered [by the junior mark]."). The leading commentator explains: "Confusion as to source,

sponsorship, or affiliation can occur when a consumer sees a junior brand in the marketplace that cues a top of mind senior brand schema in memory…[this] is 'pattern matching.'" Jerre B. Swan, *Confusion Factor Analysis—A Cognitive Update*, 101 TRADEMARK REP, vol. 101, 1123, 1225 (2011) (citations omitted). Consumers rely on memory to make brand associations.

Second, Rothschild ignores that the disclaimer on the METABIRKINS website fails to dispel confusion. (Def. Br. at 20-21.) The disclaimer consists of two lines of small text, on a web page that contains 17 large handbag images, and other eye-catching elements, including flashing text that reads, "NOT YOUR MOTHER'S BIRKIN." (Opp. SOMF ¶ 129.) Given this context, it is not surprising that, as shown by Dr. Isaacson's NFT survey, many respondents either did not notice the disclaimer, or mistakenly thought that the disclaimer indicated that Hermès is associated with METABIRKINS. (*Id.* ¶ 167.) In fact, one respondent indicated that the disclaimer did not clear up confusion as to whether the METABIRKINS were from Hermès. (*Id.* ¶ 168.)

Third, Dr. Neal's claim that a "coding error" requires the survey to be re-coded is wrong. (Def. Br. at 19.) Dr. Neal was unable to identify either a single survey that relied on this re-coding methodology, or any court decision referencing that methodology. (Opp. SOMF ¶ 173.) Dr. Neal could not identify a single survey he conducted using this method. (*Id.*) It is well-settled that Dr. Isaacson's coding method, which does not require that respondents provide the same answer twice to qualify as confused, is a standard practice accepted by courts, including this one. (*Id.* ¶ 171.) *See, e.g.*, *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 339 (S.D.N.Y. 2013) ("The Isaacson Report follows a standard, generally accepted survey format and presents a definitive finding that a negligible number of consumers were confused.").

Finally, Dr. Neal's makes the unfounded claim that the term "items" in Dr. Isaacson's NFT survey is inherently ambiguous. (Def. Br. at 21-22.) Dr. Neal did not test other verbiage,

because he did not conduct a survey, nor did he have any suggestion for alternate wording other than "some language that made it clear whether [Dr. Isaacson] was referring to the NFT or to the real world physical object depicted in the NFT." (Opp. SOMF ¶ 170.) This argument incorrectly distinguishes between confusion about the source of the METABIRKINS NFTs, and confusion about the physical handbag visually referenced in the METABIRKINS NFTs. There is no difference. The only way a respondent can be confused between the METABIRKINS website and Hermès is if they make a connection to Hermès's trademarks on the METABIRKINS website. Dr. Isaacson's survey correctly uses the term "item," which is neutral and non-leading. (*Id.* ¶ 169.) The word "NFT" is leading because it directs respondent attention to certain parts of the METABIRKINS webpage, and away from other parts of the webpage. (*Id.*)

The evidence of actual confusion is unrebutted. The METABIRKINS name is explicitly misleading.

### C.   Rothschild's Additional Arguments Concerning Explicit Misleadingness and *Rogers* Fair No Better

Rothschild cannot find refuge in the *Polaroid* factors as explained below, so he manufactures additional arguments. Rothschild argues that under *Rogers*, METABIRKINS cannot be explicitly misleading because he does not explicitly claim that Hermès is the source of the METABIRKINS NFTs. (Def. Br. at 13-14.) This is flawed and recycles the argument previously rejected. In denying Rothschild's motion to dismiss, this Court noted that the examples in *Rogers* of the explicitly misleading titles of "Jane Fonda's Workout Book," when the book was unrelated to Jane Fonda, and "Nimmer on Copyright," when the treatise was not authored by Nimmer. This Court explained that it is therefore "by no means inconsistent with finding that the title 'MetaBirkins,' when the digital images tied to the NFTs have nothing to do with Hermès, is explicitly misleading." *Hermès Int'l*, 2022 WL 1564597 at *6 n. 6. Rothschild

analogizes "Jane Fonda's Workout Book" and "Nimmer on Copyright," to Rothschild having

used "MetaBirkins by Hermès." (Def. Br. at 14.) This analogy actually supports Hermès. There

are many different "Workout Books" and several treatises on copyright law, but there is only one

source of BIRKIN: Hermès. The BIRKIN Mark is famous and identifies Hermès as the origin of

any product called BIRKIN. Moreover, Rothschild references Hermès in his advertising for the

