MbiWherO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   HERMES INTERNATIONAL, *et al.*,

4                    Plaintiffs,

5            v.                          22 Civ. 384 (JSR)

6   MASON ROTHSCHILD,

7                    Defendant.
                                         Oral Argument
8   ------------------------------x
                                         New York, N.Y.
9                                        November 18, 2022
                                         2:00 p.m.
10
    Before:
11
                          HON. JED S. RAKOFF,
12
                                         District Judge
13

14                            APPEARANCES

15  BAKER HOSTETLER LLP
         Attorneys for Plaintiffs
16  BY:  OREN J. WARSHAVSKY
         MEGAN A. CORRIGAN
17       FRANCESCA ROGO

18  LEX LUMINA PLLC
         Attorneys for Defendant
19  BY:  RHETT MILLSAPS

20       CHRISTOPHER SPRIGMAN

21

22

23

24

25

MbiWherO

```
 1              (Case called; appearances noted)
 2              THE COURT:  Good afternoon.
 3              I should mention that this very imposing jury consists
 4        of students at a class I teach at Columbia Law School.  I
 5        promised them they would hear exceptional lawyers today, so
 6        you're under pressure.
 7              Since these are cross-motions, there's no natural
 8        order, so why don't we start with defense counsel.  Both
 9        counsel, when you are speaking, you should go to the rostrum
10        there.
11              We'll hear from defense counsel first.
12              MR. MILLSAPS:  Good afternoon, your Honor.
13              Six months of intensive discovery and plaintiffs'
14        moving-target papers, and voluminous papers, show what
15        Mr. Rothschild has maintained from the beginning -- plaintiffs
16        don't have a case and never had one.
17              First, it's undisputed that the MetaBirkins images at
18        issue in this case are flat, two-dimensional digital images
19        that depict imaginary --
20              THE COURT:  As I'm sure you know, it's a requirement,
21        to be a federal judge, to be technologically ignorant; I am
22        fully qualified in that regard.  Tell me how you define an NFT.
23              MR. MILLSAPS:  An NFT, your Honor, it's in the record,
24        and it's undisputed.  An NFT is a code, a bit of code on the
25        blockchain, which is a public-server sort of situation, where
```

MbiWherO

1    there is -- an NFT is the code that exists on the blockchain,

2    and the reason that it's unique -- an NFT, of course, is a

3    non-fungible token, so an NFT is that bit of code that is

4    publicly identifiable and traceable.  One is able to look at

5    the blockchain and to see when an NFT was created, when that

6    particular token was created.

7              THE COURT:  Can you purchase an NFT?

8              MR. MILLSAPS:  People can purchase an NFT.

9              THE COURT:  Right.  So what is it you're purchasing?

10             MR. MILLSAPS:  That's a great question, your Honor.

11       An NFT, because it's just a bit of code on the

12   blockchain, an NFT has to have some sort of function or

13   something else that it's associated with or that it points to.

14   And so an NFT may serve in several different ways.  It may

15   serve as a token for admission to an event, for instance, in

16   which case it would be functioning as an admission ticket.

17   NFTs often serve as essentially deeds of ownership or

18   certificates of authenticity of artwork.  There's a whole

19   market out there now of NFT artwork.

20             THE COURT:  In this case, were purchasers becoming the

21   owners or were they becoming lessors?

22             MR. MILLSAPS:  Purchasers become the owner of the NFT

23   and the media that is attached to the NFT.  So they become the

24   owner of that particular digital image.

25             THE COURT:  Do you require persons who purchase NFTs

MbiWherO

```
1    to enter into smart contracts?

2               MR. MILLSAPS:  Your Honor, the smart contract is

3    embedded on the blockchain with the NFT.  So the smart contract

4    is public, and that's the contract that governs the terms

5    around the NFT.

6               THE COURT:  Right.  So it is, like all shrink-wrapped

7    agreements, a total meeting of the minds.  Under your smart

8    contract, didn't you retain all sorts of rights with respect to

9    the underlying MetaBirkin or whatever you relate it to?

10              MR. MILLSAPS:  So, the smart contract does not

11   transfer, for instance, the ownership of the IP.  The copyright

12   is not transferred by the artist.

13              THE COURT:  Right.  That's what I figured.  It sounds

14   to me -- maybe I'm just missing something; that's why I'm

15   asking -- more like a lease.  The person who purchased the NFT

16   could record that they had purchased it.  They could tell their

17   innumerable friends and acquaintances, gosh, I just purchased

18   this particular NFT, but they couldn't transfer the NFT without

19   permission.  Do I have that right?

20              MR. MILLSAPS:  Your Honor, they can transfer the NFT

21   at any time under the smart contract.  They can sell it like

22   any other --

23              THE COURT:  OK.

24              MR. MILLSAPS:  -- any other piece of art.

25              THE COURT:  What is it that you retained under the
```

MbiWherO

1    smart contract?

2          MR. MILLSAPS:  Under the smart contract, the creator

3    or the artist retains a right to receive royalties.  So if the

4    artwork is transferred, if it's sold to a new transferee, then

5    the smart contract automatically sends a royalty to the

6    creator.  The creator also retains, for instance, the copyright

7    rights and the artwork that's attached to the NFT, so the

8    copyright is not transferred.

9          THE COURT:  Did I miss something?  I thought that you

10   could change the underlying image.

11         MR. MILLSAPS:  It's technically possible to change the

12   image that the NFT points to, but there's no evidence in the

13   record here that Mr. Rothschild has ever had any intention to

14   change that.

15         THE COURT:  That's a different question, and certainly

16   relevant, but what I'm getting at is under the smart contract

17   he retained the right to change the image.  Yes?

18         MR. MILLSAPS:  He didn't retain the right.  The way

19   that the NFT functions is that it points to something else, and

20   the creator of the NFT determines what it points to when it's

21   created.  And also under the contract --

22         THE COURT:  What it pointed here to was an image of a

23   fur-covered Birkin bag.  Yes?

24         MR. MILLSAPS:  Yes, your Honor.

25         THE COURT:  Does that mean that if tomorrow

MbiWherO

1    Mr. Rothschild said, oh, I'm sick of the Birkin bag and he

2    changed it into an image of Aaron Judge wearing a halo, which

3    is certainly appropriate, that would be totally within his

4    legal rights?

5            MR. MILLSAPS:  That would be within his power.

6    Whether it's within his legal rights might be a question.

7            THE COURT:  Well, under the smart contract, he had the

8    right to do that.  Yes?

9            MR. MILLSAPS:  He has the ability to do it.  It's

10   unclear whether he would have the right to do it because of the

11   way these were originally sold; the way he held it out to the

12   public, someone may be able to argue they believed they were

13   buying this MetaBirkins artwork in particular, and so there was

14   a contract that was formed.  That might be possible.

15           THE COURT:  I'm not sure what you mean by the power

16   but not the right.  Are you saying the smart contract doesn't

17   resolve that?

18           MR. MILLSAPS:  The smart contract, your Honor, is

19   code, essentially.  It's not a human-readable contract

20   necessarily in the way that a written contract would be, and

21   the smart contract, for instance, automatically transfers the

22   royalties when there's a resell.  It functions in certain

23   automatic ways.

24           What I'm saying when I say he has the power to do it

25   is he has the technical ability to do it.

MbiWherO

```
1          THE COURT:  Let's take the royalties.  It's a good

2     example.  Are you saying if someone who purchased an NFT and

3     then resold it somehow could fiddle with the mechanism so that

4     the royalty was not automatically sent to Mr. Rothschild that

5     he could not sue for the royalty?

6          MR. MILLSAPS:  The purpose of the blockchain, your

7     Honor, is to create this in such a way that someone could not

8     fiddle with that.  It's all publicly available.  You're able to

9     publicly monitor it.  It's contained on decentralized servers,

10    and so it doesn't seem possible to me that somebody could

11    tamper with the royalties there in that way.

12         THE COURT:  So if you're purchasing an NFT and the

13    person who purchased it believes they are purchasing thereby

14    access, exclusive access to a particular image of a fur-covered

15    Birkin bag and they have no ability to change any of that other

16    than if they sell the whole NFT, isn't what they're really

17    purchasing something related to the Birkin bag?

18         Maybe I misunderstood the argument you were just about

19    to start to get into when you said two dimensional.  Two

20    dimensional meaning the NFT is two dimensional or two

21    dimensional meaning the image of the Birkin bag is two

22    dimensional, or what?

23         MR. MILLSAPS:  So, the image associated with the NFT

24    is a two-dimensional artwork.  It's just a depiction of an

25    imaginary Birkin bag covered in fur.  The NFT doesn't actually
```

MbiWherO

1    link to a Birkin bag.

2                    THE COURT:  No.  It links to an image.  I understand

3    that.

4                    MR. MILLSAPS:  It links to the artwork.

5                    THE COURT:  But the person who is purchasing it is

6    then purchasing the right, the exclusive right, to the image,

7    right?

8                    MR. MILLSAPS:  It's not an exclusive right to the

9    image, your Honor.  It's ownership of that NFT, that bit of

10   code and the media that's attached to the NFT, so the actual

11   digital file that's attached to the NFT.

12                    THE COURT:  I guess maybe I'm still too ignorant about

13   how all this works.  You're not purchasing the NFT because you

14   want a number; you're purchasing it because you want to have

15   access to the underlying image.  Yes?

16                    MR. MILLSAPS:  Not exactly access to it.  You want to

17   own the underlying image.

18                    THE COURT:  So it's the underlying image that's being

19   sold.

20                    MR. MILLSAPS:  That's right, your Honor.  In this

21   instance, when the NFT is attached to an image, then it would

22   be the image that's being sold.  The NFT has no character on

23   its own because it's just a bit of code.

24                    THE COURT:  That's really what I wanted to understand.

25                    MR. MILLSAPS:  Yes.

MbiWherO

```
1              THE COURT:  OK.  Go ahead.  You can continue.

2              MR. MILLSAPS:  OK.

3              So, it is undisputed that what is attached to the NFTs

4    in this case are flat, two-dimensional digital images that

5    depict imaginary Birkin bags covered in, as Dr. Blake Gopnik

6    put it, goofy, garish fake fur.  In other words, they're

7    plainly expressive works protected by the First Amendment, and

8    the Court was correct to rule at the outset that *Rogers v.*

9    *Grimaldi* applies here.  Based on the undisputed facts, *Rogers*

10   should be the beginning and the end of this case.  Plaintiffs

11   know this, which is why they're now making a new argument, at

12   the eleventh hour, in their summary judgment papers that the

13   NFTs associated with the MetaBirkins artworks are somehow

14   separable from those artworks.

15             THE COURT:  That's why I was asking the questions I

16   was just asking, but go ahead.

17             MR. MILLSAPS:  Thank you, your Honor.

18             But Hermès's own evidence shows that the NFTs at issue

19   here were always associated with the MetaBirkins artworks.

20   Mr. Rothschild previewed MetaBirkins artwork that would be

21   attached to the NFTs for weeks before he -- I'm sorry -- for

22   weeks before the NFTs were minted and sold.  Because of the way

23   that Mr. Rothschild promoted and previewed the MetaBirkins

24   artworks, the MetaBirkins NFT minters knew they would be

25   getting a MetaBirkins artwork; they just didn't know which one
```

MbiWherO

1    until after the minting was completed.

2              THE COURT:  According to what you just said, they knew

3    they would be getting one of these garish --

4              MR. MILLSAPS:  Oh.

5              THE COURT:  Go ahead.  That was just an irrelevant

6    comment.

