**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

HERMÈS INTERNATIONAL and
HERMÈS OF PARIS, INC.,

                    Plaintiffs,

          -against-

MASON ROTHSCHILD,

                    Defendant.

CIVIL ACTION NO.

22-CV-00384 (JSR)


## PLAINTIFFS' CONSOLIDATED MOTIONS IN LIMINE


**BAKER & HOSTETLER LLP**

Gerald J. Ferguson, Esq.
Oren J. Warshavsky, Esq.
Jason S. Oliver, Esq.
Jessica H. Fernandez, Esq.
Francesca A. Rogo, Esq.
45 Rockefeller Plaza, 14th Floor
New York, NY 10111
Telephone:   212.589.4200
Facsimile:   212.589.4201

Deborah A. Wilcox, Esq. (*pro hac vice*)
Key Tower
127 Public Square
Cleveland, OH 44114
Telephone:   216.621.0200

Lisa Bollinger Gehman, Esq. (*pro hac vice*)
1735 Market Street
Philadelphia, PA 19103
Telephone:   215.568.3100

**Table of Contents**

Page

ARGUMENT ...................................................................................................................1

I.      DR. GOPNIK SHOULD BE EXCLUDED ..........................................................1

        A.      Dr. Gopnik's Opinion is Comprised of *Ipse Dixit* Assertions and is
                not Based Upon Either Reliable Data or a Reliable Methodology .............2

        B.      Dr. Gopnik Improperly Opines on Ultimate Legal Conclusions ................6

        C.      Dr. Gopnik's Opinions Do Not Aid the Trier of Fact, as They Merely
                Repeat Fact Witness Testimony.................................................................7

        D.      Dr. Gopnik's Opinions Do Not Aid the Trier of Fact as He Improperly
                Interprets Rothschild's Conduct ...............................................................8

III.    DR. NEAL'S TESTIMONY AT TRIAL SHOULD BE PRECLUDED..............10

        A.      Dr. Neal Offers Opinions That Are Not Based Upon A Reliable
                Survey Methodology (Purported Flaws 1 And 2).....................................12

        B.      Dr. Neal's Report Includes Survey Critiques That Do Not Aid The
                Trier of Fact And Are Unfairly Prejudicial to Hermès (Purported
                Flaws 3-5) ...............................................................................................15

IV.     ROTHSCHILD SHOULD BE PRECLUDED FROM OFFERING
        IRRELEVANT AND PREJUDICIAL ANALOGIES CONCERNING
        THIRD PARTY ACTIONS AND/OR ARTWORK .............................................18

V.      ROTHSCHILD'S PROPOSED TRIAL EXHIBITS 593-595 SHOULD BE
        PRECLUDED UNDER RULES 401 AND 403 ...................................................25

        A.      News Articles Discussing Details of this Action Should Be Precluded,
                Including Exhibits 593-594.....................................................................25

        B.      Exhibit 595 Should Be Precluded Because It Is Irrelevant And Will
                Likely Confuse the Issues .......................................................................25

CONCLUSION.............................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akiro LLC v. House of Cheatham, Inc.*,
  946 F. Supp. 2d 324 (S.D.N.Y. 2013) (J. Rakoff) .......................................................10, 11, 15

*Almeciga v. Ctr. for Investigative Reporting, Inc.*,
  185 F. Supp. 3d 401 (S.D.N.Y. 2016)................................................................................1

*Alto v. Sun Pharm. Indus., Inc.*,
  No. 1:19-cv-09758-GHW, 2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021)..............................3

*AM Gen. LLC v. Activision Blizzard, Inc.*
  F. Supp. 3d 467 (S.D.N.Y. 2020) ..................................................................................25, 26

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
  11 F.4th 26 (2d Cir. 2021), *cert. granted*, 212 L. Ed. 2d 402, 142 S. Ct. 1412
  (2022)..............................................................................................................................21

*AU New Haven, LLC v. YKK Corp.*,
  No. 15 Civ. 3411, 2019 WL 1254763 (S.D.N.Y. Mar. 19, 2019), objections
  overruled, No. 15 Civ. 3411, 2019 WL 2992016 (S.D.N.Y. July 8, 2019) .............................7

*Aventis Env't Sci. USA LP v. Scotts Co.*,
  383 F. Supp. 2d 488 (S.D.N.Y. 2005)................................................................................9

*Beastie Boys v. Monster Energy Co.*,
  983 F. Supp. 2d 354 (S.D.N.Y. 2014)...............................................................................22

*Coty Inc. v. Excell Brands, LLC*,
  277 F. Supp. 3d 425 (S.D.N.Y. 2017)................................................................................10

*Daubert v. Merrell Dow Pharms, Inc.*,
  509 U.S. 579 (1993).........................................................................................................1

*Delrosario v. City of New York*,
  2010 WL 882990 (S.D.N.Y.2010)......................................................................................25

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997).........................................................................................................5

*Hermès Int'l v. Rothschild*,
  590 F. Supp. 3d 647 (S.D.N.Y. 2022)................................................................................23

*Hermès Int'l v. Rothschild*,
   No. 22-CV-384 (JSR), 2022 WL 1564597 (S.D.N.Y. May 18, 2022) ..................................23

*Highland Cap. Mgmt., L.P. v. Schneider*,
   379 F. Supp. 2d 461 (S.D.N.Y. 2005)...................................................................................6, 9

*Hygh v. Jacobs*,
   961 F.2d 359 (2d Cir. 1992)........................................................................................................7

*Jackpocket, Inc. V. Lottomatrix NY LLC*,
   No. 22-CV-5772 (LJL), 2022 WL 17733156 (S.D.N.Y. Dec. 7, 2022) ................................12

*King v. Wang*,
   No. 14-CV-7694 (LJL), 2021 WL 5237195 (S.D.N.Y. Nov. 9, 2021).....................................3

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)....................................................................................................................1

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
   97 F. Supp. 3d 485 (S.D.N.Y. 2015).........................................................................................7

*Malleo v. AbbVie, Inc.*,
   No. 3:17-CV-0784 (JCH), 2020 WL 3603753 (D. Conn. July 2, 2020) ...............................22

*Namer v. Broad. Bd. of Governors*,
   No. CIV.A. 12-2232, 2014 WL 5780539 (E.D. La. Nov. 5, 2014), *aff'd*, 628
   F. App'x 910 (5th Cir. 2015) ...................................................................................................15

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005)...................................................................................................1, 6

*Olin Corp. v. Lamorak Ins. Co.*,
   No. 84-CV-1968 (JSR), 2018 WL 1901634 (S.D.N.Y. Apr. 18, 2018) (Rakoff,
   J.)...............................................................................................................................................3

*Pac. Life Ins. Co. v. Bank of New York Mellon*,
   571 F. Supp. 3d 106 (S.D.N.Y. 2021).......................................................................................1

*In re Platinum-Beechwood Litig.*,
   469 F. Supp. 3d 105 (S.D.N.Y. 2020) (Rakoff, J) ...................................................................2

*In re Rezulin Prod. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004).....................................................................................8, 9

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989)..............................................................................................4, 6, 23

*T-Mobile US, Inc. v. AIO Wireless LLC*,
    991 F. Supp. 2d 888 (S.D. Tex. 2014) ...................................................................15

*THOIP v. Walt Disney Co.*,
    788 F. Supp. 2d 168 (S.D.N.Y. 2011)..............................................................12, 16

