**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

HERMÈS INTERNATIONAL and
HERMÈS OF PARIS, INC.,

    Plaintiffs,

    v.

MASON ROTHSCHILD,

    Defendant.

No. 22-cv-00384-JSR

<u>**MEMORANDUM OF LAW IN OPPOSITION TO**</u>
<u>**PLAINTIFFS' CONSOLIDATED MOTIONS *IN LIMINE***</u>

# TABLE OF CONTENTS

I.    Motion *in Limine* No. 1 to Preclude the Testimony of Dr. Gopnik ............................................1

  A.  Dr. Gopnik's Expert Testimony Is Reliable and Will Help the Jury. ......................................1

  B.  Dr. Gopnik's Testimony Relates Not to Subjective Intent or to Legal Conclusions, But to
How *MetaBirkins* and Mr. Rothschild's Conduct Should Be Understood in Their Artistic
Context.................................................................................................................................4

II.   Motion *in Limine* No. 2 to Preclude the Testimony of David Neal .........................................8

III.  Motion *in Limine* No. 3 to Preclude Evidence and Analogies about Third-Party Actions
and/or Artwork ...................................................................................................................15

IV.  Motion *in Limine* No. 4 to Preclude Proposed Trial Exhibits Pursuant to Rules 401
and 403 ...............................................................................................................................16

# TABLE OF AUTHORITIES

## Cases

*Alcantar v. Foulk*
   No. 1:14-cv-00747 LJO MJS (HC), 2016 WL 3001242 (E.D. Cal. May 25, 2016) .................5

*AM Gen. LLC v. Activision Blizzard, Inc.*
   450 F. Supp. 3d 467 (S.D.N.Y. 2020) .................................................................17

*AU New Haven, LLC v. YKK Corp.*
   No. 15 Civ. 3411, 2019 WL 1254763 (S.D.N.Y. Mar. 19, 2019) ................................2

*Banff, Ltd. v. Federated Dep't Stores*
   841 F.2d 486 (2d Cir. 1988) .............................................................................14

*Bleistein v. Donaldson Lithographing Co.*
   188 U.S. 239 (1903)...........................................................................................3

*Bluetooth SIG, Inc. v. FCA US LLC*
   468 F. Supp. 3d 1342 (W.D. Wash. 2020).............................................................8

*Brancusi v. United States*
   54 Treas. Dec. 428 (Cust. Ct. 1928) ....................................................................2

*Castillo v. G&M Realty L.P.*
   950 F.3d 155 (2d Cir. 2020) ........................................................................3, 18

*Cohen v. G & M Realty L.P.*
   320 F. Supp. 3d 421 (S.D.N.Y. 2018) ..................................................................6

*Cohen v. G&M Realty L.P.*
   No. 13-CV-05612 (FB) (RLM), No. 15-CV-3230 (FB) (RLM)
   2017 WL 1208416 (E.D.N.Y. Mar. 31, 2017)..........................................................3

*Com. v. United Books, Inc.*
   453 N.E.2d 406 (Mass. 1983) .............................................................................3

*Fin. Guaranty Ins. Co. v. Putnam Advisory Co., LLC*
   12 Civ. 7372 (AT), 2020 WL 4251229 (S.D.N.Y. Feb. 19, 2020)............................9

*Highland Cap. Mgmt., L.P. v. Schneider*
   379 F. Supp. 2d 461 (S.D.N.Y. 2005) ..................................................................6

*Hygh v. Jacobs*
   961 F.2d 359 (2d Cir. 1992) ...............................................................................5

*In re Rezulin Prod. Liab. Litig.*
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................................................... 2

*In re Vitamin C Antitrust Litig.*
   No. 05 Civ. 0453, 2012 WL 6675117 (E.D.N.Y. Dec. 21, 2012) ............................... 9

*Levinson v. Westport Nat'l Bank*
   No. 3:09-cv-00269 (VLB), 2012 WL 4489260 (D. Conn. Sept. 28, 2012) ..................... 4

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*
   97 F. Supp. 3d 485 (S.D.N.Y. 2015) ................................................................. 2

*Luke Records v. Navarro*
   960 F.2d 134 (11th Cir. 1992) ......................................................................... 3

*McCullock v. H.B. Fuller Co.*
   61 F.3d 1038 (2d Cir. 1995) ............................................................................ 8

*Nimely v. City of New York*
   414 F.3d 381 (2d Cir. 2005) ............................................................................ 5

*Packard v. City of New York*
   15 Civ. 7130 (AT) (SDA), 2020 WL 1479016 (S.D.N.Y. March 25, 2020) .................. 8

*Rogers v. Grimaldi*
   875 F.2d 994 (2d Cir. 1989) ............................................................................ 6

*Smith v. California*
   361 U.S. 147 (1959) ..................................................................................... 3

*Union Carbide Corp. v. Ever-Ready Inc.*
   392 F. Supp. 280 (N.D. Ill. 1975) .................................................................... 12

*Union Carbide Corp. v. Ever-Ready Inc.*
   531 F.3d 366 (1976) ..................................................................................... 12

*U.S. v. Ten Erotic Paintings*
   432 F.2d 420 (4th Cir. 1970) ........................................................................... 3

*U.S. v. Whorley*
   400 F. Supp. 2d 880 (E.D. Va. 2005) ................................................................. 4

*U.S. v. Arthur*
   51 F.4th 560 (5th Cir. 2022) ........................................................................... 4

*Yudkin v. State*
182 A.2d 798 (Md. 1962) ..............................................................................................3

