# Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                                                        )
HERMÈS INTERNATIONAL and HERMÈS          )
OF PARIS, INC.,                                            )
                                                        )
                                 *Plaintiffs*,          )
                                                        )
                    v.                                  )      Civil Action No. 1:22-cv-00384-JSR
                                                        )
MASON ROTHSCHILD,                              )
                                                        )
                                 *Defendant*.          )
                                                        )
_____          )

**Expert Rebuttal Report of David Neal, Ph.D.,**

**in Response to Expert Report of Dr. Bruce Isaacson**

I, Dr. David T. Neal, hereby declare as follows:

1. **Section 1: Background, Qualifications, and Purpose**

   1.1.  I submit this Rebuttal Report in the matter of HERMÈS INTERNATIONAL and
   HERMÈS OF PARIS, INC., (hereinafter, "Plaintiffs" or "Hermès") v. MASON
   ROTHSCHILD, (hereinafter, "Defendant" or "Mason Rothschild") in the United States
   District Court for the Southern District of New York.

   1.2.  I am an Executive in Residence at Duke University and Managing Partner of Catalyst
   Behavioral Sciences LLC, a research consulting firm specializing in the analysis of
   human decision making and consumer behavior, which includes extensive work in
   connection with consumer surveys.

   1.3.  At Catalyst Behavioral Sciences, I provide services for clients across a range of
   industries. Among others in the corporate sector, I act or have acted as a consultant
   regarding surveys and consumer behavior to Bayer, Microsoft, Procter & Gamble,
   Intel, and Unilever. Among others in the public and non-profit sector, I act or have

1

acted as a consultant regarding surveys and health behavior to the World Bank, The Bill and Melinda Gates Foundation, The Centers for Disease Control and Prevention (CDC), USAID, and the Surgeon General of the U.S. Army.

1.4.   I have around 20 years of experience conducting and reviewing consumer and other scientific surveys. I have been retained as an expert in a variety of trademark, patent, and false advertising matters. I have also testified as a survey expert in federal court, the National Advertising Division (NAD), and the International Trade Commission (ITC) on multiple occasions. My Curriculum Vitae, attached as Exhibit A, summarizes my education, peer-reviewed publications, and experience spanning both academic and commercial marketing research. My Curriculum Vitae also lists all cases in which, during the previous four years, I testified as an expert in a deposition or at trial.

1.5.   For the preparation of this report, I am being compensated at my customary rate of $585 per hour by Defendant. Research assistants under my supervision are being compensated at their customary rates of $125 and $95 per hour. Compensation is not dependent in any way on the results of my work, my opinions, or the outcome of this matter.

1.6.   I hold a Ph.D. in psychology from the University of Melbourne, Australia, awarded in 2005, and completed my post-doctoral training at Duke University, working in the psychology department and the Fuqua School of Business. At Duke, I served as the Director of the Interdisciplinary Social Science Research Laboratories. I was then an assistant professor of psychology at the University of Southern California (USC). I have published extensively in the areas of consumer behavior and decision-making and have taught advanced research methods (including survey design), consumer behavior, and marketing courses at Duke University and USC. In 2012, I was the joint recipient (with Professor Wendy Wood) of the Park Outstanding Contributor Award presented by the Society for Consumer Psychology. This award recognizes the best

2

peer-reviewed paper published each year in the Journal of Consumer Psychology.

1.7.   I have reviewed Plaintiffs' Amended Complaint, Defendant's Answer and Affirmative Defenses, Memorandum of Law in Support of Defendant Mason Rothschild's Motion to Dismiss the Amended Complaint, Memorandum of Law in Opposition to Mason Rothschild's Motion to Dismiss, Reply Memorandum of Law in Further Support of Defendant Mason Rothschild's Motion to Dismiss the Amended Complaint, and Judge Jed S. Rakoff's Memorandum Order in this Matter. Based upon my review of these documents, I understand that:

1.7.1.   First, Plaintiffs own federal trademark registrations for the HERMÈS word mark,[1] the BIRKIN word mark,[2] and the BIRKIN Trade Dress.[3]

1.7.2.   Second, Plaintiffs allege that "use by Defendant of the BIRKIN Mark and HERMÈS has been without Hermès' consent, has caused and is likely to continue to cause confusion and mistake in the minds of the purchasing public"[4] and "tends to and does falsely create the impression that the goods sold by Defendant are authorized, sponsored, or approved by Hermès when, in fact, they are not."[5] More specifically, Plaintiffs allege that "Defendant's uses of the HERMÈS Mark in conjunction with his use of the BIRKIN Mark, and the display of the METABIRKINS bags, serves only to create a confusing impression among consumers as to Hermès' sponsorship of the METABIRKIN collections of NFTs and the METABIRKINS Website."[6]

1.7.3.   Third, Defendant denies the likelihood of confusion allegations documented

---

[1] Plaintiff's Amended Complaint, ¶ 30.
[2] Plaintiff's Amended Complaint, ¶ 34.
[3] Plaintiff's Amended Complaint, ¶ 35-36.
[4] Plaintiff's Amended Complaint, ¶ 148.
[5] Plaintiff's Amended Complaint, ¶ 148.
[6] Plaintiff's Amended Complaint, ¶ 105.

in the preceding paragraph.[7,8]

1.8.   In connection with this matter, I was asked by Defendant's Counsel to conduct a scientific review of two surveys conducted by Dr. Bruce Isaacson, as documented in his Expert Report dated August 4, 2022.[9] In brief, Dr. Isaacson conducted two likelihood of confusion surveys, one with NFT purchasers and one with luxury handbag purchasers, with the stated aim of determining "the likelihood of confusion, if any, between the MetaBirkins NFTs, sold by Mr. Rothschild, and Hermès, including the Birkin handbag."[10] Dr. Isaacson states that his surveys measured "the likelihood of confusion associated with the NFTs using elements related Hermès' marks, including 'the famous BIRKIN Mark and HERMÈS Mark,' and the 'mark for the BIRKIN handbag's distinctive design.'"[11]

1.9.   In his "Survey of NFT Purchasers," Dr. Isaacson assigned likely purchasers of NFTs priced $2500 or higher either to a Test Cell or a Control Cell. In the Test Cell, respondents viewed a webpage featuring Defendant's accused NFTs including multiple, separate elements Plaintiffs allege cause confusion (i.e., the HERMÈS mark, the BIRKIN mark, the allegedly confusing name "MetaBirkin," and the Birkin trade dress). In the Control Cell, respondents viewed an altered version of the same webpage where all four elements alleged to cause confusion were removed and replaced with alternatives not alleged to infringe Plaintiffs' marks or trade dress. In his Expert Report, Dr. Isaacson opines[12] that likelihood of confusion was 21.6% in the Test Cell (where the four allegedly confusing elements were present) and 2.9% in the

---

[7] Defendant's Answer, ¶ 105.
[8] Defendant's Answer, ¶ 148.
[9] Hereafter, "Expert Report of Dr. Bruce Isaacson" or "Isaacson Report."
[10] Expert Report of Dr. Bruce Isaacson, ¶ 5.
[11] Expert Report of Dr. Bruce Isaacson, ¶ 5.
[12] Expert Report of Dr. Bruce Isaacson, ¶ 21.

Control Cell (where the four elements were absent). On the basis of these purported results, Dr. Isaacson concludes that net likelihood of confusion in his NFT Purchaser Survey was 18.7% (i.e., 21.6% minus 2.9%).[13]

1.10.  In his "Survey of Handbag Purchasers," Dr. Isaacson followed the same survey methodology as in his NFT Purchaser Survey, but altered the qualifying criteria for his study. Specifically, instead of recruiting NFT purchasers, Dr. Isaacson recruited likely purchasers of handbags priced $10,000 or more. Although omitted from the text of his report, Dr. Isaacson found in this second survey that 18.8% of respondents were confused in the Test Cell and 15.2% were confused in the Control Cell.[14] Thus, net likelihood of confusion in his Handbag Purchaser Survey was 3.6% (i.e., 18.8% minus 15.2%).

1.11.  By way of summary, of the two surveys reported by Dr. Isaacson, one ostensibly provides evidence for a likelihood of confusion (i.e., the "NFT Purchaser Survey," with a net confusion level of 18.7%), and one ostensibly provides evidence for the absence of a likelihood of confusion (i.e., the "Handbag Purchaser Survey," with a net confusion level of 3.6%).

## 2.  Section 2: Summary of Opinions Regarding Dr. Isaacson's Surveys

2.1.  Having reviewed his two surveys, his report, and having reanalyzed his underlying data, it is my considered opinion that the conclusions Dr. Isaacson draws regarding likelihood of confusion are not scientifically valid or reliable. I base that opinion on (a) the existence of multiple design flaws in his surveys that introduced systematic bias in favor of Plaintiffs, and (b) a highly material data coding error in his NFT Purchaser

---

[13] Expert Report of Dr. Bruce Isaacson, ¶ 21.
[14] Expert Report of Dr. Bruce Isaacson, Exhibit 11, p. 24.

