# Exhibit 6

Page 1

1   IN THE UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   ---------------------------------------X

4   HERMES INTERNATIONAL and

5   HERMES OF PARIS, INC.,

6                     Plaintiffs,

7           - against -

8   MASON ROTHSCHILD,

9                     Defendant.

10  Civil Action No.:  22-CV-00384

11  ---------------------------------------X

12

13

14              REMOTE PROCEEDINGS

15              DAVID NEAL, PhD

16         WEDNESDAY, SEPTEMBER 21, 2022

17                  4:45 P.M.

18

19

20

21

22

23  Reference No.: NY 5462232

24  Reported By:  Rita Persichetty

25

```
                                                    Page 2

 1   A P P E A R A N C E S:

 2    (All appearances via Veritext Virtual)

 3

 4   BAKER & HOSTETLER LLP

 5   Attorneys for Plaintiffs

 6        Key Tower

 7        127 Public Square, Suite 2000

 8        Cleveland, Ohio 44114

 9   BY:  DEBORAH WILCOX, ESQ.

10          - and -

11        LISA BOLLINGER GEHMAN, ESQ.

12        PHONE:  216.621.0200

13        EMAIL:  dwilcox@bakerlaw.com

14

15

16   LEX LUMINA PLLC

17   Attorneys for Defendant

18        745 Fifth Avenue, Suite 500

19        New York, New York 10151

20   BY:  RHETT O. MILLSAPS II, ESQ.

21          - AND -

22        CHRISTOPHER J. SPRIGMAN, ESQ.

23        PHONE:  646.898.2055

24        EMAIL:  rhett@lex-lumina.com

25
```

Page 3

1   A P P E A R A N C E S:

2   ALSO PRESENT:

3   VALENTINE FADIE, ESQ, In House Counsel, Hermes

4

5   Tom Keighley, Videographer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                        Page 4
```

1   ---------------- I N D E X ------------------

2   WITNESS                EXAMINATION BY        PAGE

3   DAVID NEAL, PhD     MS. WILCOX

4

5

6   ---------INFORMATION/DOCUMENTS REQUESTED------

7   PAGE     24   Any invoices from Ms. Rodman

8

9   ---------------- EXHIBITS ------------------

10                 DESCRIPTION          FOR I.D.

11  Exhibit 146    Invoice to Lex Lumina       28

12  Exhibit 147    Testimony of                56

13                 defendant's expert

14                 witness David Neal,

15                 PhD

16  Exhibit 138    Expert Report of Dr.        67

17                 Isaacson

18  Exhibit 140    Chapter on Likelihood       80

19                 of Confusion Surveys

20  Exhibit 148    Expert Report of            94

21                 Melissa Pittaolis

22  Exhibit 142    Chapter of a book          118

23  Exhibit 143    Isaacson Full Data         150

24                 File

25  Exhibit 144    File entitled              154

                                              **Page 5**

1                       **09Isaacson000093.xlsx**

2     ----------------- **EXHIBITS** -------------------

3                       **DESCRIPTION**           **FOR I.D.**

4     **Exhibit 141**   **Psychological**             **170**

5                       **Considerations in**

6                       **Designing Trademark**

7                       **and False Advertising**

8                       **Survey Questionnaires**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  All right.  Good

3         morning [sic].  We're going on the record.

4         The time is approximately 4:41 on

5         September 21, 2022.

6              Please note that this deposition is

7         being conducted virtually.  Quality of

8         recording depends on the quality of the

9         camera and the Internet connection of

10        participants.  What is seen from the

11        witness and heard on the screen is what

12        will be recorded.

13             Audio and video recording will

14        continue to take place unless all parties

15        agree to go off the record.

16             This is media unit number 1 of the

17        video recorded deposition of Dr. David Neal

18        and we're here in the matter of Hermes

19        International, et al. versus Mason

20        Rothschild.

21             This deposition is being conducted

22        remotely using virtual technology.  My name

23        is Thomas Keighley representing Veritext

24        and I'm the videographer.  Our court

25        reporter is Rita Persichetty also with

Page 7

1       Veritext.

2               I'm not related to any party in this

3       action nor am I financially interested in

4       the outcome.

5               Any objections to proceeding please

6       state them at the time of your appearance.

7               Counsel and all present, everyone

8       attending remotely, can now state their

9       appearance and affiliation for the record

10      beginning with the noticing attorney.

11              MS. WILCOX:  This is Deborah Wilcox of

12      the law firm of Baker and Hostetler

13      representing the plaintiffs Hermes

14      International and Hermes of Paris.  I have

15      with me Lisa Gehman from our Philadelphia

16      office.

17              MR. MILLSAPS:  And this is Rhett

18      Millsaps with Lex Lumina PLLC representing

19      defendant, Mason Rothschild.  I have with

20      me my colleague Chris Sprigman.

21              THE VIDEOGRAPHER:  Good.  And if I

22      could ask the court reporter to please

23      swear in the witness and we can proceed.

24   D A V I D   N E A L, PHD,

25      called as a witness, having been sworn

                                            Page 8

1          by the Notary Public, was examined and

2          testified as follows:

3     EXAMINATION BY

4     MS. WILCOX:

5          Q.    Thank you.

6                Good morning your time, Dr. Neal.

7                Could you please state your full name

8     for the record?

9          A.    Certainly.  It's David Thomas Neal,

10    N-E-A-L.

11         Q.    What is your home address.

12         A.    It's 615 Vilabella Avenue, Vilabella

13    is one word, V-I-L-A-B-E-L-L-A, Avenue, Coral

14    Gables 33146, that's in Florida.

15         Q.    What is your work address?

16         A.    That's the same.

17         Q.    Where are you located today?

18         A.    Let me just turn off my Bluetooth.

19                Okay.  You can still hear me?

20         Q.    Yes.

21         A.    Okay.  My computer tried to connect to

22    my Bluetooth speakers.

23                Could you repeat the question?

24         Q.    Where are you located today?

25         A.    I'm in Australia.  I'm in a hotel in

                                                                Page 28

1   deposition, and then obviously the preparation

2   for this deposition and the deposition itself.

3        Q.   What do you intend to charge for that

4   work?

5        A.   That being?

6        Q.   What you just described that you

7   haven't yet billed.

8        A.   Okay.  In -- in combination all of

9   those things?

10       Q.   Yes.

11       A.   Well, assuming that I use the flat

12  rate, I would estimate that might be another --

13  let me just think.  Maybe somewhere in the order

14  of $9,000.

15       Q.   I believe we have just received a copy

16  of the invoice that you sent to Lex Lumina.

17            MS. WILCOX:  Ms. Gehman, could you

18       pull that up.

19            And is this going to be Exhibit 146?

20            MS. GEHMAN:  Yes.  Bringing it up

21       right now.  Thank you for bearing with me.

22            MS. WILCOX:  Thank you.

23            (Exhibit 146, Invoice to Lex Lumina,

24  marked for identification.)

25       Q.   Dr. Neal, is this your invoice to Lex

