# Exhibit 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------x
HERMES INTERNATIONAL AND HERMES OF
PARIS, INC.

                                    Plaintiff,    :

                    - against -

MASON ROTHSCHILD,

                                    Defendant.    :
-----------------------------------------x

                            September 20, 2022
                            11:05 a.m.


            ** CONFIDENTIAL **


        VIDEOTAPED EXAMINATION BEFORE TRIAL of

DR. BRUCE ISAACSON, an Expert Witness on

behalf of the Plaintiffs herein, taken by the

Defendant, pursuant to Court Order, held at

the above-mentioned time via videoconference

by all parties, before Michelle Lemberger, a

Notary Public of the State of New York.

Dr. Bruce Isaacson   Confidential
September 20, 2022

```
 1

 2    A P P E A R A N C E S:

 3


 4    BAKER HOSTETLER, LLP
      Attorneys for Plaintiff
 5          45 Rockefeller Plaza
            New York, New York 10111
 6
      BY:  GERALD FERGUSON, ESQ.
 7          Gferguson@bakerlaw.com

 8
      A/P LISA BOLLINGER GEHMAN, ESQ.
 9        Lgehman@bakerlaw.com

10        DEBORAH WILCOX, ESQ.
          Dwilcox@bakerlaw.com
11
          KEVIN WALLACE, ESQ.
12
          VALENTINE FADIE, ESQ. - In-house counsel
13                            Hermes International

14

15
      LEX LUMINA, PLLC
16    Attorneys for Defendant
            745 Fifth Avenue, Suite 500
17          New York, New York 10151

18    BY:  RHETT MILLSAPS, ESQ.
            Rhett@lex-lumina.com
19

20    A/P MARK MCKENNA, ESQ.
          Mark@lex-lumina.com
21

22
      ALSO PRESENT:
23
          Darrak Lighty - videographer
24

25                 *      *      *      *      *
```

1

2               S T I P U L A T I O N S

3

4           IT IS HEREBY STIPULATED AND AGREED by

5    and between the attorneys for the respective

6    parties herein, that filing, sealing and

7    certification be and the same are hereby

8    waived.

9           IT IS FURTHER STIPULATED AND AGREED

10   that all objections, except as to the form of

11   the question shall be reserved to the time of

12   the trial.

13          IT IS FURTHER STIPULATED AND AGREED

14   that the within deposition may be signed and

15   sworn to before any officer authorized to

16   administer an oath, with the same force and

17   effect as if signed and sworn to before the

18   Court and that a copy of this examination

19   shall be furnished without charge to the

20   attorney representing the witness testifying

21   herein.

22

23

24

25

Dr. Bruce Isaacson   Confidential
September 20, 2022

1

2              VIDEOGRAPHER:  This is the

3      remote video deposition of Dr. Bruce

4      Isaacson in the matter of Hermes

5      International and Hermes of Paris,

6      Inc. versus Mason Rothschild.

7              Today's date is September 20,

8      2022 and the time is 11:05 a.m.,

9      New York time.  My name is Darrak

10     Lighty with U.S. Legal Support and I

11     am the remote video technician.

12             The court reporter today is

13     Michelle Lemberger also associated

14     with U.S. Legal Support.  All

15     participants will be noted on the

16     stenographic record and now the court

17     reporter will recite stipulations and

18     swear in the witness.

19             THE REPORTER:  Counsel, do I

20     have your consent to swear the

21     witness remotely?

22             MR. MILLSAPS:  Yes.

23             MR. FERGUSON:  Yes.

24             THE REPORTER:  Please state

25     your name for the record.

Dr. Bruce Isaacson   Confidential
September 20, 2022

```
 1

 2            THE WITNESS:  My name is Bruce

 3       Isaacson, last name is spelled

 4       I-S-A-A-C-S-O-N.

 5            THE REPORTER:  What is your

 6       current business address?

 7            THE WITNESS:  16501 Ventura

 8       Boulevard, Suite 601, Encino,

 9       E-N-C-I-N-O, California 91436.

10  B R U C E   I S A A C S O N having been first

11       duly sworn by a Notary Public of the

12       State of New York, was examined and

13       testified as follows:

14  EXAMINATION BY

15  MR. MILLSAPS:

16       Q.  Good morning, Dr. Isaacson.

17       A.  Good morning.

18            MR. FERGUSON:  Apologies,

19       Mr. Millsaps.  Before we begin, can

20       we also stipulate that this

21       transcript will be treated as

22       confidential as we've been doing in

23       other proceedings?

24            MR. MILLSAPS:  Sure.

25            MR. FERGUSON:  Thank you.
```

Dr. Bruce Isaacson  Confidential
September 20, 2022

1              Dr. B. Isaacson

2    practice.  I can say there appears to be

3    criticisms of my survey based on that

4    practice.

