# Defendant's Exhibit 594



PHOTO-ILLUSTRATION: SAM WHITNEY; GETTY IMAGES

JESSICA RIZZO   IDEAS   APR 3, 2022 7:00 AM

# The Future of NFTs Lies With the Courts

As the first cases involving NFTs hit the dockets, courts will decide questions around ownership, art, and commerce.

**SUPERFARM TOUTED THE** sale as "a groundbreaking landmark—both for the crypto space and the broader music industry." The newly minted NFT of Jay-Z's debut album *Reasonable Doubt* would, it said, "provide ownership of the album's copyright, transferring the rights to all future revenue generated by the album from Damon Dash to the auction winner."

The catch? Dash did not actually own the copyright to *Reasonable Doubt* (not that selling it as a non-fungible token would necessarily have worked if he did). Now he is the defendant in a federal lawsuit brought by the hip hop label Roc-A-Fella records.

This case, filed in June 2021, was one of the first involving NFTs to hit the dockets. In another case filed a few months later, Playboy Enterprises sued the operators of a counterfeit website designed to mimic the site Playboy created to sell its "Rabbitar" NFTs. According to Playboy, the scam worked—over a thousand people mistook the fake website for the real one and collectively shelled out more than a million dollars for Rabbitars they never received.

In the coming months, courts

TRENDING NOW



Astrophysicist Explains Black Holes in 5 Levels of Difficulty



SUBSCRIBE



Subscribe to WIRED and stay smart with more of your favorite Ideas writers.

are going to see an influx of NFT-related litigation. Some early NFT cases, like Dash's, will help identify places where the crypto hype machine has severed all ties with reality. Others, like the Playboy case, will hold to account a few of the many presently behaving as though the law simply disintegrates when one enters the world of Web3.

"Just because you're doing something online doesn't mean that traditional laws don't apply to you," says Juliet Moringiello, a professor at Widener University Commonwealth Law School. "And the funny thing is, we've seen this before." Moringiello points to John Perry Barlow's 1996 "Declaration of the Independence of Cyberspace," in which the cyberlibertarian poet proclaimed that the governments of the world ("you weary giants of flesh and steel") had no sovereignty over the ethereal realm of the internet. "Your legal concepts," he wrote, "do not apply to us."

"Well," says Moringiello, "yeah, they do."

Barlow is a beloved figure among some crypto boosters. In crypto discussion forums, Redditors fondly exchange favorite quotes from his "Declaration" along with conspiracy theories about his death. They describe him as being "ahead of his time."

ADVERTISEMENT



Buy, Sell, Trade. Create.
MPB

"It's unfortunate," says Erika Douglas, a professor at the Temple University Beasley School of Law who teaches a course on the regulation of emerging technologies. "It gives these early technologies a bad rap, because some of these forays are so dismissive of the law."

Because the law relies heavily on precedent, early judicial opinions in the coming wave of NFT-related litigation will have an outsize impact. Very soon, a judge is going to have to answer some foundational questions about the legal status of NFTs that will have major consequences for art and commerce in the metaverse.

"THE OBVIOUS [QUESTION]," says Christopher Odinet, a professor at the University of Iowa College of Law, "is if you have an NFT, what do you really have? Do you just have a contract right? Do you have a license right? And how do you make that decision?" While a license is a species of contract, the difference matters. A contract would be the favored mechanism for transferring ownership, but a license is merely a limited grant of permission to use something owned by someone else.

ADVERTISEMENT





MOST POPULAR


GEAR
How to Stop Falling Asleep on the Couch During Movies
REECE ROGERS


IDEAS
The Work-From-Anywhere War Is Beginning
BRUCE DAISLEY


GEAR
How to (Finally) Break That Bad Habit
SAIRA MUELLER


SCIENCE
Does Dry January Really Make People Healthier?
AMANDA HOOVER

A court could try to answer this question by enforcing a given NFT platform's terms of service, which vary widely with respect to the kinds of rights they purport to confer, but a court could also throw those terms out the window if it found them to be incoherent. Odinet and Moringiello, who study the property law of tokens, say that many of the terms of service on such platforms are. For example, when a platform reserves the right to shut down a user's account or deny a user access to their NFTs, as many do, that would seem to conflict with the idea that users have any meaningful rights to these assets at all.

