# EXHIBIT B

# Exhibit 9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HERMÈS INTERNATIONAL and HERMÈS OF PARIS, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> MASON ROTHSCHILD, <br><br> *Defendant*. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 1:22-cv-00384-JSR <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**Expert Rebuttal Report of David Neal, Ph.D.,**

**in Response to Expert Report of Dr. Bruce Isaacson**

I, Dr. David T. Neal, hereby declare as follows:

1. **Section 1: Background, Qualifications, and Purpose**

    1.1. I submit this Rebuttal Report in the matter of HERMÈS INTERNATIONAL and HERMÈS OF PARIS, INC., (hereinafter, "Plaintiffs" or "Hermès") v. MASON ROTHSCHILD, (hereinafter, "Defendant" or "Mason Rothschild") in the United States District Court for the Southern District of New York.

    1.2. I am an Executive in Residence at Duke University and Managing Partner of Catalyst Behavioral Sciences LLC, a research consulting firm specializing in the analysis of human decision making and consumer behavior, which includes extensive work in connection with consumer surveys.

    1.3. At Catalyst Behavioral Sciences, I provide services for clients across a range of industries. Among others in the corporate sector, I act or have acted as a consultant regarding surveys and consumer behavior to Bayer, Microsoft, Procter & Gamble, Intel, and Unilever. Among others in the public and non-profit sector, I act or have

Control Cell (where the four elements were absent). On the basis of these purported results, Dr. Isaacson concludes that net likelihood of confusion in his NFT Purchaser Survey was 18.7% (i.e., 21.6% minus 2.9%).[13]

1.10. In his "Survey of Handbag Purchasers," Dr. Isaacson followed the same survey methodology as in his NFT Purchaser Survey, but altered the qualifying criteria for his study. Specifically, instead of recruiting NFT purchasers, Dr. Isaacson recruited likely purchasers of handbags priced $10,000 or more. Although omitted from the text of his report, Dr. Isaacson found in this second survey that 18.8% of respondents were confused in the Test Cell and 15.2% were confused in the Control Cell.[14] Thus, net likelihood of confusion in his Handbag Purchaser Survey was 3.6% (i.e., 18.8% minus 15.2%).

1.11. By way of summary, of the two surveys reported by Dr. Isaacson, one ostensibly provides evidence for a likelihood of confusion (i.e., the "NFT Purchaser Survey," with a net confusion level of 18.7%), and one ostensibly provides evidence for the absence of a likelihood of confusion (i.e., the "Handbag Purchaser Survey," with a net confusion level of 3.6%).

## 2.  Section 2: Summary of Opinions Regarding Dr. Isaacson's Surveys

2.1. Having reviewed his two surveys, his report, and having reanalyzed his underlying data, it is my considered opinion that the conclusions Dr. Isaacson draws regarding likelihood of confusion are not scientifically valid or reliable. I base that opinion on (a) the existence of multiple design flaws in his surveys that introduced systematic bias in favor of Plaintiffs, and (b) a highly material data coding error in his NFT Purchaser

---

[13] Expert Report of Dr. Bruce Isaacson, ¶ 21.
[14] Expert Report of Dr. Bruce Isaacson, Exhibit 11, p. 24.

Survey that led Dr. Isaacson to wrongly infer a likelihood of confusion in that survey. When this error is corrected, both of Dr. Isaacson's surveys show that there is no likelihood of confusion with Plaintiffs caused by Defendant's alleged infringement of Plaintiffs' marks. The primary design flaws and data analysis errors I identified in Dr. Isaacson's surveys are as follows:

2.1.1. **Flaw 1:** Dr. Isaacson's studies inextricably combine confusion caused by the HERMÈS word mark, the BIRKIN word mark, the allegedly confusing "MetaBirkins" name, and the claimed Birkin Trade Dress. As a result, it is scientifically impossible to draw any scientific inferences about what amount of confusion, if any, is caused by any one of these elements in isolation.

2.1.2. **Flaw 2:** Dr. Isaacson correctly included a follow-up question to rule out the "reading test" problem in Eveready surveys of this kind. However, he then improperly ignored the data from this question, thereby materially inflating confusion and drawing the wrong conclusion in his "NFT Purchaser Survey." After recoding to correct this flaw, his "NFT Purchaser Survey" shows no likelihood of confusion.

2.1.3. **Flaw 3:** Dr. Isaacson's confusion questions (Q1 and Q7) are inherently ambiguous in a manner that is biased in favor of Plaintiffs and against Defendant.

2.1.4. **Flaw 4:** Dr. Isaacson's Survey of Handbag Purchasers was improperly abandoned—apparently after it produced unfavorable results for Plaintiffs. Its results are relevant and suggest either that (a) Plaintiffs' customers understand the accused NFT to be art, or (b) the Birkin mark and Birkin trade dress are very weak and are not acting as source identifiers.

