UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HERMÈS INTERNATIONAL and HERMÈS OF PARIS, INC.,<br><br>       Plaintiffs,<br><br>  -against-<br><br>MASON ROTHSCHILD,<br><br>       Defendant. | CIVIL ACTION NO.<br><br>22-CV-00384 (JSR) |

# JOINT PRETRIAL CONSENT ORDER

Pursuant to Fed. R. Civ. P. 26(a)(3) and this Court's Individual Rules of Practice, Plaintiffs Hermès International and Hermès of Paris, Inc. (collectively, "Hermès") and Defendant Mason Rothschild ("Rothschild") jointly submit this pretrial consent order.

**1. Joint Overview of the Case**

This is a trademark infringement, unfair competition, trademark dilution, and cybersquatting case brought under federal and state law.  Beyond this, the parties do not agree about the basic characterization of the case.

Hermès alleges that Rothschild's promotion and sale of his collection of 100 METABIRKINS NFTs (the "*MetaBirkins*"), which have associated images that depict fur-covered BIRKIN handbags, unlawfully use Hermès's HERMÈS trademark, BIRKIN trademark, and BIRKIN trade dress, which are federally registered trademarks.  Hermès alleges that Rothschild's adoption of the METABIRKINS mark, which comprises the generic term "meta" and the BIRKIN mark, was intentional and an attempt to capitalize on and trade off the goodwill

of the Hermès brand and one of Hermès's most iconic trademark and products – the BIRKIN handbag.

Rothschild disagrees with how Hermès frames the case. *MetaBirkins* is the title of an art project and a series of 100 artworks; it is not a mark. Rothschild has sold 100 *MetaBirkins* images, each associated with an NFT that authenticates it. Rothschild maintains that his adoption and use of the *MetaBirkins* name is protected free speech under the First Amendment because the *MetaBirkins* artworks and associated NFTs are art and commentary on Hermès's Birkin handbag, and therefore does not constitute trademark infringement, unfair competition, dilution, or anti-cybersquatting. Rothschild argues that *MetaBirkins* was an artistic experiment to comment upon the world of luxury consumerism represented by Birkin bags and the fur-free initiatives present in fashion. Rothschild contends that the sales of his works as NFTs does not constitute an attempt to digitally "knockoff" the Birkin handbag.

### 2. Particularized Description of Each Party's Claims

#### A. Hermès's Claims

This is an action at law and in equity for federal trademark infringement, unfair competition in the nature of false designations of origin, false descriptions and representations, trademark dilution, and anti-cybersquatting arising under the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.* ("Lanham Act"); and for dilution, misappropriation, and unfair competition under the fair business practices and unfair and deceptive trade practices acts of New York and New York common law. Specifically, Hermès's First Cause of Action alleges trademark infringement under 15 U.S.C. § 1114; Hermès's Second Cause of Action alleges false designations of origin, false descriptions and representations under 15 U.S.C. § 1125(a); Hermès's Third Cause of Action alleges trademark dilution under 15 U.S.C. § 1125(c); Hermès's

Fourth Cause of Action alleges cybersquatting under the 15 U.S.C. § 1125(d); Hermès's Fifth Cause of Action alleges injury to business reputation and dilution under N.Y. Gen. Bus. Law § 360-l; Hermès's Sixth Cause of Action alleges trademark infringement under New York common law; and Hermès's Seventh Cause of Action alleges misappropriation and unfair competition under New York common law.

