UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x

HERMÈS INTERNATIONAL and HERMÈS
of PARIS, INC.,

                    Plaintiffs,

          -against-                    22 CV 384(JSR)

MASON ROTHSCHILD,

                    Defendant.

-----------------------------------x

                              United States Courthouse
                              White Plains, New York

                              May 4, 2022

          (All parties appearing via teleconference)

                    THE HONORABLE JED S. RAKOFF,
                              District Court Judge

BAKER & HOSTETLER LLP (NYC)
          Attorneys for Plaintiffs
BY:  OREN J. WARSHAVSKY

LEX LUMINA PLLC
          Attorneys for Defendant
BY:  REBECCA TUSHNET

```
 1                  THE COURT:  This is Judge Rakoff.  Would counsel
 2      please identify themselves.
 3                  MR. WARSHAVSKY:  Good afternoon, your Honor.  This is
 4      Oren Warshavsky of Baker & Hostetler for the plaintiffs.
 5                  THE COURT:  Good afternoon.
 6                  MS. TUSHNET:  Good afternoon, your Honor.  This is
 7      Rebecca Tushnet from Lex Lumina.  I represent the defendant,
 8      Mason Rothschild.
 9                  THE COURT:  Good afternoon.
10                  So we're here on the motion to dismiss.  Let me hear,
11      first, from moving counsel.
12                  MS. TUSHNET:  Thank you, your Honor.  I'd like the
13      reserve some time for rebuttal, please.
14                  THE COURT:  My practice is to give rebuttal,
15      surrebuttal, and so forth until everyone's either exhausted or
16      has lost their voice.  So don't worry about that.
17                  MS. TUSHNET:  Thank you, your Honor.
18                  This case is about the difference between a handbag
19      and a picture of a fanciful, fake-fur covered handbag.  Like
20      Andy Warhol, Mason Rothschild made art.  His art sold online as
21      NFTs, which serve here as certificates of authenticity.
22      Because Rothschild made art, and because this is not a title
23      versus title case, *Rogers v. Grimaldi* applies, and Hermès has
24      not plausibly pled that the art is explicitly misleading, or
25      that Rothschild's use of MetaBirkins lacked artistic relevance
```

1    to his methods.  But this is not unfair, it's necessary for a

2    free society that trademark owners do not get to tell artists

3    what they can depict.

4         Dismissal here is required to prevent chilling

5    effects on artists who will know otherwise that they can only

6    depict famous brands if they can spend hundreds of thousands of

7    dollars for a successful defense.

8         The objective requirements of *Rogers*, artistic

9    relevance and explicit misleadingness, are evidenced on face of

10   the work and discovery will not add relevant evidence or make

11   explicit misleadingness or lack of artistic relevance

12   plausible.  *Rogers* clearly mapped out what was explicitly

13   misleading and what was --

14        THE COURT:  Let me ask you preliminarily about

15   *Rogers*.  Assuming arguendo that the *Rogers* test applies, *Rogers*

16   was decided on an appeal of summary judgment.  So your

17   adversary says that it doesn't, even assuming it otherwise

18   would apply, it still requires balancing the artistic nature of

19   the digital images and Rothschild's own intent and so forth and

20   that that's not appropriate on a motion to dismiss.  What about

21   that?

22        MS. TUSHNET:  Three points, your Honor.

23        First, in fact, courts in this circuit routinely

24   dismiss cases on a motion to dismiss in *Rogers* situations.  So

25   we cited *Brown v. Showtime Networks* and *Louis Vuitton v. Warner*

1  *Brothers*.  They cited *Medina v. Dash Films* and *Gayle v. Allee*.

2  These are all on a motion to dismiss.  There are a number of

3  others, in fact.

