N1VsHER1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    HERMÈS INTERNATIONAL. et al.,

4                  Plaintiffs,

5           v.                          22 Civ. 384 (JSR)

6    MASON ROTHSCHILD,

7                  Defendant.

8    ------------------------------x
                                        New York, N.Y.
9                                       January 31, 2023
                                        9:30 a.m.
10
     Before:
11
                         HON. JED S. RAKOFF,
12
                                        District Judge
13                                      -and a Jury-

14

15                       APPEARANCES

16   BAKER & HOSTETLER LLP
          Attorneys for Plaintiffs
17   BY:  DEBORAH A. WILCOX
          OREN J. WARSHAVSKY
18        GERALD J. FERGUSON

19   HARRIS ST. LAURENT & WECHSCLER LLP
          Attorneys for Defendant
20   BY:  ADAM B. OPPENHEIM
          JONATHAN A. HARRIS
21
     LEX LUMINA PLLC
22        Attorneys for Defendant
     BY:  RHETT O. MILLSAPS, II
23

24

25

N1VsHER1

```
1              (Trial resumed; jury not present)

2              THE COURT:  We're unfortunately missing one member of

3    the jury who called in.  Actually two called in and said they

4    would be delayed, but one has now arrived.  So we'll need to

5    wait a few more minutes.

6              Let me raise an issue that I was already concerned

7    about yesterday, and as I thought about it last night, I got

8    more concerned.

9              I think it is important for the jury to have a

10   reasonable understanding of the technology involved in this

11   case and the terminology, and to be frank, I don't think the

12   witness now on the stand did a very good job of explaining it,

13   and it got even worse because his own report came out, when I

14   questioned him after the jury had left, arguably inconsistent

15   with his own testimony.  But here is my understanding, and let

16   me find out if anyone disagrees with this.

17             Although the term NFT is not always used consistently,

18   the predominant use is to refer to what I would call the

19   equivalent of a deed or indication of ownership of an

20   underlying image.  And like a deed, it's the subject -- if you

21   had a deed to a house, the deed of course would be recorded, in

22   this case in a blockchain; there would be a contract of sale,

23   in this case the smart contract; and of course what the

24   consumer would be interested in buying is the underlying house.

25             Now what makes, arguably, a complexity here is the
```

N1VsHER1

1    contract had a number of reservations, one of which was, in

2    theory, the ability of Mr. Rothschild to change the image

3    completely from what the consumer thought they were getting.

4    That didn't happen.  But I don't think it matters in this case

5    because what was held out consistently to the consumer was they

6    would be getting an image of a MetaBirkins, which is what they

7    got.

8            So that's my understanding, but if you disagree with

9    that understanding, let me hear that now.

10           MR. WARSHAVSKY:  Your Honor, if I might.

11           Oren Warshavsky, just for the court reporter.

12           Would you like me to stand?

13           THE COURT:  Sit but speak into the microphone.

14           MR. WARSHAVSKY:  I will do.

15           Your Honor, I think when it comes to Mr. Rothschild's

16   offerings, I think your description is likely spot -- I need to

17   think about it and process it, but I think it is likely spot

18   on.

19           I think the reason it's a little -- the NFTs are

20   broader than that -- you'll hear from Hermès and I don't think

21   the other side will disagree -- is that there are other uses

22   for NFTs.  So in this, Mr. Rothschild using it in connection

23   with the image and the reason -- but Hermès, the evidence will

24   show that, you know, and I think you may recall from our

25   papers, was exploring a number of different uses, as was

N1VsHER1

1   Mr. Rothschild at a time.

2             What you're going to hear from Hermès is the other

3   uses of NFTs it was considering.  The reason we want to raise

4   that is because there is the issue of likelihood to bridge the

5   gap and proximity of the products.  So we think it is important

6   to, you know, in terms of how to make that distinction, we're

7   not sure how to do that.

8             THE COURT:  OK.  That's fair enough.

9             But I think it would be useful, maybe even through

10  this witness, revisiting his testimony yesterday and saying, in

11  effect, what I just said in fairly clear-cut fashion so that

12  the jury has a better understanding than I think was presented

13  to them yesterday.

14            Let me hear from defense counsel.

15            MR. HARRIS:  Your Honor, we agree with your

16  characterization.  Mr. Rothschild, the MetaBirkins did not have

17  further uses.  I don't know exactly what Hermès has planned,

18  but we agree with your characterization as far as the

19  MetaBirkins.

20            THE COURT:  I think my recollection is that Hermès

21  raised the theoretical ability of Mr. Rothschild to change the

22  image when they were arguing summary judgment as to what tests

23  should apply, and I already determined the Rogers test applies.

24  So somehow that essentially dropped out of the case, I think,

25  for those purposes.

1          But I haven't really thought about it.  It may

2     possibly be relevant to Polaroid factors.  I'm just not sure.

3     OK.  So what I think would be useful is maybe, before you get

4     into damages, just take the witness through what we just

5     discussed as to which there is substantial agreement from both

6     sides, and you can use leading questions for that purpose as

7     far as I'm concerned, just to get that clarified for the jury.

8          If you don't want to do it, I'll do it.  Your choice.

9          MR. WARSHAVSKY:  I think we'll try to do it first.

10          THE COURT:  That's a good idea.

11          MR. WARSHAVSKY:  But if you could just, I guess, have

12     a few minutes just to go through and explore that.

13          THE COURT:  Fortunately, the only reason I raised it

14     now, we have a few minutes because the juror is not yet here.

15          By the way, my practice is if a juror is more than a

16     half hour late, then I, after consultation with counsel,

17     usually excuse the juror.  But I'm confident this juror will be

18     here before a half hour, so...

19          OK.  Anything else we need to raise?

20          MR. HARRIS:  Your Honor, we have one issue which we

21     would like to raise very briefly at a sidebar and

22     Mr. Warshavsky has agreed to that.

23          THE COURT:  That's fine.  If counsel who is

24     questioning the witness wants to go talk to the witness, I

25     don't need --

N1VsHER1

| | |
|---|---|
| 1 | It doesn't relate to this witness, does it? |
| 2 | MR. HARRIS:  It does not, your Honor. |
| 3 | THE COURT:  All right.  So the other counsel can |
| 4 | represent himself. |
| 5 | (At the sidebar) |
| 6 | MR. HARRIS:  Your Honor, we expect Mr. Rothschild to |
| 7 | begin testifying today, being called by Hermès, and |
| 8 | Mr. Rothschild has a heart condition.  If he starts to get a |
| 9 | rapid heartbeat, we might just ask for a five- or ten-minute |
| 10 | break to deal with that. |
| 11 | MR. WARSHAVSKY:  No objection.  I would like to raise |
| 12 | a similarly sensitive issue. |
| 13 | THE COURT:  Just out of curiosity, it's plaintiff's |
| 14 | right to call them on their case, but since I'm sure defense |
| 15 | counsel was planning to call him as well, why is he being |
| 16 | called at this sort of early stage in the case? |
| 17 | MR. WARSHAVSKY:  Just the elements of the case and |
| 18 | then because I think some of his testimony is necessary to our |
| 19 | elements, and we thought it works better in connection with the |
| 20 | following witnesses. |
| 21 | THE COURT:  Well, OK. |
| 22 | MR. WARSHAVSKY:  I don't mind if they want to switch |
| 23 | the order, where we go out of order and they start the direct. |
| 24 | I would -- |
| 25 | THE COURT:  That might make a lot of sense.  So even |

N1VsHER1

1    though he'll be called now, you'll do the direct --

2              MR. HARRIS:  That's fine.

3              THE COURT:  -- and the cross.

4              MR. WARSHAVSKY:  Can I think about that?

5              I spoke very quickly.

6              THE COURT:  Let me tell you my practice in that regard

7    which may help you make your decision.

8              If plaintiff calls the adversary defendant first and

9    gives their examination first, which of course they can do by

10   leading questions, the scope of that is not limiting on the

11   defense.  So the defense then gets to do what, in effect, was a

12   direct as well as what was addressed on the initial inquiry by

13   plaintiff's counsel.

14             But I allow, in that situation, defense counsel in

15   that examination to go by leading questions on the matters that

16   had been raised by the plaintiff in their examination because

17   it's, in effect, the functional equivalent of a redirect.

18             So if you want to avoid that complexity --

19             MR. WARSHAVSKY:  I understand.

20             THE COURT:  Yes.

21             MR. WARSHAVSKY:  I'll just confer with my co-counsel.

22   I would like to raise --

23             THE COURT:  I'll tell the jury, by the way, if you

24   decide to have that, it doesn't matter who goes first as far as

25   they are concerned and all of that.

N1VsHER1

1          MR. WARSHAVSKY:  Your Honor, I would like to raise a

2     sensitive issue which I just raised to my colleague.  I notice

3     my colleague, Jerry Ferguson, did not hear that.  That's the

4     first time, twice, like he didn't come to the sidebar, he

5     didn't hear when you said sustained, he looked puzzled.

6          I talked to him a little bit this morning about it,

7     because it didn't really hit me until last night.  I don't

8     think he's hearing as well, and I don't know what to do.  He's

9     going to turn finish the examination.  I told him what I

10    suggested to him, if he's not sure, to please say I'm sorry, I

11    didn't hear.

12          I hope that's OK?

13          THE COURT:  Of course that's OK.

14          MR. WARSHAVSKY:  It was a bit of a shock to both of

15    us.

16          THE COURT:  Well, I'm a little surprised because I'm

17    not known for my quiet voice, but thank you for raising that.

18          MR. WARSHAVSKY:  It was as you might expect.  I don't

19    want to say more on the record.

20          THE COURT:  Yes.  So hopefully he'll --

21          MR. WARSHAVSKY:  He's going to do it right away.

22          MR. HARRIS:  Could I just -- one other thing.  Two

23    other things.

24          If I'm going to put Mr. Rothschild on today, which I'm

25    happy to do, I understand it's your practice to ask for a

N1VsHER1

1  binder of exhibits.

2          THE COURT:  To ask for what?

3          MR. HARRIS:  I understand it's your practice to have a

4  binder of exhibits.  I was going to bring my binder tomorrow,

5  so I will...

6          THE COURT:  I can survive without a binder.

7          MR. HARRIS:  That's fine.

8          THE COURT:  Difficult though it may be.

9          MR. HARRIS:  Your Honor, we have one more issue we

10  would like to raise in open court.

11          (In open court)

12          THE DEPUTY CLERK:  I just spoke with juror No. four

13  Mr. Mraz.  At 9:51 he was at Canal Street.  Less than ten

14  minutes.

15          MR. MILLSAPS:  Your Honor, defendant has an issue to

16  raise.

17          THE COURT:  Yes.

18          MR. MILLSAPS:  In light of the court's rulings

19  yesterday and the fact that Rogers applies, defendant would

20  like to move to preclude testimony from Dr. Kominers'

21  plaintiff's expert scheduled to testify remotely because his

22  testimony is no longer relevant in this case.

23          His testimony appears to be for two things.  One is to

24  argue that MetaBirkins are not art, and the second, he's done

25  some math clustering analysis to make the point that, in his

1  view, the prices of the MetaBirkins NFTs were most likely due

2  to the use of the mark Birkin, but he admitted that at his

3  deposition, that in his analysis he didn't take account of the

4  art market and what was going on in the art market.

5         So, you know, defendant would submit that his

6  testimony is irrelevant, and it's really only likely to

7  befuddle the jury when he starts getting up and talking about

8  the difference between art only and digital brand NFTs, a

9  category that he appears to have made up for his expert report

10 in this case, which as far as we're aware he's never written

11 about in any peer-reviewed publication.

12        THE COURT:  Well, I'm sorry that, because of

13 unexpected conflicts on my end, I haven't yet gotten you my

14 written opinion on summary judgment, though I expect to be able

15 to get it to you in the next day or so.

16        The Rogers test was applied first at the motion to

17 dismiss stage on the pleadings.  It could not be said that

18 there was a total absence of artistic expression.  The Rogers

19 test was applied again by me at summary judgment because on the

20 evidence presented, there was, at a minimum, a genuine issue of

21 dispute, and probably better than that for the defendant as to

22 there being at least some expressive aspect of artistic

23 expression in what was being produced by Mr. Rothschild.

24        Once that clicks in, the Rogers test, in my view, then

25 is the right test.  I'm not sure -- and now that you have

N1VsHER1

```
1    raised this, I need to think about it more.  I'm not sure that
2    that means that they can't argue that either there was no
3    artistic expression or that it was so trivial that it doesn't
4    overcome the alleged confusion.  So I'm not yet sure whether
5    that's a ground for excluding that witness.
6         When we get to the final charge to the jury, it's
7    possible that I may -- I'm certainly going to say the Rogers
8    test is the applicable test.  That is for sure.  But I might
9    add that if you find, however, that there was little or no
10   artistic expression involved from a standpoint of a consumer,
11   as far as something you can take account of in applying the
12   test, because it's a balancing test.
13        I mean this is, I think, something everyone agrees on.
14   Trademark law is about consumer confusion.  Totally different
15   from copyright law.  It's not a question of you're preserving
16   your monopoly over your creation, whereas artistic expression
17   is a matter of constitutional right.  So that doesn't mean that
18   there can't be a trademark claim where there is artistic
19   expression involved.  It's not an automatic total defense, but
20   what, as I indicated even in the preliminary instruction that I
21   gave to the jury, the plaintiff has to show in addition to
22   trademark infringement or dilution or whatever, has to show
23   that there was, either intentional or otherwise, the situation
24   was set up in such a way that a consumer would necessarily
25   think this was not artistic expression, but a product of Hermès
```

N1VsHER1

1    or maybe's artistic expression.

2              We'll work on the exact wording of that later.  But

3    I'm not yet sure why that doesn't mean that they can't

4    introduce someone who says this is perceived by the consumer as

5    having little or no artistic expression.  I mean, if that is

6    what that expert says.

7              MR. MILLSAPS:  Your Honor, that expert actually

8    testified at his deposition that he can't tell you what is or

9    is not art in the way that the world understands art.

10             THE COURT:  Oh, well, then he joins all the rest of

11   us.  No, but that's relevant.

12             Let me hear from plaintiff's counsel.

13             MR. WARSHAVSKY:  Your Honor, nothing has changed.

14   This motion should have been made and it should be briefed.

15   Because the problem is, we disagree with how Mr. Millsaps just

16   described this expert.  This expert is actually explaining that

17   the reason for the sale of the MetaBirkins was because, and the

18   reason they fetched the prices they did, was because they were

19   assumed to be branded NFTs.  He was explaining what that means.

20   That has nothing to do with art or not art.  So this expert is

21   not --

22             (Continued on next page)

23

24

25

N1vnher2

1           THE COURT:  Okay.  What you are saying is he's saying

2      the way this was set up, the consumer or many consumers would

3      believe that they were purchasing whatever it was something

4      produced by Hermès?

5           MR. WARSHAVSKY:  Or a brand.  Because trademark you

6      have to think it comes from a source.  So whether it's

7      associated with Hermès, from Hermès, from somebody who is

8      associated with Birkin, they don't necessarily know that Hermès

9      makes Birkins, but they think it is a Birkin, it could be any

10     of those things.  I think the expert is going to drill down to

11     the whole idea.  When you talk about explicit misleadingness or

12     intent, sometimes we have an insight, but we usually do it

13     through indirect evidence.

14          THE COURT:  All right.

15          Let me ask you this:  When are we getting to this

16     expert?

17          MR. WARSHAVSKY:  The earliest would be tomorrow.

18          THE COURT:  All right.  What I think we should do is

19     have this expert along with counsel come in at 9:00 tomorrow,

20     and I will question the expert and get a better idea of exactly

21     what he is saying and not saying and what he can say and can't

22     say and I will make a ruling before he takes the stand.

23          MR. WARSHAVSKY:  Your Honor, just one point?

24          THE COURT:  Yes.

25          MR. WARSHAVSKY:  This is the expert who is appearing

N1vnher2

1    remotely.  We will have him available on time, but we will have

2    to set up the court system.

3             THE COURT:  Are you sure you don't want to sell

4    interest in his remote appearance as an NFT?

5             MR. WARSHAVSKY:  That would be another use that is not

6    artistic for the NFT, your Honor.

7             THE COURT:  All right.  That's fine, but he will be

8    able to hear me?

9             MR. WARSHAVSKY:  He will be able to hear you.  We are

10   doing it through the court setup.  I know that we were in touch

11   with your Honor's chambers this morning about the link and

12   everything.

13            THE COURT:  Okay.  By the way, I am very sorry the

14   juror is late.  I am sure it is not the juror's fault, but we

15   are going to 3:30 today as I mentioned, 3:30 tomorrow as I

16   mentioned.  I forgot the jury, but I had already told you about

17   a week ago that we are only sitting the morning of Thursday.

18   We are not sitting at all in the afternoon of Thursday.  So we

19   lose an hour and a half there.

20            I think we will need to go Friday until 4:30 to make

21   up for some of this time.  So that's the schedule.

22            All right.  Now, did plaintiff's counsel have a chance

23   to discuss with his colleague what we discussed at the sidebar

24   about whether --

25            MR. WARSHAVSKY:  We didn't.  If I could have three

N1vnher2

1    minutes.  We could bring it up -- we could tell defense counsel

2    during the morning break.  If not, I would ask for about three

3    minutes to talk to them.

4              THE COURT:  Okay.  That's fine.  I think I have run

5    out of things to discuss, but we are still --

6              THE DEPUTY CLERK:  Still waiting.

7              MR. WARSHAVSKY:  Your Honor, if I could take my

8    colleagues out, we could have that discussion right now.

9              THE COURT:  Okay.  Go ahead.

10             MR. HARRIS:  Would your Honor mind, may I talk to my

11   colleague about logistics?

12             THE COURT:  Yes.

13             MR. HARRIS:  Thank you.

14             (Pause)

15             THE COURT:  Okay.  What is your conclusion?

16             MR. WARSHAVSKY:  Your Honor, we are going to proceed

17   as you proposed, where defense counsel --

18             THE COURT:  Defense first on the direct of

19   Mr. Rothschild even though he's being called technically as

20   part of the plaintiff's case.  I see.  I will explain to the

21   jury that who calls and who goes first is irrelevant.  And it

22   is totally irrelevant.

23             So let's discuss for a moment, it is Juror No. 4 who

24   is still not here, although he said 20 minutes ago that he was

25   at Canal Street.  He comes from Sleepy Hollow, and he drives,

N1vnher2

1    which I think frankly is a mistake, but that's his option.

2    Today, because of the rain and a little snow, there were

3    traffic delays.  I remember hearing that on the radio early

4    this morning.

5              So I can understand that he is late, but if this were

6    to become a problem going beyond today, my inclination would be

7    strongly to excuse him.  I don't think, given the schedule we

8    already have, it's complicated enough, that we can continue to

9    have all the -- I mean, those poor other jurors all of whom

10   were prompt, are sitting there.  We're wasting time.

11             Does anyone disagree with that?  I won't do that

12   today.  But I would do it if tomorrow, or further days, he is

13   late for any significant amount of time, which I will define as

14   a half hour.

15             Any disagreement with that?

16             MR. WARSHAVSKY:  Not from plaintiff, your Honor.

17             MR. HARRIS:  Not from defendant, your Honor.

18             THE COURT:  Very good.  Okay.

19             (Pause)

20             THE COURT:  I am beginning to rethink.  If he's not

21   here in another 15 minutes -- so he will be an hour late --

22   then I'm inclined, subject to agreement of counsel, to excuse

23   him today.

24             We could discuss my courtroom deputy is very

25   disappointed that no one has called a psychiatric expert to

N1vnher2

explain why anyone would ever purchase an NFT, but we will

leave that alone.

       Yes, sir?

       MR. HARRIS:  Your Honor, we have someone from our

office who can going to be coming at some point this morning to

deliver some stuff.  Ms. Robinson is going to have to go down.

       THE COURT:  That's fine.

       MR. HARRIS:  Thank you.

       THE DEPUTY CLERK:  He's here.

       THE COURT:  All right.

       THE DEPUTY CLERK:  May I bring in the jury?

       THE COURT:  Yes.

       And let's get the witness on the stand.

 KEVIN MENTZER, resumed.

       (Jury present)

       THE COURT:  Please be seated.

       So, ladies and gentlemen, I understand, through no

fault of his, that one of the jurors was very seriously delayed

in traffic.  If we are going meet our schedule for this trial,

we need to really make every effort possible to start at 9:30.

So I don't know whether that juror wants to consider taking the

train or something like that; it might avoid these kinds of

problems.

       In any event, I just wanted to let you know that

counsel and I are working very hard to keep this trial on

N1vnher2                          Mentzer - Direct

1    schedule despite various other matters that all of us have to

2    deal with.  We will be in real trouble if we can't start at

3    9:30.

4              Anyway, as you know, we are only going to 3:30 today.

5              All right.  Counsel.

6              MR. FERGUSON:  Thank you.

7    DIRECT EXAMINATION (Continued)

8    BY MR. FERGUSON:

9    Q.  Good morning, Dr. Mentzer.

10   A.  Good morning.

11   Q.  Dr. Mentzer, when you testified yesterday you gave a

12   technical explanation of what an NFT is, is that correct?

13   A.  Yes.

14   Q.  And you also explained the relationship between NFTs and

15   digital files, is that correct?

16   A.  Correct.

17   Q.  Have you also done research in social media in which you

18   examined how NFTs are referred to in common parlance?

19   A.  Oh, sure.

20   Q.  In common parlance, when people are referring to an NFT,

21   generally what are they referring to?

