N1UNHER1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    HERMÈS INTERNATIONAL, et al.,

4                    Plaintiffs,

5            v.                              22 Civ. 384 (JSR)

6    MASON ROTHSCHILD,

7                    Defendant.

8    ------------------------------x
                                         New York, N.Y.
9                                        January 30, 2023
                                         9:30 a.m.
10
     Before:
11
                         HON. JED S. RAKOFF,
12
                                         District Judge
13                                       -and a Jury-

14

15                          APPEARANCES

16   BAKER & HOSTETLER LLP
          Attorneys for Plaintiffs
17   BY:  DEBORAH A. WILCOX
          OREN J. WARSHAVSKY
18        GERALD J. FERGUSON

19   HARRIS ST. LAURENT & WECHSCLER LLP
          Attorneys for Defendant
20   BY:  ADAM B. OPPENHEIM
          JONATHAN A. HARRIS
21
     LEX LUMINA PLLC
22        Attorneys for Defendant
     BY:  RHETT O. MILLSAPS, II
23

24

25

N1UNHER1

| | |
|---|---|
| 1 | (Case called) |
| 2 | (Case called) |
| 3 | THE DEPUTY CLERK:  Counsel, please state your names |
| 4 | for the record. |
| 5 | MR. WARSHAVSKY:  Oren Warshavsky, Baker Hostetler, |
| 6 | counsel for plaintiff Hermès. |
| 7 | Good morning. |
| 8 | THE COURT:  Who are the other people at your table. |
| 9 | MR. WARSHAVSKY:  Gerald Ferguson of Baker Hostetler; |
| 10 | Deborah Wilcox of Baker Hostetler; Nicholas Martin, who is the |
| 11 | client, and Lisa Gehman of Baker Hostetler. |
| 12 | MR. MILLSAPS:  Good morning, your Honor.  I am Rhett |
| 13 | Millsaps of Lex Lumina, PLLC, for defendant Mason Rothschild. |
| 14 | And here to my right is my cocounsel Jon Harris from |
| 15 | the law firm of Harris St. Laurent & Wechsler.  And defendant |
| 16 | Mr. Rothschild is here to his right.  Also from the Harris law |
| 17 | firm is Adam Oppenheim to his right and then directly behind me |
| 18 | is my partner Chris Sprigman from Lex Lumina. |
| 19 | THE COURT:  Good morning.  All witnesses except for |
| 20 | the two client representatives seated at the respective tables |
| 21 | are immediately excluded from this courtroom until they |
| 22 | testify.  So if there's anyone in this courtroom now who is a |
| 23 | witness they need to leave right this moment. |
| 24 | Good. |
| 25 | Okay.  Let's deal with the motions *in limine*. |

N1UNHER1

1          So the motion of Hermès to exclude the testimony of

2     Dr. Gopnik is granted.

3          The motion of Hermès to exclude the testimony of

4     Dr. Neal is denied.

5          The motion to bar mention of certain analogies, such

6     as the Warhol analogy, is denied in the abstract, but I am not

7     at all sure how either side is going to put that into evidence.

8     So, for example, since Dr. Gopnik's testimony is excluded, it

9     is not coming in through him.  I suspect it may not be so

10    obvious that it comes in over hearsay and other objection, and

11    certainly no one can refer in opening or otherwise to something

12    that's not likely to be in evidence.  Even if an expert were to

13    testify to it, of course, an expert can testify to matters not

14    yet in evidence as long as they would be admissible, and I am

15    not sure any of this would be admissible.

16         So while the motion is denied, as I say it is in the

17    abstract.  That of course does not reach the issue of whether

18    or not any evidence will come into court that will allow making

19    those analogies.

20         The motion to exclude Trial Exhibits 593, 594 and 595

21    is granted.

22         Turning to defendant's motions, the motion to exclude

23    posts made on defendant's social media accounts is denied.

24         The motion to exclude the testimony of Boriana

25    Guimberteau is granted; and the motion, there are really two

1    but they are both to exclude certain postlitigation statements

2    made by Mr. Rothschild, is granted.

3           So those are the rulings on the motions *in limine*.

4           Turning to objections -- oh, I should say this.  All

5    my rulings on motions *in limine* of course are subject to the

6    exception if someone opens the door.  So if Mr. Rothschild gets

7    up and testifies about certain postlitigation statements he

8    made, then he may open the door to the statements that I just

9    excluded.  That is, I think, obvious.

10          When objections are made at trial, my practice is to

11   allow in front of the jury no more than three words, as

12   follows:  "Objection," and either one or two words of the

13   ground, like "hearsay" or "foundation."

14          Or, if it is a little more complicated than that, then

15   you can invoke the relevant rule of evidence.  So, "objection,

16   Rule 403."

17          If there's more to it than that, you can request a

18   sidebar, and I will, within limits, grant that.  But I don't

19   want argument about objections in front of the jury.

20          With respect to timing, it's gotten a little more

21   complicated since we spoke on the phone.

22          We will sit today until 4:00.

23          We will sit tomorrow, Wednesday, and Thursday only to

24   3:30.  However, we will not give the jury a midafternoon break.

25   So we will make up some of that lost time that we would have

1    had if they had sat later.

2              And then we will sit on Friday to 4 or, if necessary,

3    until 4:30.

4              In light of that somewhat shortened schedule, as I

5    already indicated was likely, I am going to tell the jury that

6    the case will likely go over, may go over to early next week.

7              That is all on my list.

8              Anything you guys wanted to raise?

9              MR. HARRIS:  Your Honor, should I stand?

10             THE COURT:  No.

11             My wife doesn't stand when she addresses me.  I don't

12   know why you should.  But do speak into the microphone.

13             MR. HARRIS:  Thank you, your Honor.

14             We have two or three interrelated issues of evidence

15   that we think are going to come up and will be implicated as

16   soon as the opening, and we want to get ahead of them so we

17   didn't interrupt the opening from Hermès' counsel.

18             THE COURT:  Go ahead.

19             MR. HARRIS:  The first issue is there are a lot of

20   text messages in this case.

21             THE COURT:  Oh, yes.  By the way, forgive me.  I'm

22   sorry.  It is my practice to, before openings, always give the

23   jury a very brief preliminary instruction describing in a rough

24   way what the case is about legally.

25             So let me hand or have my law clerk hand each side a

N1UNHER1

1    copy of the preliminary instruction.  While we are talking

2    about other things, someone from each side should look it over

3    and see whether there are any objections or additions that you

4    want to have.

5              But go ahead.

6              MR. HARRIS:  Your Honor, there are a lot of text

7    messages in the case, and many of them involve Mason

8    Rothschild, who is the defendant.  We don't object to

9    Mr. Rothschild's statements coming in, but some of these text

10   chains are quite long.  I mean, I could hand one up, but this

11   is an example.

12             THE COURT:  Sure.  Hand it up.

13             Okay.  So these are Plaintiff's Exhibit 111, is that

14   right?  Or is it your exhibit?

15             MR. HARRIS:  It should be Plaintiff's Exhibit marked,

16   your Honor.

17             THE COURT:  Okay.

18             MR. HARRIS:  It's Plaintiff's 306.

19             THE COURT:  Why is it marked as Exhibit 111.

20             MR. HARRIS:  I'm sorry.  That is an old marking from

21   the deposition.  We should have taken that off, your Honor.

22             THE COURT:  Anyway, go ahead.

23             MR. HARRIS:  So, for example, if Hermès wishes to show

24   a text from this to Mr. Rothschild, it's probably

25   unobjectionable, but I don't believe the entire document should

N1UNHER1

1    come in.

2              THE COURT:  I think that's likely the case.

3              What does that have to do with opening?

4              MR. HARRIS:  So, I was doing two things, your Honor:

5              One Mr. Rothschild is going to testify relatively

6    early in the case, so I wanted to flag the issue for you.

7              The second thing is there are some things in opening

8    that Hermès has told us that they would like to use, which I

9    think are either double hearsay, or Mr. Rothschild repeating

10   something he heard from someone else.

11             THE COURT:  Give me an example.

12             MR. HARRIS:  Yes.  So, Ashley, could you call up,

13   where would I find this, the one with "Noble says he will"?

14             It's 305, at 8.

15             Is that in here?

16             THE COURT:  Is this part of this exhibit?

17             MR. HARRIS:  Can we put it on your monitor, your

18   Honor?

19             THE COURT:  That's fine.  But is it part of this

20   exhibit?

21             MR. HARRIS:  It is not.

22             THE COURT:  It is a different exhibit?

23             MR. HARRIS:  It is, your Honor.

24             Your Honor, this is part of a long text chain, and

25   here Mason Rothschild says, "Noble says he'll get the whales on

N1UNHER1

1    it."

2           So that's double hearsay.  We would object to that.

3    That is an example.

4           THE COURT:  You can't really tell without the context.

5           Let me ask plaintiff's counsel, what are you saying

6    about this in your opening?

7           MR. WARSHAVSKY:  Thank you, your Honor.

8           I think to the extent it is an objection about

9    hearsay, what we are offering this for is that Mason Rothschild

10   was communicating this, and our point on this is that Mason

11   Rothschild was get to get whales, or big investors, and that's

12   the reason we are doing this.  Whether it's true that Noble

13   said it, when Noble said it, whether it was a lie when Noble

14   said it is almost irrelevant.  The point is he's communicating

15   this to his other investors.

16          THE COURT:  Who is Noble?

17          MR. WARSHAVSKY:  Noble is an influencer.

18          THE COURT:  Pardon.

19          MR. WARSHAVSKY:  I believe he is an influencer that

20   Mr. Rothschild is working with.

21          THE COURT:  If you don't even know who he is I don't

22   see how this can come in on opening.

23          Next?

24          MR. WARSHAVSKY:  Well --

25          THE COURT:  Sustained.

N1UNHER1

1        Once I've ruled, I've ruled.

2        MR. WARSHAVSKY:  I'm sorry.

3        MR. HARRIS:  Your Honor, I did ask for them last

4   night.  He did give them to us this morning, the list of text

5   messages he's planning on using in opening.  It is a really

6   extensive list.  It's about 30 messages, and I have had about

7   15 minutes to look at it.  But I apologize, I can't raise for

8   your Honor right now all of the text messages that I find are

9   problematic, and I don't want to interrupt his opening.

10       THE COURT:  Well, I am not quite sure what you are

11   saying, but it sounds like you are not making any further

12   objection at this time.

13       MR. HARRIS:  I am not making any further objection.

14   But if there is something which comes up in the opening which I

15   think is objectionable, I guess I am asking how you would like

16   us to handle it.

17       THE COURT:  So there are two different things you can

18   do.  If you think it is so clearly objectionable, has no basis

19   in evidence and is prejudicial on its face, then you can object

20   right then and there.  But you better be right, because it is

21   not good to interrupt counsel's openings on either side.

22       If it's something you are less certain about or you

23   feel is less material, then at the end of his opening you can

24   request a sidebar, and before we begin with your opening I will

25   hear you on that.  If I have to instruct the jury to disregard

N1UNHER1

1    something, I will.

2             MR. HARRIS:  Thank you, your Honor.

3             And then the second thing on the text messages is when

4    Mr. Rothschild testifies as Mr. Warshavsky attempts to move

5    into or Hermès attempts to move into evidence something like

6    what I have handed you, I am probably not objecting to this.  I

7    may or may not be objecting to specific text, but what I am

8    objecting to is the entirety of some 30-page chain coming in.

9             THE COURT:  Let me find out from plaintiff's counsel.

10            Are you intending to put in the whole, in this case it

11   looks like 107 pages of an e-mail chain, which certainly shows

12   that the two people involved in messaging were digitally adept,

13   but in any event, are you planning to put it all in?

14            MR. WARSHAVSKY:  We are planning to put in the whole

15   thing just so it is a complete document.  We will be happy to

16   limit it to the pages, that page or the pages around it for

17   context.

18            THE COURT:  All right.  So at the first break, why

19   don't you discuss with the defendant's counsel how they would

20   like to limit it.  That seems to me the right solution.

21            All right.

22            Anything else?

23            MR. HARRIS:  Yes, your Honor.  We have one additional

24   issue which, again, is going to come up in opening.  There is a

25   number of newspaper articles that both sides want -- different

N1UNHER1

1    articles.

2            THE COURT:  I just excluded two of them.

3            MR. HARRIS:  I know you did, your Honor.

4            THE COURT:  Yes.

5            MR. HARRIS:  Mr. Warshavsky told us last night that he

6    would like to put in an article from the New York Post and use

7    it in his opening, and we object to the article.  It's hearsay.

8            THE COURT:  Can I see it, please.

9            MR. HARRIS:  Can you publish it?

10            MR. WARSHAVSKY:  Do you have a copy of it?

11            THE COURT:  Let's have plaintiffs show it to me.

12            MR. WARSHAVSKY:  I am sorry, your Honor.  It will be a

13    moment.  I can also comment we are not offering this for the

14    truth of the matter asserted.  We are offering this, as we are

15    with anything from the press, just for the fact that it is

16    stated, because this is a case about confusion.

17            THE COURT:  The reason I excluded 593 and 594, even

18    though the same argument had been made, was that it is

19    expressly referred to this case.  Indeed, the first article,

20    which was Defendant's Exhibit 593, and the relevant section was

21    a discussion of "two potentially significant cases will take

22    place early this year in the Southern District of New York."

23    The first one that's described is a case I never heard of,

24    *Adidas v. Tom Brown*, and then there's this one.

25            I think it is a 403 problem, since the discussion is

N1UNHER1

1   in the context of this case.  So any probative value is

2   outweighed by the prejudice.  The same is also true, if I

3   recall correctly, although I will have to go back and look, but

4   anyway for 594.

5          So what is the one in the New York Post?  I should say

6   that the articles that I just excluded, one was in the New York

7   Times; the second was in another journal.  So I may have to

8   exclude the one from the New York Post on the grounds of equal

9   treatment of all publications, but let's seriously hear or see

10  what the article is.

11         MR. WARSHAVSKY:  I am asking my colleague Ms. Gehman

12  to bring it up and show what we were going to show during

13  opening.

14         Your Honor, this was an article from last January,

15  before the case, and this was an article where the New York

16  Post credited Hermès, so that Mr. Rothschild's project was –– I

17  don't want to overstate it –– sponsored by or associated with

18  Hermès.  I will get you the exact language.  That's the reason

19  for using it.

20         THE COURT:  I need to see the article.

21         MR. WARSHAVSKY:  Yes.

22         She is obtaining it right now.  I apologize, your

23  Honor.

24         THE COURT:  While we are waiting on that, anything

25  else?

N1UNHER1

1          MR. MILLSAPS:  Your Honor, we have one other issue

2     about the preliminary instruction after reading.

3          THE COURT:  Yes.

4          MR. MILLSAPS:  So the problem instruction says the

5     plaintiff Hermès owned trademarks in the word Birkin and the

6     design or trade dress of the Birkin handbag and that the

7     company claims the defendant infringed and diluted these marks.

8     But Hermès actually in their proposed jury instructions filed

9     yesterday, this is Docket No. 137-1, they have a preliminary

10    instruction, the trademarks at issue, and in that preliminary

11    instruction, they say here Hermès asserts infringement, unfair

12    competition, dilution, and cybersquatting of the Birkin

13    trademark, meaning the word Birkin.  Hermès also asserts unfair

14    competition over Mr. Rothschild's use of the Birkin trademark

15    and also use of the Birkin handbag trade dress.  So it appears

16    they are not actually asserting dilution or infringement of the

17    trade dress.

