N21nher1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

HERMÈS INTERNATIONAL, et al.,

                    Plaintiffs,

          v.                          22 Civ. 384 (JSR)

MASON ROTHSCHILD,

                    Defendant.

------------------------------x
                                      New York, N.Y.
                                      February 1, 2023
                                      9:30 a.m.

Before:

                    HON. JED S. RAKOFF,

                                      District Judge
                                      –and a Jury–


                         APPEARANCES

BAKER & HOSTETLER LLP
        Attorneys for Plaintiffs
BY:   DEBORAH A. WILCOX
      OREN J. WARSHAVSKY
      GERALD J. FERGUSON

HARRIS ST. LAURENT & WECHSCLER LLP
        Attorneys for Defendant
BY:   ADAM B. OPPENHEIM
      JONATHAN A. HARRIS

LEX LUMINA PLLC
        Attorneys for Defendant
BY:   RHETT O. MILLSAPS, II

N21nher1

```
 1              (Trial resumed; jury not present)

 2              THE COURT:  Let's get the witness on the stand.  After

 3  reviewing are Dr. Kominers' report and considering the points

 4  made by defense counsel yesterday, I didn't think a hearing was

 5  necessary.  I am going to allow him to testify, but I will

 6  state my reasons for that at the next break, so you will have

 7  the record.

 8              MR. HARRIS:  Your Honor, may I approach with binders?

 9              THE COURT:  Pardon?

10              MR. HARRIS:  May I approach with binders?

11              THE COURT:  Yes.  How much longer are you going to be

12  on direct?

13              MR. HARRIS:  Ballpark, two hours, your Honor.

14              THE COURT:  Approximately?

15              MR. HARRIS:  Two hours.

16              THE COURT:  I would suggest that it ought to be no

17  more than two hours.

18              (Continued on next page)

19

20

21

22

23

24

25
```

N21nher1                          Estival - Direct

1              (Jury present)

2     SONNY ESTIVAL, resumed.

3              THE COURT:  Please be seated.

4              Good morning, ladies and gentlemen.

5              Thank you very much for your promptness and we are

6     ready to proceed.

7              Counsel.

8              MR. HARRIS:  Thank you, your Honor.

9     DIRECT EXAMINATION (Continued)

10    BY MR. HARRIS:

11    Q.  Good morning, Mr. Rothschild.

12    A.  Good morning.

13    Q.  Mr. Rothschild, yesterday -- I just want to clarify one

14    thing.  I asked you a question about Virgil Abloh, and you said

15    he recently had a show at the Whitney Museum.

16    A.  I made a mistake.  It was actually the Brooklyn museum.

17    Q.  That was a show of his artistic works?

18    A.  Yes, as well as some of his work in, like, designing

19    fashion, architecture as well.

20             THE COURT:  Lean that microphone down a little bit.

21    Q.  When we left off yesterday, Mr. Rothschild, we were

22    discussing your "Do Not Sit" project.

23    A.  Yes.

24             MR. HARRIS:  Ashley, could you please put back up

25    Exhibit 523 in evidence.

1   BY MR. HARRIS:

2   Q.  Mr. Rothschild, when we left off yesterday, I was asking

3   you if you created these images by yourself.

4   A.  No.

5   Q.  How were the images created?

6   A.  I'm sorry.  I couldn't hear you.

7   Q.  Sure.  How were the images created?

8   A.  The images were created in a 3D program called Houdini by

9   my assistant, Mark.

10   Q.  What is mark's name?

11   A.  Mark Berden.

12   Q.  Does he work for you or is he a freelancer?

13   A.  A freelancer.

14   Q.  How did you meet Mr. Berden?

15   A.  I met Mark through, like, a freelance website.  He had a

16   portfolio of other 3D works that he did.

17   Q.  What was Mr. Burden's role in the creation of the images?

18   A.  Pretty much to simulate these 3D images at my direction.

19   So I would come up with the concept, the subject matter,

20   composition, materials used, and he could kind of execute on

21   those.

22   Q.  In your experience does, hiring others to help execute an

23   art project something that artists sometimes do?

24   A.  Yes.  I mean, to my knowledge, my favorite artists

25   personally all have, like, massive teams.

1   Q.  These teams have helped them execute projects?

2   A.  Yeah.  Like in the case of Damien Hirst, his most famous

3   paintings that sell for millions of dollars are done by, like,

4   assistants drawing circles.

5   Q.  Did you pay Mr. Berden?

6   A.  Yes.

7   Q.  Now, did there come a time when you began to work on a

8   project called "Baby Birkin"?

9   A.  Yes.

10  Q.  All right.

11          MR. HARRIS:  Ashley, could you please put up Exhibit

12  82 in evidence.  Ashley, it's in evidence.  You can publish it

13  to the jury as well.

14          Thank you.

15  BY MR. HARRIS:

16  Q.  We saw this video yesterday?

17  A.  Uh-huh.

18  Q.  What was the idea behind the Baby Birkin project?

19  A.  It's mostly a play on words, you know, a baby in Birkin.

20  The Baby Birkin was, like, really popular in pop culture at the

21  time because like the Kardashians kept wearing it and it was

22  the most popular size.  It's the smaller size, so people tend

23  to like the smaller handbags.  And it was like all over music I

24  remember, like, a Gunna song.  Specifically it was called Baby

25  Birkin, I kept hearing it all the time and the idea kind of

 1   came to my head.

 2   Q.  Was Baby Birkin done as an NFT?

 3   A.  Yes.

 4   Q.  And did you have any artistic influences for this project?

 5   A.  Specifically for Baby Birkin, I kind of just, like, the

 6   baby itself gestating in the bag is one thing, but the kind of

 7   clouded thing that you see around that was -- and you kind of

 8   see these little specks all over, there's like a famous, like,

 9   Hubble space photo of, like, the creation of a star.  It kind

10   of looks like that.  It's something being born, a star being

11   born.  I put those two together.

12   Q.  Did you work with anyone on the Baby Birkin project?

13   A.  So I collaborated with my buddy Eric Ramirez, who's been my

14   friend since like childhood, and then Mark as well.

15   Q.  And when you say Mark, that's Mr. Berden?

16   A.  Correct.

17   Q.  What was your role on the project?

18   A.  I came up with the concept completely.  The Baby Birkin was

19   just kind of the idea I came up with just from seeing it all

20   the time, hearing it in music, and then I kind of reached out

21   to Eric because Eric is known for, like, painting the handbags

22   and luggage of like famous people.  He painted Chris Jenner's

23   stuff he paints on luxury goods like Goyard, Louis Vuitton,

24   even he's painted on Birkins in the past.  I felt like it was a

25   match made in heaven to work on a project.

1    Q.  When you say Eric paints on a Birkin bag, if I buy a Birkin

2    bag, I can take it to Mr. Ramirez and he'll point a picture on

3    it?

4    A.  Yeah, whatever you want.

5    Q.  And did you make efforts to promote the Baby Birkin

6    project?

7    A.  Yes.

8    Q.  What kind of efforts did you make?

9    A.  One we released it on Basic.Space, which is a marketplace

10   for artists, creators, influencers, to kind of, you know,

11   showcase what they want to sell, whether it's art -- some of

12   them have clothing, some have furniture they make.  So together

13   we had, like, a marketing effort to get it out there.

14   Q.  And is that something in your experience that artists

15   typically do?

16   A.  For sure.

17   Q.  And did the Baby Birkin NFT sell?

18   A.  Yes, it was like a five-day auction I think, and the closed

19   price was $23,500 equivalent in Ethereum.

20   Q.  Did the project receive any press?

21   A.  Yes.

22   Q.  Do you recall where?

23   A.  Vogue was probably one of the biggest ones, it made the

24   rounds.  I don't remember every single press story, but I think

25   it hit like 15, 20 different, you know, websites.

1   Q.   Did there come a time when you started working on a project

2   called MetaBirkins?

3   A.   Yes.

4   Q.   About when was that?

5   A.   That was -- so, the idea for MetaBirkins kind of came -- I

6   didn't know what I was going to do after Baby Birkin.  I think

7   it was in September when Kering Group announced that they were

8   going fur free with a big press release that made the rounds in

9   every single website, whether it was business or art or

10  fashion.

11          And then the lightbulb went off.  Since they are going

12  fur free, I was like, oh, this is a cool opportunity to make

13  fur bags that don't, you know, utilize fur from animals or

14  killed animals since they are digital.

15  Q.   Who is the Kering Group or what is the carrying group?

16  A.   Kering Group is like a fashion conglomerate.  They own

17  Saint Laurent, who I worked for in the past, Balenciaga,

18  Alexander McQueen and, like, I don't know, five to seven other

19  brands.

20  Q.   Do they own Gucci, do you know?

21  A.   Yes.

22  Q.   And, I'm sorry, the Kering Group put out a press release

23  saying what?

24  A.   At the time you know, luxury companies were kind of getting

25  scrutinized for their use of fur products or just like skins or

1   hides that were, like, hard to kind of obtain and don't come as

2   a product of, like, the meat industry.  So they made a

3   commitment to no longer use fur in any of their products for

4   the whole umbrella of companies.

5   Q.  Were you aware of any similar statement from Hermès?

6   A.  No.

7   Q.  What is your understanding of a conceptual artist,

8   Mr. Rothschild?

9   A.  Kind of in the way that you speak, I spoke about the

10  concept stores yesterday, a conceptual artist I feel like

11  doesn't use traditional means of, you know, creating the art or

12  promoting art to get it out there.  You know, it's, when I

13  create something it's kinds of like, you know, a shot in the

14  dark.  It's definitely something that is in my head.  It is an

15  idea in its purest form, and I try to put it on paper.

16  Q.  Do you consider yourself a conceptual artist?

17  A.  I like to think so, yes.

18  Q.  Do you consider -- what type of project do you consider

19  MetaBirkins?

20  A.  I think it is a conceptual art project.

21  Q.  Why did you consider it a conceptual art project?

22  A.  One, that kind of concept, it's not like we are using

23  traditional means to create it, you know, we are using, you

24  know, 3D software.  Every single like fiber is like simulated

25  within the 3D software so every singing -- it's not like

1    Photoshop, where you just like overlay something.  Every single

2    one of those, like, furs is the color it is a supposed to be.

3    The way we sold it, you know, utilizing NFTs which was kind of

4    new and innovative technology at the time we utilized it to

5    sell art and it was just a vehicle for it.

6            THE COURT:  So now I think, forgive me, you are a

7    little too close to the microphone.  Just a little bit back.

8    That's good.

9            MR. HARRIS:  Can we -- we are going to put up, please,

10   Ashley, Exhibit 227, which is in evidence.

11   BY MR. HARRIS:

12   Q.  That, Mr. Rothschild, is the MetaBirkins website, is that

13   right?

14   A.  Correct.

15   Q.  I believe there is a date on this, which I may not be able

16   to see because my screen is a little fuzzy.  I see, "Access

17   December 1, 2021."

18           Do you see that up in the upper right-hand corner?

19   A.  Yes.

20   Q.  Okay.  When were the MetaBirkins themselves released?

21   A.  Like for sale?  Like, when you could buy them was December

22   2.

23   Q.  Okay.  So this is up before the MetaBirkins are actually

24   for sale?

25   A.  Yeah.

1   Q.  This is metabirkin.com, is that right?

2   A.  Yeah, metabirkins.com.

3   Q.  Is that a website that you set up?

4   A.  Yes.  I own the domain and I designed the website.

5   Q.  And you registered the domain?

6   A.  Correct.

7   Q.  Is there anything on this page -- again, it is just a

8   little blurry, but is there anything on this page indicating

9   that you are the creator of MetaBirkins?

10  A.  Yes.  It's says creator Mason Rothschild.

11  Q.  Where do I find that?

12  A.  The second paragraph it says creator Mason Rothschild began

13  working on MetaBirkins shortly after the success of Baby

14  Birkin.

15  Q.  And is there anything on this web page indicating that

16  Hermès was the source of the MetaBirkins?

17  A.  Not to me.  I said it was a tribute to Hermès, but never

18  said it was a collaborative artwork.

19  Q.  Were you interested in taking credit for the MetaBirkins

20  project?

21  A.  Yes, for sure.

22  Q.  Does this web page show -- by the way have you ever used

23  metabirkins.com for anything other than promoting the

24  MetaBirkins?

25  A.  No.

1   Q.  Have you ever offered to sell metabirkins.com to anyone?

2   A.  No.

3   Q.  Now, were you also previewing the images --

4               MR. HARRIS:  By the way could you put that back up for

5   one second, please, Ashley.

6               Thank you.

7               If we could see the one that's broader, if we could

8   scroll down a little.

9   BY MR. HARRIS:

10  Q.  Was this a preview of all 100 images?

11  A.  No, these are just kind of my favorites.

12  Q.  So if you take a look at these, let's take a look -- could

13  you -- is there any one of these that you would care to explain

14  to the jury what your thought process was behind it.

15  A.  The second row, the second one next to the really bright

16  colorful one is actually a Bob Ross inspired one.

17  Q.  Okay.  That's the second from the right?

18  A.  Yeah.  The second from the right.

19  Q.  The second from the right.  Who is Bob Ross?

20  A.  Bob Ross is a painter.  He's known for like the happy

21  little clouds and stuff like that, has the big afro.

22  Q.  Now, did you review these images at other places?

23  A.  Yes.  On Discord, which was where the majority of

24  communications went on for MetaBirkins.

25  Q.  What is Discord?

1    A.  Discord is a chat platform, kind of like an Instant

2    Messenger or a Facebook Messenger where you can talk in, like,

3    big about groups of people.  It was initially started for,

4    like, gamers to talk to each other and it became, like, a

5    resource for people to promote our projects in Web 3.

6    Q.  Did you also put it up on your Instagram?

7    A.  Yes.  And Twitter.

8            MR. HARRIS:  Ashley, this is for identification so

9    could you please show the witness and Court and counsel

10   Defendant's Exhibit 506 for identification.

11           Okay.

12   BY MR. HARRIS:

13   Q.  Can you just briefly explain what this is.

14   A.  This is the MetaBirkins Instagram.

15   Q.  Is this a site you created?

16   A.  Yes.

17           MR. HARRIS:  Your Honor, I offer Defense Exhibit 506.

18           MR. WARSHAVSKY:  No objection.

19           THE COURT:  Received.

20           (Defendant's Exhibit 506 received in evidence)

21           MR. HARRIS:  Please publish it, Ashley.

22   BY MR. HARRIS:

23   Q.  This is an Instagram site that you created for MetaBirkins?

24   A.  Correct.

25   Q.  And do you also have a separate Instagram, personal

N21nher1                          Estival - Direct

1    Instagram site?

2    A.  Yes.  It's @MasonRothschild.

3    Q.  You previewed -- am I right that you previewed the

4    MetaBirkins on this Instagram site?

5    A.  This one as well as my own, like, I would repost them as

6    stories and I posted a few just, like, on my feed.

7    Q.  Did you create these images that we are looking at here by

8    yourself?

9    A.  No.

10   Q.  How were they created?

11   A.  In tandem with Mark.

12   Q.  What was your role and what was Mr. Berden's role?

13   A.  Just like all the other projects, I come up with the

14   concept, the composition, all the artwork that goes, or that

15   you see on the MetaBirkins, and then he just simulates them.

16   Q.  You say he simulates them.  What do you mean by that?

17   A.  So when we created MetaBirkins, we have this kind of, you

18   know, the general shape of it, and what we do is we simulate

19   the fur, so it's not just like an overlay or anything like

20   that, but, like, you can kind of see how every kind of fur has,

21   like, color attached to it.  So in the 3D space there is actual

22   like fur fibers.

23   Q.  As opposed to just having the fur be like one color and

24   then coloring it?

25   A.  Correct.

N21nher1                          Estival - Direct

1   Q.  Did I get that right?

2   A.  Correct.

3   Q.  Okay.  Now, if you scroll down in the Instagram, did there

4   come a time when you shrouded --

5          MR. HARRIS:  There it is, scroll up.

6   BY MR. HARRIS:

7   Q.  Did there come a time when you shrouded the image?

8          Do you see that shrouded image?

9   A.  Yes.

10  Q.  Can you tell me when that came about and how.

11  A.  So, the shroud, it's popular in for NFTR projects to not

12  reveal the artwork until a certain date.  It's kind of like

13  when you get something and we don't want to give the impression

14  that the -- it's predetermined like what you will get.  So

15  especially when there's like ones that people want and there's

16  more in demand than others, like Mona Lisa, for example, or Bob

17  Ross, it's kind of just a way of randomizing the artwork prior

18  to people receiving it.

19  Q.  So, when you put the MetaBirkins up for sale, what -- if

20  somebody was -- did they put in a bid for one or how does that

21  work?

22  A.  So, no.  Everybody who was able to purchase or mint a

23  MetaBirkin for the first time was on a white list or friends

24  and family.

25  Q.  What is a white list?

1    A.   A white list is basically like a ticket to purchase.   So

2    since you have everybody's wallet addresses, anybody who you

3    have that's on the white list is able to mint versus any other

4    person.   So it's like a doorman.

5    Q.   How does somebody get on the white list?

6    A.   There's various different ways.   One of the ways was I held

7    contests within the Discord for people to kind of, you know,

8    create their own, like, fan art.   I guess you could say I would

9    pick the best ones and say, okay, you get the chance to

10   purchase a MetaBirkin.

11           We also did, we had people donate to different animal

12   shelters.   If you donated to an animal shelter, you would get

13   on a white list.   There's, I think I ran like 10, 20 different

14   contests.

15   Q.   If you're on a white list -- there were a hundred images,

16   is that right?

17   A.   Correct.

18   Q.   You previewed some of them but not all 100, is that also

19   right?

20   A.   I would say about 90 percent were previewed.

21   Q.   So if somebody is on the white list, do they know which

22   image they are going to get?

23   A.   No.

24   Q.   And how do you determine who gets what image?

25   A.   It's fully randomized.

```
 1   Q.  When you are creating your white list, you also make an
 2   effort to make sure or try to get folks who you might think
 3   would be important collectors or influencers on the white list?
 4   A.  Sure.  Just like traditional art, you would want your art
 5   to go to the best galleries or the best sculptors.
 6             MR. WARSHAVSKY:  Objection, your Honor.
 7             THE COURT:  Well, sustained as to form.
 8   BY MR. HARRIS:
 9   Q.  Do you make an effort, when you are creating the white
10   list, do you make an effort to get anybody on that white list?
11   A.  Yes.  I try to get it in the hands of good collectors.
12   Q.  Why would that be?
13   A.  Good collectors have kind of a pedigree for collecting in
14   this space.  So people who are known collectors of different
15   artworks, you know, utilizing NFTs, friends and family and
16   celebrities who have a big influence on people.
17   Q.  And when the folks purchased the MetaBirkin, they then
18   received -- what did they actually receive?
19   A.  Sorry.  Can you repeat the question?
20   Q.  Sure.  They are on the white list, you are not sure which
21   one you are going receive, it's randomized, and then on what
22   day did you release the MetaBirkins?
23   A.  So, I believe it was a day or two after where they were
24   revealed.  So they would wait -- everybody had a shroud over
25   it, and then everybody knew when the reveal date was.  They
```

1    would check, we would push the randomization, like, script, and

2    it randomizes who gets what and you refresh your, like, page on

3    like OpenSea or something like that, and then you would see

4    what you got.

5    Q.  Then you would have it?

6    A.  Yeah.  Then you would have it.

7    Q.  How much did you sell the MetaBirkins for when they were

8    minting?

9    A.   .1 Ethereum, which is the equivalent of like $450.

10   Q.  At the time?

11   A.  At the time.

12   Q.  The price of ether fluctuates?

13   A.  Yes, significantly.

14   Q.  Do you believe you could have sold them for more?

15   A.  For sure.  The demand was crazy, but that was part of the

16   experiment.

17   Q.  When you say that was part of the experiment, what do you

18   mean by that?

19   A.  I mean, Hermès Birkin bags are known to be sold for

20   $12,000, you know, minimum of $12,000, like they said.  So I

21   said, let me see if I can charge, like, almost nothing for

22   them, like $450, and see what the people do with them and see

23   what they value, is it the image or, like, the product.

24   Q.  And did the MetaBirkins -- when you minted the MetaBirkins,

25   did you keep any for yourself?

1   A.  I kept one.

2   Q.  And did the MetaBirkins jump up in value?

3   A.  Yeah.  The first one sold for the equivalent of $45,000.

4   Q.  When you say the first one, do you mean a resale?

5   A.  The first resale was $45,000.

6   Q.  Do you receive that $45,000?

7   A.  I receive seven and a half percent.

8   Q.  Why did you receive seven and a half percent?

9   A.  As I said yesterday, you can set a royalty, which is what

10  made, like, NFTs very popular in the first place, which is the

11  artist is able to collect royalties.  So anytime it gets

12  traded, I get a royalty on it.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. HARRIS:

2   Q.  And did you sell the one that you had kept for yourself?

3   A.  No, I still have it today.

4   Q.  Ballpark guess, about how much money have you made from

5   resales of the MetaBirkins?

6   A.  Um, I think 70,000.

7   Q.  You're guessing?

8   A.  Approximately, yeah.  An estimate.  It would be worth way

9   less today.

10  Q.  Is that in addition to -- and then you also received

11  approximately $45,000 when they were minted?

12  A.  Correct.  Like, I'd say 100, 10K at the time, um, but about

13  60 percent less now.

14  Q.  Can I please show DX 614 for identification to the court,

15  counsel, please, and the witness.

16          Mr. Rothschild, this is a picture that Hermès counsel

17  used in its opening.  Do you recognize what these are?

18  A.  Yes.

19  Q.  What is it?

20  A.  Um, I can't count, but I think it's all the MetaBirkins or

21  close to it.

22  Q.  The 100 that you minted?

23  A.  The 100, yeah.

24          MR. HARRIS:  Your Honor, I move DX 614.

25          MR. WARSHAVSKY:  No objection.

1           THE COURT:  Received.

2           (Defendant's Exhibit 614 received in evidence)

3    Q.  All right.  We're going to move on from this.

4           Before we do, any others of these that you would like

5    to explain?

6           Pick one more out and explain what you are doing

7    artistically.

8    A.  Let me see.  There's a pretty recognizable one in the

9    second row.  It's blue or, like, teal and purple.  I really

10   like Disney and Monsters, Inc., so it's a take on Sully, who is

11   one of the characters in that movie.

12   Q.  That's the one that is teal with the purple kind of what I

13   call polka dots?

14   A.  Yeah, polka dots.

15   Q.  OK.  Thank you.

16          Do purchasers of the MetaBirkins receive 2D or 3D

17   images?

18   A.  2D.

19   Q.  Now, you said before they were created with 3D technology

20   because you needed it for the fur, is that right?

21   A.  Correct.

22   Q.  So if it's created with 3D technology, why is it that the

23   purchasers receive a 2D image?

24   A.  Because that is what we wanted to give people.  I mean,

25   it's, like, taking a picture.  If I took a picture of this,

 1   like, water bottle, it's a real physical three-dimensional

 2   water bottle.  But if it's a picture, it is two-dimensional,

 3   you can't grab it or see behind it or anything.

 4   Q.  Can the owner of a MetaBirkins NFT print his or her

 5   MetaBirkins with a 3D printer?

 6   A.  No.

 7   Q.  Can the owner of a MetaBirkins use his or her MetaBirkins

 8   in the metaverse?

 9   A.  Um, no.  I mean, they could put it on a wallet, like, a

10   painting, but that would be the extent of it.

11   Q.  You can use it in the metaverse like a 2D image?

12   A.  Yeah.

13   Q.  In a metaverse, could an owner of a MetaBirkins use it like

14   a handbag?

15   A.  No.

16   Q.  Can they put things into it?

17   A.  No.

18   Q.  All right.  And did the MetaBirkins project have any

19   relationship to the Do Not Sit project?

20   A.  Just aside from it's a chair that you can't sit in or

21   handbag you can't put anything in.

22   Q.  Now, how did you come to choose the title MetaBirkins for

23   the project?

24   A.  Um, so, I ran out a contest, a common trend, I guess you

25   could say, to get attention to the project, people interacting

N21sHER2                        Estival - Direct

1   with you on social media.  So I ran a contest on Instagram and

2   Twitter, and the name was suggested.

3   Q.  Was this before or after they were released?

4   A.  Before.

5   Q.  Can I please put up what's for identification Defendant's

6   Exhibit 613.

7           Can you briefly describe for the court what this is?

8   A.  Um, it's an Instagram post of me, I think, on October 29,

9   2021, asking -- or saying the collection needs a name, share

10  this post, and comment your suggestion.

11  Q.  And is this your personal Instagram or the MetaBirkins

12  Instagram?

13  A.  This is mine, because it didn't have a name yet.

14  Q.  OK.  Got it.

15          MetaBirkins hadn't been created yet?

16  A.  No.

17  Q.  OK.  And the *MetaBirkins.com* website hadn't been created?

18  A.  Not yet.

19          MR. HARRIS:  OK.  Your Honor, I offer defense

20  Exhibit 613.

21          MR. WARSHAVSKY:  No objection.

22          THE COURT:  Received.

23          (Defendant's Exhibit 613 received in evidence)

24  Q.  Do you see that on the black part or that's next to the

25  picture down in the bottom there's a date.

1              Do you see that?

2    A.   Yes.

3    Q.   What is that date?

4    A.   October 29, 2021.

5    Q.   And up at the top, what are you doing here?

6    A.   I'm just previewing one.  This is, like, the caption of an

7    Instagram post saying what I'm doing.  I said, I guess I knew

8    what the price was at the time -- at the time already and, um,

9    just asking people that it needs a name and for people to share

10   it.

11   Q.   And did, in fact, people -- did you post it just on the

12   contest, just on Instagram, or did you also post it on other

13   social media?

14   A.   I posted it on Twitter.

15   Q.   And did somebody suggest names?

16   A.   Yes.  Actually, I got suggested MetaBirkins on Instagram

17   and on Twitter.

