N22sHER1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

HERMÈS INTERNATIONAL, et al.,

                    Plaintiffs,

          v.                        22 Civ. 384 (JSR)

MARTIN ROTHSCHILD,

                    Defendant.

------------------------------x

                                    New York, N.Y.
                                    February 2, 2023
                                    9:30 a.m.

Before:

                    HON. JED S. RAKOFF,

                                    District Judge
                                    -and a Jury-


                        APPEARANCES

BAKER & HOSTETLER LLP
     Attorneys for Plaintiffs
BY:  DEBORAH A. WILCOX
     OREN J. WARSHAVSKY
     GERALD J. FERGUSON

HARRIS ST. LAURENT & WECHSCLER LLP
     Attorneys for Defendant
BY:  ADAM B. OPPENHEIM
     JONATHAN A. HARRIS

LEX LUMINA PLLC
     Attorneys for Defendant
BY:  RHETT O. MILLSAPS, II

N22sHER1

```
1              (Pages 461-465 SEALED)

2              (In robing room)

3              THE COURT:  Very good.

4              MR. HARRIS:  If we may, your Honor.

5              THE COURT:  You were going to raise something?

6              MR. HARRIS:  He told me --

7              THE COURT:  This part is on the record, but not

8    sealed.

9              MR. HARRIS:  He thought he had about 45 minutes left.

10   I said fine.  He came in this morning.  Are we still on that

11   timing?  No, he's going to be longer.  I think that is going to

12   create a greater problem with our schedule.

13             THE COURT:  How much longer do you think?

14             MR. WARSHAVSKY:  Your Honor, there were some --

15             THE COURT:  I have no problem with 46 minutes.

16             MR. WARSHAVSKY:  I think it would be twice that much.

17   There was some testimony yesterday that we think was less than

18   candid, which you'll see when we start that is going to -- that

19   we intend to explore.  I didn't think we were going to have to

20   go there, but we'll see how it goes.

21             THE COURT:  All right.  I will give you up to an hour

22   and a half, what you're asking.  It's obviously an important

23   witness, but I will very strictly limit any recross.  And I may

24   ask the jury to hold their lunch break until 50 minutes.  We'll

25   make up a little time.  We'll find ways to do it because I do
```

N22sHER1

```
 1   think it is, especially given juror No. six's problem, I think

 2   it's very important we try to finish by tomorrow.

 3             MR. HARRIS:  I agree, your Honor.

 4             MR. WARSHAVSKY:  Thank you.

 5             (Continued on next page)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  I think in light of what was just brought

2    to my attention, I think we'll even go today until 115 rather

3    than one.

4          (Jury present)

5          Good morning, ladies and gentlemen.

6          THE JURY:  Good morning.

7          THE COURT:  As you know, today we're not going to have

8    an afternoon session.  I think we will go, instead of going

9    until one, we will go to 1:15 just to make the most use we can

10   of today.

11         Tomorrow, by contrast, we will be sitting all the way

12   until 4:30.  But it's counsel's expectation, and mine, that

13   that will allow us to finish all the evidence in the case

14   tomorrow.

15         OK.  Counsel.

16         MR. WARSHAVSKY:  Thank you, your Honor.

17         Can I ask that we bring up Defense Exhibit 613, which

18   was offered yesterday.

19    SONNY ESTIVAL, resumed.

20   CROSS-EXAMINATION

21   BY MR. WARSHAVSKY:

22   Q.  Mr. Rothschild, yesterday you testified that in response to

23   the Birkin naming contest, you gave user *hectourc* in the middle

24   here a MetaBirkin for picking the name?

25         MR. HARRIS:  Objection, not his testimony.

1            THE COURT:  Well, rather than have a debate about

2    whether it was or was not, just if you have a transcript, you

3    can quote it.  If not, you can just ask him again the other

4    question the underlying question.

5            MR. WARSHAVSKY:  Sure.

6            THE COURT:  Give the page number and line number.

7            MR. WARSHAVSKY:  Sure.  I'm looking at pages number

8    291, starting from line 11 through page 292, line nine.

9            THE COURT:  Go ahead.  Read it.

10            MR. WARSHAVSKY:  Read it.

11            THE COURT:  Yes.

12            MR. WARSHAVSKY:  OK.

13    BY MR. WARSHAVSKY:

14    "Q.  And did, in fact, people -- did you post it just on the

15    contest, just on Instagram, or did you also post it on other

16    social media?"

17            MR. WARSHAVSKY:  I should note, this was when your

18    counsel was examining you.

19            You responded:

20    "A.  I posted it on Twitter.

21    "Q.  And did somebody suggest names?

22    "A.  Yes.  Actually, I got suggested MetaBirkins on Instagram

23    and on Twitter.

24    "Q.  If you look in the middle of this page, there is a

25    *hectourc*?

1    "A.  Correct.

2    "Q.  Suggesting MetaBirkins?

3    "A.  Yes.

4    "Q.  Did the contest -- you said there were two, there was

5    somebody on Instagram and also someone on Twitter.

6            Do you remember the name of the person that suggested

7    it on Twitter?

8    "A.  Makisa.  Her handle is *asiancryptogirl*.

9    "Q.  Do you know her actual name?

10   "A.  Makisa, that's just her display name.  I don't know her

11   real name.  It could be, but I'm not sure.

12   "Q.  Did, in fact, the contest winners receive anything?

13   "A.  One of them did.

14   "Q.  All right.  Who received something?

15   "A.  Instagram was the first one I saw, so Instagram winner."

16           THE COURT:  OK.  So you remember giving that

17   testimony?

18           THE WITNESS:  Correct.

19           THE COURT:  OK.  Put another question.

20   BY MR. WARSHAVSKY:

21   Q.  Is that testimony accurate?

22   A.  Not on MetaBirkin, but I allowed a spot for a MetaBirkin.

23   Q.  You gave this person *hectourc* a whitelist spot for a

24   MetaBirkin?

25   A.  Yes.

1            MR. WARSHAVSKY:  OK.  I would like to show the witness

2    and counsel defense Exhibit 387 for identification.  It's a

3    rebuttal exhibit.

4            MR. HARRIS:  Your Honor, I'm sorry.  I can't read

5    that.

6            THE COURT:  Yes.  I don't think it's legible.

7            Do you want to blow up?

8            MR. HARRIS:  There we go.

9            MR. WARSHAVSKY:  Scroll to the bottom just to show

10   this is a document produced by the witness and by

11   Mr. Rothschild in this case.  Go back to the top.

12   BY MR. WARSHAVSKY:

13   Q.  This is your Instagram direct message with this person,

14   *hectourc*, correct?

15   A.  Correct.

16   Q.  And *hectourc* is writing to you beginning, we go down to the

17   bottom, you actually write to hectourc --

18           THE COURT:  Wait a minute.  Are you offering this?

19           MR. WARSHAVSKY:  Sure.  We'll offer it into evidence.

20           THE COURT:  You can't quote from it if it's not in

21   evidence.

22           MR. WARSHAVSKY:  I understand.

23           THE COURT:  Any objection?

24           MR. HARRIS:  No objection, your Honor.

25           THE COURT:  Received.

1                    (Plaintiff's Exhibit 387 received in evidence)

2                    THE COURT:  Show it to the jury.

3                    MR. WARSHAVSKY:  All right.

4                    THE COURT:  Go ahead.

5    BY MR. WARSHAVSKY:

6    Q.  This is your direct message with *hectourc* on Instagram,

7    correct?

8    A.  Yes.

9    Q.  And the first from you is –- the first message is from you

10   at the bottom:  MetaBirkins, baby.  I got a Birkin with your

11   name on it.

12                   That's from you, correct?

13   A.  Yes.

14   Q.  And then there is some back and forth.

15                   And let's go to November 30.  *Hectourc* says, Hey, just

16   wanted to know if you guys need anything from me.

17                   You didn't respond to that, right?

18   A.  No.

19   Q.  Let's go up to the emoji from December 3 at 1:39 p.m.

20   A.  Yes.

21   Q.  That's while the MetaBirkins were minting?

22   A.  Well, the day before.

23   Q.  It was 24-hour period, right?

24   A.  Yeah.

25   Q.  So this was while the minting process was going on still?

1    A.  Yes.

2    Q.  OK.  And this is an emoji of somebody with their head in

3    their hands?

4    A.  I think it is, like, prayer hands.

5    Q.  Prayer hands.  And then above that, later that day *hectourc*

6    writes, Hope you guys will see this, correct?

7    A.  Um, yes.

8    Q.  OK.  Let's go to December 4 at 12:05 p.m.

9            That's after the MetaBirkins had minted, right?

10   A.  Yes.

11   Q.  And *hectourc* writes, Hey, guys.  Hitting you guys up again

12   about my gifted Birkin.  Just want to make sure I'm not being

13   ignored?

14   A.  Yes.

15   Q.  And you didn't respond to that, right?

16   A.  No.

17   Q.  OK.  Above that we have two you guys on December 6.  I

18   don't know if that is you or yo, guys.  And then the second

19   one, I already missed out on the first release.

20           You don't respond to that, right?

21   A.  Yes.

22   Q.  OK.  And let's turn to Plaintiff's Exhibit 388.

23           Mr. Rothschild in this case -- just to the judge,

24   defense counsel, and the witness, please.

25           This is a Twitter direct message, correct?

1   A.  Yes.

2   Q.  That you produced in this case?

3   A.  Correct.

4           MR. WARSHAVSKY:  Offer into evidence, your Honor.

5           MR. HARRIS:  No objection, your Honor.

6           THE COURT:  Received.

7           (Plaintiff's Exhibit 388 received in evidence)

8   Q.  Hey MetaBirkins team.  Just trying to reach out about my

9   gifted MetaBirkin from the naming contest on Instagram a while

10  back.  My IG is *hectourc*.  Thanks.

11  A.  Yes.

12  Q.  Did you respond to this?

13  A.  No.

14  Q.  OK.  So *hectourc* is suggesting he didn't receive a

15  whitelist spot, correct?

16  A.  Yes.

17  Q.  So going back to your testimony of yesterday, did *hectourc*

18  receive a MetaBirkin?

19  A.  To my knowledge.  So *hectourc* is actually a friend of my

20  friend Love Menzi on Instagram, so he communicated that way.

21  Q.  OK.  So are you saying that *hectourc* received a whitelist

22  spot?

23  A.  To my knowledge, at the time, it was -- I looked into this

24  after the fact, but I did have these direct messages.

25  Q.  OK.  But your testimony yesterday was that you gifted --

1    that he received the gift.  You corrected me earlier and said

2    that he received a whitelist spot.  Here he is saying to you,

3    he didn't receive a whitelist spot, and you didn't respond,

4    correct?

5    A.  To my knowledge, at the time when you asked me the

6    question, that's what I thought.

7    Q.  OK.  So but right now as we sit here today, I'm asking you,

8    was your testimony yesterday accurate?

9    A.  Um, so my knowledge yesterday, that's what it was.  That

10   was my testimony.  I didn't have these, um, Instagram messages

11   yesterday.

12   Q.  Well, you did have these Instagram messages, Instagram and

13   Twitter, because these came from you, correct?

14   A.  Correct, in discovery.

15   Q.  OK.  So I just want to make sure we're clear.

16          The testimony you gave yesterday was incorrect?

17   A.  It was based on what knowledge I had at the time.

18          MR. WARSHAVSKY:  Move to strike, your Honor.

19          THE COURT:  No, I'm not going to strike that.

20          But do you want to change now your response?

21          THE WITNESS:  Me?

22          THE COURT:  Yes.

23          THE WITNESS:  I don't.

24          THE COURT:  Now that you've seen these documents, are

25   you still adhering to the testimony you gave yesterday, or do

1  you now have a revised view?

2            THE WITNESS:  I have a revised view.

3            THE COURT:  What's your revised view?

4            THE WITNESS:  That these were the text messages that

5  *hectourc* sent, but we had our forms of communication through

6  friends.  Um, I -- that's my revised.

7            THE COURT:  All right.  Go ahead, counsel.

8  BY MR. WARSHAVSKY:

9  Q.  Mr. Rothschild, did you give *hectourc* a whitelist spot?

10 A.  To my knowledge at the time, yes.

11 Q.  OK.  Which MetaBirkin -- we have your wallet and all the

12 MetaBirkins here on.  We have the ETH wallets here.

13            Which one did he get?

14            We'll check into this and come back to it.

15            Which whitelist spot do you think you gave him?

16 A.  I'm not sure.

17 Q.  Which MetaBirkin did he get?

18 A.  I'm not sure.

19 Q.  So you had follow-up discussions with *hectourc*.  You didn't

20 respond to any of this.  You said you had follow-up discussions

21 through a friend?

22 A.  Yes.

23 Q.  Who is that friend?

24 A.  Love.

25 Q.  Did you produce anything of your discussions of Love in

1   this case?

2   A.  I'm not positive they were via DM or in person.  They all

3   live in Los Angeles.

4   Q.  You followed up with someone in person who is a friend of a

5   friend rather than responding to this person?

6   A.  Correct.

7   Q.  OK.  So it's your testimony still that you gave him a

8   whitelist spot?

9   A.  To my knowledge.

10  Q.  So the documents are wrong?

11  A.  These documents were just a small amount of time.  It's

12  been a year since then.

13  Q.  That wasn't my question.

14          Are these documents wrong?

15  A.  No.

16  Q.  They are right?

17  A.  Yes.

18  Q.  So *hectourc* is complaining that he doesn't get a whitelist

19  spot.

20          You're still saying you gave him one?

21  A.  To my knowledge, yes.

22  Q.  When you keep saying "to your knowledge," you either gave

23  the whitelist spot or you didn't.

24          THE COURT:  Counsel, your job is to put questions, not

25  to put statements.

1          MR. WARSHAVSKY:  My apologies, your Honor.

2     Q.  What evidence do you have that you gave *hectourc* a

3     whitelist spot?

4     A.  I looked into this prior to this trial to find more

5     information, but I don't have these direct messages any longer.

6     Q.  On Friday you had an Instagram story with a picture from an

7     office building saying prepping, prepping, prepping, correct?

8     A.  Correct.

9     Q.  So you were preparing for this case?

10    A.  Um, as I think people do.

11    Q.  Yes?

12    A.  Yes.

13    Q.  OK.  And in preparing for this case, you were talking --

14    were you looking at the evidence and talking about this?

15    A.  Um, yes.

16    Q.  OK.  Because, in fact, throughout this case, that was the

17    first time -- yesterday on the stand was the first time you

18    said in this case that you gave a bag to *hectourc*, correct?

19    A.  Yes.

20    Q.  At your deposition when I asked you about it, you didn't

21    bring up *hectourc*, correct?

22    A.  I had to look into my direct messages then.  I can't

23    remember everything.

24          MR. WARSHAVSKY:  OK.  Your Honor, move to strike.

25          THE COURT:  No.

1    Q.  OK.  At your deposition, did you mention *hectourc*?

2    A.  No.

3    Q.  On summary judgment briefing in this case, did you

4    participate in that?

5             MR. HARRIS:  Objection, your Honor.

6             THE COURT:  Sustained.

7    Q.  When you were doing your prepping, prepping, prepping

8    Friday, were you focused on that Instagram post?

9             MR. HARRIS:  Objection, your Honor.

10            THE COURT:  As phrased, sustained.

11   Q.  Did you look at that Instagram post on Friday?

12   A.  What Instagram post?

13            MR. WARSHAVSKY:  Can you bring back up Exhibit 631.

14   Q.  This Instagram post.

15   A.  Um, did I look at it on Friday specifically?

16   Q.  Yes.

17   A.  I don't remember.

18   Q.  Did you look at it Saturday?

19   A.  I'm sure I've seen it through the trial prep.

20   Q.  I'm just asking if you saw it on Saturday?

21   A.  I'm not sure what day.

22            THE COURT:  I think he's fairly answering your

23   questions, counsel.  Put a new question.

24   Q.  OK.  Do you remember yesterday we talked about the Baby

25   Birkin?

1    A.  Yes.

2    Q.  And do you remember I asked you about whether or not you

3    bid on it?

4    A.  Yes.

5              MR. WARSHAVSKY:  OK.  And may I read the testimony,

6    your Honor, from yesterday?

7              THE COURT:  Yes.

8              MR. WARSHAVSKY:  OK.  This was questions from me

9    yesterday afternoon:

10   "Q.  By the way, did you bid on the Baby Birkin yourself?

11   "A.  No.

12   "Q.  Do you remember me asking you about this at your

13   deposition?

14   "A.  I was the first bid.

15   "Q.  So you did bid on it?

16   "A.  Yes.

17   "Q.  Had you won the bid, you would have bought it from

18   yourself?

19   "A.  For 100, yes.  It would be minted.

20   "Q.  OK.  Was that an effort to prop up the price?

21   "A.  No, it was just to -- I wanted to own my artwork.  So,

22   like, when you bid, it would have to be minted.  It wasn't

23   minted until somebody bid on it."

24   Q.  Was that testimony accurate?

25   A.  Pretty accurate.

 1   Q.  OK.  What do you mean by "pretty accurate?"

 2   A.  I mean, yeah, the testimony is accurate from the

 3   transcript.

 4   Q.  OK.  But were your answers accurate?

 5   A.  Um, yes.  There is a little bit more, like, explanation

 6   behind it, but if you're asking just about the testimony, then

 7   yes.

 8              MR. WARSHAVSKY:  OK.  I would like to show the

 9   witness, the court, and counsel plaintiff's Exhibit 389 for

10   identification.

11              THE COURT:  Are you offering this?

12              MR. WARSHAVSKY:  I offer it into evidence.

13              THE COURT:  Any objection?

14              MR. HARRIS:  No objection, your Honor.

15              THE COURT:  Received.

16              (Plaintiff's Exhibit 389 received in evidence)

17              You can show it to the jury.

18              MR. WARSHAVSKY:  Thank you.

19   BY MR. WARSHAVSKY:

20   Q.  This was the bid you were referring to?

21   A.  Yes.

22   Q.  And you misremembered that, I assume when you said 100, you

23   just misremembered it was actually 300?

24   A.  Whatever the first -- I think it was the minimum bid, so I

25   assumed it was 100.

1              MR. WARSHAVSKY:  I would like to show the court,

2     defense counsel, and the witness Plaintiff's Exhibit 390.

3              Offer into evidence.

4              MR. HARRIS:  No objection, your Honor.

5              THE COURT:  Received.

6              (Plaintiff's Exhibit 390 received in evidence)

7              THE COURT:  Again once, it's received.  You need to

8     show it to the jury.

9              MR. WARSHAVSKY:  Publish to the jury, please.

10    BY MR. WARSHAVSKY:

11    Q.  So is this a second bid on a Baby Birkin by you?

12    A.  At the time there's people who didn't have the ability to

13    place bids, so that was me placing bids for them.

14    Q.  So you were placing a bid for somebody else here?

15    A.  Yes.  There was some instances where friends were bidding

16    as well.

17    Q.  Why wouldn't people have an ability to place a bid?

18    A.  Why?

19    Q.  Yes.

20    A.  Um, through the -- the Basic.Space website had a little bit

21    of a registration period.

22    Q.  So who did you place this bid for?

23    A.  I don't remember.

24    Q.  So yesterday you testified that you were willing to pay --

25    well, at least $300 to buy back the Baby Birkin, is that

1    correct?

2    A.   To --

3    Q.   To buy the Baby Birkin?

4    A.   To mint it.

5    Q.   You said that would be so you can own your own art?

6    A.   Um, yeah.  Just to own it.

7    Q.   OK.  Yesterday your counsel asked you if you owned a

8    MetaBirkin.

9            Do you remember that?

10   A.   Yes.

11   Q.   And you testified that you did, correct?

12   A.   Yes.

13   Q.   OK.  And I think you testified that the minting cost for

14   the MetaBirkins were less, correct, they were .1 ETH?

15   A.   .1.

16   Q.   So they were actually -- so $450, is that right?

17   A.   At the time.

18   Q.   That's right, because ETH fluctuates.

19           Is that what you mean?

20   A.   Yes, like, on December 2, it was around $450.

21   Q.   Did you pay for your MetaBirkins?

22           Did you pay .1 ETH?

23   A.   Um, I believe so or -- I'm not sure.  We had the ability

24   to, like, mint it on our own price, but I could have paid .1.

25   I'm not sure.

1   Q.  Do you remember discussing this at your deposition?

2   A.  Um, I don't.  I don't.

3   Q.  You don't.

4           It's possible you didn't pay anything to mint the

5   MetaBirkin?

6   A.  There would have to be gas fees associated, at the very

7   least.

8           MR. WARSHAVSKY:  Can we have the witness's deposition

9   testimony available.

10          Please make sure it's just counsel, myself, and the

11  court.

12          If you like, we can come back to it.  Come back to it?

13  OK.

14  Q.  Now, yesterday you testified, when your counsel was talking

15  to you, just going to the substance here, that everything you

16  did with the MetaBirkin was public.

17          Do you remember that discussion?

18  A.  I believe so.

19  Q.  OK.  And that you didn't have, you couldn't do anything

20  secret because it was on the blockchain, is that right?

21  A.  Yes.

22  Q.  That didn't stop you from trying, though, did it?

23  A.  Trying what?

24  Q.  To do things that were secret?

25  A.  I feel, like, that's an opinion.

1    Q.  OK.  Fair enough.

2              MR. WARSHAVSKY:  Can we turn to Plaintiff's Exhibit

3    306, and I believe that's been admitted, at least portions of

4    it.  Can you turn to page 88, please.  Maybe show him 87 and

5    88.

6    Q.  Here, I'm looking at your testimony at page 88.

7              MR. HARRIS:  Objection.

8              MR. WARSHAVSKY:  I'm sorry.  Fair enough.  I'm looking

9    at your text on page 88.

10             Thank you, counsel.

11             See, wait.  Will it show our transfers of crazy money

12   between accounts, though?  LOL.  People might think I

13   backdoored.

14   A.  I need to see the rest of the context.  Um, three ...

15   Q.  While you're looking, I can tell you the other context.

16             Below you have a question, you write, do you have a

17   sep metamask wallet.

18             Then if we can turn to the next page.  You can

19   highlight that.

20             You say:  Yeah.  Let me send to one you didn't send me

21   money from because there is some Sherlock Holmes level people

22   in here.

23             You didn't say people.

24   A.  I'm sorry.  This is a long document, so I'm trying to make

25   sure that this is exactly what I'm saying.

1                (Pause)

2                So, from this, um, this was one of the actual

3       MetaBirkins that was supposed to be given to somebody.  So we

4       had that extra MetaBirkin, and Tyga was not responsive at the

5       time.  So I'm saying -- well, Alex says, F Tyga.  And then I

6       say, OK, F Tyga.  And then Alex says, Want to give it to us and

7       sell it?  And he sends the addy, but then we actually ended up

8       giving that MetaBirkin to Tyga.

9                So this isn't really anything -- what I'm saying is,

10      to my memory and what I'm reading here, these MetaBirkins --

11      and we can have an expert look at the blockchain

12      transactions -- these ones actually did go to Tyga, and one

13      actually went to La La.  It was just after the fact.

14      Q.  We'll take a look.

15               Just out of curiosity, on page -- we'll go back to

16      that in a little bit.  Page 89, though, Moshe Sacks has a text

17      in the middle of the page.

18               I think we said yesterday, Moshe and Alex are the same

19      person, correct?

20      A.  Yes.

21      Q.  There was a text with a long string there.

22               Do you know what that is?

23      A.  That is a wallet.

24      Q.  So that's a wallet that he's -- is it your understanding

25      that's a wallet he sent to you?

