N23VHER1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   HERMÈS INTERNATIONAL, et al.,

 4                  Plaintiffs,

 5           v.                              22 Civ. 384 (JSR)

 6   MASON ROTHSCHILD,

 7                  Defendant.               Trial

 8   ------------------------------x
                                             New York, N.Y.
 9                                           February 3, 2023
                                             9:35 a.m.
10
     Before:
11
                          HON. JED S. RAKOFF,
12
                                             District Judge
13                                           -and a Jury-

14

15                         APPEARANCES

16   BAKER & HOSTETLER LLP
          Attorneys for Plaintiffs
17   BY:  DEBORAH A. WILCOX
          OREN J. WARSHAVSKY
18        GERALD J. FERGUSON

19   HARRIS ST. LAURENT & WECHSLER LLP
          Attorneys for Defendant
20   BY:  ADAM B. OPPENHEIM
          JONATHAN A. HARRIS
21
     LEX LUMINA PLLC
22        Attorneys for Defendant
     BY:  RHETT O. MILLSAPS, II
23        CHRISTOPHER SPRIGMAN

24

25
```

1          (Trial resumed; jury not present)

2          THE DEPUTY CLERK:  May I bring in the jury?

3          THE COURT:  Please.

4          And let's get the witness on the stand.

5          (Jury present)

6          THE COURT:  Good morning, ladies and gentlemen.  And

7    thank you, as always, for your promptness.

8          And we are ready to proceed.

9          MR. WARSHAVSKY:  Thank you, your Honor.

10   AMBRE-ELISE BINOCHE,

11       called as a witness by the Plaintiffs,

12       having been duly previously sworn, testified as follows:

13   DIRECT EXAMINATION (continued)

14   BY MR. WARSHAVSKY:

15   Q.  Ms. Binoche, when we left, we were talking about an NFT

16   project.  I want to switch a little bit and talk about

17   metaverse plans.

18          MR. WARSHAVSKY:  And I'd like to furnish to counsel,

19   the Court, and the witness Exhibit 41.

20          And your Honor, the parties had already -- to try and

21   speed things along, I understand that this exhibit is

22   stipulated to now for admissibility.  So we would just offer it

23   in to speed it up.

24          THE COURT:  Received.

25          (Plaintiffs' Exhibit 41 received in evidence)

 1   BY MR. WARSHAVSKY:

 2   Q.  Ms. Binoche, have you seen this document before?

 3   A.  Yes.

 4   Q.  Who created this document?

 5   A.  I co-created.

 6   Q.  Okay.  And who did you co-create it with?

 7   A.  With other members of the communication team at Hermès.

 8   Q.  Okay.  Can you tell us what this document is about.

 9   A.  So it's a Power Point presentation about 90 we had on Petit

10   H and Horizons in the metaverse.

11   Q.  Okay.  And who is -- I think you said Petit H.  Who is

12   Petit H?

13   A.  Petit H is mitty at Hermès.  By mitty we mean business

14   division.  And this Petit H is in charge of creating objects

15   through material which hasn't been used by other business

16   divisions.

17   Q.  Okay.  And does Hermès have an understanding of what type

18   of clients purchase those objects?

19   A.  Yes, very specific clients.  Petit H has clients who are

20   passionate about this kind of objects.  And they are very

21   exclusive.  They are collectors of Petit H objects.

22   Q.  And what is Horizons, the other name here?

23   A.  So Horizons is another business division dedicated to

24   creation of bespoke objects.

25   Q.  And why did Hermès choose Petit H and Horizons to work on

1    this project?

2    A.   Because Petit H and Horizons are a very specific mitty and

3    have increment the fact that they have very specific and

4    exclusive clients.

5    Q.   And I think the way -- is the way you described it, you

6    said -- was the word you used miniverse, is that what you said,

7    or metaverse, I'm sorry?

8    A.   Yeah, it's metaverse and miniverse.  I think that if we can

9    go through the presentation, I can explain the difference

10   between.

11   Q.   Okay.  Then let's go ahead.  Can you please turn to page 3

12   of the Power Point.  And can you explain what this slide is

13   about.

14   A.   So this slide is the introduction of the presentation.  We

15   explain the context and also the goal.  So we wanted to see how

16   Petit H and Horizons can enter in the metaverse, and see how we

17   can engage to specific clients around the private, unique,

18   immersive, and exclusive experience focused on the house

19   objects.

20   Q.   Thank you.  Can we turn to page 5 of this document, please.

21            Can you explain what this slide shows.

22   A.   So this slide explains in more detail the experience.  So

23   the experience was a virtual collaborative experience.  The

24   goal was to find a treasure represented by Horizons object in

25   an oneiric universe.  So it's like a virtual escape game.  We

1    wanted to invite some clients to be completely immersed in its

2    own universe.  So that's a miniverse; you can see the little

3    bubble, player 1, player 2, etc.  And each player must solve

4    puzzle to advance in each universe with the help of other

5    players.  So it mean that they can talk to each other and a

6    good communication between them would contribute to the success

7    of the game.

8    Q.  Did this experience involve NFTs?

9    A.  Yes.  So at the end of the experience, each player is going

10   to be into a common space, which is the metaverse.  And we

11   would receive an NFT corresponding of the treasure they found.

12   They can talk about their own experience.

13   Q.  Okay.  And when you talk about experience, is that also --

14   would you also call it a game?

15   A.  Yes, it's a game, but you are completely involved in the

16   specific universe, so it's a way to -- it's also a way to get

17   to observe something.

18         MR. WARSHAVSKY:  If we could turn to pages 6 and 7.

19   Q.  Can you explain these slides.

20   A.  Yes.  So on the left you can see some picture of real Petit

21   H objects, the panda, the kangaroo, the horse.  And the idea

22   was to mobilize those real objects in 3D and make them the

23   avatar of the experience.  So each player can choose to be a

24   panda or a kangaroo, etc.

25         And on the other slide on the right, so you can see

N23VHER1                    Binoche - Cross

1   picture of Horizons objects, real objects.  And the idea was

2   also to mobilize them in 3D.  And those objects of treasure all

3   have to find.

4   Q.  Okay.  Thank you.  No further questions.

5           THE COURT:  Cross-examination.

6   CROSS-EXAMINATION

7   BY MR. MILLSAPS:

8   Q.  Good morning, Ms. Binoche.  Thank you for being here today.

9           Yesterday you testified about two artists that Hermès

10  has collaborated with, Lucas Zanotto and Neil Beloufa, do you

11  recall that?

12  A.  Yes.

13  Q.  Why did you choose these two artists to collaborate with?

14  A.  The art buying department choose to work with those artist

15  because their universe were very interesting to play with; and

16  it's also related to Hermès.  It goes to Hermès inspirations.

17  Q.  Are you saying that their artwork was related to Hermès

18  before Hermès collaborated with them?

19  A.  No.

20          Can I ask translation, just to be sure to get the

21  right answer?

22          Not really.  Difficult to explain.  It's just Hermès

23  saw that they -- their work was great, so that's all.

24  Q.  Did you discover these two artists and recommend them to

25  the art department?

1   A.  No, because the art buying department share with me the

2   name of the artist.  And regarding Neil Beloufa, the artist I

3   talked about yesterday, we discover in during the innovation

4   day an internal event at Hermès.

5   Q.  And so Hermès liked these artists and invited them to

6   collaborate, is that how it happened?

7   A.  Yes.

8   Q.  And when Hermès does a collaboration with an artist like

9   this, does Hermès make clear that Hermès is behind the project

10  with this artist?

11  A.  Can you translate?

12          Yes.  I think that when I explain yesterday, the

13  creation Lucas Zanotto does for our Instagram account, we

14  mention the name of the artist in the caption.  And it's a way

15  to express that we work with him.

16          MR. MILLSAPS:  Ashley, would you please put up

17  Plaintiffs' Exhibit 43 which is in evidence.

18  Q.  Ms. Binoche, this is an exhibit we were looking at

19  yesterday of a -- is this an Instagram post by Hermès?

20  A.  Yes.

21  Q.  And this is the video that Hermès created in collaboration

22  with the artist Lucas Zanotto; is that right?

23  A.  Yes.

24  Q.  Is this typically how Hermès promotes an artistic

25  collaboration, as you see it here in this Instagram post?

1  A.  Yes, by mentioning the name of the artist in the caption of

2  the post.

3  Q.  Does Hermès ever do a collaboration with an artist that is

4  promoted only by the artist name, but without any mention of

5  Hermès?

6  A.  I'm going to ask for translation.

7       I think that it's clear on this post that it's a

8  collaboration between Hermès and the artist, as it is post on

9  Hermès account.  And we mention the name of the artist.

10 Q.  And when Hermès collaborates with an artist, is it correct

11 that Hermès makes clear in its promotions that it's Hermès

12 collaborating with a particular artist?

13 A.  I think that with that kind of promotion, it's clear.

14 Q.  I just want to make sure you understand.  I'm not just

15 asking about this Instagram post.  I'm saying in general, when

16 you collaborate with an artist, when you promote that

17 collaboration, do you make clear that Hermès is collaborating

18 with that artist?

19 A.  I think that it depends of the supports.  On Instagram it

20 is important for us to show that kind of things from creation.

21 Q.  By the way, Ms. Binoche, do you know how Lucas Zanotto made

22 this video that we see here, the screenshot of it that we see?

23 A.  I'm not creation expert, but through a dedicated tool, you

24 know, that creates 3D video, that kind of thing.

25 Q.  Do you know if Lucas Zanotto works with any assistant or

N23VHER1                          Binoche – Cross

1    any other team that he has?

2    A.  I don't know.

3    Q.  Are you aware that Lucas Zanotto has made NFT projects?

4    A.  Yes.

5    Q.  Are you aware of a 5,000-piece NFT project he created

6    called Mood Rollers?

7    A.  Not really.  Not in detail.

8    Q.  Have you looked at any of his NFT projects online?

9    A.  Yes.

10   Q.  Which ones have you seen?

11   A.  I can't precisely remember.

12   Q.  Are you aware that some of them are sold on OpenSea?

13   A.  Yes.

14           MR. MILLSAPS:  Ashley, could you just show the witness

15   and the Court and counsel the Mood Rollers OpenSea page.

16   Q.  Ms. Binoche, have you seen this project by Lucas Zanotto

17   before?

18   A.  That kind of project, in my mind, I remember that kind of

19   scene.  Not as precisely I'm able to see it right now.

20   Q.  Have you ever looked at his work on OpenSea?

21   A.  Yes, quickly.

22           MR. MILLSAPS:  I offer this OpenSea page as an

23   exhibit.

24           MR. WARSHAVSKY:  Objection.

25           THE COURT:  Sustained.

N23VHER1                              Binoche – Cross

1    BY MR. MILLSAPS:

2    Q.  Ms. Binoche, yesterday you also talked about an artist

3    named Neil Beloufa.

4    A.  Yes.

5    Q.  And I believe that when you talked about him, you referred

6    to him as an NFT artist, do you remember that?

7    A.  Yes.

8            MR. MILLSAPS:  Could we look at Exhibit 39, please,

9    Ashley.  That's in evidence.  And specifically page 4 of that

10   exhibit, please.

11   Q.  Ms. Binoche, looking at this email, this is, it looks like,

12   Danièle Attias replying to you.  Is that what we're looking at?

13   A.  Yes.

14   Q.  Do you see where -- do you see the third line there where

15   it says "he is a very interesting plastics artist"?

16   A.  Yes.

17   Q.  Do you know why this individual referred to him as a

18   plastics artist, but you referred to him as an NFT artist?

19   A.  Because he also creates sculptures and physical things.

20   Q.  And I think you testified yesterday that Neil Beloufa

21   talked about a sculpture that he created that you can interact

22   with, and at the end of the experience you get an NFT; is that

23   right?

24   A.  Yes.

25   Q.  Do you know if Neil Beloufa works with anyone else to

1    create the scriptures that he makes?

2    A.  I don't know.

3    Q.  And you just talked about some of the plans that Hermès has

4    for NFTs in the metaverse, right?

5    A.  Yes.

6    Q.  Has Hermès made any plans for its NFTs public?

7    A.  We are thinking about it, working on it, considering it.

8    Q.  So it has not made any plans for NFTs public; correct?

9    A.  By plan, can you just translate to be sure.

10            No, today only internal projects.

11            MR. MILLSAPS:  I have no further questions.

12            THE COURT:  Any redirect?

13            MR. WARSHAVSKY:  No redirect, your Honor.

14            THE COURT:  Thank you very much.  You may step down.

15            THE WITNESS:  Thank you.

16            (Witness excused)

17            THE COURT:  Please call your next witness.

18            MR. WARSHAVSKY:  Your Honor, the next witness is

19    Dr. Scott Kominers, who's testifying remotely.  And

20    Mr. Ferguson will be examining.

21            THE COURT:  Okay.

22            MR. FERGUSON:  Your Honor, if I may, can I call him to

23    tell him to connect to the remote?

24            THE COURT:  All right.

25            MR. FERGUSON:  Thank you.

1    SCOTT DUKE KOMINERS,

2         called as a witness by the Plaintiffs,

3         having been duly sworn, testified as follows:

4              THE COURT:  Counsel.

5    DIRECT EXAMINATION

6    BY MR. FERGUSON:

7    Q.  Dr. Kominers, what are the topics you're going to be

8    testifying on this morning?

9    A.  I'm here to describe the market for NFTs and the associated

10   business models, as well as the position of the MetaBirkins

11   within that market.

12   Q.  Are you retained by one of the parties in this case?

13   A.  Yes.

14   Q.  Who retained you?

15   A.  Baker Hostetler.

16   Q.  And on whose behalf did they retain you?

17   A.  Hermès.

18              MR. FERGUSON:  Can we go back to the image of Dr.

19   Kominers.  I'm sorry, I'm not seeing it on the screen.

20              THE WITNESS:  I'm still here.

21   Q.  Good to see you again.

22   A.  Good to see you as well.

23   Q.  Prior to being retained in this matter, have you ever been

24   retained on any project by Baker Hostetler before?

25   A.  I have not.

1   Q.   Prior to being retained in this matter, have you ever been

2   retained by Hermès before?

3   A.   I have not.

4   Q.   Have you ever testified as an expert witness before?

5   A.   I have not.

6   Q.   What is the rate that -- or rates that you're charging for

7   compensation for your services in connection with this matter?

8   A.   I charge $1500 an hour for ordinary consulting services,

9   and $2,000 an hour for testimony.

10  Q.   And how did you come up with the 1500 an hour?

11  A.   That was my standard consulting rate at the time I was

12  retained.

13  Q.   And what's the 2,000 an hour based on?

14  A.   I was recruited by an expert search firm which advised me

15  at the time that experts typically charge a slightly higher

16  amount for testimony.  And so I suggested this number to them

17  and they seemed to suggest it was reasonable.

18  Q.   I ask that you look at Exhibit 96, which is before you and

19  is with counsel and with the Court.

20  A.   Yup.

21  Q.   Can you identify this document.

22  A.   Yes.  This is my CV as of January 5th, 2023.

23            MR. FERGUSON:  I offer Exhibit 96 into evidence.

24            MR. OPPENHEIM:  No objection.

25            THE COURT:  Received.

```
 1              (Plaintiffs' Exhibit 96 received in evidence)
 2              MR. FERGUSON:  Mr. Ferrer, can you please put the
 3    slides on the screen.
 4    Q.  While he's doing that, Dr. Kominers, can you tell us about
 5    your education since high school?
 6    A.  Certainly.
 7              I completed my bachelors in mathematics at Harvard,
 8    followed by a masters and Ph.D. in business economics, both at
 9    Harvard as well.
10    Q.  What is your current academic positions?
11    A.  I'm currently appointed as a professor of business
12    administration at Harvard Business School, as well as a faculty
13    affiliate of the Harvard Department of Economics.
14    Q.  Is there a field within the discipline of economics that
15    you focus on?
16    A.  Yes.  My work focuses on market design, which is the branch
17    of economics concerned with the structure and design of markets
18    and market institutions.
19    Q.  Is market design a recognized field within the discipline
20    of economics?
21    A.  Yes, it even recently received two different Nobel Prizes
22    in the past decade, I suppose.
23    Q.  Do you also currently have an industry position?
24    A.  Yes.
25    Q.  Could you describe that for us.
```

1    A.  Certainly.

2            I'm a research partner at a16z crypto.

3    Q.  What is a16z crypto?

4    A.  A16z crypto is a branch of the venture firm Andreessen

5    Horowitz.  And this particular branch is specifically focused

6    on crypto and Web3 business and applications, including

7    non-fungible token-based businesses, NFT-based businesses.

8            My work there is as a member of their research team,

9    which they launched in early 2022.  I'm an inaugural member of

10   the team and the only economist on the team at present.

11   Q.  Please explain to us what you meant by crypto in that last

12   answer.

13   A.  Certainly.

14           Crypto is a category of, you know, internet

15   information, both, you know, sort of, records of ownership or

16   fungible tokens like crypto currencies, but also software, sort

17   of computer programs that are run on top of a decentralized

18   network called a blockchain.  So they are, sort of, in effect,

19   a computer in the sky that records a massive ledger and, you

20   know, of information sort of stored for individuals, and then

21   software programs that can interact with that information.

22   Q.  What is Web3 that you referred to in a prior answer?

23   A.  Web3 is a class of business models drawn in contrast to

24   Web2, the era of the internet characterized by centralized

25   platforms, such as Facebook, Twitter, and LinkedIn.  Web3 uses

1  blockchains to give individuals direct ownership of their data

2  and other digital assets, and then is characterized by

3  businesses that give individuals that ownership as a way of

4  encouraging them to, sort of, grow the platform or its

5  associated brand.

6  Q.  In your academic work, have you been published?

7  A.  Yes.

8  Q.  How many times have you been published?

9  A.  I've published over 100 articles, roughly 75 or so of them

10  refereed.

11  Q.  What does it mean for an article to be refereed?

12          MR. FERGUSON:  I apologize.  I'll try and interrupt

13  when the stenographer --

14          THE COURT:  When the reporter has a question.

15          How do you spell "referee"?

16          THE WITNESS:  Oh, like a sports referee,

17  R-E-F-E-R-E-E.  And then refereed as a past participle would be

18  with a D, "refereed."

19          THE COURT:  So the question was?

20  BY MR. FERGUSON:

21  Q.  The question was what does it mean for an article to be

22  refereed?

23          THE COURT:  Yes.

24  Q.  Please answer.

25          THE COURT:  He may answer, although I find it totally

1   irrelevant.

2              MR. FERGUSON:  I'll move on to the next question.

3              THE COURT:  Very good.

4   Q.  Have you published articles in the area of Web3 crypto and

5   NFTs?

6   A.  Yes.

7   Q.  Tell us about articles you've published in the area of Web3

8   crypto and NFTs.

9   A.  So, for example, Steve Kazinski and I coauthored the first

10  ever *Harvard Business Review* article about NFTs, in which we

11  talked about what NFTs are, how they create value, and how

12  brands can use them to drive value to a community of

13  enthusiasts.

14             I subsequently coauthored the first Harvard Business

15  School case study on NFTs, focusing on the Bored Ape Yacht

16  Club.  And more recently have just submitted a manuscript under

17  contract, also joint work with Steve Kazinski of a full-length

18  book to be published by Penguin Portfolio, focusing on how NFTs

19  create value.

20  Q.  Please summarize for us the opinions that you developed in

21  connection with your work in this matter.

22  A.  Certainly.

23             I see the slides are -- we'll just keep going.

24  Q.  You keep talking.  The technical people are sorting out the

25  slides.  We'll keep talking.

N23VHER1                    Kominers - Direct

A.  Great.  Sorry for the technical difficulties.

Certainly.

So I was asked, as I said, to look at the structure of the NFT market and identify relevant submarkets.  I found two relevant submarkets -- submarkets relevant to the case.  First the art only submarket, in which NFTs simply convey ownership and an associated digital or physical asset.  And the digital brand submarket, in which the NFTs are -- not just convey ownership in a digital asset, but are furthermore supplemented with various forms of utility in order to build identity and community around the brand.

I then was asked to look at the position of the Baby Birkins and the MetaBirkins within the NFT market.  And I found that the Baby Birkins had many of the characteristics of an art only NFT, whereas the MetaBirkins were solidly within the digital brand of the submarket.

Finally, I conducted an empirical analysis of the MetaBirkins trading prices, sales dynamics over the early period immediately following mint.  I found that they had significantly outside prices, they were significant outliers relative to the vast majority of the NFT projects that debuted at that time.  And to the extent that they had patterns similar to anything, it was mostly to large-scale digital brand projects that had launched with significant support and often even significant prior investment at the time -- in the time

1   period.

2               Finally, I concluded that the most likely association

3   for the MetaBirkins outlier position within the market was the

4   Hermès association.

5   Q.  Please describe the methodology that you employed in

6   developing these opinions.

7   A.  Certainly.

8               Just as in any other market design exercise,

9   especially when looking at a novel or nascent market, you

10  use -- I used a mixture of qualitative and quantitative

11  methods, starting with ethnography and case studies around the

12  market, followed by empirical analysis of the market data,

13  supplemented throughout by economic theory around the structure

14  of the market and the various use cases for NFTs.

15  Q.  Is this a methodology that you have employed before?

16  A.  Absolutely.

17  Q.  Describe how you've employed this methodology in prior

18  projects.

19  A.  Certainly.

20              So as I said, this is essentially the approach I apply

21  when entering any market design research exercise.  I used it

22  most recently prior to my work on NFTs in the context of

23  vaccine investment and distribution, in collaboration with a

24  team of economists that advise COVAX, the World Bank, and other

25  international agencies on vaccine investment and distribution.

1          I also used in my prior research on patents, and the

2     markets for patent-based intellectual property.  And moreover,

3     used it also in the context of matching markets, which I've

4     been working on since my Ph.D.

5     Q.  Going back to your first opinion where you talk about there

6     be two submarkets within an NFT market, there are only NFT

7     submarket and the digital branded NFT submarket.  Can you

8     describe to us in greater detail what you mean by the art only

9     NFT submarket.

10    A.  Certainly.

11         So in the art only submarket -- sorry.  Stepping back

12    one second.  So a non-fungible token is sort of like a digital

13    deed; it's a record on a blockchain ledger that grants

14    ownership -- serves as an ownership record and can grant

15    ownership to associated assets, just like a deed might.  And so

16    your non-fungible token might be attached to a media file and

17    serve as an ownership record for that media file; so it's like

18    a digital deed to that file.

19         In the art only submarket, that's essentially the only

20    function of the NFT.  An NFT is just serving as a digital

21    ownership record, typically associated to a media file, that

22    media or sound or something of the sort typically referred to

23    in the community, you know, casually as art.

24    Q.  Please elaborate for us what you mean by the digital brand

25    NFT submarket.

N23VHER1                          Kominers - Direct

1   A.  Certainly.

2           So in the digital brand NFT submarket, NFT creators

3   often start with an NFT that is just an ownership record for --

4   or some piece of media, maybe an image of a cartoon character

5   or some sort of collectible.

6           But then they build around those NFTs significant

7   utility.  They try and convince people to, sort of, form

8   identity and community around the NFTs and the associated

9   assets.  They will often give various forms of rewards,

10  sometimes free airdrops; they might build in a loyalty program;

11  they might, you know, create events.

12          They create many different forms of utility that drive

13  value over and above simple ownership, all of which are

14  directly attached, again, to the underlying NFT.

15          And, sorry, I should say, there's a business model

16  around this, right.  You start with ownership, you build on

17  utility, and then people form identity and eventually community

18  on top of that.  And so you build this very dedicated community

19  of brand enthusiasts.

20          MR. FERGUSON:  We're at the stage where I was hoping

21  to give Dr. Kominers a prepared demonstrative.  Is it possible

22  that we're going to be able to share the screen?  Is it soon or

23  should I just come back to it?

24          MR. FERRER:  Come back to it.

25          THE WITNESS:  I can see the slides, for what that's

1    worth, but I don't know whether they are showing in the room.

2              MR. FERGUSON:  Can Dr. Kominers show the slides?

3              THE WITNESS:  I can see them.  I suppose I could try

4    and open them.

5    BY MR. FERGUSON:

6    Q.  You can see them, but we can't.  So we'll just -- can you

7    give us an example of an NFT in the art only NFT submarket?

8    A.  Certainly.

9    Q.  Please provide that example.

10   A.  So I prepared a demonstrative of X Copy's *Right Click Save*

11   *As Guide*, which is a famous work by the NFT creator X Copy, an

12   anonymous individual who has been working on NFTs for years.

13   Q.  And why do you characterize that NFT as participating in

14   the art only NFT submarket?

15   A.  So to my knowledge, X Copy has not built any significant

16   forms of utility around any of their NFTs; and indeed in the

17   case of the *Right Click and Save As Guide*, this particular

18   image, it's an animated media file, has been made creative --

19   or has been opened up to creative commons licensing.  So, in

20   fact, anyone who wants can create their own reproductions;

21   which means really the NFT is just about owning the original.

22   And it's a significant original; the most recent sale I think

23   was about for about $2.5 million.

24   Q.  Dr. Kominers, can you share your screen?  Can you try and

25   share your screen right now?

1    A.  Yeah, I was about to try that.  I was about to ask whether

2    I could try that, rather.

3             So share, window.  Can you see that?

4    Q.  I'm not seeing the slides right now.

5    A.  Interesting.  So it shows that it is doing a share screen.

6    Do you have it now?  Is it my copy?  So I'm scrolling now.  Do

7    I have control?

8             THE COURT:  Nothing is being seen at the moment.

9             THE WITNESS:  Oh, I'm sorry.

10            THE COURT:  It's all right.  I'm old enough to

11   remember when we were able to use paper.

12            THE WITNESS:  Believe it or not, at least

13   pre-pandemic, I taught on a blackboard.

14   BY MR. FERGUSON:

15   Q.  Could you try sharing it again?

16   A.  Certainly.

17            All right.  How about now?

18   Q.  I've seen it.

19            Okay.  Could you just skip through the slides quickly

20   to the art only NFT that you described.

21   A.  Certainly.  Sorry.  Hold on.

22            So this is the right click -- this is the X Copy NFT I

23   was describing.  Is it showing?

24   Q.  It is showing.

25            What did you say the recent sale price for this NFT

1   was?

2   A.   On the order of $2.5 million, I believe.

3   Q.   Go to the next slide and give us an example of a digital

4   brand NFT.

5   A.   Certainly.

6           So here I'm showing the front page of the website of

7   the Bored Ape Yacht Club.  The Bored Ape Yacht Club is perhaps

8   the most successful digital brand NFT to date, certainly one of

9   them.

10          And it started with a series of NFTs associated to

11  images of cartoon apes, as you see.  But since then the

12  creators have added on all sorts of utility, everything from,

13  you know, sort of, airdrops of, you know, of mutant serums that

14  would mutate your ape, to holding a large-scale music festival

15  with live performances from M&M and Snoop Dogg that was

16  accessible to holders.

17  Q.   This distinction you're making between art only and digital

18  brand NFTs, is this a distinction that is made in the NFT

19  marketplace?

20  A.   Absolutely.

21  Q.   Please elaborate on what you mean by that.

22  A.   So, first of all, you know, the terminology is standard.

23  So people explicitly refer to some NFTs as being art only or

24  via synonyms of that term, like just art or something.  And

25  they draw an explicit distinction between the art only NFTs and

N23VHER1                          Kominers - Direct

1    those that deliver utility.  And utility is associated with the

2    aspiration of being a brand.  And you see NFT project creators

3    explicitly talk about this.

4              The Bored Ape Yacht Club talks about themselves as a

5    brand.  The Gutter Cat Gang, another prominent NFT project

6    calls itself a global street wear brand built on top of NFTs.

7    You see this language very explicitly, and you also and

8    especially perhaps see it when people are talking about value,

9    when they're trying to understand should I acquire this NFT,

10   you know, you see chatter about, like, what is the utility,

11   sort of what's the value of the brand they are building.

12             MR. OPPENHEIM:  Objection, your Honor.  Hearsay.

13             THE COURT:  Overruled.

14   Q.  In developing your opinions in this case, did you consider

15   statements made by Mason Rothschild?

16   A.  I did.

17   Q.  Please go to the next slide.  And can you describe the

18   demonstrative that you prepared.

19   A.  So this demonstrative includes audio from a Twitter space

20   that Mason Rothschild participated in on August 16th of 2022.

21             Twitter spaces are sort of like a live audio platform

22   hosted on Twitter.  So it's a little bit like live radio.

23   Anybody who's on Twitter can show up -- at the time can show up

24   and join one of these spaces and have a conversation.

25             In this particular conversation, Rothschild explicitly

N23VHER1                          Kominers - Direct

```
1    spoke about art only versus utility in the context of NFT brand
2    building.
3    Q.  Do you want to go ahead and play it.
4    A.  Yes.  And I'm suddenly realizing, I don't know if the audio
5    is sharing properly.  If not, I'm going to stop the screen
6    share, turn on audio sharing, and replay.  Let me know if
7    you're hearing the audio, please.  Not yet.
8    Q.  We're not hearing anything.
9    A.  Do you hear the audio?
10           Okay.  Hang on.  Sorry.  I have to turn on audio
11   sharing separately.  One moment.
12           Include computer sound.  All right.  Okay.
13           So this time I believe you should also get the audio.
14   Let me know if it's at a proper volume, please.
15   Q.  Go ahead.  We're still not getting the audio.
16   A.  Oh, no.  Interesting.
17   Q.  Why don't you just play it again and state -- and state the
18   statements that you're relying on.
19   A.  Certainly.
20           And you can see that the text of the audio is
21   scrolling by.  So he says, I don't agree with all of Gucci's
22   projects that have been in Web3 thus far.  I think they're a
23   little bit useless and, you know -- Jacob Pace, somebody else
24   says something.  It's just they're too obvious.
25           Rothschild says --
```

1              MR. OPPENHEIM:  Objection, your Honor.

2              THE COURT:  Hold on.  There's an objection.

3              MR. OPPENHEIM:  Your Honor, I'd object and make a

4    similar motion to strike those parts of the witness's testimony

5    referring to the statements of people who are not the

6    defendant.

7              THE COURT:  No, excuse me.  I'm considering the

8    objection.

9              Overruled.

10   BY MR. FERGUSON:

11   Q.  Could you start from the beginning, Mr. Kominers?

12   A.  Yes.

13            I don't agree with all of Gucci's projects that have

14   been in Web3 thus far.  I think they're a little bit useless.

15   And, you know, it's just they're too obvious.

16            And Rothschild responds:  It's too obvious.  And

17   honestly, like, there's no real utility to it.  It doesn't --

18   like it doesn't do anything.  It's purely art and I get that.

19   But I feel like now they've just diluted their brand in Web3

20   to, like, not really have much behind it.

21            THE COURT:  All right.

22            Now, counsel come to the sidebar.

23            (Continued on next page)

24

25

1              (At sidebar)

2              THE COURT:  I may distinguish two situations.

3              It is appropriate for an expert to comment as a matter

4    of -- even though it involves hearsay, on comparable NFTs and

5    comparable artistic NFTs that he is considering in his

6    comparison.  But I worry that he's getting close to what I

7    forbade earlier, which is any comment on whether or not this is

8    art.

9              Now, I allowed that because he said it's art, but,

10   nevertheless, I'm not really seeing what the relevance is of

11   his saying that it's art, but it's useless.  What's the

12   relevance of that to any issue in this case?

13             MR. FERGUSON:  It's this witness -- it's the defendant

14   acknowledging the distinction between art only NFTs and NFTs

15   that have art plus utility.

16             THE COURT:  I don't recall under the *Rogers* test that

17   utility is a factor.

18             MR. FERGUSON:  But what is a factor under your Honor's

19   rulings in this case is what was the defendant's intent in

20   issuing these NFTs.  And understanding the market context in

21   which he issued the NFTs is relevant to his intent.

22             THE COURT:  Sustained.

23             (Continued on next page)

24

25

1              (In open court)

2              THE COURT:  The jury will disregard the last answer.

3              Put another question.

4    BY MR. FERGUSON:

5    Q.  Let's move to the next slide.  Go ahead to the next slide

6    so the jury can see what is shown in this slide.

7    A.  Certainly.

8              So this slide shows the media file associated to the

9    Baby Birkin NFT.  There is audio, although I'm not sure it's

10   going to go through.

11             (Video played)

12   Q.  And in your report, did you offer an opinion as to what

13   submarket the Baby Birkin NFT participated in?

14   A.  Yes.

15   Q.  And what's your opinion?

16   A.  My opinion is that the Baby Birkin NFT had many of the

17   attributes of an art only NFT.

18   Q.  Please explain that opinion.

19   A.  To the best that I was able to discern, the Baby Birkin NFT

20   only gave ownership of this media file.  In particular, there

21   were no forms of utility stacked on top of that.

22   Q.  Please go to the next slide.

23             Did you form an opinion as to which submarket the

24   MetaBirkin NFTs participated in?

25   A.  I did.

1    Q.   What was your opinion?

2    A.   My opinion is that the MetaBirkin NFTs were solidly within

3    the digital brand submarket.

4    Q.   And can you elaborate on what you mean by that?

5    A.   Certainly.

6              Rothschild explicitly created various forms of utility

7    around the NFTs, the MetaBirkin NFTs and, moreover, sort of

8    marketed and promoted them in ways consistent with the digital

9    brand submarket.

10   Q.   In forming this opinion, did you consider communications

11   made by Mr. Rothschild such as this one before you which is in

12   evidence as Exhibit 126?

13   A.   Yes.

14   Q.   Please elaborate on the significance of this communication.

15   A.   So this is a Twitter post from Mason Rothschild soon after

16   the MetaBirkins mint, in which he describes the MetaBirkins as

17   part of an NFT trinity.

18             And the other two projects in the "trinity" are the

19   Bored Ape Yacht Club, which, as I already mentioned, is one of

20   the most successful digital brand NFTs of all time; and also

21   the Doodles, which happen to be another of the most successful

22   digital brand NFTs of all time and that were particularly

23   popular at the time of this tweet.

24             And so he explicitly categorizes the MetaBirkins as in

25   a category with these two digital brand NFTs rather than say

N23VHER1                         Kominers - Direct

1   some very successful and famous art only NFTs, such as X

2   Copy's.

3           Moreover, at the bottom, you see it says hashtag

4   MetaBirkins to Pluto rocket emoji.  The interpretation here is,

5   first of all, Rothschild is saying the MetaBirkins will go up

6   in value, but, moreover, he's saying --

7           MR. OPPENHEIM:  Objection, your Honor.

8   A.  I interpret it as saying they will go up in value in the

9   same way that the Bored Ape Yacht Club and the Doodles did.

10  And both of those products grew in value tremendously

11  through -- in building a utility creation activities.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Overruled.

2          The objection the witness could not hear, which I

3   could hear, is overruled.

4          THE WITNESS:  I'm sorry.

5   BY MR. FERGUSON:

6   Q.  Would you please move to the next slide.

7          I'm asking you to look at Exhibit 255 which is in

8   evidence, and if you want to click again to highlight certain

9   text.

10          Is this a document that you considered in developing

11   your opinions in this case?

12   A.  Yes.

13   Q.  What is the significance of this document?

14   A.  So this is a post on the platform medium which Rothschild

15   posted immediately prior to the MetaBirkins mint called

16   MetaBirkins and beyond.  Digital brand NFT projects such as the

17   Bored Ape Yacht Club will typically make a statement about, you

18   know, one or a series of statements called a roadmap describing

19   the ways in which they intend to generate utility of the

20   driver's value back to holding the NFT.

21          This statement by Rothschild -- I'm sorry.  Is there

22   an objection?

23          This statement by Rothschild would be, you know, sort

24   of a beginning of a roadmap.  And explicitly what he said is

25   the Baby Birkin and MetaBirkins have all led up to this.  I'm

1   launching yet another NFT collection.  This is before the

2   MetaBirkins had even minted, and the first MetaBirkins Discord

3   server members and the top MetaBirkins holders are going to

4   receive preferential access to this new project.

5          He explicitly says, Your early support will be

6   rewarded.  This is, as I say, very consistent with other sorts

7   of, you know, early stage roadmaps announcing there will be,

8   you know, new NFTs down the line, holders of this collection

9   will get access to those, and we will continue to build value

10  rewarding our supporters.

11  Q.  Dr. Kominers, you had talked earlier about identification

12  as one of the characteristics of NFTs in the digital brand

13  submarket.

14         Can you go to the next slide and explain what you mean

15  by identification in this context?

16  A.  Certainly.

17         So this is a demonstrative I've prepared using four

18  Twitter profiles of members of the Bored Ape Yacht Club.  These

19  are people who hold the Bored Ape Yacht Club NFT and self-

20  identify as members of the Bored Ape community.

21         And the signifier of this self-identification is that

22  they are using their apes as their profile pictures.  And

23  you'll note they have hexagonal profile pictures, so they

24  didn't just upload these images.  They are using a feature from

25  Twitter where they connect their crypto wallet.  And the link,

1    you know, to the Twitter account to their Bored Ape NFT and it

2    pulls the image and loads it, and it puts it in this hexagon,

3    sort of as a verification that you, in fact, hold the NFT.

4          And so, you know, this is very common, actually, for

5    these digital brand NFTs to encourage people to represent

6    themselves as members of the community in digital spaces, like

7    on Twitter, and particularly to make use of these tools to

8    prove that they are a real holder of the NFT.

9    Q.  Please go the next slide.

10          What does this tell us about the identification, about

11   this identification function you were talking about?

12   A.  So here we see Mason Rothschild, who himself holds a Bored

13   Ape Yacht Club NFT, using that Bored Ape associated image as

14   his profile via that same, you know, verified profile method

15   that I was describing.

16          So as you can see, he's got a hexagonal profile

17   picture, he has linked his crypto wallet to Twitter, Twitter is

18   loading the picture from there as a direct utilization of the

19   NFT.

20          My understanding also is that he went after this

21   particular Bored Ape because it matched his, like, you know,

22   public Internet identity as a Web3 cowboy described in the

23   lower right.

24          MR. OPPENHEIM:  Objection and move to strike, your

25   Honor.

1          THE COURT:  Overruled.

2     BY MR. FERGUSON:

3     Q.  In developing your opinions in this case, did you consider

4     statements made by Mr. Rothschild in connection with

5     identification?

6     A.  Yes.

7     Q.  Please flip to the next slide, which is Exhibit 134 in

8     evidence.  Feel free to click again to highlight the text.

9          Please elaborate the significance of the statements

10    here in connection with identification which you were

11    describing.

12    A.  Certainly.

13         So as I mentioned, digital brands will often encourage

14    their holders of their NFTs to use those NFTs as their

15    representation in digital space.  Here, Rothschild is

16    recirculating, I believe, an Instagram post from Lana Rhoades

17    and says -- who had changed her profile picture to her

18    MetaBirkin.  Rothschild says, Do as Lana Rhoades does.  Change

19    your profile photo to your favorite #MetaBirkin.

20         You know, then later, the very bottom you'll see the

21    additional line #mintaMetaBirkinholdaMetaBirkin.  This, again,

22    is invoking, you know -- it's an invocation to community.

23    People who collect from, you know, individual NFT projects, you

24    know, think of themselves as collectors.  When you really

25    engage with a project and become part of it, you consist of a

```
 1    brand, you change your self-identity to be a holder.
 2              MR. OPPENHEIM:  Objection, move to strike.
 3    A.  So, here, the inter- --
 4              THE COURT:  Ground?
 5              MR. OPPENHEIM:  The witness has no foundation to
 6    testify as to the meaning of this hashtag, your Honor.
 7              THE COURT:  Are you saying it was not part of his
 8    report?
 9              MR. OPPENHEIM:  I am, your Honor.  I don't believe --
10              THE COURT:  That's a yes-or-no question.
11              MR. OPPENHEIM:  I'm sorry.  Yes.
12              THE COURT:  I don't recall it being part of his
13    report, but if plaintiff's counsel wants to show me where it
14    is, I'll consider it.
15              MR. FERGUSON:  I don't recall it being part of the
16    report.
17              We'll move along, your Honor.
18              THE COURT:  The objection is sustained.  The jury will
19    disregard the last part of the witness's answer.
20    BY MR. FERGUSON:
21    Q.  Could you go to the next slide, please.
22    A.  Certainly.
23    Q.  You had also talked earlier about token gating as being a
24    feature of NFT and the digital brand, the NFT submarket.
25              Can you elaborate on what you mean by token gating?
```

1    A.  Certainly.

2            Token gating is a mechanism by which ownership of a

3    given NFT is, you know, used as effectively like a ticket.

4    Sort of gains you access to either a digital or physical space

5    or event.

6    Q.  Can you please go to the next slide.

7    A.  Yes.

8    Q.  Does this slide illustrate token gating?

9    A.  Yes.

10           So this a slide -- this is a slide illustrating the

11   Bored Ape Yacht Club's Ape Fest from 2022.  This is last year.

12   It was a four-day long music festival, and holding a Bored Ape

13   NFT acts as a ticket to the event.  Basically, you had access

14   to this music festival if you held, you know, you held the NFT

15   and access to the music festival is free.  All you needed to do

16   was hold a Bored Ape NFT.

17   Q.  In connection with developing your opinions in this matter,

18   did you consider whether Mr. Rothschild offered token gating?

19   A.  Yes.

20   Q.  What did you determine?

21   A.  Um, so he had made a variety of promises with regards to

22   events, especially associated to the, I Like You, You're Weird

23   project, which holders of MetaBirkins received preferential

24   access to and some received for free, including the opportunity

25   to attend, you know, a music event that he himself organized,

1   I believe, at Terminal 27 that was both, apparently, open to

2   I Like You, You're Weird token holders.

3   Q.   And let's go to the next slide.

4             Does this slide illustrate the event you're referring

5   to?

6   A.   Yes, indeed.

7   Q.   If you could go to the next slide.

8             You had also referred to AirDropping and claim as

9   features of NFTs in the digital brand submarketplace?

10  A.   Yes.

11  Q.   Could you go to the next slide and elaborate on what you

12  mean by AirDropping and claim?

13  A.   Certainly.

14            The AirDropping and claiming are two different

15  versions of essentially the same functionality where holders of

16  a given NFT received other assets, digital or physical or both,

17  simply for being a holder of the NFT.  You know, it's a little

18  bit as if, you know, if you went to a given concert, they give

19  you a free T-shirt or something like that.

20            Here, I prepared an illustration using, in fact, one

21  of my own NFTs or two of my own NFTs.  On the left you see a

22  SupDuck.  This is part of a collection of cartoon duck

23  characters created by the NFT creator, FrankyNines.  And very

24  early on in the SupDucks ecosystem, you know, one of the first

25  forms of utility they delivered was that everyone who had a

1  SupDuck was able to claim a pet.  You know, effectively a pet

2  for their duck, King Frog, pictured on the right.

3          I note in particular, that part of the way this

4  worked, was that your frog would get a bunch of the

5  similarities to your duck.  They would share the same color and

6  the same eye pattern and the same background.  And this is very

7  common, especially early on.

8          I'm sorry.  I couldn't hear if there was an objection.

9  Q.  No, there wasn't.

10 A.  No?

11         OK.  Sorry.  there is sometimes a little bit of a

12 scratchy noise and I can't tell whether someone is talking.

13         Anyway, as I was saying, the similarly between the

14 King Frog and the SupDuck is very common with digital brand

15 NFTs, especially early on.  You try to and -- you know, the

16 Airdrops or claims -- oh, sorry, I forgot.

17         AirDrop is it's sent to you via direct deposit.

18 Claim, you have to take an action to receive the new asset.

19         In any event, it's common for these digital brands to

20 sort of proliferate their iconography and imagery through

21 associated collections with similar traits and attributes as

22 you see here.

23 Q.  Could you move to the next slide and explain its

24 significance.

25 A.  Certainly.

1        So I mentioned that AirDrops and claims can be for

2   digital assets and they can also be for physical assets.

3        Here, again, referencing an NFT in my own collection

4   is a physical claim.  So the Badam Bomb Squad, which is part of

5   the Adam Bomb Squad NFT ecosystem created by the streetwear

6   brands The Hundreds, gave each holder of a Badam Bomb NFT the

7   right to claim a free T-shirt from their collection, which,

8   again, as you can see, you know, has the BBS logo.  It's a

9   Badam Bomb T-shirt to represent your ownership of this digital

10  asset in physical space.

11       You can see here that it was a claim.  This is from

12  the receipt, via Shopify, I think, it says NFT used Badam Bomb

13  Squad number 3037, price free.

14  Q.  In developing your opinions, did you consider whether

15  Mr. Rothschild discussed AirDropping in the context of the

16  MetaBirkins project?

17  A.  I did.

18  Q.  Would you please go to the next slide, which is Exhibit 144

19  in evidence, and explain the significance of this slide.

20  A.  Certainly.

21       So here is a tweet from Rothschild in January, early

22  January 2022, in which he says MetaBirkins are the key to

23  unlock all my future projects.  And among the, you know, sort

24  of the value, the endless value for the people who believe in

25  me and my work, and among the value he is promising, he is

1    explicitly promising guaranteed AirDrops for holders.

2    Q.  Please flip to the next slide, which is Exhibit 146 in

3    evidence.

4         Does this document have significant in connection with

5    your findings?

6    A.  Yes.

7    Q.  Please explain.

8    A.  So this is an Instagram post from the official MetaBirkins

9    account in December 2021, soon after the MetaBirkins minted.

10   And if you look at the very top, it says a gift for all first

11   collection holders, AirDropping soon.  And, you know, it shows

12   a picture of, you know, a horse charm.

13        In fact, it's an Hermès horse charm that's been made

14   like fluffy or fuzzy in the same way that the MetaBirkins are,

15   and the interpretation here is that the holders of the

16   MetaBirkins NFTs, you know, all first collection holders will

17   be receiving this as a digital asset, AirDropped soon.

18        Again, as I said, in the context of the SupDuck and

19   the King Frog, you can see here, you know, sort of building out

20   the product ecosystem, again, using a product, you know, a new

21   digital asset that is closely linked to the original digital

22   asset in terms of, you know, it's structure and iconography and

23   reference.

24        You know, it's, yet again, an Hermès asset that has

25   been, sort of, made fuzzy, you know, in the same way that the

1   MetaBirkins were, just as the King Frog sort of shares a lot of

2   similarity with the SupDuck.

3   Q.  Moving to the next slide.  Let's talk about the

4   significance of loyalty rewards in connection with digital

5   brand NFTs.

6        Why don't you move to the next slide --

7   A.  Certainly.

8   Q.  -- and elaborate for us what this illustrates.

9   A.  Certainly.

10        So it is very common also for digital brands to, sort

11   of, treat their long-time holders or multi-unit collectors or

12   something as sort of in terms of loyalty tiers in the same way

13   you might see with, like, frequent flyer miles or something of

14   the sort.

15        Pictured here is the, you know, the matrix or the most

16   recent Bored Ape Yacht Club release.  And, you know, the key

17   is, that if you held an ape and a Bored Ape kennel club, that

18   was the pet -- they also did a pet sort of like King Frog, the

19   pet dog associated to your ape, if you held both of these

20   assets, you got a higher tier for, you know, access to their

21   new game than if you just held an ape.  That's the sort of

22   first row versus the second row.  And similarly with the mutant

23   in a kennel club, which we'll talk about later.

24        And we see this, you know, both with classic brand,

25   with sort of modern, like, sort of, fully NFT native brands and

1    classic brands.  Starbucks, for example, has recently built a

2    loyalty rewards program on top of an NFT backbone as well.

3    Q.  Could you move to the next slide, and we're looking again

4    at Exhibit 255, which you have discussed before.

5         Does this document have significance in connection

6    with loyalty rewards?

7    A.  Indeed.

8         So, as I mentioned, this, you know, sort of early

9    roadmap indication from Rothschild promised, you know, your

10   early support will be rewarded.  That's the bottom highlight.

11        But in particular, it promised a form of loyalty

12   reward.  The top ten longest MetaBirkin holders with the top

13   generative project minting will be gifted an item from the

14   collection.  I believe, in practice, it ended up being

15   implemented slightly differently.  He, in fact, ended up giving

16   it to the top holders, so the people that had the most

17   MetaBirkins.

18        But, you know, in the same way, it's, you know, sort

19   of promising rewards to the people who are engaged and, like,

20   sort of long-term participants in the brand.

21   Q.  Moving to the next slide, you also reference a

22   transformative as a feature of digital brand, the digital brand

23   NFT marketplace.

24        Could you go to the next slide and explain the

25   demonstrative you've prepared to illustrate this point?

1    A.  Indeed.

2           This one in particular may be a little bit harder

3    without the audio.  I'll explain it in detail.

4           So you're currently looking at a screen cap, and then

5    I'll show, you know, a clip of the video of Steve Aoki using

6    what's called a mutant serum.  I mentioned that one of the

7    AirDrops from the Bored Ape Yacht Club was the mutant serum.

8    This is a different NFT.  Everyone who held a Bored Ape on a

9    particular date received, direct deposited to their crypto

10   wallet, essentially just delivered to them, one of three

11   different types of NFT which, you know, you could then use in

12   what's almost a game.

13          In theory, it's sort of a game where you interact your

14   mutant serum with your ape to produce yet another NFT, which is

15   called a mutant ape.  So, basically, it is a piece of -- NFTs

16   are software.  They are sort of a piece of software on the

17   blockchain that interacts with the mutant serum NFT and your

18   ape NFT, deletes the mutant serum, like you consumed it, and

19   produces from it a mutant ape NFT.

20          So this is a video of -- oh, people did this, you

21   know, live.  They did it in live streams and it was, sort of, a

22   big event.  So here is Steve Aoki, who is a D.J. and NFT

23   collector and influencer, you know, using the mutant serum on

24   his ape.

25          May I play the demonstrative?

1    Q.  We're not going to hear it.  If you want to explain.

2              Please start, yes.

3              (Video played)

4    A.  We're going to mutate this right now using the M2 serum,

5    and he clicks drink it.  It says mutating.  It's produced

6    mutant ape yacht club 13735.  And here it is now -- he's

7    excited.  He's going, Wow, here it is.

8              But the point is he, in that process, when he clicks

9    drink it, it triggered a blockchain program, computer program,

10   that deleted the mutant serum, read the data of his ape, and

11   then it produced this associated mutant, which as you can see

12   shares some characteristics.  So his ape had these coins over

13   its eyes.  This had these melted coins over the eyes.  It is

14   designed, sort of, as a mutation that looks similar but more,

15   you know, mutated abstract.  You know, so this NFT was produced

16   and landed in his crypto wallet at the end of the software

17   program.

18   Q.  In developing your opinions, did you consider whether Mason

19   Rothschild discussed transformative -- this transformative

20   feature?

21   A.  I did.

22   Q.  Please move to the next slide, exhibit 239, pages five and

23   six in evidence.

24              Explain the significance.

25   A.  So I mentioned earlier that Rothschild had promised to

1    AirDrop this sort of fuzzy variant of the Hermès rodeo horse

2    charm.  He considered several different -- based on his sort of

3    communications, it's clear he considered several different

4    structures around what that AirDrop, what form that AirDrop

5    might take.

6            But here, he's discussing with Mark Design, his

7    designer, one in which they -- you know, that takes the same

8    form as the mutant serum.  So the idea is they were going to

9    AirDrop an all-white horse and you can, quote-unquote, burn.

10   That's the deletion operation.  You can delete the horse NFT to

11   get, he says, a fluffily horse to match their Birkin.

12           And so the idea would be you would have a MetaBirkin.

13   You know, it generates a horse charm that is sort of fluffified

14   and has the same pattern, you know, matching their Birkin, same

15   pattern as in your other NFT.

16           THE COURT:  Counsel, because we're having a lunch

17   break at noon today, I think we need to give the jury their

18   midmorning break sometime in the next few minutes.

19           MR. FERGUSON:  OK.  I think we've come to a good

20   breaking point real quick.

21           Want me to break now?

22           THE COURT:  No.  Go ahead.

23           MR. FERGUSON:  Is it OK if I go a few more minutes?

24           THE COURT:  Go ahead.

25           MR. FERGUSON:  Thank you.

1    BY MR. FERGUSON:

2    Q.  Go to the next slide, please.

3    A.  Certainly.

4    Q.  Why don't you go ahead to the next slide and describe to us

5    the demonstrative, the demonstrative you've created to

6    illustrate your testimony.

7    A.  Certainly.

8        So one other major category of utility that NFT

9    projects bring is what's called functional utility, which is

10   the ability to use the NFTs associated assets in various, you

11   know, sort of other activities, right.  It might be a game.  It

12   might be a metaverse platform.

13       Here, I've prepared a series of three brief

14   demonstratives illustrating these different forms of functional

15   utility.  The first one here, you can see in the upper left on

16   this screen, this is one of my crypto wallets.  I worked with,

17   you know, a blockchain developer that I've worked with

18   previously to produce an NFT with a generic image of a handbag,

19   but that otherwise has all of the simple functionalities as the

20   MetaBirkins NFTs.  In particular, it uses a version of the

21   MetaBirkins source code which itself was built from public

22   libraries.

23       Here, we have a handbag NFT.  What I'm going to show

24   you is how that NFT, you know, despite being just an image, can

25   be used in the metaverse platform on cyber.  I'm going to use

N23sHER2                          Kominers - Direct

1     it and wear it at the metaverse platform, the on cyber Macy's

2     Thanksgiving Day parade, which was held this past November.

3     Macy's created a metaverse platform where you'll see parade

4     floats and so forth --

5              MR. OPPENHEIM:  Objection, your Honor.

6     A.   -- for which --

7              I'm sorry?

8              MR. OPPENHEIM:  Objection.

9              MR. FERGUSON:  Your Honor, may I approach?

10             THE COURT:  No, because we're going to give the jury

11    their midmorning break right now, and then I'll hear you at

12    that time.

13             MR. FERGUSON:  OK.

14             THE COURT:  The witness should plan to resume in

15    ten minutes, but you can disappear remotely until then.

16             Ladies and gentlemen.

17             THE WITNESS:  Thank you, your Honor.

18             THE COURT:  Ladies and gentlemen, because we're on a

19    tight schedule, if we can keep this break to ten minutes, that

20    would be appreciated.

21             (Continued on next page)

22

23

24

25

 1               (Jury not present)

 2               THE COURT:  Someone needs to disconnect the witness

 3       for the next ten minutes.

 4               Please be seated.

 5               What was it you wanted to raise at the sidebar?

 6               MR. OPPENHEIM:  As anyone initial matter, your Honor,

 7       none of this testimony is reflected in the witness's -- either

 8       the witness's report or --

 9               THE COURT:  Yes.  I'm very concerned about that, too.

10               When I made my rulings on the defense motion to

11       exclude this report, the focus was on his report basically

12       saying that what the consumers were buying here had nothing to

13       do with artistic expression.  And I don't recall, having gone

14       back and read the report -- I'll try to do that during this

15       break -- but I don't recall a lot of what he's been testifying

16       here to today.

17               An expert under the federal rules is strictly limited

18       to what is in his report because otherwise it constitutes

19       unfair surprise.  So as I say, I'll go look at the report, but

20       do you want to point me as to where in his report there is the

21       stuff he's now been testifying to.

22               MR. FERGUSON:  The Macy's parade, NFT parade, which

23       he's about to discuss is in his report on page 21.

24               THE COURT:  That's what he's about to discuss.

25               We are talking about the stuff that he has discussed

1    so far that there were objections to.

2              MR. FERGUSON:  I could go through.  I've got

3    references.  I prepared kind of a cheat sheet with references.

4    It is throughout his report.

5              THE COURT:  With that representation, I'll go look at

6    the report and hold off on making any ruling until we finish

7    the break in ten minutes.

8              MR. FERGUSON:  Your Honor, could I apologize and raise

9    one other issue?

10             THE COURT:  Yes.

11             MR. FERGUSON:  So under the pretrial order that the

12   parties jointly submitted and your Honor answered,

13   demonstratives were required to be submitted at 8:00 the day

14   before they were supposed to be used, and objections were

15   supposed to be made by nine o'clock, then the parties were

16   supposed to meet and confer.

17             These were provided on Tuesday night because there was

18   a hope or expectation at that point that Dr. Kominers may be

19   testifying by Wednesday.  We have never received any objection

20   to these demonstratives until now.

21             THE COURT:  Well, that's a good point, but not quite

22   as good as you think it is, because I never signed the pretrial

23   consent order in this case because I had problems with parts of

24   it.

25             Nevertheless, I think you could argue that even though

1   I did not order, therefore, anything in the pretrial consent

2   proposed order, nevertheless you had an agreement reflected in

3   that draft that your adversary has not adhered to.

4           MR. FERGUSON:  That is correct.

5           THE COURT:  It is still alive on that point.  So what

6   about that?

7           MR. OPPENHEIM:  Thank you, your Honor.

8           I am, to be clear, not objecting to the

9   demonstratives.  I am objecting to the witness's testimony,

10  specifically his most recent comments about the way in which

11  the subject NFTs are wearable and his plans for wearing them.

12  That is not in his report.

13          MR. FERGUSON:  I would have to look at the transcript

14  references.  I'm not sure what counsel is referring to anymore.

15          THE COURT:  All right.  Well, in any event, you asked

16  for an estimated 80 minutes on the direct.  He has gone

17  55 minutes.  I'm going to hold you to 80 minutes strictly.

18          MR. FERGUSON:  I would expect --

19          THE COURT:  So you might want to get on to some of the

20  other stuff that is clearly in his report.

21          MR. FERGUSON:  I would expect you to, your Honor, and

22  we will.  That's why it is so important, again, when we came up

23  with this time estimate was based on the agreement regarding

24  the demonstratives being honored.  As long as that is going to

25  be honored, we are going to hit this time limit.

1            THE COURT:  I'll think about all that.

2            We'll see you in five minutes.

3            (Recess)

4            I've taken a further look at the witness's --

5            how does he pronounce it, Kominers?

6            THE WITNESS:  Kominers, please, your Honor.

7            THE COURT:  Thank you.

8            All 103 pages, single space, but including some of it

9    as appendices, but he really offers three opinions which are

10   set forth on the first page of his report under the heading

11   Summary of Opinions.

12           The first opinion is that there are two broad

13   submarkets within the NFT market.  One is the art-only NFTs.

14   Second is the -- what he calls the digital brand NFTs.

15           I think he's finished everything he was going to say

16   on that, correct?

17           MR. FERGUSON:  Correct.

18           THE WITNESS:  Yes, your Honor.

19           THE COURT:  Second opinion was that while

20   Mr. Rothschild's Baby Birkin NFT had many of the attributes of

21   the art-only submarket, the MetaBirkins NFT project had

22   attributes more consistent with those of the digital brand

23   market.  Now, I'm not sure whether he's finished that or not.

24           MR. FERGUSON:  Five minutes at the most, less than

25   five minutes.

1          THE COURT:  And then the final opinion was that his

2     empirical analysis as an economist of the price and trading

3     history of the MetaBirkins tokens, as compared with other

4     similar markets, suggests that the most likely explanation for

5     the MetaBirkins market prices and trading volumes is the

6     connection that constitutes the brand, digital brand submarket,

7     which seemed to me, when I made my earlier rulings about all

8     this, the key thing that he was testifying about that

9     distinguished his report from certain objections that were made

10    by the defense and that also seemed to me relevant both to

11    liability and to damages.

12          So are we going to get to there, to the third opinion?

13          MR. FERGUSON:  I apologize, Judge.  Your Honor, I

14    didn't hear you.

15          THE COURT:  Are we going to get to the third opinion?

16          MR. FERGUSON:  I'm sorry?

17          THE COURT:  Are we going to get to the third opinion?

18          MR. FERGUSON:  We are getting there very quickly.

19          THE COURT:  All right.  I think while I haven't had a

20    chance to parse through enough to say for sure that each of the

21    statements he made is contained in his report, I will accept

22    from a quick review the representation of counsel that they

23    were, other than the one that I sustained the objection to

24    earlier.

25          But I do think it's important to keep him focused on

1    the fact that he's offering an opinion as an economist and not

2    as an art maven or anything of that sort.

3              Oh, here he is.  All right.  I'm sorry, I didn't

4    realize you were back.  I'm glad you heard that.  I'm sure you

5    have exquisite taste in art, but it's of no relevance to your

6    opinion here today.

7              Let's bring in the jury.

8              THE WITNESS:  Thank you, your Honor.  I am definitely

9    not an art maven.

10             THE DEPUTY CLERK:  Jury entering the courtroom.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  Thank you, ladies and gentlemen.

 3              There was an important legal issue that I had to

 4    resolve with counsel, but it's all resolved now.

 5              So please continue.

 6    BY MR. FERGUSON:

 7    Q.  Dr. Kominers, I'm going to request that we very quickly go

 8    through the three demonstratives you've created.  Just explain

 9    what they are, their significance to your opinion, and then we

10    will have time to get to your concluded opinion.

11    A.  Certainly.  First of all --

12    Q.  We can't see the PowerPoint.

13    A.  Are you able to see the screen?

14    Q.  We aren't able to see the screen.

15              Can you share the screen again?

16    A.  Oh, goodness.  I am currently sharing the screen.

17              THE COURT:  We will have to call our expert.

18              MR. FERGUSON:  We see it.

19              THE COURT:  There we go.

20              MR. FERGUSON:  Happy day.

21              THE WITNESS:  Have you got it now?

22              THE COURT:  Yes.

23              THE WITNESS:  Thank you.

24    BY MR. FERGUSON:

25    Q.  Please quickly run through what these illustrate.

1    A.  Certainly.

2          So as I said right before we broke, this is an

3    illustration of how one can use, you know, this demo NFT we

4    constructed as your identity in digital space, particularly in

5    the Macy's on cyber metaverse.

6          Here, this is the NFT.  As you see, it's associated to

7    a generic handbag image I constructed, and then here you're in

8    the Macy's metaverse.  My wallet is connected.  You load, you

9    know, choose NFT avatar, and select the handbag.  And, you

10   know, again, didn't upload an image or anything.  It loads it

11   directly out of your crypto wallet.  And now here you are

12   represented, you know, sort of exploring the Macy's

13   Thanksgiving Day parade.

14         There is a second quick clip here.  There is a second

15   type of avatar.  So the main avatar on cyber is these disks,

16   but there is a second person which is this particular humanoid

17   character.  And you'll see for the humanoid character --

18   whoops -- the shop was apparently too quick.  But for the

19   humanoid character, the NFT image manifests above it, sort of

20   in a bubble above their head, which is a common way to display

21   these metaverse assets.

22         Here, a second instance of functional utility I

23   acquire a Dolce & Gabbana disco drip NFT, which represented

24   an -- OpenSea is this, you know, sort of flat image that has a

25   little bit of an animated rotation or something to it.  But

1  when you load it into Decentraland, it immediately integrates

2  with a digital wearable.

3          Here, I am buying the NFT.  Complete purchase.  It now

4  shows up.  Here we are in Decentraland.  That's my avatar.  You

5  know, going through my avatar's different, sort of, outfits in

6  a menu called the backpack.  It will switch to the second page

7  in a moment where you'll see the Dolce & Gabbana outfit I just

8  purchased load in the bottom right corner.  And so you simply

9  click it.  It manifests on your avatar.  And then you hit done,

10  and now you're wearing this digital asset in Decentraland.

11          And then finally, I have one more Decentraland

12  demonstrative.  So here, you know, the character, again,

13  wearing the Dolce & Gabbana outfit I just purchased.  I'm now

14  going to purchase a digital handbag, this time from the

15  Decentraland marketplace, and I will show you how that

16  manifests here as well.

17          Again, these are all NFTs.  I should say, each of

18  these purchase processes, there are some clips to speed it up

19  for viewing, but each of the purchase processes takes fewer

20  than two minutes or so in total.

21          So I go to the Decentraland marketplace, I buy this

22  wearable diamond dragon handbag, that fox is the crypto

23  transaction processing.  You bought the handbag.  And now,

24  again, it manifests here under collectibles.  You click on the

25  handbag, the digital collectible, and then it manifests.  The

1   character is holding it.  And then, again, manifests directly

2   into the world.

3          So you see it swings around like a handbag, and so

4   this is an -- these are all examples of functional utility

5   associated to NFT assets of handbags and other digital fashion

6   items.

7   Q.  In developing your opinion that MetaBirkins were part of

8   the digital brand submarket, did you consider statements of

9   Mason Rothschild related to functional utility?

10  A.  Yes.

11  Q.  Please go to the next slide.  This is Exhibit 306 at

12  pages 27, 28 in evidence.

13         What is the significance of this statement for your

14  opinions?

15  A.  Um, so here, Rothschild in a text message conversation

16  described the MetaBirkins NFTs as "technically metaverse ready

17  cause fully 3D."  And, you know, thus -- you know, the

18  interpretation would be that you could use these assets in

19  platforms like Decentraland, you know, that I was just

20  illustrating.

21  Q.  Move forward, please, and sum up your conclusions with

22  respect to your second opinion regarding MetaBirkins NFTs.

23  A.  Certainly.

24         So as I mentioned, the two submarkets I had

25  identified, art only and digital brand, are separated by the

1    inclusion of utility features.  So in the art-only submarket,

2    you know, holding the NFT grants just ownership.  You know,

3    it's just a digital deed for a file.

4           Whereas, in the digital brand submarket, you know,

5    sort of the creators' attach many different forms of utility in

6    the hopes of building additional value and then eventually

7    identity and community around the NFTs.

8           As you see here, as we illustrated, Rothschild -- or

9    as I've illustrated, Rothschild engaged creating many different

10   types of utility around the MetaBirkins which match up with

11   different forms of utility that are standard in this space:

12   Identification and community, token-gated events, AirDrops,

13   loyalty rewards, transformative utility, and functional utility

14   as well.

15   Q.  Thank you very much.

16          Let's move to the market analysis that you conducted.

17   A.  Certainly.

18   Q.  The next slide.

19          So please explain the market analysis that you

20   conducted.

21   A.  Certainly.

22          So as I mentioned, I -- with the assistance of a

23   research assistant, one of my former students -- conducted an

24   empirical study of the price and trading patterns of the

25   MetaBirkins in comparison to other contemporaneous crypto --

1    other contemporaneous NFT projects.

2            We collected data from Icy Tools.  Icy tools is a

3    well-known aggregator of NFT transaction data that's used by

4    professional NFT traders and collectors.  We, you know -- and

5    aggregates, sort of, all, you know, NFT transactions, you know,

6    across time.

7            We collected data for the 413 contemporaneously

8    launched NFT collections and looked at their trading patterns

9    over the first 17 days.  The choice of 17 days is because the

10   MetaBirkins were removed from OpenSea, which was at the time

11   the principal NFT marketplace, 17 days in.

12           And so for, you know, for fairness and essentially to

13   avoid bias in the assessment, we looked at the same duration

14   trading period for all the different NFTs in the sample.  So

15   there were 413 NFTs.  There were NFT projects considered, many

16   of them with very large numbers of tokens.  And we looked at

17   how their trading patterns were similar to or different from

18   the MetaBirkins.

19   Q.  And, unfortunately, Dr. Kominers, for us looking here in

20   the courtroom, the screenshot of the courtroom is covering the

21   right-hand side of the slide.

22   A.  Ah.

23   Q.  Can you tell us --

24           THE COURT:  Hold on.  Let's see if he can fix it.

25           MR. FERGUSON:  We're going to try to fix that very

 1    quickly.

 2                 THE COURT:  Ah.

 3    BY MR. FERGUSON:

 4    Q.  OK.  Can you summarize what is shown with respect to

 5    MetaBirkins compared to other sales during this timeframe?

 6                 Now we see the whole slide.

 7    A.  Excellent.  Great.

 8                 So, as I said, we looked at price and trading

 9    patterns, and we used several different metrics to make this

10    assessment, as well as a clustering analysis as a robustness

11    check.

12                 Here, just, you know, sort of, one of the simplest

13    metrics is just average daily trade price over that first

14    17-day period.  So what you see, every dot here represents a

15    different NFT project launched within a two-week window of

16    MetaBirkins.  And you can see that MetaBirkins is a massive

17    outlier in terms of average daily trade price.

18                 In fact, it's the second highly average daily trade

19    price in the sample.  The one exception, you know, the one

20    higher being NeoTokyo Citizen, which is a massive NFT creator

21    and investor network that launched with a partnership with

22    Twitch.TV, and has, sort of, a huge follower base and investor

23    base at the start.

24                 And so relative to almost every project that launched

25    in the same time period, MetaBirkins was a massive outlier in

1    terms of average daily trade price, I think three standard
2    deviations above the mean.
3    Q.  Can you give another example of the analysis you've
4    performed on this data going to the next slide?
5    A.  Certainly.
6    Q.  We see the whole slide now.
7    A.  There we go.
8            So, as I said, we used several different metrics.
9    Another one we looked at is the daily trading market cap.  So
10   this is the average -- the average daily trade price times, you
11   know -- so market cap is the daily trade price times the number
12   of units traded.  Sort of think of it as, like, a gross volume
13   measurement in dollars.
14           That measurement, of course, depends on the total size
15   of the collection, right.  A collection with a million tokens
16   might have many more trades than a small collection.
17           Here, I'm showing the average trading market cap over
18   17 days, same sample period, for tokens with 1,000 fewer
19   supplies.  So remember, the MetaBirkins had 100 tokens.  That
20   is still up to ten times the size of the MetaBirkins
21   collection.
22           And, once again, the MetaBirkins are a significant
23   outlier.  There is only a handful of other projects that were
24   even vaguely in that range.  The next, like, the next smallest
25   of them had over 400 tokens.  That was Mobland.  And all of

1    these were projects, again, with significant support and, sort

2    of, a lot of, you know, product delivery when they launch.

3    Mobland, for example, launched with a fully functional game and

4    $8 million in investment collected to date.

5    Q.  Can you go to the next slide and give an analysis of the

6    projects that you saw as in the same range as MetaBirkins

7    during the time period that you've identified for the

8    MetaBirkins?

9    A.  Certainly.

10          Let me just quickly, you know, to make clear what is

11   going on here, you see I tagged some of the other projects that

12   were in the MetaBirkins rank.  Here, I'm summarizing

13   information about those projects in relation, you know, in

14   comparison to the MetaBirkins.

15          So these are the projects that were in the same sort

16   of range as MetaBirkins under a variety of different metrics.

17   First, as I mentioned, NeoTokyo Citizen, which is a, you know,

18   massive collection -- was and is a massive collective of NFT

19   collectors and creators and investors, launched by founders

20   with a combined 1.6 million YouTube following and roughly a

21   million Twitter followers.

22          Mobland, as I mentioned, launched with a fully

23   realized game.  You know, they are a metaverse crime game.

24   Apologies for talking about a metaverse crime game in a

25   courtroom, but that is what it is.  They launched with

1    $8 million in venture capital funding.

2           Subtraction is, I believe, an art-only project, but

3    launched by a creator with a long history of major works.  He

4    had sold work at Sotheby's, you know, a few weeks before.  In

5    2016 he did a major collaboration with Samsung and he had over

6    140,000000 Instagram followers at the time.

7           Synthetic Dreams was a collaboration with Google AI

8    Quantum, I think, as part of their, like, summer institute or

9    something, you know, created by, you know, Google in

10   collaboration with this creator with over 500,000 followers.

11          Mint Disk was a project of ARFKT, and spelled

12   A-R-F-K-T but it is pronounced artifact, which is a digital

13   street NFT-based streetwear brand that was acquired by Nike.

14   And this was the app that you used to get access to their

15   characters in their world called a CloneX.

16          And then X-Consoles was another gaming project.  This

17   one launched with, sort of, a white paper and plans to build a

18   series of what are called player-earned games.  And holders of

19   the tokens were at least, you know, sort of playing to receive

20   revenue from the game design.  This was backed by a number of

21   established creators and collectors in the space, including

22   Cosimo de' Medici, who is one of the most central tastemakers

23   of all NFTs.  And so all of these were projects with

24   established and very significant followings.  Most of them, you

25   know, themselves digital brands with fully functional products

N23sHER2                          Kominers - Direct

1     at the time of launch.

2              In comparison to that, the MetaBirkins NFT project was

3     created by Rothschild, who at the time had fewer than 10,000

4     followers -- I think it was more on the order of 8,000 -- and

5     had, you know, created the Baby Birkin previously, but had none

6     of the, you know, sort of public support or history of product

7     of these various NFT projects.

8              And in particular, you know, the fact that the

9     MetaBirkins were performing empirically on par with these

10    massive digital brands, you know, strongly suggested that, you

11    know, that something was giving value to the MetaBirkins over

12    and above.  And I concluded the Hermès association was the most

13    likely driver, both directly and indirectly.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. FERGUSON:

2   Q.  Would you go to the next slide, which is our last slide.

3   Talk about the price analysis, the sales analysis you

4   conducted, how it relates to your findings, and then give

5   your --

6   A.  Certainly.

7         So as I mentioned, we looked at the sales and trading

8   data under a variety of different forums.  Here is just one

9   more illustration.  So I've plotted first the reveal.  So the

10  MetaBirkins were originally sold unrevealed; there was just

11  like an image of a sheet over a pedestal.  And there was active

12  trading before that.  And then there was the reveal, when they

13  were replaced with what is currently the image associated with

14  the NFTs.

15        I'm also tagging -- we talked about the Lana Rhoades

16  tweet.  She's a crypto influencer who Rothschild -- or sorry,

17  Rhoades' post, who Rothschild re-tweeted.  And Future, another

18  crypto influencer, who was re-tweeted in that NFT trinity post.

19        And then finally, the *Financial Times* article in which

20  Hermès explicitly disclaimed involvement with the project.  And

21  so here, just a couple things to note looking at the trading

22  patterns.

23        So, first of all, you see a drop in trading prices

24  following the reveal.  There was sort of a bunch of activity at

25  high or medium prices, and it drops to medium, and then much

1     lower.  This is somewhat common in NFT projects, especially

2     digital brands, after their initial reveal.  But, in

3     particular, so it illustrates -- at least we don't see people,

4     like, going and grabbing the specific MetaBirkin that they

5     really wanted; it doesn't just seem as if they are choosing --

6     they were buying much more actively pre-reveal and post, and it

7     doesn't seem like they are choosing on the basis of the

8     individual item.

9            We see some uptick following the influencer tweets,

10    but then a steady downward trend following the *Financial Times*

11    article.  And I want to be very careful about making causal

12    claims here because I'm not making a causal statement, although

13    my guess is a regression discontinuity here would show

14    precisely these trends that I'm describing.

15           But certainly, especially here, you know, this decline

16    following the *Financial Times* article would not be consistent

17    with people actively valuing the MetaBirkins.  It would be hard

18    for this to be consistent with people actively valuing the

19    MetaBirkins because they were not associated with Hermès,

20    right.  Sort of, making the Hermès nonaffiliation clearer to

21    the market was not associated with an increase in price and, if

22    anything, seems to have been, you know, preceded a period of

23    significant price decline.

24    Q.  My final question, can you summarize your findings from

25    your empirical study?

1  A.   Certainly.

2          So as I described, we saw that the MetaBirkins had

3  significant -- they were outliers in the market with regards to

4  all the different, you know, trading price analyses -- trading

5  and price analyses we looked at.  To the extent that they were

6  outliers, their closest cousins, right, they were closest in

7  position to major NFT projects, most of them major digital

8  brand NFT projects produced with significant investment up

9  front and, sort of, fully functional, like fully realized

10 utility at launch.

11         And to the best of my ability to ascertain, the

12 clearest explanation for this or most likely explanation for

13 this outsized performance of the MetaBirkins relative to peer

14 projects is the Hermès brand association.

15         MR. FERGUSON:  No further questions.

16         THE COURT:  Cross-examination.

17 CROSS-EXAMINATION

18 BY MR. OPPENHEIM:

19 Q.   Good afternoon, Dr. Kominers.

20         Thank you very much for your time with us today.

21         My name is Adam Oppenheim.  I'm one of the lawyers

22 representing Mason Rothschild.

23         I'd actually like to start with the chart we were just

24 looking at a moment ago.

25         MR. OPPENHEIM:  Ashley, could you please put up page

1   50 of the demonstrative that we were looking at.

2          Just one second, Dr. Kominers.

3   Q.  Dr. Kominers, I'm going to begin -- when the chart gets up,

4   I'll illustrate my question by pointing to it.

5          This was the most recent chart you looked at, it was

6   the one that showed the prices of MetaBirkins over time; is

7   that correct?

8   A.  Yes.

9          MR. OPPENHEIM:  How are we doing?

10  Q.  This is the part of your examination where I would be

11  pointing to the demonstrative.  I'd like to ask you --

12  A.  I'm sorry.

13  Q.  That's okay.

14         While we're waiting, my question is going to be

15  specifically about the X axis in that chart that we looked at

16  or the horizontal line across the bottom where I believe we

17  depicted dates; is that right?

18  A.  Yes.

19  Q.  And again, trusting me a little bit, because I don't have

20  it in front of me right now -- I can.

21         Dr. Kominers --

22         MR. OPPENHEIM:  Can I ask the witness to put it up on

23  the screen?  I think, your Honor, that might avoid these

24  technical difficulties.

25         THE WITNESS:  Certainly.

1    Q.   Thank you.

2    A.   Sorry.  I was going to volunteer, but I don't know if I was

3    allowed to.

4    Q.   We have a lot of rules here.  I appreciate that.

5    A.   Can you see it?

6    Q.   I can't yet, but we have people on it.

7              Just one second please.

8    A.   Oh, okay.  I have it now screen sharing.  Sorry for the

9    technical difficulties.

10   Q.   Dr. Kominers, I'm going to continue while we work with

11   this.

12             You described the shape of the curve that emerged from

13   the plot points on that last chart; correct?  You spoke, I

14   believe, about the decline in price immediately after minting

15   and some of your observations from that shape; is that right?

16   A.   Yes.

17   Q.   But the dates on the bottom of your chart, I noticed that

18   they weren't linear.  Is that right?

19   A.   Yes.

20   Q.   And what I mean by that, Dr. Kominers, is that -- well, the

21   distance for what I would call about the first two-thirds of

22   that X axis represent a period of about 24 days from December

23   3rd, 2022, to December 26, 2022.  But then the last little bit

24   of that table seemed to go from that date in December of 2022,

25   all the way to November of the next year; is that right?

1    A.   Yes.

2    Q.   Okay.  So my question is if you had made that X axis

3    linear, that is, if the difference between each point was the

4    same, would that curve have looked different?

5    A.   Yes, it actually might have been a sharper decline.

6    Q.   Okay.  And so some of the conclusions that you testified

7    about might be a little bit different than what the jury heard;

8    is that right?

9    A.   As I said, it might have been a sharper decline than

10   pictured.

11   Q.   It might have been.  It might have been.

12        I also noticed that on a couple of the slides right

13   before that -- I'm sorry, it's going to reflect that I don't

14   have expertise here, but I believe you testified that some

15   outliers were removed from those charts; is that correct?

16        Oh, thank you very much.

17   A.   One outlier was removed, yes.

18   Q.   Okay.  Could we back up.  I'm sorry, I don't actually know

19   who's controlling the exhibit.  I believe you are, Dr.

20   Kominers?

21   A.   Oh, okay.

22   Q.   Could you go back to page 47 please?  I think it's back a

23   few pages here.  And thank you very much for your help.

24   A.   I think I'm no longer in control of the slides.  I think

25   this is now your computer.

1   Q.  This is slide 47.  This is the slide I was referring to.

2   It appears that, in fact, there are two data -- I should say

3   two groups of data points that you've excluded from this slide;

4   is that right?

5   A.  Yes.

6   Q.  And what would this chart look like -- excuse me.

7            What would this chart look like if we made it big

8   enough to include the data points associated with Mobland and

9   X-Consoles, would it look different?

10  A.  Well, it would just be more squished.  So those two had

11  data points much higher up, so we either have to stretch the

12  screen or squish the chart.

13  Q.  I see.  Is it right that if we included the data from

14  Mobland and X-Consoles, that, well, MetaBirkins would be much

15  closer on the points in the line that you showed to the jury;

16  is that right?

17  A.  No.

18  Q.  What's not right about it, Dr. Kominers?

19  A.  The distance is not the distance as it appears on the

20  slide, but the distance in terms of dollars.  And the distance

21  in terms of dollars is the same in respective of how you draw

22  the scale.

23  Q.  Of course.  Thank you.  That is absolutely true.

24            THE COURT:  Counsel, just put questions.

25  Q.  Is it the case that the appearance of the chart would be

1    that the dots would appear closer together if all the data were

2    included on the table?

3    A.  I suppose so, yes.

4    Q.  Dr. Kominers, you testified your area of expertise was

5    economics and market design.  And I believe you've stated that

6    you have a focus on NFTs and crypto technology; is that

7    correct?

8    A.  Yes.

9    Q.  And you teach at Harvard; correct?

10   A.  Yes.

11   Q.  Okay.  Can you tell me what are you teaching this semester?

12   A.  So I'm currently on leave, but I just finished teaching a

13   Web3 immersion course.

14   Q.  Is that a class that you teach to undergraduate students?

15   A.  That's a course I teach to MBAs and occasionally other

16   students from the university.

17   Q.  I think you explained that your involvement in this case

18   began with a referral; is that correct?

19   A.  Yes.

20   Q.  And the name of the company that got you hired here, they

21   are called Rubin Anders; is that right?

22   A.  Yes.

23   Q.  And you had never worked with Rubin Anders before your work

24   on this case?

25   A.  No, I had not.

1   Q.  So how did they reach out to you?  Was it by phone or

2   email?  How did they get in touch with you?

3   A.  Email.

4   Q.  And did that email explain what kind of an expert they were

5   looking for?

6   A.  I don't recall.

7   Q.  And as you testified, you're being paid for your testimony

8   today; correct?

9   A.  Yes.

10  Q.  And you were also paid -- I'm sorry.

11          You were also paid by Hermès for the work you did on

12  this case; is that right?

13  A.  Oh, sorry, and I should have been clear.  I mean paid to

14  testify.  And was paid to do work on this case, yes.

15  Q.  Okay.  And you charge two different rates for those two

16  things; correct?  It's $1500 an hour when you're working, and

17  then $2,000 an hour when you testify; correct?

18  A.  I mean, testimony is also work, but, yes, that's the

19  distinction.

20  Q.  Thank you.

21          How much have you charged them for your work so far on

22  this case, Dr. Kominers?

23  A.  I don't know off the top of my head.

24  Q.  Do you have some idea of a guess for the jury?

25  A.  I don't have a clear estimate, sorry.

N23VHER3                        Kominers - Cross

1   Q.   Okay.  Could you estimate how much time you've put in on

2   this matter?

3   A.   Again, if I knew that off the top of my head, I could

4   estimate the exact number.  I don't know.

5           THE COURT:  So if I understand it, you charge one rate

6   for the work that you do before testifying, and then another

7   rate while you're testifying, yes?

8           THE WITNESS:  Yes, your Honor.

9           THE COURT:  So was the work that you did before

10  testifying more than ten hours?

11          THE WITNESS:  Yes.

12          THE COURT:  Was it more than 100 hours?

13          THE WITNESS:  I believe so, yes.

14          THE COURT:  All right.

15          And then you charge more for testifying, but that's

16  because you have to undergo the rigors of cross-examination,

17  right?  You don't have to answer that.

18          THE WITNESS:  Exactly, your Honor.

19          THE COURT:  Go ahead, counsel.

20          MR. OPPENHEIM:  Thank you, your Honor.

21  BY MR. OPPENHEIM:

22  Q.   By my quick math, Dr. Kominers, that sounds like a total of

23  somewhere between 150 and $170,000.  Does that sound ballpark

24  correct to you or would you like to suggest something

25  different?

1   A.  That sounds ballpark reasonable.

2   Q.  And did anyone help you with your work on this case, Dr.

3   Kominers?

4   A.  Yes.

5   Q.  And who helped you?

6   A.  My research assistant I mentioned earlier, Tynan Seltzer.

7   Q.  Tynan Seltzer, that's right.  Does Mr. Seltzer get paid by

8   Hermès as well?

9   A.  Yes.

10  Q.  And how does that work, could you explain that to me?  Do

11  you send a bill to Hermès that includes -- is it Dr. Seltzer or

12  Mr. Seltzer?

13  A.  Mr. Seltzer.

14  Q.  Does that -- I'm sorry, I didn't mean to cut you off.

15  A.  So all billing is handled through Rubin Anders.  Tynan and

16  I send independent invoices to Rubin Anders which they then

17  forward on.

18  Q.  What does Mr. Seltzer charge for his time?

19  A.  He has been charging $500 per hour.

20  Q.  $500?  Okay.

21      And do you get a piece of that $500 or does it all go

22  to Mr. Seltzer?

23  A.  It all goes to him.

24  Q.  And does the referring -- I'm sorry.  The referring

25  company, is -- that's Rubin Anders.  Do they get a piece of the

1    compensation as well?

2    A.  I'm not completely certain.  My understanding is that they

3    add a markup to my compensation, but not to Tynan's.

4    Q.  Okay.  I understand.

5             So the money you charge and you've received is only a

6    portion of what the plaintiff is paying for your work today;

7    correct?

8    A.  Yes, that is correct.

9    Q.  Okay.  And I apologize, Dr. Kominers, did you tell me

10   already about how many hours you think Mr. Seltzer worked on

11   this matter?

12   A.  No.

13   Q.  Do you have any -- do you think he worked about the same

14   number of hours as you or maybe fewer or more?

15   A.  Likely more, actually.

16   Q.  Do you think maybe twice as many hours as you?

17   A.  I don't know.

18             MR. OPPENHEIM:  Your Honor, I'm going to attempt to

19   turn on the Elmo, if I may.

20             THE COURT:  Sure.

21   Q.  Dr. Kominers, you have a great deal of experience with

22   NFTs.  And if I remember correctly, you testified that you

23   collect NFTs; is that right?

24   A.  Yes.

25   Q.  And how many NFTs do you have?

1    A.  I don't know the precise number.

2            And with apologies, if you're displaying something, I

3    can't see the display yet.

4    Q.  All right.  Dr. Kominers, you can still hear me; correct?

5    A.  Yes.  Barely.

6    Q.  Okay.  Okay.  I think in your testimony you were describing

7    the --

8            MR. OPPENHEIM:  And, your Honor, I would ask the

9    Court's permission for this demonstrative.  I'd like to

10   summarize the witness's testimony.

11           THE COURT:  Let's see how it goes.  So far we're

12   getting a really good close-up of your fingernails.

13           THE WITNESS:  I should say I can't even see that, so

14   I'm not sure whether the display is being forwarded properly.

15   Q.  You testified, I believe, that the broader NFT market has a

16   number of identifiable submarket categories; is that right?

17   A.  Yes.

18   Q.  And I think today -- I'm sorry, I don't mean to yell at

19   you.  I'm far from the microphone; I want to make sure you can

20   hear me.

21           I think in your testimony today you talked about two

22   of them; correct?  You talked about a submarket category that

23   you call art only; is that right?

24   A.  Yes.

25   Q.  Okay.  And then you talked about another submarket category

1     where the market behavior is identifiably different, and that

2     is called the digital brand subcategory; is that right?

3     A.  Yes.

4     Q.  And it's your testimony that these two market subcategories

5     have identifiable trading characteristics; is that correct?

6     A.  My testimony is that they have -- they have identifiable

7     value creation characteristics.

8             MR. FERGUSON:  Can the witness see what's on the

9     screen?

10    Q.  Dr. Kominers, did you hear that?

11    A.  I cannot see what's on the screen.

12            THE COURT:  It's all right.  We can proceed.

13            All that's been put on the screen so far are two

14    circles, one marked "art only," the other marked "digital

15    brand."  So it's no different from what's been brought out in

16    testimony.  Let's go.

17    Q.  Dr. Kominers, these are not the only two submarkets; they

18    are just the two we're talking about today.  I believe you've

19    identified other submarkets, such as ones for music and such as

20    ones for other things like tickets; is that right?  There are a

21    number of market subcategories; is that correct?

22    A.  Yes.

23    Q.  And I believe that you've testified that the quality of

24    utility is central to the distinction you are making between

25    the art only subcategory and the digital brand category; is

1   that correct?

2   A.  Yes.

3   Q.  Okay.  And is it fair to say that an NFT project which has

4   utility cannot be part of the art only submarket; correct?

5   A.  This one I can't quite answer as a yes and no.  May I give

6   an extended answer?

7             THE COURT:  Yes.

8   A.  So there are projects from the art only submarket that

9   effectively cross over into becoming digital brands that sort

10  of start and initially market themselves as art only, and then

11  decide to introduce various forms of utility and engage in

12  digital brand building.

13  Q.  So that observation is true regardless of what it is that

14  the NFT is attached to; is that right?

15  A.  Could you clarify the question?

16  Q.  Sure.

17            So the existence of utility -- or utility is a

18  characteristic that can be observed regardless of what in

19  particular the NFT is attached to.

20  A.  I see.  By "attached to," you mean, like, you know, whether

21  it's attached to an image, a video file, or something of the

22  sort?

23  Q.  Yes.

24  A.  Yes.

25  Q.  And so even if, for example, the NFT is attached to a

1   painting, if that NFT provides utility, you would still be of

2   the opinion that it belonged in the digital, or it could not

3   belong to the art only category; is that correct?

4   A.  If the creator of the NFT were actively building utility

5   around the NFT, yes, the fact that it's attached to a painting

6   would not have bearing on whether it is or is not a

7   utility-based NFT.

8   Q.  And it's your testimony and your opinion that the

9   MetaBirkin NFTs trade more like digital brand submarket than

10  they do like NFTs in the art only submarket; correct?

11  A.  This, again, doesn't have a clear yes or no answer.  May I

12  give a sentence?

13              THE COURT:  Yes.

14  A.  So it is my opinion that the MetaBirkins trading patterns

15  were most consistent with those of other project --

16  contemporaneous projects in the digital brand submarket.  As I

17  illustrated on that penultimate slide, there was an art only

18  project sort of on one metric, at least, that had similar

19  trading patterns.  But across all of the metrics, the

20  MetaBirkins were most consistent with projects in the digital

21  brand submarket and, moreover, established and highly, sort of,

22  structured and build out digital brands.

23              THE COURT:  Remind the jury what you mean by

24  "utility."

25              THE WITNESS:  Certainly, your Honor.

1          Utility are -- so recalling that a non-fungible token,

2     an NFT, is a digital ownership record, sort of like a digital

3     deed.  It represents ownership, say, of an image; but also, at

4     the same time, you can use it to unlock features, perhaps

5     through software.

6          And so utility are various features built on top of

7     that digital asset.  Community membership; airdropping, like

8     direct deposit of new assets to people who hold it; functional

9     utility, like the ability to connect your crypto wallet and

10    just load whatever is attached in the digital asset in the

11    metaverse world.  There's are all forms of utility that

12    creators actively build onto NFTs to build brands around.

13         THE COURT:  All right.

14         With apologies, but as I previously informed everyone

15    yesterday, I need to give the jury their lunch break now

16    because I need to -- I'm actually giving a Zoom speech to

17    Stanford Business School, which is not Harvard Business School,

18    but it has its place.

19         THE WITNESS:  They are great.

20         THE COURT:  Anyway, so we will resume with this

21    witness at 1 o'clock.  Have a good lunch.

22         (Jury not present)

23         THE COURT:  Okay.  We'll see you all at 1 o'clock.

24         (Luncheon recess)

25         (Continued on next page)

1                    A F T E R N O O N   S E S S I O N

2                              1:00 P.M.

3          (Jury not present)

4          THE COURT:  So just before we bring in the jury, since

5   I know we have some very distinguished guests from some obscure

6   law school, where we're at, for those of you who just came in,

7   is that we are on cross-examination of one of the plaintiffs'

8   experts, who has testified, in effect, that the MetaBirkin

9   NFTs, which were sold in this case and which are the subject of

10  the claims made by Hermès, the plaintiff, were economically

11  viewed or treated by the marketplace as brand-related rather

12  than otherwise.  And now that opinion is being cross-examined

13  by defense counsel, who still has, I think, about ten minutes

14  left of cross-examination, if my timing is correct.  Maybe 11.

15          All right.  We need to get the witness back also.  The

16  witness is testifying remotely.

17          THE LAW CLERK:  It's been too long.  I forgot he was

18  testifying remote.  I think he's here.

19          THE COURT:  Okay.  Good.

20          All right.  Bring in the jury.

21          (Jury present)

22          THE COURT:  Please be seated.

23          All right.  Go ahead, counsel.

24          MR. OPPENHEIM:  Thank you, your Honor.

25          Is there a way for the witness to appear on screen for

1    everyone?

2              THE COURT:  I thought we just had him.  There he is.

3              MR. OPPENHEIM:  Thank you very much.

4              THE COURT:  Hasn't aged at all.  Go ahead.

5    BY MR. OPPENHEIM:

6    Q.  Hello again, Dr. Kominers.  You can hear me okay?

7              I'm sorry.  I'm glad I asked, because I can't hear

8    you.

9              THE COURT:  We can't hear you.

10             MR. OPPENHEIM:  And that's all you have to say.

11             (Pause)

12             THE WITNESS:  All right.  Take two.

13             Can you hear me now?

14             THE COURT:  We can.

15             THE WITNESS:  Excellent.

16             Sorry again for the technical difficulty.

17             MR. OPPENHEIM:  Ashley, could you please put up page

18   44 of the demonstrative from Dr. Kominers' direct.

19   BY MR. OPPENHEIM:

20   Q.  Dr. Kominers, I'd like to ask you one more question about

21   your chart that we didn't go over.

22             THE COURT:  I think you need to speak a little louder.

23             THE WITNESS:  Certainly.

24             MR. OPPENHEIM:  Yes, sir.

25   A.  In particular, I can't hear you if you're saying anything

1   right now.

2               THE COURT:  No, he's not.  He's trying to put up a

3   chart that will only take 20 minutes.

4   Q.  Dr. Kominers, could I ask you please to put up page 44.

5   You helped us with this last time.  Wait.

6   A.  Certainly.

7   Q.  I'm sorry, Dr. Kominers.  Just a second.

8   A.  Okay.  So you don't want me loading it?

9   Q.  Dr. Kominers, why don't you load it up.  That seemed to

10  work well.

11  A.  I will do so.

12  Q.  Thank you very much.

13  A.  Okay.

14  Q.  Thank you.

15              And that's exactly the page.  I appreciate it very

16  much.

17  A.  Oh, this page here?

18  Q.  Page 44, I believe.

19  A.  You wanted this one, I think.

20  Q.  Yes, that's correct.  Thank you.  I see it says 47 on your

21  copy, 44 on mine; we are looking at the same chart.  Thank you.

22  A.  Certainly.

23  Q.  Dr. Kominers, you prepared this chart titled "The Average

24  Daily Trade Price Over First 17 Days"; is that correct?

25  A.  Yes.

1   Q.  And on this chart we have plotted the number of price

2   points corresponding to the average daily trading price for

3   certain NFT projects; is that correct?

4   A.  Yes.

5   Q.  And again, this time I see that we have eliminated an

6   outlier; is that correct?

7   A.  Yes.

8   Q.  And so am I correct that if the Y axis on this chart, that

9   is, the vertical axis, went from zero to $110,000, rather than

10  zero to $20,000, that it would visually compress some of the

11  data we see on the steep part of the curve, the right side of

12  this chart; is that right?

13  A.  It would visually compress it if the image were this size;

14  if it were taller, it would not.  But whatever the case, it

15  wouldn't change the statistical properties of the data.

16  Q.  Right.  So the dollar amounts would remain the same, but

17  MetaBirkin's relative price to the other points on the curve

18  would appear to be different; is that right?

19  A.  No, I don't believe so.

20  Q.  Can you explain why it is that you don't believe so.

21  A.  Sure.

22          The relative price is just the difference in dollars

23  between the MetaBirkins and the other points in the curve.  And

24  as I mentioned under direct examination, the MetaBirkins are

25  three standard deviations above the mean.  And so the

N23VHER3                        Kominers - Cross

1   measurement of relative price is the same.

2   Q.  How many standard deviations above the mean was NeoTokyo

3   Citizen?

4   A.  Many more than that.  I think something like 20.  I don't

5   remember the precise number off the top of may head.

6   Q.  And the X axis of this chart, that shows prices in dollars;

7   correct?

8   A.  The X axis, no.

9   Q.  I'm sorry, the horizontal -- I'm sorry.  Thank you.

10         The Y axis.

11  A.  The Y axis, yes.

12  Q.  Okay.  But these NFTs don't trade in dollars typically, do

13  they, Dr. Kominers?

14  A.  They trade in Ethereum.

15  Q.  Okay.  And the value of Ethereum changes over time as well,

16  correct?

17  A.  Yes, although it did not change that much in that sample

18  period.

19  Q.  Okay.  But certainly if we were to look beyond 17 days, say

20  to today, is the value of Ethereum today approximately the same

21  as it was in the 17 days in which MetaBirkins is first trading?

22  A.  No.

23  Q.  Your analysis looked at the price of these NFTs as they

24  traded over time; correct?

25  A.  Yes.

1    Q.  And so one of your conclusions was that the prices

2    reflected the fact that MetaBirkins NFTs were trading like a

3    brand; is that right?

4    A.  The conclusion was that the MetaBirkins were trading at

5    outlier prices.  And the other projects in those price ranges

6    were mostly large-scale digital brand NFT projects.

7    Q.  In your work, Dr. Kominers, you did not consider, for

8    example, whether those prices reflected that people liked the

9    art; is that right?

10   A.  No, that's not correct.

11   Q.  Okay.  Well, please tell me how it's not correct.

12   A.  So we did an extensive study.  My research assistant looked

13   at every single post, you know, in Twitter and in Discord that

14   we were able to see.  And I read a very large fraction of them

15   as well to look at the different ways in which people were

16   talking about and describing their reasons for wanting to

17   acquire MetaBirkins.

18        And, you know, over the course of this, we did not see

19   large numbers of people pointing to the, you know, visual

20   features or imagery much more, they were pointing to the

21   branded features, the various forms of promised utility, and

22   particularly the opportunity to use digital Birkin bags in the

23   metaverse.

24   Q.  Is that analysis, the analysis of things that people told

25   you, was that included in your report?

1    A.  Sorry.  To clarify, it wasn't things that people told us,

2    it was the written history of the Twitter feed and other

3    communications channels that Rothschild and his collaborators

4    maintained around the MetaBirkins and subsequent NFT projects.

5    And they were all listed in the documents considered, and we

6    did reference them in the report.

7    Q.  I just want to make sure I understand.  Because what you

8    are saying now is the things you looked at were the comments of

9    other people on those documents, Twitter feeds, and other

10   documents, which you've concluded reflected that they were not

11   paying these prices because they liked the art, is that what

12   you're saying?

13   A.  No, that's not what I'm saying.

14   Q.  Okay.  Could you tell me exactly what you were saying about

15   your analysis of whether or not these prices --

16   A.  What I'm saying --

17   Q.  I'm sorry, can I just finish?

18   A.  Certainly.

19   Q.  Could you help me understand what your testimony is, the

20   observations you made, about whether or not these prices

21   reflected that people like the art?

22   A.  Certainly.

23        First, you initially asked me whether we considered

24   the possibility that the imagery itself -- or whether people

25   liked the art, the imagery might be driving their decisions.

 1   And I was answering yes, we did consider that.  We did an

 2   extensive look to try and understand how people talked about

 3   their reasons for purchasing the MetaBirkins and the sources of

 4   value they seemed to see.

 5          And, you know, the statistical analysis we did cannot

 6   rule out individual explanations, but it sort of shows the

 7   association between the MetaBirkin.  The pricing and trading

 8   factors around the MetaBirkins were consistent much more with

 9   these digital brand NFTs, which is also consistent with how we

10   saw people talking about their reasons for wanting to own them.

11   Q.  And do you think that the analysis you performed in that

12   regard was sufficiently robust to inform your testimony today?

13   A.  Yes.

14   Q.  And has that always been your position, that that analysis

15   was sufficiently robust to inform your testimony today?

16   A.  To the best of my knowledge.

17   Q.  Do you remember being deposed in this case, Dr. Kominers?

18   A.  Yes.

19   Q.  You were deposed under oath; correct?

20   A.  Yes.

21          MR. OPPENHEIM:  Your Honor, may I have permission from

22   the Court to read the witness statement from page --

23          THE COURT:  So with respect to when you want to read

24   deposition, you have to give the page and line numbers to your

25   adversary so that they can take a quick look and see if there's

1    any objection to your reading it.

2              MR. OPPENHEIM:  Yes, your Honor.  I'm going to refer

3    to page 249, between lines 5 and 18.

4              THE WITNESS:  I don't believe I have it directly in

5    front of me.

6              THE COURT:  You don't need to see it.  Just

7    plaintiffs' counsel that needs to see.

8              THE WITNESS:  Oh, I see.

9              THE COURT:  Any objection?

10             Hearing no objection, you can proceed.

11             MR. OPPENHEIM:  Thank you, your Honor.

12   BY MR. OPPENHEIM:

13   Q.  Dr. Kominers, do you remember stating:  For this empirical

14   analysis, I -- I certainly have read some things about the

15   broader art marketing context.  But for this analysis, let me

16   think.  I guess we did to some degree consider it, but couldn't

17   figure out a way to do it that would be robust.

18             MR. WARSHAVSKY:  Objection, your Honor.

19             The question wasn't read.  And I think the question

20   contextualizes the answer.

21             THE COURT:  Yes.  What's the question?  Read it aloud

22   to me now.

23             MR. OPPENHEIM:  Did you do any research whatsoever

24   into what people are paying for art outside of the world of

25   NFTs?

1          THE COURT:  Okay.  That is not -- that question and

2     the answer called for -- it is not inconsistent then with his

3     prior testimony, so the jury will disregard the deposition

4     testimony that was just read.

5          MR. OPPENHEIM:  No further questions.

6          THE COURT:  Any redirect?

7          MR. FERGUSON:  No redirect, your Honor.

8          THE COURT:  Very good.  Thank you so much.

9          You can sign off.

10          THE WITNESS:  Thank you, your Honor.

11          (Witness excused)

12          THE COURT:  All right.  Please call your next witness.

13          MR. WARSHAVSKY:  Your Honor, the plaintiffs call

14     Maximilien Moulin, who is outside and will be brought in.

15      MAXIMILIEN MOULIN,

16          called as a witness by the Plaintiffs,

17          having been duly sworn, testified as follows:

18          THE COURT:  The record will reflect that although the

19     witness speaks and understands English, an interpreter is here

20     if he needs any help.  Go ahead.

21          MR. WARSHAVSKY:  Thank you, your Honor.

22          Your Honor, again, for this witness, counsel have

23     agreed that there's no objection to the exhibits, so we can

24     publish them --

25          THE COURT:  We still need -- what's their numbers?

1            MR. WARSHAVSKY:  It's Plaintiffs' Exhibit 27 -- I'm

2   sorry, your Honor, I have it in the outline.  34, 28, 37, and

3   385.

4            THE COURT:  Received.

5            (Plaintiff's Exhibits 27, 28, 34, 37, 385 received in

6   evidence)

7   DIRECT EXAMINATION

8   BY MR. WARSHAVSKY:

9   Q.  Mr. Moulin, who are you employed by?

10  A.  Hermès.

11  Q.  Do you have a title at Hermès?

12  A.  I'm head of the H Lab.

13  Q.  What is the H Lab?

14  A.  It's an innovation laboratory within the information

15  technology department at Hermès.

16  Q.  How long have you been the head of H Lab?

17  A.  Almost three years now, since April 2020.

18  Q.  Can you briefly describe your responsibilities as the head

19  of H Lab.

20  A.  I'm managing a team of seven people.  I'm driving division

21  and delivering projects and activities of innovation.

22  Q.  Okay.  I'm going to come back to H Lab in a minute, but can

23  you tell us about your educational background?

24  A.  I went to college and studied mathematics and information

25  technology, computer science.

N23VHER3                        Moulin - Direct

1    Q.  Did you receive a degree?

2    A.  Yes, I received a bachelor degree.

3    Q.  In what subject?

4    A.  Sorry, in mathematics and computer science.

5    Q.  Did you obtain any other degrees?

6    A.  Yes, master in engineering, science engineering.

7    Q.  Okay.  And did you specialize when you got your masters?

8    A.  Yes, in information technology.

9    Q.  Thank you.

10         What did you do after earning your master's degree?

11   A.  I started working for Orange.

12   Q.  And who is Orange?

13   A.  Orange is the leading telecommunication company in France.

14   It's like AT&T in the U.S.

15   Q.  Thank you.

16         How long did you work there?

17   A.  I work there for five years.

18   Q.  What were your responsibilities at Orange?

19   A.  First I was an information technology system architect

20   working on conferencing systems and telecommunications.  And

21   then I got involved in designing the biggest data center that

22   Orange built.

23   Q.  And the biggest data center that Orange built, where was

24   that, was that in France?

25   A.  Yes, in Normandy, in France.

1  Q.  And can you briefly tell us what you did after that?

2  A.  I created my own company for almost two years.  And then I

3  joined the conservancy called Whitestone Technologies.  And I

4  finally arrived at Hermès in April 2020.

5  Q.  And you spoke a little bit about H Lab.  Can you tell us --

6  can you explain who H Lab is or what H Lab focuses on?

7  A.  Yes.  The H Lab is a small laboratory that is exploring new

8  technologies and new methodologies to accelerate transformation

9  that can create value for the business divisions of Hermès.

10 And by "business divisions," I mean the division that create

11 objects like silk or leather or whatever.

12 Q.  So when you speak about divisions, you mean like the

13 leather division, the silk division, that's what you mean?

14 A.  Exactly.  Or the watch division.

15 Q.  When you said H Labs explores technologies, is it all types

16 of technologies or is there a specific focus?

17 A.  No, only information technologies.

18 Q.  Do you know when H Lab was created?

19 A.  It was created in 2018.

20 Q.  And can you give some examples of the technologies H Lab

21 has looked at?

22 A.  Yes.  Augmented reality, virtual reality, artificial

23 intelligence, 3D, realtime 3D, metaverse, NFTs, etc.

24 Q.  Can you briefly explain how H Labs works in the broader

25 context of Hermès?

N23VHER3                         Moulin - Direct

 1  A.   Yes.  We do three types of activity, I would say.

 2           First one is that we perform a technological watch,

 3  meaning we explore new trends, new technologies, and try to

 4  find which technologies could create value for the business

 5  divisions of Hermès.

 6  Q.   That's one.

 7  A.   Next we make Hermès employees aware of those technologies,

 8  especially the business division, that could be interested by

 9  those technologies.

10  Q.   What's the third?

11  A.   And then when we have a match between a technology and

12  business division, we develop a solution, test it, and

13  eventually commercialize it.

14  Q.   And when you arrived at H Lab, was Hermès working on NFTs?

15  A.   Yes.

16  Q.   How so?

17  A.   We were working on an idea of digital certificates,

18  certificate that would involve in it.

19  Q.   And you joined in 2020, but do you know when Hermès started

20  working on NFTs?

21  A.   In December 2019.

22  Q.   Was H Lab working with any third parties for the digital

23  certificates?

24  A.   Yes.

25  Q.   Who were the third parties?

1   A.  Third party vendor called Arianee.

2   Q.  Can you spell that for the reporter?

3   A.  A-R-I-A-N-E-E.

4   Q.  And when did H Lab partner with Arianee?

5   A.  In December 2019.

6   Q.  Who is Arianee?

7   A.  Arianee is a leading NFT platform that works for brands and

8   especially for fashion and luxury industry.

9   Q.  Who was responsible for developing ideas on NFTs within

10  Hermès?

11  A.  Mainly the H Lab, in collaboration with business divisions,

12  and some functions at Hermès, like legal and communication.

13  Q.  When H Lab is working on a project like NFTs, does that

14  need to be approved by someone before H Lab can develop it?

15  A.  Yes.

16  Q.  And can you explain the approval process briefly.

17  A.  Yes.  Usually it's approved -- it has to be approved by top

18  management of the business division, and then by an executive

19  committee sponsor.

20  Q.  Okay.  And what use or uses does Hermès believe it has for

21  NFTs?

22  A.  We have five main uses.  The first one is the one I already

23  spoke about, digital certificates for different products.  Then

24  some uses would be NFTs as proof of attendance for private

25  events or for events within Hermès that could provide exclusive

1    services; the NFT could provide exclusive services and

2    products.  Then we consider use of an NFT as a virtual product

3    for virtual world, video games.  Then we also think of NFTs as

4    a product, a virtual product itself that could be a piece of

5    art, for example, as decorative purpose.  And finally, the last

6    one would be NFTs as a collectible to celebrate loyalty.

7            MR. WARSHAVSKY:  Can you please publish Plaintiffs'

8    Exhibit 27 which was just received.

9    Q.  Have you seen this document before?

10   A.  Yes.

11   Q.  Did you create this document?

12   A.  Yes.

13   Q.  And when did you create it?

14   A.  In June 2021.

15   Q.  And why did you create it?

16   A.  To explain NFTs internally, what it is and what are the

17   applications we could imagine for Hermès.

18           MR. WARSHAVSKY:  And if we could turn to page 28.

19   Q.  Can you tell me what this slide shows.

20   A.  A summary of different NFT applications.

21   Q.  And these are the cases you were just talking about?

22   A.  Yes.

23           MR. WARSHAVSKY:  Can we turn to page 29.

24   Q.  And can you explain what this slide shows?

25   A.  It's NFT digital certificate to combat fraud.

N23VHER3                         Moulin - Direct

1   Q.  And can you explain how a digital certificate would combat

2   fraud?

3   A.  Yes.  The idea that you go to one of our stores, you buy a

4   bag or a watch, for example.  It goes with a digital

5   certificate.  Digital certificate is there to authenticate the

6   bag or the watch.  And so you could declare it stolen if it has

7   been stolen, and it's also a way to combat counterfeiting.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. WARSHAVSKY:

2   Q.  Is Hermès working on this application?

3   A.  Yes.

4   Q.  And you're involved in this application?

5   A.  Yes.

6   Q.  Can we turn to page 30.

7           Can you explain what this is?

8   A.  It's the idea for NFT as a proof of that could provide

9   exclusive services for excluded products, for example.

10  Q.  Is Hermès working on this application?

11  A.  Yes.

12  Q.  Could we turn to page 31, please.

13          Can you explain what this slide shows?

14  A.  It's NFT as virtual product to be used in virtual worlds or

15  video games.

16  Q.  What types of products would that be?

17  A.  It would be any product.  It could be a scarf, a watch, a

18  bag, a clothing or shoe, that could be used to dress your

19  avatar in a virtual world.

20  Q.  Is this an application Hermès is currently considering?

21  A.  I'm sorry, yes.

22  Q.  Can we turn to page 32.

23          Can you explain what this slide shows?

24  A.  It's the idea of NFTs as a virtual product that could be

25  used as a proposed decorative purpose in your home or in your

1   virtual gallery.

2   Q.  Can you explain how that would work?

3   A.  You can imagine that you have a piece of art that is

4   delivered through an NFT, and that could be displayed on some

5   TVs compatible with NFTs in your home or could be displayed in

6   a virtual gallery on the wallet of a virtual gallery, like,

7   virtual world.

8   Q.  Has Hermès developed this application?

9   A.  Yes.

10  Q.  When did Hermès begin developing this application?

11  A.  We began discussing the project in November 2021 and began

12  the project itself in January 2022.

13  Q.  Did Hermès actually roll out the product?

14  A.  Internally, yes.

15  Q.  We'll come back to this in a minute.  Can you turn to

16  page 33, please.

17          Can you explain what this slide shows?

18  A.  It's NFTs as collectible that you could retrieve in any

19  touchpoint with a brand and that could celebrate loyalty.

20  Q.  Could we turn back to page 35.

21          Can you explain what this slide shows?

22  A.  It shows the idea of using NFTs as virtual products in

23  video games, virtual, that could be used in different types of

24  games.

25  Q.  Could you provide an example to explain what that means?

1   A.  Yeah.  It's, for example, you have virtual wardrobe or

2   virtual scarf or tie.  You could dress your avatar with it and

3   play in Roblox or Fortnite or whatever.

4   Q.  I see there are other brands on this slide.  Why did you

5   list them?

6   A.  To strengthen the argument that it was interesting for us

7   to investigate this space, and that we already did and already

8   entered this space.

9   Q.  Just to explain, when you're talking about things like

10  clothing or what's listed here, why would it need to be an NFT?

11  A.  Mainly because it's a way to get something that's

12  interpretable, meaning that you can use it in different video

13  games.  You can use the same clothes in Fortnite or in Roblox

14  or in SunBot or whatever virtual world is.  And also because

15  it's a way to own it and to have something that is unique as

16  our real physical products.  A Birkin bag, for example, is

17  unique.  It's uniquely made by craftman, and we would like to

18  have the same thing in the virtual world.

19  Q.  I would like to publish Exhibit 34, please.

20          Looking at this and if we can go to -- I see we're on

21  page two.

22          Have you seen this document before?

23  A.  Yes.

24  Q.  Can you tell us what this document is?

25  A.  It's an e-mail I sent to my team.  I forward it to my team.

1    It's coming from the CEO of Arianee.

2    Q.  If we can turn to page -- this is forwarding a

3    presentation, correct?

4    A.  Yes.

5    Q.  If we can turn to page five.

6            So who made this presentation?

7    A.  Arianee did.

8    Q.  Arianee.

9            And did you ask Arianee to prepare this presentation

10   as part of the work it was doing for Hermès?

11   A.  Yes.

12   Q.  Why did you ask Arianee to prepare this?

13   A.  Because at the time, in 2021, the NFT market was quite

14   booming and so cases were popping out.  Arianee was changing

15   its services, and I wanted a presentation of their services to

16   be able to update our presentation internally and give some

17   insight internally.

18   Q.  If we can turn to page seven.

19           Can you tell us what this page is showing?

20   A.  Different types of NFT applications for our products and

21   digital goods.

22   Q.  And, in particular, looking at the left side, can you

23   explain what that is?

24   A.  It's what we call a digital twin.  So it's the idea of

25   having a 3D replica of the physical product to use it as an

1   augmented reality filter or we use it in the virtual world.

2   Q.  And this is an NFT?

3   A.  Yes.

4   Q.  Is a digital twin related to a digital certificate?

5   A.  It would be embedded in a digital certificate.

6   Q.  How would the digital twin work?

7   A.  Well, the idea is you buy a bag, for example, a Birkin bag,

8   and you get out with a digital certificate.  You have inside

9   the digital certificate, you have a digital twin that is a

10  representation in 3D of this bag, or actually we can give

11  fancier presentation or creative one and this representation is

12  3D replica.  You can use it as an augmented reality fixture to

13  show yourself with it on social media or connect to video games

14  and dress your avatar with carry the bag.

15  Q.  Did you circulate this in Hermès?

16  A.  Yes.

17  Q.  Did Hermès do anything with respect to the digital twin

18  project?

19  A.  We did a prototype in October 2021.

20  Q.  What prototype was the digital twin made for?

21  A.  It was made for Kelly Birkin and Constance bags.

22  Q.  And when you did the digital twin, did the NFT have the

23  digital replica of those items?

24  A.  Yes.

25  Q.  Did you follow Arianee's advice on this project?

1    A.  Yes.

2    Q.  Is Hermès currently developing this project?

3    A.  Yes.

4    Q.  Did Hermès ever publish anything about this product

5    externally?

6    A.  No.

7    Q.  If we can turn to Plaintiff's Exhibit 28.

8             Can you tell us, did you create this document?

9    A.  Yes.

10   Q.  OK.  Generally speaking, what is this document about?

11   A.  It's an idea notebook about NFT applications for Hermès.

12   Q.  OK.  If we can go to page seven, please.

13            Can you tell me what page seven shows?

14   A.  It shows different -- different use cases.  Well, the use

15   case of virtual product used in video games and virtual worlds,

16   and it shows different brands that entered this field.

17   Q.  And why did you include a slide showing other fashion

18   brands?

19   A.  To strengthen this idea that others are going to this field

20   and we should we might be interested in going also exploring

21   also this field.

22   Q.  And these two images here, why did you choose these two?

23   A.  Well, to show that you can dress an avatar with a T-shirt

24   or even carry a bag.

25   Q.  Was it also to show Hermès what it could do?

1    A.  Yes, exactly.

2    Q.  And the image on the right, why did you include that one?

3    A.  To show that an avatar could also carry a bag in a virtual

4    world.  And so it could also carry a Birkin bag, for example,

5    whatever.

6    Q.  Thank you.  If we could publish Plaintiff's Exhibit 37.

7            Have you seen this document before?

8    A.  Yes.

9    Q.  Did you create this document?

10   A.  Yes.

11   Q.  When did you create it?

12   A.  In beginning 2022.

13   Q.  OK.  Can you tell us generally what this document is about?

14   A.  It's about an NFT project called silk division.

15   Q.  Let's turn to page six.

16           Can you explain this project?

17   A.  The silk division was created in 1937, so we imagined

18   creating 1997 unique physical ties that would be -- that would

19   be relating to 1937 NFTs.

20   Q.  And earlier you discussed a digital twin.

21           Would this be an example of a digital twin?

22   A.  Yes.

23   Q.  And this application, am I understanding correctly that

24   each person had purchased a tie would also receive an NFT?

25   A.  Yes.

1    Q.  OK.  When did you first start discussing this project?

2    A.  We first discussed this project in November 8, 2021, at the

3    innovation day.

4    Q.  And I think we heard about this before, but what is

5    innovation day?

6    A.  It's an internal event h Lab is organizing each year to

7    show new trends, new technologies and discuss projects we have

8    been developing in the past year.

9    Q.  When did H Lab first start developing this project?

10   A.  We started just after the early days, so in January 2022.

11   Q.  Let's briefly go through some of the slides of this, so

12   maybe start at page seven.

13            I'm going to want to stop.  Maybe start at page seven

14   and explain -- maybe show seven and eight -- and start by

15   explaining seven and eight quickly.

16   A.  Yes.  So the idea is that you purchase a tie, a physical

17   one, and you get an NFT that is not yet revealed.  The NFT is

18   going to your wallet.  It's a place where you store NFTs.  It's

19   an Hermès wallet in this case.  Then when you get the NFT

20   first, you have some media content about the know-how of the

21   silk division, how do you make a tie, how do you create it.

22   Q.  All right.  And then if we can turn to page nine.

23   A.  Then to reveal the true form of the NFT, you need to scan

24   with your phone the back of a tie or your Hermès logo.

25   Q.  And page ten.

1    A.   Then you reveal the NFT.  Here, it takes the form of a

2    rabbit because we were working on ties that show carrots and

3    rabbits.  So you have this little rabbit that is unique, and

4    you can use it as an augmented reality animation first.

5    Q.   And does the augmented reality work with a digital twin?

6    A.   Well, it's not exactly the exact twin of the tie, but it's

7    version, a digital version of the creative idea around the tie,

8    so it can be ...

9    Q.   If we can turn to page 11.

10            What is this one?

11   A.   Yeah, this the augmented reality filter so that you can

12   show yourself with the rabbit on your shoulder during -- on

13   social media preferable.

14   Q.   And if we go to page 12, please.

15   A.   Here, it's different types of interactions.  So the NFT

16   could be also a way to access different services and events.

17   Here, it would imagine private sales, tie-tying classes,

18   meeting with the artist who did the tie and worked on the tie

19   design.

20   Q.   And page 13?

21   A.   You could also access to exclusive, more exclusive events,

22   such as the Sout Hermès or a fashion show by burning your NFT

23   or giving it back.

24   Q.   Page 14.  Page 14?

25   A.   Here, the idea is if we have several NFTs, you could

1    imagine that you merge an NFT of silk division with an NFT of a

2    hat division, and that would get more unique NFT which would

3    have the hat and tie both.

4    Q.  Page 15?

5    A.  If you want to offer the tie itself, you could configure

6    the NFT so that you enter a message for the one you are

7    offering the tie, and the message would be delivered as an

8    augmented reality animation.

9    Q.  And page 16?

10   A.  And the last one is that when you come back to Hermès via

11   NFT back home, that it gets animated.

12   Q.  Is Hermès working on this project now?

13   A.  Yes.

14   Q.  Can we turn to 17 for a moment, actually, too.

15            Can you explain what's on this slide?

16   A.  It was more long-term ideas for this project.  You can see

17   at the bottom three well-known NFT projects, the Doodles, the

18   Bored Apes, and the World of Women.  And we were thinking at

19   one point to partner and maybe put a tie on -- or scarf on the

20   World of Women, for example.

21   Q.  Am I looking at this correctly, the one on the left is

22   Doodles, the one in the middle Bored Ape, and the one on the

23   right, was it World of Women, did you say?

24   A.  World of Women, yes.

25   Q.  OK.  And at the top you, once again, you note Gucci and

1    10KTF.  Why did you refer to those?

2    A.  Because, at this time, Gucci partnered with 10KTF, which is

3    a digital craftman that uses NFT to build digital products, and

4    we thought the idea was interesting to look at.

5    Q.  OK.  If you can turn to slide 18, please.

6              Can you just explain what this shows?

7    A.  It's other long-term ideas and, for example, the idea of

8    being able to resell your product on an NFT platform, like

9    OpenSea or Rarible, and also use an NFT in a virtual world,

10   such as Decentraland or Roblox, or even social media.

11   Q.  OK.  And slide 17 and 18 that we just saw, is Hermès still

12   considering those?

13   A.  Yes.

14   Q.  OK.  But they are not being used -- they are not being

15   developed yet?

16   A.  No.

17   Q.  There has been some testimony by you, and different

18   witnesses, about NFTs for certificate of employment.  I want to

19   talk a little bit about one.

20             I think you mentioned NFTs that Hermès employees

21   receive.  Can you explain that NFT project?

22   A.  Yes.  Actually, the followup of this project we've just

23   seen.  At one point of a project, we started to work with a

24   digital NFT artist, and we defined an experience where you

25   would be talking with virtual parts and that would -- and this

1  discussion would be unique.  And then at the end, you would get

2  a souvenir of this discussion as an NFT unique itself.

3  Q.  Has Hermès actually come out with this project?

4  A.  Yes.

5  Q.  Where has this project been offered?

6  A.  Internally, during internal event called Podium.

7  Q.  And why was this NFT project only released internally?

8  A.  Because when we work in digital, it's like when we work

9  with the physical project.  We try to reach the highest

10 standard of quality.  So we take the time to test internally

11 and have feedback before going public.

12 Q.  OK.  And was the NFT created?

13 A.  Yes.

14 Q.  I think you said it was released.  When was the Podium day

15 that it was released?

16 A.  Two weeks ago.

17 Q.  When did you first discuss the project?

18 A.  In November 2021, on November 8, 2021, during the

19 innovation day.

20 Q.  Was this created by an Hermès employee?

21 A.  No.

22 Q.  Who created it?

23 A.  The art itself was created by two artists, Dmitry

24 Kravchenko and Neil Beloufa.

25 Q.  All right.  Is this the first project you made --

1          THE COURT:  I'm sorry.  Just so I'm clear and the jury

2    is clear how this works, so if you are a consumer, how do you

3    find out about this NFT?

4          THE WITNESS:  It could be -- we didn't work on the way

5    we will interact directly with a client in the end.  But in the

6    idea, we had initially -- when you buy the tie, you could get

7    into an experience, physical experience, where at the end you

8    retrieve your NFT.  Like, I show --

9          THE COURT:  So are you paying anything additional for

10   the access to the NFT beyond what you're paying for the tie?

11         THE WITNESS:  No.  It would be offered with the tie.

12         THE COURT:  All right.  And then when you go, so you

13   just then sign up for the NFT, is that it?

14         THE WITNESS:  Yes.

15         THE COURT:  And when you go to the NFT, what do you

16   see?

17         What's the digital image associated with it?

18         THE WITNESS:  Today the form it took is a horse,

19   like -- you have to show it.  I should show it to you to

20   explain, but it's, like, a horse, but it's sticking out its

21   tongue as a little animation.

22         THE COURT:  So you see a kind of humorous art?

23         THE WITNESS:  Yes.  It's been created by the artist.

24         MR. WARSHAVSKY:  It's our next exhibit, your Honor.

25         THE COURT:  Excuse me?

1              MR. WARSHAVSKY:  It's our next exhibit.

2              THE COURT:  Well, I can't wait, but I just wanted to

3     make sure I understand how this works.

4              And then can you resell that?

5              THE WITNESS:  Today, we don't allow resell.

6              THE COURT:  OK.  All right.  Go ahead, counsel.

7     BY MR. WARSHAVSKY:

8     Q.  And before I get to the exhibit, I just wanted to ask you,

9     you mentioned the artist.

10             Was that the first project you made with Mr. Neil

11    Beloufa?

12    A.  Yes.

13    Q.  OK.  And did you personally receive this NFT?

14    A.  Yes.

15    Q.  OK.  I'm going to show you, can you please publish

16    Exhibit 385.

17             Before -- don't start the video yet, but can you tell

18    us what this video is going to show us?

19    A.  Yes.  It's actually recalled off my screen, my iPhone

20    screen.  And on it, you will see the Hermès wallet where you

21    have the NFT stored and the NFT itself we are talking about.

22    Q.  OK.  So I'm going to ask you to walk us through the video.

23             If you can start the video on the first screen.

24    A.  On the top left of the Hermès wallet, I will click on it

25    and the video gets started.

1          (Video played)

2    A.   Here, you have two collections involved.  Two collections

3    that are the innovation day, because at the innovation day, we

4    issued also 20 different NFTs, and the Podium I was talking

5    about, which is this internal event of the divisions of Hermès

6    showed our new collections.

7          And if you play, I will click on Podium and there are

8    four NFTs inside.  They are all unique.  You can play.

9    Q.   Press play again.

10         (Video played)

11   A.   Here, you have four NFTs.  And when you click on the

12   first -- so it can play again -- you get the NFT that is going

13   to show up.

14         You can play.

15         (Video played)

16         Here is the horse sticking out his tongue, and you

17   have a little description of the NFT itself and why it's

18   special and why it is exclusive.

19         And you can pause.

20   Q.   OK.  Is this a unique NFT?

21   A.   Yes.

22   Q.   How can you tell this is a unique NFT?

23   A.   If you come back just a little bit earlier -- well, you can

24   see, but there was written --

25         MR. HARRIS:  If we can bring it back up, Humberto,

1   please.

2   A.   There was written on the bottom a serial number.  Here, you

3   have a serial number in French.  Just before.

4        Here.  E-mail series of the serial number, NFT 157.

5   It's the number of this NFT in increments or time.

6        THE COURT:  Just, again, what is the purpose of adding

7   this to the sale of the tie?

8        THE WITNESS:  Well, for this specific implementation,

9   the idea is for decorative, a piece of art we give with the

10  tie, but we present what is linked to the collection itself,

11  more an illustration.  And for us --

12       THE COURT:  If you buy the tie, you get to see a horse

13  sticking out his tongue.

14       All right.

15       THE WITNESS:  You should discuss it with the artist.

16  BY MR. WARSHAVSKY:

17  Q.   Does Hermès want to release this NFT commercially?

18  A.   Yes.

19  Q.   When?

20  A.   It needs to be -- first we need to get some feedbacks

21  internally and then get it validated.  But during the --

22  Q.   Is Hermès currently working on this NFT project?

23  A.   Yes.

24       MR. WARSHAVSKY:  Thank you.  No further questions,

25  your Honor.

1          THE COURT:  Cross-examination.

2    CROSS-EXAMINATION

3    BY MR. HARRIS:

4    Q.  Good afternoon.

5          Is it Mr. Moulin?

6    A.  Yes.

7    Q.  OK.  My name is Jonathan Harris.  I'm one of Mason

8    Rothschild's attorneys.  Nice to meet you.

9          You were answering questions at the end about the

10   horse NFT, right?

11         That horse NFT has not been released to the public,

12   right?

13   A.  Right.

14   Q.  And Hermès has, none of these things you talked about today

15   have been released to the public, right?

16   A.  Right.

17   Q.  OK.  And the only people who have the horse NFT, if I heard

18   your testimony right, are employees, right?

19   A.  Yes.

20   Q.  And do employees get anything for having the horse NFT?

21   A.  No.

22   Q.  OK.  So let's take a look.

23         Let's take these.  Mr. Warshavsky showed you

24   Plaintiff's Exhibit 27, and that's --

25         MR. HARRIS:  If we can put that up, please, Ashley..

1   Q.  While it's coming up, Plaintiff's Exhibit 27, this is a

2   presentation that you put together, am I right?

3   A.  Yes.

4            MR. HARRIS:  OK.  And Ashley, can we --

5            Should I ask them to put it up?

6            MR. WARSHAVSKY:  We can get it up.

7            MR. HARRIS:  Can you guys get it up?

8            Thank you.  That would be great.

9   Q.  All right.  This is a presentation that you did?

10  A.  Yes.

11  Q.  This is actually a translation of a presentation you did,

12  right?

13  A.  Yes.

14  Q.  OK.  And on page, Plaintiff's Exhibit 27, page ten --

15  page 14, my bad -- it's a blockchain vs. NFTs, right?

16           Do you see that?

17  A.  Yes.

18  Q.  This is your presentation, right?

19  A.  Yes.

20  Q.  And it says, NFTs allow for the establishment of a new,

21  more ethical decentralized relationship between owners of

22  luxury items and brands, right; you see that?

23  A.  Yes.

24  Q.  Or between artists and their customers.

25           Do you see that?

1    A.   Yes.

2    Q.   You wrote that?

3    A.   Yes.

4    Q.   OK.  Now, can we please turn to page 28 of that exhibit.

5           This is your overview page, and then you talked about

6    six different things that Hermès could do with NFTs with the

7    public, correct?

8    A.   Five, actually, but yes.  Because we showed six, but six is

9    not considered biased today.

10   Q.   I'm sorry.  The six is not considered what?

11   A.   When I describe five in these cases we were considering,

12   it's the first five of this page, and the sixth is not

13   something we concerned the public.

14   Q.   It's not viable yet, technologically?

15   A.   Oh, I wouldn't say that, but it's just that it's not

16   something that concerns customers.

17   Q.   OK.  So I'll just go to the first five.

18           Number one, if we can please turn to page 29, please.

19   Number one, this is where an NFT is associated with a product

20   to track authenticity, right?

21           THE WITNESS:  I didn't get that.

22           (Interpretation)

23   A.   Yes.

24   Q.   If I go in and I buy a Birkin bag for $12,000 --

25   A.   Or $6,000.

1    Q.  -- or whatever the price is, I would get an NFT, which like

2    a deed to a house, points to that Birkin bag, is that right?

3                THE WITNESS:  I didn't catch the last part.

4                I didn't catch the last part.

5                (Interpretation)

6    A.  I'm sorry.  I didn't catch what you meant by house points.

7                THE COURT:  The NFT is basically a certificate that

8    shows either you own or have entitlement or have some

9    relationship to the underlying digital image, yes?

10               THE WITNESS:  I'm not sure.  I'm sorry.

11               (Interpretation)

12               Yeah.  Well, it's not only the image here.  The idea

13   is that with a digital certificate -- you have to see it, like,

14   maybe it's better -- better explained with a watch.

15               When you buy a watch, you have an authentication

16   certificate within the box of the watch.  It is a paper,

17   because it's a regimentation.  You have that when you build

18   watches, and the idea is to digitalize.  First digitalizing

19   that certificate.

20               So yes, when you buy a Birkin bag, you get an

21   authentication certificate, and then this certificate is

22   allowed to follow the life cycle of a product.  So if you come

23   back to Hermès and get your bag repaired, you will be able to

24   receive a reparations on the certificate.  When you resell it,

25   the guy that will buy the bag will also know that it has been

1    previously owned and that it has been repaired once or twice.

2              THE COURT:  So that's very helpful, but I think maybe

3    I wasn't very clear.  I was trying to move things along.

4              I'll try again.

5              THE WITNESS:  Sorry.

6              THE COURT:  In your example, the certificate is just a

7    bunch of words or symbols, but it gives you the right to, in

8    your first example, not only own the watch, but bring it back

9    and have various rights with respect to the watch, yes?

10             THE WITNESS:  Yes.

11             THE COURT:  OK.  And the NFT program that you were

12   contemplating for Hermès would have meant that someone who

13   bought a tie, could then get access to an NFT that would also

14   give them access to the image, very vivid image we saw a few

15   minutes ago, yes?

16             THE WITNESS:  Yes.

17             THE COURT:  Yes.  OK.  Good.

18             Go ahead, counsel.

19             MR. HARRIS:  Thank you, your Honor.  I think that

20   shortens this.

21   BY MR. HARRIS:

22   Q.  So in that example which is on page one, idea one on

23   page 29 and idea two on page 30, I think are basically the two

24   things we just talked about if you combined them.

25             What you have to do is, you get a physical product --

1    am I getting this right?

2           You get a physical product, and then that physical

3    product would have an NFT attached to it that might get you an

4    art image, or it might get you something else, is that right?

5    A.  It depends on the use case, actually.  The digital

6    certificate itself is a use case where you get kind of

7    authentication certificate, but gives you services around the

8    physical product itself.  So it's services to repair your watch

9    or your bag, to get some specific related services to the

10   product.

11          And then the idea number two is more about other types

12   of use cases.  For example, you attend an event at Hermès, and

13   maybe this event gives you some exclusive services, maybe, to

14   meet someone or to access to another event, etc., etc.

15          And of course you can combine some use cases together

16   or you could also imagine other kinds of use cases.

17   Q.  And you couldn't do any of those things you just talked

18   about with a MetaBirkin, right?

19   A.  I'm not sure I understand your question.

20   Q.  Well, MetaBirkin doesn't link to any physical Hermès

21   products, correct?

22   A.  Yeah.

23   Q.  And a MetaBirkin wouldn't give you access to any Hermès

24   events, correct?

25          MR. WARSHAVSKY:  Objection, foundation.

1              THE COURT:  Well, are you familiar with the MetaBirkin

2       NFTs and the underlying images they are associated with?

3              THE WITNESS:  Yeah.

4              THE COURT:  You are?

5              OK.  Go ahead.

6       BY MR. HARRIS:

7       Q.  So a MetaBirkin couldn't give you access to an Hermès

8       event, right?

9       A.  As -- well, it's impossible to insert, actually, because as

10      I said, you could have NFTs that are not related to a product.

11      You could have NFTs that are related to something I gave you.

12      I'm not -- I don't need a product to give you an NFT.  I could

13      give you an NFT just for -- well, just like this, because I

14      want to give you an NFT.  This NFT could give you access to

15      other things.  So we could have been issuing that kind of NFT.

16             THE COURT:  So I need to move this along.

17             So Hermès has claimed in this case that the MetaBirkin

18      NFTs infringe their trademark, diluted their trademark, or

19      otherwise interfered.  And among the things that they say

20      there was an interference with, is their allegation, that the

21      MetaBirkin NFTs interfered with Hermès' plan to have its own

22      NFTs.

23             Do you understand that's the claim, that's part of the

24      claim that Hermès is making in this case?

25             THE WITNESS:  Yes.

1           THE COURT:  So my question is:  Exactly how did the

2     Hermès NFTs -- excuse me.

3           Exactly how did the MetaBirkins NFTs, which you say

4     you have some familiarity with, interfere with Hermès' own NFT

5     project?

6           THE WITNESS:  Well, you're asking my --

7           THE COURT:  I'm asking you.  I'm not asking that

8     horse.

9           THE WITNESS:  You could, actually.  It would be fun.

10          Um, well, I am -- as only a technologist, I would say,

11    I'm not a lawyer and I'm not an artist, I would say the fact is

12    that it could confuse people on whenever this entity gives them

13    some advantages within Hermès.

14          If we get out with NFTs, well, we will be always

15    having questions and having people asking for some things

16    thinking that MetaBirkin, it's, like, in the metaverse --

17          THE COURT:  So you're saying it interfered in a sense

18    that it would potentially cause confusion that could impact,

19    among other things, your own NFT project; is that what you're

20    saying?

21          THE WITNESS:  Yes.

22          THE COURT:  All right.  Go ahead, counsel.

23    BY MR. HARRIS:

24    Q.  To follow up on that question, does the MetaBirkin NFT stop

25    Hermès from doing any of the projects that you testified Hermès

1   is interested in doing today?

2   A.  Your question is did it stop us?

3   Q.  Could it stop?

4   A.  Could it stop?

5            I don't know.  I don't know.

6   Q.  All right.  If I go into an Hermès store to buy an Hermès

7   purse and I'm going to get an Hermès NFT with that, is there

8   any risk, in your view, that I'm going to be confused that I

9   get rights, similar rights, from a MetaBirkin?

10           MR. WARSHAVSKY:  Objection.

11           THE COURT:  Yes, sustained.

12           MR. HARRIS:  I was just trying to follow up on your

13   question.

14           THE COURT:  Pardon?

15           MR. HARRIS:  I was trying to follow up on your

16   question.

17           THE COURT:  I know.  Unfortunately for you, the

18   questions I asked were evidentiarily correct and yours is not.

19           Put another question.

20   BY MR. HARRIS:

21   Q.  In order to do the things the NFT projects that you're

22   talking about, I would have to --

23           Let's take the handbags.  I think it's the simplest.

24   I would have to go to an Hermès store, buy an Hermès handbag --

25           Let's take your tie project.  I would have to go to an

1   Hermès store, I would have to buy an Hermès tie, and as a

2   result of buying that Hermès tie, I would then get an NFT that

3   had certain attributes, is that correct?

4           That's how you envisioned the program working?

5   A.   That's one of our plans.  But as I said, there are others

6   that doesn't imply a physical product.

7   Q.   And for the ones that didn't -- I'm sorry.  I'm just

8   looking at your Exhibit 37 which you went through at length.

9           This is your 1937 project, is that right?

10  A.   I'm sorry.  Which one?

11  Q.   This Exhibit 37.  Don't worry about the exhibit.

12          This is your 1937 project that you just testified

13  about at length, right?

14  A.   1937?

15  Q.   The one with the ties?

16          (Interpretation)

17  A.   The silk product, yes.

18  Q.   You just testified about this at length, right?

19  A.   Yes.

20  Q.   You went through about 12 slides, right?

21  A.   Yes.

22  Q.   And the whole linchpin to this entire project was that you

23  started off with an -- which this is not, by the way -- you

24  started off with an Hermès tie, right?

25  A.   Yes.

```
 1   Q.   That you presumably bought in an Hermès store, right?

 2   A.   Yes.

 3              THE COURT:  I'm sorry.  I didn't mean to cut you off.

 4              MR. HARRIS:  I'm thinking of finishing, your Honor,

 5   but I was going to wait.

 6              THE COURT:  You have no more questions?

 7              MR. HARRIS:  I don't have any more, your Honor.

 8              THE COURT:  Very good.

 9              Any redirect?

10              MR. WARSHAVSKY:  No, your Honor.

11              THE COURT:  Very good.

12              Thank you so much.  You may step down.

13              THE WITNESS:  Thank you, sir.

14              (Witness excused)

15              THE COURT:  Please call your next witness.

16              MR. WARSHAVSKY:  Your Honor, the next witness will be

17   Dr. Bruce Isaacson, and Deborah Wilcox from my firm will be

18   doing the questioning of Dr. Isaacson.

19              THE COURT:  About time.

20              THE DEPUTY CLERK:  Please remain standing.  Raise your

21   right hand.

22    BRUCE ISAACSON,

23        called as a witness by the Plaintiff,

24        having been duly sworn, testified as follows:

25              Please be seated.
```

1          MS. WILCOX:  State your name, Dr. Isaacson.

2          THE DEPUTY CLERK:  State your name and spell it slowly

3   for the record.

4          THE WITNESS:  Sure.

5          My name is Bruce Isaacson.  My last name is spelled

6   I-s-a-a-c-s-o-n.

7          THE COURT:  Counsel.

8   DIRECT EXAMINATION

9   BY MS. WILCOX:

10  Q.  Dr. Isaacson, what are you here to talk about today?

11  A.  I'm here to talk about a survey that I conducted.  This

12  survey measures the likelihood of confusion between the

13  MetaBirkin web page at *www.MetaBirkins.com* and Hermès or

14  Birkin.

15  Q.  And who retained you in this case?

16  A.  I was retained by Baker Hostetler, who is the attorneys for

17  Hermès.

18  Q.  Could we talk a bit about your background please.

19         MS. WILCOX:  I would ask that Mr. Ferrer pull up

20  Exhibit 190, page two, for the judge, the witness and counsel.

21  Q.  Dr. Isaacson, can you describe this document, page two,

22  please?

23  A.  Sure.  This is my c.v., and it describes my work

24  experience, my training, my education, my testimony experience

25  and other aspects of my background.

1          MS. WILCOX:  Your Honor, I offer Plaintiff's

2    Exhibit 190 into evidence.

3          MR. HARRIS:  No objection.

4          THE COURT:  Received.

5          (Plaintiff's Exhibit 190 received in evidence)

6          MS. WILCOX:  Mr. Ferrer, could you please publish that

7    to the jury.

8    BY MS. WILCOX:

9    Q.  Dr. Isaacson, you are employed by MMR Strategy Group.

10         How many years have you spent there?

11   A.  A little more than 17 years since 2005.

12   Q.  What is your role at MMR?

13   A.  I'm president.

14   Q.  How many years have you been president?

15   A.  Since the time I arrived there 17 years ago.

16   Q.  What does MMR do?

17   A.  MMR conducts research primarily in the form of surveys, and

18   we use that research to help our customers, our clients,

19   understand what their customers are doing or what their

20   customers are thinking.

21         We work in three areas.  We call them practice areas.

22   One of them is we conduct litigation surveys like the survey

23   I'll talk about today.  I've testified previously about surveys

24   that I've conducted on behalf of a wide range of companies and

25   organizations, that include Hilton Hotels, Marriott Hotels,

1    Jeep, Monster Energy, the United States Postal Service.  In

2    fact, sometimes our clients for litigation surveys are agencies

3    of the federal government, so we've done a fair amount of work

4    for the Federal Trade Commission, for the patent and trademark

5    office, and also for the Department of Justice.

6            The second practice area in which we work is surveys

7    that we conduct so that companies can substantiate claims that

8    they want to make on packages and in advertising.

9            And then a third practice area is surveys and

10   marketing consulting that we provide for commercial companies

11   who want to introduce a new product to the marketplace, develop

12   a marketing strategy, or locate new customers.

13           And the last two areas are customers in recent years

14   have included companies like Nestle, Allstate Insurance, and

15   Remax, the real estate company.

16   Q.   How much of MMR's work involves conducting surveys?

17   A.   All of our work involves conducting some type of research

18   and almost all of our work involves the conducting survey.

19   Q.   Can what type of surveys are those?

20   A.   They are a wide range of surveys, but they include surveys

21   of consumers, and also sometimes they include surveys of

22   business customers as well.

23   Q.   How many surveys, that is, has MMR conducted since you've

24   been president?

25   A.   In those 17 years, we've conducted more than 1,000 surveys,

1    and I've been personally involved in almost all of them.

2    Q.  How many people work with you at MMR?

3    A.  14 including myself.

4    Q.  Could you briefly give us their backgrounds?

5    A.  Sure.  So among the 14 people, again, including myself, we

6    have five people who have Ph.D.s or doctorates, and then we

7    have seven people who have master's degrees.  Those graduate

8    degrees are in subjects like marketing, business, social

9    sciences, statistics, and even food science.

10   Q.  And you are here today to serve as an expert witness about

11   a likelihood of confusion survey that you conducted?

12   A.  That's correct.

13   Q.  How many times have you served as an expert witness before

14   and where?

15   A.  I've testified in more than 100 matters about a survey

16   either that I've conducted or that someone else has conducted

17   and I've testified in federal courts like this one, in state

18   courts, and a wide range of other venues and before a wide

19   range of other authorities.

20   Q.  How many matters have you worked on that involved trademark

21   likelihood of confusion surveys?

22   A.  I've worked on more than 70 matters that have involved

23   likelihood of confusion surveys.

24   Q.  How many times have you testified about a trademark

25   likelihood of confusion survey?

1   A.  I've testified either through a report or through oral

2   testimony like today in more than 45 matters involving

3   likelihood of confusion surveys.

4   Q.  How much time was your firm paid for conducting the

5   likelihood of confusion survey in this case?

6   A.  For the likelihood of confusion survey that my firm

7   conducted in this matter, up through the expert report, my firm

8   billed $130,000, and that includes the cost of designing and

9   conducting the survey and then writing up the results in an

10  expert report.

11  Q.  Did your firm engage in any additional work after

12  conducting the likelihood of confusion survey?

13  A.  Yes, and my time for that additional work is billed at $900

14  an hour.

15  Q.  Dr. Isaacson, before we talk more about your survey, let's

16  discuss a bit more about your background.

17          MS. WILCOX:  Mr. Ferrer, could you please turn to page

18  three.

19  Q.  Dr. Isaacson, walk us through your education briefly.

20  A.  Sure.  It's listed at the top of the page that's on the

21  screen now.

22          I have an undergrad degree which is a bachelor of

23  science in engineering.  That's from Northwestern University.

24  I have an MBA, which is a master of business administration

25  degree.  That's from Harvard Business School.  And I also have

1   a DBA degree, that stands for doctor of business

2   administration.  That's a doctorate in marketing, also from

3   Harvard Business School.

4   Q.  Did you receive any awards during your graduate education

5   and could we look at slide four, please?

6             THE COURT:  Counsel, come to sidebar.

7             (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N23sHER4                          Isaacson - Direct

1              (In open court)

2              THE COURT:  Now, you asked for 60 minutes direct, and

3     I'm not going to give you more than 60.

4              MS. WILCOX:  Yes.

5              THE COURT:  In fact, I will cut you off at 61.

6              MS. WILCOX:  I'm getting to the good stuff.

7              THE COURT:  Well, you're certainly taking your time is

8     my point.

9              MS. WILCOX:  I see.

10             THE COURT:  I really don't know that we need to know

11    what educational awards he received, fascinating though that

12    might be.

13             Let's move along.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     BY MS. WILCOX:

3     Q.  Dr. Isaacson, we're going to speed things up.

4          So how about letting us know if you have written on

5     any topics recently relating to likelihood of confusion

6     surveys?

7     A.  Sure.  About two years ago, I published an article in the

8     journal called The Trademark Reporter, which is a peer-reviewed

9     journal specific, and that article was specifically on the kind

10    of survey that I'll be talking about today.

11    Q.  So let's talk about this likelihood of confusion survey.

12         What does your survey measure in this case?

13    A.  My survey measures whether consumers who come to the

14    *MetaBirkins.com* website are likely too be confused with regard

15    to Hermès or with regard to Birkin.

16    Q.  What kind of confusion survey did you conduct?

17    A.  Conducted a survey which uses a format called Eveready, and

18    that name comes from the first time that was used, which is

19    about 45 years ago.  And since then it's come to be one of the

20    most widely used methods for measuring likelihood of confusion.

21    Q.  How does an Eveready survey measure that likelihood of

22    confusion?

23    A.  It's very straightforward.  You show one thing to consumers

24    and you measure -- you ask questions to measure whether they

25    confuse it with something else.  So in the case of my survey, I

1    showed them the *MetaBirkins.com* web page and asked questions to

2    understand whether they confused it either as coming from

3    Hermès or Birkin or as sponsored, authorized, or approved by

4    Hermès or Birkin.

5    Q.  Dr. Isaacson, did you prepare any slides for us to help us

6    walk through this testimony?

7    A.  Yes.

8             MS. WILCOX:  Mr. Ferrer, could you please pull up

9    Exhibit 193.

10   Q.  What is this document, please, Dr. Isaacson?

11   A.  These are the demonstrative exhibits that I prepared to

12   describe my survey.

13            MS. WILCOX:  Your Honor, I offer Plaintiff's Exhibit

14   193 into evidence.

15            MR. OPPENHEIM:  No objection, your Honor.

16            I'm sorry.  Excuse me.  I'm sorry.  Objection.

17            THE COURT:  OK.  Well, I will allow this to be shown

18   to the jury as an aid to following the witness's testimony, but

19   they will not be received in evidence.  They will not be

20   available to the jury during their deliberations, but they can

21   be viewed now as an aid to following his testimony.

22            MS. WILCOX:  Thank you, your Honor.

23            Mr. Ferrer, could you please go to slide two.

24   BY MS. WILCOX:

25   Q.  Dr. Isaacson, what are we looking at here?

1   A.  What we're looking at is a picture of the top part of the

2   web page that I showed in my survey.  In my survey, this looked

3   like an actual web page, but this is just the top part of what

4   people saw in the course of the survey.

5   Q.  Could we please go to the next slide.

6          What is this page?

7   A.  Some of the images that *MetaBirkins.com*, when you move your

8   mouse over them, text appears and then disappears.  When you

9   move your mouse again, and this shows the handbag at the top of

10  the web page with and without that text that is superimposed

11  when you move your mouse over the handbag.

12  Q.  And if we can go to the next slide, four, please.

13         What are we looking at?

14  A.  What we're seeing here is one of the rows of handbags

15  further down the web page and, again, superimposed text appears

16  when you move your mouse.

17         In this case, that text says Not Your Mother's Birkin,

18  and this shows those images with and without that text.

19  Q.  Why did you choose to measure the *MetaBirkins.com* web page?

20  A.  Well, because it's one of the places where the MetaBirkins

21  are advertised, and also because it has a disclaimer, and I

22  wanted my research to reflect the effect of the disclaimer as

23  well.

24         MS. WILCOX:  Mr. Ferrer, could you please pull up

25  Exhibit 192.

1   Q.  Is this a page where the disclaimer appears, Dr. Isaacson?

2   A.  It does.  This shows the whole web page that was in my

3   survey, including the disclaimer.

4   Q.  Could you please read what the disclaimer says?

5   A.  Sure.  It says, We are not affiliated, associated,

6   authorized, endorsed by, or in any way officially connected

7   with the Hermès, or any of its subsidiaries or its affiliates.

8   The official Hermès website can be found at

9   *http://www Hermès.com/*.

10             THE COURT:  I'm sorry, counsel.  I apologize, but I

11   think we need a quick sidebar.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

N23VHER5                          Isaacson - Direct

1              (At sidebar)

2              THE COURT:  So at the time I made my ruling a few

3    minutes ago saying that these would only be received to help

4    follow his testimony, it's because the label on them was

5    "demonstrative exhibits."  But what I'm now hearing is that

6    this is what he actually used in the survey; this is the actual

7    survey, in effect, which I think would be admissible.

8              Any objection?

9              MR. OPPENHEIM:  No, sir.

10             THE COURT:  Then we will now receive -- what's the

11   full number?  Well, when you get back, just read off the full

12   numbers and those will be received.

13             MS. WILCOX:  Thank you, your Honor.

14             MR. OPPENHEIM:  If I may, your Honor, it might be

15   appropriate to voice objections to the pages that were not part

16   of the marking.

17             THE COURT:  Yes.  I'll make that clear to the jury

18   that what is being received, and they will have access to the

19   actual survey, but not the other slides that don't relate to

20   the survey itself.

21             MR. OPPENHEIM:  Okay.  Thank you.

22             (Continued on next page)

23

24

25

1           (In open court)

2           THE COURT:  Ladies and gentlemen, I wanted to slightly

3    revise the ruling I made a few minutes ago, in light of the

4    testimony that's now being given.

5           Those are the slides that are the witness's actual

6    survey, will be received in evidence and you'll have them

7    available for you when you get to the jury room.

8           There are some other slides that are not part of the

9    survey; those are only being offered as aids to following

10   testimony.  You don't have to worry now about which is which

11   because they're going to give you when you get to the jury room

12   not only all the exhibits, lucky you, but an index to the

13   exhibits so you can find what you want.

14          Okay, counsel.

15          MS. WILCOX:  Thank you, your Honor.

16   BY MS. WILCOX:

17   Q.  Why did you want to include the disclaimer in your test

18   page of the likelihood of confusion survey?  Doesn't it

19   disclaim any relationship with Hermès?

20   A.  I wanted to include it so that I could have my survey

21   measure the effect of the disclaimer.  If we zoom back out to

22   see the whole web page, you can see there's three things that

23   can occur when someone comes to this web page.  They might see

24   the disclaimer and they might realize from the disclaimer that

25   Hermès or Birkin is not in any way connected with this web

page.  They might not notice the disclaimer at all; it is only

two faint lines on a very busy page.  And then they might see

the disclaimer and misread it and take away the mistaken

impression that the web page is connected with Hermès or

Birkin.  So I wanted to make sure that my survey reflected the

effect of the disclaimer.

Q.  So even with a disclaimer, there can still be a likelihood

of confusion?

A.  Absolutely.

Q.  Did your survey only measure this metabirkins.com web page?

A.  No, my surveyed measured this web page, which I call the

test web page; and then an altered version of this web page,

which I call the control web page.

Q.  Why did your survey include a control version of the

website?

A.  Well, this matter involves disputes over three very

specific things on this web page.  One is the use of the word

"Hermès"; the other is the use of the word "Birkin"; and then

the third is the shape or the look of the handbag on the page.

        And by having -- my test web page includes those three

items.  My control web page does not include those three

elements.  And so by having one web page that does and one web

page that does not, I could compare the two web pages, and that

way I could measure the effect of those specific elements as

opposed to anything else that's happening on the web page.

1  Q.  In fact, let's walk through your control page.

2         MS. WILCOX:  Mr. Ferrer, please pull up Exhibit 193

3  again, slide 5.

4  Q.  What are the changes that you made, Dr. Isaacson?

5  A.  Well, I removed the word "Birkin," that's point number one,

6  and changed it to "Handbag."  And similarly in point number

7  two, I changed "MetaBirkins" to "Metahandbags."  I removed the

8  word "Hermès" and changed it to "Darcy."  And then I changed

9  the shape of the handbags so they would be less like the shape

10  of a Birkin bag.  In the control, they are more square, they

11  are less tapered, they don't have a padlock, and there are some

12  faint vertical metallic lines that I removed as well.

13         MS. WILCOX:  Please turn to slide 6.

14  Q.  And Dr. Isaacson, is this what you were just describing?

15  A.  That's correct.  You can see up at the top it says

16  "Metahandbags."  You can see that the shape of the handbag is

17  slightly different and it doesn't have the padlock on it.  And

18  if you look carefully at the disclaimer, you'll see it says

19  "Darcy" instead of saying "Hermès."

20         MS. WILCOX:  And the next slide, please.

21  Q.  What is this?

22  A.  This is more of the same page.  Again, you can see that the

23  shape of the handbag is changed.  This is the control web page

24  again.

25  Q.  And the next three of three, slide 8.  What is this?

1    A.   This is more of the control.  And again, you can see that

2    the wording of that slogan has changed, and the shape of the

3    bags and the look of the bags has changed.

4    Q.   In the survey, did people see the control home page as

5    individual slides?

6    A.   No, they saw it as a web page, the same way that they saw

7    the test web page as a web page.

8    Q.   So what were the specific parts of the metabirkins.com web

9    page that your survey measured?

10   A.   It measures the use of the word "Hermès," the use of the

11   word "Birkin," and the use of that look and shape of the

12   handbag.

13   Q.   Did you test the elements individually or together as a

14   group?

15   A.   All together as a group.

16   Q.   Why?

17   A.   Because that's how someone would encounter them who came to

18   the web page.  They'd see them all together, not individually.

19   Q.   Did people taking your survey see both the test version and

20   the control version of the MetaBirkin web page?

21   A.   No, they would see one or the other, but not both.

22   Q.   Let's walk through the survey methodology that you used.

23        What steps did you take in your trademark likelihood

24   of confusion survey?

25   A.   The survey had three steps.

 1            In the first step, I qualified people to make sure I

 2     was interviewing the right people.

 3            In the second step, I showed them either the control

 4     web page or the test web page.

 5            And then in the third step, I asked questions to

 6     measure likelihood of confusion.

 7            MS. WILCOX:  Let's turn back, please, to Exhibit 193,

 8     and go to slide 9.

 9     Q.  And let's talk about this likelihood of confusion survey

10     among the NFT purchasers.  Who did you interview?

11     A.  Sure.

12            So I interviewed a group of NFT purchasers.  And this

13     slide shows you the primary qualification criteria that I used

14     to select these people.  They had to be at least 18 years old;

15     they had to indicate that in the next 12 months they were

16     likely to purchase an NFT for digital artwork or for fashion

17     apparel or fashion accessories; they had to indicate that they

18     would be willing to spend $2500 or more to purchase an NFT; and

19     they had to indicate that they would consider using

20     cryptocurrency or a credit card to purchase something online.

21     Q.  Why did you qualify people as being willing to spend $2500?

22     A.  Well, the time I did my -- I designed my survey, the

23     MetaBirkins NFTs were advertised for sale on websites at a

24     price in a cryptocurrency called Ethereum, and that price

25     converted to $2500 in dollars.

```
 1   Q.  And why did you qualify people as needing to use
 2   cryptocurrency or a credit card to buy something online?
 3   A.  Because that was the only way that you could buy one of the
 4   MetaBirkins NFTs.  You had to either use cryptocurrency or use
 5   a credit card that would purchase things in cryptocurrency.
 6   Q.  After someone was qualified to take the survey, what
 7   happened next?
 8   A.  After they were qualified, they would see either the test
 9   or the control web page.  And then I asked questions to measure
10   the likelihood of confusion for that web page.
11           MS. WILCOX:  Let's look at slide 10, please.
12   Q.  Could you walk us through these questions.
13   A.  Sure.
14           These are the questions that my survey -- these are
15   some of the questions that my survey asked to measure
16   likelihood of confusion.
17           The first two questions on this slide are a pair.  The
18   first one asks:  What company, companies, person or people do
19   you think makes or provides the items shown on the web page?
20           And then in follow up to that question, question two
21   asks:  What makes you think that?  Please be as specific as
22   possible.
23           The next three questions are a series.
24           And the first of those is question 3, which asks:  Are
25   you aware of any other brands or products made or provided by
```

1    whoever makes or provides the items on the web page?

2              If they answer yes to that, then they get question 4:

3    What other brands or products do you think are made or provided

4    by whoever makes or provides the items shown on the web page?

5              And they get the same followup in question 5 that they

6    would have gotten in question 2 to ask:  What makes you think

7    that?

8              So on this page, there are two questions that are

9    measuring confusion, question 1 and question 4.

10             MS. WILCOX:  Please turn to the next slide.

11   Q.  What are these questions, Dr. Isaacson?

12   A.  This is the last series in the questionnaire that's

13   measuring confusion.

14             The first question asks whether they think that

15   whoever makes or provides the items shown on the web page is or

16   is not sponsored, authorized or approved by another company,

17   person, or brand.

18             If they answer is, then they get question 7:  What

19   other company, person or brand do you believe sponsors,

20   authorizes or approves whoever makes or provides the items

21   shown on the web page?

22             And of these three questions, the only question that

23   measures confusion is question 7.  So questions 1, 4, and 7 are

24   the critical questions in the survey in terms of measuring

25   confusion.

1    Q.   How many people did you interview for this survey?

2    A.   A total of 201 people.  And those were divided between

3    people who saw the test web page and people who saw the control

4    web page.

5    Q.   What does that number of interviewees tell you?

6    A.   It tells me that we have enough interviews so that the

7    results of the survey are reliable.

8    Q.   How did you go about finding the people to interview for

9    this survey?

10   A.   Well, this was a web page.  So I located people online and

11   interviewed them online.  And I located them through a

12   specialized service that provides potential respondents for

13   surveys like this.  And for participating in the survey, people

14   received a small incentive as a way to thank them for their

15   time and to encourage them to participate.

16   Q.   Now, let's discuss the results of the survey.  Your survey

17   asked questions to measure the likelihood of confusion and

18   people answered in their own words?

19   A.   That's correct.

20   Q.   How did you decide what responses indicated someone who was

21   confused?

22   A.   Well, everybody answered questions 1, 4, and 7 in their own

23   words.  And I looked at the responses to those questions to see

24   whether they mentioned Birkin or whether they mentioned Hermès.

25   And if they mentioned one of those two words, I knew that they

1    were confused.  And if they did not mention one of those two

2    words, I knew that they were not confused.

3          MS. WILCOX:  Could we please turn to slide 12.

4    Q.  Could you describe for us what this slide represents.

5    A.  Sure.

6          This is the results of question 1, some of the results

7    from question 1.  And these are actual answers that people

8    typed into the survey with their own spelling, their own

9    capitalization, their own punctuation.  And this shows you what

10   they answered in response to the question:  Who do you think

11   makes or provides the items shown on the web page?

12         So if we look at the first row, the person who had ID

13   No. 2 said:  Birkins is the company that makes these NFT.

14         And if you just look down the page, you can see the

15   next person said:  Hermès.

16         The next person said:  Hermès, Birkin, and

17   MetaBirkins.

18         Then you can see responses further down the page that

19   refer to Birkin and responses that refer to Hermès as well.

20   Q.  Now, looking at ID No. 18, the person listed Hermès Birkin

21   bags, or MetaBirkins.  Did you count that person as confused?

22   A.  I did.

23   Q.  And why is that?

24   A.  Because they are not sure who makes it.  They mentioned

25   Hermès Birkin, and they mentioned MetaBirkins.  And it's

1  possible that they think there is a connection between the two.

2  It's possible that they think that they are separate parties.

3  But by virtue of the fact that they are mentioning Hermès

4  Birkin, they are counted as confused.

5  Q.  You said that your survey also asked people why they

6  answered that way.

7          MS. WILCOX:  Could we please turn to the next slide

8  13.

9  Q.  And walk us through this one, Dr. Isaacson.

10  A.  Sure.

11          This is the response -- this is some of the responses

12  to question 2, which asks:  What makes you think that?

13          And this gives people an opportunity to explain their

14  answer.

15          So that same respondent No. 2 says:  The fact that

16  they are called Birkins.

17          You can see respondent 71 says:  Because of the name

18  Birkins.

19          You can see respondent 142:  The name of the website

20  is MetaBirkin.

21          And over the last image in each row is Birkin, the

22  name of the bag.  So they are explaining their answer in their

23  own words.

24          MS. WILCOX:  Let's please turn to the next slide.

25  Q.  What are some of the responses to question No. 4?

1    A.   Sure.   So the responses to No. 4 -- and remember, No. 4 is

2    asking -- you can see it up at the top of the slide.   It's

3    asking for other brands or products.   And so in response to the

4    question, 14 says:   Hermès does clothes, handbags, and what I

5    assume they meant to type as shoes.

6          You can see 18 mentions:   Luxury handbags, footwear,

7    fragrances, accessories, watches and jewelry.

8          So this gives people another opportunity to identify

9    in response to a different question, what the company that they

10   think is behind or connected with the web page that they are

11   looking at.

12          MS. WILCOX:   Could we please turn to the next slide.

13   Q.   What is this summary here, Dr. Isaacson?

14   A.   This shows you for a handful of respondents, all of their

15   responses to the questions that measure confusion.

16          So the first column is the response to question 1,

17   then question 4, and then question 7.   And as you look across

18   the rows, you can see the answers that people provided in

19   responses to each of these questions.   Where you see a blank,

20   that means someone didn't answer that question, probably

21   because they weren't asked it because of how they answered the

22   prior question.

23   Q.   And Dr. Isaacson, is counting confusion across questions 1,

24   4, and 7 consistent with the methodology you've used over the

25   last 17 years in your many other trademark likelihood of

1    confusion surveys?

2    A.  Yes, it's -- yes.

3    Q.  And let's look at respondent 209 at the bottom.  This

4    individual said Hermès in question 1, and then MetaBirkins and

5    Mason Rothschild in 4 and 7.  Did you count them as confused?

6    A.  I did.

7    Q.  Why is that?

8    A.  Well, they are very clear about their answer.  In response

9    to question 1, when you ask them about the company or people

10   that make or provide the items, they say Hermès.

11          When we ask them, for example, in question 4, about

12   other brands or products, they answer MetaBirkins.

13          So it's possible that they think in some way

14   MetaBirkins is connected with Hermès; it's possible they

15   recognize them as different entities.  I can't tell from these

16   answers.  But I do know that their answer to question 1 is very

17   clear that they think that Hermès is behind the web page that

18   they are looking at.

19          MS. WILCOX:  Please turn to the next slide.

20   Q.  What is this results page showing?

21   A.  This is a different kind of summary to question 1.  This

22   summary shows you the category of responses that people

23   provided in response to question 1.  And the critical row that

24   we're looking at, that I'm looking at when I analyze this, is I

25   want to know the percentage of people who say Hermès or Birkin

1    in response to question 1.  And you can see for the test web

2    page, 17.5 percent mentioned one of those two names.  And for

3    the control web page, 1.9 percent mentioned one of those two

4    names.

5    Q.  We see here that more people said MetaBirkins or Mason

6    Rothschild than said Hermès or Birkin.  What does that mean to

7    you with respect to confusion?

8    A.  It doesn't mean anything with respect to confusion.  The

9    survey is designed to measure confusion with respect to Hermès

10   or Birkin.  So what I'm focused on when I'm analyzing these

11   responses is the percentage of people who said Hermès or

12   Birkin.

13            THE COURT:  Why doesn't it indicate that 51 percent

14   were not confused?

15            THE WITNESS:  Your Honor, it does indicate that 51

16   percent mentioned MetaBirkins or Mason Rothschild.  Some of

17   those 51 percent may also have said Hermès or Birkin.

18            THE COURT:  How many?

19            THE WITNESS:  I don't know off the top of my head.

20   I'm sorry.

21            MS. WILCOX:  This is the survey as to question 1, and

22   we have a few other questions to look at as to how people

23   responded to get to the overall tab.  In fact, why don't we

24   look -- if your Honor permits, why don't we look at the slide

25   that gives the results across all four questions.

1           THE WITNESS:  If I can just add one more response to

2      that question.

3           People could have said more than one category in

4      response -- in answering question 1.  So it's possible that

5      someone might -- that people gave -- in fact, a number of

6      people gave responses where they would have been counted in

7      multiple rows across that table.

8           THE COURT:  Go ahead, counsel.

9           MS. WILCOX:  Could we please turn to slide 19.

10     Q.  And describe for us what this chart shows, Dr. Isaacson.

11     A.  Sure.

12          This is counting the number of people who said Hermès

13     or Birkin in question 1, in question 4, and in question 7.  And

14     as I just mentioned, they might have said Hermès or Birkin and

15     said other things, they might have said Vogue, they might have

16     said Meta, they might have given a response that would have

17     fallen into another category as well; and, in fact, a number of

18     people did that.

19          But the survey, again, is designed to measure

20     confusion between metabirkins.com and Hermès or Birkin.  And

21     counting that level -- that type of confusion, in response to

22     question 1 we have 17.5 percent for the test and 1.9 percent

23     for the control.  We have, in response to question 4, an

24     additional 4.1 percent and one percent.  And then zero percent

25     in response to question 7.  And when you add up down the

1   column, you get to 21.6 percent for the test web page, and 2.9

2   percent for the control web page.  And there's a number there

3   that says net confusion.  And net confusion is simply the

4   difference if you subtract the control from the test, and the

5   difference is 18.7 percent.  That's the net confusion for this

6   web page with respect to Hermès or Birkin.

7   Q.  What does that net confusion percentage of 18.7 percent

8   tell you?

9   A.  That tells me the amount of confusion associated with the

10  use of the Birkin name, the use of the Hermès name, and the use

11  of the shape of that handbag.  And that number is of a

12  magnitude, of a size that I would typically interpret as

13  meaning that there's a substantial likelihood of confusion.

14  Q.  Why do you conclude that this means there's a substantial

15  likelihood of confusion?

16  A.  Because the number is big enough that I and, in my

17  experience, others would typically interpret this as meaning

18  that there's a substantial likelihood of confusion.

19  Q.  And when you say "others," who are you referring to?

20  A.  Other survey experts and other surveys that I've seen

21  evaluated.

22  Q.  Dr. Isaacson, you just told us about the survey of the NFT

23  purchasers you interviewed.  Was there any other group that you

24  also interviewed?

25  A.  Yes, I also conducted a survey among handbag purchasers.

1   Q.  And are there any differences in the design of the surveys?

2   A.  There are very similar surveys.  The only thing that

3   differed between the two surveys is one interviewed handbag

4   purchasers and one interviewed NFT purchasers.

5        MS. WILCOX:  Could we please turn to slide 20.

6   Q.  Could you walk us through what this slide shows.

7   A.  This slide shows the qualification criteria for people to

8   qualify for the survey of handbag purchasers.  And just to be

9   clear, you could be in one survey or the other, but not both.

10       So this is a separate group of people who had to be at

11  least 18 years old, had to indicate that they were likely to

12  purchase a handbag in the next 12 months, had to be willing to

13  spend $10,000 or more to purchase a handbag, and had to also

14  indicate that they read online content about fashion or

15  artwork.

16  Q.  Why did the handbag survey require qualifying someone as

17  someone who had purchased a handbag at $10,000 or more?

18  A.  Because I looked around online, and the lowest price that I

19  could find a Birkin handbag for which was on a resale website

20  was for $10,000.

21  Q.  What were the results for the survey among the expensive

22  handbags purchasers?

23  A.  I have a slide with that.  I believe that's the next slide.

24  Q.  Yes.  Please turn to slide 21.

25  A.  So this shows, again, questions 1, 4, and 7, again, with

respect to Hermès or Birkin for the survey that was -- for the
group of handbag purchasers.  And you can see when we total up
down the column, we get 18.8 percent for the test web page,
15.2 percent for the control web page, and the net, which is
the difference between the two, is 3.6 percent.

Q.  And what do these results say to you?

A.  Well, the net confusion is much lower.  The other net
confusion was 18.7 percent.  So this net confusion is a little
more than 15 percent -- 15 percentage points lower.  And it's
lower in part because the test is a little bit lower, but
primarily because the control is much higher.  The other
control was about 12 percentage points lower than this one.
And so the net is lower, the control is much higher.

Q.  What does it mean to you that the control web page showed
15.2 percent of the people were confused by it?

A.  It tells me that when you interview and locate a group of
people who are qualified as purchasing very expensive handbags,
and you show them a survey image that involves handbags, that a
larger percentage of them are likely to say that -- are likely
to mention Birkin or Hermès in response to an image like that.

        MS. WILCOX:  You can take the slides down, Mr. Ferrer.

Q.  You said that you surveyed NFT purchasers and these
expensive handbag purchasers.  Are you relying on both of those
to measure the likelihood of confusion of consumers in this
case?

1   A.  I'm only relying on the group of NFT purchasers and not on

2   the group of handbag purchasers.

3   Q.  So why did you conduct both surveys of those groups?

4   A.  Well, at the time that I was designing my survey, it wasn't

5   clear where the MetaBirkins NFTs were going to be marketed to.

6   And since I conducted my survey or after I conducted my survey,

7   I learned that the MetaBirkins NFTs would be primarily marketed

8   to NFT purchasers.

9   Q.  What is the scientific methodology you use for determining

10  the type of purchasers to survey?

11  A.  Well --

12          THE COURT:  The objection to the use of the term

13  "scientific" is granted.  Rephrase the question.

14          MS. WILCOX:  Sure.

15  Q.  Dr. Isaacson, what steps did you take to determine the type

16  of purchasers to survey?

17  A.  Well, when you're conducting a confusion survey, you want

18  to talk to people who would be the kind of people who would be

19  in a position where they could be confused.  And that means

20  you're talking to people who are relevant to the context,

21  meaning they are the people who would be marketed to.

22          MS. WILCOX:  And Mr. Ferrer, if we could please pull

23  up Plaintiffs' Exhibit 193 again, slide 22.

24  Q.  Dr. Isaacson, did you reach any conclusions based on your

25  survey for likelihood of confusion among NFT purchasers?

1    A.  Yes, I did.

2    Q.  What are your conclusions?

3    A.  Well, I conclude that the 18.7 percent net measure from the

4    survey of NFT purchasers is at or above measures that are

5    typically interpreted as indicating a substantial likelihood of

6    confusion.  And then based on that result, those results, I

7    conclude that there is a likelihood of confusion between the

8    MetaBirkins web page and Hermès or Birkin.

9    Q.  And what does that likelihood of confusion of the NFT

10   purchasers mean in this context?

11   A.  It means that people who encounter that web page, that

12   there's a likelihood that a substantial percentage of them

13   would either think that that web page comes from Hermès or

14   Birkin or is sponsored or authorized or approved by Hermès or

15   Birkin.

16   Q.  And how does that matter in this case?

17   A.  Well, it matters from the consumer's perspective because

18   when we go to something like a web page where we see something

19   advertised, consumers want to know who it is they are dealing

20   with.

21        And it matters from the company's perspective because

22   if a consumer comes to a web page and, for example, has an

23   experience and thinks they are dealing with one company, and it

24   turns out they are dealing with another company, then they may

25   blame the company that they think they are dealing with.

1               And so in this context, if there's confusion, then a

2     company like Hermès loses control of their brand experience.

3     And that's something that companies find very --

4               MR. OPPENHEIM:  Objection, your Honor.

5               Move to strike the final part.

6               THE COURT:  Sustained.

7     Q.  One last quick question for the moment, Dr. Isaacson.

8               Had you ever heard of defendant Mason Rothschild's

9     proffered expert witness, Dr. David Neal, before this lawsuit?

10    A.  No.

11    Q.  Thank you for your time today.

12              MS. WILCOX:  I don't have any further questions at

13    this time.

14              THE COURT:  All right.  So we will take our

15    mid-afternoon break.

16              Again, ladies and gentlemen, to keep things rolling,

17    if we can hold it to about ten minutes, that would be

18    appreciated.

19              (Jury not present)

20              THE COURT:  You may step down.

21              We'll see you in ten minutes.

22              THE WITNESS:  Thank you, your Honor.

23              THE COURT:  All right.  We'll see you in ten minutes.

24              Oh, I'm sorry.  Let me have my law clerk hand out to

25    counsel my proposed jury instructions.  And we're going to have

1    a charging conference at 5 o'clock today.  But we're going to

2    break at 4:30.  So you will have ample time to review the

3    instructions.

4                (Recess)

5                THE DEPUTY CLERK:  May I bring in the jury?

6                THE COURT:  Please.

7                So rarely has our courtroom been filled with so many

8    brilliant minds.  I've decided that scientifically.

9                So while we're waiting for the jury --

10               (Jury present)

11               THE COURT:  Please be seated.

12               Go ahead, counsel.

13               MR. OPPENHEIM:  Thank you, your Honor.

14   CROSS-EXAMINATION

15   BY MR. OPPENHEIM:

16   Q.  Good afternoon, Dr. Isaacson.

17               Thank you for being here with us today.

18   A.  Good afternoon.

19   Q.  My name is Adam Oppenheim.  I am one of the lawyers for

20   Mason Rothschild.  I have a few questions for you.

21               Now, this matter today, this is not the first time

22   you've done work with the lawyers for Baker Hostetler; is that

23   correct?

24   A.  It's the first time I've done work with these particular

25   attorneys, but not the first time I've done work with Baker

1    Hostetler.

2    Q.  I think this is the -- is this the eighth or ninth time

3    that you've done work with attorneys from Baker Hostetler?

4    A.  I believe this is the ninth time.

5    Q.  Okay.  So you performed a survey among NFT -- possible NFT

6    purchasers; correct?

7    A.  Correct.

8    Q.  But first you had to find those people; and so to do that,

9    I believe I heard you testify that you located people online

10   through a service.  Is that correct?

11   A.  That's correct.

12   Q.  And what was the name of that service that you used?

13   A.  The name of the service, I believe, was Prodege,

14   P-R-O-D-E-G-E.

15   Q.  Thank you.

16          And I think you said that -- what do they get -- do

17   you know, do they get an email or an advertisement that invites

18   them to participate in the survey?

19   A.  There's two ways you can be invited into the survey.  One

20   way is to receive an email, and the second is in the -- this

21   service, each person who's a member of this service has a

22   portal or a dashboard, and they might see a notice in their

23   portal or dashboard.

24   Q.  Do you know how a person would end up with a portal or

25   dashboard before when they were first located?  Did they have a

1    prior arrangement with Prodege?

2    A.  Well, you belong to this service.  And the service

3    maintains some information on people who had volunteered to

4    take surveys from time to time.  And when they get a survey,

5    either a notice or an email is posted that tells them the

6    length of the survey and the number of points involved, but not

7    the subject matter of the survey.

8    Q.  You said something in there, the number of points involved.

9    What does that mean?

10   A.  It means that -- I mentioned during my testimony that

11   people receive incentives for taking the survey.  And

12   typically, the incentives are in the form of points that can be

13   exchanged for merchandise or for travel or other kinds of

14   things over time.

15   Q.  Do you know how many points people get on average for

16   completing a survey?

17   A.  It varies a lot, depending on the nature of the survey.

18   Q.  Do you know how many points people got for participation in

19   these surveys?

20   A.  I believe the point value for this particular survey was in

21   the range of 10 to 12 dollars per completed survey.

22   Q.  I'm sorry.  You did a conversion I was about to ask you

23   about.  I guess the points can be converted into an approximate

24   dollar amount; is that right?

25   A.  Well, I'm converting them into a dollar amount.  I don't

1   know exactly how many points that was, but I know the dollar

2   equivalent of the points, the value of the points, was around

3   10 to 12 dollars for this particular survey.

4   Q.  Okay.  And is that -- in your experience, is that number

5   relatively high or relatively low for participation in a

6   survey?

7   A.  It's neither.  We have surveys that are lower than that, we

8   have surveys that are much, much higher than that.

9   Q.  Okay.  What's the most number of points you've ever heard

10  being awarded for participation in a survey?

11  A.  Several $100 for very hard-to-find people.

12  Q.  What's the least amount of points you've ever heard of

13  provided for participation in a survey?

14  A.  In the range of three to four dollars.

15  Q.  Do you have any input on the incentive that's offered to

16  participants?

17  A.  I do not.

18  Q.  Okay.  So the survey -- and here, again, I'm going to be

19  talking about the NFT survey.  I presume, by the way, that a

20  similar process was undertaken for what I'll call later the

21  handbag survey, the second survey you spoke about.  That was a

22  separate qualification process?

23  A.  Correct.

24  Q.  So the NFT survey, that was designed to identify confusion

25  among likely NFT purchasers; correct?

1    A.  Correct.

2    Q.  And am I correct that you were looking for people who,

3    among other things, were likely to purchase an NFT for either

4    digital artwork or an NFT for fashion apparel or accessories?

5    A.  Correct.

6    Q.  Next 12 months -- sorry.

7            And would be willing to spend $2500 or more on that

8    NFT.  That's the list?

9    A.  That's not the entire list, but both of those criteria that

10   you listed are correct.

11   Q.  Okay.  So when you were looking for people that were likely

12   to purchase an NFT for either digital artwork or for fashion

13   apparel or accessories, are those all the same thing?

14   A.  I'm not sure what you're asking me.

15   Q.  I noticed that in the qualification question there were two

16   types of NFT purchasers you looked for, people who were looking

17   for digital artwork or fashion apparel and accessories.  My

18   question is were people who answered yes to those things

19   combined into one category of likely NFT purchasers?

20   A.  Yes.

21           MR. OPPENHEIM:  Ashley, could you put up Exhibit 6

22   from Exhibit 189, just to the Court and the witness and

23   counsel, please.

24   Q.  Do you see the document in front of you, Dr. Isaacson?

25   A.  Yes.

1   Q.   What is this document?

2   A.   This is the questionnaire for the NFT purchasers survey.

3   That means it's the question that qualified people and that

4   measured confusion in the survey.

5   Q.   I'm sorry.  I didn't mean to cut you off.  I apologize.

6           Did you finish your answer?

7   A.   I did.  Thank you.

8           MR. OPPENHEIM:  Ashley, if you could just scroll a

9   page or two.

10  Q.   I'd like to ask you, Dr. Isaacson, we're going to go

11  through these in detail, just right now I'm wondering if you

12  could confirm that these are, in fact, the survey questions

13  that you asked to qualified participants in the NFT survey?

14  A.   I can't see the whole exhibit, but it's the beginning part

15  of the survey questions that I asked.

16          MR. OPPENHEIM:  Your Honor, I would move for the

17  admission of this Exhibit 6 to the report of Dr. Isaacson.

18          MS. WILCOX:  No objection.

19          I understand the entire survey itself will be

20  admitted.

21          THE COURT:  No.  If you want to offer the entire

22  survey -- do you want to offer the entire survey?

23          MR. OPPENHEIM:  Not at this time.

24          THE COURT:  Do you want to offer the entire survey?

25          MS. WILCOX:  I do, your Honor.

1              THE COURT:  So weighing the competing arguments, the

2     entire survey will be received.

3              MR. OPPENHEIM:  Thank you, your Honor.

4              (Plaintiffs' Exhibit 6 received in evidence)

5              THE COURT:  And that's all labeled Exhibit 6?

6              MR. OPPENHEIM:  I believe it is, your Honor.  I

7     believe each page of this exhibit actually says Exhibit 6.

8              THE COURT:  Okay.  Very good.

9              At the end of today, after we've excused the jury,

10    work out the exact numbers from that earlier part of this

11    testimony where some exhibits were received and some were not.

12    But we need to have the court reporter put the exact numbers.

13             MR. OPPENHEIM:  Yes, your Honor.

14             THE COURT:  Go ahead.

15    BY MR. OPPENHEIM:

16    Q.  So we're going to start with A, and this is the qualifying

17    questions.  Do you know if this format --

18             MR. OPPENHEIM:  You could stop there, Ashley.  Thank

19    you.

20    Q.  The format in which these questions are presented in your

21    exhibit, does this mimic the format in which the participants

22    would see the qualifying questions on the initial survey?

23    A.  It would be the same phrasing in the survey, but this

24    exhibit doesn't show the format in which they were listed in

25    the survey.  And it also includes programming language that

1    would not have been visible in the survey.

2    Q.  I'm going to use some of that programming language to help

3    understand exactly what happens as people walk through these

4    questions.

5         It's helpful, I think, am I correct, that first a

6    person answers this first question on gender, and it is only,

7    as it says below, if they select male or female that they will

8    then continue on to question B; is that correct?

9    A.  That's correct.  There's another criteria in there, but

10   they need to select one of those two to be able to continue.

11   Q.  And if they don't, they are out?

12   A.  Correct.

13   Q.  So if they go on to question B, which asks them their age,

14   I see down below that, again, you've listed a number of -- I

15   guess maybe they are programming criteria, that here indicate

16   that certain people will be terminated and certain people will

17   not.  It looks here like you've terminated the participation of

18   people 17 years old or younger who prefer not to answer, and

19   then it says "quota filled," which I guess means you have

20   enough people in that age category already; is that correct?

21   Is that how this works with question B?

22   A.  That's correct.

23        MR. OPPENHEIM:  Ashley, if you could scroll down so

24   that I could see question C, which similarly asks for ZIP code.

25   Q.  And again, says "if quota filled, terminated."  I imagine

1  in your survey, once you have enough respondents from a

2  particular ZIP code, you move on; is that right?

3  A.  Once we had enough respondents from a particular region of

4  the country, we would use ZIP codes; we would assign people

5  from different parts of the country and that's what the quota

6  was based in, but you're generally correct.

7          MR. OPPENHEIM:  Ashley, just a little bit, I want to

8  make sure I'm not cutting off D, this will be the last one.

9  Q.  Question D asks which of the following types of items you

10  are likely to purchase in the next 12 months.  And here we're

11  looking for people who select the first voice visible on this

12  page, which is non-fungible token or NFT; correct?

13  A.  That's correct.

14  Q.  Now, I will scroll through this if you want, and I can

15  furnish you with a paper copy.  I'm not sure if you know this

16  answer.  Are there questions in here to address whether or not

17  these survey respondents are telling you the truth on answer?

18          MS. WILCOX:  Objection.

19  A.  Yes.

20          (Continued on next page)

21

22

23

24

25

1        THE COURT:  Wait.  There was an objection, but I'm

2   going to overrule the objection, and the answer is yes.

3   BY MR. OPPENHEIM:

4   Q.  To clarify, what we really have here, please correct me if

5   I'm wrong, are people who said they were considering buying NFT

6   for $2,500 or for art or for fashion this year, is that right?

7   A.  I'm not sure which questions you're asking me about.  If

8   you're only asking me about question D or the prior three

9   questions we just saw.

10  Q.  I understand.

11       In this case -- I'm only asking about question D, I

12  apologize, that was not -- in their answers to question D, am I

13  correct that what you are actually getting is what they said

14  they would do, not necessarily what they would do, right?

15       You have to rely on them telling the truth, is that

16  right?

17  A.  That's correct.  In the case of question D, we're getting

18  their answer to the question.

19  Q.  And did you ask people, for example, if they had the

20  ability to buy $2,500 NFT of art or of a fashion accessory?

21  A.  No.

22  Q.  Did you ask people if they had previously purchased an NFT

23  for more than $2,500?

24  A.  No.

25  Q.  Did you ask people if they, for example, had a digital

1    wallet to confirm that they could buy a $2,500 NFT?

2    A.  No.  I asked them whether they would be willing to purchase

3    something using cryptocurrency or a credit card, as I talked

4    about in my testimony, but I did not confirm that they had a

5    digital wallet.

6    Q.  Did you check the blockchain to see if they had ever minted

7    an NFT?

8    A.  No.

9    Q.  And did you follow up with these survey respondents, that

10   is did you check to see if any of them actually did buy a

11   $2,500 NFT within however many months had gone by?

12   A.  No.

13   Q.  There was no followup whatsoever?

14   A.  There was some followup, but not on that particular

15   question.

16   Q.  OK.  What was the followup on?

17   A.  The followup was on the first three questions in the

18   survey.

19   Q.  But not on the preliminary qualifications survey?

20   A.  It was only on age, gender, and region, and not on the

21   substantive qualification questions.

22   Q.  Can we look quickly at your demonstrative.

23            MR. OPPENHEIM:  Ashley, if you could pull up slide six

24   of Dr. Isaacson's demonstrative.

25            I believe this is, your Honor --

1          You had it right before.  Sorry.  Trying to figure out

2     if this is it.  I believe this is just a demonstrative.

3          Thank you.

4     Q.  Now, this is your answers to question one from the -- I'm

5     sorry, that was not accurate.

6          These are the answers to question one from your NFT

7     purchaser survey, correct?

8     A.  Correct.

9     Q.  And I think I got this right during your testimony.

10         Did you count people who said Hermès in response to

11    question one as confused?

12    A.  Yes, or Birkin.

13    Q.  I'm sorry?

14    A.  Or Birkin.

15    Q.  Thank you.

16         But if it was only Hermès you counted them as

17    confused, correct?

18    A.  Correct.

19         MR. OPPENHEIM:  Ashley, you can take that down.

20    Q.  Dr. Isaacson, you also testified earlier about a second

21    survey that you performed at the direction of the lawyers from

22    Baker Hostetler, is that correct?

23    A.  That's correct.

24    Q.  So, for that survey, you also looked to the Internet to the

25    same third party that helped you locate respondents for the NFT

1    survey, correct?

2    A.  Correct.

3    Q.  But this time, instead of asking -- instead of looking for

4    people who wanted to spend $2,500 on an NFT art or fashion,

5    this time you attempted to locate people who told you that they

6    were contemplating the purchase of $10,000 handbags in the next

7    12 months, is that correct?

8    A.  Correct.

9    Q.  And, I'm sorry, how much did it cost to conduct the handbag

10   survey, Dr. Isaacson?

11   A.  The number that I gave you earlier was the blended price

12   across the two surveys, the average price across the two

13   surveys.

14   Q.  So each one cost $130,000, or is that a total cost?

15   A.  I'm sorry.  I apologize, I answered a question I didn't

16   understand.

17        The total cost of conducting the surveys, the survey

18   among both groups, was $130,000, including the handbag survey

19   and the NFT survey.

20   Q.  Are you able to identify at all the handbag survey alone?

21   A.  Off the top of my head, I can't break it out across the two

22   groups.  But it was more difficult to locate handbag buyers

23   than it was to locate NFT buyers.

24   Q.  So is it possible that the handbag survey was actually more

25   expensive than the NFT survey?

N23sHER6                    Isaacson - Cross

1    A.  It could have been a bigger contributor to the cost than
2    the NFT survey.
3    Q.  So, at some point, at some point Hermès' attorneys called
4    you and told you they didn't want you to base your opinion on
5    the handbag survey, is that right?
6    A.  The conversation that they had with me was about where the
7    NFTs were being marketed, the MetaBirkins NFTs were being
8    marketed.
9         MR. OPPENHEIM:  Your Honor, I would move to strike as
10   nonresponsive.
11        THE COURT:  No.  I don't think it's nonresponsive, but
12   just so we're clear on what the answer is, at some point did
13   Hermès attorneys indicate to you a preference for one survey or
14   the other?
15        THE WITNESS:  No, sir, not in those terms.
16        THE COURT:  All right.  So what did they say?
17        THE WITNESS:  They told me that they understood that
18   Mr. Rothschild was going to be marketing his NFTs to -- his
19   MetaBirkins NFTs to NFT purchasers and not to handbag
20   purchasers.
21        THE COURT:  OK.
22        MR. OPPENHEIM:  Just one moment.
23   BY MR. OPPENHEIM:
24   Q.  So, again, the net confusion you observed in the handbag
25   survey, at some point the lawyers told you they were not going

N23sHER6                           Isaacson - Redirect

1   to rely on is 3.6 percent, is that right?

2   A.  It's correct, the number was 3.6 percent.

3   Q.  And you did not form a conclusion about whether or not that

4   number would have shown confusion amongst handbag purchasers,

5   is that correct?

6   A.  I was asked about that in my deposition.  I'm not sure what

7   you're -- I'm not sure if you're limiting this to my report.

8   Q.  I'm asking you a question.

9           Have you ever formed an opinion about whether or not

10  that 3.6 percent number from the handbag survey reflected

11  confusion amongst handbag purchasers?

12  A.  I have expressed an opinion in this matter on that

13  3.6 percent.

14  Q.  And what is that opinion, sir?

15  A.  That number is below the number that would typically be

16  interpreted as indicating likelihood of confusion, 3.6 percent.

17          MR. OPPENHEIM:  Thank you.  I have no further

18  questions at this time, your Honor.

19          THE COURT:  Redirect.

20  REDIRECT EXAMINATION

21  BY MS. WILCOX:

22  Q.  Dr. Isaacson, I would just like to explore with you that

23  handbag survey and the numbers that came out as a result of the

24  test.

25          What did you see for the number of people who were

1    demonstrating confusion when they answered questions one, four,

2    and seven?

3    A.   The confusion compared to the NFT survey, the confusion for

4    the handbag survey was a little bit lower, about three

5    percentage points lower for test respondents, but much higher

6    for control respondents.  12 percentage points higher for

7    control respondents.  So that is why the difference for the

8    survey is 15 percent, because that's how the math works.  Most

9    of that is coming from a higher control rather than from the

10   lower test.

11   Q.   And you determined based on your experience in looking at

12   markets over the last 17 years which market was relevant for

13   issuing your opinion on likelihood of confusion in this case?

14   A.   That's correct.

15   Q.   And which market is where you would find people who are

16   buying at *MetaBirkins.com*?

17   A.   NFT purchasers.

18           MS. WILCOX:  I don't have any further questions.

19           THE COURT:  Any recross?

20           MR. OPPENHEIM:  No, your Honor.

21           THE COURT:  Thank you so much.  You may step down.

22           THE WITNESS:  Thank you, your Honor.

23           (Witness excused).

24           THE COURT:  Please call your next witness.

25           MR. WARSHAVSKY:  We call Luisa Vittadini, who is

N23sHER6                        Vittadini - Direct

```
 1   outside.
 2              THE DEPUTY CLERK:  Please remain standing.  Raise your
 3   right hand.
 4    LUISA MARIA VITTADINI,
 5        called as a witness by the Plaintiff,
 6        having been duly sworn, testified as follows:
 7              State your name and spell it slowly for the record.
 8              THE WITNESS:  Luisa Maria Vittadini.
 9              THE DEPUTY CLERK:  Please spell your last name.
10              THE WITNESS:  V-i-t-t-a-d-i-n-i.
11              THE COURT:  The record will reflect that although the
12   witness speaks and understands English, the interpreter is here
13   in case she needs any clarification.
14              MR. WARSHAVSKY:  Thank you, your Honor.
15              Your Honor, again, in order to hasten the exhibits,
16   there are two exhibits counsel don't agree to, but the others I
17   would like to list to offer.
18              THE COURT:  Go ahead.
19              MR. WARSHAVSKY:  Exhibits 45, 253, 254, 315 and 380.
20              THE COURT:  Received.
21              (Plaintiff's Exhibits 45, 253, 254, 315 and 380
22   received in evidence)
23              MR. WARSHAVSKY:  Thank you, your Honor.
24   DIRECT EXAMINATION
25   BY MR. WARSHAVSKY:
```

1  Q.  Ms. Vittadini, good afternoon.

2          By whom are you employed?

3  A.  By Hermès.

4  Q.  When did you first start working at Hermès?

5  A.  In April 2019.

6  Q.  What was your title when you joined Hermès?

7  A.  Corporate communication manager.

8  Q.  Can you please describe your responsibilities as the

9  corporate communications manager?

10  A.  I was in charge of the global carpet communications

11  strategy of the company, meaning working on the message

12  regarding business carpet, social responsibility, values of the

13  company.  And in my scope, I also handled the relationship with

14  the business press.

15  Q.  And when you say corporate communications, which channels

16  do you mean by that?

17  A.  The channel for the messages or for the press and

18  institutional communication moments.

19  Q.  Thank you.

20          Are you still the corporate communications manager

21  today?

22  A.  I've been promoted to associate director of carpet

23  communication.

24  Q.  When were you promoted?

25  A.  In January 2023.

1  Q.  When you were promoted to associate director, did any of

2  your responsibilities change?

3  A.  Yes, the scope was expanded.

4  Q.  And what additional responsibilities do you have?

5  A.  Um, additional responsibility, now I handle also the carpet

6  communication events part and I have a team to assist me on all

7  the admission.

8  Q.  How big is your team?

9  A.  I'm sorry?

10 Q.  How big is your team?

11 A.  Two people.

12 Q.  We'll come right back to it, I just want to do some

13 background.

14         Where are you from?

15 A.  I'm from Lodi, which is a town in Italy.

16 Q.  And can you tell us about your education background and the

17 degrees you've obtained?

18 A.  I study and got a bachelor degree of the Catholic

19 University of Milan in economics, and then master degree in

20 business school in Milan in Academy Center of International

21 Relations, and then I went to Paris for a dual master degree in

22 international relations at Paris Dauphine, international

23 relation, university.

24 Q.  When did you graduate with a master's degree from the

25 school in Paris?

1   A.   2015.

2   Q.   What did you do upon graduating?

3   A.   I went to work at Image 7.

4   Q.   What is Image 7?

5   A.   It's a PR and communication firm in Paris.

6   Q.   How long did you work there?

7   A.   Seven months.

8   Q.   What was your position?

9   A.   I was junior -- junior consultant in PR and communication.

10  Q.   Where did you work next?

11  A.   Next at Vae Solis Communication.

12  Q.   And what was your position there?

13  A.   Again, I was junior consultant in PR and communication

14  strategy.

15  Q.   How long did you work there?

16  A.   Seven months.

17  Q.   Where did you work next?

18  A.   At Edelman, and Edelman, the French branch of Edelman.

19  Q.   And that's Edelman, the very large communications company?

20  A.   Yes, it's global communication firm.

21  Q.   How long did you work at Edelman?

22  A.   A bit more than two years.

23  Q.   OK.  What was your position there?

24  A.   I was consultant in communication strategy and press

25  relations.

1    Q.   Which industries did you cover?

2    A.   Several.  I had some clients from the luxury sector, food

3    and beverages, startups, too.

4    Q.   And where did you work next?

5    A.   At Hermès.

6    Q.   Does Hermès monitor the press?

7    A.   Yes.

8    Q.   What is your understanding of how Hermès monitors the

9    press?

10   A.   Partly internally, and we also have third-party suppliers.

11   Q.   And you're in charge of that?

12   A.   I work with them.

13   Q.   You work with them.  All right.

14        Have you heard about the MetaBirkins NFTs?

15   A.   Yes.

16   Q.   When did you first learn about the MetaBirkins NFTs?

17   A.   The 30 of November, 2021.

18   Q.   How did you learn about the MetaBirkins NFTs?

19   A.   Because I received an e-mail from Peter Malachi, which is

20   our director of communication of Hermès U.S.  He sent me an

21   e-mail regarding the upcoming release of MetaBirkins and

22   another communication from Mason Rothschild on the topic.

23   Q.   And what did you do in response to that e-mail?

24   A.   I share it with the communication team and legal team, and

25   I asked to the communication team to follow the media regarding

1  MetaBirkins.

2  Q.  And who did the monitoring for the MetaBirkins NFT and

3  Mr. Rothschild?

4  A.  We did internally and at some point with the third-party

5  supplier.

6  Q.  As the corporate communications manager, did you receive

7  monitoring notifications?

8  A.  Yes.

9  Q.  How frequently did you receive those notifications?

10  A.  Daily, sometimes weekly, depending from the volume of

11  those.

12  Q.  Is the monitoring that Hermès does of either Mr. Rothschild

13  or the MetaBirkins, was that exhaustive?

14  A.  No.  Actually, our monitoring for the press covers France

15  media and a few key English-speaking media, like five.  And

16  then the web part, it's not exhaustive with keywords.

17  Q.  With keywords you said?

18  A.  Yeah.

19  Q.  In your role at Hermès, do you communicate with the

20  press --

21  A.  Yes.

22  Q.  -- and media?

23        I'm sorry.  The press and media, I should say?

24  A.  Yes.

25  Q.  Have you received questions from the media and press about

1   the MetaBirkins NFTs?

2   A.   Yes.

3   Q.   And how does the press typically contact you?

4   A.   Typically by e-mail.

5   Q.   Did any press reach out to you about the MetaBirkins NFTs

6   after you heard about it from Mr. Malachi in November 2021?

7   A.   Yes.

8   Q.   Which press or media reached out to you?

9   A.   The first media that reach out was Financial Times and two

10  or three days later was Business of Fashion.

11  Q.   I would like to show the witness, the court and defense

12  counsel for identification Plaintiff's Exhibit 48.

13          Have you seen this document before?

14  A.   Yes.

15  Q.   If we can show the witness both pages of the document,

16  please.

17          Did you receive this e-mail at the time?

18  A.   Yes.

19          MR. WARSHAVSKY:  OK.  Plaintiffs would offer this into

20  evidence, your Honor.

21          MR. HARRIS:  Your Honor, objection, hearsay.

22          MR. WARSHAVSKY:  Your Honor, can I respond to that?

23          THE COURT:  Well, I'm still looking at the exhibit.

24          MR. WARSHAVSKY:  All right.

25          THE COURT:  All right.  What's your response?

1             MR. WARSHAVSKY:  This isn't being offered for truth,

2    your Honor, it's just to tee up the fact that the request was

3    made.

4             THE COURT:  No, I think this is not like other

5    situations we've had.  I think this is filled with statements

6    that would be taken for their truth even if the jury was

7    instructed otherwise.  I don't see much other relevance to it.

8             Sustained.

9    BY MR. WARSHAVSKY:

10   Q.  OK.  Do you remember who from the Financial Times e-mailed

11   Hermès?

12   A.  Yes.  Cristina Criddle, the reporter from the Financial

13   Times.

14   Q.  And who did Cristina Criddle send an e-mail to?

15   A.  She send it to Karen, the deputy director of communication

16   at Hermès.

17   Q.  Does Hermès ordinarily respond to these types of inquiries?

18   A.  No.  We don't usually answer to this kind of e-mail because

19   the communication department is pretty discrete, and we don't

20   usually comment what is in the press that is not directly

21   linked to Hermès activity.

22   Q.  Did Hermès respond to this inquiry from the Financial

23   Times?

24   A.  Yes.

25   Q.  Do you remember what the response was?

1   A.  Yes.  So we answered to the journalist that, no, Hermès

2   hadn't authorized any -- the creation or commercialization of

3   MetaBirkins, that there was no connection between Hermès and

4   the MetaBirkins and Mr. Rothschild, and that this was an

5   example of fake Hermès product.

6   Q.  Why did Hermès decide to respond to Ms. Criddle?

7   A.  Because we believed it was important to not leave room for

8   the misunderstanding we were observing and to clear up any

9   beliefs of a possible relationship or partnership between

10  Hermès and MetaBirkins and to avoid any confusion or

11  misunderstanding for the readers and the consumers linked to

12  possible belief in a partnership.

13  Q.  And did the fact that the communication or the request was

14  coming from the Financial Times factor into the decision to

15  respond?

16  A.  Yes.

17  Q.  How so?

18  A.  Because Financial Times has a broad scope and address broad

19  important number of readers as a broad audience, so we believed

20  it was a way to address a really wide net of people.

21  Q.  And do you know whether an article was eventually published

22  in the Financial Times?

23  A.  Yes.

24  Q.  All right.  And do you remember when that happened?

25  A.  December 10, 2021.

1   Q.  Did the Financial Times include the statement from

2   Hermès --

3   A.  Yes.

4   Q.  -- to your recollection?

5          Did Hermès receive other inquiries?

6          I think you said Hermès received another inquiry

7   around the same time?

8   A.  Yes, two days later, Business of Fashion.

9          MR. WARSHAVSKY:  OK.  Given the court's prior ruling,

10  I'm not going to ...

11  Q.  How did you receive --

12         THE COURT:  That seems very shrewd on your part.

13         MR. WARSHAVSKY:  I try to evolve.

14  Q.  Do you remember how you were contacted by Business of

15  Fashion?

16  A.  By e-mail.

17  Q.  Do you remember the name of the individual who e-mailed

18  you?

19  A.  Marc Bain.

20  Q.  And do you remember what, if anything, Mr. Bain was asking

21  Hermès to comment on?

22  A.  Yes.  Mr. Bain wanted to know if there was a connection

23  between us and the -- and Mr. Rothschild on the project.

24  Q.  Did Hermès respond to Mr. Bain?

25  A.  No.

1   Q.  What are the -- you spoke a little bit earlier about

2   important fashion magazines.

3           What are the most important fashion magazines from

4   Hermès' perspective?

5   A.  So fashion, I would say Vogue, Elle, Harper's Bazaar, and

6   L'Officiel.  And then business fashion, I would say Women's

7   Wear Daily and Business of Fashion.  And then the luxury and

8   fashion sections of Financial Times and *New York Times* for

9   sure.

10  Q.  After the Financial Times article was published, did other

11  press sources, to your knowledge, did other press continue to

12  publish articles about an association or possible association

13  between the MetaBirkins and Hermès?

14  A.  Yes.

15  Q.  Can you give some examples of the publications you're aware

16  of?

17  A.  Elle, L'Officiel, New York Post, and Challenges.

18  Q.  I would like to turn to Plaintiff's Exhibit 380 which has

19  been accepted and publish that for the jury.

20          Is this the Elle article you were referring to?

21  A.  Yes.

22  Q.  And when did you first see it?

23  A.  December 2021.

24  Q.  Do you know the full title of the article?

25  A.  Birkin NFT:  Everything you need to know about the handbag

N23sHER6                    Vittadini - Direct

1  of the future.  Birkins for the digital age?

2  Q.  Do you know whether this was always the title of the Elle

3  article?

4  A.  No, it wasn't.

5  Q.  OK.  The title, do you know -- was the title corrected from

6  something else?

7  A.  Yes.

8  Q.  And how do you know that the title was corrected?

9  A.  Because part of the monitoring was on Google, and when we

10  Googled Hermès NFT, we found another title for the Elle

11  article.

12         MR. WARSHAVSKY:  OK.  And if we can turn to

13  Plaintiff's Exhibit 45.  Again, this was previously admitted,

14  so it can be published.

15  Q.  Can you tell us what this document is?

16  A.  It's a Google research of the two keywords Hermès and NFT.

17  Q.  Is this a search that you did?

18  A.  Yes.

19  Q.  And when did you do it?

20  A.  Last week on the 26 of January.

21  Q.  And where were you doing the search from?

22  A.  New York.

23  Q.  And what about this search caught your eye?

24  A.  So the second title is the Elle article, and the title is

25  Hermès Goes Virtual with Launch of Birkin Bags as NFTs.

1   Q.  OK.  So just to be clear -- if you can scroll up little

2   bit, Humberto -- your search here was just for Hermès NFT on

3   Google?

4   A.  Yes.

5   Q.  If we could -- I'm sorry.

6           Obviously, does this title match the Elle article we

7   saw a moment ago?

8   A.  No.

9   Q.  OK.  If we can turn to plaintiff's Exhibit 315.

10          Have you seen this document before?

11  A.  Yes.

12  Q.  And what is it?

13  A.  It's the article from Elle.

14  Q.  OK.  And this one is taken from the page wall, is that

15  right?

16  A.  Yes.

17  Q.  OK.  And if we go to the bottom, can you see the title

18  there?

19  A.  So, yeah.  Hermès goes virtual --

20  Q.  Hang on.  If you can scroll down for the --

21  A.  Hermès Goes Virtual with Launch of Birkin Bag as NFTs.

22  Q.  Thank you.

23          As part of your job with Hermès, do you have any idea

24  about the circulation of Elle?

25  A.  At Elle, it's about, yes, several million readers.  And in

1   the U.S., it's 50 million unique monthly readers.  And in the

2   U.S., Instagram, Facebook, I would say 12 million followers.

3   Q.  And the first number, I'm sorry, did you say 50, five zero,

4   or one five?

5   A.  50 million monthly unique visitors for *Elle.com* and

6   12 million followers for Elle USA Instagram and Facebook.

7   Q.  If we can turn to Plaintiff's Exhibit 253, which has

8   already been admitted.

9           Can you tell me what this document is?

10  A.  It's an article from the New York Post.

11  Q.  OK.  If we can turn to -- do you know the date of the

12  article?

13  A.  January 8, 2022.

14  Q.  If we could turn to page eight of the article, please.  If

15  you can read the caption below the images.

16  A.  The VR-only MetaBirkin bag, a Digital Version of the Hermès

17  fave, can sell for tens of thousands of dollars.

18  Q.  And do you know what the two images shown are, if we could

19  see that?

20  A.  Yes, two MetaBirkins.

21  Q.  And just to be clear, I think the jury knows, but does

22  Hermès make a VR bag?

23  A.  No.

24  Q.  OK.  If we could turn to the next page, page nine.

25           And do you see this statement?

1    A.   Even Hermès, the company responsible for the ridiculously

2    expensive Birkin bag, has entered the metaverse.  On December

3    17, the company unveiled the MetaBirkin -- a VR version of its

4    signature bag, created by LA artist, Mason Rothschild, and made

5    just for 100 of them.

6    Q.   And, once again, as part of your -- does the Hermès team

7    know how much -- what the -- I'm trying to use the words you

8    used before -- the commercial impressions are for the New York

9    Post?

10   A.   Yes.  Its unique monthly visitors is 71 million.

11   Q.   71 million unique visitors a month?

12   A.   Yeah, and --

13               THE COURT:  All of whom, I assume, are fashionistas.

14               MR. WARSHAVSKY:  Sports fans, too.

15   Q.   OK.  I want to turn to Plaintiff's 254, which has also been

16   admitted.

17               Have you seen this document before?

18   A.   Yes.

19   Q.   OK.  Can you tell us what this is?

20   A.   It's an article from Challenges.

21   Q.   OK.  And is Challenges one of the names you said before?

22   A.   Yes.

23   Q.   And do you see the date, do you know the date of the

24   article?

25   A.   It's 23 of May, 2022.

N23sHER6                    Vittadini - Direct

1   Q.  OK.  And so this was clearly after Hermès' statement to the

2   Financial Times, is that correct?

3   A.  Yes.

4   Q.  And the New York Post article we saw, that came out after

5   the Hermès' statement to the *New York Times*, is that correct?

6   A.  Yes.

7   Q.  And the Elle article we saw, did that come out after

8   Hermès' statement to the Financial Times?

9   A.  Yes.

10  Q.  If we can you go down to the first paragraph, and can you,

11  here -- can you read the part in bold?

12  A.  So, yeah.

13  Q.  Starting with even Hermès.

14  A.  Even Hermès, which unveils virtual bags under the name

15  MetaBirkin, then there is an erratum.

16  Q.  Do you know how Challenges got that erratum?

17  A.  Yes.

18  Q.  How did Challenges become aware of that?

19  A.  We asked for a correction.

20  Q.  OK.  Are you aware of other examples of confusion or other

21  statements affiliating Hermès with MetaBirkins?

22  A.  As I say, the monitoring is France mostly.  So considering

23  those article, I -- I think, yeah, there are other articles in

24  the press, especially globally.

25  Q.  All right.  Is it possible for Hermès to monitor every

N23sHER6                          Vittadini - Cross

1    instance of press on any given topic?

2    A.  No.  No.

3    Q.  I have another question.

4            Have you ever heard of an individual named Clement

5    Quan?

6    A.  No.

7    Q.  And last night I asked you to ask others at Hermès if they

8    had ever heard of an individual named Clement Quan.

9            MR. HARRIS:  Objection, your Honor.

10           THE COURT:  Sustained.

11           MR. WARSHAVSKY:  Thank you.  I have no further

12   questions at this time.

13           THE COURT:  Cross-examination.

14   CROSS-EXAMINATION

15   BY MR. HARRIS:

16   Q.  Good afternoon, Ms. Vittadini.  I keep introducing myself,

17   but I know you've been sitting outside.  My name is John

18   Harris, and I'm an attorney for Mason Rothschild.

19   A.  Good afternoon.

20   Q.  Ms. Vittadini, I'm going to take these exhibits in the

21   order in the book, not the order you were asked.  OK.

22           So do you have an exhibit binder?

23   A.  Yes.

24   Q.  All right.  If you could turn to exhibit, Plaintiff's

25   Exhibit 45 in evidence that you were just shown by your

1   counsel, and that's a Google search that you did for Hermès

2   NFT, right?

3            And you did this, you can't see it on the screen, but

4   you can see it actually on the printed copy that you did

5   this -- there it is -- you did this just last week?

6   A.   Yes.

7   Q.   OK.  Actually, the third entry is, Hermès is Suing a

8   Digital Artist for Selling Unauthorized Bags, right?

9   A.   Yes.

10  Q.   So that comes right up.

11           And then if we look at this one, you were talking

12  about Elle magazine, right?

13           And it says Hermès Goes Virtual with Launch of Birkin

14  Bags as NFTs, right?

15  A.   Yes.

16  Q.   That's not actually -- if someone clicks on that article,

17  that's not actually the title that they click through to,

18  right?

19  A.   If you open the article, it's the article we --

20  Q.   It's the article we saw?

21  A.   We saw before, yes.

22  Q.   And we'll get to is that in a minute.

23           And then right below it, what it actually says, is

24  digital artist Mason Rothschild has designed 100-piece capsule,

25  right?

1              Does it mention Mr. Rothschild's name?

2   A.   Of virtual Hermès Birkin bags.

3   Q.   Yes.

4   A.   The Elle one.

5   Q.   It continues on.

6   A.   Yes.

7   Q.   And where that actually comes from, Ms. Vittadini, is if

8   you look at your exhibit -- I'm sorry.

9              If you look at Plaintiff's Exhibit 315 in evidence,

10  what that actually comes from is -- if you could put up the

11  first page of that exhibit, Ashley, and scroll down, please --

12  is that there is a little document title that wasn't corrected

13  by Elle, right?

14  A.   Exactly.

15  Q.   And you could ask Hermès could ask Elle to correct that,

16  correct?

17  A.   I believe the article was corrected already, but the

18  metatitle, it's the title of the original document.  And the

19  one that it's on Google, I think the metatitle, it's not

20  correctable.

21  Q.   This is something that Elle could easily correct, right?

22  A.   Elle already corrected the article.

23  Q.   They did, they corrected the article and they just didn't

24  correct this little digital tag, right?

25  A.   It's the -- it's the title, the metatitle.

1    Q.  And I'm sorry I keep asking you the same question.  I know

2    maybe you're not an expert in this.

3            But do you know or not know if it would be difficult

4    for Elle to correct this little digital tag?

5    A.  Yes.

6    Q.  And they could correct it, right?

7    A.  I think -- I think it's not correctable, but I'm not an

8    expert.

9    Q.  You're not.

10           So, actually, if someone actually clicks through, if

11   someone is actually interested, OK, maybe someone interested in

12   buying a MetaBirkin, if they were to click through -- if you

13   could scroll down, Ashley, scroll up, sorry; keep scrolling up,

14   please -- what they actually see is the full article, right?

15           This is what they click through to, right?

16           And this article has been corrected, right?

17   A.  Yes.

18   Q.  OK.

19           MR. HARRIS:  Your Honor, may I have one moment, your

20   Honor.

21           THE COURT:  Yes.

22   Q.  Ms. Vittadini, you were asked questions about a New York

23   Post article, right, and that's Plaintiff's Exhibit 235.

24           MR. HARRIS:  Could we put that up on the screen,

25   please.

1            MR. WARSHAVSKY:  I think it's 253.

2            MR. HARRIS:  Do I have the wrong number?

3            THE COURT:  253.

4            MR. HARRIS:  253, please.

5   Q.  That's the New York Post article.  If we look in the upper

6   left-hand corner, that's from 1/26/22?

7   A.  Yes.

8   Q.  And then do you have the current one?

9            Just give me a second.

10           You gave circulation figures for the New York Post,

11  right?

12  A.  Yes.

13  Q.  A lot of people read The Post.

14           Do you know how many people actually clicked on this

15  article?

16  A.  I -- I don't know.  I think it's -- the information is not

17  available.  We can have the information about the circulation.

18  Q.  Do you know, do you have any idea about whether people go

19  to the post, they click on articles about the Yankees and the

20  Giants and Jets or click on fashion articles?

21  A.  So the information available is for the New York Post.

22  It's the monthly unique visitors, and for the monthly unique

23  visitor, you have for each person the average -- an average

24  they open five pages.  So it's 414 million page views per

25  month.

N23sHER6                    Vittadini - Cross

1   Q.  I understand that, but actually my question was --

2            THE COURT:  I think your question was, do they click

3   on articles about losing teams.

4            Go ahead, counsel.

5   Q.  Right.  You don't know how many people read the New York

6   Post for this article, right?

7   A.  The New York Post, yes.  This article in particular, I

8   don't have the right exact number.

9   Q.  Now, if you look at the article you have up there, at page

10  nine, please.  This is the paragraph at the top of the screen

11  is the paragraph that Mr. Warshavsky drew your attention to, is

12  that right?

13  A.  I'm sorry?

14            I have --

15            THE COURT:  This is the question, this is the item

16  that you were asked about before, right?

17            THE WITNESS:  Yes.

18            THE COURT:  Yes.

19  BY MR. HARRIS:

20  Q.  In fact, this item you were asked before about quotes from

21  Elle magazine, right?

22  A.  Yes.

23  Q.  Now, do you know if the New York Post, like Elle magazine,

24  has since been corrected?

25  A.  Yes.

1    Q.  And it has been, hasn't it?

2    A.  Yes, by Hermès.

3    Q.  Do you know if Mr. Rothschild -- do you know if

4    Mr. Rothschild also reached out to or his representatives

5    reached out to publications to correct?

6              THE COURT:  She could only know that through hearsay.

7              Sustained.

8              MR. HARRIS:  Your Honor, may I have one moment?

9              THE COURT:  Yes.

10             MR. HARRIS:  Your Honor, I have no further questions.

11             THE COURT:  All right.  Any redirect?

12             MR. WARSHAVSKY:  No redirect, your Honor.

13             THE COURT:  Thank you so much.  Please step down.

14             (Witness excused)

15             Please call your last witness.

16             MR. WARSHAVSKY:  Your Honor, the plaintiff actually

17   rests.

18             THE COURT:  I know.  I think defense counsel has a

19   final witness.

20             MR. HARRIS:  We just have to go get her.

21             THE COURT:  Go ahead.  That's fine.

22             MR. WARSHAVSKY:  Your Honor, as a practical matter,

23   Ms. Wilcox will be doing the cross.

24             THE COURT:  OK.  I don't think we'll probably get to

25   cross until Monday.

N23sHER6                    Neal - Direct

1          MR. MILLSAPS:  The defense calls Dr. David Neal.

2     DAVID THOMAS NEAL,

3          called as a witness by the Defendant,

4          having been duly sworn, testified as follows:

5          THE DEPUTY CLERK:  Please state your name and spell it

6     slowly for the record.

7          THE WITNESS:  Dr. David Thomas Neal, N-e-a-l.

8          THE COURT:  Counsel.

9     DIRECT EXAMINATION

10    BY MR. MILLSAPS:

11    Q.  Good afternoon, Dr. Neal.

12    A.  Good afternoon.

13    Q.  Thank you for being here with us.

14         Dr. Neal, could you just introduce yourself briefly

15    for the jury?

16    A.  Certainly.  My name is Dr. David Neal.  I am the founder

17    and managing partner of Catalyst Behavioral Sciences.  I'm also

18    an executive and resident at Duke University.

19    Q.  Dr. Neal, could you just briefly describe your education?

20    A.  Certainly.  I have a Ph.D. from Melbourne University in

21    Australia.  That's the accent.  I came about 20 years ago to

22    the U.S. to do some more study at Duke.  I did a post-doc at

23    Duke in psychology and neuroscience, and I ran a research lab

24    at Duke.  Then I was an assistant professor at the University

25    of Southern California.  And now I am an executive in residence

1   back at Duke University, in addition to running my research

2   firm.

3              MR. MILLSAPS:  Ashley, would you please call up

4   Defendant's Exhibit 588 to page 35, just for the witness and

5   counsel and the court.

6   Q.  Dr. Neal, while she's calling that up I'll just ask you,

7   what are your duties as managing partner --

8              Well, before we get into that, have you published

9   anything?

10  A.  Yes.  I have 26 peer-reviewed publications.  Probably two

11  of those are especially relevant to what we're doing here

12  today.  One of them I won the award for the best paper in the

13  Journal for Consumer Psychology in 2012, and then just last

14  year I wrote a chapter in, I think what most people think is

15  the leading treatise on surveys in trademark litigation, and I

16  wrote a chapter in that book on essentially how to avoid bias

17  in trademark litigation surveys.

18  Q.  What is the name of that book, Dr. Neal?

19  A.  It is Surveys and False Advertising in Trademarks.

20  Q.  And are there other authors on that book?

21  A.  Yes.  It's edited by a very well-known professor, Sherry

22  Diamond.  She wrote the Federal Judicial Center's reference

23  guide on surveys, and a very prominent attorney, Jerry Swan.

24  Q.  If you would please take a look at your screen.

25              And do you recognize this document?

 1   A.  I do.

 2   Q.  Did you create this document?

 3   A.  I did.

 4           MR. MILLSAPS:  I would offer Defendant's Exhibit 588

 5   and just the c.v. here starting on page 35 into evidence.

 6           MS. WILCOX:  No objection.

 7           THE COURT:  Received.

 8           (Defendant's Exhibit 588 received in evidence)

 9   BY MR. MILLSAPS:

10   Q.  Dr. Neal, could you tell us what your duties are as

11   managing partner at your --

12           Well, first of all, what is your position at Catalyst

13   Behavioral Sciences?

14   A.  I'm the founder and the managing partner.

15   Q.  And when did you found the company?

16   A.  In 2013.

17   Q.  And what kinds of work does Catalyst Behavioral Sciences

18   do?

19   A.  We do survey research, and it falls into three main

20   categories.  One could be trademark litigation or surveys in

21   legal cases generally, like this one.

22           But I also do a lot of surveys, typically for big

23   companies, to help understand their customers.  So I've done

24   work for Intel, Microsoft, Gillette, Tide detergent, Bounty

25   paper towels, lots of brands that we all have at home.

1           And the third kind of survey research I do is in a

2   health context.  So I do work sometimes in the United States,

3   sometimes in a global health and development context.  So I've

4   worked, for example, for the Bill & Melinda Gates Foundation

5   for U.S. aid for the Surgeon General of the Army on soldier

6   mental and physical help, that kind of thing.

7   Q.  And have you served as an expert before in other legal

8   cases?

9   A.  I have, many times.

10  Q.  How many?

11  A.  Well, probably I've done hundreds of surveys, I would say,

12  in the context of trademark, false advertising, patent cases.

13  Q.  And just so we can understand your survey work outside of

14  lawsuits a little bit more, could you briefly tell us about one

15  of those projects that you mentioned in a bit more detail?

16  A.  Sure.  So, perhaps, my biggest project at the moment is for

17  the CDC, and it's a four-year grant where I'm the principal

18  scientist.  And it is a series of surveys to try and understand

19  pre-diabetes.

20          So a lot of us, 90 million Americans have

21  pre-diabetes, which means you don't quite yet a diabetes, but

22  we're doing these surveys to try and work out how to help

23  people change a little bit of their eating, a little bit of

24  their were exercise, to try to prevent them from progressing

25  pre-diabetes to diabetes.

1    That is what that survey-based project is about.

2    Q.  And so you've told us about three broad survey-related

3    areas that you work in.

4         How would you sum up your expertise in a nutshell?

5    A.  Yeah.  So the common denominator is really a designing and

6    then executing scientific surveys to try to understand human

7    behavior and human thinking.

8    Q.  Dr. Neal, what were you asked to do in this case?

9    A.  So, fairly simple.  I was asked to take a very careful,

10   independent look at the two surveys that Dr. Isaacson did and

11   work out whether I believe they are scientifically valid and

12   reliable.  And then I was also asked to look at his conclusion,

13   that I suspect he said this to you, that 18.7 percent of people

14   are confused and think that Hermès puts out Mr. Rothschild's

15   NFT.  I was asked to look at that conclusion and work out if

16   that was accurate based on the data that he collected.

17   Q.  And did you carry out that analysis?

18   A.  I did.

19   Q.  Was your company paid for the work that you did in

20   connection with the evaluation of Dr. Isaacson's survey?

21   A.  Yes.

22   Q.  And how much have you been paid for your work in this case?

23   A.  I believe I charged 21,000 for the initial review of the

24   surveys and writing my report, and then another 8,000 for the

25   depositions and the preparation for the deposition.

1    Q.  How do you bill for your time?

2    A.  Hourly, usually.

3    Q.  What is your hourly rate?

4    A.  $585.

5    Q.  Do you work with any research assistants on your work?

6    A.  I do.  I have a person with a Ph.D. and another person with

7    a master's degree, and they assist me in most projects.

8    Q.  Did they assist you in this project?

9    A.  They did to a small degree.

10   Q.  Was your payment in any way dependent on the outcome of

11   this case or the opinions that you offer?

12   A.  No.  I'm paid exactly the same amount regardless of how

13   this matter gets resolved.

14   Q.  Did you prepare some slides to help us walk through your

15   findings.

16   A.  Just a handful, yes.

17          MR. MILLSAPS:  OK.  Ashley, would you please put up

18   Dr. Neal's demonstratives.

19          THE COURT:  Counsel, I think maybe, even though you

20   still have three minutes, I see the door to the cell block just

21   opened.  I assume they are not coming for any of you, so that's

22   because I have a sentencing in a couple minutes.  Maybe this is

23   a good time to break.

24          Ladies and gentlemen, even though we're not quite

25   finished, we're still on schedule because counsel have

N23sHER6                          Neal – Direct

1   voluntarily agreed to cut a half hour off of each of their

2   closing statements.

3            So we will finish Dr. Neal's testimony first thing

4   Monday morning and then go immediately into closing arguments

5   of counsel.  So we are still right on schedule to have the case

6   presented to you for your deliberations shortly after lunch on

7   Monday.

8            In the meantime, do not discuss the case with anyone,

9   don't look at anything in the media, don't try to Google

10  anything about the case.  You know all my instructions.

11           My most important instruction is to have a really

12  great weekend, and we will see you on Monday at 9:30.

13           You may step down.

14           (Witness temporarily excused)

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  So I have a sentencing that will take no

3     more than a half hour.  We will resume at five o'clock for the

4     charging conference, and also for any motions that anyone wants

5     to make.

6          Plaintiff has already rested, but also if there is

7     anything, since we have Dr. Neal's expert report, if anyone

8     wants to refer to that as part of the motion practice, I'll

9     allow that.

10          Now, the court reporter has asked that we not stay

11     beyond 7:15 because of a ferry that she has to take.  I was

12     only planning to stay until seven, but if she wants to stay

13     until 7:15.

14          All right.  We'll see you at five o'clock.

15          (Recess)

16

17

18

19

20

21

22

23

24

25

N23VHER7

| | |
|---|---|
| 1 | THE COURT:  First we will hear any motions that the |
| 2 | defense wants to make, and these will be deemed for all |
| 3 | purposes to be motions made both at the close of the |
| 4 | plaintiffs' case and at the close of all the evidence, even |
| 5 | though there's still more evidence to come, but we know what it |
| 6 | is. |
| 7 | MR. SPRIGMAN:  Your Honor, my name is Chris Sprigman. |
| 8 | I'm here on behalf of the defendant, Mason Rothschild. |
| 9 | So do we want to get to JMOL first or instructions? |
| 10 | THE COURT:  No, I want your motions first. |
| 11 | MR. SPRIGMAN:  Okay. |
| 12 | Your Honor, we have a motion on the application of |
| 13 | *Rogers*.  And in particular, we think at this point the evidence |
| 14 | has established to an extent that a reasonable jury couldn't |
| 15 | disagree, first, that Mr. Rothschild's use, as you have said in |
| 16 | your summary judgment opinion it must be, is not solely a |
| 17 | commercial use, not solely a use intended to profit from |
| 18 | confusion, but is, in fact, actuated, at least in part — and we |
| 19 | believe in large part — by an artistic intent, which we've |
| 20 | heard testified to by Mr. Rothschild, and we think -- |
| 21 | THE COURT:  This will be an important matter when we |
| 22 | get to the charge, but I don't see how it's a matter for a |
| 23 | motion for a verdict in your favor when there clearly is |
| 24 | competing evidence on that issue. |
| 25 | MR. SPRIGMAN:  Your Honor, we think the evidence |

1    that's come out at this trial will make it impossible for a

2    rational jury to credit the idea that Mr. Rothschild was

3    motivated solely on an intent to profit from Hermès's marks.

4    Mr. Rothschild has a record as a visual artist, both before and

5    after MetaBirkins; Mr. Rothschild testified as to his artistic

6    intent.  That testimony stands uncontradicted.

7         THE COURT:  First of all, the jury -- his credibility

8    was clearly impeached.  And the jury can, therefore, draw an

9    adverse inference as to anything he said.  Forgive me, but I

10   think that's the law of evidence 101.

11        MR. SPRIGMAN:  Well, your Honor, I would just say that

12   the evidence was clear that Mr. Rothschild attempted to correct

13   misimpressions when they did occur.  The evidence was clear

14   that Mr. Rothschild charged a relatively low price for the

15   MetaBirkins and sought to see what the community would do with

16   them.

17        THE COURT:  You know, those are all excellent

18   arguments for the jury.  And as you intuit, I could not award a

19   verdict in your behalf unless no rational juror could possibly

20   find that his sole motivation was to make a lot of money, or if

21   it's not even a lot of money, was commercial.

22        MR. SPRIGMAN:  Your Honor, I'm going to then move a

23   little bit laterally and just say that, with respect, your

24   Honor, we believe that that is not what *Rogers* requires.

25   *Rogers* requires, first, that the use be artistically relevant

N23VHER7

1    to the art.  The use is the title MetaBirkins.  The artistic

2    relevance of MetaBirkins to the art which depicts a Birkin bag

3    and brings it into the metaverse is the simplest kind of

4    artistic relevance.  It's artistic relevance that describes the

5    content of the artwork.

6            *Rogers*, as applied, in case after case, inquires into

7    that simple question first as a threshold:  Is the artistic --

8    is the use of the mark artistically relevant to the artwork for

9    which it is used.  You, yourself --

10           THE COURT:  Why isn't it -- that's certainly a

11   possibility.  Why isn't it equally a possibility that he used

12   that term because he wanted solely to snooker people into

13   buying his NFTs?

14           MR. SPRIGMAN:  Your Honor, the word "because" in the

15   sentence that you just uttered is the problem.  *Rogers* asks as

16   a threshold question, once we have determined that something is

17   art, which your Honor has determined --

18           THE COURT:  Well, I actually -- if you read carefully,

19   as I hope you did the summary judgment paper -- my summary

20   judgment order, I determined that for purposes of summary

21   judgment that there was meaningful evidence that could go to

22   the jury that this was art and, therefore, that the *Rogers* test

23   was the appropriate test.

24           Now, let's assume that the Court were able to

25   determine on the record that there was at least some artistry

N23VHER7

1     involved, such as inputting fur on the images of Birkin bags.

2     I don't know that that under *Rogers* gets you the whole way.  If

3     that's what you think gets you the whole way, then the whole

4     balancing test of *Rogers* is irrelevant.

5           MR. SPRIGMAN:  I don't think that at all, your Honor.

6     I don't think that gets me the whole way, but I think that gets

7     me into *Rogers*.  I'm in *Rogers*.  First question under *Rogers* is

8     not about his intent, but whether the use is artistically

9     relevant to the art.  The fact is --

10          THE COURT:  And I must say -- and I want to hear more

11    of what you say, as I also pointed out in my summary judgment

12    paper, the courts of the United States have been less than

13    helpful in telling me what is meant by "artistically relevant"

14    or "explicitly misleading," the two key phrases.  So I

15    certainly look forward, however I come out, to being

16    second-guessed by the Court of Appeals.

17          But supposing he put together -- this is not this

18    case, but he put together -- he made a bunch of counterfeit

19    Birkin bags, and then attempted to sell them through the web by

20    saying, Please visit my site, metabirkins.com, where you will

21    see a digital image of what I can sell you.

22          MR. SPRIGMAN:  Yes.

23          THE COURT:  Would that be artistically relevant?

24          MR. SPRIGMAN:  No, your Honor.  And that's an easy

25    case.

1          THE COURT:  I agree it's an easy case.  That's why --

2     what more can you expect from me?

3          MR. SPRIGMAN:  That is not particularly illustrative

4     of this case.  Let me explain first why that's an easy case and

5     why this has very little to do with this case.

6          The legal definition of a counterfeit under the Lanham

7     Act is a good that carries a mark, that carries a mark that is

8     identical to or substantially indistinguishable from a

9     registered mark and that is likely to confuse consumers.  It is

10    a good, it is not an image.  An image cannot be a counterfeit.

11         So set that aside.

12         What I'm here to try to supply, and I sympathize with

13    your plight that the courts have not supplied content to these

14    concepts precisely, but I do think you can read that content

15    off of the many, many *Rogers* cases, which I would add, Judge,

16    in distinction to something you said in your opinion, I know of

17    only one *Rogers* case that has gone past the summary judgment

18    motion, and that is *Gordon v. Drake*, where the use was

19    absolutely not artistically relevant; it was literally the use

20    of the slogan "Honey Badger Don't Care," which was trademarked,

21    believe it or not, deep explanation for why, on a greeting

22    card.  That use was not an artistic use, it was simply a

23    straightforward infringing use.

24         This is nothing like that, your Honor.

25         THE COURT:  Supposing we have -- again, it's not this

N23VHER7

```
1    case.  Supposing we had a tape-recording in which
2    Mr. Rothschild says, You know what?  I'm tired of being a
3    failed artist.  I want to be a rich fraudster.  And so I'm
4    going to design these fur-covered Birkin bags, and I'm going to
5    take the well-known mark Birkin and just say -- give them to
6    a -- for sale under the title MetaBirkins.
7           So in my hypo, there's no question that he's not
8    acting as an artist; he's acting as a conman in my hypo.  My
9    apologies to Mr. Rothschild for giving this hypo.  That would
10   be an example, would it not, of not being artistically
11   relevant?
12          MR. SPRIGMAN:  That would, indeed, your Honor.  But --
13          THE COURT:  You've got plenty of evidence on your
14   side, but given the evidence on the other side, wasn't that --
15   why isn't that a possible view of what the jury could find?
16          MR. SPRIGMAN:  Your Honor, two responses.
17          First, that is not this case, right.  And always, even
18   in the First Amendment context, the application of a test like
19   the Rogers test has to take account of outliers like the one
20   that you just articulated.
21          But the test also at the same time has to be
22   accommodating of unclear cases.  Even unclear cases, where
23   there is some element of profit-making that might raise some
24   questions, if that use of the mark is artistically relevant,
25   this test is a precautionary test, like the defamation test is
```

1   under the First Amendment for public figures or matters of

2   public concern.

3         THE COURT:  Never heard of that.

4         MR. SPRIGMAN:  As you well know, your Honor.

5         And so my concern here is that the way you seem to be

6   applying the *Rogers* test, with all respect, is a way of

7   applying it that does not take account of the structure of that

8   test.  You're, in some sense, treating it as a free-form

9   balancing test.  It is not.  It is a structured balancing test,

10   a gated balancing test that is designed to create breathing

11   room for artistic expression.

12         Your Honor, and if I may return to this case, what's

13   happened here is exactly the kind of thing that the test is

14   trying to prevent from happening, which is Hermès, in a sense,

15   whether they win or lose, has already won.  Because they've

16   made clear that a luxury goods company can hang up an artist

17   whose work they object to, for whatever reason, through motion

18   to dismiss, through summary judgment, through zillions of

19   dollars of discovery in lawyers and experts, to get to a

20   courtroom and fight it out in front of a jury.  And that is not

21   the situation the *Rogers* test is designed to promote.

22         The *Rogers* test is designed to promote and has, in

23   fact, promoted directly the opposite of that.  Cases have been

24   got rid of on motion to dismiss; cases have been gotten rid of

25   on summary judgment.  The only case where summary judgment was

1    granted and then reversed recently is *Gordon v. Drake*.  And

2    that case is like the case you're positing.  Judges and juries

3    can tell the difference; but if a case is a jump ball, if it's

4    not that screaming case of pretext like the one that you just

5    described for me, we should not be here.

6         THE COURT:  Let me ask you this.  And first off, I'm

7    glad you added "with all respect."  Whenever I hear counsel say

8    that, I need to find my microscope.

9         Is the test objective or subjective?

10        MR. SPRIGMAN:  The test is objective, your Honor.  It

11   is objective.  It is objective in the first factor, which is

12   artistic relevance.  You look at the use.  You ask, is the use

13   artistically relevant to the artwork?

14        Here, no reasonable jury could find that it's not for

15   the simplest possible reason:  The use describes the content.

16   You know, Ginger and Fred in *Rogers v. Grimaldi* described the

17   content of the film.  Regardless of whether people were

18   confused by that — and they were, by the way, there's evidence

19   in that case that the court saw 38 percent total confusion,

20   that is confusion about source, affiliation, licensing, 38

21   percent total confusion.  The court said, That's not the point.

22   The point is this use is artistically relevant.

23        And it didn't, to get to the second factor --

24        THE COURT:  Let's just stick with the first for a

25   minute.

1          MR. SPRIGMAN:  Yes, sir.

2          THE COURT:  So if the test is objective, not

3    subjective, then on your theory, the hypo I just gave, where we

4    have a tape-recording, where that artist says, I'm not going to

5    be an artist in this time, I'm going to be a fraudster, would

6    be irrelevant.

7          MR. SPRIGMAN:  No, your Honor.

8          THE COURT:  Or certainly not dispositive.

9          MR. SPRIGMAN:  No, your Honor.  I'm not saying it

10   would be irrelevant.  It might be relevant, for example, on the

11   second factor, which is explicit misleadingness.  And our

12   assessment of whether particular uses of the mark --

13         THE COURT:  So how do you define "artistically

14   relevant"?

15         MR. SPRIGMAN:  I define it the way *Rogers* and the

16   *Rogers* line of cases define it.  And that is simple in this

17   case, your Honor, because this, at least on that issue, is not

18   a complex case.  Is the use meaningful to the art.

19         So if the MetaBirkins had been named Banana Boat, I

20   would say, Well, I'm struggling to find the artistic relevance.

21   Banana Boat is actually a sunscreen; that's why I used that

22   example, it's a trademark for sunscreen.

23         So if the MetaBirkins --

24         THE COURT:  I'm here in New York in January.  That's

25   an apt analogy.

1            MR. SPRIGMAN:  Your Honor, I'm engaging in wishcasting

2    for spring.

3            But let me just say that Banana Boat is a trademark.

4    And if Mr. Rothschild had named the MetaBirkins Banana Boat, we

5    would not be struggling with artistic relevance either; we

6    would be saying actually there is none.  Maybe the one with the

7    banana on it, we would say it was relevant to that.  But

8    MetaBirkins was chosen the way most artistic titles are chosen.

9    Andy Warhol's Campbell's soup cans — and I hope I'll be able to

10   say that — were named that because they described what's in the

11   work.  And so too, MetaBirkins was named that because they

12   described, A, what's in the work --

13           THE COURT:  So if I understand your argument, you're

14   saying that any time a person uses a trademark to describe his

15   creation, it is automatically artistic expression.

16           MR. SPRIGMAN:  No, I'm not saying that.

17           THE COURT:  Okay.

18           MR. SPRIGMAN:  If it is artistic expression, *Rogers*

19   applies.  If there's some creative aspect to it, *Rogers*

20   applies.

21           Here, I'm sorry, but clearly there is, because I'm a

22   copyright expert, okay, first and foremost.  If I was a

23   copyright lawyer working at the copyright office and someone

24   sent me the MetaBirkin, I would grant it a copyright

25   registration.  It contains more than a modicum of creative

N23VHER7

1      expression.  It qualifies.

2              THE COURT:  Are you planning to resign your current

3      position and apply to work at the copyright office?

4              MR. SPRIGMAN:  Your Honor, that would be a substantial

5      pay cut.  And except for some people I know, that rarely

6      happens.

7              But, in any event, back to artistic relevance.  We use

8      a trademark in a title.  The title describes the work.  That

9      element of the *Rogers* test, I think, we're done with.

10             The second element is the element we're left to

11     contend with.  The second element is that the use must be

12     explicitly misleading.  The examples given in the *Rogers* case,

13     for example, is a workout book that isn't from Jane Fonda.  And

14     it says it's titled "Jane Fonda's Workout Book."  That is

15     explicitly misleading.

16             Or to come back to this case, if Mason Rothschild

17     titled MetaBirkin, MetaBirkins by Hermès, that would be

18     explicitly misleading.  Any use of the mark that confuses

19     people not by directly misinforming them about the source, but

20     confuses people because it raises an inference that they might

21     draw that leads to a mistaken conclusion, that is not

22     explicitly misleading, that is just misleading.  That is the

23     difference between a regular trademark case and a *Rogers* case.

24     That is the difference the First Amendment makes.  And again,

25     with respect, your Honor, so far the decisions in this case

1    have not tracked.

2            Now, some courts in the Second Circuit will apply the

3    *Polaroid* factors.  We have maintained throughout that that is a

4    subset of cases, cases involving title versus title conflicts.

5    And why?  Because there, there are two parties with First

6    Amendment rights.  Both creative works have titles; both First

7    Amendment rights are at stake.  They are of equal dignity.  And

8    so the test is somewhat less protective.

9            But here in this case, respectfully to Hermès, they

10   have no First Amendment rights.  The Birkin bag is not a speech

11   product.  The MetaBirkin is.  That is the difference.

12           And so in assessing explicit misleadingness, the

13   *Polaroid* factors should be nowhere found.

14           If, however, Judge, you are determined to apply them,

15   then the standard for applying them must be extraordinarily

16   careful, careful to show — as you note in your opinion, but I

17   don't yet see in the jury instructions, and we'll talk about

18   that separately — that the level of likelihood of confusion

19   shown must be so particularly compelling that it commands a

20   conclusion that the statements that were made with the use of

21   the mark have an explicitly misleading effect.

22           The *Polaroid* factors in that sense are just used as a

23   way to inform the fact-finder about the nature of the

24   statements.  And what we're being informed about is not the

25   effect on the user; what we are being informed about is the

N23VHER7

nature of the statements.

So, your Honor, just to kind of try to pull this all together on the second factor, there is no explicitly misleading statement here. Mason Rothschild never used the Birkin mark in a way that explicitly misleads. If some consumers were misled — and there is very poor evidence of that, and we can get to that in a moment. But if some consumers were mislead, it's in the nature of the ordinary drawing a misleading inference which the First Amendment commands we must stay away from. That's what the *Rogers* test is about.

Now, again, I believe for any reasonable jury, given that understanding of the *Rogers* test, the *Rogers* test compels a finding of no liability on each and every claim in this case. If you, on the other hand, decide, Well, I'm going to apply the *Polaroid* factors, I still believe the Polaroid factors applied within the confines of the *Rogers* test properly command a finding of no liability with respect to each and every claim of this case. And the reason for that is, your Honor -- and we're not done yet --

THE COURT: Let me just -- I'm not clear why you say the *Polaroid* factors don't apply. Assuming for the sake of argument that the *Rogers* test is satisfied by the plaintiffs, the plaintiffs still have to show infringement under the *Polaroid* factors, do they not?

1          MR. SPRIGMAN:  They do, your Honor.

2          Again, I do not think they've satisfied the Rogers

3    test.  I do not think they could satisfy the Rogers test.

4    Assuming for the moment counter-factually that that is true,

5    they have to show confusion.

6          Now, we're not done yet on this subject, but I think

7    what you're going to see is that their survey is entitled to no

8    credibility whatsoever.  The question they asked was wrong.

9    They failed to qualify the correct people.  The analysis was

10   done very poorly.

11         I'll give you just one enormous problem.  Their claim

12   in this case of trademark infringement involves the Birkin mark

13   and the trade dress.  It does not involve, your Honor, the

14   Hermès mark, and yet their survey expert included the Hermès

15   mark in their stimulus.  He is counting people as confused to

16   only mention the word Hermès.  That is not a part of their

17   claim, your Honor.  This survey simply does not fit the claim

18   that they have finally landed on after months and months and of

19   unclarity about what their claim was.  This survey is worth

20   precisely zilch.

21         That, we will get to tomorrow.  But I think, your

22   Honor, even if Rogers doesn't apply, they are nowhere on this

23   claim and this claim should be denied as a matter of law.

24   Maybe you'll hear Dr. Neal on that and you'll postpone a

25   decision until then.

1              But to return to what I think the headline is here,

2       the Rogers test, properly construed, properly applied, commands

3       a decision in this case.

4              THE COURT:  All right.  I'm glad to know that I have

5       no choice in this matter.

6              Let me hear nevertheless from plaintiff's counsel.

7              MR. SPRIGMAN:  Your Honor, I wanted to note one thing.

8       We have two other motions that we need to at least mention in

9       order to preserve them.

10             THE COURT:  OK.  What are they?

11             MR. SPRIGMAN:  First, your Honor, in the beginning of

12      this case, we made an argument that the Supreme Court's

13      decision in *Daystar* basically made the trademark claims in this

14      case not viable.

15             Why?  Because in that case, the Supreme Court faced a

16      situation where a World War II documentary, produced on

17      videotapes, the copyright had been allowed to lapse on that

18      documentary.  And the competitor took the documentary and kind

19      of edited it a bit and repackaged it and published that under a

20      different name without crediting the original producer.

21             The original producer brought a Lanham Act claim

22      saying this is passing off the documentary they produced as the

23      documentary produced by the competitor.  Justice Scalia, may he

24      rest in peace, said no.  In fact, the Lanham Act applies to

25      goods, and we do not understand goods to refer to intangibles

1    like a creative product like the documentary.

2            If Justice Scalia said the competitor was complaining

3    about, you know, confusion about the source of the plastic

4    videotapes on which the documentary was shipped, then we have

5    something to talk about.  But they are not.  He said they are

6    complaining about the documentary which is a communicative

7    product that is not within the definition of goods.

8            Justice Scalia said this because to read the Lanham

9    Act in any other way, he said, would create what he called "a

10   mutant species of copyright law," which he was not going to do.

11   So that claim was done.

12           What do we have here in this case?  We have Hermès

13   complaining about not a tangible product.  Mason Rothschild is

14   not making handbags that are called MetaBirkins.  He's making

15   pictures of handbags.  That is a communicative product.  It is

16   not a good as the Lanham Act understands that term.  The

17   trademark claims in this case have been defective from the

18   start.

19           So I understand that you told us previously that you

20   didn't believe that that was right.  We continue to adhere to

21   it, and we would like to preserve it, at least, but would like

22   you to reconsider, better yet.

23           THE COURT:  Why do you think it's not a good?

24           MR. SPRIGMAN:  Why do I think it's not a good?

25           THE COURT:  That the digital images are not a good.

1          MR. SPRIGMAN:  Because the word "good" is not a

2     dictionary definition, it is an understanding within ambit of

3     the Lanham Act, and within the ambit of the Lanham Act, to

4     avoid creating a constitutional conflict between the Lanham

5     Act, which is enacted under the commerce clause, and the

6     copyright act which is enacted under the patent and copyright

7     clause, under Article 1, Section 8, clause 8.  The Supreme

8     Court unanimously says, We understand the word 'good' to not

9     apply to communicative products.  It applies to stuff.

10          This isn't stuff.  MetaBirkins aren't stuff.  The

11     MetaBirkins are a communicative product.  The Lanham Act should

12     not be used to suppress --

13          THE COURT:  Well, I understand the distinction between

14     a good and communicative product, but I'm not so sure why you

15     say this is a communicative product.

16          If your client is an artist making art and you want to

17     buy his art, if you bought a painting, that would clearly be

18     buying a good.  The fact that the painting is digital, why

19     should that matter?

20          MR. SPRIGMAN:  Your Honor, the painting is both an

21     object and a work.

22          All right.  So if there were a dispute about the

23     source of the object, then this would be within the Lanham Act.

24     If it were a dispute about the source of the work, then this

25     would not be within the Lanham Act.

1          Here, all we have, essentially, is a work.  We don't

2     have objects.  Mason Rothschild hasn't transferred an object.

3     In fact, the object exists on a server that is run by something

4     called the InterPlanetary File System.  Not in the control of

5     Mason Rothschild, not in the control of the owner.  Well, it is

6     related to the smart contract, so it is under the control of

7     Mason Rothschild in the sense that he could replace a different

8     image on the InterPlanetary File System, which we discussed.

9          But the point is what's been transferred is

10    essentially something incorporeal.  It's a work.  It's not a

11    particular physical object.

12         THE COURT:  All right.  And you had one other motion?

13         MR. SPRIGMAN:  Yes, I do.

14         Your Honor, the third motion -- hang on to your

15    seat -- is that dilution is unconstitutional.  It is a

16    violation of the First Amendment.

17         Why is it a violation of the First Amendment?

18         Dilution law, which is not -- as you noted in your

19    opinion and in your jury instructions -- not based on

20    confusion, so not based on the harm to consumers that the

21    Lanham Act is generally based in.  Dilution law is based in,

22    essentially, content regulation.  It is an injunction, a law

23    that enjoins actions that might change the way people think

24    about a trademark.

25         So the kind of dilution that we are talking about here

1    goes under the name of blurry.  They are not alleging that

2    Mason Rothschild tarnished their mark, right.  They are

3    alleging that he blurred it.  And the definition of blurring is

4    one of the trickiest things in the law.  But it's more than a

5    mere association.  It's a notion that the distinctiveness of

6    that mark has been impaired because now, when people think

7    about the word Birkin, they allege, they think not only about

8    the ultra expensive handbag for the privileged, they now think

9    about this guy's art.  OK.

10        They may not be confused about the source of these

11   things, but the signifier Birkin now has another

12   neuroconnection.  It had one only to handbags before, now it

13   also has one to an artwork.  That kind of superintendence by

14   the law about the associations that people form with words is a

15   content-based regulation of speech that fails the Central

16   Hudson test.

17        I will say, this argument is built on top of a whole

18   bunch of empirical work investigated whether dilution even

19   exists at all.  It is a very dangerous claim because the

20   supposed government interest in preventing it is scant.

21   Constant regulation is rarely within the government's interest

22   when it comes to something like commercial speech, which is

23   what the Birkin handbag is.  It's only the MetaBirkin that is

24   non-commercial speech, your Honor.  That isn't speech that is

25   something merely proposing to sell you something.  Unlike the

1   Birkin bag, which is commercial speech.

2           The government's interest is relatively scant, and

3   Mr. Rothschild's interest in speaking is enormous.  It is of

4   the highest level under First Amendment doctrine.  This

5   regulation fails Central Hudson.

6           I think if you wrap this all up here, your Honor, my

7   third point goes back to my first.  The Constitution mandates a

8   test, the Second Circuit held -- and long may this test

9   reign -- that makes the First Amendment operative in the Lanham

10  Act realm.  It protects artists like Mason Rothschild from

11  precisely what is happening here.

12          This test, properly applied, will vindicate his First

13  Amendment interest, which means you don't have to get to

14  *Daystar* and you don't have to get to the Central Hudson problem

15  with dilution.  We can do away with this on the, I thought,

16  relatively clear law that the Second Circuit, the Ninth

17  Circuit, the Sixth Circuit, the Third Circuit have given us.

18          Your Honor, if you have any more questions, I'm

19  delighted to answer them.

20          THE COURT:  Well, I think it might be appropriate,

21  under the basic rules of adversarial system, to hear now from

22  your adversary.

23          MR. SPRIGMAN:  Thank you, your Honor.

24          MR. WARSHAVSKY:  Thank you, your Honor.

25          I guess there are three separate motions here, your

1    Honor.  I'll take a stab at Rogers.  I'm not going to have as

2    much as my adversary here.

3              Your Honor, in terms of Rogers, this is now the fourth

4    time the same argument has been repeated.  The last three times

5    I think we've gone through this, I think your summary judgment

6    decision issued yesterday spells it out.  I'm not sure what I

7    can add to what you wrote, frankly.  But what I would say is, I

8    will take one -- well, I guess I point to two pieces of it,

9    your Honor, which is, number one, what Mr. Sprigman and what

10   previously Mr. Rothschild's counsel had argued is an

11   articulation of Rogers which doesn't find support in any case

12   law.

13             They found, I should say, any case law in this

14   circuit.  Occasionally they found another case which was in --

15   I can't remember what it was.  I apologize.  This has all been

16   briefed so many times.  Well, at least three times to you.  I

17   think each time we've gone back to the framework of Rogers,

18   which is about this.  I don't really understand.  I'm not sure

19   I understand counsel's argument or his response to you.

20             I think your Honor put it best when you were citing

21   Louis Vuitton, page 20 of your decision yesterday.  In such a

22   case, the defendant invokes First Amendment as a pretext for

23   his real objective to unfairly proffer from the popularity and

24   goodwill of the plaintiff had worked hard to cultivate.  That

25   is precisely the case Hermès is putting up.

1              We think we put it on persuasively.  You know,

2      hopefully the jury will agree with us.  But certainly

3      everything that is in your Honor's decision of this balancing

4      of the Rogers test, I think, is really clear.  I don't think

5      Rogers itself was a summary -- it wasn't a motion to dismiss.

6      It was summary judgment at the end.

7              And at that point, Rogers was a very different kind of

8      case.  Rogers was a case which used the title Fred and Ginger

9      and had nothing to do with -- I mean, one could question

10     whether it was really even a mark, if it were a straight mark,

11     it would even count as a trademark use under the trademark test

12     itself.  It had nothing to do with Fred Astaire and Ginger

13     Rogers.  It was -- well, it had nothing to do with Fred Astaire

14     or Ginger Rogers.  It certainly wasn't a trademark use.

15             Here, it's kind of interesting the way Mr. Sprigman

16     defined it.  I think his definition of what Mr. Rothschild is

17     doing is a bit self-defeating.  It actually leads right into

18     Mr. Rothschild's Yahoo Finance interview where he says he was

19     trying to create a luxury product for the metaverse, while he

20     keeps saying it's art, it's art, it's art.

21             The reality is that Mr. Rothschild said he was

22     bringing a luxury product to the metaverse.  Ultimately, we're

23     talking about a luxury product.  You know, whether it's a

24     Birkin bag, whether it's a Bentley out on the street, whatever

25     it might be.  A luxury product is a luxury product and it's not

1    just art.

2              It may have artistic elements.  I mean, we have

3    testimony from two witnesses that we showed the Birkin bags.

4    You see there is a lot of artistry in the Birkin bags.

5              THE COURT:  So what do you think, maybe I'm somewhat

6    mischaracterizing the argument, but part of your adversary's

7    argument is that if it's an art, if it's a good in the sense of

8    a painting is a good, then it's fully protected.  If, instead,

9    it's something else, a digital image designed in your view to

10   confuse, then it's not a good.

11             MR. WARSHAVSKY:  Well, I think part of that is whether

12   it's a non-commercial association, right.  I'm not sure.

13             Are you asking now about the artistic relevance?

14             THE COURT:  No.  I'm combining two of his arguments in

15   a way that occurred to me.  For all I know, it could have

16   occurred to Justice Scalia.

17             MR. WARSHAVSKY:  I think he got that one wrong, too.

18             MR. SPRIGMAN:  Now I know.

19             MR. WARSHAVSKY:  In terms of the whole point I think

20   of Rogers is that it's supposed to be a non-commercial

21   association, right.  And so in the Fred and Ginger, it was a

22   non-commercial association with Ginger Rogers.  I guess Fred

23   Astaire, too, but it was a non-commercial association.

24             Here, we have just the opposite, right.  This is,

25   whatever you're going to call it.  It's leaning into the whole

1    idea of a luxury market and trying to develop that luxury

2    market somewhere else.  I guess if you asked me -- which is

3    maybe that's where you were going -- what if somebody had a

4    picture, they did an exquisite painting of a Birkin bag and

5    called it Birkin number one and Birkin number two, something

6    like that.  I think there, we would start looking at the

7    surrounding circumstances, too.

8            I think that is how we look at artistic relevance.

9    That's why I have some difficulty with the whole idea of an

10   objective test.  Here, it wasn't just one.  I think maybe an

11   easier distinction might be the Baby Birkin itself, right.  The

12   Baby Birkin we would never say is an infringement.  Never,

13   right.  Because it is kind of a description of what is going

14   on.  I don't really know what that is.  It's a bit of a one

15   off.

16           Here, it is very different.  And I think that was the

17   whole idea behind what Scott Kominers said and what we elicit

18   from Mr. Rothschild.  He was building a brand, right, and it

19   was much more.  I mean, before it was even released, we have

20   testimony yesterday about using MetaBirkins as a Discord

21   community.  It's a community that has nothing to do with the

22   holders.  It's all about advertising.

23           So if we look at the non-commercial element, it's

24   purely commercial.  He was pulling people in, and I think that,

25   to me, is the big difference.  So if, on the other hand, going

1    back to the purely analogue analogy, if we were to have a

2    gallery called Birkin Gallery, there might be a bigger issue.

3    If the artist starting calling themselves -- I know

4    Mr. Rothschild didn't do this -- but called it Birkin --

5               THE COURT:  I'm still a little unclear -- and I know

6    what your adversary's view of this is because I asked him this

7    as well -- but I don't know whether the test under the two

8    prongs of Rogers, but particularly the first test -- no,

9    actually, both tests -- is subjective or objective or both.

10              If it's subjective, let's take the second prong, for

11   example, explicitly misleading.  If the jury, for example, were

12   to disbelieve the testimony of Mr. Rothschild that this was all

13   intended to be social commentary and they were to infer from

14   what they would then consider a bold-faced lie that that is

15   strong evidence that he intended to mislead, that I think would

16   still not totally satisfy the second element.  You would have

17   to show to some, some extent that it was objectively misleading

18   as well as that was his intent.

19              MR. WARSHAVSKY:  Well --

20              THE COURT:  I find that problem also present even to a

21   greater extent in the first element, the artistic expression.

22   In some sense, that's in the head of the artist, the would-be

23   artist, and that's why I gave the hypo of the tape-recording

24   where he says, I'm tired of being an artist.

25              But you can still imagine a case where what he

1    created, even if he created it for what in his head, was a

2    commercial purpose.  In fact, objectively had elements of

3    artistry to it, such as adding fur to a bag.  And I don't think

4    the law -- I'm sorry -- that defense counsel thinks the law is

5    so clear in this area.  Being I'm just a dumb judge I think

6    it's not well developed at all.

7              But, in any event, what do you say to all that?

8              MR. WARSHAVSKY:  Well, what I say to that, your Honor,

9    is that I think the check on that, the subjective/objective

10   test, is why *Twin Peaks* goes back to the Polaroid factors,

11   right.

12             Because I think even in your analogy, the defendant

13   could try to mislead and fail, for example, right.  And then,

14   of course, there is no claim.  But I think that is why,

15   actually, all these factors work together, and I think that is

16   why *Twin Peaks* looked at it that way.  And I think that is even

17   why Rogers works.  All the factors, you know, none of these

18   factors sit in a vacuum.  I think that is the problem I have

19   with the way that defense counsel has raised this.

20             It seems to be, with them, it's almost like, you know,

21   you get to this stop, go.  You know, if it's expression, we

22   stop.  I don't think that is what Rogers was meant, and I think

23   the proof of that is that it was a summary judgment and it went

24   up and down a bit.

25             THE COURT:  So I think I agree with you.  At least I'm

1    not making any rulings right now, but at least if the idea is

2    to protect free speech in the form of artistry, artistic

3    expression, then the intent of the artist is certainly

4    relevant.  Because if the artist himself didn't think he was

5    creating a work of art and wasn't planning to exercise his

6    First Amendment rights, then is not entitled, perhaps, to the

7    same First Amendment protection as someone who knowingly,

8    willfully, and purposely is trying to say something in the form

9    of art that the First Amendment serves to protect.

10          On the other hand, one can hypothesize, for example,

11   someone acting with a purely commercial motive that,

12   nevertheless, would have objectively an artistic element to it.

13   And so I'm still mulling this all over, but I think to me

14   that's part of the problem here.

15          MR. WARSHAVSKY:  Again, your Honor, I agree, but I

16   think that's why the *Twin Peaks* court goes back to the Polaroid

17   to show that, right.

18          THE COURT:  Yes.  And that's a good point because

19   Polaroid, it should not be forgotten -- though Polaroid, of

20   course, did not involve the First Amendment -- but Polaroid

21   does have both objective and subjective elements.

22          All right.  I interrupted you.  What else did you want

23   to say?

24          MR. WARSHAVSKY:  Well, I think that was it on Rogers,

25   your Honor.  I think --

1        THE COURT:  What about the other motion?

2        MR. WARSHAVSKY:  Well, with the *Daystar*, your Honor, I

3   think *Daystar* was a case where -- it's been a while since I

4   read it, I apologize.  I wasn't expecting to argue it, but I'm

5   happy to.

6        Which is that *Daystar* was a case where the complaining

7   party -- I think it was the plaintiff -- tried to recapture

8   copyright claims by alleging it under trademark, and basically

9   saying that because credits were missing, it was a trademark

10  violation.  I can't remember if it was because there was a

11  license or the film was out of copyright.  I can't remember

12  which one it was.

13        What's that?  It was out of copyright.

14        The copyright had expired and that was -- and the

15  point was that the plaintiff was trying to recapture, and I

16  think that is the difference.  In a way, it was almost a

17  preemption-type case because, as counsel said, copyright --

18  strange to talk about preemption with two sets of federal laws,

19  but it was the -- you couldn't -- the copyright does have

20  specific field preemption, whereas trademark does not.

21        You know, one cannot try to succeed in bringing a

22  copyright claim through any other state law claim.  So, for

23  example, if I thought that you infringed my artwork, but for

24  whatever reason I couldn't get a copyright, Mr. Sprigman might

25  have decided it wasn't worthy and I couldn't bring a

1   misappropriation claim.  That was really what the Supreme Court

2   was saying.  You can't gussy up a copyright claim and call it a

3   trademark or vice versa.  You can't gussy it up to call it

4   that.

5           There, I think the distinction the Supreme Court was

6   making was, look, trademark rights don't go to intellectual

7   contribution.  So if you're the producer of a film and it's out

8   of copyright and I just cut out your name, it's bad, maybe I

9   shouldn't have done it, but your copyright is over.  You can't

10  complain about me taking away your copyright.  And you can't

11  come back and try to say, aha, because I was the one who

12  created it.  By taking my name off of it, you've now committed

13  a Lanham Act violation because of the source.

14          Therefore, what the Supreme Court was saying in

15  *Daystar* was that source of goods means who people think are the

16  source of the film or the source of the video.  It's not who

17  they think the producer is or the director is.  It doesn't go

18  to, in that context, let's call it the credits.

19          So I think it's inapplicable.  Again, I think for the

20  same reason your Honor denied, you know, you've ruled on this

21  issue twice.  I think we adopt our prior pleadings and your

22  Honor's prior rulings, and that's it.

23          In terms of the dilution argument, I'm not sure I

24  really understood it, to be frank.

25          THE COURT:  It sounded to me -- I could be wrong, of

1   course -- like an argument for a higher court.  I think while

2   counsel, I'm sure, was trying to convince me as well, it

3   sounded more like to throw out most of the law of dilution

4   under the First Amendment.  You know, that's something a higher

5   court would be in a much better position to do than a district

6   court.  That doesn't mean I shouldn't consider it.  Of course,

7   I will.

8           MR. WARSHAVSKY:  Well, your Honor, then I think I

9   would go to --

10          I'm looking at what my learned colleague just gave me.

11  It explained the theory of dilution by blurring, and let's

12  start with that, which is I'm reading from *Savin Corp*, which is

13  391 F.3d 439, 2004, which is a Second Circuit case which is

14  talking about and explaining -- it says that if one small user

15  can blur the sharp focus of a famous mark to uniquely signify

16  one source, then another, and another small user can and will

17  do so.  Like being stung by 100 bees, significant injury is

18  caused by the cumulative effect, not just by one.

19          This is consistent with the classic view that the

20  injury caused by dilution is the gradual diminution of

21  whittling away of the value of the famous mark by blurring uses

22  by others.  It's also consistent with the rule in the

23  likelihood of confusion cases, that even a small infringer will

24  not be permitted to nibble away at all the plaintiff's

25  reputation and goodwill.

1          That's a quote there.  It's a block quote from

2   *McCarthy*.  The point being that this is also a public right,

3   and I'm not quite sure how to make the argument on behalf of

4   the government here.  I will say on behalf of Hermès, Hermès

5   has that right and, you know, I always think here, when I think

6   of dilution, I don't think of the sting, the bee stings.  I

7   always think of the straw.  You know, the straw, there is a

8   straw that breaks the camel's back, right.  And every straw on

9   its own is just a small straw, but there is that one that

10  finally breaks the camel's back.  And that's why dilution is so

11  important.

12         The whole point of the Lanham Act, when you get down

13  to it, it is almost consumer protection act as much as it is to

14  protect the brand owner.  And it's that balance, so that I know

15  that when I go into a store and buy a red can of soda with

16  white cursive on it, I know I can trust it's Coca-Cola.  It's

17  not somebody else, somebody else's product who just got to use

18  it and confuse me, right.

19         It's to protect the consumers, but it also protects

20  the brand owner on the goodwill they worked hard to establish.

21  Here, in this case, you know, 40 years for Birkin, 187 for

22  Hermès.

23         THE COURT:  Let me ask you a very different question,

24  not one that your adversary addressed.

25         But assuming for the sake of argument -- and I don't

1   agree with his overall views as to why all the claims should be

2   dropped -- it seemed to me that the unfair competition claim

3   ultimately was subsumed both as to damages, as to everything

4   else, by your other claims and, therefore, was simply

5   duplicative.  And that is why in the charge I gave you, I

6   didn't include a charge of that.

7          But maybe I'm missing something there.

8          MR. WARSHAVSKY:  So as to damages, I think you're

9   right.  As to the actual claim, I might ask if my colleague

10  Ms. Wilcox can address that.

11         THE COURT:  Sure.

12         MS. WILCOX:  Thank you, your Honor.

13         The second cause of action in the amended complaint is

14  relating to that fact that Mason Rothschild uses the Birkin

15  mark in his slogan Not Your Mother's Birkin.  He uses it in

16  MetaBirkins.  He uses, obviously, the trade dress of the Birkin

17  bag, which is also registered.

18         And to the extent the Hermès use is in play, it's

19  because it's featured in his disclaimer multiple times.  And

20  the testimony from Dr. Isaacson is that people read disclaimers

21  like that.  They see the trademark multiple times, that can add

22  to confusion.

23         THE COURT:  I guess my question is, in what respect

24  does your unfair competition claim on the facts of this case

25  and the facts of your approach vary from your other claims?

1          MS. WILCOX:  It varies mostly because of the addition

2     of the handbag design itself.

3          THE COURT:  Well, but as you just said, part of your

4     trademark claim is that he infringed your trademark -- putting

5     dilution aside for a second -- because he not only used the

6     term MetaBirkins, but that was then on the facts of this case a

7     reference to Birkin bags covered with fur.

8          And that latter part involved trade dress, right?

9          MS. WILCOX:  That's right.

10          THE COURT:  And putting it a different way, the

11     trademark, as registered, includes not only the name, but

12     designs and so forth.  I don't see what's left of the unfair

13     competition that isn't already fully encompassed within your

14     infringement claim.

15          MS. WILCOX:  So that the infringement claim, to be

16     clear, is not just of the Birkin trademark, but also of the

17     federally registered Birkin trade dress design of the bag.

18          THE COURT:  Yes, that's why I think it's duplicative.

19     Defense counsel did not make the argument.  There is an

20     argument that arguably could have been made that your pleadings

21     could be read to separate out the use of the term Birkin in the

22     infringement claim and the use of the trade dress in the unfair

23     competition.

24          But, in fact, the way you tried the case, the way you

25     argued the case, it was clear that you were including both

 1   within your infringement claim.  And so as a technical matter,

 2   if I had to, I could have conformed the pleadings to the proof.

 3           But my practical point is, since they are now combined

 4   and that's the way the jury has heard the case, why not just

 5   get rid of the unfair competition and not have them confused by

 6   why is there this duplicative claim?

 7           MS. WILCOX:  I believe in your Honor's instructions

 8   you do mention distinctive designs and, perhaps, we just need

 9   to be --

10           THE COURT:  Maybe beef that up?

11           MS. WILCOX:  Correct.

12           THE COURT:  That's possible.  All right.

13           Now, I know that both sides have more arguments to

14   make, but I will give you that opportunity in a minute, or

15   I'll tell you why I'm going to give you that opportunity in a

16   minute, but I think we need to turn to the charge.

17           Assume only for purposes of the charge that I've

18   denied the motions.  I'm not denying the motions.  I am still

19   considering them, but obviously, if I grant the motions.

20           MR. SPRIGMAN:  Your Honor, will I get an opportunity

21   to respond as the movant?

22           THE COURT:  Yes.

23           MR. SPRIGMAN:  Because I wasn't sure I understood you.

24           THE COURT:  So my longstanding practice in any case

25   where the motions to dismiss at the close of the evidence are

 1  not frivolous is to first wait for closing arguments of counsel
 2  because that often clarifies some of the issues.

 3          For example, here the argument, there is no evidence
 4  of this, and the other side is going to say yes, there is
 5  evidence.  And they will have to, you know, come up with it in
 6  their closing argument.  So then my practice is always to go
 7  back and look at the transcript and refresh my own recollection
 8  as to a lot of the specifics.  And the result is that I don't
 9  usually, in any close case, rule on these motions until later
10  in the day.

11          Now, in the case you've never heard of called *Palin*, I
12  was criticized for taking a midway step.  I should have granted
13  the motion before it went to the jury or should have waited
14  until after the jury.

15          MR. SPRIGMAN:  You can't win.

16          THE COURT:  Exactly.

17          But in any event, I will either try to get you a
18  decision before it goes to the jury, or I will get you a
19  decision after the jury comes back, and I won't do the middle
20  route.

21          So after the summations are over, we are going to
22  break for lunch.  The jury is going to break for lunch, but you
23  folks and I will hear at that point any further argument that
24  anyone wants to make.

25          MR. SPRIGMAN:  I look forward to it.  Thank you.

1            THE COURT:  Let's turn to the charge.

2            MR. WARSHAVSKY:  Your Honor, just a quick question.

3    Is that when you would like to hear if the plaintiff is making

4    the same motion?

5            THE COURT:  Yes.

6            MR. WARSHAVSKY:  Not to make it after the close of

7    evidence?

8            THE COURT:  Yes, yes.

9            Because according to the defense, Dr. Neal is going to

10   blow you out of the water.

11           MR. SPRIGMAN:  I can't wait.

12           THE COURT:  I'm sorry?

13           MR. HARRIS:  Your Honor, we had something we wished to

14   raise about Dr. Neal.  I am happy to wait until after the jury

15   charge.  I know we are all wanting to get out of here at a

16   certain time.  I just wanted to alert the court.

17           THE COURT:  Well, what did you want to raise?

18           MR. HARRIS:  Well, it's twofold.

19           THE COURT:  At least his accent is much less than the

20   other plaintiff's witnesses, the plaintiff's witnesses' accent.

21           MR. HARRIS:  Your Honor, Dr. Neal is basically, as you

22   know, a rebuttal expert, right.  And what's happened in the

23   case, as I understand it -- and you know I'm a late arrival to

24   the case -- but what has happened in the case, as I understand

25   it, is that any allegations about the use of the Hermès as a

1    mark have dropped out.

2          And Dr. Isaacson's -- is that correct?

3          Dr. Isaacson, as you saw today, and as we brought out

4    on cross, his confusion numbers include both Hermès and Birkin.

5    So I don't believe that's in Dr. Neal's report.

6          We would like the opportunity to submit a supplemental

7    quick report over the weekend so that Dr. Neal could address

8    that on the stand.

9          MS. WILCOX:  Your Honor, if I may.

10          The fact that the Birkin mark is a mark of Hermès, as

11    the trademark owner, is the reason why it doesn't make sense to

12    say that when people said, whoops, answered in response to the

13    question, who do you think makes the item shown on this

14    website, said Hermès.  I mean, that is an answer that reflects

15    that they are thinking about Hermès the company, the owner of

16    the Birkin trademark.  Also, if they said Birkin, because not

17    everybody always knows who the exact owner is.

18          THE COURT:  If I understand what you're saying, you're

19    saying they wouldn't say Hermès unless they were confused about

20    the mark, and the fact that it's a different term may mean that

21    it's indirect confusion rather than direct confusion.  It's

22    inferential rather than direct confusion.  But so what.  That's

23    just more circumstantial evidence of confusion.

24          Do I understand that is basically your argument?

25          MS. WILCOX:  No.  I think it's more simple than that,

1    if I'm understanding.  There is two trademarks in this case.

2              THE COURT:  Well, you didn't sue on Hermès.

3              MS. WILCOX:  Exactly.

4              THE COURT:  You sued on -- but your experts said the

5    only way a respondent can get to saying Hermès is because they

6    have to have thought of Birkin as being part of Hermès.

7              MS. WILCOX:  That's correct.

8              THE COURT:  That's what I mean by indirect.

9              So what about that?

10             MR. SPRIGMAN:  Your Honor, that can't be right.  The

11   reason is because, whereas up until a few weeks ago, they were

12   suing on Hermès, and then they clarified and said they weren't.

13             But their survey expert did a survey where he prompted

14   them with, among other things, Hermès.  So he prompts them with

15   Hermès and --

16             THE COURT:  OK.  I'm not sure how to come out.  That's

17   a good point.  I've forgotten that chronology.

18             So how quickly can you get in your supplement report?

19             MR. SPRIGMAN:  Like, tomorrow.

20             THE COURT:  Tomorrow, yes.

21             So you can put in a supplement report by no later

22   than -- do you want six p.m.?

23             MR. HARRIS:  Six p.m. would be perfect, your Honor.

24             THE COURT:  All right.  Then if you want to respond,

25   you can put in something by six p.m. Sunday.

1              And this is great, because I was thinking I might be

2      bored this weekend, and now I'll have plenty to keep me busy.

3              MR. SPRIGMAN:  Glad to oblige.

4              MR. HARRIS:  Your Honor, one other very minor point.

5              When I was questioning Mr. Rothschild yesterday on

6      redirect, on several occasions I said defendant's exhibits

7      rather than plaintiff's exhibits.  I just misspoke.

8              THE COURT:  So you need to clarify that tomorrow on

9      the record, either in the presence of the jury or outside the

10     presence of the jury, I don't care, as long as we have it on

11     the record.

12             I'm so glad you raised that, because what you guys

13     need to do this weekend, aside from some minor things like

14     preparing your closing argument, is put together the full set

15     of exhibits and index, a joint index, you'll need to coordinate

16     on this.  And in the process of doing that, be sure you get the

17     right numbers of the exhibits.  Then we can put them on the

18     record, whatever clarifications are necessary.

19             MR. HARRIS:  Thank you, your Honor.

20             THE COURT:  OK.  Let's turn to the charge.

21             MR. WARSHAVSKY:  Your Honor, one point, too, is that

22     we have spoken, and I think both parties may stipulate to a few

23     additional exhibits that didn't make it in.

24             THE COURT:  That's fine.

25             OK.  With respect to --

1           Let me give a copy to our court reporter.  I know she

2     wants and autographed copy.  We'll just give her a plain copy

3     and a copy to my law clerk as well.

4           With respect to the general instructions which are

5     pretty much my normal Instructions One through Eight, any

6     objections or additions to those instructions?

7           I'll ask that first of plaintiff's counsel and then of

8     defense counsel.

9           MR. WARSHAVSKY:  No.  We had none, your Honor.

10          THE COURT:  OK.  Defense counsel?

11          MR. SPRIGMAN:  We have none, also, your Honor.

12          THE COURT:  Very good.

13          Now we get to more difficult matters.  With respect

14    to -- and the way I set this up, as you can see, I first said

15    that -- putting aside the First Amendment issues, we don't even

16    get there if they hasn't established confusion and so forth for

17    infringement, so we have that first.  Then we say, even if they

18    show that, we still lose if they haven't proven there is no

19    First Amendment.

20          I think I would reword the title of the 14th

21    instruction, which is now First Amendment defense, to First

22    Amendment protection.  I think that's to make clear that the

23    burden remains with the plaintiff at all times.

24          But now, taking these instructions one at a time, any

25    objection to instruction number nine from the plaintiffs?

1              And this assumes that we are dropping unfair

2      competition.

3              MR. WARSHAVSKY:  No objections in mine, your Honor.

4              THE COURT:  Any?

5              MR. SPRIGMAN:  None from us either.

6              THE COURT:  Very good.

7              Ten, same question.  Anything from plaintiff's

8      counsel?

9              MR. WARSHAVSKY:  Your Honor, from ten, the objection

10     which I think is resolvable is just about comporting the

11     language to the discussion you and Ms. Wilcox had to explain

12     the two marks --

13             THE COURT:  I'm sorry?

14             MR. WARSHAVSKY:  -- and the exhibits.

15             We're trying to do that here.

16             THE COURT:  See, this was really, again, part of why I

17     dropped the unfair competition.  I made clear to the jury, or

18     try to make clear to the jury in this instruction, that it's

19     both the word Birkin and the designs that are covered by the

20     registered trademark, which I point them to Exhibit 5 so they

21     can see what is covered.

22             So more generally, many of the witnesses have, in

23     fact, conflated those two on their testimony.  We had this

24     whole little back-and-forth earlier in the case about whether

25     NFT, MetaBirkins NFT meant technically just what was the

1   certificate of ownership or whether it also included the

2   underlying images.  And without objection from either side, I

3   instructed the jury that it was both.  One was technical, but

4   the other was also embraced.  That was through a question to

5   one of the witnesses.  I can't remember which one.

6           Anyway, before we get to defense counsel, anything

7   else?

8           MR. WARSHAVSKY:  Well, I think you would add the

9   exhibit that covers.  It says there is two exhibits.  I believe

10  it's 5 and 6.

11          THE COURT:  5 and 6.  I'm sorry?

12          MR. WARSHAVSKY:  I believe so.  I'm going to

13  double-check, because there were two exhibits.  And then I

14  think we would --

15          THE COURT:  OK.  Certainly if they were both

16  registrations and covered this, they should be included, I

17  agree.

18          MR. WARSHAVSKY:  I think we would say -- I think we

19  call, instead of the distinctive designs, we would call it the

20  Birkin handbag trade dress, just so it's not --

21          THE COURT:  I avoided the use of trade dress because I

22  think it's a nice legal term.  I didn't think the jury would

23  know necessarily what that meant.  That's why I used the term

24  designs.  If you want me to --

25          MR. WARSHAVSKY:  Maybe the shape of the bag or

1  configuration.  I just didn't want them to think it was the

2  designs on the bag --

3            THE COURT:  Oh, OK.

4            MR. WARSHAVSKY:  -- perhaps.

5            THE COURT:  Let me think of some synonym.

6            MR. WARSHAVSKY:  We could say the handbag, the Birkin

7  handbag configuration, or shape.

8            THE COURT:  How about the New York Post version,

9  ridiculously expensive?

10           MR. WARSHAVSKY:  I don't think we would like that,

11 your Honor, whether it's accurate or not.  I think we would say

12 because it's the shape and the features.

13           THE COURT:  All right.  I will work on some -- I'm

14 going to send you a revised verse of it Sunday night so you'll

15 have it before you have to give your closing arguments.  But

16 I'll work on some synonym there, more expressive.

17           Now let me hear from defense counsel.

18           MR. SPRIGMAN:  Your Honor, with respect to this

19 instruction, we have no particular issue with the instruction,

20 but I do think there is an issue here, which is the Hermès mark

21 has been mixed up in this.  And people do, on the jury, by now

22 associate the Hermès mark with the Birkin mark.  And it would

23 be helpful for the jury to know that the Hermès mark is not at

24 issue here because they've heard it many, many times.

25           THE COURT:  I'll think about that.  But here, of

1    course, in this instruction I specifically say the word Birkin,

2    and we can say and the designs associated with.  I say

3    therewith, I could say with that term.

4              MR. SPRIGMAN:  Yes.

5              THE COURT:  But I'll think about whether we need an

6    additional sentence saying Hermès is not -- I'm disinclined to

7    do that for the reasons I just expressed, I think, but it's a

8    different point.

9              The point I made before in favor of plaintiffs was, I

10   think, the expert could fairly argue that Hermès should be

11   included within the confusion because you don't get to Hermès

12   unless you also are thinking Birkin in this case.  But you're

13   making a different point.  You're saying, yes, we don't want

14   the jury to think that the term Birkin was somehow infringed.

15             MR. SPRIGMAN:  Your Honor, you don't have --

16             THE COURT:  But no one has argued that.

17             MR. SPRIGMAN:  Yes, I understand.  You don't have to

18   think about Birkin to get to Hermès.  You're looking at a

19   stimulus that says Hermès, you get to Hermès directly.  This is

20   the problem with the test throughout.  Hermès and Birkin have

21   been mixed up promiscuously, including  in Dr. Isaacson's

22   report.  He stimulates them with the stimulus Hermès.

23             The fact that the answer Hermès from time to time

24   could be not a product of thinking Birkin and relating to

25   Hermès, but going to Hermès directly from the appearance of

1   Hermès on the screen.

2          THE COURT:  Well, I mean, that's certainly, you

3   know --

4          MR. SPRIGMAN:  He could have resigned the stimulus.

5          THE COURT:  That is certainly why I gave you

6   permission to have a supplement report, but I don't think --

7   the only question is do we need to add a sentence to

8   Instruction No. 10 saying that the term that's in play here is

9   Birkin, not Hermès.

10          MR. SPRIGMAN:  I would ask you to wait on that because

11   if we put in a supplement report that makes it clear that that

12   is the real danger in the report.  It's not just in the report,

13   it's in the entire conduct of the trial that that danger arises

14   because these two marks have been --

15          THE COURT:  All right.  Well, anyway, since at the

16   moment you want to hold off, that's fine.

17          We'll just wait --

18          MR. SPRIGMAN:  Thank you.

19          THE COURT:  -- until I hear further from you on that.

20          But in that regard, after I send you the revised

21   charge on Sunday, there will be no further arguments on the

22   charge, except for something I've reserved on or something

23   that's a typo.

24          So how long do you want?  When do you want to put in

25   your position on that?

 1                 MR. SPRIGMAN:  When will you have --

 2                 MR. HARRIS:  When would you like it?

 3                 THE COURT:  I want it included as a separate letter.

 4       Anything that I give permission to one side or the other to

 5       hold off tonight, put in your letter on Saturday in a separate

 6       letter, and then they can respond to it in their letter.

 7                 MR. HARRIS:  We'll put in anything by Saturday by six,

 8       same time.

 9                 THE COURT:  Saturday -- well, I want to have time to

10       do the final revisions of the charge and get it to you, and I'm

11       having dinner with Judge Scofield and her significant other and

12       my wife on Sunday night, mainly so she and I can chew the cud

13       on the lawyers in this case.

14                 But why don't we say this, if you don't mind.  Your

15       submissions by five o'clock on Saturday and their submissions

16       by five o'clock on Sunday.

17                 MR. HARRIS:  Your Honor, we'll get you both

18       submissions on Saturday.

19                 THE COURT:  Great.  No. 11, this is just about the

20       elements of trademark infringement without the Rogers issue.  I

21       only gave seven of the eight Polaroid factors.  I left out the

22       eighth because it didn't seem to me to apply.

23                 But any problems, from starting again at plaintiff's

24       counsel, to instruction No. 11?

25                 MR. WARSHAVSKY:  So, your Honor, the first I think is

```
 1    just consistent with ten, so that the language is trademarks.

 2    I think that -- right, it's in the singular here, whereas I

 3    think it is going to be in the plural is all.

 4              THE COURT:  Well, I think --

 5              MR. WARSHAVSKY:  Unless we define it broadly.

 6              THE COURT:  Yes.  I think maybe something about as

 7    previously defined in instruction 10 or something like that.

 8              MR. WARSHAVSKY:  I think that's fine, your Honor, as

 9    long as it's clear it refers to both.

10              THE COURT:  Yes.

11              MR. WARSHAVSKY:  Then, your Honor, I'm looking at the

12    sixth instruction or the sixth factor.

13              THE COURT:  Factor.

14              MR. WARSHAVSKY:  Factor, sorry.  And two points there,

15    which is I think that it would be, with the intention of

16    consumers associated with NFTs with Hermès with the Birkin

17    mark, because you don't -- the point of trademark is you don't

18    always know the source here.

19              Certainly --

20              THE COURT:  So instead of Hermès?

21              MR. WARSHAVSKY:  Or in addition.

22              THE COURT:  You want Birkin or something like that?

23              MR. WARSHAVSKY:  I would want Hermès or the Birkin

24    mark, and then profit from the representation of Hermès or the

25    Birkin mark.
```

1          THE COURT:  I'll her from defense counsel on that in a

2     minute.

3          Anything else?

4          MR. WARSHAVSKY:  Yes.  Also on this, I think the blind

5     eye should be to the likelihood the consumers would be confused

6     not the high likelihood, because it's only a likelihood of

7     confusion test.

8          THE COURT:  Yes, I think that's right.

9          Let me hear from defense counsel.

10          MR. HARRIS:  Raise one point and turn over to

11     Mr. Sprigman.

12          In the second sentence, Hermès contends that

13     Rothschild's use of the Birkin mark is likely to confuse

14     consumers into thinking blah, blah, blah.

15          I think it should be that he's likely to consume --

16     consumers who are potential purchasers of MetaBirkins NFTs,

17     because I believe that based on Dr. Isaacson's testimony today,

18     he has conceded that there is no confusion among consumers of

19     Hermès handbags.

20          THE COURT:  Yes.  All right.  So potential consumers,

21     I agree.

22          OK.  I agree with that.

23          MR. SPRIGMAN:  So, your Honor, my ask is going to be a

24     little bit more pervasive.

25          So instruction 11 should be demoted.  What should be

1    in place of instruction 11 is a revised version of instruction

2    number 14.  The way this is currently structured, you had

3    written it initially framed the First Amendment as a defense.

4    The First Amendment is not a defense in a Rogers case.

5              THE COURT:  Well, that's why I changed the wording.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N23VHER9

1          THE COURT:  That's why I changed the wording.

2          MR. SPRIGMAN:  Right.  I understand.

3          But now having recognized that, the first thing, in

4    our view, the jury should consider is the First Amendment,

5    which is first for a reason.  And I think that here, your

6    Honor, what would be helpful is to move instruction 14 to 11,

7    to drop the first paragraph, because it is not a defense, and

8    to say to the jury that if they find these *Rogers* -- unless

9    Hermès can prove these two things, they find for Rothschild on

10   all claims.

11         In terms of the two things that need to be proved

12   after we removed the first paragraph, you say:  It is

13   undisputed that the MetaBirkin NFTs, including the associated

14   images, are in at least some respects works of artistic

15   expression.  I'm puzzled by the part "are at least in some

16   respects."

17         THE COURT:  We'll get to 14 in a minute.

18         I understand the argument.  In fact, when I was

19   drafting this, I kind of went back and forth in my own mind as

20   to which should come first.  But, of course, what I'm trying to

21   do always is make things as simple for the jury as possible.

22         None of you are old enough to remember what was the

23   practice in the bad old days when I was first trying cases

24   where, in this Court and, indeed, in virtually every court, in

25   every federal court in the United States, the judges would read

N23VHER9

```
1   to the jury a 50-page unbelievably convoluted charge whose only
2   purpose was to prevent any appellate issue, and the jury would
3   never even be given a written copy.  And that was the universal
4   practice.  And the theory being that the jury exercises the
5   voice of the community or something like that.  So far be it
6   that we should ask them to exercise reason.
7            So my object is to make things as simple for the jury
8   and straightforward for the jury as possible.  And so my
9   reasoning was the *Rogers* test, no matter how phrased — and
10  we'll get to that in a minute — is, I think, going to be
11  something that will not be part of their everyday experience.
12  It's a much more legalistic kind of concept.
13           And they only have -- they have to reach it, but they
14  only have to reach it if they find that plaintiffs have already
15  proven under regular standards infringement or dilution or
16  whatever.  And so that was my reasoning for doing it in the
17  order I did.  And I'm still inclined that way, but I agree,
18  it's a close question.
19           MR. SPRIGMAN:  Your Honor, I'm going to be frank.  I
20  disagree because whether you phrase it as a defense or not, the
21  way this is structured, it looks to the jury like an excuse.
22  If they find Mr. Rothschild liable under the standards that
23  should not, by any means, apply in this case, but apply in a
24  case where it's a handbag versus a handbag instead of a handbag
25  versus a picture of a handbag --
```

N23VHER9

| | |
|---|---|
| 1 | THE COURT:  Well, I hear that, and I don't think |
| 2 | that's a frivolous argument.  And I appreciate your saying you |
| 3 | disagree with me, because you've never disagreed with me |
| 4 | before. |
| 5 | MR. SPRIGMAN:  That's what I'm here for, your Honor. |
| 6 | THE COURT:  But I think one of the reasons I |
| 7 | thought -- another reason I thought it best to proceed this way |
| 8 | is that the test -- or, excuse me, the factors that they would |
| 9 | normally consider on things like explicitly misleading are |
| 10 | things that are also *Polaroid* factors.  It's not all of it, and |
| 11 | I actually agree with you, it's a high standard.  But it is the |
| 12 | *Polaroid* factors which were the product of the brilliance of |
| 13 | Henry Friendly, to -- you can have your Justice Scalia, but in |
| 14 | my view, Henry Friendly is the plus ultra. |
| 15 | MR. SPRIGMAN:  I am on board with you, Judge, on that. |
| 16 | THE COURT:  But, in any event, it was designed to get |
| 17 | at whether things are misleading, confused, and so forth. |
| 18 | So I thought it was also helpful to the jury to have |
| 19 | that first in their minds before we got to the higher standard |
| 20 | that has to be met under the First Amendment. |
| 21 | MR. SPRIGMAN:  Your Honor, I understand the |
| 22 | motivation.  But it clashes with *Rogers*.  And I'll just read |
| 23 | something very brief from *Rogers* that I think will make this |
| 24 | clear. |
| 25 | THE COURT:  Go ahead. |

N23VHER9

1        MR. SPRIGMAN:  *Rogers* said:  We believe that, in

2   general, the act should be construed to apply to artistic works

3   only where the public interest -- the act should be construed

4   to apply to artistic works only where the public interest in

5   avoiding consumer confusion outweighs the public interest and

6   free expression.  In the context of allegedly misleading titles

7   using a celebrity's name, that balance will normally not

8   support application of the act unless the title has no artistic

9   relevance to the underlying work whatsoever or if it has some

10  artistic relevance unless the title explicitly misleads.

11       Now, the court drops a footnote, very important

12  footnote.  The footnote says:  This limiting construction would

13  not apply to misleading titles that are confusingly similar to

14  other titles.  The public interest in sparing consumers this

15  type of confusion outweighs the slight public interest in

16  permitting others to use such titles.

17       That, your Honor, is *Twin Peaks*.  *Twin Peaks* takes up

18  that invitation in footnote 5 and applies the *Polaroid* factors

19  in a case where the limiting construction doesn't apply because

20  it's title versus title.  That's when the *Polaroid* factors

21  apply.

22       Now, what I read to you at the beginning, I think,

23  pretty clearly says that you've got to start with *Rogers*,

24  because *Rogers* determines --

25       THE COURT:  Well, I don't agree that it says I have to

N23VHER9

1    start.  But I think there is some merit to your arguments as to

2    why it might be more logical and more reflective of the balance

3    to start.  So I'm still open to that possibility.

4            So assuming we started, we would still get to the

5    instruction on infringement if they --

6            MR. SPRIGMAN:  We would.  We would get there later,

7    but we would start with the instruction --

8            THE COURT:  No, no, no.  I understand.  But I'm just

9    saying -- because I have to put together a charge.  Assuming

10   for the sake of argument that we start with 14 as modified --

11           MR. SPRIGMAN:  Yes.

12           THE COURT:  -- do you have any other problem with what

13   will then be the next thing, if, and only if, you find they've

14   survived that test, then we get to infringement, and then I'll

15   give them essentially what is now instruction 11.

16           MR. HARRIS:  Your Honor, I think -- I'm not exactly

17   sure that it's a problem with 11; but it would need to be in

18   here the particularly compelling language.  I know things are

19   being moved around.  So I'm not sure where in your formulation

20   that would go.  But that's my understanding.

21           THE COURT:  Unless I missed something completely,

22   here's the choice:  Either, as it presently reads, we say, In

23   order to find liability on each of the three claims, you have

24   to find this on infringement, you have to find this on

25   dilution, you have to find this on cybersquatting.  But even if

N23VHER9

1    you find that as to one or more of these claims, you still

2    can't find liability unless they survive the high bar of the

3    *Rogers* test.  What your colleague is arguing is we should

4    reverse the order, and I'm really thinking about that.

5            MR. HARRIS:  Yes.

6            THE COURT:  But all I'm saying so we can get through

7    tonight, assuming for the sake of argument I reverse the order,

8    do you have any other problems with instruction 11 which will

9    now become instruction 12, in effect?

10           MR. SPRIGMAN:  We do.  When you reverse the order,

11   we'd like the *Polaroid* factors banished because it's not a

12   title versus title case.  But let's deal with that separately.

13           But further on instruction 11, we have a couple of

14   issues.

15           So first, in the second line -- well, first, starting

16   at the first, so we have context, you say:  Specifically,

17   Hermès asserts that Mr. Rothschild has infringed Hermès's

18   Birkin mark through his MetaBirkins NFT project.  Well, I want

19   to be specific there.  Because *Rogers* is about the use of the

20   mark.  So rephrase that to "has infringed Hermès's Birkin mark

21   through his use of the title MetaBirkins for the MetaBirkins

22   images."  That's the use.

23           THE COURT:  That was similar really to what they were

24   saying; had to be changed in that sentence, it had to be

25   spelled out more fully and I will do that.

N23VHER9

1          MR. SPRIGMAN:  So my colleague makes a point about

2     potential purchasers.  In the next sentence you say:  Is likely

3     to confuse consumers, it has to be potential purchasers of the

4     MetaBirkins NFT.

5          THE COURT:  I already agreed with him.

6          MR. SPRIGMAN:  Right.

7          And then, I'm going to go down further, you start

8     talking about the strength of the Hermès Birkin mark.  So this

9     illustrates a problem with the *Polaroid* factors.  So typically,

10    when it's an ordinary trademark case, it's handbag versus

11    handbag.  Yeah, a mark's strength tends to increase the

12    likelihood of confusion.  But when the accused product is an

13    image, is a picture, the mark's strength, which is associated

14    with its home, it's the handbag on which it sits, would be more

15    likely to inform a consumer that, in fact, the artwork is not

16    from Hermès, because Hermès hasn't been in the art business.

17    The Birkin trademark powerfully speaks of a thing made of

18    leather that costs five or six figures.  It doesn't speak of an

19    artwork.  And this is one of the reasons why *Polaroid*, applied

20    carelessly in a case like this, is dangerous.

21          So the strength points in the opposite direction here,

22    which is, you know, one of the reasons why we shouldn't be — at

23    least in the *Rogers* instruction — using it.  But if we're using

24    it in the general instruction, we should be careful about how

25    we use it.

N23VHER9

1          So I would actually say that the stronger the mark,

2     the more distinctive it is, the less likely people are to

3     think -- because it's not used on a handbag, it's used on a

4     picture of a handbag.  And as McGreed would say, it's a

5     different thing, so we're in a different spot.

6          THE COURT:  All right.  Well, I hear you, but I

7     disagree.

8          MR. SPRIGMAN:  Okay.

9          THE COURT:  Anything else?

10         MR. SPRIGMAN:  Yes.

11         On the fifth factor, you say:  The more sophisticated

12    and careful the average consumer of a product is, the less

13    likely that consumers will be confused.  For expensive

14    products, there typically is a presumption that consumers are

15    sophisticated.  So for products more expensive than sneakers,

16    for example, these products are clearly in that category.  So

17    something about, you know, these are sophisticated consumers.

18         THE COURT:  Well, I think you're right about the

19    presumption and you're probably entitled to some language about

20    that.  So I'll add that.

21         MR. SPRIGMAN:  Okay.

22         On the sixth factor, you say starting on the third

23    line:  Consumers would associate his NFTs with Hermès so as to

24    profit from Hermès's reputation.  They've made some

25    interventions there.  But it's not to profit from their

N23VHER9

1   reputation, it's to profit from confusion.  And that's a

2   different thing.

3          If, for example -- it's especially important in a case

4   like this where it's -- it may -- you know, from my perspective

5   it's entirely possible that consumers were attracted to the

6   MetaBirkins not because they were confused, but because they

7   valued the commentary.  So does he intend to profit from their

8   reputation?  Well, I guess, because he's commenting on a very

9   reputable article.  That is different from people being

10  confused about it.

11         You know, Andy Warhol didn't comment on Walmart soup,

12  he commented on Campbell's.  And Mason Rothschild didn't

13  comment on a handbag from, you know, Century 21, he commented

14  on a Birkin.

15         THE COURT:  Well, I think -- I'm not sure I agree with

16  adding language.  I think the way to do it is just take out the

17  words "so as to profit from Hermès's reputation."

18         MR. SPRIGMAN:  Okay.

19         Seventh -- the seventh factor.  This, again, is a

20  problem with the application of the *Polaroid* test in this

21  sphere.  All this evidence about bridging the gap, Hermès's

22  intent to enter the market for NFTs, if the MetaBirkins is a

23  First Amendment protected piece of noncommercial expression --

24  by "noncommercial," that doesn't mean not sold for money.  As

25  you know, Judge, that just means something other than a purely

N23VHER9

1    commercial form of speech.  Then Hermès has no right to oust --

2    no presumptive right to oust someone from a speech market.  And

3    that's what the seventh factor would purport to allow Hermès to

4    do.

5          There's authority that Hermès cannot oust -- not

6    Hermès.  It's authority that trademark owner in a case

7    involving noncommercial speech, First Amendment protected

8    speech, has no right to bridge the gap in a way that would oust

9    someone from a speech market.  So this factor should just

10   disappear.

11         THE COURT:  All right.  So let me hear from

12   plaintiffs' counsel.  Both sides are agreed they would need to

13   spell out the first sentence on instruction number 11 a little

14   bit more fully.  I will do that.

15         The other changes — and then I'll hear from

16   plaintiffs' counsel whether they object to any of those changes

17   — is first to add the word "potential" before "consumers" in

18   the second sentence.  Secondly, in the fifth factor, to add

19   something along the lines of "There is a presumption that

20   anyone who can buy a Birkin bag is sophisticated."  I mean,

21   that's not the right word, "presumption," but that's the gist

22   of it.  And therefore, less likely to be confused.

23         MR. SPRIGMAN:  Buy an NFT.

24         The only amendment, I would say buy an NFT, your

25   Honor, because the Birkin bag is, again, confusion among Birkin

1   bag purchasers is not really an issue here.

2           THE COURT:  Well, the one I really want to hear from

3   plaintiffs' counsel, because I think there's something to what

4   defense counsel just said, is whether the seventh factor is

5   really present in this case.

6           MR. WARSHAVSKY:  Your Honor, I could address all of

7   them.

8           THE COURT:  Okay.  Go ahead.

9           MR. WARSHAVSKY:  The first is their definition of the

10  MetaBirkins NFTs.  Mr. Rothschild came out at trial.  And what

11  the evidence shows is Mr. Rothschild uses the MetaBirkin, the

12  MetaBirkin's name in numerous places.  I think it would be

13  unfair to just limit it to what they are calling, you know, the

14  label.  I thought when we came up with MetaBirkins NFT, we were

15  going to use what your Honor uses.  That was fine.  But he uses

16  MetaBirkins for a Discord community, he uses it Not Your

17  Mother's MetaBirkin, he's used it in other places.  So I

18  thought the way you had it worded, MetaBirkins NFT project, I

19  think you can include everything.

20          THE COURT:  Which was his term.

21          MR. WARSHAVSKY:  Well, I think they were trying to

22  limit it.

23          THE COURT:  No, no, no.  By "him" I mean

24  Mr. Rothschild.  Mr. Rothschild used the word "project."

25          MR. WARSHAVSKY:  Correct.  So as he used --

```
 1              THE COURT:  Okay.  Go on.

 2              MR. WARSHAVSKY:  And then in the second sentence, I'm

 3    not quite sure where you landed.  If it's likely to confuse

 4    potential consumers, that's fine.  As I heard them say it --

 5              THE COURT:  That was all.  Just adding the word

 6    "potential."

 7              MR. WARSHAVSKY:  Okay.  That's the only change,

 8    nothing else.

 9              MR. HARRIS:  I don't want to interrupt --

10              MR. WARSHAVSKY:  Come on, guys.  You guys, give us a

11    chance.

12              I just want to be clear, because what I heard them say

13    was consumers of MetaBirkins.  And I think that would be

14    entirely wrong.  So I think it has to be potential consumers.

15    And if that's out, if that's where you landed, that's fine.

16              THE COURT:  That's what I understood they were asking

17    for and that's all I added.

18              MR. WARSHAVSKY:  And then in the -- in terms of the

19    fifth charge, your Honor, the challenge, I think, I have with

20    this, if you add in the cost -- the cost, which --

21    sophistication, I do -- I agree that cost is certainly a part

22    of -- this is a nascent market.  This is a market that's really

23    two, three years old.  So I think if you're going -- the think

24    the way you had it was fine.  I think you're going to add in

25    cost.  I think there should be something to the idea that
```

N23VHER9

1    the -- that this still is a nascent market.  I think you can

2    see it by the fact that it's entirely collapsed.

3           I remember mentioning that in argument, your Honor,

4    when you said, Well, people spend a lot of money.

5           And I said, Everybody is investing in crypto generally

6    and it's crashed.  The NFT market has done the same.  And I

7    think that what we all know as -- I think what everybody

8    realizes is that there was some irrational exuberance and

9    people were rushing to that market.  And so while I don't mind

10   adding in expense, then I think it also has to be added that --

11   something to the extent that when it's a nascent market, it

12   might cut against the sophistication factor as well.

13           THE COURT:  All right.  Let me think about that.

14           MR. WARSHAVSKY:  And then when it goes to the sixth

15   factor, I don't really know what authority -- either for the

16   sixth or seventh Mr. Sprigman was referring to.

17           But the point is that if they don't want to say

18   Hermès's reputation, it's goodwill, really the question there

19   is did Mr. Rothschild have -- was he attempting to profit from

20   the goodwill that's become attributable to the Birkin

21   trademark.  So it doesn't have to be Hermès's reputation, but

22   it should be the goodwill associated with the Birkin mark or

23   Birkin marks.

24           THE COURT:  Okay.  I will consider that.

25           MR. WARSHAVSKY:  And then we turn to the seventh.

1          Your Honor, I understand that Mr. Sprigman thinks

2     these *Polaroid* factors are inappropriate, and that might be --

3     but the seventh factor actually is very important; and we put

4     on a lot of testimony about it.

5          And the reason is that when the goods aren't the

6     same -- the whole point of the trademark law is, you know, what

7     is -- you know, what's within the trademark owner's zone of

8     protection?  And I think that the reason this factor is so

9     important is that whether we call it -- you know, whether

10    Mr. Sprigman calls it artwork, whether it's -- I'm not sure how

11    I feel about that and he keeps calling it expression and

12    titles.  I don't agree with how he keeps refining it.  Hermès

13    did have -- I mean, we saw --

14         THE COURT:  We know that -- if I understand the

15    argument from your adversary, there's no doubt that there's

16    testimony that Hermès had plans to sell its own NFTs.

17         MR. WARSHAVSKY:  Right.

18         THE COURT:  Although the timing of that may be a

19    little questionable.  But the question is in what respect in

20    this case did the -- did Mr. Rothschild's activities interfere

21    with them.  And I'm not sure I heard testimony to that effect

22    from -- there was the witness on the stand describing at some

23    length how you were going to have -- if you bought a tie from

24    Hermès, you would also get the benefit of having a horse stick

25    out his tongue at you.  But I didn't see how any -- I don't

1    recall any evidence about how that interfered with your NFT

2    project.

3            MR. WARSHAVSKY:  I think there's two questions

4    embedded in what your Honor just asked.  And one is the damage.

5    I'd first go to the factor.  The factor itself is likelihood to

6    bridge the gap, right.  And that has nothing to do with harm;

7    that just has to do, does -- will the senior user go into that

8    market.  That's the reason for that test.

9            But then both Mr. Martin, who's here at the end of the

10   table, and the witness did say -- and I think your question

11   might be a little bit more of a dilution question, candidly,

12   about -- and both of them said that the problem is that any

13   time that anybody -- that Hermès does anything, they will --

14   the MetaBirkins will be thought of.  And, in effect, we had one

15   witness who showed that when she did the Google search last

16   week of Hermès NFT, the second item was the L light.  And that

17   wouldn't necessarily go --

18           THE COURT:  Well, you're right that the seventh

19   element is -- seventh factor is about bridging the gap.  And

20   maybe I need to make clearer then that that is what is being

21   referred to here, because I don't think the way I have it

22   worded now makes that clear.

23           On the damages, we'll get to that.  So okay.

24           MR. SPRIGMAN:  Your Honor, just a direct cite on this,

25   which is the *AM General* case, which says:  When First Amendment

N23VHER9

1    considerations figure strongly in a case, the weight of the

2    likelihood of bridging the gap factor must be minimal for the

3    very reason that the claim that you can displace someone from a

4    speech market, a protected speech market, because one day you

5    want to speak, is not a weighty claim.

6            MR. WARSHAVSKY:  But the *AM General* case is total in a

7    positive.

8            THE COURT:  But if I follow your proposal of putting

9    the *Rogers* test factors first, then we're over that by the time

10   we get to this.

11           MR. SPRIGMAN:  Not necessarily.  Only if you eliminate

12   the *Polaroid* factors and do inexplicitly misleading when we get

13   to what is now instruction number 14, what I'm going to ask you

14   to do, which is to define it in a way that I think will be

15   helpful to the jury.

16           THE COURT:  All right.  I will take all of this under

17   consideration.

18           With respect to trademark dilution --

19           MR. HARRIS:  Your Honor, may I just raise --

20           THE COURT:  Yes.  Except I'm frankly getting a little

21   perturbed that I can't seem to get the lawyers at defense table

22   to limit their arguments, one, to one lawyer; two, to when I

23   ask them for their objections, as opposed to 10, 15, 20 minutes

24   later.  But what would you like to say?

25           MR. HARRIS:  Your Honor, first of all, I apologize.

N23VHER9

|   |   |
|---|---|
| 1 | Second of all, I had raised the issue, and I thought |
| 2 | you had agreed to it, and then you hadn't stated it as you went |
| 3 | through the things.  Maybe I just misheard.  But I had raised |
| 4 | the issue that the only thing that Hermès is alleging in this |
| 5 | case at this point is forward confusion, which is that it is |
| 6 | potential consumers NFT of -- |
| 7 | THE COURT:  So thank you for raising that.  But I felt |
| 8 | good about saying things I just did anyway, but thank you for |
| 9 | raising that. |
| 10 | So that's a different point than what I had |
| 11 | understood.  So let me make a note here right now about that |
| 12 | and I will take that into consideration. |
| 13 | MR. HARRIS:  Thank you, your Honor. |
| 14 | THE COURT:  All right.  Trademark dilution.  Again, |
| 15 | forget about the order question.  Anything that plaintiffs |
| 16 | would change? |
| 17 | MR. WARSHAVSKY:  No, your Honor. |
| 18 | THE COURT:  Anything defense counsel would change? |
| 19 | MR. SPRIGMAN:  Yes.  Two things, broadly. |
| 20 | If you look at the third paragraph, it begins:  The |
| 21 | Birkin mark is famous if it is widely recognized by the general |
| 22 | consuming public as designating Hermès as the source of goods |
| 23 | bearing the mark. |
| 24 | This case poses a special problem with respect to |
| 25 | fame.  So fame is typically a mark that is a household name |

N23VHER9

1    across the United States:  Chevy, Coke, Nike.

2              Hermès Birkin mark is not such.  All the while --

3              THE COURT:  Why do you say that?

4              MR. SPRIGMAN:  So they've been using famous

5    colloquially.

6              THE COURT:  So --

7              MR. SPRIGMAN:  So what I would -- sorry.

8              THE COURT:  Every time I meet over the last month a

9    couple I know, dozens of couples, and I say to them, Do you

10   know what a Birkin bag is?  And the male always says, Never

11   heard of it.  And the female always says, Of course.

12             MR. SPRIGMAN:  Yes, your Honor.

13             THE COURT:  So why isn't it fame?

14             MR. SPRIGMAN:  That answers the question.  The general

15   consuming public of the United States includes men, first of

16   all.  And even in this bubble of ultra privilege in which we

17   live where people can afford Birkin bags --

18             THE COURT:  I'm sorry, how many men are consumers of

19   handbags?

20             MR. SPRIGMAN:  No, your Honor, that is not the

21   standard.  The standard under the Lanham Act for fame, for

22   trademark fame, is the general consuming public of the United

23   States, which means, first, general --

24             THE COURT:  That's, of course, the term I use here.

25   In the sentence I say:  The Birkin bag is famous if it is

1    widely recognized by the general consuming public.

2            MR. SPRIGMAN:  Your Honor, nationwide.  Because we all

3    live in New York City, where it's environs.  Birkins, if you

4    had a relative in Peoria, not to slight Peoria, it's

5    unlikely --

6            THE COURT:  I put it to my cousin in -- my cousin and

7    her husband in San Diego over the weekend.  She knew

8    immediately what I was talking about and said she only wished

9    she had one.

10           MR. SPRIGMAN:  Your Honor, San Diego is a city in

11   which Hermès has a store, because San Diego is also an enclave

12   of the rich.  Most of this country is not an enclave of the

13   rich and people in most of this country have no idea, have

14   never heard of either Hermès or a Birkin bag.

15           I'm sure if you travel out to New Jersey --

16           THE COURT:  Why isn't that just argument?  What I've

17   said in this is the Birkin bag -- excuse me, the Birkin mark is

18   famous if it is widely recognized by the general consuming

19   public as designating Hermès as the source of the goods bearing

20   the mark.  In measuring fame, you may consider your own

21   experiences, as well as the extent, history, and geographic

22   reach of advertising and publicity of the mark both by Hermès

23   or third parties, the amount, volume, and geographic reach of

24   sales of products bearing the mark, the extent to which members

25   of the public actually recognize the mark, and whether the mark

N23VHER9

1    was federally registered.

2              So I've repeated twice in specific terms the

3    geographic argument.  And I've also included the more general

4    language about the general consuming product, giving full reign

5    to your colleague on summation to say they never heard of

6    Birkin in Peoria, although I doubt there's been any evidence of

7    that, but that still may be an argument.

8              So what more do you want?

9              MR. SPRIGMAN:  I would like you to just do it a little

10   bit more clearly for the jury, which means general consuming

11   public nationwide or general consuming public of the United

12   States.

13             THE COURT:  Denied.

14             MR. SPRIGMAN:  Make that clear.

15             THE COURT:  Let's go on to cybersquatting.  Anything

16   plaintiffs would change on that?

17             MR. WARSHAVSKY:  No, your Honor.

18             THE COURT:  Anything defense would change on that?

19             MR. SPRIGMAN:  No, your Honor.

20             THE COURT:  All right.  Now we get to 14.  And

21   obviously the wording will have to change if we go first with

22   that, but let's get beyond that.

23             So the first sentence would now be, if we go first

24   with that:  Before you reach anything else, you need to

25   determine, words to that effect, whether Mr. Rothschild must be

N23VHER9

 1    found not liable on all claims because, in creating the

 2    MetaBirkins NFTs, he engaged in artistic expression protected

 3    by the First Amendment.  Hermès asserts this.

 4              And then I have — which I think defense counsel is

 5    saying should be the end of the case, but we're putting that

 6    aside for the moment — it is undisputed that MetaBirkins NFTs,

 7    including the associated images, are, in at least some

 8    respects, works of artistic expression.

 9              So let me hear from plaintiffs' counsel.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. WARSHAVSKY:  Thank you, your Honor.

2          Maybe I'll just first address the issues inside it,

3   and then the order, if that's OK.

4          THE COURT:  Sure.

5          MR. WARSHAVSKY:  The first is, I think, your Honor,

6   based on the Rogers test and what's happened today, I think

7   that in between one and two should be the disjunctive "or."  I

8   don't think Hermès has to prove both.  I think that it's either

9   to exploit or that such use is misleading, right.

10          And then I think the description of misleading -- I'm

11   just trying to track the summary judgment decision.  I think

12   I'm doing it accurately.

13          THE COURT:  Yes.  So I think I want to hear from

14   defense counsel.  I think you're right about "or" rather than

15   "and."

16          MR. WARSHAVSKY:  Here is why I think I would change

17   the instruction.

18          What I would say is this.  If defense wants to change

19   the verdict form, that's one thing.  But it seems to me that,

20   after the paragraph, it should say, if you find that

21   evidence -- again, I'm trying to track the order of the summary

22   judgment opinion -- if you find that evidence of the likelihood

23   of confusion is particularly compelling, then you must find in

24   favor of Hermès and against Mr. Rothschild.

25          They might not agree with that.  But the point being,

1    I think that the Polaroid factors should come first because

2    they animate the second part of that instruction.  Going back

3    to why everything works together.  If on the verdict form they

4    want to flip it, I think that's different.  But I think, while

5    looking at this, a lot more explanation is needed if you don't

6    do to the Polaroid factors on confusion first.

7           Because, of course, if there is no confusion, this

8    goes out the window.  But if there is confusion, then the

9    second part of the test would be, again, taking the language

10   from your decision, particularly compelling.

11          THE COURT:  All right.  So, I'm sorry, I understand

12   your argument about order.  But what words would you change?

13          MR. WARSHAVSKY:  I was actually adding a sentence,

14   your Honor.  So I would change it to the disjunctive between

15   one and two and then --

16          THE COURT:  Yes, that I agree with.

17          MR. WARSHAVSKY:  And then at the end, if you find that

18   evidence of likelihood of confusion is particularly compelling,

19   then you must find in favor of Hermès and against

20   Mr. Rothschild.

21          And then it would follow.  Even if you have found --

22   otherwise found Mr. Rothschild liable for one of Hermès'

23   claims --

24          THE COURT:  See --

25          MR. WARSHAVSKY:  I guess you can flip that.

1       THE COURT:  -- my problem with that -- because I

2   recognize that language has been used -- is I don't know what

3   compelling means.  If I'm a juror, I don't know what that

4   means.  This is why I say, when drafting these instructions,

5   what we all have to do is put ourselves in the seat of an

6   ordinary juror.  So to say if somebody is particularly

7   compelling then X follows, even without getting into the

8   arguments about whether that is the law or not, just in the

9   wording, I don't think it tells the jury anything very useful.

10       Because I'll give you, perhaps, a not-very-good

11  analogy, but there have been a lot of studies done about how

12  jurors view the three standards:  Preponderance of the

13  evidence, clear and convincing, and proof beyond a reasonable

14  doubt.  Every one of those studies has said that jurors fully

15  understand and have no difficulty with preponderance of the

16  evidence, more likely than not, or proof beyond a reasonable

17  doubt.  If we have any doubt found, then you've got to acquit.

18  Then you don't know beans about what is meant by clear and

19  convincing.  That's the problem I have with the term

20  particularly compelling.

21       MR. WARSHAVSKY:  OK.  I'm sorry.  Ms. Wilcox is trying

22  to explain it.  Maybe I can let her.

23       THE COURT:  OK.  I'll make an exception, once again.

24       MS. WILCOX:  Thank you, your Honor.  I have a theory.

25       THE COURT:  By the way, we haven't heard anything from

1    at least four other attorneys here who have been remarkably

2    silent.  Go ahead.

3              MS. WILCOX:  And they are diverse, too.

4              Here is a working theory, that this sort of two-part

5    test that you have from Rogers is meant to establish that

6    standard of a more compelling case because these are added

7    factors on top of the other.

8              THE COURT:  That's the argument for putting it second

9    as opposed to first.  I understand.  I'm still thinking about

10   that one way or not.

11             But the more narrow question is whether we should add

12   something.  I define explicitly misleading is that it clearly

13   and unambiguously confused consumers or prospective consumers.

14   And that, I think, is language that any juror can reasonably

15   understand and is consistent with the argument that I also

16   think is right, that Rogers intended that the standard had to

17   be high for First Amendment protection reasons.

18             So you want me to add something that, if you find that

19   the evidence of confusion was particularly compelling, you must

20   find that this factor is satisfied for the plaintiffs.  And I'm

21   just having trouble seeing how the jury would evaluate that.

22             MR. WARSHAVSKY:  I think two small points, one which I

23   just realized as you were reading it, I didn't pick up.  I

24   think two should have potential consumers as well as would be

25   potentially confused, not that they were confused.

1          THE COURT:  What is the difference between --

2          MR. WARSHAVSKY:  I think it says --

3          THE COURT:  -- consumers or prospective consumers,

4    that's not the same?

5          MR. WARSHAVSKY:  I was actually going beyond confused,

6    or would have confused, meaning I don't think you have to show

7    the consumers were unambiguously confused.

8          THE COURT:  I'll consider that.

9          MR. WARSHAVSKY:  Maybe it's something like the

10   pointing back to the likelihood, because the confusion test is

11   that Polaroid factor.  I just want to make sure the jury is

12   pointed back to that, not that they think it is something

13   separate than Polaroid.  I think that is why *Twin Peaks* went

14   there.

15         In turn, your Honor, I plagiarized from you in coming

16   up with that language, so that's maybe why it sounded familiar.

17   But that was what we tried to do.  I'm certainly open to

18   suggestion.

19         THE COURT:  You learn from experience.

20         MR. WARSHAVSKY:  On both sides, yes.

21         THE COURT:  All right.  I will think about it.  Thank

22   you.

23         Yes.  Any problems now with 14, other than the first

24   beginning of it, which has to obviously be fixed?

25         MR. SPRIGMAN:  Yes.

1          So, your Honor, let me just, a thing that I think is a

2     small thing, but the real question is about what explicitly

3     misleading means.  I'll get to that in a moment.

4          Again, we would ask that you just remove the first

5     paragraph.  The second paragraph where you say it is undisputed

6     that the MetaBirkins NFTs included the associated images --

7     including -- I'm sorry -- the associated images are in at least

8     some respects works of artistic expression.

9          I'm not sure what you mean by "are in at least some

10    respects."  It would maybe sound to the jury like you're

11    slighting the artistic quality of the works and, frankly, this

12    is part of the problem that the jury really shouldn't be

13    judging the artistic quality of the works.  Once they qualify

14    as art, they should be passing through the gate of Rogers.

15          THE COURT:  They are not being asked to say whether it

16    was good art or bad art.

17          MR. SPRIGMAN:  I understand.

18          THE COURT:  I'm surprised, frankly.  I thought you

19    would be delighted with the sentence because what I'm saying,

20    or at least what I was attempting to say, is that even though

21    there are great disputes between the parties over how much of

22    this is artistic expression, there is no dispute that there is

23    at least some artistic expression ergo Rogers applies.

24          MR. SPRIGMAN:  OK.  I understand your thought, and I'm

25    willing to, you know, limit my suggestion to maybe what you

1    just said would be a clear articulation of that and wouldn't

2    necessarily --

3              THE COURT:  OK.  I can fix the wording on that.

4              MR. SPRIGMAN:  So then you say, given that, you can

5    find Mr. Rothschild liable on any of Hermès' claims if and only

6    if Hermès has proved by a preponderance of the evidence that,

7    one, Mr. Rothschild used the Birkin mark not for any artistic

8    or non-commercial purposes, but rather to solely -- I think the

9    word solely has to be in there -- solely to exploit the

10   popularity and goodwill that consumers associate with the

11   Birkin mark.

12             Again, your Honor, this first part of the test should

13   not be a freeform balancing test but, in fact, if there is any

14   artistic purpose, this element should be found in favor of

15   Mr. Rothschild.  So the word "solely" would help.

16             THE COURT:  Well, see, that's why I was very surprised

17   when you disagreed with me on our discussion of objective

18   versus subjective.  If we were talking about his intent, then

19   the word "solely" might have to be in there.

20             But you told me, oh, no, it's an objective test.

21             MR. SPRIGMAN:  Your Honor, I'm arguing in two

22   different levels at the same time.

23             THE COURT:  That's clear.

24             MR. SPRIGMAN:  Yes, but, your Honor, you have to give

25   me points on that, because I'm arguing within the framework

1    that you have set down.  I'm also arguing with the framework I

2    think is right, having read these cases many, many times.  So

3    please give me the latitude to operate in both a practical and

4    ideal.

5              THE COURT:  Yes.

6              MR. SPRIGMAN:  So with respect to the second, and that

7    is really the nub, the nub is -- again, I have sympathy for

8    you.

9              What does explicitly misleading mean?

10             Let me suggest something that I think would be helpful

11   to the jury.  Explicitly misleading use is not a use which may

12   merely confuse consumers who draw mistaken inference of

13   connection to Hermès, and explicitly misleading use must

14   suggest that connection directly and unambiguously.

15             That's the heart of it.

16             THE COURT:  Well, part of it is there.  I say clearly

17   and unambiguously.  I'm willing to change clearly to directly.

18             So you just want the additional --

19             MR. SPRIGMAN:  Well, your Honor, what I'm reacting to

20   is somewhat infelicitous construction of a statement, a use --

21   I'm sorry -- a use of a mark clearly unambiguously confuses

22   people.  That is a conceptual mouthful, if I may mix metaphors.

23             And what I was trying to do was to break this out a

24   little bit into the idea that ordinary confusion and ordinarily

25   confusing use of a mark confuses consumers by allowing them to

draw mistaken inference.  That is not explicitly misleading

use.  Explicitly misleading use which, again, is the point of

the Rogers test to really limit liability here, to instances

where someone goes out and says, This is from Hermès, right, in

the title.

        MetaBirkins by Hermès would be an explicitly

misleading use.  You can read that right off of Rogers in the

examples that they use to define it.  Not an inference, but an

explicit statement that commands the conclusion, if anyone is

paying attention, that --

        THE COURT:  All right.  So just read me the specific

language that you would substitute for that second sentence.

        MR. SPRIGMAN:  And (2) that such use was explicitly

misleading.  An explicitly misleading use is not a use which

may merely confuse consumers who draw mistaken inference of

connection to Hermès.  An explicitly misleading use must

suggest that connection directly and unambiguously.

        THE COURT:  All right.  What are you reading from, by

the way?

        MR. SPRIGMAN:  What I wrote.

        THE COURT:  That's a good authority.

        All right.  I will certainly consider that.

        Now since we are getting quite late and our reporter

has to leave in approximately one minute, I'll hear from

plaintiff's counsel in a minute on 14.

1              But is there anything anyone has any material problem

2       with on instructions 15, 16, 17 and 18?

3              MR. WARSHAVSKY:  Plaintiff does not, your Honor.

4              MR. SPRIGMAN:  Nor defendant, your Honor.

5              THE COURT:  OK.  There was one other thing that

6       plaintiff counsel wanted to say on 14?

7              MR. WARSHAVSKY:  Yes, your Honor.

8              I have real trouble with the way that Mr. Sprigman

9       keeps changing the standard here.  I think we have to go back

10      to *Twin Peaks*.  He keeps reading *Twin Peaks* and Polaroid out of

11      this test, and even *Twin Peaks*' discussion of Rogers is as a

12      balancing test.

13             And so I think that, yes, Rogers gave some examples.

14      I think *Twin Peaks* is still the state of the law.  And to that

15      end, I want to go back to -- I do think at the end, it should

16      be about likely to confuse consumers, whether it is clearly and

17      unambiguously.

18             We limit to the subset of consumers.  We're talking

19      about 100.  The whole point of this is actually about the

20      likelihood of confusing others and members of potential

21      consumers.  I think it should match whatever you land on, on

22      the likelihood of confusion.  Whatever we're going to call

23      potential consumers, whatever it might be, it shouldn't be

24      limited to past tense people, consumers in the past.

25             I also think that, to the extent that I tried to write

1    as quickly as I can what Mr. Sprigman was reading, but I think

2    we still have -- I think he's reading Polaroid out.  So I can't

3    respond exactly to his words, but what I would say is that I

4    think if he's going to say that it must point to Hermès, I

5    don't think that is right.  It's whether or not consumers are

6    going to be confused.

7            Even at that higher level, I think you have that in

8    the clearly, unambiguously language.  Clearly, unambiguously

9    direct.  That might be that raising, that compelling showing.

10   Maybe that's the better language for the compelling that we

11   were talking about.  Maybe that's led into that clearly and

12   unambiguously, and that gets read right back into the Polaroid

13   factors.  That might be the way to solve this problem.

14           My concern is that every time Mr. Sprigman speaks, he

15   keeps changing the text.  He keeps doing it without authority.

16   I think we keep trying to go back to *Twin Peaks*, and I'm not

17   sure --

18           THE COURT:  I will certainly want to look at all the

19   major cases before making a decision.  I thank both counsel.

20   This was actually very helpful argument and very useful to the

21   court.  I look forward, more or less, to your letters.

22           why don't we get together Monday at nine o'clock, just

23   in case there are any other issues we need to deal with, and

24   we'll see you then.

25           (Adjourned to Monday, February 6, 2023, at 9:00 a.m.)

1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3     AMBRE-ELISE BINOCHE

4    Direct By Mr. Warshavsky . . . . . . . . . . 606

5    Cross By Mr. Millsaps  . . . . . . . . . . . 610

6     SCOTT DUKE KOMINERS

7    Direct By Mr. Ferguson . . . . . . . . . . . 616

8    Cross By Mr. Oppenheim . . . . . . . . . . . 672

9     MAXIMILIEN MOULIN

10   Direct By Mr. Warshavsky . . . . . . . . . . 697

11   Cross By Mr. Harris  . . . . . . . . . . . . 720

12    BRUCE ISAACSON

13   Direct By Ms. Wilcox . . . . . . . . . . . . 731

14   Cross By Mr. Oppenheim . . . . . . . . . . . 763

15   Redirect By Ms. Wilcox . . . . . . . . . . . 777

16    LUISA MARIA VITTADINI

17   Direct By Mr. Warshavsky . . . . . . . . . . 779

18   Cross By Mr. Harris  . . . . . . . . . . . . 795

19    DAVID THOMAS NEAL

20   Direct By Mr. Millsaps . . . . . . . . . . . 802

21

22

23

24

25

```
 1                      PLAINTIFF EXHIBITS

 2   Exhibit No.                              Received

 3    41    . . . . . . . . . . . . . . . . . 606

 4    96    . . . . . . . . . . . . . . . . . 618

 5    27, 28, 34, 37, 385   . . . . . . . . . . 697

 6    190   . . . . . . . . . . . . . . . . . 732

 7    6   . . . . . . . . . . . . . . . . . . 769

 8    45, 253, 254, 315 and 380   . . . . . . . 779

 9                      DEFENDANT EXHIBITS

10   Exhibit No.                              Received

11    588   . . . . . . . . . . . . . . . . . 804

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```