```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   HERMÈS INTERNATIONAL, et al.,

 4                   Plaintiffs,

 5         v.                              22 Civ. 384 (JSR)

 6   MASON ROTHSCHILD,

 7                   Defendant.            Trial

 8   ------------------------------x
                                          New York, N.Y.
 9                                         February 6, 2023
                                           9:30 a.m.
10
     Before:
11
                         HON. JED S. RAKOFF,
12
                                          District Judge
13                                          -and a Jury-

14

15                          APPEARANCES

16   BAKER & HOSTETLER LLP
          Attorneys for Plaintiffs
17   BY:  DEBORAH A. WILCOX
          OREN J. WARSHAVSKY
18        GERALD J. FERGUSON

19   HARRIS ST. LAURENT & WECHSLER LLP
          Attorneys for Defendant
20   BY:  ADAM B. OPPENHEIM
          JONATHAN A. HARRIS
21
     LEX LUMINA PLLC
22        Attorneys for Defendant
     BY:  RHETT O. MILLSAPS, II
23        CHRISTOPHER SPRIGMAN

24

25
```

1          (Trial resumed; jury not present)

2          THE COURT:  All right.

3          So let me thank counsel for both sides for their

4     letters submitted over the weekend, which I have carefully

5     reviewed.

6          Is there anything further that defense counsel wants

7     to say on the issue of whether or not to allow the supplemental

8     report and corresponding supplemental testimony by Dr. Neal?

9          MR. SPRIGMAN:  Your Honor, very briefly, the issue

10     here is one of the evidence and the effect of Dr. Isaacson's

11     report.  The Hermès mark is either in the claim or out.

12          In the complaint, there are many paragraphs -- 148,

13     165, 166, 169 -- where Hermès makes clear that the Hermès word

14     mark is in the claim.  Now it's out.

15          The problem is that we can't tell from Dr. Isaacson's

16     report, as Dr. Neal will testify, whether confusion that is

17     purported to be measured is caused by the Birkin word mark, the

18     Birkin trade dress or the Hermès word mark.

19          Hermès now says, well, the Hermès word mark is just an

20     aggravating factor.  Okay.  But the problem there is, first, we

21     need to know if the marks that are actually in the claim are

22     causing confusion.  Then we can assess whether the Hermès mark

23     is an aggravating factor.

24          As the record stands now, your Honor, given their

25     posture in this litigation, the Hermès word mark's presence in

1    the test stimulus but not in the control stimulus, your Honor,

2    is in fact a confound to this report.

3           That we think is an important element of evidence for

4    the jury to understand.  We think that unless Dr. Neal is

5    allowed, now that Hermès has clarified their claim, to testify

6    to this, we would be materially prejudiced.  That is why we put

7    in the supplemental report.

8           By the way, Dr. Neal, I should add, in his initial

9    report made an analysis that relates directly to this issue.

10   In fact, this supplemental report is an extension of that

11   analysis.  He said that Hermès' expert Dr. Isaacson had tested

12   all of potential stimuli together and so that you could not

13   disentangle what element of the so-called confusion had been

14   caused by each of these elements.  Now that the Hermès mark is

15   out, that critique sharpens, and that's what we want to be able

16   to tell the jury, your Honor.

17          THE COURT:  Let me hear from plaintiff's counsel.

18          MS. WILCOX:  Thank you, your Honor.

19          This case has not changed in the scope of the rights

20   that Hermès is claiming are infringed and diluted by Mason

21   Rothschild's MetaBirkin NFTs.  We have said since July, when

22   Dr. Isaacson started this survey and later produced his report,

23   maintained he was testing the web page metabirkins.com that the

24   defendant put out and where a person who might be interested in

25   buying an NFT would go to see what it is all about.

1           It is the use of the Birkin name and a slogan as part

2    of MetaBirkins of course, and that the actual designs of the

3    digital images copy the trade dress, those are the key

4    elements.  The fact that there was a disclaimer that mentioned

5    Hermès the company that puts out these products three times was

6    also very relevant to Dr. Isaacson.  He grouped all of those

7    things together because that is what the real world is.

8           The survey is meant to capture as much of the real

9    world as the purchaser sees things as possible.  So that's what

10   he did.

11          THE COURT:  So my view is this:  First, whatever may

12   have been said in the complaint throughout this case, it's been

13   the plaintiff's consistent position and the Court's

14   understanding that the mark that was being infringed allegedly

15   was the Birkin mark, as my instructions indicate, and that the

16   reference to Hermès was part of the overall picture, but was

17   not a separate claim.

18          So I don't see the basis at this very late stage for a

19   supplemental report from Dr. Neal.  I do think that for what

20   was just represented by defense counsel about what's in his

21   original report that he still then can make the argument that

22   different things are being globbed together and that that makes

23   the survey less useful, less valuable than it might otherwise

24   be or whatever he wants to conclude in that regard.

25          Someone should go tell Dr. Neal, since he's going to

1    be on the stand in ten minutes, that that's how we're going to

2    handle it.

3         Now, the other issue that I wanted to be sure to

4    reach, because we will be going into summations after

5    Dr. Neal's testimony, is Instruction No. 14, particularly the

6    third paragraph of it.

7         I spent a good deal of the weekend reflecting on the

8    various excellent arguments I have received from both sides at

9    the charging conference, and the instructions that I sent you

10   over the weekend reflect my rulings.

11        I will note one thing for the record, since it was one

12   of the issues that I was uncertain about, in the end I have put

13   the instructions regarding the three claims first, before the

14   instruction on First Amendment protection for several reasons.

15        One is I think that's the more logical way for the

16   jury to proceed.  If there's no infringement they don't reach

17   the First Amendment question.

18        Secondly, as we all know, the Supreme Court has taken

19   cert. in the *Jack Daniels* case, so it's possible the *Rogers*

20   test may not survive, though I personally hope it does.  In

21   that case, if they found infringement, but found that it was

22   barred by the First Amendment defense, the Court could then

23   reinstate the infringement conclusion without having to go

24   through a whole new trial.  We might still have to have a trial

25   of damages, but that would be a much more abbreviated matter.

1    But I did add to Instruction No. 9, where I am describing the

2    basic claims, a sentence to flag the First Amendment defense

3    was coming.  I think that was a fair resolution of the

4    competing arguments.

5           Now, the more I thought about the *Rogers* test and the

6    various cases not just in the Second Circuit but elsewhere that

7    have elaborated and expanded the *Rogers* test over the weekend,

8    the more I thought that on the facts of this case the real

9    question is the defendant's intent.

10          Because while both *Rogers* and the related cases speak

11   in, frankly, less than clear terms like "explicitly misleading"

12   or "artistically relevant" and the like, the real question

13   here, so far is the defense is concerned, is did Mr. Rothschild

14   intend to mislead?  In which case, of course, he has no First

15   Amendment protection, any more than a con man has First

16   Amendment protection from telling lies to the public to make

17   money.  Or did he not intend to mislead, in which case I think

18   there can be no question that there was at least some artistic

19   aspect to what he was offering.

20          As indicated in the instruction by his covering the

21   Birkin bags with fur, he says he covered it with fur to show

22   how ridiculous the consumer interest in Birkin bags was and the

23   plaintiff says, no, it was just part of his whole way to try to

24   sneak in as he sought to dupe the public.

25          They would be fair arguments to the jury, but that all

1    goes to his intent.  That's why I said I think the focus is

2    really on intent.

3           So I try to capture that, but I have added some

4    additional words since I sent this to you on Saturday to the

5    third paragraph of Instruction No. 14.  Everything else will

6    remain exactly as it is, and all objections thereto are

7    preserved.

8           But here is now what I have for 14:

9           "It is undisputed that the MetaBirkins NFTs, including

10   the associated images, are in at least some respects works of

11   artistic expression, such as, for example, the addition of the

12   total fur covering on the Birkin bag images.  Given that,

13   Mr. Rothschild is protected from liability on any of Hermès'

14   claims unless Hermès proves by a preponderance of the evidence

15   that Mr. Rothschild's use of the Birkin mark was not just

16   likely to confuse potential consumers, but was intentionally

17   designed to mislead potential consumers into believing that

18   Hermès was associated with Mr. Rothschild's MetaBirkin

19   projects.  In other words, if Hermès proves that Mr. Rothschild

20   actually intended to confuse potential customers, he has waived

21   any First Amendment protection."

22          I think, as will be obvious, that doesn't use some of

23   the buzzwords from *Rogers* and related cases, but I think the

24   whole *Rogers* issue in this case turns on his intent.

25          So let me hear any comments on the new version of

1    paragraph 3 first from plaintiff's counsel and then from

2    defense counsel.  Again gem thank you, your Honor.

3              MS. WILCOX:  Thank you, your Honor.

4              Thank you for that careful consideration and revised

5    text, which we agree that the intent is key in this case.  We

6    were trying to come up with our own way of bringing it back in

7    and following your summary judgment discussion of the Second

8    Circuit law.  So I think that is a good rewrite with respect to

9    that second prong.

10             We still have concern that the first prong seems to

11   have disappeared.

12             THE COURT:  I think the first prong, the defense has

13   shown and made enough that no reasonable juror could conclude

14   that there wasn't any artistic expression in Mr. Rothschild's

15   stuff.  That's why I didn't charge the first prong.

16             MS. WILCOX:  We might make a note of an objection

17   then.

18             THE COURT:  Yes.  I assume you would object to that,

19   so objection duly noted.

20             Let me hear from defense counsel.

21             MS. WILCOX:  If you wouldn't mind.

22             THE COURT:  Sorry.  Go ahead.

23             MS. WILCOX:  I am also considering whether this

24   revision deals with another issue that we were thinking about,

25   where the dilution cause of action has no requirement of

1    misleading conduct, but it does relate to an intent to

2    associate versus the intent to cause confusion.  I think you

3    might have addressed that with this.

4            THE COURT:  I use the word "associated" in the new

5    version, yes.

6            MS. WILCOX:  Okay.  Thank you.

7            MR. SPRIGMAN:  Your Honor, just in response to that

8    last quickly.  Yes, the dilution cause of action does require

9    an intent to associate, but in addition, it requires harm to

10   the mark.  It requires an impairment of the mark's

11   distinctiveness.  So we think that your instructions as they

12   stand make that clear to the jury, or at least clear enough.

13   These are lay people, and this is complicated.

14           But back to the instruction itself, we here at this

15   table believe that the instruction gives the jury words they

16   can use to actually apply the principle, and we are satisfied

17   with it.

18           That said, Judge, we do remain, we have remaining

19   arguments on the JMOL and in particular something that I think

20   is central to the relationship between *Rogers* and this case

21   that I would just like at some point to get to.

22           THE COURT:  If we had had more time right now, I was

23   going to hear the further argument on the Rule 50 motions, but

24   as I promise you, you will have that opportunity before I rule.

25           MR. SPRIGMAN:  Thank you, your Honor.

1           THE COURT:  So we will get to that later.  Let's see

2    if the jury is here.

3           THE DEPUTY CLERK:  They are.

4           MR. HARRIS:  Your Honor?

5           THE COURT:  Yes.

6           MR. HARRIS:  May I address one private matter at a

7    sidebar, please.

8           THE COURT:  Sure.

9           (At sidebar)

10          MR. HARRIS:  Your Honor, Mr. Rothschild got food

11   poisoning last night, and I'm hoping he is going to be able to

12   make it here today, but I don't want to the jury to have any

13   type of misimpression.

14          THE COURT:  Why don't I just say, without getting into

15   the details, that Mr. Rothschild is excused and everyone agrees

16   we can proceed in his absence.

17          MR. HARRIS:  He may appear.

18          THE COURT:  You want me to say delayed not because of

19   his fault?

20          MR. HARRIS:  Yes, thank you, your Honor.

21          (In open court)

22       (Continued on next page)

23

24

25

 1              (Jury present)

 2    DAVID THOMAS NEAL, resumed.

 3              THE COURT:  Good morning, ladies and gentlemen.

 4              Welcome back.  I hope you had a good weekend, but now

 5    we have work to do.

 6              I should mention that, through no fault of his own in

 7    any respect, Mr. Rothschild is delayed this morning.  He will

 8    be with us later, but counsel have agreed we can proceed even

 9    in his absence.

10              So, counsel.

11    DIRECT EXAMINATION (Continued )

12    BY MR. MILLSAPS:

13    Q.  Good morning, Dr. Neal.

14    A.  Good morning.

15    Q.  When we left off on Friday afternoon, we had just gone

16    through an overview of your background and credentials.  Do you

17    recall testifying that you have published 26 peer-reviewed

18    papers?

19    A.  Yes, I do.

20    Q.  Have you also acted as a scientific peer reviewer for other

21    peoples' articles?

22    A.  I have.  In fact, I was a peer reviewer on many journals in

23    psychology and consumer behavior.

24    Q.  Has your previous work as an expert witness involved the

25    design and implementation of surveys to assess whether there is

1   a likelihood of confusion between two trademarks?

2   A.  Yes.  I have done that many times.  A rough estimate would

3   be 60 to 90 different surveys of that kind specifically.

4   Q.  And the jury heard Dr. Isaacson talk about his use of the

5   *Eveready* method for testing likelihood of confusion.  Have you

6   used that specific method in conduct surveys before?

7   A.  I have.  That's a common method, and I've probably used it

8   50 times I would say.

9   Q.  Before we get into the details of what you have to say,

10  have you heard of Dr. Isaacson before this case?

11  A.  I had.  We actually worked on the same side of a case a

12  couple of years ago.  So I was aware of him from that prior

13  case.

14  Q.  And on Friday afternoon, did Dr. Isaacson approach you here

15  in the courthouse?

16  A.  He did, yes.  I think just to say hello, since we had never

17  met in person before, despite having worked on that case.

18  Q.  Now, you testified on Friday about your assignment in this

19  case.  But would you just remind us of what your goals were.

20  A.  Sure.  Pretty simple.  To conduct a scientific review of

21  the two surveys that Dr. Isaacson did, and in particular to

22  look at his conclusion from the first survey, the one of the

23  NFT purchases, where he concluded that there was a likelihood

24  of confusion.  I looked very closely at that confusion to work

25  out if it was accurate or not.

1  Q.  Did you prepare some slides for your presentation today?

2  A.  I did.

3         MR. MILLSAPS:  Ashley, would you please put up the

4  first slide here.

5  BY MR. MILLSAPS:

6  Q.  Dr. Neal, could you explain your methodology for evaluating

7  Dr. Isaacson's surveys?

8  A.  Certainly.  This is pretty similar to the process you go

9  through in any scientific technical review of someone else's

10  work.  You begin by very carefully going through the

11  questionnaires themselves kind of line by line looking for any

12  biases or ambiguous language or any design flaws.

13         The second thing you do is you actually go into the

14  raw data.  So basically every single person's answer to every

15  single question, you look at that, and you reanalyze the data

16  to see if the person who analyzed it initially, so

17  Dr. Isaacson, did it correctly.

18         And then the final thing is you write up whatever you

19  find in a formal report.

20         MR. MILLSAPS:  And Ashley could we go to the next

21  slide.

22  BY MR. MILLSAPS:

23  Q.  At a high level, Dr. Neal, how would you summarize your

24  conclusions about Dr. Isaacson's surveys.

25  A.  Sure.  Perhaps the most important one thing is that NFT

1   purchaser survey, where Dr. Isaacson told you that he found

2   evidence of confusion, that people would think the MetaBirkins

3   NFT is in -- that Hermès is involved in that NFT somehow, in

4   that survey, Dr. Isaacson misclassified a large number of

5   respondents as confused who actually were not confused.

6           I was able to fix that error, and I'll walk you

7   through how I did it.  Once you correct for that mistake, you

8   get 9.3 percent confusion, not the 18.7 percent number that he

9   reported.

10  Q.  And, Dr. Neal, why would it matter if confusion dropped

11  from what Dr. Isaacson reported, which was 18.7 percent, down

12  to 9.3 percent?

13  A.  Right.  So it seems like a small drop, right?  Just from

14  18.7 down to 9.  It is actually hugely consequential because

15  survey experts typically use a threshold of around 15 percent

16  as the minimum for deciding that there is a likelihood of

17  confusion, right?

18          So when Dr. Isaacson had a number like 18.7 percent,

19  he was just a little bit above that minimum number.  But when I

20  reanalyzed his data, his real number is 9.3, which falls well

21  below that typical minimum threshold for determining that

22  there's some confusion.

23          So when you get a number like that, like 9.3, the

24  proper conclusion is that there is no confusion.  Because it

25  doesn't have to be zero; it just has to be so small that it is

1    considered immaterial.  And 15 is that typical magic number, if

2    you like, for reaching that determination.

3          MR. MILLSAPS:  Ashley, would you go to the next.

4    BY MR. MILLSAPS:

5    Q.  Dr. Neal, were there other flaws in Dr. Isaacson's survey?

6    A.  Yes.  There were a couple of other flaws that -- like buyer

7    survey language, and I will talk you through that.

8          I wasn't able to fix those flaws by reanalyzing the

9    data, but I know that they pushed the confusion numbers up in

10   an artificial way, so I would say even that 9.3 percent number

11   is a bit high and the real number is no doubt a little bit

12   lower than that.

13   Q.  And, Dr. Neal, were you aware that Dr. Isaacson conducted a

14   survey as well among handbag purchasers?

15   A.  Yes.  So those first three conclusions are all about that

16   NFT purchaser survey, so people out there interested in buying

17   NFTs.

18         He also did a survey of people who spend a lot of

19   money on handbags, $10,000 or more.  In that survey, he found

20   no confusion whatsoever.  Inexplicably, it doesn't really show

21   up in his report, I think it's important for us to look at that

22   survey as well.

23         Being a good scientist means you look at all of the

24   data from all of the studies you run, and that second survey of

25   handbag purchasers tells us very clearly that likely purchasers

of Hermès products, people who buy the expensive handbags, are

not likely to be confused and think that Hermès puts out the

MetaBirkins NFT.

Q.  Dr. Neal, when you read Dr. Isaacson's report in this case,

did he report on his findings there in the handbag survey?

A.  Not really.  They were kind of hidden in the exhibits in

his report, so I had to go in myself and calculate the

confusion number for the handbag purchaser survey to discover

that it was so low.  He did have the raw numbers to calculate

it in his report, but in the main body of his report he didn't

even describe any conclusions about that study.

Q.  And before we dive into this first flaw, you've said that

there are several flaws with the survey.  When you say "flaw"

are you being nitpicky about his survey, or are these important

things?

A.  These are all very significant flaws.  There were some

additional flaws that are in my report that maybe are less

significant.  I am not focusing on those here.  I am just

telling you about the really big issues that materially change

the conclusion from the study, that change the implication from

supporting confusion to showing that there is no confusion.

Those are the flaws that I'm focusing on.

          MR. MILLSAPS:  Ashley, could we go to the next slide,

please.

BY MR. MILLSAPS:

 1  Q.  So, before we get into the flaws, could you just walk us

 2  through how Dr. Isaacson's survey design worked here.

 3  A.  Sure.  So I will try not to be too nerdy, but I think it is

 4  helpful just to have a reminder of how an *Eveready* survey

 5  works.  If you remember, that's the name of the survey format

 6  that Dr. Isaacson used.

 7          It kind of works like this:  If you start at the top,

 8  you begin by recruiting the right kind of consumers.

 9          Dr. Isaacson did this step correctly.  He went out and

10  he found likely purchasers in the United States of NFTs, right?

11  People in the market to buy an NFT.  No problem there.

12          Then what he did was he randomly assigned people to

13  one of two conditions, a test or a control, just like you might

14  in a drug trial, right?  Some people get the drug, some people

15  get a placebo.

16          But in his test condition, people saw the MetaBirkins

17  website, which includes the word "Birkin," "not your mother's

18  Birkin," it includes the word "MetaBirkins," it includes

19  "Hermès" in the little disclaimer at the bottom.  And according

20  to the plaintiff, it includes the trade dress, the design of

21  the Birkin handbag.

22          In the control group he took all of those things away.

23          So imagine yourself, you are in one of these two

24  conditions and then you just get asked a series of questions:

25  "Who do you think makes or puts out the items shown on the

 1 | website?"

 2 |        You write down whatever you think.

 3 |        "Who do you think sponsors approves or authorizes the

 4 | items?"

 5 |        You write down whatever you think.

 6 |        And then if we bring the next animation up --

 7 | Q.  Actually, before we do that, Dr. Neal, I have one other

 8 | question.

 9 | A.  Sure.

10 | Q.  Just at the beginning here, where Dr. Isaacson was sampling

11 | likely purchasers of NFTs, were you aware of the criteria that

12 | he used to determine if someone was likely to purchase a

13 | high-value NFT?

14 | A.  Yes.  I believe it was $2500 or more.

15 | Q.  Do you know what he did to verify whether those people

16 | actually intended to spend that kind of money on an NFT?

17 | A.  Not very much.  In the survey, what would be normal if

18 | you're trying to find a hard-to-reach population, there aren't

19 | a lot of people out there who are buying $2,500 NFTs, so

20 | normally what you would do is you would add perhaps some

21 | questions to verify that people know what they are talking

22 | about, maybe that they've got a crypto wallet, something like

23 | that.  He didn't do that.

24 |       MR. MILLSAPS:  Ashley, could we go to or just I think

25 | advance on this slide.

BY MR. MILLSAPS:

Q.  If you could go on with what you were explaining about this, Dr. Neal.

A.  Right.  So, going back to the test and the control, you've seen the MetaBirkins website or the control, where he's removed those elements that I've mentioned.  And you literally just count up the number of people who mention the plaintiff as either making or providing the items or sponsoring, approving, or authorizing them.

       In his analysis that he presented to you, he said that in his test cell 21.6 percent of people identified the plaintiff.  And in the control, it was only 2.9.  So what we do is we subtract the control number from the test, and that we call that number the net confusion number.  That's 18.7.

       So, so far what I have done is I have just explained to you what he did and how he reached that conclusion, and now I am going to explain to you what was wrong with that.

       MR. MILLSAPS:  Ashley, if you could go to the next slide.

BY MR. MILLSAPS:

Q.  Dr. Neal, you mentioned this flaw No. 1, a misclassification by Dr. Isaacson of respondents.

       Could you explain that.

A.  Yes.  So the basic idea is that he counted a whole bunch of people as confused who actually were not confused.  And the

1    reason for this is he ignored something called the playback

2    problem.  And this is a problem is that arises in particular

3    surveys, not all of them, but it arises any time when the

4    plaintiff and the defendant are using the same name, right?

5           So actually the originally case, the first one ever

6    done back in 1975 faced exactly this problem because it was one

7    company using the name and the other company using the name .

8           What does that mean?

9           It means that if you show people the defendant's

10   product, so here that would be the MetaBirkins website, and you

11   ask who puts this out, people are just going to read back the

12   name if that is on the screen, right?  And you don't know from

13   that whether they're really thinking about the plaintiff or

14   they're just reading back the word that you saw on the screen.

15          And I will give you an example to make it a bit more

16   concrete in a minute, but the critical point is there's a

17   solution to the playback problem, and ever since 1975 the

18   solution has been to add this extra question.  And

19   interestingly, Dr. Isaacson did include it.

20          So it's question 4 here, right?  "What other brands or

21   products do you think are made by whoever makes or provides the

22   items shown on the web page?"

23          So if we move to the next screen, I will show you how

24   this helps us solve that playback problem.

25              Okay.  So I just wanted to give you an example of

 1    the stimulus, the MetaBirkins website that people saw, right?

 2            Just to remind you, that there is a lot of information

 3    on it, and there's a lot of brands popping up here, right?

 4            So the word "MetaBirkins" appears.  The word "Birkins"

 5    appears.  The word "Hermès" appears in I think three other

 6    spots.  So do other names, like, "Forbes," "Twitter,"

 7    "Preview."

 8            Now, the problem is, if you put a stimulus like this

 9    in front of a survey respondent and you say, who puts this out?

10    The survey respondent just wants to be helpful, and so they'll

11    start guessing.  They will be like, I don't know, Twitter or

12    Forbes.  Forbes is written here.

13            So you end up with a lot of answers like that that

14    don't really reflect confusion.  It is not really the person

15    thinking, oh, I think Forbes magazine puts out this NFT.

16    They're basically just parroting back, or playing back, the

17    names that are on the screen.

18            So if we can move on to the next slide, I'll show you

19    how we use the data from that extra question to solve this

20    problem.

21    Q.  We are about to move on to that slide, Dr. Neal.  I just

22    wanted to ask you about the slide we were just looking at.

23            We saw some little red dotted lines.

24            Did you add those to that?

25    A.  Yes.  Just to show where the marks Hermès, Birkin,

1   MetaBirkin were located on that screen.

2   Q.  And sorry, if you could just go back to that?

3   BY MR. MILLSAPS:

4   Q.  Dr. Neal, what is this that we are looking at now?

5   A.  This is basically the same thing, but from the desktop

6   version of his survey.  Some people went through on a smart

7   phone; some people went through on a desktop.  They saw the

8   same information, but it just looked a little bit different.

9          MR. MILLSAPS:  Okay.

10          Ashley, if we could go to the next slide.

11   BY MR. MILLSAPS:

12   Q.  So is there a way to fix this flaw?

13   A.  There is.  And it dates back to 1975.  So I want to explain

14   to you how we used the answer to that extra question that

15   fortunately Dr. Isaacson did include.  It's the Q4 one here.

16   But he ignored the data from it.

17          So let's look at example person 1.  These are real

18   people from Dr. Isaacson's data.  I didn't make up these

19   answers.  These are real actual respondents from his survey.

20          So person 1, when they got asked question 1, "Who

21   makes or provides the items shown on the web page?" they said

22   Birkin.

23          Okay.  And then at Q4 when they were asked, well,

24   "What other brands or products do you think are made by

25   Birkin?" because they just indicated Birkin, they said, "Birkin

1    makes real bags that are incredibly popular for people to own

2    and carry."  Right?

3           So that person is confused.  Dr. Isaacson was a

4    hundred percent correct to classify that person as confused,

5    because they said Birkin, and then they successfully identified

6    at least some good put out by Hermès.

7           The same cannot be said of person 2.  Person 2 also

8    said Birkins for question 1, but when they were asked, "What

9    other brands or products do you think are made by whoever makes

10   or provides Birkins?" they said Forbes.

11          Now, Forbes is a magazine.  Forbes was just one of the

12   other brands that was shown to them on the previous screen.  So

13   this person has failed that playback test.  They are obviously

14   just trying to be helpful, and they are writing in brand names

15   that they saw on the previous screen.  So that person should

16   not have been classified as confused.

17          The critical issue here is that Dr. Isaacson only got

18   to 18.7 percent by totally ignoring all of these Q4 answers,

19   right?  So what he did is he classified both of these people as

20   confused.

21          That was a mistake, because he ignored the playback

22   rule, and he ignored this time-honored method that dates back

23   right to the very first survey for dealing with this known

24   problem.  And because he misclassified a whole bunch of people,

25   that drove up his confusion number.  That's the only way he got

1   it up to 18.7 percent.

2          MR. MILLSAPS:  Ashley, if we could go to the next

3   slide.

4   BY MR. MILLSAPS:

5   Q.  Did you recode the data in a proper fashion?

6   A.  I did.  It is a little bit hard to see on this screen, but

7   basically what I did was I went through and found every single

8   person that Dr. Isaacson said was confused.  Then I looked at

9   their Q4 responses to see whether they really were confused or

10  not, right?  Did they identify Hermès or Birkin and then

11  successfully go on to identify some good put out by Hermès?

12         And the answer is that some do, but a whole bunch

13  don't, right?  So all the ones in green are people who

14  successfully passed the playback test.  And the ones in red,

15  those are the people he misclassified as confused who actually

16  are not.

17         MR. MILLSAPS:  Can we go to the next -- oh.

18  BY MR. MILLSAPS:

19  Q.  After accurately coding the data, what was your finding

20  again, Dr. Neal and what is the significance of that?

21         MS. WILCOX:  Objection.

22         THE COURT:  Well, it is a compound question.  Break it

23  down.

