# Exhibit 9

N22sHER1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   HERMÈS INTERNATIONAL, et al.,

 4                 Plaintiffs,

 5          v.                            22 Civ. 384 (JSR)

 6   MARTIN ROTHSCHILD,

 7                 Defendant.

 8   ------------------------------x
                                        New York, N.Y.
 9                                      February 2, 2023
                                        9:30 a.m.
10
     Before:
11
                     HON. JED S. RAKOFF,
12
                                        District Judge
13                                      -and a Jury-

14

15                       APPEARANCES

16   BAKER & HOSTETLER LLP
          Attorneys for Plaintiffs
17   BY:  DEBORAH A. WILCOX
          OREN J. WARSHAVSKY
18        GERALD J. FERGUSON

19   HARRIS ST. LAURENT & WECHSCLER LLP
          Attorneys for Defendant
20   BY:  ADAM B. OPPENHEIM
          JONATHAN A. HARRIS
21
     LEX LUMINA PLLC
22        Attorneys for Defendant
     BY:  RHETT O. MILLSAPS, II
23

24

25
```

1      THE COURT:  I think in light of what was just brought

2  to my attention, I think we'll even go today until 115 rather

3  than one.

4          (Jury present)

5          Good morning, ladies and gentlemen.

6          THE JURY:  Good morning.

7          THE COURT:  As you know, today we're not going to have

8  an afternoon session.  I think we will go, instead of going

9  until one, we will go to 1:15 just to make the most use we can

10  of today.

11          Tomorrow, by contrast, we will be sitting all the way

12  until 4:30.  But it's counsel's expectation, and mine, that

13  that will allow us to finish all the evidence in the case

14  tomorrow.

15          OK.  Counsel.

16          MR. WARSHAVSKY:  Thank you, your Honor.

17          Can I ask that we bring up Defense Exhibit 613, which

18  was offered yesterday.

19   SONNY ESTIVAL, resumed.

20  CROSS-EXAMINATION

21  BY MR. WARSHAVSKY:

22  Q.  Mr. Rothschild, yesterday you testified that in response to

23  the Birkin naming contest, you gave user *hectourc* in the middle

24  here a MetaBirkin for picking the name?

25          MR. HARRIS:  Objection, not his testimony.

1           THE COURT:  Well, rather than have a debate about

2   whether it was or was not, just if you have a transcript, you

3   can quote it.  If not, you can just ask him again the other

4   question the underlying question.

5           MR. WARSHAVSKY:  Sure.

6           THE COURT:  Give the page number and line number.

7           MR. WARSHAVSKY:  Sure.  I'm looking at pages number

8   291, starting from line 11 through page 292, line nine.

9           THE COURT:  Go ahead.  Read it.

10          MR. WARSHAVSKY:  Read it.

11          THE COURT:  Yes.

12          MR. WARSHAVSKY:  OK.

13  BY MR. WARSHAVSKY:

14  "Q.  And did, in fact, people -- did you post it just on the

15  contest, just on Instagram, or did you also post it on other

16  social media?"

17          MR. WARSHAVSKY:  I should note, this was when your

18  counsel was examining you.

19          You responded:

20  "A.  I posted it on Twitter.

21  "Q.  And did somebody suggest names?

22  "A.  Yes.  Actually, I got suggested MetaBirkins on Instagram

23  and on Twitter.

24  "Q.  If you look in the middle of this page, there is a

25  *hectourc*?

1    "A.  Correct.

2    "Q.  Suggesting MetaBirkins?

3    "A.  Yes.

4    "Q.  Did the contest -- you said there were two, there was

5    somebody on Instagram and also someone on Twitter.

6           Do you remember the name of the person that suggested

7    it on Twitter?

8    "A.  Makisa.  Her handle is *asiancryptogirl*.

9    "Q.  Do you know her actual name?

10   "A.  Makisa, that's just her display name.  I don't know her

11   real name.  It could be, but I'm not sure.

