# Exhibit 21

N23VHER1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    HERMÈS INTERNATIONAL, et al.,

 4                    Plaintiffs,

 5             v.                          22 Civ. 384 (JSR)

 6    MASON ROTHSCHILD,

 7                    Defendant.           Trial

 8    ------------------------------x
                                          New York, N.Y.
 9                                        February 3, 2023
                                          9:35 a.m.
10
      Before:
11
                          HON. JED S. RAKOFF,
12
                                          District Judge
13                                        -and a Jury-

14

15                         APPEARANCES

16    BAKER & HOSTETLER LLP
            Attorneys for Plaintiffs
17    BY:  DEBORAH A. WILCOX
           OREN J. WARSHAVSKY
18         GERALD J. FERGUSON

19    HARRIS ST. LAURENT & WECHSLER LLP
            Attorneys for Defendant
20    BY:  ADAM B. OPPENHEIM
           JONATHAN A. HARRIS
21
      LEX LUMINA PLLC
22          Attorneys for Defendant
      BY:  RHETT O. MILLSAPS, II
23         CHRISTOPHER SPRIGMAN

24

25
```

1          THE COURT:  Okay.  That is not -- that question and

2     the answer called for -- it is not inconsistent then with his

3     prior testimony, so the jury will disregard the deposition

4     testimony that was just read.

5          MR. OPPENHEIM:  No further questions.

6          THE COURT:  Any redirect?

7          MR. FERGUSON:  No redirect, your Honor.

8          THE COURT:  Very good.  Thank you so much.

9          You can sign off.

10         THE WITNESS:  Thank you, your Honor.

11         (Witness excused)

12         THE COURT:  All right.  Please call your next witness.

13         MR. WARSHAVSKY:  Your Honor, the plaintiffs call

14    Maximilien Moulin, who is outside and will be brought in.

15     MAXIMILIEN MOULIN,

16        called as a witness by the Plaintiffs,

17        having been duly sworn, testified as follows:

18         THE COURT:  The record will reflect that although the

19    witness speaks and understands English, an interpreter is here

20    if he needs any help.  Go ahead.

21         MR. WARSHAVSKY:  Thank you, your Honor.

22         Your Honor, again, for this witness, counsel have

23    agreed that there's no objection to the exhibits, so we can

24    publish them --

25         THE COURT:  We still need -- what's their numbers?

1          MR. WARSHAVSKY:  It's Plaintiffs' Exhibit 27 -- I'm

2   sorry, your Honor, I have it in the outline.  34, 28, 37, and

3   385.

4          THE COURT:  Received.

5          (Plaintiff's Exhibits 27, 28, 34, 37, 385 received in

6   evidence)

7   DIRECT EXAMINATION

8   BY MR. WARSHAVSKY:

9   Q.  Mr. Moulin, who are you employed by?

10  A.  Hermès.

11  Q.  Do you have a title at Hermès?

12  A.  I'm head of the H Lab.

13  Q.  What is the H Lab?

14  A.  It's an innovation laboratory within the information

15  technology department at Hermès.

16  Q.  How long have you been the head of H Lab?

17  A.  Almost three years now, since April 2020.

18  Q.  Can you briefly describe your responsibilities as the head

19  of H Lab.

20  A.  I'm managing a team of seven people.  I'm driving division

21  and delivering projects and activities of innovation.

22  Q.  Okay.  I'm going to come back to H Lab in a minute, but can

23  you tell us about your educational background?

24  A.  I went to college and studied mathematics and information

25  technology, computer science.

1   A.  Yes.  We do three types of activity, I would say.

2           First one is that we perform a technological watch,

3   meaning we explore new trends, new technologies, and try to

4   find which technologies could create value for the business

5   divisions of Hermès.

6   Q.  That's one.

7   A.  Next we make Hermès employees aware of those technologies,

8   especially the business division, that could be interested by

9   those technologies.

10  Q.  What's the third?

11  A.  And then when we have a match between a technology and

12  business division, we develop a solution, test it, and

13  eventually commercialize it.

14  Q.  And when you arrived at H Lab, was Hermès working on NFTs?

15  A.  Yes.

16  Q.  How so?

17  A.  We were working on an idea of digital certificates,

18  certificate that would involve in it.

19  Q.  And you joined in 2020, but do you know when Hermès started

20  working on NFTs?

21  A.  In December 2019.

22  Q.  Was H Lab working with any third parties for the digital

23  certificates?

24  A.  Yes.

25  Q.  Who were the third parties?

1             THE COURT:  Well, are you familiar with the MetaBirkin

2    NFTs and the underlying images they are associated with?

3             THE WITNESS:  Yeah.

4             THE COURT:  You are?

5             OK.  Go ahead.