METABIRKINS NFTs. Rothschild may not use the phrase "METABIRKINS by Hermès," but

his repeated use of "BIRKIN" and references to Hermès and its "iconic," "holy-grail," and

"famous" BIRKIN handbag draw a connection between the METABIRKINS and Hermès.

Rothschild argues that use of the BIRKIN Mark alone cannot establish explicit

misleadingness, but fails to cite a single Second Circuit case for support. (Def. Br. at 14.) This is

unsurprising as it is a Ninth Circuit test which is not applied in the Second Circuit. But even the

Ninth Circuit recognizes the limits to this rule and explained that "this reasoning does not extend

to instances in which consumers *would* expect the use of a mark alone to identify the source."

*Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 270 (9th Cir. 2018). Rothschild admits the fame

of the BIRKIN Mark. Consumers have come to expect the use of the BIRKIN Mark to identify

the only source of the BIRKIN—Hermès—making Rothschild's use alone sufficient to show

Rothschild's use was explicitly misleading.

Even if use of the BIRKIN Mark alone is not enough, Hermès has set forth sufficient

undisputed facts concerning Rothschild's explicitly misleading conduct. While the Court should

use the *Polaroid* factors and analysis set forth *infra*, using the Ninth Circuit standard Rothschild

advocates produce yields the same result. Under the Ninth Circuit test, evidence of explicit

misleadingness "must relate to the nature of the behavior of the identifying material's user, not

the impact of the use." *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1246 (9th Cir. 2013). Rothschild

uses the BIRKIN Mark and the images currently associated with the METABIRKINS NFTs take

the shape of the BIRKIN handbag, which is protected by the BIRKIN Trade Dress. ███████

████████████████████████████████████████████████████████████

████ (Opp. SOMF ¶ 63.) And Rothschild didn't limit his use of the BIRKIN Mark to the

METABIRKINS NFTs: he advertised them with his "NOT YOUR MOTHER'S BIRKIN"

slogan. (*Id.* ¶ 122-123, 129.) At times, Rothschild referred to the METABIRKINS NFTs by use

of the BIRKIN Mark only. (*Id.* ¶ 119-121.) Rothschild created METABIRKINS Twitter and

Instagram accounts, a METABIRKINS Discord community, and a METABIRKINS website all

to promote and advertise the METABIRKINS NFTs and his other projects. (*Id.* ¶ 165.)

Rothschild continually sought to emulate the Hermès brand, including promoting a "Horse

Companion," which was based on Hermès's Rodeo horse charm. (*Id.* ¶ 81.) ██████████

████████████████████████████████████████████████████████████

██████ (*Id.* ¶¶ 132-135.) ███████████████████████████████████

██████ (*Id.* ¶ 138), ██████████████████████████████████████ (*Id.* ¶ 139.)

While Rothschild argues that Hermès's 30(b)(6) witness could not point to any explicit

claims that Hermès was the source of the METABIRKINS, (Def. Br. at 14-15), that is a red

herring. Rothschild did not confront Mr. Martin with any of the substantial evidence here.

Instead, in a deposition on numerous topics, Mr. Martin was asked to list the evidence already in

Rothschild's possession. The deposition was not meant to be a closed-book exam where Mr.

Martin could recite each instance of consumer confusion—especially those already identified by

Hermès or those admitted to by Rothschild and his business associates.

Regardless of the test employed, Rothchild's use of the BIRKIN Mark is explicitly

misleading.