7              MR. MILLSAPS:  Thank you, your Honor.

8              Moreover, it's undisputed that NFTs are just bits of

9    code on a blockchain, as we just discussed.  They thus have no

10   character of their own but, rather, take on the character of

11   whatever they're associated with.  In this case, the NFTs are

12   associated with expressive works protected by the First

13   Amendment.  Additionally, Dr. Blake Gopnik has explained in

14   unrebutted expert testimony that even the way in which

15   Mr. Rothschild used NFTs in this particular instance was a work

16   of art in the vein of Andy Warhol's business art.

17             THE COURT:  There is at least some evidence, as I

18   recall the briefs, that his main, that he was interested mainly

19   in making a buck.

20             MR. MILLSAPS:  Are your Honor, Hermès submitted a lot

21   of Mr. Rothschild private communications with his business

22   associates and others in which they discussed making money.  As

23   Dr. Gopnik also explained in unrebutted testimony, every artist

24   wants to make money.  Every artist hopes that they're going to

25   become rich.  Most don't become as rich as Damien Hirst or

MbiWherO

Coombs, but most artists aspire to do that, and indeed, most

people are interested in making money at whatever they're

doing.

     THE COURT:  With the obvious exception of federal

judges.

     MR. MILLSAPS:  That is one glaring exception.

     THE COURT:  Go ahead.

     MR. MILLSAPS:  And so Dr. Blake Gopnik, again, it's

interesting because plaintiffs hired three experts in this

case.  They did not hire an art expert, and they knew that this

case turns on this First Amendment issue since before filing

this case.  And so Dr. Gopnik, who is one of the leading art

experts in the country, has unrebutted testimony in this case,

and his unrebutted expert testimony is that Mr. Rothschild's

expressed desire to make money from his artwork says nothing

about whether or not this is artwork.

     THE COURT:  So assuming the jury were to find that his

mental processes were I can fool people into buying my artwork

by making them think that they're buying something from Hermès,

that would still be a problem even if the First Amendment's

involved; yes?

     MR. MILLSAPS:  Your Honor, that's not the test under

*Rogers.*

     Under *Rogers*, the defendant needs to make a threshold

showing that this is art or expressive -- not art but an

MbiWherO

expressive work created, protected by the First Amendment.  And

so the Court should be looking at the work itself to determine

whether, in fact, it is speech or an expressive work protected

by the First Amendment.  Dr. Gopnik --

        THE COURT:  Yes, but if I recall, that's not the end

of the *Rogers test.*

        MR. MILLSAPS:  That's not the end of the *Rogers* test,

your Honor.

        Then, once that threshold showing is made, then the

plaintiffs must show two things.  The plaintiffs bear the

burden of proving, first, that the use of the mark is not

artistically relevant -- so in this case that MetaBirkins, the

title, is not artistically relevant -- to the artwork; and

secondly, that -- either one, of course, is sufficient, either

that or that the mark was used in an explicitly misleading way,

that explicitly misled -- in connection with the artwork,

explicitly misled people as to the source of the content.

        And so in this case, there is no evidence in the

record that MetaBirkins is not artwork.  There is only

undisputed evidence in the record both from Mr. Rothschild's

own testimony, from the testimony of his associates who were

working with him and from the unrebutted expert testimony of

Dr. Blake Gopnik recognizing the MetaBirkins image as artwork,

and Dr.Blake Gopnik goes even further, because your Honor got

this right in your opinion on the motion to dismiss in

MbiWherO

1    recognizing --

2              Sorry.  What was that?

3              THE COURT:  I must have been lucky that day.  Go

4    ahead.

5              MR. MILLSAPS:  It was when your Honor recognized that

6    these images are two-dimensional artworks, they're

7    representations or depictions of imaginary Birkin bags, they're

8    art on that level, but Dr. Blake Gopnik goes further and

9    says -- it was Dr. Blake Gopnik, by the way, who published the

10   definitive biography of Andy Warhol in 2020, nearly a thousand

11   pages.  And Dr. Blake Gopnik says not only is that obviously

12   creative expression, the images attached to the NFTs, but the

13   way that Mr. Rothschild used NFTs in this particular instance

14   to sell those images, the way those NFTs now exist in the

15   world, the way they move in the world is itself business art in

16   the vein of Andy Warhol and other artists who have engaged with

17   commerce throughout the ages, from Duchamp to Warhol to others

18   that Dr. Gopnik has discussed.  And so MetaBirkins here are

19   functioning as art on multiple levels, one of which is the fact

20   that they are essentially paintings of depictions -- they're

21   essentially digital paintings of fanciful, goofy fur-covered

22   Birkin bags, but also the way that Mr. Rothschild put them into

23   the world and used NFTs in this instance, Dr. Gopnik has

24   recognized as actually a brilliant form of business art, and

25   there's nothing in the record to rebut that.

MbiWherO

```
1        THE COURT:  All right.  I'm going to interrupt you at

2   this point and hear from your adversary.  We'll come back to

3   you shortly.

4        MR. WARSHAVSKY:  Good afternoon, your Honor.

5        I don't know if there's anything you want me to

6   address or if I could just go to some of the statements by my

7   colleague.

8        THE COURT:  Well, he's saying that, even though it

9   makes use of the Birkin bag image and name, it has been

10  transformed into something that is of artistic expression and,

11  therefore, is protected under the First Amendment except in

12  very narrow circumstances.  What do you say to all that?

13       MR. WARSHAVSKY:  Well, I don't know that it's that

14  narrow, your Honor, and your Honor, you addressed this, the

15  Rogers test itself.  Sorry.  I can't remember.  I think it's

16  footnote 3 in denying the defendant's motion for an

17  interlocutory appeal, you pointed out that there are three

18  questions.  The first is whether or not it's an expressive

19  work, and let's say they're correct on that.  But then there's

20  two more questions, and I'm going to read from it -- I

21  apologize -- just so I get it right.

22       The second question is whether the use of the

23  trademark bears any, quote, artistic relevance to the

24  underlying work.  That's the second question, and the third is

25  even if so, if it is artistically relevant, whether the work is
```

MbiWherO

```
 1   entitled to protection if it's explicitly misleading as to its
 2   source or content.  And so I think I would go to the second and
 3   third of those tests, because that's what we discussed on the
 4   motion to dismiss, and I think the evidence is overwhelming on
 5   that.
 6            THE COURT:  Let me just make sure I understand that.
 7   Are you then conceding that for purposes of summary judgment
 8   your adversary satisfies the first prong?
 9            MR. WARSHAVSKY:  No.
10            THE COURT:  Why not?
11            MR. WARSHAVSKY:  Well, because, your Honor, it's a mix
12   of utility -- when we talk about an NFT, it's a mix of utility
13   and something else.  I think it was your first question, or one
14   of your first questions, when you asked about replacement of
15   the image.  The term MetaBirkin -- and I can get to if we
16   discuss the history, but the term MetaBirkin was used to label
17   the code prior to an association with any image.  It's being
18   used as a brand name, and the code are tokens.  And you know
19   what?  NFTs, I think we all still struggle a little bit to give
20   a real-world analogue, but it's a collectible, kind of like you
21   brought up Aaron Judge, so I was thinking about baseball cards
22   when you brought that up.  It's kind of like a baseball card.
23   I collected baseball cards as a kid and you had the cards, but
24   we also had something that went along with the cards, so we
25   could display our cards.
```

MbiWherO

1      THE COURT:  What went along with them, as I recall,

2    was bubble gum.

3      MR. WARSHAVSKY:  Well, you could have bubble gum.  I

4    was thinking about my collection.  I didn't mean as a purchase.

5    But I had a display, clear display where I could put the cards

6    and put them in a leaflet.  There were also little frames that

7    I could put those cards in.  The NFT is like those frames or

8    the clear plastic sheets that you could put a card in.  And

9    then it has the card as well.  In this case, I was a little

10   surprised by my colleague's answer.  The image could be changed

11   at any time, and in fact, when these images were originally

12   minted and sold, it was a shrouded object.  That was all that

13   was attached and it pointed to it, but at any given time that

14   image could change.

15      What has the name MetaBirkins is the token, so the

16   frame.  And I would point to undisputed fact -- I might not

17   have brought it up with me -- I think it was 56, where we say

18   that Mr. Rothschild has changed the image and he could change

19   it at any time he wants to.  So it's not just the name for that

20   little picture; it's also the name for the NFT, the utility

21   itself.

22      But in addition to that, what we argue is that the

23   term MetaBirkins is used as a brand.  It's not just used as a

24   name for an artwork.  It's used as a name for a brand, and I

25   can go through -- part of that then bleeds into the second

MbiWherO

part, the second step here, the adoption and the explicit
misleadingness.  But I would start by saying I recognize that
perhaps those little images might qualify as works of art.  I
think if Dr. Gopnik testified to ultimate facts for the jury, I
don't think that's appropriate.  Dr. Gopnik also said causing
confusion also is art and that running a restaurant is art and
a business contract is art.  So the fact that he says NFTs are
art doesn't come as much of a shock.  I just don't think it's
very persuasive.

He does say it, but it is rebutted.  There was no
rebuttal, of course, because Dr. Gopnik's report was submitted
as a rebuttal report.  But we've submitted plenty of evidence
calling into question much of Dr. Gopnik's opinions and
testimony, but I don't know that that gets us very far, because
there are still the second and third elements of *Rogers*, which
I'm happy to get into.  Or I can pull back.  Which?

THE COURT:  No.  I have some more questions about your
first item, but I think we should move to the other two, and
we'll come back.

MR. WARSHAVSKY:  OK.

Your Honor, I think I would want, and it's going to be
a bit long, but I'd like to address the second element, really,
which is the artistic relevance, and that's where I think we
have several facts which I'd like to get to.  And I think to do
that, I think we pull back a little bit, because I think we

MbiWherO

1   have to look at who the defendant is and his intent through it.

2   Yes, you said we accused him of wanting to make a buck, and we

3   did.  But we accused him of more than that.

4        THE COURT:  His own words were make a bag, but as I

5   understand it, that's slang for make a lot of money.

6        MR. WARSHAVSKY:  He said plenty, and I'll get to some

7   of that, if you like.  But if we even take a step back, what is

8   Mr. Rothschild, when he testifies that he's an artist?  Because

9   that's what counsel spoke about.  And there, I point to exhibit

10  117, and if you'd like, I'd be happy to give a copy to you and

11  to counsel.  It's in our papers.  But Mr. Rothschild's first

12  foray into art was taking a Champion T-shirt and printing the

13  names of colleges, including Parsons.  And he got a cease and

14  desist letter from Parsons.  In his mind, though, that was art.

15  I would say that's pure infringing.  I would say that's no

16  different than anything a few blocks from here where people

17  sell Rolexes or other fake goods.  He says it's art.  Maybe

18  there is some creativity.  Maybe it requires some skill.

19        THE COURT:  The images are not identical to anything

20  that Hermès produces or sells.  They're covered with this fur.

21        MR. WARSHAVSKY:  OK.  You're a step ahead of where I

22  was going to, but I'm happy to get there.

23        THE COURT:  Whatever you prefer.

24        MR. WARSHAVSKY:  Well, again, we're accusing the whole

25  brand, and I want to make sure that that's not confused.  I

MbiWherO

1    know the defendant would like it if we sued for a picture.