*TravelPass Grp., LLC v. Caesars Ent. Corp.*,
    No. 5:18-CV-153-RWS-CMC, 2021 WL 6334670 (E.D. Tex. Sept. 29, 2021)....................15

*U.S. Commodity Futures Trading Comm'n v. Moncada*,
    No. 12 CIV. 8791 CM, 2014 WL 2945793 (S.D.N.Y. June 30, 2014) .................................10

*Union Carbide Corp. v. Ever-Ready Inc.*,
    531 F.2d 366 (7th Cir. 1976) .....................................................................................10

*United States v. Jones*,
    965 F.3d 149 (2d Cir. 2020)...........................................................................................1

*Yuga Labs, Inc. v. Ripps, et al.*,
    No. CV 22-4355-JFW(JEMX), 2022 WL 18024480 (C.D. Cal. Dec. 16, 2022) .....................4

**Statutes**

Lanham Act § 43, 15 U.S.C. 1125 ...............................................................................13

**Rules**

Fed. R. Evid. 401 ...........................................................................................2, 20, 26

Fed. R. Evid. 403 ....................................................2, 5, 18, 20, 21, 22, 25, 26

Fed. R. Evid. 702 ...................................................................................1, 2, 6, 15

**Other Authorities**

J. Thomas McCarthy, *McCarthy on Trademarks* § 32:163 (5th ed. 2022)...................................16

Matthew G. Ezell & AnnaBelle Santore, "Survey Practices in Lanham Act
    Matters" in Trademark and Deceptive Advertising Surveys: Law, Science, and
    Design, 317-334 (Shari S. Diamond & Jerre B. Swann, eds., 2022)......................................15

Swann, J.B. "Likelihood of Confusion" in Trademark and Deceptive Advertising
    Surveys: Law, Science, and Design, 31-56 (Shari S. Diamond & Jerre B.
    Swann, eds. 2022)............................................................................................14, 15

Pursuant to the Court's Individual Rule 9, Plaintiffs Hermès International and Hermès of Paris, Inc. (collectively, "Hermès") respectfully submit this memorandum of law in support of their motion in limine to preclude: (1) the testimony of Dr. Blake Gopnik; (2) the testimony of Dr. David Neal; and (3) evidence and false analogies about third-party actions and/or artwork; and (4) proposed trial exhibits pursuant to Rules 401 and 403. These are addressed in order.

## ARGUMENT

## I.    DR. GOPNIK SHOULD BE EXCLUDED

Federal Rule of Evidence 702 provides that a witness "qualified as an expert" may offer opinion testimony only if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Under *Daubert*, district courts are charged "'with the responsibility of acting as gatekeepers to exclude unreliable expert testimony' and junk science from the courtroom." *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993); *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 415 (S.D.N.Y. 2016) (citation omitted). "The objective of [the gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "A court's inquiry thus focuses on three issues: (i) whether the witness is qualified to be an expert; (ii) whether the opinion is based upon reliable data and methodology; and (iii) whether the expert's testimony on a particular issue will assist the trier of fact." *Pac. Life Ins. Co. v. Bank of New York Mellon*, 571 F. Supp. 3d 106, 112 (S.D.N.Y. 2021) (citing *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005)). The party seeking to present expert testimony must establish each element of Rule 702 by a preponderance of the evidence. *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020).

Under Rule 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. If the evidence is offered to help prove a proposition that is not a matter in issue, it is immaterial. McCormick On Evid. § 185 (8th ed.). Under Rule 403, the Court may still exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d 105, 114 (S.D.N.Y. 2020) (Rakoff, J).

Rothschild proffers Dr. Gopnik as an art expert to support his defense that his promotion and sale of the METABIRKINS non-fungible tokens ("NFTs") is protected by the First Amendment.

Dr. Gopnik should be precluded from testifying for several reasons. First, Dr. Gopnik's opinion is not based upon any reliable data or methodology to support his mere *ipse dixit* assertions. Second, Dr. Gopnik opines on ultimate legal conclusions which would improperly substitute his judgment for the jury's. Third, Dr. Gopnik's opinions do not aid the trier of fact, as they do nothing more than repeat Rothschild's account of his own statements and actions. Fourth, Dr. Gopnik improperly interprets and opines on Rothschild's intent in creating and promoting the METABIRKINS NFTs.

A.   **Dr. Gopnik's Opinion is Comprised of *Ipse Dixit* Assertions and is not Based Upon Either Reliable Data or a Reliable Methodology**

Dr. Gopnik's testimony should be excluded because he provides no reliable data or supporting methodology to support his mere *ipse dixit* assertions. "'*Daubert* and Rule 702 mandate the exclusion of [] unreliable opinion testimony' that is 'based on data [and] a methodology' that

are 'simply inadequate to support the conclusions reached.'" *Olin Corp. v. Lamorak Ins. Co.*, No. 84-CV-1968 (JSR), 2018 WL 1901634, at *20 (S.D.N.Y. Apr. 18, 2018) (Rakoff, J.) (citations omitted). "Even '[i]f the witness is relying solely or primarily on experience, [he still] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *King v. Wang*, No. 14-CV-7694 (LJL), 2021 WL 5237195, at *10 (S.D.N.Y. Nov. 9, 2021) (citations omitted). As this Court explained, "[i]n the absence of some recognizable, describable methodology beyond an appeal to [the expert's] qualifications an opinion based on this methodology would be the essence of unverifiable subjectivity, amounting to the sort of *ipse dixit* connection between methodology and conclusion' that is properly excluded." *Alto v. Sun Pharm. Indus., Inc.*, No. 1:19-cv-09758-GHW, 2021 WL 4803582, at *6–7 (S.D.N.Y. Oct. 13, 2021) (internal quotation marks and citation omitted).

Dr. Gopnik does not explain his methodology, and no discernible methodology can be detected. Rather, Dr. Gopnik concedes that there is no agreed upon methodology among art historians to resolve disputes as to whether a particular item is "art." Fernandez Decl. Ex. 2 at 130:23-131:2. He admits that such a dispute would be "irresolvable" among "most sophisticated art critics." *Id.* at 117:16-21. In fact, Dr. Gopnik testified that "[t]here is no consensus among art critics on pretty much any issue." *Id.* at 95:15-21; *see also* 130:23-131:2 ("Again, there's no consensus among art historians about anything, including whether the Mona Lisa is art, so there cannot be a consensus on this either"). Dr. Gopnik further stated that "[t]here would be no consensus of art critics around fur-covered Birkin bags. My guess is I'm the only art critic who's ever encountered the question of fur-covered Birkin bags." *Id.* at 101:9-12. Despite there being no consensus among art critics, even Dr. Gopnik admits that his own opinions are outside the

3

mainstream. For example, Dr. Gopnik testified that "the Mona Lisa [is] a fairly trivial object, and most art critics would disagree with [him]." *Id.* at 95:20-23.