**Statutes**

107 U.S.C. § 106A ..............................................................................................................2

**Other Authorities**

Reference Manual on Scientific Evidence.......................................................................10

Swann, J.B. "Likelihood of Confusion" in Trademark and Deceptive Advertising Surveys: Law, Science, and Design, 31-56 (Shari S. Diamond & Jerre B. Swann, eds. 2022)........................11

**Rules**

Federal Rule of Evidence 703 ............................................................................................1

Pursuant to the Court's Individual Rule 9, Defendant Mason Rothschild respectfully submits this memorandum of law in opposition to Plaintiffs' Consolidated Motions *in Limine* to preclude: (1) the testimony of Dr. Blake Gopnik; (2) the testimony of Dr. David Neal; (3) evidence and analogies about third-party actions and/or artwork; and (4) certain proposed trial exhibits pursuant to Rules 401 and 403. This Court should reject all of Hermès' motions in their entirety.

## I.   Motion *in Limine* No. 1 to Preclude the Testimony of Dr. Gopnik

Mr. Rothschild's proffered expert, Dr. Blake Gopnik, is qualified to opine on and useful to the jury in this case in determining: (i) whether *MetaBirkins* may properly be understood to be art; and (ii) whether Mr. Rothschild's conduct, and specifically his use of the "Birkin" trademark in the title *MetaBirkins*, is consistent with his stated artistic intent.

### A.    Dr. Gopnik's Expert Testimony Is Reliable and Will Help the Jury.

Hermès' attacks on Dr. Gopnik's supposed lack of "methodology" are meritless. This is a case about the boundaries of art, which requires the application of inherently difficult concepts appropriately guided by vetted expertise in the fields of art history and art criticism — precisely the expertise Dr. Gopnik is qualified to provide.

Federal Rule of Evidence 703 allows experts to base their opinions on the facts or data that the expert believes relevant "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject...." Dr. Gopnik satisfies that standard by relying on the kinds of facts and data on which experts in his fields generally rely — including the aesthetic, conceptual, and representational aspects of the artworks in question and how those works fit into art history and particular artistic genres — to identify Rothchild's *MetaBirkins* NFTs and associated images as works of art, and, specifically, as works of

conceptual art and business art in the tradition of Andy Warhol, Damien Hirst, and other well-known artists.

Although art is rarely on trial, courts have admitted expert testimony when it is—across a wide range of cases, including obscenity cases, tax cases, and cases involving the Visual Artists Rights Act (VARA), 107 U.S.C. § 106A. *See, e.g., Brancusi v. United States*, 54 Treas. Dec. 428, 430-31 (Cust. Ct. 1928) (relying on expert testimony of artists, critics, and curators to distinguish art from mere metal "objects" for the purpose of assessing tax liability). Given that factfinders might not be practiced in answering the question "is that art?", expert testimony on the subject of how experts in the field answer that question can fill in their knowledge gaps.

Such knowledge gaps are almost certain in this case. Mr. Rothschild is a conceptual artist who engages with the world of commerce; he's not a fine artist who paints landscapes. Dr. Gopnik's expert testimony will be particularly useful to the jury, both in their assessment of Mr. Rothschild's artistic intent, and in their understanding of the nature of Mr. Rothschild's art.[1] *See*

---

[1] Hermès' assertion that Dr. Gopnik's testimony should be excluded because he does nothing other than "summarize evidence" or "repeat fact witness testimony," Plaintiffs' Consolidated Motions *in Limine* ("Hermès MIL") at 7-8, is inaccurate. Much of Dr. Gopnik's report contains expert analysis identifying the artistic traditions of the genres of conceptual art and business art into which Mr. Rothschild and his *MetaBirkins* artworks squarely fit. This neither "summarizes" other evidence nor repeats the testimony of other fact witnesses—not least because there are no other witnesses on either side in this case who are qualified to give this testimony. The cases that Hermès cites are inapposite. In *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485 (S.D.N.Y. 2015), the court excluded an expert on the ground that expert testimony may not " be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." Dr. Gopnik is not offered for that purpose. Hermès' other citations, namely *AU New Haven, LLC v. YKK Corp.*, No. 15 Civ. 3411, 2019 WL 1254763, at *24 (S.D.N.Y. Mar. 19, 2019), *objections overruled*, No. 15 Civ. 3411, 2019 WL 2992016 (S.D.N.Y. July 8, 2019) (excluding portion of expert's testimony where "he goes over internal YKK documents and testifies that the documents suggest that YKK agrees with his conclusion"), and *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (excluding expert's testimony about the regulatory history of a prescription drug because it is "merely a narrative of the case which a juror is equally capable of constructing") (internal quotations omitted), are inapposite for similar reasons, and are unhelpful here.

*Castillo v. G&M Realty L.P.*, 950 F.3d 155, 166 (2d Cir. 2020) (inviting testimony of "the artistic community, comprising art historians, art critics, museum curators, gallerists, prominent artists, and other experts" to determine whether an artwork has a recognized status under VARA, as one way of implementing "Justice Holmes's cautionary observation that '[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [visual art].'") (citing *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903)); *Luke Records v. Navarro*, 960 F.2d 134, 138-139 (11th Cir. 1992) (reversible error to ignore expert testimony that a rap album had serious artistic value); *U.S. v. Ten Erotic Paintings*, 432 F.2d 420, 420 (4th Cir. 1970) (relying on affidavits in which art experts certified that the works in question had artistic merit); *Com. v. United Books, Inc.*, 453 N.E.2d 406, 412 (Mass. 1983) (expert testimony on literary or artistic merit admissible in obscenity case) (quoting *Smith v. California*, 361 U.S. 147, 164-65 (1959) (Frankfurter, J., concurring) ("[T]o exclude such expert testimony is in effect to exclude as irrelevant evidence that goes to the very essence of the defense and therefore to the constitutional safeguards of due process.")); *Yudkin v. State*, 182 A.2d 798, 801-02 (Md. 1962) (reversible error to exclude experts who would have testified that the book Tropic of Cancer had literary merit).