Survey that led Dr. Isaacson to wrongly infer a likelihood of confusion in that survey. When this error is corrected, both of Dr. Isaacson's surveys show that there is no likelihood of confusion with Plaintiffs caused by Defendant's alleged infringement of Plaintiffs' marks. The primary design flaws and data analysis errors I identified in Dr. Isaacson's surveys are as follows:

2.1.1.   **Flaw 1:** Dr. Isaacson's studies inextricably combine confusion caused by the HERMÈS word mark, the BIRKIN word mark, the allegedly confusing "MetaBirkins" name, and the claimed Birkin Trade Dress. As a result, it is scientifically impossible to draw any scientific inferences about what amount of confusion, if any, is caused by any one of these elements in isolation.

2.1.2.   **Flaw 2:** Dr. Isaacson correctly included a follow-up question to rule out the "reading test" problem in Eveready surveys of this kind. However, he then improperly ignored the data from this question, thereby materially inflating confusion and drawing the wrong conclusion in his "NFT Purchaser Survey." After recoding to correct this flaw, his "NFT Purchaser Survey" shows no likelihood of confusion.

2.1.3.   **Flaw 3:** Dr. Isaacson's confusion questions (Q1 and Q7) are inherently ambiguous in a manner that is biased in favor of Plaintiffs and against Defendant.

2.1.4.   **Flaw 4:** Dr. Isaacson's Survey of Handbag Purchasers was improperly abandoned—apparently after it produced unfavorable results for Plaintiffs. Its results are relevant and suggest either that (a) Plaintiffs' customers understand the accused NFT to be art, or (b) the Birkin mark and Birkin trade dress are very weak and are not acting as source identifiers.

2.1.5.   **Flaw 5:** Dr. Isaacson did not disclose, and refused to provide when requested,

critical data coding that he relied upon as the basis for certain opinions. I was therefore unable to complete my scientific review of his findings.

2.2.  In the following Section, I elaborate on each of these issues and provide the scientific bases for my opinions.

## 3.  Section 3: Summary of Opinions Regarding Isaacson Surveys

3.1.  I note at the outset that I respect Dr. Isaacson. However, as I explain below, my review of his Expert Report revealed at least five major flaws that render his conclusions scientifically invalid and unreliable. Moreover, one of these flaws (Flaw 2) involves a major data coding error that fundamentally alters the interpretation of the NFT Purchaser Survey. Once this error is corrected, this survey's results align with the results of his Handbag Purchaser Survey. That is, both surveys show that Defendant's MetaBirkins NFT is not causing a material likelihood of confusion with Plaintiffs.

3.2.  **Flaw 1: Dr. Isaacson's studies inextricably combine confusion caused by the HERMÈS word mark, the BIRKIN word mark, the allegedly confusing "MetaBirkins" name, and the claimed Birkin Trade Dress. As a result, it is scientifically impossible to draw any scientific inferences about what amount of confusion, if any, is caused by any one of these elements in isolation.**

3.2.1.  My first criticism concerns a fundamental limitation on the scope of any scientific inference that can be drawn from the surveys Dr. Isaacson conducted. As is common in an Eveready survey, Dr. Isaacson used a Test-Control design where respondents in the Test Cell saw content (i.e., Defendant's webpage for the MetaBirkin NFT) that included the allegedly infringing content. In the Control Cell, this content was removed and replaced with content not accused of infringing Plaintiffs' word marks or trade dress.

3.2.2.   In many cases, this approach is perfectly appropriate.[15] The present circumstances are different and more complicated, however, because Plaintiffs allege that Defendant is engaging in multiple, distinct acts of infringement that encompass a variety of word and design marks. For example, Plaintiffs allege that:[16]

> Defendant has, in connection with his goods, used in commerce, and continues to use in commerce, the BIRKIN Mark, the federally registered HERMÈS word mark, and the federally registered BIRKIN Trade Dress which tend falsely to describe the origin, sponsorship, association or approval by Hermès of the METABIRKINS NFTs sold by Defendant, despite repeated requests from Hermès stop such use.

3.2.3.   In both surveys he conducted, Dr. Isaacson exposed his Test Cell respondents to all four allegedly infringing elements (i.e., HERMÈS word mark, BIRKIN word mark, the claimed Birkin trade dress, and the allegedly confusing name "MetaBirkin"). In his Control Cell, all four of these allegedly infringing elements were removed and replaced with variations Dr. Isaacson contends are non-infringing. Stated simply, Test Cell respondents saw all four allegedly elements and Control Cell respondents saw none. Table 1 summarizes how Dr. Isaacson implemented this in the stimuli he presented to Test and Control Cell respondents in both surveys.

---

[15] For a general discussion of Test-Control designs, see Shari Seidman Diamond, "Control Foundations: Rationale and Approaches" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, p. 248 (Shari S. Diamond & Jerre B. Swann, eds., 2022).
[16] Amended Complaint, ¶ 165.

**Table 1: Differences in Test versus Control Cell Stimuli in Both Isaacson Surveys.**

| Allegedly infringed by Defendant | Dr. Isaacson's changes to Test stimulus vs. Control stimulus |
|---|---|
| HERMÈS Word Mark | 1. Instances of the word "HERMÈS" were changed to "DARCY"<br>2. "https://www.hermes.com/" was changed to "https://www.darcy.com/" |
| BIRKIN Word Mark | 3. Instances of the word "Birkin" were changed to "Handbag" |
| BIRKIN Trade Dress | 4. "the shape of the handbags was changed to a shape that is more square."[17]<br>5. "The control removed the padlock on the front of each handbag."[18]<br>6. "where vertical metallic lines were visible on the test handbags, the control handbags removed those lines from the front of the handbags."[19] |
| Allegedly confusing name "MetaBirkins" | 7. Instances of the word "MetaBirkins" were changed to "MetaHandbags" |

3.2.4.   Setting aside the other flaws documented in this report, I note that Dr.

Isaacson's approach on this issue is not inherently flawed if one only seeks to

know the combined effect of all four elements of alleged infringement. If,

however, one seeks to know what amount of confusion (if any) is caused by

any one of these elements, then Dr. Isaacson's design is fatally flawed. His

design simply makes it impossible to disaggregate what level of confusion is

stemming, for example, from Defendant's alleged use of Plaintiffs' trade dress

versus from Defendant's use of the allegedly confusing name "MetaBirkins."

---

[17] Expert Report of Dr. Bruce Isaacson, ¶ 12.
[18] Expert Report of Dr. Bruce Isaacson, ¶ 12.
[19] Expert Report of Dr. Bruce Isaacson, ¶ 12.

3.2.5.  In survey parlance, this is referred to as a "confound"[20] across the Test and Control Cells. As Professor Shari Diamond, author of the Federal Judicial Center's *Reference Guide on Survey Research*, put it, a control cell "should share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influenced is being assessed."[21] Dr. Isaacson did not vary a single characteristic across his Test (or "experimental stimulus") and Control Cells, and instead varied four distinct characteristics, each one of which is nonetheless alleged to be a distinct and independent source of confusion. Because these four characteristics were varied *en bloc* (i.e., all present in the Test; all absent in Control), it is impossible to disaggregate, or "de-confound," the specific cause of any observed confusion.

3.2.6.  I note that, given his NFT Purchaser finding of 18.7% net confusion, it is perfectly possible that none of the four, distinct alleged causes of confusion are creating a material level of confusion by themselves. For example, each could be contributing 4-5% confusion (thus reaching 18.7% in combination), such that none, by itself, causes a material level of confusion using standards commonly accepted by courts.[22]  Alternatively, the majority (e.g., 10%) may be caused by the artwork's alleged depiction of the Birkin trade dress, with the remainder being caused by one or more of the word marks. In this second

---

[20] Frank R. Kardes and Paul M. Herr, *Experimental Research Methods in Consumer Psychology*, *in* Frank R. Kardes, Norbert Schwarz, Paul M. Herr (eds.), Handbook of Research Methods in Consumer Psychology 3–16 (2019).

[21] Shari Seidman Diamond, "Control Foundations: Rationale and Approaches" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, p. 248 (Shari S. Diamond & Jerre B. Swann, eds., 2022).

[22] Matthew G. Ezell & AnnaBelle Sartore, "Survey Percentages in Lanham Act Matters" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 317-334 (Shari S. Diamond & Jerre B. Swann, eds., 2022).

scenario, none of the word marks, whether taken in isolation or in combination, would be causing a material level of confusion with Plaintiffs. Given Dr. Isaacson's confounded design, it is simply impossible to know.