```
                                              Page 29
 1   Lumina?

 2        A.   Yes, it is.

 3        Q.   Thank you.

 4             What was the understanding of your

 5   assignment in this case?

 6        A.   I would characterize it as reviewing

 7   the scientific validity and reliability of

 8   the -- the surveys that Dr. Isaacson conducted

 9   and his report in its totality.

10             Also reviewing the nature of the

11   conclusions that he drew from the data that he

12   collected and reaching an opinion based upon

13   that review as to whether his studies were

14   scientifically proper and whether his

15   conclusions validly and logically flow from the

16   data that he collected.  And then articulating

17   that -- the results of that analysis in a

18   rebuttal report.

19        Q.   Did you consider conducting any

20   surveys of your own?

21        A.   Briefly I did consider that.

22        Q.   What did you consider?

23        A.   Well, I -- I considered the scope to

24   run an Eveready survey as a rebuttal survey.

25        Q.   What do you mean the scope?
```

```
                                                Page 30
 1        A.    Well, I -- I briefly considered, I did
 2   not pursue it very far after conversations with
 3   counsel, but I -- I briefly considered whether
 4   there was time and what the broad outline of an
 5   Eveready survey might be in this particular
 6   case.
 7        Q.    And what were the reasons for choosing
 8   not to do a survey of your own?
 9        A.    Two primary factors.  One is that my
10   understanding is that the defendant did not have
11   the funds to pay for a survey.  Obviously
12   surveys are expensive.  And so my understanding
13   is there just wasn't enough money to fund a
14   survey?
15             And secondly, my understanding --
16   obviously I'm not an attorney, but my
17   understanding is that the burden falls on the
18   plaintiff to prove confusion.  And having
19   reviewed Dr. Isaacson's survey and reaching a
20   conclusion that that burden scientifically had
21   not been met, in my view, a survey was
22   unnecessary.
23        Q.    You have run surveys for defendants
24   accused of intellectual property infringement in
25   the past; is that correct?
```