5        Q.  And with respect to the 20

6    individuals identified here in your report,

7    the 20 respondents, how do you know that it

8    was proper specifically to include these 20

9    respondents?

10            MR. FERGUSON:  Objection.

11        A.  You mean specifically to exclude

12   these 20 respondents, correct?

13        Q.  Did I say include?

14            MR. FERGUSON:  That was my

15        objection, yes.

16        Q.  I'm sorry, yes.

17            How did you know it was proper,

18   specifically to exclude these 20 respondents,

19   yes?

20        A.  Well, I explained that in my report.

21   I looked at the amount of time that they had

22   taken to complete the survey and if the

23   amount of time that they had taken to

24   complete the survey was either suspiciously

25   long or suspiciously short I removed them.

Dr. Bruce Isaacson  Confidential
September 20, 2022

```
1                    Dr. B. Isaacson

2          And I also removed people whose

3    verbatims indicated that they, obviously,

4    were not paying attention in the survey.  And

5    as I mentioned before, this is consistent

6    with the practice that I followed for every

7    other litigation survey that I've ever

8    conducted.  I've never been criticized for it

9    by another expert.  I've never been

10   criticized for it by another court, and I've

11   never criticized another expert for this kind

12   of a practice.

13          And other experts routinely do this

14   as well.  And trade associations talk about

15   this practice, who deal with surveys --

16   academic experts talk about this practice.

17   This is a widely-used set of activities, and

18   in my report I explained how I did this

19   particular -- this set of removals.

20      Q.  So if I'm understanding you

21   correctly, your decision was based on your

22   coding of the specific responses; is that

23   right?

24      A.  I want to be very clear today when

25   we use the word coding.  Because I think
```

Dr. Bruce Isaacson  Confidential
September 20, 2022

```
1                    Dr. B. Isaacson

2     there's been some back and forth by e-mails

3     prior to today about what I did and there are

4     two definitions for the word coding.  And if

5     it's okay, I'd like to distinguish between

6     these two definitions.

7        Q.  Please.

8        A.   There is one -- there is one set of

9     definitions for the word coding which is

10    usually what I mean when I say the word

11    coding, and that is when you look at a

12    verbatim comment and you assign numbers to it

13    to reflect the themes that are inherent in

14    that particular comment.

15            And in my case, in my survey, I did

16    that kind of coding and those codes were

17    provided in one of the exhibits to my report.

18    I want to get you the exact exhibit number.

19            Exhibit 5 to my report provides the

20    codes that I used for coding and those codes

21    reflect the activity where I'm looking at the

22    verbatim comments that people provided and

23    assigning categories to reflect the themes

24    inherent in those comments.  That's the only

25    thing that I mean when I talk about coding.
```

Dr. Bruce Isaacson  Confidential
September 20, 2022

1                    Dr. B. Isaacson

2           When we identify respondents for

3    removal from the survey, I don't use the word

4    coding to describe that activity, nor am I

5    aware of other survey experts who would use

6    the word coding to describe that activity.

7           And so I want to distinguish between

8    removing respondents from the database and

9    assigning verbatim comments to codes that

10   reflect themes that are relevant to the

11   analysis.

12      Q.  So I understand your process, what

13   you're saying is you looked at the responses

14   from the individual respondents, you

15   identified these 20 respondents specifically

16   as having given responses that would exclude

17   them, and then you removed them; is that

18   right?

19           MR. FERGUSON:  Objection.

20      A.  Correct.

21           MR. FERGUSON:  I think that

22      mischaracterizes his testimony.  Not

23      all 20 were removed based on

24      responses, the content of the

25      responses.

1              Dr. B. Isaacson

2      A.   I think generally what you're saying

3    is correct.  I looked at these 20

4    respondents, I looked at all of the

5    respondents, and I identified either based on

6    time criteria or on the nature of the

7    verbatims, these 20 for removal from the

8    database.

9          So these 20 were never given the

10   verbatim codes that were listed in Exhibit 5,

11   but they were identified through the process

12   that you and I just discussed for removal

13   from the database.

14      Q.   So let's look at Exhibit 7 of your

15   report which is page 129 in the PDF, it

16   begins there.

17          What is Exhibit 7 to your report?

18      A.   Exhibit 7 is a summary of

19   respondents who either terminated in the

20   survey or were removed from the survey

21   database.

22      Q.   Okay.  And if we go to the page 1 of

23   that exhibit, and we look at this -- the

24   numbers here, do you see the 13, the 5 and

25   the 2 respondents towards the bottom

Dr. Bruce Isaacson  Confidential
September 20, 2022

1           Dr. B. Isaacson

2      A.  We just talked about that process.

3   I personally went through the database,

4   assisted by staff at my firm, and identified

5   respondents with nonresponsive verbatims or

6   problems with the time that they took to

7   complete the survey.  Those respondents were

8   removed from the database.