A court would also decline to enforce an NFT platform's terms of service if they violated established law. I could write a contract promising to give you my right arm in exchange for your rent-controlled Greenwich Village apartment, but no court would compel me to abide by such an agreement. Nor could I successfully contract around the fundamental precepts of property law by, say, asserting that an NFT somehow embodies property rights in a JPG file. Though this claim is carelessly thrown around all the time, it is unlikely to ever be endorsed by a court, which is why those who continue to be outraged when images associated with their NFTs are "right-click saved" have no legal recourse unless they own the underlying copyright.

Courts adjudicating these novel issues may soon be able to seek guidance from the Uniform Commercial Code, which governs commercial transactions in all 50 states. Moringiello is vice chair of the committee currently amending the UCC to provide a framework for transactions involving "controllable electronic records," a proposed new category of property that would include cryptocurrency and NFTs. The current draft amendments confer property status on NFTs and grant some certainty to loans secured by NFTs, but make clear that ownership of the token does not necessarily translate into ownership of the files associated with the tokens. Your legal relationship to the image or music file associated with the NFT will continue to be nothing more than a poetic metaphor (not that there's anything wrong with poetic metaphors, so long as you understand that's what you're getting).

Meanwhile, the class action *Friel v. Dapper Labs* is calling attention to the plight of the crypto-curious who don't understand what they're getting. The case suggests a gap in the regulation of securities, a class of tradable financial instrument that includes stocks and bonds. An issuer making a public offering of securities is required to comply with a variety of disclosure requirements to deter fraud and help investors assess risk. The plaintiffs in this case are suing Dapper Labs for selling NBA Top Shot "Moments," NFTs associated with video clips of highlights from NBA games. The plaintiffs, all of whom purchased Moments, argue that the NFTs are unregistered securities.

Because Dapper Labs failed to comply with the securities disclosure requirements, the plaintiffs allege, thousands of buyers sank money into the Top Shot marketplace and were flummoxed when they discovered that most of them would not be getting rich quick and that in fact they would have to wait months to cash out. "These aren't bubble gum cards," says the plaintiffs' attorney Phillip Kim. "People are viewing these things as investments and throwing down hundreds of thousands of dollars."



**MOST POPULAR**


GEAR
How to Stop Falling Asleep on the Couch During Movies
REECE ROGERS


IDEAS
The Work-From-Anywhere War Is Beginning
BRUCE DAISLEY


GEAR
How to (Finally) Break That Bad Habit
SAIRA MUELLER


SCIENCE
Does Dry January Really Make People Healthier?
AMANDA HOOVER

ADVERTISEMENT



If the court determines that the Moments NFTs are securities, Dapper Labs will have to either go through the registration process or verify that the purchasers were "accredited investors," meaning investors deemed wealthy and savvy enough to participate in risky financial enterprises without the ordinary guardrails.

A verdict against Dapper Labs would be a win for the legions of retail investors—an alarming proportion of whom are working-class people of color—pouring money they cannot afford to lose into Moments and similar crypto assets. "One court case is not necessarily going to be decisive," cautions Jill Fisch, a professor at the University of Pennsylvania Carey Law School. "NFTs vary," she says, "and the extent to which they're securities is going to vary from one case to another." But while a loss for Dapper Labs would not mean that all NFT sales were suddenly subject to federal securities regulations, it would put other sellers on notice that they might be, which could protect consumers by curbing some of the misleading marketing that continues to make investing in crypto so perilous for the uninitiated.

And while consumer protection and innovation are often represented as competing values, Douglas sees that framing as creating a false dichotomy. "Good regulation and good law enforcement," she says, "are positive for those who are in the space because they're doing something that's useful to the world." She sees some of the consumer protection issues emerging in crypto as "ripe for Federal Trade Commission intervention." Regulating qualifying NFT offerings as securities may be another way to promote transparency and make charlatans and scam artists hesitate before pitching their NFT collections to the public as investment schemes.

OTHER EARLY NFT cases may indirectly influence the way parties negotiate intellectual property agreements. In *Miramax v. Tarantino*, for example, the studio is suing the *Pulp Fiction* director for announcing plans to auction off NFTs associated with digital scans of the original handwritten pages of his screenplay for the 1994 cult classic. The sale, Miramax claims, would infringe the studio's copyright.