2.1.5. **Flaw 5:** Dr. Isaacson did not disclose, and refused to provide when requested,

6

critical data coding that he relied upon as the basis for certain opinions. I was therefore unable to complete my scientific review of his findings.

2.2.  In the following Section, I elaborate on each of these issues and provide the scientific bases for my opinions.

## 3.  Section 3: Summary of Opinions Regarding Isaacson Surveys

3.1.  I note at the outset that I respect Dr. Isaacson. However, as I explain below, my review of his Expert Report revealed at least five major flaws that render his conclusions scientifically invalid and unreliable. Moreover, one of these flaws (Flaw 2) involves a major data coding error that fundamentally alters the interpretation of the NFT Purchaser Survey. Once this error is corrected, this survey's results align with the results of his Handbag Purchaser Survey. That is, both surveys show that Defendant's MetaBirkins NFT is not causing a material likelihood of confusion with Plaintiffs.

3.2.  **Flaw 1: Dr. Isaacson's studies inextricably combine confusion caused by the HERMÈS word mark, the BIRKIN word mark, the allegedly confusing "MetaBirkins" name, and the claimed Birkin Trade Dress. As a result, it is scientifically impossible to draw any scientific inferences about what amount of confusion, if any, is caused by any one of these elements in isolation.**

3.2.1.  My first criticism concerns a fundamental limitation on the scope of any scientific inference that can be drawn from the surveys Dr. Isaacson conducted. As is common in an Eveready survey, Dr. Isaacson used a Test-Control design where respondents in the Test Cell saw content (i.e., Defendant's webpage for the MetaBirkin NFT) that included the allegedly infringing content. In the Control Cell, this content was removed and replaced with content not accused of infringing Plaintiffs' word marks or trade dress.

4.    What other brands or products do you think are made or provided by whoever makes or provides the items shown on the webpage?  Please be as specific as possible. If you don't know, please select "I don't know."

|  |
|--|
|  |

❑  I don't know.  **[EXCLUSIVE]**

3.3.8.    Specifically, Q4 enabled Dr. Isaacson to determine whether respondents who listed "Hermes" or "Birkin" at Q1 were, in fact, thinking of the Plaintiffs versus merely reading or playing back one of many brands written on the stimulus they had just seen.

3.3.9.    Despite having this data, Dr. Isaacson simply ignored it when calculating the confusion numbers presented in his report. Specifically, he failed to code people's answers to Q4 to identify if respondents were plausibly thinking of Plaintiffs (and hence were actually confused) versus were simply reading.

3.3.10.   This is a fatal flaw because it both (a) deviates from accepted scientific practice for Eveready surveys in circumstances such as those that apply here, and (b) as shown below, materially alters the scientific conclusion one draws from Dr. Isaacson's NFT Purchaser Survey.

3.3.11.   To correct for this fatal flaw, I reanalyzed the raw data from Dr. Isaacson's NFT Purchaser Survey applying the proper and standard coding approach to both his Test and Control Cell results. As presented in Tables 2 and 3 below, I identified the twenty-one Test Cell respondents (see Table 2) and three Control Cell respondents  (see Table 3) in the NFT Purchaser Survey that Dr. Isaacson classified as confused. I then examined these respondents' answers to Q4 to determine if each respondent was actually thinking of Plaintiffs versus merely reading/playing back. Specifically, I

14

3.4.5.   This ambiguity creates a fatal flaw for Dr. Isaacson's surveys because it is impossible to know now whether respondents were thinking of the NFT artwork when answering or thinking of the real-world object the artwork visually references. Since his question wording is consistent with both interpretations, it is impossible to know which respondents fall into each group. Respondents who interpreted the questions as a reference to the underlying physical object are not opining about confusion as to the source, affiliation, sponsorship, or approval of the Defendant's NFT artwork, but rather to a separate physical object. As a result, their opinions are not relevant to any likelihood of confusion caused by Defendant's accused goods.

3.5.   **Flaw 4: Dr. Isaacson's Survey of Handbag Purchasers was improperly abandoned—apparently after it produced unfavorable results for Plaintiffs. Its results are relevant and suggest either that (a) Plaintiffs' customers understand the accused NFT to be art, or (b) the Birkin mark and Birkin trade dress are very weak and are not acting as source identifiers.**

3.5.1.   As noted in Section 1, Dr. Isaacson conducted two surveys: One of "NFT Purchasers" and one of "Handbag Purchasers." The results of the second survey are not presented in the body of Dr. Isaacson's survey and are only included in the Exhibits.[29]

3.5.2.   Upon examining the results of the second survey, which recruited U.S. purchasers of handbags priced $10,000 or more, I calculated that Dr. Isaacson found a net level confusion of 3.6% in his "Handbag Purchasers" survey. Specifically, he found that 18.8% of respondents were confused in the Test

---

[29] See Expert Report of Dr. Bruce Isaacson, Exhibit 11.