Hermès asks this Court to: (1) permanently enjoin Rothschild from manufacturing, minting, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, renting, displaying or otherwise disposing of any NFTs, products or merchandise that use the HERMÈS trademark, BIRKIN trademark, BIRKIN trade dress or any confusingly similar METABIRKINS name or mark; from making any statement or representation whatsoever or performing any act that is likely to lead the trade or public to believe that any NFTs, products or merchandized minted, manufactured, promoted, distributed or sold by Rothschild are in any manner associated or connected with Hermès; and from using METABIRKINS or any BIRKIN-formed mark as a trade name or trademark to promote any products or business; (2) direct Rothschild to transfer control of the METABIRKINS NFTs smart contract and to modify the METABIRKINS NFTs smart contact to no longer point to the images currently associated with the METABIRKINS NFTs; (3) direct Rothschild and all those in active concert or participation with him to burn the METABIRKINS NFTs in their possession, custody or control; (4) direct Rothschild to transfer the METABIRKINS.com domain name to Hermès and to refrain from registering, using or trafficking any domain names or social media or NFT platform user names or handles that are identical or confusingly similar to the HERMÈS and/or BIRKIN trademarks; (5) award Hermès Rothschild's profits derived from the METABIRKINS NFTs and to treble that award; (6) award Hermès statutory damages of $100,000 for Defendant's violation of 15 U.S.C.

§ 1125(d)(1) pursuant to 15 U.S.C. § 1117(d); (7) award Hermès its reasonable attorneys' and investigators' fees and costs; and (8) post-judgment interest on all monetary awards.

### 3. Facts on Which the Parties Agree and Other Stipulations

#### A. Stipulations

##### 1. Jurisdiction

The parties stipulate that: (a) this Court has subject matter jurisdiction over this action under 15 U.S.C. § 1121 and under 28 U.S.C. §§ 1331, 1338, & 1367(a); (b) this Court has personal jurisdiction over Rothschild; and (c) venue is proper in this District pursuant to 28 U.S.C. § 1391.

##### 2. Authenticity

The parties stipulate to the authenticity of exhibits in the parties' respective exhibit lists as indicated therein (Exhibits 3 and 4). Also as indicated in the parties' accompanying exhibit lists, the parties have raised hearsay objections to many of the exhibits, excepting a limited number of exhibits as to which the parties stipulate that the exhibit will be offered for something other than the truth of any matter asserted, contains the statement of a party, and/or fits squarely within another hearsay objection. The parties reserve the right to raise hearsay objections as needed at trial to complete the record.

##### 3. Redactions

The parties stipulate to the redaction of personal identifiable information ("PII"), including phone numbers and email addresses and the names and contact information of individuals that are not involved in this litigation. The parties will have unredacted copies available if and as needed, for example, to refresh the witness's recollection. The parties further stipulate that social media handles will not be redacted.

**4.    Exchange of Demonstratives**

The parties agree to exchange demonstratives for witnesses that a party plans to call as a direct witness (or for opening statements or closing arguments) by 8:00PM the calendar day before anticipated use.  The parties agree to exchange native PowerPoint files without notes if they include any animations intended to be used during presentation to the jury.

The parties agree to have a standing meet-and-confer at 9:00PM to attempt to resolve any objections to the proposed demonstratives.

**B.  Agreed-Upon Statement of Facts**

The parties agree on the following facts:

**1.**    Plaintiff Hermès International is a corporation, organized and existing under the laws of France, having its principal place of business located at 24, rue du Faubourg Saint-Honoré, Paris France. Hermès does business in the United States, including New York, through its wholly-owned subsidiary Hermès of Paris, Inc.

**2.**    Plaintiff Hermès of Paris, Inc. is a corporation, organized and existing under the laws New York, having its principal place of business located at 55 East 59th Street, New York, New York 10022. Hermès of Paris, Inc. is the sole authorized distributor of the BIRKIN handbags in the United States and has the exclusive right to sell BIRKIN handbags under the HERMÈS trademark in the United States.

**3.**    Defendant Mason Rothschild is a is an individual, whose legal name is Sonny Alexander Estival, and resides in Los Angeles, California.

**4.**    Rothschild advertised, marketed, offered for sale, and sold the *MetaBirkins* in the United States, including in the State of New York.

5. The BIRKIN trademark is strong and distinctive. Rothschild has publicly stated that "there's nothing more iconic than the Hermès Birkin bag."