4          But second, in terms of rationale, *Rogers* provides

5  all the necessary guidance here.  It expressly holds that

6  ambiguous or explicitly misleading titles are not actionable,

7  and it offers examples of what would be explicitly misleading,

8  things that would be apparent on the face of the work.  No

9  amount of discovery will change what's on the face of the work,

10  and *AM General v. Activision* said very clearly and correctly,

11  no amount of evidence showing consumer confusion can satisfy

12  the explicitly misleading prong of the *Rogers* test because that

13  evidence goes only to the impact of the use on a consumer.  So

14  the parts of *Rogers* simply don't require this kind of fact

15  finding.

16          In addition, it's clear from the complaint and from

17  the exhibits that Rothschild is adamant that he's a creator.

18  So paragraph 100 of the complaint admits that the claim here is

19  one of implications not explicitness.  Then Hermès in 104, 105

20  complains that the disclaimer of affiliation with Hermès is too

21  much.  Even if Hermès doesn't like it, it negates any

22  possibility of explicit misleadingness.  And in fact, their

23  complaint that Rothschild was using too much disclaimer

24  highlights the wisdom of distinguishing explicit statements

25  from implication.  Hermès wants you to infer a connection from

1    both having a disclaimer and not having a disclaimer.  That's

2    exactly what *Rogers* instructs courts not to do, even if some

3    confusion might be reasonable under the circumstances.

4              THE COURT:  Okay.

5              MS. TUSHNET:  So I do want to go back, if I may, and

6    actually address the question of does *Rogers* apply, because you

7    said assume arguendo.

8              THE COURT:  Yes, right.

9              MS. TUSHNET:  And there are difficult questions about

10   art but whether static two-dimensional images are art is not

11   one of them.  Images are at the core of what the Supreme Court

12   has for nearly 100 years protected under the First Amendment.

13   Representations of real and unreal things are art.  Warhol's

14   paintings are art.  These are not functional.  There are no

15   allegations that you can put things in them, even within the

16   metaverse, and as such, they are pure representation and

17   therefore clearly, as was covered by *Rogers*, as the

18   Constitution requires.  *Rogers* points out that it's actually

19   the First Amendment that drives this interpretation of the

20   Lanham Act, it's not statutory.  It is the nature of

21   noncommercial speech, which includes speech that's sold for

22   profit, that makes it different from ordinary commercial

23   products like a Birkin or can of soup.

24              So whatever might be possible in the metaverse at

25   large, Hermès can't and hasn't alleged that these artworks are

1    anything other than two-dimensional artworks.

2         THE COURT:  What if the digital images that you're

3    selling had the word MetaBirkins in the image itself not just

4    in the title, would that change things?

5         MS. TUSHNET:  Your Honor, I don't think so, because

6    the question would still be about explicit misleadingness.  Of

7    course, in *Rogers v. Grimaldi*, when they distribute the movie,

8    it actually had *Ginger & Fred* printed on the copies of the

9    movie.  This is also, of course, true of *AM General* with the

10   Hummer shown in the advertising in the game itself, and in

11   fact, all the other cases decided under *Rogers*, including cases

12   like *Medina* and *Brown* and *Louis Vuitton v. Warner* where they

13   advertise the Louis Vuitton scene in the movie as a means of

14   touting the movie.  So I think that's actually inherent in

15   *Rogers*.

16        THE COURT:  Okay.

17        MS. TUSHNET:  And I want to say a little bit more

18   about what the art is here, because Andy Warhol depicted

19   mass-market objects at the height of 1960s mass culture.  Half

20   a century later, there is much greater inequality and a focus

21   on exclusivity.  And to interrogate current culture it makes

22   sense for Rothschild to make art about literally unobtainable

23   luxury.  He creates images of Birkins that don't exist.  He

24   actually challenges us to say, okay, what is luxury?  Why do

25   you value what you value?  Do you value it just because of the

1    image?  If that's so, that's something worth thinking about in

2    modern culture, and worth thinking seriously about whether this

3    is the kind of thing that we all want to be paying for, images

4    detached from any reality, and maybe we do and maybe we don't.