22   A.  They're referring to the file that it is attached to, that

23   is attached to the blockchain transaction, so in this case the

24   image of the bag itself.

25   Q.  In the context of this particular case, if people are

1    referring to MetaBirkins, generally what are they referring to?

2    A.  They're generally referring to the image itself, yes.

3    Q.  Which image are they referring to?

4    A.  The MetaBirkins bag after the reveal.

5    Q.  Did you do a damage calculation in this case?

6    A.  Yes, I did.

7             MR. FERGUSON:  And if we could put this up on the

8    screen.

9             THE COURT:  Before we get to that, I want to make sure

10   everyone, including myself, most importantly the jury, are

11   clear about this.  If I understand what you are saying, the NFT

12   as a technical matter is like a certificate of ownership, a

13   deed to a house, something like that, rather than the house

14   itself.

15            Do I have that right?

16            THE WITNESS:  That's correct.

17            THE COURT:  But in common parlance, those two are

18   often merged together?

19            THE WITNESS:  Correct.

20            THE COURT:  And the NFT, like a deed to the house,

21   gets recorded on a blockchain?

22            THE WITNESS:  Correct.

23            THE COURT:  And it's the subject of a contract of

24   sale, which we've heard is called the smart contract, right?

25            THE WITNESS:  Correct, yes.

1          THE COURT:  And the smart contract, among other

2    things, gives the originator, in this case, Mr. Rothschild, the

3    ability to receive certain monies, even if the person who has

4    purchased the NFT then resells it?

5          THE WITNESS:  There is that capability in this case.

6    It is not embedded into the smart contract.

7          THE COURT:  Ah, it is not in the smart contract, just

8    what is there is part of the arrangement?

9          THE WITNESS:  In this case it was an arrangement he

10   had with the marketplace.  It is not with the smart contract.

11         THE COURT:  Very good.

12         Go ahead, counsel.

13         MR. FERGUSON:  Thank you, your Honor.

14   BY MR. FERGUSON:

15   Q.  Dr. Mentzer, can you identify for us what's on this screen.

16   A.  This is a summary slide that I prepared to show both the

17   total revenue that Mason Rothschild would have received and the

18   total expenses that he would have incurred to deploy the

19   MetaBirkins smart contract.

20   Q.  The information that is here, where did you derive this

21   information?

22   A.  I derived this using the transaction histories off of the

23   Etherscan.io site.

24   Q.  Is Etherscan.io an account showing -- is Etherscan.io

25   showing records that are on the blockchain?

1    A.  Yes, that's correct.

2    Q.  Did you do any analysis of transactions that took place off

3    the blockchain?

4    A.  No, I did not.

5    Q.  Is it possible that transactions took place off the

6    blockchain?

7    A.  Not in the transfer of the digital assets of the

8    MetaBirkins, but there could have been other arrangements made

9    for other assets, yes.

10   Q.  Is it possible that Mr. Rothschild received compensation in

11   connection with the NFTs that wasn't received on the

12   blockchain?

13   A.  I suppose so, sure.

14   Q.  And is it possible he had expenses that aren't on the

15   blockchain?

16   A.  Absolutely.

17   Q.  And you are not offering any opinion as to anything that

18   took place off the blockchain?

19   A.  Correct.

20   Q.  Mr. Rothschild can tell us about that if there's anything

21   needed to supplement this information?

22   A.  Correct.

23   Q.  I would like to break down the elements of your calculation

24   here.

25            Let's first talk about the minting revenue.

N1vnher2                        Mentzer - Direct

             Could you just remind us what minting revenue is?

A.   That is the initial revenue received when somebody created

one of the original NFTs, so that would have been paid back to

the smart contract owner.   There were a hundred MetaBirkins

created and every wallet that minted one of those paid .1 ETH

for a total of 10 ETH.

Q.   What records did you look at to determine the information

you gave us about the amount that was paid for each minting

right?

A.   I looked at the transactions related to the minting smart

contract on the blockchain.

Q.   Is this image shown here an example of one of the

transactions you looked at?

A.   Correct.

Q.   Did you look at these records for each minting transaction?

A.   Yes, I did.

Q.   Let's talk about the royalty element of your calculation

now.   Did you do a calculation based on records on the

blockchain of all revenue generated from resales of MetaBirkins

NFTs?

A.   Yes, I did.

Q.   And can you describe for us what is shown on this slide?

A.   I found that there were a total number of 59 resales of

MetaBirkins for a total of 1.176662.55.

Q.   These transactions were actually in Etherium, or ETH, is

1   that correct?

2   A.   Correct.

3   Q.   How did you get the U.S. dollar numbers?

4   A.   I used the U.S. dollar figure as available on Etherscan.io

5   which is a representation of the value at the time of the

6   transaction.

7   Q.   And in calculating royalties, did you also look at the

8   transaction history of the MetaBirkins that you described

9   earlier?

10  A.   Yes, I did.

11  Q.   Is this one of the transaction histories you looked at?

12  A.   Yes, it is.

13  Q.   Are there rows in this slide that you particularly looked

14  at in determining the royalty calculation?

15  A.   Yes, the transaction, action, and the token transferred

16  sections.

17  Q.   What information about royalties are you able to glean from

18  this?

19  A.   We can see from the first line shown here that this was a

20  sale that occurred on the LooksRare platform.  The total amount

21  paid was 1.5 wrapped ETH, which is the equivalent of an ETH,

22  and the token exchange was 47.

23          In the bottom section we can see how that money was

24  then disbursed.

25          So, starting from the bottom, 1.3575 ETH valued, at

N1vnher2                         Mentzer – Direct

1    the time at $3,310.39, went back to the seller of this

2    MetaBirkins NFT.

3            The .1125 representing $274.34 was transferred to the

4    MasonRothschild.ETH account and the 73.16 would have been the

5    fees charged on the LooksRare platform.

6    Q.  The $274.34 as you have just described, that was the

7    royalty that went to Mr. Rothschild?

8    A.  Correct.

9    Q.  And this calculation, this just relates to one specific

10   transaction --

11   A.  Yes.

12   Q.  -- is that correct?

13           And you mentioned the LooksRare, this was a LooksRare

14   transaction.  You discussed this yesterday, but remind us what

15   LooksRare is.

16   A.  LooksRare is an NFT marketplace.

17   Q.  And did you look at other NFT marketplaces where

18   MetaBirkins were resold?

19   A.  Yes, I looked at both OpenSea and Rarible.

20   Q.  For each transaction did you calculate the royalties

21   involved?

22   A.  I did.

23   Q.  So Rarible was another marketplace you looked at?

24   A.  Correct.

25   Q.  And OpenSea was another marketplace you looked at?

1    A.  Yes.

2    Q.  And did you calculate total royalty revenue?

3    A.  Yes, I did.

4    Q.  Can you explain what you calculated?

5    A.  Using the transaction level detail from the blockchain, I

6    was able to derive that Mason Rothschild would have received

7    1.1325 ETH from Rarible, 1.0785 ETH from LooksRare, and

8    15.30817 ETH from OpenSea.  And the date, based on each of the

9    dates of the transactions, using the dollar value from

10   Etherscan, that was the total U.S. dollar amounts for those

11   transactions.

12   Q.  These royalties that you calculated, as of what date are

13   these royalties?

14   A.  They are the date of the sale, of the resale of the

15   MetaBirkins NFT.

16   Q.  Is this information current as of today?

17   A.  I believe so, yes.

18   Q.  And are these the most royalties that will ever be

19   received, or is it possible more royalties will be received in

20   the future?

21   A.  It would be expected that more would be received in the

22   future, yes.

23   Q.  And in what circumstance would that be?

24   A.  Any subsequent sale, resales.

25   Q.  So in response to some questioning from Judge Rakoff,

1    earlier you were explaining how the royalties are set.

2              Could you elaborate on that point.

3    A.  So there's two ways that it can happen.  So they can either

4    be set within the smart contract itself -- I examined the smart

5    contract here, and there were no royalty settings in there.  So

6    the other way is that the collection owner can set the royalty

7    up when they're setting the collection up on the various

8    marketplaces and set the fee that they want to receive at that

9    time.

10   Q.  And when you refer to "collection owner" in that last

11   answer, who are you referring to?

12   A.  The person or the wallet that's in control of the

13   MetaBirkins smart contract.

14   Q.  Going back to I think a slide I showed you a little while

15   ago, this is your complete calculation of revenue received in

16   connection with the MetaBirkins transactions to date?

17   A.  Yes, it is.

18   Q.  In addition to minting revenue we have discussed and

19   royalties revenue, which we have discussed, there's a category

20   MetaBirkins NFT transfers.  Can you explain to us what that

21   category is.

22   A.  So during my investigation I found that the

23   MasonRothschild.ETH wallet received three MetaBirkins after the

24   minting had occurred, and each of those transactions did not

25   have a dollar value attached to them, meaning he was given

1    those MetaBirkins NFTs.  So I looked at the prior sale before

2    each of those transfers to get a dollar value on what those

3    transfers would be worth.

4    Q.  And what was that dollar value?

5    A.  The total for the three was 28.5 ETH.

6    Q.  For the "Fees Paid" row, can you explain what you are

7    capturing in that row.

8    A.  Sure.  There's various fees that any NFT creator incurs, so

9    there are fees with putting the transactions on chain.  So the

10   creation of the smart contract has the fees as they're changing

11   the pointers, those have fees; establishing the minting

12   contract had fees.

13        So I looked at all the fees -- we call them gas

14   fees -- I looked at all of those fees and totaled those up to

15   come up with that figure of roughly .82 ETH.

16   Q.  And what was the dollar amount, U.S. dollar amount of those

17   fees?

18   A.  $3,669.

19   Q.  Based on your calculation and based on your review of the

20   records available on the blockchain, can you calculate the net

21   value in ETH of -- can you tell us the net value in ETH of the

22   compensation received by the Mason Rothschild account in

23   connection with meta Birkins?

24   A.  The total would have been 55.20249714 ETH, valued at

25   $231,055.76.

1              MR. FERGUSON:  No further questions.

2              THE COURT:  Cross-examination.

3    CROSS-EXAMINATION

4    BY MR. MILLSAPS:

5    Q.  Good morning, Dr. Mentzer.

6    A.  Good morning.

7    Q.  My name is Rhett Millsaps, and I represent Mason

8    Rothschild.  Thank you for being here today.

9              Yesterday you were asked a number of questions about

10   NFTs, and I just want to make sure that I understand your

11   testimony.

12             MR. MILLSAPS:  Ashley, could you please show the

13   witness the MetaBirkins.

14   BY MR. MILLSAPS:

15   Q.  Dr. Mentzer, on your screen you'll see just images of the

16   MetaBirkins NFTs that were sold in this case.

17             THE COURT:  Is this in evidence?

18             MR. MILLSAPS:  This is an image.

19             THE COURT:  Excuse me?

20             MR. MILLSAPS:  This should be a demonstrative exhibit.

21             THE COURT:  No.  It is not being used as a

22   demonstrative.  Take it down.  If you want to offer it, that's

23   a different question.

24   BY MR. MILLSAPS:

25   Q.  Dr. Mentzer, I just want to make sure that I understand.

N1vnher2                    Mentzer - Cross

1    The images that we have seen of the MetaBirkins, the colorful

2    imaginary Birkin fur bags, those are the images that you --

3    those are what you mean when you talk about MetaBirkins NFTs,

4    correct?

5    A.   That is correct.

6    Q.   And the MetaBirkins NFTs are flat, two-dimensional digital

7    pictures, correct?

8    A.   At this time, yes.

9    Q.   So they are not virtual wearables in the sense that some

10   fashion companies are putting out virtual wearables in virtue

11   worlds, is that correct?

12   A.   That's correct.

13   Q.   And they are not useable as handbags in the sense that 3D

14   digital objects are usable in certain digital environments,

15   correct?

16   A.   Not with current technology, no.

17   Q.   Did you follow what was going on in the world of NFTs in

18   2021?

19   A.   I did.

20   Q.   Would it be fair to say that in 2021, the majority of NFTs

21   being sold were, and traded were digital art NFTs?

22   A.   I would classify them as digital collectibles, but very

23   similar, yes.

24   Q.   And what's the difference to you between digital art and

25   digital collectibles?

N1vnher2                          Mentzer - Cross

1   A.   I think of art as a Mona Lisa and a collectible as a

2   baseball card, so I think NFTs can be broken out into those

3   categories.

4   Q.   Would you consider Andy Warhol's Campbell's soup cans

5   paintings to be collectibles or art?

6            MR. FERGUSON:   Objection.

7            THE COURT:   Sustained.   Foundation.

8   BY MR. MILLSAPS:

9   Q.   Dr. Mentzer, are you familiar with Andy Warhol's Campbell's

10  soup cans paintings?

11  A.   Yes, I am.

12  Q.   Are you aware it is a series of images of Campbell's soup

13  cans?

14  A.   Yes, I am.

15           MR. FERGUSON:   Objection.

16           THE COURT:   No.   Overruled.   This is appropriate for

17  an expert.

18  BY MR. MILLSAPS:

19  Q.   Would you consider the series of images of Campbell's soup

20  cans painted by Andy Warhol to be art or collectibles?

21           MR. FERGUSON:   Objection.

22           THE COURT:   Overruled.

23  A.   I would consider those art.

24  Q.   And why would you consider those art and not collectibles?

25  A.   Because I grew up being told they were art, and the

N1vnher2                    Mentzer – Cross

1  artist's intention and the painting of the actual images and

2  the groundbreaking nature of the series at the time.

3  Q.  Dr. Mentzer, is it your understanding that people collect

4  art?

5  A.  Of course.

6  Q.  I would like to just go to a few questions about the

7  metaverse.  Am I correct that yesterday you said that a

8  metaverse is a virtual or augmented reality environment or

9  space where people can have an avatar that represents them and

10  interact with the virtual environment?

11  A.  That's correct.

12  Q.  Is Twitter a metaverse?

13  A.  I don't think I would classify that as a metaverse, no.

14  Q.  Is Instagram a metaverse?

15  A.  I don't believe so.

16  Q.  Is Discord a metaverse?

17  A.  No.

18  Q.  Is Facebook a metaverse?

19  A.  No.

20  Q.  I'd like to turn to Mr. Rothschild's revenues from the

21  MetaBirkins that we were just discussing.

22          You recall that you were just testifying about your

23  calculations of revenue received by Mr. Rothschild for

24  MetaBirkins?

25  A.  Correct.

N1vnher2                          Mentzer – Cross

1   Q.  You calculated three streams of revenue, am I right?

2   A.  Yes.

3   Q.  One of those was minting fees?

4   A.  Uh-huh.

5   Q.  And one was royalties?

6   A.  Yes.

7   Q.  And one was NFT transfers, correct?

8   A.  Correct.

9   Q.  The revenue that you testified about that we saw -- the

10  revenue that you were testifying about Mr. Rothschild receiving

11  was an ETH cryptocurrency, is that right?

12  A.  Correct.

13  Q.  Mr. Rothschild never received dollars for MetaBirkins as

14  far as you are aware, right?

15  A.  As far as I am aware, no.

16  Q.  So the charts that we were just looking at that had dollar

17  values were a conversion of what the ETH that Mr. Rothschild

18  received at the time was worth at that time, in December of

19  2021, is that right?

20  A.  Correct.

21  Q.  Do you know what the value of that ETH would be in dollars

22  today?

23  A.  Not to the point, but it would be significantly less.

24  Q.  So then the dollar numbers that we saw on the chart that

25  you just testified would be significantly less today for that

N1vnher2                     Mentzer - Cross

1    same amount of ETH --

2    A.  Correct.

3    Q.  -- is that right?

4         And you testified that Mr. Rothschild -- actually I am

5    not sure if you testified about this, but you wrote in your

6    expert report that Mr. Rothschild received three MetaBirkins

7    NFTs on December 3, 2021, is that right?

8    A.  That's correct.

9    Q.  Do you know if Mr. Rothschild still owns those three

10   MetaBirkins?

11   A.  He still owns one of those.

12   Q.  And how do you know that?

13   A.  Because I can see that he then gave two of those to

14   subsequent wallets after he received them.

15   Q.  And do you know who the owners of those wallets are?

16   A.  No, I do not.

17   Q.  Now, the minting process for the MetaBirkins NFTs took

18   place through the metabirkins.com website, isn't that right?

19   A.  I don't know that.

20        MR. MILLSAPS:  Can we please, Ashley, show the witness

21   his expert report, which is marked as Plaintiff's Exhibit 55.

22   It's page 13 of the report.

23        THE COURT:  I think you actually have a hard copy of

24   it there as well.  It is on the left-hand -- no, no, no, where

25   it says Exhibit 1.

1              THE WITNESS:  Thank you.

2    BY MR. MILLSAPS:

3    Q.  This would be tab 55 in your binder, Dr. Mentzer.  We are

4    looking at page 13.  Dr. Mentzer, do you see that you wrote in

5    your report here, "This minting appears to have occurred

6    through the website mint.metabirkins.com"?

7    A.  Correct.

8    Q.  Would that be associated with the metabirkins.com website?

9    A.  That was my assumption at the time, yes.

10   Q.  And when you say that was your assumption at the time, were

11   you making an assumption here?

12   A.  I was not -- I did not create this image.  It was supplied

13   by you.

14   Q.  So you actually don't know which site the MetaBirkins were

15   minted through?

16   A.  Correct.

17   Q.  Now, if this were correct, and the MetaBirkins were minted

18   through the metabirkins.com website, then am I right that the

19   people who minted the MetaBirkins website, who minted the

20   MetaBirkins NFTs had to go through the MetaBirkins website to

21   do that?

22   A.  Technically, no.  They could have initiated it in some

23   other way as long as they were on the white list.

24   Q.  Mr. Rothschild charged ETH that was worth at the time

25   approximately $450 apiece from minting the MetaBirkins NFTs, is

1  that correct?

2  A.  That's correct.

3  Q.  It was after the MetaBirkins NFTs were minted that people

4  started buying and selling them on the open market for the

5  equivalent of tens of thousands of dollars, is that right?

6  A.  It started during the minting process, but, yes, after the

7  initiation of the minting process, yes.

8  Q.  But nobody paid Mr. Rothschild thousands or tens of

9  thousands of dollars for a MetaBirkins NFT, is that right?

10  A.  Not that I am aware of, no.

11        MR. MILLSAPS:  Ashley, could we show the witness

12  Plaintiff's Exhibit 83, which is in evidence.

13  BY MR. MILLSAPS:

14  Q.  Dr. Mentzer, I'm showing you Plaintiff's Exhibit 83, which

15  we were looking at yesterday and which was admitted into

16  evidence.  Do you recall testifying that the MetaBirkins NFTs

17  were associated with this image at the beginning of the minting

18  process?

19  A.  No.  This was the one that occurred after the first three

20  were minted.

21  Q.  After the first three were minted?

22  A.  Correct.

23  Q.  Okay.  But 97 of the MetaBirkins NFTs were associated with

24  this image initially?

25  A.  Yes, yes.

N1vnher2                    Mentzer - Cross

1   Q.  And those MetaBirkins NFTs were associated with this image

2   for less than 24 hours, am I right about that?

3   A.  That's correct.

4   Q.  So soon after minting was completed, the veiled image here

5   was replaced by the 97 unique MetaBirkins images, is that

6   right?

7   A.  All 100, yes.

8   Q.  All 100.

9           And those 100 MetaBirkins images have remained the

10  same from approximately December 3, 2021, to today, haven't

11  they?

12  A.  Yes, they have.

13  Q.  Are you aware that Mr. Rothschild publicly previewed the

14  MetaBirkins images in the weeks leading up to the NFT minting?

15  A.  I am not.

16  Q.  Did you do any research to see whether he might have shown

17  the MetaBirkins images before minting took place?

18  A.  The only research I did was to look at news articles so I

19  could know what I was looking for.

20  Q.  Did you ever look at the MetaBirkins website?

21  A.  Probably at some point, yes.

22  Q.  Have you looked at any communications from the MetaBirkins

23  Discord server?

24  A.  No, I have not.

25  Q.  Did you ever look at the MetaBirkins Instagram page?

N1vnher2                          Mentzer – Cross

1  A.  No.

2  Q.  Did you ever look at the MetaBirkins Twitter account?

3  A.  I don't believe so.

4          MR. MILLSAPS:  I have no further questions at this

5  time, your Honor.

6          THE COURT:  Any redirect?

7          MR. FERGUSON:  No redirect, your Honor.

8          THE COURT:  Thank you very much.

9          You may step down.

10         THE WITNESS:  Okay.

11         (Witness excused)

12         THE COURT:  Am I right that Mr. Rothschild is going to

13 be the next witness?

14         MR. WARSHAVSKY:  No, your Honor.  It will first be

15 Mr. Martin.

16         THE COURT:  Okay.

17         Please call your witness.

18         MR. WARSHAVSKY:  Plaintiffs will call Nicholas Martin.

19  NICHOLAS MARTIN,

20     called as a witness by the Plaintiff,

21     having been duly sworn, testified as follows:

22         THE COURT:  Now, we have a translator here?

23         THE INTERPRETER:  Yes, your Honor.

24         THE COURT:  Identify yourself for the record.

25         THE INTERPRETER:  Bertrand Sciberras.

1             THE COURT:  Do you want to swear him in.

2             (Interpreter sworn)

3             THE COURT:  Do I understand that the witness is able

4    to understand and speak in English for the most part, but he

5    will use the translator if necessary to clarify?