18         THE COURT:  Well, so you want me to say that the

19    company claims that the defendant Mason Rothschild infringed,

20    diluted, or otherwise engaged in unfair competition with

21    respect to these others?

22         MR. MILLSAPS:  Well, the point is that they are only

23    claiming infringement and dilution on the Birkin word mark.

24         THE COURT:  I understand that.  I agree that that --

25    but I really wonder -- for example, I didn't put in anything

N1UNHER1

1    because this is just a preliminary instruction, about

2    cybersquatting, even though that will be part of the final

3    instructions, assuming it makes it to the jury, because I want

4    to keep it simple.

5            But if you prefer, I will add the company claims the

6    defendant Mason Rothschild infringed, diluted, or otherwise

7    engaged in unfair competition with respect to one or more of

8    these marks.

9            Okay?

10           MR. MILLSAPS:  Okay.  Thank you, your Honor.

11           THE COURT:  All right.

12           I assume the plaintiff has no objection to that.

13           MR. WARSHAVSKY:  No objection, your Honor.

14           Your Honor, may I approach with the New York Post

15    article from last year?

16           THE COURT:  Yes, you may.

17           MR. WARSHAVSKY:  This is the article.  It's page 89,

18    and this is the demonstrative exhibit.

19           THE COURT:  Well, this clearly does show confusion.

20    Why should it not be part of opening statements?

21           MR. HARRIS:  Your Honor, two reasons.  First, it is

22    double hearsay.  They are reporting what Elle says.

23           THE COURT:  No, it is not being offered for its truth.

24    It is being offered for the fact that even the New York Post,

25    and I will admit that I am a great fan of the New York Post,

N1UNHER1

1    but mostly its sports coverage, but, in any event, even the New

2    York Post got it wrong.

3          MR. HARRIS:  The second reason, your Honor, the

4    stronger reason, and I believe we briefed this in the motions

5    *in limine*, is that the evidence of confusion has to be evidence

6    of confusion amongst consumers, and that evidence of confusion

7    in the press or reporters' questions is not actually valid

8    evidence of confusion in a trademark case.

9          So this is --

10          THE COURT:  That is a more germane point.  Let me hear

11    from plaintiff's counsel.

12          MR. WARSHAVSKY:  Sure, your Honor.

13          First, evidence of actual confusion is not limited --

14    I think both sides briefed this -- it is not limited to just

15    purchasers.  The whole test is the likelihood of confusion.

16    But actual confusion can be among anybody.  I think we cited --

17    I'm trying to get it out, but we cited cases from --

18          THE COURT:  Ultimately, it will have to be narrowed

19    down to consumers or potential consumers; but you're right that

20    other evidence of confusion is circumstantial evidence of

21    consumer confusion as well.  So indeed the argument would be if

22    even a reporter who covers this area got it mixed up, the poor

23    consumer would surely get it mixed up or something like that.

24          What do you say to that?

25          MR. HARRIS:  Your Honor, if I may allow Mr. Millsaps

N1UNHER1

1    to answer that.  He's more familiar with the case on that

2    issue.

3              THE COURT:  Sure.  Of course.

4              MR. HARRIS:  Give us just one moment, your Honor.  We

5    are just finding it from our motion *in limine*.

6              THE COURT:  Yes.

7              The full sentence, so the record is complete, "Even

8    Hermès, the company responsible for the ridiculously expensive

9    Birkin bag," I would think you would be delighted to have that

10   in evidence, has entered the metaverse.  "On December 17, the

11   company unveiled the MetaBirkin, a VR version of its signature

12   bag created by LA artist Mason Rothschild and made just a

13   hundred of them.  There's something for both sides actually in

14   that, including the use of the term "artist" with respect to

15   Mr. Rothschild.  But you are moving to exclude it.

16             So it is not being offered for its truth.  It is being

17   offered for evidence of confusion.  I think plaintiff's counsel

18   is right that evidence of confusion by other persons in the

19   area is relevant even though ultimately damage is determined by

20   consumer injury.

21             So I am inclined to overrule the objection.  Okay?

22             MR. HARRIS:  Okay, your Honor.  Thank you.

23             THE COURT:  Anything from plaintiff's counsel?

24             MR. WARSHAVSKY:  No, your Honor.  I have one question

25   about your *in limine* ruling if that's okay.

N1UNHER1

1          THE COURT:  Yes.

2          MR. WARSHAVSKY:  You had made a ruling on posttrial

3  statements of Mr. Rothschild.  Does that mean that those are

4  also excluded to challenge his credibility as well?

5          THE COURT:  So that's why I mentioned if he opens the

6  door.  But for at least the ones I saw the prejudice outweighed

7  the probative value if offered on your direct case.  That's why

8  I excluded it there.  If offered on cross-examination of

9  Mr. Rothschild, you'll need to overcome the fact that they

10  still seem to be quite prejudicial to Mr. Rothschild and of

11  limited probative value on impeachment.

12          Now, if he says something in his direct that opens the

13  door, that's one thing.  If he doesn't, you may still offer

14  them, but only at the sidebar.  So when you get ready to do

15  that, come to the sidebar and explain to me why my conclusion

16  of now, which is that the prejudicial impact considerably

17  outweighs their probative value, has now changed as a result of

18  whatever you say.  Okay?

19          MR. WARSHAVSKY:  Thank you, your Honor.

20          THE COURT:  All right.  Anything else?

21          MR. HARRIS:  Defendants have nothing else, your Honor.

22          MR. WARSHAVSKY:  There was one change to the

23  preliminary statement we showed to defendants.  I am hopeful it

24  is not objectionable, your Honor.

25          Can I furnish it to you.

N1UNHER1

1          THE COURT:  Yes.

2          MR. WARSHAVSKY:  I'm sorry.  It is written three

3    times.  I think if you just look to the bottom.

4          THE COURT:  I did not put NFTs in my preliminary

5    instruction, although I am sure both sides in their opening

6    statements will refer to them, because I thought it would be

7    overly complicated to the jury on a very preliminary

8    instruction.

9          My preliminary instruction starts out, as you can see,

10   by saying this is just a brief comment on some of the issues in

11   this case, and you are going to get a much more detailed

12   instruction at the end of the case.  So it was just a flag for

13   them some of the issues.

14         For example, in what you just handed up, you would add

15   "diluted these marks by creating and selling NFTs."  If I am a

16   juror I might say, "What the heck is an NFT?"  In fact, I think

17   that will be an issue that will occupy both sides on opening

18   statement, explaining to the jury what an NFT is, if I am not

19   mistaken, and I bet you can't do it in five words or less.

20         So that is why I didn't include it here.  I am going

21   to hand this back to you.

22         MR. WARSHAVSKY:  Thank you, your Honor.

23         THE COURT:  Okay.  Let's call the jury clerk and bring

24   up the jury panel.  I want to give you guys a five-minute break

25   and then we will reconvene.

N1UNHER1

1           The people in the back, when the jury panel is here,

2    they are going to have to sit in the front row so you are going

3    to need to move for now just to the back row you come back

4    later on after the jury panel is excused.

5           (Jury selection follows)

N1UsHER2

1          THE COURT:  OK.  We are ready to swear you in.

2          (A jury of eight was impaneled and sworn)

3          THE DEPUTY CLERK:  Jurors, if you would go out the

4   back of that jury box and use the aisle next to the windows and

5   go right into the door in front of you, which is your jury

6   room.

7          (Jury not present)

8          THE COURT:  To the other members of the jury panel who

9   dodged a bullet, it is still very important that you have been

10  here because you never know how many jurors we're going to

11  need.  So I appreciate deeply your willingness to be available

12  for jury service.

13          You should now go down to the room you came up from on

14  the ground floor, and my law clerk is going to call out right

15  now one of your names and will give that person the cards for

16  all of you, and that person will give the cards to the jury

17  clerk when you get downstairs.

18          Who is the person?

19          LAW CLERK:  Mary Vargas.

20          THE COURT:  Ms. Vargas, come on up and just get the

21  cards, and then everyone is excused.

22          Thank you, again.

23          (Venire excused)

24          So we'll start opening statements in ten minutes.

25  Anything else that counsel needs to raise with the court?

N1UsHER2

1          MR. WARSHAVSKY:  Your Honor, from the plaintiff, after

2    openings, the first witness will be testifying by video.  Not

3    by video, by prerecorded video.  It was the witness who is out

4    of town and unavailable.

5          THE COURT:  I'll let the jury know that.

6          MR. WARSHAVSKY:  We didn't know how you wanted us to

7    handle.  There are two objections which we both waived.

8    Otherwise, we spliced it so there are no objections.  We just

9    couldn't for those two because of when they arose.  We didn't

10   know how your Honor, if your Honor wanted to discuss it with us

11   and/or how you wanted to handle the exhibits that we had

12   offered and agreed to during that testimony.

13          Should we just hand it up to you ahead of time?

14          What would be easiest?

15          THE COURT:  Why are you starting with this witness?

16          MR. WARSHAVSKY:  Because he's the New York Hermès --

17   it's kind of the introduction to the case.

18          THE COURT:  All right.

19          MR. WARSHAVSKY:  He's the CEO of Hermès.

20          THE COURT:  Let me make sure I understand it.

21          So his testimony is -- and that is on consent of both

22   sides that he appear by video; yes?

23          MR. WARSHAVSKY:  Yes.

24          THE COURT:  So his testimony is going to be shown and

25   each of the jurors has their screen and the court has its

N1UsHER2

1      screen, so you'll just put it up on the screen.

2              When there are exhibits, you need to put them up on

3      the screen.  Maybe stop the testimony for a second, if these

4      are exhibits that are not being objected to but still have to

5      be received in evidence, and a number has to be given and the

6      court reporter has to put down what their number is.

7              So at that point we'll have to offer the exhibit by

8      number.  The other side will indicate there's no objection.

9      I'll receive it.  We'll show it on the screen, and then you'll

10     go back to the video.

11              Now there were, you say, two occasions?

12              MR. WARSHAVSKY:  There were, but the parties --

13              THE COURT:  They've disappeared?

14              MR. WARSHAVSKY:  They've disappeared.

15              THE COURT:  All right.

16              MR. WARSHAVSKY:  The exhibits, I realize your Honor

17     wasn't there.  We went through the process of offering, and

18     they were admitted at the time so that it would be clear on the

19     record for your Honor.

20              THE COURT:  I don't know what that means, but just so

21     you guys understand.

22              MR. WARSHAVSKY:  Correct.

23              THE COURT:  The only exhibits in evidence are ones

24     that have been offered during the trial.  I will then say any

25     objection?  And if there is no objection, that will be so

N1UsHER2

1    stated by the other side.  And then I will say the magic word

2    received.  If I don't say the word received, it's not in

3    evidence.  OK?

4              Very good.  See you in ten minutes.

5              (Recess)

6              THE DEPUTY CLERK:  May I bring in the jury?

7              THE COURT:  Please.

8              (Jury present)

9              Remain standing while the jury comes in.

10             Ladies and gentlemen, the jury people can all be

11   seated.  Everyone else here stands up in honor of you.  You can

12   be seated.  The only person who doesn't stand up is me.  That's

13   because I'm an old guy.

14             Now you can be seated.

15             So I've given you each a copy of a preliminary

16   instruction.  I'm going to read it to you now, but also you can

17   take it with you to --

18             We're missing a juror.

19             THE DEPUTY CLERK:  They just separated themselves.

20             THE COURT:  Pardon?

21             JUROR:  I'm in the wrong place.

22             THE DEPUTY CLERK:  I thought you just separated

23   yourselves on purpose.

24             JUROR:  My apologies.

25             THE COURT:  There we are.

N1UsHER2

1           We're going to read it together now, and then you'll

2      be able to take it with you into the jury room to consult, but

3      this is just a preliminary instruction.  At the end of the

4      case, we'll have much more detailed instruction.

5           So before we begin to hear the evidence, I want to

6      give you a brief overview of the claims in this case.  After

7      you have heard all of the evidence and the parties have made

8      their closing arguments, I will give you detailed instructions

9      of law that will displace this preliminary instruction and will

10     govern your deliberations.

11          This is a trademark lawsuit.  A trademark is a word,

12     name, or symbol that indicates to consumers the source of a

13     good or work.  A trademark's owner has the exclusive right to

14     stop others from (1) infringing the mark or using the mark in a

15     way that would confuse customers about who is behind a product

16     or work, and (2) diluting the mark or causing customers to

17     associate the mark with other products or works and thereby

18     undermining its distinctiveness.

19          The plaintiff, Hermès, owns trademarks in the word

20     Birkin and the design or trade dress of the Birkin handbag.

21     The company claims that the defendant, Mason Rothschild,

22     infringed, diluted, or otherwise engaged in unfair competition

23     with respect to one or more of these marks by creating and

24     selling a collection of digital images of fur-covered Birkin

25     handbags labeled MetaBirkins.

N1UsHER2                          Opening – Mr. Warshavsky

1          Because, however, MetaBirkins are at least in part

2     legally protected artistic works, Mr. Rothschild cannot be held

3     liable for any trademark violation, unless Hermès can prove

4     that Rothschild's use of its trademark name was either not

5     artistically relevant to the images or was explicitly

6     misleading as to their source or origin, giving people the

7     impression that the images were associated with Hermès.

8          Please remember that this preliminary instruction is

9     simply a very brief overview of the claims in this case.  I

10    will give you more detailed, final instructions that will

11    replace this overview and will govern your deliberations.

12         Now we're going to hear opening statements of counsel,

13    and I want to caution you that nothing that counsel says is

14    evidence.  The evidence will come from the witnesses, from the

15    exhibits, and from any stipulations that the parties enter

16    into.  So you may ask:  Why do we even have opening statements?

17    The answer is the evidence is going to come in one little bit

18    at a time and, therefore, it may be useful for you to have an

19    overview from the lawyers as to what they think the evidence

20    will show or fail to show, as the case may be.

21         So we begin with plaintiff's counsel.

22         Each side has been given up to a half hour or opening

23    statements.

24         MR. WARSHAVSKY:  Thank you, your Honor.

25         May it please the court, members of the jury.

1           Good morning still.  My name is Oren Warshavsky.  As I

2      mentioned earlier, I represent Hermès.  You're going to hear

3      that there are actually two companies here called Hermès.  One

4      is the U.S. company and then there is also the French parent

5      company.

6           This case is about what Hermès believes are violations

7      of its trademark rights, as you've just heard.  For almost 40

8      years, Hermès has been the manufacturer of the product called

9      the Birkin bag.  Hermès owns a federally registered trademark

10     for the word Birkin.  Hermès also owns a federally registered

11     trademark for the configuration of the Birkin bag.

12           Hermès alleges here, as you just heard, that

13     Mr. Rothschild infringed on its trademark rights when he

14     promoted and then sold a series of what is called non-fungible

15     tokens or NFTs, and they were called MetaBirkins.  I'll explain

16     to you in a little bit in a few minutes about what an NFT is.

17           Now, generally speaking, when there is a trademark

18     case, as you see in your instruction, the claim is really

19     focused on whether or not consumers will be confused.  And

20     Hermès brought this lawsuit because it thought that the

21     MetaBirkins NFTs infringed and they thought that the

22     MetaBirkins NFTs damaged the Birkin brand.

23           So let me start by telling you about Birkins

24     themselves.  What I'm holding here is an Hermès Birkin bag.