18   Q.   If you look in the middle of this page, there's a

19   *hectourc* --

20   A.   Correct.

21   Q.   -- suggested MetaBirkins?

22   A.   Yes.

23   Q.   Did the contest -- you said there were two, there was

24   somebody on Instagram and also someone on Twitter.

25              Do you remember the name of the person that suggested

1    it on Twitter?

2    A.   Makisa.  Her handle is *asiancryptogirl*.

3    Q.   Do you know her actual name?

4    A.   Makisa.  That's just her display name.  I don't know her

5    real name.  It could be, but I'm not sure.

6    Q.   OK.  Did, in fact, the contest winners receive anything?

7    A.   One of them did.

8    Q.   All right.  Who received something?

9    A.   Instagram was the first one I saw, so Instagram winner.

10   Q.   Did Makisa ever get anything from you?

11   A.   Not initially.  I didn't see her suggestion initially, but

12   I called her after the fact because she DMed me.  I saw the DM,

13   I told her to call me, and then promised her one on the next

14   collection.

15   Q.   Did you give Makisa one in the next collection?

16   A.   No.  We weren't able to launch that second collection.

17   Q.   Have you given Makisa anything else?

18   A.   Um, just asked her if she wanted, like, any of the other

19   art projects that are done, since then, that are not

20   MetaBirkins, but she's not as involved in crypto right now.

21   Q.   Does the title of MetaBirkins, why did you pick out of the

22   various suggestions, why did you pick MetaBirkins?

23   A.   Um, I thought it was a good name.  People were attaching

24   Meta before, like, describing what was -- what the artwork was

25   at the time.  You know, Facebook had named its, like,

1   metaverse, you know, Meta and they changed their whole company

2   name.

3              So it was just a common thing to put it before them.

4   I thought it represented what we were creating very well.  And

5   to me, Meta, like, I played a lot of video games and stuff, so

6   in video games, meta means, like, what's happening now, what

7   the best strategy is in a game, and I felt like it described

8   fur-free was what was happening now.  So it just felt like a

9   good pairing.

10  Q.  I may have asked you this before, but -- I think I did ask

11  you that question.

12             Did you hope to receive recognition for the work?

13  A.  Um, yes.

14  Q.  And why?

15  A.  I mean, I think everybody wants to receive recognition for

16  stuff that they do.  Artists come with the art that they

17  accomplish.  I love receiving the credit for work.

18  Q.  And did you make efforts to promote MetaBirkins?

19  A.  Yes.

20  Q.  What did you do?

21  A.  Promoted it on my personal social media.  And after we had

22  the name, I promoted it on MetaBirkins' social media, promoted

23  in Discord, which is, like, this big chat.  I gifted it to --

24  not gifted it, but I white-listed different celebrities who had

25  influence who would, like, post it and share it also to, like,

1   you know, hundreds of thousands or millions of people.

2              Um, as well as, like, whales in the NFT space, which

3   are, like, big art collectors of -- collectors of NFTs.

4   Q.  As an artist, do you try to make an effort to build a

5   community of people who hold your work or know you?

6   A.  Yeah.  I feel, like, you know, there is collectors of Andy

7   Warhol.  They probably all chat with each other and hang out.

8   I think it's important, especially in this new, kind of, day

9   and age, to be able to garner the attention of a community and

10  keep them updated on everything that you're working on.

11             Like, for example, with me, people know I work on --

12  at Terminal, and they know I have Terminal.  And in return they

13  see everything that we're working on, and it gives them that

14  feel that we're kind of, like, all in it together.

15  Q.  Now, did you ever send any text messages about promoting

16  MetaBirkins?

17  A.  Um, I'm sure I did.

18  Q.  And why would you do that?

19  A.  Um, because that's how I communicate with help through text

20  message.

21  Q.  And did you hope that MetaBirkins would increase in value?

22  A.  Um, I could only hope so, but, I mean, I can't predict what

23  happened.

24  Q.  Did you tell people that you hoped it would increase in

25  value?

1   A.  Yes.

2   Q.  Now, if you're selling them for .1 ETH, $450 a piece, and

3   you're not --

4           Why do you care if they increase in value?

5   A.  I mean, I think the main reason is, one, I think it's great

6   for somebody who collects art to see that art appreciate, you

7   know, whether it's over time or instantly.  Um, I think that's

8   a common trend -- sorry -- I think that's a common trend in the

9   art world.  You know, Boscombe will paint something and sells

10  it at auction for 100.  DaVinci will sell a painting for a

11  couple hundred million dollars, you know.  That's how I

12  understand art works, so that was important to me.

13  Q.  In those examples, both Mr. Boscombe and Mr. DaVinci are

14  deceased, so it's the holders of their current -- the current

15  holders of that pictures that would be able to resell?

16  A.  Yeah, correct.

17  Q.  Now, did you ever send any messages about pumping?

18  A.  Yes.

19  Q.  What did you mean by pumping?

20  A.  It means -- the way I would describe it in this situation

21  is really, like, telling people to share the project.  So

22  people see that association and people know that that person

23  is, like, well-respected in the art space.  Oh, we like this

24  project, therefore, the price would go up.

25  Q.  So you're --

1   A.  Theoretically, sorry.

2   Q.  That's OK.

3         So you were asking -- am I right or wrong that you

4   were asking other people to pump the project?

5   A.  Um, yes.

6   Q.  And why would you ask other people to pump the projects?

7   A.  I guess, like, my level of influence can only go so far.

8   Um, you know, at the time, I wasn't, like, massive on Instagram

9   or anything like that.  Um, I had, like, you know, a good

10  ecosystem of people around me, but, you know, the more

11  influence that is, kind of, around the project, the more

12  attention it will get.

13  Q.  And did you ever use the word chill?

14  A.  Um, yes.

15  Q.  And is that in text messages?

16  A.  I think so, yes.

17  Q.  What did you mean by that?

18  A.  Chill is also, like, speak well of, you know.  I think

19  these are all kind of, like, slang, like, that we use so.  It's

20  kind of, like, bro-ey talk.  But for the most part, it just

21  means to speak highly of or -- or yeah, I think that's the best

22  way I can describe it.

23  Q.  When you say slang that we use, who is the "we" you're

24  referring to?

25  A.  Honestly, just me and my friends and, you know, people who

1   are, like, who collect NFTs or participate in Web3.  It's at

2   the very infancy stage right now, so it's very um, like, a frat

3   or, like, a very bro-ish type of talk.

4   Q.  And you were never a fraternity member, were you?

5   A.  No.

6   Q.  But very briefly for the jury, because I think it's the

7   first time the term came up, excuse me if I'm wrong, what is

8   Web3?

9   A.  Web3 is kind of what we're in right now.  So, like the

10  easiest way to describe it is Web1 is when you would log in

11  with your e-mail and password.

12          Web2 is kind of, like, the next evolution of that,

13  where you log in with, like, Google.  You know, it says sign in

14  with Google or sign in with Amazon.

15          Web3 is signing in with a wallet, which is, like, your

16  source of identification.  You have a seat phrase about, like,

17  self-custody.

18  Q.  When you say sign in with a wallet, your referring to like

19  a crypto wallet?

20  A.  Yeah, a crypto wallet.

21  Q.  And, Mr. Rothschild, do you think you can get away with

22  things in art by saying "in the style of?"

23  A.  Um, no, not necessarily.

24  Q.  All right.  Did you ever send a text message along those

25  lines?

1    A.  Um, yes.

2    Q.  What were you thinking when you sent that?

3    A.  Um, when I said get away with, I was, kind of, referring to

4    the situation.  I was speaking about this situation that we're

5    in today, where I should be able to get away with creating this

6    artwork, um, because it's my artistic expression and, you know,

7    a company like Hermès shouldn't be able to sue me for it.

8    Q.  Mr. Rothschild, is everything you did with MetaBirkins

9    public?

10   A.  Um, yes.  I mean, every communication is on Discord, which

11   is a public place.  Anybody could join and all my transactions

12   are public on the blockchain.

13   Q.  Did you have any ability to get away with anything in

14   secret with MetaBirkins?

15   A.  Um, I don't think so, especially not at this stage, you

16   know, of discovery.

17   Q.  Did you tell friends in text messages you might be

18   collaborating with Hermès?

19   A.  Yes, at some point.

20   Q.  And why?

21   A.  Um, I work in fashion, so I know a lot of people in

22   fashion.  And one of those people, um, was a high-ranking

23   member at a big, um, company called Yoox, said he had

24   connections at Hermès.  And numerous people told me this, and

25   they said that they would try to get them on the line with me.

1   Q.  What is -- I'm sorry -- Yoox, Y-u-t-e?

2   A.  Y-o-o-x.

3   Q.  What is Yoox?

4   A.  They are a company.  They sell a lot of brands, plus they

5   also handle the e-commerce.  I don't know what they do today.

6   This is just, like, my knowledge at the time.  They handle

7   e-commerce for a lot of different companies, one of them was

8   Celerant, handled the web store and fulfillment.

9   Q.  Why did you think they might be able to help you

10  collaborate with Hermès?

11  A.  That member who reached out to me was a president of that

12  company at the time, um, and I just -- I just believed them.

13  Q.  And were you, in fact, hoping to be able to collaborate

14  with Hermès?

15  A.  For sure.

16  Q.  And would you have liked to have collaborated with Hermès?

17  A.  Definitely.

18  Q.  Did there come a time you gave an interview, you gave an

19  interview or had an interview with Yahoo Finance?

20  A.  Correct.

21  Q.  Do you recall when that was?

22  A.  It was shortly after the mint of MetaBirkins, so it had to

23  be, like, mid or early December.  Um, anytime after the 4th, I

24  believe.

25          MR. HARRIS:  Your Honor, the next exhibit you admitted

1   yesterday with a limiting instruction.  It's the Yahoo Finance

2   article.  I'm going to just show the part of it that, if I may,

3   to the jury that you allowed in.

4           THE COURT:  That's fine.

5           MR. HARRIS:  OK.  Ashley, just Mr. Rothschild's

6   statement.

7           All right.  Thank you.  Put it up on my screen first,

8   if you want to check to make sure we're getting it right.

9           Not the question, just the answer actually.

10          Can you do that?  I think that's fine.

11          Oren, do you have any objection?

12          Your Honor, is that OK if we show it at is?

13          THE COURT:  Yes.

14          MR. HARRIS:  Thank you.

15  BY MR. HARRIS:

16  Q.  Do you recall giving an interview?

17          I think I just asked you that.  You gave an interview

18  to Yahoo Finance?

19  A.  Yes.

20  Q.  And you gave this answer.

21          Could you just read the first two sentences of it,

22  please, to the jury?

23  A.  I say:  I mean, for me, there's nothing more iconic than

24  the Hermès Birkin bag, and I wanted to see as an experiment to

25  see if I could create the same kind of illusion that it has in

1   real life as a digital commodity.

2   Q.  What was the illusion that you hoped to create or test with

3   MetaBirkins?

4   A.  Um, I wanted to see what people valued, you know, um, in

5   art.  I've seen a bunch of, like, funny just, kind of, art

6   projects and that -- and for me, if I, you know, charge a lot

7   less than the actual value of the product on the -- on the flip

8   side, on the resale side, will people attribute that same value

9   as, like, the real life product to this digital flat 2D image.

10  Q.  Are you familiar with any other art projects that play with

11  the concept of what people will value things for?

12  A.  Um, I mean, there is a ton.  One of my buddies, he sells

13  uncirculated money, and people will pay -- it's, like, burned

14  and uncirculated.  People pay $50,000 for, like, literally

15  $1,000 in actual value.

16  Q.  So if it's $1,000 bill or some such thing?

17  A.  Yeah, like, ten hundreds and then sells them for 50,000

18  because, yeah, he's an artist.

19  Q.  The rest of that sentence -- well, let's start at the top.

20          You say:  For me, there is nothing more iconic than

21  the Hermès Birkin bag.  We talked about that yesterday.

22          Why did you pick the Birkin bag for the fur-free

23  project?

24  A.  Um, I had just come off the heels of Baby Birkin, which was

25  super successful.  It sold for $23,500, and then it resold for,

```
1    like, $47,000, I think, at the time.  Um, so super successful,

2    and I didn't know it was going to follow up with anything,

3    honestly, until I saw that fur-free press release.

4           And then, like I said, the light bulb went off.  When

5    it comes to just utilizing the Birkin bag, it was -- I live in

6    LA.  Every housewife has one.  Every person who comes into our

7    store has one.  Our top clients are, like, Kylie Jenner comes

8    in and really popularized the Baby Birkin.  I see it all the

9    time.  I hear it all the time.  It just was a recurring theme.

10   Q.  Now, then you say you wanted to create the same kind of

11   illusion that it has in real life as a digital commodity, what

12   did you mean by the digital commodity part of this?

13   A.  It's probably a bad choice of words. I mean, I'm not the

14   greatest with my vocabulary, and it's my first time doing a big

15   national TV interview.  But to my understanding, you know,

16   people buy and sell art, you know, and a commodity is something

17   that you buy and sell.  So I attributed the word commodity to

18   explain something that you buy or sell or trade.

19   Q.  Can we skip down a little bit to one, two, three, four,

20   five -- five lines from the bottom.  There is a comma, then it

21   says, Keeping that scarcity of 100 bags total and seeing what

22   the community does with that.

23          What are you talking about there?

24   A.  Since there was only 100, and at the time, at the peak,

25   there was, like, about 50,000 people who wanted one.  Well, in
```

```
1    the Discord server, you can see how many people have joined
2    your server.  There was 50,000 people going for 100 different
3    items, right.  Um, so, you know, it's a standard supply-and-
4    demand thing.  You know, there was only 100, but there was
5    50,000 people who wanted them.  What happens there, what do the
6    people do with it.
7    Q.  Take that down, please, Ashley.
8             Mr. Rothschild, who is Ken Loo?
9    A.  It's my publicist.
10   Q.  What is your current relationship with Mr. Loo?
11   A.  Um, he's currently still by publicist.
12   Q.  And did he work on the MetaBirkins project?
13   A.  He was my publicist for it, but he didn't, like, make
14   anything or do any part of the creative.
15   Q.  Did you ask Mr. Loo to make it known that you were the
16   creator of the MetaBirkins?
17   A.  Um, yes.
18   Q.  And what did you ask Mr. Loo to do?
19   A.  Honestly, we were fielding a bunch of, like, press requests
20   and stuff.  So Ken, as my publicist, is tasked with making sure
21   that I was credited for it, used the proper images, they don't
22   post, like, the wrong images -- there was a lot of fake
23   collections going on at the time -- and if they needed a quote
24   from me for the article.
25   Q.  And did Mr. Loo give any instructions as to how he was to
```

1    characterize the source of the MetaBirkins?

2    A.   Yeah.  It was always to make sure it was not, um, a

3    collaboration or done by Hermès.  We have corrected the press

4    on numerous occasions where they accidentally said it was

5    Hermès and we said, Hey, like, that's incorrect.

6           You know, I have Google alerts which tells me every

7    time something gets published by me or has my name or

8    MetaBirkins.  I was constantly monitoring it, making sure

9    nothing wrong was written in the press.

10   Q.   Did you ever become aware, Mr. Rothschild, that any

11   purchasers of MetaBirkins were confused as to whether you were

12   the creator?

13   A.   No.

14   Q.   Did you ever need to correct any purchaser of a MetaBirkins

15   as to the source of the goods?

16   A.   Um, no.

17   Q.   You testified just a little bit ago that you kept one

18   MetaBirkin for yourself, right?

19   A.   Correct.

20   Q.   And when the MetaBirkins were originally minted, how many

21   of them did you get?

22   A.   I minted one and then, um, one of my engineers had minted

23   one to test the contract.  And then my other one, I had two

24   engineers, and they minted two of them prior to me.  The first

25   three that get minted, I think, um, I forget the name of the

1   expert earlier, but he said that there was three in my account.

2   Um, that was just done to -- I had two celebrities that needed

3   them.  And they didn't have a wallet set up, so they

4   transferred to me to then transfer to them.

5   Q.  Can you tell us who those celebrities are?

6   A.  One was Future and the other -- I forget the other.  One of

7   them was the rapper Future.

8   Q.  And so you have how many MetaBirkins of that original 100

9   minting do you have right now?

10   A.  One.

11   Q.  And does your wife Ericka have any?

12   A.  Yes.  My fiancée.

13   Q.  Fiancée.

14        How many does she have?

15   A.  One.

16   Q.  Do you know who Truman and Alex Sachs are?

17   A.  Yes.

18   Q.  Who are they?

19   A.  They are brothers, my friends from -- I think we've been

20   friends for maybe eight years now.

21   Q.  How do you know them?

22   A.  The Internet.

23   Q.  Internet?

24   A.  Yeah.

25   Q.  OK.  Have you met them in person?

1  A.  Yes.

2  Q.  And did there come a time around the time you were doing

3  MetaBirkins that the Sachs brothers were going to invest in

4  your projects?

5  A.  Yeah.  They were going to invest in me personally, not in

6  MetaBirkins specifically.  But they wanted to invest in me to

7  keep creating.

8  Q.  What do you mean by they were going to invest in you

9  personally?

10  A.  Um, in me as an artist, in me as a digital creator.  They

11  saw the potential in me, and they wanted to be a part of that.

12  Q.  Were you going to set up some kind of business together?

13  A.  Um, not necessarily a business.  They were just giving me

14  the resources to continue to create.  Um, you know, that's a

15  financial kind of -- you know, they gave me some cash to be

16  able to continue to create because, you know, these things cost

17  money.

18  Q.  How would they have made money?

19  A.  We would have split, like, revenue on projects that I

20  created.

21  Q.  And did they, in fact, give you money to invest?

22  A.  Yes.

23  Q.  How much?

24  A.  About $100,000.

25  Q.  So I asked a bad question.  They didn't give you money to

1   invest, they were investing in -- they gave you 100,000 to

2   invest in your projects?

3   A.   Yeah.   They invested 100,000 in me.

4   Q.   And then did there come a time that the Sachs brothers

5   indicated they wanted to pull out of that project or not go

6   ahead?

7   A.   Um, after I got the cease and desist, or I got the actual

8   complaint that we were getting sued, um, I knew that they were

9   a little bit hesitant to invest because, you know, the -- the

10  most exciting project I had at the time was MetaBirkins.   So

11  they got a little bit of cold feet, so I sent them the money

12  back.

13  Q.   Mr. Rothschild, was there a point in time when you had

14  plans or thoughts about minting additional MetaBirkins?

15  A.   I'm sorry.   Can you repeat the question?

16  Q.   Sure.   Bad question.

17          The original minting was 100 MetaBirkins, correct?

18  Did there come a point in time when you thought about releasing

19  additional MetaBirkins?

20  A.   Um, yes.

21          MR. HARRIS:   Ashley, is Defendant's 506 in evidence?

22  I think it is.

23          Could we please put up defendant's Exhibit 506.

24  Q.   All right.   What, again, is Defendant's Exhibit 506?

25  A.   It's the MetaBirkins Instagram.

1    Q.  And these images we're looking at here, are these ones that

2    were actually released?

3    A.  No.  These were ones that we started creating for the

4    second collection.

5    Q.  Is this Instagram page public so people could have seen

6    these?

7    A.  Yes.  It's still public.

8    Q.  There is one on the bottom right-hand corner of the screen

9    with a banana taped to a white fuzzy MetaBirkin?

10   A.  Yeah.

11   Q.  Can you please explain for the jury what the thinking is

12   behind that?

13   A.  There was an art piece at Art Basel that sold for a couple

14   million dollars.  This was just a banana duct-taped to a white

15   wall, and I thought that was funny.

16   Q.  Is this a reference to that?

17   A.  Yes.

18   Q.  Was this actually released?

19   A.  No.

20          MR. HARRIS:  Now, can we also look also on this

21   Instagram there is a picture, Ashley.

22   Q.  Are you familiar with -- yes, there is a picture right

23   there?

24   A.  Yes.

25   Q.  What is that a picture of?

1   A.  It's a picture of -- I think she uses pencil --

2   C.J. Hendry, a picture of a Birkin on a concrete block.

3   Q.  She's an artist and she's done that?

4   A.  Yeah, she's a pretty big artist.

5   Q.  Then up on the upper right-hand corner here, there's

6   MetaBirkins art we love.

7           Are you the person who posted that?

8   A.  Yeah.  I'm the only person that controls the MetaBirkins

9   Instagram.

10  Q.  And it says by C.J. Hendry and Barbara Segal.

11          Who is Barbara Segal?

12  A.  Barbara makes, like, marble Birkins.  She carves them.

13  Q.  I believe there is a picture of one of those on this

14  Instagram?

15  A.  Yeah.  That's Barbara.

16  Q.  Is that Barbara Segal?

17  A.  Yes.

18  Q.  And these are stone Birkins that she sells as art?

19  A.  Yes.

20  Q.  Have you ever met either C.J. Hendry or Barb Segal?

21  A.  No, but I've spoken to Barbara.

22  Q.  Thank you.

23          Did there come a time when you planned or thought

24  about gifting a horse charm image to owners of MetaBirkin NFTs?

25  A.  Yes.

1            MR. HARRIS:  Can we please -- I believe this is in

2    evidence, Exhibit 146.  Could you just show it to me please

3    just for the judge and the witness.

4            Is that in evidence?

5            MR. WARSHAVSKY:  I believe so.  Yes, absolutely.

6            MR. HARRIS:  Please go ahead.

7    BY MR. HARRIS:

8    Q.  What is that image of?

9    A.  It's, like, a fuzzy horse.

10   Q.  And was that going to be a 2D or 3D image?

11   A.  Also 2D.

12   Q.  Could anyone have ridden their fuzzy horse in the

13   metaverse?

14   A.  No.

15   Q.  And what was the thought for the fuzzy horse?

16   A.  It was partially, you know, because Hermès makes this, kind

17   of, fuzzy horse charm.  And, two, it was kind of, like, at the

18   time, I have a couple horse tattoos.  I really like horses, and

19   I just like wanted to give people a gift for supporting me in

20   NFTs.  You know, everybody who owns your artwork by -- not by

21   name or anything, but by their wallet.  It's a common thing to

22   be able to AirDrop something into their wallet that is, like, a

23   surprise.

24   Q.  Since you raised the tattoos, you also have other art

25   tattoos?

1    A.  Yes.  I have a Damien Hirst skull on my arm, and I have a

2    couple Francisco de Goya etchings, a bullfighter, and I have

3    this one right here, horse tattoo.  I got a bunch.

4    Q.  Mr. Rothschild, you said the Hermès horse was fuzzy.

5            Is it fuzzy?

6    A.  Furry.

7    Q.  What?

8    A.  Furry.

9    Q.  Yours is furry.

10           Is Hermès'?

11   A.  I think it's just leather.

12   Q.  So you were making a -- I just want to understand.

13           You were making a fuzzy image of an Hermès that is a

14   leather?

15   A.  Yeah.  Pretty much, like, the MetaBirkins.

16   Q.  OK.  Did you ever release the additional MetaBirkins, the

17   banana one, to be minted?

18   A.  No.

19   Q.  Did you ever gift the horse image?

20   A.  No.

21   Q.  Why not?

22   A.  I had a cease and desist and eventually got sued, so I

23   didn't want to continue to push things out while there is

24   litigation happening.

25   Q.  What did you do after receiving the cease and desist?

1  A.  I got a lawyer, um, who are in this room right now to

2  handle the response, because I'm not a lawyer.

3  Q.  Did you ask that lawyer to reach out to Hermès?

4  A.  Yes.

5  Q.  Did there come a time where you were sued by Hermès?

6  A.  Yes.

7  Q.  And when was that?

8  A.  I think it was mid January.

9  Q.  Of?

10  A.  2021 or two -- 2022, sorry.

11  Q.  And how did you learn you were sued?

12  A.  In the press.

13  Q.  And were you served a lawsuit?

14  A.  Um, we accepted service via e-mail.  They had my e-mail.

15  They had my lawyer's e-mail.  They had my address.  Um, but

16  they -- I guess they decided that that wasn't enough, so they

17  decided to serve me at work a few different times.

18  Q.  When you say serve you at work a few different times, can

19  you describe that?

20  A.  They had their process server come to my store, Terminal 27

21  in Los Angeles, hold up a picture of me, and ask our customers

22  and employees if they knew me.

23  Q.  Had they just e-mailed it to you, would you have accepted

24  service?

25  A.  Oh, yes.  We told them we would accept this service by

1    e-mail.

2    Q.  How did you feel when you were served?

3    A.  Um, I mean, it sucks to get served.  I was, like, yeah.  I

4    wasn't expecting it because we were just, kind of, in the midst

5    of talks, so neither me nor my legal team knew that we were

6    even going to get sued at that point.

7    Q.  Were you angry?

8    A.  Definitely.

9    Q.  Did there come a time that you made a mock-up of an NFT

10   with the complaint?

11   A.  Yeah.

12        MR. HARRIS:  Ashley, could you please show the witness

13   and the court and counsel Defendant's Exhibit 559, please.

14        Can you show, just so the judge can see, can you show

15   the entire -- it's a text chain.

16   Q.  Who is -- I'm sorry.

17        Who is Garrett McManus?

18   A.  He's one of my good friends.  He is one of the -- he was

19   one of the bigger players on the marketing side of CashApp and

20   now he works at MoonPay.

21   Q.  What is MoonPay?

22   A.  MoonPay is, like, the PayPal of crypto.  It's a -- it's a

23   finance company in crypto.  They are pretty big.  Yeah.

24        MR. HARRIS:  And can we just scroll up now just a

25   little bit.  I want to show the witness, please.

1    Q.  Do you recognize what that is?

2    A.  Yes.

3    Q.  What is that?

4    A.  It's a MetaBirkin that has the paperwork they sued me with

5    in front of it.

6           MR. HARRIS:  Your Honor, I offer defendant's Exhibit

7    559.