```
 1   A.  Yeah.

 2   Q.  In response to this text?

 3   A.  Yes.

 4   Q.  OK.  You can take that down.

 5           Yesterday you talked a bit with your counsel about I

 6   Like You, You're Weird.

 7           Do you remember that?

 8   A.  Yes.

 9   Q.  Your counsel asked you, generally, about royalties.

10           Do you remember that?

11   A.  Yes.

12   Q.  And you said you are no longer receiving royalties,

13   correct?

14   A.  We turned off royalties recently.

15   Q.  Isn't it true that the I Like You, You're Weird is being

16   dissolved?

17   A.  Not dissolved.  Um, no, not dissolved.

18   Q.  OK.  You and the -- we'll come back to the wording.

19           Isn't it true that you and the co-creator split, went

20   separate ways?

21           MR. HARRIS:  Objection, your Honor.

22           THE COURT:  Ground?

23           MR. HARRIS:  Relevance.

24           THE COURT:  Well, I can't tell you.  I'll allow it to

25   go for a few questions.  We'll see.  Overruled.
```

1              Go ahead.

2              Do you want to put the question again?

3    Q.  Isn't it true, Mr. Rothschild, that you and the co-creator

4    I think it's Amber Park, had a fight and went separate ways?

5    A.  Um, we went separate ways, but I wouldn't go that -- into a

6    fight or anything like that.

7    Q.  OK.  We can come back to that, too, in a minute.

8              Isn't it true that you only turned off the royalties

9    after you went your separate ways?

10   A.  Yes.

11   Q.  And isn't it true that you turned off royalties after

12   people complained that you were charging royalties for the

13   purchase of NFTs, that they would have to burn to maintain

14   their value?

15   A.  This was prior, like, we -- I asked the community or the

16   people who hold them what their opinion is on everything.  And

17   after they were a little frustrated with things, we made it so

18   you didn't have to burn them, and the burn would have given you

19   something else.

20   Q.  The burn would have given them something else, which was a

21   whitelist to one of your other projects?

22   A.  Yes.

23   Q.  OK.  So they would be burning something they paid for to

24   get a whitelist spot to pay more -- to pay again to get your

25   next project?

1   A.  No.  It would be free for them.

2   Q.  It would be a free whitelist.

3        But when they minted, would they have to pay?

4   A.  Um, just gas fees which would be, like, a dollar.

5   Q.  OK.  And we'll talk about I like You, You're Weird in a

6   little bit.  I want to go back to the exhibit we were

7   discussing when we left off yesterday, Plaintiff's Exhibit 242.

8        So when we left yesterday, we were talking about NFT

9   Kings in this document.  Do you remember?

10  A.  Correct.

11  Q.  OK.  And you were asking to do a show for you, is that

12  correct?

13  A.  Yes.

14  Q.  And I just want to make sure I understand the nature of the

15  transaction here.

16        You provided NFT Kings a whitelist spot, correct?

17  A.  I believe so.

18  Q.  And that was in exchange for him chilling or doing a chill

19  post, correct?

20  A.  Promoting.

21  Q.  Well, what did you call it here?

22  A.  It's what -- well, we talk in slang.  Nobody says that, so

23  I'm just clarifying what that means.

24  Q.  You call that a chill post, correct?

25  A.  I call it, but not a lot of people would understand that

1   word.

2   Q.  OK.  Let's use the word that you call it.

3           The value for NFT Kings is that if he chills, the

4   value of the MetaBirkin goes up, correct?

5   A.  That's -- I mean, promotion is just to get into people's

6   eyes.  That doesn't mean the price goes up.

7   Q.  Well, yesterday you said, when your lawyer was asking you

8   about this, you said you wanted the price to go up for

9   collectors, right?

10  A.  Yes.

11  Q.  And that was the reason you were asking people to chill,

12  correct?

13          MR. HARRIS:  Objection, your Honor.  Misstates the

14  testimony.

15          THE COURT:  Well, I don't see that he answered yes,

16  the witness answered yes to the question.

17          "Well, yesterday you said, when your lawyer was asking

18  you about this, you said that you wanted the price to go up for

19  collectors, right?

20          "Yes.

21          And then the pending question is:  "And that was the

22  reason you were asking people to chill, correct?"

23          So I think that the defense objection is misplaced.

24  Overruled.

25          Do you want to put the question again?

```
 1              MR. WARSHAVSKY:  If I can remember it.
 2              THE COURT:  The question was:  And that what the
 3     reason you were asking people to chill, correct?
 4              What's the answer?
 5     A.  Yes, I was asking people to promote it for more visibility.
 6     Q.  OK.  So NFT Kings, at that point, he has the whitelist
 7     spot, he can either keep it or sell it, correct?
 8              I'm sorry.  Let me ask that -- it was a bad question.
 9              NFT Kings gets the whitelist spot, and once he minted
10     the MetaBirkin, he can either keep it or sell it, correct?
11     A.  Yes.  That's up to them.
12     Q.  OK.  Now, if we can turn to page six.  Maybe turn to page
13     one again, I'm sorry, just because I want to get the timing
14     here.
15              So this is on December 2, correct?
16     A.  Yes.
17              MR. WARSHAVSKY:  OK.  If we can just unzoom that,
18     please, Humberto.  If we can turn to page six.
19     Q.  Here you say, can you do one more chill post for me,
20     correct?
21     A.  Yes.
22     Q.  So that means NFT Kings had already done a chill post for
23     you?
24     A.  It was a story.
25     Q.  OK.  So a chill story?
```

1   A.  Promotion story, yeah.  Chill story.

2   Q.  OK.  I mean, what you wrote here is one more chill post?

3   A.  Yes.

4   Q.  OK.  And you said it's blown up since.

5       Does that mean that the MetaBirkins NFT project blew

6   up after the first chill post?

7   A.  It could be, or it could just be that people were finding

8   it.  I'm not sure if I'm speaking directly to his initial post.

9   Q.  OK.  Could have been another reason that it's blown up, you

10  mean?

11  A.  Yes.  There was multiple people posting about it.  It was

12  growing every day.

13  Q.  But you wanted him to do another one, correct?

14  A.  Yes.

15  Q.  And that's because it would drive interest or demand for

16  the MetaBirkins, correct?

17  A.  Um, the more people that see it, the more demand.

18  Q.  And you thought it would also be good for NFT Kings, right?

19      We can look at pages six and seven, just so we can see

20  it.

21      You thought that NFT Kings -- I'm sorry.  I'm

22  misspeaking.  I apologize.

23      You thought this would also be good for NFT Kings

24  because he already, he already had a MetaBirkin or he had a

25  whitelist spot, correct?

1   A.  Yes.

2   Q.  So, just so I understand the relationship and we can be

3   clear about that, NFT Kings gets a free whitelist spot for

4   doing the first post, correct, in exchange for doing a post?

5   A.  Yes, I gave a whitelist spot.

6   Q.  And then he pays $450 or so to mint, correct?

7   A.  Correct.

8   Q.  OK.  And that's because he's done the chill, correct?

9   A.  It's because -- yeah, he posted it, yes.

10  Q.  As soon as he minted, he can sell the MetaBirkin that he

11  bought for $450 at whatever the market's at, correct?

12  A.  Yeah, whatever he wants to sell it for.

13  Q.  And at that time you thought the top of the market would be

14  somewhere between 25 and $50,000?

15  A.  Approximately.

16  Q.  OK.  But that was speculative?

17  A.  Yes.

18  Q.  So is the idea that the MetaBirkin are kind of like an

19  investment?

20  A.  Um, I believe art is an investment.

21  Q.  And the more people you have chilling the MetaBirkins or

22  that art, the higher the value will go?

23  A.  Um, the more people who see it and like it gives it the

24  opportunity to be bought for more money.

25  Q.  The people who are chilling are compensated by getting the

1    NFT?

2    A.   Just the ones that I know and that I spoke to prior to the

3    launch.

4    Q.   Were there any rules about how long someone chilling a

5    MetaBirkin NFT had to hold it?

6    A.   I don't believe so.

7    Q.   And I think we've used words like pump and chill.

8         Are pump and chill the same thing?

9    A.   Um, sort of.

10   Q.   Is there a difference between the two of them?

11   A.   They both mean, like, promote.

12        MR. WARSHAVSKY:  Can we show Plaintiff's Exhibit 259,

13   please -- I don't think it's admitted -- for identification.

14   Q.   This is a tweet from your Twitter, correct?

15   A.   Correct.

16   Q.   And you did that?

17   A.   I did that.

18        MR. WARSHAVSKY:  OK.  Move into evidence.

19        MR. HARRIS:  No objection, your Honor.

20        THE COURT:  Received.

21        (Plaintiff's Exhibit 259 received in evidence)

22        MR. WARSHAVSKY:  You can furnish to the jury, please.

23   Q.   So your tweet talks about, well, it says NFTs in a

24   nutshell, and then you define pump and dump.

25        Do you see that?

1  A.  I'm not defining them.  I'm just saying what the state of

2  the market was at the time.

3  Q.  OK.  So this is what you understood the state of the market

4  to be?

5  A.  That's what was happening at the time, in my opinion.

6          MR. WARSHAVSKY:  OK.  If we can turn to Plaintiff's

7  Exhibit 313.

8          I'm not sure if it's been admitted, which I think has

9  already been received into evidence.

10  Q.  This is your communication with the Sacks brothers,

11  correct; we looked at this before?

12  A.  Yes, and Jesse Lee.

13  Q.  Jesse Lee.  If we can go to page 111.

14          All right.  And here, this is a text from you on the

15  upper right, correct, I told Noble that I would give him a bag

16  if he could get whales to sweep the floor?

17  A.  Yes.

18  Q.  And who is Noble?

19  A.  Noble is just kind of an NFT influencer, also.

20  Q.  When you said you would give him a bag if he got whales to

21  sweep the floor, what did that mean?

22  A.  It's kind of, like, a chill promotion, same thing as NFT

23  Kings.

24  Q.  But what does sweeping the floor mean?

25  A.  To buy -- um, it's basically the same thing.  So basically

1    it's just people buying them.

2    Q.  OK.  So you're trying to get an influencer to get other

3    people to raise the price, is that accurate?

4    A.  Um, telling people to buy them which, in turn, would raise

5    the price.

6    Q.  All right.  Thank you.

7            If we can turn to Plaintiff's Exhibit 255, which I'll

8    offer for identification.

9            This a blog post from you, correct?

10   A.  Yes.

11           MR. WARSHAVSKY:  And I'll offer into evidence.

12           MR. HARRIS:  Your Honor, sorry.  Just one second.

13           No objection, your Honor.

14           THE COURT:  Received.

15           (Plaintiff's Exhibit 255 received in evidence)

16   Q.  And when you say -- you say my goal is for MetaBirkins to

17   double as an investment.

18           Do you see that?

19   A.  Yes.

20   Q.  OK.  What did you mean by that?

21   A.  Art is an investment and they double as an investment for

22   the holders.

23   Q.  And then you say you're looking for the right holders.

24           Do you see that?

25   A.  Correct.

1    Q.  And what are the right holders?

2    A.  I'm sorry.  Can I fix that, what I answered?

3    Q.  Sure.

4    A.  I said it would eclipse in the hands of the right holders,

5    so it's a little different than what you said.

6    Q.  OK.  What did you mean by the right holders?

7    A.  Um, I guess, people who are willing to, kind of -- who see

8    the value in the artwork.  Um, people who are willing to, like,

9    hold the artwork or not willing to just, kind of, like, sell it

10   for nothing.

11   Q.  OK.  And have you ever used the term paper handers?

12   A.  Yeah.

13   Q.  What is a paper hander?

14   A.  Um, somebody who sells something for less than it's worth.

15   Q.  So were paper handers the right holders for MetaBirkins?

16   A.  Probably not, I mean, for anything, that's an investment.

17   Q.  OK.  Now, if we look at the first bullet at the bottom of

18   the page where it says beyond?

19   A.  Yeah.

20   Q.  Do you see that?

21   A.  Correct.

22   Q.  You say that you're going to give -- you're talking about

23   the MetaBirkins Discord server, correct?

24   A.  Correct.

25   Q.  And the MetaBirkins Discord server is a community that you

1  run?

2  A.  Um, yes.

3  Q.  OK.  And here you're inviting people to the MetaBirkins

4  community in exchange for being whitelisted for your next --

5  for a generative project, correct?

6  A.  Yes.

7  Q.  And the generative project was I Like You, You're Weird?

8  A.  Correct.

9  Q.  And you said you only had plans to create 100 MetaBirkins,

10  correct?

11  A.  Yes.

12  Q.  OK.  So that means at least 900 people who you were

13  inviting to the community and giving a gift, what you call a

14  prize, a gift, a reward maybe, is that --

15  A.  A whitelist spot.

16  Q.  A whitelist spot.  OK.

17       At least 900 people who were getting the whitelist

18  spot weren't going to be MetaBirkins holders, right?

19  A.  No.  Yeah, or --

20       Sorry.  Can you reask it again so I can answer it

21  again?

22  Q.  Sure.  At least 900 people that were not MetaBirkins

23  holders would get the whitelist spot, but then join the

24  community at MetaBirkins, but they wouldn't get a MetaBirkin,

25  correct?

1   A.  Yeah.  So, this is basically the first -- the first

2   thousand people who joined the MetaBirkins Discord server, they

3   get enrolled.  You can give people, like, a title, I guess.

4   I'm trying to explain it just so people understand.  You give

5   them a role and that role was, like, early -- like, an early

6   supporter.  So those people got whitelist spots for I Like You,

7   You're Weird.

8   Q.  So it's kind of like a loyalty program?

9   A.  It's just the first people who came.

10  Q.  So is that a loyalty program, or no?

11          MR. HARRIS:  Objection, asked and answered.

12          THE COURT:  Well, I'll allow it.  Keeping in mind the

13  time.

14          You may answer.

15          THE WITNESS:  All right.  I answered, didn't I?

16  Q.  Is that the same as a loyalty program?

17  A.  No, not to me.  It's just the first people.

18          MR. WARSHAVSKY:  Can we turn to Plaintiff's Exhibit 76

19  offered for identification.

20          We would offer it into evidence, or I could identify

21  it.

22  Q.  Is this a tweet you made?

23  A.  That I made?

24  Q.  No.

25  A.  Wait.  So what part, like, the art or --

1    Q.  Is this a Twitter account you controlled at any or

2    partially controlled at any point?

3    A.  Partially controlled, yes.

4    Q.  Did you do this post?

5    A.  Um, prob -- most likely.

6              MR. WARSHAVSKY:  We would offer it into evidence.

7              MR. HARRIS:  No objection, your Honor.

8              THE COURT:  Received.

9              (Plaintiff's Exhibit 76 received in evidence)

10   Q.  Can you tell us what this is?

11             MR. WARSHAVSKY:  Furnish to the jury.

12   A.  What was that?

13   Q.  Can you tell us just very generally what this is?

14   A.  This is -- it's called a roadmap.  It just tells you what

15   you're doing with, um, a project.

16   Q.  Why did you issue this?

17   A.  To tell people what our project was about.

18             MR. WARSHAVSKY:  OK.  If we can turn to Plaintiff's

19   Exhibit 305 for identification.  Actually, let's get rid of

20   that.  I don't want to use that.

21             If we can go to Plaintiff's Exhibit 154 marked for

22   identification.  I'll skip this one to try to move quickly.

23   BY MR. WARSHAVSKY:

24   Q.  We spoke earlier about -- we spoke not earlier, I guess

25   yesterday -- about the website for the MetaBirkins NFTs.

1              Do you remember that?

2     A.  Yes.

3     Q.  And that website is *www.MetaBirkins.com*, correct?

4     A.  Yes.

5     Q.  And do you remember when you registered that name?

6     A.  Um, I guess it would be after I got the name suggested.

7     Q.  OK.  So sometime late October, early November 2021?

8     A.  I assume so.

9     Q.  That would have been before October 29, 2021?

10    A.  No, it would be after the name was suggested.

11    Q.  OK.  But before December 1, when the MetaBirkins were

12    minted?

13    A.  Yeah.

14    Q.  So sometime within the November 2021, probably?

15    A.  Correct.

16            MR. WARSHAVSKY:  I would like to show for

17    identification, switching a little bit here, Plaintiff's

18    Exhibit 323 marked for identification.

19    Q.  Have you seen this document before?

20    A.  Um, yes.

21    Q.  This is an e-mail that you're on, correct?

22    A.  Yes.

23    Q.  And it's you, someone named Kenneth Loo, and someone named

24    Cristina Criddle, correct?

25    A.  Correct.

1   Q.   Who is Kenneth Loo?

2   A.   My publicist.

3   Q.   At this time, what was Kenneth Loo doing, if you recall?

4   A.   Um, fielding PR requests.

5            MR. WARSHAVSKY:  OK.  We would move Plaintiff's

6   Exhibit 323 into evidence.

7            MR. HARRIS:  Your Honor, I have no objection to

8   Mr. Rothschild's statements.

9            I would have the same objection as yesterday with

10  respect to other people's statements.

11           THE COURT:  All right.  So it will be limited to

12  questions about what Mr. Rothschild said, except as necessary

13  to provide context.

14           (Plaintiff's Exhibit 323 received in evidence)

15  Q.   When Kenneth Loo was communicating here, was he doing it on

16  your behalf?

17  A.   Yes.

18  Q.   And with your authorization?

19  A.   Yes.

20  Q.   OK.  And the first message discusses an --

21           THE COURT:  Given that answer, I will revise my last

22  ruling.  The exhibit is received without limitation.

23           MR. HARRIS:  Your Honor, may I just mention there is

24  third-person statements on it.

25           THE COURT:  The statements of Mr. Rothschild and the

1   statements of Mr. Loo are received.  The statements of any

2   other persons are received only to show context and not for

3   their truth.

4           MR. WARSHAVSKY:  Thank you, your Honor.

5           If you can publish to the jury.

6   BY MR. WARSHAVSKY:

7   Q.  So this is about Mr. Loo setting up an interview for you in

8   the Financial Times, correct?

9   A.  I believe so.

10  Q.  OK.  And you actually spoke to this reporter, Cristina

11  Criddle, correct?

12  A.  I don't think so.

13          MR. WARSHAVSKY:  If we can turn to page two.

14          I'M sorry.  Let's go back to page one for a second,

15  maybe I'm ...

16          OK.  Now to page two.

17  Q.  And so Mr. Loo writes to Ms. Criddle about it, and you do

18  as well, about the volume of MetaBirkins, correct?

19  A.  Oh, yeah.  Provide an update.

20          MR. WARSHAVSKY:  And then if we can go to page three.

21  Q.  We see Ms. Criddle.

22          Does this refresh your recollection as to whether or

23  not you spoke to Ms. Criddle?

24  A.  Yes.  I mean, Ken spoke the majority, but, yeah, I just

25  don't remember this specifically.

N22sHER1                          Estival - Cross

1   Q.  OK.  And Ms. Criddle is asking here if you can confirm how

2   many fakes have been sold?

3   A.  Correct.

4   Q.  And she was -- at that time you had said there were

5   counterfeit MetaBirkins, correct?

6   A.  Correct.

7   Q.  And that is what she's asking you about, to your knowledge?

8   A.  Yes.

9   Q.  And then the next one she's asking you for screenshots.

10          Do you see that?

11  A.  Yes.

12  Q.  OK.  And you didn't respond to either of those, right?

13  A.  It was Ken's job to respond, really.

14  Q.  OK.  And then, of course, later that morning she asks about

15  a quote from Hermès as well as a quote from someone named Colin

16  Bell --

17  A.  Correct.

18  Q.  -- an IP attorney at Brabners.

19          Do you know who Colin Bell is?

20  A.  No.

21          MR. HARRIS:  Your Honor, I would object to the

22  admission of the quote about Colin Bell, which is double

23  hearsay, and this is an e-mail from Ms. Criddle, who is not

24  here.

25          THE COURT:  I think this is just laying the foundation