24         MR. MILLSAPS:  Okay.

25         Yes, I will do that, your Honor.

 1                Thank you.

 2      BY MR. MILLSAPS:

 3      Q.  Dr. Isaacson, could you just tell us what the implications

 4      of this first flaw were.

 5      A.  Okay.  So the main implication is that when Dr. Isaacson

 6      said he got 18.7 percent confusion, he was wrong.  He actually

 7      got 9.3 percent confusion.  That's the first takeaway.

 8      Q.  And what is the significance of that number, Dr. Neal,

 9      again?

10      A.  As I said before, the kind of magic number, the minimum

11      threshold that most experts cite to, is 15 percent.  So it's

12      only if you get 15 percent or above that you can reach a

13      conclusion that confusion exists.

14                THE COURT:  Just so we're clear, that's not a rule

15      that's set by law.  It's just set by the convention among

16      people who do these kinds of surveys, yes?

17                THE WITNESS:  Yes, sir.

18                That's right.

19                THE COURT:  Very good.

20                Go ahead.

21                MR. MILLSAPS:  Can we go to the next slide Ashley.

22      BY MR. MILLSAPS:

23      Q.  Dr. Neal, you mentioned that there was also a second flaw

24      in the NFT purchaser survey.

25                Could you explain what that flaw is.

1    A.    Sure.  So Dr. Isaacson's job was to work out if people were

2    confused about who puts out the NFT, right?  That's really

3    important.  He needed to work out if people were confused about

4    who puts out the NFT.

5          The confusion questions he used don't even make

6    mention of an NFT.  Instead, he used vague language that I've

7    got here on the screen.  He says, "Who makes or provides the

8    items shown on the web page?" or "Who sponsors approves or

9    authorizes the items shown on the web page?"

10         That might seem like a subtle distinction, you know,

11   NFT versus items, but when you look at the answers that people

12   gave in the survey, it's quite obvious that multiple people

13   were confused by this, and they interpreted it as asking them

14   about who puts out the real-world handbags that are

15   artistically depicted, right?

16         So they didn't interpret it as being asked about who's

17   behind the NFT.  They interpreted it as who's behind the

18   real-world handbags that may be artistically depicted in the

19   NFT.

20         And so of course if a person, for example, was aware

21   of Birkin handbags and could see that this was an artistic

22   depiction of a Birkin, they might think, well, this is asking

23   me who puts out the real-world handbag.  And that answer would

24   be Hermès.  But that's not confusion about the source of the

25   NFT.  That's someone accurately saying Hermès puts out the

1   real-world handbag.

2          So this is a real problem for his survey, because his

3   survey had to establish that people were confused specifically

4   about the source of the NFT.  And as I said, it's obvious from

5   looking at people's answers that a bunch of people didn't

6   interpret it that way.  And that in turn would have inflated

7   the confusion rate even further.

8   Q.  Is there a way to correct for this flaw like you were able

9   to correct for flaw number 1?

10  A.  Unfortunately, not that I could think of.  There's no way

11  to reanalyze the data to fix this.  The only thing I can say is

12  that we know that it would have pushed up the confusion rate in

13  an artificial way.

14          MR. MILLSAPS:  Ashley, could we go to the next slide.

15  BY MR. MILLSAPS:

16  Q.  Actually, before we get to the next slide, Dr. Neal, you

17  mentioned there were some other flaws that you haven't included

18  in the slides here.  Is there any other flaw that you found

19  that you would say is consequential in some way here?

20  A.  Perhaps one more would be is that, as I understand it, only

21  the word "Birkin" and the trade dress and the word

22  "MetaBirkins" are accused of causing confusion.  But

23  Dr. Isaacson's design also included the word "Hermès" in the

24  test, and it missing in the control.

25          Now, what does that mean?

1          It means that he can't isolate the effect of the three

2     elements, Birkin, MetaBirkin, trade dress of the Birkin, he

3     can't isolate the effect of those three things separate from

4     the effect of Hermès.

5          That's a scientific problem, because it means that

6     ultimately he can't tie his 18.7 percent number, which as I've

7     explained is wrong and too high, but he can't tie that number

8     specifically to the three things that the plaintiff alleges is

9     causing confusion.

10         The nerdy technical term is he has a confound in his

11    study design, because Hermès was present in the test and it was

12    missing in the control.

13    Q.  So, just very briefly, Dr. Neal, how would you summarize

14    your conclusions about Dr. Isaacson's NFT purchaser survey?

15    A.  So the main conclusion really is that the survey does not

16    show 18.7 percent confusion.  It shows under 10 percent

17    confusion.

18         That, in the parlance of survey experts working in

19    these kinds of surveys, means there is no confusion.  Confusion

20    doesn't have to be zero.  I don't think I have ever run a

21    survey that's found zero confusion.  But as long as the number

22    is below 15, that's the most typical threshold number, the

23    proper conclusion is the survey shows there is no material

24    confusion at all.

25         MR. MILLSAPS:  Ashley, could we go to the next slide.

1            Thank you.

2   BY MR. MILLSAPS:

3   Q.  Dr. Isaacson, you mentioned -- or, Dr. Neal, you mentioned

4   Dr. Isaacson's handbag purchaser survey.

5            Could you just, again, explain what you did to analyze

6   the results of that survey.

7   A.  Certainly.  So, as I mentioned, Dr. Isaacson ran this

8   survey, but he didn't properly write up the results in his

9   report.  He did have all the information there hidden in kind

10  of exhibits, and I could go in and calculate the confusion

11  number from this second survey, right?

12           Just as a reminder, this is the survey of the people

13  spending $10,000 or more on handbags, right?  So that would

14  include likely customers of Hermès goods.

15           The design was basically the same as the first survey.

16  What he found, there was a confusion level of 3.6 percent.  So

17  incredibly low, way below that 15 percent threshold.

18           What do we take away from this?  This very clearly

19  shows that Hermès customers are not at all likely to be

20  confused and think that Hermès is behind Mr. Rothschild's

21  MetaBirkins NFT.

22  Q.  Dr. Neal, in your opinion, was it proper for Dr. Isaacson

23  to ignore the results of his survey in reporting his opinions

24  about confusion over MetaBirkins?

25  A.  No, it wasn't, because the proper scientific method means

 1    if you design two studies, you had a good reason to design two

 2    studies, and you present the results from the two studies

 3    regardless of whether they help you or hurt you.  That's the

 4    neutral scientific way of doing things.

 5            And I didn't find Dr. Isaacson's explanation for, you

 6    know, running the study, getting, frankly, a bad result for

 7    Hermès and then claiming the study was irrelevant, I did not

 8    find that scientifically sound reasoning.

 9    Q.  Thank you, Dr. Neal.  I just have a few more questions.  We

10    have just gone through a lot of information.  In closing I

11    would just like to ask you a hypothetical.

12            Let's say that Dr. Isaacson's survey was flawless,

13    there were no flaws, and you agreed with his 18.7 percent

14    conclusion.  How would you characterize a finding of 18.7

15    percent confusion?

16    A.  If it was a properly designed study, which you know I

17    believe this is not, a finding of 18.7 would suggest some level

18    of confusion, but it's barely above the minimum level.  It's

19    less than 4 percentage points above the minimum.

20    Q.  Have you found in your own confusion surveys results higher

21    than 18.7 percent?

22    A.  Yes, many times.

23    Q.  Have you found results higher than 25 percent?

24    A.  Yes, many times.

25    Q.  Have you found results higher than 35 percent confusion?

1    A.  Yes, I have.

2    Q.  So would it be accurate to describe Dr. Isaacson's

3    purported finding of 18.7 percent confusion as meaning that

4    there's substantial likelihood of confusion?

5              THE COURT:  Sustained.

6              MS. WILCOX:  Thank you, your Honor.

7    BY MR. MILLSAPS:

8    Q.  Dr. Neal, my last question:  Do you consider 18.7 percent

9    confusion to be a substantial likelihood of confusion?

10   A.  No, I do not.  I would characterize it as barely above the

11   minimum.

12             MR. MILLSAPS:  Thank you.

13             No further questions, your Honor.

14             THE COURT:  Just so that I am clear, so the people who

15   run these kind of surveys, as I understand your testimony, have

16   decided among themselves that the cutoff point is 15 percent,

17   right?

18             THE WITNESS:  Well, I would probably characterize it

19   as partly driven by the experts and partly driven by courts,

20   because, of course, courts have accepted different numbers.

21             THE COURT:  Courts have accepted different numbers,

22   and the question of what the courts have decided is entirely

23   for the Court, not for a witness.

24             THE WITNESS:  Yes.  That's my understanding.

25             THE COURT:  So, going back to what is in your domain,

1    what the experts have chosen, so if the cutoff is 15 percent,

2    and you think that, well, even though this -- if the study had

3    been done properly that would have been above the cutoff, but

4    you say it's not really as good as a higher figure, then why

5    doesn't that cut the other way?  If it's 9 percent, as you

6    calculate, while that's below the cutoff, it is still some

7    confusion, not no confusion.  True?

8              THE WITNESS:  Well, my understanding is that courts

9    and experts have taken the position that every survey has some

10   noise in it.  And so you are unlikely to get zero purely

11   because of noise.  So a 9 percent figure actually could

12   effectively be zero because it's so small it could just be the

13   product of noise.

14             THE COURT:  But in this case, you very helpfully

15   undertook to look at the actual responses so the impact of

16   noise was minimized under your analysis because you got more

17   deeply into the data.  Yes?

18             THE WITNESS:  That's fair to say.

19             THE COURT:  Okay.

20             Go ahead, counsel.

21   CROSS-EXAMINATION

22   BY MS. WILCOX:

23   Q.  Good morning, Dr. Neal.

24   A.  Nice to see you again.

25   Q.  Nice to see you.  I last saw you on Zoom a world away.

1    A.  Yes.

2    Q.  So, to be clear, you did not conduct any survey in this

3    case?

4    A.  That's correct.  I did not.

5    Q.  But you have conducted surveys in the past for others who

6    were sued for trademark infringement?

7    A.  I have.  There wasn't the budget here to do it.  It is my

8    understanding Mr. Rothschild couldn't afford it.  Otherwise

9    perhaps I would have.

10            MS. WILCOX:  Move to strike, your Honor.

11            THE COURT:  Sustained.

12   BY MS. WILCOX:

13   Q.  You were retained on August 4, 2022, by the Lex Lumina law

14   firm, represented here by Rhett Millsaps and Chris Sprigman.

15   A.  I think that's correct.

16   Q.  You issued your rebuttal report seven days later, and you

17   agreed in advance that that would cost $21,000 no matter what

18   you did with it?

19   A.  I wouldn't characterize it quite like that.  I think that's

20   the estimate I provided, and that is indeed what I billed.

21   Q.  And were you paid for that?

22   A.  Yes.

23   Q.  Then you billed another $9,000 to Lex Lumina?

24   A.  For the deposition, correct.

25   Q.  Were you paid for that?

1  A.  Yes, I was.

2  Q.  What about Mr. Rothschild's other law firm, Paris St.

3  Laurent & Wechsler?  Have you sent any bills to them?

4  A.  No, I have not.

5  Q.  When you are testifying like here today at trial, what are

6  you being paid?

7  A.  Well, my day rate is normally $4,000 for a trial, but if I

8  am on the stand for not a long period of time, I sometimes

9  charge less.

10  Q.  What are you charging now?

11  A.  It depends.

12         THE COURT:  I think what he's indicated is it depends

13  on how long your cross-examination is.

14  A.  If you could drag it out as long as possible, that would be

15  great.

16  Q.  I would love to, but we won't in the interest of time.

17         So you testified there are not a lot of people who are

18  buying high-end NFTs.  Did I hear you correctly?

19  A.  I indicated that it is a difficult sample to recruit for

20  compared to what you commonly do in trademark surveys, you

21  know, where it might be people who buy detergents or people

22  buying a car.

23  Q.  Have you ever attempted your own survey of NFT purchasers?

24  A.  I have not.

25  Q.  And --

1    A.  Actually, let me correct that.

2    Q.  Okay.

3    A.  Sorry.  Without disclosing any confidential engagements, I

4    have embarked on some research projects along that line.

5    Q.  Have you looked at the range of prices that NFT purchasers

6    paid in this case for MetaBirkins NFTs?

7    A.  I have certainly looked at the NFT website.  I don't

8    remember analyzing the price range.

9    Q.  So you are not aware that the original minters who

10   purchased the first MetaBirkins NFTs paid around $450 for each?

11   A.  No, I didn't know that.

12   Q.  And that was in the cryptocurrency Ethereum.  Are you

13   familiar with that?

14   A.  I am familiar with that.

15   Q.  And that cryptocurrency has varied and fluctuated widely in

16   what it translates into in U.S. dollars?

17   A.  I am aware of that.

18   Q.  You agree that Dr. Isaacson chose the proper survey format

19   in this case, correct?

20   A.  He chose the proper survey format, but he didn't implement

21   it properly.

22   Q.  I only asked you if he chose it.  Could you please answer

23   the question.

24            THE COURT:  No, he answered the question fairly.

25            Go ahead.  Put another question.

1   BY MS. WILCOX:

2   Q.  You claim if someone asks a question in the very first

3   question, for example, No. 1, and it demonstrates they were

4   confused that you are going to start subtracting that

5   respondent as being counted as confused if you determine later

6   in other questions that you don't like their answers?

7           MR. MILLSAPS:  Objection.

8   A.  No --

9           THE COURT:  I think the question is somewhat

10  confusing.

11          MS. WILCOX:  We don't want that.

12          THE COURT:  Put a new question.

13  BY MS. WILCOX:

14  Q.  So let's go back.  In fact, this might be more helpful.

15          The respondents were looking at the metabirkins.com

16  web page when they were looking at the test, not the control,

17  but the test.

18          Is that your understanding?

19  A.  Correct.

20  Q.  And then they were asked a series of questions about who

21  they thought would be responsible for putting out the items

22  shown, is that correct?

23  A.  Yes.

24  Q.  And whether they thought the items might be sponsored or

25  approved by someone as well?

1    A.  Correct.

2    Q.  And so you decided to look at the verbatims, as they're

3    called, the actual words each person said in response to each

4    question, is that right?

5    A.  Yes.

6    Q.  And then you applied your own judgment as to whether or not

7    you thought they were confused?

8    A.  No, ma'am.

9    Q.  Who did the analysis then?

10   A.  I did the analysis.  But it was not my own judgment.  I

11   applied the exact coding scheme developed in the survey in

12   1975, as clearly documented, and then I believe upheld at the

13   appeals level, which clearly describes the coding method to

14   address this problem of both parties using the same name.  So

15   the coding method I used is identical to what is described in

16   the original survey.  It was Dr. Isaacson who invented his own

17   method that deviated from that.

18   Q.  Well, Dr. Neal, you're testifying that the survey was the

19   appropriate format and it was set up in 1975.  Is that when the

20   case --

21            MR. MILLSAPS:  Objection.  Compound.

22            THE COURT:  Well, that's right, but I think she was

23   just trying to move things along.

24            I will allow it.  I will break it down.

25            The survey was the appropriate format, yes?

1              THE WITNESS:  Yes.  Provided it was coded accurately.

2              THE COURT:  It was set up in 1975?

3              THE WITNESS:  I believe so.

4              THE COURT:  Go ahead, counsel.

5    BY MS. WILCOX:

6    Q.  Are you aware of any more recent court opinions that follow

7    your view of subtracting respondents?

8              THE COURT:  Sustained.

9    BY MS. WILCOX:

10   Q.  Are you aware of any more recent court opinions that

11   support the approach you are advocating in this case?

12   A.  As -- well, I am not a lawyer, so I don't track court cases

13   per se.  What I cited in my report was the most up-to-date

14   scholarly treatise by Jerre Swann, published in 2022, in a book

15   coauthored by Professor Shari Diamond who wrote the Federal

16   Judicial Center's Reference Guide on Survey Research.  And

17   Mr. Swan reiterates the necessity of using this coding scheme

18   as enshrined in the original in circumstances like this.

19             (Continued on next page)

20

21

22

23

24

25

1  BY MS. WILCOX:

2  Q.  Well, in fact, since you're paraphrasing, let's look at the

3  actual words of Mr. Swann.

4       MS. WILCOX:  Mr. Ferrer, could you please pull up Neal

5  Deposition Exhibit 140, and it's page 000145.

6  Q.  Dr. Neal, is this the paragraph of the treatise that you

7  were mentioning?  If we go to the middle, there are relatively

8  minor wrinkles.

9  A.  Yes, that's it.

10  Q.  In this case, Jerre Swann is discussing that it was likely

11  necessary in Eveready to differentiate between respondents who

12  were merely pulling back the Eveready label on the lamp from

13  those who believe the lamp was put up by the battery company.

14  He uses the words "likely necessary"; correct?

15  A.  He does.

16  Q.  He doesn't say "absolutely necessary"?

17  A.  Well, he says "likely necessary."  It also was the basis of

18  the decision in the *Eveready* case, that is how the data were

19  coded.  It's also just plain logic, right, that if you -- and

20  we saw that in the data that I put up.  Some people clearly are

21  engaging in this practice of just trying to be helpful --

22       THE COURT:  Well, I think you've answered the

23  question.

24       MS. WILCOX:  Thank you, your Honor.

25       THE COURT:  Put another question.

1   Q.  And in that *Eveready* case, there was no control group that

2   was meant to help eliminate noise; is that correct?

3   A.  That is correct.

4   Q.  And since that time in 1975, the trademark survey community

5   of experts has been following the practice of adding a control

6   group; is that correct?

7   A.  Yes, but it doesn't involve this problem.

8   Q.  That's your opinion.

9        But among your peers, we know Dr. Isaacson disagrees

10  with you.  There is at least one other person, right, who

11  doesn't agree with your interpretation of the Eveready format

12  as requiring eliminating this playback; isn't that right?

13  A.  Well, I'm sure there are experts that have a variety of

14  opinions.  My opinion is anchored in the documented coding of

15  the original Eveready, and reaffirmed right here by Jerre Swann

16  in 2022.

17  Q.  Now, in the *Eveready* case, wasn't it true that the

18  plaintiff had the trademark Eveready and the defendant had the

19  trademark Ever-Ready, just spelled with a hyphen between the

20  term, right?

21  A.  That's correct.

22  Q.  So those words sound absolutely identical; is that right?

23  A.  Yes, I believe that's right.

24  Q.  So if a respondent answered, I believe Eveready puts this

25  out, you wouldn't necessarily know which Eveready they were

 1   contemplating in answering that question?

 2   A.  Correct.

 3   Q.  And in this case, I know you understand that the Birkin

 4   trademark that is owned by Hermès the key word mark at issue,

 5   Birkin versus MetaBirkins; is that correct?

 6   A.  Yes, that's my understanding.

 7   Q.  And Birkin versus the slogan "Not Your Mother's Birkin";

 8   correct?

 9   A.  Correct.

10   Q.  Do those words sound absolutely identical to you, like

11   Eveready and Ever-Ready?

12   A.  I think they don't, but I think that's missing the point

13   that I was trying to make.

14   Q.  Well, thank you for answering my question.

15          You didn't discuss this particular case with Jerre

16   Swann, did you?

17   A.  I don't believe so.  I have discussed this issue with him

18   previously, but I don't -- no, I did not discuss --

19   Q.  He's not here to testify today about his comments about

20   whether this was only likely necessary and Eveready versus your

21   interpretation that it's required?

22          THE COURT:  Sustained.

23   Q.  When you went and reviewed the actual responses from the

24   interviewees to determine what you thought they were thinking,

25   did you go back to the original interviewees and ask them?

 1   A.   No, I think that would be logistically impossible.  And it

 2   also wasn't necessary because, as I said, the data was there,

 3   it had just been ignored by Dr. Isaacson.

 4   Q.   That data is something that you looked at by yourself or

 5   did you have anyone assist you?

 6   A.   Both.  I looked at it myself and I believe I had a research

 7   assistant look at it with me.

 8   Q.   So it wasn't clear enough for one person to determine what

 9   the interpretations of those responses should be?

10              MR. MILLSAPS:  Objection.

11              THE COURT:  Sustained.

12   Q.   Dr. Neal, you would agree that this is what's called a

13   forward confusion case?

14   A.   I believe that's what's alleged, yes.

15   Q.   And in a forward confusion case, you survey the junior

16   user's consumers; correct?

17   A.   Correct.

18   Q.   And in this case the junior user is Mr. Rothschild?

19   A.   Or his product is.

20   Q.   Sorry?

21   A.   His product, his MetaBirkins website.

22   Q.   Yes.  And so the products said that MetaBirkins that are

23   sold through NFTs?

24   A.   That's my understanding, yes.

25   Q.   To buyers of NFTs?

1    A.  Correct.

2    Q.  So NFT buyers are the relevant population to survey?

3    A.  For forward confusion, that's correct.

4    Q.  Have you ever conducted a survey where the criteria for

5    participating required the interviewee to be in the market for

6    something that cost more than $10,000?

7    A.  Yes.

8    Q.  And when you are looking for those interviewees, is there

9    any kind of priming that happens, because you're already

10   looking for someone who might be in a smaller pool because

11   they're willing to spend something like $10,000 on an item?

12             MR. MILLSAPS:  Objection.

13             THE COURT:  Well, I'm a little unclear what's meant by

14   any kind of priming.  Why don't you rephrase the question.

15   Q.  Dr. Neal, I learned a little bit about priming from reading

16   some of your background materials.  Could you tell us what

17   "priming" means?

18   A.  Sure.  So priming would be -- in this kind of context it

19   would be typically some kind of improper raising of awareness

20   or salience of a particular idea in a way that it might

21   influence you later on.

22             So, for instance, if I said, Doctor, doctor, doctor, a

23   couple of minutes later other concepts like hospital and nurse

24   might be a little bit more accessible in your thinking.  That's

25   priming.

1    Q.  And so when you are looking for people to respond to the

2    survey and you set a criteria, and it's in the industry like in

3    our case it was involving handbags; correct?

4    A.  Yes.

5    Q.  So there are only, let's say, a rarefied number of

6    companies that even make $10,000 and above handbags, would you

7    agree?

8    A.  I haven't studied it, but that sounds reasonable.

9           MS. WILCOX:  Could we please, Mr. Ferrer, pull up the

10   Exhibit 193, which is in evidence.  I believe it's slide 21.

11   Q.  And you testified that you looked at Dr. Isaacson's survey

12   results from interviewing handbag purchasers.  And you found a

13   net confusion level of 3.6 percent; is that correct?

14   A.  Correct.

15   Q.  But the actual test web page showed 18.8 percent of the

16   people looking at the metabirkins.com page were confused;

17   correct?

18   A.  Correct.  But that number is meaningless.

19   Q.  Well, the number with the control web page shows 15.2

20   percent of the respondents were confused.  And because that

21   confusion was so high when the expensive handbag survey takers

22   looked at a control page that had no reference to Birkin or the

23   Birkin bag or the Hermès and the disclaimer, it still thought

24   it was Hermès or Birkin; correct?

25          MR. MILLSAPS:  Objection.

1           THE COURT:  Sustained.

2   Q.  This survey that Dr. Isaacson conducted indicated that 15.2

3   percent of the respondents who saw the control page indicated

4   confusion; correct?

5   A.  That's correct.

6   Q.  Thank you.

7           Now, this case is about NFTs.  And I'm sure we have

8   all learned a lot, if I'm only just speaking for myself.

9           What is your definition of an NFT?

10  A.  Well, I'm obviously not a technical expert, but it stands

11  for non-fungible token.  I understand that it is to be some

12  kind of digital token that is secured by blockchain technology

13  traceable.  It's got a lineage as it moves from person to

14  person, can be tracked.  And it can have other digital objects

15  attached to it like an artwork, but that's my nonexpert

16  definition.

17  Q.  So it's like a deed we've been discussing during this case;

18  is that right?

19  A.  I wouldn't have the technical knowledge to say that.

20  Q.  Or you would agree that it could be called a digital token?

21          MR. MILLSAPS:  Objection.

22          THE COURT:  I'm not sure why these questions are being

23  put to this witness.  But I will remind the jury that in this

24  case, the NFTs were the equivalent of a certificate of

25  ownership of the underlying digital images subject to the smart

1  contract; and that we have allowed other witnesses to speak of

2  MetaBirkin NFTs as including both the certificate, if you will,

3  and the underlying images.

4          Go ahead, counsel.

5          MS. WILCOX:  Yes.  Thank you, your Honor.

6  Q.  The reason that you criticize Dr. Isaacson for saying, Who

7  do you think makes the items shown on this web page, is because

8  he should have used the word "NFT"; correct?

9  A.  I think that would be a better term that he could have

10 used.

11 Q.  And when you issued your expert report on September 1,

12 2022, you did not identify any word to replace items in that

13 report?

14 A.  I did in my deposition, but not in the report.

15 Q.  In fact --

16         THE COURT:  So if I understand though what you're

17 getting at, you think it should have used the word "images"

18 rather than "items"?

19         THE WITNESS:  No, I think he should have used the word

20 "NFT," since that's the accused --

21         THE COURT:  Yes, but that doesn't -- as you, yourself

22 just indicated, you're not an expert on NFTs; so presumably

23 most people taking the survey would not be an expert on NFTs.

24         But I thought your point — maybe I missed it — was

25 that by using the term "items," he made the people taking the

1    survey think, Oh, these bags are actually produced; whereas if

2    he had used a term like "images" or "digital images," who

3    produces these images, then that would have been clear.  Isn't

4    that the point you were making?

5             THE WITNESS:  Yes.  Anything that gets -- any language

6    that gets away from what actually happened in the data, which

7    is some people thinking, Oh, I'm being asked who put out the

8    real-world physical handbag that might be artistically depicted

9    here.  So any language — yours might be better, but any

10   language that got away from that wrong interpretation that his

11   survey respondents clearly had some of them.

12            THE COURT:  All right.  Go ahead.

13   BY MS. WILCOX:

14   Q.  And on the metabirkins.com web page, you can't find the

15   actual NFT tokens or deeds that we have identified?

16            MR. MILLSAPS:  Objection.

17            THE COURT:  Sustained.

18   Q.  And today your testimony is that he should have used the

19   word "NFT" in this survey, Dr. Isaacson's survey?  Just

20   asking --

21            MR. MILLSAPS:  Objection.

22   Q.  I'm sorry.  I want to be clear that the question I'm

23   asking, is your testimony today that the word "items" should

24   have been replaced by "NFT"?

25   A.  My testimony is that "items" was bad.  It's true that I

1  don't have the technical expertise to propose perhaps the best

2  alternative, so my testimony really is that the word "items"

3  was bad.

4  Q.  Dr. Neal, you agree, do you not, that a survey stimulus

5  must replicate the market conditions a purchaser would

6  encounter?

7  A.  Yes, I do.

8  Q.  And that the closer the survey methods mirror the situation

9  in which the ordinary person would encounter the trademark, the

10  greater the evidentiary weight of the survey results?

11  A.  As a general rule, I agree with that.

12  Q.  And Dr. Isaacson tested the metabirkins.com web page to

13  determine whether it caused confusion as either coming from

14  Hermès or Birkin or sponsored, authorized or approved by Hermès

15  or Birkin, is that a fair summary?

16  A.  No, because of the mistakes that he made in executing that.

17  Q.  Well, he was testing a web page with all of its elements of

18  the Birkin name and trade dress and Hermès in the disclaimer;

19  is that right?

20  A.  Yes, that's right.

21  Q.  And the, I think you used the term today, "artistic images"

22  that are on the metabirkins.com site, those are not photographs

23  of the Hermès Birkin bag, right?

24  A.  That's my understanding.  I don't really technically know

25  how they're created, but that's my understanding.

1   Q.  So those are not real Birkin bags that are in those images?

2   A.  Again, I'm not a technical expert, but that is my

3   understanding.

4   Q.  I have no further questions.  Thank you very much.

5          THE COURT:  Redirect.

6   REDIRECT EXAMINATION

7   BY MR. MILLSAPS:

8   Q.  Dr. Neal, you got cut off a lot when you were trying to

9   explain some of your answers; so I just want to go back to

10  those points so that you can give your explanations.