12   "Q.  Did, in fact, the contest winners receive anything?

13   "A.  One of them did.

14   "Q.  All right.  Who received something?

15   "A.  Instagram was the first one I saw, so Instagram winner."

16          THE COURT:  OK.  So you remember giving that

17   testimony?

18          THE WITNESS:  Correct.

19          THE COURT:  OK.  Put another question.

20   BY MR. WARSHAVSKY:

21   Q.  Is that testimony accurate?

22   A.  Not on MetaBirkin, but I allowed a spot for a MetaBirkin.

23   Q.  You gave this person *hectourc* a whitelist spot for a

24   MetaBirkin?

25   A.  Yes.

1         MR. WARSHAVSKY:  OK.  I would like to show the witness

2    and counsel defense Exhibit 387 for identification.  It's a

3    rebuttal exhibit.

4         MR. HARRIS:  Your Honor, I'm sorry.  I can't read

5    that.

6         THE COURT:  Yes.  I don't think it's legible.

7         Do you want to blow up?

8         MR. HARRIS:  There we go.

9         MR. WARSHAVSKY:  Scroll to the bottom just to show

10   this is a document produced by the witness and by

11   Mr. Rothschild in this case.  Go back to the top.

12   BY MR. WARSHAVSKY:

13   Q.  This is your Instagram direct message with this person,

14   *hectourc*, correct?

15   A.  Correct.

16   Q.  And *hectourc* is writing to you beginning, we go down to the

17   bottom, you actually write to hectourc --

18        THE COURT:  Wait a minute.  Are you offering this?

19        MR. WARSHAVSKY:  Sure.  We'll offer it into evidence.

20        THE COURT:  You can't quote from it if it's not in

21   evidence.

22        MR. WARSHAVSKY:  I understand.

23        THE COURT:  Any objection?

24        MR. HARRIS:  No objection, your Honor.

25        THE COURT:  Received.

1                    (Plaintiff's Exhibit 387 received in evidence)

2                    THE COURT:  Show it to the jury.

3                    MR. WARSHAVSKY:  All right.

4                    THE COURT:  Go ahead.

5     BY MR. WARSHAVSKY:

6     Q.  This is your direct message with *hectourc* on Instagram,

7     correct?

8     A.  Yes.

9     Q.  And the first from you is -- the first message is from you

10    at the bottom:  MetaBirkins, baby.  I got a Birkin with your

11    name on it.

12                    That's from you, correct?

13    A.  Yes.

14    Q.  And then there is some back and forth.

15                    And let's go to November 30.  *Hectourc* says, Hey, just

16    wanted to know if you guys need anything from me.

17                    You didn't respond to that, right?

18    A.  No.

19    Q.  Let's go up to the emoji from December 3 at 1:39 p.m.

20    A.  Yes.

21    Q.  That's while the MetaBirkins were minting?

22    A.  Well, the day before.

23    Q.  It was 24-hour period, right?

24    A.  Yeah.

25    Q.  So this was while the minting process was going on still?

N22sHER1                         Estival - Cross

 1   A.  Yes.

 2   Q.  OK.  And this is an emoji of somebody with their head in

 3   their hands?

 4   A.  I think it is, like, prayer hands.

 5   Q.  Prayer hands.  And then above that, later that day *hectourc*

 6   writes, Hope you guys will see this, correct?

 7   A.  Um, yes.

 8   Q.  OK.  Let's go to December 4 at 12:05 p.m.

 9           That's after the MetaBirkins had minted, right?

10   A.  Yes.

11   Q.  And *hectourc* writes, Hey, guys.  Hitting you guys up again

12   about my gifted Birkin.  Just want to make sure I'm not being

13   ignored?

14   A.  Yes.

15   Q.  And you didn't respond to that, right?

16   A.  No.

17   Q.  OK.  Above that we have two you guys on December 6.  I

18   don't know if that is you or yo, guys.  And then the second

19   one, I already missed out on the first release.