6    BY MR. HARRIS:

7    Q.  So a MetaBirkin couldn't give you access to an Hermès

8    event, right?

9    A.  As -- well, it's impossible to insert, actually, because as

10   I said, you could have NFTs that are not related to a product.

11   You could have NFTs that are related to something I gave you.

12   I'm not -- I don't need a product to give you an NFT.  I could

13   give you an NFT just for -- well, just like this, because I

14   want to give you an NFT.  This NFT could give you access to

15   other things.  So we could have been issuing that kind of NFT.

16            THE COURT:  So I need to move this along.

17            So Hermès has claimed in this case that the MetaBirkin

18   NFTs infringe their trademark, diluted their trademark, or

19   otherwise interfered.  And among the things that they say

20   there was an interference with, is their allegation, that the

21   MetaBirkin NFTs interfered with Hermès' plan to have its own

22   NFTs.

23            Do you understand that's the claim, that's part of the

24   claim that Hermès is making in this case?

25            THE WITNESS:  Yes.

N23sHER4                    Moulin - Cross

1          THE COURT:  So my question is:  Exactly how did the

2     Hermès NFTs -- excuse me.

3          Exactly how did the MetaBirkins NFTs, which you say

4     you have some familiarity with, interfere with Hermès' own NFT

5     project?

6          THE WITNESS:  Well, you're asking my --

7          THE COURT:  I'm asking you.  I'm not asking that

8     horse.

9          THE WITNESS:  You could, actually.  It would be fun.

10         Um, well, I am -- as only a technologist, I would say,

11    I'm not a lawyer and I'm not an artist, I would say the fact is

12    that it could confuse people on whenever this entity gives them

13    some advantages within Hermès.

14         If we get out with NFTs, well, we will be always

15    having questions and having people asking for some things

16    thinking that MetaBirkin, it's, like, in the metaverse --

17         THE COURT:  So you're saying it interfered in a sense

18    that it would potentially cause confusion that could impact,

19    among other things, your own NFT project; is that what you're

20    saying?

21         THE WITNESS:  Yes.

22         THE COURT:  All right.  Go ahead, counsel.

23    BY MR. HARRIS:

24    Q.  To follow up on that question, does the MetaBirkin NFT stop

25    Hermès from doing any of the projects that you testified Hermès

 1   Q.  That you presumably bought in an Hermès store, right?

 2   A.  Yes.

 3              THE COURT:  I'm sorry.  I didn't mean to cut you off.

 4              MR. HARRIS:  I'm thinking of finishing, your Honor,

 5   but I was going to wait.

 6              THE COURT:  You have no more questions?

 7              MR. HARRIS:  I don't have any more, your Honor.

 8              THE COURT:  Very good.

 9              Any redirect?

10              MR. WARSHAVSKY:  No, your Honor.

11              THE COURT:  Very good.

12              Thank you so much.  You may step down.

13              THE WITNESS:  Thank you, sir.

14              (Witness excused)

15              THE COURT:  Please call your next witness.

16              MR. WARSHAVSKY:  Your Honor, the next witness will be

17   Dr. Bruce Isaacson, and Deborah Wilcox from my firm will be

18   doing the questioning of Dr. Isaacson.

19              THE COURT:  About time.

20              THE DEPUTY CLERK:  Please remain standing.  Raise your

21   right hand.

22    BRUCE ISAACSON,

23        called as a witness by the Plaintiff,

24        having been duly sworn, testified as follows:

25              Please be seated.

1          MS. WILCOX:  State your name, Dr. Isaacson.

2          THE DEPUTY CLERK:  State your name and spell it slowly

3     for the record.

4          THE WITNESS:  Sure.

5          My name is Bruce Isaacson.  My last name is spelled

6     I-s-a-a-c-s-o-n.

7          THE COURT:  Counsel.

8     DIRECT EXAMINATION

9     BY MS. WILCOX:

10    Q.  Dr. Isaacson, what are you here to talk about today?

11    A.  I'm here to talk about a survey that I conducted.  This

12    survey measures the likelihood of confusion between the

13    MetaBirkin web page at *www.MetaBirkins.com* and Hermès or

14    Birkin.

15    Q.  And who retained you in this case?

16    A.  I was retained by Baker Hostetler, who is the attorneys for

17    Hermès.

18    Q.  Could we talk a bit about your background please.

19          MS. WILCOX:  I would ask that Mr. Ferrer pull up

20    Exhibit 190, page two, for the judge, the witness and counsel.

21    Q.  Dr. Isaacson, can you describe this document, page two,

22    please?

23    A.  Sure.  This is my c.v., and it describes my work

24    experience, my training, my education, my testimony experience