IV.     **POINT FOUR: THE TRADITIONAL *POLAROID* FACTORS DEMONSTRATE A LIKELIHOOD OF CONFUSION EXISTS**

To determine whether the METABIRKINS Mark is likely to cause confusion, courts in this Circuit examine the eight factors enumerated in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961).[2] In connection with both the *Rogers* test and Hermès's affirmative claim, the *Polaroid* factors demonstrate, unequivocally, that Rothschild's METABIRKINS NFTs infringe Hermès's BIRKIN Mark.

A.      **Strength of the BIRKIN Mark**

Rothschild admits that the BIRKIN Mark is strong. (Def. Br. at 17-18.)

B.      **Similarity of the BIRKIN Mark and METABIRKINS Mark**

Rothschild does not dispute that the Marks are nearly identical. Rothschild admits that the METABIRKINS NFTs "obviously and necessarily evoke the Birkin bag." (Def. Br. at 18.) However, Rothschild argues that the METABIRKINS images are not reproductions of BIRKIN handbags. (Def. Br. at 18.) This is misdirection: Hermès's trademark infringement claim concerns the use of the name METABIRKINS—associating the name with images that are near replicas of BIRKIN handbags is an aggravating factor. Rothschild's images need not be exact reproductions for Rothschild to infringe the BIRKIN Mark. Rothschild also ignores that "METABIRKINS" entirely encompasses "BIRKIN." Yet he admits that "META" is a prefix. (Def. Br. at 11, 18.) The generic prefix creates the explicitly misleading impression that Hermès is selling BIRKIN handbags in the METAverse.

---

[2] The *Polaroid* factors are the: (1) strength of the plaintiff's mark; (2) similarity of the marks; (3) competitive proximity of the products in the marketplace; (4) likelihood that the senior user will "bridge the gap" by moving into the junior user's product market; (5) evidence of actual confusion; (6) junior user's bad faith in adopting the mark; (7) respective quality of the products; and (8) sophistication of the consumers in the relevant market. *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 499 (S.D.N.Y. 2013) (citing *Polaroid*, 287 F.2d at 495).

Rothschild incorrectly argues that *AM Gen. LLC v. Activision Blizzard, Inc.* holds that marks used for different purposes, are not similar. 450 F. Supp. 3d 467, 477 (S.D.N.Y. 2020) (Def. Br. at 18.) In *AM Gen. LLC*, the video game creators of the well-known game "Call of Duty," known for its realism, depicted plaintiff's Humvees tactical defense vehicles. 450 F. Supp. 3d at 475. The Humvee vehicles inside the game were merely one of numerous design features in the hyper-realistic game, unlike here, where Rothschild generated the METABIRKINS NFTs to be individually sold as digital commodities. *Id.* at 481. (Opp. SOMF ¶¶ 91, 117.) The *AM Gen. LLC* court explained that the parties used the Humvee marks "for different purposes." *Id. a*t 481. Unlike in *AM Gen. LLC*, Rothschild's own expert, Dr. Gopnik, attested that "the success of Rothschild's 'METABIRKINS' depend on their connection to the Hermès brand" (*Id.* ¶ 136), and Rothschild intended the METABIRKINS NFTs to be "a tribute to [Hermès's] Birkin." (*Id.* ¶ 116.)

### C.    <u>Proximity of Products</u>

Rothschild argues the METABIRKINS images are not handbags. (Def. Br. at 18.) But
████████████████████████████████████████████████████ and a "tribute to
Herm[è]s'[s] most famous handbag, the Birkin." (Opp. SOMF ¶¶ 106, 116.) Rothschild also
████████████████████████████████████████████████████████████████
███████████████ (*Id.* ¶ 62.) ███████████████████████████████████
███████████████████████████ (*Id.* ¶¶ 62, 130, 132.) In addition, Hermès has sold fur-covered BIRKIN handbags, and Rothschild selling NFTs depicting fur-covered BIRKIN handbags is undeniably competitive. (*Id.* ¶ 140)[3] The U.S. Patent and Trademark Office