2    We're not.  We're suing for the use of the name MetaBirkins,

3    and I think in that regard, I want to start, perhaps, with

4    Mr. Rothschild's statements themselves.  Right?

5            When he commenced this project, what did he call it?

6    He called it Birkin.  Right?  And there is, he first told a

7    friend and it's paragraph 197.  It's an undisputed fact.  He

8    first told his friend he expected to take a nice 16- to 17,000

9    off of the Birkins, period.  Right?  To entice the designer,

10   the person that actually created these images, to generate

11   these images, he said he had an offer of 36,000 for 50 bags but

12   he thought he could get it to a hundred thousand for a hundred

13   of them, and he doesn't dispute that.  He says he wanted to

14   print money.  But then --

15           THE COURT:  Maybe I'm not totally following your

16   point.  The reason a purchaser would purchase one of these NFTs

17   was not so they could own the brand.  It was so they could own

18   the underlying image.

19           MR. WARSHAVSKY:  Actually, that's not even clear from

20   the evidence we submitted, your Honor.  You could see that some

21   people actually thought and wrote on social media they thought

22   they were getting a bag as well, thought they were getting a

23   real live bag.

24           THE COURT:  All right, but they certainly didn't think

25   they were just getting the words MetaBirkins.  That wasn't what

MbiWherO

```
1   they did purchase.

2           MR. WARSHAVSKY:  No.  They were purchasing something

3   from a brand.  Birkin is -- and I realize I'm hopscotching

4   around a little bit, because I have when I deal with this, but

5   Birkin is one of the best known trademarks there is.  Right?

6           THE COURT:  I gather that.  I have no expertise, but

7   it is true that my wife told me that she was very disappointed

8   that some of the bags had not been marked as exhibits in this

9   case.

10          MR. WARSHAVSKY:  I'm not going to touch that, your

11  Honor.  But I think the evidence is clear that there was over

12  $300 million in advertising over the last decade.  The name has

13  been in exclusive use by Hermès for the last 30 years.  Sales

14  each year over the last ten years have been at least a hundred

15  million in the U.S. alone, and there's unsolicited media

16  coverage.  Whether you look at Page Six or television shows,

17  the Birkin is the most iconic -- and you don't have to take my

18  word for it; you could take Mr. Rothschild's word that there

19  was nothing more iconic than the Birkin bag; it was the holy

20  grail of the internet.

21          So Birkin is a brand.  So when we talk about what

22  people thought they were getting, our complaint wasn't about

23  what people necessarily thought they were getting, whether it

24  was code or it was a picture or something.  It was that they

25  thought it was from Hermès.  That's why this is a trademark
```

MbiWherO

1   suit.  Right?  And it's about using it and creating a brand

2   around Birkin.  And I want to start with what Mr. Rothschild

3   said.

4              THE COURT:  On that theory, as I understand it, both

5   from what you're saying now and from your brief, I don't even

6   have to reach the artistic expression issue, right, if you're

7   right about that?

8              MR. WARSHAVSKY:  Well, if I'm right about that, I

9   think that's correct.  But I think we can still hit those

10  points, because I think the second and third points of *Rogers*

11  still bend heavily our way.

12             THE COURT:  All right.

13             MR. WARSHAVSKY:  And where I would start, again, using

14  Mr. Rothschild's own words, in paragraph 176 of the undisputed

15  facts, Mr. Rothschild is telling two potential investors I

16  don't think people realize how much you can get away with in

17  art by saying in the style of.  He's suggesting he can get away

18  with something.  And as your Honor knows from the motion to

19  dismiss and our submissions, even after this whole thing

20  started, he kept saying he was inspired by Hermès, that it was

21  a tribute to Hermès.  But I would submit it was much more than

22  just an inspiration or inspired by.

23             We have Mr. Rothschild, when he starts the project,

24  referring to it as Birkins.  On October 19, 2021, he told

25  Mr. Burden, the person that created these designs, that, quote,

MbiWherO

1    he might get some help from Hermès themselves.  That's at

2    paragraph 172, undisputed.

3              On October 24, 2021, Mr. Rothschild told his business

4    partner, Eric Ramirez, that he was negotiating with Hermès

5    right now.  That's paragraph 173, undisputed.

6              On October 28, 2021, he told his friend, Aaron

7    Maretzki, that he was doing a new set of Birkin NFTs and

8    pushing to make it official with Hermès.  Paragraph 174, all

9    undisputed.

10             He was telling everybody what?  That he was going to

11   be doing something with Hermès and he was doing a Birkin

12   project.  Nothing about inspiration, knowing about art.  He was

13   looking to make money.  He was looking to make Birkin NFTs.

14             In opposing summary judgment now, for the very first

15   time, Mr. Rothschild says he was talking to a previously

16   undisclosed CEO who was going to help him reach out to Hermès

17   and this was just puffery.  We still don't know the name of

18   this mystery person.  It wasn't identified in initial

19   disclosures.

20             THE COURT:  Yes, but I'm not totally sure what that

21   proves in terms of any of the real issues.  If I understand

22   your argument, Mr. Rothschild develops these images of

23   fur-covered Birkin bags and he believes that he can get Hermès

24   to join with him in the sale because the NFT market is hot, or

25   whatever, and they say no, not interested, or maybe say we want

MbiWherO

1    to do our own, and so he goes ahead and markets his own.  If,

2    in fact, the issue is whether the underlying images have

3    artistic expression, why does that history matter?

4         MR. WARSHAVSKY:  Because of the second prong, your

5    Honor.  Again, in denying the motion to dismiss, your Honor

6    explained the artistic relevance inquiry, and I'm going to

7    quote from your opinion:  "The artistic relevance prong ensures

8    that the defendant intended an artistic -- *i.e.*,

9    noncommercial -- association with the plaintiff's mark as

10   opposed to one in which the defendant intends to associate with

11   a mark, to exploit the mark's popularity and goodwill."  And I

12   would submit, your Honor, that in that question you just asked

13   me, you're already assuming that he's looking at it as a

14   business venture to trade off on an iconic mark.  And the

15   problem is we're also assuming that he was having those

16   negotiations with Hermès.  I would suggest to you he never did.

17   This was an individual who hasn't been identified to your Honor

18   or us or anybody else and is in, at the same time -- well,

19   let's take a step back.

20        Why would Mr. Rothschild suggest he was having a

21   discussion with Hermès if he wasn't?  It is obviously because

22   he knows that the word Birkin is associated with Hermès, as

23   everybody knows.  He is using their trademark.  At that time he

24   just says Birkin and at that time he's talking to -- one of the

25   quotes I gave to you, he was talking to the designer.  So he

MbiWherO

didn't have a product to go give.  He wanted to make something
that looked like a Birkin, and I'll get to it in a moment,
but -- well, I may as well say it here.

       To make the product, what did he give the designer,
the person that created these images?  He gave a schematic of
Hermès's Birkin bag.  That's a schematic.  The Birkin bag is
not -- sorry.  I'm stumbling over my words a bit.  The name
Birkin isn't the only intellectual property of Hermès that's
protected here.  The Birkin bag shape, its trade dress, is also
federally registered and incontestable, and he turned and gave
that to his designer while suggesting that he might be doing
something with Hermès.

       Now, if Mr. Rothschild's statement is to be believed,
that he was actually having these discussions with this mystery
CEO who worked at a fashion house, what would that -- and
again, I don't know if it happened, but anybody who is a CEO of
a fashion house knows that the only thing a fashion house
really has is its intellectual property.  And if this mystery
CEO was really negotiating on Mr. Rothschild's behalf, the
first thing this mystery CEO would say is you'd better get a
license before you use Birkin, because that's what any fashion
house would say.  This court is flooded with those kinds of
lawsuits.  I'm sure you know them better than I do.

       But second, let's say Mr. Rothschild and the mystery
CEO were negotiating with Hermès and that leads into the

MbiWherO

question you asked me earlier.  If they were trying to have

that discussion, it shows that they understand one of two

things: either that Hermès wouldn't want this to be -- you

know, would require a license or wouldn't want somebody trading

with their Birkin name; or that he was looking for a commercial

project, that he was looking at this as commercial.  He was

adopting it for commercial, again, going to that second prong,

using it in a noncommercial way.  That's the only reason to

reach out to Hermès.

And I think we then have to go to some of the other --

we don't have to speculate on some of this.  I mean even though

we don't know the mystery CEO, we don't have to speculate,

because a few weeks later, on November 12, 2021, an

acquaintance asked Mr. Rothschild whether there would

potentially be any legal issues with doing his Birkin NFT.

Again, that was still what it was called, Birkin NFT.  And

Mr. Rothschild responded that "a cease and desist would help,

TBH LOL" -- TBH, meaning to be honest; LOL, laugh out loud.  So

we know that at least as of November 12, 2021, a few weeks

before minting, Mr. Rothschild was already talking about the

fact and joking with friends that Hermès was going to be

unhappy and he might get a cease and desist.

And then on December 1, 2021, about three weeks later,

the day before the MetaBirkins were minted, Mr. Rothschild

wrote in a text to colleagues, we need to make a push for a

MbiWherO

1    push with Hermès.  That's paragraph 175 of the undisputed

2    facts.  And in that same text, Mr. Rothschild didn't refer to

3    the mystery CEO.  At that point he said he had a connection

4    with someone at Vogue, who had a direct line to Hermès.  And

5    like the mystery CEO, we don't know who it was, never

6    identified in this case, but we'll leave that for the moment.

7          Three days later, December 4, the day after the

8    MetaBirkins are finished printing, Mr. Rothschild wrote a text

9    to Truman Sacks and Allan Sacks, potential investors, that he

10    was trying to negotiate with Hermès through Sotheby's.  That's

11    at paragraph 177, undisputed.  Again, like the mystery CEO,

12    like the person at Vogue, we don't know who any of these people

13    are.

14          So we have a few options here.  In our papers we show

15    that Mr. Rothschild has a habit --

16          THE COURT:  All of this goes to what was in his mind,

17    his intent, which, as you say, is one of the prongs.

18    Classically that has not been something that can be resolved on

19    summary judgment.  If I recall correctly, in this very case,

20    even before he got a cease and desist letter, he put on the

21    website we're not related to Hermès, or something to that

22    effect, and when there were articles in that well-known source

23    of fashion expertise, The New York Post, suggesting that there

24    was a relationship with Hermès, he had contacted them and

25    various magazines to say no, it's not.  So why isn't this a

MbiWherO

```
1     jury question, the question of what was in his mind?

2               MR. WARSHAVSKY:  All of what you've alluded to, those

3     facts are all post-sale.  The disclaimer is post-sale.  And I'm

4     sorry.  I might have to ask one of my colleagues or -- I

5     thought that the disclaimer is post-cease and desist letter.

6               THE COURT:  Maybe.  I could be wrong.

7               MR. WARSHAVSKY:  And post-sale, so if he knew he was

8     going to get the cease and desist --

9               THE COURT:  Let's assume it was afterwards -- and I

10    don't actually recall one way or the other -- you would say oh,

11    this was just covering up afterwards because he got this letter

12    and he had to worry about action might be taken.  But he might

13    argue, no, that that was is perfectly sincere and I was so glad

14    to reach out to the Post and to the various magazines to make

15    sure they understood that they got it wrong, why isn't that,

16    again, a classic jury question?

17              MR. WARSHAVSKY:  Well, I think, your Honor, I go back

18    to what the second prong looks at, which is was his adoption of

19    the name for noncommercial reasons?  And I think all the

20    objective manifestations of that subjective intent showed that

21    this was about making money and trading off on Hermès's

22    goodwill.  Right?  So we see what he says at the time.  Could

23    he now testify to contradict that?  Perhaps.  But what he's

24    really shrouded himself in is that it's not a brand and that

25    he's an artist.  Right?
```

MbiWherO

1          THE COURT:  It's not a question of what he would

2    testify to now, because I have to take the record as it is

3    before me, but I do have to, on your motion, take every

4    reasonable inference in his favor, and vice versa on their

5    motion.