Dr. Gopnik defines "Business Art" in a manner that others do not embrace. Dr. Gopnik's definition for "Business Art," is broad enough to include the work of Andy Warhol and Marcel Duchamp, while also including: investing money in the stock market, creating a corporation, the public sale of works at auction, opening a restaurant, adopting the trademark of another company, activity geared towards provoking a lawsuit, and making money. *Id.* at 123:20-124:22, 128:12-14, 129:13-25, 131:3-7, 203:13-204:6, 236:22-238:24, 245:6-11; Ex. 1 at ¶¶ 9-12, 15, 17, 20; Ex. 3. There are a vast array of commercial activities that Dr. Gopnik classifies as "Business Art." *Id.* Dr. Gopnik opines that all of the business activities listed above become "expressive works" if and when declared "Business Art." *Id.* Interestingly, Dr. Gopnik's opinion about transactions qualifying as "Business Art" is contradicted by a recent ruling. In *Yuga Labs, Inc. v. Ripps, et al.*, No. CV 22-4355-JFW(JEMX), 2022 WL 18024480, at *5 (C.D. Cal. Dec. 16, 2022)*, the defendant, invoking *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), argued that certain NFT transactions qualified as expressive works protected by the First Amendment. The *Yuga Labs* court disagreed, explaining that under *Rogers*, "[t]hese are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment." *Yuga Labs*, 2022 WL 18024480, at *7.[1]

When asked at his deposition how he determines whether someone engages in "Business Art," Dr. Gopnik testified that he looks at the "larger set of contextual clues that tell you, oh, this

---

[1] It is, perhaps, noteworthy that *Yuga Labs* comes from the Ninth Circuit. Throughout this case, Rothschild has argued for this Court to apply the Ninth Circuit law implementing *Rogers*. Yet even under that Circuit's configuration, it would appear that Dr. Gopnik's position concerning what constitutes an expressive work would be problematic.

might be worth looking at as an artistic activity[.]" Fernandez Decl. Ex. 2 at 118:20-22. This is far from a reliable methodology. [2]

When defining "Business Art," Dr. Gopnik could not point to any sources that share his definition of "Business Art" testifying that it "would seem lame within. . . the social context of art history." *Id.* at 120:18-25. He then quickly corrected himself by stating he was "excluding" the articles he wrote discussing "Business Art" "which [he] tend[s] to agree with." *Id.* at 121:4-8. Put plainly, Dr. Gopnik's opinions—expressed without methodology—are unique to him.

Apparently, because he wrote a biography of Andy Warhol, Dr. Gopnik equates Rothschild to Warhol. But he does so with nothing beyond conclusory statements. Fernandez Decl. Ex. 1 at ¶¶ 4, 12, 15. His unsupported, conclusory assertions are devoid of analysis and lack methodology. Indeed, he does not even purport to apply a methodology. Dr. Gopnik's "opinion evidence [] is [only] connected to existing data [] by the *ipse dixit* of the expert" and thus, "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Allowing Dr. Gopnik to offer his opinions would be highly prejudicial to Hermès, as the trier of fact would likely give significant deference to Dr. Gopnik's opinion while providing no help to the jury. Fed. R. Evid. 403.

Dr. Gopnik does not explain any methodology for determining what falls within his definition of "Business Art"; he merely opines that the METABIRKIN NFTs fall within that

---

[2] Even if looking at the "larger set of contextual clues that tell you, oh, this might be worth looking at as an artistic activity" is a reliable methodology, Dr. Gopnik's analysis still renders his opinion problematic. In looking at the "larger set of contextual clues" to form his opinions, Dr. Gopnik was not aware that: (i) Rothschild promoted the METABIRKINS NFTs, made them available for purchase, and then sold them while the images still depicted only a shrouded object—a key point in this case; (ii) Hermès sold Birkin bags with fur (which would undercut a claim that the concept is unique); and (iii) Rothschild's first "art" project was selling unlicensed, college branded tee-shirts. Fernandez Decl. Ex. 1 at ¶ 38; Ex. 2 at 97:12-20; 161:16-20; 208:22-210:12.

definition. In so doing, Dr. Gopnik tacitly concedes that there is no identifiable methodology; it is a purely subjective analysis that rests solely with him. Interestingly, Dr. Gopnik refers to the METABIRKINS as having a "speculative quality" (Fernandez Decl. Ex. 1 at ¶ 37) which, when coupled with his other opinions, suggests that he can classify anything as "Business Art." Dr. Gopnik opines that the jury "should read the image [that] comes attached to [the METABIRKINS NFTs] as an attempt to make a larger comment . . . ." *Id.* ¶ 40. However, "[t]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it.' . . . The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." Fed. R. Evid. 702 advisory committee's note to 2000 amendments. Dr. Gopnik effectively concedes that his conclusions are not based on a methodology (reliable or otherwise) and that they would not be accepted by others. Dr. Gopnik's testimony should be precluded because his opinions fail to meet the threshold test of reliability.

**B.** **Dr. Gopnik Improperly Opines on Ultimate Legal Conclusions**

Dr. Gopnik's testimony also should be precluded because he provides inadmissible legal conclusions. It is well settled that expert testimony is inadmissible under Rule 702 if it "usurp[s] either the role of the trial judge instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Nimely*, 414 F.3d at 397 (internal quotation marks and citations omitted); *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468 (S.D.N.Y. 2005) (experts "may opine on an issue of fact within the jury's province," however, an expert "may not give testimony stating ultimate legal conclusions based on those facts.") (citation omitted).

Dr. Gopnik improperly seeks to substitute his opinion for that of the jury in considering the *Rogers* test. First, Dr. Gopnik opines that Rothschild's METABIRKINS NFTs are "art." Specifically, Dr. Gopnik states that "the images and NFTs produced and sold by Mason Rothschild

find their natural and obvious home among the artistic experiments carried out by modern artists over the last century." Fernandez Decl. Ex. 1 at ¶ 1. He concludes that "the only place where 'MetaBirkins' can afford to live" is within "Business Art." *Id.* ¶ 31. Dr. Gopnik also includes numerous improper conclusions that the METABIRKINS NFTs and images associated with them are art. *Id.* ¶ 8 ("Mason Rothschild's own art"); *id.* ¶ 11 ("Rothschild's 'MetaBirkins' artwork"); *id.* ¶ 26 ("Rothschild's 'MetaBirkins' mine a similar artistic seam."); *id.* ¶ 35 ("Rothschild's artistic expression").

Second, Dr. Gopnik opines on the ultimate issue of whether the METABIRKINS title is artistically relevant. He concludes that "[t]he name 'MetaBirkins' therefore tells us, among other things, that we should read the image it comes attached to as an attempt to make a larger comment on the nature of the Birkin bag." *Id.* ¶ 40; *see also id.* ¶ 36 ("At its most basic, the title "MetaBirkins" does what titles in art most commonly do: It indicates the subject of the artwork."); *id.* ¶ 39 ("It tells an informed viewer that the interest we are supposed to take in the Birkin that Rothschild has labelled 'meta' comes from a larger comment it makes, rather than from its mere virtues as a depiction of a fancy purse."). Dr. Gopnik should not be permitted to testify on these ultimate issues at the crux of this action. Allowing him to tell the jury how to react to and judge the "METABIRKINS" name would impermissibly "tell the jury what result to reach" and thus would substitute the expert's judgment for the jury's. *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992). For this reason, Dr. Gopnik should be precluded from testifying at trial.

   **C.    Dr. Gopnik's Opinions Do Not Aid the Trier of Fact, as They Merely Repeat Fact Witness Testimony**

   Dr. Gopnik's testimony also should be precluded because he does "little more than summarize evidence in the record in order to construct a narrative." *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 508 (S.D.N.Y. 2015); *AU New Haven, LLC v. YKK*

*Corp.*, No. 15 Civ. 3411, 2019 WL 1254763, at *24 (S.D.N.Y. Mar. 19, 2019), objections overruled, No. 15 Civ. 3411, 2019 WL 2992016 (S.D.N.Y. July 8, 2019) (excluding in part an expert opinion where expert "goes over internal [defendant] documents and testifies that the documents suggest that [defendant] agrees with his conclusion" because "[t]his testimony is nothing more than a narrative of the case which a juror is equally capable of constructing"). "Such material, to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004).