Hermès challenges the fields of art history and art criticism, complaining that Dr. Gopnik's analysis does not hew to a recognized methodology. That the fields of art history and art criticism have methodological disagreements does not make art historians or art critics different from other experts, many of whom belong to disciplines which harbor methodological disagreements. *See Cohen v. G&M Realty L.P.*, No. 13-CV-05612 (FB) (RLM), No. 15-CV-3230 (FB) (RLM), 2017 WL 1208416, at *2-3 (E.D.N.Y. Mar. 31, 2017) (art experts are allowed to invoke "iconoclastic and disputable aesthetic theories," which can provide "a legal basis for the

plaintiffs' expert's chosen methodology"; even court's skepticism about premises and rigor do

not merit exclusion where experts used variety of relevant factors to reach their conclusions;

"any remaining problems with the expert are for the jury to decide").

Indeed, courts have recognized that the comparative method used in art history and art

criticism, and employed by Dr. Gopnik here, is appropriate to evaluate "literary" or "artistic"

value—an inquiry that often is required in obscenity cases. For example, in *United States v.*

*Arthur*,  the defendant's expert report compared the accused materials to "literature and art that is

generally accepted as having serious artistic or literary value," and the court of appeals held that

excluding this testimony was error. 51 F.4th 560, 573-74 (5th Cir. 2022). "Determining whether

a work has serious literary or artistic value is not a strictly scientific inquiry," *id.* at 574, but the

comparative method was sufficiently reliable: "[A]s a matter of common sense, comparing the

content, as well as the literary and artistic devices used, in the charged materials with works a

reasonable person would understand as having literary or artistic value is a logical method for

determining whether a reasonable person would also interpret the charged materials as having

such value." *Id.*; *see also U.S. v. Whorley*, 400 F. Supp. 2d 880, 884-85 (E.D. Va. 2005)

(rejecting motion *in limine* and admitting literature expert's testimony comparing accused works

with "works of literary value"); *cf. Levinson v. Westport Nat'l Bank,* No. 3:09-cv-00269 (VLB),

2012 WL 4489260, at *6 (D. Conn. Sept. 28, 2012) (finding expert testimony "sufficiently

reliable" where expert compared relevant industry standard practices with facts of case).

### B.   Dr. Gopnik's Testimony Relates Not to Subjective Intent or to Legal Conclusions, But to How *MetaBirkins* and Mr. Rothschild's Conduct Should Be Understood in Their Artistic Context.

Hermès also argues that Dr. Gopnik should be excluded—or his testimony limited—

because he is testifying about Mr. Rothschild's subjective intent. Hermès misapprehends the

4

scope of Dr. Gopnik's testimony. Dr. Gopnik is *not* being offered to testify about Mr. Rothschild's subjective intentions or state of mind, Dr. Gopnik will testify about how Mr. Rothschild's *conduct* is consistent with artistic traditions, practices, and works well-known to experts in his fields. Dr. Gopnik will do so based on his understanding of the artistic conventions that Mr. Rothschild appears to be working within, his analysis of how Mr. Rothschild's work engages the artistic genres of conceptual art and business art, and his expertise and knowledge regarding how other recognized artists within those genres have approached their work in ways that are similar to what Mr. Rothschild has done with *MetaBirkins* and his other art projects. *Cf. Alcantar v. Foulk*, No. 1:14-cv-00747 LJO MJS (HC), 2016 WL 3001242, at *12, n.17 (E.D. Cal. May 25, 2016) ("There is an important difference between an expert's testimony that a specific individual possessed a specific intent, and testimony that gives meaning to the defendant's actions.") (cleaned up).

Hermès also argues that Dr. Gopnik is seeking to testify about ultimate legal conclusions, or that he seeks to substitute his opinion for that of the jury on the application of the *Rogers* test. Again, Hermès misapprehends the testimony. Dr. Gopnik's testimony is helpful to the jury in making *factual* determinations: whether Mr. Rothschild's *MetaBirkins* are art, what the relationship is between the title "MetaBirkins" and the *MetaBirkins* artworks, and whether Mr. Rothschild's conduct is consistent with his stated artistic intent. Dr. Gopnik's testimony thus is helpful to the jury in assessing whether the *Rogers* test protects Mr. Rothschild's work.[2] Hermès

---

[2] None of the cases that Hermès cites are apposite. In *Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992), the court held that testimony by an expert that a defendant's use of force was not "justified under the circumstances," not "warranted under the circumstances," and "totally improper" should have been excluded because it crossed over into the territory of an ultimate legal conclusion. *Id.* at 364. Dr. Gopnik is not being offered to testify, as the expert in *Hygh* did, on the ultimate issue of liability. Likewise, in *Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005), the court excluded the testimony of an expert offered to testify as to the credibility of two police officers—a determination that the jury could make for itself. Dr. Gopnik is not offered to

could have hired their own art expert to testify but did not. *See, e.g.*, *Cohen v. G & M Realty L.P.*, 320 F. Supp. 3d 421, 438-39 (S.D.N.Y. 2018) (discussing parties' dueling art experts).