3.3. **Dr. Isaacson correctly included a follow-up question to rule out the "reading test" problem in Eveready surveys of this kind. However, he then improperly ignored the data from this question, thereby materially inflating confusion and drawing the wrong conclusion from his "NFT Purchaser Survey." After recoding to correct this flaw, his "NFT Purchaser Survey" shows no likelihood of confusion.**

    3.3.1. Setting aside the various flaws documented in this report, Dr. Isaacson's two surveys generally sought to follow the Eveready format[23] for studying likelihood of confusion. In this approach, relevant consumers are presented with a stimulus capturing the junior user's[24] alleged infringement (vs. a control where the alleged infringement is removed) and are then asked a series of open-ended question to determine if they believe the junior user's goods/services are put out by the senior user, or are affiliated, sponsored, approved, or authorized by the senior user.

    3.3.2. In certain circumstances, a survey expert must include an additional follow-up question to rule out the possibility that respondents are merely reading or "playing back" what is shown to them in the survey, rather than actually being confused and thinking specifically of the senior user when they see the junior user's allegedly infringing goods. This question is needed, for example, when

---

[23] For a general discussion, see Swann, J.B. "Likelihood of Confusion" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 31-56 (Shari S. Diamond & Jerre B. Swann, eds. 2022), p. 59-79.

[24] This description applies to the more common scenario of "forward confusion." In a reverse confusion scenario, respondents see the senior user's goods/services.

the study stimulus (e.g., imagery of the junior user's allegedly infringing goods/services) literally uses the senior user's mark. In such circumstances, a respondent who provides the senior user's mark in response to an Eveready probe may be simply reading or playing back what was shown to them rather than expressing substantive confusion with the senior user.

3.3.3.  I note that those circumstances unequivocally apply here because the Test stimulus Dr. Isaacson showed to respondents included the word mark HERMÈS and the word mark BIRKIN, albeit in the form of a disclaimer (in the case of HERMÈS) or in the form of a sentence in the NFT artwork itself (in the case of BIRKIN, i.e., "NOT YOUR MOTHER'S BIRKIN").

3.3.4.  The solution to this problem is to include a follow-up question in which respondents are asked to identify any additional goods or services that are put out by the source they have in this mind. The answers to this question allow the survey expert to work out whether a respondent is merely reading (i.e., a respondent who plays back the senior user's mark but then fails to identify any goods/services put out by the senior user) versus is actually confused (i.e., a respondent who plays back the senior user's mark and then correctly identifies any goods/services put out by the senior user).

3.3.5.  As noted authority Jerre Swann put it in discussing the original Eveready Survey:

> "the 'please name any other products put out by the same concern that puts out the ____ shown here' question (which measured the *reach* of the *battery* brand to products in a different category) was likely necessary in *Eveready* to differentiate between respondents who were merely "playing back" the Ever-

Ready label on the lamp from those who believed the *lamp* was put out by the battery company."[25]

3.3.6.  Critically, Dr. Isaacson did include at least one question that partly addresses this issue. Specifically, in both of his surveys, Dr. Isaacson first asked Q1, shown below:

1.   What company, companies, person, or people do you think makes or provides the items shown on the webpage?  Please be as specific as possible. If you don't know, please select "I don't know."

|  |
|  |

❑ I don't know.  **[EXCLUSIVE]**

3.3.7.  After doing so, he followed up with Q2, Q3, and Q4. As shown below, Q4 provides a probe that can help rule out the reading test/playback issue, as is required in the present circumstances.

3.   Are you aware of any other brands or products made or provided by whoever makes or provides the items shown on the webpage?  Please answer **[MATCH ORDER TO Q.D:  yes, no,]** or you don't know.  **(SELECT ONE RESPONSE)**

**RESPONSES**
**[MATCH ORDER TO Q.D.  ANCHOR "I DON'T KNOW" LAST.]**
Yes, I <u>am</u> aware of other brands or products made or provided by whoever makes or provides these items
No, I <u>am not</u> aware of other brands or products made or provided by whoever makes or provides these items
I don't know

---

[25] Swann, J.B. "Likelihood of Confusion" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 31-56 (Shari S. Diamond & Jerre B. Swann, eds. 2022), p. 59-79.

4.      What other brands or products do you think are made or provided by whoever makes or provides the items shown on the webpage?  Please be as specific as possible.  If you don't know, please select "I don't know."

|  |
|--|
|  |

❑  I don't know.  **[EXCLUSIVE]**

3.3.8.    Specifically, Q4 enabled Dr. Isaacson to determine whether respondents who listed "Hermes" or "Birkin" at Q1 were, in fact, thinking of the Plaintiffs versus merely reading or playing back one of many brands written on the stimulus they had just seen.

3.3.9.    Despite having this data, Dr. Isaacson simply ignored it when calculating the confusion numbers presented in his report. Specifically, he failed to code people's answers to Q4 to identify if respondents were plausibly thinking of Plaintiffs (and hence were actually confused) versus were simply reading.

3.3.10.  This is a fatal flaw because it both (a) deviates from accepted scientific practice for Eveready surveys in circumstances such as those that apply here, and (b) as shown below, materially alters the scientific conclusion one draws from Dr. Isaacson's NFT Purchaser Survey.

3.3.11.  To correct for this fatal flaw, I reanalyzed the raw data from Dr. Isaacson's NFT Purchaser Survey applying the proper and standard coding approach to both his Test and Control Cell results. As presented in Tables 2 and 3 below, I identified the twenty-one Test Cell respondents (see Table 2) and three Control Cell respondents  (see Table 3) in the NFT Purchaser Survey that Dr. Isaacson classified as confused. I then examined these respondents' answers to Q4 to determine if each respondent was actually thinking of Plaintiffs versus merely reading/playing back. Specifically, I

coded them as reading/playing back if they failed to mention any of Plaintiffs'
goods despite being prompted to do so at Q4.  Tables 2 and 3 identify the
individuals I recoded and provide the recoded data underlying my
conclusions.

**Table 2: Test Cell Respondents Coded as Confused by Dr. Isaacson in Survey of NFT Purchasers and Dr. Neal's Recoding.***

| ResponseID | Q1 Response | Q4 Response | Q7 Response | Isaacson Confusion Coding | Neal Confusion Recoding |
|---|---|---|---|---|---|
| 2 | Birkins is the company that makes these NFT | real handbags are also made | | 1 | 1 |
| 14 | looksrare and hermes | hermes does clothes, handbags, shies | | 1 | 1 |
| 15 | Hermes | Satchel | Hermes | 1 | 1 |
| 18[26] | Based on descriptions disclaimer  it's Hermès Birkin bags, or MetaBirkins. | Well if your question is referring to who makes the actual handbag shown, Hermès sells luxury handbags, footwear, fragrances, accessories, watches and jewelry to my knowledge. | | 1 | 1 |
| 20 | the company that makes birkins | | the brand that makes the actual bags | 1 | 1 |
| 33 | hermes birkins | | | 1 | 0 |
| 57 | Hermes, and its endorsed by Vogue Business, Complex, Input mag.. etc. | An NFT for faux fur bags. | All the brands listed under "read" | 1 | 0 |
| 65 | Bodkin, Gucci and chanel | Birkin and chanel | | 1 | 0 |
| 71 | birkins | forbes | | 1 | 0 |
| 83 | The company is Birkin, you can see the brand clearly | | | 1 | 0 |
| 101 | The company Hermes | The brand meta verse | OpenSea let's | 1 | 1 |

---

[26] I note that, in response to Q2, ResponseID 18 wrote: "Q2 Response: "The webpage Name and
description states it's MetaBirkins. But also, the webpage disclaimer at the bottom clearly states the
author of the post or NFT is not affiliated with "Hermès" who is the actual registered Trademark Owner
of Birkin bags" Despite this, this Test Cell respondent was nonetheless classified by Dr. Isaacson as
"confused." For the purposes of my analysis in Table 2 only, I retained Dr. Isaacson's classification of
this person, thereby giving the benefit of any doubt to Plaintiffs.

| | | | | |
|---|---|---|---|---|
| | makes the meta Burlington bag | makes the nft and the brand Hermes makes the bag | the nft be published and then I | | |
| 108 | metabirkins | hermes | hermes | 1 | 0 |
| 116 | birkins | birkin clothing | meta | 1 | 1** |
| 129 | MietaBirkins | Hermes | MietaBirkins | 1 | 0 |
| 141 | Birkin | babybirkin | | 1 | 0 |
| 142 | birkin | birkin makes real bags that are incredibly popluar for people to own and carry | | 1 | 1 |
| 157 | Berkin | | | 1 | 0 |
| 165 | Hermes | | Elie ,I think it cares about NFT and wants to invest in it. | 1 | 0 |
| 169 | MetaBirkin, Hermes, Forbes, Vogue | | Hermes | 1 | 0 |
| 202 | A store outlet that is pretty expensive that sells meta birkins. | Hermes Birkin is the company that makes Birkin and I think they do crypto. | | 1 | 1 |
| 209 | HERMES.COM | Metabirkins.com | Mason Rothschild | 1 | 0 |
| **Total Confused in Test Cell of Survey of NFT Purchasers** | | | | **21.6% (21/97)** | **9.3% (9/97)** |

*1 = confused, 0 = not confused. Note also that the coding for Isaacson is collapsed across all of his coding variables corresponding to Q1, Q4, and Q7.