```
                                          Page 31
 1        A.    I certainly have done that in the past
 2   that's right, yes, when the budgets allowed for
 3   it.
 4        Q.    In fact, you did one for Walmart.
 5   Does that ring a bell?
 6        A.    Yes.  And Walmart -- Walmart is
 7   obviously a very well funded entity.
 8        Q.    And you also did a survey for Evofem
 9   Biosciences; is that correct?
10        A.    I -- I did.  I need to confirm if they
11   were the defendant.  And they, again, are a
12   large pharmaceutical firm.
13        Q.    Well, your survey was in the nature of
14   a rebuttal likelihood of confusion survey?
15        A.    I'd need to check, but it's -- it's
16   certainly possible, yes.
17        Q.    And you also did a survey for a case
18   that was Solid 21 versus Richemont and
19   MontBlanc; is that correct?
20        A.    That is correct.
21        Q.    And another one for the case Solid 21
22   versus Breitling, and that one you represented
23   Breitling; is that correct?
24        A.    That's correct.
25        Q.    And the same -- I forgot to ask you
```

Page 32

```
 1   about Richemont and MontBlanc.  You represented
 2   those parties in that case; is that correct?
 3        A.   Yes.  Again, all -- all very large
 4   international multinational firms.
 5        Q.   How much time would you want to have
 6   to conduct an Eveready survey for this case?
 7        A.   Well, how much time I would want to
 8   have would typically be a minimum of six weeks,
 9   sometimes that's not possible and it can be done
10   faster, but that would be a -- a -- a
11   comfortable minimum, in my view.
12        Q.   What is the shortest period of time in
13   which you have ever conducted an Eveready
14   survey?
15        A.   I don't -- I wouldn't be able to
16   recall that with accuracy.  It's -- it's I think
17   faster than six weeks but I -- I wouldn't be
18   able to give you an accurate answer to that.
19        Q.   Beyond receiving Dr. Isaacson's report
20   and the pleadings you mentioned in this case,
21   did you request any additional materials from
22   Lex Lumina?
23        A.   Well, I'm not sure that your question
24   encompasses this, but obviously I requested
25   certain data sets that were admitted from
```

```
                                            Page 49
 1      Q.   Well, we will go through that in
 2   further detail.
 3      A.   I'm sure.
 4      Q.   So --
 5      A.   That was a lot.
 6      Q.   I know.  I understand you have
 7   identified these five, what you call, flaws in
 8   the survey.
 9           Is there anything else on which you
10   are opining in this case?
11      A.   There -- there -- it's possible there
12   may be.  I don't know what I'll be asked.  I
13   don't know what this possible supplementary or
14   supplemental report might include, but I can't
15   think of anything else now.
16      Q.   Okay.  Let's go to your actual --
17           MR. MILLSAPS:  Deborah, I just want to
18       note we've been going a little over an hour
19       now, it might be a good time to have a
20       short break.
21           MS. WILCOX:  Okay.  Can we take a
22       break for five minutes, does that work for
23       everyone?
24           MR. MILLSAPS:  Is that sufficient for
25       you, Dr. Neal?
```

```
                                              Page 50
 1              THE WITNESS:  Sure, that works.
 2              MR. MILLSAPS:  Okay.
 3              MS. WILCOX:  Okay.  See you in five.
 4              THE WITNESS:  Okay.
 5              THE VIDEOGRAPHER:  Let's go off the
 6         record.  The time is 5:45 and we're going
 7         to go off the record.
 8                   (Short recess taken)
 9              THE VIDEOGRAPHER:  Okay.  The time is
10         approximately 5:52 and we are back on the
11         record.
12         Q.   Dr. Neal, we'd like you to look at
13    your report, which I understand you have a copy
14    of in front of you.  And though for the record
15    we will pull it up, and I believe it is
16    Exhibit 137?  Yes.
17              Do you see the report on your screen?
18         A.   I do.
19         Q.   Yes.  And it's 40 pages long.
20              Does that sound right?
21         A.   Including my CV?  Yes.
22         Q.   Yes.
23         A.   That's right.
24         Q.   Okay.  Very good.
25              I'd like to direct your attention to
```

Page 51

```
1    paragraph 3.2.4 of your report.  Which I believe
2    is page 9.
3              Do you see that section?
4         A.   I do.
5         Q.   Yes.  And you say, "Setting aside the
6    other flaws documented in this report, I note
7    that Dr. Isaacson's approach on this issue is
8    not inherently flawed if one only seeks to know
9    the combined effect of all four elements of
10   alleged infringement."
11             Is that still your opinion today?
12        A.   Yes, it is with respect to that one
13   flaw in isolation, yes.
14        Q.   And you agree, don't you, that a
15   survey stimulus must replicate market
16   conditions?
17             MR. MILLSAPS:  Objection.
18        A.   Well, there's -- there's a general
19   goal of replicating market conditions as closely
20   as possible, but it's well acknowledged that no
21   survey, just by virtue of the fact that it is a
22   survey, is a perfect replication of market
23   conditions.  But I would -- I would agree with
24   you that a general goal is to, as much as
25   possible, replicate market conditions.
```

Page 52

1        Q.   And defendant, Mason Rothschild, in

2    this case is -- is the one who chose to use the

3    plaintiff's trademark Birkin so many times on

4    MetaBirkins.com; isn't that right?

5               MR. MILLSAPS:   Objection.

6        A.   I don't know who made that decision.

7        Q.   If you go -- have you gone to the

8    website MetaBirkins.com?

9        A.   Yes.

10       Q.   And you saw the trademark Birkin

11   there?  I believe you mentioned that earlier in

12   the summary of one of your opinions.

13       A.   I saw the name Birkin there, yes.

14       Q.   How many times?

15       A.   I didn't count.

16       Q.   Do you recall the different ways in

17   which the MetaBirkins.com web page uses the

18   Birkin trademark?

19       A.   I know that it is embedded in a -- a

20   phrase "not your mother's Birkin."  And then I'm

21   not sure whether part of your allegation is that

22   it's -- it's used within the name MetaBirkin,

23   but if that is your allegation then that, and

24   taking that at face value, then it's there as

25   well.