9           We recorded the summary of what we

10  removed, that left me with the final

11  database, and then I analyzed that database

12  and reported that the entirety of that

13  database in my expert report.

14      Q.  And at the time, were those -- how

15  were those respondents removed at the time?

16      A.  In Excel, I've already answered

17  that.

18      Q.  So did you just delete the rows from

19  the Excel spreadsheet as you went through to

20  remove those respondents?

21      A.  Well, at some point they -- we

22  didn't delete their data from our records,

23  but we did delete those respondents from the

24  database that we were analyzing.

25           So the answer is both yes and no to

Dr. Bruce Isaacson  Confidential
September 20, 2022

1                    Dr. B. Isaacson

2     your question.

3          Q.  And your testimony is that you

4     identified which particular respondents you

5     removed in Excel?

6          A.  Yes.  And I should add that I have

7     three times identified those respondents and

8     provided all of that data to counsel.  And I

9     believe counsel has provided that information

10    to you as well.  I guess -- no, I'll stop

11    there.

12         Q.  Where is that list of respondents in

13    Excel?

14         A.  I've provided that list three times

15    to counsel.  And counsel, as far as I know,

16    has provided that to you.

17              MR. FERGUSON:  I'll represent

18          that that's been provided,

19          Mr. Millsaps.

20         Q.  I'm trying to figure out where it

21    was -- I'm sorry, let me -- I'm just going

22    to -- we're going to have to walk them in

23    Excel so you can show me and I'm going to go

24    to the next exhibit.

25              Let's look at -- we'll mark this as

Dr. Bruce Isaacson  Confidential
September 20, 2022

```
 1                    Dr. B. Isaacson
 2    Exhibit 2.
 3                 (Whereupon, at this time, the
 4          reporter marked the above-mentioned
 5          Excel data file as Exhibit 2 for
 6          identification.)
 7          Q.  This is a file provided to us by
 8    counsel, by Hermes' counsel on August 31st.
 9    The file is labeled Isaacson full data file
10    NFT 8-30-22.XLXS.
11                 Dr. Isaacson, are you able to
12    download this Excel file and open it?
13          A.  I believe so, and I'm in the process
14    of doing so now.
15                 I'm trying to do this without
16    closing Zoom which I did last time which
17    caused some technical issues.
18          Q.  No problem.  We'll take the time.
19          A.  Thank you.
20                 I have the file open.
21          Q.  Okay.  So when did you create this
22    document?
23          A.  I apologize, I'm going to need
24    another minute.
25          Q.  Okay.
```

Dr. Bruce Isaacson  Confidential
September 20, 2022

1                    Dr. B. Isaacson

2        A.  We're going to have to go off the

3    record again, if you're going to want me to

4    look at this.  I apologize, I'm on a laptop

5    that's not mine, and I'll need to set up my

6    laptop so I can look at this file.

7        Q.  We should do that.  We won't exclude

8    you for, you know, your response time.  It's

9    not a problem.

10        A.  Well said.

11        Q.  We're going to look at several Excel

12    files so we should get the tech up and

13    running.

14        A.  Okay.

15        Q.  We'll go off the record for, shall

16    we say, five minutes, ten minutes?

17        A.  I'd say, let's take a ten-minute

18    break and come back at six past the hour, if

19    that's okay.

20            VIDEOGRAPHER:  All right.

21        Going off the record, the time is

22        11:56 a.m. New York time.

23            (Whereupon, a brief recess was

24        taken.)

25            VIDEOGRAPHER:  The time is

Dr. Bruce Isaacson  Confidential
September 20, 2022

| | |
|---|---|
| 1 | Dr. B. Isaacson |
| 2 | 12:08 p.m. New York time.  We're back |
| 3 | on the record. |
| 4 | BY MR. MILLSAPS: |
| 5 | Q.  Dr. Isaacson, during that little |
| 6 | break, did you review any documents? |
| 7 | A.  I did not. |
| 8 | Q.  Okay.  So let's go to that Excel |
| 9 | file that we were just looking at, if we |
| 10 | could, which is Exhibit 2. |
| 11 | Can you point me in this Excel file |
| 12 | to where you identify the 20 respondents that |
| 13 | were removed? |
| 14 | A.  Sure.  They're in the tab labeled |
| 15 | all starts NFT purchasers. |
| 16 | Q.  Okay.  And where would I look there |
| 17 | to find them? |
| 18 | A.  Well, you'd locate the |
| 19 | respondents -- you want me to walk you |
| 20 | through the process? |
| 21 | Q.  Yes. |
| 22 | A.  Okay.  And I'll just say for the |
| 23 | record that I provided this file in response |
| 24 | to a very specific request that came from |
| 25 | opposing counsel, and that request was for |

Dr. Bruce Isaacson  Confidential
September 20, 2022

1                    Dr. B. Isaacson

2    all respondents who completed the survey and

3    all respondents who started the survey.