Back when the contracts were being drawn up, of course, it never would have occurred to anyone to take into account who retained the right to mint and sell NFTs associated with *Pulp Fiction*. Tarantino granted Miramax "all rights" to the film except a handful of specifically reserved rights. These reserved rights included, critically for the lawsuit, the right of screenplay publication. Miramax argues that "the proposed sale of a few original script pages … as an NFT is a one-time transaction, which does not constitute publication." This is a perverse interpretation of the word "publication," and the court should rule in Tarantino's favor on this point. In his answer to Miramax, Tarantino argues that the studio is using "the concept of NFTs to confuse the public and mislead this Court in an effort to deny artists such as Tarantino their hard earned and long-standing rights." He has a point. In this case, NFTs are largely a distraction.



**MOST POPULAR**


GEAR
How to Stop Falling Asleep on the Couch During Movies
REECE ROGERS


IDEAS
The Work-From-Anywhere War Is Beginning
BRUCE DAISLEY


GEAR
How to (Finally) Break That Bad Habit
SAIRA MUELLER


SCIENCE


GEAR
How to Stop Falling Asleep on the Couch During Movies
REECE ROGERS


IDEAS
The Work-From-Anywhere War Is Beginning
BRUCE DAISLEY


GEAR
How to (Finally) Break That Bad Habit
SAIRA MUELLER


SCIENCE
Does Dry January Really Make People Healthier?
AMANDA HOOVER

ADVERTISEMENT



But another important clause in the contract offers a more general lesson for artists and their attorneys. Miramax says it controls the right to sell NFTs associated with excerpts of the screenplay because the 1993 contract granted the studio the right to distribute *Pulp Fiction* "in all media now or hereafter known." The contract used no such forward-looking language in assigning Tarantino his more limited reserved rights. If Tarantino had no screenplay publication provision to fall back on, this clause might have sunk his case. Artists who care about retaining the right to use crypto to derive alternative sources of revenue from their intellectual property will want to specifically negotiate for it going forward.

While *Miramax* will come down to contract interpretation, *Hermès v. Rothschild* may provide an early indication of whether corporate interests will outweigh the value of artistic expression in the metaverse. The luxury design house is suing artist Mason Rothschild for selling a series of "MetaBirkin" NFTs. According to Hermès, the MetaBirkins consist of "blurry images of … the famous Birkin handbag," the least expensive of which retails for about $10,000. Having these images circulating in the metaverse will confuse consumers and dilute the brand, Hermès alleges.

Rothschild counters that the MetaBirkins are not blurry, but furry. The artist's images are "made with pixels, but the bags are depicted as fur-covered," a visual critique of the animal cruelty involved in making a Birkin, he contends in his answer to Hermès. In contrast to the designer bags, "which are made from the tanned hides of slaughtered animals," Rothschild says, the MetaBirkins are not handbags; "they carry nothing but meaning."

Comparing the MetaBirkins to Andy Warhol's depictions of Campbell's Soup cans, Rothschild situates himself in an established tradition of artists who have taken up iconic brands as their subject matter. The fact that his images are associated with NFTs makes no legal difference, he says. What matters is that the First Amendment guarantees his "right to respond in the marketplace of ideas to the inescapable corporate brand messages by which we are bombarded every day, virtually everywhere we look."

Unlike Playboy, Hermès does not sell NFTs, so its claims of unfair competition are rather speculative. If the court were to determine that the brand's monopoly extends to images like Rothschild's, it would be major loss for artists and all who value freedom of expression, a signal that the metaverse is likely to be treated less as a new frontier for human creativity and more as an annex-in-waiting for established business concerns.

The outcomes of these early cases will have ripple effects that extend far beyond the parties themselves. On March 9, President Biden published an executive order on "Ensuring Responsible Development of Digital Assets," which directs key federal agencies to coordinate and assess the field's challenges and opportunities. As the claims of crypto enthusiasts begin to be tested in court, regulators and legislators will be watching, waiting, and getting ideas of their own for how the law needs to change to accommodate crypto.

**Sign Up For Our Daily Newsletter And Get The**

**Best Of WIRED.**

Email Address      SIGN UP

By signing up, you agree to our user agreement (including the class action waiver and arbitration provisions), our privacy policy and cookie statement, and to receive marketing and account-related emails from WIRED. You can unsubscribe at any time.