6. Hermès publicly objected to Rothschild's advertising, marketing, offering for sale, and sale of the *MetaBirkins* on December 10, 2021 by commenting to the *Financial Times*, and sent Rothschild a cease and desist letter on December 16, 2021.

7. Rothschild, after receiving the cease and desist, added a disclaimer to the *MetaBirkins* website which read: "We are not affiliated, associated, authorized, endorsed by, or in any way officially connected with the HERMÈS, or any of its subsidiaries or its affiliates. The official HERMÈS website can be found at https://www.Hermès.com/."

**4. Particularized Contentions Regarding the Disputed Facts**

    **A. Hermès's Contentions**

Hermès's infringement and unfair competition claims turn on the question of whether Rothschild's use of the BIRKIN trademark in connection with the METABIRKINS NFTs (the "Accused Products") creates a likelihood of confusion. That assessment will be made by the jury as it considers the *Polaroid* factors:

(1) the strength of the BIRKIN trademark;
(2) the similarly of the parties' trademarks;
(3) the competitive proximity of the products in the marketplace;
(4) the likelihood that Hermès will bridge the gap by moving into Rothschild's product market;
(5) evidence of actual confusion;
(6) Rothschild's bad faith in adopting the BIRKIN trademark;
(7) the respective quality of the products;
(8) the sophistication of the consumers in the relevant market.

At trial, Hermès will present substantial evidence on each of the *Polaroid* factors. The BIRKIN trademark is strong and a distinctive mark. Hermès will show consistent use of the BIRKIN Mark over the past decades; over a billion dollars of sales of the BIRKIN handbag over

the last 10 years; millions of dollars a year in advertising, which includes advertising the BIRKIN handbag and BIRKIN trademark; and substantial unsolicited media surrounding the BIRKIN handbag.

Rothschild's METABIRKINS mark uses the entirety of Hermès's BIRKIN mark, differentiated only by an explicitly misleading generic prefix "meta," which refers to the "metaverse." Rothschild's addition of the generic term "meta" to Hermès's BIRKIN trademark creates the explicitly misleading impression that Hermès, the only source of BIRKIN handbags, is offering BIRKIN handbags in the METAverse. This confusion is exacerbated by the appearance of the digital handbag, which uses the BIRKIN trade dress.

The Accused Products are in close competitive proximity to BIRKIN handbags. While the Accused Products may depict virtual handbags, the U.S. Patent and Trademark Office has taken the position that virtual and physical goods are the kind that may emanate from a single source, under a single mark and that the same providers of real fashion goods often provide virtual fashion goods.

Hermès will show evidence of its plans to "bridge the gap" and enter the metaverse and use NFTs. In fact, Hermès has been developing an NFT strategy for the company since at least 2019, prior to Rothschild's sale and promotion of the Accused Products, and has previously issued NFTs.

Hermès will introduce at trial examples of consumers, industry experts, the press, and Rothschild's own agents and partners being confused as to: (1) Hermès's affiliation with the METABIRKINS collection of NFTs; (2) the relationship between the METABIRKINS NFTs and authentic BIRKIN handbags; and (3) Hermès's authorization or sponsorship of the METABIRKINS collection of NFTs. Furthermore, the survey conducted by Dr. Bruce Isaacson

is admissible evidence of actual confusion. The survey measured the likelihood of confusion among NFT purchasers as to the source or sponsorship of Rothschild's NFTs. The survey found net confusion among the NFT audience of 18.7%. Net confusion this high is evidence of a substantial likelihood of confusion.

Evidence of Rothschild's bad faith comes from Rothschild's own statements, which make clear that Rothschild: (a) sought to make money by capitalizing on the fame of the BIRKIN trademark; (b) targeted and incentivized individuals to inflate the value of the Accused Products by "shilling" and "pumping" the price of the Accused Products; (c) falsely claimed to business associates that he was actively negotiating a partnership with Hermès; and (d) wanted a cease and desist letter from Hermès to attract attention to the Accused Products.