5    He might be a good artist, he might be a bad artist.  People

6    have very different opinions on Warhol and always have, but he

7    is still an artist.  He makes his art through communication and

8    not through selling physical objects.  I also -- excuse me.

9              THE COURT:  Go ahead.

10             MS. TUSHNET:  I just wanted to make a point about the

11   confusion that Hermès attempts to create in its briefing by

12   merging together *Rogers* cases and title versus title cases that

13   are influenced by *Rogers*.  So *Rogers* points out that the

14   categorical balancing that it mandates has to be different when

15   the plaintiff itself is known for and has the foundation of its

16   right in its own creative work, such as *Gone with the Wind* that

17   it's known for.

18             In a *Rogers* case, it's not a title versus title case,

19   so you do *Rogers* uninflected with anything else.  And you can

20   see that from *Rogers* itself, which only considers explicit

21   misleadingness and artistic relevance.  It doesn't do any

22   *Polaroid* balancing.  Cases after Rogers in the same vein, like

23   *AM General*, mention the *Polaroid* factors, but if you look at

24   them, actually don't do *Polaroid* balancing, because the

25   *Polaroid* factors generally go to implicit misleadingness not

1   explicit misleadingness.  Title versus Title cases are
2   different.  You still have to take account of the First
3   Amendment, but because of the greater potential for confusion,
4   you do a First Amendment inflected *Polaroid* analysis, still
5   giving very heavy weight to the First Amendment interest in
6   free expression.  But they're not the same, and Hermès'
7   foundation of its right is not in a title, that no *Polaroid*
8   analysis is required.
9         THE COURT:  Okay.  I think maybe it's time to hear
10   from plaintiffs' counsel, then we'll come back to defense
11   counsel.
12         MR. WARSHAVSKY:  Thank you, your Honor.
13         Your Honor, I think I would start with how my
14   adversary defined the issue.  The issue is the title for
15   artworks.  And I think my adversary's argument here is really
16   about the case that they think they've pleaded or maybe one
17   that they expect to happen after discovery rather than what's
18   in our complaint.  And what I would start with -- I'll address
19   the title piece shortly -- but what I would start with is all
20   the uses -- well, let me take a step back.
21         Our complaint alleges trademark infringement through
22   a real -- a series of conduct, a real course of conduct over a
23   few month period.  And much of that, much of those all
24   allegations have nothing to do with a title of the artwork,
25   they have to do with the opening of storefronts under the name

 1    MetaBirkins.  It has to do with a web page called MetaBirkins.

 2    It has with a Twitter handle and an Instagram account called

 3    MetaBirkins, all of which promote sales, all of which link to

 4    storefronts.

 5              In point of fact, also in our complaint, if your

 6    Honor would like, I can cite you to paragraphs.  Might take a

 7    moment but I can do.

 8              The defendant has actually marketed other NFTs under

 9    the MetaBirkins brand.  In effect, in our complaint, we

10    actually point to the fact that the defendant has created these

11    hashtag campaigns using the MetaBirkins' mark, and in point of

12    fact his contributors for other, the non-MetaBirkins NFTs still

13    use those MetaBirkins hashtag campaigns.  In all those

14    instances, MetaBirkins is being used as a trademark not as a

15    title to anything.  But then when we talk about, well, what are

16    NFTs and is this artwork, and we heard an interesting

17    discussion from Professor Tushnet, but what I would suggest is

18    that we look at, rather than the commentary about what we

19    believe the NFTs are meant to be commentary about and actually

20    compare it to the defendant's own words.  And in that, your

21    Honor, I would turn to Exhibit Y of the complaint, which is a

22    Yahoo finance article, and beginning at the bottom of the first

23    page, Mr. Rothschild, we'll call him a defendant, I'm not sure

24    what his real name is, he says, he starts by saying, "I mean,

25    for me, there's nothing more iconic than the Hermès Birkin bag.