6             MR. WARSHAVSKY:  That's right, your Honor.

7             THE COURT:  Very good.

8             MR. WARSHAVSKY:  Your Honor, may we furnish the

9    witness and your Honor with the exhibit binders?

10            THE COURT:  Yes.

11   DIRECT EXAMINATION

12   BY MR. WARSHAVSKY:

13   Q.  Good morning, Mr. Martin.

14   A.  Good morning.

15   Q.  By whom are you employed?

16   A.  Hermès International.

17   Q.  Where is Hermès International located?

18   A.  In Paris, France.

19   Q.  What type of entity is Hermès International?

20   A.  It is the holding company of the Hermès Group.

21   Q.  About how many companies sit under Hermès International?

22   A.  A little bit more than 130.

23   Q.  Where are those subsidiaries located?

24   A.  In France and abroad.

25   Q.  Do you know how many different countries they are located

N1vnher2                    Martin - Direct

1   in?

2   A.   I think it covers a little bit more than 35 different

3   countries.

4   Q.   What is your position at Hermès International?

5   A.   I am the group general counsel.

6   Q.   Can you briefly describe your responsibilities as the group

7   general counsel?

8   A.   I head the legal team in France and abroad, and I am in

9   charge of all legal topics for all entities in all the world.

10  Q.   Have you always held this position?

11  A.   No.

12  Q.   How long have you worked at Hermès International?

13  A.   Almost 19 years.

14  Q.   I am just going to back up a little bit and ask you a few

15  questions about your background.

16            Where are you from?

17  A.   I'm from France.

18  Q.   Where in France?

19  A.   I am born in Lyons.

20  Q.   Can you tell us about your educational background?

21  A.   I studied law at the University of Lyons Trois in Lyons,

22  France.

23  Q.   Did you receive a degree?

24  A.   Yes.

25  Q.   What degrees do you hold?

N1vnher2                         Martin - Direct

1    A.   I have a bachelor in law and two master's degrees in

2    business law.

3    Q.   Are you a lawyer in France?

4    A.   Yes.

5    Q.   When did you graduate from the university?

6    A.   1997.

7    Q.   And what did you do after graduating from college -- or

8    graduating from the university?  I'm sorry.

9    A.   I did a few internships in France and in Spain, and then I

10   started working in a law firm in Argentina.

11   Q.   How long did you work there?

12   A.   Two years and a half.

13   Q.   What did you do after that?

14   A.   I moved back to France, and I started working at Hermès.

15   Q.   What was your position when you first joined Hermès?

16   A.   I was in-house counsel.

17   Q.   What were your responsibilities?

18   A.   I was in charge of intellectual property matters.

19   Q.   How long did you have this position?

20   A.   I held this position for six years.

21   Q.   What did you do next?

22   A.   I joined Ralph Lauren in Geneva, Switzerland.

23   Q.   That's Ralph Lauren?

24   A.   Ralph Lauren, the U.S. company.

25   Q.   What was your position at Ralph Lauren?

N1vnher2                          Martin - Direct

1   A.  I started as senior counsel, and I was promoted as legal

2   director.

3   Q.  And what were your responsibilities there?

4   A.  I was dealing with all kinds of business/legal matters,

5   real estate, contract.

6   Q.  What did you do after that?

7   A.  I went back to Hermès in Paris.

8   Q.  In what capacity did you go back to Hermès?

9   A.  I was the intellectual property director.

10  Q.  What region did that cover?

11  A.  The entire -- all countries.

12  Q.  What were your responsibilities as the intellectual

13  property director?

14  A.  I was in charge of securing, protecting, and defending the

15  intellectual property rights of the group.

16  Q.  By "the group" you mean Hermès?

17  A.  Yes.

18  Q.  How long did you hold that position?

19  A.  Six years.

20  Q.  So that takes us to about 2016?

21  A.  Yes.

22  Q.  And what position did you have after that?

23  A.  I was promoted to deputy general counsel.

24  Q.  What responsibilities did you have as the deputy general

25  counsel?

N1vnher2                        Martin - Direct

1    A.   In addition to intellectual property, I was also in charge

2    of business law in general.  And I was assisting the group,

3    deputy at the group general counsel.

4    Q.   How long did you hold that position?

5    A.   Three years.

6    Q.   So until 2019?

7    A.   Yes.

8    Q.   And what position did you have next?

9    A.   The one I have today.

10   Q.   Can you tell the jury a little bit about the origin of

11   Hermès.

12   A.   So Hermès is a French family-owned company.  Its origin

13   dates back to 1837.  Initially, it was a workshop that was

14   manufacturing bridles, harnesses, and saddles for horses and

15   horse carriages.

16   Q.   Has the business changed since then?

17   A.   Yes.

18   Q.   When did the business start changing?

19   A.   One of the main transitions took place at the beginning of

20   the 20th century when the car appeared, and there was this

21   transition from the horse to the car.

22   Q.   And did Hermès' business continue to change over time?

23   A.   Yes.

24   Q.   How?

25   A.   Because -- sorry.

N1vnher2                         Martin - Direct

1   Q.  Go ahead.

2   A.  Because of the transition from the car, which at that

3   time -- from the horse, sorry, which at that time was our main

4   client, we needed to switch to the car, so we started

5   manufacturing luggages, handbags.  And after that step by step

6   we expanded our activities to other products like jewelry

7   products, silk products.

8   Q.  How would you describe Hermès as a company today?

9   A.  I would say it's a house of creation and craftsmanship

10  focused on the idea of manufacturing and creating very

11  high-quality, lifestyle products.

12  Q.  What is the value of intellectual property to Hermès?

13  A.  We are a house of creation, so intellectual property rights

14  are very important for Hermès.

15  Q.  How does Hermès value its trademarks generally?

16  A.  Of course, we consider it's one of our main assets.

17  Q.  Does Hermès have a position on the value of the Birkin

18  trademark?

19  A.  The Birkin trademark is used to identify our best-selling

20  products.  So I would say after the Hermès trademark, it's

21  probably our most important trademark.

22  Q.  Does Hermès place a monetary value on the Birkin trademark?

23  A.  No.

24  Q.  Why not?

25  A.  Because we are never to have a specific figure.  For us it

N1vnher2                          Martin - Direct

1    is invaluable.

2    Q.   I'm sorry.  Did you say "unvaluable" or "invaluable"?

3    A.   Invaluable.  Sorry, sorry.

4    Q.   How many product does Hermès offer?

5    A.   I would say thousands.

6    Q.   And where do the Birkin products rate in terms of how they

7    sell?

8    A.   Where are they sold you mean?

9    Q.   No.

10   A.   Sorry.

11   Q.   No.  Not geographically.  Where do Birkin bags rank --

12   A.   Ah, sorry.

13   Q.   -- in the scheme of the product offered by Hermès?

14   A.   As I said, for us it's our best selling product.

15   Q.   Can you tell us a little bit about the customer demand for

16   the Birkin?

17   A.   It's very high.

18   Q.   What do you mean by that?

19   A.   I mean that it's so high that we are unable to satisfy all

20   the demand.

21   Q.   Does Hermès have a position on why the Birkin bag has been

22   successful?

23   A.   Of course, because of its design, because of its -- the raw

24   material that we use, which is a very high quality, because of

25   the craftsmanship that is used, the know-how that is used to

1   manufacture the same, and because it became like a status

2   symbol.

3   Q.  Does Hermès have an idea about how -- let me ask it

4   differently.  Does Hermès know how customers use their Birkin

5   bags?

6   A.  I mean, they are various ways that you use a bag.  Of

7   course, first it's a bag, so it's something that you can wear

8   you can put your items in it.  I think as I mentioned earlier,

9   the Birkin bag is more than a bag.  It is something that you

10  own, that you are proud to show, that you are engaged with, so

11  the way of living is also to own the same.

12              (Continued on next page)

1   BY MR. WARSHAVSKY:

2   Q.  And yesterday we saw the testimony of Robert Chavez.

3        Do you remember that?

4   A.  Yes.

5   Q.  Did you hear Mr. Chavez talk about the wish list?

6   A.  Yes.

7   Q.  Does Hermès keep track of how many wish lists there are?

8   A.  No.

9   Q.  Can Hermès currently meet demand for the Birkin trademark?

10  A.  No.

11  Q.  Does Hermès create that scarcity?

12  A.  No.

13  Q.  So what explains that scarcity?

14  A.  The first point is the raw material we use.  We only use

15  very high-quality raw material.  And unfortunately we are

16  unable to find sufficient raw material to manufacture more

17  bags.

18        The second is linked to the knowhow that is requested

19  in order to manufacture a handbag.  And unfortunately, despite

20  the fact that we tried to open new manufacturing unit and to

21  train new craftsman, we are unable to have sufficient

22  experience, experienced craftsman to manufacture all the bags.

23  Q.  Does Hermès consider the Birkin handbag itself to be

24  famous?

25  A.  Yes.

1   Q.  Why is that?

2   A.  Because it's our top-selling product, our most iconic bag,

3   and our bag, the product division where we the fame of Hermès

4   is more important.

5   Q.  Does Hermès consider the Birkin trademark to be a famous

6   trademark?

7   A.  Yes.

8   Q.  Why is that?

9   A.  Because it identifies our most iconic products and because

10  it is used in all the press and media to describe one of the

11  most iconic-owned bag.

12  Q.  I would like to now show you a few Birkin bags.

13          MR. WARSHAVSKY:  Your Honor, may I approach the

14  witness with the handbags?

15          THE COURT:  Yes.

16  Q.  So let's start with what's been marked as Exhibit 26, which

17  is the black Birkin handbag.  Can you maybe hold that up.

18          Is that in fact a Birkin handbag?

19  A.  Yes.

20          MR. WARSHAVSKY:  Your Honor, we would offer Exhibit 26

21  into evidence.

22          MR. MILLSAPS:  No objection, your Honor.

23          THE COURT:  Received.

24          (Plaintiff's Exhibit 26 received in evidence)

25  Q.  While you're holding the handbag, can you show us some of

1  the distinctive features of the Birkin handbag?

2  A.  I would say it's rectangular shape, the flap, the leather

3  flap, which three lobes, the metallic pieces that we call

4  *touret*, where you put the two leather strap, and then at the

5  two leather strap, you have a swivel clasp where you can put

6  the lock and to lock your -- to close your bag.  And this very

7  specific small piece of leather, which we call the *clochette*

8  because is the shape of a small bell which is *clochette* in

9  French, where the keys are, and we put this leather in order to

10  protect the bag from being damaged by the keys.

11  Q.  And is there anything distinctive about the handles?

12  A.  The particularity, the two handles with the shape.

13  Q.  Thank you.

14      What colors do the Birkin bags come in?

15  A.  I would say all colors.

16  Q.  I would like you to -- the bag that is in the front with

17  the orange top, can you hold that bag?

18  A.  Yes.  Sorry.

19  Q.  Can you tell us what that is?

20  A.  This is a specific collection of Birkin bag.

21  Q.  Does it have a name?

22  A.  It's name Rainbow.

23  Q.  When did this bag come out?

24  A.  2020.

25      MR. WARSHAVSKY:  Oh, I'm sorry.  Your Honor, plaintiff

1   offers Exhibit 35 into evidence.

2            MR. MILLSAPS:  No objection.

3            THE COURT:  Received.

4            (Plaintiff's Exhibit 35 received in evidence)

5   Q.  Does Hermès make Birkin handbags with different materials?

6   A.  Yes.

7   Q.  Does Hermès make Birkin handbags with different prints and

8   designs?

9   A.  Yes.

10  Q.  If I could ask you to pick up the third handbag that's

11  there.

12           Is that a Birkin handbag?

13  A.  Yes.

14  Q.  Does that have a name?

15  A.  It's name Faubourg tropical.

16           MR. WARSHAVSKY:  And plaintiff would offer Exhibit 13

17  into evidence.

18           MR. MILLSAPS:  No objection.

19           THE COURT:  Received.

20           (Plaintiff's Exhibit 13 received in evidence)

21  Q.  Can you tell us a little bit about the design of this

22  handbag?

23  A.  So it's a specific collection because on the bag you have

24  the design of a facade, which is called Faubourg tropical, and

25  it's embroidered.  Embroidered, it's a word difficult to say.

1    Sorry.

2              So you have this very specific design, and it comes

3    from a scarf that has been designed by two artists, Octave

4    Narsal and Theo de Getz.

5    Q.  Are those two artists employees of Hermès?

6    A.  No, they are not.

7    Q.  And yesterday Mr. Chavez spoke about the typical time for a

8    Birkin bag.

9              Did you hear that?  Did you hear when he talked about

10   that?

11   A.  The what?  Sorry.

12   Q.  The typical time it takes a craftsman to make a Birkin bag?

13   A.  Yes.  Sorry.

14   Q.  OK.  And he spoke about generally being 18 to 24 hours.

15             How long does it take to make a bag like the Faubourg

16   tropical?

17   A.  I don't have the exact numbers, but Narsal and de Getz that

18   I referred to, because the embroidery takes a long time, I

19   don't have the exact number.

20   Q.  So you talked a little about the leather for the Birkin

21   bags.

22             From where does Hermès source the leather for its

23   Birkin bags?

24   A.  The large majority, I think it is 96 percent, of our

25   leather is actually a buyback from the food industry.

1    Q.  What do you mean by that?

2    A.  It means it's waste that we collect and that we give a

3    second life through -- through the leather and the use we make

4    of the same.

5    Q.  And that's about how much, what percentage?

6    A.  96.

7    Q.  I think you spoke a little bit about media coverage.  I

8    just want to go back over that.

9            Does the Birkin handbag get media coverage?

10   A.  Yes.

11   Q.  I can move those bags.  We don't have to...

12           MR. WARSHAVSKY:  Your Honor, is it OK if Ms. Damian

13   moves the bags?

14           THE COURT:  Yes.

15           Did you want to circulate the bags to the jury?

16           MR. WARSHAVSKY:  If they would like to see them, sure.

17           THE COURT:  Well, I don't know what is in their head,

18   but if I were them, I would like to see them.

19           MR. WARSHAVSKY:  OK.

20           THE COURT:  Why don't we circulate them to the jury.

21   Recognizing, of course, that there is no charge for just

22   looking.

23           (Pause)

24           All right.

25           MR. WARSHAVSKY:  Thank you.

1            I apologize.  I lost my place a little bit.  I'm just

2    going to -- I apologize if I asked a question a second time.

3    BY MR. WARSHAVSKY:

4    Q.  How often does the Birkin handbag get media coverage?

5    A.  Constantly.

6    Q.  Does Hermès pay for that media coverage?

7    A.  No.

8    Q.  Is unsolicited media coverage important to Hermès?

9    A.  Of course.

10   Q.  Why?

11   A.  Because it's genuine coverage, meaning we don't pay for the

12   same.

13   Q.  Why would that be important or valuable to Hermès?

14   A.  Because it shows that the magazines are interested in our

15   products and that they -- they -- they are placing the same in

16   their articles without us paying for that.

17   Q.  And now we've looked at three Birkin handbags.

18           Have any of those three received press coverage?

19   A.  Yes.

20   Q.  We would like to show the witness, but not the jury,

21   Exhibit 16.  If you can look in the book.

22           Are you familiar with that document?

23   A.  Yes.

24   Q.  Did Hermès compile that document?

25   A.  Yes.

N1VsHER3                         Martin - Direct

 1   Q.  Can you tell us generally what that document is?

 2   A.  It's press keeping from fashion magazine.

 3            MR. WARSHAVSKY:  Your Honor, we would offer Exhibit 16

 4   into evidence.

 5            MR. MILLSAPS:  No objection.

 6            THE COURT:  Received.

 7            (Plaintiff's Exhibit 16 received in evidence)

 8            MR. WARSHAVSKY:  Can you turn to page four of that

 9   document.

10            It's OK to show this to the jury, your Honor?

11            THE COURT:  Yes.

12            MR. WARSHAVSKY:  Humberto, if you could turn to page

13   four.  Thank you.

14   BY MR. WARSHAVSKY:

15   Q.  Is there a Birkin bag on this page?

16   A.  Yes.

17   Q.  OK.  Can you tell us generally where it is?

18   A.  It's the yellow bag which is on the left side.

19   Q.  Is this a bag that Hermès offers for sale?

20   A.  Yes.

21   Q.  Did Hermès pay for this image to be included in this

22   magazine?

23   A.  No.

24   Q.  Can we turn to page six, please.

25            Can you tell me what is displayed on this page?

1   A.  Various articles and a Birkin bag.

2   Q.  Do you know the name of this handbag?

3   A.  Yes.  It's the same collection as the one we showed.  It's

4   the Rainbow.

5   Q.  But it's slightly -- it seems to be slightly different

6   colors, is that right?

7   A.  Yes.  It's not exactly the same colors because in the

8   collection, you had two different type of colors.

9   Q.  Did Hermès pay for this ad?

10  A.  No.

11  Q.  Did Hermès -- it's not an ad, I'm sorry.

12          Did Hermès pay for this picture?

13  A.  No.

14  Q.  Did Hermès create this picture?

15  A.  No.

16  Q.  Did Hermès provide this picture to anybody?

17  A.  No.

18  Q.  Can we turn to page eight, please.

19          Can you tell us generally what is on page eight?

20  A.  You have a bird and a bag, which is an Hermès bag.

21  Q.  Do you know the name of this bag?

22  A.  It's Birkin contour, specific collection of Birkin bag.

23  Q.  Once again, did Hermès or somebody working for Hermès take

24  this picture?

25  A.  No.

1   Q.  Did Hermès pay for this picture to be shown in this

2   magazine?

3   A.  No.

4   Q.  Do you know when this bag was introduced?

5   A.  2018, I think.

6   Q.  Did Hermès provide this picture to this magazine?

7   A.  No.

8   Q.  Can we go to page ten, please.

9           Can you tell me what is shown in this picture?

10  A.  It's another type of Birkin bag.

11  Q.  And what's it called?

12  A.  It's called Fray Fray.

13  Q.  Is this a bag that Hermès makes?

14  A.  Yes.

15  Q.  What materials -- is this a Birkin bag?

16  A.  Yes, it's a Birkin bag.

17  Q.  And what materials is this made from?

18  A.  It's made of leather and canvas.

19  Q.  If we can go to page 12.  If we look at the bottom of the

20  page.

21          Is that another picture of a Birkin bag?

22  A.  Yes.

23  Q.  Can you tell us the name of that Birkin bag.

24  A.  It is named Faubourg.

25  Q.  Is there a meaning to the name?

1  A.  Yes, it's because the design on the bag corresponds to the

2  facade of our Faubourg store, which is our historical store in

3  Paris.  Faubourg.

4  Q.  When you say corresponds, I just want to -- do you mean

5  it's a --

6        Do you mean that to be it's a depiction of the

7  storefront?

8  A.  Yes.  The design corresponds to the depiction of the

9  facade.

10  Q.  If we could see there's text here.  Maybe if I could have

11  you just read the first line through Birkin on the second,

12  starting with this holiday season?

13  A.  This holiday season, Hermès injects a dose of quirkiness

14  and humour into its iconic Birkin.

15  Q.  Thank you.

16        Did Hermès provide this text?

17  A.  No.

18  Q.  Did Hermès write this text?

19  A.  No.

20  Q.  When did the Faubourg Birkin get released?

21  A.  2019.

22  Q.  Is there anything about the clochette on this bag?

23  A.  Yes, you're right.  The clochette, it's not the same shape

24  as the one I describe earlier.

25        On this specific collection, we played on the

N1VsHER3                          Martin - Direct

1   clochette.  And you can see it has a shape of our orange paper

2   bag, which is a bag that you take when -- that we give you when

3   you buy a product at our store.

4   Q.  Can we turn to page 30.

5            Are all of these Birkin bags?

6   A.  Yes.

7   Q.  Did Hermès take this picture?

8   A.  No.

9   Q.  Did Hermès provide this picture to this magazine?

10  A.  No.

11  Q.  For all the bags that we've seen so far, are these bags

12  sold in the United States?