25     First witness you're going to hear from is named Robert Chavez.

Mr. Chavez is the CEO of Hermès in New York.  Now, Mr. Chavez is away and unavailable.  You're actually going to see a recording of his testimony taken a few weeks ago.

Mr. Chavez will tell you a little bit about the Birkin bag itself.  He will explain that it takes 18 to 24 hours for a highly skilled craftsman to make an Hermès Birkin bag.  That means about one to two Birkins per week per craftsman.

Mr. Chavez will also discuss with you the sales of the Birkin bag in the United States.  He will tell you that every year, for the last ten years, Birkins have sold over –- Hermès has sold over $100 million worth of Birkin bags in the U.S. alone.  So over a billion dollars over the last decade.

You will hear a little bit about how Hermès markets the Birkin.  You will also hear about the media coverage that the Birkin bag receives.  That media coverage is anything from magazines and newspapers to television series and movies. Mr. Chavez will even tell you about an episode of the TV show *Sex and the City*.  That episode was filmed in the New York, in Hermès' New York-based boutique, and Mr. Chavez helped coordinate that episode.  The episode was about a character on the show purchasing a Birkin bag from that boutique.  That was what the whole show was about.

Mr. Chavez and then an individual named Nicolas Martin, who is sitting at the table here, will both explain that Hermès has a number of trademarks.  The first, as I said

1   before, covers the word Birkin.  The second covers the

2   configuration of the bag.  Mr. Chavez will testify that the

3   Birkin bag is Hermès' most iconic product.  You will hear the

4   name from Hermès' witnesses, including Mr. Martin.

5          You will also hear the following from the defendant

6   Mr. Rothschild.

7          (Video played)

8          As I explained, the accused product here is an NFT or

9   non-fungible token.  Now I certainly don't know what they are,

10  or well enough to explain.  And so after Mr. Chavez, you're

11  going to hear from Dr. Kevin Mentzer, who is going to explain

12  about NFTs.  Dr. Mentzer is a professor of data science and

13  engineering technologies at Nichols College, and he is going to

14  explain exactly what a non-fungible token or NFT is.  He will

15  also explain a little bit about how the blockchain works and

16  how non-fungible tokens are governed by something called a

17  smart contract.

18         But a smart contract is not really a contract.  It's

19  not really smart.  It's computer code that creates rules

20  governing NFTs, and you will see that the smart contract here

21  controls everything about the MetaBirkins NFTs.  And you'll see

22  a piece of the code and you'll hear from Dr. Mentzer and

23  Mr. Rothschild himself that these non-fungible tokens, the code

24  themselves were indelibly marked and named MetaBirkins.

25         Now, the MetaBirkins are more than just a token and

1    code.  The MetaBirkins NFTs that we talked about are associated
2    with digital files.  There are 100 different MetaBirkins and
3    each was connected, MetaBirkins NFTs, and each was connected to
4    a digital file with an image.  Here, I hope you're seeing one a
5    little bit close up.  There are 100 different of these NFTs,
6    and each had an associated digital image or file like that.
7              After Dr. Mentzer, you're going to hear from Nicolas
8    Martin, Hermès' global general counsel.  Mr. Martin will tell
9    you about Hermès the parent company.  It's the one from France.
10   Mr. Martin is going to tell you a little bit about the history
11   of the company which dates back to 1837, when Hermès began by
12   creating leather products for equestrian uses, such as horse
13   saddles, bridles, things like that.
14             Over time, obviously, Hermès expanded to what it has
15   become now which is a fashion house, providing itself on making
16   only the highest quality goods.  Mr. Martin will explain to you
17   the value of the Birkin handbag to Hermès.  He will also
18   explain the value of the Birkin trademarks to Hermès.
19   Mr. Martin will show you a number of different bags.  We have
20   two more in court here.  There is this one, which is called at
21   tropical.  There is this one here which is called the sunset.
22             Mr. Martin will explain that the Birkin bags come in
23   every color with a number of designs and will take you through
24   several more that are in the exhibits that we don't have in
25   court but you'll see pictures of.  Included in those were

1   artworks placed on the bags and some of these are

2   collaborations with outside artists, sometimes inside internal

3   artists.  Mr. Martin will show you other Birkin bags and

4   provide you some of the descriptions of media.  Finally,

5   Mr. Martin will explain to you why Hermès had concerns with

6   Mr. Rothschild's MetaBirkins project and why Hermès brought

7   this lawsuit.

8            After Mr. Martin, you'll hear from Mr. Rothschild

9   himself.  Mr. Rothschild will tell you about his background.

10  You'll see that Mr. Rothschild's first creative project was

11  printing the name of art colleges on Champion T-shirts.  You'll

12  hear from Mr. Rothschild that his actions were not authorized

13  by those schools, such as Parsons which is on your screen.  And

14  you will hear that Parsons at that time sent Mr. Rothschild a

15  cease and desist letter.

16           Now, you're going to hear that word a few times, cease

17  and desist letter.  That means different things to different

18  people.  Generally, a cease and desist letter is something that

19  is sent from somebody who thinks they own a right to someone

20  else who they think may have violated the right, asking them to

21  cease from that conduct, and to desist from doing it in the

22  future.  That's why it is called, in shorthand, a cease and

23  desist.

24           You will see that Mr. Rothschild explained to two of

25  his business associates that he doesn't think people realize

1    how much you can get away in art by saying "in the style of."

2    You will hear that Mr. Rothschild's biggest project through at

3    least the first half of 2021 was called Baby Birkin.  That NFT

4    project was an animation of a fetus growing inside a Birkin.

5    You will hear that was a financially lucrative project for

6    Mr. Rothschild.

7            Now, you're also going to hear that Mr. Rothschild

8    didn't create these or generate these images himself.  Instead,

9    Mr. Rothschild hired someone named Mark Durham, you'll see here

10   referred to as Mark Design.  Mark Design generated the images

11   for all of Mr. Rothschild's NFT projects through the

12   MetaBirkins.  In fact, you'll hear the MetaBirkins were created

13   with software called Houdini, the same software used for prior

14   NFT projects by Mr. Rothschild.

15           You will see communications where Mr. Rothschild

16   actually asked Mark Design what the project software is, saying

17   he wanted to learn how to use it.  The text you're seeing

18   occurred while Mark Design was actually generating the images

19   for the MetaBirkins here.  You'll see that Mr. Rothschild, in

20   trying to entice Mark Design to participate in the MetaBirkins

21   projects writes, We are sitting on a gold mine.  I'm a

22   marketing king.

23           Now, the name MetaBirkins was not adopted at the

24   beginning of this project.  You'll see during this process,

25   Mr. Rothschild repeatedly referred to his NFT projects as

N1UsHER2                          Opening - Mr. Warshavsky

1    Birkins.  Here, you see Mr. Rothschild cites to Mark Design,

2    Let's do another series of Birkins.  You'll also see

3    Mr. Rothschild writing to another potential business associate,

4    Doing a new set of Birkins.

5            You will see that to make the images themselves, Mark

6    Design used a three-dimension schematic of an Hermès Birkin

7    bag, and even that the markup here was made using Hermès'

8    orange color and Hermès' logo to create a sample.  You will

9    also see Mark Design provided Mr. Rothschild with a number of

10   samples of patterns or signatures to put the images on these

11   Birkin bags.

12           Mr. Rothschild also sent similar patterns to Mark

13   Design, and you will see that Mark Design then imprinted with

14   various fur types and images to create what is now the 100

15   MetaBirkins images.  Mr. Rothschild's goal was to make as many

16   of the Birkin NFTs as possible.  At one point he asked Mark

17   Design if he can crank out 100 Birkins.  You will also see

18   Mr. Rothschild later failed to disclose Mark Design's

19   involvement, and even took credit for the work done by Mark

20   Design.

21           As I mentioned, Hermès takes the position that other

22   than the word Hermès, it's most famous trademark is Birkin.  It

23   brought this lawsuit because it thought that people would

24   wrongly think that Hermès was involved with this MetaBirkins

25   project.

N1UsHER2                          Opening – Mr. Warshavsky

1          While the MetaBirkins NFT project was being developed,

2     Mr. Rothschild spoke to others suggesting that he might develop

3     a relationship with Hermès.  For example, when introducing the

4     project to Mark Design, Mr. Rothschild says, We might need some

5     help from Hermès themselves.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N1unher3                          Opening – Mr. Warshavsky

1          You will also see that Mr. Rothschild told his friend

2    and sometimes collaborator Eric Ramirez that Hermès might

3    partner with him on the MetaBirkins and that he was

4    negotiating.

5          You will see that when Mr. Rothschild was exploring a

6    collaboration for the still-unnamed Birkin project, one

7    potential collaborator asks whether it is official with Birkin

8    and Mr. Rothschild responded, "Pushing for it."

9          You will see that in talking to business associates

10   Mr. Rothschild indicated that he had contacted Vogue, who would

11   help him with Hermès, and then with the same business

12   associates said that he planned to work with Sotheby's to

13   connect him to Hermès.

14         You will see that there are other times that

15   Mr. Rothschild suggested he was either talking to or

16   negotiating with Hermès.  You will also hear that none of these

17   discussions or negotiations ever happened, not one.

18         Now, until this time, Mr. Rothschild was calling this

19   project Birkins.  You will see that on October 29, 2021, while

20   Mark Design was working on completing the images,

21   Mr. Rothschild took to Twitter and teased one of the bags and

22   ran a contest.  And here he says, "Releasing 50 one-of-a-kind

23   Birkins of varying rarity.  The collection needs a name.  Share

24   this post and reply with your suggestion.  Best suggestion gets

25   gifted a Birkin."

N1unher3                    Opening - Mr. Warshavsky

1          And you will see that various people had submissions.

2          A little later on that same day, October 29, someone

3   named McKissa responded with seven suggestions.  The fourth was

4   MetaBirkin.

5          Now we know that Mr. Rothschild eventually adopted the

6   MetaBirkin name.  We also know that the MetaBirkin collection

7   was released about a month later, on December 2, 2021.  And on

8   December 3, 2021, we see McKissa asking Mr. Rothschild whether

9   she would be getting an NFT because she came up with the name.

10  Mr. Rothschild will testify that he did not give McKissa the

11  NFT because he came up with the MetaBirkin name himself.  Also

12  in this contest you will see that another user responded with a

13  suggestion not your mom's Birkin.

14         And you will see that on Mr. Rothschild's MetaBirkin

15  website he used the slogan, "Not your mother's Birkin" to

16  advertise the MetaBirkins on his website.  Mr. Rothschild will

17  also testify that he did not provide that user with any of his

18  Birkins or MetaBirkins.

19         Mr. Rothschild's promotion also included issuing a

20  blog post, posting a blog post on November 22, where he

21  explained that he knew he had to try and recreate the same

22  exclusivity and demand of Hermès' most famous handbag.  His

23  goal was for MetaBirkins to double as an investment for holders

24  like the real world holy grail handbag.

25         Mr. Rothschild took to social media, including

N1unher3                    Opening – Mr. Warshavsky

1    Twitter, Instagram, and Discord creating MetaBirkin presences

2    on each.  Those were separate from his own account, which he

3    also used to promote MetaBirkins.

4           During this time Mr. Rothschild also began working on

5    accessories for his MetaBirkins.  Nicholas Martin will explain

6    to you that one of the Hermès's products is a horse charm which

7    goes by the name rodeo.

8           You will hear that Hermès sells that rodeo charm to

9    put on various items, including the Birkin bag.  You will see

10   that Mr. Rothschild sent a picture of that horse charm, the

11   Hermès horse charm, to Mark Design and asked Mark Design to

12   create an image based on that to give to individuals that

13   purchased MetaBirkins.  You will also seal that Mark Design

14   created an image and Mr. Rothschild later teased this design on

15   his Instagram account.

16          You will also see that in the time leading up to the

17   minting of the MetaBirkins, Mr. Rothschild was actively seeking

18   people to help him promote the collection.  You will see that

19   he often used words like "pump" and "shill," which meant to

20   promote.

21          You will see that he was seeking people that he called

22   whales, whales who were people that would bid more money and

23   raise the floor price.  So you will see that Mr. Rothschild

24   offered to provide influencers with MetaBirkins for free or for

25   a very low price if they would either pump or shill for him.

1    He would talk to friends and others about getting them

2    to pump and shill.  You will see that he repeatedly asked an

3    influencer to shill the MetaBirkins, promising that influencer

4    that the value of the MetaBirkins the NFT would raise -- here

5    he thought it would be to 50, which meant 50 ether,

6    cryptocurrency, or about $200,000 at that time.  He also asked

7    to get NFT investors, the whales, to set the floor price, what

8    he kept referring to as sweep the floor.

9    You are also going to hear from another expert, named

10   Scott Kominers.  Dr. Kominers is a professor at Harvard

11   Business School who specializes in cryptocurrency and digital

12   marketing.  Dr. Kominers will explain to you that in his

13   opinion the MetaBirkins NFTs are branded NFTs.  Dr. Kominers

14   will explain that in his opinion in the case of a branded NFT

15   it is the brand name and the brand identification that is

16   responsible for the sale of the NFT.

17   You will see that Mr. Rothschild often used the

18   MetaBirkin name the way others use a brand name.  You will see

19   that he tweeted at the time the name of three collections:

20   Bored Ape, Doodles, and MetaBirkins.  Dr. Kominers will explain

21   in his opinion Bored Ape and Doodles are branded NFTs, meaning

22   that the reason people purchased those NFTs what was because

23   they were part of a broader brand.

24   You will see that when the MetaBirkins were originally

25   sold to the public and minted, they were not connected to the

N1unher3                         Opening – Mr. Warshavsky

1   images we saw before.  While those images did exist on

2   Mr. Rothschild's website, the only image that people saw when

3   they were making the purchase was that of a shrouded bag.  You

4   will see that, while the original purchase price was .1 eth, or

5   about $450 at the time, some people immediately resold their

6   MetaBirkin NFTs.

7            You will also hear that during the initial sale

8   several people purchased these shrouded objects for several

9   thousand dollars, paying as much as $42,000 for what at the

10  time was this shrouded image.

11           Dr. Kominers will explain that in his opinion the

12  reason for these kinds of sales in these amounts of money is

13  because of the Birkin name.  Once the MetaBirkins were

14  released, a number of people believed that Hermès was involved

15  in the MetaBirkins.  You will hear about articles in the

16  Financial Times, Elle Magazine, and other fashion magazines,

17  and even the New York Post.

18           You will see that they thought that Hermes was

19  involved with the MetaBirkins.  Here you can see a New York

20  Post article that even after Hermès and Mr. Rothschild both

21  said that Hermes was not involved in the MetaBirkins, the New

22  York Post, along with publishing pictures of a couple of

23  MetaBirkins, wrote, "Even Hermès, the company responsible for

24  the ridiculously expensive Birkin bag, has entered the

25  metaverse.  On December 17, the company unveiled a MetaBirkin,

1    a VR version of its signature bag."

2              You will see that Mr. Rothschild texted to one of his

3    friends, "Sorry, was doing BOF interview."  BOF is Business of

4    Fashion Magazine.  He says, "Bro, it's crazy.  Apparently the

5    word around the media world is that this is a press stunt by

6    Hermès, and I'm like paid by Hermès."

7              You will also see that Mr. Rothschild sent another

8    text saying, "L'Officiel," which is a French fashion magazine,

9    "thought that the MetaBirkins were an official Hermès thing."