8           MR. WARSHAVSKY:  No objection.

9           THE COURT:  Received.

10          (Defendant's Exhibit 559 received in evidence)

11   A.  Is it really blurry on your screen?

12   Q.  It's really blurry on my screen.

13          Can we maybe make it a little smaller or zoom in?

14   A.  I think if you zoom out.  It's 200 percent right now.

15   Q.  All right.  So it's small, but it's not blurry.

16          So what are we seeing here on the screen?

17   A.  That's the complaint that -- or Hermès suing me, the actual

18   paperwork that I got.

19   Q.  And did you ever release that MetaBirkin image?

20   A.  No, I was just notifying people that I got sued.

21   Q.  Did you send it to some people, some friends?

22   A.  Yeah.

23   Q.  All right.  And then can we look at the next image.

24          What is that an image of?

25   A.  It's a dead crocodile with a Birkin handle.

1    Q.  And why did you create that image?

2    A.  I was pissed for being sued by Hermès, and I knew they had,

3    like, a little bit of a history of their handling of getting

4    crocodile skin to the point where Jane Birkin wanted to remove

5    her name from the Birkin bag.  So I decided to do this as kind

6    of, like, an F you.

7    Q.  And did you ever release the image of the crocodile?

8    A.  Not publicly, only, like, in private text messages.

9               MR. HARRIS:  Your Honor, I'm moving very briskly.  I

10   probably have less than 20 minutes left.

11              Would you like me to finish or take a break?

12              THE COURT:  No.  I think we normally take our break at

13   11, so move right ahead at the rate you're going.

14              MR. HARRIS:  Thank you, your Honor.

15   BY MR. HARRIS:

16   Q.  Mr. Rothschild, have you worked on art projects since

17   MetaBirkins?

18   A.  Yes.

19   Q.  All right.  Let me back up.  I'm sorry.

20              Do you know a company called Electric Field?

21   A.  Yes.

22   Q.  What is Electric Field?

23   A.  It's an artist management company.

24   Q.  What is an artist management company?

25   A.  A company -- just artists, musicians, song writers, um,

1    they even have, like, a portfolio company where they invest.

2    Q.  Who are some of clients?

3    A.  Post Malone, Doja Cat, a bunch of song writers, like, Billy

4    Walsh, who writes, like, everybody's hits for, like, ETS, and

5    everybody.

6    Q.  And do you have a relationship with Electric Field?

7    A.  It's my manager, Austin Rosen.

8    Q.  And what is CAA?

9    A.  They are the biggest talent agency in the world.

10   Q.  And do you have a relationship with CAA?

11   A.  They are my agents.

12   Q.  And did CAA have an NFT artist before they signed you?

13   A.  I believe I was the first.

14   Q.  And how about Electric Field?

15   A.  I was the first.

16   Q.  Now, could you tell me what Gasoline is?

17   A.  Gasoline is, um, a studio created at the top of the year to

18   create these projects, since we were getting so much demand

19   from different companies or artists for us to help them enter

20   this new, like, NFT Web3 space.

21   Q.  And when did you form Gasoline?

22   A.  This year, January.

23   Q.  January of 20 --

24   A.  2023.

25   Q.  Literally last month?

1  A.  Officially, yes.

2  Q.  All right.  And how many people are employed at Gasoline?

3  A.  Um, we're mostly freelancers.  Um, I have four, four

4  engineers and two artists, and then my publicist.

5  Q.  What is the difference between an engineer and an artist?

6  A.  My engineers work on the code front end and back end, like,

7  website development.  And then my artists, we create the art

8  for these different companies.

9  Q.  What is your role at Gasoline?

10  A.  CEO and creative director.

11  Q.  Do you have investors for Gasoline?

12  A.  Now we do, yes.

13  Q.  And did there come a time when you did a project for an

14  entity called Scope?

15  A.  Yes.

16  Q.  What is Scope?

17  A.  Scope is the biggest art show in terms of, like, volume at,

18  like, at Art Basel in Miami, which is, like, a big art fair for

19  furniture design, art, everything.

20  Q.  And did you do that project individually or through

21  Gasoline?

22  A.  Um, it was done by me, and then Gasoline produced it.

23  Q.  And may I please put up for identification Defendant's

24  Exhibit 526.

25          Could you please describe for the court what

1   Exhibit 526 is?

2   A.  Um, it's, like, a compilation of the different floaties,

3   NFTs that we created as the ticket for Scope.

4           MR. HARRIS:  Your Honor, I offer Defendant's Exhibit

5   526?

6           MR. WARSHAVSKY:  No objection.

7           THE COURT:  Received.

8           (Defendant's Exhibit 526 received in evidence)

9   Q.  Please explain for the jury what you're doing in this

10  project.

11  A.  Um, Scope is on the beach in Miami, so I made a bunch of

12  floaties.  It was kind of a take on, like, a little bit of

13  global warming, where it's just, like, you know, you're going

14  to need a floatie to get to the next art show.  So I'm giving

15  you those floaties because of rising sea levels.

16  Q.  And what was this used as?

17  A.  This was a ticket.  So you would, um, show this at the door

18  and you would be able to get in.  And this was a VIP ticket.

19  Q.  Was this an NFT?

20  A.  Yes.

21  Q.  So just to explain technically, if I was somebody who comes

22  to the show, I would get this ticket as an NFT.

23          It would be on my phone?

24  A.  Your phone or your computer, yeah.

25  Q.  And then I would show that and that's my entry?

1   A.  Correct.

2   Q.  All right.  And then have you also done work for Formula 1?

3   A.  A driver in Formula 1, but not Formula 1 the entity.

4   Q.  And was that yourself or through Gasoline?

5   A.  Both.  So I -- CAA is my, like, my representation.  They

6   get me the gigs as a studio, as a collective.  We create the

7   asset.

8   Q.  What did you do for Formula 1?

9   A.  Designed a driver's helmet for the Abu Dhabi race last

10  year, as well as, like, their daily-use helmet.

11          MR. HARRIS:  Ashley, could you please put up for

12  identification Defendant's Exhibit 607.

13  Q.  Could you briefly designed for the court what that is?

14  A.  Yes.  There is another picture, but, like, this is -- the

15  race was in Abu Dhabi, so we did a take on the Empty Quarter

16  desert in Abu Dhabi, did kind of, like, a dust storm, put the

17  driver's number on there, their sponsors and, yeah.

18          MR. HARRIS:  Your Honor, I offer Defendant's Exhibit

19  607.

20          MR. WARSHAVSKY:  No objection.

21          THE COURT:  Received.

22          (Defendant's Exhibit 607 received in evidence)

23  Q.  You said there was another picture.

24          MR. HARRIS:  Ashley, could you put up Defendant's

25  Exhibit 608.

N21sHER2                         Estival – Direct

1            Just for -- sorry.  You have to publish this first.

2       I'm sorry.

3       BY MR. HARRIS:

4       Q.  Mr. Rothschild, just in the interest of time, is this a

5       good enough representation of the helmet?

6       A.  It's a pretty good representation.

7            MR. HARRIS:  OK.  Thank you.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Did there come a time when you did a project called, "I

2    Like You, You're Weird"?

3    A.  Yeah.

4    Q.  And what is that project?

5    A.  It's 10,000 kind of cartoon little, like, cartoons we

6    called Weirdos.

7            MR. HARRIS:  Ashley, could you put up for

8    identification Defendant's Exhibit 525.

9    BY MR. HARRIS:

10   Q.  Could you briefly describe for the Court and counsel what

11   Defendant's Exhibit 525 is.

12   A.  It's the OpenSea page of the "I Like You, You're Weird"

13   collection.

14           MR. HARRIS:  Your Honor, I offer Defendant's Exhibit

15   525.

16           MR. WARSHAVSKY:  No objection, your Honor.

17           THE COURT:  Received.

18           (Defendant's Exhibit 525 received in evidence)

19           MR. HARRIS:  Your Honor, may I have 30 seconds --

20   less, 10 seconds -- just to ask a question?

21           Thank you, your Honor.

22   BY MR. HARRIS:

23   Q.  Could you please describe for the jury what these images

24   represent and maybe pick one out.

25   A.  Yeah.  It was a character that me and my partner at the

1    time had created.  It's kind of like a way for people to

2    represent themselves like for their profile picture or anything

3    like that.  We kind of created a community around it.

4    Q.  When you said your partner, did you have a partner for this

5    project?

6    A.  Yes.

7    Q.  Who is that?

8    A.  Amber Park.

9    Q.  Who is Amber Park?

10   A.  She is a Korean-American artist both me and my fiancee have

11   known for about a decade and we decided to jump in to do a

12   project together.

13   Q.  Were these NFTs?

14   A.  Yes.

15   Q.  Can we just -- I am just picking a Weirdo on the right.

16   Weirdo 4100.

17   A.  Yeah.

18   Q.  Okay.  How was this Weirdo created?

19   A.   It was illustrated, and then we illustrate all the

20   different kind of traits and stuff and then we put them into a

21   randomizer and it will change the body.  It will give them a

22   different head, a different mouth, a different set of eyes, a

23   hat, and, like an ear.

24   Q.  So you create the base parts?

25   A.  Yeah.

1    Q.  Like you create the eyes?

2    A.  It's like Mr. Potato Head.

3    Q.  Okay.  All right.  And then they are put together.  Got it.

4    This Weirdo 4100, this is OpenSea.  OpenSea as we discussed

5    before somewhat in this trial, that's a site where you can buy

6    and sell --

7    A.  NFTs.

8    Q.  -- NFTs.

9         Did Weirdo 4100, was he sold?

10   A.  Yeah.  We sold 10,000 of these in less than 24 hours.

11   Q.  You sold 10,000 meaning yourself and Ms. Park --

12   A.  Correct.

13   Q.  -- sold 10,000 of them?

14   A.  Yes.

15   Q.  Was that the entire release?

16   A.  Yes.

17   Q.  What we are looking at here, would this be somebody

18   reselling it or thinking of reselling it?

19   A.  Yes.  They are reselling it.

20   Q.  So I would buy this Weirdo, but it wouldn't be from you?

21   A.  Yeah.  It would be from the person who owned it after

22   purchasing it.

23   Q.  And do you get a piece of the --

24   A.  We did initially, but we turned off the royalties on the

25   project.

1    Q.  So you do not get royalties on it?

2    A.  Not today.

3    Q.  You sold the 10,000.  How much did you sell them for?

4    A.  I think it was .08 Ethereum at the time.  I am not sure

5    what the equivalent was at the time.

6    Q.  Okay.  And you could have sold -- if you sold them out, you

7    said in 48 hours, is there a reason you didn't make more?

8    A.  We did make more.  That collection called "I Hate You,

9    You're Scary."  So you would be able to burn your artwork to

10   get the new one.

11   Q.  Okay.  Let's talk about that.

12          MR. HARRIS:  Would you please put up for

13   identification, please, Ashley, DX 527.

14   BY MR. HARRIS:

15   Q.  And could you please briefly describe for the Court and

16   counsel what it is we are looking at?

17   A.  This is the OpenSea page, "I Hate You, You're Scary."

18   Q.  Very briefly, what is "I Hate You, You're Scary"?

19   A.  They are like the anti-Weirdos.  We are telling a story

20   with this whole thing, you know, like, where these are kind of

21   like the antagonists of the Weirdos, so they're kind of a

22   little bit darker and scarier looking.

23          MR. HARRIS:  Your Honor, I offer DX 527.

24          MR. WARSHAVSKY:  No objection.

25          THE COURT:  Received.

```
 1                (Defendant's Exhibit 527 received in evidence)

 2                MR. HARRIS:  And can we just go up a little -- thank

 3    you.

 4    BY MR. HARRIS:

 5    Q.  Are these created the same way as the "I Like You, You're

 6    Weird" characters?

 7    A.  Yes.  But we went the extra mile on these and we animated

 8    them.  I think if you hover over one, it should move.

 9                All right.  If you press the play button maybe.

10                Yeah, so they move.

11    Q.  Did you release these?

12    A.  Yes.  So the -- we didn't sell them.  The way you would get

13    one is by burning a Weirdo and you would get it for free.

14    Q.  So if you acquired a Weirdo, you would get the Scary?

15    A.  If you burned it, which means like getting rid of the

16    artwork forever.

17    Q.  You have to trade it?

18    A.  Trading.

19    Q.  You're trading the Weirdo for the Scary?

20    A.  Basically.

21    Q.  Do you know who artist called Tom Sachs is?

22    A.  Yes.

23                MR. HARRIS:  I'm sorry.  I don't --

24                Your Honor, I am going to finish by 11.  This is the

25    last thing I am doing.
```

1   BY MR. HARRIS:

2   Q.   Who is Tom Sachs?

3   A.   He is a conceptual artist, has been doing it for a while,

4   has collaborated with Nike recently, rebranded a McDonald's and

5   posted that yesterday.

6   Q.   Do you know about a project he has called Rocket something?

7   A.   Yes.   Tom Sachs Rocket Factory.

8   Q.   What is Rocket Factory?

9          MR. WARSHAVSKY:   Objection, your Honor.   Foundation.

10          THE COURT:   How do you know about the project?

11          THE WITNESS:   I know Tom personally now and I have

12   known him for years.   He is a prominent artist.

13          MR. WARSHAVSKY:   Withdrawn.

14          THE COURT:   All right.

15          Go ahead.

16   BY MR. HARRIS:

17   Q.   What is Mr. Sachs' Rocket Factory project?

18   A.   It is a collection -- it is an NFT project.   It is a

19   collection of different rocket components, so like with the

20   tail, the body and, like, the head of the rocket.   And you are

21   able to sell them, and each part of the capsule or the rocket

22   capsule is branded with different logos.

23   Q.   And do you know if those are also done as -- are those

24   physical or NFTs or how are those done?

25   A.   They are NFTs that can also be turned physical.   If you

N21nher3                           Estival - Direct

1   collect the rocket and you submit it to the launchpad, they

2   physically create that rocket and launch it here in New York

3   City.

4            MR. HARRIS:  Your Honor, may -- Ashley, could you

5   please put up for the witness and Court and counsel Defendant's

6   Exhibit 517.

7   BY MR. HARRIS:

8   Q.  Please briefly describe for the Court what that is.

9   A.  This is an example of one of the rockets.  It is a perfect

10  rocket, which means the tail, the body, and the head are all

11  matching logos.  And it's branded with Hermès branding.  On the

12  right is the physical and in the middle is the video of the

13  launch.

14           MR. HARRIS:  Your Honor, I offer Defendant's Exhibit

15  517.

16           MR. WARSHAVSKY:  Object on relevance, your Honor.

17           THE COURT:  Come to the sidebar.

18       (Continued on next page)

19

20

21

22

23

24

25

1           (At sidebar)

2           THE COURT:  What is the relevance?

3           MR. HARRIS:  The relevance, your Honor, is -- we

4    briefly discussed this yesterday.  The relevance, your Honor,

5    is that this is a commercial project using the Hermès rocket

6    done by an artist who Mr. Rothschild knows and uses the Hermès

7    name and branding, and Hermès has not challenged it and they

8    know about it and they have not done anything to stop it.

9           THE COURT:  Wait a minute.

10          Is this an actual project, or it is a planned project?

11          MR. HARRIS:  It is an actual project.

12          THE COURT:  When was it introduced?

13          MR. HARRIS:  I don't know the answer, your Honor, but

14   I can find out.

15          THE COURT:  Was it before or after Mr. Rothschild's

16   project?

17          MR. HARRIS:  I believe -- I don't want to be

18   inaccurate -- I believe it was before, but I can check that.

19          THE COURT:  So if it was after, I don't see the

20   relevance at all.

21          MR. HARRIS:  Okay.

22          THE COURT:  If it was before, the relevance, if any,

23   would only be what?  Just showing that he thought other artists

24   were doing what he proposed to do?  So what?

25          MR. HARRIS:  So, your Honor, I mean, he uses the

1   Hermès logo right there.  It is similar, in effect, to the

2   Stone Birkin which is uses the name and calls it Stone Birkin.

3   Hermès is effectively picking and choosing what art projects

4   they think they can stop, and I believe that is a violation of

5   the First Amendment.

6              THE COURT:  What is wrong with that?

7              MR. HARRIS:  I think it is a violation of the First

8   Amendment.

9              THE COURT:  Why is that relevant?  If I am a company

10  and there are five people infringing my trademark and I choose

11  to go after three of them and not the other two?  What does

12  that prove.

13             MR. MILLSAPS:  Your Honor, may I?

14             MR. WARSHAVSKY:  I am going to object.  We keep

15  getting two sets of arguments.  I'll let it happen this, time

16  but if this could be the last time.

17             THE COURT:  I agree with that.  We should only have

18  one person arguing, but I will hear this.

19             MR. MILLSAPS:  The relevance, your Honor, is that it

20  isn't just a commercial project.  When it's art, it is

21  protected by the First Amendment.  A company should not be able

22  to pick and choose which artist they want to shut down and

23  which artists they don't like.

24             THE COURT:  I think that is totally irrelevant.

25             Sustained.

N21nher3                          Estival - Direct

1              MR. HARRIS:  Your Honor, may I ask him if he was aware

2     of this project before?

3              THE COURT:  You can ask him that, but that is as far

4     as it goes.

5              While we are at the sidebar, something totally

6     unrelated.  Juror No. 5 mentioned to my courtroom deputy either

7     yesterday or possibly even Monday that she had a doctor's

8     appointment on Thursday.

9              My courtroom deputy said, "Well, can you move it?"

10             And she said, "Yes."

11             Then this morning she said to my courtroom deputy,

12    "Don't forget that I have my doctor's appointment tomorrow."

13             My courtroom deputy reminded her that she had agreed

14    to move it.

15             My courtroom deputy suggested, and I think it is a

16    good idea, that I call her up to the sidebar at the break and

17    just remind her, with you guys present, remind her that she

18    should be moving that, but I just want to give you that

19    background so you will know why I call her up to the sidebar.

20             MR. HARRIS:  I don't want to overstep your Honor.  May

21    I ask if it was an influence?

22             THE COURT:  Pardon?

23             MR. HARRIS:  May I also ask if Mr. Sachs is an

24    influence.

25             MR. WARSHAVSKY:  If I could respond to this, I don't

1    think this should be allowed at all, your Honor.  This was our

2    motion *in limine*.  It is hard to try a case within a case.

3            If they want to ask Hermès about why Hermès may or may

4    not have gone after something it knows, that's one thing; but

5    it is quite another to ask a witness who doesn't know anything

6    about Hermès what he knows about this project.

7            THE COURT:  Here's where I come down:  For now I am

8    going to exclude it, including the question you just wanted to

9    put, but with two reservations.

10           First, I think it is critical that you find out

11   whether it was before or after.

12           MR. HARRIS:  That was the question I was going to ask

13   him.

14           THE COURT:  Well, okay.

15           Because if it's after, that's the last question.

16           MR. HARRIS:  I was going to stop.  If it was before, I

17   was just going to ask one more question.

18           THE COURT:  Then the second thing is, while I think

19   his intent is an issue in this case, it bears on some of the

20   *Rogers* factors.  It's not be all or end all, so to that limited

21   extent I think if it's before, then you can ask him whether it

22   impacted him.

23           MR. HARRIS:  Okay.

24           THE COURT:  But then that is as far as it goes.

25           MR. HARRIS:  That's it.

1          MR. WARSHAVSKY:  Can I be heard on that?  I'm sorry.

2          The problem I have with that is all of these, if

3     Hermès, whether Hermès knows or not, all of these factors, as

4     we have seen in this case or all of these -- I'm sorry, all of

5     these issues, as we have seen in this case, are highly fact

6     dependent.  So the fact that that rocket that we just saw that

7     already has the Hermès logo on it and Hermès may not have

8     acted --

9          THE COURT:  I am not allowing them to argue and I have

10    excluded now several times the argument that this is relevant

11    to whether Hermès should have acted or not.

12          Now it's being offered with these new questions on a

13    different ground, which is you are contending that his intent

14    or the effect of what he did was purely commercial.  That

15    partly goes to what his intent was.  It is not totally decided

16    by his intent, but the intent is relevant.

17          Indeed, I would be very surprised if you didn't ask

18    him a lot of cross-examination questions bearing on his intent.

19    So that's where it comes in, but for that limited purpose.

20          MR. HARRIS:  I am going to ask the two questions and

21    then my exam is over.

22          THE COURT:  Okay.

23          MR. HARRIS:  All right.

24          (Continued on next page)

25

1                    (In open court)

2                    MR. HARRIS:  Ashley, please take that down.  Thank

3     you.

4     BY MR. HARRIS:

5     Q.  Mr. Rothschild, do you know if the Tom Sachs Rocket Factory

6     was done before you did the MetaBirkins project?

7     A.  It was before.

8     Q.  Was Mr. Sachs' project an influence on you?

9     A.  Tom Sachs in general is an influence on me, but the project

10    specifically was not.

11                   MR. HARRIS:  Thank you.

12                   THE COURT:  Okay.

13                   MR. HARRIS:  No further questions.

14                   THE COURT:  Very good.

15                   So ladies and gentlemen, we will take our midmorning

16    break and resume in 15 minutes.

17                   (Continued on next page)

18

19

20

21

22

23

24

25

N21nher3                          Estival - Direct

1                  (Jury not present)

2                  (At sidebar; Juror No. 5 present)

3             THE COURT:  Thank you once again for your excellent

4    service.  You had mentioned I understand to my courtroom deputy

5    that you had an appointment tomorrow morning, and I thought we

6    had arranged to move that.

7             JUROR:  In the morning.  I have it 10:30 tomorrow.

8             THE COURT:  You will need to move that.  You need to

9    move it.

10            JUROR:  I am calling today.

11            THE COURT:  So can you move it.  We need you here

12   tomorrow right here in court.  We can't have you at the

13   appointment.

14            JUROR:  Yes, I will call them now.

15            THE DEPUTY CLERK:  Now is good.

16            THE COURT:  Excellent.  Thank you.

17            THE DEPUTY CLERK:  Move it for two weeks so you will

18   be sure and safe to get there.

19            JUROR:  Okay.

20            THE DEPUTY CLERK:  Thank you so much.

21          (Continued on next page)

22

23

24

25

1          (In open court)

2          THE COURT:  You may step down.

3          I wanted to put on the record, both my reasons for

4    previously granting the motion *in limine* to exclude the

5    testimony of Dr. Gopnik and also my ruling earlier this morning

6    to allow the testimony of Dr. Kominers.

7          Dr. Gopnik is offered as an expert on "business art,"

8    but both in his report and in his deposition he fails to

9    identify in any meaningful fashion what his methodology is for

10   he applied it in this case, which, of course, are the express

11   requirements, among others, of Rule 702 of the Federal Rules of

12   Evidence.

13         Now, for example, he testified in his deposition,

14   "There is no consensus among art historians about anything, so

15   there cannot be a consensus on fur-covered Birkin bags."

16         Okay.  Now, that's not the end of the subject because

17   experts can disagree, but it certainly means that there is not

18   a general acceptance of any particular approach to what is or

19   is not business art.

20         Then he goes on to say when specifically asked for his

21   methodology, he stated, that, well, he "looks at the larger set

22   of contextual clues that tell you, oh, this might be worth

23   looking at as an artist's activity."

24         When asked to define what that sentence meant, he

25   refused, or declined I should say, and never offered a

1   systematic definition for business art.

2          So basically this is just his personal opinion.  That

3   doesn't do it anymore.  There was a time before Rule 702 was

4   amended where arguably that may have been allowed, but 702 was

5   amended to require an expert to demonstrate as a precondition

6   of admissibility a reliable methodology.

7          I might also add, though I don't think it's necessary

8   to reach this, that under the *Kumho Tire* case and other

9   subsequent cases even nonscientific evidence from experts

10  should be viewed at least somewhat in light of the *Daubert*

11  factors.

12         His opinion, near as I can tell, wouldn't meet any of

13  the *Daubert* factors.  It not only hasn't been tested, it is on

14  its face untestable, unfalsifiable.  It has no known error

15  rate.  It has not been peer reviewed.  And it has not been

16  generally accepted.  In fact, it is as he explains it

17  essentially a hunch or a purely subjective opinion.

18         So that's why I excluded Dr. Gopnik.

19         Now, Dr. Kominers is giving an economic analysis based

20  on his background as a professor of business at Harvard

21  Business School, where, among other things, he studies the

22  economics and market design of NFTs.  His analysis and his

23  methodology are quite clear.  He does a comparison between how

24  NFTs that are associated with other brands operate in the

25  marketplace, the other brands being brands that expressly

N21nher3                      Estival - Direct

1    entered into the NFT marketplace.  And he compares that to what

2    happened in the MetaBirkin marketplace, and he concludes that

3    the effect was, in his view, solely or wholly comparable to

4    what happens to those other brands and, therefore, reflected

5    the consumers' and the sellers' and purchasers' belief that

6    this was an Hermès Birkin bag product.

7            Now, there are lots of questions I am sure he will be

8    asked on cross-examination about that, but the methodology is

9    clear.  The relevance to numerous factors both under the

10   *Polaroid* factors and under the *Rogers* test is clear.  So

11   there's no comparison between him and Dr. Gopnik.

12           So those, without further elaboration, are the bases

13   for my rulings.  I will give you another ten minutes for the

14   break and then we will resume with cross-examination of

15   Mr. Rothschild.

16           Let me mention one other thing.  At the end of the

17   lunch break today, I am going to want you to give me who are

18   the remaining witnesses and a reasonably good idea of how long

19   each witness is going to be -- I know you can't predict that

20   with certainty at this point -- so that we can schedule things

21   like the charging conference and things like that.