```
 1   in response.

 2             MR. WARSHAVSKY:  It is.

 3             THE COURT:  Overruled.

 4   BY MR. WARSHAVSKY:

 5   Q.  If we can turn to the next page to show page four as well,

 6   please.

 7             Then Ken Loo responds saying, I'm not sure how your

 8   article about counterfeits on OpenSea opened this line of

 9   questioning.

10             Is this because this was concerning to you and

11   Mr. Loo?

12   A.  No.  Cristina reached out about counterfeits and then she

13   changed the topic midway, so we thought we got bait-and-

14   switched.

15   Q.  OK.  But you didn't provide any evidence about the

16   counterfeits here?

17   A.  Cristina was asking questions that we weren't -- you know,

18   she asked about the counterfeits initially, and then she

19   started getting these different quotes and stuff.  So it was

20   just poor journalism, and we didn't feel like we needed to

21   respond to her.

22   Q.  OK.  So if we can turn to page six.

23             Ms. Criddle then responds, right, and she still -- her

24   statement, whether it's true or not, says that, for context,

25   This piece is still about counterfeit NFTs as well as this.  I
```

1    went to Hermès for a comment on MetaBirkin and that was their

2    statement.

3    A.   Correct.

4    Q.   Right?

5             And then she tells, whether it's true or not --

6             How does Ken Loo respond?

7    A.   Um, that we are removing our comment from the piece.

8    Q.   So instead of -- but she still -- did Ms. Criddle still

9    include your comments in the piece?

10   A.   I don't remember.

11   Q.   All right.  But you still didn't provide any response to

12   Ms. Criddle about the fakes that you thought were -- the fake

13   MetaBirkins that you thought were existing?

14   A.   Like I said, she switched her story midway through, so we

15   didn't feel the need to continue providing information to her.

16   Q.   OK.

17   A.   We felt a little disrespected.

18   Q.   OK.  If we can turn to --

19            Well, let me start with this.  Do you remember

20   Mr. Martin testifying earlier that Hermès had no records of you

21   or anyone on your behalf communicating with Hermès?

22   A.   I'm sorry.  Can you repeat that?

23   Q.   Yes.  Do you remember Mr. Martin testifying Tuesday that

24   Hermès had no records of you or anyone on your behalf

25   communicating with Hermès?

1    A.  He testified that?

2            He said that?

3    Q.  Yes.

4    A.  I think so, yes.

5    Q.  OK.  If we can turn to Plaintiff's Exhibit 243, which has

6    already been admitted into evidence, page five.

7            And at the bottom you say, We might be some help from

8    Hermès themselves.

9            Did you mean that you were -- you were helping Hermès

10   or Hermès might help you?

11   A.  I honestly don't remember.  It's kind of a typo also, so

12   I'm not really sure what my thinking was here.

13   Q.  At this time, had you spoken to anybody at Hermès?

14   A.  No.

15   Q.  Can we turn to Plaintiff's Exhibit 224 for identification,

16   and this is a document produced by you.

17           This is a text exchange between you Eric Ram, correct?

18   A.  Correct.

19   Q.  And produced by you in this litigation, correct?

20   A.  Yes.

21   Q.  Eric Ram is actually Eric Ramirez, your childhood friend?

22   A.  Yes.

23           MR. WARSHAVSKY:  And we would offer it into evidence,

24   your Honor, subject to the same objections.

25           THE COURT:  Yes.

1             MR. HARRIS:  Thank you, your Honor.

2             (Plaintiff's Exhibit 224 received in evidence)

3             MR. WARSHAVSKY:  If we can go to pages --

4             THE COURT:  Received.

5             Go ahead.

6    BY MR. WARSHAVSKY:

7    Q.  So are these the images provided to you by Mark Design or

8    Mark Berden?

9    A.  Correct.

10   Q.  If we can turn to page four.

11            You say at the top, you write to Mr. Ramirez, Hermès

12   might partner on me with this, negotiating RN, correct?

13   A.  Correct.

14   Q.  OK.  At this time, had you spoken to anybody at Hermès?

15   A.  No.

16   Q.  If we can turn to Plaintiff's Exhibit 225 marked for

17   identification.

18            This is a text exchange between you and Aaron Maresky,

19   correct?

20   A.  Correct.

21   Q.  And this was produced by you during discovery, correct?

22   A.  Yes.

23            MR. WARSHAVSKY:  And we would offer this exhibit into

24   evidence subject to the same prior agreement, rulings and

25   agreement.

1           THE COURT:  Same objection, same ruling, received.

2           MR. HARRIS:  Yes, your Honor.

3           (Plaintiff's Exhibit 225 received in evidence)

4           MR. WARSHAVSKY:  OK.

5    BY MR. WARSHAVSKY:

6    Q.  Who is Aaron Maresky?

7    A.  A friend.

8    Q.  If we can turn to page three, show two, two and three to

9    the client.  Now page three.

10          OK.  You start by saying on page three, I was going to

11   make a fluffy Birkin with a heart NFT, maybe you all want to

12   collab.

13          What is a heart NFT?

14   A.  It's an artwork collection by clothing designer -- the name

15   is slipping my mind right now.  And then Aaron was part of the

16   team at the time, so it was just a drawing of a heart.  They

17   did 10,000 of them.

18   Q.  OK.  So when you asked if -- when you say, maybe y'all want

19   to collab, you're talking about potentially collaborating with

20   Mr. Maresky?

21   A.  He was part of that team at the time.  I thought he could

22   get it to the artist that does hearts NFT.

23   Q.  And if we can turn to the next page.

24          Mr. Maresky writes to you, is it official with Birkin?

25          How do you respond?

N22sHER1                          Estival - Cross

1    A.  Pushing for it.

2    Q.  At this time, were you negotiating with Hermès?

3    A.  No, but that doesn't infer that.  I said, pushing for it,

4    which means I would try.  But then I say, but I have major

5    press.

6    Q.  So, I'm sorry, when you were saying pushing for it, that's

7    not meant to convey that you're pushing to negotiate with

8    Hermès?

9    A.  I said I would try, yes.

10   Q.  Saying that you're trying to negotiate?

11   A.  Trying to collaborate with Hermès.

12   Q.  OK.  If we can turn to Plaintiff's Exhibit 373 for

13   identification.

14          This is a text message between you and someone named

15   Lauren that you produced in discovery.

16          Do you know who Lauren is?

17   A.  Yes.

18          MR. WARSHAVSKY:  We would move subject to the same

19   objection and agreement.

20          THE COURT:  Same objection, same ruling, received.

21          (Plaintiff's Exhibit 373 received in evidence)

22   Q.  Turn to page 11.

23          This is, by the way, December 2.  the MetaBirkins were

24   minting, correct?

25   A.  Yes.

1  Q.  If we can go to page 11, maybe top of page ten because of

2  how the text split.

3         So we see at the bottom of page ten, the top of

4  page 11, Lauren writes, How did the call go with Hermès?

5         Do you see that?

6  A.  Yes.

7  Q.  OK.  And you respond two things here.  Looks like you're

8  switching between conversations.  You say they can be used

9  against me, looks like if Hermès wants to be bad, and then the

10  next one, that's TBD next week, Tuesday.

11         Do you see your three texts?

12  A.  Correct.

13  Q.  Which one was responding to Lauren?

14  A.  What do you mean?

15  Q.  Lauren asks, How did the call go with Hermès?

16         Lauren asks, How did the call go with Hermès?

17         Did you have a call with Hermès at that time?

18  A.  No, but I was told from that same person I recommended -- I

19  mentioned yesterday that they would try to put me in touch with

20  somebody from New York.

21  Q.  And who was that person?

22  A.  It was a president of a former president of Yoox.

23  Q.  What's the name of the person?

24  A.  Can I --

25         Is that all right to say, like ...

N22sHER1                          Estival - Cross

1    Q.   Yeah.

2    A.   Clement Quan.

3    Q.   OK.   And Clement Quan told you that he was calling Hermès

4    on your behalf?

5    A.   He said he knew people and they would try to get me on the

6    line with somebody, so.

7    Q.   Who did he say he knew?

8    A.   Somebody from the New York PR department.

9    Q.   Does Hermès have a New York PR department?

10   A.   I don't know.   This is what somebody else is telling me.

11   Q.   OK.   And did Clement Quan make any calls on your behalf; do

12   you know?

13   A.   I'm not sure.

14   Q.   Did Clement Quan ever send you any texts about calls with

15   Hermès?

16   A.   We predominantly talked on the phone.

17   Q.   But you never had this call?

18   A.   No.

19   Q.   If we can turn -- by the way, who is Lauren?

20   A.   She worked for Basic.Space at the time.

21   Q.   OK.   Were you working with Basic.Space on --

22            Let me ask it differently.

23            Was Basic.Space a business partner of yours?

24   A.   Um, for Baby Birkin, yes.

25   Q.   And was Lauren also doing work for you in connection with

1   the MetaBirkins?

2   A.  Um, she did, like, PR for Basic.Space, and they were

3   supposed to help get press as well.

4   Q.  OK.  Weren't there other projects, like, did you ever

5   discuss maybe making bathrobes for the MetaBirkins?

6   A.  Um, I think so, yes.

7   Q.  And you had those discussions with Lauren?

8   A.  Yes.

9   Q.  And those were real world projects to wear?

10  A.  Just a bathrobe?

11  Q.  Yes.

12  A.  Yeah, a bathrobe.

13  Q.  And those would have a MetaBirkin' logo on it or a --

14          Let me ask it better.

15          Those bathrobes that you were talking about were going

16  to have a MetaBirkin logo on them?

17  A.  I don't believe so.  Maybe the name.

18  Q.  The name?

19  A.  But they were going to have their wallet addresses on them

20  to identify them.

21  Q.  OK.  Thank you.

22          If we could turn to Plaintiff's Exhibit 306, which has

23  already been introduced.  Page 47.  This is your discussion

24  with Truman and Alex Sacks.

25          You write -- so this is two days earlier, November 30?

1    A.  Yes.

2    Q.  And you say, We need to make a push with Hermès just to

3    try.  My plug at *Vogue* has a direct line to Paris.

4    A.  Correct.

5    Q.  OK.  So two days earlier you're talking about your plug at

6    *Vogue*?

7    A.  Yes.

8    Q.  Who was your plug at *Vogue*?

9    A.  Just different writers at *Vogue* that were covering Baby

10   Birkin.

11   Q.  Which writer?

12           Which writer was that?

13   A.  Um, I don't have their name.

14   Q.  OK.  And you didn't mention Clement Quan here.

15           You mentioned *Vogue*?

16   A.  Yes.

17   Q.  If we could -- well, let's stay here for a minute.  If we

18   can go back to 46 and 47.

19           You talk about next projects being MetaParteks and

20   MeteMilles.

21           Do you see that?

22   A.  Correct.

23   Q.  Those were ideas you had?

24   A.  Just ideas.

25   Q.  And on the next page you say, I create watches and we pitch

1    the companies to partners.

2              Do you see that?

3    A.  Yes.

4    Q.  Did that ever happens?

5    A.  No, they were just ideas.  I'm just talking with my

6    friends.

7              MR. WARSHAVSKY:  I would offer plaintiff's exhibit --

8    I'll skip that for now.

9              If we can go to Plaintiff's Exhibit 305.  I'll offer

10   for identification.

11   Q.  This is a text exchange between thank you, Moshe Sacks and

12   Truman Sacks, correct?

13   A.  Correct.

14             MR. WARSHAVSKY:  We would offer into evidence under

15   the same, the same conditions, objections and agreement, your

16   Honor.

17             THE COURT:  Yes, received.

18             (Plaintiff's Exhibit 305 received in evidence)

19   Q.  If we can turn to page eight.

20             So this is on December 1 -- I'm sorry -- December 4.

21   Can you look at your text at the bottom.  My goal was to use

22   Sotheby's to get Hermès maybe on board.

23   A.  Correct.

24   Q.  So who did you know at Sotheby's?

25   A.  Um, the -- it was -- his name is Mason also, but we had a

1     few calls.  I think it's Mason Howell.

2     Q.  So on December 4, you were looking at getting Sotheby's on

3     board?

4     A.  They reached out to me and had contact.  I just took the

5     call.

6     Q.  And this is before, in your text to Lauren, you said the

7     call was going to happen a few days later and that was by

8     Clement Quan?

9     A.  Correct.

10    Q.  OK.

11    A.  But that's different context, you know.  Like, these are

12    two different ideas for a call, so they are not referring to

13    the same thing.

14         MR. WARSHAVSKY:  OK.  I would like to mark for

15    identification Plaintiff's Exhibit 303.  Actually, I'm going to

16    skip Plaintiff's Exhibit 303.

17         Can we show Plaintiff's Exhibit 300.  I'm sorry, it's

18    not in evidence.  Just to the witness and counsel and the

19    court.

20    BY MR. WARSHAVSKY:

21    Q.  This a post by you?

22    A.  Yes.

23         MR. WARSHAVSKY:  Offer into evidence.

24         MR. HARRIS:  Your Honor, may I ask one voir dire

25    question?

1          THE COURT:  Sure.

2          MR. HARRIS:  Mr. Rothschild, when was this post made?

3          THE WITNESS:  I think it was October of last year or

4   November.

5          MR. HARRIS:  2020?

6          THE WITNESS:  2022.

7          MR. HARRIS:  2022.

8          Your Honor, no foundation.  Objection.

9          THE COURT:  No.  I think under the cyber-squatting

10   claim, his overall intent is at issue and it has some possible

11   bearing on that.

12          Overruled.

13          MR. WARSHAVSKY:  Can you publish this to the jury.

14   BY MR. WARSHAVSKY:

15   Q.  This was a post by you?

16   A.  Yes.

17   Q.  What did you mean?

18   A.  At the time, there was a lot of things going on in crypto

19   with, like, FTX, sandbag Manfried, as well as things that I was

20   dealing with -- well, not personally dealing with.  But things

21   that I knew of within different companies that I worked for,

22   um, that seemed to be kind of extortion.  So I was just

23   speaking to that.  Nothing to do with me personally.

24   Q.  OK.  I would ask to show the exhibit, the witness,

25   Plaintiff's Exhibit 100 at pages 347 to 348.  This has been an

1    issue for other pages, so please don't show the jury yet.

2              Just looking, is this from Instagram or Twitter?

3              I think it's from Twitter.

4    A.  Twitter.

5    Q.  OK.  And the tweet is on 347.  That's the page on your

6    left-hand side or by you, correct?

7    A.  Yeah.

8    Q.  OK.

9              MR. WARSHAVSKY:  We'll offer this page into evidence,

10   your Honor, page 347.

11             MR. HARRIS:  No objection.

12             THE COURT:  Received.

13             (Plaintiff's Exhibit 100, page 347 received in

14   evidence)

15   Q.  And this is a retweet by you, correct?

16   A.  By who?

17   Q.  Well, if we look at the bottom of the page, it says

18   MetaBirkins retweeted.

19             Do you see that?

20   A.  Oh, yeah.

21   Q.  OK.  And can you show the whole tweet, please?

22   A.  You know what comes after the avatar/PFP frenzy?  Metaverse

23   fashion.  Dressing those metaverse avatars.  Digital outfits

24   and accessories.  And the tweet goes on to the next page.

25             MR. WARSHAVSKY:  Let me offer the first page into

 1    evidence.  Just show the rest of the tweet.

 2              Counsel, any objection to me showing the remainder of

 3    the tweet from the following page?

 4              MR. HARRIS:  Your Honor, this is all hearsay, your

 5    Honor.

 6              THE COURT:  I'm sorry.  I can't hear you.

 7              MR. HARRIS:  I'm sorry, your Honor.

 8              I didn't have an objection to the MetaBirkins tweet,

 9    but this part is all hearsay, your Honor.

10              THE COURT:  Well --

11              MR. WARSHAVSKY:  I can establish.

12              THE COURT:  Come to the sidebar.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  How are you going to establish?

3              MR. WARSHAVSKY:  It's a retweet by him.  He's