11         Ms. Wilcox, do you recall that she asked you about how

12  after the Eveready survey, control groups were added?  And you

13  began to say that that doesn't solve the playback problem, when

14  you were cut off.  Could you go on and explain what you were

15  going to explain there.

16         THE COURT:  Just so the jury is not under a

17  misunderstanding, he was cut off because he had already

18  answered the question.  It wasn't that counsel for plaintiffs

19  was wrongly cutting him off.  But that doesn't mean that you

20  can't inquire further, so go ahead.

21         MR. MILLSAPS:  Thank you, your Honor.

22  Q.  Could you explain why adding a control group doesn't solve

23  the playback problem?

24  A.  Sure.  So it is true that the surveys have got better as

25  time has gone on.  And so the very first Eveready survey that

1    was done didn't have a separate control group.  And Dr.

2    Isaacson's does, as every single Eveready survey that now any

3    expert would do.

4         The issue is having a control group doesn't solve this

5    reading back problem, because the control group didn't include

6    the words "Hermès" or "Birkin" or "MetaBirkins."  And so you

7    still have the problem that in the tests where people see

8    MetaBirkins, Birkin, Hermès, some of the people who see that

9    probably have never heard of Hermès before in their lives.  And

10   someone asks them who puts this out, and they're like, I don't

11   know, Hermès.  That's not confusion.  That's guessing.  That's

12   parroting back what's on the screen.  And that's why you have

13   to have that follow-up question.  It's why Eveready had it back

14   in 1975.  And the control group doesn't in any way address that

15   problem.  Control groups are good, but they don't solve that

16   particular problem.

17   Q.  Dr. Neal, do you recall that Ms. Wilcox showed you a

18   chapter --

19        THE COURT:  Plaintiffs feel compelled to object to the

20   notion that there's anyone in the universe who hasn't heard of

21   Hermès.

22        MS. WILCOX:  Thank you, your Honor.  I thought that

23   was maybe a joke.

24   Q.  Dr. Neal, do you recall that Ms. Wilcox showed you a

25   paragraph from a chapter of Jerre Swann's book talking about

1    this playback or reading back problem?

2    A.   Yes.

3    Q.   And do you know Jerre Swann personally who wrote that book?

4    A.   I do.

5    Q.   And have you discussed this issue with Jerre Swann before?

6    A.   Yes, I have.

7    Q.   Do you recall that Ms. Wilcox also pointed out to you that

8    in *Eveready*, the names were identical between the two marks,

9    Eveready; and then asked you about this case where the test

10   stimulus showed MetaBirkins, as well as Birkin and Hermès; do

11   you recall those questions?

12   A.   Yes.

13   Q.   And you responded:  I think that's missing the point I was

14   trying to make.  Do you recall that?

15   A.   Yes.

16   Q.   Could you explain what you meant by that?

17   A.   Sure.  So the issue with playback is simply whether the

18   respondent is saying a list of brands.  And it doesn't matter

19   if the brands are embedded in a slogan like "Not Your Mother's

20   Birkin," people are still going to see the word "Birkin" or

21   "MetaBirkin," they are going to see "Birkin" inside

22   "MetaBirkin."

23           And because of the playback problem, that means that

24   even if it's embedded in a slogan, some people, when they come

25   to guess and they are trying to be helpful and answer the

1    survey questions, they are going to shrug their shoulders and

2    they're going to say Birkin.

3         And so it doesn't matter whether the identical term

4    being used by the plaintiff and the defendant is literally

5    identical or it's -- it wasn't literally identical in the

6    *Eveready* case, by the way.  It doesn't matter if it's embedded

7    in a slogan, it's still going to trigger some participants to

8    just parrot back.  And we need to find who those people are

9    because they don't count as confused.

10   Q.  Thank you.

11        And do you recall that Ms. Wilcox asked you whether

12   you had a research assistant look at Dr. Isaacson's coding data

13   as well?

14   A.  Yes.

15   Q.  And why did you have a research assistant also look at the

16   data that you were analyzing?

17   A.  It's standard safety conservative protocols; just to make

18   sure that, you know, I didn't miss something or that she didn't

19   miss something.  So we normally code things independently.  We

20   come together and we compare our coding.  And normally we coded

21   everything exactly the same, but occasionally something might

22   be different and then we discuss it.  I think in this instance

23   we coded everything identically.

24   Q.  And do you recall that Ms. Wilcox was asking you questions

25   about who was the relevant population to survey for this case,

1   whether it was NFT buyers or handbag purchasers?

2   A.  Yes.

3   Q.  And if you had been hired by Hermès to conduct the surveys

4   that Dr. Isaacson conducted, would you have known the answer to

5   that question before you conducted the surveys?

6   A.  Yes.  That's one of the things that's strange here.  If

7   forward confusion is being alleged, then you would normally

8   only run a forward confusion survey.  I understood that perhaps

9   the second survey was relevant to whether Hermès wanted to

10  branch out into NFTs.

11  Q.  And so if the plaintiffs said, Well, the handbag purchaser

12  survey was irrelevant for this reason or that reason, would

13  they have known that before the survey was conducted in the

14  first place?

15  A.  Yes, absolutely.

16          When you start a project like this, you discuss with

17  the law firm, you know, what is the scope of the allegation.

18  And then you align on a survey, maybe you do more than one

19  survey.  But I've never been in a position where you and the

20  lawyers say, We need to do these two surveys.  Let's go and do

21  them.  Oh, this one produced really bad results.  Actually,

22  that survey is irrelevant.

23          MS. WILCOX:  I'm going to object, your Honor.

24          THE COURT:  Well, the question as posed was answered

25  in the first two words, which was "Yes, absolutely."  So the

 1    rest of the answer will be stricken.

 2          MR. MILLSAPS:  And how would you have known -- sorry,

 3    could I get the question -- the last question read back so I

 4    can remember --

 5          THE COURT:  The question was:  If the plaintiffs said,

 6    Well, the handbag purchaser survey was irrelevant, would they

 7    have known that before the survey was conducted in the first

 8    place?  And his answer was yes.

 9    Q.  And how would they have known that, Dr. Neal?

10    A.  Well --

11          MS. WILCOX:  Objection.

12          THE COURT:  No, I'll allow it.

13    A.  How would they have known that it was irrelevant before

14    conducting it?  Well, because the law firms know what claims

15    they're bringing; they know what kind of confusion they are

16    alleging.  And they design a survey to test whatever the

17    alleged confusion is.  So that's why that's an unusual set of

18    circumstances.

19          MR. MILLSAPS:  And I just have one more question, but

20    I need to show Dr. Isaacson slide 21, the one that Ms. Wilcox

21    was showing him.  I'd ask, Ms. Wilcox, would you be able to put

22    up Dr. Isaacson's slide 21 for us?  Thank you very much.

23    Q.  Dr. Neal, do you recall that Ms. Wilcox was asking you

24    about the numbers in the test web page and the control web page

25    columns here for the handbag survey?

1    A.   Yes.

2    Q.   And what do those numbers mean?

3    A.   So in any experiment, the numbers you get in the test, in

4    the control by themselves really don't mean very much at all.

5    So the 18.8 percent that Dr. Isaacson got on a test page and

6    the 15.2 percent that he got on a control web page, they don't

7    really mean very much, except possibly the fact that if you're

8    speaking to people who know handbags, who know expensive

9    handbags, a bunch of them are going to say Hermès to anything.

10            What matters is the net.

11            The net is the difference in confusion when the

12   specific things that the plaintiff is alleging to cause

13   confusion are present, that's the test, versus when they are

14   absent in the control.

15            So the net, that 3.6 number, that tells us how much

16   extra confusion is coming from the name Birkin, the

17   MetaBirkins, and the shape, the design of the Birkin handbag.

18   So that is a tiny number, 3.6.  This study shows that those

19   three alleged causes of confusion are actually not causing any

20   confusion whatsoever, very close to zero.  And that is amongst

21   Hermès' own likely buyers.

22   Q.   Thank you.  No further questions.

23            THE COURT:  Any recross?

24            MS. WILCOX:  No, your Honor.

25            THE COURT:  Thank you very much.

```
 1              You may step down.

 2              (Witness excused)

 3              THE COURT:  Okay.  So, ladies and gentlemen, we're

 4   going to give you a ten-minute break now, and then we're going

 5   to hear the closing arguments of counsel.  Each of the counsel

 6   has asked for an hour, so that will take us right up to our

 7   lunch break at 1 o'clock.  Then we'll have our lunch, and then

 8   I'll give you my instructions of law, which will take about a

 9   half hour.  And then the case is yours.

10              So take a ten-minute break.

11              (Jury not present)

12              THE COURT:  So I will note for the record that it is

13   generally agreed that one of the greatest novels ever written

14   was Swann's Way.  But the record will reflect that that was not

15   written by Jerre Swann.

16              Let me have my law clerk pass to counsel the final

17   charge.  And you're free -- either counsel is free to refer to

18   it during closing argument.

19              I had forgotten this morning, really we ran out of

20   time.  Was there any objection to the verdict form?

21              MS. WILCOX:  Your Honor, there was a little bit of

22   cleanup under the trademark infringement Polaroid factors that

23   we wanted to bring to your attention.

24              THE COURT:  No, no, no, I'm asking about the verdict

25   form.
```

1                MS. WILCOX:  Oh, the verdict form.

2                With your Honor's change in the First Amendment, we

3       had a question about whether we were going to ask for the

4       dilution and cybersquatting claims to be broken out

5       individually under the First Amendment analysis, but I do not

6       believe that is needed any longer.

7                THE COURT:  No, given that we've now reduced it to the

8       question of intent, I don't think it matters.  So I take it you

9       are otherwise satisfied with the verdict form.

10               MS. WILCOX:  Yes, thank you.

11               THE COURT:  All right.

12               MR. HARRIS:  We have no objection, your Honor.

13               THE COURT:  All right.

14               So I'll give you folks -- I'm sorry, yes.

15               MR. HARRIS:  Your Honor, I don't know if you're going

16      to get off the bench.  I have one issue.

17               THE COURT:  That's what I was planning to do, but if

18      you'd rather have the pleasure of my company, I'm at your

19      disposal.

20               MR. HARRIS:  I would, your Honor.

21               Your Honor, when we made an agreement with plaintiffs'

22      counsel not to call Mr. Loo to save time, there were two

23      documents that we had intended to put in through Mr. Loo.  I do

24      not believe they are controversial documents.  One is a press

25      release that Mr. Loo put out regarding MetaBirkins, and the

```
 1   other is a correction to a reporter.

 2           And I had understood that these documents would be

 3   stipulated in.  And Mr. Warshavsky last night told me that they

 4   would not be stipulated in.

 5           And, A, I would ask that they be stipulated in; and,

 6   B, if they are not stipulated in, I would certainly ask that

 7   Mr. Warshavsky not say anything contrary to these documents.

 8           MR. WARSHAVSKY:  I'm not sure I agree with the --

 9           THE COURT:  No party is required to stipulate to

10   anything.  So if you're not stipulating to them, they are not

11   in.  But what about the question about --

12           MR. WARSHAVSKY:  I wasn't intending to discuss the

13   documents.

14           THE COURT:  Okay.  Good.

15           MR. HARRIS:  Thank you, your Honor.

16           THE COURT:  That reminds me, there was this one

17   question about how much of one exhibit was in or out, has that

18   been resolved?

19           MR. HARRIS:  Your Honor, the exhibit is in.  The only

20   issue is the pages.  It was a very long document.

21           THE COURT:  Right.

22           MR. HARRIS:  It was going to be -- I can meet with

23   Mr. Warshavsky at the break.

24           THE COURT:  You'll have the lunch break to work this

25   all out, but I want to be able right after my charge to send
```

the exhibits and the index to the jury.  So just make sure it's

done before then.

          MR. HARRIS:  Thank you, your Honor.

          THE COURT:  Okay.  Very good.

          We'll take five more minutes.

          (Recess)

          THE DEPUTY CLERK:  Shall I bring in the jury?

          THE COURT:  Please.

          (Jury present)

          THE COURT:  Ladies and gentlemen, we're about to hear

closing arguments from counsel.  I want to remind you, as I did

before opening statements, that nothing that counsel says is

itself evidence.  The evidence, which is now totally before

you, came from the witnesses and the exhibits and there are a

few stipulations, and those are the only sources of evidence.

          But now that the evidence is fully completed, it may

be helpful for you to hear from counsel as to what they think

the evidence shows or fails to show, as the case may be.  And

that's why we have closing arguments, to help you with your own

deliberations.

          So we'll begin with plaintiffs' counsel.

          MR. WARSHAVSKY:  Thank you, your Honor.

          Good morning.  The end is in sight.  And thank you

all.  I know I speak for everybody by thanking you.  This is an

important case for both sides and very much appreciate your

1    consideration.

2             This case has proceeded a little bit oddly in that

3    it's kind of felt at times like we're almost trying two

4    different cases.  And so I thought I'd almost level set for a

5    little bit.  And I want to go back to where I started a week

6    ago when I was giving my opening statement.

7             And what I told you was that there are two main

8    reasons that Hermès brought this lawsuit.  First, Hermès

9    believed that consumers were going to be confused by the

10   MetaBirkins NFTs; and second, Hermès believed that the

11   MetaBirkins NFTs damaged their Birkin brand.

12            Mr. Rothschild's counsel, Mr. Millsaps, then got up

13   and talked about Mr. Rothschild's right as an artist.  And he

14   then said that this case was about a multibillion-dollar

15   corporation trying to punish Mr. Rothschild because they don't

16   like his art, and because they are scared of what it might show

17   about the luxury consumer culture.

18            I submit you didn't see any evidence of that

19   throughout this trial.  Hermès took no position about

20   Mr. Rothschild's art; certainly took no position about any

21   commentary.  I'm not sure we heard about any commentary.  And

22   Hermès is certainly not here to punish Mr. Rothschild.  And

23   I'll get to that a little bit later.

24            The evidence actually showed just the opposite, right.

25   Nicholas Martin got up and testified.  And his testimony was

1    that Hermès has not brought a claim like this — just a

2    trademark infringement claim, straight trademark infringement

3    claim — in over 20 years.  He then said it never sued an

4    artist, it never even sent a cease and desist to an artist.

5    And that was even true for Mr. Rothschild's Baby Birkin

6    project, right.

7              So why was this case different?

8              And that's a theme I'm going to come back to in a

9    moment.

10             But let's talk for a minute about what a trademark

11   infringement case is really about.  And as Judge Rakoff said,

12   he's going to provide you with the instructions.  But

13   generally, trademark infringement is about consumer confusion.

14   The central question is whether a potential consumer, when he

15   or she sees the MetaBirkins NFTs, is likely to be confused that

16   they somehow are connected to or sponsored by Hermès.

17             Hermès's second claim, the damage -- where it's been

18   damaged is what's called dilution.  And that looks to whether

19   the MetaBirkins NFTs somehow does damage to Hermès's Birkin

20   trademark.  I'm going to explain those both a little bit more

21   later.

22             But let's get back to the central question again:  Why

23   did Hermès bring this claim?

24             Now, Nicholas Martin went through those reasons.

25             First, there were 100 NFTs.  They looked similar to

1    Birkin bags.  The collection was called MetaBirkins, which

2    seems like a simple combination of the words "Birkin" and

3    "metaverse."  And they were promoted like a brand.

4            And, in fact, in his Yahoo! Finance article --

5    interview, rather, Mr. Rothschild told us that was what he was

6    doing, bringing the Birkin into the metaverse.  We're going to

7    come back to that a few times.

8            And what happened next was confusion followed, right.

9    And then Mr. Rothschild teased the Hermès rodeo horse as a

10   charm.  And then he announced that there would be up to 1,000

11   more, 900 more MetaBirkins.  And even though Hermès made a very

12   public statement to the *Financial Times*, something you heard it

13   never does, confusion continued.

14           Now, let's think about trademarks for a minute.

15   Trademark infringement is not generally a side-by-side

16   comparison.  We think about market conditions, right.  And you

17   kind of heard a little bit of that colloquy when Ms. Wilcox and

18   Dr. Neal were talking.

19           And what do I mean by that?

20           Hermès Birkin handbags and Mason Rothschild's NFTs are

21   not usually sold — and nobody would encounter them —

22   side-by-side, right.

23           And let's look at a few slides we're going to run

24   through of some Birkin bags and some of the MetaBirkins.

25           Now, imagine if you saw the Birkin bag a week or two

1    ago or a month ago, and then saw the corresponding MetaBirkin.

2    Each Birkin bag I'm showing you here is an exhibit you have in

3    front of you.  Some of them were exhibits that Nicholas Martin

4    discussed and he went through.  Others are exhibits about media

5    coverage and magazines and movies.

6         Now, Mr. Martin and Mr. Chavez told you that Birkin

7    bags had been made in every color combination imaginable.  It

8    had included a number of materials.  Do these look that

9    different to you?  If you saw the Birkin bag on the left two

10   weeks ago, three weeks ago -- I'm sorry, and then the

11   MetaBirkin that's on the right, would you know the differences?

12   They have all the same elements.  And Mr. Martin even -- they

13   have the same metallic pieces, they have all the pieces that

14   Mr. Martin discussed.  And even on this last one here, if you

15   can hold it here, Humberto, this was one that Mr. Martin

16   actually specifically discussed because as the black hardware,

17   both on the MetaBirkin and on the Birkin.

18        Mr. Martin and Dr. Kominers explained Mr. Rothschild

19   was building a brand.  And that testimony was not rebutted by

20   Mr. Rothschild.  We all remember Dr. Kominers' chart showing

21   that in every way, the MetaBirkins were actually a branded NFT.

22   And Dr. Kominers' unrebutted testimony was that for these types

23   of NFTs, there are two distinct submarkets, art only and

24   digital brand.  Obviously there are other types of NFTs, but we

25   remember this chart, right.

 1          And with the digital brand NFTs there is some creative

 2   component.  But the NFT creator builds a brand identification

 3   and value component by offering other benefits.

 4          Now, Dr. Kominers called those utilities.  I'm going

 5   to call them benefits, because I think it makes a little more

 6   sense to me.

 7          And here we know that those benefits were utilized by

 8   Mr. Rothschild.  And we know that in promoting the MetaBirkins

 9   project, Mr. Rothschild expressly promoted the MetaBirkins NFT

10   as a successor to or somehow in league with the most well-known

11   and most successful digital brand NFT projects, including the

12   Bored Ape Yacht Club and Doodles.

13          Dr. Kominers also evaluated the MetaBirkin sales.  Dr.

14   Kominers did an economic analysis.  His unrebutted conclusion

15   was that the MetaBirkins sold at the amounts they did because

16   of the Birkin name.  We were all here when Mr. Rothschild's

17   counsel asked whether it could have been because consumers just

18   liked the art.  Dr. Kominers gave you the answer:  No.  And we

19   don't have any information to the contrary.  Dr. Kominers'

20   testimony was unrebutted.  Mr. Rothschild produced no evidence

21   that a single person was interested in these MetaBirkins

22   because the images depicted on them.  Not a shred of evidence.

23          Now, Mr. Rothschild's counsel complained about these

24   exhibits right here, because they did not include the outliers

25   that are removed.  And I'll likely do that again.  But my guess

1    is that to do that, they will either make their own charts

2    which shrink this, or they'll have to go up really high.  And

3    either way, the message will be the same:  The MetaBirkins art

4    outlier, even if they are greater outliers, they are an

5    outlier.

6           Dr. Kominers then went through the entire sales

7    system, and he showed something very clearly.  The MetaBirkins

8    were sold at high prices even before people knew which

9    MetaBirkins they were buying.  The point was that someone

10   paying $40,000 for the MetaBirkins that we see right here on

11   the left side of the screen, they might get a plain yellow

12   MetaBirkin or they might get the *Mona Lisa*.  They didn't know

13   which one.  When they made the purchase, the image was still

14   under a shroud.

15          And Dr. Kominers' point — which, again, was entirely

16   unrebutted — is that people are willing to spend that kind of

17   money because of the name MetaBirkins.  They didn't know what

18   art piece they were getting, if we were to call it "the art

19   piece," which I think we are.

20          Now, Nicholas Martin testified about Hermès's concern

21   about the *Yahoo! Finance* interview.  And Dr. Kominers saw the

22   same thing, because in that interview Mr. Rothschild said his

23   goal was to create a digital commodity.  He didn't talk about

24   an artwork.  And his audience understood what that meant; he

25   wanted to buy something usable in the metaverse.  He was clear

1  that this was about fashion entering the metaverse.

2      And but we don't have to guess, right.  Because

3  Mr. Rothschild told investors that these were metaverse-ready

4  and fully 3D.  Did not like the way they looked in certain

5  metaverses, but we see that he took them there.  And Dr.

6  Kominers actually showed how easy it was.  Even if an avatar is

7  not, let's say, wearing an item or an item is not 3D, it can

8  still be used.  We saw that as Dr. Kominers used the exact same

9  kind of purse NFT to move his avatar through the Macy's Day

10  Parade, remember that.

11      And here's where we get to a bit of a tension when we

12  look at an exhibit like this.  Because Mr. Rothschild fought

13  back.  And this brings up kind of an unattractive topic, which

14  we have to get through, which is Mr. Rothschild's relationship

15  with the truth.  It's a strained one.  And let's start with

16  what Mr. Millsaps himself said about Mr. Rothschild during his

17  opening statement last week.

18      He said:  You will also learn that Mr. Rothschild

19  sometimes exaggerates and embellishes the truth, especially

20  when he is promoting himself and his projects.

21      And here you are stuck deciding which statements of

22  Mr. Rothschild to believe:  What he put in writing at the time

23  or what he is saying now, as he is promoting his claim here in

24  court.  We'll discuss credibility a little bit more later, but

25  I will give you a different example before going back to this

1    3D issue.

2          In my opening statement, I referred to

3    Mr. Rothschild's statement to his investors that people don't

4    realize how much you can get away with by saying "in the style

5    of."  His counsel tried to rehabilitate him.  What did

6    Mr. Rothschild say?

7          He said:  When I said get away with, I was kind of

8    referring to the situation, I was speaking about this situation

9    that we're in today, where I should be able to get away with

10   creating the artwork because it's my artistic expression and,

11   you know, a company like Hermès shouldn't be able to sue me for

12   it.

13         The only problem is Mr. Rothschild made this statement

14   before Hermès knew who he was.  And his statement was made on

15   November 30th or December 1st.  And what we're looking at here,

16   it's actually the very page in that text stream before the one

17   we were looking at where he was talking about 3D.

18   Mr. Rothschild wasn't being candid with us when he was

19   explaining.

20         And, you know, Mr. Millsaps is Mr. Rothschild's

21   attorney.  He's advocating for Mr. Rothschild.  And he told you

22   about Mr. Rothschild.  And we heard it another time, when you

23   heard in my opening, I talked about the naming contest.  And I

24   talked about a winner named Makisa.  And then Mr. Rothschild

25   came up and told us a story about a different winner that he

1   gifted a MetaBirkin to.  And then when I asked him and showed

2   him the documents, of course he had to turn back on that.

3        Now, turning back to this 3D issue, it is better --

4   it's better for Mr. Rothschild's case to now say that there was

5   no 3D capability, right.  Because that cuts away from what Dr.

6   Kominers was saying.  But Mark Berden, who we've called Mark

7   Design, was using 3D software called 2D.  Why was he using that

8   3D software?  Why would Mr. Rothschild send these images, which

9   clearly are not the 2D MetaBirkins we've seen, but rather some

10  sort of 3D image, if he wasn't planning for something later?

11  The answer is obvious, and it's consistent with what he said in

12  the *Yahoo! Finance* interview:  He was planning to bring the

13  Birkin into the metaverse.

14       And then we see a re-tweet like this by him on

15  November 25th, right.  And this is another user suggesting that

16  this is the future of metaverse fashion.  And Mr. Rothschild

17  decides to publish it.  He says he re-tweets it because he

18  thought it was just a good idea.  But he's a marker.  He was

19  promoting.

20       Now, you also heard Nicholas Martin explain that

21  Hermès was worried that Mr. Rothschild did two more things.

22       First, after asking Mark Berden to create the Hermès

23  rodeo charm and Mr. Rothschild teased it; second, he teased

24  that he would be releasing the greater product.

25       Now, Dr. Kominers' unrebutted testimony again is that

this is consistent with a brand.  Mr. Rothschild provided no

evidence to the contrary.  In fact, we see he was planning just

that, to create a product line.  Mr. Rothschild was planning to

make 900 MetaBirkins in a month.  He was going to make 500 mare

ones, and he was creating his brand.

You heard that, at its fastest, it takes Hermès a week

to make two Birkin bags.  Sometimes they don't even make a

Birkin bag in a week.  Mark Berden was making 40 to 50

MetaBirkins a day.  Mr. Rothschild told his purchasing audience

on *Yahoo! Finance* that he was creating a digital commodity; and

his private statements confirmed what he meant.  And that is

why Hermès brought this lawsuit.  Mr. Rothschild was making a

digital brand with his MetaBirkins and that conduct damaged

Hermès.

So let's turn to Hermès's first claim, trademark

infringement.

Trademark infringement consists of a balancing test.

And you'll see in the instruction that Judge Rakoff will give

you that all of the factors are to be balanced.

Let's talk -- and there are several of them.  Let's

talk about the first factor, the strength of the Birkin mark.

Now, you're going to see and you're going to hear me

talking, you're going to see in the instructions Birkin mark or

Birkin trademark.  We're really talking about are the two

marks, right.  We've talked about that.  There is the Birkin

1   word mark covering the name, but then there's also the federal

2   registration that covers the bag, except -- other than the

3   handles and the clochette.

4       Mr. Martin testified that the Birkins features -- he

5   testified to what they were when he was holding the bag.  And I

6   don't think anyone disputes what those famous features are.

7   Those features are the rectangular shape on the front, the

8   triangular side configuration, the flap that has three lobes,

9   the leather straps that go across the top, the metallic

10  hardware and the clasp.  That's all in the federally registered

11  trademark.

12      Mr. Martin also explained that, like other Hermès

13  bags, the Birkin comes with what he called the clochette, the

14  little bell-shaped guard for the key, so that the key — and you

15  can see on those Birkins there — doesn't scratch the leather.

16  Sometimes when we see the pictures of the Birkin bag, the

17  clochette is on it, sometimes users take it off.

18      You heard from both Mr. Martin and Mr. Chavez that the

19  Birkin is the bestselling product sold by Hermès out of the

20  thousands of products Hermès sells.  It's kind of remarkable,

21  given that in the world of fashion, we're discussing a product

22  that came out in 1984.

23      You've heard that Hermès cannot satisfy customer

24  demand for the Birkin bag.  You heard that the Birkin bag is

25  constantly appearing in the media, and you've seen a sampling

1    of the types of coverage that Birkin gets, both in print media

2    and in television and in movies.  Most important, all the media

3    coverage is unsolicited.  You heard from Bob Chavez that in the

4    U.S., Hermès, in addition to this, spends millions of dollars a

5    year advertising its products, including the Birkin.

6          Most important here, Mr. Martin explained that at this

7    point the Birkin bag is more than just a handbag, it's a status

8    symbol.  As he explained, the Birkin bag is more than a

9    handbag, it is something that you own, that you are proud to

10   show, that you are engaged with.  Mr. Rothschild agreed.  As he

11   said to *Yahoo! Finance*, to him there's nothing more iconic than

12   the Hermès Birkin bag.

13         So on the first of these factors, strength of the

14   mark, it's clear that this factor tips heavily in favor of

15   Hermès.

16         Now, let's look at the second factor, similarity.

17         Here we see the two names:  Birkins and MetaBirkins.

18   They are nearly identical.  Mr. Rothschild even capitalizes the

19   letter B.  No one can seriously question whether, when looking

20   at the term "MetaBirkins," that what pops out is the Birkin

21   name.  All we have here is the addition of the generic phrase

22   "meta."  And it's Birkins in the metaverse.  And that is

23   essentially what Mr. Rothschild said to *Yahoo! Finance*.  He was

24   bringing Birkins into the metaverse.

25         When he teased his new collection on Instagram and

1    Twitter, he called them Birkins and asked for names.  And on

2    two different social media platforms, a generic choice from

3    different users was given, MetaBirkins, both came immediately.