20           You don't respond to that, right?

21   A.  Yes.

22   Q.  OK.  And let's turn to Plaintiff's Exhibit 388.

23           Mr. Rothschild in this case -- just to the judge,

24   defense counsel, and the witness, please.

25           This is a Twitter direct message, correct?

1    A.  Yes.

2    Q.  That you produced in this case?

3    A.  Correct.

4            MR. WARSHAVSKY:  Offer into evidence, your Honor.

5            MR. HARRIS:  No objection, your Honor.

6            THE COURT:  Received.

7            (Plaintiff's Exhibit 388 received in evidence)

8    Q.  Hey MetaBirkins team.  Just trying to reach out about my

9    gifted MetaBirkin from the naming contest on Instagram a while

10   back.  My IG is *hectourc*.  Thanks.

11   A.  Yes.

12   Q.  Did you respond to this?

13   A.  No.

14   Q.  OK.  So *hectourc* is suggesting he didn't receive a

15   whitelist spot, correct?

16   A.  Yes.

17   Q.  So going back to your testimony of yesterday, did *hectourc*

18   receive a MetaBirkin?

19   A.  To my knowledge.  So *hectourc* is actually a friend of my

20   friend Love Menzi on Instagram, so he communicated that way.

21   Q.  OK.  So are you saying that *hectourc* received a whitelist

22   spot?

23   A.  To my knowledge, at the time, it was -- I looked into this

24   after the fact, but I did have these direct messages.

25   Q.  OK.  But your testimony yesterday was that you gifted --

1    that he received the gift.  You corrected me earlier and said

2    that he received a whitelist spot.  Here he is saying to you,

3    he didn't receive a whitelist spot, and you didn't respond,

4    correct?

5    A.  To my knowledge, at the time when you asked me the

6    question, that's what I thought.

7    Q.  OK.  So but right now as we sit here today, I'm asking you,

8    was your testimony yesterday accurate?

9    A.  Um, so my knowledge yesterday, that's what it was.  That

10   was my testimony.  I didn't have these, um, Instagram messages

11   yesterday.

12   Q.  Well, you did have these Instagram messages, Instagram and

13   Twitter, because these came from you, correct?

14   A.  Correct, in discovery.

15   Q.  OK.  So I just want to make sure we're clear.

16        The testimony you gave yesterday was incorrect?

17   A.  It was based on what knowledge I had at the time.

18        MR. WARSHAVSKY:  Move to strike, your Honor.

19        THE COURT:  No, I'm not going to strike that.

20        But do you want to change now your response?

21        THE WITNESS:  Me?

22        THE COURT:  Yes.

23        THE WITNESS:  I don't.

24        THE COURT:  Now that you've seen these documents, are

25   you still adhering to the testimony you gave yesterday, or do

 1  you now have a revised view?

 2              THE WITNESS:  I have a revised view.

 3              THE COURT:  What's your revised view?

 4              THE WITNESS:  That these were the text messages that

 5  *hectourc* sent, but we had our forms of communication through

 6  friends.  Um, I -- that's my revised.

 7              THE COURT:  All right.  Go ahead, counsel.

 8  BY MR. WARSHAVSKY:

 9  Q.  Mr. Rothschild, did you give *hectourc* a whitelist spot?

10  A.  To my knowledge at the time, yes.

11  Q.  OK.  Which MetaBirkin -- we have your wallet and all the

12  MetaBirkins here on.  We have the ETH wallets here.

13              Which one did he get?

14              We'll check into this and come back to it.

15              Which whitelist spot do you think you gave him?

16  A.  I'm not sure.

17  Q.  Which MetaBirkin did he get?

18  A.  I'm not sure.

19  Q.  So you had follow-up discussions with *hectourc*.  You didn't

20  respond to any of this.  You said you had follow-up discussions

21  through a friend?