25    and other aspects of my background.

1    and I've been personally involved in almost all of them.

2    Q.   How many people work with you at MMR?

3    A.   14 including myself.

4    Q.   Could you briefly give us their backgrounds?

5    A.   Sure.  So among the 14 people, again, including myself, we

6    have five people who have Ph.D.s or doctorates, and then we

7    have seven people who have master's degrees.  Those graduate

8    degrees are in subjects like marketing, business, social

9    sciences, statistics, and even food science.

10   Q.   And you are here today to serve as an expert witness about

11   a likelihood of confusion survey that you conducted?

12   A.   That's correct.

13   Q.   How many times have you served as an expert witness before

14   and where?

15   A.   I've testified in more than 100 matters about a survey

16   either that I've conducted or that someone else has conducted

17   and I've testified in federal courts like this one, in state

18   courts, and a wide range of other venues and before a wide

19   range of other authorities.

20   Q.   How many matters have you worked on that involved trademark

21   likelihood of confusion surveys?

22   A.   I've worked on more than 70 matters that have involved

23   likelihood of confusion surveys.

24   Q.   How many times have you testified about a trademark

25   likelihood of confusion survey?

1            THE WITNESS:  If I can just add one more response to

2    that question.

3            People could have said more than one category in

4    response -- in answering question 1.  So it's possible that

5    someone might -- that people gave -- in fact, a number of

6    people gave responses where they would have been counted in

7    multiple rows across that table.

8            THE COURT:  Go ahead, counsel.

9            MS. WILCOX:  Could we please turn to slide 19.

10   Q.  And describe for us what this chart shows, Dr. Isaacson.

11   A.  Sure.

12           This is counting the number of people who said Hermès

13   or Birkin in question 1, in question 4, and in question 7.  And

14   as I just mentioned, they might have said Hermès or Birkin and

15   said other things, they might have said Vogue, they might have

16   said Meta, they might have given a response that would have

17   fallen into another category as well; and, in fact, a number of

18   people did that.

19           But the survey, again, is designed to measure

20   confusion between metabirkins.com and Hermès or Birkin.  And

21   counting that level -- that type of confusion, in response to

22   question 1 we have 17.5 percent for the test and 1.9 percent

23   for the control.  We have, in response to question 4, an

24   additional 4.1 percent and one percent.  And then zero percent

25   in response to question 7.  And when you add up down the

1    column, you get to 21.6 percent for the test web page, and 2.9

2    percent for the control web page.  And there's a number there

3    that says net confusion.  And net confusion is simply the

4    difference if you subtract the control from the test, and the

5    difference is 18.7 percent.  That's the net confusion for this

6    web page with respect to Hermès or Birkin.

7    Q.  What does that net confusion percentage of 18.7 percent

8    tell you?

9    A.  That tells me the amount of confusion associated with the

10   use of the Birkin name, the use of the Hermès name, and the use

11   of the shape of that handbag.  And that number is of a

12   magnitude, of a size that I would typically interpret as

13   meaning that there's a substantial likelihood of confusion.

14   Q.  Why do you conclude that this means there's a substantial

15   likelihood of confusion?

16   A.  Because the number is big enough that I and, in my

17   experience, others would typically interpret this as meaning

18   that there's a substantial likelihood of confusion.

19   Q.  And when you say "others," who are you referring to?

20   A.  Other survey experts and other surveys that I've seen

21   evaluated.

22   Q.  Dr. Isaacson, you just told us about the survey of the NFT

23   purchasers you interviewed.  Was there any other group that you

24   also interviewed?

25   A.  Yes, I also conducted a survey among handbag purchasers.

1   outside.

2            THE DEPUTY CLERK:  Please remain standing.  Raise your

3   right hand.

4    LUISA MARIA VITTADINI,

5        called as a witness by the Plaintiff,

6        having been duly sworn, testified as follows:

7            State your name and spell it slowly for the record.

8            THE WITNESS:  Luisa Maria Vittadini.

9            THE DEPUTY CLERK:  Please spell your last name.

10           THE WITNESS:  V-i-t-t-a-d-i-n-i.

11           THE COURT:  The record will reflect that although the