---

[3] Rothschild incorrectly argues that Dr. Isaacson's Handbag survey offers evidence of meaningful differences in the parties' products. (Def. Br. at 19, n.3.) The Handbag survey's measures were 18.8% for the test webpage, and 15.2% for the control. (Opp. SOMF ¶ 175.) Although the difference is 3.6%, both the test and control measures were relatively high,

("USPTO") has taken the position that virtual and physical goods are the kind that "may emanate from a single source, under a single mark" and that "[t]he same providers of real fashion goods often provide virtual fashion goods." (*Id.* ¶¶ 49.) Accordingly, the USPTO rejected trademark applications for GUCCI and PRADA, filed by individuals not affiliated with the fashion brands, "virtual versions" (*Id.* ¶¶ 50-51) of the goods registered by Gucci and Prada because "consumers would be likely to assume the existence of a connection between the parties" (*Id.*) and also noting that the brands are "so well-known that consumers would presume a connection." (*Id.*) The same is true here, as Rothschild testified. (*Id.* ¶ 48.)

### D. Likelihood of Hermès Bridging the Gap

███████████████████████████████████████████

Rothschild's conduct being "insulated artistic expression." (Def. Br. at 19.) Rothschild again cites *AM Gen. LLC* for support. (*Id.*) (citing *AM Gen. LLC*, 450 F. Supp. 3d at 482). However, the court in *AM Gen. LLC* found that plaintiff "presented no evidence that it [was] likely to enter the video game industry let alone evidence that consumers would expect it to do so." 450 F. Supp. 3d at 482.████████████████████████ (*Id.* ¶¶ 46-47.) And just like other major fashion brands have already entered the metaverse, customers expect Hermès to do the same. (*Id.* ¶¶ 48-51.)

### E. Evidence of Actual Confusion

This evidence is discussed at Sections II.B and III.A-B, *supra*.

### F. Rothschild's Bad Faith Adoption of METABIRKINS

This evidence is discussed at Section II.B, *supra*.

---

showing that the relevant consumers are likely to think of HERMÈS or BIRKIN when they see a handbag on the METABIRKINS.com website, despite the changes to the control. (*Id.*)

### G.    Quality of Products

Rothschild argues that this factor should not be considered, citing *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239 (1903) a case brought under the Copyright Act of 1870. That authority is irrelevant and unpersuasive. It is undisputed that Hermès's BIRKIN handbag is of high-quality while ███████████████████████████████████████████████████

████████████████████ (Opp. SOMF ¶¶ 45, 64-65.) ███████████████████

████████████████████████████████████████████████████████

██████ (*Id.* ¶ 93-105.) On October 11, 2022, Rothschild tweeted as follows: "NFTs in a nutshell: Overpromise, underdeliver=PUMP[;] Underpromise [sic], overdeliver=DUMP." (*Id.* ¶ 103.) Thus, Rothschild explains what his METABIRKINS NFTs were all about: overpromising and underdelivering, tacitly evidencing the inferiority of his NFTs. It is not surprising that customers expected more from the METABIRKINS NFTs, including receiving a real-world handbag, leaving some speculating that the METABIRKINS NFTs were just a scam or "rug." (*Id.* ¶ 66.)

### H.    Sophistication of Consumers

Rothschild argues, without evidence, that consumers "would carefully consider the entire description of METABIRKINS before purchase." (Def. Br. at 23.) However, as discussed *supra* in Sections III.A-B, the evidence of actual confusion demonstrates that the NFT community is not as discerning as Rothschild hypothesizes, despite the high price of the METABIRKINS NFTs. Indeed, the NFT community is relatively young and not well versed in this new and fast-paced market. Even if the Court finds the consumers to be sophisticated, courts have found "that the evidence of actual confusion establishes a strong likelihood that . . . the sophisticated consumers . . . will continue to be confused." *De Venustas v. Venustas Int'l, LLC.*, No. 07 CIV. 4530 LTS/THK, 2007 WL 2597122, at *7 (S.D.N.Y. Sept. 11, 2007).

23

I.      **Conclusion of Factors**

Each *Polaroid* factor weighs only in Hermès's favor. Thus, Rothschild's motion for summary judgment should be denied.