6          MR. WARSHAVSKY:  Right.

7          THE COURT:  So my question is, isn't it a reasonable

8    inference that the lengths he went to to disassociate himself

9    from Hermès show that he did not have the particular motivation

10   that you're ascribing to him?

11         MR. WARSHAVSKY:  No, because he did it post-sale.

12   Right?  This test talks about the adoption and even the

13   *Polaroid* factor talks about the adoption.  And at the time he

14   was adopting the mark, he was trading -- we have text after

15   text of him trying to trade off on that Birkin name.  Right?

16   The fact that post-sale, after he made his money and got a

17   cease and desist letter from Hermès, he tried to correct, after

18   collecting, that's not -- the test isn't is he a good or bad

19   guy for all time?  The test is when he adopted the mark, was he

20   trying to trade off on Hermès's goodwill?

21         And here, I think all the evidence points in one

22   direction.  In fact, if you read through Dr. Gopnik's report,

23   which, again, I think, is rife with problems, and I think we

24   point that out, Dr. Gopnik almost suggests that Mr. Rothschild

25   has to create that image.  Right?  And I think that

MbiWherO

1    Mr. Rothschild, in discussing, I think if we look at his acts,

2    what good faith basis is there for taking a federally

3    registered trade dress and taking the schematic of a Birkin bag

4    and saying, to make a design based on it and then calling it a

5    Birkin?  And then he teases it, you know, and let's talk about

6    this brand name for a minute.

7          This brand name, MetaBirkins -- he was calling it

8    Birkin for a while.  We have produced here, your Honor, in

9    there, when he posts, when he teased one image and said he's

10   creating one-of-a-kind Birkins for a sale, there's no question

11   that that's Hermès's mark and uses Hermès's design to make it

12   look like Hermès -- an Hermès Birkin bag I mean -- and he

13   teased it and said, whoever comes up with the best name, I'll

14   give a free NFT.  One submission said MetaBirkin.  Another said

15   Not Your Mom's Birkin.

16         Now, he said at his deposition that he used both of

17   those.  Right?  He used both MetaBirkins, from one submission,

18   and he used Not Your Mother's.  He didn't use Not Your Mom's;

19   he used Not Your Mother's.  In his deposition, Mr. Rothschild

20   said, oh, but I came up with that ahead of time.  So if we're

21   to believe Mr. Rothschild's testimony that he came up with

22   MetaBirkins ahead of time, then it means that he teased it as a

23   Birkin and called it a Birkin and teased it that way to gain

24   interest.  Right?

25         If we don't believe Mr. Rothschild's testimony -- and

MbiWherO

1    in fact, this woman who first -- I think it's a woman -- who

2    came up with the MetaBirkin name, actually came up with it,

3    then Mr. Rothschild didn't even pick the name himself.  Right?

4    So it has nothing to do with -- it was somebody else who came

5    up with it.  So I would suggest, your Honor, that all the

6    evidence here, regardless of which way -- you know, Mr.

7    Rothschild -- a lot of his testimony is to contradict his

8    documents at the time.  Right?  And he comes up to try and

9    weave it together.  But what I suggest to you is either way

10   they have it, Mr. Rothschild was trying to profit off of the

11   Birkin name and the Birkin image.  And we know that not just

12   from the statements that I was reading to you -- and we have

13   more -- but we know it from his interviews, his interviews

14   post-printing when he knew there might be an issue, his

15   interview with Yahoo Finance, when he says there's nothing more

16   iconic than a Birkin bag and he's trying to create the same

17   thing.

18          More important, in both the Yahoo Finance article and

19   in the Financial Times article, what does Mr. Rothschild say?

20   He says people are now trying to counterfeit his MetaBirkins.

21   Right?  That's what he says.  People are out there

22   counterfeiting his MetaBirkins, and they were doing it right

23   around the same time.

24          Now, we asked for evidence of that.  We have not seen

25   it.  We showed the Financial Times and asked for evidence of

MbiWherO

1    it.  We haven't seen it.  We believe Mr. Rothschild was doing

2    it to burnish his own credibility, but even if he was telling

3    the truth, he was talking to the press as though MetaBirkins

4    was a brand.  And if he was telling the truth, then he was

5    upset that he was being counterfeited.  How could he be

6    counterfeited unless MetaBirkins was a brand and he was using

7    it as a brand?

8             And so I think we can look at all those pieces of

9    evidence.  And again, the intent is not whether he's bad or

10   good.  The intent is whether it was a noncommercial purpose,

11   and I think, here, that's unequivocal.  I don't think there's

12   any way for them to escape it.

13            THE COURT:  All right.

14            MR. WARSHAVSKY:  I'm happy to go also to the third

15   factor.

16            THE COURT:  Yes, you're on a roll.  Go ahead.

17            MR. WARSHAVSKY:  I wouldn't go that far, but OK.

18            The third factor, your Honor, then leads into explicit

19   misleadingness, and I think we can show quite a bit.  I think

20   we've already established some, I think it's through the

21   papers, but it points back to the *Polaroid* factors, and your

22   Honor, in denying the motion to dismiss and denying defendant's

23   motion for an interlocutory appeal, you cite that.  You cite

24   the *Twin Peaks* case, and I read the *Twin Peaks* case this

25   morning, and I'd like to -- because I know the defendants say

MbiWherO

```
1    we shouldn't look to the Polaroid factors.  But I thought, your
2    Honor, when you, I can't remember if it was in denying the
3    motion.  It was in one of your two decisions in this case.  You
4    said Twin Peaks emphasizes that the relevant question is
5    whether the defendant's use of the mark is misleading in the
6    sense that it induces members of the public to believe the
7    allegedly infringing use was prepared or otherwise authorized
8    by plaintiff.  Under the Rogers balancing test, the Court
9    should consider the Polaroid factors to determine whether the
10   likelihood of confusion analysis is sufficiently compelling to
11   outweigh the public interest in free expression.  And I'd like
12   to first turn to the Twin Peaks case, because I think it's a
13   helpful case to think about.
14        The Twin Peaks case, there was a famous TV show, if
15   you remember, from the late '80s or early '90s called Twin
16   Peaks, and there was a book that came out.  It was a 128-page
17   book called Welcome to Twin Peaks.  Judge Martin issued a
18   ruling, finding copyright infringement and trademark
19   infringement.  The Second Circuit vacated the trademark
20   infringement because Judge Martin, among other things, didn't
21   go through the Polaroid factors.
22        But what the Second Circuit looked at instead of just
23   saying, well, Rogers makes this an expressive work, discussed
24   the work a little bit.  It was 128-page book with seven
25   chapters about the TV show.  The first chapter was about the
```

MbiWherO

popularity of the show.  The second was about the characters of
the show; the third, the photos -- the plots from episodes and
commentary; the fourth and fifth were about David Lynch and
Mark Frost and the setting.  The sixth chapter was about the
music from the show.  The last chapter was about trivia.  Both
the front and back of the book had disclaimers, by Penguin
Publishing, a notable publisher.  And the Second Circuit
remanded.  I'm just going to read what the Second Circuit said
when it remanded.

It said:  "The special consideration bearing on the
book's title concerns the wording and appearance of the title.
The title not only uses the name Twin Peaks but precedes the
name with the phrase 'welcome to.'  The title thus copies a
legend that appears on a roadside sign in the introduction
sequence of each televised episode.  Moreover, the book title
is presented against the backdrop that appears to be a wooden
slab, apparently an attempt to evoke the wooden roadside sign.
It's a fair question whether a title that might otherwise be
permissible under *Rogers* violates the Lanham Act when displayed
in a manner that conjures up a visual image prominently
associated with the work bearing a mark that was copied."

Right?  Here, we say they don't even get to the third
prong.  But if they do, it is beyond ken that Mr. Rothschild
used the MetaBirkin name next to an image that was meant to be
a Birkin bag, and it was copied from a Birkin bag, and he

MbiWherO

| | |
|---|---|
| 1 | admitted he tried to recreate it and he admitted that he tried |
| 2 | to make something that looked like it, and he succeeded.  And |
| 3 | not just The New York Post, which far be it for me to defend |
| 4 | The New York Post -- |
| 5 | THE COURT:  I'm not critical of the New York Post. |
| 6 | MR. WARSHAVSKY:  I like the sports section. |
| 7 | THE COURT:  I think anyone who reads The New York |
| 8 | Times and The Wall Street Journal ought to temper that by |
| 9 | reading The New York Post. |
| 10 | MR. WARSHAVSKY:  Certainly the sports section. |
| 11 | THE COURT: For sure. |
| 12 | MR. WARSHAVSKY:  But it was also Elle magazine.  It |
| 13 | was French -- there was an intellectual property attorney.  You |
| 14 | might not think much of us, but intellectual property attorneys |
| 15 | were confused.  Individuals were confused.  Everybody saw it |
| 16 | this way.  And then if you read Dr. Gopnik's report, he even |
| 17 | suggests that this is part of the goal. |
| 18 | And my colleague just handed me -- the disclaimer was |
| 19 | post sale, post cease and desist and only on a website that |
| 20 | didn't facilitate the sales.  And Rothschild admits that in his |
| 21 | undisputed facts, paragraph No. 27, just to go back to that. |
| 22 | But going back to *Twin Peaks* and analogizing it here, |
| 23 | your Honor, here, we know why the name was chosen.  Here, it's |
| 24 | not a book.  It's something that's meant to emulate the Birkin |
| 25 | bag, and it's sold right next to it.  So I don't think |

MbiWherO

1  Mr. Rothschild can escape that.

2          Then the third element, of course, goes to the

3  well-known *Polaroid* factors, and I don't think that for the

4  most part the defendants disagree with some of those.  And

5  those are -- I just want to make sure I get them right here.

6  Sorry, your Honor.

7          The strength of the Birkin mark, that's admitted.

8          The similarity of the marks, your Honor can look.  One

9  is Birkin.  One is MetaBirkins.  We've cited in the brief to

10  Prof. McCarthy's treatise, adding a descriptive term or a

11  generic term to an existing trademark doesn't move you away

12  from similarity.

13          Similarity of the products or services, I might put a

14  pin in that for a moment.

15          Likely -- well, similarity of the products and

16  services and the likelihood that the senior user will bridge

17  the gap, I'd like to talk about those two together, because

18  it's very hard in a nascent industry like the metaverse and

19  NFTs to really describe how close the goods are.  We have

20  quoted testimony here from -- not testimony.  I'm sorry.  We've

21  quoted texts from Mr. Rothschild to business partners, and he

22  said the MetaBirkin images are fully metaverse ready and

23  totally 3D.  The software used to create those images was

24  Houdini.  In their current form, they're definitely two

25  dimensional, as Mr. Millsaps stated.  However, I would submit

MbiWherO

1    that in that text chain and even in disputing the -- well, in

2    his response, the undisputed facts, Mr. Rothschild says, well,

3    they would look clunky.  That doesn't mean they're not

4    metaverse ready.  They are.  Is a virtual handbag or a picture

5    of a handbag the same as a real handbag?  I think that's a

6    tough question in the nascent industry, but I think the next

7    factor, the likelihood of bridging the gap makes it a nonissue.

8         Mr. Rothschild testified and a few of the experts said

9    all fashion brands are going into the metaverse -- Gucci,

10   Chanel, Adidas, Nike, Mr. Rothschild.  Hermès itself has been

11   working on NFT projects, not necessarily the same one, but

12   certainly to -- actually realized one such product.  It was

13   more of a gated, ticket event of the type Mr. Millsaps was

14   referring to, but it was already in that space and all the

15   brands are going.  So the likelihood, No. 4, if we look at

16   three and four together, then I think it's clear that those

17   both weigh in Hermès's favor.