Rather than helping the jury understand the evidence through specialized knowledge or expertise, Dr. Gopnik simply recites otherwise admissible evidence about which he has no personal knowledge. Dr. Gopnik recounts Rothschild's own statements throughout the Report, including Rothschild's statements on social media. Fernandez Decl. Ex. 1 at ¶ 14 (quoting from Rothschild's Twitter Space conversation). Dr. Gopnik also restates Rothschild's published interview to provide context for the METABIRKINS NFTs. *Id.* ¶ 34 ("As Rothschild put it in an interview"); *id.* ¶ 37 ("Rothschild himself has said"); *id.* ¶ 38 ("As Rothschild explained in an interview"). Dr. Gopnik's testimony is, at most, cumulative. However, as an expert, allowing him to merely recite and emphasize Rothschild's own statements would improperly bolster Rothschild's testimony and improperly endorse and provide an air of credibility to Rothschild's testimony.

**D.    Dr. Gopnik's Opinions Do Not Aid the Trier of Fact as He Improperly Interprets Rothschild's Conduct**

Dr. Gopnik repeatedly speculates about Rothschild's intent, motive, and state of mind concerning the creation and promotion of the METABIRKINS NFTs and images. Courts have found inadmissible expert testimony where it "propose[s] improperly to assume the role of advocates for the [defendant's] case by arguing as to the intent or motives underlying the conduct

of [defendant], a transgression that has resulted in the exclusion of 'expert' testimony as to the 'real motive' behind" certain actions. *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d at 546; *see also Highland Cap. Mgmt., L.P.*, 379 F. Supp. 2d 461 at 469-470 (excluding parts of the expert report where it "offers only 'factual narratives and interpretations of conduct or views as to the motivation of parties.'") (citation omitted). Allowing Dr. Gopnik to testify about Rothschild's subjective intentions "creates the possibility that the jury, fully capable of reaching such a conclusion by itself, might give undue deference to the expert's conclusion." *Aventis Env't Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 516 (S.D.N.Y. 2005).

Here, Dr. Gopnik improperly interjects his opinion concerning Rothschild's state of mind when creating the METABIRKINS NFTs. For example, Dr. Gopnik opines that the production of NFTs "allows Rothschild to make an important artistic point about the way that our society—including the art world—is dominated by high-status goods." Fernandez Decl. Ex. 1 at ¶ 34; *see also* ¶ 33 ("The central interest in Rothschild's 'MetaBirkins' NFTs similarly comes from their place as high-priced commodities"); *id.* ¶ 34 ("Rothschild's NFT'd 'MetaBirkins' are meant to mimic this economic aspect of the real-world bags they depict"); *id.* ¶ 37 ("Rothschild's art asks us to imagine the 'Metabirkin' as the kind of deluxe Hermès bag a MetaKardashian might carry, in the virtual reality we will all inhabit"); *id.* ¶ 38 ("As Rothschild explained in an interview, he wanted to transfer the real-world aura of the physical Birkin into the virtual domain"); *id.* ("Rothschild's ridiculous fur flags the absurdist, parodic intent of his project."). Dr. Gopnik directly opines about Rothschild's state of mind: "Rothschild himself has said that one thing **he has in mind**, in his artistic experimentation, is to transfer the Birkin bag … into a digital world where virtuality reigns . . . ." *Id.* ¶ 37 (emphasis added). Dr. Gopnik concludes that the finder of

fact "should read the image [that] comes attached to [the METABIRKINS NFTs] as an attempt to make a larger comment on the nature of the Birkin bag . . . ." *Id.* ¶ 40.

Rothschild "is perfectly free to testify about his intentions and motivations, but no total stranger can offer his impressions about why" Rothschild created the METABIRKINS NFTs. *U.S. Commodity Futures Trading Comm'n v. Moncada*, No. 12 CIV. 8791 CM, 2014 WL 2945793, at *4 (S.D.N.Y. June 30, 2014). Dr. Gopnik's testimony should be precluded.

## III.    DR. NEAL'S TESTIMONY AT TRIAL SHOULD BE PRECLUDED

In support of Hermès's claim for trademark infringement, and specifically evidence of actual confusion, its expert, Dr. Bruce Isaacson, designed and conducted an *Eveready*[3] format confusion survey and issued a report on August 4, 2022. Fernandez Decl. Ex. 4 (Expert Report of Dr. Bruce Isaacson ("Isaacson Report")). Rothschild seeks to rebut Dr. Isaacson's survey through his expert, David Neal, Ph.D., who did not conduct any type of survey and instead merely issued a rebuttal report critiquing the Isaacson Report on September 1, 2022. *Id.*, Ex. 5 (Expert Rebuttal Report of David Neal, Ph.D. ("Neal Report")).

It should be noted that Dr. Isaacson was applying the widely-accepted survey format deemed appropriate under *Eveready* and its progeny. *See Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 339 (S.D.N.Y. 2013) (J. Rakoff) (describing the *Eveready* survey format and noting that it "is generally accepted and represents the 'gold standard' for cases involving strong marks"); *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 451 (S.D.N.Y. 2017) (citing *Akiro LLC*, 946 F. Supp. 2d at 339). Nonetheless, Dr. Neal opines that the Isaacson Report contains five flaws: (1) using the phrase "items shown on the webpage" (Survey Questions 1 and 7); (2) ignoring responses to a follow-up question (Survey Question 4); (3) testing all infringed elements together;

---

[3] *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366 (7th Cir. 1976).

(4) abandoning a Handbag survey; and (5) failing to disclose "critical" coding data. These are all contrivances and Dr. Neal should be precluded from testifying in this regard.

As to the first two grounds, Dr. Neal's critique applies survey methodology that is not scientifically reliable and, though he claims to have used before, Dr. Neal could point to no example of its use or instance where the methodology had been tested. Fernandez Decl. Ex. 6 at 111:6-22. Indeed, even here, Dr. Neal failed to conduct a rebuttal survey to test his theories. *Id.* at 29:19-31:3. In contrast, Dr. Isaacson employed a standard coding method for his NFT survey that has been accepted by courts, including this one. *See Akiro LLC*, 946 F. Supp. at 339 ("The Isaacson Report follows a standard, generally accepted survey format and presents a definitive finding that a negligible number of consumers were confused."). As such, Dr. Neal's critique on the first two grounds fail, and he should be precluded from testifying to them.

As to the third ground (testing all elements together), Dr. Neal was forced to admit that Dr. Isaacson's methodology was proper to the extent that the survey was testing the combined effect of the BIRKIN mark, BIRKIN handbag, HERMÈS mark, and the METABIRKINS NFTs. As to the fourth ground (the handbag survey), Hermès is making a "forward" confusion argument—that NFT purchasers will be confused. Hermès is not making the argument that handbag purchasers will be confused. Dr. Isaacson offered an opinion as to the former and not the latter. As such, Dr. Neal's opinion is irrelevant and would only serve to confuse a jury and should be precluded. Finally, as to the fifth ground (coding data), Dr. Neal's objection seems to be a discovery dispute, and one that is both incorrect and confusing. The underlying data used by Dr. Isaacson (that Dr. Neal sought) was provided. Further, any additional so-called "coding" data Dr. Neal sought did not exist.

As such, Dr. Neal's opinions and testimony should be precluded at trial because his opinions are not based upon a reliable survey methodology, they do not aid the trier of fact, and if permitted, would be unfairly prejudicial to Hermès.