Nor can Hermès reasonably claim that Dr. Gopnik's testimony is not relevant. Whether *MetaBirkins* are art and the nature of the relationship between the *MetaBirkins* images and the NFTs with which they are associated are in dispute. It is therefore central to Mr. Rothschild's defense that he be able to present evidence from an expert who can place Mr. Rothschild's *MetaBirkins* and the NFTs with which they are associated within the context of the history and traditions of art, and within the artistic conversation to which Mr. Rothschild's art belongs.[3]

Hermès also makes factual arguments that are for the jury. For example, in a footnote of its motion, Hermès argues that Dr. Gopnik was not aware that Mr. Rothschild "promoted the METABIRKINS NFTs, made them available for purchase, and then sold them while the images still depicted only a shrouded object...." Hermès MIL at 5 n.2.  Hermès first raised its "shrouded

---

testify about Mr. Rothschild's credibility as a witness. Rather, he is offered to testify about how, in his expert opinion, both Mr. Rothschild's *MetaBirkins* and Mr. Rothschild's conduct can be understood in an artistic context. Finally, Hermès cites *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468 (S.D.N.Y. 2005), in which the Magistrate Judge barred an expert on the grounds that he was offering to testify directly about the defendant's state of mind: "The [Expert] Report's narrative also includes O'Shea's own speculation regarding the state of mind and motivations of certain parties who were involved in the relevant transaction, often without citation to any record evidence. For example, he asserts that an individual involved in the transaction was 'likely aware' that certain parties to the transaction could be preparing to sell stock and that this individual was 'also likely concerned' that the sale of the stock could 'depress the market price of McNaughton stock.'" *Id*. at 469. Dr. Gopnik is not offering to testify about Mr. Rothschild's state of mind.

[3] Mr. Rothschild preserves his argument that *Rogers* is an objective test, and that if the *MetaBirkins* title objectively has any artistic relevance whatsoever to the *MetaBirkins* images, then Mr. Rothschild's intent in creating those images is irrelevant, and Mr. Rothschild can be held liable only if Hermès can show that Mr. Rothschild explicitly misled consumers regarding the source of the *MetaBirkins*. *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989).

object" argument after receiving Dr. Gopnik's report. When Hermès subsequently raised the point in Dr. Gopnik's deposition, Dr. Gopnik addressed it:

> Q.   [Showing Exhibit 57]. What else would you need to know about this -- what's depicted in this exhibit in order to determine whether it's a work of art?
>
> A.   Well, among other things what I want to do -- I guess I could do it right here. It seems to be one of the other MetaBirkins covered with a sheet, which would actually indicate to me more rather than less that it's participating in a larger artistic project. It seems to be riffing on other items from the MetaBirkins repertoire. And the pedestal with a draped object on top of it very much refers to statuary in the history of art. The act of unveiling a statue is something that exists in the history of art. So it seems very much to be part of that discourse. So, yes, the answer is I would say yes, it does seem to be understood in an artistic context.

Declaration of Adam Oppenheim dated January 23, 2023 ("Oppenheim Decl.") ¶ 2, Ex. A (B. Gopnik Dep. (Sept. 23, 2022) Tr.) at 207:4-208:7.

> Q.   Referring back to Exhibit 57, people who purchase MetaBirkins without seeing what it is, with respect to this purchase, was art not at stake? [...]
>
> A.   They know exactly what MetaBirkins is. They have an image of one version, one component, one moment in MetaBirkin projects. They see a sculpture pedestal with a draped something on it which might be purse-like. The fact it says MetaBirkins makes you think I wonder if there's a Birkin underneath that. They have lots of information there to think that there might be something artistic going on. And it's in the world of NFTs, NFT images, which automatically says, Wait a minute, something art-like might be going on here; I should pay attention.

*Id.* at 213:24-214:23.

Apparently because Hermès did not like Dr. Gopnik's answer, it now seeks to exclude Dr. Gopnik's answer. That is no basis for exclusion. Rather, it only reinforces the relevance of Dr. Gopnik's testimony.[4]

---

[4] Hermès makes two more arguments in a footnote. First, Hermès claims that when Dr. Gopnik rendered his opinion in his expert report, he did not know that Hermès has in fact made bags "with fur". *See* Hermès MIL at 5 n.2. Those bags are not, like *MetaBirkins*, entirely covered in

The bottom line is this: Hermès could have offered an art expert to challenge Dr. Gopnik and to explain why, in Hermès' view, *MetaBirkins* are not art. Hermès chose not to do so, despite knowing from the beginning of this case that Mr. Rothschild asserted that *MetaBirkins* are art. Hermès should not now be permitted to escape the consequences of its choice by denying Mr. Rothschild the ability to defend himself.

## II.   Motion *in Limine* No. 2 to Preclude the Testimony of David Neal

Hermès seeks to preclude the testimony of Dr. David Neal, an expert whose testimony rebuts the confusion survey offered by Hermès's expert, Dr. Bruce Isaacson.