**"I understand that "Birkin clothing" does not exist, but since Hermes makes clothing, this is coded as an instance of confusion to give any benefit of the doubt to Plaintiffs.

**Table 3: Control Cell Respondents Coded as Confused by Dr. Isaacson in Survey of NFT Purchasers and Dr. Neal's Recoding.***

| ResponseID | Q1 Response | Q4 Response | Q7 Response | Isaacson Confusion Coding | Neal Confusion Recoding |
|---|---|---|---|---|---|
| 52 | | The digital retailer partnered with Hermes and Rothschild. | Basic.space is where they were available so besides Hermes I would say that they probably sponsor the project. | 1 | 0 |
| 98 | MetaHandbags. Made by one Mr Rothchilds. Sold on looksrare.com | | | 1 | 0 |
| 105 | Hermes | | Meta | 1 | 0 |
| Total Confused in Control Cell of Survey of NFT Purchasers | | | | 2.9% (3/104) | 0.0% (0/104) |

*1 = confused, 0 = not confused. Note also that the coding for Isaacson is collapsed across all of his coding variables corresponding to Q1, Q4, and Q7.*

3.3.12.  As Table 2 shows, after applying this standard coding to Dr. Isaacson's Test Cell data, the percentage of respondents who are actually confused drops to 9.3% (9/97) from the 21.6% (21/97) figure incorrectly reported by Dr. Isaacson. As Table 3 shows, after applying this same standard coding to Dr. Isaacson's Control Cell data, the percentage of respondents who are actually confused drops to 0.0% (0/104) from the 2.9% (3/97) figure incorrectly reported by Dr. Isaacson.

3.3.13.  With the corrected numbers provided in Tables 2 and 3, it is possible to calculate a corrected net confusion number for Dr. Isaacson's NFT Purchaser Survey. Doing so materially alters the scientific conclusion drawn from this survey. Specifically, Dr. Isaacson reported that net likelihood of

confusion in his NFT Purchaser Survey was 18.7% (i.e., 21.6% Test Cell
confusion minus 2.9% Control Cell confusion).[27] Table 4 below provides the
corrected calculation, using the standard coding approach used in Eveready
surveys in these specific circumstances.

**Table 4. Corrected Net Confusion Results in the NFT Purchaser Survey After
Correcting Dr. Isaacson's Analysis Error.**

|  | Percent and Number Confused in Survey of NFT Purchasers |
|---|---|
|  | Full Sample (N=201) |
| Test Cell | 9.3% (9/97) |
| Control Cell: | 0.0% (0/104) |
| NET CONFUSION (Test-Control) | **9.3%** |

3.3.14.   As Table 4 shows, after correcting for Dr. Isaacson's error, his NFT
Purchaser survey shows that only 9.3% of respondents confused
Defendant's NFT with Plaintiffs because of the alleged infringement of
Plaintiffs' marks and trade dress. Specifically, 9.3% (9/97) of Test Cell
respondents were confused and 0.0% (0/104) of Control Cell respondents
were confused. Thus, net confusion stemming from the combination of the
four alleged forms of infringement (the HERMÈS mark, the BIRKIN mark,
the allegedly confusing "MetaBirkin" name, and the claimed Birkin trade
dress) is 9.3% (i.e., 9.3% Test Cell confusion minus 0.0% Control Cell
confusion). A net level of 9.3% confusion falls comfortably below commonly

---

[27] Expert Report of Dr. Bruce Isaacson, ¶ 21.

accepted thresholds[28] for establishing a likelihood of confusion in Lanham Act matters.

3.3.15. Although not required to support the revised analysis I performed, I note that several additional factors support the conclusion that Dr. Isaacson's flawed analysis led him to include individuals who were obviously reading (and not actually confused). Those additional factors are:

3.3.15.1. First, multiple Test Cell respondents wrongly classified as confused by Dr. Isaacson explicitly or implicitly referenced in their answers that they were simply reading back what was on the screen. For example, in response to Dr. Isaacson's Q2, i.e., "What makes you say that?", Respondent 142 wrote "the name of the website is meta birkin and over the last image in each row is birkin the name of the bag," Respondent 141 wrote "I saw Birkin on the webpage and in the description of the product," and Respondent 18 wrote "The webpage Name and description states it's MetaBirkins. But also, the webpage disclaimer at the bottom clearly states the author of the post or NFT is not affiliated with "Hermès" who is the actual registered Trademark Owner of Birkin bags." Clearly, these respondents are indicating that their verbatims are being driven by what they are reading in the Test stimulus, i.e., Defendant's webpage.

3.3.15.2. Second, multiple additional Test Cell respondents wrongly classified as confused by Dr. Isaacson appear simply to have written down all brands they read on the stimulus. For example, Respondent 169 wrote

---

[28] Matthew G. Ezell & AnnaBelle Sartore, "Survey Percentages in Lanham Act Matters" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 317-334 (Shari S. Diamond & Jerre B. Swann, eds., 2022).

"MetaBirkin, Hermes, Forbes, Vogue" in response to Q7 and

Respondent 57 wrote "Hermes, and its endorsed by Vogue Business,

Complex, Input mag." These respondents, moreover, failed to identify

any of Plaintiffs' goods at Q4 (or elsewhere), thus reinforcing the idea

that they were not actually thinking of Plaintiffs and merely "playing

back," the multiple brands they saw on the screen.

3.4.  **Fatal Flaw 3: Dr. Isaacson's confusion questions (Q1 and Q7) are inherently ambiguous in a manner biased in favor of Plaintiffs and against Defendant.**

 3.4.1.  A third flaw in Dr. Isaacson's surveys centers on the unclear and ambiguous nature of the confusion questions he asked. These questions, Q1 and Q7, are shown below.

1. What company, companies, person, or people do you think makes or provides the items shown on the webpage?  Please be as specific as possible. If you don't know, please select "I don't know."

 ☐ I don't know.  **[EXCLUSIVE]**

7. What other company, person or brand do you believe sponsors, authorizes, or approves whoever makes or provides the items shown on the webpage?  Please be as specific as possible. If you don't know, please select "I don't know."

 ☐ I don't know.  **[EXCLUSIVE]**

 3.4.2.  Notably, in both questions, Dr. Isaacson refers to Defendant's goods merely as "the items shown on the webpage." This is inherently ambiguous since

20

respondents could logically interpret this as a reference to the NFT artwork itself or to the real-world handbag the artwork visually references. To the extent that respondents interpreted it as the latter, their answer would not reflect confusion about who puts out the NFT artwork but who puts out the physical object visually referenced in the NFT artwork.

3.4.3.   To use a famous analogy, had Dr. Isaacson used his ambiguous question to study Andy Warhol's Campbell's Soup paintings, it is perfectly plausible that respondents might indicate that "Campbell's Soup" puts out the "soup items shown" yet not believe that Campbell's Soup puts out the painting nor is affiliated with it, sponsored it, or authorized it.

3.4.4.   Exactly the same issue arises here given the ambiguity of Dr. Isaacson's question, which fails to properly contextualize and anchor the judgment respondents are being asked to make. I note that this ambiguity is even evident in the answers of several respondents, who chose explicitly to mention it in providing their answers. Table 5 provides just three examples.

**Table 5: Respondents' Verbatims Showing How Respondents Were Confused by Dr. Isaacson's Survey Questions.**

| ResponseID | Verbatim Response |
|---|---|
| 18 | Q4 Response: "Well if your question is referring to who makes the actual handbag shown,  Hermès sells luxury handbags, footwear, fragrances, accessories, watches and jewelry to my knowledge." <br><br> Q2 Response: "The webpage Name and description states it's MetaBirkins. But also, the webpage disclaimer at the bottom clearly states the author of the post or NFT is not affiliated with "Hermès" who is the actual registered Trademark Owner of Birkin bags." |
| 101 | Q4 Response: "The brand meta verse makes the nft and the brand Hermes makes the bag" |
| 28 | Q2 Response: "Because of the name but maybe that is the name of the nfts and not the company but Im assuming that is Mason Rothchilds company name" |

3.4.5.   This ambiguity creates a fatal flaw for Dr. Isaacson's surveys because it is impossible to know now whether respondents were thinking of the NFT artwork when answering or thinking of the real-world object the artwork visually references. Since his question wording is consistent with both interpretations, it is impossible to know which respondents fall into each group. Respondents who interpreted the questions as a reference to the underlying physical object are not opining about confusion as to the source, affiliation, sponsorship, or approval of the Defendant's NFT artwork, but rather to a separate physical object. As a result, their opinions are not relevant to any likelihood of confusion caused by Defendant's accused goods.