```
                                          Page 56
 1        A.    Correct.
 2        Q.    Okay, thank you.
 3              Actually, let's look at your testimony
 4   from that case.
 5              MS. WILCOX:  Ms. Gehman, if you could
 6        pull up the PODS Enterprises versus U-Haul
 7        International testimony.  We'll need to
 8        mark this as an exhibit.
 9              MS. GEHMAN:  One moment.
10              (Exhibit 147, Testimony of defendant's
11   expert witness David Neal, PhD, marked for
12   identification.)
13        Q.    Do you recall providing testimony in
14   the PODS versus U-Haul case in the Middle
15   District of Florida?
16        A.    Yes, I do.
17        Q.    It's dated September 18, 2014?
18        A.    That seems about right.
19        Q.    We're showing you Exhibit 147.
20   Testimony of defendant's expert witness David
21   Neal, PhD.
22              MS. WILCOX:  And if you could please
23        scroll to the next page.
24        Q.    Do you keep copies of your transcripts
25   from trial testimony?
```

Page 57

```
 1        A.    Not -- not typically.
 2        Q.    Have you ever seen your trial
 3   testimony in this case?
 4        A.    I don't believe so.  It's -- it's
 5   possible that I saw it many years ago, but I
 6   don't have any recollection.
 7              MS. WILCOX:  And if you can look at
 8         page 3 of that.  There where it says near
 9         the bottom, "That's right."
10              Yes, thank you.
11        Q.    And so you were -- you were testing to
12   create a real world naturalistic scenario.  And
13   if you recall, you told people you'd be looking
14   at a web page, and you showed them an actual web
15   page from U-Haul; is that correct?
16        A.    That's correct.
17              MS. WILCOX:  And if you can turn to
18         page 5 of the testimony.
19        Q.    We're in the top quarter of the page.
20   When I asked you about whether your goal was to
21   ask about the overall impression from looking at
22   the website, you said you didn't remember that,
23   but I'm going to point you to this testimony you
24   gave.  And you see the question:
25              "So you asked -- when viewing this web
```

Page 58

1   page, did you consider asking something more

2   specific like, look for the word 'pod' and tell

3   me what you think?

4            "Answer:  I did consider that but that

5   would have been, again, inappropriate.  That's

6   not the -- that would have moved people into a

7   style of thinking about a website that you don't

8   normally engage in.  When we open a web page we

9   look at the whole web page.  Our eye scans where

10  it naturally scans.  There is not something that

11  makes us zoom into one particular word.  So our

12  goal here was to ask a question about what the

13  overall impression from looking at the website

14  is."

15           Does that refresh your recollection

16  about the testimony that you gave?

17       A.   Yes, but I'm -- I'm not giving a --

18  that -- in that sentence there I'm not

19  describing the -- the judgment that I asked

20  people subsequently to make, which is an

21  association -- the specific construct that I was

22  measuring in that survey was association.

23           I'm making the point here that when I

24  was showing people the website I didn't want to

25  direct their attention anywhere in particular I

Page 59

```
 1    wanted them just to have whatever overall --
 2    natural overall impression they normally would
 3    have.
 4         Q.   And Dr. Isaacson did the same thing in
 5    his survey with his test, isn't that right,
 6    showing the MetaBirkins.com web page?
 7         A.   That's not the -- the problem.  He did
 8    do that but he failed to use different
 9    versions -- he -- he could have very simply
10    solved this problem and kept what you are
11    rightly pointing out is the goal of a
12    naturalistic survey.
13              He could, for example, have created
14    multiple conditions, one where he just changed
15    "not your mother's Birkin" to "not your mother's
16    handbag," but he kept Hermes and he kept the
17    trade dress.  He could have -- that would have
18    been even more naturalistic, to use your term,
19    than the control which removed everything.
20              Secondly, he could have created
21    another condition where he just removed Hermes
22    and he kept Birkin, MetaBirkin and the trade
23    dress.  He could have created a version where he
24    just changed the trade dress.  Those would have
25    been different conditions.  They all would have
```

Page 60