4              I was not, at that point, asked for

5    nor do I keep in the normal course of

6    business, a separate file that only has the

7    20 respondents in it.  I did, I'll also point

8    out for the record, eventually provide a file

9    that only had the 20 respondents in it.  But

10   this was -- this file can be used to identify

11   easily to identify the 20 respondents, but

12   the reason this file is in the format it is

13   in is because this is how I keep things in

14   the normal course of my business, and also

15   this is what I was requested -- this is what

16   the request came in asking for.

17             There are two tabs in this file.

18   One of the tabs says, data file NFT

19   purchasers, and the other says, all starts

20   NFT purchasers.  I'm going to refer to the

21   two tabs as the data file and the all starts

22   file, if that's okay.

23        Q.   Yes.

24        A.   The data file -- the data file

25   contains the 201 respondents who completed

Dr. Bruce Isaacson  Confidential
September 20, 2022

```
 1                    Dr. B. Isaacson
 2      the survey and who were in the final database
 3      for the survey.  The all starts tab contains
 4      thousands of respondents and as I mentioned
 5      before, it contains so many respondents
 6      because that's all of the respondents who
 7      started the survey.
 8           But it is very easy using that all
 9      starts file to identify the respondents
10      who -- to identify the respondents -- only
11      the 20 respondents who were removed from the
12      survey database.  And the way that one would
13      do that is one would look in the all starts
14      file, one would go to column AZ, and the top
15      of that column in row A -- in cell AZ 1
16      has a -- says Q 11.
17           Q 11 refers to question 11.  Every
18      one of these columns in the all starts tab
19      and in the other tab has a column header that
20      the top row of that column lists something
21      that refers to either a question from the
22      survey or the analysis of that question.  In
23      this case, that is question 11 in the survey.
24      Question 11 was the last question that was
25      asked in the survey database.
```

Dr. Bruce Isaacson  Confidential
September 20, 2022

```
 1                     Dr. B. Isaacson

 2            So the first step in this process is

 3     to filter the all start database to identify

 4     only the respondents who completed the

 5     survey.  And that is all of the respondents

 6     who in question 11 would have a 1 and would

 7     not have a blank and would not have a 2.

 8            A blank would mean that they were

 9     never asked question 11, and a 2 would mean

10     that they did not respond yes to question 11.

11            So we're looking for -- we would

12     first, in the first step we would filter on

13     column AZ to identify everyone who had

14     provided a 1 in response to question 11.

15     That would identify the 221 respondents who

16     completed the survey.  And then all that one

17     would have to do once one had done that, is

18     then one would compare between the data file

19     and the all starts file using the sample IDs.

20            Any sample ID that was contained in

21     the all starts -- in the all starts tab, that

22     had a 1 for question 11, and that was not

23     contained in the data file tab would be

24     some -- would be one of -- there will be only

25     20 people like that, and that will be the 20
```

Dr. Bruce Isaacson  Confidential
September 20, 2022

```
 1                 Dr. B. Isaacson
 2   decided to remove for that reason?
 3       A.  I just explained that.
 4       Q.  Well, my understanding of what you
 5   just explained is that we could look at the
 6   responses and sort of guess based on our own
 7   evaluation of the responses that you removed
 8   them for that reason.  But is there an actual
 9   notation that shows, I removed this
10   respondent for this particular reason?
11                 MR. FERGUSON:  Objection of
12         form.
13       A.  I just want to be clear, you
14   wouldn't be guessing, because you'd be
15   looking at the timestamp and you'd be looking
16   at the verbatims.  So you could use that if
17   you wanted to identify the reasons for
18   removal.
19       Q.  Does the spreadsheet tell us which
20   verbatim comments aren't responsive?
21       A.  By looking at the verbatim comments,
22   you can identify the ones that are not
23   responsive.  Or you can, again, you have a
24   separate database which identifies separately
25   and adds a field for each of the two reasons
```

```
 1                    Dr. B. Isaacson

 2    that we're talking about for removal.

 3         Q.  So on the database that we're

 4    looking at here, the one that we're talking

 5    about, Exhibit 2, you say we can look at the

 6    responses and identify which ones are not

 7    responsive.  We can look at the verbatim

 8    comments and identify those.

 9              Does that not require a judgment

10    call by the person who is looking at the

11    responses?

12         A.  Number one, I think it's pretty

13    clear from looking at the verbatim comments

14    which of those are not responsive.  And

15    number two, I also want to be clear that I

16    provided this database in response to a

17    specific request that came from opposing

18    counsel.

19              We're talking about respondents who

20    I did not rely upon for my analysis, and

21    we're talking about a database that fit the

22    requirements.  I was not asked by opposing

23    counsel when I produced this database for a

24    separate list of respondents that I removed

25    from the database with the reason for removal
```