## More Great WIRED Stories

- 📩 The latest on tech, science, and more: Get our newsletters!
- It's like GPT-3 but for code—fun, fast, and full of flaws
- You (and the planet) really need a heat pump
- Can an online course help Big Tech find its soul?
- iPod modders give the music player new life
- NFTs don't work the way you might think they do
-  Explore AI like never before with our new database
- 🏃, Want the best tools to get healthy? Check out our Gear team's picks for the best fitness trackers, running gear (including shoes and socks), and best headphones

---

Jessica Rizzo is an attorney with the law firm Montgomery McCracken Walker & Rhoads. She writes about art, technology, and the law.

IDEAS CONTRIBUTOR

TOPICS   BLOCKCHAIN   CRYPTOCURRENCY   MONEY   FINANCE   LAWS
COURTS   COPYRIGHT   INTELLECTUAL PROPERTY   NFTS

### MORE FROM WIRED



**ChatGPT, Galactica, and the Progress Trap**

When large language models fall short, the consequences can be serious. Why is it so hard to acknowledge that?

ABEBA BIRHANE



**Effective Altruism Is Pushing a Dangerous Brand of 'AI Safety'**

This philosophy—supported by tech figures like Sam Bankman-Fried—fuels the AI research agenda, creating a harmful system in the name of saving humanity

TIMNIT GEBRU



**'Magic Avatar' App Lensa Generated Nudes From My Childhood Photos**

The dreamy picture-editing AI is a nightmare waiting to happen.

OLIVIA SNOW



**AI Reveals the Most Human Parts of Writing**

When do writers want help finding inspiration? And when do they want full control? Computers could expose the true future of the medium.

KATY ILONKA GERO



**The Work-From-Anywhere War Is Beginning**

Forget return-to-office mandates. The most sought-after talent want ultimate flexibility. Their bosses need to get on board.

BRUCE DAISLEY



**I Think My Face Was Deepfaked Into a Chinese Camping Stove Ad**

Here's how a stock image—that looked like me—made its way to Chinese marketplaces. With each repost and edit, I grew more convinced that it *was* me.

AMANDA FLORIAN



**El Niño Is Coming—and the World Isn't Prepared**

Global heating will set the stage for extreme weather everywhere in 2023. The consequences are likely to be cataclysmic.

BILL MCGUIRE



**Mass Climate Migration Is Coming**

With rising sea levels and extreme weather events, the global north needs to prepare to welcome displaced people.

GAIA VINCE

SPONSORED STORIES



### You Can Do Anything You Want In This Game
RAID: Shadow Legends



### Read This Before You Renew Amazon Prime Again
Capital One Shopping



### Why People in Brooklyn are Loving Martha Stewart's Meal Kit
Martha Stewart & Marley Spoon



### The genius trick every traveler should know
Capital One Shopping



### Simple Method To Reduce Neuropathy (Watch)
Awareness Alert



### Brain Surgeon – Do This to Relieve Tinnitus and Hearing Loss (Try Tonight)!
Hearing Loss & Tinnitus Help



### This Is The Highest Rated Hearing Aid In The US
hear.com







WIRED

WIRED is where tomorrow is realized. It is the essential source of information and ideas that make sense of a world in constant transformation. The WIRED conversation illuminates how technology is changing every aspect of our lives—from culture to business, science to design. The breakthroughs and innovations that we uncover lead to new ways of thinking, new connections, and new industries.

MORE FROM WIRED
- Subscribe
- Newsletters
- FAQ
- Wired Staff
- Press Center
- Coupons
- Editorial Standards
- Black Friday
- Archive

CONTACT
- Advertise
- Contact Us
- Customer Care
- Jobs

RSS  |  Accessibility Help  |  Condé Nast Store  |  Condé Nast Spotlight   COOKIES SETTINGS   United States

© 2023 Condé Nast. All rights reserved. Use of this site constitutes acceptance of our User Agreement and Privacy Policy and Cookie Statement and Your California Privacy Rights. WIRED may earn a portion of sales from products that are purchased through our site as part of our Affiliate Partnerships with retailers. The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Condé Nast. Ad Choices

Winter Sale: Get WIRED for just $29.99 $5. Plus, get free stickers! Subscribe now.