Hermès will introduce evidence showing it is one of the world's most iconic luxury brands and makes one of the finest, high-quality handbags. The BIRKIN handbag is difficult to produce and sells at high prices because of the intensive labor and craftmanship (18-24 hours per bag) and the high-quality leathers and materials required to make BIRKIN handbags. By contrast, the Accused Products made by Rothschild's designer used software to generate the images of the Accused Products and sought to make them as quickly as possible.

Evidence of consumer comments on social media and the survey of Dr. Isaacson among NFT purchasers will show that consumers are not particularly sophisticated in determining whether the Accused Products were authorized, affiliated, or sponsored by Hermès. It is only natural that consumers have been confused by Rothschild's use of the BIRKIN trademark and BIRKIN trade dress, and his repeated references to Hermès.

As discussed in Section 5 below, Hermès seeks monetary relief to remedy the infringement and unfair competition by Rothschild, including a disgorgement of Rothschild's

profits from the METABIRKINS NFTs project, which includes minting revenue, royalty revenue, and transfer revenue in the amount of approximately $231,000. Hermès further seeks (a) a trebling of the jury's award of Rothschild's profits pursuant to 15.U.S.C. § 1117(a); (b) Hermès reasonable attorneys' and investigator's fees and costs, pursuant to 15.U.S.C. § 1117(a) and state law; and (c) post-judgment interest on all monetary awards.

Hermès's dilution claims require Hermès to show that the BIRKIN mark is famous (or distinctive under New York law) and that Rothschild's use of the METABIRKINS mark in connection with the Accused Products is likely to dilute the distinctiveness of the BIRKIN mark. 15 U.S.C. §1125(c).  Whether a trademark is likely to cause dilution by blurring depends on the factors set out in 15 U.S.C. § 1125(c)(2)(B)(i)-(vi) to be assessed by the jury, including:

(1) The degree of similarity between the METABIRKINS trademark and the BIRKIN trademark;
(2) the degree of inherent or acquired distinctiveness of the BIRKIN trademark;
(3) the extent to which Hermès is engaging in substantially exclusive use of the BIRKIN trademark;
(4) the degree of recognition of the BIRKIN trademark;
(5) whether Rothschild intended to create an association with the BIRKIN trademark; and
(6) any actual association between the METABIRKINS trademark and the famous trademark.

The evidence Hermès will set forth at trial related to the *Polaroid* factors discussed above, also supports Hermès's claim for dilution: the trademarks are highly similar; the BIRKIN trademark is strong and distinct; Rothschild acted in bad faith by adopting the METABIRKINS mark with the intent to create an association with Hermès and the BIRKIN mark; and there has been actual confusion as to the association between the METABIRKINS NFTs and Hermès and its BIRKIN trademark.

9

The primary remedy for trademark dilution is a permanent injunction. In cases such as this, however, where Rothschild willfully intended to trade on the recognition of the BIRKIN trademark, Hermès seeks recovery of Rothschild's profits. 15 U.S.C. § 1125(c)(5).

Hermès's cybersquatting claim requires Hermès show the BIRKIN mark was distinctive at the time METABIRKINS.com was registered; METABIRKINS.com is confusingly similar to the BIRKIN mark; and Rothschild had a bad faith intent to profit from the BIRKIN mark. As noted above, METABIRKINS is confusingly similar to BIRKIN and Rothschild has acted in bad faith to profit from the BIRKIN trademark. At trial, Hermès will further show that Rothschild registered METABIRKINS.com on November 7, 2021, over a decade after the BIRKIN trademark was registered with the U.S. Patent and Trademark Office on September 6, 2005.

As discussed in Section 2.A. above, Hermès seeks permanent injunctive relief to remedy the cybersquatting by Rothschild. Further, as set forth in Section 5 below, Hermès also seeks statutory cybersquatting damages, not less than $1,000 nor more than $100,000.