1   And I wanted to see, as an experiment, if I could create the

2   same kind of illusion that it has in real life as a digital

3   commodity."  So he's calling it a commodity, not a work of art.

4           Later, in the same paragraph, he says, "Because I

5   feel like there's nothing stronger in this NFT space than

6   community and being able to garner the attention and build a

7   relationship with the consumer."

8           Later, further down on the second page of this

9   article, again at Exhibit Y, Mr. Rothschild is speaking and he

10  says, "I was explaining to somebody before, there's not much

11  difference between having the crazy car or the crazy handbag in

12  real life because it's kind of just that, that showing of like

13  wealth or that kind of explanation of success.  And now you're

14  able to bring that into the metaverse with these iconic NFTs

15  that have fetched crazy amounts of money."

16          If we skip to the bottom of that page, again, it's

17  the second page, he's asked by the interviewer, it's the last

18  question, the interviewer asks, "But do you have to look out

19  for counterfeiting, you know, in the NFT space?"

20          The defendant answers, "100 percent.  Actually, like

21  before my collection dropped, there was a bunch of like

22  counterfeit NFTs that weren't from my collection.  We're in the

23  process of like verifying mine on OpenSea."  Skipping a little,

24  further down he says, "So, yeah, like counterfeits are

25  definitely there."

```
 1              And I'm going to stop at that, your Honor, because
 2   what is a counterfeit?  What is the defendant -- let's take the
 3   defendant at his own words.  The defendant is not saying he's
 4   saying artwork, he's not saying he's commenting, he is telling
 5   you very plainly that he is trading off on the goodwill of
 6   Hermès and he's doing so to make money because there's a
 7   blurred distinction.  Because people just like they will pay
 8   for an iconic bag, he's hoping they'll pay for what he calls a
 9   digital commodity, and he once said others seeing the value are
10   counterfeiting his MetaBirkins.  So he may think he's a
11   terrific craftsman, but your Honor, so are the people selling
12   fake Rolexes and fake Hermès bags near the courthouse.  Those
13   are genuine -- I'm sorry, they're not genuine, they're far from
14   genuine.  Actually, they're great craftsmanship.  A lot of
15   people can't tell them apart.  Certainly there's artistic value
16   to any of this.  It doesn't allow for trademark infringement.
17   Here, what's happening is the defendant is trying to cash in on
18   Hermès' name and he has succeeded.
19              Mr. Rothschild, or again, whatever his name is, his
20   other works sell for nothing.  These sell for the same price as
21   Birkin bags.  Then we can look to the confusion.  I know for
22   trademark infringement we look to likelihood of confusion, but
23   at this stage I think I would just point -- we can go through
24   those factors, but I would point to the actual confusion.
25              Not surprising, because he's adopted the entire
```

1   Birkin trademark, Mr. Rothschild has confused *Elle* magazine, he

2   confused the *New York Post* fashion reporters, he confused an

3   intellectual property attorney giving a speech on NFTs and the

4   metaverse speaking at an intellectual property conference.  He

5   confused another journal called *L'Officiel*, I think.  It's all

6   cited in our complaint.  But he's also confused consumers.

7   Consumers, you can see, we've quoted a few in our complaint,

8   but they thought -- not only did they think it was from Hermès,

9   not only did they complain, they thought it was somehow

10  attached to a real Hermès bag, because that's what others have

11  done.

12          So I think, your Honor, when you look at the totality

13  of the defendant's conduct, this is trademark infringement.

14  It's no more, no less.

15          THE COURT:  If I were to conclude that your complaint

16  does not plausibly allege that Rothschild is currently selling

17  digital handbags, would I then have to grant the motion?

18          MR. WARSHAVSKY:  Not at all, your Honor.  I think

19  we've gone through the likely -- I hope we've gone through, in

20  a good way, the likelihood of confusion analysis, but it never

21  has to be the same goods.  Trademark infringement is about

22  whether or not -- the touchstone is a likelihood of confusion

23  and is the eight *Polaroid* factors, and it goes through whether

24  consumers would be confused.  And in fact, one of the factors

25  is likelihood, whether there's a likelihood of bridging the

1   gap.  And the likelihood of bridging the gap, it starts with

2   the assumption that the trademark owner is not in the space.