13  A.  Yes.

14           MR. WARSHAVSKY:  I would like to show the witness

15  Exhibit 377.  Just the witness.

16  Q.  Can you tell us generally what this document is?

17  A.  It's a press magazine where you can see Birkin bag.

18  Q.  Have you seen this document before?

19  A.  Yes.

20  Q.  Is this also from Hermès' compilations?

21  A.  Yes.

22           MR. WARSHAVSKY:  Your Honor, we would offer

23  Exhibit 377 into evidence.

24           MR. MILLSAPS:  No objection.

25           THE COURT:  Received.

```
 1                 (Plaintiff's Exhibit 377 received in evidence)

 2                 MR. WARSHAVSKY:  If we can then show --

 3                 THE COURT:  Counsel, we need to find a time in the

 4     next five minutes to give the jury their morning break.

 5                 MR. WARSHAVSKY:  I think if I can go through this

 6     document.

 7                 THE COURT:  That's fine.

 8     BY MR. WARSHAVSKY:

 9     Q.  Can we go to page four of this document, please.

10                 Is this a Birkin bag?

11     A.  Yes.

12     Q.  Does this Birkin bag have a name?

13     A.  Yes.  One, Two, Three and Away We Go.

14     Q.  Can you describe a little bit about the design on the

15     Birkin bag here?

16     A.  It's Birkin bag where we placed the design of our scarfs,

17     which is named One, Two, Three and Away We Go.  So that's why

18     this Birkin bag has this name.

19     Q.  And was the design created by an artist?

20     A.  Yes.

21     Q.  Do you know the name of the artist?

22     A.  Yes.  His name is Nigel Peake.

23     Q.  Nigel Peake?

24     A.  Nigel Peake.  Sorry.

25     Q.  Is Mr. Peake an employee of Hermès?
```

```
1    A.  No, he's not.

2    Q.  Is it unusual for Hermès to work with outside artists?

3    A.  No, it's not.

4    Q.  Is this an Hermès advertisement?

5    A.  No.

6    Q.  If we can turn to page eight.

7             If you can read -- I'm sorry to do this to you.  If

8    you can read just the beginning of the first sentence?

9    A.  The whimsical name for a whimsical bag, the One, Two, Three

10   and Away We Go Birkin comes from architect, illustrator, and

11   artist, Nigel Peake.

12   Q.  Did Hermès write this language?

13   A.  No.

14   Q.  Did Hermès provide this language to the press?

15   A.  No.

16   Q.  I'm going to try to quickly take you to look at a few other

17   bags.  Could we turn to page nine, please.

18             Can you tell us what this is?

19   A.  It's a specific collection of Birkin bag named So Black

20   because it is all black, including the metallic pieces, the

21   hardware.

22   Q.  Could we turn to pages 18 to 19.

23             Can you tell us what's depicted in 18 and 19?

24   A.  It's a Birkin bag.

25   Q.  Is this a bag sold by Hermès?
```

1    A.  Yes.

2    Q.  And did Hermès provide these pictures here?

3    A.  No.

4    Q.  And the bags we have seen in this exhibit, are these all

5    sold by Hermès in the United States?

6    A.  Yes.

7              MR. WARSHAVSKY:  That's all for this exhibit, your

8    Honor.

9              THE COURT:  All right.  Ladies and gentlemen, we'll

10   take our midmorning break for 15 minutes.

11             We'll see you in 15 minutes.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Jury not present)

 2              THE COURT:  The witness can step down.  We'll see you

 3    in 15 minutes.

 4              (Recess)

 5              Let's get the witness back to the stand.

 6              MR. WARSHAVSKY:  Your Honor, may we quickly give you

 7    this.  You asked for this during the break.

 8              THE COURT:  Yes.

 9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Go ahead, counsel.

3              MR. WARSHAVSKY:  Thank you, your Honor.

4    BY MR. WARSHAVSKY:

5    Q.  Can you please call up Exhibit 14 for the witness to see.

6              Have you seen this document before?  It's also

7    Exhibit 14 in your binder.

8    A.  Yes.

9    Q.  Is this document created by Hermès?

10   A.  Yes.

11             MR. WARSHAVSKY:  Offer Exhibit 14 into evidence.

12             MR. MILLSAPS:  No objection.

13             THE COURT:  Received.

14             (Plaintiff's Exhibit 14 received in evidence)

15             MR. WARSHAVSKY:  If we can also furnish it to the jury

16   now.

17   BY MR. WARSHAVSKY:

18   Q.  Mr. Martin, can you tell us what Exhibit 14 is?

19             Can you look through the images and tell us what this

20   is?

21   A.  It's a Birkin bag made of leather and fur.

22   Q.  Can you tell what kind of leather?

23   A.  Crocodile skin.

24   Q.  Is this a product of Hermès?

25   A.  Yes.

1    Q.  Did Hermès sell this bag?

2    A.  Yes.

3    Q.  Just to make sure, is this a Birkin bag?

4    A.  Yes, it's a Birkin bag.

5    Q.  Thank you.

6            MR. WARSHAVSKY:  Humberto, can you please show the

7    witness Exhibit 15.

8    Q.  Have you seen this document before?

9    A.  Yes.

10   Q.  Did Hermès create this document?

11   A.  Yes.

12           MR. WARSHAVSKY:  We offer Exhibit 15 into evidence.

13           MR. MILLSAPS:  No objection.

14           THE COURT:  Received.

15           (Plaintiff's Exhibit 15 received in evidence)

16   Q.  Can you tell us generally what this is?

17   A.  It's a Birkin bag.

18   Q.  What is it made from?

19   A.  Leather and fur.

20   Q.  Did Hermès sell this bag?

21   A.  Yes.

22   Q.  OK.  We heard from Mr. Chavez that Hermès has registered

23   the Birkin mark in the U.S.

24           Do you recall that testimony?

25   A.  Yes.

1   Q.  Do you know about how many -- does Hermès trademark

2   registrations in other places?

3   A.  Yes.

4   Q.  Do you know about how many trademark or how many other

5   countries Hermès has registered its Birkin trademark?

6   A.  I would say around 60.

7   Q.  Are all those registrations owned by the same company?

8   A.  Yes.

9   Q.  Which company?

10  A.  Hermès International.

11  Q.  The same one that owns the U.S. registrations?

12  A.  Yes.

13  Q.  You mentioned a number of subsidiaries.

14          Do they have permission to use the mark?

15  A.  Yes, or the retail subsidiaries of Hermès have the

16  exclusive right to use the Birkin mark in their country.

17  Q.  Switching gears a little bit.  We heard Mr. Chavez discuss

18  a little bit about the metaverse.

19          Does Hermès have plans to enter the metaverse?

20  A.  Yes.

21  Q.  Can you briefly describe for the jury what those plans are?

22  A.  I only have a general view of the same, but I know for

23  instance that the communication department is working on a

24  small metaverse called miniverse, which would be a place an

25  individual can interact.

N1VsHER3                        Martin - Direct

1    Q.   Do you know the specific plans?

2    A.   No.

3    Q.   Who would?

4    A.   Ambre-Elise Binoche.

5    Q.   And she is scheduled to testify here at this trial?

6    A.   Yes.

7    Q.   Does Hermès have plans with respect to NFTs?

8    A.   Yes.

9    Q.   Can you briefly describe those plans?

10   A.   Yes.  As I said, I have a general view of the same.  There

11   is one which is related to what we call a digital twin.  The

12   idea being to have attached to a physical good an NFT which

13   would be the twin of the physical good, which in the NFT, you

14   could have all the detail of the bag.  So you can track the

15   same and secure the same to combat fraud.

16        That's one of the project I'm aware of, but I know we

17   have various other project.  I have seen NFT being used to

18   attend events.  So I think it's called attendance NFT.  So when

19   you attend an event, you can keep with you an NFT.  And I think

20   we showed one example in the opening.

21        And I also know that we are considering using NFT

22   associated to a physical good in order to enhance the

23   experience of our customers.  You can imagine, for instance,

24   you buy our scarfs and your NFT gives you access to a digital

25   file where your scarf is moving and you find the story and the

1    characters are moving.

2              That's the kind of project I'm aware of.

3    Q.  Do you know the specifics of those plans?

4    A.  No.

5    Q.  Who would?

6    A.  Maximilien Moulin.

7    Q.  And Mr. Moulin is an Hermès employee?

8    A.  Yes.

9    Q.  And he'll be here to testify as well?

10   A.  Yes.

11   Q.  And do you know any of the specifics of the developments of

12   those plans right now either for the NFTs or metaverse?

13   A.  No.

14   Q.  Is Hermès doing anything to protect its marks in the

15   metaverse or for NFTs?

16             Let me ask that question better.  Do you know whether

17   Hermès is doing anything to protect its trademarks either for

18   use in the metaverse or with respect to NFTs?

19   A.  Yes.

20   Q.  What is Hermès doing?

21   A.  I mentioned earlier that our trademarks are our main

22   assets.  So of course it is important for us to protect the

23   same on the digital web, so we applied for registration of our

24   marks to convert digital goods in order to avoid any third

25   party to try to register the same.

1  Q.  Does Hermès have an understanding of whether other fashion

2  brands have entered the metaverse?

3  A.  Yes.

4  Q.  Can you tell me what other brands Hermès is aware of

5  participating in the metaverse?

6  A.  I don't have of the specific projects, but I know most of

7  the luxury brands actually entered -- have a plan in relation

8  to NFT.  Gucci is probably the most -- one of the most famous.

9  Louis Vuitton did something to.  Prada, Balenciaga, and you

10 have other brands like Nike, Adidas.

11 Q.  Does Hermès look to what other brands are doing with either

12 luxury -- I'm sorry -- with either the metaverse or NFTs?

13 A.  Yes.

14 Q.  Why is that?

15 A.  I mean, some say that the Web3, the blockchain, the NFT,

16 and the metaverse is part of the future of the luxury industry.

17 We don't know, and only time will tell.  But as I said, we have

18 a very creative innovative company, thanks to the creativity

19 that we have been in this condition from the house to the car.

20 I'm not necessarily comparing the transition from the house to

21 the car as a transition that we face today.  But for sure, the

22 Web3, and all I mention, NFT blockchain is part of our future

23 and it's important for us to look at it and to protect our

24 brand in this universe.

25 Q.  Do you know whether other fashion brands have filed

 1   trademark applications for NFTs?

 2   A.  Yes.

 3   Q.  How do you know?

 4   A.  Because, as I mentioned earlier, we are looking at what the

 5   industry is doing in this new territory.

 6   Q.  Does that include in the United States?

 7   A.  Yes.

 8   Q.  Are you aware of whether other -- are you aware of whether

 9   other fashion brands have faced a situation where third parties

10   have filed trademark applications for their trademarks?

11           MR. MILLSAPS:  Objection, foundation relevance, then

12   hearsay.

13           THE COURT:  Well, clearly hearsay.

14           Sustained.

15   Q.  When did you first learn about the MetaBirkins NFTs?

16   A.  It was on November 30, 2021.

17   Q.  How did you learn about the MetaBirkins NFTs?

18   A.  I received a call.

19   Q.  From whom?

20   A.  It was a third-party individual.

21   Q.  Do you remember that individual's name?

22   A.  Yes.

23   Q.  What's that individual's name?

24   A.  Alexander Torkaman.

25   Q.  Do you know who Mr. Torkaman is?

N1VsHER3                         Martin - Direct

1    A.  I didn't know at that time, but he introduced himself as

2    being a member of the AWS family.

3    Q.  What did Mr. Torkaman say to you?

4    A.  He just informed me of the coming launch of the MetaBirkins

5    NFT.

6    Q.  And what did you do after speaking to Mr. Torkaman?

7    A.  I asked him to send me the details he had on this project.

8    Q.  Did he send them to you?

9    A.  Yes.

10   Q.  What did you do after that?

11   A.  I shared the information internally with the legal team.

12   Q.  And what, if anything, did the legal team do next?

13   A.  We looked at the surrounding circumstances, we visited the

14   place where Mr. Rothschild was promoting his project.

15   Q.  And what, if anything, did you notice?

16   A.  The first thing we noticed is that it was using our

17   trademark Birkin.

18   Q.  What else?

19        Did you notice anything else?

20   A.  We noticed it was an NFT, which is a digital asset, that we

21   consider as very important for the future of our brand.  We

22   noted that it was not a single NFT, but a collection of 100

23   NFT.

24   Q.  And where did you see that?

25   A.  On the social media and on the website he created to

N1VsHER3                          Martin – Direct

1    promote his collection.

2    Q.  Did you view the MetaBirkins NFTs at that time?

3    A.  They were not released when I had been informed because I

4    think they were released on December 2., but I saw pictures of

5    the images.

6    Q.  About how many pictures did you see; do you recall?

7    A.  I don't remember.

8    Q.  Do you think it was 100?

9    A.  I don't think it was 100 at that time because it was before

10   the release.

11   Q.  I'm sorry.  Where did you see these pictures?

12   A.  On the social media account created by Mr. Rothschild and

13   on the website that he created under the domain name

14   *MetaBirkins.com*.

15   Q.  I would like to show the witness Exhibit 227.

16          Can you tell me generally what you understand this to

17   be?

18   A.  The *MetaBirkins.com* website.

19   Q.  Is this the site that you accessed?

20   A.  Yes.

21          MR. WARSHAVSKY:  We would offer this into evidence as

22   Exhibit 227.

23          MR. MILLSAPS:  No objection.

24          THE COURT:  Received.

25          (Plaintiff's Exhibit 227 received in evidence)

 1                  MR. WARSHAVSKY:  Maybe if we could shrink this back

 2      down a little.  If we could show the second page to the

 3      witness.  Just go back up.

 4      BY MR. WARSHAVSKY:

 5      Q.  This is the website you saw at the time?

 6      A.  Yes.

 7      Q.  And was there anything else about this website that

 8      concerned Hermès?

 9      A.  The images were depicting Birkin handbags in different

10      colors with different grains.

11      Q.  After you saw the website, what happened next?

12      A.  We were working on the case when Mr. Rothschild gave an

13      interview on Yahoo Finance.  We were informed about this

14      interview?

15                  MR. WARSHAVSKY:  All right.  Can you show the witness

16      Exhibit 224.  I think this is both a video file and a

17      transcript of that video file.  So we are just showing the

18      transcript right now.

19      BY MR. WARSHAVSKY:

20      Q.  Is this the Yahoo Finance article you were referring to?

21      A.  Yes.

22      Q.  What is the date of the article?

23      A.  December 6, 2021.

24      Q.  Did you listen to the interview?

25      A.  Yes.

N1vnher4                        Martin - Direct

Q.   When did you do that?

A.   I think it was on 7th or the 6th.

          MR. WARSHAVSKY:  We would offer Exhibit 224 into
evidence.

          MR. MILLSAPS:  Your Honor, I would ask for a sidebar
on this one.

          THE COURT:  All right.

          (Continued on next page)

1                 (At sidebar)

2                 MR. MILLSAPS:  Your Honor, this is an article that

3     contains a transcript of Mr. Rothschild's interview which we

4     have no problem with.  But to the extent there's commentary in

5     the article, we would object on hearsay grounds.

6                 MR. WARSHAVSKY:  Commentary by other parties?

7                 MR. MILLSAPS:  By the Yahoo writer or the journalist

8     in the article.

9                 MR. WARSHAVSKY:  To the extent there is anything from

10    that writer, I don't believe we are going to rely on anything

11    from that writer.  We will see where the witness goes, but

12    certainly to the extent that the witness talks about it or we

13    relied on it, it would not be for the truth of the matter

14    asserted.  It would just to be as to the context for

15    Mr. Rothschild's responses.

16                THE COURT:  Let me see the article.

17                MR. WARSHAVSKY:  I apologize.  I think it's 224 in

18    your --

19                THE COURT:  Let me see the article.

20                MR. MILLSAPS:  Your Honor, it's 244 in the binder.

21                MR. WARSHAVSKY:  It's 244.

22                THE COURT:  244.  Thank you.  I have it now.

23                The good thing about this is, at least in the form

24    handed up to the Court, the print is so small that no one can

25    complain about its admission because no one will be able to

N1vnher4                        Martin - Direct

1    read it.

2              Let me take a closer look.

3              Well, there are a number of factual assertions made by

4    the interviewer, which would be hearsay; but it is also true

5    that they are offered to set the context of what is then being

6    asked of Mr. Rothschild.

7              So I think, to move things along, I will admit it now

8    in its entirety, but be careful not to question him about

9    anything other than what Mr. Rothschild said and anything he

10   wants to say about that.

11             If during the lunch break or tonight you guys want to

12   take a closer look at it and redact any of the statements there

13   that are hearsay that you think could be prejudicial, that

14   would be fine.  I will sustain that, but at least for now I

15   think we can admit it.

16             MR. HARRIS:  Thank you.

17             MR. MILLSAPS:  Thank you, your Honor.

18             MR. WARSHAVSKY:  Thank you, your Honor.

19             (Continued on next page)

20

21

22

23

24

25

N1vnher4                          Martin - Direct

1              (In open court)

2              THE COURT:  All right.  The exhibit is received

3    subject to the limitations stated at the sidebar.

4              (Plaintiff's Exhibit 244 received in evidence)

5    Q.  Is this the Yahoo Finance article you were referring to?

6    A.  Yes.

7              MR. WARSHAVSKY:  Okay.  And if we could call out --

8    well, if we could call out paragraph three, the third paragraph

9    on page 2.

10   BY MR. WARSHAVSKY:

11   Q.  Was there anything in this statement by Mr. Rothschild that

12   concerned you?

13   A.  Yes.

14   Q.  What concerned you?

15   A.  We were worried by the fact that he was introducing the

16   idea of the digital commodity, so we understood that the idea

17   was to bring the Birkin bag into the digital world through this

18   digital commodity in order to interact with consumers related

19   to the Birkin and to try to interact with the community, to

20   create a community, which we understand is very important in

21   the digital world.

22   Q.  Anything else about this quote that concerned you?

23   A.  Not a concern, but he was talking about Birkin bag being

24   the most iconic bag.

25   Q.  That we agree with him on?

N1vnher4                          Martin – Direct

```
 1    A.  Yes.
 2              MR. WARSHAVSKY:  If we could go to the sixth paragraph
 3    on the next page.
 4    BY MR. WARSHAVSKY:
 5    Q.  Was there anything Mr. Rothschild stated here that
 6    concerned you?
 7    A.  The concern is the concern that we have all, is that he
 8    explained that today the difference between the physical world
 9    and the digital world is being blurred, and that people don't
10    know what will go in the virtual -- the difference between the
11    virtual goods and the physical goods, and he was going to try
12    to play on this lack of clear difference in order to promote
13    his NFT.
14    Q.  Thank you.  After this article came out, was there anything
15    else that happened that concerned Hermès?
16    A.  Yes.
17    Q.  What was that?
18    A.  We noticed that he planned to launch a new batch of NFTs.
19    Q.  Do you remember about when that was?
20    A.  I think it was just after the interview.
21              MR. WARSHAVSKY:  Okay.  Can I ask that you show the
22    witness page 227 of Exhibit 99.
23    BY MR. WARSHAVSKY:
24    Q.  Have you seen this before?
25    A.  Yes.
```

N1vnher4                         Martin - Direct

1   Q.   What do you understand this to be?

2   A.   It is a post on the account MetaBirkins.

3   Q.   Is this the announcement you were referring to?

4   A.   Yes.

5          MR. WARSHAVSKY:   Plaintiffs would offer page 99 of

6   Exhibit 227 into evidence.

7          MR. MILLSAPS:   No objection.

8          THE COURT:   Received.

9          (Plaintiff's Exhibit 227, page 99 received in

10  evidence)

11  Q.   Looking at this announcement, can you tell the date on

12  this?

13  A.   It's December 8, 2021.

14  Q.   And what in particular was concerning to you?

15  A.   The post saying the second collection is coming soon.

16  Q.   Did Mr. Rothschild -- strike that.  Was there anything else

17  that concerned Hermès at this time?

18  A.   At that time, I think at the equivalent time we discovered

19  that he was also going to use another of our products to

20  promote his MetaBirkins NFT.

21         MR. WARSHAVSKY:   Humberto, can you please bring up

22  Exhibit 146.

23  BY MR. WARSHAVSKY:

24  Q.   Just generally speaking, do you know what this document is?

25  A.   Yes.  It is a post on the MetaBirkins social media.

1          MR. WARSHAVSKY:  The plaintiffs would offer Exhibit

2    146 into evidence.

3          MR. MILLSAPS:  No objection.

4          THE COURT:  Received.

5          (Plaintiff's Exhibit 146 received in evidence)

6    BY MR. WARSHAVSKY:

7    Q.  Is this the post you were discussing?

8    A.  Yes.

9    Q.  Do you remember where this was posted?

10   A.  On the social media MetaBirkins.

11   Q.  Does Hermès offer anything like a horse charm?

12   A.  Yes.

13         MR. WARSHAVSKY:  Humberto, could you please show the

14   witness page 9 of Exhibit 239.

15   BY MR. WARSHAVSKY:

16   Q.  Have you seen this image before?

17   A.  Yes.

18         MR. WARSHAVSKY:  We would offer Exhibit 239 into

19   evidence.

20         MR. MILLSAPS:  No objection.

21         THE COURT:  Received.

22         (Plaintiff's Exhibit 239 received in evidence)

23   BY MR. WARSHAVSKY:

24   Q.  Looking at this, can you tell me what's pictured here?

25   A.  It is a little charm called Rodeo, which is commercialized

N1vnher4                          Martin - Direct

1   by Hermès.  It is a charm that you usually attach to your bag.

2   Q.  After Hermès saw the horse charm, what happened next?

3   A.  I think that we were contacted by some media.

4   Q.  Do you remember which media?

5   A.  I remember the Financial Times.

6   Q.  Did the Financial Times say why they were contacting

7   Hermès?

8   A.  Yes.

9   Q.  What did they say?

10  A.  They were asking whether we were partnering with this

11  product.

12  Q.  Did Hermès respond to that?

13  A.  Yes.

14  Q.  What did Hermès say?

15  A.  That we were not partner.

16  Q.  Do you know whether the Financial Times published that

17  article?

18  A.  Yes.

19          MR. WARSHAVSKY:  Humberto, could you please show the

20  witness Exhibit 379.

21  BY MR. WARSHAVSKY:

22  Q.  Have you seen this document before?

23  A.  Yes.

24  Q.  Is this the document you're referring to?

25  A.  Yes.

1          MR. WARSHAVSKY:  Hermès would offer Exhibit 379 into

2     evidence.

3          MR. MILLSAPS:  No objection.

4          THE COURT:  Received.

5          (Plaintiff's Exhibit 379 received in evidence)

6     BY MR. WARSHAVSKY:

7     Q.  What is the date of the article?

8     A.  December 11, 2021.

9     Q.  Did you have an understanding of what this article -- well,

10    let me ask it differently.  What was Hermès' understanding

11    about this article?