10             Mr. Rothschild explained what he was doing and what

11   his goals were in the Yahoo Finance interview we played a clip

12   from before.  After saying that there was nothing more iconic

13   than the Birkin bag that we just heard, Mr. Rothschild said he

14   wanted to see whether he could create the same illusion that

15   the Birkin had in real life as a digital commodity, and then

16   that he wanted to garner the attention of people and build that

17   relationship with the consumer.

18             Let's listen to that.

19             (Video played)

20             MR. WARSHAVSKY:  Shortly after this, Mr. Rothschild

21   started to tease more MetaBirkins.  He told potential investors

22   that he was working on 900 more.  He asked Mark Design how many

23   they could make and that he was hoping to pump up the volume.

24             Mr. Rothschild told investors he planned on doing a

25   TikTok campaign, "Finally got my Birkin."

1          Now, you will see that Mr. Rothschild was confronted

2     more than once with the possibility that Hermès might object to

3     his actions.  For example, in November 2021, before the

4     MetaBirkins were released, a friend asked him whether there

5     were any potential legal issues, and Mr. Rothschild responded

6     that a cease and desist letter, the kind of letter I was

7     talking about earlier, would be helpful.

8          And in fact, you will hear that after Mr. Rothschild's

9     release of the MetaBirkin, the interview on Yahoo Finance, the

10    teasing of more MetaBirkins, the horse, Hermès actually then

11    sent a cease and desist letter to Mr. Rothschild.

12         Instead of abiding by Hermès's request, you will see

13    that Mr. Rothschild decided to notify everyone that Hermès had

14    sent the cease and desist letter.  You will see that though

15    Hermès never published it or published anything about it

16    Mr. Rothschild did.  You will see that he even joked with his

17    investors that he planned to make an NFT out of the cease and

18    desist letter.  Mr. Rothschild published open letters to Hermès

19    and even at the end of it threatened to sue Hermès.

20         Mr. Martin will explain that Hermès's position is that

21    the MetaBirkin interfered with Hermès's plans.  More important,

22    because Mr. Martin is not involved in the day to day of those

23    plans, you are actually going to hear from an individual named

24    Maximilien Moulin.

25         Mr. Moulin will explain that Hermès was focusing on

N1unher3                        Opening – Mr. Warshavsky

1   NFTs for the last several years and that in 2021, before the

2   MetaBirkins were released, he created a presentation detailing

3   a number of use cases.

4          He will also show you that at the direction of Hermès,

5   there was a presentation of a Birkin-related NFT in June 2021

6   and that a prototype of that NFT was created.  He will explain

7   that Hermès is being very deliberate and focused on the highest

8   quality, as it always does, but that it has an NFT in the works

9   and has had a few of them in the works actually, but one has

10  already been -- has been distributed internally and it's likely

11  to be released later this year.

12         You will also hear from another Hermès employee,

13  Ambre-Elise Binoche.  Ms. Binoche will tell that you Hermès

14  works with digital artists all the time and what her thoughts

15  are on Hermès entering the metaverse.

16         You will also hear from Dr. Bruce Isaacson, a survey

17  expert.  Dr. Isaacson conducted a survey to determine whether

18  potential NFT purchasers, that is, people who are in the market

19  to buy NFTs, would be confused into believing that the

20  MetaBirkins were actually offered by Hermès.

21         Dr. Isaacson will explain that there was an 18.7

22  percent confusion rate among that group of individuals, and

23  Dr. Isaacson will testify that this indicates a substantial

24  likelihood of consumer confusion.

25         You will hear from Mr. Rothschild's publicist, Kenneth

N1unher3                          Opening - Mr. Warshavsky

1   Loo, that a number of people contacted him because they thought

2   that Mr. Rothschild's project was affiliated with Hermès.

3          You will also see how the MetaBirkins have fared.  You

4   will see that most of the highest prices came before the shroud

5   was lifted.  You will see that the prices went down until one

6   of the influencers pumped -- or shilled, or whatever we are

7   going to call this -- the MetaBirkins, at which time the prices

8   climbed up.

9          Then you will see that after the Financial Times did

10  an article saying that Hermès was not involved with the

11  MetaBirkins, the prices started to diminish.

12         You will further see that the prices continued to

13  diminish after Mr. Rothschild discussed Hermès's cease and

14  desist letter and then as he discussed this lawsuit.  And in

15  the end Hermès will argue that Mr. Rothschild violated Hermès

16  trademark rights, or Mr. Rothschild's own profit.

17         Hermès will ask you to find that by selling and

18  promoting the MetaBirkins NFTs, Mr. Rothschild engaged in

19  trademark infringement, dilution, and unfair competition and

20  ask that you return a verdict in Hermès' favor.

21         Thank you for giving me your attention.

22         THE COURT:  All right.  Thank you very much.

23         Now we will hear from defense counsel.

24         MR. MILLSAPS:  Your Honor, if I may, would it be okay

25  for me to speak from this point, so I can see the screen along

N1unher3                        Opening – Mr. Warshavsky

1   with the jurors?

2               THE COURT:  That's fine.

3               MR. MILLSAPS:  Thank you.

4          Thank you, your Honor.  Good morning.

5          Good morning, members of the jury.

6          I Just want to introduce myself again and

7   Mr. Rothschild's team here.  I am Rhett Millsaps, from the law

8   firm Lex Lumina, here on behalf of the artist Mason Rothschild.

9   With me are my cocounsel, Jon Harris.  You will be seeing him

10  as well from the law firm of Harris, St. Laurent & Wechsler.

11              Also with us are Monica Delgado, who works with his

12  firm; Ashley Robinson, also who works with his firm; Adam

13  Oppenheim, also with the Harris firm; and then my partner at

14  Lex Lumina, Chris Sprigman.

15              And, of course, this is the defendant, Mr. Rothschild.

16              Mason, would you please stand up for a minute.

17              Members of the jury, Mr. Rothschild is an

18  up-and-coming artist and an entrepreneur, and he's here today

19  to stand up for himself and for artistic freedom.  And you will

20  be hearing directly from him on the witness stand.

21              Now, you just heard Hermès' version of this dispute

22  and its view of Mr. Rothschild as the plaintiff.  Hermès gets

23  to go first throughout this case.  I will ask you to keep your

24  minds open until you have heard all of the evidence and from

25  all of the witnesses, including Mr. Rothschild.

1          And Mr. Rothschild and our team and I am sure everyone

2     in the courtroom today would very much like to thank you for

3     being here.  We know that you are putting in a lot of effort

4     and time to serve as juror in this case, and we are grateful

5     for that.

6          I just would like to show you again the holy object

7     that brings us all here today in the courtroom.

8          Mr. Warshavsky, may I borrow this bag?

9          MR. WARSHAVSKY:  Sure.

10          MR. MILLSAPS:  Thank you.

11          Hermès was kind enough to let me borrow this to show

12     it to you.  This is Hermès' most popular product, but not

13     everyone can get one.  Not only is there a waitlist to buy one,

14     but the cheapest one of these bags is going to set you back

15     about $12,000.  Some of these bags go for as much as $200,000.

16          And you heard Mr. Warshavsky say Hermès has sold over

17     a billion dollars of these bags in the last ten years in the

18     U.S. alone, about $100 million worth of these bags every year

19     for the last ten years.

20          You also heard Mr. Warshavsky say that there are a lot

21     of cultural references to the Birkin bag in television shows

22     like Sex and the City, Gilmore Girls, and films and music that

23     you may have heard from Cardi B or Beyoncé.

24          That is because -- and Hermès is very proud of this --

25     the name Birkin has transcended its status as a mere trademark

1  indicating the source of goods, and Birkin has become a

2  cultural symbol of rarefied wealth and privilege in our

3  society.

4          Now, as you can see here, it is a leather purse, a

5  very fancy French leather purse, but it is a purse.  You can

6  carry your wallet and your keys in it.

7          Ashley, would you please put the MetaBirkins on the

8  screen.

9          The images that you see on your screen now are

10 MetaBirkins.  They're flat digital pictures of imaginary Birkin

11 bags fully covered in cartoonish colorful fur sitting on a

12 white pedestal.  During this trial you will hear

13 representatives of Hermès admit that Hermès has never made or

14 sold anything that looks like this.  It came out of

15 Mr. Rothschild's imagination.

16         And you will learn something obvious, but something

17 very important in this case.  MetaBirkins exist only on your

18 screen in two dimensions.  You can't carry them to the store.

19 You can't put your keys or your tiny dog in them.  You can't

20 even do any of those things with a MetaBirkin in a digital

21 world, like a video game.  It is a flat digital picture like a

22 painting connected to an NFT.

23         Now, you will be hearing a lot about NFTs during this

24 trial.  An NFT is just a snippet of code on a public internet

25 register called a blockchain.  That's so everyone can trace and

N1unher3                    Opening – Mr. Warshavsky

1    see when an NFT was created and who owns it now and what its

2    ownership history has been.

3          The easiest way to think of an NFT is like a deed or a

4    certificate of title, but it's digital.  It's called a token

5    because it represents something else, just like a deed to a

6    house represents the house or a certificate of title represents

7    the car that's owned.

8          You will see that an NFT, like a deed, doesn't have

9    any inherent nature or value by itself.  An NFT derives its

10   value from whatever it is attached to.  Just like the deed to a

11   house would be meaningless if the house didn't exist.

12         You are going to hear that over the last few years

13   NFTs have become an exciting new way for artists to sell their

14   work and build audiences and engage with their communities.

15         A little over a year ago, Mr. Rothschild came up with

16   the idea to make a series of digital pieces of art depicting

17   imaginary fur covered Birkin bags and to sell them with NFTs.

18   He decided to call these artworks MetaBirkins.

19         Now, before I go any further, I just want you to

20   understand why we are all here today.  Hermès, this

21   multibillion dollar fancy French purse maker, has sued

22   Mr. Rothschild because Hermès says that these MetaBirkins NFT

23   artworks hurt its coveted Birkin brand.

24         The evidence is going to show you otherwise.  This

25   really is a case about a multibillion dollar corporation trying

N1unher3                    Opening - Mr. Warshavsky

1    to punish Mr. Rothschild because they don't like his art, and

2    they are scared of what it might show about luxury consumer

3    culture.

4            Now, there are three key facts in this case.

5            Fact one:  The MetaBirkins on your screen are art, and

6    Mr. Rothschild had an artistic intention in using the name

7    MetaBirkins for this series of NFT artworks.  You can see the

8    name MetaBirkins describes what you see on your screen.  They

9    are artworks depicting imagery Birkin bags.

10           Mr. Rothschild also wanted to make money with his art.

11   Hermès will want you to focus only on the money part and ignore

12   the art part.  But you will see from the evidence that both of

13   those things were true at the same time.  They are two sides of

14   the same coin.  Mr. Rothschild wanted to make art and he wanted

15   to make money and a name for himself with his art.  What you

16   see on your screen is art.

17           Fact two:  Mr. Rothschild wanted the credit for

18   MetaBirkins.  He set up a MetaBirkins website and social media

19   accounts that identified him as the creator of MetaBirkins.  He

20   identified himself as the creator of MetaBirkins in media

21   interviews.

22           He reached out to some reporters to correct them when

23   they mistakenly wrote articles saying that Hermès put out

24   MetaBirkins.  And maybe more important than the evidence that

25   you will see is what you won't hear.  You won't see any

evidence that Mr. Rothschild ever told anyone that MetaBirkins came from Hermès, because he wanted the credit for his own artwork.

Fact three:  Consumers who pay tens of thousands of dollars for luxury handbags like Birkin bags or NFT art were not confused about where MetaBirkins came from.  Hermès own evidence is going to show this to you.

Hermès is going to try to make a big deal out of the fact that Mr. Rothschild hoped to make money with MetaBirkins. They are going make a big deal out of the fact that he put a lot of effort into trying to pump up the price and the excitement for his MetaBirkins art.  They are going to make a big deal about the fact that he told his associate that he hoped he could get Hermès to collaborate with him.

Mr. Rothschild doesn't dispute any of that.  It is all true.  It is perfectly legal for people to make money with their art.  In fact, the First Amendment of our Constitution protects that right for every American.  And you will hear from Hermès' own witness that it is not unusual for artists to approach Hermès to pitch a collaboration with them, because they want to work with Hermès.

We are here today because trademark rights are limited by the First Amendment, which protects artistic creations like Mr. Rothschild's MetaBirkins.  The First Amendment's guarantee of freedom of speech and expression protects the right for any

N1unher3                    Opening - Mr. Warshavsky

of us to depict and comment on the things that we see in the

world around us, including the trademarked products and brands

that bombard us everywhere we look, especially products that

have become significantly and widely discussed symbols in our

culture, like the Birkin bag.

Also -- and I will talk more about this later --

nobody was confused about what they were buying when they

bought the MetaBirkins NFTs and artworks.  I would like to talk

to you for a minute about Mr. Rothschild.

Who is Mason Rothschild?  During this trial you are

going to learn a good bit about Mr. Rothschild.  I think that

you will learn that there is a lot to like about him.  But you

will see some of Mr. Rothschild's flaws as well else a human

being as you can see sitting here.  You will learn that

Mr. Rothschild is a clever, passionate, sometimes even funny

guy who has lots of ideas, lots of ambition, and he works hard

to bring his ideas into reality.

Like many people, he isn't just one thing.  He is an

artist, he is an entrepreneur, he's a businessman, he is a

clever marketing guy.  He's also a fiance and a devoted dog

dad.

You will see that he cares a lot about using his art

to draw attention to social issues that he cares about.  You

will also learn that he sometimes exaggerates and embellishes

the truth, especially which he's promoting himself and his

N1unher3                    Opening - Mr. Warshavsky

1    projects.

2          But you will see from the evidence that Mr. Rothschild

3    is straight when it comes to the important things.  Like paying

4    back around a $100,000 investment when the deal fell through.

5          You are going to learn some more things about

6    Mr. Rothschild that will help you understand what shaped him

7    and his artistic outlook.  Despite his name, Mr. Rothschild was

8    not handed anything.  His birth name is Sonny Alexander

9    Estebal, but he adopted the name Mason Rothschild when he was a

10   teenager for reasons that you will hear him explain.

11         He is a first-generation American, born in Pasadena

12   and raised in San Mateo, California.  His mom came to the U.S.

13   from the Philippines; his dad came from Colombia.

14         He graduated from high school at the age of 16, and he

15   took classes at a local community college for a year and some

16   online classes at the University of San Francisco in business

17   and marketing.  But Mr. Rothschild never finished college.

18   He's mostly self-taught in both business and art.

19         On the business side, Mr. Rothschild started out

20   working in retail, first for a couple of small streetwear

21   brands and then for bigger companies in the luxury fashion

22   space, like Yves Saint Laurent and Dior.  He wanted to get into

23   other things while he was working in retail, so he started

24   doing some consulting work around digital marketing and social

25   media for various companies.

N1unher3                           Opening – Mr. Warshavsky

1          In 2021, Mr. Rothschild and his fiance, Erica Del

2     Rosario, opened a concept store, an artistic community called

3     Terminal 27 in Los Angeles.

4          Six months after it opened, Vogue Magazine named

5     Terminal 27 one of the best fashion boutiques in America.

6     That's the business side of Mr. Rothschild, which you can see

7     involves a lot of creativity.

8          Mr. Rothschild is an artist too.  Hermès wants you to

9     believe that Mr. Rothschild can be only one thing; he's either

10    a business guy or he's an artist.  But the evidence will show

11    you that he's both.