22           Okay.  Real good.

23           (Recess)

24           MR. WARSHAVSKY:  May I raise one issue with the Court

25   before the jury comes in, your Honor.

| | |
|---|---|
| 1 | THE COURT:  Yes. |
| 2 | Go ahead. |
| 3 | MR. WARSHAVSKY:  Your Honor, could we do a sidebar, |
| 4 | your Honor, for one minute. |
| 5 | (At sidebar) |
| 6 | MR. WARSHAVSKY:  Your Honor, one of the exhibits we |
| 7 | intend to use on cross-examination is an exhibit that was part |
| 8 | of the defendant's motion *in limine*, which was about knowing |
| 9 | the judge.  We do not intend to use that part of the text and |
| 10 | have shown defense counsel which parts we intend to use.  We |
| 11 | will block those parts of the screen, and I understand defense |
| 12 | counsel has no issues with us using -- |
| 13 | MR. HARRIS:  I understand that they are going to use a |
| 14 | part of Rothschild 1039293. |
| 15 | THE COURT:  I am not going to be able to deal with |
| 16 | this at sidebar. |
| 17 | MR. HARRIS:  I am not objecting, your Honor. |
| 18 | THE COURT:  Someone is going to have to -- and |
| 19 | hopefully with a hard copy and not up on the screen -- show me |
| 20 | at that point.  Just say paragraphs 3, 5 or 7, whatever and I |
| 21 | will rule on then. |
| 22 | MR. HARRIS:  Okay. |
| 23 | MR. WARSHAVSKY:  Yes, your Honor. |
| 24 | (In open court) |
| 25 | THE COURT:  Okay.  Let's bring in the jury. |

```
 1              (Jury present)

 2              THE COURT:  Please be seated.

 3              Okay.  Cross-examination.

 4              MR. WARSHAVSKY:  Thank you, your Honor.

 5   CROSS-EXAMINATION

 6   BY MR. WARSHAVSKY:

 7   Q.  Good morning, Mr. Rothschild.

 8   A.  Good morning.

 9   Q.  Mr. Rothschild, I want to ask you a little bit about some

10   of the ways you conduct business.  Do you communicate with the

11   people you work with primarily through text messaging?

12   A.  Yes.

13   Q.  And do you primarily use text messages like WhatsApp and

14   Apple Chat for your communication?

15   A.  Yes.

16   Q.  With your business associates?

17   A.  Yes, sometimes.

18   Q.  Do you store those communications on your phone?

19   A.  Like, save them?  Yeah, I mean, they're just on my phone.

20   Q.  I think you spoke a little bit earlier about Truman Sacks

21   and Alex Sacks?

22   A.  Yes.

23   Q.  You said that they were -- would you describe them as

24   potential investors?

25   A.  They invested, but then I gave the money back, so they are
```

1    just my friends.

2    Q.   Okay.  Micah Spear, is that how you say his name?

3    A.   Yes.

4    Q.   Micah Spear, is he a business associate?

5    A.   He is a friend.

6    Q.   He's a friend.

7           And Mark Design, how did you describe your

8    relationship with Mark Design?

9    A.   First he was, you know, someone that I hired to work with

10   me and has since become kind of a friend.

11   Q.   And your communications with Mark Design were also by text?

12   A.   Yes.

13          THE WITNESS:  Should I just put these on the floor?

14          THE COURT:  Just put them on the side there.  When we

15   get to them you -- they'll let you know when we get to them.

16          THE WITNESS:  Got it.

17   BY MR. MILLSAPS:

18   Q.   I think you said that Eric Ramirez, you sometimes do

19   business with him?

20   A.   He is a friend, too.  We work together sometimes.

21   Q.   When you have communications about business, you do it by

22   text?

23   A.   Sometimes by text, sometimes by phone.

24   Q.   But if it's in writing it's by text?

25   A.   Yes.

1  Q.  And are you familiar with an individual named Aaron

2  Maresky?

3  A.  Yes.

4  Q.  Who is Mr. Maresky?

5  A.  Also a friend I have known for a few years.

6  Q.  Do you do business with Mr. Maresky?

7  A.  Not currently.

8  Q.  Have you ever done business with Mr. Maresky?

9  A.  Not that I can recall.

10  Q.  Okay.  Earlier, when your counsel asked you about how long

11  you've known Alex and Truman Sacks you said eight years,

12  correct?

13  A.  Truman, yes.

14  Q.  Well, actually you said for both of them that you knew them

15  for eight years, correct?

16  A.  Well, I was referring to Truman.  Alex is his brother.

17  Q.  And Alex Sacks you actually met on November 30, 2021,

18  correct?

19  A.  Could be around that time that's when I was introduced to

20  him via text.

21          MR. WARSHAVSKY:  I would like to show the witness and

22  the other side Plaintiff's Exhibit 277.

23  BY MR. WARSHAVSKY:

24  Q.  It should also be on the screen in front of you, if that's

25  easier, Mr. Rothschild.

```
 1    A.  That is easier.

 2    Q.  Have you seen this document before?

 3    A.  Yes.

 4    Q.  Can you tell us what it is?

 5    A.  My LinkedIn.

 6    Q.  Does it look accurate?

 7    A.  Not to what it is today, but, yes.

 8    Q.  But at the time of this exhibit?

 9    A.  I would assume so, yes.

10           MR. WARSHAVSKY:  We would move this into evidence,

11    your Honor.

12           MR. HARRIS:  No objection.

13           THE COURT:  Received.

14           (Plaintiff's Exhibit 277 received in evidence)

15    BY MR. WARSHAVSKY:

16    Q.  What is your title here?

17    A.  What part?

18    Q.  How do you describe yourself as your employment here?

19    A.  Marketing strategist.

20    Q.  You also, if we scroll down, you have marketing director

21    for Terminal 27.

22    A.  Yes.

23    Q.  Is that your current position?

24    A.  No.  It's chief marketing officer now.

25    Q.  Okay.  Thank you.
```

1              What's the difference between the chief marketing

2       officer and a marketing director?

3       A.  It is just artificial titles within a company.

4       Q.  But the duties are the same?

5       A.  I have a little bit more that I do now.

6       Q.  If we go down to skills, one of your skills is trend

7       forecasting.  What is trend forecasting?

8       A.  Just knowing what's in and what's cool.

9       Q.  What do you mean by what's in and cool?  Can you explain

10      that a little more.

11      A.  Just knowing what trends are happening right now.  What's

12      cool in fashion or technology, art, business.

13              MR. WARSHAVSKY:  Okay.  I would like to show the

14      witness and the other side Plaintiff's Exhibit 281.

15      BY MR. WARSHAVSKY:

16      Q.  Have you seen this document before?

17      A.  Yes.

18      Q.  Can you tell us what is this is.

19      A.  It is an old résumé.

20              MR. WARSHAVSKY:  We move this into evidence.

21              MR. HARRIS:  No objection.

22              THE COURT:  Received.

23              (Plaintiff's Exhibit 281 received in evidence)

24      BY MR. WARSHAVSKY:

25      Q.  This is a résumé you sent out to potential employers?

1   A.  At the time, yes.

2   Q.  Okay.  And how did you describe yourself here?

3   A.  Marketing strategist.

4   Q.  Okay.  If we look at your first experience there, the first

5   experience listed Barney's New York?

6   A.  Yes.

7   Q.  How did you describe yourself there?

8   A.  Marketing strategist.

9   Q.  What was your position at Barney's New York?

10  A.  Sales.

11  Q.  What do you mean by sales?

12  A.  Salesperson.

13  Q.  You were on the floor?  The salesperson on the floor?

14  A.  Yes.

15  Q.  So were you a marketing strategist at Barney's New York?

16  A.  No.  That was a typo that I expressed at my deposition.

17  Q.  That is a typo?

18  A.  I was copying and pasting from the previous, the other job

19  titles that you can see below it.

20          MR. WARSHAVSKY:  Okay.  If we could zoom out of that,

21  please.

22  BY MR. WARSHAVSKY:

23  Q.  You listed a few different skills and expertise here?

24  A.  Uh-huh.

25  Q.  Advertising, branding and identity, marketing, and public

1   relations.  How are those different?

2   A.  They're different things.  Public relations is not

3   marketing, and fashion buying is not marketing.  They are all

4   different skills.

5   Q.  Okay.  Well, how is marketing different from advertising?

6   A.  To me, honestly, at the time I was 17, and I was just

7   trying to make my résumé look at good as possible to potential

8   hires.

9   Q.  And you have here fashion buying.  At this time were you a

10  buyer for any companies?

11  A.  No.

12  Q.  So you didn't have a skill or expertise in fashion buying

13  at this time?

14  A.  I don't believe that you can -- you can claim things that

15  you think you are good at in your résumé that you haven't done

16  before.  But at the time I had experience working with

17  different brands and streetwear companies, and I would see what

18  was good and what was not, so I felt like I had that

19  credential.

20  Q.  Is that because you saw it was good and what you thought

21  was trendy?  Is that what you said?

22  A.  That's not what I said.

23  Q.  I'm sorry.  What did you say?

24  A.  I feel like I had different skills which I proved at

25  different parts of my career.  This was very early on in my

1   career, like post high school, and I thought that I would be

2   good at that.  So I put it on my résumé to potentially get a

3   job.

4   Q.  So you thought you would be good at it?

5   A.  Correct.

6   Q.  Did you ever work at an advertising firm?

7   A.  No, but I created advertising assets.

8           MR. WARSHAVSKY:  Move to strike the last part of the

9   answer, your Honor.

10          THE COURT:  What do you mean when you say created

11  advertising assets?

12          THE WITNESS:  May I answer in the microphone?

13          THE COURT:  Yes.

14          THE WITNESS:  You can see print ads for American

15  apparel.  I designed those ads.

16          THE COURT:  Were these ads that were commissioned or

17  just something you were coming up with?

18          THE WITNESS:  No, freelance ads that I altered

19  digitally in Photoshop that were published.

20          THE COURT:  These were existing freelance ads?

21          THE WITNESS:  I'm sorry?

22          THE COURT:  I don't know what --

23          THE WITNESS:  So I --

24          THE COURT:  What do you mean by freelance ads?

25          THE WITNESS:  I got a contract to create or edit

1    photos in Photoshop by the company, and they got published.

2          THE COURT:  What company was that?

3          THE WITNESS:  American Apparel, which is in this

4    résumé.

5          THE COURT:  Okay.

6          Go ahead, counsel.

7    BY MR. WARSHAVSKY:

8    Q.  Did you ever work at a marketing firm?

9    A.  No.

10   Q.  Did you ever work at a public relations firm?

11   A.  No.

12   Q.  What was your marketing experience at that time?  Was it

13   the same as your advertising experience?

14   A.  I would say at the time I was working for a streetwear

15   company called R H U D E, which is my buddy Rhuigi, and we were

16   marketing the brand to sell more product.

17   Q.  Now, we are going to switch gears a little bit to talk

18   about the MetaBirkins for a little bit.

19          I think you said you had hired Mark Design, is that

20   correct?

21   A.  Correct.

22   Q.  And I think we asked you, other than through text message,

23   did you have any other communications with -- any other written

24   communications with Mark Design?

25   A.  Probably on the site that I hired him on.

1  Q.  But that would be it?

2  A.  To my knowledge.

3  Q.  So I would like to show the witness and the Court

4  Plaintiff's Exhibit 20.

5          MR. HARRIS:  Two O?

6          MR. WARSHAVSKY:  I'm sorry, Plaintiff's Exhibit 240,

7  two four zero.

8  BY MR. WARSHAVSKY:

9  Q.  Have you seen this document before?

10  A.  I think so.

11  Q.  This is a document you produced in this case, correct?

12  A.  Yes.

13  Q.  And this is a text message exchange between you -- well,

14  here it says Mark Design.  Is Mark Design the same as Mark

15  Berden?

16  A.  Correct.

17  Q.  This is a text exchange between the two of you?

18  A.  Yes.

19          MR. WARSHAVSKY:  We would offer this into evidence,

20  your Honor.

21          MR. HARRIS:  No objection.

22          THE COURT:  Received.

23          (Plaintiff's Exhibit 240 received in evidence)

24          MR. WARSHAVSKY:  So we can publish it to the jury.

25  BY MR. WARSHAVSKY:

1   Q.  Here you start saying, "Let's do another series of

2   Birkins," correct?

3   A.  Yes.

4   Q.  Is this the first time you -- well, let me ask it

5   differently.  Were you referring to NFTs?

6   A.  Yes.

7   Q.  Was this the first time you discussed these NFTs?

8   A.  I am not sure.

9   Q.  And here, because the name hadn't come up yet, you were

10  just referring to them as Birkins, correct?

11  A.  Yes.

12  Q.  When you say "another series," what do you mean by

13  "another"?

14  A.  This is after Baby Birkin.

15          MR. WARSHAVSKY:  If we could turn to page 6.

16  BY MR. WARSHAVSKY:

17  Q.  Mark asks you, "NFTs?"

18          And you respond, "NFTs."

19          Do you know why that was the question and answer

20  there?

21  A.  Sorry.  Can you repeat the question.

22  Q.  Sure.  Do you know Mark used the word "NFTs"?

23  A.  Because it's Baby Birkin and an NFT.

24  Q.  Do you know why you use the word "NFTs"?

25          MR. WARSHAVSKY:  Scroll down.

N21nher3                          Estival – Cross

1   A.  Because that's what Baby Birkin was.  When I said another

2   series, we referred to creating another NFT.

3   Q.  Throughout this discussion -- and you can look in your book

4   if you like -- did you ever use the word "art"?

5   A.  No.

6          MR. WARSHAVSKY:  If we could show the Court and the

7   other side Plaintiff's Exhibit 316.

8          Humberto, I'm not sure -- plaintiff's Exhibit 316,

9   Humberto.

10          Okay.  Thank you.

11  BY MR. WARSHAVSKY:

12  Q.  Mr. Rothschild, have you seen this before, this document

13  before?

14  A.  It looks to be a text message chain.

15  Q.  Who is the text exchange between?

16  A.  Me and Kenneth Loo.

17  Q.  Who is Kenneth Loo?

18  A.  My publicist.

19  Q.  And this is a document you produced in this case?

20  A.  I believe so, yes.

21  Q.  What was your primary way of communication with Kenneth

22  Loo?

23  A.  Text message.

24          MR. WARSHAVSKY:  I move it into evidence, your Honor.

25          MR. HARRIS:  Your Honor, I have no objection.

N21nher3                              Estival - Cross

1              THE COURT:  Received.

2              (Plaintiff's Exhibit 316 received in evidence)

3     BY MR. WARSHAVSKY:

4     Q.  Please turn to page 2.  Can you read the last text you sent

5     to Kenneth Loo?

6     A.  "I'm making 13 Birkin NFTs."

7     Q.  And in this text chain, which you also have in the book, do

8     you ever refer to the project as "art"?

9     A.  No, because I was creating NFTs that are attached to art.

10    Q.  That wasn't my question, Mr. Rothschild.

11             MR. WARSHAVSKY:  I will actually, your Honor, move to

12    strike.

13             THE COURT:  Well, I will strike everything after the

14    word "no."

15             MR. WARSHAVSKY:  Thank you, your Honor.

16             THE COURT:  So if a question can be answered simply

17    yes or no, just answer yes or no.  If it requires a further

18    explanation, of course, then you may answer, and I will

19    determine whether it's appropriate or not, but I think that

20    question could be answered yes or no.

21             Go ahead.

22             THE WITNESS:  Got it.

23    BY MR. WARSHAVSKY:

24    Q.  I'm sorry.  Looking through the document, the entire

25    document --

1  A.  What number was that again?

2  Q.  This was 316.

3         My question is, do you say "art" anywhere in the

4  document?

5  A.  No.

6         MR. WARSHAVSKY:  Can you please show the Court and the

7  other side Exhibit 243, please.

8  BY MR. WARSHAVSKY:

9  Q.  Have you seen this document before?

10 A.  Yes.

11 Q.  Can you tell us what this is?

12 A.  Another text message chain.

13 Q.  Between whom?

14 A.  Myself and Mark.

15 Q.  You produced this in litigation?

16 A.  Yes.

17        MR. WARSHAVSKY:  Move it into evidence, your Honor.

18        MR. HARRIS:  Your Honor, it is going to be more than

19 three words.  Can we have a quick sidebar?

20        THE COURT:  All right.

21        (Continued on next page)

22

23

24

25

1          (At sidebar)

2          MR. HARRIS:  Your Honor, it is a very long chain.  My

3    guess is I won't object to the part that Mr. Warshavsky is

4    seeking to introduce, but I really don't have the ability to --

5          THE COURT:  So why don't I receive it without

6    prejudice to your raising objections as he goes through it to

7    specific items, and I will rule right then and there.

8          MR. HARRIS:  Okay.

9          THE COURT:  What is the nature of your objection?

10         MR. HARRIS:  It would be hearsay, your Honor.

11         MR. WARSHAVSKY:  Your Honor, can I respond to that as

12    long as we are at sidebar?

13         THE COURT:  Yes.

14         MR. WARSHAVSKY:  We heard from this witness that this

15    is an individual that he hired, that his communications were by

16    text, and they were stored on his cell phone, which would

17    suggest to me that is a business record between this witness

18    and his employee for these purposes.  Therefore, it comes

19    within the hearsay exception.

20         I don't think we are going to be offering most of this

21    for the truth of the matter asserted, but to avoid this

22    issue --

23         THE COURT:  I don't think you have established enough

24    to show this is a business record.  The mere fact that the

25    person was an employee doesn't mean that this is a business

N21nher3                          Estival – Cross

1    record, but maybe you can establish it.

2              Anyway, we will proceed accordingly.

3              MR. HARRIS:  Your Honor, I expect there will be some

4    additional like this.  Can I just say "same objection"?

5              THE COURT:  Yes.

6              MR. HARRIS:  Okay.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N21nher3                          Estival – Cross

1             (In open court)

2             MR. WARSHAVSKY:  I think I had just moved --

3             THE COURT:  So the exhibit is received, subject to the

4    limitations stated at the sidebar.

5             (Plaintiff's Exhibit 243 received in evidence)

6             MR. WARSHAVSKY:  If we could furnish it to the jury.

7    BY MR. WARSHAVSKY:

8    Q.  Here, this message begins with -- well, can you describe

9    what the first text is in this chain.

10   A.  The words?  The words or --

11   Q.  Well, it looks like an image to me.

12   A.  Yes.

13   Q.  Actually, because of the way these were produced the color,

14   which is actually on 21 --

15            MR. WARSHAVSKY:  Humberto, could you go to page 21.

16            THE COURT:  I'm sorry.  Remind me.

17            What's the number of this exhibit?

18            MR. WARSHAVSKY:  It is, I'm sorry, Exhibit 243.

19            THE COURT:  Okay.

20   BY MR. WARSHAVSKY:

21   Q.  Is this an image made by Mark Design -- by Mark Berden.

22   I'm sorry.

23   A.  Yes.

24   Q.  And he was sending this to you on October 19?

25   A.  Yes.

1    Q.  Is this the next communication you had after the last one

2    we saw, when you said, "Let's do another series of Birkins"?

3    A.  I'm not positive.

4    Q.  Do you think it could be?

5    A.  It could be.

6            MR. WARSHAVSKY:  If we could turn to page 2 of that

7    exhibit.

8    BY MR. WARSHAVSKY:

9    Q.  You and Mark Design are chatting here.  Can you explain

10   what you are discussing here.

11   A.  We are discussing the fluffiness of the MetaBirkin.

12   Q.  Okay.  And here, as Mark Design is writing back to you,

13   this is him talking to you as I understand it in the scope of

14   his employment with you?

15   A.  Am I looking at the right page?

16   Q.  Well, the one that starts "working now."

17   A.  Yes.

18   Q.  Okay.  So here what you are talking about with Mark Design

19   is the business he's doing for you?

20   A.  Yes.  He's saying that he is working.

21   Q.  Okay.  And then if we look below --

22           MR. WARSHAVSKY:  If you could shrink that.  Sorry.

23   BY MR. WARSHAVSKY:

24   Q.  He's saying he has to set it up to interact with the model

25   and then apply the right materials.  Is that the work he's

N21nher3                              Estival - Cross

```
 1    doing for you?

 2    A.  Yes.

 3    Q.  And that's your communication about that work?

 4    A.  Correct.

 5    Q.  Were there any other means of communication at this time

 6    between you and Mark Design?

 7    A.  We would mainly talk on WhatsApp.

 8    Q.  And is this a discussion one of the initial discussions you

 9    are having about how Mark Design was going to be generating

10    these images?

11    A.  I believe so.

12          MR. WARSHAVSKY:  If we turn to page 15 -- actually, if

13    we could start on 14.  I'm sorry about that.

14    BY MR. WARSHAVSKY:

15    Q.  Do you see your last text on the page.  You say, "What

16    program is this"?

17    A.  Yes.

18    Q.  Okay.  And when you were asking what program, were you

19    asking about the program that generated what became known as

20    the MetaBirkins?

21    A.  Yes.

22          MR. WARSHAVSKY:  If we go to the next page.

23    BY MR. WARSHAVSKY:

24    Q.  Do you see where Mark Design says "Houdini"?

25    A.  Correct.
```

1    Q.  If we go to your text in the middle of the page, is that a

2    typo in your text?

3    A.  The --

4    Q.  The one at 16:48:20.

5    A.  "I really gotta learn these."

6    Q.  That's a typo that says, "I really gotta learn these"?

7    A.  Yes.

8    Q.  When you said "I really gotta learn these," what were you

9    referring to?

10   A.  The program.

11   Q.  Which program?

12   A.  Houdini.

13   Q.  So at the time the MetaBirkins NFTs were being generated,

14   you didn't know how to use Houdini?

15   A.  Correct.

16           MR. WARSHAVSKY:  Okay.  If we could turn to

17   Plaintiff's Exhibit 272.

18           Show the Court, the witness, and defense counsel.

19           MR. HARRIS:  I'm sorry.  What was the number?

20           MR. WARSHAVSKY:  272.

21           MR. HARRIS:  Thank you.

22   BY MR. WARSHAVSKY:

23   Q.  Have you seen this document before?

24   A.  Yes.

25   Q.  You produced this in this litigation?

1    A.  Yes.

2    Q.  Can you tell us generally what this is.

3    A.  Me discussing compensation with Mark.

4    Q.  Okay.  This is a text message between you and Mark Design?

5    A.  Yes.

6            MR. WARSHAVSKY:  We would offer Exhibit 272 into

7    evidence.

8            MR. HARRIS:  Your Honor, same.

9            THE COURT:  Yes.  The same ruling.

10           Received subject to the limitation stated at sidebar.

11           (Plaintiff's Exhibit 272 received in evidence)

12           MR. WARSHAVSKY:  If we could turn to page 3 here.

13   BY MR. WARSHAVSKY:

14   Q.  And at the top Mark Design writes to you, "Without

15   recognition they are worth" --

16           MR. HARRIS:  Objection to that, your Honor.

17           THE COURT:  Okay.  Hold on.

18           I'm sorry.

19           Page 3?

20           MR. WARSHAVSKY:  Page 3.

21           THE COURT:  Oh, I see.

22           That particular response is, I think, ambiguous on its

23   face, so the jury will disregard that response.

24           Go ahead.

25           MR. WARSHAVSKY:  Your Honor, I don't think I asked my

N21nher3                          Estival – Cross

1    question.  I was going to start --

2              THE COURT:  I am just saying --

3              MR. WARSHAVSKY:  Okay.

4              THE COURT:  -- it actually goes back to page 2, at the

5    bottom of the page, and then the portion that is being objected

6    to is at the very top of page 3, and that objection is

7    sustained.

8              MR. WARSHAVSKY:  Your Honor, can I ask for a quick

9    sidebar?  I'm sorry to do it so quickly.

10             THE COURT:  All right.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At sidebar)

2              MR. WARSHAVSKY:  Your Honor --

3              THE COURT:  Excuse me, before I hear from you, let me

4    just make clear what you offered was at the top of page 3 --

5    that's why I asked you what page -- and it is half of an entry,

6    a single sentence, but you only offered the last half.

7              And I am sustaining the objection to that because half

8    of a sentence is inherently ambiguous, not to say misleading.

9              So that was my ruling.  Now if you want to put in the

10   entire sentence, we go back to page 2, Mark Design says, "I

11   can't get the similarities out fast as I expected without the

12   recognition they are worthless."  That may not be one sentence

13   because there are all sorts of redactions in between, which

14   makes this one of the least promising exhibits that I have seen

15   in this case.

16             But, in any event, what is here is that whatever is at

17   the top of page 3 was preceded by something.  Either it was

18   preceded by what I just read or it was preceded by something

19   that's been redacted.

20             But on its face the jury could not possibly make any

21   head or tails of it because it's a dangling part-sentence.

22   That was the basis for my ruling.

23             Now let me hear you.

24             MR. WARSHAVSKY:  I understood the objection to be

25   based on hearsay.  What I was going to say is I wasn't going to

N21nher3                          Estival - Cross

ask particularly about that.  I was going to ask about what
they were discussing, what he understood.

          I will give more context.  The redactions, actually it
was the defendant's redactions.  It is phone numbers.  That's
why they are all redacted.  It is actually not text.

          THE COURT:  So is the sentence I just read on page 2
the start of the sentence?

          MR. WARSHAVSKY:  It definitely is.  And I will start
with that.

          THE COURT:  All right.  If you can clear up the
ambiguity --

          MR. WARSHAVSKY:  Yes.

          THE COURT:  -- we would then reach the hearsay issue.
I don't think any of this is likely to be hearsay because at an
absolute minimum it goes to the state of mind of the witness.

          So, for example, here is the word "worthless."  And if
the witness were to say, "Oh, yeah, I understood everything we
were doing was worthless" that goes to the state of mind.

          He may say something totally different.  It is not
being offered for its truth.  It is being offered for state of
mind.  So it will be received.

          If at some point you think it's worth giving the jury
an instruction on that, I'm happy to do so, though I have a
feeling you might just prefer to move it along.

          MR. HARRIS:  Okay.