4    publishing it.  I'm not offering it for the truth of the matter

5    asserted at all.  It's a retweet by him, so he's the one

6    publishing it on his account.

7              THE COURT:  So what's the relevance?

8              MR. WARSHAVSKY:  Well, it says that the brand, that

9    the big brands are entering the metaverse, get in there now,

10   @MetaBirkins.

11             THE COURT:  OK.  I see.

12             So the argument would be he adopted this ambition by

13   retweeting it?

14             MR. HARRIS:  I would still say hearsay, your Honor.  I

15   understand the point.  He can answer the questions.

16             THE COURT:  But I think -- no, I think the foundation

17   has been laid.

18             MR. HARRIS:  I agree.

19             THE COURT:  You'll have to ask those questions, but on

20   that basis.  Received.

21             MR. WARSHAVSKY:  Thank you, your Honor.

22             (Continued on next page)

23

24

25

1              (In open court)

2    BY MR. WARSHAVSKY:

3    Q.  This was a retweet by you, correct?

4    A.  Yes.

5    Q.  And you understood what you were retweeting at the time?

6    A.  Yes.

7    Q.  OK.  And this says, digital brands -- dressing those

8    metaverse avatars.  Digital outfits and accessories.  Big

9    brands are already experimenting with NFTs.  Be early.

10   @MetaBirkins.

11              Do you see that?

12   A.  Correct.

13   Q.  And you retweeted that?

14   A.  Correct.

15   Q.  OK.  And did you think that was good for the MetaBirkins,

16   did you retweet it because you thought it was good for

17   MetaBirkins' promotion?

18   A.  I'm retweeting something that somebody else said.

19   Q.  But you chose to retweet it?

20   A.  Yes.

21   Q.  And did you choose to retweet it because you thought it

22   would be helpful in your promotion?

23   A.  Not necessarily.  It's just telling people what this

24   person's personal opinion is on the future of NFTs.

25              MR. WARSHAVSKY:  OK.  If we can go to Plaintiff's

1    Exhibit 309, marked for identification.

2    Q.  This is a text message between you and Mr. Sacks, correct?

3    A.  I think so.  I just see my name, but...

4    Q.  But the ones on the left are your tweets -- your text

5    messages?

6    A.  Yes.

7            MR. WARSHAVSKY:  Move to admit this document.

8            MR. HARRIS:  Your Honor, I cannot read the embedded,

9    the little part that's embedded.  We just don't know what it

10   is.

11           MR. WARSHAVSKY:  This is just being offered for

12   Mr. Rothschild's statement.

13           THE COURT:  He's saying he can't read it.  You want to

14   show him a hard copy?

15           THE WITNESS:  It's really small.

16           MR. HARRIS:  Your Honor, there is a part of it I can't

17   read.  If they can zoom in on it or the rest of the document

18   can be admitted.

19           THE COURT:  Well, it will be received, and if there is

20   a problem with that, we can always redact that.

21   BY MR. WARSHAVSKY:

22   Q.  I just want you to focus on the left-hand side,

23   Mr. Rothschild --

24   A.  Yes.

25   Q.  -- and your statements.  Sorry, I was doing BoF interview.

1              Who is BoF?

2    A.   *Business of Fashion*.

3    Q.   And then you said, Bro, it's crazy.  Apparently the word

4    around the media world is that this is a press stunt by Hermès

5    and I'm, like, paid by Hermès.

6              Do you see that?

7    A.   Yes.

8    Q.   OK.  Who were you talking with at *Business of Fashion*?

9    A.   A reporter.

10   Q.   And who told you that the word around the media world is

11   that this was a press stunt by Hermès?

12   A.   I believe it was Ken.

13   Q.   OK.  Ken Loo, your --

14   A.   Publicist.

15   Q.   OK.  And is that the same for, like, I'm paid by Hermès?

16   A.   Yeah.  It's one thought.

17   Q.   OK.  Thank you.

18             Can we turn to Plaintiff's Exhibit 308 marked for

19   identification.

20             These are text messages between you, Alex and Truman

21   Sacks, correct?

22   A.   Yes.

23   Q.   And where it says MR, those are texts by you?

24   A.   Yes.

25             MR. WARSHAVSKY:  Your Honor, we would offer subject to

N22sHER1                          Estival - Cross

1    the same objections and agreements.

2              THE COURT:  Received.

3              (Plaintiff's Exhibit 308 received in evidence)

4              MR. WARSHAVSKY:  Please publish.

5    Q.  So this is after you received the cease and desist letter,

6    correct?

7    A.  Correct.

8    Q.  And these were your plans of what to do?

9    A.  That's correct.

10   Q.  OK.  And you wrote, In order to shed confusion between the

11   Hermès Birkin and its successor.

12             What did you mean by successor?

13   A.  The MetaBirkin.

14   Q.  So the MetaBirkins were the successor to the Hermès Birkin

15   bag?

16   A.  This is, like, a joke, but, like, it's to be funny.

17   Q.  It's a joke.  OK.

18   A.  Yeah.  It's, like, I just got a cease and desist, so ...

19   Q.  OK.  Turn to page 13.

20             On the left-hand side, these are texts from you,

21   correct?

22   A.  Some of them are.

23   Q.  I'm looking at the ones on the bottom.

24   A.  Yes.

25   Q.  And you say, Christ, L'Officiel thought it was an official

1   Hermès thing.

2              Do you see that?

3   A.  Yes.

4   Q.  And you give a screenshot from *L'OfficielUSA.com*?

5   A.  Yes.

6   Q.  And and how did you get that?

7   A.  How did I get what?

8   Q.  Where did you take that screenshot from?

9   A.  Um, probably -- I mean, I think, maybe, Google.

10  Q.  So did you go to the *L'OfficielUSA.com* website to get it?

11  A.  No.  I went on Google.

12  Q.  You went on Google.

13             OK.  How did you find out about this?

14  A.  I have Google alerts.

15  Q.  OK.  So the Google alert told you about this, you think?

16  A.  Yes, yes.

17  Q.  And is this a picture of the MetaBirkins website, or is

18  this a picture of part of the MetaBirkins website?

19  A.  Um, yes.  This was also separate, so I don't know, um, if

20  it was from within the site or if it was taken as an image.

21  It's an image.

22  Q.  OK.  So if we go back to page seven of this, maybe six and

23  seven.

24             So you're responding to text messages with Moshe Sacks

25  and Truman Sacks.  And you say, you see, and then on to page, I

1  guess, page six and then page seven, you say, It's kinda

2  stupid.  The only time I use Hermès in the claimer?

3          Do you see that?

4  A.  Disclaimer.

5  Q.  Disclaimer, you're right.

6          Do you see that?

7  A.  Yes.

8  Q.  Isn't it true that the disclaimer was only put on your

9  website after you received the cease and desist letter?

10  A.  Yes.

11  Q.  If we can go to Exhibit 251 for identification.

12          This is a screenshot from the MetaBirkins Discord

13  server, correct?

14  A.  Correct.

15  Q.  And this is a post by you, correct?

16  A.  Yes.

17          MR. WARSHAVSKY:  Offer this into evidence.

18          MR. HARRIS:  What is this?

19          MR. WARSHAVSKY:  It was Exhibit 251.

20          MR. HARRIS:  251.

21          No objection, your Honor.

22          THE COURT:  Received.

23          (Plaintiff's Exhibit 251 received in evidence)

24          MR. WARSHAVSKY:  Can we publish to the jury, please.

25  Q.  This was a contest you were running on the MetaBirkins

N22sHER1                          Estival - Cross

1    Discord server, correct?

2    A.  Yes.

3    Q.  And you were telling people to build MetaBirkins with

4    household items, correct?

5    A.  Yes, like, arts and crafts.

6    Q.  So the MetaBirkins, WHAT would be built here would be

7    physical items, correct?

8    A.  Um, they could be.

9    Q.  OK.  Well, you said build a MetaBirkin using household

10   materials.

11           Are there household materials that aren't physical

12   goods?

13   A.  I'm just saying some people submitted nonphysical things

14   that they made on a computer, also.

15   Q.  OK.  If we can take this down.

16           Turn to Plaintiff's Exhibit 239, which has already

17   been received into evidence.  If we can turn to page four.

18           This is a screenshot, text message with a screenshot

19   that you sent to Mark Design, correct?

20   A.  Correct.

21   Q.  OK.  And this is the picture of the Hermès charm, correct?

22   A.  That's correct.

23   Q.  OK.  And you understand that's a product that Hermès sells,

24   right?

25   A.  Yeah.

N22sHER1                          Estival – Cross

1   Q.   And you were sending this to Mark Design to try and make an

2   image, correct?

3   A.   As a reference.

4               (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1   BY MR. WARSHAVSKY:

 2   Q.  And you were doing this to make more money; correct?

 3   A.  No, this was free.

 4   Q.  Okay.  Could you turn to pages 5 and 6 of this text,

 5   please.  You say here on the right-hand side, page 6:  That way

 6   we can sell 25 to 50 more things at .1 ETH, make more money.

 7   And people would get both will be like they have a rarer work.

 8   That will go for more.

 9            MR. HARRIS:  Objection.  I'd just like the prior text

10   read as well, your Honor, for context.

11            THE COURT:  I'm sorry, I need to have the last

12   question reread.

13            MR. WARSHAVSKY:  I was starting -- I was just reading

14   through these texts.  I didn't get to my question.

15            THE COURT:  I'm sorry.  Because it wasn't on my

16   screen, I didn't see it.  But what's the objection again?

17            MR. HARRIS:  I just wanted Mr. Warshavsky to start

18   sooner in the text chain for context.

19            THE COURT:  Sustained.

20   BY MR. WARSHAVSKY:

21   Q.  Okay.  We started with a picture -- go back to page 3 -- 4,

22   rather, please.  Page 3 and page 4.  You tweet you send this to

23   Mark Design; correct?

24   A.  Yes.

25   Q.  Okay.  And then I showed you pages after this, pages 5 and

1   6.

2   A.  Yes.

3   Q.  Okay?  Do you see those?  Those two pages.

4   A.  Yes.

5   Q.  The text on the right side of the page, once again, aren't

6   you discussing making more things?

7   A.  Yes.

8   Q.  And selling them at .1 ETH?

9   A.  Just because they are an idea doesn't mean that that was

10  the actual idea that we finished with.

11  Q.  That wasn't what I asked.

12          You were proposing selling them at .1 ETH?

13  A.  At this time.

14  Q.  Okay.  And you said to make more money?

15  A.  At this time.

16  Q.  And so it was people who got both would have a rarer work?

17  A.  This is me ideating.

18  Q.  I understand.  But I was asking you -- I asked you when you

19  sent this to Mark Design earlier if it was to make more money.

20  And now I'm showing you your text on this page to say wasn't it

21  to make more money?

22  A.  At the time.  But I'm saying -- you asked me a question

23  prior to that.  And then I'm saying what the actual end up idea

24  was.  So this is like ideas change over time.

25  Q.  There was a fluffy horse release from this; correct?  Or a

1   fluffy horse made from this; correct?

2   A.  A picture of a fluffy horse preview.

3          MR. WARSHAVSKY:  Can we pull up the fluffy horse for a

4   second.  Actually, you don't have to.

5   Q.  The fluffy horse, I think we all saw it, that you teased on

6   Instagram?

7   A.  Correct.

8   Q.  Was that fluffy horse commentary?

9   A.  Commentary?

10  Q.  Yes.

11  A.  No, it was just for fun.

12  Q.  Turn to Plaintiffs' Exhibit 306 please.

13         THE COURT:  Counsel, keep in mind you have five

14  minutes.

15         MR. WARSHAVSKY:  Can we then turn to --

16  A.  Can I expand on my answer?

17  Q.  I'm sorry?

18  A.  Can I expand on my answer from the last question?

19         THE COURT:  No.

20         MR. WARSHAVSKY:  Can you turn to -- offer for

21  identification Plaintiffs' Exhibit 284.

22         Can we turn to Plaintiffs' Exhibit 287.

23  Q.  This is a text exchange between you and Mark Design?

24  A.  Correct.

25  Q.  Okay.

1           MR. WARSHAVSKY:  We'd admit this into evidence, your

2    Honor, subject to the same restrictions.

3           THE COURT:  Yes.  Received.

4           (Plaintiffs' Exhibit 287 received in evidence)

5           MR. WARSHAVSKY:  Okay.

6    Q.  This is after Hermès sued you; correct?  This is after

7    Hermès sued you; correct?

8    A.  Yes.

9    Q.  And your text to Mark Design says:  Did you tell someone

10   you created MetaBirkins?

11   A.  Yes.

12   Q.  Okay.  And Mark says:  Nah, just family are working on

13   this.  Why?  See that?

14   A.  Yes.

15   Q.  And how do you respond?  Let's go to page 2, see how you

16   respond to him.  Someone claimed that they I didn't make them

17   in the lawsuit.  Is that a true statement?

18   A.  I'm not sure.  I forget what the full complaint was.

19   Q.  Okay.  Mark Design wasn't named in the complaint, was he?

20   A.  No.

21   Q.  And nothing -- was there anything in the complaint -- do

22   you recall anything in the complaint suggesting anyone other

23   than you was the creator of the MetaBirkins?

24   A.  I don't remember.

25           MR. WARSHAVSKY:  Can we turn to Plaintiffs' Exhibit

374.

Q.  This is a text exchange between you and Mark Design;
correct?

A.  Yes.

Q.  Okay.  And you produced it in this case; correct?

A.  Yes.

          MR. WARSHAVSKY:  Offer into evidence subject to the
same conditions, your Honor.

          THE COURT:  Received.

          (Plaintiffs' Exhibit 374 received in evidence)

          MR. WARSHAVSKY:  And if we turn this --

Q.  Mark Design is talking -- is sending you images; correct?

A.  Yes.

          MR. WARSHAVSKY:  Okay.  If we turn to the next page,
page 5.

Q.  And you continue to talk back and forth with Mark Design
this day about different images; correct?

A.  Yes.

          MR. WARSHAVSKY:  Okay.  If we could turn the page.
I'm sorry, where are the images?  I want the images themselves.
Can we turn to page 4.  I want the images with the complaint.
There, the one you just showed.

Q.  This is an image that Mark Design sent to you; correct?

A.  Yeah.

Q.  We saw this one yesterday?

1   A.  Yes.

2            MR. WARSHAVSKY:  And can we go to page 3 then.

3            Wasn't there the one with the MetaBirkin with the

4   complaint?  There we go.  Page 11.  Sorry.

5   Q.  This is another image that Mark Design sent to you;

6   correct?

7   A.  Yes.

8   Q.  Okay.  And your counsel showed you those yesterday;

9   correct?

10  A.  I believe so, yes.

11  Q.  And you said you created them; correct?

12  A.  Created -- we know that Mark was the one who, like,

13  simulated them.

14  Q.  Did you send these to Mark Design?

15  A.  No, but I thought we established this already, so no.

16  Q.  Okay.  Did you instruct Mark Design to make these?

17  A.  This one I'm not sure.  I could look at the rest of the --

18  Q.  Why don't you look at the text messages.

19  A.  What's the exhibit?

20  Q.  374.

21           MR. WARSHAVSKY:  The next exhibit I'd like to show is

22  288.

23  A.  Okay.  I read through some of it.

24  Q.  Is there anywhere where you ask Mark Design to put these

25  images in this text?

1    A.  No.  But I said I'd only use them if they got nastier with

2    me.

3    Q.  Okay.  So Mark Design came up with these and sent them;

4    correct?

5    A.  Yes, the croc.

6            MR. WARSHAVSKY:  And then, your Honor, here I'd like

7    to show the exhibit we discussed previously, Exhibit 288.

8            THE COURT:  Yes.

9            MR. WARSHAVSKY:  Which we had shown with a portion of

10   it blocked out.

11           THE COURT:  Yes.

12   A.  For the --

13           THE COURT:  No, no, no.  There's no pending question.

14           Go ahead.  There's no pending question.  That means no

15   more testimony from you until there's a question.

16           MR. WARSHAVSKY:  If we could show the Court and

17   counsel 288 blocked out, 288, page 2 and 3.  And if you could

18   please block out -- okay.  Is that acceptable to publish,

19   counsel?

20           MR. HARRIS:  Yes.

21           THE COURT:  Okay.  Proceed.

22   Q.  This is a text exchange between you and David Cohen;

23   correct?

24   A.  Correct.

25   Q.  Okay.  And this is about three days later; correct?