4           Now, if we look at the images as well, we see that the

5    MetaBirkins incorporate all of the design elements of the

6    Birkin bag.  Both everything in its trademark and everything in

7    the commercial implementation as well, such as the clochette

8    and the handles.  And we don't have to guess about the accuracy

9    here, do we.  Mark Berden used a 3D schematic of an Hermès

10   Birkin bag for the creation of the MetaBirkin.  As such, not

11   only were the images identical, the goal was actually making

12   the images identical.

13          Let's turn to factor three, competition.  This looks

14   to whether the MetaBirkin NFTs compete for the same consumers

15   as Hermès does.  And they do.

16          Hermès defines the Birkin bag as a luxury product.

17   You heard that a few times.  Mr. Martin explained that the

18   Birkin bag is also a status symbol that people engage with.

19   That's unrebutted.

20          Mr. Rothschild said almost the same thing in his

21   *Yahoo! Finance* interview.  First he discussed his motive,

22   saying he wanted to create a digital commodity that had the

23   same kind of illusion that the Birkin bag has in real life.

24   And then he explained that this introduction of, like, Web3 and

25   the metaverse is allowing us to actually own these commodities

1   in this place where we can actually show them off.  I was

2   explaining to somebody before, there's not much difference in

3   between having the crazy car or the crazy handbag in real life

4   because it's kind of just that, that showing of, like, wealth

5   or that kind of explanation of success.

6          And now you're able to bring that into the metaverse

7   with these iconic NFTs.

8          And here he's referring, of course, to the

9   MetaBirkins.

10         These iconic NFTs that have fetched crazy amounts of

11  money in the resale market for NFTs.  So I feel like the

12  difference between the two is getting a little bit blurred now

13  because we have this new outlet, which is the metaverse, to

14  showcase our product, showcase them in a virtual world, and

15  even just show them online.

16         Robert Chavez then also testified that Birkin bags

17  actually go up in value after they are purchased.  It is a bit

18  unusual, right.  And some people even call them an investment,

19  he said.

20         This is exactly what Mr. Rothschild said as well.  He

21  wanted the MetaBirkins to double as an investment, like the

22  Holy Grail handbag, as he called it.

23         And we have the unrebutted testimony of Dr. Kominers,

24  who explained that Mr. Rothschild was trying to create

25  community, identity, and other benefits — remember he called

1  them utilities — that come with a brand.  It's clear and

2  undisputed that Mr. Rothschild was creating a brand, and that

3  there was -- and that Hermès and the MetaBirkins NFTs were

4  competing for the same types of customers.

5         Let's go to factor four, actual confusion.

6         Now, of course, actual confusion here is quite clear.

7  Mr. Rothschild himself admits to the actual consumer confusion.

8         On December 16, while in receipt of the cease and

9  desist letter from Hermès, Mr. Rothschild told investors his

10 plan.  He was going to make an announcement stating:  In order

11 to shed confusion between the Hermès bag Birkin and its

12 successor — and, of course, he confirmed for us when he

13 testified that he was calling the MetaBirkins the successor to

14 the Birkin, he didn't call them artwork — that he would change

15 the name to MetaFurkins.  This is a plan that he would fail to

16 follow through with though.

17        We know that Mr. Rothschild was trying to get his

18 MetaBirkins covered in the *Financial Times*, which we'll discuss

19 a little bit more later.  But what we also know is that Hermès

20 came out with a very strong statement which actually spooked

21 Mr. Rothschild.

22        But what happened next?

23        Mr. Rothschild does an interview with a publication

24 called *Business of Fashion*, and then texts his friends and

25 business colleagues that the word in the media was that the

1    MetaBirkins were a press stunt by Hermès, and that he was

2    working for Hermès.

3           And you heard from Mrs. Vittadini that Hermès was also

4    contacted by the *Business of Fashion* to see whether it was

5    involved in the MetaBirkins.  And that was just days after

6    Hermès's announcement in the *Financial Times*.

7           And after that, we see Mr. Rothschild texting his

8    friends who are, again, also his business partner, with a

9    screenshot from the fashion magazine *L'Officiel*.  It shows a

10   picture of Mr. Rothschild's website, and the title is "Hermès

11   MetaBirkin NFT Sell for Record Prices Fashion NFTs, Hermès

12   Birkin Bags."  And if that text and image are not enough,

13   Mr. Rothschild tells his friends *L'Officiel* thinks that the

14   MetaBirkins are an official Hermès thing.

15          Ms. Vittadini testified that *L'Officiel* was an

16   important fashion magazine; and Mr. Rothschild testified to the

17   same, and that it covers both France and the United States.

18          Ms. Vittadini testified that another one of the most

19   important fashion magazines is out.  And we know that on

20   December 17th, *Elle* published an article with the title "Hermès

21   Goes Virtual with Launch of the Birkin Bags as NFTs."

22          Now, although the title of the *Elle* article was

23   quickly corrected, if you look at that *Elle* article itself, it

24   still refers to the MetaBirkins as Birkin NFTs.

25          We also saw that the metadata of the article kept the

1   original title.  Ms. Vittadini showed that even though the

2   title was changed, a Google search performed on January 26th,

3   two weeks ago, in New York, one year after Hermès brought this

4   lawsuit, a search for Hermès and NFTs still yielded the *Elle*

5   article as a second hit.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          That's a real consumer impression.  Remarkably, on

2    cross-examination, Mr. Harris seemed to suggest that it was

3    Hermès' fault that this metadata had not been corrected.

4          Ms. Vittadini, whether she's right or wrong, testified

5    that she doesn't believe it could be corrected.  But if

6    Mr. Rothschild is worried about that, he can correct it.

7          Why didn't he?

8          Now, we fast forward to January 20, 2022, a month

9    after Hermès' statement to the Financial Times, the New York

10   Post published an article saying that Hermès unveiled the

11   MetaBirkin, a version of the signature bag created by LA artist

12   Mason Rothschild.  The picture of the MetaBirkins has a caption

13   calling them a be our only MetaBirkin -- I'm sorry -- a digital

14   version of the Hermès name can sell for tens of thousands of

15   dollars.

16         Of course, it was Hermès, not Mr. Rothschild, that

17   corrected this article.

18         You saw another article from challenges magazine from

19   May of 2022, about four months after this lawsuit was brought.

20   This magazine referred to the luxury world investing in NFTs.

21   It started with two examples.  One was Gucci, the other was

22   Hermès.

23         The article explains that Hermès unveiled virtual

24   handbags under the name MetaBirkins.

25         And once again it was Hermès, not Mr. Rothschild, that

1    made this correction.

2          Mr. Rothschild testified to you that Mr. Loo, his

3    press agent, received other inquiries from the press about the

4    relationship between Hermès on the one hand and Mr. Rothschild

5    and the Birkin handbags on the other.

6          The only document we saw from Mr. Rothschild was on

7    this.  I don't think we have a date here, and the original

8    message was deleted and we don't really have any other

9    information other than the fact that someone in this

10   MetaBirkins community, which Mr. Rothschild posts and curates

11   or moderates, wrote to Mr. Rothschild and asked about the

12   disclaimer on his website and whether Hermès was involved with

13   the MetaBirkin.

14         You just heard a little while ago the testimony about

15   that disclaimer, and here you somebody on the MetaBirkins

16   community having the same issue.

17         We also heard from Bob Chavez, and he told you about

18   people here, students here asking about Hermès involvement with

19   MetaBirkins.

20         And, now, during his opening statement, Mr. Millsaps

21   said that none of the MetaBirkins purchasers were confused.

22   Yet we heard Mr. Rothschild tell you that neither he nor his

23   counsel know the true identity or the personal identity of any

24   of the purchasers other than those that were his friends.

25         No one had ever talked to these anonymous or

1   pseudonymous individuals.  We have Mr. Rothschild's claims to

2   have interacted with some of these purchasers, and we don't

3   have a single piece of corroborating evidence.

4         And, Mr. Rothschild, he hasn't proved completely

5   trustworthy.  We do have Mr. Rothschild's other social media.

6   You will see here three separate entries across two pages where

7   potential purchasers were confused, and one purchaser clearly

8   thought she was getting a bag.

9         And while Mr. Rothschild's counsel might tell you that

10  we cannot trust these people, we know that Mr. Rothschild never

11  responded to them.

12        We also know that Mr. Rothschild was leaning into this

13  confusion.  Not only did he use the Birkin name, and not only

14  did Mark Design create these bags using the schematic and

15  Hermès Birkin bag, but before the cease and desist,

16  Mr. Rothschild actually teased a charm, and that was meant to

17  look like the rodeo charm, as we know.

18        We also know that there was a survey.  We have heard a

19  lot about that for the last few days.  And it was done by the

20  top survey expert, Dr. Isaacson.  Dr. Isaacson found that the

21  net confusion was 189.7 percent.  That means about one in five

22  people seeing Mr. Rothschild's website with the disclaimer were

23  confused.

24        If we are to listen to Dr. Neal, it is one in ten.

25  Again, this factor is not close.  People are confused.

1             Factor five, the degree of care.

2             You will recall that during Mr. Millsaps' opening he

3    talked about Dr. Isaacson's survey.  We heard about it again,

4    and you will recall a lot of discussion about the handbag

5    survey.

6             That's a classic red herring.  You are going to see

7    the jury instruction.  The question here is not -- you are not

8    going to see anywhere on your jury instruction any question

9    about whether Hermès' customers would be confused.  The only

10   question here is whether a potential NFT customer would be

11   confused.

12            What we know about the NFT marketplace is that it's

13   highly speculative.  Mr. Rothschild and his counsel told you

14   about Mr. Rothschild's initial sales here were for $450.

15            The original minters of the MetaBirkins then turned

16   around and put many of them right up for sale.  As we

17   discussed, those that were sold were these shrouded images.

18   The highest prices for the MetaBirkins -- I know we have seen

19   this, we are going to see a few of these a few times -- the

20   highest prices were during the period when they were shrouded,

21   when customers didn't know which one they were getting.

22            Potential purchasers were spending tens of thousands

23   of dollars, and until the unveiling they didn't know, were they

24   getting the yellow plain one or were they getting the Mona

25   Lisa?  Mr. Rothschild explained to you there is a clear

1   difference.  The ones like the Mona Lisa were much more

2   desirable.

3          And we can see the immature nature of this market with

4   Mr. Rothschild's next project.  He testified that the minting

5   fee for that project was either 08 or .1 ETH.  Let's assume it

6   was .08 ETH.  That was about $390 at the time because Ether was

7   trading at 350.  Last night, when I looked, Ether was worth

8   about $1600 and bids are now about .03 ETH or about $48.

9          So the "I Like You, You're Weird" project, which we

10  heard so much about, those NFTs are selling for about 12

11  percent of what they minted for.  That drop in price provides

12  us with very keen insight into this NFT mark.

13         It is immature, it is highly speculative, and most

14  people don't know how it works, meaning that people are

15  obviously less careful and sophisticated about their purchases.

16         Now let's talk about bad faith.

17         This is unfortunately not a nice discussion.  Like

18  you, I saw Mr. Rothschild on the stand.  I think he's charming.

19  I think he's funny.  I want to like him.

20         Unfortunately, though, we can't always believe what he

21  says.  We have to remember that when considering the testimony

22  of Mr. Rothschild at trial, which contradicts what he wrote

23  before the lawsuit, we have to decide which one we believe.

24         We know obviously that Mr. Rothschild was well aware

25  of the Birkin trademark.  We also know that Mr. Rothschild's

three prior art projects are appropriated.  His first project

was the college shirts with the college logo.  He admits that

at least one of those schools, Parsons here in New York, sent

him a cease and desist letter.

This MetaBirkins project was going to be his biggest

and it wasn't even close.  Mr. Rothschild told his friends and

associates, some of whom were potential investors, that he was

planning to collaborate with Hermès.

We saw that on December 2, 2021.  Mr. Rothschild

texted Lauren from Basic.Space that he was going to be speaking

to Hermès on December 4, 2021.

He testified that Mr. Clement Quan, a fashion industry

executive -- I'm sorry this is December 7, 2021.  He testified

that Mr. Clement Quan, a fashion industry executive, was

planning to communicate with Hermès on his behalf.

You see no documents showing that Mr. Rothschild had

any discussions with Mr. Quan or Mr. Quan saying that he

called.  While Mr. Rothschild testified that Mr. Quan knew

people at Hermès, in Hermès' promotions department, he never

said whom he knew, and Mr. Rothschild claims he never followed

up with Mr. Quan.  And you heard Ms. Vittadini.  She said she

had never heard of Mr. Quan.

But there are internal inconsistencies here as well.

In between December 1 and December 7, Mr. Rothschild claimed to

have two other people reaching out to Hermès.  The first was

 1   his contact at Vogue, whose name he could not remember.  That

 2   was on December 1.  The second was another person at Sotheby's,

 3   who he wanted to use to get to Hermès onboard on December 4.

 4        If Mr. Quan was reaching out to Hermès, why would

 5   Mr. Rothschild in two different discussions then suggest two

 6   other lines of communication, both of which he couldn't --

 7   well, sorry.

 8        This gets even more -- we know that when

 9   Mr. Rothschild approached Mark Berden, he said Hermès might be

10   involved with this project.  That was clearly before

11   Mr. Rothschild was talking with Mr. Quan, with Sotheby's, or

12   Vogue.

13        We also heard about Aaron Maresky.  We saw

14   Mr. Rothschild was hoping for a collaboration with Mr.

15   Mareksy's company.  And Mr. Maresky immediately asked whether

16   the relationship with Birkin was official.  And Mr. Rothschild

17   responded that he was pushing it for it.

18        We also know Mr. Rothschild told his childhood friend

19   Eric Ramirez that Hermès might partner with him, and that he

20   was negotiating with them.  But we know that Hermès has no

21   record of Mr. Rothschild reaching out, and has no record of

22   anyone reaching out on his behalf.

23        Simply put, Mr. Rothschild was misleading people.

24        The reason for bringing up these text messages isn't

25   to embarrass Mr. Rothschild.  Rather it is to show something

 1    obvious.  Mr. Rothschild knew and clearly suspected that

 2    everyone would assume that the MetaBirkins project was trading

 3    off of Hermès goodwill, he was using the Hermès Birkin name,

 4    and he was using the Hermès Birkin trade dress, what we call

 5    calling the Hermès marks and the Hermès trademarks.

 6             What must be remembered here is that at the time

 7    Hermès had no thoughts about Mr. Rothschild.  Hermès didn't

 8    care about the Baby Birkin NFT, as you heard.  Hermès didn't

 9    know about Mr. Rothschild's plans for the MetaBirkins.  The

10    person bringing up Hermès over and over again was

11    Mr. Rothschild alone.  It was to legitimize his project.

12             Now let's assume for a minute that Mr. Rothschild was

13    seeking a collaboration.  We can see from Mr. Rothschild he

14    wasn't seeking that collaboration based on the negotiations or

15    permissions that we might think about.  He was seeking that

16    collaboration on beating Hermès to the market.

17             Even if the statements about Mr. Quan, Vogue and

18    Sotheby's are all true, those discussions were after the

19    MetaBirkins were released and before Hermès commented.

20    Therefore, these discussions would have been about

21    strong-arming Hermès into some sort of collaboration.

22             While Mr. Rothschild was pushing Mark Design to crank

23    out the MetaBirkins, Mr. Rothschild was promoting.  We saw that

24    he took to Instagram and Twitter to run those contests we

25    talked about.  He runs the contests using what looks exactly

1    like the Birkin design trademark, teasing an image which he

2    refers to as a Birkin, and asking for a name for the

3    collection.  His tweet and his Instagram posts contain no

4    disclaimer.

5         And then let's look at what happened after the Yahoo

6    Finance interview.  We saw his publicist Ken Loo try to set up

7    an interview the Financial Times.  That was done to promote

8    Mr. Rothschild and the MetaBirkins.

9         He claimed he wanted to discuss people who were

10   selling counterfeit MetaBirkin NFTs.  Yet the only information

11   he provided to this reporter was sales, had to do with his own

12   sales.  Not once did he provide the information that the

13   reporter was seeking about these fakes.

14        For this article that was set up to promote

15   Mr. Rothschild, we know now that the Financial Times actually

16   reached out to Hermès.  Luisa Vittadini explained that she

17   responded by saying there was no affiliation.

18        What did Mr. Rothschild do?

19        He tried to back out.  he could have said he wasn't

20   involved with Hermès, that he was trying to do a tribute or

21   whatever else.  He didn't do that.  He ran away.

22        The article from the Financial Times, however, was a

23   pretty clear public statement by Hermès, and that was on

24   December 10, 2021.

25        We see that the only time Mr. Rothschild began to use

1   this disclaimer was after Hermès -- was not even after this

2   article.  It was several days later, after Hermès actually sent

3   the cease and desist.  And we know that the disclaimer didn't

4   remedy confusion.

5        And now at one point during this trial Judge Rakoff

6   asked Mr. Rothschild whether he was trying to reference Hermès'

7   Birkin bag.  His response is that he was in some ways.  We will

8   talk about that again.

9        But in Yahoo Finance he was a bit more plain about his

10  intentions.  He wanted to take the iconic Birkin handbag and

11  bring it into the metaverse.

12       Can be there any clearer evidence that Mr. Rothschild

13  was trying to trade off of Mr. Hermès goodwill?

14       Perhaps Mr. Rothschild will argue that he tried to

15  correct mistakes, and if he did, it was clearly only after he

16  received the cease and desist letter from Hermès.

17       Mr. Chavez, Mr. Martin, Mr. Rothschild, Mr. Moulin,

18  and Dr. Kominers all told you that the metaverse is the future

19  or part of the future for fashion.  Everyone knows this.  They

20  all cited examples Gucci, Prada, Balanciaga, Nike, and Adidas,

21  among others.

22       Mr. Rothschild as a trend forecaster -- remember he

23  said he is a trend forecaster and a marketer -- clearly

24  understood that brands were entering the metaverse.  It is

25  beyond question that he was trading off the two Birkin

1    trademarks, to trade off of Hermès' goodwill, and he knew

2    Hermès was going to be upset.

3            Now let's talk about Hermès' plans to enter the

4    metaverse, the seventh factor.  Again, we think all these

5    factors tip only in favor of Hermès, as will this one.

6            You heard from four different witnesses about Hermès'

7    plans for NFTs in the metaverse.  It is undisputed of course

8    that other brands have been involved with NFTs and have entered

9    the metaverse, but Hermès doesn't make those plans public.

10           You heard from Mr. Chavez, Mr. Martin, Mr. Moulin,

11   Ms. Binoche that Hermès is very careful.  Everyone was very

12   clear, and I don't think Mr. Rothschild will disagree, that

13   Hermès makes only the highest quality products.  And that the

14   ethos, that ethos it is apparent here as well.

15           You saw plans dating back to 2019 which are quite

16   sophisticated.  The person in charge on the technical side,

17   Mr. Moulin, has a number of degrees, and actually built the

18   largest data network for the largest phone company in France.

19           You heard him and Ms. Binoche say that they were

20   working with digital artists for a number of projects,

21   including some related to NFTs and the metaverse.

22           You heard from Mr. Martin, however, that Hermès

23   actually filed trademark applications for NFTs in the

24   metaverse.  They did that here in and in France.  You also

25   heard from various Hermès witnesses, such as Mr. Chavez,

1    Mr. Martin, Ms. Binoche, and Mr. Moulin, that Hermès often

2    collaborates with artists.  It celebrates those collaborations.

3         You saw Hermès's website, which is up here.  It

4    credits the artists that work on its products.  You saw that

5    when it comes to product like scarfs, Hermès actually has the

6    artists sign those products.

7         You have seen it with the Birkin bags, where it

8    actually promotes the artist who is involved.  When Hermès

9    works with an artist, it lets the world now.  Now Hermès'  plan

10   for the metaverse and NFTs were private.  You actually got a

11   world premier, right, for the publication of those plans.  You

12   were the first people outside of Hermès to actually see these

13   plans and the first ones to see this horse.

14        And as we know and as you heard, this NFT is not

15   attached to a product.  Indeed, Mr. Moulin's presentation

16   showed a number of other NFTs uses, like this digital twin, and

17   those that include NFTs as a mere picture to use in a virtual

18   world.

19        And when you get the jury instructions, it is not --

20   this requires -- this factor only requires that Hermès have

21   concrete plans prior to Mr. Rothschild accused conduct.  It

22   doesn't require that Mr. Rothschild know about these plans.

23        As the instructions are going to explain, you are to

24   balance these different factors.  But as you have seen here,

25   there's evidence in only one direction on each of them, and it

1    tilts towards Hermès.

2           Let's talk a little bit about dilution.  The next

3    cause of action.  Whatever you decide on trademark

4    infringement, the claim for trademark dilution it is a totally

5    separate claim.  And again the judge will instruct you on the

6    law, but generally speaking trademark dilution occurs when

7    someone uses a trademark that is similar to a famous mark and

8    that use harms the famous mark's distinctiveness.  That kind of

9    dilution is called blurring.

10          Here we have a very famous trademark, Birkin.  But the

11   more people that start using the Birkin name, the less it will

12   operate as a way to denote Hermès' Birkin handbags.  Put

13   differently, the more people that use this trademark, the less

14   likely people will be to associate it with Hermès.

15          It might be helpful if we give a hypothetical example.

16   We all see Starbucks every day.  You know it sells coffee and

17   some pastries and other items.

18          Now, if a cosmetics brand came out with Starbucks

19   cosmetics and a sports brand came out with Starbucks skis and

20   somebody else came out with sports cars, Starbucks sports cars,

21   none of those would be likely to infringe the Starbucks

22   trademark, but each one of them would actually damage

23   Starbucks.

24          Now I am making these up obviously, but you could

25   understand very easily how Starbucks would lose its

1   distinctiveness, how suddenly when someone talked about

2   Starbucks you would say, is that the car company or is that the

3   ice hockey or that the coffee company?

4           But nonetheless it would do damage, right?  Once

5   others use Starbucks, the original Starbucks loses the value in

6   its brand.

7           The same is true here with Birkins, which is sold by

8   Hermès.  It is kind of a tricky concept.  The best analogy I

9   have about dilution is a bee sting.  Each time someone uses a

10  famous mark, it is like a bee sting to the brand owner.

11          The brand owner might not be hurt by one sting, but as

12  soon as one bee is permitted to sting, so is another.  So today

13  we have MetaBirkins.  Tomorrow we could have the same sold

14  thing as NFT Birkins or Birkin NFTs or web Birkins or digital

15  Birkins or internet Birkins or web 3 Birkins.

16          If that happens, the term Birkin is much less

17  distinctive than it is now.  Suddenly the term Birkin can

18  almost be used by anybody.  The value of the trademark is

19  significantly diminished.

20          Turning back to the bee sting analogy, at some point

21  each additional sting is more and more damaging, and it kills

22  the brand.  The law of dilution allows the trademark owner to

23  stop the very first bee sting that dilutes the brand.  And that

24  is what we are discussing here.

25          You heard both Nicholas Martin and Maximilien Moulin

1    discuss that they were concerned, that as soon as Hermès became

2    involved with NFTs publicly, or as soon as there a Birkin NFT

3    project, they feared that the MetaBirkins would come to mind.

4         And we saw what happened when Luisa Vittadini did the

5    Google search for Hermès NFTs.  That's the reason Hermès is

6    bringing the dilution claim.

7         Now let's talk the factors of a dilution claim.  Just

8    like trademark infringement, dilution is based on a few

9    factors.

10        Here there are three:

11        First, whether the Birkin mark is famous;

12        Second, whether it became famous before Mr. Rothschild

13   sold the MetaBirkins; and

14        Third, whether Mr. Rothschild's use is likely to

15   dilute the distinctiveness of the Hermès brand.

16        Now, when it comes to the first two factors, the

17   Birkin mark's fame and whether it was famous before

18   Mr. Rothschild began using it, they are really not in dispute

19   here.  You heard from both Nicholas Martin and Bob Chavez about

20   its fame.  You heard about the TV shows and the movies, and we

21   have a great deal of evidence concerning the different

22   magazines and newspapers.  You even heard about the Sex and the

23   City episode which is all about the Birkin bag.

24        You heard about the fact that, even though Hermès has

25   sold over $1 billion worth of Birkin bags in the last ten years

1    alone in the U.S., that Hermès still cannot meet customer

2    demand.

3            Whether we call it a waitlist or wish list doesn't

4    really matter.  The impact is the same.  The customer demand

5    for Birkins far outpaces Hermès ability to make these bags.

6    And again we have Mr. Rothschild's own opinion that nothing is

7    more iconic than the Hermès Birkin bag.

8            Finally, though I suspect Mr. Rothschild's counsel

9    will come in and argue something different, here's what he said

10   last week:  The name Birkin has transcended its status as a

11   mere trademark indicating the source of goods, and Birkin has

12   become a cultural symbol of rarefied wealth and privilege in

13   our society.  In short, last week, this was a part of their

14   defense.

15           Now, the third factor is whether or not

16   Mr. Rothschild's use is likely to dilute.  And it is probably

17   becoming apparent that we lawyers like to use the factors, and

18   we have five subfactors for this factor.

19           Those five factors are:  The degree to which the

20   trademarks are the same, the strength of the Hermès trademark,

21   the degree to which the Birkin is widely recognized, whether

22   Mr. Rothschild intended to create an association with the

23   Birkin mark, and any actual association by consumers.

24           Once again, there's very little dispute on most of

25   these factors.  Birkin and MetaBirkins, they're pretty darn

1    similar.  The Birkin mark is strong, as we discussed just

2    before.  We also know that the Birkin mark is widely

3    recognized.

4          And, again, in addition to all the other evidence

5    submitted by Hermès, you have this statement by Mr. Rothschild

6    that there is nothing more iconic.

7          And then when discussing Mr. Rothschild's intent,

8    while there is a great deal of evidence during the trial, Judge

9    Rakoff asked this:  "And you intended to associate, to indicate

10   to the people who were accessing this that this was in some

11   sense a reference to Birkin bags, yes?

12             "In some ways yes, a reference."

13         And the final factor is whether or not consumers made

14   that association.

15         Here, we have the meeting which was dedicated to

16   fashion and/or articles talking about the MetaBirkins.  These

17   articles all show a belief that Hermès was involved with the

18   MetaBirkins.

19         Let's also remember that the world of NFTs and the

20   metaverse are still new.  If you read these articles, wouldn't

21   you have thought that Hermès was involved in the MetaBirkins?

22   Some of these articles, such as the one with the New York Post,

23   show other fashion brands entering the metaverse.

24         Do you have any doubt about the other fashion brands

25   that are mentioned?

1          Do you have any doubt that other people reading this

2    would come to that conclusion?

3          You heard Mr. Rothschild and Hermès testify that

4    brands are in fact entering the metaverse, and you have seen a

5    few pictures of those other brands in the metaverse.

6          Why would anybody coming across these articles

7    question that Hermès is not the source of the MetaBirkins?

8          Of course, what can't be forgotten here is that

9    Mr. Rothschild, and more precisely Mark Berden, worked from a

10   schematic of the Hermès Birkin bag.  And you must remember the

11   entire configuration of the Birkin bag, other than those

12   handles, are subject to another trademark.

13         Obviously the clochette and the handles are on the

14   actual Birkin bag, as you have seen, and Mr. Rothschild

15   succeeded in creating this association, and this was an example

16   of the bee sting for Hermès.  As I said, Hermès has the

17   absolute right to stop these bee stings for the dilution, which

18   has happened.

19         Now, I told you this type of dilution is called

20   blurring.  Let's look at what Mr. Rothschild said in the Yahoo

21   Finance article.  He said there's not much difference in

22   between having the crazy car or the crazy handbag in real life,

23   because it's kind of just that, that showing of, like, wealth

24   or that kind of explanation of success.  And now you're able to

25   bring that into the metaverse, where these iconic NFTs that

1   have fetched crazy amounts of money in that resell markets for

2   NFTs, so I feel like the difference between the two is getting

3   a little blurred now, because we have this new outlet, which is

4   the metaverse, to showcase our products, showcase them in our

5   virtual world, and even just show them online.