22  A.  Yes.

23  Q.  Who is that friend?

24  A.  Love.

25  Q.  Did you produce anything of your discussions of Love in

1    this case?

2    A.  I'm not positive they were via DM or in person.  They all

3    live in Los Angeles.

4    Q.  You followed up with someone in person who is a friend of a

5    friend rather than responding to this person?

6    A.  Correct.

7    Q.  OK.  So it's your testimony still that you gave him a

8    whitelist spot?

9    A.  To my knowledge.

10   Q.  So the documents are wrong?

11   A.  These documents were just a small amount of time.  It's

12   been a year since then.

13   Q.  That wasn't my question.

14           Are these documents wrong?

15   A.  No.

16   Q.  They are right?

17   A.  Yes.

18   Q.  So *hectourc* is complaining that he doesn't get a whitelist

19   spot.

20           You're still saying you gave him one?

21   A.  To my knowledge, yes.

22   Q.  When you keep saying "to your knowledge," you either gave

23   the whitelist spot or you didn't.

24           THE COURT:  Counsel, your job is to put questions, not

25   to put statements.

```
 1              MR. WARSHAVSKY:  My apologies, your Honor.
 2   Q.  What evidence do you have that you gave hectourc a
 3   whitelist spot?
 4   A.  I looked into this prior to this trial to find more
 5   information, but I don't have these direct messages any longer.
 6   Q.  On Friday you had an Instagram story with a picture from an
 7   office building saying prepping, prepping, prepping, correct?
 8   A.  Correct.
 9   Q.  So you were preparing for this case?
10   A.  Um, as I think people do.
11   Q.  Yes?
12   A.  Yes.
13   Q.  OK.  And in preparing for this case, you were talking --
14   were you looking at the evidence and talking about this?
15   A.  Um, yes.
16   Q.  OK.  Because, in fact, throughout this case, that was the
17   first time -- yesterday on the stand was the first time you
18   said in this case that you gave a bag to hectourc, correct?
19   A.  Yes.
20   Q.  At your deposition when I asked you about it, you didn't
21   bring up hectourc, correct?
22   A.  I had to look into my direct messages then.  I can't
23   remember everything.
24              MR. WARSHAVSKY:  OK.  Your Honor, move to strike.
25              THE COURT:  No.
```

1   Q.  OK.  At your deposition, did you mention *hectourc*?

2   A.  No.

3   Q.  On summary judgment briefing in this case, did you

4   participate in that?

5            MR. HARRIS:  Objection, your Honor.

6            THE COURT:  Sustained.

7   Q.  When you were doing your prepping, prepping, prepping

8   Friday, were you focused on that Instagram post?

9            MR. HARRIS:  Objection, your Honor.

10            THE COURT:  As phrased, sustained.

11   Q.  Did you look at that Instagram post on Friday?

12   A.  What Instagram post?

13            MR. WARSHAVSKY:  Can you bring back up Exhibit 631.

14   Q.  This Instagram post.

15   A.  Um, did I look at it on Friday specifically?

16   Q.  Yes.

17   A.  I don't remember.

18   Q.  Did you look at it Saturday?

19   A.  I'm sure I've seen it through the trial prep.

20   Q.  I'm just asking if you saw it on Saturday?

21   A.  I'm not sure what day.

22            THE COURT:  I think he's fairly answering your

23   questions, counsel.  Put a new question.

24   Q.  OK.  Do you remember yesterday we talked about the Baby

25   Birkin?

1    A.  Yes.

2    Q.  And do you remember I asked you about whether or not you

3    bid on it?

4    A.  Yes.

5              MR. WARSHAVSKY:  OK.  And may I read the testimony,

6    your Honor, from yesterday?

7              THE COURT:  Yes.

8              MR. WARSHAVSKY:  OK.  This was questions from me

9    yesterday afternoon:

10   "Q.  By the way, did you bid on the Baby Birkin yourself?