12  witness speaks and understands English, the interpreter is here

13  in case she needs any clarification.

14           MR. WARSHAVSKY:  Thank you, your Honor.

15           Your Honor, again, in order to hasten the exhibits,

16  there are two exhibits counsel don't agree to, but the others I

17  would like to list to offer.

18           THE COURT:  Go ahead.

19           MR. WARSHAVSKY:  Exhibits 45, 253, 254, 315 and 380.

20           THE COURT:  Received.

21           (Plaintiff's Exhibits 45, 253, 254, 315 and 380

22  received in evidence)

23           MR. WARSHAVSKY:  Thank you, your Honor.

24  DIRECT EXAMINATION

25  BY MR. WARSHAVSKY:

1    Q.  Ms. Vittadini, good afternoon.

2            By whom are you employed?

3    A.  By Hermès.

4    Q.  When did you first start working at Hermès?

5    A.  In April 2019.

6    Q.  What was your title when you joined Hermès?

7    A.  Corporate communication manager.

8    Q.  Can you please describe your responsibilities as the

9    corporate communications manager?

10   A.  I was in charge of the global carpet communications

11   strategy of the company, meaning working on the message

12   regarding business carpet, social responsibility, values of the

13   company.  And in my scope, I also handled the relationship with

14   the business press.

15   Q.  And when you say corporate communications, which channels

16   do you mean by that?

17   A.  The channel for the messages or for the press and

18   institutional communication moments.

19   Q.  Thank you.

20           Are you still the corporate communications manager

21   today?

22   A.  I've been promoted to associate director of carpet

23   communication.

24   Q.  When were you promoted?

25   A.  In January 2023.

1   Q.  What are the -- you spoke a little bit earlier about

2   important fashion magazines.

3           What are the most important fashion magazines from

4   Hermès' perspective?

5   A.  So fashion, I would say Vogue, Elle, Harper's Bazaar, and

6   L'Officiel.  And then business fashion, I would say Women's

7   Wear Daily and Business of Fashion.  And then the luxury and

8   fashion sections of Financial Times and *New York Times* for

9   sure.

10  Q.  After the Financial Times article was published, did other

11  press sources, to your knowledge, did other press continue to

12  publish articles about an association or possible association

13  between the MetaBirkins and Hermès?

14  A.  Yes.

15  Q.  Can you give some examples of the publications you're aware

16  of?

17  A.  Elle, L'Officiel, New York Post, and Challenges.

18  Q.  I would like to turn to Plaintiff's Exhibit 380 which has

19  been accepted and publish that for the jury.

20          Is this the Elle article you were referring to?

21  A.  Yes.

22  Q.  And when did you first see it?

23  A.  December 2021.

24  Q.  Do you know the full title of the article?

25  A.  Birkin NFT:  Everything you need to know about the handbag

1   of the future.  Birkins for the digital age?

2   Q.  Do you know whether this was always the title of the Elle

3   article?

4   A.  No, it wasn't.

5   Q.  OK.  The title, do you know -- was the title corrected from

6   something else?

7   A.  Yes.

8   Q.  And how do you know that the title was corrected?

9   A.  Because part of the monitoring was on Google, and when we

10  Googled Hermès NFT, we found another title for the Elle

11  article.

12          MR. WARSHAVSKY:  OK.  And if we can turn to

13  Plaintiff's Exhibit 45.  Again, this was previously admitted,

14  so it can be published.

15  Q.  Can you tell us what this document is?

16  A.  It's a Google research of the two keywords Hermès and NFT.

17  Q.  Is this a search that you did?

18  A.  Yes.

19  Q.  And when did you do it?

20  A.  Last week on the 26 of January.

21  Q.  And where were you doing the search from?

22  A.  New York.

23  Q.  And what about this search caught your eye?

24  A.  So the second title is the Elle article, and the title is

25  Hermès Goes Virtual with Launch of Birkin Bags as NFTs.

1    Q.  OK.  So just to be clear -- if you can scroll up little

2    bit, Humberto -- your search here was just for Hermès NFT on

3    Google?

4    A.  Yes.

5    Q.  If we could -- I'm sorry.

6            Obviously, does this title match the Elle article we

7    saw a moment ago?

8    A.  No.

9    Q.  OK.  If we can turn to plaintiff's Exhibit 315.

10            Have you seen this document before?

11   A.  Yes.

12   Q.  And what is it?

13   A.  It's the article from Elle.

14   Q.  OK.  And this one is taken from the page wall, is that

15   right?

16   A.  Yes.

17   Q.  OK.  And if we go to the bottom, can you see the title

18   there?

19   A.  So, yeah.  Hermès goes virtual --

20   Q.  Hang on.  If you can scroll down for the --

21   A.  Hermès Goes Virtual with Launch of Birkin Bag as NFTs.