V.      **ALL OTHER CLAIMS SHOULD NOT BE DISMISSED**

A.      **Rothschild's Use of the METABIRKINS NFTs Is Likely To Cause Dilution**

Rothschild cannot credibly deny that the BIRKIN Mark is famous. (Opp. SOMF ¶¶ 41, 62, 116.) He admits that the METABIRKINS NFTs are commercial commodities, and Rothschild uses the METABIRKINS Mark for his commercial enterprise and to promote his business. (*Id.* ¶¶ 87, 89, 91.) Thus, the federal dilution statute applies. The facts supporting the infringement claim, discussed *supra* at Section IV, also support a likelihood of dilution by blurring. Further, Rothschild's use of the BIRKIN trademark is not merely "referential." (Def. Br. at 24, n.4.) Rothschild derives commercial benefit from using the BIRKIN Mark to associate the METABIRKINS NFTs with Hermès's popularity and the iconic BIRKIN handbag. As Dr. Gopnik explained: "the success of Rothschild's 'METABIRKINS' depends on their connection to the Hermès brand" and Rothschild portrayed the METABIRKINS NFTs as "a tribute to [Hermès's] most famous handbag, the Birkin." (Opp. SOMF ¶¶ 116, 136.)[4]

B.      **Hermès's Other Claims Should Not Be Dismissed**

*Rogers* does not bar Hermès's causes of action for trademark infringement or dilution. It is for these same reasons that *Rogers* also does not preclude Hermès's remaining six causes of action, which largely have the same elements.  Rothschild's actions were commercially driven, and it is undisputed he profited as a result. (Opp. SOMF ¶¶ 89; *see supra* at Section IV.E.)

---

[4] *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010) (Def. Br. at 24, n.4.) is inapposite. There, eBay's used the TIFFANY trademark to advertise authentic Tiffany products. *Id.* at 112. Rothschild does not use the BIRKIN Mark to identify Hermès's products.

Rothschild attempts to diminish Hermès's cybersquatting claim (Def. Br. at 24.), arguing that the use of METABIRKINS.com domain name is the "title of his art." This is inaccurate. The domain name is the fixed title of the smart contract governing the NFTs, and the NFTs are merely accompanied by an image that can change at any point. (Opp. SOMF ¶¶ 55-56.) "METABIRKINS" is not the title of the image, but rather the name of the NFTs and brand (*Id.* ¶¶), which Rothschild adopted in bad faith to capitalize on Hermès's goodwill. Hermès is not simply "relabeling" the same claim. As alleged in the Complaint, each cause of action is separate and distinct and derived from, actual injuries to Hermès resulting from Rothschild's actions. Even applying *Rogers*, it is clear that there is a high likelihood of confusion between the METABIRKINS NFTs and the BIRKIN. Hermès's claims are valid and Rothschild has not met his burden to show he is entitled to judgment on these claims.

## CONCLUSION

For the foregoing reasons, Hermès respectfully requests that Defendant's motion for summary judgment be denied in its entirety.

Dated: October 21, 2022
     New York, New York

**BAKER & HOSTETLER LLP**
Deborah A. Wilcox, Esq. (*pro hac vice*)
Key Tower
127 Public Square
Cleveland, OH 44114
Telephone:   216.621.0200

**BAKER & HOSTETLER LLP**
Lisa Bollinger Gehman, Esq. (*pro hac vice)*
1735 Market Street
Philadelphia, PA 19103
Telephone:   215.568.3100

**BAKER & HOSTETLER LLP**

By:   /s/ *Gerald J. Ferguson*
    Gerald J. Ferguson, Esq.
    Oren J. Warshavsky, Esq.
    Kevin M. Wallace, Esq.
    Megan A. Corrigan, Esq.
    45 Rockefeller Plaza
    New York, NY 10111
    Telephone:   212.589.4200
    Facsimile:   212.589.4201

    *Attorneys for Plaintiffs*
    *Hermès International and*
    *Hermès of Paris, Inc.*