18        And I think if we go back to the similarity of uses,

19   there is testimony about wearability.  I think both parties

20   went down that road a little bit based on, I think it's

21   footnote 3 in your Honor's motion to dismiss, where you say,

22   well, if it's wearable, that may change the analysis.  What I

23   would submit, your Honor, is if it's useable it should change

24   the analysis.

25        Mr. Martin, Hermès's 30(b)(6) witness, explained that

MbiWherO

an Hermès bag, when you have a Birkin bag, it's not just

putting it on your shoulder.  You're making a statement when

you put it, for example, on a table in front of you, like any

other luxury item, when you put it as your picture in your

Twitter profile or your Facebook profile or whatever you may

use.  And in that sense the MetaBirkin is used the same way.

And so he looks at them as being similar already.

        THE COURT:  I'm not totally sure I follow all this,

but I admit that my knowledge of the metaverse is limited.  I

don't understand, for example, how you could ever, in any way

consistent with the English language, wear a MetaBirkin or

carry a MetaBirkin.

        MR. WARSHAVSKY:  Well, I think that's why --

        THE COURT:  Now, if you're telling me that what has

developed, and maybe it has, is something so far removed from

reality that it carries out imaginary actions and they are

somehow to be equated with real actions, OK.  I'll have to

remember that when I write my next opinion.  I won't send it to

the Second Circuit.  I'll send it to the metaverse.  But I

understand that people do buy NFTs, apparently a lot of people

buy them.  I hope they're not using cryptocurrency.  But it has

a, if you will, value, an economic and mental value.  But it's

not like they think they're buying a physical bag.  There's

still that difference.

        MR. WARSHAVSKY:  That's right, and I don't think --

MbiWherO

```
1     there were user comments that we submitted to your Honor where

2     they thought they were also getting in addition a bag.  They

3     thought it came as part of a bag, because other brands do that.

4     And in fact, Mr. Rothschild's now manager, when he was first

5     talking to Mr. Rothschild -- again, we cite it in the papers --

6     Mr. Rothschild's manager thought that if you bought -- well, he

7     asked Mr. Rothschild when I buy this, do I also get the bag?

8               Mr. Rothschild's response is telling.

9               THE COURT:  That was really part of your evidence on

10     the confusion element.

11              MR. WARSHAVSKY:  Yes.

12              THE COURT:  Not on what we're discussing now.

13              MR. WARSHAVSKY:  No, not on usability.  Yeah, and I

14     think you've heard me struggle with trying to say how similar

15     are the goods.  Right?  I think it's very hard to talk about

16     virtual goods and real-world goods and compare them and talk

17     about similarity, and that's why I was combining that with the

18     likelihood, the fourth *Polaroid* factor, which is whether the

19     senior user is likely to bridge the gap.  Right?  And in that

20     sense, I think even the statements of defendant's experts

21     support that.  But you could take Mr. Rothschild's testimony,

22     you could take other testimony, which says that brands have

23     already entered the metaverse and they have created NFTs.

24     There are NFT projects by all the big brands.  They do try to

25     push out into virtual reality, sometimes they're spectacular
```

MbiWherO

1   failures, and they do use NFTs.

2           So that's why we look at similarity of the products

3   and services and bridging the gap together, because I think

4   that those two -- in some cases they don't necessarily go

5   together, but I think here they do because the virtual reality

6   or the metaverse or NFT representations are meant to emulate

7   the real-world product.  Right?  If you're going to have a bag

8   as your display, it's meant to look like a real bag.  Right?

9   Now, of course, you're not going to put your keys -- I mean

10  it's virtual.  You're not going to put your keys in it.  You're

11  not going to put your wallet.  You're not going to put your

12  brief.  You can't.

13          However, we did submit, just for thoroughness, we did

14  submit a video of somebody who -- I don't think it's still

15  there, do you -- of somebody actually creating TikToks showing

16  what they're putting in and taking out of their MetaBirkin,

17  much the way they would a Birkin, and they took out a bottle of

18  vodka and a book, things like that.  So that's why I'm

19  combining those two together.

20          THE COURT:  More like 64 home runs on the metaverse.

21          MR. WARSHAVSKY:  Right now, I think there's 63.

22          Mr. Rothschild's intent, the fifth factor, I think

23  we've discussed that.  I don't think you want to hear more of

24  that.

25          Evidence of actual confusion, again, I think you're

MbiWherO

1    well aware of.  You cited the article, but there were articles.

2    There was confusion.  We also submitted a survey which goes to

3    the overall likelihood of confusion.

4            THE COURT:  If I recall, now I have to refresh my own

5    recollection here, but your survey showed that, the survey was

6    administered to those who were likely to purchase NFTs for

7    digital artwork, fashion apparel or fashion accessories, and

8    confusion among that audience was 18.7 percent.  But, among

9    purchasers or potential purchasers of luxury handbags, the net

10   confusion level is only 3.6 percent.  So I'm not totally sure

11   what you're asking me to infer from that survey.

12           MR. WARSHAVSKY:  A higher number.  You know, this

13   is -- we're looking at how the potential purchasers of NFTs

14   were confused.  We've shown that, and I think the net confusion

15   analysis, you know, we're looking at that, new markets.  It's a

16   nascent market, and that gets into the seventh and eighth

17   factors, which I was going to get to.  But those are the

18   consumers.  I don't know that people who are buying Birkin bags

19   are always buying NFTs.  I think it's probably a smaller

20   percentage.  So we looked at those and tried to emulate the

21   circumstances under which --

22           THE COURT:  Your boss has a note for you.

23           MR. WARSHAVSKY:  OK.  Thank you, because this really

24   was helpful.

25           I think that the handbag was not relevant because the

MbiWherO

1  survey was forward looking and based on Hermès's claim, and

2  therefore, you look to the junior user's -- meaning

3  Mr. Rothschild's -- use of the mark.  And I think that's in our

4  reply papers.

5          THE COURT:  OK.

6          MR. WARSHAVSKY:  But I must admit I had my notes on

7  it, but we were looking forward.

8          Should I just get to the seventh and eighth factors?

9          THE COURT:  Yes.  Go ahead.

10          MR. WARSHAVSKY:  OK, the seventh and eighth factors.

11          THE COURT:  I do want to hear from your adversary.

12          MR. WARSHAVSKY:  I know, and he's typing away.  I know

13  he has a lot to say.

14          The seventh and eighth factors are the sophistication

15  of the purchasers and the quality of the defendant's goods.

16          When it comes to sophistication, this is a nascent

17  industry.  I think you can see from some of the questions that

18  these aren't the most sophisticated.  They are spending a lot

19  of money.  To answer your question earlier, you can only buy

20  these NFTs with cryptocurrency.  You can't buy it any other

21  way, and depending on what ecosystem or what blockchain it's

22  on, that would dictate what cryptocurrency you could use.  And

23  as we've seen over the last ten days or so, not that the crypto

24  market but the NFT market has cratered.  Why?  Because what we

25  see is that it's not the most sophisticated people going out

MbiWherO

1    and purchasing.  There aren't studies yet on the

2    sophistication, but nonetheless, we would say that in a nascent

3    industry like this, where most people don't really understand

4    NFTs or how to use them or how to display them, that

5    sophistication -- or that the price of the goods isn't all we

6    would look at.

7            And likewise, the quality of the goods, your Honor, I

8    must admit to you I don't know what to say.

9            THE COURT:  Well, I'm not sure what you just said

10   indicates, because if what you're saying, in effect, is that

11   the unsophisticated purchasers are easily defrauded, of course,

12   Hermès wants to get in on this market too, as I understand it.

13           MR. WARSHAVSKY:  They do.

14           THE COURT:  So that sounds like unclean hands to me.

15           MR. WARSHAVSKY:  I don't know why that would.  The

16   quality of the products has nothing -- you know, the question

17   about sophistication isn't about tricking customers or not

18   tricking customers.

19           THE COURT:  I know, but you were going beyond that,

20   and you were saying -- maybe I misunderstood your point.  You

21   were saying that you inferred from the fact that this market

22   had cratered that the people who originally invested in it were

23   unsophisticated.  Wasn't that your argument?  Did I

24   misunderstand?

25           MR. WARSHAVSKY:  Well, it was part of it, yes.  Really

MbiWherO

1    what I said was it's a nascent industry.

2              THE COURT:  I think the way one would express what you

3    just said was they were suckers, they were duped, they were

4    defrauded, and now they're being victimized.  And maybe I'm

5    reading too much into your argument.

6              MR. WARSHAVSKY:  Well, I mean maybe the people who

7    invested in FTX.  I wouldn't suggest that -- this is trademark

8    infringement.  I'm saying the lack of sophistication allowed

9    them to be confused as to source.  It has nothing to do with

10   being suckers or investing in bad schemes.  But much like any

11   time we talk about sophistication of consumers, in a trademark,

12   it's one of the *Polaroid* factors, and the reason it's there is

13   that if consumers are less sophisticated they don't recognize

14   the difference between genuine and infringements, and so it's

15   part of a likelihood of confusion analysis, not a question

16   about clean hands or trying to profit off them.

17             THE COURT:  All right.

18             MR. WARSHAVSKY:  What I was suggesting was that what

19   we see by dint of what's happened over the last few weeks is

20   that the whole market cratered.  I mean everybody cratered.  I

21   think that's a testimony to the lack of sophistication.  I

22   wouldn't suggest to you that everybody who's in that market by

23   any stretch is a charlatan.

24             Going back to the proximity of the goods, one of my

25   colleagues handed up to me that right now, and it's in

MbiWherO

1    counterstatement paragraphs 49 to 51, that proximity of the

2    goods is evidence that the USPTO is handling applications and

3    denying NFT applications, finding them similar to physical

4    goods.  So the USPTO is looking at those goods as similar.

5    Again, it's counterstatement paragraphs 49 to 51.  I think we

6    still struggle with that, between a virtual good and a real

7    good, but at least one government body is looking at it that

8    way.

9         I think I've hit all the *Polaroid* factors.  I don't

10   know if you have other questions.

11        THE COURT:  I think we will interrupt you.  We'll come

12   back to you for more final comments later if you missed

13   anything.  But I think it's now time to hear from defense

14   counsel.

15        MR. WARSHAVSKY:  Thank you, your Honor.

16        THE COURT:  Thank you.

17        MR. MILLSAPS:  Thank you, your Honor.

18        It's kind of hard to know where to start because that

19   was a blizzard of red herrings, and the actual legal issues --

20        THE COURT:  Blizzard of red herrings?  Boy, that's a

21   difficult metaphor.

22        MR. MILLSAPS:  Maybe.  I hope I'm not being judged on

23   that, my metaphors, your Honor.

24        So let's just go back to artistic relevance.  OK?  And

25   your Honor was asking Mr. Warshavsky some questions about

MbiWherO

1    Mr. Rothschild's intent.

2              The only, the only relevance of intent under *Rogers* is

3    whether the defendant used the mark because the defendant

4    solely intended to trade off of the goodwill of the mark.  The

5    *Rogers* cases are clear in that there was no relevance to the

6    associated artwork.  So using MetaBirkins as a mark to sell

7    some good that is an artwork simply because the defendant is

8    hoping that the name Birkin will catch people's attention and

9    it has no artistic relevance to the artwork, that's where

10   intent would come into play.