### A.    Dr. Neal Offers Opinions That Are Not Based Upon A Reliable Survey Methodology (Purported Flaws 1 And 2)

Dr. Neal first objects to Dr. Isaacson's use of the phrase "items shown on the webpage" in the questions measuring confusion as "inherently ambiguous." Fernandez Decl. Ex. 5 at 20. Question 1 asked, "What company, companies, person, or people do you think makes or provides the items shown on the webpage?" Question 7 asked: "What other company, person or brand do you believe sponsors, authorizes, or approves whoever makes or provides the items shown on the webpage? Please be as specific as possible. If you don't know, please select 'I don't know.'" *Id.*, Ex. 4 at 15, ¶ 18.i; 23, ¶ 46.

Contrary to Dr. Neal's barebones conclusion that the term "items" was ambiguous, Dr. Isaacson chose the term "items" because it is neutral and non-leading. *Id.*, Ex. 7 at 169:18-170:5; 172:10-21; *see also THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168, 183-84 (S.D.N.Y. 2011) (finding a survey inadmissible, in part, because it suffered from demand effects by asking "leading questions about 'shirts' instead of neutral questions about 'products'"). He did not choose to use the word "NFT" because it is leading in that it directs respondents' attention to certain parts of the MetaBirkins.com webpage, and away from other parts of the webpage. *Id.* Leading questions can produce impermissible demand effects because they "suggest[ ] to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items." *Jackpocket, Inc. V. Lottomatrix NY LLC*, No. 22-CV-5772 (LJL), 2022 WL 17733156, *46 (S.D.N.Y. Dec. 7, 2022) (citation omitted). Moreover, Dr. Neal offered no suggestion for an

alternative to the term "items," other than "some language that made it clear whether [Dr. Isaacson] was referring to the NFT or to the real world physical object depicted in the NFT." Fernandez Decl. Ex. 6 at 128:17-130:21. There is simply no survey methodology or caselaw to support Dr. Neal's opinion that these particular survey questions were "inherently ambiguous" such that there is bias in Hermès' favor. *Id.,* Ex. 5 at 20. As such, he should be precluded from offering opinions concerning this purported "flaw."

Second, Dr. Neal proposed an unreliable and untested survey methodology that would require Dr. Isaacson to include a follow-up question to rule out a "reading test" problem (which Dr. Isaacson did). According to Dr. Neal, to code a respondent as confused, answers to both Questions 1 and 4 would need to indicate confusion. *Id.* at 15-17. Question 4, asked, "What other brands or products do you think are made or provided by whoever makes or provides the items shown on the webpage?" Fernandez Decl. Ex. 4 at 15, ¶ 18.ii.  One purpose of a follow-up question like this is to "rule out the possibility that respondents are merely reading or 'playing back' what is shown to them in the survey." *Id.*, Ex. 5 at 11-12, ¶ 3.3.2. However, Question 4 was also one of the questions that measured confusion. *Id.*, Ex. 4 at 15, ¶ 20 (Questions 1, 4, and 7 measured confusion). Surveys have more than one question to measure confusion not because respondents will repeat themselves or "read back," but because the Lanham Act discusses different types of confusion, such as confusion as to affiliation, connection, association, origin, sponsorship, or approval a respondent is not likely to answer every question with the same response. *See* Lanham Act § 43(a)(1), 15 U.S.C. 1125(a)(1). Given that the survey's confusion questions ask about different types of confusion, it is reasonable to expect respondents to answer each of those questions differently, and it is not reasonable to expect them to repeat the same answer across differently-phrased questions.

In support of Dr. Neal's novel argument that answers to <u>both</u> Questions 1 and 4 need to indicate confusion, he cites a single sentence in a chapter of a book authored by Jerre B. Swann:

> "the 'please name any other products put out by the same concern that puts out the lamp shown here' question (which measured the *reach* of the *battery* brand to products in a different category) was likely necessary in *Eveready* to differentiate between respondents who were merely 'playing back' the Ever-Ready label on the lamp from those who believed the *lamp* was put out by the battery company."

Fernandez Decl. Ex. 5 at 12-13, ¶ 3.3.5 (citing Swann, J.B. "Likelihood of Confusion" in Trademark and Deceptive Advertising Surveys: Law, Science, and Design, 31-56 (Shari S. Diamond & Jerre B. Swann, eds. 2022), p. 59-79). Dr. Neal cites to no surveys that have actually used this approach, and no court opinions recommending this approach; nor could he identify any during his deposition. *Id.*; Fernandez Decl. Ex. 6 at 111:6-22. Dr. Neal also omits the very next sentence in the same paragraph, which reads, "Where there are no such concerns, and particularly where the products directly compete, the question is not usually asked." Swann, J.B. "Likelihood of Confusion" in Trademark and Deceptive Advertising Surveys: Law, Science, and Design, 31-56 (Shari S. Diamond & Jerre B. Swann, eds. 2022), p. 61. There are no such concerns here. As such, this reference does not support Dr. Neal's argument. Dr. Neal is offering a method to reanalyze the survey data that is entirely without any basis in logic or precedent, and such an opinion should be precluded at trial.

In any event, Dr. Isaacson did not ignore data from the follow-up question. He coded the survey data according to accepted survey methodology for *Eveready* surveys, and counted as confused survey respondents who indicated that they were confused in either of their responses. Fernandez Decl. Ex. 4 at 24, ¶¶ 54-56. Dr. Isaacson, and many other survey experts, have asked questions similar to those asked in the NFT survey in many other surveys, and have used the coding method that Dr. Isaacson followed in this matter, which does not require that respondents provide

the same answer twice to count as confused. *See, e.g.*, *Akiro LLC*, 946 F. Supp. at 339; *T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 923-26 (S.D. Tex. 2014); *Namer v. Broad. Bd. of Governors*, No. CIV.A. 12-2232, 2014 WL 5780539, at *15-16 (E.D. La. Nov. 5, 2014), *aff'd*, 628 F. App'x 910 (5th Cir. 2015); *TravelPass Grp., LLC v. Caesars Ent. Corp.*, No. 5:18-CV-153-RWS-CMC, 2021 WL 6334670, at *10 (E.D. Tex. Sept. 29, 2021). While Dr. Neal's recoding found 9.3% net confusion, that number is not reliable because it is not based on a reliable methodology and still shows actual consumer confusion. Fernandez Decl. Ex. 5 at 17, ¶ 3.3.13; 18-19, ¶ 3.3.14 (citing Matthew G. Ezell & AnnaBelle Santore, "Survey Practices in Lanham Act Matters" in Trademark and Deceptive Advertising Surveys: Law, Science, and Design, 317-334 (Shari S. Diamond & Jerre B. Swann, eds., 2022), at p. 332 (citing to "courts finding that survey percentages of 7.7 percent, 7.5 percent, and 9 percent supported a finding of likely confusion")).

### B.      Dr. Neal's Report Includes Survey Critiques That Do Not Aid The Trier of Fact And Are Unfairly Prejudicial to Hermès (Purported Flaws 3-5)

The remaining three "flaws" claimed in the Neal Report are neither flaws nor survey critiques that help the trier of fact understand evidence or determine a fact at issue, as required by Rule 702(a).  Fed. R. Evid. 702(a). Additionally, the third purported flaw discussed below—to the extent there is any probative value—is substantially outweighed by unfair prejudice to Hermès.