Hermès' arguments for excluding Dr. Neal essentially boil down to the contention that Dr. Neal's criticisms of Dr. Isaacson's report are wrong, and therefore Dr. Neal shouldn't get to testify. But this is exactly the kind of dispute on which it is appropriate to admit expert testimony and rebuttal. *See, e.g., McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (finding that disputes as to faults in methodology go to the weight, not the admissibility, of expert testimony); *Bluetooth SIG, Inc. v. FCA US LLC*, 468 F. Supp. 3d 1342, 1349 (W.D. Wash. 2020) (criticisms of survey expert who didn't conduct his own trademark survey went only to weight, not admissibility); *Packard v. City of New York*, 15 Civ. 7130 (AT) (SDA), 2020 WL 1479016, at *5 (S.D.N.Y. March 25, 2020) (disputes concerning expert's methodology went to weight, not admissibility); *Fin. Guaranty Ins. Co. v. Putnam Advisory*

---

fake fur—they are leather with some bits of fur stuck on. *See* Declaration of Megan A. Corrigan dated Oct. 7, 2022, Exs. 60-61 (ECF Nos. 73-29 & 73-30). When Hermès asked Dr. Gopnik about this at deposition he testified that it did not affect his opinion. *See* Oppenheim Decl. ¶ 2, Ex. A (B. Gopnik Dep. (Sept. 23, 2022) Tr.) at 98:8-101:5. Second, Hermès claims that when Dr. Gopnik rendered his opinion he did not know that Mr. Rothschild's art project entitled *Art School Dropout* involved the sale of what Hermès refers to as "unlicensed, college branded tee-shirts." Hermès MIL at 5 n.2. Hermès also asked Dr. Gopnik about this at his deposition, and Dr. Gopnik stated that what Hermès showed him did not change his opinions and in fact the "Art School Dropout" t-shirts appeared to bear the hallmarks of an artistic project. *See* Oppenheim Decl. ¶ 2, Ex. A (B. Gopnik Dep. (Sept. 23, 2022) Tr.) at 161:16-167:7.

*Co., LLC*, 12 Civ. 7372 (AT), 2020 WL 4251229, at *11 (S.D.N.Y. Feb. 19, 2020) (same); *cf.*

*In re Vitamin C Antitrust Litig.*, No. 05 Civ. 0453, 2012 WL 6675117, at *8 (E.D.N.Y. Dec. 21,

2012) (noting that plaintiffs' motion "asks the Court to take sides in a dispute between experts

about the intricacies of econometric modeling" which is "not the proper function of a *Daubert*

motion.").

The jury will almost certainly have no experience assessing trademark surveys or

employing empirical methods, and Dr. Neal's testimony is therefore critical to Mr. Rothschild's

efforts to rebut Dr. Isaacson's report and highlight the defects in Dr. Isaacson's empirical work.

"It should be noted," Hermès states in its motion, "that Dr. Isaacson was applying the

widely-accepted survey format deemed appropriate under *Eveready* and its progeny." Hermès

MIL at 10. But as Dr. Neal will testify, in fact Dr. Isaacson *misapplied* the *Eveready* survey

format in ways "that introduced systematic bias" in favor of Hermès. Oppenheim Decl. ¶ 3, Ex.

B (Expert Rebuttal Report of David Neal, Ph.D., in Response to Expert Report of Dr. Bruce

Isaacson ("Neal Rep.")) ¶ 2.1 at 5-6.

Dr. Neal opines that the Isaacson Report contains five flaws: (1) using as a survey

prompt the ambiguous phrase "items shown on the webpage" (Survey Questions 1 and 7); (2)

ignoring responses to a follow-up question (Survey Question 4); (3) testing all infringed

elements together; (4) abandoning a survey of handbag purchasers; and (5) failing to disclose

"critical" coding data. *Id.* at 5-7.

Regarding the first criticism, Hermès argues that Dr. Neal should be precluded from

testifying about the ambiguity of the phrase "items shown on the webpage" in questions

attempting to measure confusion. According to Hermès, Dr. Isaacson's questions were

appropriate because Dr. Isaacson's "items shown on the webpage" formulation was neutral and

non-leading. Hermès MIL at 12. But the stimulus that Dr. Isaacson used was a screenshot of the MetaBirkins.com website, which depicted Mr. Rothschild's *MetaBirkins* artworks. Those artworks are fanciful depictions of Birkin bags, and as Dr. Neal explained, there is no way to know whether respondents understood the "items" identified in Dr. Isaacson's question to refer to Mr. Rothschild's artworks or to the Birkin bags his artworks depict. Oppenheim Decl. ¶ 3, Ex. B (Neal Rep.) ¶ 3.4.5 at 22 ("This ambiguity creates a fatal flaw for Dr. Isaacson's surveys because it is impossible to know now whether respondents were thinking of the NFT artwork when answering or thinking of the real-world object the artwork visually references.").[5] As Dr. Neal explained, that ambiguity is fatal, because if respondents were focused on the real-world Birkin bags depicted in the artworks, then they were not confused at all—the source of those bags *is* Hermès.

Hermès wrongly claims that no methodology or case law supports Dr. Neal's opinion that the question was inherently ambiguous. The need for unambiguous questions is central to all survey methodology. *See* Reference Guide on Survey Research, in Reference Manual on Scientific Evidence at 248 ("If the crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey."), *see also id*. at 248 n.75 ("When there is any question about whether some respondent will understand a particular term or phrase, the term or phrase should be defined explicitly."). Dr. Neal's testimony will be invaluable in helping the jury to understand the implications of the ambiguity in Dr. Isaacson's questions, given what those

---

[5] Of course, to the extent that Dr. Isaacson's survey purports to measure confusion regarding the source of the *MetaBirkins* images, the survey is irrelevant. Hermès insisted on summary judgment that its claim is not at all about confusion regarding the source of the images, but only about Mr. Rothschild's use of the *MetaBirkins* name for the NFTs associated with the images. *See* Hermès Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Hermès SJ Opp.") (ECF No. 89) at 2-3 ("The first inquiry… is whether the METABIRKINS NFTs are works of artistic expression. They are not; they are digital code, not indelibly tied to any artwork at all. As such, *Rogers* does not apply here.").

questions purport to test, which undoubtedly has skewed Dr. Isaacson's survey results in favor of Hermès.