3.5.   **Flaw 4: Dr. Isaacson's Survey of Handbag Purchasers was improperly abandoned—apparently after it produced unfavorable results for Plaintiffs. Its results are relevant and suggest either that (a) Plaintiffs' customers understand the accused NFT to be art, or (b) the Birkin mark and Birkin trade dress are very weak and are not acting as source identifiers.**

3.5.1.   As noted in Section 1, Dr. Isaacson conducted two surveys: One of "NFT Purchasers" and one of "Handbag Purchasers." The results of the second survey are not presented in the body of Dr. Isaacson's survey and are only included in the Exhibits.[29]

3.5.2.   Upon examining the results of the second survey, which recruited U.S. purchasers of handbags priced $10,000 or more, I calculated that Dr. Isaacson found a net level confusion of 3.6% in his "Handbag Purchasers" survey. Specifically, he found that 18.8% of respondents were confused in the Test

---

[29] See Expert Report of Dr. Bruce Isaacson, Exhibit 11.

Cell and 15.2% were confused in the Control Cell.[30] Thus, net likelihood of confusion in his Handbag Purchaser Survey was 3.6% (i.e., 18.8% minus 15.2%). A net confusion level of 3.6% falls far below any reasonable threshold for determining that a likelihood of confusion exists.[31]

3.5.3.   Since he designed and executed it, I assume that Dr. Isaacson believed that his Handbag Purchasers survey was an appropriate and relevant survey to conduct in this matter. However, at some point between fielding the survey and writing his report, he appears to have decided that the results of this survey were no longer relevant. In explaining this decision, he states that his opinions "are based on the survey of NFT purchasers rather than the survey of handbag purchasers because Hermès has made allegations in this matter that are consistent with forward confusion."[32]

3.5.4.   In response, I offer the following opinions:

3.5.4.1.   First, I respectfully suggest that it is "bad science" to design and execute a study and then retroactively decide that the survey is no longer relevant when it yields results unfavorable to the party sponsoring the research. If Dr. Isaacson's study was proper and relevant when it was designed, it remains proper and relevant even if it yields results that run contrary to the interests of Plaintiffs (i.e., shows no likelihood of confusion).

3.5.4.2.   Second, Dr. Isaacson's proffered reason for not relying on his own survey is demonstrably incorrect. As noted above, he implies that his Handbag

---

[30] Expert Report of Dr. Bruce Isaacson, Exhibit 11, p. 24.
[31] Matthew G. Ezell & AnnaBelle Sartore, "Survey Percentages in Lanham Act Matters" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 317-334 (Shari S. Diamond & Jerre B. Swann, eds., 2022).
[32] Expert Report of Dr. Bruce Isaacson, ¶ 91.

Purchasers survey was a test of "reverse confusion" and hence not relevant to Plaintiffs' claims (of forward confusion). However, the Handbag Purchasers survey is not a reverse confusion survey because the stimulus he showed was the <u>junior user's</u> allegedly infringing webpage. A reverse confusion survey would involve presenting the <u>senior user's</u> goods and testing if consumers thought they were put out by, or affiliated, approved, authorized, or sponsored by the junior user.[33] Thus, his Handbag Purchasers survey is not a reverse confusion survey, and this cannot, therefore, be a proper basis for abandoning it.

3.5.4.3.    Third, regardless of whether it had shown evidence for or against likelihood of confusion, Dr. Isaacson's Handbag Purchaser survey is flawed because it failed to recruit consumers likely to be exposed to the junior user's allegedly infringing  goods. To be clear – this is not an issue of forward versus reverse confusion as Dr. Isaacson wrongly suggests. His Handbag Purchaser survey is not a reverse confusion survey for the reasons documented above. But neither is it a proper survey of forward confusion. As noted authorities Barber and Yaquinto put it (bolding added), "The relevant universe for testing "forward" confusion is conventionally the **junior user's potential customers** given that forward confusion occurs when consumers believe that the junior user's products or services are put out by, sponsored by, or affiliated with the senior user."[34] By recruiting the

---

[33] *See* William G. Barber and Giulio E. Yaquinto. "The Universe" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 31-56 (Shari S. Diamond & Jerre B. Swann, eds. 2022).

[34] *See* William G. Barber and Giulio E. Yaquinto. "The Universe" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 31-56 (Shari S. Diamond & Jerre B. Swann, eds. 2022).

senior user's customers, Dr. Isaacson failed to meet this forward confusion requirement and thus did not test confusion among those likely to encounter the allegedly infringing goods.

3.5.4.4.   Fourth, despite the multiple flaws documented in this report (which generally apply to both surveys Dr. Isaacson conducted), the results of the Handbag Purchasers survey do have at least some informational value, albeit for questions other than likelihood of confusion. In particular, the results of this second survey strongly suggest either that Plaintiffs' likely customers (a) understand the accused NFT to be art, or (b) perceive the Birkin mark and Birkin trade dress to be weak source identifiers for Hermès.

3.5.4.5.   I base that conclusion on several factors. First, Dr. Isaacson's Handbag Purchasers survey recruited U.S. consumers who spend $10,000 or more on handbags. Accordingly, this survey clearly narrowed to the consumer universe of individuals likely to purchase luxury handbags, including Plaintiffs' Birkin bag. Second, given this, what do Dr. Isaacson's findings among these individuals suggest about the strength of the BIRKIN mark and the claimed Birkin trade dress? To answer this question, it is useful to recall that in his Test Cell, respondents saw a stimulus that allegedly includes both the Birkin trade dress and also the BIRKIN mark. For example, Test Cell respondents saw the following:[35]

---

[35] Expert Report of Dr. Isaacson, Exhibit 2, page 5.

**Test Versions of MetaBirkins Handbags, With and Without Superimposed Words (2 of 5)**



3.5.5.   In the Control Cell, Dr. Isaacson removed the claimed Birkin trade dress and removed the claimed BIRKIN mark. For example, Control Cell respondents saw the following:[36]

---

[36] Expert Report of Dr. Isaacson, Exhibit 2, page 5.

Control Versions of MetaBirkins Handbags, With and Without Superimposed Words (2 of 5)



3.5.6. What did the presence (Test Cell) versus absence (Control Cell) of these purportedly "famous" and "distinctive"[37] source indicators do to the results of Dr. Isaacson's survey? The answer is, very little. In the Test Cell, where these source indicators were present, only 18.8%[38] of luxury handbag purchasers identified Plaintiffs (i.e., Hermes, Birkin) as the source of the item shown or as sponsoring, authorizing, or approving the item shown. More importantly, when these source indicators were removed in the Control Cell,15.2% of luxury handbag purchasers still identified Plaintiffs.[39] Thus, the presence (vs. absence) of these purportedly famous and distinctive source indicators caused an increase of only 3.6% (i.e., 18.8% minus 15.2%) in the likelihood that

---

[37] Amended Complaint, ¶14.
[38] Expert Report of Dr. Bruce Isaacson, Exhibit 11, p. 24.
[39] Expert Report of Dr. Bruce Isaacson, Exhibit 11, p. 24.

Plaintiffs' likely purchasers associated the depicted goods with Hermes.

3.5.7.   There are only two plausible explanations for this *de minimis* increase in mentions of Plaintiffs observed in the Test Cell (vs. the Control Cell) of Dr. Isaacson's Handbag Purchasers survey.

3.5.7.1.   First, Plaintiffs' BIRKIN mark and Birkin trade dress may indeed theoretically be distinctive among luxury handbag purchasers, but those purchasers may also recognize Defendant's NFT to be an artistic representation. Under this analysis, despite their familiarity with Plaintiffs' marks and trade dress, luxury handbag purchasers may understand that Defendant's NFT is art, and therefore generally believe it not to be put out by Plaintiffs or authorized, sponsored, or approved by Plaintiffs.

3.5.7.2.   The only plausible alternative explanation is that Plaintiffs are incorrect when they assert that the BIRKIN mark is "famous" and that the Birkin trade dress is "distinctive."[40] If the presence (vs. absence) of <u>both</u> of these source indicators combined is driving only a 3.8% increase in mentions of Plaintiffs, then the word mark and trade dress cannot plausibly be considered famous or even strong. Under this analysis, the results from Dr. Isaacson's survey of Handbag Purchasers suggest that the BIRKIN mark and Birkin trade dress are weak, causing fewer than 1 in 25 likely purchasers to think of Plaintiffs.