```
 1   been more naturalistic than his actual control,
 2   which removed everything, and that would have
 3   enabled him to meet this goal of having a
 4   naturalistic design while also being able to
 5   draw a scientific -- scientific inference that,
 6   oh, the Hermes mark by itself is driving this
 7   amount of confusion.  The Birkin mark by itself
 8   is driving this amount of confusion.
 9           So you're right that there is a
10   general goal to be naturalistic.  However, he
11   also needed -- that doesn't give him an excuse
12   for confounding the influence of the four
13   factors allegedly driving confusion.  And he
14   could have created a perfectly naturalistic
15   design, one that's in fact more naturalistic
16   than the one he did, because less would be
17   changing from the real world, and met what I'm
18   saying -- solved what I'm saying is this fatal
19   flaw.
20       Q.   Well, if you were assigned to look at
21   the combined effect of all the four elements of
22   the uses of Birkin and Hermes and the others as
23   you mentioned in -- in this case, what would you
24   have done differently in designing the survey?
25           MR. MILLSAPS:  Objection.
```

1    additional evidence that comes in the form of Q4

2    that the person is affirmatively thinking of

3    Hermes.  And the way you know that is that they

4    mention at least some goods or services put out

5    by the senior user.  Person 108 has not done

6    that.

7         Q.   Is it your opinion that if a

8    respondent used the term "MetaBirkins" that that

9    shows no confusion?

10        A.   Well, it's not -- it doesn't -- it's

11   not a good -- MetaBirkin, as I understand it, is

12   not a good put out by Hermes.  You can correct

13   me if I'm wrong about that, but that's my

14   understanding.

15        Q.   That, of course, is one of the

16   questions in the case is whether people are

17   confused when they see MetaBirkins.

18             So are you -- you give it -- if you

19   recall, Dr. Isaacson scores MetaBirkins as not

20   the same as someone answering Birkin, but he

21   still gives them a code that counts towards some

22   level of confusion, and you're saying that

23   should be given absolutely no weight?

24             MR. MILLSAPS:  Objection.

25        A.   I think if someone just repeated

                                           Page 111

1    MetaBirkins and said nothing else related to
2    Hermes, that would not be -- even setting aside
3    this issue of the other products, that would not
4    be sufficient evidence that the person was
5    confused and thinking of Hermes.
6         Q.    Have you seen any court require this
7    follow-on question that you are describing in
8    this section of your report?
9         A.    Well, depends on what you mean by
10   require.  I -- I mean the original Eveready
11   survey, which I think was -- I think the
12   plaintiff lost that at the district level and
13   then the circuit court, if memory serves,
14   overturned that and affirmed the survey.  So
15   that obviously is -- is one.
16              I -- I am not aware, although I
17   wouldn't be because I don't track these legal
18   dimensions of things, I would not necessarily be
19   aware of a court rejecting this one way or the
20   other.  You know, rejecting someone who failed
21   to do this.  I don't know that, but I haven't
22   investigated that, I haven't researched that.
23              I know that whenever I encounter this
24   issue, including with, you know, very prominent
25   law firms who run a lot of surveys like this,

Page 112

1   this issue always comes up, and -- in

2   circumstances like this, and this is the

3   standard approach that I have consistently seen.

4   And I have never -- I have never seen someone

5   ask this question and then -- in circumstances

6   like this, and then fail to use the data in the

7   manner that I'm saying is logically appropriate,

8   supported by authoritatively treatises and was

9   used in the original Eveready itself.

10       Q.   Although you have been critiqued for

11  doing that very thing at least in the Growmark

12  case.  Have you been --

13       A.   But as -- as we saw, the -- the expert

14  there was clearly wrong in her interpretation of

15  what Jerre Swann discussed.  I -- I have -- you

16  asked me initially, have you discussed this

17  issue with Jerre Swann, and I said no.  I have

18  discussed this issue in the past at great length

19  with -- with his longest term collaborator who's

20  published multiple times with him, and I know

21  that what I'm saying is consistent with the way

22  that Jerre Swann thinks about this issue, at

23  least as understood by his longest term protege

24  and co-author.

25       Q.   Who is?

Page 127