Dr. Bruce Isaacson  Confidential
September 20, 2022

```
1                    Dr. B. Isaacson

2    for each of those respondents.  That's not

3    something that's normally provided in the

4    normal course of conducting litigation

5    surveys, because it's not something that

6    survey experts rely upon.

7              So if you're asking me why is there

8    not a field here to identify the specific

9    verbatim comments that I deemed to be

10   nonresponsive, it's because I don't normally

11   keep that in the normal course of my

12   business.  It's because survey experts don't

13   normally keep that as part of

14   generally-accepted practices.

15             And the reason they don't is because

16   we're talking about data that I did not rely

17   upon, but later when I was asked, can you

18   identify each of the reasons why you removed

19   each of the people that you removed, I

20   provided a separate database that provided

21   that.

22        Q.  So just so I understand, you

23   provided that separate database after you

24   provided this database because this database

25   would not have allowed for that information
```

Dr. Bruce Isaacson  Confidential
September 20, 2022

| | |
|---|---|
| 1 | Dr. B. Isaacson |
| 2 | to be known? |
| 3 | MR. FERGUSON:  Objection. |
| 4 | A.  No, you're misstating what I said. |
| 5 | I believe that this database would |
| 6 | have allowed that information to be known, |
| 7 | but it appeared from the e-mails that counsel |
| 8 | for Hermes was forwarding me from opposing |
| 9 | counsel, that opposing counsel seemed to be |
| 10 | claiming that they were having some |
| 11 | difficulty identifying those people. |
| 12 | I don't think it was difficult to |
| 13 | identify from what I provided, but I also |
| 14 | want to be clear that I wasn't asked to |
| 15 | provide that.  I wasn't asked for the reasons |
| 16 | for each of those people to be -- that why |
| 17 | they were removed, nor do I keep that in a |
| 18 | separate database as part of my normal course |
| 19 | of business activities. |
| 20 | But I created that database, that |
| 21 | separate database that only had the |
| 22 | exclusions along with the reasons for |
| 23 | exclusion, to respond to e-mails from |
| 24 | opposing counsel claiming that they couldn't |
| 25 | figure out something that I thought was -- |

Dr. Bruce Isaacson  Confidential
September 20, 2022

```
 1                    Dr. B. Isaacson

 2    excluded people.  As I indicated, you have

 3    the timestamp, you have the verbatim

 4    comments, and in response to requests from

 5    opposing counsel, that they couldn't figure

 6    out something that I think is very clear from

 7    working with this database, particularly for

 8    someone who does this on a regular basis, we

 9    provided this in an even easier format.

10         But I believe that it's very

11    straightforward to work through what we did

12    based on the data that we've provided here.

13    And the fact that someone is in one tab as

14    opposed to being in the other tab tells you

15    that we didn't include them and then you have

16    the timestamp data, and then you have the

17    verbatim data.

18         And if that wasn't enough, we then

19    went ahead and created something in response

20    to make sure that opposing counsel could sort

21    this out.

22         Q.  You keep saying that you created

23    this in response to a request by opposing

24    counsel.  Was this data comparison possible

25    in any information that you provided in the
```

Dr. Bruce Isaacson  Confidential
September 20, 2022

```
 1                    Dr. B. Isaacson

 2   exhibits to your report?

 3       A.   The exhibits to my report did not

 4   provide the data for people who had not

 5   completed the survey.  As I mentioned before,

 6   I don't normally provide that.  And survey

 7   experts don't normally provide that,

 8   certainly not in the confines of an expert

 9   report.

10            The reason why I did provide that is

11   because I was -- the reason why we provided

12   the all starts tab, which I thought was an

13   unusual request but I received the request

14   from opposing counsel, I forget the exact

15   phrasing, but the phrasing was something

16   like, everybody who ever started the survey.

17            And so we provided a database in

18   response to what we were provided.  I was not

19   asked to only provide -- at that point in

20   this process, I had not been asked to only

21   provide the people who we had removed from

22   the survey database, and I was never asked to

23   specifically indicate the reasons for

24   removal.

25            Had I received a request like that
```

Dr. Bruce Isaacson  Confidential
September 20, 2022

1                    Dr. B. Isaacson

2    earlier, I would have talked to counsel for

3    Hermes and I would have been happy to provide

4    something earlier.  But the reason why this

5    database in Exhibit 2 is in the form that it

6    is in is because it was responding to the

7    specific request that I received from

8    opposing counsel, which is not what you're

9    asking me about right now.

10           You're asking me -- you asked me for

11   one thing and then you're asking me why it

12   wasn't something else.  And it wasn't

13   something else because you asked me for

14   what -- because I provided what opposing

15   counsel asked me for.

16      Q.  Just so I understand what you're

17   saying, so am I right that you're essentially

18   saying that you don't believe it's important

19   to provide with your report information that

20   identifies those that you removed from a

21   survey?