### B. Rothschild's Contentions

Rothschild's *MetaBirkins*—the images, associated NFTs, and name—are creative expression protected by the First Amendment and by well-settled Second Circuit law. Under the holding of *Rogers v. Grimaldi*, 695 F. Supp. 112 (S.D.N.Y. 1988), Hermès must show that *MetaBirkins* has no artistic relevance whatsoever, or if it has some, whether *MetaBirkins* explicitly misleads as to the source of the content of the work. The standard is daunting for a good reason: our laws permit and encourage artistic expression.

The evidence shows that Hermès is typically permissive of artists' use of its marks—so long as the point of the art is not to draw unwanted attention to the absurdity of luxury handbags. The *MetaBirkins* images are renderings of imaginary Birkin bags entirely covered in colorful

10

fake fur. They are a fanciful artistic two-dimensional depiction of the Birkin bag and a reference to the fashion industry's fur-free initiative.

Nor is it important that Rothschild sells his *MetaBirkins* artworks, or that he does so by way of NFT which, themselves, have an artistic function in his work.

At trial, Rothschild will demonstrate that both the content and the name of the *MetaBirkins* artwork have artistic relevance to the *MetaBirkins* art project. The title of *MetaBirkins*—the use of the prefix "Meta" with "Birkin"—sends a signal to the audience that the images are an artistic comment on Birkin bags and the world of luxury they represent. Rothschild's use of *MetaBirkins* is an artistic experimentation which allowed consumers to experience the real-world aura of the physical Birkin in the virtual domain. The images themselves were artistically relevant to the *MetaBirkins* project, allowing Rothschild to portray an absurdist, parodic intent and commentary on both luxury goods and the fur-free initiatives in fashion.

The evidence at trial will also show that Rothschild did not explicitly mislead as to the source of the work. The use of "Birkin" in the title of Rothschild's art project is not sufficient to warrant restriction of his artistic expression: it does not make a direct claim about source. There is no evidence that Rothschild attempted to mislead consumers to believe that *MetaBirkins* is associated with Hermès; in fact, the evidence is to the contrary. Rothschild, justifiably, always wished to be credited as the artist behind *MetaBirkins*: he took care to inform consumers that he, not Hermès, created the artworks; promptly contacted or caused his representative to contact press outlets when they mistakenly attributed *MetaBirkins* to Hermès to point out that the project was not in fact affiliated with Hermès and correct any press releases; and Rothschild added a

11

disclaimer to the *MetaBirkins* website to explicitly state that the project was in no way affiliated, associated, authorized, endorsed by, or connected with Hermès.

Given the applicability of *Rogers*, the *Polaroid* factors require only a "quick look" in determining whether an artistic defendant's First Amendment interests should be outweighed. Such a "quick look" here of the eight factors points to the conclusion that Rothschild's First Amendment interests outweigh any Lanham Act claim.

***First***, the evidence will show that the strength of the Birkin mark actually weighs against a finding of confusion and in favor of artistic relevance, given it is more likely that *MetaBirkins* would be recognized by consumers as art, outside the scope of Hermès' product line.

***Second,*** while necessarily similar to the Birkin bag, the evidence will show that *MetaBirkins* are fanciful two-dimensional pictures of the Birkin bag, not a replication, which use related but different marks for different purposes.

***Third,*** the evidence will show that the *MetaBirkins* artworks are not "digital knockoffs" of the Birkin handbag; the artworks are not handbags, and there is no such thing as a "digital knockoff" in this context.

***Fourth,*** regardless of Hermès' plans for the NFT, it cannot control the market for artistic references.

***Fifth,*** the evidence will show that there is no actual confusion between the two-dimensional fanciful *MetaBirkins* artworks and Hermès' Birkin bag – which is an actual handbag. The survey conducted by Hermès' witness, Dr. Bruce Isaacson employs flawed methodology to exaggerate data which, properly analyzed, shows confusion levels far below his estimates (and below relevant benchmarks for liability).