3   And there's plenty of cases, and I don't think we've cited

4   them, because I don't think we anticipated that question, but

5   we're happy to send you that, if you'd like, plenty of cases

6   where an infringer is not allowed into a certain zone where

7   those goods would confuse the ultimate consumer.

8           But, your Honor, it's not just trademark infringement

9   that's alleged in our complaint.  There's also cybersquatting

10  from taking the name, which is pretty simple, but also

11  dilution.  And that one, I think if you look at the test for

12  dilution, I think, again, we could -- Mr. Rothschild's

13  interview from *Yahoo Finance* would certainly cover that, but

14  certainly seems to hit the entire test, but we discuss that, I

15  think it's on page 15 of our opposition, but that dilution

16  assumes that -- or can include certainly cases where it's

17  different goods.

18          So I think under any of our causes of action the

19  identity of the goods is not the touchstone for the test.  It

20  could be relevant.

21          And your Honor, I'm not sure that -- your Honor, I

22  feel like through the briefing we used the term digital handbag

23  because that's what was being used in some places.  Other

24  places he used commodity.  I don't really know, in fairness,

25  what they call this other than it's an NFT, it's a digital

14

1  commodity, it looks like a handbag.  Whether it can be used to

2  store a phone.  I just don't know.  I don't know enough.  I

3  don't know that we know enough right now to get there.

4        What we're complaining about is the use of the name.

5  In fact, your Honor, I guess one point I would say with respect

6  to all of these is Birkin is not a word that otherwise exists

7  in the English language.  Birkin is a term that's unique, and

8  people hear the term Birkin, and we've alleged this in the

9  complaint, and we've given a lot of support for it, people hear

10  the word Birkin and they assume that it's Hermès, and everybody

11  identifies it with the iconic Hermès Birkin bag, much like they

12  would with Coca Cola.  If you hear Coca Cola -- if I see a

13  shirt that says Coca Cola, just because it's not a soft drink

14  doesn't mean it wouldn't be confused or that it might not be

15  confused that it's Coca Cola authorized or somehow associated

16  with or affiliated or endorsed by Coca Cola.

17        I don't know if I've answered your question.

18        THE COURT:  Yes, you have.

19        MR. WARSHAVSKY:  Okay.

20        THE COURT:  So anything else you wanted to say?

21        MR. WARSHAVSKY:  I don't think so.  I might just

22  touch, your Honor, on the issue with the disclaimer.  I think

23  we plead, and I think the law is pretty good in this regard,

24  your Honor, that a disclaimer, first of all, a lot of

25  disclaimers don't work.  Some of them actually sow seeds of

1   confusion.  Here, whether a disclaimer works or doesn't work

2   would be an issue of fact at the very least, and frankly, the

3   disclaimer is only on one of these storefronts.  So I think to

4   the extent the defendant wants to seek some sort of safe harbor

5   in the fact that one of the storefronts during the sale may

6   have had a disclaimer, the fact the rest didn't and he

7   continues to market certainly doesn't.

8           And I would also, your Honor, point -- I guess

9   there's a disclaimer after the fact is also looked at

10  differently, that's the *Chambers* case, your Honor.

11          And I would also, I think, go back to one other point

12  about the fact that this is a trademark usage, your Honor,

13  which is that we've alleged in our complaint, and obviously we

14  think it's true, that the defendant actually has said he's

15  going to set up a MetaBirkins marketplace and a MetaBirkins

16  exchange for the exchange of NFTs.  I'm not exactly sure I know

17  the difference between these two things are, however, that is

18  clearly, that is not -- there's nothing about it that's

19  artistic.  That's promotion.  That's using a trademark.  And I

20  believe that's all.  If anything else comes to me --

21          THE COURT:  I'll give you another shot in a minute.

22          MR. WARSHAVSKY:  Okay.

23          THE COURT:  Let me hear from moving counsel again.

24          MS. TUSHNET:  So Hermès counsel expressed some

25  uncertainty about what you call this.  What you call is this is

1    an image.  And indeed, Hermès' complaint repeatedly does.