12    A.  The Financial Times, following our response saying that we

13    were not a partner, published this article and put the title,

14    "Hermès Clashes with Artist Who Created Metabirkins NFT."

15    Q.  What happened after Hermès saw the Financial Times article?

16    A.  We sent a cease and desist letter to Mr. Rothschild.

17          MR. WARSHAVSKY:  I would like to show the witness

18    Exhibit 20.

19    BY MR. WARSHAVSKY:

20    Q.  Is this the letter you were referring to?

21    A.  Yes.

22          MR. WARSHAVSKY:  Plaintiffs would offer Exhibit 20

23    into evidence.

24          MR. MILLSAPS:  No objection.

25          THE COURT:  Received.

1              (Plaintiff's Exhibit 20 received in evidence)

2    BY MR. WARSHAVSKY:

3    Q.   What is this document, if you know?

4    A.   It's a letter sent by our lawyer to Mr. Rothschild.

5              MR. WARSHAVSKY:   If we could turn to page 2.

6    BY MR. WARSHAVSKY:

7    Q.   Do you have an understanding of what Hermès was demanding

8    Mr. Rothschild do?

9    A.   Yes.

10   Q.   What was that?

11   A.   We were asking him to stop advertising, promoting, and

12   selling the Birkin NFT.

13   Q.   Did Mr. Rothschild stop using the NFTs you were concerned

14   about?

15   A.   No.

16   Q.   By that I mean did he stop promoting those NFTs?

17   A.   No.

18   Q.   What happened after you sent this letter?

19   A.   Despite the statement that we made at the Financial Times,

20   we had knowledge of actual cases of confusion in the media.

21             MR. MILLSAPS:   Objection, your Honor.   We would move

22   to strike the witness's testimony on the basis of hearsay.

23             THE COURT:   Sustained.   The jury will disregard the

24   last answer.

25             MR. WARSHAVSKY:   Okay.

N1vnher4                         Martin - Direct

1   BY MR. WARSHAVSKY:

2   Q.  Did you see other articles about the MetaBirkins?

3   A.  Yes.

4   Q.  Was there -- just yes or no so counsel can object -- was

5   there anything about those articles that concerned you?

6   A.  Yes.

7   Q.  Okay.  Without characterizing what the writer may have

8   thought, what about those articles concerned you?

9           MR. MILLSAPS:  Objection.

10          THE COURT:  Well, I think if phrased -- let me ask you

11  this:  As a result of viewing those articles, did you or Hermès

12  take further action?

13          THE WITNESS:  From one of them, yes.

14          THE COURT:  All right.

15          What further action did you take?

16          THE WITNESS:  We asked the corresponding media to

17  correct the statement that was made in the article.

18          THE COURT:  I think that then is admissible.  What was

19  the statement made in the article?

20          THE WITNESS:  The article was saying that the

21  MetaBirkin was made by or in partnership with Hermès.

22          THE COURT:  All right.

23          Go ahead, counsel.

24  BY MR. WARSHAVSKY:

25  Q.  Where was that article published?

1   A.   In Challenges.

2   Q.   Did Hermès interact with Mr. Rothschild before sending the

3   cease and desist letter?

4   A.   No.

5   Q.   Has Hermès interacted with Mr. Rothschild since he sent

6   that letter, since Hermès sent that letter?

7   A.   No.

8   Q.   Did Hermès ever publicize the cease and desist letter it

9   sent to Mr. Rothschild?

10  A.   No.

11  Q.   Did Hermès tell anybody in the media about the cease and

12  desist letter it sent Mr. Rothschild?

13  A.   Apart from asking the Challenge Media to correct the

14  article, no.

15  Q.   My question was whether Hermès ever sent the cease and

16  desist letter to the media?

17  A.   No.   Sorry.

18  Q.   Has Hermès been contacted to comment on this case?

19  A.   Yes.

20  Q.   Has Hermès ever commented on this case?

21  A.   No.

22  Q.   Yesterday during openings both sides referred to and I

23  think Mr. Millsaps showed a video, something called "The Baby

24  Birkin."

25          Have you ever seen that before?

N1vnher4                        Martin - Direct

1    A.  Yes.

2            MR. WARSHAVSKY:  We would move to admit the Baby

3    Birkin exhibit and show the video.

4            MR. MILLSAPS:  No objection.

5            THE COURT:  Received.

6            MR. WARSHAVSKY:  I think it's Exhibit 82.

7            (Plaintiff's Exhibit 82 received in evidence)

8            (video played)

9    BY MR. WARSHAVSKY:

10   Q.  When is the first time you saw that video?

11   A.  I think it was in June 2021.

12   Q.  Did Hermès send a cease and desist letter or otherwise

13   object to this video?

14   A.  No.

15   Q.  Why not?

16   A.  Because we looked at the surrounding circumstances of this

17   particular NFT and we considered that there was no risk of

18   confusion and no risk of brand dilution.

19   Q.  Is it common for Hermès to file lawsuits?

20   A.  No.

21   Q.  You have worked at Hermès for nearly 20 years, right?

22   A.  Yes.

23   Q.  In the legal department, right?  Always in the legal

24   department?

25   A.  Yes.

1   Q.   Okay.  Other than counterfeiting, you know, like stuff you

2   might see a few blocks from here, do you know the last time

3   Hermès brought a trademark infringement lawsuit in the U.S.?

4   A.   I am only aware of one case more than 20 years ago.

5   Q.   Before we saw a few -- we have seen a few articles that

6   we've shown the jury, some of those articles, and has Hermès

7   ever sent a cease and desist to the people that published those

8   articles?

9   A.   No.

10  Q.   Has Hermès ever sued anybody for using the Birkin bag in

11  those articles?

12  A.   No.

13  Q.   We also saw Mr. Chavez introduce the exhibit which the jury

14  will see which has the Hermès bag in various movies and films.

15          Are you familiar with that exhibit?

16  A.   Yes.

17  Q.   Has Hermès ever sent a cease and desist letter to any of

18  those users of the Birkin trademark or bag?

19  A.   No.

20  Q.   Did Hermès ever bring a lawsuit about those?

21  A.   No.

22  Q.   Have you ever seen artists' paintings of Birkin bags?

23  A.   Yes.

24  Q.   Did you ever send a cease and desist letter to the artists

25  who painted pictures of the Birkin bags?

N1vnher4                         Martin - Direct

```
1    A.  Not that I am aware.

2    Q.  Are you aware of Hermès ever suing those artists?

3    A.  No.

4    Q.  Have you seen sculptures of Birkin bags?

5    A.  Yes.

6    Q.  Have you --

7    A.  Sorry.

8    Q.  It was a glitch.  Don't worry.  I don't think there's

9    anything wrong.

10        Did Hermès ever send a cease and desist letter to the

11   artists who created those sculptures?

12   A.  No.

13   Q.  Did Hermès ever sue those artists or sculptors or both?

14   A.  No.

15   Q.  Has Hermès ever seen, people who have taken professional

16   photographs of Birkin bags?

17   A.  Yes.

18   Q.  Has Hermès ever sent those photographers cease and desist

19   letters?

20   A.  No.

21   Q.  Has Hermès ever sued those photographers?

22   A.  No.

23   Q.  And the different artworks we are talking about, whether

24   they're photographs, sculptures, pictures -- paintings rather,

25   whatever, is Hermès aware of those being displayed in
```

1    galleries?

2    A.   Some of them, yes.

3    Q.   Did Hermès ever send a cease and desist letter to those

4    galleries?

5    A.   No.

6    Q.   Did Hermès ever sue those galleries?

7    A.   No.

8    Q.   We heard some of the cross-examination by Mr. Oppenheim of

9    Mr. Chavez talking about the different numbers.  Do you

10   remember that from yesterday?

11   A.   Different newspapers?

12   Q.   No, I'm sorry.  There was a financial table that both

13   Mr. Oppenheim and I questioned Mr. Chavez about.

14           Do you remember that?

15   A.   Yes, sorry.

16   Q.   That generally was a picture of Hermès financial -- sales

17   information, correct?

18   A.   Yes.

19   Q.   Its revenues from sales?

20   A.   Yes.

21   Q.   Okay.  Do you know whether the sale of the Birkin handbags

22   suffered as a result of the MetaBirkins NFTs?

23   A.   I don't know.

24   Q.   Do the Birkin handbag sales increase every year?

25   A.   Yes.

N1vnher4                        Martin - Direct

1    Q.  Did the sales of the Birkin bags increase from 2020 to

2    2021?

3    A.  Yes.

4    Q.  And did the Birkin bag sales increase last year from 2021

5    to 2022 after the MetaBirkins were released?

6    A.  I think, yes.

7    Q.  Does Hermès believe it's been damaged by the MetaBirkins

8    NFTs?

9    A.  Yes.

10   Q.  How so?

11   A.  We consider that there's been confusion in the consumers

12   and that our brand has been diluted, and Birkin being one of

13   the most important brands for the group, we think we have

14   suffered damages in relation to this brand dilution and the

15   consumer confusion.

16          MR. MILLSAPS:  Your Honor, objection.  We move to

17   strike the witness's testimony insofar as he just testified

18   about consumer confusion because there is no evidence admitted

19   of consumer confusion.

20          MR. WARSHAVSKY:  I am happy to respond or sidebar,

21   your Honor.

22          THE COURT:  Overruled.

23          The objection is overruled.

24          MR. WARSHAVSKY:  Thank you, your Honor.

25   BY MR. WARSHAVSKY:

1  Q.  In Hermès' opinion, how has the Birkin brand been diluted?

2  A.  I think we invested a lot of time and money in order to

3  have a trademark as famous as Birkin.  As I mentioned earlier,

4  NFT is probably part of the future of our company.  The fact

5  that our main trademark has been used by a third party without

6  our authorization on the digital asset, which is similar to our

7  product, if we are to enter into this new digital world, if we

8  want to bring our most iconic handbag in this digital world,

9  there would always be a reference to this MetaBirkin.  And I

10  think that being the first is a first, and we lost this

11  opportunity of being the first on the market, which I think is

12  really something very impactful for Hermès.

13                MR. WARSHAVSKY:  Thank you, Mr. Martin.

14                I have no further questions at this time.

15                THE COURT:  Cross-examination.

16  CROSS-EXAMINATION

17  BY MR. MILLSAPS:

18  Q.  Good morning, Mr. Martin.

19  A.  Good morning.

20  Q.  As you know, my name is Rhett Millsaps, and I represent

21  Mason Rothschild.  Thank you for being here today.

22                It is your understanding that the MetaBirkins are

23  flat, two dimensional digital pictures, isn't that right?

24  A.  I am not an IT expert so I will rely on the expert which

25  explains that today that's right.

1    Q.  Today that's correct?

2    A.  Yeah.

3    Q.  Mr. Martin, there's no evidence that Mr. Rothschild ever

4    told anyone that MetaBirkins came from Hermès, isn't that

5    right?

6               MR. WARSHAVSKY:  Objection.

7               THE COURT:  Well, as phrased, sustained.

8    BY MR. MILLSAPS:

9    Q.  Mr. Martin, are you aware of any evidence that

10   Mr. Rothschild ever told anyone that the MetaBirkins came from

11   Hermès?

12   A.  No.

13   Q.  Mr. Martin, you were just testifying that Hermès has been

14   damaged by consumer confusion, is that right?

15   A.  Yes.

16   Q.  What is the evidence of consumer confusion that you have

17   seen?

18   A.  I think we have an expert report on consumer confusion.  I

19   can also refer to Mr. Bob Chavez' testimony, which if I

20   remember correctly mentioned that some of his students were

21   confused.

22               I have seen articles in the press media saying that

23   this project was made in partnership, made by Hermès, and I

24   anticipate that the people that, when you read a newspaper, you

25   can believe that what is written in the newspaper is true, and

1  we have had one case of consumer confusion, but I understand

2  it's a French case, so it is not relevant here.

3  Q.  So, if I understand what you just said, it's fair to say

4  that Hermès has no evidence of an actual consumer in the U.S.

5  being confused about the source of MetaBirkins?

6        MR. WARSHAVSKY:  Objection.

7  Q.  Is that correct?

8        THE COURT:  Hold on.

9        Sustained.

10 BY MR. MILLSAPS:

11 Q.  Mr. Martin, are you aware of any evidence that an actual

12 consumer of Hermès' products was confused about the source of

13 MetaBirkins?

14 A.  I mentioned the student from Mr. Bob Chavez' testimony, and

15 if we relate to outside -- is it related only to the U.S., your

16 question, sir?

17 Q.  Yes, I asked in the U.S.

18 A.  Sorry.  So I only refer to the case, to the testimony of

19 Mr. Chavez.

20        MR. MILLSAPS:  Ashley, could you put up Plaintiff's

21 Exhibit No. 227, which is in evidence.

22 BY MR. MILLSAPS:

23 Q.  Mr. Martin, am I correct that this is a screen shot of the

24 MetaBirkins website as of December 1, 2021?

25 A.  Yes.

N1vnher4                    Martin - Cross

1   Q.  These are the MetaBirkins NFTs, correct?

2   A.  These are images that were presented as a potential NFT,

3   because at that time it was not minted, but, yes.

4   Q.  So this was Mr. Rothschild previewing the MetaBirkins NFTs

5   before they were minted, is that right?

6   A.  This is my understanding, yes.

7   Q.  And do you see some link between the title MetaBirkins and

8   what you see in the images here on the screen?

9        MR. WARSHAVSKY:  Objection.

10        THE COURT:  Overruled.

11  A.  I see a bag, a digital bag with the shape Birkin, so if you

12  mean that MetaBirkins means a digital bag, a Birkin digital

13  bag, yes, there is a link.

14        MR. MILLSAPS:  Ashley, would you please put on the

15  screen Plaintiff's Exhibit 377, which is in evidence.

16  BY MR. MILLSAPS:

17  Q.  Mr. Martin, this is an exhibit of it looks like numerous

18  photographs of Birkin bags that have appeared in different

19  publications.

20        Is that fair to say?

21  A.  Yes.

22  Q.  For these photo shoots, did the publications buy these

23  Birkin handbags, or did Hermès give or loan them to them for

24  these photo shoots?

25  A.  I can't tell.  I don't know.

1  Q.  Does Hermès get requests from publications for Birkin bags

2  to use for photo shoots like this?

3  A.  Yes.

4  Q.  And when Hermès receives those requests, does Hermès

5  provide the requested bags?

6  A.  Sometimes, yes.

7  Q.  How does Hermès decide whether or not to provide the

8  requested bags?

9  A.  I can't tell.  I am not from the press department.  But I

10 anticipate it depends on the media, because our products are

11 very valuable products, so I anticipate that we check before we

12 provide them to the press.

13        MR. MILLSAPS:  Ashley, could you please put

14 Plaintiff's Exhibit 16 on the screen, which is in evidence.

15 BY MR. MILLSAPS:

16 Q.  Mr. Martin, am I correct that this, Plaintiff's Exhibit 16,

17 is a collection of magazine covers and articles that reference

18 the Birkin?

19 A.  Yes.

20 Q.  And isn't it fair to say that the publications collected

21 here, these are for high-end magazines for luxury consumers,

22 right?

23 A.  I am not -- I am not a media expert.  I am not sure I can

24 tell.  The way you described it, it is for me fashion media.

25 Whether it's high end, I can't tell.

N1vnher4                    Martin - Cross

1   Q.  Does Hermès place paid advertisements in media?

2   A.  Yes.

3   Q.  Why does Hermès do that?

4   A.  To promote its products, its creativity, its brand.

5   Q.  Where does Hermès place those advertisements for the Birkin

6   bag in particular?

7   A.  We actually don't do advertisements, meaning physical

8   advertising with a Birkin are very rare.  I think we did it

9   once like 20 years ago.  But if you refer to our advertising

10  campaign, we are promoting the same in a lot of different types

11  of magazine.  Once again, I'm not the expert from the media

12  from the group, so I won't be able to describe all of them.

13  Q.  Are you able to describe some of them?

14  A.  I may try.

15  Q.  Could you describe some of them for us.

16  A.  You mean part of the example or --

17  Q.  No, I'm asking where that advertising campaign for the

18  Birkin would be placed, in what types of publications?

19  A.  I'm sorry.  I am more familiar with France so if I refer to

20  a magazine in France, would that be okay.

21  Q.  Okay.

22  A.  For instance, I know that in France we have an advertising

23  campaign in Le Point, a day-to-day magazine, not necessarily

24  focused on fashion.  We are actually placing also our

25  advertising campaign in the street and in fashion magazines,

N1vnher4                    Martin - Cross

1    such as in France I would say Elle is an important one, but to

2    be honest I think we are placing our advertising copy in a lot

3    of different medias.

4    Q.  Do you know the circulation numbers for any of those

5    publications that you just mentioned?

6    A.  No.

7              MR. MILLSAPS:  Ashley, would you please put

8    Plaintiff's Exhibit 379 on the screen.  This one is in evidence

9    as well.  Actually, before we go to this exhibit, Mr. Martin,

10   let me just ask you Hermès has never conducted a survey that

11   shows that the Birkin trademark is widely recognized by the

12   general consuming public throughout the United States, has it?

13   A.  No.

14             MR. MILLSAPS:  Okay.  Ashley, when you're able if you

15   could put up Plaintiff's Exhibit 379, please.

16             THE COURT:  Are you having a problem?

17             So are you familiar with the Elmo that is right there

18   in the rostrum that you are standing beside?

19             MR. MILLSAPS:  Familiar with what, your Honor?

20             THE COURT:  What's called the Elmo.  Let me have my

21   law clerk take this old-fashioned physical copy of the exhibit.

22             MR. MILLSAPS:  Okay.

23             THE COURT:  And give it to you and you can put it in a

24   way that everyone in the courtroom can see it.

25             MR. MILLSAPS:  Thank you, your Honor.

N1vnher4                         Martin - Cross

1           MR. WARSHAVSKY:  If it would be helpful we could show

2      the exhibit, I think it's still teed up, if Mr. Millsaps would

3      like.

4           THE COURT:  Show him the Elmo.

5           Do you know where the Elmo is?

6           THE LAW CLERK:  No.

7           THE COURT:  Get Linda.

8           You will be surprised to hear that for 200 years

9      trials occurred in the United States without any screens

10     whatsoever, just using paper copies of exhibits.

11          All right.  It is not on my screen.

12          MR. MILLSAPS:  It is not on my screen either.

13          THE COURT:  You know what, this is such a moving

14     experience that I am going to give the jury their lunch break a

15     little bit early.  So we will take our lunch break now and

16     resume at 10 minutes to 2.  So you are excused.

17          (Jury not present)

18          THE COURT:  You can step down.

19          We will see you after lunch.

20          MR. WARSHAVSKY:  Your Honor --

21          THE COURT:  Much as I would enjoy staying here while

22     you guys all figure this out, because there's been too little

23     humor injected into my life this morning, I'm going to leave

24     and go have lunch.  When you get this figured out, you can

25     leave too.

N1vnher4                    Martin – Cross

1              MR. WARSHAVSKY:  Your Honor may I just correct

2     something for the record.  Apparently I have been advised that

3     I transposed something.

4              THE COURT:  I'm sorry.

5              MR. WARSHAVSKY:  Apparently in reading I transposed

6     something.  I had asked to admit Exhibit 99, page 227.  It's

7     Exhibit 227, page 99.

8              THE COURT:  Okay.  Received.

9              (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      AFTERNOON SESSION

 2                          1:50 p.m.

 3          (Jury not present)

 4          THE COURT:  So this is not our day for jury

 5  promptness.  Apparently one of the jurors still has not

 6  returned from lunch, so we'll wait a few minutes to hear what

 7  the story is.

 8          Let's get the witness on the stand and stand for the

 9  jury.

10          (Jury present)

11          All right.  Counsel.

12  CROSS-EXAMINATION

13  BY MR. MILLSAPS:

14  Q.  Ashley, would you please put on the screen Plaintiff's

15  Exhibit No. 20, which is in evidence.

16          Mr. Martin, who sent this cease and desist letter to

17  Mr. Rothschild?

18  A.  Our lawyers.

19  Q.  And your lawyers are your agents, correct?

20  A.  What do you mean by agent?

21  Q.  Your lawyers act on Hermès' behalf at your direction and

22  control, is that right?