12         And you will hear that's not unusual.  Andy Warhol

13    worked in advertising before he became a famous artist.  Plenty

14    of artists have day jobs.  Now, Mr. Rothschild is not an artist

15    who paints landscapes or portraits, like Bob Ross or Leonardo

16    da Vinci.

17         You will see from the evidence that Mr. Rothschild is

18    a conceptual artist.  There have been many famous conceptual

19    artists who came before Mr. Rothschild like Andy Warhol and

20    Damian Hurst.  The evidence will show that Mr. Rothschild, a

21    conceptual artist, is the idea guy.  He is not usually the guy

22    who executes the ideas.

23         Like other conceptual artists -- you will see from the

24    evidence that he did this with several -- I'm sorry.  Like

25    other conceptual artists, Mr. Rothschild often works with other

N1unher3                        Opening - Mr. Warshavsky

1    people who have the technical skills to bring his ideas into

2    the world.  You will see from the evidence that he did this

3    with several of his NFT projects, including MetaBirkins.

4    Mr. Rothschild did not actually generate the MetaBirkins images

5    by himself.  He hired an assistant to work at his direction to

6    help him create the images that he envisioned in his

7    imagination.

8            But I want to back up for a minute, because MetaBirkin

9    was not Mr. Rothschild's first art project.  You will learn

10   that Mr. Rothschild's first art project that got some attention

11   was in 2015, when he was just 21 years old.  His first art

12   project was screen printing a collection of fake art school

13   T-shirts that were lampooning the fact that these fancy art and

14   design schools like Parsons School of Design here in the city

15   sold really ugly school merch that none of its students wanted

16   to wear.  So he called the collection Art School Dropout.

17           The press and the art schools got what Mr. Rothschild

18   was doing at the time.  This example highlights two important

19   things that you will hear from witnesses in this trial and that

20   I ask you to keep in the back of your mind over the next few

21   days.

22           The first is that art doesn't exist in a vacuum.  It's

23   often about context.  Sometimes you can't see that something is

24   art unless you know how it fits into the larger context of art

25   history or what's going on in the art world.  The second is

N1unher3                        Opening – Mr. Warshavsky

1    that there is a long history of artists who deliberately engage

2    with and blur the boundaries between art and commerce to expose

3    aspects of the world that we live in.

4           And today we live in a world dominated by brands.

5    From McDonald's to Starbucks to BMW to Birkin.  Artists often

6    reflect the world that they see around them, so it is not a

7    surprise that there have been artists like Andy Warhol and

8    Mr. Rothschild who play with our consumerist culture and our

9    obsession over luxury goods as their artistic subjects.

10          Now going back to Mr. Rothschild's work as an artist,

11   in 2021, Mr. Rothschild jumped into the world of NFT art.

12          Ashley, would you please put Mr. Rothschild's NFT

13   chair artworks on the screen.

14          This is Mr. Rothschild's first NFT art project that he

15   created in the spring of 2021.  I am sure you have seen this

16   kind of thing before, a fancy chair in a fancy store that looks

17   realty tempting to sit in.  But there is a sign next to it that

18   says, "Do not sit."

19          So Mr. Rothschild's first NFT art pieces were a

20   comment about that.  You can see he created a 3D –– this is a

21   digital 3D chair.  It's kind of falling apart.  You can see

22   it's covered in plastic.  He created two of these, and he

23   called the collection "Do Not Sit."

24          And someone bought one of these pieces of NFT art for

25   the equivalent of $4,000 at the time, literally just a digital

N1unher3                    Opening – Mr. Warshavsky

1    image of a chair attached to an NFT.

2            Now, there are multiple artistic layers to this that

3    Mr. Rothschild can explain a lot better than I can, and you

4    will hear from him very soon.  But you can see that this is

5    art.  Around the same time, Mr. Rothschild and another creator

6    had an idea for another NFT art project.  They would create a

7    short digital animation depicting a fetus gestating inside of a

8    Birkin bag and call it "Baby Birkin."

9            Ashley, would you please put Baby Birkin on the

10   screen.

11           This was a reference to Hermès Baby Birkin bag.  It's

12   the smallest version of the Birkin bag that Hermès sells for

13   around $9,000 or $10,000.  And you might have seen the children

14   of celebrities like Kim Kardashian carrying this around.  In

15   May 2021, the Baby Birkin NFT artwork sold for the equivalent

16   of $23,500.  It also attracted some significant press

17   attention, including from Vogue Magazine.

18           Mr. Rothschild realized he had struck a chord with

19   this.  People, especially people who spend crazy amounts of

20   money on NFT art, apparently love the Baby Birkin artwork's

21   silly play on consumer culture and luxury goods.

22           So Mr. Rothschild had idea for a follow-up.  He would

23   create a series of digital NFT artworks that would depict

24   imaginary Birkin bags covered in colorful cartoonish fur with

25   some referencing other famous artists like Mona Lisa and

N1unher3                          Opening – Mr. Warshavsky

1    Vincent Van Gogh's "Starry Night."

2              Mr. Rothschild was inspired in part by the discussion

3    around fur-free initiatives in fashion at the time.

4              Ashley, would you please put up the MetaBirkins on the

5    screen.

6              He also wanted to do an artistic experiment, to see

7    where the value in the Birkin bag really lies.

8              Is the value really in the painstakingly handcrafted

9    physical handbag?

10             Or is the value in the image and the illusion that the

11   culture projects on to the physical object?

12             Mr. Rothschild wanted to see if people would actually

13   ascribe a same kind of value to two dimensional digital

14   paintings of imaginary furry Birkin bags they ascribed to the

15   actual physical Birkin bags that Hermès sells.

16             So in October 2021, Mr. Rothschild announced on his

17   social media that he would release a series of NFT artworks

18   depicting imagery, fur covered Birkin bags at the beginning of

19   December.

20             He started previewing some of these artworks on his

21   own social media accounts, and he asked his followers for

22   suggestions for a title for this new series.  A couple of

23   people suggested MetaBirkins and Mr. Rothschild ultimately

24   chose that title because he thought it was a great fit for the

25   artworks and the art project as a whole.

1          Once he had a title, Mr. Rothschild set up a

2   MetaBirkins.com website and MetaBirkins social media accounts

3   to start building hype and promoting this new series of

4   artworks just like folks in Hollywood do to promote their

5   upcoming blockbuster movie.  You will see from the evidence

6   that Mr. Rothschild identified himself as the creator of

7   MetaBirkins, and he never told anyone that Hermès created

8   MetaBirkins.

9          Now, you heard some of these MetaBirkins sold for tens

10  of thousands of dollars.  But you need to understand that

11  Mr. Rothschild did not sell them for that price.

12  Mr. Rothschild initially sold them for approximately $450

13  apiece.  It was after he released them that other people

14  started buying and selling them on the open market for

15  thousands or tens of thousands of dollars, and Mr. Rothschild

16  got a small percentage of those sales.  That was the whole

17  point of his experiment, to see what people would do with these

18  MetaBirkins once they were out in the world.

19         Now, Mr. Rothschild turned over thousands of his text

20  messages to Hermès for this case.  Hermès has combed through

21  all of those text messages trying to find cynical stuff to show

22  you, and all they found were text messages showing

23  Mr. Rothschild doing what artists have always done, trying to

24  drum up interest in his art and promote it.  This is not new.

25  Artists in all media have always sought to generate excitement

N1unher3                         Opening – Mr. Warshavsky

1    and interest among the big spenders, the whales of the market

2    for art.

3              Hermès says that this shows that Mr. Rothschild just

4    wanted to make money and wasn't interested in art.  But you

5    will see from the evidence that's not true.  Mr. Rothschild was

6    just doing all the things that artists do to promote their

7    work.  He tried to get interest from celebrities and

8    influencers.  He tried to get MetaBirkins in the hands of good

9    collectors and to reward them for supporting his art.  He tried

10   to build a community of people who like his art.

11             And Mr. Rothschild has continued to make art since

12   MetaBirkins were released and Hermès filed this lawsuit.

13             Ashley, would you please put Mr. Rothschild's artwork

14   on the screen.

15             Here's a sample of some of the art that Mr. Rothschild

16   has created after he did MetaBirkins.  Last year Mr. Rothschild

17   worked with another artist to create and release another NFT

18   project called, "I Like You, You're Weird."

19             You can see that on the left-hand screen, the little

20   weirdo that you see in the upper left corner.  They released

21   10,000 of the weirdo artwork you see on your screen here

22   attached to NFTs.

23             On the right, or I suppose it is actually in the

24   middle here, is an artwork that Mr. Rothschild created just a

25   couple of months ago in tandem with the prestigious SCOPE Art

Show in Miami that happened in the same time as Art Basel in

dis.  Mr. Rothschild was commissioned by the Scope Art Show to

create art for an NFT ticket to its show.

This is the art that he created.  The art is actually

an animation.  You are seeing a screen shot here.  It's like

pool floaties, and he called the art "Floaties."

By the end of this trial, it will be clear -- oh, I

should also point out another art project that he does is here

on the right.  It's called, "I Hate You, You're Scary."  It is

one of the little scary figures there.  And then down in the

lower left-hand corner you see some artwork that Mr. Rothschild

did for an F1 racing helmet that is on the helmet.  This is all

in the last year.

Now, by the end of this trial, it will be clear to you

that MetaBirkins are art protected by the First Amendment, not

consumer commodities or consumer products like Hermès is going

to want you to believe.

But even if MetaBirkins were just a consumer product

that competes with Hermès' products, the evidence will show

that Hermès still has no case here at the end of the day,

because the heart of a trademark case is confusion,

specifically, whether there's evidence that a significant

number of relevant consumers were confused or likely to be

confused about where the product came from.  Hermès spent a lot

of money to hire the experts that they showed you, and in

N1unher3                        Opening – Mr. Warshavsky

1    particular an expert to conduct two surveys to see whether

2    consumers were likely to be confused about whether MetaBirkins

3    came from Hermès.

4           You are going see that those surveys actually show,

5    not surprisingly, that the vast majority of people who spent

6    tens of thousands of dollars on fancy French purses or NFT art

7    understood that MetaBirkins did not come from Hermès.  At the

8    end of the day, that is all you need to know to find in favor

9    of Mr. Rothschild.

10          At the end of this case, I or one of my colleagues

11   here is going to stand here again closing.  And you will see

12   that MetaBirkins are art, that Mr. Rothschild is an artist with

13   artistic intention, that the MetaBirkins title is artistically

14   relevant to the MetaBirkins images because they depict

15   imaginary furry Birkin bags, that Mr. Rothschild wanted the

16   credit for his artwork, he was proud of it, and that nobody

17   paying $12,000 or more for a luxury handbag was confused about

18   where MetaBirkins came from.

19          And we are going to ask you to find in favor of

20   Mr. Rothschild on all of Hermès claims.

21          Thank you.

22          THE COURT:  Thank you very much.

23          Plaintiff will call their first witness.

24          MR. WARSHAVSKY:  Your Honor, at this time we call

25   Robert Chavez to testify by video.  May we furnish the court

N1unher3                         Opening – Mr. Warshavsky

1    with copies of the exhibits?

2             THE COURT:  Ladies and gentlemen, in certain

3    circumstances, and with the consent of both sides, certain

4    witnesses will testify by video.  You should evaluate that just

5    as if they were here testifying live.

6             (Video played)

7             (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N1UsHER4

1              MR. WARSHAVSKY:  Your Honor, at this point in the

2      transcript, we are about to introduce Exhibit 1 to the witness.

3              THE COURT:  Any objection?

4              MR. HARRIS:  No objection.

5              THE COURT:  Plaintiff's 1 is received.

6              (Plaintiff's Exhibit 1 received in evidence)

7              (Video played)

8              MR. WARSHAVSKY:  Your Honor, at this point we would be

9      offering in Exhibit 3.

10              THE COURT:  Any objection?

11              MR. HARRIS:  No objection.

12              THE COURT:  Plaintiff's Exhibit 3 is received.

13              (Plaintiff's Exhibit 3 received in evidence)

14              (Video played)

15              MR. WARSHAVSKY:  Your Honor, we're about to show

16      Exhibit 4 to the witness.

17              THE COURT:  OK.

18              MR. HARRIS:  No objection, your Honor.

19              THE COURT:  Exhibit 4 is received.

20              (Plaintiff's Exhibit 4 received in evidence)

21              (Video played)

22              MR. WARSHAVSKY:  Your Honor, at this point we are

23      about to turn to Exhibit No. 5 and would offer it into

24      evidence.

25              MR. HARRIS:  No objection.

N1UsHER4

1        THE COURT:  Exhibit 5 is received.

2            (Plaintiff's Exhibit 5 received in evidence)

3            (Video played)

4        MR. WARSHAVSKY:  Your Honor, at this point we would

5    offer into evidence Exhibit 6.

6        MR. HARRIS:  No objection.

7        THE COURT:  Plaintiff's Exhibit 6 is received.

8            (Plaintiff's Exhibit 6 received in evidence)

9            (Video played)

10       MR. WARSHAVSKY:  Your Honor, at this point we would

11   offer into evidence Exhibit 7, which are those trademarks.

12       MR. HARRIS:  No objection, your Honor.

13       THE COURT:  Plaintiff's Exhibit 7 is received.

14           (Plaintiff's Exhibit 7 received in evidence)

15           (Video played)

16       MR. WARSHAVSKY:  Your Honor, we're about to offer

17   Exhibit 8 into evidence, which is media coverage.

18       MR. HARRIS:  No objection.

19       THE COURT:  Exhibit 8 is received.

20           (Plaintiff's Exhibit 8 received in evidence)

21       Counsel, find a time in the next two or three minutes

22   to pause because we want to give the jury their one o'clock

23   lunch.

24       MR. WARSHAVSKY:  Your Honor, I think we can pause

25   here.

N1UsHER4

1                    THE COURT:  Very good.

2                    Ladies and gentlemen, we'll take lunch now and resume

3        at two o'clock.

4                        (Jury not present)

5                    We'll see you all at two o'clock.

6                        (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N1UsHER4

<pre>
 1                          AFTERNOON SESSION

 2                            (2:00 p.m.)

 3              THE COURT:  We are going to go without a break until

 4     about a few minutes before 4.

 5              How much longer is the video?

 6              MR. WARSHAVSKY:  The video I think is about 40 minutes

 7     longer.

 8              THE COURT:  Okay.

 9              (Jury present)

10              THE COURT:  Please be seated.

11              All right.  We are ready to resume.

12              (Video played).

13              MR. WARSHAVSKY:  Your Honor, AT this point we are

14     about to show Exhibit 9.

15              MR. HARRIS:  No objection, your Honor.

16              THE COURT:  Plaintiff's Exhibit 9 is received.

17              (Plaintiff's Exhibit 9 received in evidence)

18              (Video played)

19              MR. WARSHAVSKY:  At this point, your Honor, we would

20     offer Exhibit 10 into evidence.

21              MR. HARRIS:  No objection.

22              THE COURT:  Received.

23              (Plaintiff's Exhibit 10 received in evidence)

24              (Video played)

25              MR. WARSHAVSKY:  Again, your Honor, at this point we
</pre>

N1UsHER4

1    offer Exhibit 11.

2              MR. HARRIS:  No objection.

3              THE COURT:  Received.

4              (Plaintiff's Exhibit 11 received in evidence)

5              (Video played)

6              MR. WARSHAVSKY:  Your Honor, we would request Exhibit

7    12 be admitted into evidence.