N21nher3                          Estival – Cross

1                MR. WARSHAVSKY:  Thank you, your Honor.

2           Thank you for indulging us.

3        (Continued on next page)

```
 1                  (In open court)
 2      BY MR. WARSHAVSKY:
 3      Q.  So, Mr. Rothschild, if I could ask you to look one page
 4      back.
 5                  MR. WARSHAVSKY:  Humberto, if you could show that,
 6      please.  Page 2.
 7      BY MR. WARSHAVSKY:
 8      Q.  So maybe if you can read page 2 and let us know when you
 9      are done and we'll switch to page 3, Mr. Rothschild.
10                  THE COURT:  Let me just see if I can move this along.
11                  You see, Mr. Rothschild, where Mr. Design states to
12      you, "I can't get the similarities out fast as I expected
13      without the recognition they are worthless."
14                  Do you see that from page 2 going on to page 3?
15                  THE WITNESS:  Correct.
16                  THE COURT:  Did you have an understanding of what he
17      meant?
18                  THE WITNESS:  I think he meant like, since we're
19      covering the whole bag in fur, you lose a lot of fidelity.  And
20      I guess we were just trying to make sure that it, you know,
21      still represented what we were trying to create.
22                  THE COURT:  Okay.
23      BY MR. WARSHAVSKY:
24      Q.  And so when you were speaking about rec –– when the
25      discussion was talking about recognition, that was the shape of
```

1    the Birkin bag?

2    A.  Yes.

3    Q.  And was the recognition of the Birkin bag what gave these

4    Birkin NFTs at least part of their value?

5    A.  They were called MetaBirkins, so we were speaking to what

6    we were showing in the artwork.

7    Q.  Okay.  So the date of this --

8          MR. WARSHAVSKY:  Can we go back to the beginning of

9    this exhibit.

10   BY MR. WARSHAVSKY:

11   Q.  The date here is November 4?

12   A.  Yes.

13   Q.  If you could look through the exhibit, can you tell me

14   where in the exhibit you use the word "MetaBirkins"?

15   A.  We didn't have the name yet, but I had the idea.  This was

16   post press release from Kering Group.

17   Q.  Okay.  So, going back, I asked you if the recognition as a

18   Birkin bag was important, or at least somewhat important to the

19   value of this project.

20   A.  There was no value being kind of showcased here.  We were

21   talking about the -- without the recognition that we are

22   creating the meta-- well, the prementioned MetaBirkins,

23   obviously didn't have a name yet, it was part of showing what

24   they were.

25   Q.  Okay.  But talking about recognition, the recognition you

```
 1   were speaking about --

 2   A.  Right.

 3   Q.  -- was the Birkin shape?

 4   A.  Yes.

 5   Q.  Thank you.  Without that Birkin shape, the image would be

 6   worthless?

 7   A.  No.  It -- with the recognition of, like, the actual --

 8   because there is a fur, right, and we did different lengths of

 9   fur at this point.  If you couldn't see it, then nobody would

10   know what we were talking about.

11            MR. WARSHAVSKY:  If we could scroll back out.

12   BY MR. WARSHAVSKY:

13   Q.  You wrote a question here, "How much time is each bag

14   taking"?

15   A.  Yes.

16   Q.  Why did you say "bag" instead of "art."

17   A.  Because the subject matter of the art is a handbag.

18   Q.  But you called it a bag, correct?

19   A.  Yes.  But that's what --

20   Q.  These are just yes-or-no questions.  You called it a bag,

21   correct?

22   A.  Yes.

23   Q.  In this text chain, though you are using the word "art" in

24   your answers to me, in this text chain is there anywhere you

25   say the word "art"?
```

1    A.  No.

2              MR. WARSHAVSKY:  If we could turn to page 9.

3    BY MR. WARSHAVSKY:

4    Q.  You write to Mark Design, "It's already hyped up and

5    investors are hyped on it."

6              Do you see that?

7    A.  Yes.

8    Q.  Who are the investors you are talking about?

9    A.  At this point I believe it was Basic.Space.

10   Q.  So Basic.Space was going to invest in this project?

11   A.  They were going to pay for the minting fees and costs

12   associated with development of, like, the website, but that

13   was, like, the extent of their investment.

14   Q.  What does "hyped on it" mean?

15   A.  Excited.

16   Q.  So Basic.Space was excited?

17   A.  Yes, since we launched the Baby Birkin on it.

18   Q.  Did Basic.Space get involved in the MetaBirkins?

19   A.  They were going to be, but we had some disagreements on

20   advertising it or showing it.  They wanted a lot more credit,

21   so I decided to do it on my own.

22   Q.  Okay.  So the answer is no?

23   A.  No, but it is a little bit more complicated than that.

24   Q.  Okay.  Well, is it complicated?  I asked you if Basic.Space

25   was ultimately involved.

1    A.  Yes.

2    Q.  Basic.Space was ultimately involved?

3    A.  No.  I'm saying --

4    Q.  Okay.

5    A.  -- they weren't.

6          MR. WARSHAVSKY:  Okay.  Let's turn to pages 21 and 22.

7    BY MR. WARSHAVSKY:

8    Q.  Mark Design was sending you something here?

9    A.  Yes.

10   Q.  Was this the schematic for a Birkin?

11   A.  Yes.

12   Q.  I am going to show you this in a minute on the color

13   copies.

14         MR. WARSHAVSKY:  If we could turn to page 33.

15   BY MR. WARSHAVSKY:

16   Q.  Do you recognize what this is?

17   A.  Yes.

18   Q.  What is this?  I'm referring to the picture.

19   A.  It looks like Elmo's face on a MetaBirkin.

20         MR. WARSHAVSKY:  Okay.  If we could go to pages 34 and

21   35.

22   BY MR. WARSHAVSKY:

23   Q.  So you are responding to Mark Design that you liked the way

24   this looks, right?

25   A.  Yes.

N21nher3                          Estival - Cross

```
1    Q.  You say, "That's actually cute"?

2    A.  Cute.

3             MR. WARSHAVSKY:  Okay.  And if we go to the next page.

4    BY MR. WARSHAVSKY:

5    Q.  Can you read your text at the top of the page.

6    A.  "I don't want to get sued to hell."

7    Q.  Okay.  So you don't want to get sued to hell?  So who is

8    going to sue you?

9    A.  Sesame Street.

10   Q.  And why would Sesame Street sue you?

11   A.  Because of Elmo's face.

12   Q.  So if you used Elmo's face you expected Sesame Street to

13   sue?

14   A.  I was kind of making a joke here.

15   Q.  That's a joke?

16   A.  Yes.

17            MR. WARSHAVSKY:  If we could turn to pages 54 to 57.

18            If we could show 54 and 55, and I guess 56.  So 54 and

19   55.  Maybe take 56 down for a second.

20   BY MR. WARSHAVSKY:

21   Q.  54 and 55 were schematics for the Birkin bag?

22   A.  Yes.

23            MR. WARSHAVSKY:  Now if we could show 56.

24   BY MR. WARSHAVSKY:

25   Q.  That is an Hermès pattern and the Hermès logo?
```

```
 1    A.  I don't know if it is an Hermès pattern, but it is the

 2    Hermès logo.

 3    Q.  Hermès uses that orange color for its bags and everything

 4    else?

 5    A.  I think so, yes.

 6             MR. WARSHAVSKY:  Okay.  If we turn to page -- well,

 7    57.  If we could just do 57 here.  Okay.

 8    BY MR. WARSHAVSKY:

 9    Q.  This was also generated -- this shows the product of those

10    last three slides, is that right?

11    A.  Yes, but never produced.

12    Q.  Okay.  Would you agree with me that this depicts an Hermès

13    logo in an Hermès orange on a Birkin bag?

14    A.  Yes.

15    Q.  This was being used as a model?

16    A.  As a sample.

17    Q.  It was a sample?

18    A.  It's a tech test.

19    Q.  It was a tech test that Mark Design sent to you?

20    A.  Yes.

21             MR. WARSHAVSKY:  If we could turn to Exhibit 239,

22    please.  I'm sorry, just for the witness, counsel and the

23    judge.

24    BY MR. WARSHAVSKY:

25    Q.  This is another text exchange between you and Mark Design?
```

N21nher3                        Estival - Cross

1   A.  Yes.

2   Q.  It was also produced in discovery?

3   A.  Yes.

4           MR. WARSHAVSKY:  Move to introduce.

5           MR. HARRIS:  Same, your Honor.

6           THE COURT:  Same ruling.

7           MR. WARSHAVSKY:  If we could turn to page 7?

8           THE COURT:  So it's received, but without prejudice to

9   specific objections that you might make as to specific items

10  being inquired on.

11          MR. HARRIS:  Thank you, your Honor.

12          (Plaintiff's Exhibit 239 received in evidence)

13          MR. WARSHAVSKY:  If page 7 could be furnished to the

14  jury.

15          THE COURT:  Yes.

16  BY MR. WARSHAVSKY:

17  Q.  Can you please read the top message you sent to Mark.

18  A.  "Realistically do you think we can crank out 100 Birkins?"

19  Q.  Is that because you wanted to move quickly?

20  A.  I just wanted to make a new project.

21  Q.  Well, earlier we saw you talk to him about investors being

22  hyped, right?

23  A.  Yes.

24  Q.  Okay.  I think you testified yesterday that in 2020, 2021

25  the NFT market was exploding, is that right?

1    A.  Yes.

2    Q.  Did you want to take advantage of that?

3    A.  I wanted to do a follow-up to Baby Birkin.

4    Q.  Okay.  Did you want to do it quickly?

5    A.  Yes.

6    Q.  And you wanted Mark Design to move quickly with these

7    designs if he could?

8    A.  I was just asking him if it was possible.

9    Q.  I understood that.

10          Were you asking him if it was possible so he could do

11   it quickly?

12   A.  I don't see where it says "quickly," but I just --

13   Q.  I was asking you that.  I wasn't asking if it said quickly

14   here?

15   A.  No.

16   Q.  So you didn't care how quickly he did it?

17   A.  I have respect for the artist and the designer, so I wasn't

18   rushing him to do it.

19   Q.  Okay.  We'll come back to that then.

20   A.  Okay.

21   Q.  So let's go to Exhibit 243.  Can you tell us what this is.

22   A.  It is a page or the picture?

23   Q.  No, the document, Exhibit 243?

24   A.  More text messages.

25   Q.  Between you and Mark Design?

1   A.  Yes.

2   Q.  And this is what you produced in discovery?

3   A.  Yes.  I think we looked at this.

4           MR. WARSHAVSKY:  I offer it into evidence.

5           MR. HARRIS:  I think you already offered this subject

6   to --

7           MR. WARSHAVSKY:  This is the same one?

8           I'm sorry.  This was already admitted.

9           My apologies.

10          MR. WARSHAVSKY:  If you could turn to page 3.

11  BY MR. WARSHAVSKY:

12  Q.  If you need context we can turn to pages 2 and 3.

13          Do you see those?

14  A.  Yes.

15  Q.  Okay.  So you say, "Once we set it up, it will be pretty

16  quick to change colors and make a few different ones."  Right?

17  A.  Yes.

18  Q.  So you were asking there about the speed in which they

19  could be made, correct?

20  A.  No.  I was speaking to the ease.  If you could do something

21  easily, you could most likely do something quickly, but, yes, I

22  was speaking to if it was easy enough to do.

23  Q.  So the word "quick" means "ease" to you?

24  A.  Yes, in this context.

25  Q.  Do you other times use the word "quick" as "ease," or just

1    here just in this text?

2    A.  I sometimes associate the two.

3    Q.  Okay.  So when we see "easy and quick" we should use them

4    interchangeably?

5    A.  Sometimes.  I think we all know the term like "quick and

6    easy."

7    Q.  We know the term "quick and easy"?

8    A.  Yes.

9    Q.  So do "quick" and "easy" mean two different things in that?

10   A.  What I am saying is in the context of this particular text

11   that you are showing me.

12            MR. WARSHAVSKY:  Move to strike, your Honor.

13            THE COURT:  Overruled.

14   BY MR. WARSHAVSKY:

15   Q.  Here you're referring to the MetaBirkins images, correct?

16   A.  I believe so.

17   Q.  You wanted to make a few different ones easily?

18   A.  Yes.  Like the process of producing them.

19            MR. WARSHAVSKY:  Okay.  Can you turn to page 5.  Show

20   the witness pages 4 and 5 just for context.

21   BY MR. WARSHAVSKY:

22   Q.  And you write to Mark Design, "In a few different color

23   backgrounds for each."

24            Do you see that?

25   A.  Yes.

```
 1   Q.  And his response to you is, "Yeah, changes should be fast."

 2   A.  Yes.

 3   Q.  Do you think he understood you to be talking about ease or

 4   speed?

 5   A.  Both.

 6              MR. WARSHAVSKY:  All right.  If we could unzoom that.

 7        I'm sorry, if we could turn -- okay.  If we could turn

 8   to Exhibit 273.  Show the witness, the Court and defense

 9   counsel.

10   BY MR. WARSHAVSKY:

11   Q.  This is a document you produced in this case, correct?

12   A.  Yes.

13   Q.  This is a text message between you and Mark Design,

14   correct?

15   A.  Yes.

16   Q.  And so this was after the first 100 MetaBirkins were

17   minted, correct?

18   A.  Yes.

19              MR. WARSHAVSKY:  We would offer this document into

20   evidence.

21              MR. HARRIS:  Same, your Honor.

22              THE COURT:  Same ruling.  Received.

23              (Plaintiff's Exhibit 273 received in evidence)

24              MR. WARSHAVSKY:  Okay.  If we could turn to page 4.

25   BY MR. WARSHAVSKY:
```

N21nher3                              Estival – Cross

1    Q.  If you want, you can scroll through all of it.  We can show

2    pages 2, 3 and 4 for reference.

3              MR. WARSHAVSKY:  Can we put 3 and 4 on the screen,

4    Humberto, please.

5    BY MR. WARSHAVSKY:

6    Q.  Here, at the bottom of 4, what did you understand Mark

7    Design to be saying to you?

8    A.  What is the question?  Sorry.

9    Q.  At the bottom of page 4, what did you understand Mark

10   Design to be saying to you?

11   A.  He said he can get 40 to 50 out per day, so two to three

12   days, and then switch to the specials and the legendary ones.

13   Q.  What did you understand that to mean?

14   A.  For the simple ones that he was showing in terms of simple

15   one-colored ones, it would take two or three days, and then if

16   we were working on special ones, which had a little more going

17   on in the artwork.

18              (Continued on next page)

19

20

21

22

23

24

25

1   BY MR. WARSHAVSKY:

2   Q.  So when he said he could get 40 to 50 out per day for two

3   to three days, that meant it took -- it would only get one out

4   in two to three days, is that what you just said?

5   A.  40 to 50 per day, as it says.

6   Q.  So he was talking about generating the MetaBirkins?

7   A.  Yes.

8   Q.  OK.  And he was saying here, he could generate 40 to 50 per

9   day?

10   A.  Yes.

11        MR. WARSHAVSKY:  Shrink out of that.  Turn to page

12   six, five and six so the witness can see it in context.

13        I think we just saw page four.  Now we can look at

14   page five and six.

15        Here, you're discussing --

16   Q.  Let me know when you've read it.

17   A.  Yes.

18   Q.  So here, you and Mark Design are talking about the profits

19   you expect to make from the second collection of MetaBirkins

20   NFTs, is that correct?

21   A.  Yes.

22   Q.  OK.  And then you're also talking about at the bottom here,

23   where it starts, yeah, I'll start on those specials ASAP.

24        Do you see that discussion?

25   A.  Yes.

```
 1   Q.  Do you want to see the following page seven to for context?
 2            MR. WARSHAVSKY:  If you can unzoom that, please, and
 3   go to the top of seven.
 4   Q.  Here you say, so Mark Design could hammer these out,
 5   correct; you're still talking about the MetaBirkins, right?
 6   A.  Second collection, yes.
 7   Q.  And so the goal here was to generate 50 images a day,
 8   correct?
 9   A.  Um, that wasn't a goal.  That is what Mark said he could
10   do.
11   Q.  OK.  So you had the plans for the second NFT collection,
12   correct, this is what this is all about, the second MetaBirkins
13   collection?
14   A.  Yes.
15   Q.  This is what this is all about?
16            MR. WARSHAVSKY:  Can we go to Plaintiff's 306.
17            Furnish to the court and the other side, not to the
18   jury.  I don't believe it's been admitted.
19   Q.  OK.  So this is a text exchange between you, Truman Sachs
20   and Alex Sachs, correct?
21   A.  Yes.
22   Q.  It was produced by the Sachs, Truman Sachs in this case,
23   right, if you know?
24   A.  I don't know, but yeah.
25   Q.  But it is a text exchange between the three of you, only
```

1   the three of you?

2   A.  Yes.

3           MR. WARSHAVSKY:  Move into evidence, your Honor.

4           MR. HARRIS:  Your Honor, my objection goes a little

5   further with this exhibit.

6           THE COURT:  I'll allow it.

7           MR. HARRIS:  Is that on the same basis, your Honor?

8           THE COURT:  Well, other than hearsay, you have another

9   objection?

10           MR. HARRIS:  It's 100 pages, your Honor.  I have

11   hearsay and relevance to parts of it.

12           MR. WARSHAVSKY:  Your Honor, I might have a solution.

13           THE COURT:  Overruled as to relevance.

14           On a quick look through this exhibit, the hearsay

15   objection is overruled because some of the statements are the

16   defendant's and others are relevant to his state of mind.

17           I am concerned, however, about the length, so I will

18   direct counsel for both sides that what they think the jury

19   should take into account, if anything, from this exhibit has to

20   be specific entries that they direct to the attention of the

21   witness and not anything else.

22           With that limitation, the exhibit is received.

23           MR. HARRIS:  Thank you, your Honor.

24           MR. WARSHAVSKY:  Thank you, your Honor.

25           (Plaintiff's Exhibit 306 received in evidence)

1   BY MR. WARSHAVSKY:

2   Q.  If you could turn to page seven of that exhibit.

3           At this time, you're still talking to Truman and Mosh

4   Sachs as potential investors, or had they already invested?

5   A.  I'm talking to my friends who invest.

6   Q.  OK.  I think you said Truman and Alex Sachs gave you

7   $100,000 or invested $100,000?

8   A.  What is the date of this?

9   Q.  If we can go back to the top.  I think the challenge with

10  some of these -- and you can look through it as we go through

11  it.  As your counsel noted, these are ongoing text messages.

12  Some of them get quite long.  I think this is late November

13  into early December, but you can look through it in the book if

14  you would like to up to.  Page seven.

15  A.  So it's before MetaBirkins launched, so I haven't got an

16  investment yet.

17  Q.  When about did they -- did the Sachs brothers invest

18  $100,000?

19  A.  I believe it was after the launch of MetaBirkins.

20  Q.  Do you remember about how long after?

21  A.  I don't remember exactly.

22  Q.  Why don't we put up six and seven just in case to give

23  context, if the witness wants it.  I'm particularly talking

24  about look being at page seven.  Well, let's look at page six,

25  too, honestly.

1          Here you say, you start by saying that you crank out

2   900.  Do you see that?

3   A.  Yes.

4   Q.  And there are you referring to the MetaBirkins?

5   A.  The next collection.

6   Q.  The second collection of MetaBirkins?

7   A.  Yes.

8   Q.  OK.  When you say you learned how to render during

9   quarantine, what does it mean to render?

10  A.  Um, create 3D art.

11  Q.  And then if we can go to the bottom of page seven, what I

12  was initially asking you about, you say -- what did you mean

13  when you said, we can launch anything now, but def more

14  Birkins?

15  A.  MetaBirkins was -- I'm a little lost with the context, but

16  I think we can launch anything now, as in new projects, but def

17  more Birkins meaning more MetaBirkins.

18  Q.  OK.  If we can turn to page 31.

19          So looks like this starts December 1, first 30 pages

20  were all November 30.  You say the community voted for 500 to

21  1,000 more MetaBirkins NFTs.  You said MetaBirkins.

22          Where was the vote?

23  A.  Discord.

24  Q.  And you say you can probably crank out 300 with your team

25  before Christmas?

1    A.  Yes.

2    Q.  So at that point, there would be an expectation that you

3    can get 300 out in the next 23 days?

4    A.  Yes.

5    Q.  And then you say the full collection will be 1,000.

6         Did you have an idea when that would be finished?

7    A.  Um, I probably explain it later down the line, but I'm not

8    sure.

9    Q.  OK.  And then you say Dutch auction, what's a Dutch

10   auction?

11   A.  The price goes down over time.

12   Q.  So here, are you saying it would start at two ETH and then

13   every hour it would go down point one?

14   A.  Yes.

15   Q.  So after one hour it would be 1.9 and so on?

16   A.  Yes.

17   Q.  Is the Dutch auction to drive up the price or to make as

18   much money as possible on each, is that the idea?

19   A.  It's just an auction.  So the Dutch auction allows it to

20   be -- the price to be labeled due to the demand.

21   Q.  OK.  So the original one started at point one ETH?

22   A.  Yes.

23   Q.  OK.  And in this one, you thought would start at two ETH,

24   correct?

25   A.  Yes.

1    Q.  And it might go down, though, right?

2    A.  This was a plan.  This was never executed.

3    Q.  If we go to page 32, but that was --

4            Well, let's go back for a minute because maybe I just

5    want to make sure we understand.

6            Your plan was to release -- you didn't release a

7    second set of MetaBirkins, that's what you mean, right?

8    A.  No.

9    Q.  But the plan was if it was released, it would -- the

10   thought here was that you could start at two ETH?

11   A.  This was a thought at the time.

12   Q.  OK.

13   A.  But we had plenty of ideas.

14           MR. WARSHAVSKY:  OK.  And if we can turn to page 32.

15           Now you're continuing to have this same discussion --

16   I'm sorry.  I'm sorry.  I thought I was ...

17           We can move to the next exhibit.  I'm sorry.  I was

18   looking at a different --

19           Can you go to the top of 32 maybe.  I'm sorry.

20   Looking at the bottom of 31.  The bottom of 31, top of 32.

21   BY MR. WARSHAVSKY:

22   Q.  Do you see that text?

23   A.  Half of it.

24   Q.  Well, it should be on both pages.

25   A.  Yeah.

1   Q.  OK.  Well done.  OK.

2           You start by saying there is going to be 500 meh ones.

3   What did you mean by that?

4   A.  Simple ones.

5   Q.  And what did you mean by simple ones; does that mean like

6   one color?

7   A.  Like, one color.

8   Q.  One color was meh, and then you said 300 all right ones.

9           What does all right ones mean?

10  A.  Just, like, working up the scale of, like, cool factor.

11  Q.  And then 90 cool ones, I guess is that further up that

12  scale?

13  A.  Yeah.  They are cooler.

14  Q.  Then ten super specials?

15  A.  Yeah.

16  Q.  And is a super special something like the Mona Lisa one, is

17  that what you mean by that?

18  A.  No.  This is, like, some that were, like, covered in slime

19  and some were, like, had, like, mammoth tusks coming out of

20  them.  There was, like, a lot of work done on them.

21  Q.  So where would the Mona Lisa one be in this range?

22  A.  It was different.  I mean, MetaBirkins, the original

23  collection of MetaBirkins was all, kind of, they didn't have

24  any additional, um, elements to them, like 3D elements to them,

25  like, tusks or anything.  They were all just simulated fur with

1   a graphic.

2          And for this next collection, we really wanted to,

3   like, go above and beyond.  So you saw the banana earlier today

4   duct-taped to the bag and, like, a bunch of different ones.

5   Q.  Let me stop you there.

6          Where would the banana be on this range?

7   A.  The cool ones.

8   Q.  That would be a cool one.

9          And so would Mona Lisa be an all right one or meh one?

10  A.  Can I explain a little bit more in depth?

11         It's not really yes or no.

12  Q.  We can pick a different one.  You showed a few.

13  A.  Yeah.  I mean, for the Mona Lisa one, the goal of that

14  first collection was -- you didn't know what you were going to

15  get.  So do people value the Mona Lisa one versus all red one,

16  you know, like, people attribute more value to the one that had

17  the Mona Lisa on it.  It's kind of the -- to the eye of the

18  beholder.  People are only willing to pay -- or they give a

19  price to whatever.  It's whatever somebody is willing to pay

20  for the one that they want.

21  Q.  OK.  I understood that.  I guess what I'm trying to

22  understand is what would count as, on this scale of coolness,

23  would the Mona Lisa rate anywhere on this one?

24  A.  It's hard to say because the ten supers are the ones that

25  have extra work.  90 cool ones, I would say the Mona Lisa, it

1  would be a super in terms of, like, what people value it at.

2  But in terms of the work put into it to create it, it would be

3  on, like, the all right scale.

4  Q.  It would be the all right one.  OK.  Thank you.

5          If we can turn to Plaintiff's Exhibit 235.  This is

6  another text message between you and Mark, correct?

7  A.  Um-hmm.

8  Q.  This was also produced in discovery by you?

9  A.  Yes.

10          MR. WARSHAVSKY:  Subject to the same objection, we

11  would offer into evidence, your Honor.

12          MR. HARRIS:  Same, your Honor.

13          THE COURT:  Same ruling.  Received.

14          (Plaintiff's Exhibit 235 received in evidence)

15          MR. WARSHAVSKY:  We can furnish to the jury.

16          And if we could turn to page -- well, pages one and

17  two, if you can show it to the witness.

18  Q.  Here you're talking about making more MetaBirkins, right?

19  A.  Yes.

20  Q.  And, once again, we're talking about the time scale and

21  what Mark can do, regardless of what the time scale is, you're

22  trying to understand how much Mark can make here?

23  A.  To a certain extent, yes.

24  Q.  Now, let me ask you a totally different question.

25          Have you heard of the term blue chip?

```
1    A.  Yes.

2    Q.  Is that like a stock?

3    A.  I referred to it as art as well.  There is blue chip art as

4    well.

5    Q.  What is a blue chip art?

6    A.  A high-valued art.

7    Q.  OK.  Can you give me an example of a blue chip art?

8    A.  Salvator Mundi.

9    Q.  OK.  So let's go to Plaintiff's Exhibit 232 then.

10         Once again, this is a text message between you and

11   Mark Design dated November 29, correct?

12   A.  It's blank.

13   Q.  It's blank?

14         Well, if you look in your book, I think the first page

15   ask, but...

16   A.  Oh, wait.  What page am I looking at?

17   Q.  You can look through all of them, if you would like.  We're

18   showing you what was produced to us in discovery.

19   A.  Are you asking me about something specific in here?

20   Q.  I was asking about the whole chain so I can admit it into

21   evidence.

22   A.  Oh, two --

23   Q.  232.

24         MR. WARSHAVSKY:  If you want to show the second page

25   to the witness, defense counsel and the Court.
```

1   A.  Yes.

2   Q.  This was produced by you in discovery?

3   A.  Yes.

4        MR. WARSHAVSKY:  Again, subject to, I guess, the same

5   discussions, move into evidence, your Honor.