1   A.  From when?

2   Q.  From the text we saw from Mark Design.

3   A.  Sure.  Yes.

4   Q.  Okay.  And who is David Cohen?

5   A.  One of my managers, like my day-to-day.

6   Q.  At this time he wasn't your manager though, right?

7   A.  I would have to see the date, but potentially.

8   Q.  And you described him also as a potential investor at one

9   point; correct?

10  A.  They are my management company.

11  Q.  Okay.  And you say -- let's look at your text in the

12  middle.  I actually have a play I just thought of.  Call the

13  next collection Irreparable Damage, then drop gems like this.

14  A.  Yes.

15  Q.  And we looked at the two next pages.  So if you look at

16  this page and then the following page.

17          So you told David Cohen this was your idea; correct?

18  A.  For the -- well, I said the idea for Irreparable Damage

19  and, like, the thought behind it.  It goes beyond an image.

20  Q.  You just read the text from Mark Design.  Didn't Mark

21  Design use those exact words in that text?

22  A.  I don't think he said Irreparable Damage.

23  Q.  Okay.

24          MR. WARSHAVSKY:  If we could turn back to Exhibit 374.

25  A.  And then I believe we had a -- like, for the framed

1   complaint, it says in this text message, I see people are in

2   full, or Mark says that.  And then he says, Send over the

3   lawsuit as well from the framed one.  So we definitely had a

4   conversation about me proposing that framed one initially,

5   that's what I was trying to clear up.

6   Q.  Now you're saying it was your idea?

7   A.  I'm just saying -- he says, Send over the lawsuit as well

8   for the framed one, which means there's some kind of context

9   that's missing in this text chat.

10  Q.  Okay.  So now you've read it.

11          Did he come up with the name Irreparable Damage?

12          MR. WARSHAVSKY:  Can we keep going, page 2, show page

13  2 and 3 next.  I'm sorry, 4 and 5.

14  A.  I don't see where it says Irreparable Damage.

15          MR. WARSHAVSKY:  I know I'm out of time, your Honor.

16          THE COURT:  Yes, you're five minutes over the allotted

17  time.

18  A.  Am I missing it?

19          THE COURT:  Excuse me.

20          So we will give the jury their mid-morning break at

21  this time.  And we will resume in 15 minutes.

22          (Jury not present)

23          THE COURT:  All right.  So that concludes the

24  cross-examination.  How long are you going to be on redirect?

25          MR. HARRIS:  Your Honor, I will be an hour or less.

1          THE COURT:  Okay.  Very good.

2          We'll see you in 15 minutes.

3          (Recess)

4          THE COURT:  Let's get the witness back on the stand.

5          (Jury present)

6          THE COURT:  Redirect.

7   REDIRECT EXAMINATION

8   BY MR. HARRIS:

9   Q.  Good morning, Mr. Rothschild.

10  A.  Good morning.

11  Q.  Mr. Rothschild, I'm going to try to speak a little faster

12  today than yesterday, trying to move it along.

13  A.  Got it.

14  Q.  Okay.  Do you recall that yesterday Mr. Warshavsky asked

15  you some questions about secure your bag?

16  A.  Yes.

17          MR. HARRIS:  Ashley, could you please put up Exhibit

18  313 in evidence.

19  Q.  And what is this?

20  A.  This is the minting page for MetaBirkin.

21  Q.  And so if somebody bought a MetaBirkin and they clicked

22  through, they went to this page to mint; is that right?

23  A.  Correct.

24  Q.  Did you create this page?

25  A.  Yes.  Well, I designed it, yes.

1    Q.  You designed it.

2          And what's the reference to secure your bag to?

3    A.  So secure the bag in like pop culture, in like rap and

4    stuff, just means to secure something of value.  And we had

5    already said you can't see it behind it because this is like a

6    compressed mobile version, but it says press the button below

7    to mint your MetaBirkin now.  We just didn't want to say the

8    same thing twice.

9          MR. HARRIS:  So can you please zoom in on that,

10   Ashley.

11   Q.  Behind the secure your bag it says -- it says press the

12   button below to mint?

13   A.  And it says your MetaBirkin now.

14         MR. HARRIS:  Can you zoom in on that more, Ashley.  Is

15   it possible?  All right.

16   Q.  On the actual version of the site, could the people see --

17   this is a printed copy.  Can people see the "to mint your

18   MetaBirkin now"?

19   A.  Most people mint on a desktop just because it's way safer.

20   So this is just like a very compressed version of it.

21   Sometimes mobile gets a little buggy.

22         MR. HARRIS:  Thank you.

23   Q.  Mr. Warshavsky was asking you questions yesterday about

24   Discord, do you recall that?

25   A.  Yes.

1   Q.   Now, Discord is a -- we talked about this briefly.  It's an

2   online community?

3   A.   Yes.

4   Q.   And how do you communicate with people in Discord?

5   A.   It's kind of like a big chat, a chat platform.  So you just

6   open these different channels, and people can talk, kind of

7   like how I described hashtags.  Each channel is like a hashtag,

8   and people can talk, depending on what they want to talk about.

9   Q.   Can people put videos up?

10  A.   Videos, voice memos, I can stream myself.

11  Q.   And can people direct message each other or is it just the

12  whole group?

13  A.   Both.

14  Q.   Do people sometimes direct message you?

15  A.   All the time.

16  Q.   And your Discord handle, is that the right word?

17  A.   Yes.

18  Q.   Your Discord handle is public?

19  A.   Yes, it's Mason Rothschild #0001.

20  Q.   And do people from the Discord community of MetaBirkin, do

21  they sometimes direct message you?

22  A.   Yes.

23  Q.   And if they direct message you, would you have read those

24  messages?

25  A.   Most of them, the ones that I could see.

1    Q.   And would you respond?

2    A.   Yes, I respond to them publicly as well.

3    Q.   We're going to come back to that.

4         Mr. Warshavsky asked you yesterday, do you have any

5    documents showing that there were more than nine or 10,000

6    members of the MetaBirkin Discord?

7    A.   Yeah.

8    Q.   Discord channel, is that the right word?

9    A.   Discord server.

10   Q.   Discord server.

11        Were there more members than that?

12   A.   Yes.

13   Q.   Now, does Discord have a feature in Discord where somebody

14   who logs into your Discord server --

15   A.   Yeah.

16   Q.   -- can tell how many members there are at that time?

17   A.   Yes.  In most Discord servers, they have a member count at

18   the top, which we had for the MetaBirkin server and a few of my

19   other servers.

20        MR. HARRIS:  Can I please pull up what is marked for

21   identification, your Honor, Defendants' Exhibit 619, just for

22   the witness and the Court, counsel.

23   Q.   Could you briefly describe what this is, Mr. Rothschild.

24   A.   This is me speaking through the MetaBirkins Twitter saying

25   that we're pausing registration at 24,000 members.

1    Q.  And is this a post that you put out publicly?

2    A.  Yes, this went out on Twitter.

3    Q.  And this 24,000 number, that's right at the top of the

4    Discord?

5    A.  Yes, this is on December 15th.  And this would have been

6    the number that I saw at the top.  And everybody could see

7    publicly, so I couldn't, like, lie about it.

8           MR. HARRIS:  Your Honor, I offer Defendant's Exhibit

9    619.

10          MR. WARSHAVSKY:  Your Honor, I think this is -- I

11   think this is hearsay within hearsay, given the testimony.

12          THE COURT:  Let me ask the witness, this is something

13   you put together?

14          THE WITNESS:  This is my -- my tweet.

15          THE COURT:  Overruled.

16          MR. HARRIS:  Thank you.  Please publish that.

17          THE COURT:  This is, I think, fair rebuttal, and the

18   door was opened to this.  Received.

19          MR. HARRIS:  Thank you, your Honor.

20          (Defendant's Exhibit 619 received in evidence)

21          THE COURT:  So maybe this has been answered, but at

22   least to me it's unclear.  The decision to use the term

23   "MetaBirkins" was yours, yes?

24          THE WITNESS:  The final decision to actually use the

25   term, yes.

1          THE COURT:  Okay.  And you intended to associate -- to

2   indicate to the people who were accessing this that this was in

3   some sense a reference to Birkin bags, yes?

4          THE WITNESS:  In some ways, yes, a reference.

5          THE COURT:  Okay.  And just so I understand how the

6   purchasing went, they knew that when they purchase an NFT, even

7   though for 24 hours they would only see a shrouded image, that

8   what they were ultimately going to get was one of these --

9          THE WITNESS:  Yeah, one --

10          THE COURT:  -- MetaBirkin fur-covered MetaBirkin

11   images; correct?

12          THE WITNESS:  Yes.

13          THE COURT:  Go ahead.

14   BY MR. HARRIS:

15   Q.  In fact, Mr. Rothschild, did there come a point in time

16   where the Discord had more than 24,000 members?

17   A.  Yes, this was just on December 15th.

18          MR. HARRIS:  You can take that down, please, Ashley.

19   Q.  Mr. Warshavsky asked you some questions yesterday about a

20   community poll, do you recall that?

21   A.  Right.

22          MR. HARRIS:  If you could please put up in evidence,

23   Ashley, Exhibit 306, page 31.

24   Q.  And you were shown this yesterday, right?

25   A.  Yes.

1    Q.  All right.  And so you -- and there was discussion about

2    would there be additional MetaBirkins and how many?

3    A.  Correct.

4    Q.  All right.  And you wrote, community voted for 500 to 1,000

5    more, right?

6    A.  Correct.

7    Q.  What did you mean by community voted for 500 to 1,000 more?

8    A.  Through a lot of the decisions that I make, I ask the

9    community, since we have 25,000-plus people.  I wanted to ask

10   for their opinion and what they felt was right.  So I was, for

11   the most part, went by the community's final vote.

12   Q.  Which community?

13   A.  The MetaBirkins community.

14   Q.  Is that on Discord or someplace else?

15   A.  Discord is where I ran the poll.

16   Q.  So you ran the poll on Discord?

17   A.  Correct.

18   Q.  And then members of the community had the ability to vote?

19   A.  Yes, so they would be able to press a button which would

20   show what their response would be.

21        MR. HARRIS:  Your Honor, I offer -- not I offer,

22   sorry.  Ashley, could you please put up Defendant's Exhibit 615

23   for identification.

24   Q.  Could you briefly describe to the Court what this is.

25   A.  Yes.  This is a vote.  If you scroll up or -- well, above

1   that, it says -- I'm asking the community for how many I should

2   make for the next collection.  And you can see that option

3   number three is -- can you scroll up a little bit.  It says 501

4   to 1,000 total MetaBirkins, that was the winning vote; 430

5   people voted for that.  And then it says the community votes,

6   I'll listen.  I'll say I'm leaning towards 900 to make it an

7   even thousand, but this vote will determine that, and then the

8   community ended up voting for that.

9   Q.  This screenshot is something that is available at Discord?

10  A.  Yeah, every single member can see this.

11          MR. HARRIS:  Your Honor, I offer DX 615.

12          MR. WARSHAVSKY:  No objection.

13          THE COURT:  Received.

14          (Defendant's Exhibit 615 received in evidence)

15  Q.  So you put it out to the community.  And if I'm reading

16  this right -- am I reading this right, 298 people voted for

17  option two?

18  A.  Yes.

19  Q.  And then 430 people voted for option three, which is 501 to

20  1,000 MetaBirkins?

21  A.  Yes.

22  Q.  And was it your plan -- and this is after the first batch

23  had been minted; is that right?

24  A.  Yes.

25  Q.  And so was --

1   A.  Actually, no, this is -- this is the day before, actually.

2   Q.  I see.  I see there's a date here, 12/01/2021?

3   A.  Yes.

4   Q.  Okay.  And so -- and then was it your plan to follow

5   through with what the community expressed its preference for?

6   A.  Yes.

7   Q.  You were shown a resume yesterday by Mr. Warshavsky, do you

8   recall that?

9   A.  Yes.

10          MR. HARRIS:  Ashley, could you please put up Exhibit

11  281 in evidence.

12  Q.  Mr. Rothschild, this resume is dated 2014 at the top.

13  A.  Yes.

14  Q.  Do you see it also says what your birth date is?

15  A.  Yes.

16  Q.  You told Mr. Warshavsky yesterday you were 17 or so when

17  you made this resume?

18  A.  Yes.

19  Q.  How old were you when you made this resume?

20  A.  19.

21  Q.  Okay.  So you would have been 19 -- you were 19 or 20?

22  A.  Depending on if it was before or after September.

23  Q.  All right.  Now, Mr. Warshavsky asked you some questions

24  about your position at Barneys, do you recall those questions?

25  A.  Yes.

1    Q.  Yes.  All right.

2           Now, did you, in fact, work at Barneys?

3    A.  Yes.

4    Q.  What was your job at Barneys?

5    A.  Sales.

6    Q.  And how old were you when you got that job?

7    A.  About 19, I think.

8    Q.  And is Barneys a prestigious position?

9    A.  At the time, yes.  I think out of business now, but at the

10   time they were big.

11   Q.  Were there a lot of other 19-year-old salespeople at

12   Barneys?

13   A.  I think I was the youngest by maybe like a decade.

14   Q.  And how did you get that position?

15   A.  I went up to their HR department, put on my best outfit,

16   told them who I was, and I guess they liked me.

17   Q.  And was Barneys looking for some younger people?

18   A.  At the time, yes.

19   Q.  Why is that?

20   A.  They were launching -- they were starting to get into --

21   they had a new department called Men's Emerging Designers.  And

22   it was a lot of young brands, kind of like the Virgil Ablohs

23   and stuff that we spoke about before.  They had their brands in

24   there, like, the off-whites and stuff, or Fear of God.  And

25   they wanted, like, younger kids to sell that to the younger

1    audience.

2    Q.  Is marketing strategist on this; correct?

3    A.  Yes.

4    Q.  Barneys?

5    A.  Oh, no, sorry, I thought you meant just like in general.

6    Q.  You said in response to a question from Mr. Warshavsky that

7    you just copied it from the prior one?

8    A.  Yeah.

9    Q.  All right.  The prior one is Rhude or Rhude?

10   A.  Rhude.

11   Q.  Prior one is Rhude.  What is Rhude?

12   A.  Rhude is the brand of one of my childhood friends who's

13   also friends with Eric Ramirez, who we've seen mentioned a few

14   times.  We're all from Los Angeles.

15   Q.  Did you do marketing strategy for Rhude?

16   A.  At the time, yes.

17   Q.  And what is Mr. Rhude's current position?

18   A.  He's the creative director of Bally Switzerland, which is a

19   pretty big fashion house that you'll see on, like, Rodeo Drive

20   or out here.

21           MR. HARRIS:  Please take that down, Ashley.

22           Can we please put up Exhibit 126 in evidence.

23   Q.  Do you recall being shown Exhibit 126 yesterday by

24   Mr. Warshavsky?

25   A.  Correct.

1    Q.  All right.  What is Exhibit 126 please?  I'm just taking a

2    drink.  You please go ahead.

3    A.  Oh, okay.  It is a video recording — obviously you can't

4    see the video — of Future's post of a MetaBirkin; and then me

5    describing what is in that post.

6    Q.  May I unpack this a little?

7    A.  Sure.

8    Q.  You sent a tweet?

9    A.  Yes, this is my tweet.

10   Q.  That's from your person -- you have a personal Twitter

11   account?

12   A.  Yes.

13   Q.  All right.  You sent a tweet.

14            And what are you tweeting?

15   A.  I'm basically tweeting what is in the image or what Future

16   tweeted.  So he posted a picture of a bored ape, which is below

17   this picture of a doodle, this balloon.  Then he posts a

18   picture of a MetaBirkin, and then he posts a picture of the

19   doodle.  So -- and I'm saying MetaBirkin is Pluto, Pluto is

20   Future's nickname.

21   Q.  I'm going to get to that.

22            This is actually a video, this thing which you

23   re-posted?

24   A.  Yes.

25   Q.  I don't think the one we have is a video, but the original