6          Again, this is a balancing test, but it is clear that

7   every factor here balances heavily in Hermès' flavor -- favor.

8          Now, let's talk about the third claim Hermès has made,

9   cybersquatting.  The claim here again is for cybersquatting,

10  and -- apologies -- once again, it's three factors.  They're

11  kind of similar to the ones we have heard about.

12         Factor one, was the Birkin mark distinctive when

13  Mr. Rothschild registered his domain name, and we know it was.

14         Factor two, the MetaBirkins domain main is identical

15  to or confusingly similar to the Hermès Birkin mark.  Here we

16  can see it sure is.

17         Factor three is that Mr. Rothschild had a bad-faith

18  intent to profit from the Birkin bag.

19         Now, the question of whether Mr. Rothschild intended

20  to profit from the Birkin trademark is also pretty clear.

21  Mr. Rothschild never used the word "art" when discussing his

22  project.

23         You can look through the exhibits.  We did not see the

24  word "art" used by Mr. Rothschild until after the MetaBirkins

25  were released.  We saw him talking about pumping and shilling,

1    getting the price raised.  That is an intent to profit.

2            Once again, in response to the direct question from

3    Judge Rakoff Mr. Rothschild told you that his intent was at

4    least in part to invoke Hermès' Birkin.  That is enough to show

5    that Mr. Rothschild's intent was to profit from the Birkin

6    trademark.  And on that record there's no question that once

7    again all of these factors point in Hermès favor.

8            Let's talk Mr. Rothschild's main defense, which you

9    heard a lot about last week, which is the First Amendment,

10   which frankly is not technically a defense.  I'm sorry I said

11   it that way.

12           Mr. Rothschild claims that his conduct is protected

13   under the First Amendment.  You will see that Judge Rakoff in

14   his instructions is providing a very clear and understandable

15   test.

16           We have to ask ourselves in looking at that test, did

17   Mr. Rothschild use the Birkin image and the Birkin word mark

18   for a commercial reason?

19           He did.  It was a commercial choice.  It was an intent

20   to profit through confusion.

21           And even if we assume that the pictures of the

22   MetaBirkins are artistic, did he have to use them -- did he

23   have to copy them identically piece for piece?  Did he have to

24   use the Birkin maim.  Why did he chose those names?  Why did he

25   choose to copy completely?

1        To trade off of goodwill.

2        Mr. Rothschild's counsel may get up here and argue

3   that the choice of MetaBirkins was commentary and that he

4   describes the picture.

5        I am not sure whether that's right, but it is clear

6   that Mr. Rothschild didn't come up with a name for artistic

7   purposes or for any purposes other than to confusion.  As we

8   know, a couple of other people came up with this name.  We know

9   that at least part of the reason that Mr. Rothschild came up

10  with this name and he sent it to the community was to help

11  promote and sell these NFTs.  It wasn't for another purpose.

12  It was a name for a collection.

13        Now, Hermès is going to be the party that has to prove

14  that Mr. Rothschild was motivated by commercial intent and by

15  trying to confuse the consumer and to capitalize on Hermès

16  goodwill in the Birkin name.

17        But this is all quite clear, isn't it?  The different

18  users that came up with this name did so in the first day of

19  the contest.  If we look at what Mr. Rothschild said he was

20  doing in the Yahoo Finance article, he was said was bringing

21  Birkins into the metaverse.

22        That description is telling.  He is not saying that he

23  is creating art.  He's trying to describe what he is doing with

24  what he calls a digital commodity in that article.

25        The name is not about art.  It is a commercial choice

1   meant to convey that he is working with Birkins.  That name was

2   meant to exploit the popularity in the goodwill, consumers

3   associate with the Birkin trademark and the Birkin trade dress.

4   This has nothing do with art.  This is to confuse consumers.

5          Now let's go back to Dr. Kominers.  Dr. Kominers

6   methodically went through all of Mr. Rothschild's activity.  It

7   was clear that Mr. Rothschild was engaged in brand building.

8   And we know he succeed.

9          As Mr. Kominers explained without a single shred of

10  rebuttal from Mr. Rothschild, the MetaBirkins sold at the

11  prices they did because of their name.

12         Let's go back to this chart.  You know, I know I have

13  said it a few times, and I'm sorry to repeat myself, but the

14  highest prices were fetched when these NFTs were still shrouded

15  and people didn't know what they were getting.

16         Ask yourself the obvious question:

17         Who pays $40,000 without knowing what piece of art

18  they are getting?  The answer, of course, is people who assume

19  they're buying into a brand.  That's what Dr. Kominers

20  explained.

21         While Mr. Rothschild gave reasons for his pump and

22  shill comment, he was seeking influencers to help him for two

23  reasons:

24         The first was to drive up prices.  He admitted that.

25         The second, and less obvious, is that he was trying to

1    replicate what Hermès does.  He talked about celebrities

2    showing their Birkins.  That's exactly what Mr. Rothschild was

3    trying to emulate with the MetaBirkins.  He told you about what

4    happens at Terminal 27.  He's trying to do that.  The big

5    difference, Hermès doesn't pay for it.  Mr. Rothschild did, to

6    create that illusion.

7            And, again, Dr. Kominers' unrebutted testimony is that

8    a great deal of brand building happened before the MetaBirkins

9    were even released.

10           Let's take a look at some of Mr. Rothschild's other

11   comments.

12           We have Mr. Rothschild explaining his royalty as

13   luxury product, luxury tax baby.

14           Mr. Rothschild began thinking about a TikTok campaign;

15   hashtag finally got my Birkin.

16           We have his tweets associating himself with Doodles

17   and Bored Ape brands.

18           We see him forwarding a tweet by Lana Rhoades --

19   that's a piece of testimony I am never going to forget -- where

20   he suggested that people use their MetaBirkins as a profile

21   picture.

22           That's a clearly commercial endeavor.

23           We saw blog posts and social media posts by

24   Mr. Rothschild calling the MetaBirkins the key to unlock his

25   future projects and giving away gifts like diversified white

1    list spots and airdrops for future projects for people that buy

2    the MetaBirkin.  He did this before the MetaBirkins were

3    released.

4            We even saw Mr. Rothschild promise white list spots,

5    essentially a gift, for people who joined the community.

6            Can you go back one slide, please, Humberto.

7            On this document you will see that's where he promised

8    the people who just joined the MetaBirkins community.  It's got

9    nothing do with the art project.

10           Now -- sorry, if you could go back.

11           If you look at Mr. Loo's correspondence with the

12   Financial Times, which I talked about a little bit earlier, and

13   Mr. Rothschild's interview with Yahoo Finance, we see that

14   Mr. Rothschild was claiming that people were selling fake

15   MetaBirkins.

16           Now, of course, Mr. Rothschild declined to provide any

17   corroborating evidence concerning those fake MetaBirkins.  And

18   he volunteered the allegation actually when -- in response to a

19   Yahoo Finance reporter asking him if, like Birkins, his product

20   was being knocked off.  Now, if Mr. Rothschild was making this

21   up, it was to enhance the credentials of the MetaBirkins as a

22   luxury brand, in short, a marketing ploy.

23           If, on the other hand, Mr. Rothschild was telling the

24   truth and was upset about the fake MetaBirkins, it also tells

25   us that he was thinking about MetaBirkins as a brand, right?

1    Not a work of art.

2           We also see that Mr. Rothschild was trying to build a

3    brand when he used Hermès' rodeo charm, which he planned to

4    sell as part of his MetaBirkins brand.

5           We also see a text where he's telling his potential

6    investors that he can launch anything, but definitely wants

7    more Birkins.

8           And, again, going back to Yahoo Finance,

9    Mr. Rothschild said he wanted to garner the attention of people

10   and build that relationship with the consumer.

11          We know that Mr. Rothschild was seeking profits.  We

12   have this discussion with Mark Berden asking all about speed.

13   He didn't care about color or design.  He wanted to crank out

14   images.  Mr. Rothschild told his collaborator Mark Berden that

15   he was sitting on a gold mine.

16          He sought to entice influencers by talking about the

17   value the MetaBirkins might fetch.

18          In short, Mr. Rothschild made his intent plain.  He

19   wanted to cash in on the Birkin name.  That was the only reason

20   for the project.

21          If you get to the point to wonder whether or not

22   Mr. Rothschild's conduct was explicitly misleading or whether

23   his use of the MetaBirkin name itself was explicitly

24   misleading, you can think about everything we discussed earlier

25   in connection with the other factors, especially the good faith

1  evidence.

2         Remember, in his own words:  I don't think people

3  realize how much you can get away with in art by saying in the

4  style of.  That's his statement to his investors.

5         We know that Mr. Rothschild adopted the Birkin name

6  and used the configuration of the Birkin bag to make money.  We

7  know his goal was for these NFTs to sell at as high of a price

8  as possible.  We know that people purchased these NFTs because

9  it was affiliated with a brand.  Dr. Kominers' unrebutted

10 testimony makes that very plain.  And we know that

11 Mr. Rothschild succeeded.

12        Not only did we discuss the press and the few comments

13 on social media, but we have Isaacson's survey.  Dr. Isaacson

14 says 18.7 percent of potential NFT customers, or almost one in

15 five people, were confused.

16        Dr. Isaacson showed Mr. Rothschild's web page without

17 any changes, and one in five thought it was either Birkin or

18 Hermès.

19        But let's even say we want to believe Dr. Neal's

20 critique.  It's one in 10.  Right?  That's how many people are

21 confused.  As such, Mr. Rothschild's conduct doesn't get saved

22 by the First Amendment.

23        Now, as I said, I am going to switch a little bit here

24 to damages.  As I said a little while earlier, Hermès is not

25 seeking to punish Mr. Rothschild.  If punishment were Hermès'

1    goal, it would have put on a big case showing all the costly

2    ways that it is going to have to deal with correcting the

3    marketplace.

4            But had Mr. Rothschild stopped when Hermès sent the

5    cease and desist, or frankly anytime before trial, we wouldn't

6    be here.  But he didn't.  He didn't want to do that.  He didn't

7    want to walk way.

8            Instead, Mr. Rothschild tried to profit from his

9    violation of Hermès' trademark rights.  And the judge is going

10   to instruct you that Hermès has the burden of proving the

11   amount of money Mr. Rothschild received.

12           Let me just back up and say Hermès is only seeking

13   Mr. Rothschild's profits.  It is not seeking its own damages.

14   As I said, the judge will instruct you.  You will see in your

15   instructions that Hermès has the burden of showing how much

16   money Hermès made, and Mr. Rothschild then has to show you his

17   expenses.

18           Dr. Mentzer's testimony here shows precisely how much

19   money Mr. Rothschild made.  Mr. Rothschild hasn't provided any

20   evidence concerning his expenses, but actually we did that for

21   him in the Mentzer report.  As such, the proper amount of

22   damages here on Hermès's infringement and dilutions claim is

23   the amount set forth by Dr. Mentzer here, $231,000.

24           On Rothschild's -- on the cybersquatting claim rather,

25   it is statutory damages.  You are allowed to pick a number from

1    $1,000 to $100,000.  That's your discretion.

2            This really should be a pretty simple case.  You might

3    ask yourself, why did Hermès go to all this trouble?  Why pay

4    for the two law firms, why pay for the experts?  You heard how

5    expensive they were.

6            It is because Hermès takes that really seriously.

7    Hermès has built out its property.  You heard about 180 years

8    or almost 190 years that Hermès has been working to develop its

9    brand.

10           You have heard about 42 years with a Birkin bag.  If

11   you look at the big report in your file about Hermès' finances,

12   you will see that it has thousands and thousands of employees

13   around the globe.  It has 32 stores here in the U.S.

14           All those people work.  This is their prime product.

15   They can't let people sidle up to it.  They had to bring this

16   claim because Mr. Rothschild wouldn't stop using it.

17           On all the causes of action here, I showed you it's a

18   balancing test.  There's not really much dispute about any of

19   it.

20           Mr. Rothschild tried to trait off on Hermès' goodwill,

21   he used their trademark, he used the identical trade dress, and

22   he succeeded.

23           I again want to thank you for your attention and for

24   your help here.

25           THE COURT:  Thank you very much.

1              We will hear now from defense counsel.

2              MR. MILLSAPS:  Thank you, your Honor.

3              It is always a privilege to try cases in this

4    courthouse.

5              Good morning, members of the jury.  You have been an

6    impressively attentive jury in this case and I really

7    appreciate that.  I know my colleagues appreciate that

8    Mr. Rothschild appreciates that as well.

9              I am going to begin this summation and then I am going

10   to turn it over to my colleague, Jon Harris.  We are looking

11   forward to speaking with you and then placing this case into

12   your hands.

13             Now, my opposing counsel just threw a flurry of

14   information at you, so I am going to slow this down because

15   this is actually a simpler case than you might think from that

16   presentation that you just saw.

17             Under the law, Hermès is entitled to certain rights

18   and protections in the Birkin trademark.  Nobody disputes that.

19   That's a big deal.  That is a really big deal.  It's meaningful

20   to give a company the rights to a word, to a trademark, but

21   that is what the law provides.

22             No one can open a website or a luxury goods store on

23   Madison Avenue and start selling $12,000 handbags called

24   Birkins.  But because it's such a big deal to give a company

25   the exclusive right to use a word to sell its products, the law

1    also provides limitations.  One of those limitations goes to

2    the purposes of trademark law.  The heart of trademark law is

3    to protect consumers from confusion, so that when you go to

4    your local market and you buy a can of Coca-Cola, you know what

5    you are getting and you know who you're getting it from.

6           So in order to bring a trademark infringement claim,

7    Hermès must be able to show a real likelihood of confusion

8    among potential consumers.

9           No real likelihood of confusion among consumers, no

10   claim.  Period.

11          The other limitation of trademark law is based on the

12   First Amendment of our Constitution.  The First Amendment

13   protects freedom of speech and expression, including artistic

14   expression.  When we are dealing with art, like we are here

15   with the MetaBirkins, the First Amendment bars liability on all

16   the claims by Hermès unless Hermès can prove -- I am going to

17   read this from the jury instructions that Judge Rakoff is going

18   to give you when I'm done speaking:  Mr. Rothschild is

19   protected from liability on any of Hermès' claims unless Hermès

20   proves by a preponderance of the evidence that Mr. Rothschild's

21   use of the Birkin mark was not just likely to confuse potential

22   consumers, but was intentionally designed to mislead potential

23   consumers into believing that Hermès was associated with

24   Mr. Rothschild's MetaBirkins project.

25          You will see that on page 21 of the instructions that

1    you will be given.  That simply is not what the evidence shows

2    in this case.

3         Now, I understand that Hermès doesn't like

4    Mr. Rothschild's art or respect him as an artist.  That's

5    obvious.  But they are a French global corporation with more

6    than $10 billion in annual sales and over $100 million in

7    annual sales of these Birkin handbags in the U.S. alone, and

8    they want more than the law gives them.

9         They want more than what our Constitution gives them.

10   While this case is about MetaBirkins and it is about

11   Mr. Rothschild and it is about Hermès and its Birkin handbags,

12   it is also about more.  It is about the freedom that our

13   Constitution grants for artistic expression, all artistic

14   expression, good art, bad art, conceptual art, NFT art.

15        That includes art that depicts brands and products

16   that are in our faces every day everywhere we look, especially

17   a brand or a product like the Birkin bag, which has become a

18   symbol in our culture of wealth and provide.

19        But art is in conversation with the world and brands

20   and products are a big part of our world today.  They have

21   enormous power and influence over us.  So it's not surprising

22   that they're the target of artists and artistic experiments

23   like what Mr. Rothschild was doing here.

24        Now, Judge Rakoff is going to tell you in your

25   instructions that MetaBirkins are artistic works.  The linchpin

1    of this case is that Mr. Rothschild unquestionably wanted the

2    credit for his own artwork.  He told everyone he was the

3    creator, and he never tried to mislead anyone into believing

4    that the MetaBirkins came from Hermès.  That's the bottom line

5    here.

6              Also, no one was hurt.  You heard from Hermès' first

7    witness Robert Chavez, the president of Hermès in the U.S., a

8    really nice and impressive guy, that's there is no evidence

9    that MetaBirkins hurt any Birkins sales.  In fact, you heard

10   him testify that Birkins sales had continued to increase year

11   over year even after Mr. Rothschild put out his MetaBirkins.

12             That was repeated by Hermès' third witness,

13   Mr. Martin, who's been in the courtroom for the whole trial.

14   There is no evidence that any actual purchaser of MetaBirkins

15   was confused about what they were getting or where it came

16   from.

17             I am going to discuss the First Amendment protection

18   here, and then Mr. Harris will discuss with you consumer

19   confusion and Hermès' specific claims.  And if you agree that

20   the First Amendment protects Mr. Rothschild because he did not

21   intentionally and explicitly mislead anyone about who created

22   MetaBirkins, that is enough for you to render a verdict on

23   behalf of Mr. Rothschild on all of Hermès' claims.  You will

24   see that on page 21 of your jury instructions.

25             Beyond that, if you agree with what Mr. Harris has to

1    say after me, that is a separate and independent reason for you

2    to find in favor of Mr. Rothschild on all of Hermès' claims.

3           When we're done speaking with you, Judge Rakoff is

4    going to give you the set of instructions that I have been

5    referencing, and he'll explain to the law to you and your job

6    when you go back into the jury room to deliberate about all of

7    the evidence that you have seen over the last week.

8           Judge Rakoff is going to instruct you that

9    Mr. Rothschild's MetaBirkins are, at least in some respects,

10   works of artistic expression and so they are protected by the

11   First Amendment, unless Hermès can clear a very high bar in

12   this case.  Judge Rakoff will instruct you that the First

13   Amendment bars liability on all of Hermès' claims unless Hermès

14   has proved, again, unless Hermès has proved that

15   Mr. Rothschild's use of the Birkin mark was not just likely to

16   confuse potential consumers, but was intentionally designed to

17   mislead potential consumers into believing that Hermès was

18   associated with Mr. Rothschild's MetaBirkins project.  I'm

19   sorry.  It is a mouthful, and I am just reading it.

20          If anything is clear from the evidence that you have

21   seen and the testimony that you have heard, it's that

22   Mr. Rothschild had no intention to mislead anyone into

23   believing that MetaBirkins came from Hermès.  He made clear

24   that he was the creator everywhere he could because he wanted

25   the credit for his own artwork.  You saw him testify.  He was

1    proud of it.

2           Ashley, would you please put up Mr. Martin's

3    testimony.

4           You heard Hermès' representative, Mr. Martin, testify

5    that he has no evidence that Mr. Rothschild ever told anyone

6    that MetaBirkins came from Hermès.

7           Ashley, would you please show the MetaBirkins website.

8           You have seen that Mr. Rothschild identified himself

9    as the creator of MetaBirkins on the MetaBirkins website.  And

10   when Hermès sent him a cease and desist letter, he even put up

11   a disclaimer on the website to make clear, doubly clear that

12   Hermès was not affiliated with MetaBirkins.

13          Ashley, would you please show the MetaBirkins

14   Instagram page.

15          Mr. Rothschild identified himself on the MetaBirkins

16   social media pages like the MetaBirkins Instagram pages that

17   you see here.

18          Ashley, would you please show the MetaBirkins Rarible

19   page.

20          Mr. Rothschild also identified himself on auction

21   platforms where he was able to, like he did here on Rarible.

22   You can see it says, A digital art project by Mason Rothschild

23   living on the Ethereum blockchain.

24          Mr. Rothschild identified himself in media interviews

25   as the artist who created MetaBirkins.

1           Ashley, would you please play the Yahoo Finance clip.

2           (Video played)

3           MR. MILLSAPS:  You saw that Mr. Rothschild ran a

4    public channel on the Discord platform where he constantly

5    interacted with his MetaBirkins audience.  Mr. Rothschild made

6    clear in this public Discord channel --

7           And, Ashley, could you put up the first.

8           -- he made clear in the public Discord channel that he

9    was the one behind MetaBirkins.  You can see here, when he

10   posted on December 22, 2021:  No, like every disclaimer says,

11   this is an art project and not associated with Hermès.

12          And everyone in that channel, as you heard, was able

13   to message him directly at any time.  He was in constant

14   communication with these people.

15          Ashley, would you go to the next Discord slide.

16          You saw that that he ran polls of his MetaBirkins

17   members to ask them what they wanted him to do next with his

18   MetaBirkins art project.

19          And you also heard from Mr. Rothschild that when he

20   became aware of articles, he or his publicist, Ken Loo, became

21   aware of articles that mistakenly attributed MetaBirkins to

22   Hermès, they reached out to correct them.

23          Ashley, would you show that bit of Mr. Rothschild's

24   testimony.

25          I want you to just ask yourself, why would

1    Mr. Rothschild have wanted to mislead people into thinking that

2    MetaBirkins came from Hermès?

3           It would be so he could make as much money as he

4    possibly could off of the sales of them, right?

5           But we know that he didn't do that.

6           He sold the MetaBirkins for just .1 ETH, the

7    equivalent of about $450 at the time.

8           Now, as you heard, there was a lot of excitement about

9    the MetaBirkins NFTs when they were released.  He'd been

10   building that excitement up by previewing them for weeks on

11   Discord on his social media pages on the website.

12          It's pretty clear that demand was high enough at that

13   point that he could have charged a lot more money than what he

14   did for those 100 MetaBirkins NFTs, but he didn't do that.

15          He didn't do that because that was part of his

16   artistic experiment, as you heard him explain, and as he

17   explained in the Yahoo Finance interview that you've seen clips

18   of, because he wanted to see what kind of value people would

19   ascribe to these two dimensional pictures of imaginary Birkin

20   bags once they were released out into the world.

21          Now, you have heard Mr. Warshavsky, my opposing

22   counsel, go on about the fact that MetaBirkins NFTs were

23   attached to the shrouded object for less than 24 hours when

24   they were being minted.

25          All right.  I am not sure what he's getting at here.

1   If this were a case where the artworks were not previewed and

2   customers had no idea what they were buying, other than a

3   shrouded image called MetaBirkins, then maybe what he was

4   saying to you would be relevant.

5          But that's not what happened here.

6          Here, it is undisputed that Mr. Rothschild previewed

7   the MetaBirkins artworks before the NFTs were released.

8          Everybody who bought a MetaBirkins NFT knew that they

9   were going to get one of the 100 MetaBirkins artwork.  This

10  wasn't a secret.  Even Mr. Martin, Hermès representative,

11  admitted this in his testimony.

12         If anything is clear in this case, it is that

13  Mr. Rothschild never intentionally tried to mislead anyone into

14  believing that MetaBirkins came from Hermès.  He wanted to

15  conduct an artistic experiment, and he wanted the credit for

16  his own artwork.

17         After I sit down, Mr. Harris is going to talk with you

18  in more detail about the evidence of confusion in this case.

19  What I will say about it now is that the evidence that

20  potential consumers were likely to be confused into thinking

21  that MetaBirkins came from Hermès is weak.  You just heard

22  Dr. Neal testify about how weak it is.  It doesn't come close

23  to clearing the high bar of the First Amendment.

24         Now, there will always be people who are confused

25  about things, whether in a survey that you are giving them or

on social media.  But it is clear from Hermès' own survey

evidence that it is not exceptionally likely that potential

consumers, people who spend thousands of dollars on handbags or

NFTs, would be confused about whether MetaBirkins comes from

Hermès.

It is not surprising that the evidence of confusion is

so weak, because Mr. Rothschild, as you have seen, made clear

wherever he could that he created MetaBirkins.  He is the

artist.  He created them.  And he's proud of it.

He has a constitutional right to create his

MetaBirkins artwork, he has a constitutional right to promote

them, and he has a constitutional right to sell and make money

from his MetaBirkins artwork, so long as he doesn't explicitly

mislead people into believing that it came from Hermès and not

him.  That is the bottom line in this case.

But our Constitution doesn't enforce itself.  Our

Constitution gives you, as members of this jury, the power to

enforce it.  The rights that it guarantees, like the freedom of

speech and artistic expression that are protected by the First

Amendment, those rights are only guaranteed if we all uphold

them in moments like this.

I am confident that when you go back to the

deliberation room and you look at the totality of the evidence

in this case, you will see that the First Amendment bars

liability on all of Hermès' claims in this case.

1          Thank you so much for your time and attention.

2          I will turn this over to Mr. Harris now to discuss

3    with you confusion and Hermès' claims of dilution and

4    cybersquatting.

5          MR. HARRIS:  Mr. Warshavsky, would you mind if I

6    borrowed one of those bags?

7          MR. WARSHAVSKY:  Not at all.

8          MR. HARRIS:  I will take the black one.  Thank you.

9          MR. WARSHAVSKY:  You got it.

10          MR. HARRIS:  Good afternoon.

11          Let let's talk about confusion.  This is a Birkin bag.

12    It takes 18 to 24 hours to make.  It is a real handbag that can

13    hold real things.

14          This is Exhibit 506 in evidence.  These are

15    MetaBirkins you can photocopy.  They're two dimensional images.

16    You can cut one out and hold it up like this.

17          It is an art project.  This is one of the MetaBirkins

18    that was not actually made.  It is the one with the banana.

19    That's not a real banana.  You can't eat it.  You can't put it

20    in a MetaBirkin, and you can't even print it out 3D.

21          What you can do with a MetaBirkin, if you wish, is

22    print it out with your photocopier, put it in your pocket like

23    this, or you can look at it on your computer screen.

24          You heard Mr. Rothschild testify they are a 2D image.

25          Now, this is the example Mr. Rothschild used.

1        He took a water bottle.  This is a 3D object.  You can

2   take a 2D picture of it, you take a 2D picture of it, it's a 2D

3   image, and then you can photocopy it.  That's what you can do

4   with a MetaBirkin.  There is no confusion, and there's no

5   likelihood that a substantial number of consumers would be

6   confused.

7        (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. HARRIS:  Hermès spent a lot of money to hire three

2     expensive experts to come in here and testify.  You heard from

3     Dr. Kominers.  Smart fellow.  Well paid, to say the least.  But

4     you may find, you may find, that Dr. Kominers did not actually

5     say anything that matters to the claims in this case.

6          He had two main points.

7          The first had to do with segmenting the NFT mark.

8          Ashley, thank you.

9          And Dr. Kominers testified — my colleague tried to

10    draw this on the Elmo.  Testified that the NFT market has

11    different submarkets:  tickets, music, art only, digital brand,

12    other.

13          And if you go to the second slide, Dr. Kominers said

14    if you have an NFT that's attached to a painting, that's art

15    only.  If you have an NFT that's attached to a painting and it

16    offers some more functionality, like the ability to get on a

17    list for a future project, now it's a digital brand.

18          Now, we don't disagree, no one here disagrees that

19    MetaBirkins offered an image plus certain other things, like

20    what I just said, the ability to get on a list for a future

21    project.  Just don't know what that is relevant to.  You can

22    buy a Timex watch for maybe $20.  It will tell the time.  You

23    can buy a simple alarm, gets you up in the morning.  Or you can

24    buy a Timex watch with an alarm.  Those are both watches.  Now,

25    perhaps Dr. Kominers would call the watch with the alarm not

1  watch only.  Okay.

2          Dr. Kominers showed you a picture of an NFT frog.

3  That's the one over here on the left of the screen.  We found

4  some other pictures of frogs on the internet.  A frog with a

5  crown is still a frog, maybe not frog only.

6          So what Dr. Kominers does is argue that having utility

7  converts something into being a digital brand.  The things that

8  doctor -- the things that Dr. Kominers identifies are the

9  things that artists have been doing for ages, which people have

10 testified to here:  putting buyers on the list for future

11 projects, having a community, trying to promote their work and

12 promote the discussion.

13         Mr. Moulin, you may recall, one of Hermès's witness,

14 came in here to testify and brought a Power Point he created on

15 NFTs.  This is one of the things he wrote.  This is his slide:

16 NFTs allow for the establishment of a new more ethical and

17 decentralized relationship between owners of luxury items and

18 brands or between artists and their customers.  Mr. Moulin flew

19 in from France for that.  Or between item artists and their

20 customers.