11   "A.  No.

12   "Q.  Do you remember me asking you about this at your

13   deposition?

14   "A.  I was the first bid.

15   "Q.  So you did bid on it?

16   "A.  Yes.

17   "Q.  Had you won the bid, you would have bought it from

18   yourself?

19   "A.  For 100, yes.  It would be minted.

20   "Q.  OK.  Was that an effort to prop up the price?

21   "A.  No, it was just to -- I wanted to own my artwork.  So,

22   like, when you bid, it would have to be minted.  It wasn't

23   minted until somebody bid on it."

24   Q.  Was that testimony accurate?

25   A.  Pretty accurate.

1    Q.  OK.  What do you mean by "pretty accurate?"

2    A.  I mean, yeah, the testimony is accurate from the

3    transcript.

4    Q.  OK.  But were your answers accurate?

5    A.  Um, yes.  There is a little bit more, like, explanation

6    behind it, but if you're asking just about the testimony, then

7    yes.

8              MR. WARSHAVSKY:  OK.  I would like to show the

9    witness, the court, and counsel plaintiff's Exhibit 389 for

10   identification.

11             THE COURT:  Are you offering this?

12             MR. WARSHAVSKY:  I offer it into evidence.

13             THE COURT:  Any objection?

14             MR. HARRIS:  No objection, your Honor.

15             THE COURT:  Received.

16             (Plaintiff's Exhibit 389 received in evidence)

17             You can show it to the jury.

18             MR. WARSHAVSKY:  Thank you.

19   BY MR. WARSHAVSKY:

20   Q.  This was the bid you were referring to?

21   A.  Yes.

22   Q.  And you misremembered that, I assume when you said 100, you

23   just misremembered it was actually 300?

24   A.  Whatever the first -- I think it was the minimum bid, so I

25   assumed it was 100.

1            MR. WARSHAVSKY:  I would like to show the court,

2    defense counsel, and the witness Plaintiff's Exhibit 390.

3            Offer into evidence.

4            MR. HARRIS:  No objection, your Honor.

5            THE COURT:  Received.

6            (Plaintiff's Exhibit 390 received in evidence)

7            THE COURT:  Again once, it's received.  You need to

8    show it to the jury.

9            MR. WARSHAVSKY:  Publish to the jury, please.

10   BY MR. WARSHAVSKY:

11   Q.  So is this a second bid on a Baby Birkin by you?

12   A.  At the time there's people who didn't have the ability to

13   place bids, so that was me placing bids for them.

14   Q.  So you were placing a bid for somebody else here?

15   A.  Yes.  There was some instances where friends were bidding

16   as well.

17   Q.  Why wouldn't people have an ability to place a bid?

18   A.  Why?

19   Q.  Yes.

20   A.  Um, through the -- the Basic.Space website had a little bit

21   of a registration period.

22   Q.  So who did you place this bid for?

23   A.  I don't remember.

24   Q.  So yesterday you testified that you were willing to pay --

25   well, at least $300 to buy back the Baby Birkin, is that

N22sHER1                    Estival - Cross

1   correct?

2   A.   To --

3   Q.   To buy the Baby Birkin?

4   A.   To mint it.

5   Q.   You said that would be so you can own your own art?

6   A.   Um, yeah.   Just to own it.

7   Q.   OK.   Yesterday your counsel asked you if you owned a

8   MetaBirkin.

9          Do you remember that?

10  A.   Yes.

11  Q.   And you testified that you did, correct?

12  A.   Yes.

13  Q.   OK.   And I think you testified that the minting cost for

14  the MetaBirkins were less, correct, they were .1 ETH?