22   Q.  Thank you.

23            As part of your job with Hermès, do you have any idea

24   about the circulation of Elle?

25   A.  At Elle, it's about, yes, several million readers.  And in

1   the U.S., it's 50 million unique monthly readers.  And in the

2   U.S., Instagram, Facebook, I would say 12 million followers.

3   Q.  And the first number, I'm sorry, did you say 50, five zero,

4   or one five?

5   A.  50 million monthly unique visitors for *Elle.com* and

6   12 million followers for Elle USA Instagram and Facebook.

7   Q.  If we can turn to Plaintiff's Exhibit 253, which has

8   already been admitted.

9           Can you tell me what this document is?

10  A.  It's an article from the New York Post.

11  Q.  OK.  If we can turn to -- do you know the date of the

12  article?

13  A.  January 8, 2022.

14  Q.  If we could turn to page eight of the article, please.  If

15  you can read the caption below the images.

16  A.  The VR-only MetaBirkin bag, a Digital Version of the Hermès

17  fave, can sell for tens of thousands of dollars.

18  Q.  And do you know what the two images shown are, if we could

19  see that?

20  A.  Yes, two MetaBirkins.

21  Q.  And just to be clear, I think the jury knows, but does

22  Hermès make a VR bag?

23  A.  No.

24  Q.  OK.  If we could turn to the next page, page nine.

25          And do you see this statement?

1   A.  Even Hermès, the company responsible for the ridiculously

2   expensive Birkin bag, has entered the metaverse.  On December

3   17, the company unveiled the MetaBirkin -- a VR version of its

4   signature bag, created by LA artist, Mason Rothschild, and made

5   just for 100 of them.

6   Q.  And, once again, as part of your -- does the Hermès team

7   know how much -- what the -- I'm trying to use the words you

8   used before -- the commercial impressions are for the New York

9   Post?

10  A.  Yes.  Its unique monthly visitors is 71 million.

11  Q.  71 million unique visitors a month?

12  A.  Yeah, and --

13          THE COURT:  All of whom, I assume, are fashionistas.

14          MR. WARSHAVSKY:  Sports fans, too.

15  Q.  OK.  I want to turn to Plaintiff's 254, which has also been

16  admitted.

17          Have you seen this document before?

18  A.  Yes.

19  Q.  OK.  Can you tell us what this is?

20  A.  It's an article from Challenges.

21  Q.  OK.  And is Challenges one of the names you said before?

22  A.  Yes.

23  Q.  And do you see the date, do you know the date of the

24  article?

25  A.  It's 23 of May, 2022.

1    Q.  OK.  And so this was clearly after Hermès' statement to the

2    Financial Times, is that correct?

3    A.  Yes.

4    Q.  And the New York Post article we saw, that came out after

5    the Hermès' statement to the *New York Times*, is that correct?

6    A.  Yes.

7    Q.  And the Elle article we saw, did that come out after

8    Hermès' statement to the Financial Times?

9    A.  Yes.

10   Q.  If we can you go down to the first paragraph, and can you,

11   here -- can you read the part in bold?

12   A.  So, yeah.

13   Q.  Starting with even Hermès.

14   A.  Even Hermès, which unveils virtual bags under the name

15   MetaBirkin, then there is an erratum.

16   Q.  Do you know how Challenges got that erratum?

17   A.  Yes.

18   Q.  How did Challenges become aware of that?

19   A.  We asked for a correction.

20   Q.  OK.  Are you aware of other examples of confusion or other

21   statements affiliating Hermès with MetaBirkins?

22   A.  As I say, the monitoring is France mostly.  So considering

23   those article, I -- I think, yeah, there are other articles in

24   the press, especially globally.

25   Q.  All right.  Is it possible for Hermès to monitor every

1    instance of press on any given topic?

2    A.  No.  No.

3    Q.  I have another question.

4            Have you ever heard of an individual named Clement

5    Quan?

6    A.  No.

7    Q.  And last night I asked you to ask others at Hermès if they

8    had ever heard of an individual named Clement Quan.

9            MR. HARRIS:  Objection, your Honor.

10           THE COURT:  Sustained.

11           MR. WARSHAVSKY:  Thank you.  I have no further

12   questions at this time.

13           THE COURT:  Cross-examination.

14   CROSS-EXAMINATION

15   BY MR. HARRIS:

16   Q.  Good afternoon, Ms. Vittadini.  I keep introducing myself,

17   but I know you've been sitting outside.  My name is John

18   Harris, and I'm an attorney for Mason Rothschild.

19   A.  Good afternoon.

20   Q.  Ms. Vittadini, I'm going to take these exhibits in the

21   order in the book, not the order you were asked.  OK.

22           So do you have an exhibit binder?

23   A.  Yes.

24   Q.  All right.  If you could turn to exhibit, Plaintiff's

25   Exhibit 45 in evidence that you were just shown by your