11             But there is no jury issue of intent because clearly

12   the MetaBirkins artworks themselves are expressive works, which

13   would be protected under the First Amendment.  They are images

14   of imaginary Birkin bags covered in goofy, garish fake fur.  So

15   once you have crossed that threshold question and you're

16   reaching the question of artistic relevance, the threshold for

17   artistic relevance, as your Honor noted in your opinion denying

18   the motion to dismiss, is intended to be low and won't be

19   satisfied unless the use has no artistic relevance to the

20   underlying work whatsoever.  That is an issue that the Court

21   can decide by looking at the mark as it's being used in the

22   title in relation to the artwork.  And here, clearly, there's

23   artistic relevance between the MetaBirkins title and the

24   MetaBirkins images and art project as a whole.

25             The MetaBirkins images, as Hermès's own 30(b) witness

MbiWherO

acknowledged, and was obliged to admit, is descriptive of what
you see in the MetaBirkins images.  They are fanciful
depictions of imaginary, fur-covered Birkin bags.  So there
really in no question here that the MetaBirkins title is
artistically relevant to the MetaBirkins artworks.

Now, my opposing counsel spent a lot of time
discussing a lot of private statements by Mr. Rothschild to his
colleagues, his associates, his friends in the process of
thinking about and creating his MetaBirkins art project.
Normally, those kinds of communications never come out into the
public because those are the sorts of things that artists would
have privately with their associates and with their friends.
These are irrelevant statements under a *Rogers* analysis and, in
this case, under a trademark case.  Even under an ordinary
trademark infringement case, it's black letter law that those
are irrelevant statements because they were not made to the
public.  They weren't made to consumers or potential consumers
of Birkin bags or MetaBirkins artworks and NFTs.  And
additionally, your Honor, you have the unrebutted expert
testimony of Dr. Gopnik, who says clearly the MetaBirkins title
is artistically relevant obviously for the same reason that
Mr. Martin, Hermès's general counsel, acknowledged, because it
is descriptive of what you see in the artwork, but it's
additionally artistically relevant because the addition of
meta, the prefix "meta," with Birkin signals to the viewer that

MbiWherO

1    this is communicating something about the meta nature of the

2    artistic experiment that Mr. Rothschild was conducting.

3            And let's talk about that artistic experiment for a

4    minute because this is incredibly important in this case.  My

5    opposing counsel also spent a lot of time talking about how

6    well-known the Birkin mark is, how famous and iconic it's

7    become in the culture.  That's a very important point in this

8    case because a Hermès has admitted that the Birkin mark is not

9    just a source identifier.  Most trademarks simply function as

10   source identifiers and people use them because they're trying

11   to trade on their goodwill and enter a similar marketplace.

12   But the Birkin mark here, it is undisputed, has transcended its

13   role as a source identifier in our culture.  It's undisputed

14   that the Birkin mark has become a name that is synonymous with

15   rarefied wealth; that through prolific references in pop

16   culture -- I believe Beyoncé sings about it in one of her

17   songs, people are often talking about Birkins in our culture

18   because our culture is, for better or worse, obsessed with

19   wealth and financial success.

20           And so the First Amendment interests in this case are

21   quite severe when you have an artist who is commenting about a

22   mark that has become a cultural object, that everyone else in

23   the culture is referencing it, in pop culture references,

24   songs, artwork, and those sorts of things.

25           THE COURT:  I saw that also in your brief, and maybe

MbiWherO

```
1    it was in your client's deposition.  You were saying that this

2    was more than just an artistic endeavor in the abstract.  It

3    was a political message?

4             MR. MILLSAPS:  It was -- if you look at the record,

5    your Honor, and I think this is unsurprising for most any

6    artwork that's worth discussing.  There wasn't just one message

7    behind MetaBirkins.  It was inspired, in part, by fashion's

8    fur-free initiative.  That's why Mr. Rothschild decided to

9    cover the MetaBirkins in the, quote, goofy, garish fake fur,

10   because in a sense, it was selling something that was covered

11   in fur but not actually made from animals, and it was a nod to

12   that.

13            On the website, Mr. Rothschild said this is a tribute

14   to the iconic Birkin bag because artists often make tributes to

15   things that they are interested in in the culture and that are

16   widely talked about and looked at in the culture.

17            Mr. Rothschild also said in his Yahoo News interview,

18   which your Honor, I believe, quoted in your opinion on the

19   motion to dismiss and which was in the complaint, that he was

20   seeking to do an experiment here with the MetaBirkins NFTs, and

21   he has elaborated on that experiment in his testimony that's in

22   the record, that he was investigating where the image, where

23   the value lies in the Birkin.  Is it in the actual, physical

24   product that Hermès is selling, or is it in this image that has

25   taken on a larger life of its own in our culture?  And
```

MbiWherO

```
1    Dr. Gopnik additionally explains that he understands
2    MetaBirkins to be exploring that question in doing that.  And
3    so there are multiple angles and probably others.
4              THE COURT:  You think that someone who purchased a
5    MetaBirkin NFT was motivated, I'm going to expose the
6    hollowness of wealth by spending my own money to purchase this
7    MetaBirkin?  That seems extraordinarily --
8              MR. MILLSAPS:  Your Honor, that's not what we're
9    saying or arguing here.  That really doesn't have to do with
10   the intention of the purchase of a MetaBirkin.
11             THE COURT:  Well, I understand that, but you're saying
12   that part of the motivation was to expose the materialism,
13   overmaterialism of what is conveyed by the notion of owning a
14   Birkin bag.  But if that motivation is so concealed that when
15   you look at the actual expression itself, the fur-covered
16   Birkin bag and the way the public reacted to that -- namely, by
17   purchasing it so they could brag to their friends that they got
18   a Birkin bag -- it casts doubt on whether objectively that
19   really could have been the motivation, that political message
20   could have been part of the motivation of the artist.
21             MR. MILLSAPS:  Your Honor, we're not arguing that the
22   purchasers had that understanding or motivation, and I'm sorry
23   if I haven't been clear here.  The artist's motivation, what he
24   experimented with here was to see what the culture would do
25   with these things that he put out into the culture, which were
```

MbiWherO

1    just two-dimensional depictions of, as Dr. Gopnik put it,

2    goofy, garish fake fur-covered Birkin bags.  And so the

3    experimenting here was to see will the culture ascribe the kind

4    of value to these artworks that it ascribes to an actual Birkin

5    bags.  That was the experiment, and the experiment seems to

6    have been fulfilled.  But that's what we're saying here.  And

7    the artist was saying, and also Dr. Gopnik as an expert in

8    business art was saying, that's why he recognized this as a

9    classic example of business art in the vein of Andy Warhol and

10   other artists who have engaged with commerce in this way.

11          THE COURT:  Now, of course, your client, if he's not

12   being hypocritical, will now devote all his earnings from this

13   to some charity for the poor.

14          MR. MILLSAPS:  I'm afraid, your Honor, that my client

15   is having to devote all of his earnings and more to this case,

16   but my client does have other artistic projects that focus on

17   climate change and other issues that are in the record, such as

18   the "I Like You You're Weird" digital series that followed

19   MetaBirkins and has nothing to do with MetaBirkins.

20          But you know, there's another issue here in this

21   discussion, your Honor, that's important to talk about, and

22   that is Hermès would very much like to draw a divider between

23   art and commerce:  Art is over here; commerce is over here;

24   never the two shall meet.  That is never how art has been in

25   the history of art.  Art has always been intertwined with

MbiWherO

```
 1    commerce.  Artists are business people as well, whether they're
 2    running the business themselves, whether they have a gallery
 3    running it for the them or they have a manager doing it for
 4    them, artists are trying to sell something, just like everyone
 5    else.  And additionally, on top of that there is business art,
 6    which is what Dr. Blake Gopnik is an expert in and what his
 7    report addresses here, and that is where artists deliberately
 8    engage with commerce, because they want to be provocative.
 9              THE COURT:  Look, those are all fair points.  As I
10    understood the argument being made by plaintiffs' counsel, it
11    was that doesn't mean that someone who's just engaged purely in
12    infringing a trademark for their own profit can pass it off as
13    art, as business art, that the line needs to be drawn between
14    those two situations.  That's what I took to be his argument.
15              MR. MILLSAPS:  Yes, your Honor, but we also have a
16    case here where MetaBirkins are not the type of product that
17    Hermès sells.  We should get into this on the *Polaroid* factors,
18    which we're very happy to walk through.  But in terms of just
19    the threshold question on *Rogers* about whether or not this is
20    artistic -- or expressive content protected by the First
21    Amendment, there's nothing in the record to dispute that.  And
22    on artistic relevance, it's an incredibly low bar, which says
23    that unless --
24              THE COURT:  Yes, I would agree with you.  I wouldn't
25    put the word "incredibly" in front of it, but it's a low bar.
```

MbiWherO

```
 1   But it's not zero, is the point.  There still is a point beyond
 2   which trademark infringement cannot be covered up by a claim of
 3   artistic expression if there is no reasonable way it could be
 4   viewed as artistic expression and if the intent was never
 5   artistic expression.  Now, you're pointing out why you think
 6   that's not the case here, and I understand that.
 7                MR. MILLSAPS:  Yes.
 8                THE COURT:  Yes.
 9                MR. MILLSAPS:  Yes, your Honor.  I would wholly agree
10   with your statement, and in this case obviously there is ample
11   evidence that this is artistic expression in the record, and it
12   is undisputed.
13                Additionally, my adversary said that Dr. Gopnik was
14   acting as a rebuttal expert.  Your Honor, I'm not sure why
15   that's the case.  Dr. Gopnik never purported to act as a
16   rebuttal expert.  Dr. Gopnik's report was submitted as one of
17   defendant's --
18                THE COURT:  I think his point was not well-taken there
19   but I'll hear from him on that.  It was rebuttal only in the
20   sense that it followed after your expert's report, but that
21   doesn't mean that he wasn't subject to deposition inquiry in
22   which all these issues could be explored.
23                MR. MILLSAPS:  Yes, your Honor.
24                I don't know if your Honor has any further questions
25   on artistic relevance.
```

MbiWherO

```
 1          THE COURT:  I haven't, and I'm not sure either of you

 2   want to spend much time on it, but there are claims in addition

 3   to the trademark claims, which are obviously central.  There's

 4   dilution claims and there's something called cybersquatting.

 5   Every time I work out from now on, instead of actually

 6   squatting, I'm just going to cybersquat.  But in any event, if

 7   you wanted to say anything about those, now would be a good

 8   time.

 9          MR. MILLSAPS:  Your Honor, before I do that, I do want

10   to go through the *Polaroid* factors.

11          THE COURT:  Oh, yes.

12          MR. MILLSAPS:  And the explicit misleadingness prong,

13   but I was curious if your Honor had any further questions about

14   artistic relevance.

15          THE COURT:  No.  I understand what the arguments are

16   about.

17          MR. MILLSAPS:  OK.  Then I'll get to those.

18          On explicit misleadingness, we certainly don't

19   disagree that plaintiffs have submitted a voluminous record

20   here of evidence.  But this evidence shows that there is no

21   genuine dispute here over whether Mr. Rothschild used the mark

22   in an explicitly misleading way in connection with the

23   MetaBirkins art project in this case.

24          As your Honor's well aware, our contention is that the

25   Court need not apply the *Polaroid* factors in this case to look
```

MbiWherO

1    at explicit misleadingness because *Rogers* itself did not apply

2    those, and they were applied in *Twin Peaks* in the case of a

3    title versus title dispute of two artistic works, and we don't

4    believe that should apply here.  But we're more than happy for

5    the Court to apply the *Polaroid* factors in this case.

6          THE COURT:  First of all, I think there is a real

7    issue of whether they're applicable or not.  I thought your

8    papers were helpful in that regard, but let's assume for the

9    sake of argument, because I certainly haven't resolved that or

10   any other issue today, so go ahead and address that if you

11   want.