Dr. Isaacson conducted an NFT survey measuring "the likelihood of confusion between Birkin bags from Hermès and MetaBirkins NFTs, which are sold by the Defendant, Mason Rothschild." Fernandez Decl. Ex. 4 at 1, 15, 38. Dr. Isaacson tested all alleged infringed elements together. The survey found net confusion among the NFT audience of 18.7%. *Id.* at 15, 38. The survey measured confusion by determining whether respondents who were shown the MetaBirkins.com website associated it with Hermès. *Id.* at 3-7, Figures 1-2; Ex. 7 at 108:15-109:7.

There is no doubt that the stimulus a survey expert shows respondents needs to recreate the real world. Courts consider whether the survey "sufficiently simulated the actual marketplace conditions in which consumers encountered the parties' products so as to be a reliable indicator of consumer confusion." *THOIP*, 690 F. Supp. 2d at 232. Thus, Dr. Isaacson showed respondents the MetaBirkins.com website, which is where Rothschild advertised the METABIRKINS NFTs. Fernandez Decl. Ex. 4 at 3-7, Figures 1-2; *Id.*, Ex. 7 at 108:15-109:7.

Dr. Neal agrees that an *Eveready* survey, the format used by Dr. Isaacson, must "as much as possible, replicate market conditions." Fernandez Decl. Ex. 6 at 51:14-25; 57:11-59:3. Indeed, "the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results." J. Thomas McCarthy, *McCarthy on Trademarks* § 32:163 (5th ed. 2022). And the survey here actually used Rothschild's marketing; yet Dr. Neal claims that Dr. Isaacson committed a "flaw" by testing all elements together. Fernandez Decl. Ex. 5 at 7. However, the Neal Report opines that "Dr. Isaacson's approach on this issue is not inherently flawed if one only seeks to know the combined effect of all four elements of alleged infringement." *Id.* at 9 (emphasis added). This is precisely what Dr. Isaacson was doing—he tested the elements together because that is how consumers encountered the alleged infringing elements in the marketplace at Rothschild's MetaBirkins.com website. As such, this survey critique is moot and would not aid the trier of fact in understanding evidence or determine a fact at issue.

Dr. Neal further improperly opines that Dr. Isaacson's Handbag survey was "improperly abandoned." *Id.* at 22. This is not accurate. Dr. Isaacson conducted the Handbag survey but he did not offer any opinion as to that survey because his "opinions in this matter are based on the survey of NFT purchasers rather than the survey of handbag purchasers because Hermès has made

allegations in this matter that are consistent with forward confusion." Fernandez Decl. Ex. 7 at 126:23-127:9; Ex. 4 at 35, ¶ 83; 37, ¶ 91. The Handbag survey would be appropriate if there was a reverse confusion claim, as the survey was conducted among a different audience–potential purchasers of luxury handbags. *Id.* However, Hermès's claim is for forward confusion and thus the Isaacson Report opines only on Dr. Isaacson's survey among NFT purchasers.   Fernandez Decl. Ex. 4 at 37, ¶ 91. Dr. Neal agrees this was the proper universe to survey, admitting, "the most relevant universe for forward confusion is typically likely purchasers of the junior user's goods." *Id.*, Ex. 6 at 140:23-141:5. The NFT survey conducted by Dr. Isaacson is the survey that will aid the jury in determining whether there was actual confusion among consumers of Rothschild's METABIRKINS NFTs.

Finally, Dr. Neal claims that Dr. Isaacson did not disclose "critical coding data," but as Dr. Isaacson testified and counsel for Hermès informed Rothschild's counsel, all survey data was provided to Dr. Neal as it was maintained in the ordinary course of Dr. Isaacson's practice. Fernandez Decl. Ex. 7 at 31:20-33:11, 39:3-18, 42:8-44:16, 49:19-50:21. Some data was provided after the Neal Report issued, which was requested in an alternate format and/or is data not normally disclosed by Dr. Isaacson, e.g., the all-starts data which reflects every survey participant, even those that did not complete the survey. *Id.* at 49:19-50:21; 55:11-16. Dr. Isaacson properly and in accordance with well-accepted survey methodology removed "speedsters" (completing the survey in under two minutes), "laggards" (taking more than one hour), and respondents with nonsensical responses from the survey database, and thus did not code them so there was no coding data to provide for those respondents. *Id.* at 31:20-33:11; 39:3-18. Dr. Neal agreed with the removal of these respondents under Dr. Isaacson's coding. *Id.*, Ex. 6 at 158:4-160:6.

Despite having access to all the survey data, Dr. Neal never amended his report and did not issue a supplemental report. To put before the jury Dr. Neal's claim that Dr. Isaacson improperly withheld survey coding data—which is patently false—is far more prejudicial to Hermès than probative to Rothschild. "The court may exclude relevant evidence if its probative value is substantially outweighed by" unfair prejudice. Fed. R. Evid. 403. Because this survey critique has no probative value, is unfairly prejudicial to Hermès, and otherwise does not aid the trier of fact, Hermès requests that it be excluded.

## IV.    ROTHSCHILD SHOULD BE PRECLUDED FROM OFFERING IRRELEVANT AND PREJUDICIAL ANALOGIES CONCERNING THIRD PARTY ACTIONS AND/OR ARTWORK

Much of the evidence Rothschild seeks to introduce has nothing to do with either his METABIRKINS NFTs or Hermès's infringement claims. As he has in the press and in other filings, most of this appears to be aimed at claiming that he is somehow protected because other artists have engaged in conduct (unrelated to Hermès's or BIRKINS) that he believes is analogous to his own. Likewise, Rothschild appears to argue that because others have had projects involving the BIRKIN name or design, that somehow provides him with a safe harbor to exploit the same in connection with METABIRKINS NFTs. This evidence is irrelevant and, even if relevant, more prejudicial than probative.

Perhaps the best example of these claims are the references to Andy Warhol and the Campbell's Soup can paintings. Rothschild's second exhibit (now, Exhibit 502) is a Campbell's Soup can; the third is a series of Warhol's 1962 paintings depicting Campbell's Soup cans. (Exhibit 503). Obviously, neither Warhol nor Campbell's Soup have anything to do with this case—their inclusion here it is to draw a false analogy. The problem is that whether Campbell's Soup objected to Warhol's work, beyond being irrelevant, is unknown. Further, regardless of the nature of the relationship between Warhol, his drawings, and Campbell's Soup—nothing about that relationship

is relevant here. Indeed, if Warhol were deemed to infringe Campbell's trademark or copyrights, that would not render Rothschild an infringer. Simply put, the activities of two non-parties 60 years ago is irrelevant to this matter.

The Warhol and Magritte (Exhibits 503 and 504) comparisons are false analogies for another reason. Since this case began, Hermès's claim has been for trademark infringement covering Rothschild's use of the METABIRKINS name in connection with the METABIRKINS NFTs. The METABIRKINS NFTs are associated with images of handbags that, by Rothschild's admission, are meant to look like Hermès's BIRKIN bags. Rothschild has tried to argue that Hermès's claim is about the images alone. That is incorrect. Indeed, after summary judgment Rothschild and his counsel (Messrs. Millsaps and Sprigman) were interviewed by *Women's Wear Daily* where they commented extensively about the case and the parties' claims.[4] And while Hermès disagrees with most of the characterizations by Rothschild and his counsel (including counsel saying: Hermès's argument is "really shifting into absurd territory;" that this was an "11th-hour argument;" that Hermès's position "wasn't really working;" and that Hermès ever said that the Court "should pay no attention to the images"), Rothschild's counsel did explain that Hermès's "argument is [Rothschild] is selling NFTs, he wasn't selling artwork." Fernandez Decl. Ex. 9 at 7. Even Rothschild does not argue that the pieces of code that create the NFTs, and are labelled METABIRKINS, are "art." And Rothschild does not dispute that the images associated with the METABIRKINS NFTs can be changed by him at any time. (ECF No. 68-1 at 28, 29, 32-33.) The images are important, of course, but simply comparing this case to Warhol's Campbell's Soups images is highly flawed.