Regarding Dr. Neal's second criticism—that Dr. Isaacson failed to account for answers to a follow-up question about what other brands or products are put out by "whoever makes or provides the items shown on the webpage"—Hermès again argues that Dr. Neal's testimony should be excluded because Hermès disagrees with the criticism. As Dr. Neal noted, the follow-up question is meant to rule out the possibility that respondents are simply "reading back" the Birkin mark. Oppenheim Decl. ¶ 4, Ex. C (D. Neal Dep. (Sept. 21, 2022) Tr.) at 109:8-110:6.

Hermès acknowledges that purpose. Hermès MIL at 13 ("One purpose of a follow-up question like this is to "rule out the possibility that respondents are merely reading or 'playing back' what is shown to them in the survey."). But Hermès then insists that the follow-up was not necessary in this case. In support of that argument, Hermès (after insisting that Dr. Neal cited no authority to support his criticism) relies on the very authority Dr. Neal cited in his report, an article by Jerre Swann, to argue that the follow-up question need not be asked when there are no concerns about reading back. *See* Hermès MIL at 14. The sentence that Hermès quotes from Swann says that "[w]here there are no such concerns [about respondents "reading back"], and particularly where the products directly compete, the question is not usually asked." Swann, J.B. "Likelihood of Confusion" in Trademark and Deceptive Advertising Surveys: Law, Science, and Design, 31- 56 (Shari S. Diamond & Jerre B. Swann, eds. 2022), at 61. But of course, the products here *do not compete directly*, and Dr. Isaacson *did ask the question*. He simply ignored the answers when reporting his results.

Indeed, as Dr. Neal explained, correcting for Dr. Isaacson's inaccurate coding "materially alters the scientific conclusion one draws" from Dr. Isaacson's survey. Oppenheim

Decl. ¶ 3, Ex. B (Neal Rep.) ¶ 3.3.10 at 14. Hermès' naked assertion that there are no concerns about reading back in this case is just that—a naked assertion. Dr. Neal is a survey expert, and he is entitled to explain why Hermès is wrong.

Hermès wrongly claims that Dr. Neal failed in his deposition to cite any cases that actually include follow-up questions to rule out the possibility of "reading back." In his deposition, Dr. Neal specifically referred to the survey introduced in the *Ever-Ready* case itself—the very case for which the methodology that Dr. Isaacson used is named. Oppenheim Decl. ¶ 4, Ex. C (D. Neal Dep. (Sept. 21, 2022) Tr.) at 111:6-15; *see Union Carbide Corp. v. Ever-Ready Inc.*, 392 F. Supp. 280, 292 (N.D. Ill. 1975) (describing two confusion surveys introduced, both of which included a question asking respondents to name other products "put out by the same concern" that puts out the tested product).[6] That is precisely what Swann referenced in the passage that Hermès quotes.

"As to the third ground (testing all elements together)," Hermès argues that Dr. Neal should be precluded from testifying because he admitted that Dr. Isaacson's methodology was proper to the extent that the survey was testing the combined effect of the Birkin mark, Birkin handbag, Hermès mark, and what Hermès refers to as the "METABIRKINS NFTs", but which is more properly referred to as the *MetaBirkins* artwork (*i.e.*, the image of a fanciful, fur-covered Birkin bag). Hermès MIL at 16. This entirely misses the point of Dr. Neal's critique and the testimony he will offer. The problem is that what Dr. Isaacson tested is inconsistent with Hermès' legal claim in this case. Dr. Neal's testimony will make clear what Dr. Isaacson

---

[6] As Dr. Neal noted, the Seventh Circuit reversed the District Court in the *Ever-Ready* case, and the Seventh Circuit specifically credited the surveys. *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.3d 366, 387 (1976) ("We do, however, hold the district court clearly erroneous in not crediting the surveys taken by Carbide.").

tested, what he did not test, and what the consequent implications are for proving Hermès' claims.

Hermès maintained in its summary judgment papers and at oral argument that its trademark claim is not about Mr. Rothschild's images; Hermès rather asserts that its claims are only about use of the *MetaBirkins* name for NFTs. *See* Hermès SJ Opp. (ECF No. 89) at 2-3 ("The first inquiry… is whether the METABIRKINS NFTs are works of artistic expression. They are not; they are digital code, not indelibly tied to any artwork at all. As such, *Rogers* does not apply here."). That is the entire reason that Hermès introduced its "shrouded object" argument, discussed above; Hermès is asserting that *MetaBirkins* purchasers didn't care about the images, but were in fact buying only NFTs, which are, in Hermès' view, "commodities." *See, e.g.,* Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment (ECF No. 76) at 17 ("The METABIRKINS NFTs are commercial commodities, with utilities extending beyond any form of artistic expression."). Given Hermès' theory of this case, Dr. Neal's testimony is highly relevant: it explains how Dr. Isaacson's survey, which did not show survey participants the NFT, but rather the *MetaBirkins* images, does not prove the claim that Hermès actually is making. Put plain, Hermès cannot exclude Dr. Neal on the basis that Dr. Isaacson's survey is valid for proving a claim that Hermès is not making.