3.6. **Flaw 5: Dr. Isaacson did not disclose, and refused to provide when requested, critical data coding that he relied upon as the basis for certain opinions. I was**

---

[40] Amended Complaint, ¶14.

**therefore unable to complete my scientific review of his findings.**

3.6.1.  Dr. Isaacson's Expert Report confirms that his NFT Purchaser Survey produced a "database of 221 completed interviews."[41] That is, 221 respondents passed all screening criteria and completed his survey. Despite this, the final data set Dr. Isaacson relies upon includes only 201 respondents. This discrepancy (221 versus 201) is, according to Dr. Isaacson, caused by his decision to exclude "20 respondents"[42] after data collection based on his subjective review of their answers. Specifically, he states that these individuals were "removed during quality control or validation."[43] According to Exhibit 7 of his Expert Report,[44] 13 of these respondents were removed because they "(p)rovided open-ended responses that reflected a lack of attention." An additional 5 respondents were removed because of "time to complete the survey[45]" and a further 2 were removed because  they "(p)rovided open-ended responses that reflected a lack of attention and time to complete the survey."

3.6.2.  I note first that, despite making 8 requests,[46] Counsel for Plaintiffs repeatedly (a) refused to identify the 20 respondents Dr. Isaacson excluded, and (b) furthermore refused to provide the data coding Dr. Isaacson performed on these respondents that forms the basis of his opinion that they should be excluded.

3.6.3.  For multiple reasons, this is highly improper scientific conduct and it violates well-

---

[41] Expert Report of Dr. Bruce Isaacson, ¶ 51.
[42] Expert Report of Dr. Bruce Isaacson, ¶ 51.
[43] Expert Report of Dr. Bruce Isaacson, ¶ 51.
[44] Expert Report of Dr. Bruce Isaacson, Exhibit 7, p. 1
[45] Per footnote 3 in Exhibit 7 of Dr. Isaacsons's report, this was defined a "respondents who took less than two minutes or more than one hour to complete the survey."
[46] Via Counsel for Defendant, I made 8 requests for the relevant missing data. These requests, made via email, were sent on August 24, 26, 27, 29, 31, and September 1.

accepted data reporting requirements that apply to surveys in litigation and scientific surveys in general. In support, I note that:

3.6.3.1.    First, Dr. Isaacson (or someone working at his direction) appears to have reviewed the data from these 20 respondents, and coded them for exclusion based on a subjective determination that each respondent completed the survey too quickly, too slowly, and/ or was not paying sufficient attention based on certain open-ended answers they provided. On the basis of this coding, Dr. Isaacson then reached an opinion that these respondents should be excluded. Despite this, Dr. Isaacson refused to even identify the 20 individuals (from a dataset of more that 3800 people) let alone provided the coding he performed, which forms the basis of his opinion. As a result, he has simply failed to provide for independent review the data underlying a key opinion in his Expert Report.

3.6.3.2.    Second, requirements concerning the disclosure of expert's coding of data are clearly provided in The Federal Judicial Center's *Reference Guide on Survey Research*, which explains that: "In all cases, the verbatim responses should be available so that they can be recoded using alternative criteria."[47] To be clear, by refusing to even identify the individuals who were excluded, Dr. Isaacson has made it impossible for the data to "be recoded using alternative criteria,"[48] as the Reference Guide on Survey Research stipulates must be allowed "in all cases."[49]

---

[47] Diamond, S. S. (2011). Reference guide on survey research. *Reference Manual on Scientific Evidence*: *Third*, p. 413.
[48] Ibid. 413.
[49] Ibid, 413.

3.6.3.3.   Third, as noted authority on trademark surveys, Dr. Jacob Jacoby, explains, experts must disclose their coding as a basic matter of scientific transparency:

> "A fundamental requirement for research to qualify as being scientific is for independent parties to be able to examine and, if desired, replicate and test the original researcher's procedures, coding, and analyses. Among other things, this means that if requested by opposing counsel and expert, the data matrix needs to be provided. If the data matrix is provided but without the codebook, there may be no way for the opposing party to figure out what the numbers in each column signify. In some instances, the absence of a codebook may be because the original researcher did not prepare one. In other instances, opposing counsel may refuse to provide the codebook, arguing that what was done is self-obvious-essentially saying 'you figure it out.' Recognize that because such a reply violates a fundamental scientific requirement, it may jeopardize admission of the entire survey or having it accorded weight."[50]

3.6.4.   In summary, it was highly improper for Dr. Isaacson to refuse to identify the excluded individuals or disclose the coding he performed to reach his opinion that they should be excluded. It rendered it impossible for me to evaluate the scientific validity of his approach, replicate his analysis, or complete my independent view of his surveys and opinions.

## 4.  Section 4: Summary of Opinions

4.1.   As documented in this Expert Rebuttal Report, it is my considered scientific opinion that the conclusions Dr. Isaacson draws regarding likelihood of confusion are not

---

[50] Jacob Jacoby (2013). Trademark Surveys: Designing, implementing, and evaluating surveys. p. 886.

scientifically valid or reliable. I base that opinion on (a) the existence of multiple design flaws in his surveys that introduced systematic bias in favor of Plaintiffs, and (b) a highly material data coding error in his NFT Purchaser Survey that led Dr. Isaacson to wrongly infer a likelihood of confusion in that survey. When this error is corrected, both of Dr. Isaacson's surveys show that there is no likelihood of confusion with Plaintiffs caused by Defendant's alleged infringement of Plaintiffs' marks. The primary design flaws and data analysis errors I identified in Dr. Isaacson's surveys are restated below:

4.1.1. **Flaw 1:** Dr. Isaacson's studies inextricably combine confusion caused by the HERMÈS word mark, the BIRKIN word mark, the allegedly confusing "MetaBirkins" name, and the claimed Birkin Trade Dress. As a result, it is scientifically impossible to draw any scientific inferences about what amount of confusion, if any, is caused by any one of these elements in isolation.

4.1.2. **Flaw 2:** Dr. Isaacson correctly included a follow-up question to rule out the "reading test" problem in Eveready surveys of this kind. However, he then improperly ignored the data from this question, thereby materially inflating confusion and drawing the wrong conclusion in his "NFT Purchaser Survey." After recoding to correct this flaw, his "NFT Purchaser Survey" shows no likelihood of confusion.

4.1.3. **Flaw 3:** Dr. Isaacson's confusion questions (Q1 and Q7) are inherently ambiguous in a manner that is biased in favor of Plaintiffs and against Defendant.

4.1.4. **Flaw 4:** Dr. Isaacson's Survey of Handbag Purchasers was improperly abandoned—apparently after it produced unfavorable results for Plaintiffs. Its results are relevant and suggest either that (a) Plaintiffs' customers understand the accused NFT to be art, or (b) the Birkin mark and Birkin trade dress are very weak and are not acting as source identifiers.

4.1.5.   **Flaw 5:** Dr. Isaacson did not disclose, and refused to provide when requested, critical data coding that he relied upon as the basis for certain opinions. I was therefore unable to complete my scientific review of his findings.

## 5.  Section 5: Other Information/Materials Reviewed

5.1.   In preparing this Rebuttal Report, I reviewed:

5.1.1.   Expert Report of Dr. Bruce Isaacson

5.1.2.   Plaintiffs' First Amended Complaint

5.1.3.   Defendant's Answer and Affirmative Defenses

5.1.4.   Memorandum of Law in Support of Defendant Mason Rothschild's Motion to Dismiss the Amended Complaint

5.1.5.   Memorandum of Law in Opposition to Mason Rothschild's Motion to Dismiss

5.1.6.   Reply Memorandum of Law in Further Support of Defendant Mason Rothschild's Motion to Dismiss the Amended Complaint

5.1.7.   Judge Jed S. Rakoff's Memorandum Order in this Matter

5.1.8.   Other materials as cited throughout this report.

5.2.   This report is based on information currently available to me, and I reserve the right to amend or supplement this report and my opinions when and if additional information or documents are made available to me.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, this 1st day of September 2022.

David T. Neal, Ph.D.