```
 1   least the person who wrote this in the website
 2   believes MetaBirkins to be?
 3            MR. MILLSAPS:  Objection.
 4       A.   I don't know that I'm qualified to
 5   make an inference about what the person who
 6   wrote this believes.  That's certainly the
 7   language that appears here.  Of course, there's
 8   also an image of the artwork, so people are not
 9   just reading a text-based description, they're
10   also seeing a picture.
11            So those things collectively I -- I
12   think would help people understand what it is
13   that's being sold.  But certainly that
14   expression that you asked me to read is -- is
15   here on the page.
16       Q.   You take issue with Dr. Isaacson
17   asking the respondents -- I should have the
18   exact -- using the term "item," right.  And
19   let's in fact go back to his survey so we can
20   read the question that he asked.
21            And that would be in paragraph 43.
22       A.   Of his report?
23       Q.   Yes.
24       A.   Yeah.
25       Q.   So yes, you have your copy there,
```

1  Dr. Neal.

2          MS. WILCOX:  And Ms. Gehman is

3      scrolling as fast as she can to paragraph

4      43.

5          MS. GEHMAN:  I haven't found a faster

6      way.

7          MS. WILCOX:  I know.  Okay, thank you.

8      Q.    Okay.  So as Dr. Isaacson says in 43,

9  "Next, the survey among NFT purchasers asked

10 questions to measure confusion, starting with

11 confusion as to source.  Question one asked,

12 what company, companies, person or people do you

13 think makes or provides the items shown on the

14 web page.  Be specific -- sorry, be as specific

15 as possible.  If you don't know, please select I

16 don't know."

17          And you take issue with his use of the

18 word "items" to refer to the MetaBirkins NFTs;

19 is that right?

20     A.    Correct.

21     Q.    What word would you have chosen if you

22 were conducting the survey?

23     A.    I haven't reflected on that deeply.  I

24 didn't need to do that obviously for my

25 rebuttal, and I was -- since I wasn't designing

Page 129

```
 1   my own survey.  I think that he needed to use
 2   some language that made it clear whether he was
 3   referring to the NFT or to the real world
 4   physical object depicted in the NFT, which I
 5   understand the plaintiff alleges is a Birkin
 6   bag.
 7            So any language I think that would
 8   successfully do that, it might -- potentially,
 9   I'd have to reflect on it some more, but it
10   might be something like provides the NFT shown
11   on the web page.  That would help
12   disambiguate -- that would help clarify for
13   respondents that they were being asked not about
14   the real world item that might be depicted but
15   the actual NFT itself.
16       Q.   But you didn't do anything to actually
17   test that selection of verbiage for question
18   one; is that right?
19       A.   Well, as I explained, the defendant
20   didn't have -- doesn't have the money, as I
21   understand it, to -- for a survey, and because
22   the burden falls on the plaintiff there wasn't
23   really scope to do that.
24            But I don't need to do a survey to
25   know that using the language "items" is
```

1   ambiguous, and that if I show you a picture of

2   something and I say what is the item shown, a

3   reasonable speaker of English might think oh,

4   it's whatever is depicted in the picture or they

5   might think it's a reference to the picture

6   itself.  That doesn't require a survey that's

7   good survey design using language that doesn't

8   have multiple ambiguous interpretations.

9        Q.   Well, if I told you Dr. Isaacson used

10   the term "items" so as not to lead the

11   respondents, would that change your opinion?

12        A.   How would it be leading to use

13   language that correctly calls out the object

14   that he's asking people to offer an opinion

15   about?

16        Q.   So you're saying you don't agree with

17   that, that wouldn't change your opinion?

18        A.   I'm saying I don't see how an

19   alternative would be -- an alternative that

20   correctly identifies the object would be

21   leading.

22        Q.   Did -- did Lex Lumina provide you with

23   the expert report that plaintiffs submitted in

24   this case from Dr Scott Kominers (phonetic)?

25        A.   No.

```
 1      Q.    You've mentioned a few times NFT

 2   artwork.

 3            MS. WILCOX:  And if we could look

 4       again at that Exhibit 2.  I just want to be

 5       clear -- I'm sorry, we'll have to -- don't

 6       look at the scrolling you'll get dizzy.  I

 7       already had to take some Tylenol.

 8      Q.    So we're going to Exhibit 2 which is

 9   MetaBirkins.com, the best possible

10   representation that could be garnered of the

11   dynamic site.

12            Okay.  There's no reference to the

13   word "artwork" on the web page; is that right?

14            Take your time.

15      A.    Yes, I -- I don't see the word "art."

16   There is a -- a picture, which to me conveys

17   that what you're buying is the artwork, but the

18   word "art" does not appear here.

19      Q.    Nor does the word "image"?

20      A.    The expression "graphic execution" is

21   here, which is perhaps a synonym or art or an

22   image.