22      A.  I don't, as a normal matter of

23   course, nor do other survey experts include

24   data from people who don't complete the

25   survey.  To take an example, except to

Dr. Bruce Isaacson  Confidential
September 20, 2022

1                    Dr. B. Isaacson

2       Q.   Okay.  Why does the year matter?

3       A.   Well, I've conducted this survey in

4    2022, and my understanding is that Mr. Warhol

5    made his paintings in the 1960s.  So the

6    world was different back then.

7            He was also making a physical

8    painting involving the, as I mentioned, a

9    commonly purchased item.  Here it's a very --

10   it's a very different time, it's a very

11   different context.  It's a different medium

12   that he's using to create the item.  And so

13   it's two very different set of circumstances.

14           I'm not a lawyer, but I would

15   imagine the law has changed since the 1960s

16   with regard to these kinds of issues, and I

17   know the marketing -- the way that brands

18   treat marketing, which is something that I

19   know something about, has changed a lot since

20   the 1960s.

21           Back in the 1960s, brands didn't

22   worry about social media.  So there's a lot

23   that's different in the context today and

24   there's a lot back in the 1960s; the kind of

25   format that I use for this particular survey

1                    Dr. B. Isaacson

2    hadn't been invented.

3           So it's just, there's a lot

4    different in the context today versus when

5    Mr. Warhol was working with Campbell soup

6    cans.

7       Q.  Okay.  So taking that hypothetical

8    example of the survey over the Campbell Soup

9    cans, sitting here today, you can't say

10   whether someone who gave a response in such a

11   survey distinguishing between the painting

12   and the soup was making a distinction between

13   two different things?

14              MR. FERGUSON:  Objection.

15      A.  I think I said it.  There's a lot to

16   think about with regard to a survey like

17   that, and I'd have to think about with regard

18   to the design.  But I can say that the way

19   that likelihood of confusion surveys work is

20   you're looking for cognitive connections.

21           You're looking for people who see

22   one item and make a connection to another

23   item.  So in this case, what my survey

24   measures is whether when someone looks at the

25   MetaBirkins web page and sees a fur-covered

Dr. Bruce Isaacson  Confidential
September 20, 2022

1                    Dr. B. Isaacson

2       bag, that looks, still has the shape of a

3       Birkin and uses the word Birkin and has

4       Hermes in the disclaimer.  Whether that's

5       enough to trigger a cognitive connection,

6       where they believe that what they're looking

7       at comes from Birkin and/or Hermes.  And I

8       believe this respondent ID 101 has clearly

9       demonstrated that that is the case for them.

10          Q.  Are you saying --

11          A.  I don't know what a Campbell Soup

12      survey would look like, but I didn't design a

13      Campbell Soup survey.

14          Q.  Okay.  Are you saying that the

15      cognitive connection and confusion are the

16      same thing?

17          A.  What I'm saying is that from a

18      survey standpoint, what a likelihood of

19      confusion survey measures is whether people

20      make a cognitive connection between an

21      accused item and usually the plaintiff in the

22      case, or between an accused item, let me say,

23      and another item.

24              The survey measures cognitive

25      connections.  You're showing one thing and

Dr. Bruce Isaacson  Confidential
September 20, 2022

1                      Dr. B. Isaacson

2    seeing whether they think it's something

3    else.  And this person, we showed them

4    MetaBirkins and they thought it was Hermes,

5    and they said so twice.

6        Q.  So is your survey only measuring a

7    cognitive connection?

8        A.  That's the mechanics of how the

9    survey works, is by people making a cognitive

10   connection between two things that have a --

11   that had some alleged elements of similarity

12   in them.

13       Q.  Let's look at response ID number 18.

14           I'm sorry, can we go back to 101 for

15   a second?  Just looking back at 101 that we

16   were just discussing, can you tell me why

17   this respondent was not excluded as providing

18   open-ended responses that reflected lack of

19   attention?

20       A.  Because they didn't provide

21   open-ended responses that reflect lack of

22   attention.

23       Q.  And how did you determine that?

24       A.  By looking at their responses.

25       Q.  Okay.  Can you walk me through how

Dr. Bruce Isaacson  Confidential
September 20, 2022

1               Dr. B. Isaacson

2   handbag purchaser survey; is that right?

3       A.   That's correct.

4       Q.   And which of those surveys do you

5   rely on when you draw your conclusions about

6   confusion in this matter?

7       A.   The NFT survey.

8       Q.   Am I correct that you're not relying

9   on any of the results from your handbag

10  purchaser survey for your conclusions about

11  confusion here?

12      A.   Correct.

13      Q.   So are you relying on the handbag

14  survey as the basis for any opinions in this

15  matter?

16      A.   No.

17      Q.   Are both of the surveys you

18  conducted scientifically valid and reliable?

19      A.   Yes.

20      Q.   Did you conduct any additional

21  surveys that are not discussed in your

22  report?