***Sixth,*** Rothschild will demonstrate at trial that he repeatedly made clear that he was the artist responsible for the *MetaBirkins*.  Hermès' contention—that Rothschild's profit motivation establishes *per se* bad faith—is wrong, and reflects the absence of any other supporting evidence. It is not enough that Rothschild sought to make money through the sale of his art and used his business acumen to increase his success—artists are allowed to sell their works, eat and pay rent, and typically make efforts to do so.

***Seventh***, the quality factor is inapplicable to the case at hand given courts' reticence to engage in aesthetic discrimination.

***Finally,*** the evidence will show that given the market prices of the parties' products, reasonable consumers would carefully consider the entire description of *MetaBirkins* and form an understanding of the origin of *MetaBirkins* before purchase, including understanding that the artworks are unaffiliated with Hermès.

As to the remainder of Hermès' claims, the evidence will show that (i) Rothschild's creation and sale of *MetaBirkins* artworks is "noncommercial" and (ii) the same flaws that plague Hermès' trademark infringement claims preclude its dilution, unfair competition, and cybersquatting claims.  All of Hermès' claims focus on the same speech that is protected under *Rogers*, which rejects the underlying premise of each of Hermès' claims: that artistically relevant depictions of trademarks can be wrongful in the absence of explicit falsity.

5. **Statement of Relief Sought**

Hermès seeks monetary relief from the jury for its Causes of Action in the form of (a) Rothschild's profits from the METABIRKINS NFTs project, which includes minting revenue, royalty revenue, and transfer revenue in the amount of approximately $231,000; and (b) statutory cybersquatting damages, not less than $1,000 nor more than $100,000.

Additionally, Hermès seeks monetary relief from the Court in the form of (a) a trebling of the jury's award of Rothschild's profits pursuant to 15.U.S.C. § 1117(a); (b) Hermès reasonable attorneys' and investigator's fees and costs, pursuant to 15.U.S.C. § 1117(a) and state law; and (c) post-judgment interest on all monetary awards.

Hermès also seeks permanent injunctive relief as detailed in Section 2.A. above.

Rothschild seeks a finding that his art is protected activity and seeks attorneys' fees and costs.

### 6. Witness Lists

Hermès's witness list is attached hereto as Exhibit 1.  Rothschild's witness list is attached hereto as Exhibit 2.

### 7. Exhibit Lists

Hermès's final exhibit list, along with Rothschild's particularized objections thereto, is attached hereto as Exhibit 3.  Rothschild's final exhibit list, along with Hermès's particularized objections thereto, is attached hereto as Exhibit 4.

### 8. Estimated Length of Trial

The parties estimate this jury trial will take approximately five (5) trial days.

Dated: January 27, 2023

/s/ *Gerald J. Ferguson*
**BAKER & HOSTETLER LLP**
Gerald J. Ferguson, Esq.
Oren J. Warshavsky, Esq.
Jessica H. Fernandez, Esq.
Francesca A. Rogo, Esq.
45 Rockefeller Plaza, 14th Floor
New York, NY 10111
Telephone: 212.589.4200

Deborah A. Wilcox, Esq. (*pro hac vice*)
Key Tower, 127 Public Square
Cleveland, OH 44114
Telephone: 216.621.0200

Lisa Bollinger Gehman, Esq. (*pro hac vice*)
1735 Market Street
Philadelphia, PA 19103
Telephone: 215.568.3100

*Attorneys for Plaintiffs*

Dated: January 27, 2023

/s/ *Rhett O. Millsaps*
**LEX LUMINA PLLC**
Rhett O. Millsaps II, Esq.
Rebecca Tushnet, Esq.
Christopher J. Sprigman, Esq.
Mark McKenna, Esq. (*pro hac vice*)
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: 646.898.2055

**HARRIS ST. LAURENT & WECHSLER LLP**
Jonathan Harris, Esq.
Adam B. Oppenheim, Esq.
Ashley Robinson, Esq.
40 Wall Street, 53rd Floor
New York, NY 10005
Telephone: 212.397.3370

*Attorneys for Defendant*