2           Relatedly, the concept of commodity and the concept

3    of work of art are not opposites.  Your own bookshelves, your

4    Honor, undoubtedly feature many commodities with standard

5    exchange values that are fully protected by the First Amendment

6    because they are books and art.  Rothschild is asking with his

7    art where does aura come from.  The relationship between art

8    and commerce has been a major subject for artists for decades,

9    and the question that *Rogers* asks you to ask as a threshold

10   question is, is this an expressive work or is he selling an

11   ordinary consumer product like a can of soup?  And the answer

12   is clear and I don't think really contested here.

13          Relatedly, *Rogers* explicitly approved the marketing

14   activity surrounding a film, and for good reason.  And indeed,

15   subsequent *Rogers* case like *Empire* and *AM General* have also

16   done so explicitly.

17          Rothschild, like other artists, is allowed to tell

18   you what he created.  My esteemed colleague omits the things

19   he's calling storefronts, web page, Twitter, Instagram, all of

20   them about MetaBirkins telling you what he has created as an

21   artist.  And indeed, selling a picture is protected by the

22   First Amendment.  The fact that it sold for money does not

23   change the level of First Amendment protection it gets.  There

24   are no nonconclusory allegations that these marketing uses are

25   anything other than statements pointing to his authorship of

1    the MetaBirkins images.  So for example, Exhibit AZ he calls

2    MetaBirkins my previous project.  That type of promotion is

3    clearly allowed by *Rogers* itself.

4            In *Empire*, in fact, the defendants created an entire

5    brand connected to the *Empire* TV show, including marketing

6    performances by artists who had been featured on the show.  In

7    *louis Vuitton*, they marketed the movie with pictures of and

8    references to Louis Vuitton.  These results are logical because

9    the protection granted by the First Amendment who makes the art

10   also should allow artists to tell you what they have to offer.

11           So again, other cases that have granted motions to

12   dismiss have included allegations about marketing, for example,

13   *Brown v. Showtime Networks*, which we cite in our motion to

14   dismiss, alleged a marketing strategy of promoting the

15   plaintiff's appearance in the accused film.  After that, I

16   think there is not too much, although I want to make a couple

17   of comments about some various points.

18           In terms of Rothschild complaining about

19   counterfeits, he's created a copyrighted work, actually, he

20   created 100 of them, he has the right to object to unauthorized

21   copies, like the copyright of *Ginger & Fred* does, like

22   Activision does very actively with *Call of Duty*.

23           And with respect to actual confusion, just a couple

24   of points.  The existence of questions online actually

25   demonstrate that there's no explicit misleadingness.  Because

1    if the misrepresentation were explicit, there would be no need

2    to ask questions.

3            Relatedly, this is evidence of the effect not of

4    whether the artwork itself is explicitly misleading, and no

5    amount of implication adds up to being explicitly misleading.

6    Indeed, counsel's own discussion of the assumptions that people

7    are making demonstrates there's no explicit misleadingness.

8            Finally, and relatedly, the disclaimer can only

9    create an issue of fact if you're performing regular *Polaroid*

10   analysis.  It cannot create an issue of fact as to explicit

11   misleadingness.  I think that basically deals with the other

12   causes of action as well.  I will just mention that for

13   cybersquatting *Rogers* is a First Amendment test that carried

14   out the necessary balancing, and therefore, both logically

15   applies and informs your judgment of what counts as plausibly

16   pleading something.  It can't be bad faith to make a work that

17   is protected by the First Amendment and tell people that you

18   have made that work.