23  A.  Yes.

24  Q.  So you directed them to send this letter to Mr. Rothschild,

25  correct?
```

N1VsHER5                          Martin - Cross

1    A.  Yes.

2    Q.  Do you remember testifying earlier today that Hermès had no

3    contact with Mr. Rothschild after sending him the cease and

4    desist letter?

5    A.  Yes.

6    Q.  Isn't it a fact that Mr. Rothschild sent a response to this

7    cease and desist letter through his lawyers just a few days

8    after he received it?

9    A.  Yes, he answered.

10   Q.  Would you please look at the document in your binder that's

11   been premarked as Plaintiff's Exhibit 21.

12          Do you recognize this document, Mr. Martin?

13   A.  Yes.

14   Q.  What is this document?

15   A.  It's the answers from Mr. Rothschild to our attorney.

16   Q.  So, in fact, you did have some contact with Mr. Rothschild

17   after sending your cease and desist letter, is that right?

18   A.  Through our attorneys, yes.

19   Q.  And your attorneys are effectively Hermès, correct?

20   A.  Yes.

21          MR. MILLSAPS:  Your Honor, I offer Plaintiff's Exhibit

22   No. 21 into evidence.

23          MR. WARSHAVSKY:  No objection, your Honor.

24          THE COURT:  Received.

25          (Plaintiff's Exhibit 21 received in evidence)

N1VsHER5                    Martin – Cross

1   BY MR. MILLSAPS:

2   Q.  Mr. Rothschild's lawyers are his agents as well as far as

3   you understand, isn't that right, Mr. Martin?

4   A.  Yes.

5          MR. MILLSAPS:  Ashley, would you please show this

6   document to the jury now.

7   Q.  So communications from Mr. Rothschild's lawyer are

8   effectively communications from Mr. Rothschild, isn't that fair

9   to say?

10  A.  Yes.

11  Q.  Looking at this letter, isn't it the case that

12  Mr. Rothschild, through his lawyers, explained to Hermès that

13  MetaBirkins are artistic works depicting fur-covered Birkin

14  bags?

15  A.  Yes.

16  Q.  Now, you testified that Hermès sent its cease and desist

17  letter after you discovered that Mr. Rothschild was planning to

18  release more MetaBirkins NFTs, is that right?

19  A.  Sorry.  Can you repeat the question?

20  Q.  Am I right that you testified that Hermès sent its cease

21  and desist letter to Mr. Rothschild after you discovered that

22  Mr. Rothschild was planning to release more MetaBirkins NFTs?

23  A.  Yes.

24  Q.  And am I right that you testified that you sent the cease

25  and desist letter after you discovered that Mr. Rothschild was

1  planning to release digital image of a fanciful, fur-covered

2  horse charm?

3          MR. WARSHAVSKY:  Objection.

4          THE COURT:  Hang on a minute.

5          (Pause)

6          Ground?

7          MR. WARSHAVSKY:  Mischaracterization.

8          THE COURT:  Sustained.

9  BY MR. MILLSAPS:

10 Q.  Mr. Martin, am I right that you testified that you sent a

11 cease and desist letter to Mr. Rothschild after you discovered

12 that he was planning to release some kind of horse item to

13 MetaBirkins' holders?

14         MR. WARSHAVSKY:  Objection, your Honor.

15         THE COURT:  Well, when you sent the cease and desist

16 letter, you've already said that was after you discovered that

17 he was planning some new digital images.

18         What were the new digital images that you understood?

19         THE WITNESS:  I understood that it was new images of a

20 new batch of NFT.  And if we talk about the rodeo, I saw the

21 rodeo charm before we sent the cease and desist letter.

22 Q.  What was the rodeo charm?

23 A.  It was introduced, if I remember correctly, as a gift,

24 potential gift to owner of Meta NFT.

25 Q.  And that was also a two-dimensional digital image of a

1   fur-covered horse charm, isn't that right?

2   A.  If my memory is correct, yes.

3   Q.  So, Mr. Martin, before lunch you then testified, correct me

4   if I'm wrong, that Hermès sent Mr. Rothschild a cease and

5   desist letter when it discovered these plans, but then had no

6   further contact with Mr. Rothschild; was that your testimony?

7   A.  Yes, but for me, the answer from was not part -- I mean,

8   what I wanted to say -- perhaps I did it wrong -- is that I

9   had no direct contact with Mr. Rothschild after the cease and

10  desist letter.  He answered through his lawyers, through his

11  lawyers.  But I had no contact, Hermès had no direct contact

12  with Mr. Rothschild.  That was the way I understood for me.

13  Q.  So you don't consider contact through your lawyers who are

14  working as your agents to be Hermès having contact with

15  Mr. Rothschild?

16          MR. WARSHAVSKY:  Objection.

17          THE COURT:  Sustained.

18          I think he's indicated that he, all he was saying was

19  that he didn't have direct contact with Mr. Rothschild.  The

20  jury can see that there were letters sent in both directions,

21  all containing the sweet nothings that are typical of lawyers'

22  letters.

23          MR. MILLSAPS:  Your Honor, I would like to ask for a

24  sidebar before I continue with my questioning.

25          THE COURT:  Sure.

1          (At the sidebar)

2          MR. MILLSAPS:  Judge, the issue is that

3   Mr. Warshavsky's questioning, he was asking him did Hermès --

4   Mr. Martin testified that they saw that Mr. Rothschild had all

5   of these plans to release these things and that they sent a

6   cease and desist letter.  And then Mr. Warshavsky asked if

7   Hermès ever had any contact with Mr. Rothschild again.  And

8   Mr. Martin said no, leaving a false impression.

9          THE COURT:  But he's already indicated that he

10  misunderstood what was being asked there and that he was

11  referring to Mr. Rothschild in person and in his personal

12  capacity, not through his lawyers.

13         MR. MILLSAPS:  Right.

14         THE COURT:  You've brought this out, it's a fair

15  point, and you've brought it out repeatedly, but don't we need

16  to move on then.

17         MR. MILLSAPS:  The only other point that I want to

18  make on this issue is that Mr. Rothschild, in fact, engaged in

19  extensive settlement negotiations for a while with Hermès, and

20  Hermès filed a lawsuit in the middle of those negotiations

21  without notifying Mr. Rothschild.  He read about it in the

22  press.

23         THE COURT:  Of course you know settlement discussions

24  are not admissible.

25         MR. MILLSAPS:  Yes, your Honor.

1          THE COURT:  So you think the door has been opened by

2     that statement before, so what's your view?

3          MR. WARSHAVSKY:  Your Honor, if they want to ask that,

4     I'm fine with it.  But then I'm going to follow up and I want

5     to expose all of those settlement discussions.  If they want to

6     talk about it, I would be more than happy to on

7     Mr. Rothschild's exam to follow up on what Mr. Rothschild's

8     demands were.  If they are open to that, they can open this

9     door, and I'm more than happy for that.

10         I'm aware that --

11         MR. HARRIS:  Your Honor, I don't think --

12         THE COURT:  I can't hear you.

13         MR. HARRIS:  I'm sorry, your Honor.  I don't think we

14    wanted to get into the substance of the discussions.  I think

15    we just wanted to say, which I think is actually admissible,

16    that discussions were held.

17         THE COURT:  Well, that's why I think I will allow the

18    question to be put:  Wasn't there subsequent settlement

19    discussions; yes or no?  Answer, yes.  And ultimately did they

20    not result in a settlement?  Duh.  Yes, that much I will allow.

21    That doesn't open the door to anything beyond that would open

22    the door.

23         MR. MILLSAPS:  Thank you, your Honor.

24         (Continued on next page)

25

 1              (In open court)

 2    BY MR. MILLSAPS:

 3    Q.  Mr. Martin, isn't it true that Mr. Rothschild not only

 4    promptly responded to Hermès' cease and desist letter with a

 5    letter from his own lawyers, but he also engaged in discussions

 6    with Hermès about possible settlement?

 7              THE COURT:  You mean through his lawyers?

 8    Q.  Through his lawyers?

 9    A.  I think, yes.

10    Q.  And are you aware if those conversations had concluded

11    before Hermès filed this lawsuit?

12              THE COURT:  Sustained.

13    Q.  Those settlement discussions obviously did not result in a

14    settlement, isn't that right, Mr. Martin?

15              THE COURT:  If what you mean is that the matter, since

16    it hasn't been settled, has been left to the good judgment of

17    our jury, I think I can take judicial notice of that.

18              MR. MILLSAPS:  Thank you, your Honor.

19    BY MR. MILLSAPS:

20    Q.  Mr. Martin, when Hermès filed this lawsuit against

21    Mr. Rothschild, Mr. Rothschild was represented by the lawyers

22    that sent the response to the cease and desist letter, isn't

23    that right?

24              MR. WARSHAVSKY:  Objection.

25              THE COURT:  Unless there was earlier contact, I don't

1    know how he would know that of his knowledge.

2              Sustained.

3    Q.  Mr. Martin, when Hermès filed this lawsuit against

4    Mr. Rothschild, were you aware that Mr. Rothschild was still

5    represented by the lawyers to which he was engaging in

6    settlement discussions?

7    A.  I would say yes.

8    Q.  Do you know how Mr. Rothschild found out that Hermès filed

9    a lawsuit against him?

10   A.  When we notified him of the claim.

11   Q.  Do you know when you notified him of the complaint?

12   A.  I don't remember the exact date.

13   Q.  Do you know if your lawyers notified his lawyers of the

14   complaint before it went in the press or after it went into the

15   press?

16             THE COURT:  Sustained.

17   Q.  And, Mr. Martin, Mr. Rothschild never released any further

18   MetaBirkins NFTs, is that correct?

19   A.  Yes.

20   Q.  And Mr. Rothschild never released an image of a furry horse

21   charm, is that correct?

22   A.  To my knowledge, yes.

23             MR. MILLSAPS:  Ashley, would you please show

24   Plaintiff's Exhibit 14, which is in evidence.

25   Q.  Mr. Martin, this is a Birkin bag that Hermès made and sold,

1   is that right?

2   A.  Yes.

3   Q.  And you said that this bag is made with crocodile skin, is

4   that correct?

5   A.  At least part of the same with fur and crocodile skin, yes.

6   Q.  Was the crocodile skin waste from the food industry?

7   A.  No.

8   Q.  Do you know how much this bag sold for?

9   A.  I don't remember.

10  Q.  Would this be one of the more expensive or less expensive

11  Hermès bags?

12  A.  I would say it would be an expensive one.

13  Q.  Why would you say this one would be an expensive one?

14  A.  Because of the material which is being used.

15  Q.  Do you know where the fur that Hermès uses in products like

16  this bag comes from?

17  A.  No.

18  Q.  Is the fur waste from the food industry?

19  A.  No.

20  Q.  Has Hermès agreed to go fur-free like other fashion

21  companies have?

22  A.  No.

23  Q.  Now, do you recall earlier we were looking at a bunch of

24  magazine articles showing pictures of Birkin bags?

25  A.  I'm sorry.  Yes.

1   Q.  OK.  We didn't see any pictures of Birkins with fur on them

2   in any of those magazine articles, did we?

3   A.  Not that I remember.

4   Q.  Would it be fair to say that it's uncommon for a Birkin bag

5   to have fur on it?

6   A.  We have a very limited edition.

7   Q.  Are you aware of Hermès ever releasing a Birkin bag fully

8   covered in fur, including the handle?

9   A.  We have made so many Birkin bag, that I cannot guarantee.

10  That, I don't remember seeing one.

11          MR. MILLSAPS:  Ashley, if you would please put

12  Plaintiff's Exhibit 379 on the screen.  This is also in

13  evidence.

14  Q.  Mr. Martin, do you recall that earlier you were discussing

15  your concerns about confusion around MetaBirkins?

16  A.  Yes.

17  Q.  Do you recall that we were talking about this article right

18  here from the financial times that appears to be from

19  December 11, 2021, is that correct?

20  A.  Yes.

21  Q.  So this article would have been less than ten days after

22  the MetaBirkins were released, is that right?

23  A.  Yes.

24  Q.  Do you see that the headline here says, Hermès Clashes with

25  Artist Who Created MetaBirkins NFT?

1   A.  Yes.

2   Q.  Does that indicate to you that this journalist was confused

3   about where MetaBirkins came from?

4            MR. WARSHAVSKY:  Objection, your Honor.

5            THE COURT:  Sustained.

6            MR. MILLSAPS:  Ashley, would you please show only the

7   witness and the court what's been marked as Defendant's

8   Exhibit 510.

9            Your Honor, this is an exhibit that's in color.  I was

10  only able to get black-and-white printouts, but I'm happy to

11  approach and give them to you and the witness.

12           THE COURT:  Well, are you offering this?

13           MR. MILLSAPS:  I'm not offering.  I want to ask the

14  witness about it before offering.

15           THE COURT:  Well, put a question and I'll see.

16           MR. MILLSAPS:  OK.

17  BY MR. MILLSAPS:

18  Q.  Mr. Martin, do you recognize what you see here on the

19  screen?

20  A.  Yes.

21  Q.  What is this?

22  A.  Um, can I refer to my deposition?

23           I'm not sure.  It's a document you showed me during my

24  deposition.

25  Q.  Do you have an understanding of what this is aside from

1    that?

2    A.   I understand it's a print showing different pictures from

3    photographer named Tyler Shields.

4              MR. MILLSAPS:  Your Honor, I would offer this into

5    evidence as Defendant's Exhibit 510.

6              MR. WARSHAVSKY:  Objection.

7              THE COURT:  Well, I think, reluctantly, I need to have

8    a sidebar on this one.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  So what are you ultimately trying to show

3      through this?

4              MR. MILLSAPS:  What I'm trying to show is that this is

5      a picture that uses the mark Birkin as being sold by the

6      artist.  I want to show that there are other artists who are

7      putting images like this out there.

8              THE COURT:  He has only the vaguest recollection of

9      this and apparently it was based mostly about questions that

10     were put to him at his deposition.  I'm not sure how you can

11     get this in through this witness in any way that would identify

12     what the purpose you say you want to use it.

13             I'm a little skeptical about the relevance in any

14     event, but assuming there, for sake of argument, I don't think

15     this is the witness that can really be availed to you there.

16             So sustained.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1             (In open court)

2    BY MR. MILLSAPS:

3    Q.  Mr. Martin, are you aware of an artist named Tyler Shields?

4    A.  Yes.

5    Q.  What is your knowledge about Tyler Shields?

6    A.  During my deposition, you mentioned the name.  So I know

7    he's a photographer.

8             THE COURT:  Other than what you were asked about or

9    told during your deposition, did you have any prior knowledge

10   of Mr. Shields?

11            THE WITNESS:  I don't think so.

12            THE COURT:  OK.

13            MR. MILLSAPS:  Your Honor, may we approach for a

14   sidebar?

15            THE COURT:  Sure.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

N1VsHER5                        Martin - Cross

1                  (At the sidebar)

2                  MR. MILLSAPS:  Your Honor, part of the relevance, this

3      is a trademark case.  This is an artist who makes these prints

4      using Birkin handbags and titles them with the Birkin title and

5      sells them for thousands of dollars online, and if Hermès is

6      not aware of them, then it's relevant to whether or not why are

7      they suing Mr. Rothschild here over the images he's created

8      connected to NFTs.

9                  THE COURT:  No, no, no.

10                 To put those kinds of questions, I mean, if your

11     argument is that because he doesn't know Tyler Shields, that

12     means that Hermès has not enforced his trademark against this

13     other artist involved so much many inferences as to be

14     speculative, that's why I think there may be another witness

15     who can do this for you, but not this one.

16                 MR. MILLSAPS:  OK.  Thank you, your Honor.

17                 (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court)

2     BY MR. MILLSAPS:

3     Q.  Mr. Martin, aside from your deposition, have you ever heard

4     of an artist named Becky Rosa?

5     A.  I don't think so.

6     Q.  Are you aware of an artist who carves Birkin bags out of

7     stone and sells them?

8     A.  You showed me -- outside the deposition --

9     Q.  I'm sorry, Mr. Martin.  Aside from the deposition, are you

10    aware of an artist who carves Birkin bags out of stone and

11    sells them?

12    A.  No.

13             THE COURT:  It's kind of hard to love a round, but

14    still.

15    Q.  Mr. Martin, are you aware of an artist named Tom Sachs,

16    aside from your deposition and what we might have discussed

17    there?

18    A.  There are so many artists that Tom Sachs, perhaps that was

19    a name I knew before the deposition.

20    Q.  How would you have known about Tom Sachs before the

21    deposition?

22    A.  Because when you showed me pictures, I think I -- it

23    reminded me of something.

24    Q.  Are you aware of Tom Sachs ever doing any art using any of

25    Hermès' marks?

1    A.  Yes.

2    Q.  What art are you aware of that Tom Sachs has made using

3    Hermès' marks?

4    A.  I -- I'm not sure I remember what, but I think it was --

5              THE WITNESS:  How do you say --

6              THE INTERPRETER:  Rocket.

7    A.  -- a rocket with different brands, and Hermès was one of

8    these rockets.

9    Q.  Are you aware if Tom Sachs released that art with NFTs?

10   A.  No.

11             MR. MILLSAPS:  Your Honor, I have no further

12   questions.

13             THE COURT:  Redirect?

14             MR. WARSHAVSKY:  Just one or two, your Honor.

15             THE COURT:  Go ahead.

16   REDIRECT EXAMINATION

17   BY MR. WARSHAVSKY:

18   Q.  Mr. Martin, during Mr. Millsaps' questioning of you, he

19   asked you about promotion and I think you said something in the

20   street.

21             Did you say that, that Hermès does advertising in the

22   streets?

23   A.  I think we were talking about the advertising campaign and

24   in the media, and I mentioned in the street because in

25   France -- and I think it's the same in the U.S. -- you place

1    your advertisement in the street.  But thereafter I saw it was

2    not the same media.

3    Q.  OK.  And you're talking about things like bus stops, for

4    example, or billboards?

5    A.  Yes, billboard.

6              MR. WARSHAVSKY:  No further questions.

7              THE COURT:  OK.  Anything else?

8              MR. MILLSAPS:  No, your Honor.

9              THE COURT:  Thank you very much.  You may step down.

10             (Witness excused)

11             Who is the next witness?

12             MR. WARSHAVSKY:  Your Honor, the next witness is

13   Mr. Rothschild.

14             THE COURT:  OK.  I need to explain to the ladies and

15   gentlemen that you should not worry about the order of the

16   witnesses or who is calling a witness, who is not calling a

17   witness, because Mr. Rothschild, even though he's being

18   technically called by both sides, we're going to let his

19   lawyers do the questioning first because it makes more logical

20   sense.  But there is nothing special about it, it's just the

21   way things work.

22             So let's get the witness up here.

23    SONNY ESTIVAL,

24        called as a witness by the Defendants,

25        having been duly sworn, testified as follows:

1          THE DEPUTY CLERK:  Please be seated.

2          State your name and spell your last name for the

3    record.

4          THE WITNESS:  Sonny Estival.  I go by Mason

5    Rothschild.

6          THE DEPUTY CLERK:  Spell the first whole name.

7          THE WITNESS:  S-o-n-n-y E-s-t-i-v-a-l.

8          THE COURT:  Just so we're clear, your birth name is

9    Sonny Estival, but you go by the name Mason Rothschild; is that

10   it?

11         THE WITNESS:  Yes.

12         THE COURT:  Go ahead.

13   DIRECT EXAMINATION

14   BY MR. HARRIS:

15   Q.  Mr. Rothschild, good afternoon.

16   A.  Good afternoon.

17   Q.  If I don't keep my voice up, please tell me.

18   A.  OK.

19   Q.  Thank you.

20         If for any reason you need to take a break,

21   Mr. Rothschild, just please let me know and we can have a

22   break.

23   A.  Thank you.

24   Q.  Mr. Rothschild, is art important to you?

25   A.  Yes.

1   Q.   Why?

2   A.   Because I've been in this space for a while doing my own

3   art, visiting art galleries.  Today we sell art.  It's always

4   been a main staple in my life.

5   Q.   You say it's a main staple of your life.

6              How old are you, Mr. Rothschild?

7   A.   I'm 28.

8   Q.   And how about fashion, is that important to you?

9   A.   Yes.

10  Q.   All right.  Have you been involved in fashion?

11  A.   Yes.  Since I could remember, yeah.

12  Q.   And in your experience, Mr. Rothschild, do art and fashion

13  intersect?

14  A.   Definitely.

15  Q.   And how?

16  A.   I do believe fashion is a form of art, especially in the

17  field that I'm in right now.

18  Q.   And, Mr. Rothschild, what was your intent in doing the

19  MetaBirkins project?

20  A.   Um, the intent was, one, to create an art project, and two,

21  it was to see if this artistic kind of project could serve as

22  an experiment, you know, to, one, speak on the fur-free

23  initiative of fashion at the time which was going on

24  immediately after that, which was the inspiration for

25  MetaBirkins at first, and to see if people could create that

1  same value.

2  Q.  And did you hope to make money from the MetaBirkins

3  project?

4  A.  Yes.

5  Q.  And did you promote the MetaBirkins project?

6  A.  Yes, I did.

7  Q.  Did you ever seek to mislead anyone to believe that the

8  MetaBirkins came from Hermès?

9            MR. WARSHAVSKY:  Objection.

10           THE COURT:  Overruled.

11  A.  Um, no.

12  Q.  Who did you ascribe the MetaBirkins project to,

13  Mr. Rothschild?

14  A.  Just myself.

15  Q.  Was that important to you?

16  A.  Yes.

17  Q.  And why?

18  A.  Since I came up with the idea and created the art, I feel

19  like it was important for me to tell people that it was me

20  behind it.

21  Q.  Are you aware of any purchaser of a MetaBirkins being

22  confused and thinking that the MetaBirkins came from Hermès?

23           MR. WARSHAVSKY:  Objection.

24           Actually, withdrawn.

25  A.  Not that I'm aware of.

1          MR. HARRIS:  Judge, should I continue?

2          THE COURT:  I'm sorry?

3          MR. HARRIS:  May I continue?

4          THE COURT:  Well, he withdrew the objection.

5          MR. HARRIS:  OK.

6          MR. WARSHAVSKY:  Sorry to interrupt.

7     BY MR. HARRIS:

8     Q.  We're going to talk about this more.

9          Can the MetaBirkins be used as a handbag in the

10    metaverse?

11    A.  No, they cannot.

12    Q.  Do you have respect for Hermès?

13    A.  Yes.

14    Q.  Even though they sued you?

15    A.  Maybe a little bit less after the lawsuit.

16    Q.  Why do you still have respect for Hermès, Mr. Rothschild?

17    A.  I think you guys have all heard from testimonies, they've

18    been around for over 100 years.  Like I said, I value fashion

19    and art, and I appreciate what they do.

20    Q.  And do you view the Birkin bag as an iconic item?

21    A.  Yes.

22    Q.  Now where did you grow up, Mr. Rothschild?

23    A.  Um, I was born in Pasadena and raised in the Bay Area.

24    Q.  And when did you move from Pasadena to the Bay Area?

25    A.  About eight years old.

1    Q.  What did your parents do when you were living in the Bay

2    Area?

3    A.  My mom does medical records at a women's health clinic,

4    OB/GYN, and my dad works security for two art and science

5    museums.

6    Q.  And what art and science museums were those?

7    A.  The Young Museum and the Academy of Sciences in Golden Gate

8    Park.

9    Q.  And when would you first start visiting art museums?

10   A.  Um, as soon as my dad started working there, and I think as

11   he probably took us prior, but I can remember, like, 12, 13

12   years old.

13   Q.  And your dad, he was a security guard at the museum.

14        Would you go to visit him there?

15   A.  Yes, especially during the summer.

16   Q.  And how often was that?

17   A.  Um, I would say, like, every quarter when they had, like, a

18   new exhibition or something.

19   Q.  And, by the way, where are your parents from?

20   A.  Um, my mom is from the Philippines and my dad is from

21   Colombia.

22   Q.  And after going to the arrested museums, would you talk

23   about the art with your family?

24   A.  Mainly my dad, but my mom would kind of listen in.

25   Q.  And where did go to high school?