8              MR. HARRIS:  No objection.

9              THE COURT:  Received.

10             (Plaintiff's Exhibit 12 received in evidence)

11             MR. HARRIS:  Your Honor, defendant offers this as

12   Defendant's Exhibit 600.

13             THE COURT:  Any objection?

14             MR. WARSHAVSKY:  No objection, your Honor.

15             THE COURT:  Received as Defendant's Exhibit 600.

16             MR. WARSHAVSKY:  Thank you.

17             (Defendant's Exhibit 6 received in evidence)

18             (video played)

19             MR. HARRIS:  Your Honor, defendant offers that Exhibit

20   as Defendant's 601.

21             MR. WARSHAVSKY:  No objection, your Honor.

22             THE COURT:  601 is received.

23             (Defendant's Exhibit 601 received in evidence)

24             (video played)

25             MR. WARSHAVSKY:  Your Honor, that's the end of

N1UNHER5                          Mentzer – Direct

1   Mr. Chavez's testimony.

2            THE COURT:  Very good.  Please call your next witness.

3            MR. WARSHAVSKY:  Your Honor, Hermès will call

4   Dr. Kevin Mentzer, who is waiting outside.

5    KEVIN MENTZER,

6         called as a witness by the Plaintiff,

7         having been duly sworn, testified as follows:

8   DIRECT EXAMINATION

9   BY MR. FERGUSON:

10  Q.  Good afternoon, Dr. Mentzer.

11  A.  Good afternoon.

12  Q.  What are the topics you are here to talk to us about today?

13  A.  In general, I am here to talk about blockchain NFTs and the

14  relationship of the MetaBirkins NFT in relation to blockchain.

15  Q.  And who retained you to provide this testimony?

16  A.  Baker Hostetler, attorneys for Hermès.

17  Q.  Prior to being retained in this litigation, have you ever

18  worked or performed any work for Baker Hostetler before?

19  A.  No, I had not.

20  Q.  Prior to being retained in this litigation, have you ever

21  performed any work for Hermès before?

22  A.  No.

23  Q.  Prior to being retained in this litigation, have you ever

24  testified as an expert before?

25  A.  No, I have not.

1  Q.  Could you look at Exhibit 57 in your exhibit binder.

2           We will give you an exhibit binder.  That will help.

3           I ask if you can turn to Exhibit 57 and identify what

4  is shown as Exhibit 57.

5  A.  This is a copy of my résumé.

6  Q.  And who prepared this document?

7  A.  I did.

8  Q.  I offer Exhibit 57 into evidence.

9           MR. MILLSAPS:  No objection, your Honor.

10           THE COURT:  Received.

11           (Plaintiff's Exhibit 57 received in evidence)

12  BY MR. FERGUSON:

13  Q.  Dr. Mentzer, can you describe for us what appears on the

14  slide I have just put in front of you.

15  A.  This is a slide that I prepared that is a subset of my

16  résumé, focusing in on my education and my professional work

17  history.

18  Q.  After high school, did you obtain an advanced degree?

19  A.  Yes, I did.

20  Q.  What was that?

21  A.  My first degree was a bachelor of science in business

22  administration with a concentration in computer information

23  systems from Bryant University.

24  Q.  After graduating from Bryant University, did you obtain

25  employment?

1    A.  Yes, I did.

2    Q.  And what was that?

3    A.  I was hired initially as a systems analyst for Hanover

4    Insurance Company.

5    Q.  Referring to the slide, under the heading of "Professional"

6    there are three entries from 1991 to 2004.

7           Could you summarize the type of responsibilities you

8    had in each of those jobs.

9    A.  Sure.  I started my career as a systems analyst, which is a

10   combination of business analyst along with some coding

11   responsibilities, so you could refer to me as a programmer at

12   that point.  I was promoted to a senior systems analyst

13   basically working on designing software for Hanover insurance.

14          I was using a tool called Progress Software, which is

15   also a programming language.  And so I actually went to work

16   for Progress Software shortly after leaving Hanover Insurance,

17   where I was a consultant working with Progress' clients related

18   to programming issues around their language.

19          I left there to found my own company, Counterpoint

20   Technologies Corporation, which was an IT consulting firm where

21   my clients -- focused on software development and system

22   analysis and design for my clients.

23   Q.  Did there come a time when you received an advanced degree?

24   A.  Yes.

25   Q.  What was that?

N1UNHER5                         Mentzer - Direct

1   A.   In 2004 I received my master of science in information

2   technology from Bentley University.

3   Q.   Did you have a concentration in obtaining that degree?

4   A.   No.   That was a specialized degree in IT related to --

5   Bentley is known as a business school, so related to technology

6   related to business.

7   Q.   After obtaining your MS in information technology from

8   Bentley University, did you have further employment?

9   A.   I did.

10  Q.   Can you describe that for us.

11  A.   I went to work for a startup called Blue Cod Technologies

12  as their director of software development, where I oversaw a

13  software team responsible for developing a claims processing

14  and policy management system to serve our outsourcing customers

15  in the insurance space.   After that I went to work for Energy

16  Services Group, again as a consultant, assisting them with

17  analysis and design along with coding.

18  Q.   Did there come a time when you left Energy Services Group?

19  A.   Yes.

20  Q.   What did you do next?

21  A.   I went back for my Ph.D. at that point at Bentley

22  University.

23                  (Continued on next page)

24

25

1    BY MR. FERGUSON:

2    Q.  And did there come a time when you obtained a Ph.D.?

3    A.  Yes.

4    Q.  Could you describe that for us?

5    A.  I received my Ph.D. in 2016, as I mentioned from Bentley

6    University, which is a business school in Massachusetts.  So my

7    Ph.D. is in business with a concentration in business

8    analytics.

9    Q.  What is a concentration in business analytics; could you

10   elaborate on that for us?

11   A.  From a business perspective, business analytics is all

12   about gathering data to analyze what happened in the past.  So

13   it tends to be backwards looking.  We gather data from any

14   source that we can and usually use a combination of software

15   tools along with coding to be able to analyze that data to be

16   able to explain what is happening in the organization.

17   Q.  Looking at the slide in front of you under the heading of

18   academic appointments, I see you've had a series of academic

19   appointments, is that correct?

20   A.  Yes.

21   Q.  Could you tell us about the first position, adjunct

22   instructor at Bentley University?

23   A.  During my Ph.D. program, after I completed the coursework,

24   I was then hired on as an adjunct instructor at Bentley

25   University to teach business analytics, statistics, and an MBA

1    course in emerging technologies and the impact that it has on

2    society.

3    Q.  Did there come a time when you received a further academic

4    appointment?

5    A.  Yes.

6    Q.  Would you describe that for us?

7    A.  In 2015, one year prior to finishing my Ph.D., I started a

8    tenured track position at Bryant University as an assistant

9    professor in computer information systems department then.

10   Q.  Did you obtain further appointment after that?

11   A.  I obtained tenure at Bryant, so I was promoted to the

12   associate professor level in 2021.

13   Q.  Did there come a time when you received a further academic

14   appointment?

15   A.  Yes.

16   Q.  Can you describe that for us?

17   A.  So in 2022, I was recruited by the president of Nichols

18   College to come work for him, and I was given a title of

19   trustee endowed professor of data science and emerging

20   technologies.

21   Q.  Could you elaborate for us what is meant by data science in

22   this context?

23   A.  So data science, if we talk about business analytics being

24   backward looking, data science tends to be forward looking.  So

25   we're building predicative models to be able to understand or

1   to be able to predict events in the future.

2   Q.   What does it mean to be an endowed professor?

3   A.   That's really the highest designation you can get as a

4   professor.  It is a select few who get that, and it's a signal

5   that the school recognizes you as a leader in your field.  I'm

6   the only one at Nichols College.

7   Q.   Referring both to your professional life and then your

8   academic appointments, in the course of your work history you

9   have experience writing computer code?

10  A.   That's correct.

11  Q.   Would you tell us about that experience?

12  A.   It's been extensive over my 20-year professional career as

13  well as my academic career.  I've coded in probably a dozen

14  different languages and taught probably a half a dozen

15  different languages and courses.

16  Q.   Over the course of your career, have you had involvement in

17  emerging technologies?

18  A.   Yes.

19  Q.   Could you describe that for us?

20  A.   So in the business world, programming-type positions are

21  usually either maintenance roles or kind of new development.

22  My entire career was focused on new development.  So I was

23  always utilizing the newer technologies so starting my career

24  publishing client serve development, when it was new, working

25  with companies as the web and the Internet emerged, worked with

1     kind of outsourcing environments.  So really my entire career

2     has been forward looking.

3     Q.  Referring to the bottom of the slide, there is, under the

4     heading licenses and certifications, there is a reference to

5     certified blockchain solution architect.

6          Can you explain to us what that is?

7     A.  Sure.  That's a certification issued by the blockchain

8     training alliance where I had to sit for an exam and pass,

9     which basically tested me on global concepts related to

10    blockchain.  So I had to be able to distinguish between

11    private, things like that, all various types of blockchains

12    that are out there, as well as a touching upon the solidity

13    programming language, which is used in primarily in the

14    Ethereum blockchain.

15    Q.  Prior to seeking the certification, had you had involvement

16    with blockchain technologists?

17    A.  I had, yes.

18    Q.  When were you first involved with blockchain technologists?

19    A.  My first paper I wrote during my first year of my Ph.D.

20    program, that would have been in 2011.  I wrote a paper on the

21    impact bitcoin would have on the business community.  I also

22    helped found and fund a blockchain club at Bryant University

23    which was responsible for kind of the education of blockchain,

24    as well as I obtained funding to build a crypto mining lab on

25    campus.

1    Q.  When the first paper you referring to, the first paper you

2    wrote on blockchain, what was the dollar value of blockchain

3    when you were first writing about it?

4    A.  It was $4 at that time.

5    Q.  That's changed a little bit?

6    A.  Yes.

7    Q.  Is there a relationship between blockchain and NFTs?

8    A.  Yes.  NFTs live on the blockchain, so it's the newer

9    iteration of how we're using blockchain.

10   Q.  Have you had involvement with NFTs?

11   A.  I have.  I have, yes.

12   Q.  When did you first have involvement with NFTs?

13   A.  So I started studying impacts that NFTs have on Ethereum

14   blockchain in fall of 2017 with the rollout of the first

15   commercially successful NFT, one could argue, crypto Cadence.

16   Q.  Why did you obtain certification as a blockchain solution

17   architect?

18   A.  At that point, I was designing a special topics course for

19   Bryant University to teach blockchain, and I wanted to make

20   sure that my course could prepare my students to take a similar

21   exam.

22   Q.  Are you still certified as a blockchain solution architect?

23   A.  I am not, no.

24   Q.  Why not?

25   A.  I used it for the purpose of designing that course and I

1    didn't see the need to keep up with it.

2    Q.   Can you describe what's on the slide I've just put in front

3    of you?

4    A.   This is a slide that I prepared that has a subset from my

5    resume of my presentations and roll as conference organizers,

6    with a specific focus on blockchain and NFT.

7    Q.   Under the presentation, presentations and panels heading,

8    are any of these presentations particularly related to the work

9    that you did in connection with this litigation?

10   A.   Sure.  The last one listed there with a student Michael

11   Gaugh, 2018, *The Impact of Cryptokitties on the Ethereum*

12   *Blockchain*.  I followed basically the same process that I

13   followed to evaluate the MetaBirkins project for that

14   assignment.  So I was looking at transaction level detail of

15   the cryptokitties NFT on the Ethereum market and comparing that

16   to overall volume to see if we truly were seeing lag in network

17   time as a result of this NFT.

18   Q.   In the conferences that you've identified as a conference

19   organizer, can you talk about your role as a conference

20   organizer in these conferences?

21   A.   Sure.  I am responsible for evaluating submissions from

22   other academics.  I make the initial decision as to whether the

23   papers should go out for review or not.  If I do decide they

24   should go out for review, I find reviewers to go ahead and

25   review those papers.  I summarize the comments back and give

1    that feedback to the authors so they can hopefully revise their

2    papers to the point where it would be accepted for those

3    conferences.

4    Q.  And in this capacity, have you reviewed any papers in

5    connection with block chain technologies and NFTs?

6    A.  Oh, sure.  We see plenty of papers on blockchain and NFTs.

7              THE COURT:  Counsel, please approach the sidebar.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N1UsHER6                      Mentzer – Direct

1              (At the sidebar)

2              THE COURT:  Is defense counsel challenging the

3    expertise of this witness?

4              MR. MILLSAPS:  We are not, your Honor.

5              THE COURT:  Why are we spending all this --

6              MR. FERGUSON:  I'll move along.

7              THE COURT:  Yes.

8              Also, please be aware that under Second Circuit

9    precedent, you do not say to the judge, Judge, we offer this

10   person as an expert in such and such, and then look for the

11   judge for a ruling, because it's now exclusively a jury

12   question.

13             MR. FERGUSON:  All right.

14             THE COURT:  I have to, of course, deal with

15   admissibility, but that's done outside the presence of the

16   jury.

17             MR. FERGUSON:  I apologize, your Honor.  How should I

18   offer him?

19             THE COURT:  You don't offer him at all.  You say did

20   you form some experts opinions in this case.

21             (Continued on next page)

22

23

24

25

1              (In open court)

2    BY MR. FERGUSON:

3    Q.  You'll be pleased to hear I'm moving along.

4              In connection with your engagement in this matter, did

5    you form expert opinions, Doctor?

6    A.  Yes, I did.

7    Q.  Can you summarize for us the topics that you formed expert

8    opinions on?

9    A.  I was asked to evaluate the MetaBirkins NFT at a blockchain

10   level so I could explain kind of the impact that the

11   MetaBirkins NFT did have as well as being able to explain the

12   technology of blockchain and particularly NFTs from a

13   technological point of view.

14   Q.  What is blockchain?

15   A.  In general, blockchain is a distributive ledger.  We can

16   think of a distributive ledger as your checkbook is a type of

17   ledger.  So the idea being that each line in your checkbook as

18   you're trying to balance your checkbook is a transaction.

19             A blockchain is no more than a series of transactions,

20   but we know the transactions of every participant in the

21   blockchain, on the blockchain.  We call it blockchain because

22   we take those transactions and we periodically wrap them you up

23   in a block, and then we kind of timestamp that block.

24             We then chain that block to the next block using some

25   hashing algorithms to chain two blocks together.  That provides

1    what we call immunability.  I can't change a prior block or any

2    transactions after they've been certified.

3    Q.  Could you explain to us what is depicted in this slide?

4    A.  So it's to show that we -- that a block is no more than a

5    series of transactions, and then we chain each block to the

6    next block.

7    Q.  What's depicted in this next slide?

8    A.  So a blockchain is decentralized.  So there is no central

9    authority, there is no company behind blockchain, there is no

10   government behind blockchain.

11        So this image I put together to represent that it is

12   truly distributed and really anyone can participate.  And as a

13   result of that, you have the entire blockchain available to

14   you, should you want to see it.

15   Q.  Are there different types of blockchain?

16   A.  Yes, there are.

17   Q.  Can you describe those for us?

18   A.  The two biggies are -- the two biggest blockchains are also

19   public blockchains.  Bitcoin I think we're all familiar with,

20   and then Ethereum would be another large one.

21   Q.  Can you explain to us the differences --

22        Let me rephrase that.  Are there differences between

23   bitcoin and Ethereum?