6        MR. HARRIS:  Same, your Honor.

7        THE COURT:  Same ruling.  Received.

8        (Plaintiff's Exhibit 232 received in evidence)

9   BY MR. WARSHAVSKY:

10  Q.  OK.  So if we can furnish to the jury pages one and two.

11  If you can show pages one and two so the witness can see it in

12  context.

13        This is a text message from you to Mark Design,

14  correct?

15  A.  Yes.

16  Q.  What are you sending to Mark Design?

17  A.  Screenshot of the Discord.

18  Q.  And --

19  A.  The MetaBirkins Discord.

20  Q.  What was the reason for sending that?

21  A.  I was -- I think I was showing him, um, what the Discord

22  was.

23        If I can look through it.  Just give me one second.

24  Q.  We can turn to page three?

25  A.  Yeah.  I was talking about --

1    Q.  How about if we show pages two and three, if that is what

2    you're looking at.

3    A.  Yeah.  You want me -- do you have a question?

4    Q.  I was asking why you sent it to him.

5    A.  I was showing him how many people had joined the Discord.

6    Q.  OK.  And you say this might be the next blue chip, correct?

7    A.  Yes.

8    Q.  Because you had 10,000 members?

9    A.  Yes.

10   Q.  And now, I think you said earlier to counsel that you had

11   50,000 members, is that correct?

12   A.  Later on.  I mean, this was just a moment in time.  It

13   grows over time.  People join.

14   Q.  How many members are there today?

15   A.  I'm not sure.

16   Q.  So why does Discord members matter for blue chip, if it's

17   just about art?

18   A.  The, like, art, if there is only one, the demand -- it's a

19   supply-and-demand thing.  There is 10,000 people, but there is

20   only one, one bag.  So it's just, like, you know, there is --

21   this is supply and demand.

22              MR. WARSHAVSKY:  If we can turn to page six.  Maybe

23   page five and six so the witness has context.

24   Q.  Here you're talking, this is when you float the idea to

25   Mark Design to make 900 more MetaBirkins, is that correct?

1  A.  Yes.  But in the previous text message as you showed me,

2  there was a change in what we were going to release.

3  Q.  I'm not sure.  My question was, is this the first time you

4  spoke to Mark Design about making 900 more?

5  A.  Um, I don't believe so, but what I was saying was --

6  Q.  So when do you think you first said it, Mr. Rothschild?

7          MR. HARRIS:  Objection.

8  A.  There is --

9          THE COURT:  I'll allow it.  Overruled.  I think the

10  witness was going beyond the scope of the question.  We'll let

11  it stand as is, since counsel interrupted appropriately in that

12  case.

13          Go ahead.  Put another question.

14  BY MR. WARSHAVSKY:

15  Q.  When do you think you first -- if this wasn't the first

16  discussion, when was the first discussion?

17  A.  Um, I'm not positive in the timeline, but there was a text

18  you just showed me that we said that we would just do, like,

19  200 more.  So it was a changing dynamic.

20  Q.  Are 200 and 900 the same thing?

21  A.  No.

22  Q.  OK.  So when I asked you is this the first time brought up

23  900, you said no.

24          What were you referring to?

25  A.  I'm saying I wasn't sure.  I have, like -- because we just

1  showed another text, there is a lot of dates going on.  Lots of

2  time.

3  Q.  Well, these are all your texts, right?

4  A.  Yes.

5  Q.  And I'm showing you the documents that you produced to us,

6  correct?

7  A.  Correct.

8  Q.  And I'm just asking you yes-or-no questions, to understand

9  and move this quickly, correct?

10 A.  I wasn't sure if this is the first time because --

11            THE COURT:  Whoa, whoa, whoa, woah.  Hold on.

12            Whether or not the question can be answered yes or no

13 or requires a further explanation is in the determination of

14 the court.  Not counsel, not the witness.  In this case, I

15 think the witness was right that a further explanation was

16 appropriate, so put a new question.

17            MR. WARSHAVSKY:  OK.

18 BY MR. WARSHAVSKY:

19 Q.  So why don't you look at the document and let's shrink this

20 and go back.

21            You can look at the entire text chain, Mr. Rothschild.

22 A.  OK.

23 Q.  If we can show the jury pages one and two.

24 A.  Or two and three, right?

25 Q.  I was going to start at one and two so there is a date.

1   A.  OK.

2   Q.  This is November 29, correct?

3   A.  Yes.

4   Q.  So this is before the release of the first MetaBirkins,

5   correct?

6   A.  Yes.

7   Q.  OK.  Let's go to pages three and four.

8        Here you're talking about next potentially next drops,

9   correct?

10  A.  Yes.

11  Q.  OK.  And you start by talking about drops of 100, correct?

12  A.  Yes.

13  Q.  OK.  Let's go to the next page.  Pages four and five.

14       Does this refresh your recollection as to whether you

15  had prior discussions about the second drop?

16  A.  Um, not necessarily.  This is a wide timeline from the

17  first text you showed me.

18  Q.  I'm sorry.  From which one?

19       When you say the first text --

20  A.  The one that was a couple exhibits prior to this.

21  Q.  The one between you and the Sachs brothers where you

22  mention 900 more?

23  A.  Um, or it was Mark.  I'm not positive.

24  Q.  So if we look at page six.

25       You say we'll make 900 more, correct?

1   A.  Yes.

2   Q.  And then you say 400K, correct?

3   A.  Yes.

4   Q.  OK.  And how did you calculate 900 to 400K?

5   A.  Probably multiplied it times, like, point one ETH or

6   something.

7   Q.  Because at that time ETH were about 4500, does that sound

8   about right?

9   A.  Sounds about right.

10  Q.  So assuming a mint price of point one ETH, is that the

11  idea?

12  A.  I think so, yeah.

13  Q.  OK.  So here is an interesting point.

14          So let's go back to Plaintiff's 306, and if we can

15  turn to page seven.  Page seven.  Pages six and seven.  I'm

16  sorry.

17          And this is the same day, right, when you're saying

18  you can crank out 900?

19  A.  Yes.

20  Q.  And this is also the same day you're talking about the

21  Dutch auction, correct?

22  A.  Um, I assume so.

23  Q.  OK.  So if we go back down, back to Exhibit 232.  If we can

24  look at 232, page six.

25          So here when you're -- well, if you cannot -- if you

1   can shrink that back.

2              You say 400K, 100K for ya.  That meant 100K you were

3   paying to Mark Design?

4   A.  Yes.

5   Q.  25 percent?

6   A.  About, yeah.

7   Q.  You didn't tell Mark Design about your idea about the Dutch

8   auction?

9   A.  No.  Like I said, my mind is saying a bunch of different

10  things to different people.  Um, it's just whatever is on my

11  mind at the time.

12  Q.  OK.  And if you did the Dutch auction at two ETH, then I

13  guess ETH, if it was at 4500, that means the potential for a

14  second drop would be about $4 million, correct?

15  A.  Approximately.

16  Q.  OK.  And you talked earlier about an experiment of keeping

17  scarcity.

18              How would making 900 more, when you're talking about

19  400K and how much other people make, how does 900 more enter

20  into your experiment of scarcity?

21  A.  At the time there was 50,000, approximately, people in the

22  Discord, so 1,000 total would still be scarce compared to the

23  demand.

24  Q.  Well, didn't you just show -- didn't we just look at a text

25  that said 10,000?

1   A.  10,000 what?

2   Q.  Can we go back to page three, pages two and three.

3        Didn't you say 10K members here?

4   A.  Yes.

5   Q.  OK.  So it wasn't 50,000, it was 10,000?

6   A.  We were growing by thousands of people per day.

7   Q.  Well, OK.  Do you have any document to show that?

8   A.  I don't.  But this context says a few hours later, 10K

9   members.  So you can kind of assume that people were joining.

10  Q.  I didn't ask what you -- I'm sorry.  Go ahead.

11       I didn't ask what you assumed.  I asked you a very

12  simple question.

13       Do you have any documents to show that it ever grew

14  over 10,000 members?

15  A.  Um, that I produced?

16  Q.  Do you have any documents here in court today that you

17  produced, anywhere else?

18  A.  No, but people --

19  Q.  That was my question.  You don't.

20       OK.  So it's 10,000 members.  Now you're saying you're

21  going to produce 900 more?

22  A.  Um, yes.

23  Q.  OK.  So what you're saying, did you speak to any -- did you

24  speak to all 10,000 members?

25  A.  Um, I held different, um, poles to see the demand, we

1    brought up in an earlier exhibit, and I asked the community how

2    many they felt I should continue to make.

3    Q.   That wasn't my question, Mr. Rothschild.

4    A.   I was just giving you context.

5    Q.   That's not context.

6           I asked you if you spoke to the 10,000 members?

7    A.   I make server-wide announcements.  So yes, I speak to them

8    all at once.

9    Q.   Did you speak to the 10,000 members individually?

10   A.   No.  That would be difficult.

11   Q.   OK.  Did you speak to 9,000 of the members individually?

12   A.   No, but I took a poll for all of them, that all of them

13   could have access to and vote for.

14          MR. WARSHAVSKY:  Your Honor, could we have a sidebar,

15   please?

16          THE COURT:  No, because it's time for lunch.

17          So, ladies and gentlemen, enjoy your lunch and we'll

18   see you at two o'clock.

19          (Continued on next page)

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  You can step down.

3              (Witness temporarily excused)

4              Please be seated.

5          I do think that the witness, who earlier was

6     faithfully adhering to my direction that if a question can be

7     answered simply yes or no, it should be without further

8     explanation, and then only if it can't fairly be answered yes

9     or no is further explanation required is not as assiduously

10    applying that direction as he did earlier.

11             Sometimes he offers explanations that are necessary,

12    but many times recently he has not.  For example, the pending

13    question was:  Did you speak personally to all 900, or whatever

14    it was?  And the answer was no, but then he went on to say, but

15    I took a survey or whatever.  I don't have the transcript right

16    in front of me, but the answer was just no, and that's all.

17             So maybe his counsel wants to talk to him a little bit

18    over the break to make sure that he understands the rules of

19    the game.

20             We'll see you at two o'clock.

21             (Luncheon recess)

22

23

24

25

                              AFTERNOON SESSION

                                 2:00 p.m.

1

2

3          (Jury not present)

4          THE COURT:  While we're waiting for the jury, give me

5     the quick overview of the timeline.

6          MR. WARSHAVSKY:  Your Honor, counsel spoke.

7          We expect Mr. Rothschild to go at least today and

8     probably tomorrow morning as well.

9          After that, with Dr. Kominers, we expect between both

10    sides probably 90 to 120 minutes.  So that's direct and cross.

11         After Dr. Kominers, there will be two Hermès

12    employees, Max Moulin and -- I'm sorry, the names -- two

13    employees.  I think between the two of them will be about

14    two hours total, maybe less.

15         There is then two experts.  I think we agreed, between

16    the two of them, maybe two and a half hours total, maybe a

17    little bit longer.

18         There was one witness that both parties had, Kenneth

19    Loo.  We have agreed to cut him.

20         THE COURT:  All right.  It sounds to me --

21         MR. WARSHAVSKY:  Sounds like Friday afternoon.

22         THE COURT:  Sounds to me like the evidence will end

23    Friday afternoon, and we'll have to figure out maybe, we'll

24    have the charging conference Friday night.

25         OK.  Let's bring in the jury.

1          (Jury present)

2          THE COURT:  So, ladies and gentlemen, I've been just

3    going over the schedule with counsel, and I wanted to share

4    that with you, and then we'll get the witness back on the stand

5    in a second.

6          So we are very much on target.  Now tomorrow, we will

7    only sit until one o'clock because of other matters that I have

8    to deal with.  But on Friday we will go until 4:30.  The reason

9    we will do that is we expect to be able to finish the evidence

10   in this case by late afternoon on Friday.

11         Assuming that occurs as planned, then Monday morning

12   we'll have closing arguments of counsel, my charge to the jury,

13   and the case will be yours to start deliberating Monday

14   afternoon.

15         So we are very much on schedule, but I wanted to share

16   that with you.

17         OK.  Let's get the witness back on the stand.

18         MR. WARSHAVSKY:  Thank you, your Honor.

19   BY MR. WARSHAVSKY:

20   Q.  Mr. Rothschild, when we broke we were looking at

21   Plaintiff's Exhibit 232, where you were going back and forth

22   with Mark Design.

23         Do you recall that?

24   A.  Yes.

25   Q.  OK.  Can we turn to page 11 of that exhibit, please.

N21sHER6                           Estival - Cross

1          Here, your text message saying -- do you need to see

2     the tenth page here, just for context, or no?

3          MR. WARSHAVSKY:  Put the tenth page up, Humberto, so

4     he can see both.

5     Q.  Here on page 11 you say, We're sitting on a gold mine.

6          Are you talking about the next drop of the MetaBirkins

7     you were planning?

8     A.  Um, just MetaBirkins entirely.

9     Q.  MetaBirkins entirely.  OK.

10         MR. WARSHAVSKY:  OK.  You can take the exhibit down.

11    Thank you.

12    Q.  I just want to switch gears.

13         Earlier this morning you talked about the negotiations

14    that led up to the lawsuit.  Do you remember that?

15    A.  Yes.

16    Q.  OK.  Your counsel was speaking to Hermès' counsel at the

17    time, is that right?

18    A.  Yes.

19    Q.  OK.  And are you aware that your counsel had provided

20    Hermès' counsel with a deadline to conclude negotiations on the

21    same day that you were sued?

22         MR. HARRIS:  Objection, your Honor.

23         THE COURT:  Hang on.  Let me see.

24         Well, even though the door was opened, I think in the

25    end it's more a matter for confusion than for probative value.

1   On 403, I sustain the objection.

2              MR. WARSHAVSKY:  Understood, your Honor.

3   Q.  Mr. Rothschild, I want to ask you a little about the

4   Parsons project that we spoke about.

5   A.  Yes.

6   Q.  So you just said you were engaging in artistic expression

7   because people wanted Parsons T-shirts and you made it for

8   them, is that right?

9   A.  Well, it was my take on what I thought it should look like.

10  Q.  OK.  What did the Parsons T-shirts look like at that time?

11  A.  The ones that I created?

12  Q.  No, the ones that Parsons was selling.

13  A.  I can't remember specifically.

14  Q.  Well, tell us of the design.  Did it have the Parsons name?

15  A.  Um, not that I remember.

16  Q.  What color was it?

17  A.  Um, various colors.  There was -- they had a certain line

18  of merchandise at their store.

19  Q.  So you don't remember, sitting here today you don't

20  remember what it looked like?

21  A.  It was a while back.

22  Q.  OK.  You said that Saint Martins liked your work and wanted

23  to partner with you, is that correct?

24  A.  Somebody from their student store reached out.

25  Q.  OK.  Did you ever produce in this case any of that

1    correspondence?

2    A.  I do not have e-mails from 2015.

3    Q.  OK.  We just have your word for it?

4    A.  Correct.

5    Q.  OK.  Chair one, we talked about the Do Not Sit.  Do.

6          You remember we spoke a little about that and we spoke

7    about chair one, chair two?

8    A.  Um-hmm.

9    Q.  OK.  Can we call chair one the one that went from one ETH

10   and the chair two went for something less.

11         Does that make sense?

12   A.  Yeah.

13   Q.  OK.  Chair one, was that the one that you said was done

14   by -- that was based on Pierre Jeanneret, was that the name?

15   A.  Yes.

16   Q.  Now, by the way, if I understood counsel correctly,

17   somebody else generated that image for you, correct?

18   A.  Yes.

19   Q.  Was that Mark Design?

20   A.  Yes.

21   Q.  OK.  He wasn't named anywhere on the project?

22   A.  No.

23   Q.  OK.  And you didn't call that the Pierre Jeanneret chair,

24   right?

25   A.  No, it's called Do --

1   Q.  I'm sorry.  Go ahead.

2   A.  No, it's called Do Not Sit.

3   Q.  OK.  But you didn't have anything calling it metakangaroo

4   chair or metaPierreJeanneret in any of your marketing?

5   A.  No, but I put it in the description.

6   Q.  So in the description it was called met -- I'm asking the

7   title of the work?

8   A.  It was called Do Not Sit.

9   Q.  You didn't have a website called kangaroo chair or Pierre

10  Jeanneret?

11  A.  No.

12  Q.  You didn't say Not Your Father's kangaroo chair or

13  something like that for advertising it?

14  A.  No.

15  Q.  Did you ask people -- you talked a little bit about pumping

16  and chilling.

17          Did you ask anybody to pump and chill for you for

18  that?

19  A.  No.

20  Q.  And you said it was sold for one ETH, correct?

21  A.  Yes.

22  Q.  Isn't it true that a friend bought that from you?

23  A.  Yes.

24  Q.  OK.  And then we talked about chair two.

25          Chair two, that was the one where it was a Michel

1    Ducaroy, am I he pronouncing that correctly?

2    A.  I'm not sure, but sounds about right.

3    Q.  Sound about right.

4         You know which one I mean?

5    A.  Yes.

6    Q.  OK.  You didn't call that the metaMichelDucaroy chair?

7    A.  No.

8    Q.  And you didn't have a website that used Michel Ducaroy's

9    name?

10   A.  No.  I sold on Foundation.

11   Q.  Did anybody pump or chill for that chair?

12   A.  Um, people talked about it, but -- which is what that kind

13   of means.  But I didn't describe it as that.

14   Q.  OK.  You minted that chair on about April 3, correct;

15   April 3, 2021, correct?

16   A.  Sounds right.

17   Q.  OK.  And at that time you listed it for about 1 ETH,

18   correct?

19   A.  Um-hmm.

20   Q.  And no one bought it at that price, right?

21   A.  No.

22   Q.  And about on April 5, 2021, you reduced it .5 ETH, right?

23   A.  Yes.

24   Q.  And nobody bought it then right?

25   A.  No.

N21sHER6                        Estival – Cross

1   Q.  On April 14, you actually reduced it to .33 ETH, correct?

2   A.  Yes.

3   Q.  And nobody bought it then, right?

4   A.  No.

5   Q.  OK.  And then it actually took until November 30, 2021,

6   after you teased the MetaBirkins for somebody to buy that,

7   right?

8   A.  I don't know the dates.

9   Q.  Does that sound about right?

10  A.  Could be.

11  Q.  And who bought -- let me ask it better.

12          One of your friends bought that chair from you, too,

13  right?

14  A.  Not one of my friends, but a friend of a friend.

15  Q.  A friend of a friend.  OK.

16          Now, your next project after the Do Not Sit was the

17  Baby Birkin, correct?

18  A.  Um-hmm.

19  Q.  And this time you did copy -- I think as you testified, you

20  copied the outline of the Hermès Birkin bag, correct?

21  A.  Um-hmm.

22  Q.  And I don't know if you said -- I apologize for asking

23  again.

24          Did Mark Design do the animation for that as well?

25  A.  Yes.

1   Q.  But he's not credited anywhere?

2   A.  No.

3   Q.  Just you and Eric Ramirez?

4   A.  Yes.

5   Q.  And this sold for much more, correct, ten times that

6   amount?

7   A.  Approximately.

8   Q.  And, by the way, did you bid on the Baby Birkin yourself?

9   A.  No.

10  Q.  No.  Do you remember me asking you about this at your

11  deposition?

12  A.  I was the first bid.

13  Q.  So you did bid on it?

14  A.  Yes.

15  Q.  So had you won the bid, you would have bought it from

16  yourself?

17  A.  For 100, yes.  It would be minted.

18  Q.  OK.  Was that an effort to prop up the price?

19  A.  No, it was just to -- I wanted to own my artwork.  So,

20  like, when you bid, it would have to be minted.  So it wasn't

21  minted until somebody bid on it.

22  Q.  OK.  And at that time, you didn't -- you didn't have a

23  *BabyBirkin.com* website, did you?

24  A.  No.

25  Q.  You didn't ask anybody to pump and chill for that, did you?

N21sHER6                           Estival - Cross

1   A.  Um, not that I recall.  But, I mean, like, people knew

2   about it, told people about it, and we did promote it to NFT

3   collectors at the time.

4   Q.  OK.  Well, in this case, again, I think we heard your

5   lawyer in opening statement say that you produced thousands of

6   text messages.

7           Were any of those text messages about pumping and

8   chilling the Baby Birkin?

9   A.  I'm not sure.

10  Q.  OK.  And you only made one, correct?

11  A.  Yeah.

12  Q.  And we'll get into it a little bit later.

13          For the MetaBirkins, you had to build a MetaBirkins

14  campaign, correct?

15  A.  It was a contest.

16  Q.  You didn't do that for Baby Birkin, did you?

17  A.  No.

18  Q.  Just to contrast, just to finish this thought, for the

19  MetaBirkins you made 100, correct?

20  A.  Yes.

21  Q.  You made a *MetaBirkins.com* website, correct?

22  A.  Yes.

23  Q.  You made social media accounts, including Twitter,

24  Instagram, and Discord, correct?

25  A.  Yes.

1    Q.  And that is something you didn't do for prior projects?

2    A.  No, because they were just one.

3    Q.  And in some of your promotion, you actually encouraged

4    others to make MetaBirkins with household items like the

5    MetaBirkins, like the build-your-own MetaBirkin, correct?

6    A.  Yes.

7    Q.  And as you discussed with counsel, we'll discuss in a

8    little bit, you actually asked influencers to pump and chill

9    for you for the MetaBirkins, correct?

10   A.  Yes.

11   Q.  And you sought whales to sweep the floor, am I saying that

12   correctly?

13   A.  Um-hmm.

14   Q.  And is that correct?

15   A.  Yes.

16         MR. WARSHAVSKY:  OK.  Let's talk a little about the

17   MetaBirkins name and slogan.

18         Now, Humberto, can you please bring up Exhibit 238,

19   just to the witness, the court and defense counsel, please.

20   Q.  OK.  Have you seen this document before?

21   A.  Yes.

22   Q.  Can you tell us generally what it is?

23   A.  It is the same post from Instagram announcing what was to

24   eventually be called MetaBirkins and then asking people to

25   suggest names.

1   Q.  OK.  But it's a Twitter post on your account?

2   A.  Yes.

3           MR. WARSHAVSKY:  Move into evidence, your Honor.

4           MR. HARRIS:  No objection.

5           THE COURT:  Received.

6           (Plaintiff's Exhibit 238 received in evidence)

7   Q.  OK.  So this is the contest, the other side of the contest

8   that you ran on Twitter, right?

9   A.  Yes.

10  Q.  And as you said, you were requesting names and --

11          MR. WARSHAVSKY:  Oh, I'm sorry.  Humberto, please

12  furnish to the jury.

13          Done?

14          OK.  One step ahead of me.

15  Q.  This is where you were requesting the names, and I think

16  earlier you noted that someone named Makisa had responded,

17  correct?

18  A.  Yes.

19  Q.  And actually, if we can go down, I guess, to the Makisa

20  response.  You see it on the page.  Can you maybe blow it up a

21  little bit.

22          Clearly that same day she wrote back to you

23  MetaBirkin, correct?

24  A.  Yes.

25  Q.  And earlier when you spoke, you said the reason that you

1   didn't provide something to Makisa was because you received a

2   response on Instagram, is that correct?

3   A.  Yes.

4   Q.  Do you remember I asked you about this at your deposition?

5   A.  Yes.

6   Q.  OK.  And do you remember what you responded at your

7   deposition?

8   A.  Um, I think I responded incorrectly, but I looked after the

9   deposition to verify.

10  Q.  So at your deposition when you were testifying under oath,

11  what you did you say to us?

12  A.  I would have to get a reminder.  I think I said that --

13  Q.  We'll show it to you.

14          Can we furnish the witness and his counsel with his

15  deposition testimony.

16          So do you see where I'm looking at line 15 to 18?

17  A.  Yes.

18          MR. HARRIS:  Do you have a hard copy?

19          MR. WARSHAVSKY:  Do I have a hard copy?

20          MR. HARRIS:  I'm sorry.  What page is this, please?

21  BY MR. WARSHAVSKY:

22  Q.  What response did you give to me at your deposition?

23  A.  We ended up coming up with a name prior to this actually.

24  We had a few variations.

25  Q.  So now you're saying that that testimony was wrong?

N21sHER6                        Estival - Cross

1   A.  That testimony was incorrect.  I looked it up after.

2              MR. WARSHAVSKY:  OK.  If we can go back to the Twitter

3   post, please.

4              The Twitter post -- sorry.  If we can go to

5   *JessLozano*.  I don't know how to pronounce it.

6              Down a little.  There you go.

7              Can you please blow up the two November 3 ones.

8   Q.  This user -- I'm not sure how to say that -- wrote back and

9   in the first post on November 3 said Not Your Mom's Birkin.

10             Do you see that?

11  A.  Yes.

12  Q.  OK.  And ultimately you used Not Your Mother's Birkin as

13  your slogan on your website, correct?

14  A.  Yes.

15  Q.  Did you give this person a MetaBirkin?

16  A.  No, because it was not the name.

17  Q.  Oh, because it was Not Your Mother's Birkin rather than Not

18  Your Mom's Birkin?

19  A.  Yes.  And we also knew of this Slogan.  Tiffany's was using

20  it at the time to describe Not Your Mother's Tiffany.

21  Q.  I see.  So, well, all right.  We can close this exhibit.

22             So you used the same -- I'm sorry.

23             Who was using it?

24             What was the name of that person?

25  A.  Tiffany's.

1    Q.  You were using the Tiffany's logo, you just changed it to

2    Birkin?

3    A.  There was no logo.

4    Q.  I'm sorry.  Slogan?

5    A.  Um, the slogan is people attach not your mother's to a lot

6    of things, like, not your mother's cheesecake or not your

7    mother's cooking or something like that.  It's a common saying,

8    but I've seen the ads from Tiffany's most recently.