```
1   is a video.

2   A.  Yeah, the original is a video.

3   Q.  You re-tweeted the video.  And when you -- Mr. Warshavsky

4   asked you about @MetaBirkin2Pluto yesterday, right?  Do you

5   recall that?

6   A.  Yes.

7   Q.  Okay.  What did you mean by that?

8   A.  One is a play on words because, like, MetaBirkins2Pluto,

9   Future's nickname is Pluto.  And Lil Uzi Vert's nickname is

10  Baby Pluto.  They did an album together.

11  Q.  And so when you're saying the NFT Trinity, Bored Ape,

12  doodles, MetaBirkins, are you referring to Mr. Future; is that

13  right?  Are you referring to Mr. Future's post?

14  A.  Yes.

15  Q.  Okay.  Thank you.

16          You've been asked a series of questions by

17  Mr. Warshavsky, I forget if it was today or yesterday, both

18  about disclaimers.  Do you recall that?

19  A.  Yes.

20  Q.  All right.  So I'm going to show a series of documents.

21          MR. HARRIS:  Can we start with Exhibit 230, which is

22  in evidence.

23  Q.  You were shown this document yesterday, do you recall that?

24  A.  Correct.

25  Q.  What is this document?
```

1   A.   This is the MetaBirkins collection page on Rarible, which

2   is a marketplace for NFTs.

3   Q.   And it says -- and you were shown this yesterday?

4   A.   Yes.

5   Q.   Digital art project by Mason Rothschild living on the

6   Ethereum blockchain, right?

7   A.   Yes.

8   Q.   Did you write that?

9   A.   Yes.

10  Q.   Who does that attribute this project to?

11  A.   Me.

12  Q.   Do you mention Hermès?

13  A.   No.

14          MR. HARRIS:  Can we please put up Exhibit 227 in

15  evidence.

16  Q.   Am I correct that this is -- well, what is this?

17  A.   This is the MetaBirkins page on December 1st.

18  Q.   And you wrote this?  Did you write this?

19  A.   I had some help, but yes.

20  Q.   But this is your site, metabirkins.com site?

21  A.   Yes, I own the website.

22          MR. HARRIS:  This is just not something -- I cannot

23  read this.  That's much better.

24  Q.   Can you read that now, Mr. Rothschild?

25  A.   The whole thing?

1    Q.  Just the words.  Can you read the letters?

2    A.  Oh, yes.

3    Q.  Okay.  All right.  You called it here a tribute to Hermès's

4    most famous handbag, right?

5    A.  Correct.

6    Q.  You said in the next paragraph:  Creator, Mason Rothschild,

7    began working on MetaBirkins, right?

8    A.  Correct.

9    Q.  Now, was it your intent to take credit for the MetaBirkins?

10   A.  Yes, since day one.

11   Q.  Was it your intent to have anybody think the MetaBirkins

12   came from Hermès?

13   A.  No.

14   Q.  Did there come a time when you added an explicit disclaimer

15   to this website?

16   A.  Yes.

17   Q.  Okay.

18           MR. HARRIS:  Your Honor, I'd like to -- Ashley, sorry.

19   Ashley, if you could please put up Defendant's Exhibit 505 for

20   identification.

21   Q.  Mr. Rothschild, could you please briefly describe what is

22   Defendant's Exhibit 505.

23   A.  It's the MetaBirkins page.  I think we changed this as soon

24   as we got the cease and desist.  And it says:  You're not

25   affiliated, associated, authorized, endorsed by, or in any way

1    officially connected with Hermès or any of its subsidiaries or

2    affiliates.  The official Hermès website can be found here.

3              MR. HARRIS:  Your Honor, may I offer Defendant's

4    Exhibit 505?

5              MR. WARSHAVSKY:  No objection.

6              THE COURT:  Received.

7              (Defendant's Exhibit 505 received in evidence)

8    Q.  That language you just discussed, that's at the bottom?

9    A.  It's actually on, like, the first page.  So this website is

10   divided into three tiers, and this is the first page that

11   everybody could see in one screen.

12   Q.  So if I go to metabirkins.com today, I see this on what I

13   would call the home page?

14   A.  Yes.

15   Q.  Now, do you recall how soon after you received the cease

16   and desist letter you put that up?

17   A.  It was probably very quick.

18   Q.  Did you also put up a similar disclaimer on Discord?

19   A.  Yes.

20             MR. HARRIS:  Ashley, could you please show the witness

21   what's been marked as Defendant's 620 for identification.

22   Q.  And could you briefly describe for the Court -- briefly

23   describe for the Court what this Defendant's Exhibit 620 is.

24   A.  This is some screenshots of public messages that I sent in

25   the MetaBirkins server, Discord server.

1          MR. HARRIS:  Your Honor, I offer Defendant's Exhibit

2     620.

3          MR. WARSHAVSKY:  Is this the whole document?

4          MR. HARRIS:  So it's Discord.  So it's like an

5     infinite scroll.  So this is the relevant page.  But I don't

6     object to more of it coming in.

7          MR. WARSHAVSKY:  I think we have no objection to the

8     part that was shown to the witness.  The rest we have to --

9          THE COURT:  That portion is received.

10          (Defendant's Exhibit 620 received in evidence)

11          MR. HARRIS:  Thank you, your Honor.

12     Q.  And what did you write on Discord?

13     A.  I referred people over to the disclaimer.

14     Q.  And then if you could just read the very first thing.

15     A.  So somebody asked a question if we are affiliated.  And I

16     said is the question that I am affiliated with Hermès?  And I

17     said no, like every disclaimer, this is an art project and not

18     associated with Hermès.  And this is December 22nd.

19     Q.  And this would be publicly available to everyone on the

20     Discord channel?

21     A.  Correct.

22          MR. HARRIS:  Thank you.

23          Ashley, could you please put up plaintiff's -- this is

24     in evidence, Plaintiff's Exhibit 272.  And you've already

25     turned to page 58.  Thank you.

1   Q.  Do you recall being shown this image by Mr. Warshavsky

2   yesterday?

3   A.  Yes.

4   Q.  Did you ever make this as a MetaBirkin?

5   A.  No.

6   Q.  Did you ever attempt to sell it as part of a MetaBirkins

7   collection?

8   A.  No.

9   Q.  Did you ever plan to sell it as part of a MetaBirkins

10  collection?

11  A.  No.  This is Mark poking some fun.

12  Q.  This is a private message?

13  A.  Private message.

14          MR. HARRIS:  Can we please -- Ashley, could you please

15  put up Plaintiff's Exhibit 306 in evidence, and please turn to

16  page 3.

17  Q.  Mr. Warshavsky showed this to you yesterday, and he

18  directed your attention to the bottom part of this, where you

19  say:  And we could do a TikTok campaign.  Do you see that?

20  A.  Yes.

21  Q.  Do you recall being asked those questions yesterday?

22  A.  Yes, I do.

23  Q.  It says -- and it says to say like at finally got my

24  Birkin, right?

25  A.  Yes.

1    Q.   Okay.  And then I think you wrote -- is this your -- this

2    is you writing?

3    A.   Yes.

4    Q.   And you write --

5    A.   At the bottom, yes.

6    Q.   All the boyfriends will get their -- "GF" means girlfriend?

7    A.   Yes.

8    Q.   A MetaBirkin.

9    A.   Yes.

10   Q.   Okay.  Did you, in fact, do that TikTok campaign?

11   A.   No.  Like I said, there's a lot of ideas that you'll see,

12   hundreds or thousands of text messages.

13   Q.   Do you recall that Mr. Warshavsky asked you a series of

14   questions yesterday about whether you ever spoke to any buyers

15   of MetaBirkins?

16   A.   Yes.

17   Q.   Did you, in fact, communicate with -- we covered this a

18   little bit before.  Did you communicate with community members

19   in the Birkin community?

20   A.   Every day.

21   Q.   That's two-way communication?

22   A.   Yes, public too.

23   Q.   Do you know if you communicate with any buyers of

24   MetaBirkins?

25   A.   Yes.  I mean, they all identify by verifying their -- that

1   they own one.

2   Q.   How do you do that?   How do you verify that someone owns a

3   MetaBirkin?

4   A.   You can use software that just -- like, somebody will

5   connect their wallet and it just proves that they hold --

6   Q.   And did any buyer of MetaBirkin ever reach out to you and

7   express confusion thinking they were getting an actual handbag?

8   A.   No.

9   Q.   Did any buyer of MetaBirkin ever reach out to you and

10  express confusion thinking they were getting something by

11  Hermès?

12  A.   No.

13  Q.   Mr. Warshavsky asked you this this morning.   This is

14  Defendant's Exhibit 390.

15          MR. HARRIS:   I don't believe we have -- I don't know

16  if we have this exhibit.   Mr. Warshavsky, would you mind --

17  would you be able to put that up for us?

18          MR. WARSHAVSKY:   Sorry, which exhibit?

19          MR. HARRIS:   390.

20          We have it?   We do have it.   Okay.   Thank you.

21          I'm sorry, in fact, we don't have Exhibit 390.   You

22  know what?   I will do without the exhibit.

23  Q.   Mr. Warshavsky --

24          MR. WARSHAVSKY:   Put it up?

25          MR. HARRIS:   Put it up.   Thank you.

1              MR. WARSHAVSKY:  390.

2              MR. HARRIS:  I'm not seeing it.  Yeah.

3     Q.  Mr. Warshavsky, do you recall being shown this document

4     this morning?

5     A.  Yes.

6     Q.  All right.  And this was -- am I right, is this a bid for

7     Baby Birkin?

8     A.  Correct.

9     Q.  Mr. Warshavsky asked you, do you recall who you placed this

10    bid for, right?

11    A.  Yes.

12    Q.  Do you recall -- do you remember one way or the other who,

13    if anyone, you might have placed any bids for for the Baby

14    Birkin?

15    A.  Sorry, can you repeat that?

16    Q.  You said -- I believe your testimony -- correct me if I'm

17    wrong, I believe your testimony was that a friend had asked you

18    to place a bid?

19    A.  Yes.

20    Q.  Or friend or friends?

21    A.  Yes.

22    Q.  Was it a friend or friends?

23    A.  Multiple people were interested, especially once they got

24    to a certain point.

25    Q.  All right.  And do you recall the names of anyone that you

N22VHER2                        Estival - Redirect

1   might have placed a bid for?

2   A.   There was a few different clients that we had, also, like,

3   Terminal, who -- which is my store, who never had purchased one

4   before, but they collected art.

5   Q.   And they asked you to place a bid?

6   A.   Yes.

7   Q.   All right.  Got it.

8          Did one of them ultimately win it?

9   A.   No.

10  Q.   Did you know the person who bought the Baby Birkin?

11  A.   They went unnamed, they are anonymous.  That was part of

12  the restriction from a lot of people because it was, like, you

13  know, it was crypto.  A lot of people didn't know what it was

14  at the time.

15  Q.   Okay.  And, in fact, your bid -- you did not place the

16  winning bid?

17  A.   No, the winning bid was 23,500.

18  Q.   And then the Baby Birkin was resold.  Were you the

19  purchaser of the Baby Birkin when it was resold?

20  A.   No, I think it was purchased for, like,

21  40-something-thousand by a private collector.

22  Q.   Thank you.

23         Now, you talked a bunch this morning about promoting,

24  do you recall that?

25  A.   Yes.

1    Q.   And is NFT Draft Kings a human being?

2    A.   NFT Kings?

3    Q.   Yes.

4    A.   Yes, he's a human being.

5    Q.   Draft Kings is a different event, right?

6    A.   Yeah.

7    Q.   Okay.  NFT Kings is a human being, okay?

8    A.   Yes.

9    Q.   And you made an arrangement with NFT Kings that if he

10   promoted, you would whitelist him?

11   A.   Correct.

12   Q.   Did you make arrangements like that with anyone else?

13   A.   Some of the celebrities I asked, but I couldn't force them.

14   I was like, Hey, would you post this if, like, you got a

15   whitelist?  But that made up, you know, 15 percent of the total

16   100.  Everybody else was contest, like, building a MetaBirkin

17   or I had people donate money to different animal charities.

18   There's so many different ways to get them and that's where the

19   majority of the supply went.

20   Q.   Now, did people also promote who did not get -- who were

21   not offered anything?

22   A.   Yes.  Some of the -- people made TikToks about it.  They

23   were, like, Oh, like, this kid, this artist made, you know, a

24   Baby Birkin and sold for 23,000.  People would just make

25   TikToks and they would go viral.

1    Q.  Is that something that happens in Web3.0 space, that people

2    will promote without being paid?

3    A.  I think it happens --

4              MR. WARSHAVSKY:  Objection.

5              THE COURT:  Sustained.

6              MR. HARRIS:  Your Honor, may I rephrase it?

7              THE COURT:  Yes.

8    BY MR. HARRIS:

9    Q.  In your experience, Mr. Rothschild, to your experience, are

10   you aware in the Web3.0 space of people promoting without being

11   paid?

12   A.  Yes.

13   Q.  You were asked a series of questions about -- it's on

14   multiple exhibits, I don't want to take the time.  And I also

15   didn't write down all the exhibit numbers.  So we could just do

16   this, okay.

17            You were asked about Clement Quan trying to get in

18   touch with Hermès, right?  Do you recall that?

19   A.  Yes.

20   Q.  Did you have reason to believe -- what was your reason to

21   believe that Clement Quan could get in touch with Hermès?

22   A.  These people were, like, high-ranking members in the

23   fashion industry; so I just believed them.  President of, like,

24   a multi-million or billion-dollar company that's based in

25   fashion that works with a lot of fashion companies, I would

1   assume that they had some type of connection.

2   Q.  Now, they asked you -- also asked you about your

3   contacts -- Mr. Warshavsky also asked you about your contacts

4   at *Vogue*, right?  Do you recall that?

5   A.  Yes.

6   Q.  What's your basis for believing that your contact at *Vogue*

7   could get in touch with Hermès?

8   A.  Because they worked for the biggest fashion publication in

9   the world.

10  Q.  And then you were asked some questions about a fellow with

11  your name, Mason, who works at Sotheby's; right?

12  A.  Correct.

13  Q.  What is Sotheby's?

14  A.  It's a -- they do real estate, but they are also one of the

15  biggest art auction houses and collectors.

16  Q.  What was your basis for believing that this fellow named

17  Mason from Sotheby's could get in touch with Hermès?

18  A.  Mason specifically handled -- he was the handbag specialist

19  at Sotheby's at the time.  And he worked with a lot of --

20  Q.  Have you since ever done any -- sold anything through

21  Sotheby's or have any plans to?

22  A.  We've had communications with Sotheby's and Christie's,

23  but, I mean, we're in the midst of a lawsuit.

24  Q.  And Christie's is another large auction house?

25  A.  Yeah, I think it's like second or they are probably the

1   same.

2   Q.  All right.  You were shown Defendant's Exhibit 259.

3          MR. HARRIS:  Could you please put that up.  It's in

4   evidence, Ashley.  Plaintiffs' exhibit.  Plaintiffs' Exhibit

5   259.  Thank you.  Could you please put that up.  Thank you.

6   Q.  All right.  And now when -- what year were MetaBirkins

7   minted?

8   A.  2021.

9   Q.  And do you believe there were changes in the NFT market

10  between 2021 and 2022?

11  A.  Yeah, it changes every day.

12  Q.  All right.  And what did you think -- you were shown this

13  tweet.  And the date of this tweet is what?

14  A.  October 11, 2022.  So, like, almost a year later.

15  Q.  And what's the context for this tweet please?

16  A.  It was just sad to see that some projects that, you know,

17  don't do anything and, like, you know, don't have a strong

18  community, they go crazy in terms of their pricing.  And then,

19  like, people who work, like, super, super hard to promote, they

20  give their holders or audience value, they don't go up in

21  value.

22  Q.  Is this a public or a private tweet?

23  A.  Public.

24  Q.  Do you believe that MetaBirkins overpromised and

25  underdelivered?

1    A.  No.

2    Q.  Do you believe that MetaBirkins underpromised and

3    overdelivered?

4    A.  No, this was like a year, you know, prior to anything.

5    This is --

6    Q.  This has nothing to do with MetaBirkins?

7    A.  No.

8    Q.  Okay.  You were shown Defendant's Exhibit 346 -- I'm sorry,

9    Mr. Millsaps corrects me, these are all plaintiffs' exhibits.

10   You were shown these by Mr. Warshavsky this morning; is that

11   right?

12   A.  I believe so, or yesterday.

13           MR. WARSHAVSKY:  Counsel, I don't have anything on my

14   screen.

15           MR. HARRIS:  Defendant's Exhibit 346, please.  I'm

16   sorry, plaintiffs'.  Do we have that, Ashley?  Mr. Warshavsky,

17   could you please put up Plaintiffs' Exhibit 346.

18           MR. WARSHAVSKY:  Is this for the jury?

19           MR. HARRIS:  It's in evidence.  Ashley says I have the

20   wrong number.  All right.

21   Q.  You were shown Mr.  --

22           MR. HARRIS:  This is in evidence, your Honor.

23           Could you please highlight -- zoom in on the one on

24   the bottom.  There you go.

25   Q.  This is a -- Mr. Warshavsky asked you questions about

1  something you re-tweeted from a man or a woman named Badsushi?

2  A.  Yes.

3  Q.  And when you re-tweet this statement, are you adopting that

4  statement as your own?

5  A.  No, just sharing it.

6  Q.  Sharing it.

7       And why would you share something like that?

8  A.  I thought it was a good idea, you know.  The space is

9  changing every single day with just different innovation.  But

10 it's not specific to just MetaBirkin itself; it's speaking to

11 the -- you know, he's like saying avatar or PFP frenzy.

12 MetaBirkin is not an avatar or a PFP.  So you just speaking to

13 what the lay of the land was with, like, Bored Ape Yacht Club,

14 Artifact, so on and so forth.

15 Q.  And, in fact, MetaBirkins could not actually dress avatars;

16 is that right?

17 A.  Not at 2D.

18 Q.  You were shown Defendant's Exhibit 300.

19       MR. HARRIS:  It's in evidence, Ashley, if you could

20 please put it up.

21       (Continued on next page)

22

23

24

25

1   BY MR. HARRIS:

2   Q.  Plaintiff's Exhibit 300.

3           Mr. Rothschild, do you recall, is this a private

4   message?

5   A.  Public.

6   Q.  How do you know it's public?

7   A.  Because it's a tweet, so it goes to everybody who follows

8   me.

9   Q.  OK.  Do you know when you sent this tweet?

10  A.  I think it was, like, October, November last year.

11  Q.  2022?

12  A.  Um, yeah, 2022.

13  Q.  Are you writing about MetaBirkins here?

14  A.  No.

15  Q.  Are you writing about how you conduct business?

16  A.  No.

17  Q.  What are you writing?

18  A.  How our people conduct business.

19  Q.  And, in particular, what are you writing about?

20  A.  A few different things.  There was business being conducted

21  at companies that I worked with, um, that I didn't think was

22  very admirable, and then there was a lot of things going on in,

23  um, crypto that was very not admirable, as people have seen

24  with, like, FTX or SPF.

25  Q.  This isn't something you're writing in secret?

1    A.   No.

2    Q.   Do you know how many people follow you on Twitter?

3    A.   Um, at this time, maybe, like, 25,000.  Today it's, like,

4    30,000.

5    Q.   All of these people would have seen this tweet?

6    A.   Correct.

7              MR. HARRIS:  Ashley, could you please put up

8    Plaintiff's Exhibit 308.  Could you please go to page 13, which

9    is in evidence.

10   Q.   Do you recall Mr. Warshavsky asked you some questions about

11   this?

12   A.   Yes.

13   Q.   And what is L'Officiel?

14   A.   It's a magazine, fashion magazine.

15   Q.   Is it a fashion magazine primarily in France?

16   A.   Um, France and here.

17   Q.   OK.  And did you ask Mr. Loo to reach out to L'Officiel

18   after this?

19   A.   Yeah.  As soon as I saw it, I told them to reach out to

20   them and fix it.

21   Q.   And what do you mean by reach out to them and fix it?

22   A.   Say that it's not an Hermès project, it's my project.

23   Q.   And are you aware if Mr. Loo did that?

24   A.   I believe he did.

25   Q.   He worked for you?

1   A.  He's my publicist.

2   Q.  Your agent?

3   A.  My publicist.

4   Q.  And he still works for?

5   A.  He still what?

6   Q.  He still works for you?

7   A.  Yes.

8   Q.  And Mr. Loo generally follows your instructions?

9   A.  For the most part.

10  Q.  Mr. Rothschild, do you recall, at the very end of your

11  questioning -- this will be my last topic -- the very end of

12  your questioning by Mr. Warshavsky you were being asked

13  questions -- we'll put it up on the screen -- about Plaintiff's

14  Exhibit 374.

15          This is a text chain between yourself.

16          MR. HARRIS:  It's in evidence, your Honor, subject to

17  your ruling.

18          THE COURT:  Yes.

19  Q.  This is a text chain between yourself and -- Mark Design is

20  Mark Berden?

21  A.  Yes.

22  Q.  Does he go by Mark Design, or is that what you called him

23  in your --

24  A.  I just saved his number as Mark Design.

25  Q.  You saved his number as Mark Design?

1   A.  Yes.

2   Q.  And you write, A friend had an amazing idea for this

3   situation.  A big critique for the whole Hermès brand?

4   A.  Repeat that.

5   Q.  I'm sorry.  It's there right on the screen.  I'm sorry.

6   That's from Mark Design.  I had that wrong.

7   A.  Yes.

8   Q.  Did you also communicate with Mr. Berden by phone calls or

9   other methods?

10  A.  Yes, sometimes, whenever we were both available.  We're in

11  different time zones, so it was easier to text.

12  Q.  All right.  And then, if you can turn, please, to page 11

13  of this exhibit.

14          This is the picture we saw yesterday of the complaint

15  in this case against a white MetaBirkin, right?

16  A.  Yes.

17  Q.  Is that an idea that you and Mr. Berden went back and forth

18  on?

19  A.  Yes.

20  Q.  All right.  And is that typical of the way you and

21  Mr. Berden worked?

22  A.  Yes.  I believe we made one that was the initial cease and

23  desist as well.

24  Q.  So this is actually, like, a second version of this idea?

25  A.  Yeah.  We went from cease and desist to actually, like,

1   lawsuit.  So we made two.

2   Q.  And then if you can please turn to page three of this

3   exhibit.

4            There's a white MetaBirkin with some Campbell soup

5   cans, right?

6   A.  Yes.

7   Q.  And what's going on in this picture?

8            MR. WARSHAVSKY:  Objection.

9            Your Honor, approach?

10           THE COURT:  All right.  Come to sidebar.

11           (Continued on next page)

1              (At the sidebar)

2              THE COURT:  When was this generated?

3              MR. WARSHAVSKY:  This was generated by Mark Design,

4    not Mr. Rothschild, at the time of the lawsuit.  The issue I

5    have with it is this was generated by Mark Design.  All of the

6    objections by counsel to date to these exhibits were about

7    statements of other people.

8              This is something that when Mark Design, commenting on

9    the lawsuit, and now we're asking Mr. Rothschild to opine on

10   it.  And it's a back door into the Warhol comparisons that we

11   previously complained about.  That's all this is.

12             MR. HARRIS:  Your Honor, it's an exhibit he offered.

13   It's obviously not being admitted for the truth.

14             My objection had been on hearsay grounds, not being

15   admitted for the truth of the matter asserted, and this witness

16   just testified that he collaborated with Mr. Design on these

17   things and not exactly sure what my question was, but I

18   think --

19             THE COURT:  Your question is what did he mean by it.

20   And what's he going to say?

21             MR. HARRIS:  I do not know, your Honor.

22             THE COURT:  Well, then that's another reason for

23   sustaining the objection.

24             MR. HARRIS:  Your Honor, I did not expect him to offer

25   this exhibit, and I do think he opened the door to it and, I do

1    think, the opportunity to take advantage of it.

2                THE COURT:  Well --

3                MR. WARSHAVSKY:  That's not accurate, your Honor.  We

4    talked about this yesterday, and I said I was going to be

5    showing these.  And I said I was going to be showing these, and

6    these have been in our exhibit list from the beginning, and

7    this exhibit was shown at the witness's deposition for the very

8    reasons I asked about it today.

9                THE COURT:  So I think if we put aside for just one

10   second, but only for one second, the opening the door issue,

11   then the question would be clearly objectionable for several

12   reasons.

13               The most obvious one being that if after a lawsuit is

14   filed someone makes an out-of-court statement saying, I'm

15   completely innocent and they are completely wrong, or I think

16   that their complaint is in violation of the First Amendment or

17   anything like that, none of that comes in both because it's

18   hearsay, an out-of-court statement, offered for its truth, and

19   because it's self-serving, and third, because it's highly

20   prejudicial, since the issue for the jury is what occurred

21   before the complaint was filed, not occurring thereafter.

22               There is an exception here for the disclaimer that he

23   put on after the cease and desist letter, but that's a

24   different story.  However, I think there were a number of

25   questions asked by plaintiff's counsel on cross that went well

1    beyond events that occurred before the filing of the complaint,

2    including even what he discussed with his counsel over the

3    weekend, and I allowed those questions.

4           But that certainly makes meaningful the argument that

5    the door has been opened to what I suspect the witness will

6    say, counsel doesn't know, which is that I was saying that,

7    saying this was like the Andy Warhol Campbell's soup situation.

8           I think that door has been opened, so the objection is

9    overruled.

10          MR. HARRIS:  I request the court reporter to read back

11   the question.  I'll ask you read back the question.  I want to

12   make sure I get the question right.

13          (Continued on next page)