21         So let's get back to Dr. Kominers.  Dr. Kominers did

22 some math and showed a bunch of charts.  Used his math to argue

23 that MetaBirkins are more akin to a digital brand than art

24 only.  Again, I don't know that that matters to any of the

25 claims in the case.  But even if it did, let's look at Dr.

1    Kominers's math and his charts.

2              Please put up slide 6, Ashley.

3              This is Dr. Kominers' market analysis chart.  And if

4    you see up at the top, NeoTokyo Citizen, which is 111,000,

5    isn't shown.  It's not shown because the number is too high.

6    It's kind of like the Russian judge and the figure skating to

7    throw out the data you don't like.  And so we did this chart

8    with the full data.  And when you see it with the full data,

9    MetaBirkins is much closer to the other group than the NeoTokyo

10   Citizens.  Again, I'm not 100 percent what the chart is trying

11   to show, but that's the actual chart.

12             By the way, also you heard — and Mr. Warshavsky said

13   in his own closing today — that these things were sold in

14   Ether.  And the price of Ether fluctuates against dollars.  Dr.

15   Kominers did his chart in dollars.  So we don't even know if it

16   accounts for the fluctuations in the price of Ether over time.

17   That's what the chart looks like.

18             So he did another chart.  Again, I'm not 100 percent

19   sure what this chart is supposed to show, but I do know one

20   thing:  Dr. Kominers threw out Mobland and threw out

21   X-Consoles, didn't put them on his chart.  Russian judge.

22             Let's see what the chart looks like with that data.

23             With that data, MetaBirkins, down towards the bottom

24   of that chart.

25             And by the way, also on Dr. Kominers' chart he put

1   MintDisc above -- he put MetaBirkins above MintDisc.  If you

2   look at the data, MintDisc is above MetaBirkins, not that it

3   matters.  All right.  That's the actual chart.

4          So let's take a look at another chart Dr. Kominers

5   showed you.  This is a chart that Hermès's counsel showed you

6   in closing this morning.  That's the chart Dr. Kominers showed

7   you.

8          Now, what's interesting about this chart -- Ashley, if

9   you could -- see that red box?  We printed this chart out.  We

10  printed this chart out on eight and a half by 11 paper and

11  measured it last night.  That red box -- the whole chart is

12  nine and a half inches.  That red box is eight inches.  That's

13  less than one month.  It's 23 days, maybe it's 24.  December 3

14  to December 26.  That's eight inches.

15         The next part, Ashley.

16         That little part now in blue or black, that's 11

17  months.  That's 1.5 inches.  Again, the chart is in dollars.

18  Chart doesn't account -- we know -- Mr. Warshavsky just said

19  that the price of Ether has declined from about 4500 to

20  about -- at the time of the minting to about 1600 yesterday,

21  when he looked on the internet.  We know Ether fluctuated.  We

22  know this stuff was sold in Ether.

23         This chart is in dollars.  It's no effort that I'm

24  aware to account for changes in the price of Ether.  And then

25  this time scale was used to create whatever impression the

1   intent was.

2          And finally, Dr. Kominers put up this summary chart,

3   right.  This chart Dr. Kominers was using to compare

4   MetaBirkins to the things you see on this page.  But there's

5   something really interesting about the things you see on this

6   page.  He put back in all the data he had excluded when he was

7   the Russian judge.  NeoTokyo, that wasn't on his other chart.

8   It got excluded.  Mobland, that wasn't on his other chart.  It

9   got excluded.  X-Console wasn't on his other chart, that got

10  excluded.  But this chart, they included.

11         Now, what's left?  MetaBirkins, a project that

12  involves Samsung and Sotheby's, a project that involves Nike

13  and a company Nike bought, and a project that involves

14  apparently Google.  That's what's left.  That's Dr. Kominers.

15         Now, there are two types of groups of consumers who

16  could be potentially confused in this case, right.  And there's

17  potential confusions by handbag consumers and there's potential

18  confusion by NFT consumers.  You heard a lot of testimony on it

19  this morning from Dr. Neal, not going to repeat, right.

20         But quickly, Dr. Isaacson conducted a survey aimed at

21  confusion among purchase of handbags.  We heard that testimony.

22  And he found there was only 3.6 percent, percentage that was

23  too low to support a claim of confusion.

24         Can you put that transcript up?

25         This is from -- I can't see because of menu, but it's

1    transcript page, I think, 777.  Sorry, just can't see it on my

2    screen.

3           He was asked:  Have you ever formed an opinion -- this

4    is Dr. Isaacson was asked:  Have you ever formed an opinion

5    about whether or not that 3.6 percent number from the handbags

6    survey reflected confusion amongst handbag purchasers?

7           Answer:  I have expressed an opinion in this matter on

8    that 3.6 percent.

9           And what is that opinion, sir?

10          That number is below the number that would typically

11   be interpreted as indicating likelihood of confusion, 3.6

12   percent.

13          That's Dr. Isaacson's testimony.

14          Now, what's interesting is Dr. Isaacson didn't rely at

15   all on this number for his conclusions, he just tossed it out.

16   Russian judge.

17          And so can we put this back there?

18          There's no case here for confusion among handbag

19   consumers.  Not a case.  And you heard Dr. Neal talk about that

20   this morning, and you'll hear the judge.

21          So what does that leave us?  Potential confusion by

22   purchasers of NFTs.

23          I want to get this very correct.  The issue is whether

24   Mr. Rothschild's use of the Birkin name and/or the handbag's

25   distinct visual appearance is likely to confuse potential

1    consumers into thinking that the MetaBirkin NFTs are made and

2    sold or otherwise connected with, associated with, sponsored by

3    or approved by Hermès.  And then, in determining this,

4    determining whether consumers are likely to be confused, you

5    may draw on your own common experience.  You should take into

6    consideration the following factors.

7            I was reading that from the instructions.

8            Now, you heard Mr. Warshavsky go through these factors

9    at length.  Factors are, of course, not the ultimate question

10   you are being asked to decide.  The ultimate question you are

11   being asked to decide is whether, on balance, a likelihood of

12   confusion exists.  That was a partial sentence, but you'll get

13   the whole sentence.  Reading from the instructions.

14           So the factors are on a checklist; two factors for

15   Hermès, four factors for Rothschild, right.  The question is,

16   on balance, whether a likelihood of confusion exists.

17           Now, one of the factors as to whether there's any

18   actual confusion by any actual purchasers of the bag.  And we

19   would submit that this factor deserves substantial -- there's

20   no evidence in this case that any actual purchaser of an actual

21   MetaBirkin was confused.  No purchaser, no evidence that any

22   purchaser of a MetaBirkin reached out to Mason Rothschild and

23   Discord or through the MetaBirkin's web page or anywhere else,

24   upset, angry, asking for their money back, saying, Hey, where's

25   my Birkin bag?  There's simply none of that.  And why would

1    there be?  Because another factor on confusion is good faith,

2    especially intent.  And this was discussed at length by

3    Mr. Millsaps.  I'm not going to repeat it here.

4         But Mason Rothschild took every opportunity to

5    announce himself as the creator of the project, over 25,000

6    people on Discord he was speaking to.  He was on Instagram

7    publicly, he was on Twitter, he was on the MetaBirkins website.

8    He never, ever publicly claimed once to be associated with

9    Hermès.  The most he ever did was send some private text to

10   friends saying he was hoping to collaborate with Hermès, which

11   never happened.  And Hermès belittles those attempts, because

12   they say, We don't know who Clement Quan is, or maybe you don't

13   really know the person at *Vogue*, or maybe you don't really have

14   a relationship with Sotheby's.  They belittle the attempts.

15   Whatever.  That's the only -- he did try.  But the point is

16   those were private.  They were never -- those are in private

17   texts.

18        In public, the only evidence is that Mason Rothschild

19   is proud of what he did and took credit for it.  And when

20   Hermès complained and sent a cease and desist letter,

21   Mr. Rothschild put up a disclaimer on the website which you've

22   already seen.  He and his publicist, Ken Loo, reach out to make

23   corrections, which you've heard.  Why?  Because he was proud of

24   his project and wanted credit for it.  He wanted -- he wanted

25   to make some money from it, too.  Hermès belittles that.

1    Something improper about making money.  Like it's okay to spend

2    18 hours having a craftsman make a fancy handbag and sell

3    that -- those products for $100 million a year just in the U.S.

4    alone, but it's not okay to make a MetaBirkin art project and

5    make money from that.

6              All right.  So against this, what is the evidence of

7    likelihood of confusion?  What evidence does Hermès offer?

8    Well, offers some questions from journalists.  Questions from

9    journalists are not evidence of consumer confusion by potential

10   NFT purchasers.  Journalists are paid to ask questions.  That's

11   their job.  They're not a good proxy for people of $2500 or

12   more to spend for expensive NFTs or have a crypto wallet who

13   are interested in potentially buying a MetaBirkins.

14             And then they have some articles, they showed you some

15   articles; we saw them again today, right?  Well, the articles

16   were corrected again.  They are not evidence of confusion by

17   consumers.  Maybe some evidence of some confusion by

18   journalists, right, which is corrected, right, which is all

19   evidence of Mason Rothschild's desire to take credit, right.

20             So we've got that.  We've got a few newspaper articles

21   which are corrected.  We've got a few journalist inquiries,

22   that's their job.

23             So what have we got left on confusion?

24             Well, we got the testimony of Dr. Isaacson, based on

25   his -- not the handbag people, those people are gone.  We've

1    got the testimony of Dr. Isaacson based on his survey of

2    potential NFT purchasers.  Dr. Neal talked about this survey at

3    length this morning and I am going to hit this very quickly,

4    okay.

5          But here's something interesting:  The survey is based

6    on individuals who said in response to an online survey that

7    they would consider buying a $2500 NFT in the next 12 months.

8    There's no work done by Dr. Isaacson to determine if any of

9    those folks actually bought an NFT for $2500 or any other price

10   in the next 12 months.  There's no work done by Dr. Isaacson to

11   check whether they ever bought an NFT.  He has no knowledge if

12   they had a crypto wallet, if they owned any Ether.  There's no

13   questions about whether these folks follow NFTs on Discord or

14   anywhere else.

15         What does he have?  There's an online survey for folks

16   who say this is something they consider and they are willing to

17   do this in return for about 10 to 12 dollars in gift cards.

18   Since we've been talking about Starbucks this morning, that's

19   probably enough to buy about two cups of coffee at Starbucks.

20         And you may find that is not a representative sample

21   of folks who might mint a MetaBirkin NFT using a crypto wallet

22   paying in Ether.  And that's important for two reasons:

23         First, you may find Dr. Isaacson didn't sample the

24   right group to begin with.  Second, another factor you may

25   consider for likelihood of confusion is the sophistication of

the consumer.  Because folks paying $2500 for an NFT artwork,

paying a lot of money for anything, for that matter, are likely

to be going to pay attention, right, going to pay more

attention to buying a $2500 item than if you're buying

something for a buck 50 off of the shelf at the Walmart.

That's probably right.

Then you heard Dr. Neal's testimony which I'm not

going to repeat here, that, well, Dr. Isaacson asked the right

question to weed out folks with this issue over feedback issue.

Dr. Isaacson then ignored the answer to his own question.  Why

would Dr. Isaacson ignore the answer to his own question?

Didn't like the data.  Russian judge.  Just ignore it.

The combined effect of these flaws was to overstate

the amount of confusion from 18 percent or so to something

below ten percent.  By the way, survey is just one factor,

right?  But that is, that survey properly looked at is evidence

of a lack of confusion.  The actual confusion was below ten

percent.  And you heard Dr. Neal testify that below 15 percent,

15 percent, not ten percent, is generally considered not

sufficient to find confusion.  Again, just one factor, and

that's assuming Dr. Isaacson even was surveying the right

folks.

So we believe -- not we believe, you may find there is

no likelihood of confusion in this case.  Even if this were an

ordinary trademark case, without the First Amendment overlay,

given everything we have just discussed, the lack of any actual

confusion by any actual purchasers.

        Mr. Rothschild's good faith and repeated efforts to

take credit and correct the record; the sophistication of the

purchasers, these are people spending a lot of money who need

to have a crypto wallet to do this; and all the issues Dr. Neal

discussed with Dr. Isaacson's survey.  So there is no

confusion.  Really, what more do we need than this?

        Next issue is dilution, separate claim.  In order to

prevail, Hermès must prove the Birkin mark is famous and was

famous before Mr. Rothschild first sold any of the MetaBirkin

NFTs.  We don't dispute -- we don't dispute that the Birkin

mark is iconic among the wealthy.  It is.  That is different

than famous.  Famous, and you will read, "famous" means widely

recognized by the general consuming public as designated Hermès

as the source of goods bearing the mark.  General consuming

public, you may find, is not folks on Park Avenue carrying

Birkin bags; it's the general consuming public of the United

States, meaning folks all over the country, all income groups,

both men and women.

        Ford Mustang is famous, widely recognized by the

general consuming public as coming from Ford.  Coca-Cola is

famous, Nike is famous, Walmart is famous.  There's plenty of

evidence in this case, which we don't dispute, of the Birkin

bag being featured in high-end fashion magazines like *Vogue* and

1   *Town & Country*, and being legendary among consumers of $12,000

2   handbags.  That is very different than evidence of the Birkin

3   bag being widely recognized by the general consuming public of

4   this country, like Coca-Cola.

5         Counsel for Hermès just stood up here not -- maybe not

6   half an hour ago, maybe a little more, and said Hermès only has

7   32 stores in the United States total.

8         The second thing Hermès would need to prove on this

9   dilution thing is that Mr. Rothschild's use of the MetaBirkins

10   name and the images associated with it are likely to dilute the

11   distinctiveness of the Birkin mark; that is, not that there is

12   an association, but that the association dilutes the

13   distinctiveness of the mark, that because of Mr.  -- because of

14   Mr. Rothschild's MetaBirkins, the Birkin mark has less power in

15   identifying Birkin bags to the wealthy consumers who covet them

16   and can afford them.

17         Really?

18         Does that sound right to you?

19         As counsel showed you pictures of bees, all right.

20   Mr. Rothschild is not responsible for the other bees.  He's not

21   responsible for somebody who's making a stone sculpture of the

22   Birkin bag.  He's not responsible for being singing about the

23   Birkin bag in a rap song.  Mr. Rothschild owns his conduct and

24   is responsible for his conduct.

25         Come to Hermès's third claim in this case, which is

1    for cybersquatting.  This isn't a case where Hermès owns

2    hermès.com and someone goes out and squats on hermès.org,

3    demands a ransom.  Judge Rakoff will tell you that bad faith is

4    one of the elements of cybersquatting that Hermès must prove.

5    There's no basis in this case to find Mr. Rothschild squatted

6    or squatted in bad faith on any web domain.

7         The uncontradicted evidence is Mr. Rothschild used

8    metabirkins.com only for the MetaBirkins project, and he never

9    attempted to sell the metabirkins.com site to anyone.  There's

10   no evidence he attempted to hold the metabirkins.com website

11   name hostage or he attempted to divert customers from Hermès's

12   own website.  The evidence is that Mr. Rothschild only used

13   metabirkins.com to sell the MetaBirkins he created.  In so

14   doing, he acted in good faith.  As my colleague covered, from

15   the start metabirkins.com website informed consumers that Mason

16   Rothschild was the creator.  And after Hermès sent a cease and

17   desist, Mr. Rothschild put up a disclaimer.  There's no claim

18   here for cybersquatting.

19        So we come to damages.  It's our part of the case for

20   us.  We hope you won't get to damages.  We're asking you not to

21   get to damages.  We're asking you to find Mr. Rothschild not

22   liable for trademark infringement, not liable for dilution or

23   cybersquatting, and to find his activities protected by the

24   First Amendment of the Constitution.

25        THE COURT:  Thank you very much.

1              I'm sorry, were you --

2              MR. HARRIS:  I have maybe -- I don't have a lot left.

3              THE COURT:  No, no, go ahead.  You have ten minutes

4       left.

5              MR. HARRIS:  I am going to do --

6              THE COURT:  I just misunderstood.

7              MR. HARRIS:  Thank you, your Honor.

8              Don't want to miss the grand finale.  Sorry.

9              But when you come to damages, there's the testimony of

10      Mr. Chavez, the head of Hermès in the United States.

11      Mr. Chavez testified that Birkin sales increased in 2021 and

12      '22.  And he testified, here is the bottom Q:  Are you aware of

13      loss of sales revenue in North America because of the

14      MetaBirkin?

15             No, I am not.

16             So Hermès, which has no damages, is asking instead for

17      the profits made by Mr. Rothschild.  You heard he minted 100

18      Birkin bags at 1.1 Ether each and got a small piece of resales.

19      You heard he got paid in Ether, which the testimony is it's now

20      gone down in price.  You heard that in total, the minting fees

21      amounted to about $45,000, and about $67,000 for resales.

22             Mr. Warshavsky, if you could do me a favor and put up

23      the chart you used from your expert, the damage chart.  I think

24      it's the last chart you used.

25             You'll see the chart is from Dr. Mentzer.  The minting

1  revenue is about $45,000.  That's converted from the Ether; the

2  Ether are worth less now.  The royalties are about 69,000.  We

3  talked about that.  Artists, when they do NFTs, are able to get

4  a share of royalties going forward.  That would be

5  Mr. Rothschild's share, it's about 17 and a half Ether,

6  $69,000.  Again, the price has gone down.

7          Then he comes to MetaBirkin NFT transfers.  And what

8  is that?  Well, that is that Mr. Mentzer took the position that

9  because Mr. Rothschild kept three MetaBirkins out of the first

10  100 that were minted, that the damage there is $120,000 based

11  on the highest price of MetaBirkin ever traded for.  I don't

12  really understand.  But the testimony is that Mr. Rothschild

13  gave away two of those MetaBirkins, and he only has one.

14  There's no evidence in this case that he intends to sell it or

15  that he could sell it for $40,000 right now.

16          So that's the damages.  I'd ask you to disregard

17  Mr. Mentzer's $120,000, and to bear in mind the price of Ether

18  has gone down.

19          Now, again, there was no harm to -- of course, we're

20  going to ask you not to find liability and no damages.

21          Again, there was no harm to Hermès, so why?  You may

22  find Hermès didn't like Mr. Rothschild's art; that Hermès

23  judged Mason Rothschild and his art and found him wanton.

24  Maybe that Hermès 150-year-old French fashion house thinks it's

25  better than Mason Rothschild, the self-made artist with no

1  formal art school training.  And upset that a 27-year-old — now

2  28-year-old — from L.A., who Hermès had never heard of, did

3  this.

4          We heard some interesting things in this case that

5  speak to Hermès's attitude.

6          Hermès's counsel showed you in opening and then showed

7  you again today and showed Mr. Rothschild a lot of texts, but

8  didn't ask for a lot of explanation, which is his right.  We

9  provided that explanation.  You might remember the -- was shown

10 today in closing, the Future tech, the Future posting.  That's

11 a post that Future made about the MetaBirkins, rap star.  And

12 Mr. Rothschild put on -- can you put that up, Ashley?  And

13 Mr. Rothschild put up on that -- okay, I'll just keep going.

14 Don't worry about it.  I'll keep going.  They'll remember.

15         Mr. Rothschild — there it is — put up on it

16 MetaBirkins2Pluto.  And Dr. Kominers got up there and said,

17 Well, that means the price going to the moon.  Didn't bother to

18 find out that Mr. Rothschild knows Future, and that that is

19 Future's nickname.  It's an interesting thing that a man named

20 Future has a nickname.  Okay.  Another nickname.

21         All right.  So then it happens again.  They put up --

22 if you could throw up, please, Ashley, Exhibit -- the one I

23 handed to you before, it's Exhibit 313.

24         Mr. Rothschild, on direct, was examined by this,

25 leading the impression that when it was minted, it said "secure

1    the bag."  We had to bring out on cross, you can very clearly

2    see it says "press the button below to mint your MetaBirkin

3    now."  So that's just a couple of examples, all right.

4         Now, Mr. Martin, the general counsel of Oliver Mezz,

5    who's been sitting here the whole trial, testified on direct,

6    questions by his lawyer, that Hermès had no contact, no

7    contact, his words, with Mason Rothschild after sending the

8    cease and desist.

9         On cross, Mr. Martin had to correct that.  Because, in

10   fact, Mason Rothschild was respectful and his attorneys reached

11   out to Hermès's attorneys right away.  And then Mr. Rothschild

12   put a disclaimer on his website.  And he went on Discord and

13   told all those tens of thousands of people that he wasn't

14   affiliated with Hermès in any way, shape or form; this was his

15   project.  And then Hermès sued Mr. Rothschild anyway.  And then

16   even though Hermès could have sent the complaint to his lawyers

17   with whom they were in contact, Hermès chose to serve

18   Mr. Rothschild at his store showing pictures to his customers.

19   That's a lack of respect.

20        Mason Rothschild came from a good family, but he came

21   from nothing.  He made himself.  Designs now for Formula I.  He

22   did not -- he owns a boutique in Los Angeles with his fiancé.

23   He made himself an artist.  Mason Rothschild wasn't given

24   anything.  He started working at 16.  You saw our testimony

25   about how hard he's worked.

1          Hermès wants more than what they are entitled to here.

2   They want more than what the law gives them.  The law gives

3   Hermès the ability in certain circumstances to enforce their

4   trademark in the commercial market and to prevent consumer

5   confusion.

6          Here, there is no confusion.  There is no dilution.

7   There is no cybersquatting.  There is no valid claim.  And

8   Hermès still wants more.  They want control over how Mason

9   Rothschild makes a point or creates pictures.  And that is

10  protected by the First Amendment of our Constitution; that is

11  protected by you.  Thank you.

12         THE COURT:  Thank you very much.

13         Ladies and gentlemen, so we'll give you your lunch

14  break now and we'll get some medicine for our court reporter.

15  And we'll see you at 10 after 2.

16         (Jury not present)

17         THE COURT:  Just work out over the lunch break, as I

18  indicated, any remaining problems on the index of the exhibits

19  and the exhibits themselves.  But if there still is an issue,

20  I'll take it up when we get back at 10 after 2.

21         See you then.

22         (Luncheon recess)

23         (Continued on next page)

24

25

```
 1                          AFTERNOON SESSION

 2                              (2:15 p.m.

 3             THE COURT:  Please be seated.

 4             Everything worked out with the exhibits?

 5             MR. WARSHAVSKY:  Yes, your Honor.

 6             THE COURT:  When the jury retires to deliberate, give

 7    the exhibits and the index to my courtroom deputy, and she'll

 8    take them into the jury room.

 9             MR. HARRIS:  Your Honor?

10             THE COURT:  Yes.

11             MR. HARRIS:  May I ask for a similar thing as we said

12    before with respect to Mr. Rothschild?

13             THE COURT:  Yes.

14             MR. HARRIS:  Thank you.

15             THE COURT:  I can't say he's late.

16             MR. HARRIS:  He is ill, your Honor.

17             THE COURT:  I am not going to say that.  I am going to

18    say he's excused with the consent of all concerned.

19             MR. HARRIS:  Okay.

20             (Jury present)

21             THE COURT:  Please be seated.  Ladies and gentlemen,

22    you each have a copy of my instructions of what you.  We are

23    going to read them together now.

24             You can take them with you into the jury room.  And

25    you should discard the preliminary instruction that I gave you
```

1    earlier, because this replaces that.

2         I should also mention that with the consent of all

3    parties, Mr. Rothschild was excused so he is not here in the

4    courtroom, but he, of course, will be back.

5         So okay.

6         Let's turn to page 2, the table of contents.  You will

7    see that my instructions are divided into four parts.

8         There are first general instructions.  Those apply not

9    just to this case but all civil cases.

10        Then there is a heading liability.  That's about the

11   specific charges in this case.

12        And then if you do find there is any liability, then

13   you would then turn to damages.  That's the lawyers' words for

14   money.

15        And, finally, there is some concluding instruction

16   about how you fill out your verdict form.

17        So let's turn to the first instruction on page 3.

18        We are now approaching the most important part of this

19   case, your deliberations.  You have heard all the evidence in

20   the case, as well as the final arguments of the lawyers for the

21   parties.  Before you retire to deliberate, it is my duty to

22   instruct you to you as to the law that will govern your

23   deliberations.  These are the final and binding instructions,

24   which entirely replace the preliminary instruction I gave you

25   at start of the case, which you should now discard.

1        Regardless of any opinion that you may have as to what

2   the law may on be or ought to be, it is your sworn duty to

3   follow the law as I give it to you.  Also, if any attorney or

4   other person has stated a legal principle different from any

5   that I state to you in my instructions, it is my instructions

6   that you must follow.

7        Because my instructions cover many points, I have

8   provided each of you with a copy of them, not only so that you

9   can follow them as I read them to you now, but also so that you

10  can have them with you for reference throughout your

11  deliberations.  In listening to them now and reviewing them

12  later, you should not single out any particular instruction as

13  alone stating the law, but you should instead consider my

14  instructions as a whole.

15       Your duty is to decide the fact issues in the case and

16  arrive, if you can, at a verdict.  You, the members of the

17  jury, are the sole and exclusive judges of the facts.  You pass

18  upon the weight of the evidence; you determine the credibility

19  of the witnesses; you resolve such conflicts as there may be in

20  the testimony; and you draw whatever reasonable inferences you

21  decide to draw from the facts as you determine them.

22       In determining the facts, you must rely upon your own

23  recollection of the evidence.  To aid your recollection, we

24  will send you the exhibits at the start of your deliberations,

25  together with an index to help you find what you want.  If you

1    need to review particular items of testimony, we can also

2    arrange to provide them to you in transcript or readback form.

3           Please remember that none of what the lawyers have

4    said in their opening statements, in their closing arguments,

5    in their objections, or in their questions, is evidence.  Nor

6    is anything I may have said evidence.  The evidence before you

7    consists of just three things:  The testimony given by

8    witnesses that was received in evidence, the exhibits that were

9    received in evidence, and any stipulation of the parties as to

10   matters in evidence.

11          Testimony consists of the answers that were given by

12   the witnesses to the questions that were permitted to be asked

13   here in court.  Please remember that questions, although they

14   may provide the context for answers, are not themselves

15   evidence; only answers are evidence, and you should therefore

16   disregard any question to which I sustained an objection.

17   Also, you may not consider any answer that I directed you to

18   disregard or that I directed be stricken from the record.

19   Likewise, you may not consider anything you heard about the

20   contents of any exhibit that was not received in evidence.

21          More generally, you should be careful not to speculate

22   about matters not in evidence.  Your focus should be solely on

23   the evidence that was presented here in court.

24          It is the duty of the attorney for each of side of a

25   case to object when the other side offers testimony or other

1  evidence that the attorney believes is not properly admissible.

2  Counsel also have the right and duty to ask the Court to make

3  rulings of law and to request conferences out of the hearing of

4  the jury.  All such questions of law must be decided by me.

5  You should not show any prejudice against any attorney or party

6  because the attorney objected to the admissibility of evidence,

7  asked for a conference out of the hearing of the jury, or asked

8  me for a ruling on the law.

9       I also ask you to draw no inference from any rulings

10  or from the fact that on occasion I asked questions of certain

11  witnesses.  My rulings were no more than applications of the

12  law, and my questions were only intended for clarification or

13  to expedite matters.  You should understand that I have no

14  opinion as to the verdict you should render in this case.  You

15  are to perform your duty of deciding the facts without bias or

16  prejudice or sympathy or hostility to as to any party, for all

17  parties are equal under the law.  You are to perform your final

18  duty in an attitude of complete fairness and impartiality.  You

19  are not to be swayed by rhetoric or emotional appeals.  It must

20  being clear to you that if you were to let extraneous

21  considerations interfere with your thinking, there would be a

22  risk that you would not arrive at a true and just verdict.  So

23  do not be guided by anything except clear thinking and calm

24  analysis of the evidence.

25       As you know, this is a civil case.  In a civil case, a

1   party who is making a claim against another party has what we

2   call the burden of proof, which is the burden of establishing

3   each of the essential elements of that claim.  Here, the

4   plaintiffs, Hermès International Inc., and Hermès of Paris

5   Inc., which I will refer to collectively as Hermès, has

6   asserted various claims against Mason Rothschild, and therefore

7   has the burden of proof as to those claims.