15  A.   .1.

16  Q.   So they were actually -- so $450, is that right?

17  A.   At the time.

18  Q.   That's right, because ETH fluctuates.

19          Is that what you mean?

20  A.   Yes, like, on December 2, it was around $450.

21  Q.   Did you pay for your MetaBirkins?

22          Did you pay .1 ETH?

23  A.   Um, I believe so or -- I'm not sure.   We had the ability

24  to, like, mint it on our own price, but I could have paid .1.

25  I'm not sure.

1    A.  Pushing for it.

2    Q.  At this time, were you negotiating with Hermès?

3    A.  No, but that doesn't infer that.  I said, pushing for it,

4    which means I would try.  But then I say, but I have major

5    press.

6    Q.  So, I'm sorry, when you were saying pushing for it, that's

7    not meant to convey that you're pushing to negotiate with

8    Hermès?

9    A.  I said I would try, yes.

10   Q.  Saying that you're trying to negotiate?

11   A.  Trying to collaborate with Hermès.

12   Q.  OK.  If we can turn to Plaintiff's Exhibit 373 for

13   identification.

14          This is a text message between you and someone named

15   Lauren that you produced in discovery.

16          Do you know who Lauren is?

17   A.  Yes.

18          MR. WARSHAVSKY:  We would move subject to the same

19   objection and agreement.

20          THE COURT:  Same objection, same ruling, received.

21          (Plaintiff's Exhibit 373 received in evidence)

22   Q.  Turn to page 11.

23          This is, by the way, December 2.  the MetaBirkins were

24   minting, correct?

25   A.  Yes.

1    Q.  If we can go to page 11, maybe top of page ten because of

2    how the text split.

3              So we see at the bottom of page ten, the top of

4    page 11, Lauren writes, How did the call go with Hermès?

5              Do you see that?

6    A.  Yes.

7    Q.  OK.  And you respond two things here.  Looks like you're

8    switching between conversations.  You say they can be used

9    against me, looks like if Hermès wants to be bad, and then the

10   next one, that's TBD next week, Tuesday.

11             Do you see your three texts?

12   A.  Correct.

13   Q.  Which one was responding to Lauren?

14   A.  What do you mean?

15   Q.  Lauren asks, How did the call go with Hermès?

16             Lauren asks, How did the call go with Hermès?

17             Did you have a call with Hermès at that time?

18   A.  No, but I was told from that same person I recommended -- I

19   mentioned yesterday that they would try to put me in touch with

20   somebody from New York.

21   Q.  And who was that person?

22   A.  It was a president of a former president of Yoox.

23   Q.  What's the name of the person?

24   A.  Can I --

25             Is that all right to say, like ...

1    Q.   Yeah.

2    A.   Clement Quan.

3    Q.   OK.   And Clement Quan told you that he was calling Hermès

4    on your behalf?

5    A.   He said he knew people and they would try to get me on the

6    line with somebody, so.

7    Q.   Who did he say he knew?

8    A.   Somebody from the New York PR department.

9    Q.   Does Hermès have a New York PR department?

10   A.   I don't know.   This is what somebody else is telling me.

11   Q.   OK.   And did Clement Quan make any calls on your behalf; do

12   you know?

13   A.   I'm not sure.

14   Q.   Did Clement Quan ever send you any texts about calls with

15   Hermès?

16   A.   We predominantly talked on the phone.

17   Q.   But you never had this call?

18   A.   No.

19   Q.   If we can turn -- by the way, who is Lauren?

20   A.   She worked for Basic.Space at the time.

21   Q.   OK.   Were you working with Basic.Space on --

22            Let me ask it differently.

23            Was Basic.Space a business partner of yours?

24   A.   Um, for Baby Birkin, yes.

25   Q.   And was Lauren also doing work for you in connection with

1    the MetaBirkins?

2    A.  Um, she did, like, PR for Basic.Space, and they were

3    supposed to help get press as well.

4    Q.  OK.  Weren't there other projects, like, did you ever

5    discuss maybe making bathrobes for the MetaBirkins?