12         MR. MILLSAPS:  Thank you, your Honor.

13         As I said, we're actually happy for the Court to apply

14   the *Polaroid* factors in this case if that is what the Court

15   decides to do, because the undisputed evidence here shows that

16   even if this were a normal trademark infringement case and did

17   not involve a work protected by the First Amendment that would

18   trigger *Rogers,* it's a borderline case.

19         I'd like to go to the survey first, if we could,

20   because I think the survey is incredibly instructive here.  As

21   your Honor knows from our papers, Dr. Isaacson's survey was

22   incredibly flawed and incredibly stacked in Hermès's favor, and

23   actually, of course, there were two surveys, as your Honor

24   pointed out.  One of them was a survey of handbag purchasers or

25   prospective handbag purchasers which showed a net confusion

MbiWherO

1   level of 3.6 percent, which is undisputed shows no confusion

2   among that market, Hermès's own market.  Now, my adversary

3   said, well, Dr. Isaacson didn't opine on that survey because it

4   was a forward-looking survey and isn't relevant here.  But it's

5   curious that plaintiffs instructed Dr. Isaacson to conduct that

6   survey, because they knew from the pleadings, their own

7   pleadings, that it wouldn't be relevant under that theory.  Yet

8   they went ahead with it anyway, and Dr. Isaacson decided not to

9   opine on it in his report for some reason.

10          The other report that he does opine on among NFT

11   purchasers or prospective NFT purchasers actually shows

12   inconclusively that summary judgment should be granted in

13   Mr. Rothschild's favor in this case.  He purported to find 18.7

14   percent confusion, which I'm sure that your Honor's well aware

15   is a borderline confusion level in a normal trademark

16   infringement case.  Some courts don't find that to be

17   sufficient confusion level -- anything below 20 percent.  But

18   as your Honor also is aware, in applying a quick look at the

19   *Polaroid* factors, as courts do when they're applying *Rogers,*

20   the plaintiffs have to show a particularly compelling level of

21   likelihood of confusion, and there can be no question here that

22   purported net confusion level of 18.7 percent would not rise to

23   the particularly compelling level that would be necessary here.

24   Your Honor can compare the level that Dr. Isaacson reports here

25   to the level of confusion or the survey results that the *Rogers*

MbiWherO

court itself looked at, where the *Rogers* court swept aside a
survey that showed 38 percent of respondents thought that
Ginger Rogers was somehow involved with the film at issue in
that case.

Now, that was not a 38 percent confusion level, as the
plaintiffs point out in their papers, but it is the same kind
of question that Dr. Isaacson himself was looking at with his
survey, because Dr. Isaacson repeatedly testified at his
deposition, although he said he was measuring confusion it
turns out he wasn't actually measuring confusion in a way that
matters in a trademark case, where confusion means the
respondents were actually confused about the source of the
goods.  Dr. Isaacson repeatedly testified that he was testing
for cognitive connection between the test stimulus, which was
the MetaBirkins web page, and Hermès.  And cognitive connection
is essentially what the survey in *Rogers* found 38 percent of,
and the court disregarded that.  And so we're very happy for
the Court to look at the survey here and to apply the *Polaroid*
factors, because the evidence shows inconclusively there's no
genuine dispute here.

Additionally, that's if the Court were to give
plaintiffs full credit for Dr. Isaacson's survey figure there,
18.7 percent.  As we pointed out in our papers, Dr. Isaacson's
survey is based on a cascade of errors that strongly stack the
survey in plaintiffs' favor here.  At the core of it, the

MbiWherO

survey showed respondents a test stimulus that showed them the

MetaBirkins web page, which had an image of MetaBirkin, which,

of course, is a digital artwork that depicts a fanciful handbag

and the question Dr. Isaacson asked respondents was do you know

who makes the item shown on the web page?

Well, any reasonable respondent is going to look at

that and say, and wonder, do they mean the bag, the person who

makes the bag that's depicted in the artwork, or do they mean

the artwork itself?  And so our rebuttal report by Dr. Neal

makes quite clear as well why that's a problem.  And Dr. Neal

also goes on to explain that there's a glaring coding error

made by Dr. Isaacson, which probably results from the fact that

he wasn't actually measuring confusion in the traditional

trademark confusion sense, but he was measuring cognitive

connections, as he testified, because, for instance, he coded

this response as confused in his survey, as part of that

confusion level of 18.7 percent.  This was a question to

response ID18 wrote:  The web page name and description states

it's MetaBirkins, but also the web page disclaimer at the

bottom clearly states that the author of the post, or NFT, is

not affiliated with Hermès, who is the actual registered

trademark owner of Birkin bags.

Despite the respondent writing this, Dr. Isaacson

nonetheless coded this person as confused.  So the survey here

is rife with fatal errors, but even if the Court overlooks all

MbiWherO

those errors, the 18.7 percent that Dr. Isaacson arrives at is insufficient as a matter of law under a quick look at the *Polaroid* analysis to show confusion.

The other *Polaroid* factors here -- the strength of the plaintiffs' mark, well, we talked about that just a moment ago. The strength of the plaintiff's mark is why so many people in the culture are talking about it and referencing it and making art about it -- because it's become iconic in the culture. Rather than being evidence of confusion, in fact, the strength of the mark in this particular case makes it more likely that Mr. Rothschild's MetaBirkins will be recognizable by consumers as art and not be attributed by consumers to Hermès, and the Court can look at various cases for that, such as *Louis Vuitton Malletier v. Haute Diggity Dog* and *Girl Scouts of U.S. v. Bantam Doubleday Publishing Group*, which ruled that consumers can recognize small differences when dealing with extremely strong marks in the context of a book series.  Certainly the survey evidence that we just talked about showed that consumers or prospective consumers of Birkin bags or the NFTs understood, were not confused at a particularly compelling level and borderline at a level that would even be sufficient in a normal trademark infringement case.

If we look at the similarity of the marks, the MetaBirkins obviously and necessarily evoke the Birkin bag. They're conspicuously not reproductions of Birkin bags.  They

MbiWherO

are fanciful depictions covered in goofy, garish fake fur that
run contrary to Hermès's elegant image.  The MetaBirkins name
is not the same as Birkin.  It adds the prefix "meta," which
has artistic relevance, as I discussed earlier with your Honor.
And other cases involving *Rogers,* such as *AM General,* the case
involving the use of Humvee in a video game, where the Court
found that to be protected by *Rogers*, notes that when the marks
are used for different purposes, the marks are not similar.
And in this case, of course, the marks are being used for
different purposes.  Birkin is used to sell luxury handbags,
physical handbags.  Mr. Rothschild was using the mark to sell
digital artworks connected to NFTs in this case.

        If we look at the proximity of the products, despite
Hermès's early attempts -- and it's interesting because my
adversary now concedes that Hermès is not suing on the images
here.  My adversary now says they're suing on the use of the
name, the MetaBirkins mark, which is quite a turnabout in the
case from the complaint and the motion to dismiss.  Your Honor
will recall that Hermès attempted from the beginning to
characterize the MetaBirkins as digital knock-offs, and the
MetaBirkins artworks here are not handbags.  There's no
proximity.  They're no more proximate to handbags than the
image of a painted pipe is to the market for pipes.

        And this, by the way, is also shown by Dr. Isaacson.
If you look at the fact that Dr. Isaacson surveyed handbags or

MbiWherO

1    prospective handbag purchasers and there was no confusion

2    there, and he found what he purports to be an 18.7 net

3    confusion level among NFT purchasers, the differential right

4    there is an indication that the proximity-of-the-products

5    factor would weigh in Mr. Rothschild's favor on a *Polaroid*

6    analysis.

7            Then there's the likelihood of bridging of the gap,

8    and Mr. Warshavsky was up here discussing Hermès's intent to

9    enter the NFT market, which there is evidence in the record

10   for.  I cannot speak openly here about the evidence of that.

11   That was Mr. Martin, their 30(b)(6) witness's testimony; it's

12   filed under seal.  But I would point out to your Honor that if

13   your Honor reads that, your Honor will find that Hermès has

14   expressed no intent to enter the NFT art market in the way that

15   Mr. Rothschild has sold NFT artwork here, nor does Hermès even

16   express an intent to enter a market where they'll be selling

17   virtually wearable fashion items in the digital metaverse.  So

18   the likelihood of bridging-the-gap factor here would not weigh

19   in Hermès's favor in that sense.

20           And moreover, even if Hermès were intending to enter

21   the market, Hermès still cannot control artistic references to

22   Hermès's branded products.  Your Honor can look at a plethora

23   of *Rogers* cases, such as *AM General*, where Humvee was known to

24   license the Humvee mark for toys and games and things like

25   that, and the court nonetheless found that *Rogers* applies and

MbiWherO

1    protected Activision's use of the Humvee depiction in its video

2    games despite the fact that it arguably was taking away a

3    market opportunity from Humvee, where it could license that

4    mark.  Of course, every brand would like to control every

5    reference to it in the public.  There's no dispute about that.

6    Of course, Hermès would like to control every reference, and

7    Hermès would like to have a licensing opportunity any time that

8    its brand is used or referenced, but that's not the law in our

9    country and that's why we have *Rogers* and why we have the First

10   Amendment, particularly when we live in a culture and an era

11   where we are bombarded daily by brands, everywhere we turn and

12   everywhere we look, and they define in many ways life these

13   days and take up so much space in our minds; it's not

14   surprising that we have artists like Mr. Rothschild, who are

15   engaging with these brands and who are seeking to comment on

16   them in various ways.

17          If we move on to the actual confusion prong of

18   *Polaroid*, we just discussed the survey and why that shows that

19   we win under that prong, particularly because the Court, under

20   *Rogers,* must apply, in doing a quick *Polaroid* look must apply a

21   particularly compelling standard here.

22          The other evidence that Hermès points to in the record

23   for actual confusion is not actually evidence of actual

24   confusion.  Hermès points to the many statements made by

25   Mr. Rothschild privately to his associates and his friends

MbiWherO

1    about, you know, his creation of the MetaBirkins artworks, how

2    he said that he was making Birkin, you know, NFTs for a time

3    before he had chosen a title.  All of that is irrelevant.  It

4    is not evidence of confusion.

5            I should say at the top that there is no evidence in

6    the record, not a piece of evidence in the record, that shows

7    that any actual purchaser or prospective purchaser of the

8    MetaBirkins artworks or NFTs was ever confused.  There is not a

9    piece of evidence for that.  What Hermès wants the Court to

10   look at are these private statements to Hermès's associates and

11   friends, which, as a matter of law, even in an ordinary

12   trademark infringement case, do not constitute evidence of

13   confusion.

14           Hermès also has submitted a handful of social media

15   posts, which Mr. Warshavsky characterized as showing that

16   people were confused about whether or not they would be

17   receiving a Birkin bag, or whatnot.  If your Honor looks at the

18   actual social media posts, and I would be happy to discuss any

19   of them in particular if the Court has any questions, but I can

20   tell your Honor that that body of evidence does not show what

21   Hermès says that it shows.  It shows unidentified individuals

22   making comments on the various MetaBirkins.

23           THE COURT:  I think I have that from your brief.

24           MR. MILLSAPS:  Yes.

25           THE COURT:  And with apologies, because I want to give

MbiWherO

1    you the same full time that I gave your adversary, I do have

2    two other matters here this afternoon, which I would like to

3    turn to by 4 o'clock, anyway.

4            MR. MILLSAPS:  OK, your Honor.  I'll move on to just

5    the final two prongs, the good faith prong.