---

[4] The entirety of the November 22, 2022 *Women's Wear Daily* piece was reprinted on the same day by *Yahoo! Finance*.  *See* https://finance.yahoo.com/news/exclusive-mason-rothschild-speaks-herm-235953942.html.

Rothschild should be precluded from offering into evidence any testimony or exhibits concerning other artists and their works. This includes references to Andy Warhol, René Magritte, and Rothschild's proposed Exhibits 502-504 and 595-597.[5] Fernandez Decl. Ex. 8 at 2-3, 7. It is beyond cavil that: (1) Warhol works are irrelevant to METABIRKINS NFTs; (2) Warhol himself is not important for understanding Mason Rothschild; (3) exhibits concerning Warhol and other artists are irrelevant and create a false equivalence; (4) arguments concerning Warhol and other artists are misleading; (5) all such arguments and evidence are unfairly prejudicial to Hermès under Rule 403. Fed. R. Evid. 401, 403.

With respect to Exhibit 503, there is no evidence that Andy Warhol originally—or ever— titled his works, "Campbell's Soup Cans." To the contrary, Dr. Gopnik testified that "people will often refer to the Campbell's Soups in order to talk about the paintings he made in 1962 that depicted Campbell's Soup cans. They were not titled by him that I know of." Fernandez Decl. Ex. 2 at 229:25-230:5. There is no evidence that Andy Warhol marketed these images for sale under any name other than his own. Rothschild made repeated and varied references to the METABIRKINS name, including for promotion, sales, and social media accounts and Discord community. ECF No. 68-1 at 11, 29; ECF No. 73-05 at 258:21-261:9; ECF Nos. 24-43, 73-2 at 5-7, 72-34, 72-35, 72-36, 72-37; ECF Nos. 72-15, 72-46 at HERMES_0008349-8350, 8523-8533, 8713-8719, 8763-8764, 8818-8822; ECF No. 72-47 at HERMES_0009416-9432; ECF No. 72-53. This is a trademark case, and as such, comparisons to Warhol's soup can images, even if relevant, would be confusing and far more prejudicial than probative.

---

[5] Pursuant to Judge Rakoff's Individual Rule of Practice 9, Hermès will provide to the Court courtesy copies of Rothschild's proposed exhibits, to the extent it has such copies. To date, Rothschild has not provided copies of all his proposed exhibits that were not Bates stamped.

Moreover, the nature and extent of Warhol's claim to be an "artist" as opposed to an "infringer" is currently before the US Supreme Court. *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26 (2d Cir. 2021), *cert. granted*, 212 L. Ed. 2d 402, 142 S. Ct. 1412 (2022). That case will examine whether Warhol had the right to use someone else's photograph under copyright law and, for copyright (but not trademark) purposes may actually deal with where appropriation ends and "art" begins. Given the complexities of the legal issues in the ongoing *Goldsmith* case, it is simply inaccurate for Rothschild to suggest or imply that Andy Warhol was acting within the bounds of the law and that Rothschild is therefore provided a safe harbor.

Finally, allowing references to Warhol at trial would unfairly prejudice Hermès under Rule 403. Rothschild is proffering a false analogy by comparing his adoption of the BIRKIN Mark and Trade Dress in the METABIRKINS NFTs to Andy Warhol or any of Andy Warhol's works. The issue of Warhol's "artistic motivations," and the artistic nature of any of his works is not before this Court. As indicated, there is no evidence before this Court concerning whether Campbell's Soup consented to or objected to Warhol's painting. Nor would it be appropriate for the jury to consider what is "art" on the basis of the Warhol paintings, and then try to analogize the same facts here.

Rothschild's motive here is plain. After the litigation was commenced, Rothschild's @Metabirkins Twitter account posted an image of a purported 1964 letter from Campbell Soup Company to Mr. Warhol. Fernandez Decl. Ex. 10. This post and the letter it contains, which has not been authenticated, is apparently offered as a public statement that because Campbell Soup

21

Company did not object to Warhol, the METABIRKINS NFTs should not be objectionable to Hermès.[6]

Because the circumstances surrounding Warhol and his works are beyond the scope of this Court's review and the jury—and there is no basis for anyone arguing factually or legally about Warhol and his works—any reference to Warhol for the purpose of claiming that acceptance of his work as "art" immunizes Rothschild from infringement liability for the METABIRKINS NFTs should be excluded under Rule 403. The introduction of this evidence would "require the paradigmatic 'trial within a trial' that Rule 403 disfavors." *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 358–59 (S.D.N.Y. 2014) (excluding evidence under Rule 403 offered to establish willful infringement of Beastie Boys' copyrighted videos by Monster-affiliated persons and entities beyond the scope of the litigation and where there was no prior adjudication of conduct as to the copyrighted videos). Introduction of Warhol's works would create a significant risk of unfair prejudice, trial delay, and confusion that would outweigh any probative value. Likewise, any comparison between Rothschild and Warhol's storied career at trial would only serve to confuse the jury and any faint probative value is dwarfed by the resulting prejudice to Hermès. *See Malleo v. AbbVie, Inc.*, No. 3:17-CV-0784 (JCH), 2020 WL 3603753, at *1 (D. Conn. July 2, 2020) (granting motion to exclude and finding that two employees were "not similarly situated such that [one of the employee's] evidence would be relevant and probative, and to the extent that it is, its prejudicial effect would substantially outweigh its probative value.").

Rothschild seeks to bring in third-party evidence concerning "artistic" uses of Hermès's BIRKIN trademark and/or trade dress. Once again, just because other individuals or entities *may*

---

[6] A similar statement was made by Rothschild's counsel, contrasting Campbell's Soup Company's "favorable" response to Warhol on the one hand with Hermès's decision to sue Rothschild on the other hand. *See* https://www.youtube.com/watch?v=hCrTblOtc5c at 44:00-44:30.

have been involved in projects related to the BIRKIN mark or handbag does not mean Rothschild has that right. Rothschild proposes to introduce several exhibits, all of which appear to be renderings of a Hermès BIRKIN handbag by others or mentions of the BIRKIN handbag in songs. Once again, this is to create the same type of false analogy: Rothschild seeks to protect his own behavior based on that of others. This has been a repeated theme during depositions and will be repeated at trial if these exhibits are not precluded. Fernandez Decl. Ex. 11 at 179:15-187:9, 199:4-204:7, 205:11-212:24, 223:10-228:14; Ex. 12 at 70:3-76:12; 96:15-97:8.[7]

This court has rendered two decisions (to date) in this case discussing the *Rogers* test and trademark infringement analysis. *Hermès Int'l v. Rothschild*, No. 22-CV-384 (JSR), 2022 WL 1564597, at *3-6 (S.D.N.Y. May 18, 2022); *Hermès Int'l v. Rothschild*, 590 F. Supp. 3d 647, 651-654 (S.D.N.Y. 2022). Each are fact intensive, including issues like motive and intent. Trademark infringement requires a balancing of the eight *Polaroid* factors to determine whether there is a likelihood of confusion. Showing different projects to the jury in order to have the jury (or a witness) opine on whether that project—be it a stone sculpture of a Birkin handbag or a photograph—is susceptible to a claim of trademark infringement requires several steps. There is no evidence in this case about any of these third-party projects, how they were created or received, or how they were marketed. In connection with each exhibit below, there is no evidence on most (if not all) of these factual inquiries. And such a comparison requires a case-within-a-case analysis. If Rothschild were to point to a stone sculpture and analogize it to his conduct, Hermès is put in the untenable position of trying to disprove that allegation. Rothschild is offering pictures and