Finally, and importantly, Hermès' objection to Dr. Neal's testimony about Dr. Isaacson's abandoned survey of handbag purchasers should be rejected. Hermès insists that its abandoned handbag survey is not relevant because Hermès is not making a reverse confusion claim. Hermès MIL at 17 ("The Handbag survey would be appropriate if there was a reverse confusion claim, as the survey was conducted among a different audience–potential purchasers of luxury handbags"). But as Dr. Isaacson made crystal clear in his deposition, his abandoned

survey was **not a reverse confusion survey**. *See* Oppenheim Decl. ¶ 5, Ex. D (B. Isaacson

Dep. (Sept. 20, 2022) Tr.) at 134:15-22 ("But I want to be very clear, it is not a reverse

confusion survey and it is not a forward confusion survey. It is the same as my forward

confusion survey, but it is just conducted among a different audience, making it neither forward

nor reverse confusion survey.").

Dr. Isaacson is right that his abandoned survey was not a reverse confusion study—it

did not test whether consumers would be confused about *the source of Hermès' handbags*, as a

reverse confusion study would have done. *See*, *e.g.*, *Banff, Ltd. v. Federated Dep't Stores,* 841

F.2d 486, 490 (2d Cir. 1988) ("Reverse confusion is the misimpression that the junior user is

the source of the senior user's goods."). Dr. Isaacson showed his survey participants pictures of

*MetaBirkins.* He did not show his handbag purchaser respondents a picture of a Hermès

handbag, and the survey did not ask questions about the source of Hermès' handbags. *See*

Oppenheim Decl. ¶ 6, Ex. E (Expert Report Submitted by Dr. Bruce Isaacson Measuring the

Likelihood of Confusion Between MetaBirkins and Birkin Handbags) at 3-7 (showing Isaacson

test stimuli).

Dr. Neal will testify that the Isaacson handbag survey that Hermès' wants to sweep

under the rug *is* a forward confusion survey, and while it does not focus on Mr. Rothschild's

customers, it is still relevant because it shows that Hermès' customers were not confused about

the source of Mr. Rothschild's *MetaBirkins*. That is highly suggestive that there is little overlap

between Hermès' customers and Mr. Rothschild's, and that is certainly relevant to both

likelihood of confusion and Hermès' lack of harm.

Accordingly, the Court should deny Hermès' motion *in limine* No. 2 to exclude Dr.

Neal's testimony.

### III.   Motion *in Limine* No. 3 to Preclude Evidence and Analogies About Third-Party Actions and/or Artwork

Hermès' third motion *in limine* seeks to preclude evidence about artists such as Andy Warhol that are artistic influences. Mr. Rothschild, like other artists, has been shaped by the world around him, including by the work of his artistic predecessors. In a case that poses the question of whether the *MetaBirkins* project was art, and whether there was artistic relevance, Mr. Rothschild must be able to talk about his artistic influences and about the artists and artworks in the artistic genres in which Mr. Rothschild is working. This testimony from Mr. Rothschild will be necessary to show his artistic intent by explaining to the jury how, when creating *MetaBirkins*, he was aware of and responding to existing artworks—in particular, existing artworks that engage with, comment on, critique, or highlight the cultural salience of commercial products like Hermès' Birkin handbag.

Equally important to Mr. Rothschild's defense is testimony from Dr. Gopnik, who provides the outside perspective of the expert art historian and critic—which will assist the jury in understanding the context in which *MetaBirkins* may be understood as art. Dr. Gopnik, like other art historians and critics, develops his professional judgments in the context of the history of art. Dr. Gopnik's testimony setting out his professional judgments regarding *MetaBirkins*' status as art and their relationship to other artworks will help the jury understand Mr. Rothschild's *MetaBirkins* by situating them in the context of Mr. Rothschild's artistic predecessors and interlocutors. Dr. Gopnik's testimony will also help the jury understand the relevance of the *MetaBirkins* title to Mr. Rothschild's art project, and whether Mr. Rothschild's conduct was consistent with his stated artistic intention and that of other artists.

While we believe this evidence is bad for Hermès' case, Hermès has provided no reason to support its assertion that the evidence would be prejudicial. Hermès admits that the

*MetaBirkins* images are "important" while insisting that the NFTs that authenticate those images are separable, but Hermès does not explain why their purported separability supports Hermès' Lanham Act claims without regard to the artistic status of the *MetaBirkins* artworks. Hermès MIL at 19. Mr. Rothschild's position is that the *MetaBirkins* artworks and the associated NFTs are both part of a single artistic project, in which both the images and the NFTs have an artistic function. Dr. Gopnik will testify to this, and he will support that testimony with examples of other art projects, as described in his report, that are related historically, aesthetically, or in terms of their genre. If Hermès disputes the historical or aesthetic relevance of a particular comparison or analogy, it can examine the witnesses on those points, and the jury can decide whether the comparison or analogy is apt. The real problem here, at bottom, is of Hermès' own making: <u>it has failed to hire an art expert in a case that it knew from the very beginning was about art</u>.[7]

## IV.    Motion *in Limine* No. 4 to Preclude Proposed Trial Exhibits Pursuant to Rules 401 and 403

Hermès seeks to preclude the admission of three specific exhibits designated by Mr. Rothschild.