33

# Exhibit A

## Curriculum Vitae - David Neal, Ph.D.

**David T. Neal, Ph.D.**
**Founding Partner**
**Catalyst Behavioral Sciences LLC**
**Executive in Residence, Duke University**

**Prior appointments** _____

| | |
|---|---|
| 2010-2013 | Founding Partner, Empirica Research PTY LTD |
| 2009-2011 | Assistant Research Professor of Psychology<br>University of Southern California |
| 2006-2009 | Director, Social Science Research Laboratories<br>Duke University |

**Education** _____

| | |
|---|---|
| 2006 – 2009 | Postdoctoral Fellow<br>Duke University, Psychology and Neuroscience |
| 2001 – 2005 | Ph.D. in Social Psychology, University of Melbourne, Australia.<br>Dissertation: Automatic influences of stereotypes and affect on judgment and decision-making |
| 1996 – 2000 | B.A. (Hons) University of Melbourne<br>Majors: Psychology, Philosophy |

**Peer Reviewed Publications** _____

Neal, D. (2022). Psychological considerations in designing trademark and false advertising survey questionnaires. To appear in Shari S. Diamond & Jerre B. Swann (Eds.) *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*.

Wood, W., Mazar, A., & Neal, D. (2021). Habits and goals in human behavior: Separate but interacting systems. *Perspective on Psychological Science*.

Townsend, C., Neal, D. T., & Morgan, C. (2019). The impact of the mere presence of social media share icons on product interest and valuation. *Journal of Business Research*, *100*, 245-254.

Ascarza, E., Neslin, S. A., Netzer, O., Anderson, Z., Fader, P. S., Gupta, S., et al., (2018). In pursuit of enhanced customer retention management: Review, key issues, and future directions. *Customer Needs and Solutions*, *5*(1-2), 65-81.

Carden, L., Wood, W., Neal, D. T., & Pascoe, A. (2017). Incentives activate a control mind-set: good for deliberate behaviors, bad for habit performance. *Journal of the Association for Consumer Research*, *2*(3), 279-290.

Labrecque, J. S., Wood, W., Neal, D. T., & Harrington, N. (2016). Habit slips: When consumers unintentionally resist new products.  *Journal of the Academy of Marketing Science*, 1-15.

Wood, W., & Neal, D. T. (2016). Healthy through habit: Interventions for initiating and maintaining health behavior change. *Behavioral Science and Policy*, *2*(1), 71-83.

Rothman, A. J., Gollwitzer, P. M., Grant, A. M., Neal, D. T., Sheeran, P., & Wood, W. (2015). Hale and hearty policies: How psychological science can create and maintain healthy habits. *Perspectives on Psychological Science*, *10*(6), 701-705.

Teyhen, D. S., Aldag, M., Centola, D., Edinborough, E., Ghannadian, J. D., Haught, A., Jackson, T., Kinn, J., Kunkler, K. J., Levine, B., Martindale, V.E., Neal, D. T., Snyder, L. B., Styn, M. A., Thorndike, F., Trabosh, V., & Parramore, D. J. (2014). Incentives to create and sustain healthy behaviors: Technology solutions and research needs. *Military Medicine, 179,* 1419-1431.

Teyhen, D. S., Aldag, M., Edinborough, E., Ghannadian, J. D., Haught, A., Kinn, J., Kunkler, K. J., Levine, B., McClain, J., Neal, D. T., Stewart, T., Thorndike, F. P., Trabosh, V., Wesensten, N., & Parramore, D. J. (2014). Leveraging technology: Creating and sustaining changes for health. *Telemedicine and e-Health*, *20*(9), 835-849.

Teyhen, D. S., Aldag, M., Centola, D., Edinborough, E., Ghannadian, J. D., Haught, A., Jackson, T., Kinn, J., Kunkler, K. J., Levine, B., Martindale, V. E., Neal, D. T., Snyder, L. B., Styn, M. A., Thorndike, F., Trabosh, V., & Parramore, D. J. (2014). Key enablers to facilitate healthy behavior change: Workshop summary. *Journal of Orthopedic & Sports Physical Therapy, 44,* 378-387.

Norton, M. I., Neal, D. T., Govan, C. L., Ariely, D., & Holland, E. (2014). The not-so-common-wealth of Australia: Evidence for a cross-cultural desire for a more equal distribution of wealth. *Analyses of Social Issues and Public Policy, 14*(1), 339-351.

Neal, D. T., Wood, W., & Drolet, A. (2013). How do people adhere to goals when willpower is low? The profits (and pitfalls) of strong habits. *Journal of Personality and Social Psychology,104,* 959 –975.

Neal, D. T., Wood, W., Labrecque, J., & Lally, P. (2012). How do habits guide behavior? Perceived and actual triggers of habits in daily life. *Journal of Experimental Social Psychology, 48,* 492–498.

Moore, S. G., Neal, D. T., Fitzsimons, G., & Shiv, B. (2012). Wolves in sheep's clothing: When and how hypothetical questions influence behavior. *Organizational Behavior and Human Decision Processes*, *117*, 168-178.

Neal, D. T., Wood, W., Wu, M., & Kurlander, D. (2011). The pull of the past: When do habits persist despite conflict with motives? *Personality and Social Psychology Bulletin, 37,* 1428–1437.

Neal, D. T., & Chartrand, T. L. (2011). Embodied emotion perception: Dampening and amplifying facial feedback modulates the accuracy of emotion perception. *Social and Personality Psychology Science, 2,* 673-678.

Quinn, J., Pascoe, A., Wood, W., & Neal, D. T. (2010). Can't control yourself? Monitor those bad habits. *Personality and Social Psychology Bulletin, 36*, 499-512.

Wood, W., & Neal, D. T. (2009). The habitual consumer. *Journal of Consumer Psychology, 19,* 579-592.

Neal, D. T., & Wood, W. (2008). Automaticity *in situ*: Direct context cuing of habits in daily life. In E. Morsella, J.A., Bargh, & P.M. Gollwitzer (Eds.), *The Psychology of Action, Volume 2: Mechanisms of Human Action.* Oxford University Press.

Neal, D. T., & Wood, W. (2008). Linking addictions to everyday habits and plans.  *Behavioral and Brain Sciences, 31,* 455-456.

Neal, D. T., Wood, W., & Pascoe, T. (2008). Triggers of real-world habits. *Proceedings of the Annual*

*Conference of the Association for Consumer Research*. Memphis, TN.

Wood, W., & Neal, D. T. (2007). A new look at habits and the habit-goal interface. *Psychological Review, 114,* 843-863.

Neal, D. T. (2007). Habit. In W.A. Darity (Ed.), *International Encyclopedia of the Social Sciences (2nd Ed.)*. Macmillan Reference, USA.

Neal, D. T., Wood, W., & Quinn, J. (2006). Habits: A repeat performance. *Current Directions in Psychological Science, 15,* 198-202.

Haslam, N., Bain, P., & Neal, D. T. (2004). The implicit structure of positive characteristics. *Personality and Social Psychology Bulletin, 30,* 529-541.

**Other Publications** _____

Neal, D. T., Vujcic, J., Burns, R., Wood, W., & Devine, J. (2016). Nudging and Habit Change for Open Defecation: New Tactics from Behavioral Science. The World Bank Group & Catalyst Behavioral Sciences.

Neal, D. T., Vujcic, J., Hernandez, O., & Wood, W. (2015).  The Science of Habit: Creating Disruptive and Sticky Behavior Change in Handwashing Behavior.  Washington, D.C., USAID/WASHplus.

Cuddy, A. J. C., Govan, C. L., Neal, D. T., & Coster, A. (2012). "Qantas Luxury: Grounded Flights, First-class Pajamas, and Twitter Hashtags." Harvard Business School Case N9-912-026.

Neal, D. T., Govan, C., Norton, M., & Ariely, D. (2011a). Australian attitudes towards wealth inequality and the minimum wage.

Neal, D. T., Govan, C., Norton, M., & Ariely, D. (2011b). Australian attitudes towards wealth inequality and the progressive taxation.

**Invited Keynotes and Presentations** _____

May 2022   CLE Websinar. Use of surveys in patent litigation. The San Francisco Intellectual Property Law Associaion (SFIPLA).

Nov 2021    Invited lecture. UNC-Chapel Hill. Masters in Applied Statistics

Oct 2021.    Invited lecture. Abbott. Consumer Survey Design.

Aug 2021     Keynote Speaker: Habit Day Event.

Oct 2019     Speaker. R-SHOT: Results of the Zika Grand Challenge Experience. USAID. Washington, DC.

Nov 2018     Invited address. Habit, Behavior Change and the National Diabetes Prevention Program. The Centers for Disease Control and Prevention. Atlanta, GA.

Apr 2018     Speaker. Food as Medicine Conference. University of Pennsylvania.

Oct 2017     Guest speaker. Wharton Business School, University of Pennsylvania.

Aug 2017     Speaker. Habits Conference, University of Southern California

Mar 2017     Guest speaker. Miami Business School, University of Miami          .

Dec 2016     Keynote address. Physician Organization Exchange. Torrey Pines, CA.