23      Q.    Is that something that you are saying

24   is an expert or as a layperson as to that --

25      A.    I'm saying really just as a speaker of
```

Page 139

1   50 years.  So the questions may not be very

2   different.  It would depend on whether the facts

3   were different.

4       Q.   And to be clear, 1960 to 2022, as I

5   happen to know having been born in 1963, is

6   approaching 60 years.  And you said 20 but I

7   think you were looking at the time frame I

8   was -- I had prefaced.

9       A.   Sorry, I was referring to the -- I

10  said 50 and I was referring to when the Eveready

11  survey was first adopted.

12      Q.   Yeah.

13      A.   So -- which I think was in the

14  mid-seventies, right.

15      Q.   Yeah.  I -- I had just started, like

16  if you were surveying the Andy Warhol

17  paintings --

18      A.   I understand.

19      Q.   Yeah, sorry.

20      A.   An additional, yes.  Slightly longer.

21      Q.   Correct, yes.

22      A.   Yes, I -- I don't see any reason why

23  those additional ten years would necessarily

24  change the nature of the survey.  The survey

25  could be different depending on whether the

Page 140

1   facts were different.

2       Q.   Okay.  I would like to go -- let's see

3   we are in your report, to your section on the

4   handbag survey.  So let me get you to that

5   point.  3.5.

6       A.   Okay.

7       Q.   And I don't -- there's nothing in

8   particular to -- to look at, but just your

9   critique of the handbag survey, you are aware

10  that Dr. Isaacson is not offering an opinion

11  with respect to the data that he was collecting?

12      A.   I'm aware that he -- he said that.  I

13  think that's problematic, but I'm aware that

14  that's his position.

15      Q.   And would you consider this to be a

16  forward confusion case?

17      A.   Well, I think it's -- it's a matter of

18  what -- what you have alleged.  I agree, I don't

19  recall now whether the complaint formerly uses

20  the language forward or reverse but the nature

21  of the claim I would imagine is -- is forward

22  confusion.

23      Q.   And the survey on which Dr. Isaacson

24  opines is among the NFT purchasers.  Would you

25  agree that that would be the proper universe to

Page 141

```
 1   survey?
 2         A.    Setting aside the other flaws I think
 3   that, yes, the -- the most relevant universe for
 4   forward confusion survey is typically likely
 5   purchasers of the junior user's goods.
 6         Q.    Do you personally own any NFTs?
 7         A.    I do not.
 8         Q.    And have you ever made any study of
 9   who comprises the NFT purchasing market?
10         A.    I -- I can't -- we're -- we're veering
11   back into that area where there may be
12   confidential consulting engagements that fall
13   under that banner that I'm not in a position to
14   discuss.  So I think I can say broadly I have
15   looked into that issue to some degree.
16         Q.    Is there anything that you can reveal
17   with respect to that, any facts that you can
18   reveal?
19         A.    I don't think so, unfortunately.
20         Q.    Okay.
21         A.    Sorry.
22         Q.    No.  I have learned a lot about NFTs
23   during this case but I still have not purchased
24   one, although I have been tempted to for a while
25   here.
```

1          Okay.  So I'm not among those people

2     but I'm a potential -- a potential purchaser or

3     minter.  I mean, they're different.

4          A.   Okay.

5          Q.   Okay.  So I'd like to now go into this

6     coding issue that you raised with respect to the

7     excluded survey respondents.  And for sake of

8     time, we'll just walk through it with respect to

9     the NFT purchaser study.

10         A.   Okay.

11         Q.   Okay.  So first I just want to

12    understand what you mean by coding.  You've

13    mentioned that a few times, that you didn't get

14    the coding.

15          What is it that you mean by coding

16    with respect to respondents?

17         A.   Okay.  So when Dr. Isaacson fielded

18    his survey, respondents went through and they

19    answered his questions as shown in his

20    questionnaire exhibit, right.  So they end up

21    with a data -- an Excel file that's got, you

22    know, here's what person number one wrote for

23    question one, for question four, for question

24    seven, and there's a little text entry box in

25    there.  And then here's a variable that reflects

1   more sensible answers than people he kept who

2   happen to be confused and in the test cell and,

3   therefore, helpful to the confusion number.

4            So there are some people who gave, you

5   know, quite nonsensical answers that he kept who

6   were helpful to the confusion number by

7   comparison to people who were removed who by

8   removing them were helpful to the denominator.

9   So it doesn't -- sorry, go ahead.

10      Q.   Are you intending to issue a

11  supplemental report with respect to --

12            MR. MILLSAPS:  I'm just going -- I'm

13        just going to object that you keep

14        interrupting Dr. Neal in the middle of his

15        answers.

16            MS. WILCOX:  Well, his answers are

17        going beyond the question asked, and I am

18        trying to, in the interest of time, get

19        to --

20      Q.   I don't mean to interrupt you if you

21  have something that you're trying to finish that

22  answers the question I asked.  So if that's the

23  case, please let me know.

24      A.   Okay.

25            So no, my -- my -- I may -- I'm not

Page 158