23      A.   No.

24      Q.   To your knowledge, did anyone else

25  conduct any surveys not discussed in your

Dr. Bruce Isaacson  Confidential
September 20, 2022

1                    Dr. B. Isaacson

2    report?

3        A.  No.  Well, let me say I don't know

4    of any, but I haven't asked for any other

5    surveys that anyone else might have

6    conducted.

7        Q.  Fair enough.  I was asking to your

8    knowledge.

9            Going back to your report, am I

10   correct that your first survey was the survey

11   of NFT purchasers?

12       A.  No.

13       Q.  Your first survey was --

14       A.  Let me be more clear in that answer.

15           They were both conducted

16   simultaneously.

17       Q.  Okay.  And your survey of handbag

18   purchasers showed that MetaBirkins NFTs were

19   not causing any confusion among that

20   universe; am I right?

21           MR. FERGUSON:  Objection.

22       A.  No, you're not correct.

23       Q.  Dr. Isaacson, didn't your handbag

24   purchasers survey find a net confusion level

25   of 3.6 percent?

Dr. Bruce Isaacson  Confidential
September 20, 2022

1                    Dr. B. Isaacson

2        A.  Yes, approximately 3 -- around -- I

3    don't remember the exact number but I'm

4    willing to accept.  Well, let me look it up

5    and just confirm the number for you, since

6    we're talking about it.

7        Q.  Okay.

8        A.  The answer to your question is, yes,

9    that was the net measure from the survey.

10        Q.  And in your opinion, is a net

11    confusion level of 3.6 percent evidence of

12    the presence or absence of confusion?

13        A.  A net confusion level of 3.6 percent

14    would normally be associated with the absence

15    of confusion, but it's also important to

16    remember that the survey didn't show no

17    confusion.  What the survey showed is control

18    cell confusion that was almost equal to the

19    test cell confusion.

20            The control cell confusion was 3.6

21    percent lower than the test cell confusion.

22    So when you look at the results and you want

23    to understand that 3.6 percent, what's

24    happening is that people in the test cell

25    were playing back Hermes or Birkin to -- to a

1              Dr. B. Isaacson

2    not insubstantial percentage, 18.8 percent.

3              And even people in that universe who

4    see the control web page were also responding

5    with Hermes or Birkin, in this case to 15.2

6    percent.

7              So this is why I disagreed with your

8    statement earlier that it doesn't show any

9    confusion.  It does show confusion.  It just

10   shows almost equal confusion on the control

11   cell as on the test cell.  That's why the

12   results for the survey are low.

13       Q.  Okay.  And in your results, is there

14   a reason that you focus on the net confusion

15   level?

16       A.  I don't think I focused on either

17   confusion level in my results.  I provided

18   the results, but I didn't indicate -- I

19   haven't -- before you asked me just a few

20   minutes ago, I didn't interpret the results

21   in any way in my report.

22       Q.  The control specifically is meant to

23   eliminate any features that would be

24   infringing, right?

25       A.  It's meant to eliminate any features

Dr. Bruce Isaacson  Confidential
September 20, 2022

1                    Dr. B. Isaacson

2    my fingers mistyped, I meant to say Mason

3    Rothschild or some kind of an answer like

4    that, then we have to rethink your question 1

5    answer.  But we don't see any people taking

6    back their answers to prior questions.

7            So short of that, if you said you're

8    confused in question 1, you could say in

9    question 1, Hermes, and in question 4 you

10   could say Instagram, or you could say

11   something else, and then we'd still count you

12   as confused.

13       Q.  Okay.  So going back to your -- the

14   language in your questions that we were just

15   looking at, 1, 4, and 7, the questions that

16   say, quote, whoever makes or provides the

17   items shown on the web page.  What did you

18   intend that language to refer to?

19       A.  The items that are shown on the

20   MetaBirkin web page.

21       Q.  Yes.  And what are those items?

22       A.  Well, on the web page, you and I

23   were just looking at it a minute ago, but

24   it's the web page that is included in Exhibit

25   2.  So it includes the item that is --

1                    Dr. B. Isaacson

2    it's -- that the web page, to my eye, appears

3    to be marketing or selling are a series of

4    handbag images that are sold as a form of NFT

5    products.

6        Q.  Okay.  And so your understanding is

7    that they're selling images that are

8    depicting handbags?

9        A.  They're selling what the page refers

10   to as Meta handbags or -- I'm sorry, that's

11   the control version.  The test version refers

12   to what the page is referring to as

13   MetaBirkins.  And it specifically says it's a

14   collection of 100 unique NFTs, right at the

15   top of the page.  And there's a series of

16   images that reflect these MetaBirkins

17   handbags on the page.

18            So the question is intentionally

19   using the word items, though, to be

20   non-leading to the respondent about what it

21   is that they're looking at.  It doesn't refer

22   to these items as NFTs, it doesn't refer to

23   them as artwork, it doesn't refer to them as

24   products.