19           Relatedly, with dilution, along with First Amendment

20   as a direct barrier to a dilution claim, there is an explicit

21   exception for noncommercial uses, and as we explain in the

22   briefing, the courts and Congress have been clear that

23   noncommercial for the purpose of the dilution exception means

24   what it means for speech.  That is, is it speech that does

25   something more than propose a commercial transaction?  If it is

```
 1    a thing that is, in fact, being sold to you, that is
 2    noncommercial speech, like the New York Times, like a Warhol
 3    painting, and like other kinds of art.
 4              Thank you.
 5              THE COURT:  Thanks a lot.  Let me hear finally from
 6    plaintiffs' counsel.
 7              MR. WARSHAVSKY:  Thank you, your Honor.
 8              Your Honor, again, I know I said it before, I'm going
 9    to repeat it.  I feel like some of counsel's argument is really
10    more about a case they think we've pleaded but not apparent
11    from the pleadings, and I would start with the issue that
12    MetaBirkins are somehow commentary.  I don't know where -- we
13    read to you, I read to you earlier the defendant's interview.
14    Not once did he say it's commentary.  He says he's trying to
15    replicate Birkin bags.  It has nothing to do with commentary,
16    and it's not in the complaint anywhere.  His attorney -- on the
17    other side -- maybe ultimately the facts will yield this, but
18    not in the -- not in a lengthy complaint and all the exhibits
19    that we've provided is there anything about commentary.  And
20    the notion that it's just a title for artwork really does
21    ignore what's in the complaint.  And again, I would take your
22    Honor to the marketing of the other NFTs, which are called "I
23    Like You You're Weird," or we refer to ILYYW, I think.  That's
24    marketed under the MetaBirkins trademark.  MetaBirkins have
25    become a d/b/a for Mr. Rothschild.  It's not his name.
```

1          Turning to the books argument, I find it a curious

2     one.  Yes, a book is a commodity, but if I adopted your name,

3     your Honor, and started publishing a book, certainly you'd be

4     able to stop me.  That's not a trademark case.  I guess it

5     would be a right of publicity type case.  But ultimately, even

6     in the *Rogers* case there's a discussion about the Jane Fonda

7     book series and that you can't just turn the Jane Fonda workout

8     into a set of books and say it's Jane Fonda books, Jane Fonda

9     workout books, because that would be infringement.

10         And the Lanham Act generally, the Lanham Act does

11    have its own fair use, which is meant to be the negotiation

12    between the First Amendment and the Lanham Act.

13         In the *Rogers* case, I understand why counsel is

14    leaning so heavily on it but this is not like -- factually it's

15    just distinct.  And what I think this case is much more like,

16    your Honor, is your own case, *Chambers v. Time Warner*.  And In

17    *Chambers*, I assume you're familiar with it, but it is almost

18    two decades old, so just for the record, what I'll say is that

19    was the case where the plaintiffs were musicians, they brought

20    a claim in what remained in the 2003 decision, and your Honor

21    particularly in 2003 WL 7494922, where the plaintiffs brought a

22    claim -- they're musicians, recording artists that brought a

23    claim against MP3.com.  And MP3.com was using the plaintiffs'

24    names properly to identify an index the catalog, and the

25    plaintiff said the use of their name suggested an endorsement

1  under the Lanham Act.  The defendant responded that it was

2  nominative fair use, which is slightly different, I'll admit,

3  than the claim here.  But the test is still the same, it's

4  about likelihood of confusion.  And your Honor allowed the

5  complaint to go forward because you found that the plaintiff

6  had alleged there was a likelihood of confusion.  There was a

7  likelihood that consumers would believe that the songwriters or

8  musicians had, in fact, endorsed the MP3.com service.  So too,

9  here, we have an audience that believes that Hermès is behind

10 the MetaBirkins.

11          And the defendant, Mr. Rothschild, has a whole world

12 of names to pick from.  Why did he choose the MetaBirkins name?