```
 1   A.  Um, in Daly City.
 2   Q.  Did you go to public high school?
 3   A.  Public high school.
 4   Q.  And did you take any art classes?
 5   A.  Photography and drafting.
 6   Q.  And did you work while you were in high school?
 7   A.  Um, not, like, kind of, like, under-the-table jobs, but
 8   yes, I did.
 9   Q.  And what were those?
10   A.  Um, I used to kind of just hang out at skate shops and fold
11   clothes to get stickers and skate pecks, and then I helped my
12   uncle who was a cinematographer.  I was his PA.
13   Q.  And the skate shops, let's talk about those first.
14           Where were those skate shops?
15   A.  In the Haight-Ashbury District in San Francisco.
16   Q.  Did you drive yourself up there?
17   A.  No.  Since my dad worked at Golden Gate Park, which is a,
18   like, a block away, I would come with him to work and then walk
19   over.
20   Q.  And what shops did you work at?
21   A.  Um, one was called Stussy.  It's, like, a skateboard/surf
22   brand, been around for a while, and then Black Scale, also
23   streetwear brand.
24   Q.  Now, you said that your birth name was Sonny Estival?
25   A.  Yes.
```

1  Q.  Where did the name Mason Rothschild come from?

2  A.  It's a two-parter.  Mason is my mom's name.  Her birth name

3  is Maria Elizabeth, so her sisters called her May, and then I'm

4  her son.  So May's son.  I was given the birth name Sonny

5  because I was named after the doctor who delivered me because

6  there was some, like, birth complications and my parents

7  decided to name me after the doctor.

8         Oh, and the Rothschild part?

9  Q.  Yes.

10  A.  Um, I was into a lot of conspiracy theories as a kid, still

11  am, kind of, today.  And since I was going by Mason at the

12  time, at 12, 13 years old, they kind of gave me the nickname

13  Mason Rothschild to reflect the Rothschild family.  And they

14  gave me, like, the ultimate Illuminati name.

15  Q.  Who gave you that name, Mr. Rothschild?

16  A.  Just the older guys at the skate shops.

17  Q.  Mr. Rothschild, what is skatewear or streetwear, and are

18  they the same thing?

19  A.  I categorize them as the same thing.  It's kind of, like,

20  clothing the skaters wore at the time.  And, you know, it's

21  since kind of transcended and entered the luxury space.

22  Q.  While you were in school, Mr. Rothschild, did you do any

23  graphic design?

24  A.  Yes.

25  Q.  Could you please explain that?

1   A.  Um, I'm self-taught in my photo shop and illustrator.

2   Always had, like, a computer on me, so always liked to dabble

3   with fonts and, you know, illustrations.  At the time, I would,

4   like, you know, design people's, kind of, like, social media

5   pictures, like, their profile pictures.  I would do kind of

6   graphic design for local shops, restaurants, whatever.  And,

7   yeah.

8   Q.  And did that -- when did that start?

9   A.  Also around, like, 14, 15 years old.

10  Q.  And you talked about doing work for your uncle who is a

11  cinematographer.

12          What type of work did you do for him?

13  A.  I was his production assistant.  So honestly, just, like,

14  lugging things around, waking up early in the morning to get

15  ready for these shoots.  And creative input, wherever he would

16  let me.

17  Q.  Mr. Rothschild, did you attend college?

18  A.  Yes.

19  Q.  What college was that?

20  A.  First, the College of San Mateo, which is a community

21  college, and then I took part-time classes in business at the

22  University of San Francisco.

23  Q.  And how old were you when you started college?

24  A.  16 and a half.

25  Q.  And while you were in college, did you continue to work in

1   these skatewear shops?

2   A.  No.  I started doing a bit more outside of that, but the

3   skate shops were always kind of part of my, like, summer

4   activities.

5   Q.  And did you continue to do graphic design or other projects

6   like that while you were in college?

7   A.  Yeah, throughout.  That was my way of, like, making money

8   to buy clothes and sneakers.

9   Q.  And what type of projects did you do?

10  A.  I just continued down that same line of, um, you know,

11  creating, you know, clothing graphics, um, you know, that you

12  would screen print on T-shirts.  I would create stuff for the

13  restaurants, like menus, everything that I could get.

14  Q.  And how long did you take any art classes in college?

15  A.  No.

16  Q.  And what kind of classes did you take in college?

17  A.  Kind of just general education.  I took a public speaking

18  class, I took some economics classes, you know, just general

19  education stuff, English.

20  Q.  Is College of San Mateo known as an art school?

21  A.  No, it's not.

22  Q.  How long did you attend college, Mr. Rothschild?

23  A.  Um, two semesters.

24  Q.  Why did you leave?

25  A.  Um, I was already working at the time or starting to work.

1   Um, I didn't feel like I was getting a lot out of school for

2   what I wanted to do later on in life.

3   Q.  And did there come a time when you moved to New York?

4   A.  Yes.

5   Q.  And when and why was that?

6   A.  Um, I was introduced to my now fiancée on social media.  I

7   went to visit her during, like, a snowpocalypse here in New

8   York.  I liked her a lot, so I decided to move out there from

9   California.

10  Q.  How old were you then?

11  A.  18.

12  Q.  And, ballpark, when did you move to New York?

13  A.  Um, like, a date?

14  Q.  Yes.  Year, ballpark?

15  A.  Oh, shoot, 20- -- kind of off on my dates.  It's hard to

16  remember.

17  Q.  How old were you at the time?

18  A.  I was 18.

19  Q.  All right.

20  A.  Yeah.

21  Q.  And you're 28 now.  So about ten years ago?

22  A.  Yeah, about.

23  Q.  OK.  And when you came to New York, where did you work?

24  A.  Sorry.  Can you repeat the question?

25  Q.  When you came to New York, did you work?

1    A.  Oh, yes.  Yes, I did.

2    Q.  All right.  And where did you work?

3    A.  Retrosuperfuture.  I don't think it was around now.  It was

4    on Howard Street.

5    Q.  What was Retrosuperfuture?

6    A.  It was an Italian sunglass maker.

7    Q.  And what did you do there?

8    A.  Sales.

9    Q.  How many people worked in the store?

10   A.  Maybe, like, four or five.

11   Q.  Did you do anything in addition to sales?

12   A.  We all did everything.  You know, we even created some of

13   the graphics that would go on the little, um, stanchions

14   outside.  It was kind of a family operation, like, a creative

15   director was there almost, like, every day.

16   Q.  Did you recall how much you got paid at Retrosuperfuture?

17   A.  Probably not much.  Maybe, like, 15 bucks an hour.

18   Q.  Now, while you were in New York, did you begin to work on a

19   project called art school dropout?

20   A.  Yes.

21   Q.  And could you please show to --

22          MR. HARRIS:  Ashley, could you please put up for the

23   judge and counsel what I hope is Defendant's Exhibit 522.

24   Q.  Do you recognize the shirt shown in Exhibit 522,

25   Mr. Rothschild?

1   A.  Yes, I do.

2              MR. HARRIS:  Your Honor, I offer 522.

3              MR. WARSHAVSKY:  No objection.

4              THE COURT:  Received.

5              (Defendant's Exhibit 522 received in evidence)

6              MR. HARRIS:  Do I have to ask?

7              Your Honor, I'm sorry.  Do I have to ask if I can

8   publish it, or once it's received, can I --

9              THE COURT:  No, you can go ahead and publish it.

10             MR. HARRIS:  Ashley, could you please show it to the

11  jury.

12  BY MR. HARRIS:

13  Q.  All right.  Now, you mentioned that you moved to New York

14  because you met a woman who is now your fiancée.

15             What is her name?

16  A.  Ericka del Rosario.

17  Q.  And when you met her, what was she?

18  A.  She was a student at Parsons.

19  Q.  And what is Parsons?

20  A.  Um, it's a pretty prestigious art school here in New York.

21  Q.  And what is the shirt we're looking at on Exhibit 522?

22  A.  What is it?

23  Q.  Yes.  What is that?

24  A.  It's a T-shirt that says Parsons in, like, collegiate font.

25  Q.  And did you make that shirt?

1    A.  Yes.

2    Q.  All right.  Can you tell the jury how that came about,

3    please?

4    A.  Yeah.  I mean, everybody that -- I mean, having a fiancée,

5    or my girlfriend at the time, going to school then, nobody

6    wanted to wear the merch that the school had.  And me, knowing

7    traditional colleges and how they just do a standard collegiate

8    font sweater and embroidered or not embroidered, I decided to

9    give the kids what they wanted.

10   Q.  And so how did you go about designing this shirt?

11   A.  Um, I picked the font.  Um, pretty much just laid it out in

12   illustrator, chose a color, and put it on a T shirt and

13   screen-printed it.

14   Q.  All right.  Do you do anything freehand, Mr. Rothschild?

15   A.  No.

16   Q.  How do you do your work?

17   A.  Everything on the computer.  I have really, like, shaky

18   hands, so traditional drawing is not my thing.

19   Q.  In addition to doing the one for Parsons, did you do any

20   additional T-shirts?

21   A.  Yes.  For Central Saint Martins, another art school in

22   London, and then Antwerp, which is in Belgium.

23   Q.  Are those both well-known art schools?

24   A.  To me, yes.

25   Q.  And were those T-shirts eventually sold?

1    A.  Yes.  We sold out in 48 hours.

2    Q.  How many did you make?

3    A.  About 500.

4    Q.  If you sold out in 48 hours after making 500, did you make

5    more?

6    A.  I didn't.

7    Q.  Is there a reason why you didn't make more?

8    A.  Parsons wasn't too happy and, honestly, I was just happy

9    with just the moment in time that I had.

10   Q.  When you say Parsons wasn't too happy, how did you learn

11   Parsons wasn't too happy?

12   A.  They sent me a cease and desist.

13   Q.  And Saint Martins, I'm sorry, was it Saint Martins, do I

14   have that right?

15   A.  Yes, Central Saint Martins.  I could be pronouncing it

16   wrong.  That's how I said it.

17   Q.  Did you hear anything from Central Saint Martins?

18   A.  Yes, but it was a little bit more positive.

19   Q.  What did Central Saint Martins say?

20   A.  They wanted --

21               MR. WARSHAVSKY:  Objection.

22               THE COURT:  Sustained.

23               (Continued on next page)

24

25

N1vnher6                          Estival – Direct

1   Q.  Did Central Saint Martins send you a cease and desist?

2   A.  No.

3   Q.  Did Central Saint Martins approach you about something

4   else?

5   A.  Yes.

6   Q.  What was that?

7   A.  To sell it in their student store.

8   Q.  Did you in fact ever sell these T-shirts in Central Saint

9   Martins' stores?

10  A.  No.

11  Q.  And did you hear from Antwerp?

12  A.  Not at all.

13  Q.  Did this project also get attention in the press?

14  A.  Yes.

15  Q.  Do you recall where?

16  A.  Hypebeast, which is what we are looking at right now.  Four

17  Pins, which is another -- it's a kind of offshoot of Complex

18  Magazine.  That was more focused on sartorial fashion for some

19  reason.

20  Q.  For those of us not familiar with Hypebeast, how would you

21  describe Hypebeast?

22  A.  Probably one of the highest trafficked media websites for

23  like streetwear, luxury fashion, even technology and art.

24  Q.  Now, Mr. Rothschild, were you still living in New York when

25  the art school project was put out?

1    A.  No.

2    Q.  Where were you living then?

3    A.  We moved back to California.

4    Q.  "We" is?

5    A.  My girlfriend and I at the time.

6    Q.  That would be Ericka?

7    A.  Yes.

8    Q.  Ms. Rosario?

9    A.  Yes, Ms. Rosario, yes.

10   Q.  About how long did you live in New York?

11   A.  It was like seven or eight months.

12   Q.  Where did you live when were you here?

13   A.  In Brooklyn.

14   Q.  And why did you leave New York?

15   A.  I mean, the stories -- I mean, I wasn't too much of a fan

16   of just, like, the weather.  You know, coming from California

17   it's a really different kind of thing.  It was Fourth of July,

18   and I was on the subway and I was sitting under the door and

19   the kind of air conditioned fluid leaked on me, going to DUMBO

20   to watch the fireworks, and I think I knew I was going to take

21   my girlfriend back to California.

22   Q.  When you came back to California, did you get an apartment

23   or did you move back on home or what did you do?

24   A.  We moved back home temporarily, like, with my parents.

25   Q.  And did you work?

```
1    A.  Yes.

2    Q.  All right.  So when you came back home, what did you do?

3    A.  So before going back to California, I had secured a job

4    with Dior.  And that was the reason for, like, you know, being

5    confident and moving back home.

6    Q.  And what job was that?

7    A.  It was sales.

8    Q.  And where?  With which company?

9    A.  Dior.

10   Q.  What is Dior?

11   A.  It is a luxury fashion brand, been around for a long time

12   as well.

13   Q.  When you say you were doing sales for Dior, are you in a

14   store doing sales?  Are you on the phone?  Like, what kind of

15   sales were you doing?

16   A.  In the store.  I mean, I guess the title is like stylist.

17   So I get people dressed, sell them clothes in store, in San

18   Francisco.

19   Q.  In San Francisco.  For Dior.

20           And what type of clothes did you sell at Dior?

21   A.  I worked at the men's store.  I would sell a lot of suits

22   and lots of denim.

23   Q.  And about how long were you with Dior?

24   A.  A little over a year.

25   Q.  And why did you leave Dior?
```

1    A.  I got recruited by Saint Laurent in Los Angeles.  Ericka

2    didn't really like San Francisco that much, so we tried LA.

3    Q.  When you say Saint Laurent, is that Yves Saint Laurent?

4    A.  Yes, Yves Saint Laurent, YSL.

5    Q.  And what type of company is Yves Saint Laurent?

6    A.  Also a luxury fashion retailer, and they do, like, perfume

7    and stuff as well.

8    Q.  And so did you -- so you moved to Los Angeles, is that

9    right?

10   A.  Yes.

11   Q.  Where were you working for Yves Saint Laurent?

12   A.  Like, geographically?

13   Q.  Yes.

14   A.  In Beverly hills.

15   Q.  Where were you living?

16   A.  Downtown Los Angeles.

17   Q.  And what did you do at Yves Saint Laurent?

18   A.  The same; sell, sell clothing in store, style people

19   outside, like private clients.

20   Q.  Was that a desirable position for you?

21   A.  At the time, yes, for sure.

22   Q.  Is it fair to describe working at Yves Saint Laurent as

23   being a prestigious store, is that fair?

24   A.  Yes.

25   Q.  And how much money were you making at Yves Saint Laurent?

1   A.   It would range because of commissions, but between, like,

2   five and seven thousand a month.

3   Q.   How old were you at the time?

4   A.   About 20.

5   Q.   And how long were you at Yves Saint Laurent?

6   A.   About a year and a half.

7   Q.   And while you were with Yves Saint Laurent, were you

8   working on any graphics or art projects or anything of the

9   type?

10   A.   Yes.

11   Q.   And what types of things were you working on?

12   A.   So, the constant graphic stuff, was just, like, you know,

13   an additional source of income.  But I also did a couple of,

14   like, art projects as well with my buddy Eric.

15   Q.   I'm sorry.  I just didn't hear the end of that.  You just

16   trailed off.

17   A.   Sorry.  I did a couple of art projects with my buddy Eric,

18   which involved other luxury goods.

19   Q.   And those types of art projects, were you paid for those or

20   just stuff you're working on?

21   A.   No, they're pretty, like, small runs, just kind of ideas

22   that we had and we decided to execute on, so we put our money

23   into it.

24   Q.   How long were you with Yves Saint Laurent?

25   A.   About a year and a half.

1    Q.  And why did you leave Yves Saint Laurent?

2    A.  So, the creative director at the time was Hedi Slimane, who

3    I was like a big fan of when he was Dior and then Saint

4    Laurent, which was obviously why I decided to leave Dior as

5    well.  It was a great opportunity to work with somebody that I

6    admired, and he was leaving the company so I decided to kind of

7    go with.

8    Q.  What is the creative -- at a company like Yves Saint

9    Laurent, what is the creative director?

10   A.  The creative director designs or at least heads all of the

11   design for every collection.  In some cases they change, like,

12   the logo of the company, they design the shopping bags, the

13   whole experience, they create that.

14   Q.  And I'm sorry, what was the -- I just can't catch it.  What

15   was the man or woman's name who was creative director at Yves

16   Saint Laurent?

17   A.  Hedi Slimane.  He is a French designer.

18   Q.  Did you know Mr. Slimane?

19   A.  Not personally.

20   Q.  When Mr. Slimane leaves the company, you don't know him,

21   but you still feel you should leave.  Why is that?

22   A.  When a creative director leaves, the kind of company ethics

23   also change.  We felt that while the transition was kind of

24   happening, and I just wasn't a fan of what the company was

25   becoming, so I decided to leave.

1   Q.   Did you have another job?

2   A.   Not at the time, besides some freelance stuff.

3   Q.   So you're like 21, 22 years old?

4   A.   21, yeah, maybe 21 and a half.

5   Q.   Making ballpark 70,000 a year?

6   A.   Approximately.

7   Q.   You decided to leave the company because the creative

8   director left?

9   A.   Yes.

10  Q.   Were you scared?

11  A.   Not necessarily.  I always had the means of, you know,

12  making income through graphic design stuff.  I had saved up

13  plenty.  We didn't have, like, a crazy cost of living with the

14  amount of money I was making at the time and I had a good

15  amount of savings.

16  Q.   After leaving Saint Laurent, did you get another position?

17  A.   Yes.

18  Q.   And about how long did that take?

19  A.   I would say maybe like three months.

20  Q.   What was that new position?

21  A.   I was at RSVP Gallery.

22  Q.   What is RSVP Gallery?

23  A.   RSVP gallery is a concept store that started in Chicago

24  that was founded by Virgil Abloh and Don C.

25  Q.   Again, for those of us not familiar, what is a concept

1    store?

2    A.  To me a concept store is just like not a traditional brick

3    and mortar.  It's like, you know, something that goes beyond

4    just a natural, normal store.  You know they have, like, you

5    know, a cafe or, like, a library embedded into it.  So it's

6    something that's just, like, out of the ordinary.

7    Q.  You said it is not ordinary brick and mortar.  Does a

8    concept store have to have an online presence, or when you are

9    saying concept store, you are talking about the physical store

10   is not an ordinary store.  I am just trying to understand.

11   A.  I think it can go both ways.  I mean, there are, like,

12   concept e-commerce platforms, but for the most part I am

13   speaking towards, you know, RSVP Gallery being the brick and

14   mortar.

15   Q.  You say it is out of Chicago.  Did you mention who ran that

16   store?

17   A.  Yes.  It was founded by Virgil Abloh and Don C.

18   Q.  And who are -- let's take them one at a time.  Who is

19   Virgil Abloh?

20   A.  Vigil Abloh is a kind of creative director.  He started off

21   as an architect, became a stylist, became a designer, became an

22   artist, and he just had a show recently at the Whitney.

23   Q.  Did you ever meet Mr. Abloh?

24   A.  Yes.

25   Q.  And was he an inspiration to you?

1     A.   Yes.

2     Q.   Why is that?

3     A.   The work that Virgil did while he was around -- he passed

4     away last year.  Everybody who's in my age group or friend

5     group can attest some type of inspiration from him, being this

6     guy who went from architecture and started designing, you know,

7     stage visuals for Kanye or clothing capsules that turn into,

8     you know, these massive brands and eventually becoming creative

9     director of Louis Vuitton.

10    Q.   And who was Don C?

11    A.   Don C was a friend of Virgil's who was also doing

12    streetwear at the time, most notably known for putting, like,

13    snakeskin on NBA Jerseys like vintage jerseys or retro jerseys

14    and the hats.

15    Q.   While you were at RSVP -- what did you do at RSVP?

16    A.   Again, we were a small team.  We were like five people

17    total I think at the LA location.  So we did everything from

18    selling, did designing, you know, just T-shirt drops that we

19    had in the store, and just, you know, household things.

20    Q.   Did you do any creative work for RSVP?

21    A.   Yes.

22    Q.   What type of creative work did you do for RSVP?

23    A.   I designed a few T-shirts as well as designing, like, kind

24    of like art graphics for a flyer as well as social media

25    assets.

Q.  When you say "social media aspects," can you elaborate on

that please.

A.  Just like posts that you would see on Instagram or Twitter.

So I was like, you know, if we had a photo shoot or something I

would, you know, put, like, a graphic on it, telling people,

like, what brand it was, or, you know, just creating digital

assets for the company.

Q.  What is a digital asset?

A.  I guess anything that you could publish digitally.

Q.  A T-shirt is not a digital asset.  If I put a picture of

the T-shirt, if you do an Instagram post, that is a digital

asset?

A.  I would say if it goes through any type of editing or

alteration digitally like in Photoshop or Illustrator, then

it's a digital asset.

Q.  And while you were at RSVP, did you also do any freelance

graphic work?

A.  Yes.

Q.  And who were some of the folks you did freelance work for?

A.  Um, Maxfield was one of them in Los Angeles.

Q.  Let's stop right there.  What is Maxfield's?

A.  Maxfield is a luxury boutique.  It's been around I think 50

years in Los Angeles.  You know, it is an institution for

selling luxury goods as well as being like a cool concept

store.

1    Q.   Okay.  So what did you do for Maxfield's?

2    A.   At the time, my girlfriend, Ericka Rosario, was the

3    creative director, and she -- what we would do, all the same

4    things I did at RSVP.  So it was like social media assets,

5    mailers, like for, like e-mail marketing and stuff like that, I

6    would create all those graphics.

7    Q.   I'm sorry.  I just want to make sure I got it for the jury.

8         Ericka, your fiancee, is a creative director at

9    Maxfield's?

10   A.   Yes.

11   Q.   What does a creative director do at a store as opposed to a

12   brand like Saint Laurent?

13   A.   So, at the same time they are very similar.  At the time

14   Ericka was, you know, merchandising the store, making

15   everything look good.  During a holiday or any type of event

16   she would do, like, the window displays that you see in the

17   front as well as, like, the auxiliary John Bouvier house as

18   well.  She would kind of create the mood of the store as well

19   as doing the merchandising and make it look presentable.

20   Q.   In addition to Maxfield's -- I cut you off.  In addition to

21   Maxfield's, is there anybody else you did graphic work for

22   while you were working at RSVP?

23   A.   It would be hard to remember.  I did, like, a bunch of

24   stuff.  I was always kind of hustling to, to make money.

25   Q.   Do you know if, do you recall if you did any album design?