24   A.  Yes.

25   Q.  Can you explain those to us?

N1UsHER6                        Mentzer - Direct

1    A.  So this is an analogy that I frequently use with my

2    students to be able to explain them.  It's the traditional

3    phone, very good at making calls.  That's what we do with

4    bitcoin.  It's very good at doing bitcoin-related transactions

5    where you're exchanging the cryptocurrency bitcoin.

6          On the Ethereum blockchain, I refer to that more as

7    the smartphone.  It can still make the calls.  We can still

8    transfer ether, which is the cryptocurrency, ether or eth, on

9    the Ethereum blockchain, but the design of Ethereum was done in

10   such a way that it let's me invent code on the blockchain as

11   well.  So it allows me to do things like create NFT contracts,

12   smart contracts, on the blockchain.

13   Q.  What is an NFT?

14   A.  I mean, most of us think of an NFT is that picture that,

15   you know, that is associated with it from a technology point of

16   view.  An NFT, which is short for non-fungible token, is just a

17   token that -- so you can think of a subway token, right.  I

18   have a subway token.  I give one to you this week, you give me

19   one back next week.  I don't care if you give me the same one

20   back because they have the same value.  That would be a

21   fungible token.  It's not unique.

22          A non-fungible token means it's unique.  I'm going to

23   give you one.  I care about it because it has unique attributes

24   that makes it valuable, potentially valuable, or different than

25   the other tokens on there.  So a non-fungible token is a way to

1  say a unique token on the chain.

2  Q.  May NFTs be linked to digital files?

3  A.  Yes, they are.

4  Q.  And are there different types of digital files that NFTs

5  may be linked to?

6  A.  Oh, certainly.

7  Q.  Can you elaborate that for us?

8  A.  That is kind of what this slide represents.  It may be

9  linked to an image, like the Bored Ape Yacht Club NFT we're

10  seeing there first.  But it could as well be linked to a music

11  file, a movie file, or no file at all, which is why I have a

12  blank circle there.

13  Q.  So can you elaborate for us the relationship between the

14  NFT and the digital file?

15  A.  So, in general, NFTs do not store the image on the

16  blockchain.  Instead, we point to a repository that is usually

17  also on a decentralized network that points to that digital

18  file that we tend to think of as the NFT.

19  Q.  What is the role of the smart -- can you explain to us what

20  a smart contracts is?

21  A.  Smart contract is the code, usually written in the program

22  language solidity on the Ethereum blockchain which manages an

23  NFT collection.  So if I want to transfer the NFT or sell the

24  NFT, I have to go through that smart contract, which does

25  things like validate I'm the true owner of that NFT and I can

1   validly transfer them.

2   Q.   And the smart contract, is that an entry on a blockchain?

3   A.   Yes, it is.

4   Q.   Is there a reason why the digital file is usually not on

5   the blockchain?

6   A.   Yes.

7   Q.   Why is that?

8   A.   With blockchain technology, we pay fees based off of the

9   size of the transaction.  So most people when they are

10  designing their NFTs don't put the actual digital image on

11  chain or on the blockchain because it would cause much higher

12  fees to be able to do transactions with them.

13  Q.   Can you explain to us how a transaction on the blockchain

14  works?

15  A.   So, in general, all transactions are initiated by a digital

16  warrant.  That is what this slide is showing here.  We have a

17  digital wallet on both ends, the digital wallet, we don't know

18  anyone on the blockchain because we just know digital wallets.

19  So the digital wallet itself initiates a transaction that could

20  potentially transfer cryptocurrency, could transfer the NFT to

21  another digital wallet.

22  Q.   Where are NFTs bought and sold?

23  A.   You can kind of buy NFTs really on any site that's been

24  designed to be able to do that type of transactions, but most

25  folks use an NFT marketplace to be able to do those

1   transactions.

2   Q.  And what is an NFT marketplace?

3   A.  It's a common website that allows me to authenticate that I

4   own those NFTs, put them up for sale, and potentially auction

5   them off.

6   Q.  Can you describe for us what is shown on this slide?

7   A.  These are three NFT marketplaces.  OpenSea is by far the

8   biggest in this space, but I mentioned Rarible and LooksRare,

9   because we also had MetaBirkins transactions happening on those

10  two marketplaces as well.

11  Q.  You've heard already reference to the phrase metaverse.

12          What is a metaverse?

13  A.  A metaverse, in general, when we talk about a metaverse,

14  we're talking about usually a vertical reality environment or

15  space.  Could potentially be an augmented reality space.  But

16  it's the idea that I will have kind of an avatar representation

17  of myself in a vertical space and be able to kind of interact

18  with the virtual environment that's around me.

19  Q.  Can you describe for us what is shown on this slide?

20  A.  These are just three of the more commonly known metaverses

21  out there, Meta, formerly Facebook, Decentraland, and Roblox.

22  Q.  Is there a relationship between metaverses and NFTs?

23  A.  Yes, there is.

24  Q.  Could you explain that relationship?

25  A.  So many believe that the metaverses are going to be driven

1    based off of blockchain technology and will use blockchain

2    technology to be able to do things like make transactions using

3    cryptocurrencies.  And so as a natural extension of that, we

4    feel like the NFTs will also move into those spaces.

5    Q.  And are NFTs integrated into any metaverses at this time?

6    A.  They are slowly being integrated, yes.

7    Q.  I would like you to look at what has been marked as

8    Exhibit 382.

9              Can you identify this for us?

10   A.  This is an FAQ from the Decentraland website.

11   Q.  And have you seen this before?

12   A.  Yes, I have.

13   Q.  In what context have you seen this?

14   A.  I was interested in learning about how I could integrate

15   NFTs into the metaverse, and so I searched for the way to link

16   an NFT with metaverse, which directed me to this site here.

17   Q.  And is this information you considered did in connection

18   with opinions you formed in this litigation?

19   A.  Yes, it is.

20             MR. FERGUSON:  I would like to offer Exhibit 382 as an

21   exhibit.

22             MR. MILLSAPS:  Your Honor, the defendant objects.

23             THE COURT:  Well...

24             MR. MILLSAPS:  Hearsay and relevance.

25             THE COURT:  Sustained.

1    BY MR. FERGUSON:

2    Q.  And do you have an understanding of how NFTs --

3           THE COURT:  By the way, the objection is sustained on

4    grounds of hearsay.

5           MR. FERGUSON:  All right.

6           MR. MILLSAPS:  Your Honor, we would ask that the

7    slide --

8           The slide was taken down.  Thank you.

9           MR. FERGUSON:  I'm taking the exhibit down.

10   Q.  Do you have an understanding of how NFTs can be used in

11   Decentraland?

12   A.  Yes.

13   Q.  Could you describe that understanding for us?

14   A.  You would have the owner of the collection of an NFT can

15   submit to Decentraland instead of 3D files that could be used

16   in conjunction with the Decentraland metaverse without having

17   to change the NFTs on the blockchain.

18   Q.  And when this process is filed, how are the NFTs used in

19   Decentraland?

20           How can the NFTs be used in Decentraland?

21   A.  The idea being you have a 3D object that could be either a

22   series of avatars or potentially.

23   Q.  I would like to talk to you now about the work that you did

24   in connection with investigating the MetaBirkins and ask in

25   particular if you can describe the steps you took in your

1    investigation?

2    A.   OK.   I started first by familiarizing myself using publicly

3    available articles on what I was looking for, so I could get

4    familiar with what the NFT looked like and when it was

5    released.   I then searched on the major marketplaces to see if

6    I could find the MetaBirkins collection, and I could find it

7    here on the LooksRare marketplace.

8             So I just simply searched for MetaBirkins in the

9    search bar of LooksRare, which popped up the MetaBirkins

10   collection, and I was able to then click to this page to see

11   the MetaBirkins collection validated, that they looked like the

12   MetaBirkins that were being talked about in the press, and I

13   could then navigate to the transactions on the blockchain by

14   clicking where that yellow arrow is, which redirects me to the

15   smart contract related to the MetaBirkins NFT.

16   Q.   And can you describe what's shown on this slide?

17   A.   So I clicked there and that brings me to a site called

18   Etherscan.io, which is a site that is linked really through all

19   of the major marketplaces now as a source of information.   So

20   from here, I can see that the contract and I can see each of

21   the transaction level, the transaction-level details down

22   below.

23   Q.   Will you help us understand what is shown on this slide?

24   A.   So here I just tried to tie it back to my earlier

25   visualizations.   You have transaction, level of detail, that's

N1UsHER6                          Mentzer - Direct

1    what the transaction hashes.  That is the transaction-level

2    detail within the block of a blockchain.

3            The method is the method that I called that would have

4    been called in the smart contract itself.  So we see transfers,

5    approvals, etc.  We have a block itself.  If I wanted to see

6    all the transactions in the block, I could do that.  And then

7    who initiated that call to that method, along with if somebody

8    received something as a result of that while it received

9    something as a result of that call.

10           MR. MILLSAPS:  Your Honor, we object to these slides

11   being shown to the jury.  This is not in evidence.

12           MR. FERGUSON:  They are demonstratives that have been

13   created by the witness to help explain rather technical

14   concepts that he is talking about.

15           THE COURT:  Yes.  They will be allowed as

16   demonstratives, but they will not be entered into evidence and,

17   therefore, they will not be given to the jury when the jury

18   deliberates.  They can be used now to help follow his

19   testimony.

20           MR. FERGUSON:  Thank you, your Honor.

21           MR. MILLSAPS:  Thank you, your Honor.

22   BY MR. FERGUSON:

23   Q.  So what's the step that you took next?

24   A.  So I had confirmed the images are kind of what I expected.

25   So I wanted to validate that this was actually the smart

1    contract that I -- that was driving that, the collection that I

2    expected it to be.  So the order of transactions on the

3    Etherscan site is the most newest first, so I had to go down

4    back, basically, go to the last page and then go to the bottom

5    of the last page to see the first transaction.

6    Q.  Did you click where it says last?

7    A.  I clicked where I saw last, and then just scrolled down to

8    the bottom, and I could see that the transaction occurred on

9    12/2/2021, and the transaction was to create the MetaBirkins

10   contract.  So this matched the date that I was expecting based

11   off of news articles I was reading.

12   Q.  And then what did you do next?

13   A.  So now I wanted to take a quick look at the smart contract

14   itself, so I went back to the top of this page and selected the

15   contract tab right there, which shows me the actual solidity

16   code related to the smart contract.

17   Q.  Can you look at what's been marked as Plaintiff's

18   Exhibit 78.

19            Have you seen that before today?

20   A.  Yes.

21   Q.  What is that?

22   A.  It is all the code that was linked to MetaBirkins smart

23   contract that I found on the Etherscan.io site.

24            MR. FERGUSON:  I offer Exhibit 78.

25            MR. MILLSAPS:  No objection, your Honor.

1          THE COURT:  Received.

2          (Plaintiff's Exhibit 78 received in evidence)

3     Q.  What's the difference between the exhibit we're looking at

4     and the screen we're looking at right now?

5     A.  This just breaks it up based off of the various packages

6     that were used.  It's the same code.  It was all appended

7     together in one file for the other exhibit.

8     Q.  So looking at the code for the MetaBirkins NFTs, were there

9     any particular features of this code that you focused on, in

10    any particular line?

11    A.  So I started there at line 22, the constructor method,

12    which told me some things that I was interested in.

13    Q.  And what did line 22 tell you?

14    A.  I could see that they used the ERC 721 template, which is

15    the kind of the early version of NFT templates.  I could see --

16    so that tells me that this smart contract drives just the

17    MetaBirkins contract.  It can't handle other NFTs.  I could see

18    that they named the smart contract MetaBirkins, and they gave

19    it the symbol Meta.

20    Q.  What is the significance of the name MetaBirkins appearing

21    in the contract?

22    A.  It's just what they chose to name it.

23    Q.  Is this contract on the blockchain?

24    A.  Yes, it is.

25    Q.  Can this name be changed?

1    A.   No, it cannot.

2    Q.   What is the reference to Meta, m-e-t-a, that appears next

3    to MetaBirkins?

4    A.   That is the symbol.  It's not mandatory to have, but in

5    this case they have it here.  You can almost think of it as a

6    stock ticker symbol.  If I wanted to do a quick search on some

7    of the marketplaces, I could use the symbol instead of the full

8    name.

9    Q.   Can you look at what has been marked as Exhibit 80.

10          Have you seen that before today?

11   A.   Yes, I have.

12   Q.   What is that?

13   A.   That is an export out of the Etherscan.io site of all the

14   transactions related to the MetaBirkins smart contract.

15   Q.   Is this information you relied on in forming opinions in

16   this case?

17   A.   Yes, I did.

18          MR. FERGUSON:  I offer Exhibit 80 into evidence.

19          MR. MILLSAPS:  No objection.

20          THE COURT:  Received.

21          (Plaintiff's Exhibit 80 received in evidence)

22          So let me ask you this, because I'm just a dumb judge,

23   so I'm not following everything and maybe the jury isn't

24   either.

25          The MetaBirkins, a MetaBirkins is an image; yes?

1            THE WITNESS:  Is a what?

2            THE COURT:  Image.

3            THE WITNESS:  MetaBirkins, no, is the name of the

4   smart contract.

5            THE COURT:  It's the name of the smart contract.

6            So we saw earlier images of Birkin bags covered in

7   fur.

8            THE WITNESS:  Um-hmm.

9            THE COURT:  What do you call those?

10           THE WITNESS:  That's the image file connected to the

11  MetaBirkins NFT.

12           THE COURT:  OK.  So the image file is something that

13  is offered for sale; yes?

14           THE WITNESS:  That is the visual representation of

15  what is being offered for sale is the actual token, which to

16  all of us wouldn't really mean anything.

17           THE COURT:  I think my question was a yes-or-no

18  question, but OK.

19           So if you go on the relevant website and you want to

20  purchase exclusive use of this image, that's what you

21  ultimately are getting for your money, right?

22           THE WITNESS:  That is your expectation, yes.

23           THE COURT:  I think the answer to that is yes, right?

24           Can you answer a question yes or no?

25           THE WITNESS:  Yes, I can.

1          THE COURT:  So is the answer to my question yes?

2          THE WITNESS:  No.

3          THE COURT:  No.

4          Then what's the right answer?

5          THE WITNESS:  At issue there is the image can actually

6     change in the future.

7          THE COURT:  So you've heard of something called money;

8     yes?

9          THE WITNESS:  Yes.

10         THE COURT:  When a person exchanges money for certain

11    rights respecting a MetaBirkins image, what they are getting is

12    the exclusive right to have that image available and maybe to

13    the originator, true?

14         THE WITNESS:  True.

15         THE COURT:  Now we're making progress.

16         And if the person who then purchased that opportunity

17    wants to sell it, the originator then gets, pursuant to the

18    smart contract, a percentage of the sale, true?

19         THE WITNESS:  Yes.

20         THE COURT:  OK.  Go ahead, counsel.

21    BY MR. FERGUSON:

22    Q.  What is a minting contract in the context of a smart

23    contract -- in the context of an NFT?

24         I'm sorry.  Let me start that again.

25         What is a minting transaction in the context of an

1    NFT?

2    A.  So the term minting is used to refer to the initial sale of

3    the NFT.

4    Q.  Can you look at Exhibit 65.

5         Have you seen Exhibit 65 before today?

6    A.  Yes, I have.

7    Q.  Can you identify it?

8    A.  It is a screenshot that I took off of the Etherscan.io site

9    that shows the transaction-level details for the very first

10   MetaBirkins NFT that was made.

11        MR. FERGUSON:  I offer Exhibit 65 into evidence.

12        MR. MILLSAPS:  No objection, your Honor.

13        THE COURT:  Received.

14        (Plaintiff's Exhibit 65 received in evidence)

15   Q.  Is there particular information on this record that you

16   focused on in your analysis?