9    Q.  So Tiffany's doesn't an ad for itself Not Your Mother's

10   Tiffany?

11   A.  I think so.  It's something like that.

12   Q.  OK.  But you didn't say Not Your Mother's MetaBirkin, you

13   said Not Your Mother's Birkin, correct?

14   A.  Yes.

15           MR. WARSHAVSKY:  OK.  So let's take a look at your

16   website for a second.

17           You know what, if we can look at actually Plaintiff's

18   Exhibit 227.  I'm going to try to cut through a few of these.

19   If we can blow it up a little bit.

20           You know, I'm sorry.  Has this been admitted?  It has,

21   right?  OK.  So the jury should be able to see it.

22   BY MR. WARSHAVSKY:

23   Q.  This is the website we looked at before?

24   A.  Yes.

25   Q.  Can you tell me what this means where it says mint for

1    .1 ETH?

2    A.  To purchase it for .1 ETH.

3    Q.  OK.  All right.  If someone were to press that button with

4    a mouse or something or on your phone with a finger?

5    A.  Yeah, it's a button.

6    Q.  OK.  And where does that go to?

7    A.  Um, it opens a minting interface with whatever wallet you

8    have.

9    Q.  OK.  And you didn't do the minting yourself on your own

10   website, is that correct; it was a different website this went

11   to?

12   A.  Um, no.  We did it on this website.

13   Q.  OK.  So this -- so the minting is actually on the website

14   itself?

15   A.  Um, not really.  So it's done on a website, but to interact

16   with any Web3 website, you have to have a wallet, which is

17   usually an extension on your browser or your phone, which is an

18   interface that allows you to mint off of a website.

19   Q.  OK.  So but your site was the gateway for that, it wasn't

20   another site?

21   A.  Yes, it was on our site.

22   Q.  And just so I understand because you talked a little bit

23   about your own MetaBirkins.

24          Did you mint any of the MetaBirkins NFTs yourself?

25   A.  I believe I minted one.

1    Q.  Isn't it true that one of the MetaBirkins was transferred

2    to you after the mint?

3    A.  Yes.

4    Q.  And before you talked about three different MetaBirkins

5    that were minted at the beginning, and I guess what would you

6    say, weren't given to random people, is that correct?

7    A.  Weren't given to random people?

8    Q.  Let me ask it better.

9           I think you said you could account for three

10   MetaBirkins; one that went to you, two that went to

11   programmers, is that correct?

12   A.  Yeah, I think --

13   Q.  OK.

14   A.  Yeah, so it went to a member of my team.

15   Q.  OK.  Two of them went to members of your team?

16   A.  Yep.

17   Q.  And one went to you?

18   A.  Yes.

19   Q.  And those were actually NFTs, one, two, and three, correct?

20   A.  Um, I'm not positive of the number, to be honest.

21   Q.  OK.  Which one do you own?

22   A.  I think I have one.

23   Q.  OK.  But you're not sure if two and three went to your

24   workers?

25   A.  Um, it did, but I'm not sure if those were the ones that

1    were transferred.

2    Q.  Well, did NFT number two and NFT number three --

3         Let's start with just one.  Did NFT number two go to

4    one of the people that worked with you?

5    A.  Yeah.

6    Q.  Did NFT number three go to one of the people that worked

7    for you?

8    A.  Yes, but I'm not saying which ones were transferred.  The

9    question prior to that was about transferring them out or

10   transferred to your wallet, and I'm not sure if two and three

11   were transferred to my wallet.

12   Q.  I wasn't -- I appreciate that.  I'm going -- I wasn't

13   referring to the prior question.  Thank you.

14        So, but the point is that while everybody else got

15   random assignments, you and these two developers got numbers

16   one, two, and three, is that correct?

17   A.  No, they mint chronologically.

18   Q.  I see.  And you and the developers minted first, second,

19   and third?

20   A.  Yes, to test the contract.

21        MR. WARSHAVSKY:  OK.  If we can show Mr. Rothschild,

22   defendant's counsel, and the court Plaintiff's Exhibit 313.

23   Q.  This is a text message among you, Mr. Sachs, Mr. Lee, both

24   Mr. Sachs and Mr. Lee.

25        Do you see that?

1   A.  Yes.

2   Q.  You produced that in this case?

3   A.  Yes.

4           MR. WARSHAVSKY:  We would offer into evidence subject

5   to the same limitations, your Honor.

6           THE COURT:  Yes.

7           MR. HARRIS:  Same objection, your Honor.

8           THE COURT:  Received subject to the same limitation.

9           MR. WARSHAVSKY:  OK.

10          (Plaintiff's Exhibit 313 received in evidence)

11  BY MR. WARSHAVSKY:

12  Q.  If we turn to page three.  You can look at two and three

13  just to give yourself, refresh your recollection.

14          Do you see on page three you're giving -- now if we

15  can show the witness pages three and four --

16          OK.  So here is a text message from you to Mr. Sachs

17  with a link and what looks to be a screenshot, is that correct?

18  A.  Yes.

19  Q.  OK.  This is where you tell Truman Sachs to go mint?

20  A.  Yes.

21  Q.  OK.  So is this the point at which an NFT purchaser would

22  actually purchase a MetaBirkin NFT?

23  A.  Can you rephrase the question?

24  Q.  Well, let me ask it just about Mr. Sachs.  Is this the

25  point when Mr. Sachs goes to mint, is that the point in time at

1   which he would purchase his MetaBirkins NFT when he went to

2   mint?

3   A.  Yes.

4   Q.  OK.  And that's the same for everybody?

5   A.  Um-hmm.

6   Q.  OK.  And this is what -- this screenshot is what that

7   person would see?

8           THE COURT:  I'm sorry.  The witness simply said

9   um-hmm.  You have to say yes or no.  I take it that was a yes?

10           THE WITNESS:  Oh, yes, yes.  Sorry.

11  BY MR. WARSHAVSKY:

12  Q.  If we can show the image that's attached to that?

13  A.  Wait, sorry.  I wasn't saying yes to the question.  I can't

14  see the screenshot or the picture.

15  Q.  I realized the same thing.  If we can go to the --

16           OK.  So this is, again, this is the way these were

17  produced.  I'm not sure if it was you, your vendor, how it

18  happened, but the images come at the end of the text chain,

19  right, which we've discussed before.

20           This is what the mint screen would look like?

21  A.  Yes.

22  Q.  OK.  And this doesn't say secure the art, does it?

23  A.  No.

24  Q.  It doesn't say secure the MetaBirkin, does it?

25  A.  No, but it's a play on words.

1    Q.  It says secure the bag?

2    A.  Um-hmm, yes.

3    Q.  And is there a disclaimer here?

4    A.  To disclaim what?

5    Q.  Is there any sort of disclaimer here?

6    A.  No.

7    Q.  And on the mint site itself, where it said MetaBirkins, was

8    there any disclaimer saying it was not affiliated with Hermès

9    at this time?

10   A.  Not at this time.

11   Q.  OK.  This is the image -- just because I'm not sure, there

12   is a little colloquy with one of the answers -- this is what

13   any purchaser of a MetaBirkin would see when they went to the

14   site?

15   A.  If they were whitelisted.

16   Q.  If they were whitelisted.  OK.

17           All right.  Do you know how many people actually

18   minted your MetaBirkin NFTs?

19   A.  Like, how many human beings?

20   Q.  Yes.

21   A.  100.

22   Q.  OK.  Do you know that for a fact, or are you just guessing?

23   A.  Since there is 100, then yeah, it would be 100 people.

24   Maybe a little bit less because the team minted two.

25   Q.  So when someone minted an NFT, they become the holder of

1    the NFT, is that what you were saying?

2    A.  Like, the owner.

3    Q.  The owner?

4    A.  Yes.

5    Q.  OK.  So do you know any of the owners of the MetaBirkin

6    NFTs?

7    A.  Just the ones that are, like, friends and family.

8    Q.  OK.  So who is that?

9    A.  It's about 20 people.

10   Q.  Was it about, or can you name them quickly?

11   A.  Um, I can name them.  My fiancée, Truman, his brother,

12   Garrett Micah, celebrities, Future, La La.  Um, that's all I

13   can think of right now.

14   Q.  OK.  So including you and your developers, it seems like

15   there are about ten people that you can think of right now,

16   correct?

17   A.  About.

18   Q.  OK.  When you said celebrities, the celebrities you're

19   talking about are Future and La La?

20   A.  There's more, but I just can't think of them right now.

21   Q.  You can't think of them now.  OK.

22           Now, you think there about up to ten other holders

23   that you may know or you may have known at one time?

24   A.  About, yeah.

25   Q.  Of the other 80, do you know who they are?

1   A.  Just by their, like, username in Discord.

2   Q.  Do you know who they are?

3        Do you know their names?

4   A.  Not their legal names.

5   Q.  Do you know their phone numbers?

6   A.  I don't think so, no.

7   Q.  Do you know their e-mail addresses?

8   A.  No, just their wallet.

9   Q.  OK.  Well, do you know where they live?

10  A.  No.

11  Q.  OK.  When you say a wallet, you're talking about a

12  30-character string on the blockchain?

13  A.  Yes.

14  Q.  So would you agree with me that these people are either

15  anonymous or pseudonymous holders?

16  A.  From their legal name, but I interacted with them on a

17  daily basis in Discord.

18  Q.  I'm not sure I understood your answer.  I asked you would

19  you agree with me that they are anonymous or pseudonymous.

20       You don't know their names but you might know a

21  30-character string?

22  A.  I also know their Discord.

23  Q.  So you might know their Discord?

24  A.  Yes.

25  Q.  And when you say you know their Discord, you mean a user

1    handle?

2    A.   User handle.

3    Q.   On Discord?

4    A.   On Discord.

5    Q.   And you know all 80 of them?

6    A.   Not all 80, just who verifies.

7    Q.   OK.  And about how many verify?

8    A.   I'm not sure.

9    Q.   OK.  So would it be more than ten people that were

10   verified?

11   A.   Yes.

12   Q.   More than 20?

13   A.   Um, I would say about maybe half.

14   Q.   So up to 50?

15   A.   Up to 40.

16   Q.   Up to 40.  OK.

17            And have you ever spoken to these people over the

18   phone?

19   A.   No.

20   Q.   OK.  Did you ever text message with any of them?

21   A.   No.

22   Q.   OK.  So yesterday -- I'm sorry, not yesterday -- on Monday

23   when Mr. Millsaps was giving his opening statement, he said

24   nobody was confused about what they were buying when they

25   bought the MetaBirkins NFTs and artworks.

1          Did he speak -- do you know whether he spoke to any of

2     these people?

3     A.  Um, no.

4     Q.  OK.  Do you know if he texted with them or otherwise spoke

5     to them, otherwise was in communication with them?

6     A.  No.

7     Q.  Was he in touch with them on Discord?

8     A.  No.

9     Q.  OK.  So after minting, the MetaBirkins went on blockchain,

10    correct?

11    A.  Yes.

12    Q.  And they were added to NFT marketplaces like OpenSea and

13    Rarible that we've discussed?

14    A.  Yes.

15    Q.  And they were delisted from OpenSea and Rarible, is that

16    correct; they were delisted from a few?

17    A.  Yes.

18    Q.  But they are still available on LooksRare?

19    A.  Yes.

20          MR. WARSHAVSKY:  I would like to show Plaintiff's

21    Exhibit 386, please.

22          I'm sorry, just to the -- I keep doing this -- the

23    witness, judge, and defense counsel.

24    Q.  Have you seen this document before?

25    A.  Yes.

1   Q.  Are those the 100 MetaBirkin NFTs?

2   A.  This is six and a half of them, but they should all show in

3   there.

4   Q.  OK.  If we can scroll to the next page for the witness.

5   It's a 12-page exhibit, right?

6           OK.  So does this look like the NFT marketplace

7   LooksRare for the MetaBirkins NFTs?

8   A.  Yes.

9   Q.  And you linked to this website from the *MetaBirkins.com*

10  website, is that correct?

11  A.  At a certain point, yes.

12          MR. WARSHAVSKY:  All right.  Your Honor, we would move

13  this into evidence.

14          MR. HARRIS:  No objection, your Honor.

15  Q.  So the MetaBirkins can be bought and sold here, is that

16  correct?

17  A.  Yes.

18  Q.  Is there a disclaimer on this site?

19  A.  No.

20          MR. WARSHAVSKY:  If we can go to Plaintiff's Exhibit

21  230, please, to show the witness, defense counsel and the

22  court.

23  Q.  Do you know what this is, Mr. Rothschild?

24  A.  Rarible.

25  Q.  This is the way the site previously looked, is that right?

1    A.  Yes.

2    Q.  And these are the MetaBirkin NFTs, correct?

3    A.  Yes.

4    Q.  And this is a marketplace for the MetaBirkins NFTs,

5    correct?

6    A.  Yes.

7    Q.  And you linked this website from the *MetaBirkins.com*

8    website, is that correct?

9    A.  At a certain point, yes, when it was listed on there.

10              MR. WARSHAVSKY:  OK.  We'll move this into evidence.

11              MR. HARRIS:  No objection.

12              THE COURT:  Received.

13              (Plaintiff's Exhibit 230 received in evidence)

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          MR. WARSHAVSKY:  Your Honor, there was a question

2  about whether you received the previous exhibit.  I thought you

3  had, but it is unclear.

4          MR. HARRIS:  There was no objection, your Honor.

5          THE COURT:  Received.

6          (Plaintiff's Exhibit 386 received in evidence)

7          MR. WARSHAVSKY:  Sorry about that.

8  BY MR. WARSHAVSKY:

9  Q.  So looking at this, was this a description that was used

10  across all of the NFT marketplaces that sold the MetaBirkins?

11  A.  No.

12  Q.  Okay.  Where was it different?  I am talking about the

13  description along the top.

14  A.  The digital art project by Mason Rothschild.

15          What was the question?

16  Q.  Was this a description -- the MetaBirkins name

17  @MetaBirkinsNFT, I realize that the sale prices might have

18  changed, but is this generally what the different NFT

19  marketplaces looked like -- the description of MetaBirkins on

20  the NFT marketplaces looked like?

21  A.  I think so.  Yes.

22  Q.  Once again, on this one there's no disclaimer, correct?

23  A.  Yes.

24  Q.  All right.  For each of these -- I think we discussed it

25  earlier, but you received a royalty from the resale on any of

 1   these NFT marketplaces, is that correct?

 2   A.  Yes.

 3   Q.  And was that a consistent rate across the different

 4   marketplaces?

 5   A.  I think seven and a half across.

 6   Q.  Okay.  Thank you.

 7         You also ran -- we have talked a little bit about it,

 8   but just to make clear, you ran a number of social media

 9   accounts, correct?

10   A.  Like four --

11   Q.  Let me ask a better question.  You ran a number of social

12   media accounts to promote the MetaBirkins, correct?

13   A.  Yes.

14   Q.  What were they?

15   A.  MetaBirkins on Twitter and MetaBirkins on Instagram.

16   Q.  And also Discord?

17   A.  Oh, yeah.

18   Q.  Okay.  Did you also promote the MetaBirkins on your own

19   personal accounts on Twitter and Instagram?

20   A.  Yes.

21         MR. WARSHAVSKY:  Okay.  I would like to show now

22   Plaintiff's Exhibit 242 to the witness, defense counsel, and

23   the Court.

24   BY MR. WARSHAVSKY:

25   Q.  This is a text exchange that was produced by you in

1    discovery, correct?

2    A.  Yes, but I can't tell who it's to.

3    Q.  The redaction on some of these are to protect personal

4    information and are made by your team actually.  We agree with

5    them by the way.  I don't mean to --

6           MR. WARSHAVSKY:  Is there one you can furnish the

7    witness that doesn't have the redactions, so he can see who

8    it's with.

9    BY MR. WARSHAVSKY:

10   Q.  You will see here it is a text between you and just a phone

11   number.

12   A.  Yes, I just don't know what the phone number is.

13   Q.  You don't know who that refers to?

14   A.  I don't know phone numbers really.

15          MR. WARSHAVSKY:  Okay.  If we can scroll down.

16   BY MR. WARSHAVSKY:

17   Q.  Does looking at this give you any further indication of who

18   this could be?

19   A.  I still don't know who it is.

20   Q.  Okay.  Is it possible that you previously might have

21   thought this was somebody named NFT Kings?

22   A.  Oh, yes.

23   Q.  Okay.  Could this be NFT Kings?

24   A.  Possibly, yes.

25   Q.  Okay.  Just -- who is --

1          MR. WARSHAVSKY:  So if we could put back up the

2    redacted exhibit.

3    BY MR. WARSHAVSKY:

4    Q.  Who is NFT Kings?

5    A.  He's an NFT influencer.

6    Q.  This is a text exchange you produced in this, correct?

7    A.  Yes.

8          MR. WARSHAVSKY:  We would offer it into evidence

9    subject to the same restriction, your Honor.

10          MR. HARRIS:  No objection, your Honor.

11          MR. WARSHAVSKY:  Your Honor, can we refer it to the

12    jurors.

13          THE COURT:  Yes.

14          MR. WARSHAVSKY:  Could we turn please to page 4 of

15    this document.

16          THE COURT:  I should have said "received."

17          (Plaintiff's Exhibit 242 received in evidence)

18    BY MR. WARSHAVSKY:

19    Q.  I'm sorry, pages 3 and 4, so you can take a look at it.  So

20    here you are having a discussion with NFT Kings?

21    A.  Yes.

22    Q.  And are these generally discussions about how the

23    MetaBirkins are being received by whales?

24    A.  Can you ask a --

25    Q.  Maybe that is a tough one, since I don't know this.

1              MR. WARSHAVSKY:  Maybe let's look at page 4 and 5.

2       BY MR. WARSHAVSKY:

3       Q.  Here NFT Kings is asking about your royalty rate, is that

4       right?

5       A.  Yes.

6       Q.  And he asked you for after sale and you say seven and a

7       half percent, correct?

8       A.  Yes.

9       Q.  Then he asks you, "Personally or including OS fee?"

10             Is "OS" OpenSea?

11      A.  Yes.

12      Q.  You say, "Personally so 10," right?

13             So that means consumers pay a 10 percent royalty and

14      two and a half goes to OpenSea, and seven and a half goes to

15      you.

16      A.  Yes.

17      Q.  If we look at your last text here, can you read that?

18      A.  Oh, Luxury tax -- luxury product luxury tax, maybe.

19      Q.  Okay.  You are talking about the MetaBirkins there as a

20      luxury product?

21      A.  Yes.

22             MR. WARSHAVSKY:  Okay.

23             Can we turn to Plaintiff's Exhibit 100, please.

24             This is a very long exhibit, so I would ask to go to

25      page 502.

    1    BY MR. WARSHAVSKY:

    2    Q.  Is page 502 a tweet by you?

    3    A.  Yes.

    4             MR. WARSHAVSKY:  Okay.  We would move page 502 of this

    5    exhibit, so just the pages on the screen into evidence.

    6             MR. HARRIS:  May I have one second, your Honor?

    7             THE COURT:  Yes.

    8             MR. HARRIS:  No objection to the page, your Honor.

    9             THE COURT:  Page 502 is received.

   10             (Plaintiff's Exhibit 100, page 502 received in

   11    evidence)

   12             MR. WARSHAVSKY:  Can you please -- well, can we

   13    furnish it to the jury.

   14    BY MR. WARSHAVSKY:

   15    Q.  In your tweet here you are talking about rose gold, do you

   16    see that?

   17    A.  Yes.

   18    Q.  What does it mean that rose gold is the rarest hardware in

   19    the MetaBirkins collection?

   20    A.  There's the least amount of them.

   21    Q.  Okay.  And what is a hardware collection?

   22    A.  Just like the little lock that you see.

   23    Q.  So you're referring to the lock?

   24    A.  Yeah.

   25    Q.  Okay.  And that's kind of like an Hermès rose gold

1    hardware, correct?

2    A.  I am not sure if they make rose gold.

3    Q.  But you are referring to hardware the same way Hermès might

4    when you are talking about the lock?

5    A.  Any metal piece.

6              MR. HARRIS:  Objection to that, your Honor.

7              THE COURT:  Sustained.

8    BY MR. WARSHAVSKY:

9    Q.  Is there gold in this NFT?

10   A.  Is there what?

11   Q.  Is there actual gold in this NFT?

12   A.  No, it is digital.

13   Q.  So it is just a color?

14   A.  Yes, rose gold is a color.

15   Q.  It's a color meant to look like rose gold?

16   A.  Yes.

17   Q.  Do you know whether or not Hermès sells rose gold hardware

18   on its bags?

19   A.  I am not sure.

20   Q.  Okay.  Do you know whether Hermès refers to something like

21   the lock as the hardware on the bag?

22   A.  Most people do.

23   Q.  Most people do?

24   A.  Yes.

25   Q.  So -- okay.  That's how most people would talk about

1   real-world products?

2   A.  Yeah, hardware.

3   Q.  Okay.  And when you say rose gold is rare, what do you mean

4   by that if it is just a color?

5   A.  There's the least amount of them, that I said earlier.

6   Q.  Well, fair enough.

7        I guess what I'm trying to understand is, when you say

8   there's the least amount, do you mean the least amount in this

9   picture or do you mean the least amount -- let me ask it a

10  better way.  I am not doing a good job here.

11       Let me try to make it easier.

12       Is the rose gold made with the same software as

13  everything else?

14  A.  Yes.

15  Q.  It is just a color on the palette of all colors that might

16  be available to use in the same software?

17  A.  Ah --

18  Q.  No?

19  A.  Can you ask you it --

20  Q.  Sure.  Is there any -- let me break it down.

21       Is the rose gold color made by the same software as

22  everything else?

23  A.  Yes.

24  Q.  In that software, is it harder to use the rose gold?

25  A.  No.

N21nher5                          Estival - Cross

1    Q.  Could someone make a product of rose gold just as easily as

2    they could, say, yellow?

3    A.  Yes.  It's a color.

4    Q.  So what about the rose gold here makes it rare?

5    A.  I'm saying it's the least amount in the collection.  It

6    appears the least amount of times out of the hundred.

7    Q.  Okay.  So is that meant --

8            MR. WARSHAVSKY:  Okay.  I understand.

9            If we could go to Plaintiff's Exhibit 306 to furnish

10   to the Court and the witness and defense counsel.

11           This exhibit has already been admitted for limited

12   purposes I think.  So per the -- this has been received for the

13   limited purpose as discussed.

14           If we could turn to page 3, please.

15           All right.

16   BY MR. WARSHAVSKY:

17   Q.  So the date on this I think you saw was November 30?

18           MR. WARSHAVSKY:  Can you go back to the first page so

19   we can confirm that.

20   BY MR. WARSHAVSKY:

21   Q.  November 30?  Do you agree with me?

22   A.  Yes.

23   Q.  This is the text exchange between you and Alex and Truman

24   Sacks, correct?

25   A.  Yes.

1    Q.  By the way, I see that this person Alex Sacks.  Alex Sacks

2    and Moshe Sacks, is that the same person?

3    A.  Yes.

4    Q.  When we've seen three names Sacks, there's Truman Sacks,

5    and Alex and Moshe Sacks are the same person, correct?

6    A.  Yes, he just goes by Alex.

7    Q.  So sometimes you see it as Alex; sometimes you see it as

8    Moshe?

9    A.  Yes.

10   Q.  Okay.  Got it.

11          MR. WARSHAVSKY:  So we could turn to page 3.

12   BY MR. WARSHAVSKY:

13   Q.  Here you are discussing another launch of the MetaBirkins,

14   correct?

15   A.  Yes.

16   Q.  And you said, "so people gifted" -- at the bottom you say

17   -- "and we can do a TikTok campaign.

18          Do you see that?

19   A.  Yes.

20   Q.  What is a TikTok campaign?

21   A.  Just post something with, like, a hashtag.

22   Q.  That is another way to market products over social media?

23   A.  Like, yeah, to make it viral.

24   Q.  So promotion maybe is a better way to say it?

25          When you say "make it viral," you mean so lots of

N21nher5                          Estival – Cross

1  people see it?

2  A.  Yes.

3  Q.  Okay.  What does a hashtag mean?

4  A.  A hashtag is –– a hashtag is like –– if you click on a

5  hashtag, it takes you to the same conversation that people are

6  having about a certain thing that they hashtag.  So it's

7  like ––

8  Q.  It is a way to organize a campaign?

9  A.  No.  I mean, it's just like –– it's only use is not just

10 that –– it is just a reference point for everybody to –– if you

11 want to have a conversation about something, you utilize a

12 hashtag to find people that are having that same conversation.

13 Q.  Okay.  So the hashtag campaign you were thinking of here is

14 what?

15 A.  Finally got my Birkin.

16 Q.  Finally got my Birkin; not finally got my MetaBirkin,

17 correct?

18 A.  Correct.

19 Q.  When you say "finally" here –– well, strike that.

20         Do you buy NFTs?

21 A.  Yes.

22 Q.  Okay.  There was discussion both by you and I think by the

23 expert about the NFT market, right?

24         Do you buy a lot of NFTs or no?

25 A.  That's kind of up for debate.  I mean, probably not as much

1   compared to the next person, but I think I have like a hundred.

2   Q.  Okay.  About a hundred more than me.

3         Have you ever been bought a Bored Ape Yacht Club NFT?

4   A.  Yes.

5   Q.  Is Bored Ape Yacht Club a popular NFT brand?

6   A.  It is a popular -- it's the best selling NFT project.

7   Q.  Okay.  Is it the most well known do you think?

8   A.  It is up for debate, but to me between that and like Punks.

9   Q.  Punks.  Okay.  What about Doodle?

10  A.  Also a very popular one.

11  Q.  Have you ever bought a Doodle NFT?

12  A.  I did for a giveaway, but not for my own self.

13  Q.  Did you ever collaborate with either Doodle or Bored Ape?

14  A.  No.

15        MR. WARSHAVSKY:  If we please show Mr. Rothschild, his

16  counsel, and the Court Plaintiff's Exhibit 126.