```
 1                  (In open court)

 2                  MR. HARRIS:  Your Honor, may I ask the reporter to

 3       read back the question so I get it exactly right?

 4                  THE COURT:  Let me, just to move it along.

 5                  So you created this image, yes?

 6                  THE WITNESS:  Um, me and Mark.

 7                  THE COURT:  OK.  But it was at your direction?

 8                  THE WITNESS:  Um, I believe so.  We had just responded

 9       to --

10                  THE COURT:  Well, you're not disclaiming

11       responsibility; you take responsibility?

12                  THE WITNESS:  Oh, yeah, yeah.

13                  THE COURT:  All right.  And this was after the

14       complaint in this case was filed?

15                  THE WITNESS:  After the cease and desist.

16                  THE COURT:  After the cease and desist.

17                  Before the complaint?

18                  THE WITNESS:  Before the official complaint, yes.

19                  THE COURT:  OK.  And you were trying to convey a

20       message?

21                  THE WITNESS:  Um, yes.

22                  THE COURT:  OK.  And what was the message you were

23       trying to convey?

24                  THE WITNESS:  Um, we made a statement, um, comparing,

25       um, MetaBirkins to, um, Andy Warhol's Campbell soup cans.
```

1              THE COURT:  And what is Andy Warhol's Campbell's soup
2     can?
3              THE WITNESS:  It was an edition of screen prints of
4     Campbell's tomato soup cans that Andy Warhol created.
5              THE COURT:  And do I understand what you are saying is
6     that what you had in mind was a form of artistic expression?
7              THE WITNESS:  Correct.
8              THE COURT:  All right.  Go ahead, Counsel.
9              MR. HARRIS:  Your Honor, I have no further questions.
10             THE COURT:  OK.  Any recross?
11             MR. WARSHAVSKY:  Yes, your Honor.
12    RECROSS EXAMINATION
13    BY MR. WARSHAVSKY:
14    Q.  Mr. Rothschild, in response to your counsel's question
15    about Discord, you said you had public communications with
16    various purchasers of the MetaBirkins, correct?
17    A.  Yes.
18    Q.  You haven't shown us any of those in this case, have you?
19    A.  They are public.
20    Q.  But none of them have been shown?
21    A.  I produced my Discord -- the whole Discord and public
22    documents.  It's thousands and thousands of pages.
23    Q.  OK.  Have any of them been shown in court?
24    A.  Yes.
25    Q.  Which communication, which exhibit --

1           THE COURT:  No, no, no.  Although I think no objection

2      has been raised, the court needs to intervene and instruct the

3      jury.

4           Each side has the ability to present evidence to you.

5      And if it meets the requirements of the rules of evidence, it

6      will be received.  So the failure of one side or another to

7      introduce some evidence is not relevant because if it was

8      helpful to the other side, they could introduce it.

9           So my broader point is this.  You need to decide this

10     case just on the evidence that was presented.  Don't worry and

11     speculate about something that wasn't presented and why it

12     wasn't it presented.  There could be a thousand reasons why it

13     wasn't presented.  It's irrelevant.  You need to focus on what

14     was presented.

15          So the silently made objection of the defense is

16     sustained.

17          MR. HARRIS:  Thank you, your Honor.

18     BY MR. WARSHAVSKY:

19     Q.  Maybe I can ask in a confirmatory way.

20          Are any of the documents that we've seen

21     communications with you and MetaBirkins purchasers from

22     Discord?

23     A.  One more time?  Sorry, like, slower.

24     Q.  I'm trying.  I'm trying to do it in a way that is not --

25          THE COURT:  Well, there actually could be three or

1    four technical objections to that question, but I think you

2    really need to move on.

3              MR. WARSHAVSKY:  I would like to show to the

4    witness -- or the witness and counsel -- Exhibit 279 beginning

5    at page -- I'm sorry -- I need help.

6              What page is this?  Beginning at page 99, is it?

7              Beginning at page nine.  Sorry.  OK.

8    Q.  Mr. Rothschild, this is from your Instagram account, is

9    that correct?

10   A.  Um, MetaBirkins' Instagram, yes.

11   Q.  MetaBirkins' Instagram account.

12             And this is an account that you curate?

13   A.  Yes.

14             MR. WARSHAVSKY:  Your Honor, we would offer in this

15   page of Plaintiff's Exhibit 279.

16             MR. HARRIS:  Your Honor, we have no objection to the

17   exhibit.

18             THE COURT:  Received.

19             (Plaintiff's Exhibit 279, page 9, received in

20   evidence)

21             MR. WARSHAVSKY:  Publish to the jury.

22   BY MR. WARSHAVSKY:

23   Q.  Do you see the second -- the text at the top of the page?

24   A.  Correct.

25   Q.  OK.  It says, Where is my purse?  You guys scammed me.

1          Do you see that?

2    A.   Yes.

3    Q.   Did you respond to this?

4    A.   No.

5    Q.   Thank you.

6          You also spoke earlier about -- I'm sorry.  I'm just

7    trying to organize myself.  One moment.

8          You also spoke about --

9          MR. HARRIS:  Your Honor, if I may.  I'm sorry.

10         For completeness, could we also offer page eight of

11   that exhibit?

12         THE COURT:  Well, not unless you show it to me on my

13   screen.

14         OK.  That will be received.

15         Any objection?

16         MR. WARSHAVSKY:  I'm looking.  I'm not sure of the

17   relevance.  These are not by the same individuals.

18         THE COURT:  I'll receive it.

19         MR. WARSHAVSKY:  I have no objection, though.

20         THE COURT:  All right.

21         (Plaintiff's Exhibit 279, page 8, received in

22   evidence)

23   BY MR. WARSHAVSKY:

24   Q.   Now, you spoke about Mr. Loo, and I think you said that he

25   received or he informed you that he received inquiries from the

1   press, when your counsel was talking about it?

2   A.  Yes, yes.

3   Q.  And how many inquiries from the press did he receive?

4           MR. HARRIS:  Your Honor, scope.

5           THE COURT:  Overruled.

6   A.  I can answer?

7   Q.  Yes.

8   A.  I'm not sure.  A good amount.

9   Q.  Do you know about how often he received inquiries?

10  A.  About MetaBirkins or just about me in general?

11  Q.  About MetaBirkins and confusion with Hermès?

12  A.  I'm not sure.  Um, we would get a lot of different, like,

13  press requests.

14          MR. WARSHAVSKY:  OK.  Your counsel showed you an

15  Instagram post.

16          I don't think we've seen that exhibit before today.

17  Can I ask that you put up the Instagram post about the one

18  about the Discord community?

19          MR. HARRIS:  Yes.

20  A.  That's Twitter.

21  Q.  It's a tweet.  OK.

22          So at this point, you were saying that the Discord

23  server is open to new members?

24  A.  Yes.

25  Q.  OK.  But you're also -- so this is an advertisement -- or

1   let me say it differently.

2          Is this a promotion of the Discord server over

3   Instagram?

4   A.  Twitter.

5   Q.  Over Twitter?

6          I'm sorry.

7   A.  It's just giving people the link, we're pausing

8   registration at 24,000.

9   Q.  At this time you had less than 24,000?

10  A.  Close to it.

11         MR. WARSHAVSKY:  OK.  I would like to turn the

12  witness's attention to Plaintiff's Exhibit 271 to, please,

13  furnish to the court, counsel, and the witness.  In particular,

14  pages, I think, 55 and 56.

15  Q.  This is a text exchange between you and Micah Spear,

16  correct?

17  A.  Yes.

18         MR. WARSHAVSKY:  We would offer this exhibit into

19  evidence subject to the same restrictions, your Honor.

20         THE COURT:  Yes.  Received.

21         (Plaintiff's Exhibit 271 received in evidence)

22         MR. HARRIS:  Your Honor, subject to scope.  I don't

23  know what he's going to ask.

24         THE COURT:  I'm going to give you one more opportunity

25  to question, so if there is anything you think is new, you can

1   question about it then.

2              MR. HARRIS:  Thank you, your Honor.

3   BY MR. WARSHAVSKY:

4   Q.  You spoke earlier about commentary on Hermès and that is

5   why the crocodile bag was made, correct?

6   A.  Um, yes.

7   Q.  OK.  And here Micah Spears is suggesting to you that you

8   team up with PETA, correct?

9              MR. WARSHAVSKY:  I'm sorry.  Can you publish to the

10  jury this page.

11  A.  I don't see where he's, um...

12  Q.  I'm sorry.  We can go back to pages -- can we go to pages

13  53 and 54.

14  A.  OK.

15  Q.  Context.  Now can we go back to 55 and 56.

16             And putting aside your personal feelings about PETA,

17  you say -- I'm looking at your text in the middle of the page,

18  it says, And could have blow back on T27.

19  A.  Yes.

20  Q.  What's T27?

21  A.  Terminal 27.

22  Q.  And that's your company, correct.

23  A.  Um, yes.

24  Q.  OK.  And why would it have blow back on Terminal 27?

25  A.  Um, just because PETA is very aggressive.

1    Q.  Would it also have blow back on Terminal 27 because

2    terminal 27 sells calfskin products?

3    A.  We sell --

4              MR. HARRIS:  Objection.

5              THE COURT:  Ground?

6              MR. HARRIS:  Relevance.

7              THE COURT:  No.  I think it's marginally relevant.  I

8    will allow it.

9              Go ahead.

10   Q.  The question was, is part of the reason because Terminal 27

11   sells calfskin products?

12   A.  Um, we sell leather products.

13   Q.  OK.  And is one of those -- are any of those leather

14   products also calfskin?

15   A.  They could be.

16   Q.  And lambskin?

17   A.  They could be.

18             MR. WARSHAVSKY:  All right.  If we could -- I'm sorry.

19   If I could just check, I think I'm done.  If I could just check

20   with my colleagues one moment?

21             THE COURT:  Sure.

22             MR. WARSHAVSKY:  Actually, no further questions.

23             THE COURT:  OK.  Any re-re-redirect?

24             THE WITNESS:  Judge, are we going to have a break?

25             THE COURT:  We're almost done.

1           THE WITNESS:  OK.

2           THE COURT:  Just to mention, counsel, your client --

3           MR. HARRIS:  Excuse me?

4           THE COURT:  Your client would like a break soon.

5           MR. HARRIS:  I think two questions for him.

6           THE WITNESS:  I just need to use the restroom.

7           THE COURT:  All right.

8           MR. HARRIS:  If you would like a break, I have, I

9    think, two questions.

10          THE WITNESS:  Cool.

11   REDIRECT EXAMINATION

12   BY MR. HARRIS:

13   Q.  If you could put back up, please, Plaintiff's Exhibit 271,

14   which was just shown to you.

15          This was the exhibit where you asked a question about

16   PETA.  Do you recall that?

17   A.  Correct.

18   Q.  This is few pages earlier at page 52?

19   A.  Yes.

20   Q.  And the bottom of that page you ask Mr. Spear, do you know

21   any good animal welfare groups?

22   A.  Yes.

23   Q.  Do you know why you did that?

24   A.  Because we wanted to donate to animal welfare.

25   Q.  And who is we?

1    A.  Um, me.

2    Q.  And was that in relation to the MetaBirkins project?

3    A.  Yes.

4    Q.  And did you, in fact, donate to an animal welfare group?

5    A.  Yes.

6    Q.  Who did you donate to?

7    A.  Best Friends Animal Society in Kanab, Utah.

8    Q.  Do you recall how much you donated?

9    A.  I think it was a little less than 5,000.

10            MR. HARRIS:  Thank you, Mr. Rothschild.

11            THE COURT:  All right.  That was seven questions, not

12   two, but all right.

13            You may step down.

14            THE WITNESS:  Thank you.

15            (Witness excused)

16            THE COURT:  You can leave all that.

17            THE WITNESS:  Leave it?

18            THE COURT:  Please call your next witness.

19            MR. WARSHAVSKY:  Your Honor, we're going to go out of

20   order because of the length of time.

21            Could I also ask for a two-minute break before we

22   start?

23            THE COURT:  Yes, but we do want to go to 1:15.  We

24   will give everyone, including the jury, a five-minute break.

25            (Continued on next page)

1              (Jury not present)

2              THE COURT:  I just want to note for the record that my

3     law clerk just e-mailed to counsel my long-awaited summary

4     judgment opinion, but I don't think you can read it during a

5     five-minute break.

6              Take your break unfettered by that.

7              MR. HARRIS:  Your Honor, may I ask you one question?

8              THE COURT:  Yes.

9              MR. HARRIS:  Your Honor, with respect to motions at

10    the end of the case, would you like those held?

11             THE COURT:  Yes.  It's unclear in this kind of

12    situation when anyone rests, so it will be deemed that motions

13    can be made at the close of all the evidence, and they will be

14    deemed to have been made at the close of the plaintiff's case

15    as well.

16             MR. HARRIS:  Thank you, your Honor.

17             THE COURT:  Very good.

18             (Recess)

19             Let's get the next witness on the stand, please.

20             THE INTERPRETER:  I'm going to sit here, if that's OK?

21             THE COURT:  Yes.  Thank you.

22             THE DEPUTY CLERK:  Jury entering the courtroom.

23

24

25

1              (Jury present)

2              THE COURT:  Call your witness.

3              MR. WARSHAVSKY:  Your Honor, plaintiffs call

4   Ambre-Elise Binoche.

5              THE DEPUTY CLERK:  Please raise your right hand.

6    AMBRE-ELISE BINOCHE,

7         called as a witness by the Plaintiff,

8         having been duly sworn, testified as follows:

9              State your name and spell it for the record, please.

10             THE WITNESS:  Ambre-Elise Binoche, A-m-b-r-e E-l-i-s-e

11   B-i-n-o-c-h-e.

12             THE COURT:  The record should reflect that although

13   the witness clearly understands English, in an excess of

14   caution, we have an interpreter here.  So if at any point you

15   don't understand something, just ask the interpreter to

16   interpret it for you.

17             Go ahead, counsel.

18   DIRECT EXAMINATION

19   BY MR. WARSHAVSKY:

20   Q.  Good afternoon, Ms. Binoche.

21             Ms. Binoche, are you currently employed?

22   A.  Yes.

23   Q.  By whom are you currently employed?

24   A.  Hermès.

25   Q.  Do you have a title at Hermès?