8         I will describe the essential elements of Hermès'

9   claims shortly, but for now, keep in mind that for any given

10  claim you are considering, Hermès must prove each of the

11  essential elements of that claim by a preponderance of the

12  credible evidence.  The credible evidence means such evidence

13  that you find worthy of belief.  To establish an element after

14  a claim by a preponderance of the credible evidence means to

15  prove that that element is more likely true than not true.

16        When assessing whether a party has met its burden of

17  proof or failed to do so, the question is not which party

18  called the greater number of witnesses or how much time one

19  party or another spent during the trial.  The focus must always

20  be on the quality of the evidence:  Its persuasiveness in

21  convincing you of its truth.

22        In deciding whether a party meets its burden of proof,

23  you may consider both direct evidence and circumstantial

24  evidence.

25        Direct evidence is evidence that proves a fact

1  directly.  For example, where a witness testifies to what he or

2  she saw, heard, or observed, that is called direct evidence.

3          Circumstantial evidence is evidence that tends to

4  prove a fact by proof of other facts.  To give a simple

5  example, suppose that when you came into the courthouse today

6  the sun was shining and it was a nice day, but the courtroom

7  blinds were drawn and you could not look outside.  Later, as

8  you were sitting here, someone walked in with a dripping wet

9  umbrella and, soon after, somebody else walked in with a

10 dripping wet raincoat.  Now, on our assumed facts, you cannot

11 look outside of the courtroom and you cannot say whether it is

12 raining.  So you have no direct evidence of that fact.  But on

13 the examination of the facts about the umbrella and the

14 raincoat, it would be reasonable for you to infer that it had

15 begun raining.

16          That is all there is to circumstantial evidence.

17 Using your reason and experience, you infer from established

18 facts the existence or the nonexistence of some other fact.

19 Please note, however, it is not a matter of speculation or

20 guess; it is a matter of logical inference.

21          The law makes no distinction between direct and

22 circumstantial evidence.  Circumstantial evidence is of no less

23 value than direct evidence, and you may consider either or

24 both, and may give them such weight as you conclude is

25 warranted.

1    It must be clear to you by now that counsel for the

2 opposing parties are asking you to draw very different

3 conclusions about various factual issues in the case.  An

4 important part of that decision will involve making judgments

5 about the testimony of the witnesses you have listened to and

6 observed.  In making these judgments, you should carefully

7 scrutinize all of the testimony of each witness, the

8 circumstances under which each witness testified, and any other

9 matter in evidence that may help you to decide the truth and

10 the importance of each witness's testimony.

11    Your decision to believe or to not believe a witness

12 may depend on how that witness impressed you.  How did the

13 witness appear to you?  Was the witness candid, frank, and

14 forthright, or did the witness seem to be evasive or suspect in

15 some way?  How did the way the witness testified on direct

16 examination compare with how the witness testified on

17 cross-examination?  Was the witness consistent or

18 contradictory?  Did the witness appear to know what he or she

19 was talking about?  Did the witness strike you as someone who

20 was trying to report his or her knowledge accurately?  These

21 are examples of the kinds of common-sense questions you should

22 ask yourselves in deciding whether a witness is or is not

23 truthful.

24    How much you choose to believe a witness may also be

25 influenced by the witness's bias.  Does the witness have a

1  relationship with any of the parties that may affect how he or

2  she testified?  Does the witness have some interest, incentive,

3  loyalty, or motive that might cause him or her to shade the

4  truth?  Does the witness have some bias, prejudice, or motive

5  that might cause him or her to give you something other than a

6  completely accurate account of the facts he or she testified

7  to.

8          You should also consider whether the witness had an

9  opportunity to observe the facts he or she testified about, and

10  whether the witness's recollection of the facts stands up in

11  light of the other evidence in the case.

12          In other words, what you must try to do in deciding

13  credibility is to size up a person just as you would in any

14  important matter where you are trying to decide if a person is

15  truthful, straightforward, and accurate in his or her

16  recollection.

17          Some of the testimony before you is in the form of

18  videotaped deposition that was received in evidence.  At

19  various times moreover, excerpts from the depositions of

20  several witnesses were read into evidence.  A deposition is

21  simply a procedure where, prior to trial, the attorneys may

22  question a witness under oath before a court stenographer.  You

23  may consider the testimony of a witness given at a disposition

24  according to the same standards you would use to evaluate the

25  testimony of a witness given live at trial.

1          In addition, one witness testified remotely by

2    videoconference.  You should consider this testimony according

3    to the same standards you use to evaluate the testimony of the

4    witnesses who testified here in the courtroom.

5          The law permits parties to offer testimony from

6    witnesses who were not involved in the underlying events of the

7    case, but who by education or experience profess some expertise

8    in a specialized area of knowledge.

9          In this case, the expert witnesses who testified were

10   Dr. Kevin Mentzer, Dr. Scott Duke Kominers, and Dr. Bruce

11   Isaacson, called by the plaintiffs, and Dr. David Neal, called

12   by the defendant.  Specialized testimony is presented to you on

13   the theory that someone who is learned in the field may be able

14   to assist you in understanding specialized aspects of the

15   evidence.

16         However, your role in judging credibility and

17   assessing weight applies just as much to these witnesses as to

18   other witnesses.  When you consider the specialized opinions

19   that were received in evidence in this case, you may give them

20   as much or as little weight as you think they deserve.  For

21   example, a specialized witness necessarily bases his or her

22   opinions, in part or in whole, on what that witness learned

23   from others, and you may conclude that the weight given the

24   witness's opinions may be affected by how accurate or

25   inaccurate that underlying information is.  More generally, if

1    you find that the opinions of a specialized witness were not

2    based on sufficient data, education, or experience, or if you

3    should conclude that the trustworthiness or credibility of such

4    a witness is questionable, or if the opinion of the witness is

5    outweighed, in your judgment, by other evidence in the case,

6    then you may, if you wish, disregard the opinions of that

7    witness, entirely or in part.

8           On the other hand, if you find that a specialized

9    witness is credible, and that the witness's opinions are based

10   on sufficient data, education, and experience, and that the

11   other evidence does not give you reason to doubt the witness's

12   conclusions, you may, if you wish, rely on that witness's

13   opinions and give them whatever weight you deem appropriate.

14          With these general instructions in mind, let us now to

15   turn to the three claims in case that the plaintiff, Hermès,

16   brings against the defendant, Mason Rothschild:

17          First, a claim of trademark infringement;

18          Second, a claim of trademark dilution; and

19          Third, a claim of so-called cybersquatting.

20          I will shortly instruct you on each of the essential

21   elements that Hermès must prove, by a preponderance of the

22   evidence, to prevail on a given claim.  This is known as

23   establishing liability on that claim.

24          In addition, however, even if you find the defendant

25   is liable on one or more of these claims, you must also

1   consider whether the legally protected right to artistic

2   expression nonetheless bars liability or not.

3          Before we turn to Hermès' claims, a brief word about

4   the trademark at issue.  A trademark can be a word, name,

5   symbol, or design that indicates to consumers the company

6   associated with a product.  Here, Hermès asserts trademark

7   infringement, trademark dilution and cybersquatting as to the

8   Birkin mark, which is a federally registered trademark

9   described at Plaintiffs' Exhibits 5 and 6, and that covers both

10  the Birkin and the handbag's distinct visual appearance.  In

11  this case, it is undisputed that Mr. Rothschild marketed

12  certain NFTs under the heading MetaBirkins and that these NFTs

13  were associated with digital images of fur-covered Birkin bags.

14  Collectively, these NFTs and their associated images are here

15  referred to as MetaBirkins NFTs.

16         Hermès' first claim is trademark infringement.  Hermès

17  asserts that Mr. Rothschild has infringed Hermès' Birkin mark

18  (which as described in instruction No. 10 includes both the

19  word Birkin and the Birkin bag's distinct visual appearance)

20  through the use of this mark in his MetaBirkins NFT project.

21  Specifically, Hermès contends that Mr. Rothschild's use of the

22  Birkin name and/or the handbag's distinct visual appearance is

23  likely to confuse potential consumers into thinking that the

24  MetaBirkins NFTs are made and sold or otherwise connected with,

25  associated with, sponsored by, or approved by Hermès.

1    In determining whether consumers are likely to be

2    confused, you may draw on your own common experience.  You

3    should also take into account the following factors:

4        First, the strength of Hermès' Birkin trademark.  A

5    mark's strength is measured by its tendency to identify the

6    products sold under the mark as associated with a particular

7    company and may depend on factors such as advertising, media

8    coverage of products bearing the mark, sales success, the

9    longevity and exclusivity of the mark's use, consumer studies

10   linking the mark to the company, and any other factor in

11   evidence that you find bears on the strength of the mark.  The

12   stronger the mark, the more likely that similar uses by other

13   parties will cause confusion.

14       Second, the degree of similarity between Hermès'

15   Birkin mark and the MetaBirkins NFTs name and visual

16   appearance.  In particular, you should consider what effect the

17   similarity or lack thereof has on consumers and whether any

18   similarity between the parties' mark is likely to cause

19   confusion among consumers.

20       Third, whether the MetaBirkins NFTs and Hermès

21   products compete for the same consumers.

22       Fourth, whether or not there is evidence that

23   consumers are actually confused about whether Hermès offers or

24   is associated with the MetaBirkins NFTs.  While proof of actual

25   confusion is not necessary to prove trademark infringement and

1   it is enough for plaintiffs to show likelihood of confusion,

2   evidence of actual confusion can weigh in favor of there being

3   a likelihood of confusion.  Conversely, the absence of evidence

4   of actual confusion can be evidence that confusion is unlikely.

5            Fifth, the degree of care and attention that an

6   ordinary consumer would use when encountering Hermès' Birkin

7   mark and the MetaBirkins NFTs.  Generally, the more

8   sophisticated and careful the average consumer of a product is,

9   the less likely that that consumer will be confused about the

10   company or individual behind a similarly named product.  Here,

11   given the high price of Birkin handbags, you should presume

12   that consumers of the Birkin handbags are more sophisticated

13   and deliberate than ordinary consumers.

14            Sixth, whether Hermès has shown that Mr. Rothschild

15   acted in bad faith.  In this context, bad faith goes to whether

16   Mr. Rothschild used the MetaBirkins name and the visual

17   appearance of the underlying images with the intention that

18   consumers would believe that Hermès originated or endorsed the

19   MetaBirkins NFTs, or whether Mr. Rothschild chose to purposely

20   turn a blind eye to the likelihood that potential consumers

21   would be confused.

22            Seventh, the likelihood that Hermès had concrete and

23   realistic plans to produce and sell its own NFTs using the

24   Birkin mark, such that potential consumers would mistakenly

25   believe that the MetaBirkins NFT project represented Hermès'

1    entry into the NFT market.

2            In considering the factors I just described to you,

3    please keep in mind that no one factor or consideration is

4    conclusive, but each of these factors, as well as any other

5    factors you find relevant, should be weighed in light of the

6    total evidence presented at the trial to determine whether, on

7    balance, a likelihood of confusion exists.  If Hermès has

8    proved that a likelihood of confusions exists, it has carried

9    its burden of proof on its infringement claim.

10           Hermès also asserts a claim for trademark dilution

11   under federal law.  This claim does not require showing that

12   consumers are likely to be confused about the source of the

13   MetaBirkins NFTs.  Instead, it requires showing that

14   Mr. Rothschild's use of the MetaBirkins name and the images

15   associated with it are likely to dilute the distinctiveness of

16   Hermès Birkin mark by eroding its distinctiveness in the minds

17   of the public.

18           To prove dilution under information law, Hermès must

19   show by a preponderance of the credible evidence that:  (1) the

20   Birkin mark is famous; (2) the Birkin mark became famous before

21   Mr. Rothschild first sold any of the MetaBirkins NFTs; and (3)

22   Mr. Rothschild' use of the MetaBirkins name and the images

23   associated with it are likely to dilute the distinctiveness of

24   the Birkin mark.

25           The Birkin mark is famous if it is widely recognized

1  by the general consuming public as designating Hermès as the

2  source of goods bearing the mark.  In measuring fame, you may

3  consider your own experience, as well as the extent, history,

4  and geographic reach of advertising and publicity of the mark

5  (both by Hermès or third parties), the amount, volume, and

6  geographic reach of sales of products bearing the mark, the

7  extent to which members of the public actually recognize the

8  mark, and whether the mark was federally registered.

9          If you determine Hermès Birkin mark is famous and has

10  been famous since before Mr. Rothschild began selling the

11  MetaBirkins NFTs, you must consider whether Mr. Rothschild's

12  use of the MetaBirkins name and images associated with it are

13  likely to dilute the distinctiveness of the Birkin mark.

14          In determining whether such dilution is likely to

15  occur, you may consider all relevant factors, including, for

16  example:

17          The degree to which Mr. Rothschild's use of the Birkin

18  mark is similar to Hermès' use of the Birkin mark;

19          The strength of the Birkin mark, which you should

20  evaluate as described in Instruction No. 11;

21          The degree to which the Birkin mark is widely

22  recognized;

23          Whether Mr. Rothschild intended to create an

24  association with the Birkin mark;

25          Any actual association by consumers of the MetaBirkins

1  NFTs with the Birkin mark.

2       You may also consider any other relevant factors, and

3  you should remember that no one of these factors is conclusive.

4  Your task is to consider whether, after considering these

5  factors and any others you find relevant, Hermès has proved

6  that Mr. Rothschild's use of the Birkin mark is more likely

7  than not to dilute the distinctiveness of the Birkin mark.

8       Finally, Hermès alleges that Rothschild engaged in

9  cybersquatting through his use of the domain name

10  metabirkins.com for his website.  To prevail on this claim,

11  Hermès must prove the following three elements:  (1) that the

12  Birkin mark was distinctive at the time the domain name

13  metabirkins.com was registered; (2) that the metabirkins.com

14  domain name is identical to, or confusingly similar to, Hermès

15  Birkin mark; and (3) that Mason Rothschild had a bad faith

16  intent to profit from the Birkin mark.

17       In determining where Mr. Rothschild acted in bad faith

18  on this claim, you may consider whether Mr. Rothschild used the

19  domain name in connection with the offering of any goods or

20  products and whether he intended to divert customers from the

21  mark owner's online location to a site that could harm the

22  goodwill represented by the Birkin mark, either for commercial

23  gain or with the intent to tarnish or disparage the mark.  If

24  you find that Mr. Rothschild had reasonable grounds to believe

25  that the use of this domain was lawful, you must find that he

1    did not act in bad faith.

2            If, and only if, you find Mr. Rothschild is liable for

3    any one or more of the three claims described above, you must

4    then consider whether, nonetheless, Mr. Rothschild is protected

5    from liability on any claim because, in creating the

6    MetaBirkins NFTs, he engaged in artistic expression protected

7    by the First Amendment to the U.S. Constitution.

8            It must be clear to you by now that the parties

9    disagree about the degree to which the MetaBirkins NFTs are

10   works of artistic expression.  Mr. Rothschild contends that,

11   because he started the project primarily for artistic reasons,

12   the NFTs are paradigmatic works of art.  Hermès asserts that

13   any artistic expression is incidental at best, and

14   Mr. Rothschild's real intention was to confuse people into

15   thinking that his MetaBirkins NFTs were sponsored by or

16   associated with Hermès.

17           It is undisputed, however, that the MetaBirkins NFTs,

18   including the associated images, are in at least some respects

19   works of artistic expression, such as, for example, in their

20   addition of a total fur covering to the Birkin bag images.

21   Given that, Mr. Rothschild is protected from liability on any

22   of Hermès' claims unless Hermès proves by a preponderance of

23   the evidence that Mr. Rothschild many use of the Birkin mark

24   was not just likely to confuse potential consumers, but was

25   intentionally designed to mislead potential consumers into

1 believing that Hermès was associated with Mr. Rothschild's

2 MetaBirkins project.  In other words, if Hermès proves that

3 Mr. Rothschild actually intended to confuse potential

4 customers, he has waived any First Amendment protection.

5      Therefore, in your verdict form, you will first

6 indicate whether Mr. Rothschild is liable for any one or more

7 of Hermès' claims under the instructions set forth in

8 Instructions 11, 12 and 13.  But if you do find Mr. Rothschild

9 liable for one or more of these claims, you must then indicate

10 on the verdict form, in accordance with Instruction 14, whether

11 Mr. Rothschild is nonetheless protected from liability by

12 reason of his First Amendment protection.

13      If you find Mr. Rothschild liable for trademark

14 infringement and/or trademark dilution, and if you further find

15 that Hermès has overcome Mr. Rothschild's First Amendment

16 protection by proving that his use of the Birkin mark was

17 intentionally misleading, you must award Hermès the profits you

18 determine that Mr. Rothschild earned as a result of his

19 infringement and/or dilution.  You should measure such profits

20 as the difference between Mr. Rothschild's total sales of any

21 MetaBirkins NFTs that you determine infringed and/or diluted

22 Hermès' Birkin mark and the expenses Mr. Rothschild incurred in

23 order to make those sales.  The burden is on Hermès show by the

24 preponderance of the credible evidence the amount

25 Mr. Rothschild received from selling the MetaBirkins NFTs,

1  while the burden is on Mr. Rothschild to show by the

2  preponderance of the credible evidence the expenses he incurred

3  in order to sell the MetaBirkins NFTs.

4      If you find Mr. Rothschild liable for cybersquatting

5  and if you further find that Hermès has overcome

6  Mr. Rothschild's First Amendment protection by proving that his

7  use of the Birkin mark was intentionally misleading, you may

8  then award what are called statutory damages for the

9  cybersquatting.  The amount you may award as statutory damages

10  is not less than $1,000, and not more than $100,000.  In

11  determining the exact amount of statutory damages, you may

12  consider what amount may be necessary to penalize

13  Mr. Rothschild for the use of the domain name and deter future

14  cybersquatting.

15      You will shortly retire to the jury room to begin your

16  deliberations.  As soon as you get to the jury room, please

17  select one of your number as the foreperson, to preside over

18  your deliberations and to serve as your spokesperson if you

19  need to communicate with the Court.

20      You will be bringing with you into the jury room a

21  copy of my instructions of law and a verdict form on which to

22  record your verdict.

23      Let me pause there and show you the verdict form.  It

24  is very simple.  For each of the three claims you check the box

25  either liable or not liable.

1    If you check any of them as liable, then you consider

2    the First Amendment protection and decide whether or not

3    nevertheless that bars the claim or not.

4         And, finally, if you decide that there is liability

5    and that the First Amendment protection does not apply, then

6    you determine first for the infringement and dilution claims an

7    amount of damages.

8         So there is a dollar sign and you fill in an amount.

9         And then separately, for the cybersquatting claim, if

10   you find liability on that claim, statutory damages, and you

11   again put in the amount.

12        After you have filled out those questions, your

13   foreperson will then sign the verdict form, date it, seal it in

14   this envelope very cleverly marked verdict, and then it will be

15   brought to me.  But I will not open it until you are all back

16   here in the courtroom.

17        And then either I or my courtroom deputy will read it

18   to you and ask each of you individually whether that is in fact

19   your verdict.  The reason we go through all those

20   technicalities is to be absolutely sure we have your verdict as

21   you have decided it.

22        So let's go back to the instructions.

23        In addition, we will send you into the jury room all

24   the documentary and physical exhibits that were admitted into

25   evidence, along with an index so you can locate what you might

1    want.  If want any of the testimony, that can also be provided,

2    in either transcript or readback form.  But please remember

3    that it is not always easy to locate what you might want, so be

4    as specific as you possibly can be in requesting portions of

5    testimony.  Also, if you want any of the videotapes replayed,

6    please let us know, and we will bring you back into the

7    courtroom to see the relevant videotape.

8         Any of your requests, in fact, any communication with

9    the Court should be made to me in writing, signed by your

10   foreperson, and given to the marshal, who will be available

11   outside the jury room throughout your deliberations.  After

12   consulting with counsel, I will respond to any question or

13   request that you have as promptly as possible, either in

14   writing or by having you return to the courtroom so that I can

15   speak with you in person.

16        You should not, however, tell me or anyone else how

17   the jury stands on any issue until you have reached your

18   verdict and recorded it to your verdict form.

19        Each of you must decide the case for yourself, after

20   consideration with your fellow jurors of the evidence in the

21   case, and your verdict must be unanimous.  In deliberating,

22   bear in mind that, while each juror is entitled to his or her

23   opinion, you should exchange views with your fellow jurors.

24   That is the very purpose of jury deliberation -- to discuss and

25   consider the evidence; to listen to the arguments of fellow

1    jurors; to present your individual views; to consult with one

2    another; and to reach a verdict based solely and wholly on the

3    evidence.

4         If after carefully considering all the evidence and

5    the arguments of your fellow juror, you entertain a

6    conscientious views that differs from the others, you are not

7    to yield your view simply because you are outnumbered.  On the

8    other hand, you should not hesitate to change or modify an

9    earlier view that, after discussion with your fellow jurors,

10   now appears to you erroneous.  In short, your verdict must

11   reflect your individual views and it must also be unanimous.

12        This completes my instructions of law.

13        Now, all objections previously made to the charge are

14   deemed renewed at this time and preserved.

15        Is there any other reason why counsel needs to

16   approach the sidebar?

17        MR. WARSHAVSKY:  Yes, your Honor.

18        THE COURT:  Yes?

19        MR. WARSHAVSKY:  For a moment, yes.

20        THE COURT:  Go ahead.

21        (At sidebar)

22        MR. WARSHAVSKY:  Your Honor, this is a bit picayune, I

23   acknowledge, but I think during closing there was might have

24   been some confusion based on defendant's argument about Ether

25   versus U.S. dollars.  It just occurred to me as you were

1      reading it, the damages section, that damages should be in U.S.

2      dollars.  I don't know if that's a big deal or not.

3              THE COURT:  I think there is a dollar sign right there

4      in the verdict form.

5              MR. WARSHAVSKY:  I think so, too.  I didn't have the

6      verdict form.  It just hit me.  I apologize.

7              THE COURT:  I think that's obvious.  I am sure if the

8      jury has any question in that regard, they will let us know.

9              MR. WARSHAVSKY:  I'm really sorry to do that.

10             THE COURT:  That's all right.

11             (In open court)

12             THE COURT:  A couple of other housekeeping matters,

13     and we will then swear in the marshal.

14             You can take as little or as long as you want to reach

15     a verdict.  If you haven't reached a verdict by 4:30 today, you

16     should all go home and come back at 9:30 tomorrow, and your

17     foreperson should make sure that all nine of you are here

18     before you begin your deliberations again.

19             If either today or tomorrow you want to stay after

20     4:30, we can arrange that for at least until 5:30, probably not

21     beyond.  But we need to know by 4:15, if that's the case, that

22     you want that extra hour today or tomorrow.

23             And as I say to every jury, how long you take is

24     totally up to you.  You can take five minutes; you can take ten

25     days.  I don't particularly recommend either of those extremes

1    but it is entirely up to you.

2              Okay.  Let's swear in the marshal.

3              (Marshal sworn)

4              THE DEPUTY CLERK:  Jurors, please follow the marshal

5    back into the jury room.

6              (The jury retired to deliberate upon a verdict at 2:51

7    p.m.)

8              THE COURT:  Please be seated.

9              My practice while the jury is deliberating is that

10   there needs to be at least one counsel from each side either

11   present in the courtroom or immediately outside on this floor.

12   If other counsel want to go elsewhere, that's fine, but I

13   always need to have at least one person who we can consult with

14   immediately if we need to respond to any notes.

15             The only exception will be, if we go over to tomorrow

16   or any later day, I will let the jury know at that time that

17   counsel are excused for lunch from 1 to 2 so they won't expect

18   any responses to any questions during that time.

19             I want to thank all counsel in this case.  I have no

20   idea how this case will turn out, which is the way I like it,

21   but I thought all counsel did an excellent job, and I'm very

22   grateful to you for that.

23             We will all stay tuned.

24             So unless any counsel has anything further to raise --

25   yes, sir?

1          MR. SPRIGMAN:  Your Honor, on Friday you mentioned

2     that we will have additional argument on JMOL.

3          THE COURT:  This is the moment.

4          MR. SPRIGMAN:  It is down to intent, your Honor.  You

5     made it clear in instruction No. 14, right or wrong, that this

6     case comes down to Mr. Rothschild's intent.  In fact, you set a

7     very high standard for Hermès to establish that intent.

8          That intent is that Hermès must prove that

9     Mr. Rothschild's use of the Birkin mark was not just likely to

10    confuse potential consumers, but was intentionally designed to

11    mislead potential consumers into believing that Hermès was

12    associated with Mr. Rothschild's MetaBirkins project.

13         Now, your Honor, we agreed to that instruction because

14    we understood, we acknowledged based on last Friday's exchange

15    that I had with you and based on the hypothetical that you

16    offered to me that your concern was that someone who is just

17    basically a scammer should not be taking advantage of First

18    Amendment protection to perpetuate a scam.

19         We understand that, your Honor.  Right or wrong as a

20    matter ever law, we understand the concern.  Based on that

21    concern, and based on the way that you revised your instruction

22    to reflect it, I want to give you three reasons, your Honor,

23    why in my view no rational jury could find on the objective

24    evidence in this case, whether they believe Mr. Rothschild or

25    not, no rational jury could find on the objective evidence in

1   this case that Mr. Rothschild intentionally designed his

2   MetaBirkins project, intentionally designed his use of the

3   Birkin mark or the Birkin trade dress to deceive.

4          Now, I have three points.  I think I can make them

5   quickly.

6          At the end, I am going ask you to grant us judgment as

7   a matter of law on all of these claims.

8          First, Mr.  Martin, the 30(b)(6) witness for this

9   client, has admitted on the stand that there are no explicit

10  statements ever made by Mr. Rothschild inviting people to

11  believe, to conclude that Hermès was connected with the

12  MetaBirkins art project, no explicit statements in public, no

13  explicit statements in private.  None.

14         Now, that is very important, your Honor, because the

15  *Rogers* case, whether we agree on it or not -- and I can talk to

16  you, your Honor, about that.  I have done a lot more thinking

17  over the weekend.  I think I have additional things I can tell

18  you about that, but forget it.

19         Whatever we think about the precise meaning of *Rogers*

20  and its relationship with *Twin Peaks*, those cases are clear

21  that the statements must be, the use of the mark must be

22  explicitly misleading.

23         The fact that there are no explicit statements in this

24  case where Mr. Rothschild went out to the people or even his

25  private contacts and said that his project has anything to do

1    with Hermès other than referencing Hermès, commenting on

2    Hermès, that we think, your Honor, should be dispositive.

3           But that is not all.

4           Mr. Rothschild put his name on this project everywhere

5    he could.  The evidence is clear, the objective evidence.  They

6    don't have to believe everything he said.  They can look at the

7    MetaBirkins website, they can look at the Rarible auction site.

8    Any auction site where he could put his name on it, he did.

9           Mr. Rothschild is the artist.  He wanted people to

10   know that.  He was proud of it.

11          Mr. Millsaps said that, Mr. Harris said that.  It

12   reflects the objective evidence in this case.  Mr. Rothschild

13   was talking with tens of thousands of people on his public

14   publicly available, publicly viewable Discord channel for

15   MetaBirkins.  Never once did he say to anyone, those are the

16   people who are buying this NFT, those are the people who are in

17   the community that he assembled, around this artwork, never

18   once did he say to them that this artwork was anything other

19   than his work that had any connection whatsoever with Hermès.

20          Mr. Martin admitted that.  There is objective evidence

21   in this case that supports that.  There is no objective

22   evidence in this case that goes against that.  That's point

23   number one.

24          Point number two, every mistake that was made by a

25   newspaper, right, got corrected either by Mr. Rothschild or by

1    Hermès.  Reporters are paid to ask questions, and,

2    unfortunately, your Honor, sometimes they make mistakes.

3           THE COURT:  No.

4           MR. SPRIGMAN:  Hard to believe.  I understand.  But

5    it's true.

6           Mr. Rothschild or his publicist, Ken Loo, undisputed

7    evidence in this case, went out and tried to correct those

8    errors, not every one of them, but went out and tried to

9    correct those errors.