6    A.  Um, I think so, yes.

7    Q.  And you had those discussions with Lauren?

8    A.  Yes.

9    Q.  And those were real world projects to wear?

10   A.  Just a bathrobe?

11   Q.  Yes.

12   A.  Yeah, a bathrobe.

13   Q.  And those would have a MetaBirkin' logo on it or a --

14            Let me ask it better.

15            Those bathrobes that you were talking about were going

16   to have a MetaBirkin logo on them?

17   A.  I don't believe so.  Maybe the name.

18   Q.  The name?

19   A.  But they were going to have their wallet addresses on them

20   to identify them.

21   Q.  OK.  Thank you.

22            If we could turn to Plaintiff's Exhibit 306, which has

23   already been introduced.  Page 47.  This is your discussion

24   with Truman and Alex Sacks.

25            You write -- so this is two days earlier, November 30?

1    A.  Yes.

2    Q.  And you say, We need to make a push with Hermès just to

3    try.  My plug at *Vogue* has a direct line to Paris.

4    A.  Correct.

5    Q.  OK.  So two days earlier you're talking about your plug at

6    *Vogue*?

7    A.  Yes.

8    Q.  Who was your plug at *Vogue*?

9    A.  Just different writers at *Vogue* that were covering Baby

10   Birkin.

11   Q.  Which writer?

12           Which writer was that?

13   A.  Um, I don't have their name.

14   Q.  OK.  And you didn't mention Clement Quan here.

15           You mentioned *Vogue*?

16   A.  Yes.

17   Q.  If we could -- well, let's stay here for a minute.  If we

18   can go back to 46 and 47.

19           You talk about next projects being MetaParteks and

20   MeteMilles.

21           Do you see that?

22   A.  Correct.

23   Q.  Those were ideas you had?

24   A.  Just ideas.

25   Q.  And on the next page you say, I create watches and we pitch

1     the companies to partners.

2              Do you see that?

3     A.  Yes.

4     Q.  Did that ever happens?

5     A.  No, they were just ideas.  I'm just talking with my

6     friends.

7              MR. WARSHAVSKY:  I would offer plaintiff's exhibit --

8     I'll skip that for now.

9              If we can go to Plaintiff's Exhibit 305.  I'll offer

10    for identification.

11    Q.  This is a text exchange between thank you, Moshe Sacks and

12    Truman Sacks, correct?

13    A.  Correct.

14             MR. WARSHAVSKY:  We would offer into evidence under

15    the same, the same conditions, objections and agreement, your

16    Honor.

17             THE COURT:  Yes, received.

18             (Plaintiff's Exhibit 305 received in evidence)

19    Q.  If we can turn to page eight.

20             So this is on December 1 -- I'm sorry -- December 4.

21    Can you look at your text at the bottom.  My goal was to use

22    Sotheby's to get Hermès maybe on board.

23    A.  Correct.

24    Q.  So who did you know at Sotheby's?

25    A.  Um, the -- it was -- his name is Mason also, but we had a

1   few calls.  I think it's Mason Howell.

2   Q.  So on December 4, you were looking at getting Sotheby's on

3   board?

4   A.  They reached out to me and had contact.  I just took the

5   call.

6   Q.  And this is before, in your text to Lauren, you said the

7   call was going to happen a few days later and that was by

8   Clement Quan?

9   A.  Correct.

10  Q.  OK.

11  A.  But that's different context, you know.  Like, these are

12  two different ideas for a call, so they are not referring to

13  the same thing.

14          MR. WARSHAVSKY:  OK.  I would like to mark for

15  identification Plaintiff's Exhibit 303.  Actually, I'm going to

16  skip Plaintiff's Exhibit 303.

17          Can we show Plaintiff's Exhibit 300.  I'm sorry, it's

18  not in evidence.  Just to the witness and counsel and the

19  court.