6            THE COURT:  Yes.

7            MR. MILLSAPS:  So, it's undisputed in the record that

8    Mr. Rothschild, wherever he could, made clear who the source of

9    MetaBirkins was.  The website made clear that Mr. Rothschild

10   was the creator of MetaBirkins.  The social media pages either

11   said that they were created by Mr. Rothschild, or in the case

12   of his Instagram page they tagged his personal Instagram handle

13   @MasonRothschild, which, on Instagram, is a way of people

14   indicating when they've created something in the way that an

15   author would sign a painting, for instance.  It's the signature

16   that leads people back to his individual page.

17           There's evidence in the record showing that

18   Mr. Rothschild attempted to correct mistaken journalists, was

19   reaching out.  There's no evidence here that Mr. Rothschild was

20   using the mark in a bad faith way.  Dr. Gopnik's unrebutted

21   testimony also goes to the good faith of Mr. Rothschild's use

22   of the work here, which was to describe the visual artworks

23   that he created and was putting out into the world with the

24   NFTs.

25           The quality of the art here should not really be a

MbiWherO

factor because it's not really the Court's purview to be

judging the quality of artwork and whatnot, but I will note

that plaintiffs put into the record --

       THE COURT:  I know that's quite a shame, but --

       MR. MILLSAPS:  Yes.

       Plaintiffs put into the record evidence that

Mr. Rothschild was trying to make images quickly.  There is

also evidence in the record showing that Mr. Rothschild was

very concerned about getting the fake fur right, for instance,

and that was difficult for the assistant that he was working

with to help him generate those images.  But nonetheless,

again, this really shouldn't be a factor in this case given

that we're talking about artwork.

       And then on the final point, consumer sophistication,

my adversary talked a lot about how NFTs are a nascent industry

and market and consumers are kind of naïve and all of this.

First of all, there's no record, there's no evidence in the

record for this, and my adversary acknowledges that, but more

importantly, courts in trademark cases, it's an issue of black

letter law -- that when the value of a particular product goes

above a certain threshold courts then assume that a reasonable

consumer would become educated about what they're buying.  And

in this case, and courts have found that for products that,

there are $250 sneakers courts have found that over.  This is a

case that's involving artworks and NFT artworks that cost

MbiWherO

```
 1    thousands of dollars to tens of thousands of dollars and
 2    handbags that cost thousands of dollars to over a hundred
 3    thousand dollar, and so it's black letter law here that the
 4    consumer sophistication prong of the Polaroid analysis would
 5    weigh in Mr. Rothschild's favor here.  And in fact,
 6    Dr. Isaacson's survey evidence confirms that, because if people
 7    were more confused and if Mr. Rothschild were actually being
 8    explicitly misleading about the source of MetaBirkins, we would
 9    expect to find a lot more consumer confusion in Dr. Isaacson's
10    surveys, which barely even reach an arguable threshold in a
11    normal trademark case.
12              THE COURT:  All right.  With apologies, I need to cut
13    you off.  I want to give your adversary five minutes to very
14    briefly respond.
15              MR. MILLSAPS:  Thank you, your Honor.
16              THE COURT:  Thank you very much.
17              MR. WARSHAVSKY:  Your Honor, five minutes is hardly
18    enough, but I'll do what I can.  There was a lot that was said,
19    and a lot is, frankly, demonstrably false and, frankly, a
20    little disappointing.
21              THE COURT:  Well, I recognize that the attorneys for
22    both sides are being paid by the hour, but nevertheless, five
23    minutes it is.
24              MR. WARSHAVSKY:  Fair enough, your Honor.
25              Let's just talk about survey numbers for one minute.
```

MbiWherO

1   Mr. Millsaps keeps saying that the *Rogers* court said 38 percent

2   wasn't enough.  Actually, in the *Rogers* case, if you look at

3   footnote 8, and that's at 875 F.2d 1001, it was 14 percent and

4   actually the court said it was enough.  And if we look, your

5   Honor, at your case, *Energy Brands v. Beverage Marketing*, 17

6   percent net confusion was enough.

7        If we look at the undisputed facts here, what's clear

8   is that Dr. Isaacson applied the *Eveready* method, which is

9   exactly what's required in this circuit, and you can go through

10  it, you know, the overriding theme seems to be that Hermès is

11  trying to bully and stop speech.  Your Honor can look -- you

12  know, my adversary just made that up.  Hermès has not sued

13  any -- outside of the counterfeiting context, my adversary

14  named a bunch of other references to Hermès, and Hermès hasn't

15  brought suit against any of them.

16       Hermès didn't even sue Mr. Rothschild for his first

17  Baby Birkin project because they didn't think it was an

18  infringement, and that really bleeds into the purpose of the

19  trademark infringement statute.  Trademark infringement is

20  about protecting consumers just as much as it is about

21  protecting brands.  It's to protect against consumer confusion,

22  and here, consumers were confused.  And Mr. Millsaps

23  grandiosely says, well, Hermès can't tell you who or what,

24  whether these individuals were confused.  You know why?

25  Because they bought on the blockchain, and they're

MbiWherO

1    pseudonymous.  We don't know who the identity is.

2          What we know for a fact is that at least one or two

3    who posted on social media thought they were getting an Hermès

4    bag.  They wanted to know where their bag was.  What we also

5    know is that when these were sold, unlike what Mr. Millsaps

6    said, they were sold for as much, for more than the value of a

7    Birkin bag when they were shrouded images that were changed.

8    Right?  When they were first -- 16 were actually resold as a

9    shrouded image before anybody knew what the image was.

10   Mr. Millsaps would have you or Mr. Rothschild -- Mr. Millsaps,

11   whichever -- would have you believe that that was because of

12   the great art.  Your Honor, they didn't know what the art was.

13   They knew the name Birkin, and that was all it had to.

14         And I think that the test -- you know, we keep going

15   back and forth about, he says that, when we talked about good

16   faith, good faith is about the adoption of the mark.  And

17   there, when Mr. Millsaps says, well, these were private

18   discussions, exactly.  That's exactly the point.

19   Mr. Rothschild was using the Hermès mark, the Birkin mark, and

20   lying about having discussions with Hermès to get people, to

21   get associates interested and involved in the project, to get

22   them to think he wasn't going to be sued.  He said he knew he

23   could get a cease and desist letter.

24         What we haven't discussed as much is that

25   Mr. Rothschild also had the MetaBirkins Discord chat, which is

MbiWherO

a community of 36,000 members.  He used that to advertise his

other projects.  He didn't produce the blockbusting discovery,

but we produced it here, and it shows him saying that the

members of the MetaBirkins community will get -- which means

they don't buy a MetaBirkin, by the way.  It's just you join

the community, the first ten thousand will get, or first

thousand will get white listed, meaning a special spot for his

other projects.  That's using the MetaBirkins name as a brand.

        The whole point, the reason, and I'm really surprised

by the comment that Hermès is changing its tune.  Hermès didn't

sue for copyright infringement.  It didn't sue for trade dress

infringement.  It sued for trademark infringement.  It's only

sued because of the name Birkin.  However, we look at conduct

as a whole.  That's the whole point of the *Polaroid* factors.

And the whole point of the Polaroid factors is to look at

conduct.  And yes, he also happened to use -- now, if you use

Birkin to sell a car, I don't know what the result would be.

But he didn't.  He used it to sell an image of a bag, where he

copied, well, where the real, the artist, Mark Burden, copied

the Birkin bag schematics.

        As to actual confusion, the survey -- and again,

Mr. Millsaps, I don't know if he -- a survey is not a *Polaroid*

factor.  There's no *Polaroid* factor about a survey.  The survey

measured, and your Honor can read it in the briefs, we think

we're above the threshold.  We're above the threshold that your

MbiWherO

1    Honor has required.  Nonetheless, the survey actually runs

2    alongside the *Polaroid* factors.  It's not about actual

3    confusion.  The actual confusion wasn't Hermès's friends and

4    insiders.  The actual confusion was, and this was what we

5    produced, one of them was an intellectual property attorney who

6    Mr. Millsaps grilled to see if she works for Hermès.  She

7    doesn't.  It was the New York Post.  It was Vogue.  It was the

8    people who posted online.

9            And then as to -- I think the argument that -- I know

10   I'm running out of time, your Honor.  I want to go -- I think a

11   lot of Mr. Millsaps's arguments lean back into *Rogers* and what

12   is the *Rogers* test.  I mean he leans heavily into the *AM*

13   *General v. Activision* case, and just to be clear about that

14   case, that was a case where inside the game, I think it was

15   Call of Duty, somebody was using a Humvee and there was a

16   Humvee car.  It wasn't in the title.  You wouldn't know it

17   until you were playing the game, and the point was there was no

18   branding.

19           Here, the entire brand, everything, even when

20   Mr. Millsaps makes his arguments, what does he keep referring

21   to?  He talks about the metaverse.  Why?  Because that's the

22   brand.  And I go back to Mr. Rothschild's statements early on,

23   before there was a lawsuit, he said they were counterfeits.  He

24   called them Birkins.  He talked about them as a brand.  It

25   wasn't a type.  It was a brand, and that's what showed in the

MbiWherO

1    Discord.

2              I also want to talk a moment about the comment --

3              THE COURT:  You are well in excess of five minutes.

4              MR. WARSHAVSKY:  OK.  Can I finish this one point?

5              THE COURT:  Yes.

6              MR. WARSHAVSKY:  OK.  It's just about whether or not

7    Dr. Gopnik -- he keeps saying that Dr. Gopnik is unrebutted.

8    You see in the Rule 56 statement that that's not the case.  And

9    in fact, when we quote Dr. Gopnik and use his quotes, Dr.

10   Gopnik says this is out of context -- this is in yet another

11   report.  But Dr. Kominers's report actually talks about what

12   really -- it says that Mr. Rothschild used all the social media

13   to announce sales, transactions, prices, and throughout we show

14   Mr. Rothschild's testimony at the time about getting whales,

15   treating this as security, getting people to pump, getting

16   people to !Shill.  That's not an artist.  That's treating this

17   as a commodity.

18             And while Dr. Gopnik thinks that that's just like a

19   contract or a restaurant or anything else as art, that comment,

20   that's what 15 U.S.C. is meant to regulate.

21             I know I'm past my time, your Honor.

22             THE COURT:  I'm sure there are many other things you

23   wanted to respond to, but I think --

24             MR. WARSHAVSKY:  I did.

25             THE COURT:  -- we need to bring this to a halt at this

MbiWherO

1    point.  Thank you very much.

2              MR. WARSHAVSKY:  Thank you.

3              THE COURT:    I want to thank both counsel, who more

4    than met my students' expectations, I'm quite confident.  I

5    should mention that I will resolve these motions no later than

6    the end of this year, by December 31.  If I'm really in a

7    mischievous mood, I'll give it to you at 11:59 on December 31,

8    and one of you can go out and get drunk and the other can go

9    out and blow your horn.

10             But if, in fact, it turns out I don't award total

11   summary judgment for either side, then we will have a trial,

12   and the two possible dates for a trial are either January 30 or

13   March 27.  Why don't the two of you consult, talk to your

14   witnesses, and so forth.  Those are the only two possibilities,

15   but if you're both agreed on one of them, I will choose that

16   one.  If you're not in agreement, I'll have to make an

17   independent choice.

18             I'm reminded, years ago I complimented my wife's

19   cousin, who was a very sophisticated lady, who had gone through

20   four marriages, on her Gucci bag and she said to me, well, you

21   know, men come and go, but a bag is forever.

22             So on that note, we will see you anon.

23             Thanks a lot.

24             (Adjourned)

25