---

[7] Additionally, subsequent to service of Plaintiffs' Consolidated Motions in Limine, Defendant's counsel served Second Amended Initial Disclosures, providing subject matters of testimony for the identified witnesses, which includes questioning concerning Hermès's general counsel's "view of and response to … other artwork related to Hermès and/or its products." Jan. 13, 2023 Jessica H. Fernandez Decl.,  Ex. 8 at 2.

articles (both of which may or may not be accurate) that create a flawed analogy and Hermès would be without a method for rebutting the claim. Ultimately, as this Court has explained, the salient analysis is the *Rogers* test and, assuming the claim survives, application of the *Polaroid* factors. As no evidence exists on any of these points, the flawed analogy would, at the very least, be more prejudicial than probative. The below exhibits also create the issue that the jury (and Hermès), without any evidence to undertake a *Polaroid* analysis, consider whether each are a trademark infringement, and then analogize to whether the reasons for or against infringement are relevant to Rothschild's METABIRKINS NFTs. This is all irrelevant and confusing, and Rothschild should be precluded from offering the following exhibits:

- Exhibit 507: Gunna song, "Baby Birkin" (2019)

- Exhibit 508: Cardi B song, "Up" (2021)

- Exhibit 509: Beyoncé song, "Summer Renaissance" (2022)

- Exhibit 510: Webpage advertising Tyler Shields, *Glitter Birkin* (2018)

- Exhibit 511: Webpage advertising Tyler Shields, *Money Birkin* (2020)

- Exhibit 512: Webpage advertising Becky Rosa, *Hermèss Black*

- Exhibit 513: Faran Krentcil, "This 100-pound, stone-carved Birkin bag is still cheaper than the real thing," *NY Post*, September 4, 2016

- Exhibit 514: September 22, 2019, Collecting Luxury blog post titled "Barbara Segal - Artist of the Rare Stone 'Birkin' Sculpture"

- Exhibit 515: Turbosquid.com webpage advertising "Hermes - Birkin Crocodile Bag" 3-D model

- Exhibit 516: Photograph of CJ Hendry pencil drawing of Birkin bag

- Exhibit 517: Tom Sachs: Rocket Factory webpage, "Deez Nuts"

- Exhibit 558: Text messages discussing other artists, including artist CJ Hendry

- Exhibit 596: @barbarasegal public Instagram account

- Exhibit 597: Leonardo Da Vinci, *Mona Lisa* (c. 1503-19)

Fernandez Decl. Ex. 8 at 2-3, 7.

## V.     ROTHSCHILD'S PROPOSED TRIAL EXHIBITS 593-595 SHOULD BE PRECLUDED UNDER RULES 401 AND 403

### A.     News Articles Discussing Details of this Action Should Be Precluded, Including Exhibits 593-594

Rothschild and his counsel have spoken to the media about this action and the parties' claims. *See* Fernandez Decl. Ex. 9. Neither Hermès nor its counsel have done so. As such, coverage of this case was susceptible to bias. Even if it were not, though, news coverage of this case is irrelevant. Not only are these news articles hearsay (*Delrosario v. City of New York*, 2010 WL 882990, at *7 (S.D.N.Y.2010)), but they should also be precluded pursuant to Rule 403. The authors in these articles provide their own interpretation of this action, the lawsuit's possible ramifications, and Rothschild's METABIRKINS NFTs. Fernandez Decl. Ex. 8 at 7. If introduced at trial, there would be risk of unfair prejudice, confusion of the issues, and a likelihood that the jury will be misled by someone else's interpretation of this action. Fed. R. Evid. 403.

### B.     Exhibit 595 Should Be Precluded Because It Is Irrelevant And Will Likely Confuse the Issues

Rothschild identified proposed Exhibit 595 as a YouTube video titled, "Driving the GMC Hummer EV in Call of Duty: MW2 – DMZ." Fernandez Decl. Ex. 8 at 7. Rothschild seeks to introduce this evidence to support the argument he raised on summary judgment that *AM Gen. LLC v. Activision Blizzard, Inc.* holds that marks used for different purposes, are not similar. 450 F. Supp. 3d 467, 477 (S.D.N.Y. 2020); ECF No. 62 at 18. In *AM Gen. LLC*, the video game creators of the well-known game "Call of Duty," known for its realism, depicted plaintiff's Humvees

tactical defense vehicles, which are portrayed in Exhibit 595. 450 F. Supp. 3d at 475. As Hermès

argued in its opposition to Rothschild's motion for summary judgment, *AM Gen. LLC* is

distinguishable for several reasons, including that the Humvee vehicles inside the game were

merely one of numerous design features in the hyper-realistic game, unlike here, where Rothschild

generated the METABIRKINS NFTs to be individually sold as digital commodities. (ECF No. 90

¶¶ 91, 116-117, 136.) Even if it were not, none of the facts present in that case are present here.

Accordingly, Exhibit 595 should be precluded because it is irrelevant. Fed. R. Evid. 401.

## CONCLUSION

For the foregoing reasons, Hermès respectfully requests that this Court grant its motion in

limine to preclude: (i) Dr. Gopnik and Dr. Neal from offering testimony at trial; (ii) evidence and

false analogies about third-party actions and/or artwork; (iii) evidence not produced during

discovery; and (iv) proposed trial exhibits pursuant to Rules 401 and 403.


Dated: January 13, 2022
     New York, New York

**BAKER & HOSTETLER LLP**
Deborah A. Wilcox, Esq. (*pro hac vice*)
Key Tower
127 Public Square
Cleveland, OH 44114
Telephone:  216.621.0200

**BAKER & HOSTETLER LLP**
Lisa Bollinger Gehman, Esq. (*pro hac vice*)
1735 Market Street
Philadelphia, PA 19103
Telephone:  215.568.3100

**BAKER & HOSTETLER LLP**

By:  /s/ *Gerald J. Ferguson*
     Gerald J. Ferguson, Esq.
     Oren J. Warshavsky, Esq.
     Jason S. Oliver, Esq.
     Jessica H. Fernandez, Esq.
     Francesca A. Rogo, Esq.
     45 Rockefeller Plaza, 14th Floor
     New York, NY 10111
     Telephone:   212.589.4200
     Facsimile:    212.589.4201

     *Attorneys for Plaintiffs*
     *Hermès International and*
     *Hermès of Paris, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of January, 2023, a true and correct copy of the

foregoing **PLAINTIFFS' CONSOLIDATED MOTIONS IN LIMINE** was served on counsel

for Defendant Mason Rothschild at their email addresses of record:

Lex Lumina PLLC
Rhett O. Millsaps II
rhett@lex-lumina.com
Christopher J. Sprigman
chris@lex-lumina.com
Mark McKenna
mark@lex-lumina.com
Rebecca Tushnet
rtushnet@lex-lumina.com

Harris St. Laurent & Wechsler LLP
Jonathan Harris
jon@hs-law.com
Adam Oppenheim
aoppenheim@hs-law.com


*/s/ Lisa Bollinger Gehman*
Lisa Bollinger Gehman