The first, Exhibit 595, is a YouTube video titled "Driving the GMC Hummer EV in Call of Duty: MW2 – DMZ." Hermès MIL at 25. In its motion papers, Hermès argues that Exhibit 595 is irrelevant and would likely confuse the issues. *Id*. Hermès is correct that there was a trademark dispute over video game maker Activision's use in its "Call of Duty" video game of a

---

[7] The consequences of Hermès' failure to hire an art expert are evident from its statements like, "there is no evidence that Andy Warhol originally—or ever—titled his works 'Campbell's Soup Cans.'" Hermès MIL at 20. Hermès could have hired an art expert to opine on this very question, as Dr. Gopnik is prepared to do. And, of course, anyone looking at the paintings will immediately see the CAMPBELL'S mark front and center on each of them, in the distinctive lettering Campbell's uses when it applies that mark to cans of soup. There is no possible ground for Hermès to dispute that Warhol used the CAMPBELL'S mark on his paintings.

moving image of AM General's "Hummer" vehicle —an image that realistically depicts the exterior of that vehicle in full, including the trademarks used on the vehicle. In *AM Gen. LLC v. Activision Blizzard, Inc*., the Court ruled that Activision's use of the trademarks was protected by the First Amendment against Lanham Act liability. 450 F. Supp. 3d 467, 485 (S.D.N.Y. 2020). However, their argument is unhelpful here.

But Mr. Rothschild is not offering Exhibit 595 to make any point to the jury about the *Activision* case. Rather, Mr. Rothschild intends to rely on Exhibit 595 to address Hermès' contention that Mr. Rothschild's *MetaBirkins* are "usable" as handbags in the metaverse. Mr. Rothschild will rely on Exhibit 595 to show what it means for an image to be "usable" like its physical counterpart in a digital environment. In the case of the Hummer in Activision's *Call of Duty* video game, the digital image of the vehicle is "usable" because it can be driven in the game. In contrast, Mr. Rothschild's *MetaBirkins* are *not* usable—they do not open, they do not hold lipstick or a wallet, they do not provide any digital analogue to the function of a real-world handbag. They are flat, two-dimensional, non-moving images—no different from a series of paintings.

The exhibit is probative of a critical fact in this case: *MetaBirkins* function as artworks, not as handbags—not even virtual ones. That is, in turn, central to the application of the First Amendment to Mr. Rothschild's artwork and associated activities.

Second, Hermès seeks to exclude Exhibit 593, a *New York Times* article by Vanessa Friedman entitled "Six Reasons to Get Excited About Fashion in 2023" (Jan. 5, 2023), and Exhibit 594, an article in *Wired* magazine by Jessica Rizzo entitled "The Future of NFTs Lies with the Courts" (Apr. 3, 2022). Both of these articles are probative of a central fact at issue: the public's recognition of *MetaBirkins* status as art. Neither is hearsay, as neither is offered for the

truth of the matter asserted (something to which Defendant would stipulate). Instead, these exhibits are reliable evidence that the matter was asserted in prominent public fora by institutions that the public turns to for understanding art.

That this evidence will be helpful to the jury is not a novel concept. The recognition of a particular work as art by prominent news institutions—especially those with the power to shape opinion in the art world—was an approach embraced by the Second Circuit in *Castillo v. G&M Realty L.P.* In that case, the Court held that "expert testimony or substantial evidence of non-expert recognition will generally be required to establish recognized stature [of an artwork]," an approach, it added, that "ensures that the personal judgment of the court is not the determinative factor in the court's analysis." 950 F.3d 155, 166 (2d Cir. 2020).

In this case, the articles do not say that *MetaBirkins* are art; if they did, they would be inadmissible hearsay. But the articles *do* treat Mr. Rothschild's works as art—and *that* is a fact—the making of those statements of "non-expert recognition" that a juror could reasonably rely on to infer that *MetaBirkins* are, in fact, art.

For the same reasons articulated in *Castillo*, it is crucial that the jury not be deprived of evidence of this public recognition: like judges, jurors are not trained to judge the worth of visual and conceptual art, or, indeed, whether a particular work qualifies as art. Vanessa Friedman's *New York Times* article is a brief recap of several current events or disputes that are of interest to the fashion world. Ms. Friedman, who serves as the *Times'* fashion director and chief fashion critic, described *MetaBirkins* as "that group of digital representations of fuzzy, colorful Birkin-alikes that was also a comment on consumer culture — with all its potential implications for what happens when questions of fashion, creativity, artistic expression and the metaverse collide."

And Ms. Rizzo's article in *Wired*, a round-up of NFT-related legal disputes, laments the use of the metaverse as an "annex-in-waiting for established business concerns" rather than as a "new frontier for human creativity." That a publication like *Wired* would describe Mr. Rothschild as an artist and not as a businessperson is helpful to a juror tasked with determining whether *Metabirkins* are art subject to the protections of the First Amendment.

In the alternative, if the Court does rule that proposed Exhibits 593 and 594 constitute hearsay, the Court nonetheless should admit them under the residual hearsay exception in Federal Rule of Evidence 807. The articles are supported by sufficient guarantees of trustworthiness—they were published in trusted publications and are corroborated by both Mr. Rothschild's and Dr. Gopnik's testimony—and they are more probative on the point that public cultural and news institutions have recognized Mr. Rothschild's *MetaBirkins* as art than any other evidence that Mr. Rothschild could obtain through reasonable efforts.

Dated: January 23, 2023

Respectfully Submitted,

/s/ *Rhett O. Millsaps II*
Rhett O. Millsaps II
Christopher J. Sprigman
Mark P. McKenna (*pro hac vice*)
Rebecca Tushnet
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY  10151
(646) 898-2055
rhett@lex-lumina.com

Jonathan Harris
Adam Oppenheim
HARRIS ST. LAURENT & WECHSLER LLP
40 Wall Street, 53rd Floor
New York, NY 10005
(212) 397-3370
jon@hs-law.com

*Attorneys for Defendant Mason Rothschild*