Nov 2016     Keynote address. Norton Medical Group Summit. Louisville, KY.

| | |
|---|---|
| Oct 2016 | Guest speaker. Habit and Behavior Change. World Vision, Washington, DC. |
| Sep 2016 | Guest speaker.  GAIN Thought Leaders Discussion Event, Washington, DC. |
| Sep 2016 | Moderator. Behavioral Economics and SBCC. Springboard for Health Communication. |
| May 2016 | Guest speaker. Triennial Invitational Choice Symposia, Alberta, Canada. |
| Apr 2016 | Keynote address. Health Leaders Media Population Health Exchange, Austin, TX. |
| Apr 2016 | Expert panelist. Behavioral Economics in Reproductive Health Initiative, New Orleans, LA. |
| Feb 2016 | Keynote address. SBCC Summit, Ethiopia, Africa. |
| Nov 2015 | Guest speaker. USAID Nudges & Tactics to Reduce Open Defecation, Washington, DC. |
| Aug 2015 | Keynote address. Health Leaders Media CFO Exchange, Colorado Spring, Texas. |
| Jan 2015 | Presentation. Surgeon General of the US Army. Brain Health Consortium, Fairfax, Virginia. |
| Aug 2014 | Presentation. Habit and behavior change. Cincinnati Children's Hospital. |
| May 2013 | Keynote address. National Center for Women and Information Technology, Annual Summit. Tucson, AZ. |
| Jul 2012 | Guest speaker. Control and the Absent Mind Conference, Essen, Germany. |
| Oct 2011 | Keynote address. EUCognition Conference, Groningen, Netherlands. |
| Feb 2011 | Symposium presentation. Society for Personality and Social Psychology Annual Conference, San Antonio, Texas. |
| Oct 2010 | Colloquium presentation. Psychology Department. San Diego State University. |
| May 2008 | Colloquium presentation. Department of Epidemiology and Health. University College London. |
| May 2008 | Guest speaker. London School of Hygiene and Tropical Medicine. |
| Jan 2008 | Symposium presentation. Society for Personality and Social Psychology Annual Conference, Albuquerque, NM. |

**Testimony at Trial or Deposition_____**

State of Arizona  ex rel. Mark Brnovich, Attorney General v. Google LLC, a Delaware limited liability company.  The Superior Court of the State Of Arizona in and for the County of Maricopa.

RightQuestion, LLC, v. Samsung Electronics Co., LTD., and Samsung Electronics America, INC., United States District Court for the Eastern District of Texas, Marshall Division.

Luckenbach Texas, inc., v. Stewart Skloss, Stemma Loldings, L.P., Luckenbach Road Whiskey Wistillery, LLC, Luckenbach Whiskey, LLC, LRW Ventures, LLC, Frontier Spirits, LLC, and Pura Vida Spirits Company, LLC. United States District Court. Wester District of Texas, Austin Division.

Growmark, Inc., v. Hanse Orga GMBH. United States Patent and Trademark Office, The Trademark Trial And Appeal Board.

Deckers Outdoor Corporation v. Walmart  Inc & Does 1-10. United States District Court. Central District of California.

Adidas America Inc. and Adidas AG v. Fashion Nova Inc. United States District Court. District of Oregon, Portland Division.

TherapeuticsMC v. Evofem Biosciences Inc. United States District Court Southern District Of Florida, West Palm Beach Division.

River Light V, L.P. and Tory Burch LLC, v. Olem Shoe Corp., United States District Court Southern District Of New York.

Solid 21, Inc. v. Richemont North America, Inc.; Richemont International, S.A.; and Montblanc-Simplo GMBH. United States District Court for the Southern District of New York.

D. H. Pace Company, Inc., D/B/A Overhead Door Company of Atlanta and Overhead Door Company of Kansas City v. OGD Equipment Company, LLC. United States District Court For The Northern District of Georgia, Atlanta Division.

Gree Inc. v. SuperCell OY. United States District Court for the Eastern District of Texas, Marshall Division.

Solid 21, Inc. v. Breitling U.S.A., Inc. and Breitling SA (a/k/a Breitling AG). United States District Court for the Southern District of Connecticut.

Gree Inc. v. SuperCell OY. United States District Court for the Eastern District of Texas, Marshall Division.

Oroville Dam Cases. Superior Court of California. County Of Sacramento.

American Airlines, Inc. v. Delta Airlines, Inc., United States District Court for the Northern District of Texas, Fort Worth Division.

Chooseco LLC, v. Netlfix Inc. United States District Court for the District of Vermont.

Gree Inc. v. SuperCell OY. United States District Court for the Eastern District of Texas, Marshall Division.

Bluetooth SIG Inc. v. FCA US LLC. United States District Court for the Western District of Washington, Seattle Division.

Jam Cellars, Inc. v. The Wine Group LLC. United States District Court for the Northern District of California.

AWGI, LLC, Atlas Logistics, Inc. and Atlas Van Lines, Inc., V. Atlas Trucking Company, LLC., Atlas Logistics, LLC., and Eaton Steel Bar Company, Inc. United States District Court for the Eastern District of Michigan.

Solid 21, Inc. v. Ulysse Nardin, Usa Inc. A/K/A/ Ulysse Nardin, Inc.; Kering, S.A.; and Ulysse Nardin SA. United States District Court for the Southern District of Florida.

OGD Equipment Co. D/B/A Overhead Garage Door, LLLC, v. Overhead Door Corporation and Overhead Door Company Of Lubbock, Inc., United States District Court For The Eastern District of Texas, Sherman Division.

Corus Realty Holdings, Inc. v. Zillow Group, Inc., Zillow, Inc., and Trulia, LLC. United States District Court, Western District of Washington.

Dr. Mark A. Barry v. DePuy Synthes Products, Inc., Medical Device Business Services, Inc., and DePuy Synthes Sales, Inc. D/B/A/ Depuy Synthes Spine. United States District Court for the Eastern District of Pennsylvania.

Mahindra & Mahindra, LTD. and Mahindra Automotive North America, Inc. v. FCA US LLC. United States District Court for the Eastern District of Michigan.

RVCFloor Décor, Ltd., V. Floor & Decor Holdings, Inc. and Floor And Decor Outlets Of America, Inc., United States District Court For The Eastern District Of New York.

Ferring Pharmaceuticals Inc., Ferring B.V., and Ferring International Center S.A., v. Serenity Pharmaceuticals, LLC, and Reprise Biopharmaceutics, LLC, United States District Court For The Southern District Of New York.

D. H. Pace Company, Inc., D/B/A Overhead Door Company of Atlanta, v. Aaron Overhead Door Atlanta LLC, Jeremy Ryan Lucia, and Stephenie Lucia. United States District Court For The Northern District of Georgia, Atlanta Division.

Car-Freshner Corporation and Julius Samann LTD., v. American Covers LLC, F/K/A American Covers, Inc. D/B/A Handstands, Energizer Holdings, Inc,. and Energizer Brands, LLC. United States District Court For The Northern District Of New York.

Energizer Brands, LLC v. Duracell U.S. Operations, Inc. United States District Court for the Eastern District of Missouri.

Mark A. Barry M.D., v. Medtronic, Inc. United States District Court for the Eastern District of Texas, Beaumont Division.

Edible Arrangements International LLC & Edible Arrangements LLC v. 1-800-Flowers.com, Inc., 800-Flowers, Inc. And June v. Delaney and David Delaney d/b/a Fruit Bouquet Staten Island. United States District Court, District of Connecticut.

Sanford L.P. (d/b/a/ DYMO) and DYMO B.V.B.A. v. Esselte AB, Esselte Leitz GMHB & Co. KG and Esselte Corporation. United States District Court Southern District of New York.

PEI International v. U-Haul International, United States District Court Middle District of Florida, Tampa Division.

**Teaching Experience** _____

University of Southern California (2009-2011)

      Professor of Research Methodology

Duke University (2005-2009)

      Research Fellow teaching Consumer Psychology and Research Methodology

**Expert Journal Reviewer**_____

Basic and Applied Social Psychology

European Journal of Social Psychology

Journal of Consumer Research

Journal of Marketing Research

Journal of Personality and Social Psychology

Journal of Experimental Social Psychology

Personality and Social Psychology Bulletin

Psychological Science

Social Influence

Social and Personality Psychology Compass

Social Cognition

**Awards and Fellowships** _____

The Centers for Disease Control and Prevention (2019-2023), Research Grant to Investigate Retention and Enrollment Predictors in the National Diabetes Prevenion Program, $1,515,000.

2012 Society for Consumer Psychology, Park Outstanding Contributor Award (jointly with Professor Wendy Wood)

NSF Major Equipment Grant (2008-2009), $252,000. Co-PI.

Australian Postgraduate Award, 2001-2005, ($60,000)