```
 1   sure at this time about issuing a supplemental
 2   report.  I -- I have to finish the analysis
 3   first.
 4        Q.   Have you ever removed survey
 5   respondents who take too little time in taking
 6   the survey and are -- I think sometimes referred
 7   to as speedsters or something along those lines?
 8        A.   I have done that before.  I -- my
 9   general practice is not to remove speedsters,
10   and sometimes the opposite are referred to as
11   laggards.  I tend not to do that, but some
12   people do it and I don't think that it's
13   necessarily problematic to do it.
14        Q.   And did you make note of the time
15   frames that Dr. Isaacson used to identify
16   speedsters and laggards in his reports?
17        A.   Yes, I think it was less than two
18   minutes or more than an hour.
19        Q.   That's right.
20             Do you take any issue with those time
21   frames?
22        A.   No, I don't think so.  I -- I probably
23   would have looked at the -- no, I don't think I
24   have an issue with that.
25        Q.   Doctor, I'll represent to you that
```

```
                                            Page 159
 1   Dr. Isaacson testified yesterday that he did the
 2   calculations with respect to these 20 excluded
 3   individuals to determine what the different
 4   actual confusion percentage would be from the
 5   one he put in his report, and he calculated it
 6   to be 17.1 percent, namely a 1.5 percent lower
 7   number than what he identified.
 8           Do you have any reason to object to
 9   that or comment on that or is that something
10   that you said you haven't yet calculated?
11       A.   Yes, I haven't yet finished my review
12   of that so I don't know what -- what number I
13   will arrive at and whether it's different or the
14   same.
15           And I would say I presume in that
16   analysis that Dr. Isaacson didn't correct any of
17   the other issues, for example, he kept people
18   regardless of whether they identified the
19   plaintiffs' goods and he kept the person who
20   said in their open-ended answer that I'm -- I
21   recognize that the NFT is not affiliated with
22   Hermes.
23       Q.   That's right, he did not accept your
24   recoding other than to include the excluded
25   individuals who he had identified as speedsters,
```

Page 160

1    laggards or inattentive survey takers.

2         A.   Understood.

3         Q.   Do you remove respondents ever for

4    nonsensical responses when you conduct

5    likelihood of confusion surveys?

6         A.   Yes, I do.

7         Q.   What is your definition of

8    "nonsensical" in that context?

9         A.   I mean, it depends a little bit on the

10   survey, you know, an Eveready versus a Squirt,

11   because in an Eveready the open-ended answers

12   are what gets coded.  So my standard practice is

13   to -- you know, if someone gives answers that

14   indicate that they are really not paying

15   attention, like they have answered in a way that

16   is irrelevant to the question, those people

17   would typically be flagged.

18            But what I do is what I'm saying what

19   I believe Dr. Isaacson should have done, I

20   always flag those individuals but keep them in

21   the data, and I say, you know, of my sample size

22   of 400 people, 25 people gave nonsensical

23   answers, but here's the data from them and

24   here's the variable that identifies who they

25   are.  And if you decide to include them in the

1   data, here's what the results are.

2          So I'm being transparent about it.

3   I'm handing over the full data.  I'm handing

4   over the coding.  I'm identifying who was

5   excluded and not excluded, and I'm typically

6   presenting the results in a way so that the

7   reader knows what is the number, whether the

8   person is included or not included.  And that's

9   what I think is -- is the scientific standard.

10         Q.   Is -- is that what the other survey

11  experts do with respect to identifying

12  individuals who provided nonsensical answers?

13         A.   In my experience --

14              MR. MILLSAPS:  Objection.

15         A.   Yeah, I would say -- I'm sorry,

16  Rhett -- in my general experience that is what

17  other experts do.  I don't -- I have never been

18  in a situation that I was here where these

19  people were omitted and that it was essentially

20  functionally refused to hand it over and then

21  eventually getting it after the report was

22  submitted.  I've never personally experienced

23  that.

24         Q.   When you are excluding respondents for

25  nonsensical answers, are you making those

Page 178

1

2

3                    C E R T I F I C A T E

4

5    STATE OF New York)

                            :ss

6    COUNTY OF RICHMOND)

7

8        I, RITA M. PERSICHETTY, a Notary Public within

9    and for the State of New York, do hereby certify:

10       That DAVID NEAL, PhD, the witness whose

11   deposition is hereinbefore set forth, was duly sworn

12   by me and that such deposition is a true record of

13   the testimony given by such witness to the best of

14   my ability.

15       I further certify that I am not related to any

16   of the parties to this action by blood or marriage;

17   and that I am in no way interested in the outcome of

18   this matter.

19       IN WITNESS WHEREOF, I have hereunto set my hand

20   this 26th day of September, 2022.

21

22

                    RITA M. PERSICHETTY

23

24

25