25            It refers to them as items, which

Dr. Bruce Isaacson  Confidential
September 20, 2022

```
 1                    Dr. B. Isaacson
 2     standard language in a survey like this to
 3     not lead the respondent to look at one
 4     particular element on the page as opposed to
 5     looking at another element on the page.
 6          Q.  So is it possible that a respondent
 7     read the question and thought that you were
 8     referring to the Meta -- the NFT images and
 9     another respondent could read the question
10     and think that you're referring to the Birkin
11     handbag that the image depicts or references?
12                    MR. FERGUSON:  Objection to
13          form.
14                    You can answer.
15          A.  That respondent you just described
16     is confused.  You just described the textbook
17     definition of confusion in the likelihood of
18     confusion survey, that second one.
19               If I see that MetaBirkin image and I
20     think it's a Birkin handbag, I'm confused.
21     If I see that MetaBirkin image and I think
22     it's a MetaBirkin made by Mason Rothschild
23     and I don't think of Hermes and I don't think
24     of the real Birkin bag, then I'm not
25     confused.  That's exactly what my survey
```

Dr. Bruce Isaacson   Confidential
September 20, 2022

```
 1                    Dr. B. Isaacson
 2    measures.
 3        Q.  I'm asking you, is it possible that
 4    someone reads the questions here, the
 5    language in 1, 4 and 7, where it says, Makes
 6    or provides the item shown on the web page,
 7    and one person thinks that the item shown on
 8    the web page is an NFT image of a handbag,
 9    and another person reads that and thinks the
10    item shown on the web page is an actual
11    Birkin handbag.
12               MR. FERGUSON:  Objection.
13        A.  I have no idea what the question is
14    that you're asking me.  I apologize.  I know
15    it has something to do with the word item,
16    but I don't understand the hypothetical
17    scenario that you're trying to describe.
18        Q.  It's not a hypothetical at all.  I'm
19    asking you, you show the test stimulus, which
20    shows the image, right, of the MetaBirkin,
21    and you ask in several of these questions, 1,
22    4, 7, what company, companies, person or
23    people, do you think makes or provides the
24    item shown on the web page.
25               Is it possible that a respondent
```

Dr. Bruce Isaacson  Confidential
September 20, 2022

```
1                    Dr. B. Isaacson

2     looks at that and thinks that you're talking

3     about the handbag that's depicted there, and

4     then says, that's Hermes' Birkin bag.  And

5     another respondent looks at that and

6     understands that you mean to refer to the

7     image, of the image that depicts a handbag?

8              MR. FERGUSON:  Objection to the

9        form.

10       A.  It's occurring to me that the reason

11    I don't understand your question is because

12    your question is attempting to draw a

13    distinction that doesn't exist cognitively

14    for consumers.  The question is using the

15    word items to avoid being leading.

16            Had I used the word NFT in your

17    case, in the case that you just described, I

18    would have been pointing people in a

19    particular direction.  And had I used the

20    word handbag, I would have been pointing

21    people in a particular direction.

22            But as I talked about earlier, the

23    confusion is confusion, the survey is asking

24    people whether they make a cognitive

25    connection between what -- it's measuring
```

Dr. Bruce Isaacson  Confidential
September 20, 2022

1                  Dr. B. Isaacson

2     whether people make a cognitive connection

3     between what they see on the page and Hermes

4     or Birkin or the Birkin trade dress.

5            And so it's asking people who makes

6     that and they're looking at the page, and

7     they're determining whether they see

8     something that is referring to an NFT as it

9     is described on the page, made by creator

10    Mason Rothschild, or whether they're

11    referring to whether it's actually a Birkin

12    or Hermes handbag.

13           And that's based on what people

14    interpret on the page.  And that whole

15    non-leading, unbiased way of seeing whether

16    people are confused hinges on the use of the

17    word items, as opposed to a much more leading

18    term like the word NFT and a much more

19    confusing word like the word NFT which could

20    either refer to a token or a placement on a

21    block chain, placement on an internet ledger

22    or it could refer to the underlying artwork.

23    And if it refers to the underlying artwork,

24    potentially the underlying artwork reflects

25    Birkin or Hermes or the Birkin trade dress.

Dr. Bruce Isaacson  Confidential
September 20, 2022

1

2               C E R T I F I C A T E

3          I, MICHELLE LEMBERGER, a shorthand

4     reporter and Notary Public within and for

5     the State of New York, do hereby certify:

6          That the witness(es) whose testimony

7     is hereinbefore set forth was duly sworn by

8     me, and the foregoing transcript is a true

9     record of the testimony given by such

10    witness(es).

11         I further certify that I am not

12    related to any of the parties to this

13    action by blood or marriage, and that I am

14    in no way interested in the outcome

15    of this matter.

16

17

18              MICHELLE LEMBERGER

19

20

21

22

23

24

25