13 Now we've heard a very nice discussion again from counsel about

14 that it was commentary.  I defy you to find that in anything

15 that's been submitted as part of the complaint.  But again,

16 what I would say, at best there's a factual issue.  I don't

17 even think you could grant summary judgment at this point in

18 light of the admission in the Yahoo article.  I could point to

19 the other evidence, but that Yahoo article in and of itself are

20 the plaintiff's own words; he was doing it to emulate the

21 Hermès Birkin brand, and he said it's blurry and he was trying

22 to cash in on it because it's an iconic brand that he could

23 trade its good will.  And that's my commentary, he didn't say

24 that last part.

25          What I will say, though, is what I find very

1    interesting is when counsel says, well, of course he could have

2    stopped lookalikes.  That is not what is in this article.  It's

3    about whether others could use the MetaBirkins name.  And if

4    Mr. Rothschild thinks that he could stop other people from

5    using the MetaBirkins name, it means that it's because he

6    believes it's his trademark.  And he certainly, if you look

7    through our complaint, he certainly is using it that way.

8            And so all we would say, your Honor, is take him at

9    his word and listen to him and our complaint reads right

10   across.  I would challenge that it's conclusory allegations,

11   but that's in front of your Honor to look at.

12           I don't know if there are other questions --

13           THE COURT:  Both of you have very ably addressed most

14   of the questions I had.  I will give, if there's anything

15   further that moving counsel wanted to say, I'll give her that

16   opportunity.

17           MS. TUSHNET:  Thank you, your Honor.

18           Since *Chambers* I don't believe is in the briefing, I

19   will just say quickly and without too much time spent reviewing

20   it, I will point out that right after *Chambers* came down,

21   *Dastar* was decided, which clearly eliminated the theory of the

22   case.  So that does relate to the *Dastar* argument, which I'd be

23   happy to talk about, but we've also briefed it.

24           The other things that counsel brought up I would say

25   *Rogers* itself clearly rejects the adequate alternatives test as

23

1    insufficient to protect artists First Amendment interest.

2    Titles can be integral parts of the work, they tell us how to

3    interpret the works.  And indeed, titles have trademark

4    functions, which is why the Court in *Rogers* found the need to

5    develop a special test.  If they didn't have trademark

6    functions, then we wouldn't be wondering about what is the

7    extent of a trademark owner's right to control title.  But

8    because they are inextricably intertwined with the

9    noncommercial elements, we do need a separate test regardless

10   of their trademark function.

11        And just last, in terms of whether this is

12   commentary, counsel read out Rothschild's statement that he was

13   trying to find out where aura comes from.

14        Is luxury about reality or is it only about image?

15   That's actually an artistic motivation.  We think that makes it

16   simple.  Thank you.

17        THE COURT:  Thank you very much.

18        I thank both counsel for this very helpful argument.

19   Also, thank you for your proposed case management plan, which I

20   will adopt, and of course it will be dependent on how I resolve

21   this motion, but assuming for the sake of argument we do go

22   forward, then that will be the governing schedule, and we will,

23   in terms of the case management, we'll set down the final

24   pretrial conference for November 4th at 4:00 p.m.

25        Since the first operative date is, in the case

 1   management plan, is May 9th, I will get you by no later than

 2   Friday afternoon of this week a bottom-line ruling on this

 3   motion, so we'll know whether we go forward or not.  I won't

 4   have time to write a full opinion, that will follow in due

 5   course, but you will at least know the bottom line and whether,

 6   therefore, we go forward or not.

 7            So I think that covers everything on my list;

 8   anything else counsel needed to raise?

 9            MR. WARSHAVSKY:  Not from the plaintiff, your Honor.

10   Thank you.

11            MS. TUSHNET:  No, your Honor.  Thank you.

12            THE COURT:  Thanks very much.

13            That concludes this proceeding.

14                              o0o

15

16

17

18

19

20

21

22

23

24

25