```
 1   A.  Yes.

 2   Q.  Okay.  Who have you done album design for?

 3   A.  Most notably Lil Uzi Vert.  He is a rapper.

 4   Q.  Did you work with any other musicians?

 5   A.  A few small-time ones.  And then when it came to merch

 6   design, I worked with Jerry Lorenzo to help on the store

 7   merchandise for Kanye.

 8   Q.  What is merch design?

 9   A.  Like, a store merchant, like, the stuff you buy at a

10   concert as, like, a --

11   Q.  Like the hats, T-shirts --

12   A.  Hats, T-shirts.

13   Q.  Hoodies?

14   A.  Yeah.

15   Q.  If my timeline is right, we are about up to 2020, is that

16   right?

17   A.  About.

18   Q.  Okay.  So did there come a time when you left RSVP?

19   A.  Yes.

20   Q.  All right.  About when?

21   A.  What was that.

22   Q.  About when was that?

23   A.  I believe, like, the end of 2020 or early 2021.

24   Q.  Let's just mark the pandemic.  So the pandemic started in

25   February, March 2020.
```

1    A.   Uh-huh.

2    Q.   Do you recall if you left RSVP before or after the pandemic

3    started?

4    A.   It was before.

5    Q.   Before.

6    A.   Yes.

7    Q.   Okay.  And when the pandemic hit in February, March 2020,

8    what were you doing then?

9    A.   I was doing a lot of freelance work as well as doing all

10   the stuff for Maxfield because Ericka was still creative

11   director.

12   Q.   When the pandemic hit, what did you do?

13   A.   LA was pretty much in lockdown, so I just -- there wasn't

14   much work to do, all the stores were closing, so there wasn't

15   much for me to do.  So I built a PC to play some video games

16   with my friends.

17   Q.   After building a PC, did there come a time when you tried

18   to learn additional graphics programs?

19   A.   I was already doing like Photoshop and Illustrator, but

20   with a PC you are able to do a lot more in terms of like

21   processing power, so I started to learn 3D.

22   Q.   Drawing 3D.  What is drawing 3D?

23   A.   So pretty much it's creating objects and, you know, in --

24   in a 3D space versus just two dimensional.

25   Q.   So they look 3D on the page?

N1vnher6                        Estival - Direct

1   A.  Yes.

2   Q.  Am I getting that right?

3   A.  Yes.

4   Q.  All right.  Photoshop and Illustrator, are those 2D

5   programs?

6   A.  They could be used in 3D, but it is not recommended.

7   Q.  And did you also continue to do graphics for folks during

8   the pandemic?

9   A.  For sure, wherever I could find it.

10  Q.  Now, did there come a time when you started thinking about

11  opening your own store?

12  A.  That was during the pandemic.

13  Q.  How did that come about?

14  A.  At the time Ericka was working at Maxfield, and she held a

15  pretty prominent position at Maxfield, and we were approached

16  by an investor from Japan to kind of start creating our own

17  kind of concept.

18  Q.  Did you in fact do that?

19  A.  Yes.

20  Q.  With the investor from Japan?

21  A.  Yes.  During the pandemic.

22  Q.  During the pandemic?

23  A.  Uh-huh.

24  Q.  And what is that store called?

25  A.  Terminal 27.

1   Q.  Do you recall when you -- is Terminal 27 a store that you

2   and Ericka and the Japanese investor owned?

3   A.  We're actually full owners at this point now.

4   Q.  Full owners meaning you and Ericka?

5   A.  Ericka.

6   Q.  Are full owners right now?

7   A.  Yes.

8   Q.  The Japanese investor, where is he now?

9   A.  We are opening a store in Japan this year, and he's going

10  to own the majority of the rights to that.

11  Q.  Did you sign a lease for the store?

12  A.  Ericka signed the lease, but, yes.

13  Q.  Do you recall when that was?

14  A.  I would say maybe Q3 of 2020.

15  Q.  So in the middle of the pandemic?

16  A.  Yeah.

17          MR. HARRIS:  Can we please show to the -- Ashley,

18  would you please put up for the jury -- not for the jury,

19  sorry, I misspoke -- for the witness, the Court, and counsel,

20  Plaintiff's Exhibit 581 -- Defense Exhibit 581.

21  BY MR. HARRIS:

22  Q.  Do you recognize Defense Exhibit 581?

23  A.  Yes, it's a Terminal 27 website.

24          MR. HARRIS:  Your Honor, I offer Exhibit 581.

25          MR. WARSHAVSKY:  No objection.

1           THE COURT:  Received.

2           (Defendant's Exhibit 581 received in evidence)

3           MR. HARRIS:  Ashley, if you could go ahead and show it

4   to the jury.

5           Thank you.

6   BY MR. HARRIS:

7   Q.  I'm sorry.  You were saying this is the website for

8   Terminal 27?

9   A.  Correct.

10  Q.  And up at the top you can see it says "Shop, Events,

11  Gallery, Editorial."  Right?

12  A.  Correct.

13  Q.  We were talking before about a concept store.  Would it be

14  fair to describe Terminal 27 as a concept store?

15  A.  Yes.

16  Q.  What types of things -- by the way, when did Terminal 27

17  open?

18  A.  It opened in March 2021.

19  Q.  What types of things does -- sorry.  What types of things

20  does Terminal 27 do?

21  A.  We sell clothes, both emerging designers and luxury

22  designers.  We sell art, both digital and physical.  And we

23  throw some of the best parties in LA.

24  Q.  When you sell art, are there artists that have had shows at

25  Terminal 27?

1    A.  Yeah, a few.

2    Q.  And who would that include?

3    A.  Vera Colombo, Noah Dillon, and Lucas Abat who did Hot Mess,

4    and numerous others who have done stuff, like Korean designers

5    and everything.  We did 40 events last year, and I would say

6    half were artists.

7    Q.  How much dollars' worth of art do you think you sold since

8    Terminal 27 opened?

9    A.  Physical art, about a half million.  Digital art about

10   $250,000.

11   Q.  Excuse me?

12   A.  $250,000 in digital art.

13   Q.  What is your role at Terminal 27?

14   A.  I'm the CMO.

15   Q.  You are the what?

16   A.  Chief marketing officer.

17   Q.  What is Ericka's role?

18   A.  She's the CEO.

19   Q.  And did Terminal 27, does Terminal 27 receive press

20   coverage?

21   A.  Yes.

22        MR. HARRIS:  Ashley, if you could please show to the

23   witness and counsel and the Court Defendant's Exhibit 609.

24   BY MR. HARRIS:

25   Q.  Mr. Rothschild, did there come a time when Terminal 27 was

1   written up in Vogue Magazine?

2   A.   Yes.

3            MR. HARRIS:  Your Honor, I --

4   Q.   Do you recognize what I'm showing you as Exhibit 609?

5   A.   Yes.

6   Q.   What is that?

7   A.   It is an article about the best fashion boutiques in

8   America by Vogue editors, and we are on this list.

9            MR. HARRIS:  Your Honor, I offer Defendant's Exhibit

10  609.

11           MR. WARSHAVSKY:  No objection.

12           THE COURT:  Received.

13           (Defendant's Exhibit 609 received in evidence)

14           MR. HARRIS:  Ashley, if you could please show it to

15  the jury.

16  BY MR. HARRIS:

17  Q.   Can we just scroll down.  Is there a picture of the store

18  here?  I forget.

19  A.   The one with the red chair is a picture of our store.

20  Q.   The one with the red chair is a picture of -- that is a

21  picture of Terminal 27?

22  A.   Uh-huh.

23  Q.   Thank you.

24           Now, did there come a time --

25           MR. HARRIS:  You can put this down.

1    Q.  Did there come a time in March of 2021 when you started

2    working on an NFT project?

3    A.  Yes.

4            MR. HARRIS:  Your Honor, I am not exactly sure how

5    long this segment is going to be.  I'm happy to go until 3:30

6    and stop in the middle.  I'm happy to do whatever you like.

7            THE COURT:  No, I think since we lost the time we need

8    to go to 3:30.

9            MR. HARRIS:  I will just keep going.

10           Terrific.

11   BY MR. HARRIS:

12   Q.  When did you first hear about NFTs, Mr. Rothschild?

13   A.  Probably the end of 2020.

14   Q.  And what was your understanding of NFTs at the time?

15   A.  One of my friends, Hyam, was making NFTs, publishing them

16   on Foundation.  And I followed her on Instagram and that was

17   kind of like my first introduction to it.  She makes art.  She

18   also was on Twitter -- she was creative director of Twitter for

19   a little bit.  She was selling art, and I was, like, oh, this

20   is kind of a cool space to kind of check out.

21   Q.  What is Foundation?

22   A.  Foundation is like an invite-only marketplace for artists

23   who mint or sell artwork, digital artwork.

24   Q.  Sorry.  I just have to unpack that a little.  You said is

25   it -- I may not have heard you right.  You said an invitation

1   only --
2   A.  Yes, so you have to be invited.  It might have changed by
3   now, but at the time you had to be invited by another
4   foundation artist to be able to publish work on Foundation.
5   Q.  Is there a difference between publishing and minting?
6   A.  Not necessarily.  You can use them interchangeably.
7   Q.  So you saw some art on Instagram and then you went and you
8   checked it out on Foundation?
9   A.  Yeah, it was kind of something new to me.  I had heard,
10  like, in different, like, there is an app called Clubhouse that
11  got popular during the pandemic.  People were talking about
12  NFTs then, so I kind of, you know, like, knew a little bit, but
13  my friend doing it was really what made me, like, look into it
14  and try to research what was going on.
15  Q.  Okay.  So did there come a time when you decided to do a
16  project?
17  A.  Yes.
18  Q.  How did that come about?
19  A.  Honestly, like, since Hyam actually sent me an invite to
20  Foundation, I started getting the wheels turning, started
21  trying to pull some inspiration of what I wanted to do.  So I
22  thought it would be kind of funny to do something ironic in the
23  space, so I made a chair.
24  Q.  Did you make an actual chair?
25  A.  Digital chair.

1        MR. HARRIS:  Ashley, can you please put up what's been

2   marked as Defendant's Exhibit 523, again just for

3   Mr. Rothschild, the Court, and counsel.

4   BY MR. HARRIS:

5   Q.  Mr. Rothschild, do you rec -- this is actually from the

6   Foundation site.  Do you recognize those two images?

7   A.  Yes.

8   Q.  What are they?

9   A.  They are a collection of chairs that I created called "Do

10  Not Sit."

11        MR. HARRIS:  Your Honor, I offer Defendant's Exhibit

12  523.

13        MR. WARSHAVSKY:  No objection, just a request --

14        THE COURT:  Received.

15        (Defendant's Exhibit 523 received in evidence).

16        MR. WARSHAVSKY:  I think this is different than our

17  523.  I just wanted to make sure they were correlated.  Okay.

18  BY MR. HARRIS:

19  Q.  Mr. Rothschild --

20        MR. HARRIS:  Ashley, could you please show it to the

21  jury.

22  BY MR. HARRIS:

23  Q.  All right.  So, Mr. Rothschild, there's two chairs on this

24  page which are rotating.

25  A.  Yes.

1   Q.  If we start with the one on the left of the screen, okay --

2            MR. HARRIS:  Ashley, could we undo that.  Could we

3   start with the one on the right of the screen.

4   BY MR. HARRIS:

5   Q.  If we start with the one on the right of the screen, can

6   you describe, what you are thinking here when you are doing

7   this chair, what the project is.

8   A.  Yes.  So the initial idea, the project is called "Do Not

9   Sit" because I thought it would be funny to create -- since

10  they're digital chairs you can't actually sit in them, so there

11  is a collection of chairs you can't sit in.

12           So it's kind of like these iconic chairs, this one is

13  a kangaroo chair by Pierre Jeanneret.  I kind of made it --

14  since these chairs -- this chair, I think it's like a 1960s

15  chair, that was created in Chandigarh, India.  They go for,

16  like, forty, fifty thousand dollars, and they have withstood

17  the test of time for being a wooden chair.

18           So, kind of taking inspiration from Daniel Arsham, I

19  took these future, like, relic-ish chairs that are made of

20  concrete, and I kind of destroyed them a little to show that

21  they do wear and they still stand strong.

22           And then the shroud is kind of funny because at estate

23  sales, if you have ever been to an estate sale, they put this

24  kind of plastic tarp on stuff.  That was just kind of building

25  on the idea.

1    Q.  Okay.  You talked with Pierre Jeanneret.

2    A.  Yes.

3    Q.  And who is Mr. Jeanneret?

4    A.  He is an interior furniture designer, French, that actually

5    created all this furniture for a city in India called

6    Chandigarh.  He was given the task of creating all these

7    furniture pieces for the courtroom, people's dwellings, and

8    everything.

9    Q.  Now, Mr. Rothschild, you did not go to art school, right?

10   A.  Yes.

11   Q.  How do you know about Mr. Jeanneret?

12   A.  I just like furniture and I like art and I like history.  I

13   didn't need to go to school to be, like, taught about cool

14   things.

15   Q.  Why did you put the holes in the chair?

16   A.  I wanted to show a little bit of destruction, you know,

17   like, these things don't withstand the test of time in, like,

18   their purest form.  You know, they are not going to stay in,

19   like, mint condition.  I wanted to show is that there is a

20   little bit of, you know, wear and tear that goes with being

21   around for a long time.

22   Q.  This chair, the one we are looking at right here, did it

23   sell?

24   A.  Yes.

25   Q.  Is that last sold 1 Ether, is that the price?

1   A.  Yes.

2   Q.  And Ether is a currency that can be used to by NFTs, right?

3   A.  Right.  On the Ethereum blockchain.

4   Q.  The Etherium blockchain.

5          Can we look at -- if this chair were to be resold by

6   the buyer, would you get a follow-up royalty?

7   A.  I can't remember if there is a royalty set for this.  But

8   if there was, yes.  I am not sure if I set a royalty for this

9   one in particular.

10  Q.  Was that something different about NFTs that artists could

11  get resale royalties?

12  A.  Yeah.  That -- I feel like that was the driving force in

13  how NFTs got their popularity was the ability to, you know,

14  give back to artists in perpetuity, unlike how traditional art

15  is, where, you know, you have, like, Basquiat and stuff, and

16  their family won't be able to claim royalties on the millions

17  of dollars that their artwork sells for.

18  Q.  And do you recall how much money it was worth at ballpark

19  at this time?

20  A.  I think maybe 3,000, 4,000.

21  Q.  And then --

22          MR. HARRIS:  Ashley, could you please just slide over

23  and show the other chair.

24  BY MR. HARRIS:

25  Q.  All right.  What is the thought process behind this chair?

1   A.  Similar idea as you can see from the first one, but this is

2   a Toto sofa or a Toto chair by Michael Duporoy, also a very

3   popular chair.  We have one at home.  And it's kind of done

4   with like a little bit of concrete.  You can kind of see the

5   rebar through it and a missing piece off that edge.

6   Q.  You mentioned when we were talking that Daniel Arsham was

7   also an inspiration along with Mr. Jeanneret?

8   A.  Jeanneret did the chair, but in terms of like this art

9   style, Arsham was definitely my inspiration.

10  Q.  What types of works does Mr. Arsham do?

11  A.  Daniel does mainly works created out of plaster and

12  concrete.

13  Q.  Actual concrete?

14  A.  Yes.

15  Q.  And this is digital?

16  A.  This is digital, yeah.

17  Q.  This is not a real chair; this is just the image?

18  A.  Yes, not a real chair, just an image, created in 3D.

19  Q.  When someone buys this image, they are -- when someone buys

20  the NFT, they are -- is it is fair to say they're acquiring

21  this image?

22  A.  Yes, they own the image.

23  Q.  Now, did you work with somebody else?  Did you do this all

24  by yourself?

25  A.  No.

1   Q.  All right.  So what's the process by which these got made?

2   A.  So I came up with the concept of the chair, selected the

3   chair, selected the material and, like, what it would be made

4   out of and how it would look in the composition of it, the

5   lighting, everything but like the actual simulation of it.

6   Q.  You mean the actual -- the chairs are spinning.

7   A.  Uh-huh.

8   Q.  Is that the simulation or is the picture the simulation or

9   is it all a simulation?

10  A.  All a simulation.  You kind of -- when you create a -- any

11  type of 3D object, you have to create the lighting, where the

12  lighting comes from, how strong the lighting is, the backdrop.

13  You are creating a full image or a moment in time on the

14  computer.

15          THE COURT:  All right.  I think we are at 3:30.

16          So time to adjourn for today.

17          So, ladies and gentlemen, we will start at 9:30

18  tomorrow.  Have a very good evening.

19          We will see you then.

20          THE COURT:  I should mention we are sitting tomorrow

21  also until 3:30.

22          (Continued on next page)

23

24

25

N1vnher6                     Estival – Direct

1              (Jury not present)

2              THE COURT:  All right.  You can step down.

3              THE WITNESS:  Thank you.

4              (Witness left the stand)

5              THE COURT:  Okay.

6              So I will see you folks at 9:00 tomorrow.

7              Have a good evening.

8              (Adjourned to February 1, 2023, at 9:00 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     KEVIN MENTZER

 4    Direct By Mr. Ferguson . . . . . . .126 (continued
      Cross By Mr. Millsaps  . . . . . . . . . . . 136
 5     NICHOLAS MARTIN

 6    Direct By Mr. Warshavsky . . . . . . . . . . 146
      Cross By Mr. Millsaps  . . . . . . . . . . . 197
 7    Cross By Mr. Millsaps  . . . . . . . . . . . 206
      Redirect By Mr. Warshavsky . . . . . . . . . 223
 8     SONNY ESTIVAL

 9    Direct By Mr. Harris . . . . . . . . . . . . 225

10                          PLAINTIFF EXHIBITS

11    Exhibit No.                               Received

12     26    . . . . . . . . . . . . . . . . . . 155

13     35    . . . . . . . . . . . . . . . . . . 157

14     13    . . . . . . . . . . . . . . . . . . 157

15     16    . . . . . . . . . . . . . . . . . . 161

16     377   . . . . . . . . . . . . . . . . . . 166

17     14    . . . . . . . . . . . . . . . . . . 170

18     15    . . . . . . . . . . . . . . . . . . 171

19     227   . . . . . . . . . . . . . . . . . . 178

20     244   . . . . . . . . . . . . . . . . . . 183

21     227, page 99   . . . . . . . . . . . . . . 185

22     146   . . . . . . . . . . . . . . . . . . 186

23     239   . . . . . . . . . . . . . . . . . . 186

24     379   . . . . . . . . . . . . . . . . . . 188

25     20    . . . . . . . . . . . . . . . . . . 189
```

1     82    . . . . . . . . . . . . . . . . . . . 192

2     21    . . . . . . . . . . . . . . . . . . . 207

3                           DEFENDANT EXHIBITS

4     Exhibit No.                              Received

5     522   . . . . . . . . . . . . . . . . . . 236

6     581   . . . . . . . . . . . . . . . . . . 254

7     609   . . . . . . . . . . . . . . . . . . 256

8     523   . . . . . . . . . . . . . . . . . . 259

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25