17   A.  I was looking at the transaction and the value.

18   Q.  And what do these entries tell you?

19   A.  So this tells me the wallet, that starts 0X278 minted the

20   very first MetaBirkins NFT, number O, and they paid .1 ether,

21   which at the time was valued at $451.48.

22   Q.  Can you explain what is shown in this slide?

23   A.  Yes.  This is a slide that represents the date timestamp

24   for each of the NFTs, so I could understand the minting

25   pattern.

1   Q.  Focusing on the horizontal axis, what information is in

2   that axis?

3   A.  That's the date and the time.

4   Q.  And what's in the vertical axis?

5   A.  That's the NFT number.  So starting at zero and ending at

6   number 99, the final MetaBirkins NFT that was minted.

7   Q.  And what do each of the blue circles in this chart

8   indicate?

9   A.  One of the NFTs being minted.

10  Q.  I would like to -- can you look at what's been marked as

11  Exhibit 67.

12          Can you identify there document for us?

13  A.  Yes.

14  Q.  What is that?

15  A.  This is a screenshot that shows the first resale of a

16  MetaBirkins NFT.

17  Q.  And is this one of the documents you relied on in forming

18  your opinions?

19  A.  Yes.

20          MR. FERGUSON:  I would like to offer Exhibit 67 into

21  evidence.

22          MR. MILLSAPS:  No objection.

23          THE COURT:  Received.

24          (Plaintiff's Exhibit 67 received in evidence)

25  Q.  In looking at this record, what was the particular

1   information that you focused on?

2   A.   The transaction value, primarily.

3   Q.   And what information do you take from these entries?

4   A.   So I could see that the first resale occurred shortly after

5   the minting process began.  It was number 64.  MetaBirkin

6   number 64, that resold for ten ETH, which at the time was

7   $42,193.20.

8   Q.   I would like you to look at Exhibit 55.

9            Can you explain to -- have you seen Exhibit 55 before

10  today?

11  A.   Yes.

12  Q.   What is it?

13  A.   55 is my entire report, initial report, that was written

14  for counsel.

15  Q.   OK.  And does this chart appear in Exhibit 55?

16  A.   Yes.  It's appendix C in that exhibit.

17  Q.   OK.  What is the information in appendix C?

18  A.   This is a spreadsheet that I put together to track each

19  resale for all three marketplaces so I could come one total

20  amounts of the resale value and the royalties.

21  Q.   And how did you create Exhibit C?

22  A.   All from data that I downloaded off of OpenSea.

23  Q.   So looking back at Exhibit 67, would this be an example of

24  the record that you used to drive this compilation?

25  A.   Yes.

1          MR. FERGUSON:  I offer Exhibit 55 into evidence.

2          MR. MILLSAPS:  Objection, your Honor.

3          THE COURT:  Sustained.

4    Q.  What is shown in this next slide?

5    A.  This is a chart that I put together that showed all of the

6    resales of the MetaBirkins along with the dollar value amount

7    at the time that transaction occurred.

8    Q.  And is this chart derived from the compilation that you

9    created that was Exhibit C to your report?

10   A.  That's correct.

11   Q.  What does the horizontal axis represent?

12   A.  They are the unique date timestamps for each resale.

13   Q.  And what does the vertical axis represent?

14   A.  The value in U.S. dollars of those resales.

15   Q.  Now, resales were in ETH, is that correct?

16   A.  That's correct.

17   Q.  So how did you calculate the U.S. dollar amount for these

18   resales?

19   A.  I didn't calculate it.  I took it directly off of the

20   Etherscan.io site that does the conversion for me.

21   Q.  And what was the information of the Etherscan.io record?

22   A.  That would tell me both the ETH value and then the value in

23   U.S. dollars at that date and time.

24   Q.  And so each of these blue circles in this chart, what does

25   each blue circle represent?

1  A.  One of the retails.

2  Q.  And then looking at the green line that I've just added to

3  that chart, what does that green line represent?

4  A.  That represents the timeline while the minting was going

5  on, so I could see when the minting started and ended.  So I

6  could compare whether resales were occurring at the same time

7  the minting process was occurring.

8  Q.  When the MetaBirkins NFTs were created, were they linked to

9  any digital file?

10  A.  Not initially, no.

11  Q.  At the time that the minting transactions began, were they

12  linked to a digital file?

13  A.  Yes, they were.

14  Q.  And what was the digital file they were linked to?

15  A.  They were linked to a covered bag image that had some

16  animation that said future home of MetaBirkins.

17  Q.  And how did you determine that?

18  A.  One of the methods in the smart contract allows the

19  contract owner to set the repository, the point to the

20  repository for those images.  So I found the transaction

21  related to that setting and navigated to that repository to

22  look at what the images were at that time.

23  Q.  And can you show me, can you describe to me what is shown

24  in this slide?

25  A.  The top line is the actual transaction that set the pointer

1   to where the image files could be found and navigating to that,

2   you are arrive -- I could find this animated GIF file that

3   represented what they would have looked like at the beginning

4   of the minting process.

5   Q.  And so when the first three minting transactions took

6   place, individuals were buying MetaBirkins NFTs, is that

7   correct?

8   A.  So this was the image linked to the original, the first

9   three minted MetaBirkins, yes.

10  Q.  What image were those first three minters purchasing?

11  A.  It would have been linked to this image right here.

12           (Counsel confer)

13  Q.  And can you look at Exhibit 81.

14           Can you tell us what Exhibit 81 is?

15  A.  It's just marked GIF file.  I'm assuming that is the

16  animated GIF we're seeing for future home of a MetaBirkins.

17           MR. FERGUSON:  I offer Exhibit 81 into evidence.

18           MR. MILLSAPS:  No objection.

19           THE COURT:  Received.

20           (Plaintiff's Exhibit 81 received in evidence)

21  Q.  Did there come a time when the image linked to MetaBirkins

22  changed?

23  A.  Yes.

24  Q.  Can you describe for us what is shown in this slide?

25  A.  After the first three MetaBirkins were minted, I saw a

N1UsHER6                         Mentzer - Direct

1    series of transactions that were setting the base URI so this

2    would, prior to the fourth being minted, so this would have

3    been the last one which set a new repository navigating to that

4    new repository.  This is the image that was there at the time,

5    this JPEG image.

6    Q.  And is this image on the blockchain?

7    A.  No, it's not.

8    Q.  Who decides what image the NFT is going to point to?

9    A.  That's controlled by the smart contract owner.

10   Q.  So the individual purchasing the NFT doesn't have control

11   over how that pointer is going to function, is that correct?

12   A.  That's correct.

13   Q.  And could you look at Exhibit 83 in your folder.

14          Can you identify that?

15   A.  That is the covered bag image that was set after the third

16   NFT was minted.

17          MR. FERGUSON:  I offer Exhibit 83 into evidence.

18          MR. MILLSAPS:  No objection.

19          THE COURT:  Received.

20          (Plaintiff's Exhibit 83 received in evidence)

21          Counsel, find a spot in the next five minutes to break

22   for the day.

23          MR. FERGUSON:  Five minutes to break?

24          THE COURT:  Find a time in the next five minutes to

25   break for today.

N1UsHER6                          Mentzer - Direct

1          MR. FERGUSON:  OK.  Thank you.

2     BY MR. FERGUSON:

3     Q.  And did there come a time when the image changed, the image

4     linked to the NFT MetaBirkins changed again?

5     A.  Yes.

6     Q.  And can you tell us what is shown in this slide?

7     A.  That top transaction was another pointer to a new

8     repository for the MetaBirkins NFT that happened shortly after

9     the minting process was completed.  And at that time, the

10    unveiling of the individual MetaBirkins happened.

11    Q.  And can you look at Exhibit 84.

12         And can you identify that for us?

13    A.  Yes.  That would be one of the images linked to one of the

14    specific MetaBirkins NFTs.

15         MR. FERGUSON:  I offer Exhibit 84 into evidence.

16         MR. MILLSAPS:  No objection.

17         THE COURT:  Received.

18         (Plaintiff's Exhibit 84 received in evidence)

19    Q.  Can you describe for us what is shown in this slide?

20    A.  It's a combination of the earlier slide that showed the

21    minting history with date timestamp and what the image would

22    have looked like at any given point in time along that history.

23    Q.  Using the slide as a reference, how many MetaBirkins were

24    sold using the future home of a MetaBirkins?

25    A.  There were three that were sold under that original image.

N1UsHER6                          Mentzer - Direct

1    Q.  And how many were sold under the covered veiled image?

2    A.  The remaining 97.

3    Q.  Were any minting rights sold under the bag image?

4    A.  No.

5    Q.  Can you describe to us what is shown in this chart?

6    A.  This is the same chart we saw earlier that was the resales

7    with the addition of when the actual digital files changed.  So

8    the red indicated digital file there would have been the

9    animated GIF image of the covered bag, the yellow would be the

10   covered bag itself, and then the blue would be the unveiling

11   event and when the individual MetaBirkins was revealed.

12   Q.  So looking at this chart, the resales that took place to

13   the left of the blue line, what was the image linked to the

14   MetaBirkins when those resales took place?

15   A.  They were buying a covered bag image.

16   Q.  And is it possible today that the digital filed linked to

17   the MetaBirkins could change again?

18   A.  It could, yes.

19   Q.  Who has the ability to do that?

20   A.  The MetaBirkins contract owner.

21   Q.  Anybody else?

22   A.  No.

23        MR. FERGUSON:  Your Honor, I'm kind of at a logical

24   breaking point.

25        THE COURT:  OK.  Ladies and gentlemen, we are off to a

N1UsHER6                        Mentzer - Direct

good start, but it's very important that we start promptly at

9:30 to stay on schedule.  So be sure to be back in the jury

room like about 20 after nine so we can start right at 9:30.

          Have a very good evening, and we'll see you tomorrow.

          (Continued on next page)

1          (Jury not present)

2          THE COURT:  So let me show the witness page ten of his

3    expert report.  And the title is "What is a MetaBirkins NFT?"

4    The sentence that follows says, "A MetaBirkins NFT is a is a --

5    "is a" is repeated twice, but it's obviously a typo -- is a

6    token on a Ethereum blockchain -- question whether it should be

7    an Ethereum blockchain or a, but, again, inconsequential -- is

8    a token on a Ethereum blockchain that represents ownership of a

9    unique item (a MetaBirkins NFT)."

10          So the unique item is a MetaBirkins NFT; yes?

11          THE WITNESS:  Yes.

12          THE COURT:  And you accompany that on your report with

13    figure one, sample MetaBirkins NFT, and it's the image, right?

14          THE WITNESS:  Correct.

15          THE COURT:  So while I understand that you want to

16    your question or want to make a distinction, it seems to me of

17    no consequence whatsoever between the computerized data

18    associated with the image and the image.

19          In your report you identify the image as a MetaBirkins

20    NFT; yes?

21          THE WITNESS:  Yes, I do.

22          THE COURT:  And you stand by that, do you not?

23          THE WITNESS:  Yes.

24          THE COURT:  All right.  So I thought I asked you

25    whether that was a MetaBirkins NFT.  Maybe I misphrased my

1    question because I can't remember it now exactly.

2              But if I were to ask you tomorrow, are these images

3    what we mean by MetaBirkins NFTs, your answer would be yes?

4              THE WITNESS:  That would be correct.

5              THE COURT:  All right.  You may step down.

6              (Witness temporarily excused)

7              Now I take the liberty of suggesting to plaintiff's

8    counsel that, so far articulated to the jury, this witness and

9    his testimony is being made to be far more confusing than

10   helpful.  I intervened because I could see, just from looking

11   at their faces, that the jurors were confused.  And I have to

12   say, I didn't think the responses I got from the witness

13   particularly helped.

14             Now in his report, just to take an example, he defines

15   these images as MetaBirkins NFTs.  So a question could have

16   been put to him:  What's a MetaBirkins NFT?  Oh, it's this

17   image here on the screen.  And every juror would have

18   understood that.

19             But that's not the way we proceeded.  And looking at

20   his report, I notice that, for example, he spends many, many,

21   many pages describing how he computed how much money

22   Mr. Rothschild made over all this.  So I was waiting for the

23   question, that I assume hopefully will come tomorrow:  How much

24   money did Mr. Rothschild make off of the MetaBirkins NFT sales?

25             And then we would get an answer, and then you could

1   break it down to minting revenue, royalty revenue, NFT

2   transfers and fees paid, and maybe even get a little bit

3   further into how he computed that.

4          But instead, as near as I can tell, plaintiff's

5   counsel is proceeding on the theory that we first have to tell

6   the jury everything he looked at and how he defined this and

7   how he looked at that line of indecipherable print and only

8   eventually get to the bottom line.

9          If that's the case, one, we'll be here forever with

10  this witness; two, the jury will be hopelessly confused; and

11  three, the court will have no alternative but to intervene and

12  start asking my dumb questions again.

13         So I encourage counsel over the evening to talk with

14  the witness and revise your approach.  OK?

15         MR. FERGUSON:  May I address that, your Honor?

16         THE COURT:  Sure.

17         MR. FERGUSON:  All of the questions from this point

18  forward relate to the damages calculation.  So we are done on

19  these other topics and now we're moving into the damage

20  calculation.

21         THE COURT:  OK.  Isn't the first question you should

22  put to him, I would have thought, how much money did

23  Mr. Rothschild make off of all of this?

24         MR. FERGUSON:  I will start with that question

25  tomorrow.

1          THE COURT:  That sounds good.

2          MR. FERGUSON:  OK.

3          THE COURT:  We'll see you all tomorrow.

4          MR. FERGUSON:  Thank you.

5          (Adjourned to Tuesday, January 31, 2023, at 9:30 a.m.)

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     KEVIN MENTZER

 4    Direct By Mr. Ferguson . . . . . . . . . . . .68

 5                        PLAINTIFF EXHIBITS

 6    Exhibit No.                              Received

 7     1    . . . . . . . . . . . . . . . . . . . .63

 8     3    . . . . . . . . . . . . . . . . . . . .63

 9     4    . . . . . . . . . . . . . . . . . . . .63

10     5    . . . . . . . . . . . . . . . . . . . .64

11     6    . . . . . . . . . . . . . . . . . . . .64

12     7    . . . . . . . . . . . . . . . . . . . .64

13     8    . . . . . . . . . . . . . . . . . . . .64

14     9    . . . . . . . . . . . . . . . . . . . .66

15    10    . . . . . . . . . . . . . . . . . . . .66

16    11    . . . . . . . . . . . . . . . . . . . .67

17    12    . . . . . . . . . . . . . . . . . . . .67

18    57    . . . . . . . . . . . . . . . . . . . .69

19    78    . . . . . . . . . . . . . . . . . . . .91

20    80    . . . . . . . . . . . . . . . . . . . .92

21    65    . . . . . . . . . . . . . . . . . . . .95

22    67    . . . . . . . . . . . . . . . . . . . .96

23    81    . . . . . . . . . . . . . . . . . . . 100

24    83    . . . . . . . . . . . . . . . . . . . 101

25    84    . . . . . . . . . . . . . . . . . . . 102
```

DEFENDANT EXHIBITS

Exhibit No.                                    Received

6    . . . . . . . . . . . . . . . . . . .67

601   . . . . . . . . . . . . . . . . . . .67