17  BY MR. WARSHAVSKY:

18  Q.  This is a tweet by you, is that correct?

19  A.  Yes.

20        MR. WARSHAVSKY:  Okay.

21        We would offer this into evidence.

22        MR. HARRIS:  No objection.

23        THE COURT:  Received.

24        (Plaintiff's Exhibit 126 received in evidence)

25  BY MR. WARSHAVSKY:

1  Q.  In your profile picture, is that your Bored Ape Yacht Club

2  NFT?

3  A.  This is an old photo, but yes.

4  Q.  Okay.  Did you own the Bored Ape Yacht Club NFT at the

5  time?

6  A.  Yes.

7  Q.  Can you read the tweet.

8  A.  "The NFT trinity, Bored Ape Yacht Club, Doodle MetaBirkins,

9  MetaBirkins2Pluto."

10  Q.  I'm sorry? MetaBirkins2Pluto.

11        I didn't see that.  Thank you.

12  A.  Yes.

13  Q.  What is that hashtag, MetaBirkins2Pluto.

14  A.  Just a hashtag I wrote.

15  Q.  So did you consider MetaBirkins NFTs to be on the same

16  level as Bored Ape Yacht Club and Doodle?

17  A.  I was referring to Future's posts, so he posts a Doodle,

18  which is that little balloon thing at the bottom, the

19  MetaBirkin in the middle, and I think there is a Bored Ape

20  right before the Doodle.

21  Q.  I think I was -- so the NFT trinity, what did you mean by

22  NFT trinity?  Why did you talk about those three sets of NFTs?

23  A.  At the time we were like the top selling or trending

24  collections on OpenSea.

25  Q.  Okay.  Okay.  So on that -- on December 7, those were the

1    three biggest selling NFT projects?

2    A.  Not biggest selling, the biggest trending, so most like

3    attention on them.

4    Q.  I'm sorry.  Where was it the most trending NFT?

5    A.  On OpenSea they have a trending page, and then they have

6    like a sales page.

7    Q.  I see.

8    A.  They're different.

9    Q.  So trending is different from sales, but it is still on the

10   marketplace?

11   A.  Yeah.

12   Q.  Okay.  Thank you.

13         So you were using the Bored Ape as your -- at least at

14   this time, as your profile picture?

15   A.  Yes.

16   Q.  Is that the right word?

17         Didn't you promote -- did you promote MetaBirkins as

18   useable for your -- for other people's profile photos?

19   A.  One more time?  Sorry.

20   Q.  Did you suggest that -- did you promote the MetaBirkins by

21   suggesting that other people use the MetaBirkins as their

22   profile photo?

23   A.  Yes.

24         MR. WARSHAVSKY:  Okay.

25         Can we turn to Plaintiff's Exhibit 134.

1              Just to the witness, and defense counsel and the

2       Court, please.

3       BY MR. WARSHAVSKY:

4       Q.  So is this -- can you tell us what -- is this a tweet?

5              What are we looking at?  It looks like a screen shot

6       from you.

7              You produced this in this case, right?

8              That's what the Bates number shows.

9       A.  Yeah, yeah.  Is it a tweet?  Yeah, it is a tweet.  Or it is

10      a draft of a tweet, yes.

11      Q.  So this is a draft of a tweet?

12      A.  Yes, because it still says tweet at the top, but I think I

13      tweeted it.

14      Q.  Okay.  And here you say "Do as @LanaRhodes does" --

15      A.  Yes.

16      Q.  -- "and change your profile."

17             MR. WARSHAVSKY:  I'm sorry.  Can you -- I didn't even

18      ask to -- I'm sorry.

19             I am trying to go fast.

20             Your Honor, we would move this into evidence.

21             MR. HARRIS:  No objection, your Honor.

22             THE COURT:  Received.

23             (Plaintiff's Exhibit 134 received in evidence)

24             MR. WARSHAVSKY:  Okay.  Now if you could expand it

25      back.

1    BY MR. WARSHAVSKY:

2    Q.  And who is -- I'm sorry -- I can't -- is this the same name

3    here, the two --

4    A.  Huh?

5    Q.  I see you have a @ and then you have something below.

6            Is that the same person?

7    A.  The bottom is a screen shot.

8    Q.  It is a screen shot?

9    A.  Of an Instagram, at the Instagram profile.

10   Q.  Here you are suggesting -- the tweet your intending to post

11   was for people to change their profile photo?

12   A.  Yes.

13   Q.  Okay.

14   A.  So Lana at the time changed her profile picture, and I

15   thought it was kind of a cool idea, so I told everybody to do

16   it.

17   Q.  Is this a friend of yours?

18   A.  She is now a friend, yes.

19   Q.  Okay.  Did you know her at the time?

20   A.  She reached out to me.

21   Q.  Okay.

22   A.  So, yeah.

23   Q.  Is she an influencer?  Well, who is Lana Rhoades?

24   A.  She is an adult film star.

25   Q.  Oh, okay.

1    A.  Sorry.

2    Q.  Thank you.

3    A.  I'm sorry.

4            MR. WARSHAVSKY:  We are always told not to ask

5    questions we don't know the answer to.

6            If we can now turn to Plaintiff's Exhibit 144.

7            MR. WARSHAVSKY:  Your Honor, may I take a second to

8    get a drink of water.

9            I'm sorry.

10           THE COURT:  Don't ask for the video.

11           MR. WARSHAVSKY:  I just composed myself.  All right.

12           Turn to Plaintiff's Exhibit 144.  Can you show it to

13   the witness, defense counsel, and the Court, please.

14   BY MR. WARSHAVSKY:

15   Q.  Is this a tweet by you?

16   A.  Yes.

17           MR. WARSHAVSKY:  Okay.  We would offer it into

18   evidence.

19           MR. HARRIS:  No objection.

20           THE COURT:  Received.

21           (Plaintiff's Exhibit 144 received in evidence)

22   BY MR. WARSHAVSKY:

23   Q.  Can you read this text for us, just the first sentence --

24   maybe the whole thing and then explain it -- well, I will read

25   it.  "MetaBirkins are the key to unlocking all my future

1    projects."

2              What does that mean?

3    A.  People who have a MetaBirkin would get white-listed for

4    anything that I made in the future.

5    Q.  And then you say, "Endless value for the people who believe

6    in me and my work."

7    A.  Yeah.

8    Q.  So when you say the key to unlocking all your future

9    projects, when you say anybody who owns a MetaBirkin will

10   get -- well, why don't I ask you.

11             What does it mean -- if somebody wants a MetaBirkin

12   and they are guaranteed a white list, what does that mean?

13   A.  They get access for anything I make.

14   Q.  Of any project ever?

15   A.  Pretty much.  That's what I am saying here.

16   Q.  When you say "guaranteed airdrops," what does that mean?

17   A.  That just means free stuff.

18   Q.  Okay.  So I think you said earlier today that MetaBirkins

19   only exists in two dimensions.

20             Do you remember that?

21   A.  Yes.

22   Q.  In fact, I think that was part of the opening statement by

23   counsel as well, correct?

24   A.  Correct.

25   Q.  Okay.  Do you remember on Monday Dr. Mentzer referred to

```
 1   something called Decentralan?

 2   A.  Yes.

 3   Q.  What is Decentralan?

 4           Do you know Decentralan is?

 5   A.  Yes.

 6   Q.  What is it?

 7   A.  It a virtual world.

 8   Q.  Is it a metaverse?

 9   A.  Yeah.

10           MR. WARSHAVSKY:  Could we turn to Plaintiff's Exhibit

11   306, which I think has already been admitted.

12           Is plaintiff's 306 admitted?

13           MR. HARRIS:  Yes.

14           MR. WARSHAVSKY:  If we could show page 27 of

15   Plaintiff's Exhibit 306.

16           Okay.  Let's show the witness plaintiff's -- let's see

17   26 as well for context.

18           THE WITNESS:  Yes.

19           MR. WARSHAVSKY:  Okay.

20   BY MR. WARSHAVSKY:

21   Q.  So Moshe Sacks ponders about integrating the MetaBirkins

22   into Decentralan.

23           Do you see that?

24   A.  Yes.

25   Q.  You respond, "I tried.  It would be this ugly voxel
```

1    rectangle hahaha.  I need more resolution."

2            Do you see that?

3    A.  Yes.

4    Q.  Okay.  So you are talking about resolution.

5            Now let's go to your next text.

6            You say, "They're technically metaverse ready cause

7    fully 3D."

8            Is that correct?

9    A.  Yes.

10   Q.  So the MetaBirkins are metaverse ready?

11   A.  Not in their current state.

12   Q.  Here you said they're technically metaverse ready.  What

13   did you mean by technically metaverse ready?

14   A.  So, like I said, they're made in a 3D program.  But if you

15   are asking me if the MetaBirkins are today, they're 2D images.

16   Q.  But this was back --

17           MR. WARSHAVSKY:  Can we scroll back a few pages, just

18   so we can get the date.

19           This was on December -- scroll back -- this is -- I'm

20   sorry.  I think on page 19 I saw, or 20, I saw that it was

21   December 1.

22   A.  Okay.

23   Q.  So on December 1, 2021, a little over a year ago --

24           MR. WARSHAVSKY:  Let's go back to page 27, please.

25   BY MR. WARSHAVSKY:

1  Q.  You said they're technically metaverse ready?

2  A.  Yes.

3  Q.  Okay.  So does that mean they were ready technically

4  metaverse ready 13 months ago and they're not technically

5  metaverse ready today?

6  A.  No, this is just misspeak by me.  But I am saying in their

7  current state a MetaBirkin NFT today is a two dimensional

8  object.

9  Q.  I understand that is what you are saying today.  I

10  understand you said that and your counsel said that a number of

11  times.  I am talking about before this lawsuit, 13 months ago,

12  when you were talking to your two investors, you said

13  they're -- and friends -- you said they're technically

14  metaverse ready because fully 3D.

15        Did they change between December 1, 2021 and today?

16  A.  No.  I'm speaking directly towards MetaBirkins in their

17  form right now as being metaverse ready.  You can put them on

18  your wall in a metaverse, like, as a painting, but -- I mean

19  you can ask the expert as well.  They are a 2D image.

20  Q.  That is not what you said here, is it?

21  A.  Yeah --

22  Q.  If you go back a page -- I'm sorry.  I interrupted you.

23  A.  I understand what you are saying.  But I'm saying, like,

24  the build -- what it takes -- everybody I think at this point

25  understands that MetaBirkins are 3D or created in 3D, but like

1    I said, the MetaBirkins NFTs themselves are pictures of that 3D

2    image, so they're two dimensional.

3    Q.  In response to the question you said, "I tried.  It would

4    be ugly."

5    A.  Yes.

6    Q.  Are you saying the painting -- are you saying the two

7    dimensional painting, if you put it in the metaverse, would be

8    ugly, or are you saying something else?

9    A.  Yeah.  So it's like a -- a voxel is like this -- like

10   Minecraft or something --

11   Q.  Sure.

12   A.  So, you know, it's just like a couple of colors or anything

13   like that, and there's no shape to it, so it would just be like

14   a square, or a cube.

15   Q.  So when you are saying that -- when you were responding to

16   the question about integrating into Decentralan or Sandbox and

17   said, "So it's tough," you meant it was tough to put it as a

18   picture in Decentralan?

19   A.  No, I'm saying like it would be tough to -- to put this 3D

20   so again it's like Minecraft, right?  You can see how the

21   difference in, like, a MetaBirkins look is very different, and,

22   one, they're not -- there's no 3D file attached to them, so

23   they can't just be imported into a metaverse as a cube object

24   or a three-dimensional object.

25   Q.  That's not what you say at the bottom text --

1   A.  No.

2   Q.  I don't want to go back and forth on this.  You say they're

3   technically metaverse ready because fully 3d, and you just told

4   me they are not 3D.

5   A.  You're asking me two different questions.

6   Q.  I'm sorry.  I don't mean to.

7   A.  MetaBirkins, the NFT that people own today, and 13 months

8   ago when this text happened, are two dimensional.  But the way

9   we created MetaBirkins, which we have said a few times, they

10  are 3D, right?

11          So technically the 3D version that everything kind of

12  stems from is metaverse ready, but MetaBirkins today in their

13  current form and the current -- the form that they have been in

14  since they were minted is not 3D.

15  Q.  I think we'll come back to this.

16          Your counsel asked you earlier about I think it was

17  called the Floaties?

18  A.  Floaties.

19  Q.  Yeah.

20  A.  Yeah.

21  Q.  And that -- was the event you were describing something

22  that might be called an NFT-gated event?

23  A.  It is an arts show and they offer normal tickets and they

24  offer NFT tickets.

25  Q.  Have you ever heard the term NFT-gated event?

1   A.  The term is usually like token-gated, but, yes.

2   Q.  So a token-gated event.  In a token-gated event, what gets

3   used is an NFT usually?

4   A.  What gets used?

5   Q.  What kind of token is it for a token-gated event?

6   A.  NFT.

7           MR. WARSHAVSKY:  Okay.

8           If we could turn back to Exhibit 305 which I think has

9   been admitted into evidence and go to page 10.

10          Is this 305?

11          Is this not admitted?

12          Please take it down.

13          Please take it down.

14          Did you take it down?  It's down?

15          I'm sorry.  I'm sorry.

16          I thought 305 was in.  I'm sorry.

17          So go to the -- what time is it?

18          Let's skip this exhibit and let's try and go to

19   another one.

20          Can you show the witness, the Court, and defense

21   counsel Plaintiff's Exhibit 242.

22   BY MR. WARSHAVSKY:

23   Q.  Have you seen this text before?

24   A.  This is the one you showed me, right?

25   Q.  This is the one we saw before?  Okay.

```
 1                  Is this the same one we showed?

 2     A.  I think so.

 3                  MR. WARSHAVSKY:  All right.

 4                  So this has been admitted.

 5                  Can you go to page 2, please.

 6     BY MR. WARSHAVSKY:

 7     Q.  Can you read here where you say, you said, "So many celebs

 8     we had to turn down."

 9                  What celebrities did you turn down?

10     A.  One of them was Leila Cohen, who is the daughter of the

11     owner of the Mets here in New York.

12                  There's a few just smaller artists like rappers and

13     stuff that requested, but we opted to give them to the bigger

14     ones since we didn't have a large allocation for friends and

15     family.

16     Q.  Okay.  So here you are telling NFT Kings that you've turned

17     down celebrities?

18     A.  Correct.

19     Q.  Okay.  And you say, and in this chain you say we got

20     Future -- is this Tyga?

21     A.  Tyga.

22     Q.  Tyga?  Is that how you say it?

23     A.  Yeah.

24     Q.  Miley Cyrus.  Madison Beer.

25                  Are these celebrities?
```

1            I know some of them?

2    A.  Yes.

3    Q.  Future is the rapper.  You referred to Tyga.  I don't know

4    if I want to do this --

5    A.  Yes, rapper.

6    Q.  I know who Miley Cyrus is.

7            Madison Beer?

8    A.  Pop star.

9    Q.  Are those people who have MetaBirkins?

10   A.  Everyone aside from Miley.

11   Q.  So Madison Beer, Tyga have -- and Future have MetaBirkins?

12   A.  Correct.

13   Q.  Were those some of the people you couldn't think of before?

14   A.  I said Future, but Tyga and Madison.

15           MR. WARSHAVSKY:  Okay.  If we turn to page 6.

16           All right.

17   BY MR. WARSHAVSKY:

18   Q.  If you could read, if you want to see page 5 next to it.

19           We saw page 10 a little bit before.

20   A.  Yeah?  You said 10?

21   Q.  I'm sorry.  We saw -- I'm not doing well.  We saw page 5

22   before, if we turn to page 6, which is on the right side of

23   your screen.

24           You start the text chain with NFT Kings and then you

25   say, "Can you do one more shill post for me"?

N21nher5                           Estival - Cross

```
 1   A.  Yes.
 2            MR. WARSHAVSKY:  Okay.  If we keep going -- actually
 3   let's leave it there.
 4   BY MR. WARSHAVSKY:
 5   Q.  You say you are a gonna make a big -- a big bag on
 6   MetaBirkin?
 7   A.  Yes.
 8   Q.  What did you mean by "big bag"?
 9   A.  He will sell it for a lot.
10   Q.  Okay.  When you're asking him, you say, "Can you do a shill
11   post for me?" what do you mean by that?
12   A.  To tell people about the project again.
13   Q.  What would he tell people?
14   A.  He did a post, like a link of the MetaBirkin.
15            MR. WARSHAVSKY:  Okay.  If we go to page 7.
16            THE WITNESS:  I'm sorry.  I just need the page.
17   BY MR. WARSHAVSKY:
18   Q.  Your second text, I realize we all use salty language
19   sometimes.  What did you mean by, "You have a gem on your
20   hands"?
21   A.  It was a good project.
22   Q.  And then your next text says, "Like ultimate shill post"?
23   A.  Yes.
24   Q.  What is an ultimate shill post as opposed to a regular
25   shill post?
```

N21nher5                        Estival - Cross

1    A.   It's like an extra hyped one.

2    Q.   An extra hyped one.   Okay.

3         What would a shill post -- when you say a post, what

4    do you mean by a post?

5    A.   It kind of depends.   This person and this text message, or

6    in these text messages is like an NFT influencer.   He tells

7    people about cool projects, tells people like, you know, what

8    they should be trying to get, what they shouldn't or what they

9    should be buying and what they, you know, just like any

10   influencer.

11   Q.   Like a social media post by an influencer?

12   A.   Pretty much, yeah.

13   Q.   Could be on TikTok, Instagram, Twitter --

14   A.   Correct.

15   Q.   -- or whatever one of those social media posts?

16        Okay.   Your counsel asked you earlier why you wanted

17   the price to go high.   And you said because you just wanted

18   value to collectors?

19   A.   I'm sorry.   I didn't catch that.

20   Q.   Your counsel asked you why you want the price to be high,

21   you said you wanted the value to go up to provide value to

22   collectors.

23        Do you remember that?

24   A.   Yes.

25   Q.   But you also make royalties, correct?

1   A.  Yes.

2   Q.  You said seven and a half percent correct?

3   A.  Yes.

4   Q.  You also get some recognition from it, right?

5        The higher the value the more well known you can

6   become, correct?

7   A.  For sure.

8   Q.  Okay.  You might get better prices for your next project,

9   correct?

10  A.  Yes.

11  Q.  Okay.

12  A.  Just growth.

13  Q.  Okay.  So that might be a reason to do that in addition to

14  driving value for collectors.

15       Now if we turn to -- correct?

16       Do you agree with that?

17  A.  I'm sorry.  I didn't hear you.

18  Q.  Those would be benefits to you as well as to collectors,

19  correct?

20  A.  For sure.

21       MR. WARSHAVSKY:  Okay.  If we could turn to page 8.

22  BY MR. WARSHAVSKY:

23  Q.  And you say down here, "Your MetaBirkin will get you 50"

24  and then you say "K."

25       Now, can you tell me what you mean by that?

1   A.  Could you tell me the date of this?

2   Q.  Can we go back to -- I think it was December 1, but I don't

3   want to speculate.

4         Can you go back to the first page, please?

5   A.  12/2.

6   Q.  December 2.  I'm sorry.

7   A.  Okay.

8         MR. WARSHAVSKY:  So go back to page 8.  I'm sorry.

9   I'm sorry.  Yeah.  Page 8.

10  Q.  You say, "Your MetaBirkin will get you 50."

11        And then the next one says, "K."

12        So is that -- did you mean to say your MetaBirkin will

13  get you $50,000 or are you saying your MetaBirkin will get you

14  50?

15  A.  50K.

16  Q.  So 50K.  So you meant money?

17  A.  Money.

18  Q.  Okay.  And why would his MetaBirkin get him 50K?

19  A.  Because the demand was high.

20  Q.  Okay.  So if he resold it?

21  A.  If he resold it?

22  Q.  Okay.

23        MR. WARSHAVSKY:  And if we go to page 9.

24  BY MR. WARSHAVSKY:

25  Q.  You write, you start out by, "I need the shill."

```
 1  A.  Correct.

 2  Q.  So we keep seeing you are asking about the shill.

 3          Why are you telling -- so you went from asking him to

 4  shill saying you need it.

 5          Why did you need it?

 6  A.  Well, he requested a white list -- he's an NFT influencer.

 7  It's just the same thing.  It's just like I gave him a white

 8  list spot, and I was like, you should, you should tell people

 9  about it, because I gave you a white list spot.

10  Q.  Okay.  Here is he saying to you he's not -- if we look at

11  this chain, which I think you have been looking at throughout,

12  is he telling you he's not going to give you the post, but

13  there he's saying he's going to give you a story?  Is that it?

14          You say, "All right, man."

15          Do you see that part of it?

16  A.  Yes.

17          MR. WARSHAVSKY:  Okay.  Turn to page 10.

18  BY MR. WARSHAVSKY:

19  Q.  You say, "I think this is the next big thing.  If you knew

20  what I had planned today, you would say yes."

21          What did you mean by "it's the next big thing"?

22  A.  The project is the next big thing.

23  Q.  Okay.  And what did you have planned for the next day?

24  A.  It was Future posting it.

25  Q.  Okay.  Okay.  And so you are saying -- and then when you
```

1   say "you'd say yes," what you are saying is if he knew that

2   another influencer was posting it, he would post as well?  Is

3   that what that means to say?

4   A.  Repeat that.  Sorry.

5   Q.  Well, you said, "If you knew what I had planned today you'd

6   say yes."

7        What did you mean by that?

8   A.  If you knew I had the plans for the project, you knew you

9   would want to be a part of this.

10  Q.  So if he knew that Future was going to post he would want

11  to be a part of it?

12  A.  Theoretically, yeah.

13          MR. WARSHAVSKY:  Okay.

14          If we turn to page 11.

15  BY MR. WARSHAVSKY:

16  Q.  He says -- you have more of a discussion, right?

17          He says, "All right" -- or you say, "All right."

18          He says, "But I need another white list spot."

19          "WL" is white list?

20  A.  White list.

21  Q.  So he's saying if you want him to do the post, he wants a

22  white list spot, is that correct?

23  A.  Yes.

24  Q.  Okay.  And then he says, "I can't do that for nothing."

25          And you say, "I handed you a 25 -- a 25 to 50K piece."

N21nher5                      Estival - Cross

1        What did you mean by that?

2   A.  I gave him a white list -- I don't know if they were minted

3   at this point yet.  I would have to -- I forget what time we

4   minted and what time we sold.  But the day that we minted they

5   were going for 45,000.  I think that's what I was referring to.

6   Q.  Okay.  So you were saying you gave him the white list spot,

7   you wanted him to do -- in exchange you wanted him to do this

8   shill post, and that that white list spot could net him

9   anywhere from 25 to 50,000 dollars?

10  A.  Correct.

11          THE COURT:  All right.

12          Counsel, I think we've come to as far as we can go

13  today.

14          So, ladies and gentlemen, again, tomorrow we will only

15  go to 1 o'clock, so once again, please be here by 9:30 as you

16  were so kindly today and we will start promptly tomorrow.

17          Have a good evening.

18          (Continued on next page)

19

20

21

22

23

24

25

1

2                    (Jury not present)

3                    THE COURT:  You may step down.

4                    THE WITNESS:  Thank you.

5                    (Witness left the stand)

6                    THE COURT:  As far as I know, there's nothing that

7        counsel needs to raise tomorrow morning, so why don't you be

8        here at 9:25.

9                    MR. WARSHAVSKY:  Your Honor, there is one issue which

10       we think would expedite things, which was to perhaps provide

11       you with a stipulation about all those same objections, same

12       admissions so that --

13                   THE COURT:  Sure.

14                   MR. WARSHAVSKY:  Perhaps that process will go more

15       quickly.

16                   THE COURT:  Okay.  That's fine.

17                   (Adjourned to February 2, 2023, at 9:30 a.m.)

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2    Examination of:                          Page

 3    SONNY ESTIVAL

 4    Direct By Mr. Harris . . . . . . . . . . . 270
      Cross By Mr. Warshavsky  . . . . . . . . . 339
 5                    PLAINTIFF EXHIBITS

 6    Exhibit No.                          Received

 7     277  . . . . . . . . . . . . . . . . . . 342

 8     281  . . . . . . . . . . . . . . . . . . 343

 9     240  . . . . . . . . . . . . . . . . . . 348

10     316  . . . . . . . . . . . . . . . . . . 351

11     243  . . . . . . . . . . . . . . . . . . 355

12     272  . . . . . . . . . . . . . . . . . . 359

13     239  . . . . . . . . . . . . . . . . . . 371

14     273  . . . . . . . . . . . . . . . . . . 375

15     306  . . . . . . . . . . . . . . . . . . 379

16     235  . . . . . . . . . . . . . . . . . . 386

17     232  . . . . . . . . . . . . . . . . . . 388

18     238  . . . . . . . . . . . . . . . . . . 409

19     313  . . . . . . . . . . . . . . . . . . 416

20     230  . . . . . . . . . . . . . . . . . . 424

21     386  . . . . . . . . . . . . . . . . . . 425

22     242  . . . . . . . . . . . . . . . . . . 428

23     100, page 502  . . . . . . . . . . . . . 430

24     126  . . . . . . . . . . . . . . . . . . 436

25     134  . . . . . . . . . . . . . . . . . . 439
```

```
1    144  . . . . . . . . . . . . . . . . . . 441

2                        DEFENDANT EXHIBITS

3    Exhibit No.                               Received

4    506  . . . . . . . . . . . . . . . . . . 280

5    614  . . . . . . . . . . . . . . . . . . 288

6    613  . . . . . . . . . . . . . . . . . . 290

7    559  . . . . . . . . . . . . . . . . . . 314

8    526  . . . . . . . . . . . . . . . . . . 318

9    607  . . . . . . . . . . . . . . . . . . 319

10   525  . . . . . . . . . . . . . . . . . . 321

11   527  . . . . . . . . . . . . . . . . . . 325

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```