```
 1   A.  Yes.

 2   Q.  What's your title?

 3   A.  Social media and web director.

 4   Q.  How long have you held this position at Hermès?

 5   A.  Five years.

 6   Q.  Can you briefly describe your responsibilities?

 7   A.  I'm responsible for developing and implementing the social

 8   media strategy for Hermès and all activities around web

 9   listening.

10   Q.  Thank you.

11           I would like to just talk about your, you know, your

12   prior history up until your current position.

13           Where are you from?

14   A.  Limoges in France.

15   Q.  OK.  Can you tell me about your education?

16   A.  I studied French literature at the university from 2003 to

17   2005.

18   Q.  Did you have any education after that?

19   A.  Yes.

20   Q.  What was that?

21   A.  I graduated bachelor in science of languages.

22   Q.  When was that?

23   A.  In 2006.

24   Q.  And did you have any further education?

25   A.  Yes.
```

1   Q.  And what was -- can you tell us about that?

2   A.  I graduated master in sociology in 2008, and I graduated

3   another master in communication in 2010.

4   Q.  And what did you do after graduating in 2010?

5   A.  I joined digital agency.

6   Q.  OK.  What is the name of that agency?

7   A.  Intuiti.

8   Q.  What idea your title there?

9   A.  I was social media manager.

10  Q.  Where is that company located?

11  A.  Nantes, France.

12  Q.  How long did you work there?

13  A.  A year and a half.

14  Q.  What were your responsibilities there?

15  A.  I was in charge of limiting social media channels for

16  several clients of the agency.

17  Q.  What did you do after that?

18  A.  I joined training company called Mayor.

19  Q.  Did you have a title at Mayor?

20  A.  Yes.

21  Q.  What was that?

22  A.  I was head of digital communication.

23  Q.  And what with your responsibilities as head of digital

24  communications?

25  A.  I was in charge of the web and social media strategy.

1  Q.  And what did you do after that?

2  A.  After that, I worked for Hermès as social media strategist

3  consultant.

4  Q.  So you joined -- when did you join Hermès, do you remember?

5  A.  I joined Hermès in June 2015.

6  Q.  Did you have a title when you joined Hermès?

7  A.  Yes.

8  Q.  What was that title?

9  A.  Social media coordinator.

10  Q.  And what with your responsibilities as the social media

11  coordinator?

12  A.  I was in charge of coordinating all social media for

13  Hermès.

14  Q.  Did you get promoted or move to another position after

15  that?

16  A.  Yes.

17  Q.  When was that?

18  A.  It was in July 2018.

19  Q.  What position were you -- did you move to?

20  A.  Social media and web listening director.

21  Q.  Is that your current title today?

22  A.  Yes.

23  Q.  Does Hermès promote its brand on social media?

24  A.  Yes.

25  Q.  Do you help Hermès with its strategy promoting that brand?

```
 1   A.  Yes.

 2   Q.  And can you explain Hermès' social media strategy?

 3   A.  It's to be present on several social media platform, such

 4   as Instagram, Facebook, Twitter, YouTube, LinkedIn, and also on

 5   the Asian social platforms.

 6   Q.  And can you explain -- well, what are your main efforts in

 7   developing the strategy on, like, Instagram, for example?

 8   A.  On Instagram, we are focused on working with some creative

 9   talents in order to create content and then post the content on

10   Instagram.

11   Q.  And I think -- what about, I think you said, LinkedIn.

12        What about something like LinkedIn, what is the

13   strategy on LinkedIn?

14   A.  LinkedIn, we are more focused on sharing MS corporate news

15   and we want people to join the company.  We invite people to

16   join the company.

17   Q.  Who is responsibility for developing the brand strategy?

18   A.  My team.

19   Q.  And what is your team called?

20   A.  The social media team.

21   Q.  Does your team implement the strategy?

22   A.  Yes.

23   Q.  Who posts content for Hermès?

24   A.  It's my team.

25   Q.  Who validates the posts, if anyone?
```

1   A.   I validate the posts.

2   Q.   How often does Hermès post content on Instagram?

3   A.   On Instagram?  It's on average once per day.

4   Q.   Once per day?

5   A.   Yes.

6   Q.   And what about on LinkedIn?

7   A.   LinkedIn, it's three times per week, on average.

8   Q.   And what about the other social media platforms you

9   discussed?

10  A.   Less frequent.

11  Q.   Do you work with any other departments at Hermès to create

12  content?

13  A.   Yes.

14  Q.   Which departments?

15  A.   The creative team and the art buying department.

16  Q.   The art buying department you said?

17  A.   Yes.

18  Q.   And what is the art buying department?

19  A.   It's the department in charge of finding talents in order

20  to create content, and then after we post it on our social

21  platform.

22  Q.   So when you say finding talent, what do you mean by talent?

23  A.   I mean artists.

24  Q.   Why do you collaborate with the arts and creative

25  departments?

1  A.  Because they are an aspect of creation and art, and on my

2  side, I focused on social media strategies.  It's important to

3  collaborate with them.

4  Q.  So you said finding talent before and you said that's

5  artists.

6          When you find the right artist, does the artist help

7  your -- help your team create content?

8  A.  Yes.  We are in touch with the artist, and we invite him to

9  express himself and create something with Hermès objects.

10 Q.  How important are artists to Hermès?

11 A.  They are very involved and key.  Talents are our creative

12 partners.

13 Q.  You said you're partners, you said?

14 A.  Yes.

15 Q.  What types of artists does your teamwork with?

16 A.  A lot of different artists.  It can be photographer, film

17 maker, a digital artist, people who are in charge of creating

18 animation.  It can be also NFT, it can be performers, musician,

19 a lot of things.

20 Q.  OK.  Everything, it sounds like?

21 A.  Yeah.

22 Q.  Can you maybe just briefly describe a memorable artist

23 collaboration your team has had?

24 A.  I'm thinking about -- there's maybe Binois.  He created

25 some shot animation with Twitter.  It's a thing you can put --

1   it's not a scarf, but it's a little thing, and he made the

2   Tweety walk on the video.

3   Q.  We would like to show the witness, the court, and the

4   defendants, Plaintiff's Exhibit 43.

5           Do you know what this document is?

6   A.  Yes.

7   Q.  Can you briefly just tell us what this document is?

8   A.  So it's a post Hermès on the Instagram account, and it's a

9   shot video.

10  Q.  And this is one of the posts that you, your team posted to

11  the Instagram account?

12  A.  Yes.

13          MR. WARSHAVSKY:  We would offer into evidence.

14          MR. MILLSAPS:  No objection.

15          THE COURT:  Received.

16          (Plaintiff's Exhibit 43 received in evidence)

17  Q.  Can you describe what this document is?

18  A.  So it's a shot video and a 3D animation, so you can see

19  there is an orange round Hermès box, and the Hermès box is

20  falling down the stairs.  And sometimes the character is

21  smiling and sometimes it's not.  And there is a sound on the

22  video.

23  Q.  Who had the idea for this post?

24  A.  The art buying department suggest to work with this artist,

25  and I thought that we can find something interested, and so we

N22sHER3                          Binoche - Direct

1   did it.

2   Q.  Who decided to post the content?

3   A.  I decided.

4   Q.  And why did you decide to post this?

5   A.  Because it completely fits with our needs in terms of

6   animation of the Instagram account.

7   Q.  And can you briefly describe the video?

8   A.  Yes.  So it's shot animation, 3D, and the box is falling

9   down the stairs.  And sometimes the character is smiling or

10  sometime not.  You've got a sound on the video, and when the

11  box fall, there is a specific sound on it.

12  Q.  Who created the video?

13  A.  Lucas Zanotto.

14  Q.  Who is Lucas -- Lucas what?

15  A.  Zanotto.

16  Q.  Who is Lukas Zanotto?

17  A.  He's a designer and an artist.  There is a lot of things.

18  Q.  What type of artist is Lukas Zanotto?

19  A.  He works on many things.  He can be 3D animation like this

20  or sculpture.  He also did some NFTs.  I remember some -- some

21  object children can play with.

22  Q.  Is that like a digital artist?

23  A.  Yes.

24  Q.  Have you worked with Mr. Zanotto before?

25  A.  No.

1   Q.  This was the first time?

2   A.  Yes.

3   Q.  I think you said this was 3D.

4       Was this the first time Hermès did a 3D animation and

5   collaboration with an artist on social media?

6   A.  On that kind of thing, like, artistic like this, yes.

7   Q.  What about for other animations?

8   A.  Other animations can be pictures or classic films, or we

9   also did some augmentive reality folktales on Instagram.

10  Q.  And I see that, on the right here, the designer's name.

11      There's an @ sign?

12  A.  Yes.

13  Q.  Why did Hermès mention the artist on this post?

14  A.  We always mention the artist on the caption, and each post,

15  in order to let our community know that we work with this

16  artist, and it's important for us to name the artist.

17      MR. WARSHAVSKY:  I would like to introduce plaintiff's

18  exhibit -- to show the witness, the court, and defense counsel

19  Plaintiff's Exhibit 39 for identification, please.

20  Q.  Ms. Binoche, have you seen this document before?

21  A.  Yes.

22  Q.  Is this an e-mail you wrote?

23  A.  Yes.

24  Q.  When did you write this e-mail?

25  A.  On November 22nd, 2021.

1           MR. WARSHAVSKY:  We would ask to admit Exhibit 39 into

2    evidence, your Honor.

3           MR. MILLSAPS:  No objection.

4           THE COURT:  Received.

5           (Plaintiff's Exhibit 39 received in evidence)

6           MR. WARSHAVSKY:  OK.  Can you please turn to pages

7    four and five.

8    BY MR. WARSHAVSKY:

9    Q.  The subject line is Neil Beloufa.  Am I pronouncing that

10   last time correctly?

11          Who is Neil Beloufa?

12   A.  He's a digital artist.

13   Q.  And what type of digital art does he make?

14   A.  NFT art.

15   Q.  And how did Hermès come into contact with this artist?

16   A.  I met him during the innovative day, which is an internal

17   event at Hermès.

18   Q.  I'm sorry.  You called it innovation day, is that right?

19   A.  Yes.

20   Q.  And is innovation day an annual event at Hermès?

21   A.  Yes.

22   Q.  When was innovation day about?

23   A.  It was about presenting some different initiative regarding

24   new technologies, and Neil Beloufa went there in order to

25   present his work around NFTs.

1   Q.  OK.  When does innovation day occur in the year?

2   A.  It was at the beginning of November.

3   Q.  OK.  And I think you may have answered this the last, I

4   just want to make sure.

5       What is innovation day?

6   A.  Innovation day is an internal event at Hermès organized by

7   the etch lab, and the etch lab is a team dedicated to new

8   technology, new technologies.  It can be NFT.  They work on a

9   lot of things, and they organize this day in order to make

10  Hermès employee aware about new technologies, new initiatives.

11  Q.  And was Neil Beloufa present at innovation day?

12  A.  Yes.

13  Q.  Why was he -- why was he there?

14  A.  In order to talk about his work on NFTs.

15  Q.  What was the nature of his work on NFTs?

16  A.  So he talked about an experience he created.  The

17  experience was a sculpture you can interact with via screen,

18  and then at the end of the experience, you were able to get an

19  NFT of this.

20  Q.  And why were you discussing Mr. Beloufa with other

21  employees at Hermès?

22  A.  Because I found his work very interesting.  And at Hermès,

23  we take care of our tangible things, but also digital.  I

24  understood that this artist, maybe we can work with him because

25  it was interesting.  Yeah.

1   Q.  Was Hermès considering collaborating with Mr. Beloufa?

2   A.  Yes.

3   Q.  Why was Hermès considering that?

4   A.  Because we thought that we can create an experience around

5   his initiatives and with him, so yes.

6   Q.  And did Hermès eventually collaborate with him?

7   A.  Yes.

8   Q.  When did Hermès collaborate with Mr. Beloufa?

9   A.  In January of this year.

10  Q.  And was that an external event?

11  A.  No.

12  Q.  What was that?

13          What was it?

14  A.  It was in an internal event happening each year at Hermès,

15  and we created an experience during this event.

16  Q.  And what kind of project was Hermès considering when it was

17  speaking to Mr. Beloufa?

18  A.  Um, an experience, like, he did through the work.  I mean,

19  creating a physical experience, and then link it to an NFT.

20  Q.  OK.  Can you briefly describe the project?

21  A.  Yes.

22          THE COURT:  After that, we have to break.

23          Go ahead.

24  A.  The experience was physical rooms you can enter into.  And

25  then you take a seat, and in front of you, you've got a screen

N22sHER3                         Binoche - Direct

1    with an animated horse.  And you can talk with the horse, and

2    at the end of the experience, you can get an NFT of this.

3              THE COURT:  All right.  Ladies and gentlemen, as you

4    know, we're going to break now for today.

5              Now, tomorrow, in order to complete the evidence, it

6    will be a very full day.  We will start at 9:30.  We will take

7    a midmorning break probably a little early, maybe a few minutes

8    before 11, because we're going to have lunch from 12 to one

9    tomorrow.  That's because I have to give a zoom speech at

10   Stanford Business School.  Then we'll pick up again at one.

11   We'll take another short midafternoon break, and we'll go, if

12   necessary, to 4:30.

13             So I know the anticipation is overwhelming.

14   Nevertheless, go home, have a good evening, and we'll see you

15   tomorrow.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1             (Jury present).

2             THE COURT:  You can step down.  We'll see you tomorrow

3   at 9:30.

4             (Witness temporarily excused)

5             I would like counsel --

6             Please be seated.  I would like counsel this evening

7   to send me, after consultation with each side, a pretty firm --

8   I won't hold you absolutely to it -- a pretty firm idea on how

9   long you're going to be on direct and cross of all remaining

10  witnesses.

11            I should mention, though, this should not impact

12  anything, but I have invited students from courses I teach at

13  both Colombia and NYU law school to come and watch, because I

14  said there were fantastic lawyers and they needed to watch what

15  you guys were doing.  So they will be here probably at two

16  o'clock tomorrow.  So save your best fireworks for them.

17            All right.  See you tomorrow.

18            MR. HARRIS:  Your Honor, may I just raise one thing

19  regarding schedule very quickly?

20            THE COURT:  Yes.

21            MR. HARRIS:  I'm not criticized, you know.  You never

22  know how long things happen, right, how long things take.  But

23  Mr. Warshavsky has been under estimating, which is OK, but I do

24  not believe we're going to be able to finish tomorrow unless we

25  have time limitations on the witnesses.

1          THE COURT:  Well, that's why you should consult.  And

2     as you could see, I did hold him to the limitation that he gave

3     in the robing room.  But I think, let's put it this way, it's

4     not absolutely required that you finish tomorrow.  The jury

5     will be unbelievably pissed off if we don't, but I leave it to

6     you.

7          MR. HARRIS:  Thank you, your Honor.

8          (Adjourned to Friday, February 3, 2023, at 9:30 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                           Page

 3    SONNY ESTIVAL

 4   Cross By Mr. Warshavsky . . . . . . . . . . 471

 5   Redirect By Mr. Harris . . . . . . . . . . 541

 6   Recross By Mr. Warshavsky . . . . . . . . 578

 7   Redirect By Mr. Harris . . . . . . . . . . 586

 8    AMBRE-ELISE BINOCHE

 9   Direct By Mr. Warshavsky . . . . . . . . . 589

10                    PLAINTIFF EXHIBITS

11   Exhibit No.                            Received

12    387  . . . . . . . . . . . . . . . . . . 475

13    388  . . . . . . . . . . . . . . . . . . 477

14    389  . . . . . . . . . . . . . . . . . . 484

15    390  . . . . . . . . . . . . . . . . . . 485

16    259  . . . . . . . . . . . . . . . . . . 497

17    255  . . . . . . . . . . . . . . . . . . 499

18    76   . . . . . . . . . . . . . . . . . . 503

19    323  . . . . . . . . . . . . . . . . . . 505

20    224  . . . . . . . . . . . . . . . . . . 511

21    225  . . . . . . . . . . . . . . . . . . 512

22    373  . . . . . . . . . . . . . . . . . . 513

23    305  . . . . . . . . . . . . . . . . . . 518

24    100, page 347  . . . . . . . . . . . . . 521

25    308  . . . . . . . . . . . . . . . . . . 527
```

1    251    . . . . . . . . . . . . . . . . . . . 529

2    287    . . . . . . . . . . . . . . . . . . . 535

3    374    . . . . . . . . . . . . . . . . . . . 536

4    279, page 9,    . . . . . . . . . . . . . . 580

5    279, page 8,    . . . . . . . . . . . . . . 581

6    271    . . . . . . . . . . . . . . . . . . . 583

7    43     . . . . . . . . . . . . . . . . . . . 596

8    39     . . . . . . . . . . . . . . . . . . . 599

9                        DEFENDANT EXHIBITS

10   Exhibit No.                              Received

11   619    . . . . . . . . . . . . . . . . . . . 545

12   615    . . . . . . . . . . . . . . . . . . . 548

13   505    . . . . . . . . . . . . . . . . . . . 556

14   620    . . . . . . . . . . . . . . . . . . . 557

15

16

17

18

19

20

21

22

23

24

25