10          The pricing in this case, your Honor, the pricing of

11   the NFTs does not reflect someone who was simply in it for the

12   money.  Mr. Rothschild, the undisputed evidence shows,

13   objective evidence, priced these NFTs initially at .1 ETH,

14   which was about $450 at the time.

15          He had spent time building up a community around this

16   artwork.  He had spent time previewing this artwork.  People

17   were excited about this artwork.

18          Dr. Kominers says it's because of the Hermès brand.

19   You know, he doesn't know.  This artwork referred to the Hermès

20   brand.  People might have perceived a comment.

21   Mr. Rothschild -- I'll get to this at the end -- certainly

22   intended one.  Whether he was expressed that as linearly as you

23   or I might like, that's what he intended.  I will get to that.

24          The point is he priced this at .1 ETH.  People

25   perceived value in it.  They bought it, and then they traded it

1    for more.  That I would submit to you is not the pricing scheme

2    of someone looking to wring every last dollar out of confusion

3    with Hermès.  That is the pricing scheme of an artist who has

4    in mind an artistic experiment which I am about to detail for

5    you.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. SPRIGMAN:  That's my second point.

2          Here's my third and to me, your Honor, the most

3  important.  This is a First Amendment case.  The First

4  Amendment is supposed to provide all of us, including Mason

5  Rothschild, when he makes his art, with breathing room.  The

6  First Amendment is not supposed to be a hunting license for

7  companies like Hermès to pick out from thousands of texts and

8  nitpick to death in a courtroom things that Mason Rothschild

9  says to his buddies in private.  That's what so much of the

10 testimony in this case has been about, trying to paint

11 Mr. Rothschild as a scammer.

12         I would submit to you, your Honor, that if this case

13 is about intent, as you have made it to be, then if the First

14 Amendment is going to have its day in this courtroom, it should

15 be with you.  And the way you should do it, I'm asking you, is

16 to give Mr. Rothschild and artists like him who may not guard

17 every word, who may not think in advance of any possible misuse

18 and permutation that can be made by the people that they've

19 angered, give them the breathing room to be artists and not

20 lawyers.

21         Mr. Rothschild gave an interview to *Yahoo! News*.  And

22 you may remember, your Honor, months and months and months ago,

23 when my colleague Rebecca Tushnet gave an argument to you on a

24 motion to dismiss, the other side made a big deal about that

25 *Yahoo! News* interview.  That *Yahoo! News* interview, I will

1  submit to you, your Honor, captures the intuition that

2  Mr. Rothschild had that was the concept that underlie this

3  conceptual art project from the start, which is, Hermès has

4  those bags sitting on that table the entire time showing them

5  to the jury.  They are extremely proud of those bags, which

6  take 18 to 24 hours to make.  They market those bags for tens

7  of thousands of dollars to wealthy consumers.  And the story

8  they tell is that this is an authentic product that is a work

9  of art and a work of craft.

10        Mr. Rothschild, whether he fully understood it or not,

11 whether he fully intended it or not, asked a question to the

12 world about what people are doing when they spend $50,000,

13 $80,000 on a piece of cow hide.  Are they purchasing the 18 to

14 24 hours of craftsmanship or are they purchasing an image?

15 Mr. Rothschild's art asks that question.  This is the

16 experiment, he said.  I'm going to put these out into the world

17 and I'm going to see how the community values them.  Do they

18 value, as it turns out, the image the same way they value the

19 bag?

20        You know, whether he fully thought through and

21 articulated it the way you or I might, people who work with

22 words every day, the precise contours of the artistic

23 experiment is, I would submit to you, if the First Amendment is

24 going to give artists breathing room, immaterial.  We, I think,

25 can perceive it.  The words can be understood in this way.

1      The experiment worked.  It showed that for many of

2  these people, they value the image.  It will be interesting in

3  the world as we live on to see whether Hermès in the end

4  suffers from this.  But if they suffer from this, they will

5  suffer from the critique.

6      The First Amendment does not allow Hermès to sue

7  because it might suffer from critique.  This is an argument,

8  your Honor, we made to you on motion to dismiss; this is an

9  argument we made to you on summary judgment.

10      We have, in this case, proceeded over months and at

11  enormous expense to arrive at this moment where this question

12  of intent curiously turns all the way back around to where we

13  started, which is Mason Rothschild's intent was to act as

14  artists do.  It was to ask questions about the world in which

15  we live, which includes whether any of us like it or not,

16  50,000, 60,000, and up dollar handbags.  That's the question he

17  asked.  We got an answer, and here we are in court trying to

18  explain it.

19      I think we've explained it, your Honor.  And I think

20  we've explained it in a way that no rational jury can disagree

21  with.  If the First Amendment is going to have a role in

22  protecting artistic expression against this kind of thing, I'm

23  asking you, I'm begging you, grant us a JMOL.

24      THE COURT:  You feel strongly about it obviously.

25      MR. SPRIGMAN:  I do.

1          THE COURT:  And here I thought law professors were

2     without emotions.

3          So the record should reflect my beloved brother is a

4     law professor, so that was just a joke.

5          Let me hear from plaintiffs' counsel.

6          MR. WARSHAVSKY:  Well, your Honor, I definitely agree

7     with Mr. Sprigman that he's made this argument several times.

8     And I think that it still leaves us in the same spot.  And I

9     think that each time Mr. Sprigman makes this argument, it's

10    backwards.

11         He starts with a predicate that Mr. Rothschild is

12    doing something legitimate.  I think we've shown -- I think you

13    were here during my closing, I think we showed just the

14    opposite.  And in most cases, intent is not proved by the words

15    of the individual doing a particular wrong; it's proved by the

16    surrounding circumstances.

17         Here, we have somebody that actually went from a

18    schematic to copy a registered trademark.  He also took the

19    name.  That's intent to infringe.  He actually went and did it.

20         And as to the commentary piece that Mr. Sprigman is

21    talking about, I've never heard that from Mr. Rothschild.  In

22    fact, he was on the stand.  His attorneys have been saying it,

23    but he has not.  What we saw actually was quite a very

24    different intent from Mr. Rothschild.

25         I'm also going to take issue -- both Mr. Millsaps and

1   Mr. Sprigman keep talking about thousands of text messages.  We

2   took a look over the weekend.  They produced about 400 chains

3   of text messages.  And in them, they are rife -- if we went

4   through -- they are not in evidence, I'm not really going to

5   discuss it, but the ones that we've seen are all quite telling.

6          Mr. Rothschild actually goes to his colleagues,

7   Mr. Sprigman calls them his buddies.  Mr. Rothschild was on the

8   stand, you read the text, and he says that to one of his

9   buddies he wants to do a collaboration.  His buddy says, I

10  don't know why I keep calling his buddies.  His potential

11  business partner says, Is it official?  He says, Pushing for it

12  right now.  Why would he do that?  The only reason is because

13  he understands what using the word "Birkin" and using that

14  design entails.

15         Mr. Rothschild told you his intent when talking to

16  investors.  He says, I don't think people realize how much I

17  can get away with by saying "in the style of."  Here he didn't

18  even say "in the style of."  He just went and copied.  That's

19  intent.

20         The trademark law is about confusing consumers.  And

21  he went and he took Hermès's property and he really did what --

22  well, the term, I guess, I won't use it, but he made a very

23  poor copy and he did it in a way that I think was obvious.  And

24  I'm not -- again, I'm not sure that Mr. Sprigman has said

25  anything new here.  Every time we've discussed this, we've

1    talked about intent.  The fact that Mr. Rothschild says he

2    doesn't have intent, if that were the test, anybody who's ever

3    accused of any sort of tort with an intent element can simply

4    say, I didn't intend to do it.  We always prove intent from the

5    surrounding circumstances.  And here, the surrounding

6    circumstances are actually quite clear.

7          Mr. Rothschild went to all his business associates and

8    said what he was doing and he copied.  And I don't think

9    there's much more to it.

10          And then when we get to it, we can talk about the

11   pumping and chilling, frankly.  That, if you read what

12   Mr. Rothschild said, if you heard his testimony, he was doing

13   much more with it.  It was a pure economic advantage -- pure

14   economic endeavor, rather.  If you are to look at it, it reads

15   a lot like -- I hate to use words like this, because -- but it

16   reads like pump-and-dump; it looks like a true pump-and-dump,

17   right.  He's getting people to come in -- but these are

18   articles without any value, that he gets celebrities to come,

19   tell the community, go in and buy them.

20          And we see the texts that he has with it, saying, I'm

21   giving this to you.  I'm giving you this whitelist spot.  Do a

22   show pose for me.  I'm giving you $50,000.  What does that

23   mean?  Because that influencer can turn around and sell the bag

24   to someone else, who's stuck with the NFT as the price goes

25   down.

 1              So I don't think that anything about this business was

 2   legitimate.  I frankly question whether there's any art.  If

 3   you looked at most of what we did, what we showed today, you

 4   see one after the other of these Birkins.  Other than the

 5   covering with fur, they look nearly identical to what Hermès is

 6   already doing.

 7              So, you know, I understand that Mr.  -- from the very

 8   beginning, I think we haven't seen eye-to-eye on this, the two

 9   sides.  And that might be an understatement.  But I think

10   that -- I'm not sure how else they would expect to show intent

11   other than for Mr. Rothschild to say, I'm a con artist.  That's

12   basically what Mr. Sprigman is saying.  Unless he were to say,

13   I'm a con artist or to say to somebody, I'm trying to

14   explicitly mislead, you would always have to grant JMOL.  I

15   don't think that's how the law is supposed to work.

16              MR. SPRIGMAN:  Your Honor?

17              THE COURT:  Yes.

18              MR. SPRIGMAN:  Two things.

19              First of all, Mr. Rothschild absolutely did testify to

20   his artistic intent.  If you look at page 285 of his testimony,

21   beginning on line 17, there's a question:

22   "Q.  When you said that was part of the experiment — referring

23   to the *Yahoo! News* article, and he used that term — what did

24   you mean by that?

25   "A.  I mean, Hermès Birkin bags are known to be sold for 12,000

1    bucks, you know, a minimum of 12,000 bucks, like they said.  So

2    I said, Let me see if I can charge, like, almost nothing for

3    them, like, 450 bucks, and see what the people do with them and

4    see what they value.  Is it the image or, like, the product?"

5          Okay.  That's the experiment.  That's what he said in

6    the *Yahoo! News* interview; that's what he said on the stand.

7    It's been consistent.

8          This point about collaboration, you know, your Honor,

9    I've been puzzled by this point from the start.  Mason

10   Rothschild never made -- he never lied about having the

11   collaboration.  He wanted a collaboration; he told people he

12   was working on it.  He was working on it.  He was calling

13   people trying to get to Hermès because, you know, to be

14   truthful, your Honor, he was puzzled as to why they were upset

15   about this.

16         Artists collaborate with Hermès all the time.  Hermès

17   spent time telling the jury about how they collaborate with

18   artists.  The idea that Mr. Rothschild couldn't collaborate

19   with them or couldn't possibly think that he could collaborate

20   with them doesn't stand up to the evidence that Hermès itself

21   has introduced in this courtroom.  It may be that Hermès

22   considers him unworthy, but, you know, that's not

23   Mr. Rothschild's fault nor is it something that he necessarily

24   understands.

25         Look, your Honor, again, the word "explicit" appears

1    in *Rogers*.  The word "explicit" appears in *Twin Peaks*.  It is

2    the test.  This word "explicit" has got to do something.  And

3    the thing that it has to do in this case is that it has to have

4    you asking yourself, did Mason Rothschild ever explicitly tell

5    anybody, public or private, that his MetaBirkins were connected

6    in any way with Hermès?  He never said anything public.  He

7    never said, for example, your Honor, I'm going to name this

8    project MetaBirkins by Hermès.  He never did that.  He never

9    did this privately.  He never said to someone, when they said,

10   Hey, does this have anything to do with Hermès?  He never said,

11   Yeah, it does.  Or, you know, They are sponsoring it or they

12   are licensing it or I have their approval.  He never said

13   anything like that.

14          What they're reduced to, what Hermès is reduced to, is

15   taking isolated bits of flotsam and jetsam in, I'm sorry, you

16   said several 100 text chains.  It's thousands and thousands and

17   thousands of exchanges within those several 100 text chains.

18   And they are cobbling together a narrative that, to be

19   truthful, I mean, your Honor, is -- it is a concoction.

20          If you allow this case to proceed -- I mean, it's gone

21   to the jury, but I'm asking you for a JMOL so that we do not

22   get liability for First Amendment protected artistic speech

23   based on a concoction.  We should limit liability in these

24   instances to explicit statements.

25          The rule, your Honor, after hearing you on Friday, I

1  always thought -- well, I thought at least since Friday and I

2  saw it in your jury instructions, the rule is basically this:

3  If you lie, you lose.

4          He didn't lie.  He said a bunch of stuff which they

5  are taking and they are weaving into a scathe.  That shouldn't

6  be this case.  If that's the standard, then artists will be in

7  the dock repeatedly.

8          They are going to put stuff out into the world, 100

9  million bucks of it, worth a year in the United States alone

10  just on the Birkin bag.  They are going to relentlessly promote

11  it.  It is going to be picked up by the culture because they

12  are good at what they do.  And then when the culture talks back

13  to them in some way, they are going to pick and choose who they

14  like and who they don't.  They are going to exercise viewpoint

15  discrimination at the end of the day, your Honor, and that is

16  the central problem that the First Amendment is trying to

17  forestall.  Don't let them do it.

18          MR. WARSHAVSKY:  Can I just respond to two of the

19  points there?

20          THE COURT:  Sure.

21          MR. WARSHAVSKY:  I've heard from all the counsel --

22  well, not all, but I've heard from both Mr. Millsaps and

23  Mr. Sprigman that Hermès is somehow offended by the pictures

24  themselves.  They are not.  I don't know where they keep coming

25  up with it.  This has always been about a trademark.

1       And I also want to challenge this whole idea of an

2  artistic experiment.  We had Mr. Rothschild talk about the fact

3  that he was getting influencers to pump and chill.  What's the

4  experiment?  That's rigged.  There's no experiment.  There's no

5  commentary.  There's nothing to it.

6       I understand that my adversary is very passionate

7  about it, and I can't say I share it.  But what I don't

8  understand is that I suppose is where they are coming up with

9  Mr. Rothschild being persecuted here.  Ultimately, there's

10  never been a comment one way or another about Mr. Rothschild's

11  qualities as an artist, if he is one, right.

12       They had four Hermès witnesses on the stand.  They

13  didn't ask once what they thought about the art.  I don't know

14  what would have been said.  I don't know that Hermès ever

15  thought of it.  What we know is that Hermès never went after

16  the Baby Birkin.  What we know is that in depositions and

17  everywhere else, and we had that as part of our motion *in*

18  *limine*, they were asking about all different uses of the Birkin

19  in pictures and sculptures and this and that.  Hermès hasn't

20  gone after any of that.

21       Hermès went after Mr. Rothschild, and I think that

22  that's the biggest challenge we have here and that's, frankly,

23  why I think we struggle so much with *Rogers* is that

24  Mr. Rothschild is building a brand.  And I think that what it

25  shows, you know -- I know the defendant has worked very hard to

 1   say it's pictures.  We've seen much more than that.  His use of

 2   MetaBirkins, he has a community, he had a -- he basically

 3   described a loyalty program.  That has nothing to do with art.

 4   That's like an airline, right.

 5          He has a community where he says anybody who joins,

 6   they are going to -- they are going to get whitelists for other

 7   spots.  He's plugging his other -- what we see is that

 8   Mr. Rothschild is plugging his other assignments through that

 9   MetaBirkins community.  Has nothing to do with art.  He's using

10   it as a brand.

11          And I think -- you know, I think the challenge with

12   the way the *Rogers* test is set up, we were thinking about it

13   over the weekend, too, and we saw a case out of Colorado which

14   had a little bit more of a balancing test.  And I realize that

15   ship may have sailed a little bit, but ultimately there's a

16   balancing of rights here.  And brand owners aren't without

17   rights.  There is the Lanham Act and Congress does have a right

18   to regulate commerce.  And this is commercial speech, pure and

19   simple.  What Mr. Rothschild was doing was purely commercial

20   speech.

21          And look, we have the jury instruction.  But going

22   back to intent, intent is copying somebody.  Copying a

23   trademark has one -- a trademark isn't about beauty, it isn't

24   about aesthetic properties; it's about being a signifier of

25   source, period.

1        Mr. Rothschild copied the trademarks, period.  He went

2   and did his best to copy them as clearly as possible.  I don't

3   know how to be more plain about it.  I showed it three times

4   during closing.  He took the schematic of the Birkin bag and

5   the Birkin trademark and put it out there.  I'm not sure what

6   more you could do to copy a trademark and try to confuse the

7   public.  The whole point of the trademark law is to prevent

8   customer confusion.  He undertook purposefully that exact

9   activity.  If that's not intent to confuse, I don't know what

10  is.

11       MR. SPRIGMAN:  Your Honor, video games, TV shows, they

12  are all protected.  They are all brands.

13       This is not a brand, MetaBirkins, this is an art

14  collection.  If Mr. Rothschild says, I'm the guy who created

15  MetaBirkins and now I'm creating "I Like You, You're Weird,"

16  that is not building a MetaBirkins brand, that is promoting

17  Mr. Rothschild's art.  This is two very different things.

18       In terms of him copying the shape of the handbag and

19  copying the Birkin mark into the MetaBirkins name, trademark,

20  as you, your Honor, yourself observed, is not copyright.  These

21  are two different things.  Mr. Rothschild only violates the

22  trademark law, not if he copies the shape of the Birkin bag.

23  The shape of the Birkin bag is not copyrighted.  He's allowed

24  to draw -- the copyright law doesn't say anything about that.

25       He only is guilty of trademark infringement if he

1  confuses.  And because he is drawing pictures, the First

2  Amendment raises the bar, as your Honor has recognized,

3  further.  His intent must be that he designed the use of the

4  mark to confuse; that he went out there and he did this on

5  purpose; that that was his design.

6          Your Honor, I told you all these aspects of the entire

7  episode that we've been concerned with, objective aspects, not

8  having to do with Mr. Rothschild's testimony, but things that

9  are verifiable in the world just by looking at the MetaBirkins

10 website, by looking at the auction sites, by looking at the

11 prices, by looking at his communications with others that show

12 you, your Honor, that he did not go out to confuse anyone.

13         And I will just end with this:  You know a tree by its

14 fruits, okay.  What were the fruits here?  Very little, if any,

15 confusion.  A few reporters asked some questions.  A few press

16 outlets, out of all the ones that wrote about this, got it

17 wrong.

18         Dr. Isaacson got up there and gave an account of a

19 survey that, with respect, Dr. Neal took apart piece by piece.

20 At the end of the day, they have failed, even under the

21 ordinary standards, to show confusion.  But they have certainly

22 failed to show confusion out in the world at a level that would

23 support an inference that Mr. Rothschild intended to do the

24 thing that you are requiring the jury to find that he did,

25 which is that he designed this thing intentionally to confuse

1   people.  You know, if he'd done that, then he's done a very,

2   very bad job.

3          I think at the end of the day, your Honor, all this

4   evidence points in the same direction.  It points toward you

5   granting a JMOL on all these claims.  Thank you.

6          THE COURT:  Well, I am second to none in my admiration

7   for the eloquence of counsel for both sides.

8          I purposely held off ruling on this motion till I

9   heard summations from both sides, because, as I expected, that

10  was the occasion for counsel to draw my attention, as well as

11  the jury's, to specific items of evidence in this case.  And

12  it's very important because the First Amendment issue in this

13  case came down, as I've already indicated earlier today, to a

14  question of the defendant's intent.  I say that because

15  recognizing the importance of the First Amendment issue in this

16  case, I made determinations in defendant's favor that might

17  arguably have been avoided.

18         For example, even though I think there is a

19  nonfrivolous argument that the defendant was not making use of

20  the MetaBirkins -- excuse me, of the Birkins mark or the

21  Birkins design for artistic purposes and, therefore, would not

22  satisfy the first prong of the *Rogers* test, I concluded in the

23  end that there was at least an element of artistry involved

24  from the outset and so instructed the jury.

25         Similarly, even though I think there is an argument

1    that the use of the term "MetaBirkins" in the website and

2    throughout was explicitly misleading on its face and,

3    therefore, would satisfy the other prong of *Rogers*, I concluded

4    in the end that that was not a question that should go to the

5    jury in those terms because of the breadth that must be given

6    to artistic expression and constitutionally protected rights

7    under the First Amendment.

8           But I think now defense counsel goes too far in

9    suggesting that no rational juror could find for plaintiff.  In

10   the end, I found that Mr. Rothschild would be entitled to his

11   First Amendment protection unless plaintiff could prove that

12   his intent was to deceive the persons to whom he was

13   advertising his product and make them believe that it was an

14   Hermès product.  And if he did that, as I have already

15   indicated, and I think implicitly both counsel have agreed,

16   then he forfeited the First Amendment protection to which he

17   otherwise might be entitled.

18          Notwithstanding the excellent arguments just made by

19   defense counsel, I think there is ample evidence from which a

20   jury could conclude that Mr. Rothschild is a classic conman;

21   it's just that he's not yet gotten good enough to avoid, for

22   example, revealing what's really in his heart in emails that he

23   believes are private at the time.  But, nevertheless, there is

24   ample evidence from which a rational juror could, if they wish

25   — and there's certainly contrary evidence as well — conclude

1    that he set out or very early came to the conclusion that he

2    could fool people into believing that his product and his site

3    and his NFTs were sponsored by Hermès.  And at that point, if

4    the jury were to so conclude, that's the end of what remains of

5    the First Amendment argument, notwithstanding the many respects

6    in which I have leaned over in favor of that argument as

7    reflected in my charge.

8            I think as to the elements of confusion and so forth,

9    it's not even a close question.  There is plenty of evidence on

10   both sides, and the jury will have to make the classic jury

11   analysis through a multifactor test.  The very nature of these

12   multifactor tests in the various substantive counts illustrates

13   how it is the intention of the courts to leave these matters

14   largely to the collective wisdom of a jury.

15           When you have seven, eight *Polaroid* factors and the

16   jury is instructed, as the law requires, that, number one, they

17   can weigh them as ever they choose; number two, none of them is

18   dispositive; number three, they can also take into account any

19   other factor they find relevant, that is the kind of law that

20   says, We the people of the United States believe in our jury

21   system and we're leaving that balancing to the voice of a

22   community as reflected in citizens good and true who come here

23   and serve on juries.  And I think that's equally true of every

24   issue in this case.

25           The three substantive counts are all multifactor

1    tests.  The First Amendment, even after my rulings in favor of

2    the defense on so many aspects of the *Rogers* test, still leaves

3    open the question, which is a classic jury question:  What was

4    really in the heart and mind of this defendant?  And the laws

5    of the United States in 100 different situations leaves that

6    question to jurors.

7           I do think — and I'm not sure the Supreme Court is

8    going to agree — in the *Jack Daniels* case that there are very

9    important First Amendment protections here that must be

10   safeguarded.  And that is because not just the letter of the

11   First Amendment, but the spirit of the First Amendment.

12   Artists in so many respects are commentators on our society and

13   that has been part of their historic role.  That's not the only

14   role they play.  There are portrait artists who have a

15   different aspect and they are equally artists.

16          But it is critical that we leave room for social

17   commentary, whether it comes verbally or in the form of art,

18   and make sure that is not easily defeated.  But none of that

19   applies to a swindler, a fraudster who makes one pretense or

20   another, but reveals in his emails and his behavior what is

21   really in his heart, which is to cheat people.  And I think the

22   jury here could find either possibility, but certainly could

23   find that Mr. Rothschild fit that pattern.

24          So the motion, the Rule 50 motion of the defense and

25   also, while I'm at it, the Rule 50 motion of the plaintiff, is

1    denied.  And we will leave it to the jury to make their

2    decision.  Thanks very much.

3            (Recess pending verdict)

4            THE COURT:  All right.  We have a note from the jury

5    which we've marked as Jury Note No. 1.  It says:  We need the

6    cease and desist letter please, and corresponding materials of

7    back and forth.  And then it says C-O-M-M-S, which I think

8    means communications.

9            So my understanding is they already have the cease and

10   desist letter.  What is the number?

11           MR. WARSHAVSKY:  It's No. 20, your Honor.

12           THE COURT:  Plaintiffs' 20?

13           MR. WARSHAVSKY:  Yes.  And Plaintiffs' 21 is the

14   response.  And that's all in the record.

15           THE COURT:  All right.

16           MR. MILLSAPS:  Your Honor, there is testimony in the

17   record about this, if they are asking for materials on

18   communications --

19           THE COURT:  No, they say and -- it's a little

20   ambiguous.  Here's what I suggest:  Since it's already 4:18,

21   that we send them a note which I'll dictate in a moment to

22   myself, telling them of the two exhibits and asking them to

23   specify what else they want and we will have it for them first

24   thing tomorrow.  They can get it back to us before 4:30.

25           So let me try that.  Hold on.

1           All right.  So the cease and desist letter is

2   Plaintiffs' Exhibit 20, and the response from Mr. Rothschild is

3   21?

4           MR. WARSHAVSKY:  Yes, your Honor.

5           THE COURT:  To the jury:  The cease and desist letter

6   is Plaintiffs' Exhibit 20, and Mr. Rothschild's response is

7   Plaintiffs' Exhibit 21, both of which you should already have.

8   If you need anything else in this regard, please let us know

9   before you depart at 4:30 p.m., so that we can send it to you

10  promptly at 9:30 a.m. tomorrow.  Signed, Judge Rakoff.

11          Any problems with that from either counsel?

12          MR. WARSHAVSKY:  Not from plaintiff, your Honor.

13          MR. MILLSAPS:  Not from defendant, your Honor.

14          THE COURT:  Very good.

15          So I'll give it to my courtroom deputy, who will take

16  it immediately to the marshal to give to the jury.

17          All right.  Why don't you stick around to like 4:35 in

18  case they do send us another request.  And then if we haven't

19  received anything, you can all leave and, lucky you, you don't

20  have to be here before 9:30 tomorrow because we don't have

21  anything else to occupy ourselves.  I will miss you, of course,

22  but I'll bear up.

23          Okay.  Real good.  Thanks a lot.

24          (Recess pending verdict)

25          THE COURT:  Please be seated.

1           So we've received another note which we've marked as

2    Jury Note 2, which reads:  Hello, is it possible to find out

3    when Hermès applied for a digital trademark?  We only have

4    notes from testimony that it exists.  Signed Jane Kramer, who I

5    understand is Juror No. 8.  Maybe it's not Jane, maybe it's

6    Janna, I'm not sure, but anyway.  So I take it --

7           THE DEPUTY CLERK:  Jane.

8           THE COURT:  It is Jane.  Okay.

9           I take it both sides agree this never came into

10   evidence; correct?

11          MR. WARSHAVSKY:  That's correct, your Honor.

12          MR. MILLSAPS:  Correct, your Honor.

13          THE COURT:  The jury has left.

14          But let me draft something.

15          Okay.  Here is my note, which will be delivered to

16   them by my courtroom deputy the very first thing tomorrow:

17          To the jury, welcome back.  In answer to your inquiry

18   of late yesterday as to when Hermès applied for a digital

19   trademark, the answer is not in evidence and therefore cannot

20   be furnished to you.

21          Any problems with that from either counsel?

22          MR. WARSHAVSKY:  Not from plaintiff, your Honor.

23          MR. MILLSAPS:  Not from defendant.

24          THE COURT:  Okay.  I'll give it now to my courtroom

25   deputy to give to the marshal to give to the jury the very

1    first thing tomorrow.

2              All right.  So you guys are excused and I will look

3    forward to seeing you tomorrow.

4              MR. WARSHAVSKY:  Thank you.

5              (Adjourned to February 7, 2023 at 9:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         INDEX OF EXAMINATION

2    Examination of:                                    Page

3     DAVID THOMAS NEAL

4    Direct By Mr. Millsaps . . . . . . . . . . . 903

5    Cross By Ms. Wilcox  . . . . . . . . . . . . 924

6    Redirect By Mr. Millsaps . . . . . . . . . . 941

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25