20  BY MR. WARSHAVSKY:

21  Q.  This a post by you?

22  A.  Yes.

23          MR. WARSHAVSKY:  Offer into evidence.

24          MR. HARRIS:  Your Honor, may I ask one voir dire

25  question?

1    Q.  And would you respond?

2    A.  Yes, I respond to them publicly as well.

3    Q.  We're going to come back to that.

4        Mr. Warshavsky asked you yesterday, do you have any

5    documents showing that there were more than nine or 10,000

6    members of the MetaBirkin Discord?

7    A.  Yeah.

8    Q.  Discord channel, is that the right word?

9    A.  Discord server.

10   Q.  Discord server.

11       Were there more members than that?

12   A.  Yes.

13   Q.  Now, does Discord have a feature in Discord where somebody

14   who logs into your Discord server --

15   A.  Yeah.

16   Q.  -- can tell how many members there are at that time?

17   A.  Yes.  In most Discord servers, they have a member count at

18   the top, which we had for the MetaBirkin server and a few of my

19   other servers.

20       MR. HARRIS:  Can I please pull up what is marked for

21   identification, your Honor, Defendants' Exhibit 619, just for

22   the witness and the Court, counsel.

23   Q.  Could you briefly describe what this is, Mr. Rothschild.

24   A.  This is me speaking through the MetaBirkins Twitter saying

25   that we're pausing registration at 24,000 members.

N22VHER2                            Estival - Redirect

1  Q.  And is this a post that you put out publicly?

2  A.  Yes, this went out on Twitter.

3  Q.  And this 24,000 number, that's right at the top of the

4  Discord?

5  A.  Yes, this is on December 15th.  And this would have been

6  the number that I saw at the top.  And everybody could see

7  publicly, so I couldn't, like, lie about it.

8           MR. HARRIS:  Your Honor, I offer Defendant's Exhibit

9  619.

10          MR. WARSHAVSKY:  Your Honor, I think this is -- I

11 think this is hearsay within hearsay, given the testimony.

12          THE COURT:  Let me ask the witness, this is something

13 you put together?

14          THE WITNESS:  This is my -- my tweet.

15          THE COURT:  Overruled.

16          MR. HARRIS:  Thank you.  Please publish that.

17          THE COURT:  This is, I think, fair rebuttal, and the

18 door was opened to this.  Received.

19          MR. HARRIS:  Thank you, your Honor.

20          (Defendant's Exhibit 619 received in evidence)

21          THE COURT:  So maybe this has been answered, but at

22 least to me it's unclear.  The decision to use the term

23 "MetaBirkins" was yours, yes?

24          THE WITNESS:  The final decision to actually use the

25 term, yes.

```
 1              THE COURT:  Okay.  And you intended to associate -- to
 2   indicate to the people who were accessing this that this was in
 3   some sense a reference to Birkin bags, yes?
 4              THE WITNESS:  In some ways, yes, a reference.
 5              THE COURT:  Okay.  And just so I understand how the
 6   purchasing went, they knew that when they purchase an NFT, even
 7   though for 24 hours they would only see a shrouded image, that
 8   what they were ultimately going to get was one of these --
 9              THE WITNESS:  Yeah, one --
10              THE COURT:  -- MetaBirkin fur-covered MetaBirkin
11   images; correct?
12              THE WITNESS:  Yes.
13              THE COURT:  Go ahead.
14   BY MR. HARRIS:
15   Q.  In fact, Mr. Rothschild, did there come a point in time
16   where the Discord had more than 24,000 members?
17   A.  Yes, this was just on December 15th.
18              MR. HARRIS:  You can take that down, please, Ashley.
19   Q.  Mr. Warshavsky asked you some questions yesterday about a
20   community poll, do you recall that?
21   A.  Right.
22              MR. HARRIS:  If you could please put up in evidence,
23   Ashley, Exhibit 306, page 31.
24   Q.  And you were shown this yesterday, right?
25   A.  Yes.
```