**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

HERMÈS INTERNATIONAL and
HERMÈS OF PARIS, INC.,

               Plaintiffs,

               v.

MASON ROTHSCHILD,

               Defendant.

No. 22-cv-00384-JSR

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR NEW TRIAL

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT.........................................................................................................................5

I.   The Court's Instructions to the Jury Were Structured Improperly ......................................5

    A.  The First Amendment is Not a "Defense" to Trademark Claims; It is a Rule of Construction that Shapes the Plaintiff's Prima Facie Case. .........................................5

    B.  The Improper Structuring of the Instructions Prejudiced Mr. Rothschild..................7

II.   The Jury Instructions Are Substantively Inconsistent With Second Circuit Law ..............9

    A.  The *Rogers* Test is An Objective Test Designed to Decide Cases Early; This Court's Intent Instruction is at Odds With that Purpose...........................................9

    B.  The Court's Intent Test Also Is at Odds With Second Circuit Law on the Use of Intent Evidence in Ordinary Trademark Cases........................................................16

    C.  Even Applying this Court's Erroneous Intent Instruction, Hermès' Claims Must Fail—The Evidence Does not Support an Inference of Intent to Confuse...............18

III.   Hermès' Confusion Evidence is Insufficient as a Matter of Law......................................22

    A.  If this Court Applies the *Twin Peaks* "Particularly Compelling" Evidence of Confusion Standard, Hermès' Claims Must Also Fail. ...............................................22

    B.  The Court Improperly and Prejudicially Intervened in Dr. Neal's Testimony..........28

IV.   The Court Erred in Excluding Defendant's Expert Witness Blake Gopnik ......................30

    A.  The Court Misapplied *Daubert* and *Kumho Tire*........................................................30

    B.  The Court's Wrongful Exclusion of Dr. Gopnik Prejudiced Rothschild. .................35

V.   Noncommercial Speech is Not Actionable as Dilution ....................................................38

VI.   The Supreme Court's Holding in *Dastar* Directs that Rothschild's *MetaBirkins* Artworks are Beyond the Scope of the Lanham Act ........................................................39

VII.   Hermès' Cybersquatting Claim is Unsupported by Evidence and Inconsistent With the First Amendment ..........................................................................................................40

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*
   447 F. Supp. 2d 266 (S.D.N.Y. 2006) .................................................................................17

*Alcantar v. Foulk*
   No. 1:14-cv-00747 LJO MJS (HC), 2016 WL 3001242 (E.D. Cal. May 25, 2016) ................35

*AM Gen. LLC v. Activision Blizzard, Inc.*
   450 F. Supp. 3d 467 (S.D.N.Y. 2020) .........................................................................passim

*Amorgianos v. Nat'l R.R. Passenger Corp.*
   303 F.3d 256 (2d Cir. 2002) .............................................................................................31

*Baker v. Buffenbarger*
   No. 03-C-5443, 2006 WL 140548 (N.D. Ill. Jan. 13, 2006) ..............................................34

*Boucher v. U.S. Suzuki Motor Corp.*
   73 F.3d 18 (2d Cir.1996) ..................................................................................................31

*Brown v. Elec. Arts, Inc.*
   724 F.3d 1235 (9th Cir. 2013) ..........................................................................11, 13, 14, 15

*Car-Freshner Corp. v. Am. Covers, LLC*
   980 F.3d 314 (2d Cir. 2020) ........................................................................................5, 18

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*
   769 F.Supp.2d 269 (S.D.N.Y. 2011) ................................................................................32

*Clarke v. LR Sys.*
   219 F. Supp. 2d 323 (E.D.N.Y. 2002) ..............................................................................31

*Cohen v. G&M Realty L.P.*
   No. 13-CV-05612 (FB) (RLM), 2017 WL 1208416 (E.D.N.Y. March 31, 2017).............32, 34

*Commonwealth. v. United Books, Inc.*
   453 N.E.2d 406 (Mass. 1983)...........................................................................................36

*Dastar Corp. v. Twentieth Century Fox Film Corp.*
   539 U.S. 23 (2003) ..........................................................................................................39

*Daubert v. Merrell Dow Pharm., Inc.*
   509 U.S. 579 (1993) ........................................................................................................30

*Dr. Seuss Enters., L.P. v. Comicmix LLC*
   983 F.3d 443 (9th Cir. 2020) ..................................................................................11

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. Trades Council*
   485 U.S. 568 (1988) ...............................................................................................13

*ETW Corp. v. Jireh Publ'g, Inc.*
   332 F.3d 915 (6th Cir. 2003) ..................................................................................15

*Fahmy v. Jay Z*
   No. 2:07-cv-05715-CAS (PJWx), 2015 WL 5680299 (C.D. Cal. Sept. 24, 2015) ..................32

*Fed. Election Com'n v. Wisconsin Right To Life, Inc.*
   551 U.S. 449 (2007) .................................................................................................4

*Gayle v. Allee*
   18 Civ. 3774 (JPC), 2021 WL 120063 (S.D.N.Y. Jan. 12, 2021) ...............................4

*GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D. P.C.*
   769 F. Supp. 2d 630 (S.D.N.Y. 2011) .....................................................................24

*Grand River Enters. Six Nations, Ltd. v. King*
   783 F. Supp. 2d 516 (S.D.N.Y.2011) .......................................................................31

*Grubhub Inc. v. Kroger Co.*
   No. 1:21-cv-05312, 2022 WL 2774986 (N.D. Ill. May 25, 2022) ...........................25

*Hangarter v. Provident Life & Acc. Ins. Co.*
   373 F.3d 998 (9th Cir. 2004) ..................................................................................31

*Hermès Int'l v. Rothschild*
   22-cv-384 (JSR), 2023 WL 1458126 (S.D.N.Y. Feb. 2, 2023)........................passim

*Hermès Int'l v. Rothschild*
   603 F. Supp. 3d 98 (S.D.N.Y. 2022) .........................................................................1

*Hustler Magazine v. Falwell*
   485 U.S. 46 (1988) ...................................................................................................4

*In re Com. Fin. Servs., Inc.*
   350 B.R. 520 (Bankr. N.D. Okla. 2005)...................................................................33

*In re Paoli*
   35 F.3d 717 (3d Cir. 1999) ......................................................................................31

*Ke v. Liberty Mut. Ins. Co.*
  No. 20-1591, 2021 WL 5203150 (E.D. Pa. Nov. 9, 2021) .......................................................35

*Kumho Tire Co. v. Carmichael*
  526 U.S. 137 (1999) .................................................................................................................31

*Limited v. Macy's Merch. Grp. Inc.*
  15-CV-3645 KMW, 2016 WL 4094913 (S.D.N.Y. 2016) .......................................................17

*Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.*
  868 F. Supp. 2d 172 (S.D.N.Y. 2012) .....................................................................................14

*Luke Records v. Navarro*
  960 F.2d 134 (11th Cir. 1992) ..................................................................................................36

*Mattel, Inc. v. MCA Recs., Inc.*
  296 F.3d 894 (9th Cir. 2002) ...............................................................................................3, 38

*Medici Classics Productions, LLC v. Medici Grp., LLC*
  683 F.Supp.2d 304 (S.D.N.Y. 2010) .......................................................................................24

*MGFB Properties v. ViacomCBS Inc.*
  Case No. 5:19-cv-257-RH-MJF, 2021 WL 4843905 (N.D. Fla. Sept. 22, 2021)....................24

*MGFB Properties, Inc. v. Viacom Inc.*
  54 F.4th 670 (11th Cir. 2022) ................................................................................2, 3, 10, 13

*Monbo v. Nathan*
  --- F.Supp.3d ---, 18-CV-5930 (MKB), 2022 WL 4591905 (E.D.N.Y. 2022)...........................4

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.*
  590 F. Supp. 2d 500 (S.D.N.Y. 2008) .....................................................................................17

*Phoenix Entm't Partners v. J-V Successors, Inc.*
  305 F. Supp. 3d 540 (S.D.N.Y. 2018) .....................................................................................40

*Phoenix Entm't Partners, LLC v. Rumsey*
  829 F.3d 817 (7th Cir. 2016) ...................................................................................................40

*Pulse Entm't Corp. v. David*
  No. CV 14-4732 (C.D. Cal. Sept. 17, 2014)............................................................................40

*Rebellion Devs. Ltd. v. Stardock Ent., Inc.*
  No. 12-12805, 2013 WL 1944888 (E.D. Mich. May 9, 2013) ................................................14

*Reply All Corp. v. Gimlet Media, Inc.*
No. 15-CV-4950 (WFK)(PK), 2020 WL 13536220 (E.D.N.Y. Feb. 12, 2020)........................24

*RJR Foods, Inc. v. White Rock Corp.*
603 F.2d 1058 (2d Cir. 1979) .................................................................................................29

*Rogers v. Grimaldi*
695 F. Supp. 112 (S.D.N.Y. 1988) .........................................................................................12

*Rogers v. Grimaldi*
875 F.2d 994 (2d Cir. 1989) .............................................................................................passim

*Smith v. California*
361 U.S. 147 (1959) ...............................................................................................................36

*Syler v. Woodruff*
610 F. Supp. 2d 256 (S.D.N.Y. 2009) ......................................................................................4

*Tiffany & Co. v. Costco Wholesale Corp.*
971 F.3d 74 (2d Cir. 2020) ...............................................................................................17, 18

*Twentieth Century Fox Film Corp. v. Empire Distrib., Inc.*
875 F.3d 1192 (9th Cir. 2017) ...............................................................................................13

*Twin Peaks Prod. v. Public. Int'l*
996 F.2d 1366 (2d Cir. 1993) ...........................................................................................passim

*Two Hands IP LLC v. Two Hands Am., Inc.*
563 F. Supp. 3d 290 (S.D.N.Y. 2021) ....................................................................................24

*U.S. v. Arthur*
51 F.4th 560 (5th Cir. 2022) ..................................................................................................35

*U.S. v. United Foods, Inc.*
533 U.S. 405 (2001) .................................................................................................................3

*U.S. v. Whorley*
400 F. Supp. 2d 880 (E.D. Va. 2005) .....................................................................................35

*W.W.W. Pharm. Co. v. Gillette Co.*
808 F. Supp. 1013 (S.D.N.Y. 1992) .......................................................................................25

*Wonder Labs, Inc. v. Procter & Gamble Co.*
728 F. Supp. 1058 (S.D.N.Y. 1990) .......................................................................................17

*Yudkin v. State*
    182 A.2d 798 (Md. 1962) .................................................................................36

**Statutes**
15 U.S.C. § 1125(c)(3)(C) ...............................................................................38

**Rules**
Federal Rule of Evidence 702 .....................................................................30, 35

Federal Rule of Evidence 703 ..........................................................................30

**Other Authorities**
6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5th ed. 2022) ......................3, 26, 29

Committee on Model Jury Instructions, Ninth Circuit, *Manual of* Model Civil Jury
    Instructions *for the* Ninth Circuit 15.19A...................................................................9

George Dickie, ART AND THE AESTHETIC: AN INSTITUTIONAL ANALYSIS 34 (Cornell Univ. Press,
    1974)...............................................................................................................34

Lee Ann W. Lockridge, *When Is A Use in Commerce a Noncommercial Use?*, 37 Fla. St. U. L.
    Rev. 337 (2010) ................................................................................................38

Lynn M. Jordan & David M. Kelly, *Another Decade of* Rogers v. Grimaldi*: Continuing to
    Balance the Lanham Act with the First Amendment Rights of Creators of Artistic Works*, 109
    TRADEMARK REP. 833 (2019)...........................................................................3, 6

William T. Gallagher, *Trademark and Copyright Enforcement in the Shadow of IP Law*, 28
    SANTA CLARA COMPUTER & HIGH TECH. L.J. 453 (2012) ......................................13

## PRELIMINARY STATEMENT

The Second Circuit's decision in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) is the law of this case. *See Hermès Int'l v. Rothschild*, 22-cv-384 (JSR), 2023 WL 1458126 (S.D.N.Y. Feb. 2, 2023) (Rakoff, J.); *Hermès Int'l v. Rothschild*, 603 F. Supp. 3d 98 (S.D.N.Y. 2022) (Rakoff, J.). But when instructing the jury, the Court failed to implement the *Rogers* test, instead instructing the jury that it could hold Mr. Rothschild liable if it found that he intended to confuse consumers. *See* Declaration of Adam B. Oppenheim ("Oppenheim Decl."), Ex. A at 21–22.

That instruction cannot be justified under Second Circuit law. Moreover, there is clear evidence that the Court's instructions prejudiced Mr. Rothschild. As a note sent by the jury foreperson to the Court reveals, the jury concluded that Mr. Rothschild had violated the law without considering the First Amendment issue at all—directly contrary to what *Rogers* requires. Moreover, the foreperson's note suggests that once the jury had concluded that Mr. Rothschild had broken the law, it was reluctant to find that the First Amendment protected him if doing so meant he would avoid the consequences of what they determined was wrongful conduct. But *Rogers* defines a plaintiff's prima facie case in trademark claims involving expressive works; it prohibits application of the Lanham Act unless the defendant's use has no artistic relevance whatsoever or is explicitly misleading. 875 F.2d at 999. The jury here, instead, viewed the First Amendment as an "excuse" for infringing conduct—the very thing *Rogers* prohibits.

The jury mishandled the First Amendment issue because this Court's instructions invited them to do so in two ways. **First**, the *structure* of the Court's instructions was legally erroneous. The Court instructed the jury first to determine whether Rothschild was liable for infringement, dilution, or cybersquatting, and then to turn to the *Rogers* considerations only *after* determining Rothschild was liable on one or more of those claims. Oppenheim Decl., Ex. A at 14–22. *Rogers*

1

does not create an affirmative defense excusing otherwise unlawful conduct; it *replaces* the ordinary infringement rules with two and only two considerations: artistic relevance and explicit misleadingness.[1] There is no precedent whatsoever in this Circuit for treating *Rogers* like an affirmative defense, as this Court's instructions did.

**Second**, this Court's First Amendment instruction (No. 14) was error. The Court instructed the jury that it could find Mr. Rothschild liable if Rothschild's use of the *MetaBirkins* name was "not just likely to confuse potential consumers but was intentionally designed to mislead potential consumers into believing that Hermès was associated with Mr. Rothschild's MetaBirkins project. In other words, if Hermès proves that Mr. Rothschild actually intended to confuse potential customers, he has waived any First Amendment protection." Oppenheim Decl., Ex. A at 21–22. That is not the *Rogers* rule—indeed, the majority opinion in *Rogers* does not even use the word "intent" when describing the legal standard. 875 F.2d at 999. *Rogers* describes the plot of the movie and the role of the characters as part of its discussion of the title's artistic relevance. *Id*. at 1001 ("The central characters in the film are nicknamed "Ginger" and "Fred," and these names are not arbitrarily chosen just to exploit the publicity value of their real life

---

[1] As Rothschild has maintained throughout this case, the Second Circuit, in *Rogers*, never considered the *Polaroid* factors, even with respect to explicit misleadingness. *Twin Peaks Prod. v. Public. Int'l* modified *Rogers* only for title-versus-title conflicts, a different type of case than this one. 996 F.2d 1366 (2d Cir. 1993); *see also*, *MGFB Properties, Inc. v. Viacom Inc*., 54 F.4th 670, 679 (11th Cir. 2022) ("Although not applicable to the facts of *Rogers,* the Second Circuit added a footnote that 'The *Rogers* test would not apply to misleading titles that are confusingly similar to other titles because the public interest in sparing consumers this type of confusion outweighs the slight public interest in permitting authors to use such titles.' This footnote has become known as the 'confusingly similar titles' exception or the 'title-versus-title' exception.") (cleaned up). Even under the *Twin Peaks* approach, the *Polaroid* factors are relevant only to the determination of explicit misleadingness, and evidence of confusion in that context must be "particularly compelling."

counterparts but instead have genuine relevance to the film's story.").[2] It then considers explicit misleadingness without engaging any of the *Polaroid* factors. The inquiry is objective, not subjective. Intent plays no role.

This Court's intent instruction undermines the speech-protective purpose of the *Rogers* test. *Rogers* protects speech by allowing cases to be disposed of early, eliminating the threat of ruinously expensive discovery and trial, which would chill free expression. *See MGFB Properties, Inc. v. Viacom Inc*., 54 F.4th 670, 688 (11th Cir. 2022) (Brasher, J., concurring) (*Rogers* avoids need for "extensive fact-finding"; "certainty is especially important in an area like this one where even the prospect of liability has the effect of chilling constitutionally protected speech"); s*ee also* 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5th ed. 2022) ("McCarthy") § 31:144.50 ("A trademark infringement claim brought against the use of a mark in an expressive work can be dismissed under the *Rogers* rule by a motion for summary judgment or a Rule 12(b)(6) motion to dismiss for failure to state a claim."). Indeed, "[n]early every case applying *Rogers* has done so on either a motion to dismiss or on summary judgment." Lynn M. Jordan & David M. Kelly, *Another Decade of* Rogers v. Grimaldi*: Continuing to Balance the Lanham Act with the First Amendment Rights of Creators of Artistic Works*, 109 TRADEMARK REP. 833, 871 (2019).

---

[2] In finding Ginger Rogers' right of publicity claim also to be barred, the Second Circuit referred back to its finding of artistic relevance for purposes of the Lanham Act claims and reiterated that "the title 'Ginger and Fred' [was] clearly related to the content of the movie and is not a disguised advertisement for the sale of goods or services or a collateral commercial product." *Rogers*, 875 F.2d. at 1004-05. As that quote demonstrates, the court was not contrasting artistic relevance with intent to cause confusion; it was using artistic relevance to track the distinction between commercial and noncommercial speech. Noncommercial speech is speech that is itself the object of sale, while commercial speech is speech that sells something else. *See*, *e.g.*, *U.S. v. United Foods, Inc.*, 533 U.S. 405, 409 (2001); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002) (same; rejecting infringement claim against song).

By establishing a relatively simple, objective standard for protecting First Amendment values in trademark cases, the *Rogers* test is consistent with the prophylactic approach typical of First Amendment doctrine. *See*, *e.g.*, *Fed. Election Com'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 468 (2007) ("Far from serving the values the First Amendment is meant to protect, an intent-based test would chill core political speech by opening the door to a trial on every ad within the terms of § 203, on the theory that the speaker actually intended to affect an election, no matter how compelling the indications that the ad concerned a pending legislative or policy issue."); *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988) (holding that the First Amendment limits scope of intentional infliction of emotional distress tort "to give adequate 'breathing space' to the freedoms protected by the First Amendment").

In contrast, this Court's focus on intent is not consistent even with the cases that follow *Twin Peaks* and use the *Polaroid* factors to evaluate explicit misleadingness. In those cases, intent is not dispositive, but is merely *one* of many factors to be considered in assessing whether evidence of confusion is "particularly compelling." *See, e.g.*, *Twin Peaks*, 996 F.2d at 1379 (using all *Polaroid* factors); *Monbo v. Nathan*, --- F.Supp.3d ---, 18-CV-5930 (MKB), 2022 WL 4591905, at \*36–\*37 (E.D.N.Y. 2022); *Gayle v. Allee*, 18 Civ. 3774 (JPC), 2021 WL 120063, at \*5–\*7 (S.D.N.Y. Jan. 12, 2021); *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 480–84 (S.D.N.Y. 2020); *Syler v. Woodruff*, 610 F. Supp. 2d 256, 264–67 (S.D.N.Y. 2009).

In fact, this Court's instruction gave more weight to intent than courts do even in ordinary trademark cases where no free-speech interest is at stake. Under Second Circuit law, "bad intent" is not a free-floating inquiry. For it to be relevant at all, a plaintiff must produce explicit evidence of the defendant's intent to cause confusion. But even where that intent is shown by overwhelming evidence, bad faith and an intent to deceive "do not alone determine likelihood of

confusion nor provide an occasion for imposing punishment." *Car-Freshner Corp. v. Am. Covers, LLC,* 980 F.3d 314, 333 (2d Cir. 2020). But that is exactly how this Court's instructions treated intent here: if the jury found likely confusion under the ordinary test, intent removed First Amendment protection.

The Court's use of intent was especially pernicious in this case because the Court had already found that the *MetaBirkins* artworks artistically referenced the Birkin bag. *Rothschild*, 2023 WL 1458126, at *5-*7. Artistic reference may incidentally result in consumer confusion, but *an intent to engage in artistic reference is not the same as an intent to confuse.* The former is protected by the First Amendment even if the artist is referencing a well-known brand. The latter may, in some situations, be trademark infringement. But it is exceedingly difficult for any factfinder to distinguish those different forms of intent—intent to reference looks much the same as intent to confuse, because in many cases reference will predictably lead to at least some level of confusion. As explained below, the evidence in this case provided no basis for the jury to distinguish intent to reference from intent to confuse without eviscerating Mr. Rothschild's First Amendment rights. It was improper to instruct the jury that it could deny Mr. Rothschild First Amendment protections based on an unguided and impermissible assessment of his intent.

Under the *Rogers* test as correctly applied, Mr. Rothschild's *MetaBirkins* artworks are protected by the First Amendment, and all of Hermès' claims must be rejected as a matter of law.

## ARGUMENT

### I.   THE COURT'S INSTRUCTIONS TO THE JURY WERE STRUCTURED IMPROPERLY

#### A.   The First Amendment is Not a "Defense" to Trademark Claims; It is a Rule of Construction that Shapes the Plaintiff's Prima Facie Case.

In its initial proposed instructions, this Court proposed to instruct the jury that the First Amendment was a "defense" to Hermès' trademark infringement and cybersquatting claims. As this Court correctly recognized at the time, this would have been error. Oppenheim Decl., Ex. B at 849:20–23. The First Amendment is not a "defense" to trademark infringement. Rather, it is a rule of construction that determines as a threshold matter what the plaintiff must prove in order to make out a claim. *Rogers* itself makes this point clear:

> We believe that in general the Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression. In the context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.

875 F.2d at 999. *See also* Jordan & Kelly, *supra*, at 837 ("*Rogers* effectively employs the First Amendment as a *rule of construction* to avoid conflict between the Constitution and the Lanham Act, and does so by setting certain threshold requirements in cases involving creative works before the Lanham Act will apply.") (emphasis added).

Despite acknowledging the *Rogers* rule of construction, the Court made only cosmetic changes to its instructions, removing the word "defense" but crucially—and prejudicially to Mr. Rothschild—maintaining the ordering of the instructions. Thus, the jury was directed first to determine whether Mr. Rothschild was liable for trademark infringement (as well as dilution and cybersquatting) *under the ordinary standards that apply when no First Amendment rights are at stake*. Only if the jury found infringement under these ordinary standards, it was then invited to consider whether Mr. Rothschild—who had just been branded as an infringer—should nonetheless escape liability because he had, in effect, an "excuse."

Given that the Court had determined artistic relevance in Mr. Rothcshild's favor, the jury should have been instructed only on explicit misleadingness, the final consideration under *Rogers*. The ordering of the instructions invited the jury to consider whether, in effect, Mr. Rothschild should be let off on a technicality. That is not what *Rogers* requires. Removing the word "defense" from the First Amendment instruction did not cure the incorrect ordering; nor did placing the burden on Hermès to prove intent.

**B.      The Improper Structuring of the Instructions Prejudiced Mr. Rothschild.**

Direct evidence that this Court's improper structuring of the jury instructions prejudiced Mr. Rothschild came in the form of a jury note that read as follows:

> Dear Judge Rakoff: #1. If the jury decides that Mr. Rothschild infringed and diluted the TM and is liable for cybersquatting YET feels there is a 1st Amendment protection, is he able to continue selling the NFTs as well as keep ownership of www.metabirkins.com? #2. If we are unanimous on the first 3 charges but can't resolve the first amendment issue what happens?

Oppenheim Decl., Ex. C at 1086:10–16. This note indicates that, due to this Court's improper ordering of the jury instructions, the jury had concluded that Mr. Rothschild had violated the law without considering the First Amendment issue at all. Moreover, the note plainly suggests that once the jury had determined that Mr. Rothschild had broken the law, it was reluctant to find that the First Amendment protected his speech if that meant he would be released entirely from the consequences of what they viewed as his unlawful conduct. Had *Rogers* been correctly applied, the jury could not have found Mr. Rothschild's conduct to be unlawful in the first place without considering First Amendment protections.

The same prejudice is reflected in a LinkedIn comment by jury foreperson Jane Kramer, posted after the trial had concluded. Responding to a post by trademark lawyer David Bernstein stating that he "expect[s the Second Circuit] to be far more deferential to the important First

Amendment issues at play here than was the district court," and that "[t]rademark law was not designed to give brand owners the power to stop commentators from talking about brands or to stop artists from depicting brands in their art," Ms. Kramer wrote the following: "This was a smart bunch of people I led as foreperson. I personally feel our decision actually protects digital artists in the metaverse and NFT space who use their freedom of expression with the goodwill of the brand and the consumer in mind. *If so there is no need to hide under the cloak of the 1st amendment*." Oppenheim Decl., Ex. D (emphasis added).

Ms. Kramer's framing of the First Amendment as an excuse was a result of the improper sequence of the jury instructions. Under *Rogers*, whether Mr. Rothschild's conduct was wrongful or not could only be judged in the first instance by reference to the narrow application of the Lanham Act that *Rogers* states is necessary when speech interests are at stake. If the jury had been instructed to apply the *Rogers* test in the way that *Rogers* itself frames it, then Mr. Rothschild's First Amendment rights would have been considered without him first being adjudged a lawbreaker. This is the order in which the Ninth Circuit's model jury instruction put the question: the model instruction (which assumes that the plaintiff's use of the defendant's mark is artistically relevant) allows a jury to find liability only if it determines that the defendant's use was explicitly misleading ***and*** is likely to cause confusion. The *first* inquiry is explicit misleadingness, and it is only if the defendant's use of the plaintiff's mark is found to be *explicitly* misleading that confusion is considered at all:

### 15.19A Expressive Works

The defendant's work, [*insert name of allegedly infringing work*], is an expressive work that is protected by the First Amendment.

Therefore, you may find for the plaintiff on [his] [her] [its] trademark infringement claim only if the plaintiff proves by a preponderance of the evidence that:

1.     the defendant's use of the plaintiff's mark is explicitly misleading as to the source of content of [insert name of allegedly infringing work]; and

2.     the defendant's use of the plaintiff's mark is likely to cause confusion about the source of the plaintiff's or the defendant's goods.

The defendant's use of the mark is explicitly misleading only if it explicitly misleads consumers into believing that the plaintiff sponsored or is somehow associated with [*insert name of allegedly infringing work*].

Committee on Model Jury Instructions, Ninth Circuit, *Manual of Model Civil Jury Instructions for the Ninth Circuit* 15.19A. The Ninth Circuit's jury instruction is structured consistently with *Rogers.* This Court's instructions were not.

## II.     THE JURY INSTRUCTIONS ARE SUBSTANTIVELY INCONSISTENT WITH SECOND CIRCUIT LAW

### A.     The *Rogers* Test is An Objective Test Designed to Decide Cases Early; This Court's Intent Instruction is at Odds With that Purpose.

Under *Rogers*, the First Amendment protects Mr. Rothschild's artistic expression unless it "has no artistic relevance to the underlying work whatsoever, or if it has some artistic relevance, unless [the use of the trademark] *explicitly* misleads as to the source or content of the work." 875 F.2d at 999 (emphasis added).

Applying this test to the film at issue in *Rogers*, the Second Circuit noted evidence of confusion among the film's publicists and a consumer survey showing that 38% of respondents mistakenly believed Ginger Rogers was associated with the film, with 14% believing that Rogers was directly involved in *making* the film. *Id.* at n. 8.[3] Given "both the survey and the evidence of the actual confusion among the movie's publicists," the Court stated that "there [was] no doubt a

---

[3] The 38% number represents "total" confusion (*i.e.*, source confusion as well as confusion regarding other forms of affiliation such as sponsorship or licensing)—this is the number that is relevant as a measure of trademark confusion. The 14% number is akin to "source" confusion, standing alone.

risk that some people looking at the title 'Ginger and Fred' might think the film was about

Rogers and Astaire in a direct, biographical sense." *Id.* at 1001. The Court nonetheless held the

title to be protected, because it "contain[ed] no *explicit* indication that Rogers endorsed the film

or had a role in producing it." *Id.* (emphasis added). The Court dismissed the survey, stating that

it "indicate[d] at most that some members of the public would draw the incorrect inference that

Rogers had some involvement with the film." *Id*. "[T]hat risk of misunderstanding, not

engendered by any overt claim in the title, [was] so outweighed by the interests in artistic

expression as to preclude application of the Lanham Act." *Id.; see also MGFB Properties, Inc.*,

54 F.4th at 682 (rejecting survey data showing substantial confusion: "We reject this evidence

because any misunderstanding represented by the survey data was not engendered by any *overt*

*claim*.") (internal quotation omitted) (emphasis added).

     *Rogers* directs that Hermès' claims must be dismissed. This Court determined that Mr.

Rothschild's *MetaBirkins* images were in fact artworks and instructed the jury accordingly.[4] This

Court also determined that the *MetaBirkins* title was artistically relevant to the *MetaBirkins*

artworks; the jury was not asked to determine that question.[5] That leaves only explicit

---

[4] "It is undisputed, however, that the MetaBirkins NFTs, including the associated images, are in at least some respects works of artistic expression." Oppenheim Decl., Ex. A at 21.

[5] "For example, even though I think there is a nonfrivolous argument that the defendant was not making use of the MetaBirkins -- excuse me, of the Birkins mark or the Birkins design for artistic purposes and, therefore, would not satisfy the first prong of the Rogers test, I concluded in the end that there was at least an element of artistry involved from the outset and so instructed the jury." Oppenheim Decl., Ex. I at 1072:18–24. The Court also did not ask the jury to determine explicit misleadingness, although it is not clear whether the Court determined that Hermès failed to present sufficient evidence on explicit misleadingness, or if the Court decided to replace the inquiry that *Rogers* requires with its intent question. *Id.* at 1072:25–1073:7 ("Similarly, even though I think there is an argument that the use of the term 'MetaBirkins' in the website and throughout was explicitly misleading on its face and, therefore, would satisfy the other prong of *Rogers*, I concluded in the end that that was not a question that should go to the jury in those terms because of the breadth that must be given to artistic expression and constitutionally protected rights under the First Amendment.").

misleadingness, and no reasonable jury could have found that Mr. Rothschild's use of the *MetaBirkins* name or the fanciful images of fur-covered Birkin bags were explicitly misleading. Hermès' own witness, Nicolas Martin, admitted that he was aware of no evidence that Mr. Rothschild had ever told anyone that *MetaBirkins* came from Hermès. Oppenheim Decl., Ex. E at 198:9–12. And neither the *MetaBirkins* title in itself nor the use of the Birkin mark on the metabirkins.com website can be deemed *explicitly* misleading as that term is used in *Rogers,* for the same reason that the title "Ginger and Fred" was not explicitly misleading about the source of the Fellini movie—an *explicitly* misleading use is one that directly, unambiguously, and overtly claims that the mark owner is the source. A use that may result in a mistaken *inference* about source is not explicitly misleading; such a use is, at most, *implicitly* misleading. *Rogers* expressly rejected implicit misleadingness as a sufficient basis for liability. *See* 875 F.2d at 999-1000.

This is more than a detail: If *Rogers* is misread to permit the possibility that the mere use of a mark in a title or on a website could be *explicitly* misleading, then the *Rogers* test would not actually provide any protection to expressive content at all. That is why courts applying *Rogers* have said that explicit misleadingness cannot be established by use of the mark alone. *See Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1245 (9th Cir. 2013) ("if the use of a mark alone were sufficient it would render *Rogers* a nullity") (cleaned up); *Dr. Seuss Enters., L.P. v. Comicmix LLC*, 983 F.3d 443, 462–63 (9th Cir. 2020) (concluding that the copying of distinctive elements of Dr. Seuss books was not explicitly misleading where the actual creator was disclosed).

Because there is no evidence that Mr. Rothschild's use of the Birkin mark or trade dress[6] were explicitly misleading, the case should have ended with a judgment in Mr. Rothschild's

---

[6] Defendant is aware of no authority explaining what it would mean to use trade dress in the design of a consumer product in an explicitly misleading way. It cannot be that merely imitating the trade dress, especially in the imprecise and highly stylized way that Mr. Rothschild has done

favor. Instead, this Court added a new third element to the *Rogers* test: one that invited the jury

to hold Mr. Rothschild liable if it found that he intended to cause confusion. As explained below,

no reasonable jury could have found such an intent under relevant Second Circuit law. *See*

Section II.C, *infra*. But the jury never should have been asked about Rothschild's intent at all.

Nothing in *Rogers* suggests that courts, let alone juries, are supposed to undertake an unguided

inquiry into subjective intent. The *Rogers* test is *objective*, focusing on overt indicia. For

example, in *Rogers* itself, the district court judge determined that the film's title, "Ginger and

Fred," was artistically relevant to the expressive work solely by examining the film at issue. *See*

*Rogers v. Grimaldi*, 695 F. Supp. 112, 120 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 994 (2d Cir. 1989).

Once a low threshold of artistic relevance is met—as it was in *Rogers* and in this case—the

*Rogers* test undertakes a second and final objective inquiry. It examines the defendant's overt

use of the mark and distinguishes between an *explicitly* misleading use, which is actionable, and

a use that is merely *implicitly* misleading, which is not.

The *Rogers* test includes *only* two factors. Taken together, they "insulate[] from

restriction titles with at least minimal artistic relevance that are ambiguous or only implicitly

misleading but leaves vulnerable to claims of deception titles that are explicitly misleading as to

source or content, or that have no artistic relevance at all." 875 F.2d at 1000. No other inquiry is

mentioned or contemplated. And, vitally, the "explicitly misleading" prong "means what it says:

the junior user must make 'overt claims or explicit references' to association with the senior

user." *Twentieth Century Fox Film Corp. v. Empire Distrib., Inc.*, 875 F.3d 1192, 1199 (9th Cir.

---

in his *MetaBirkins*, could qualify as *explicitly* misleading. *See*, *e.g.*, *AM Gen.*, 450 F. Supp. 3d at
486 ("Given the improbability of confusion between a vehicle and a video game—or, in the case
of the contested toys, between a plastic figurine and a full-blown military machine—this Court
grants Defendants' motion for summary judgment on Plaintiff's federal and New York trade
dress claims.").

2017); *accord Brown*, 724 F.3d at 1245 ("We must ask. . . whether there was an explicit indication, overt claim, or explicit misstatement that caused such consumer confusion." (cleaned up)); *MGFB*, 54 F.4th at 682 ("The relevant question is whether (1) the secondary user overtly marketed the protected work as endorsed or sponsored by the primary user or (2) otherwise explicitly stated that the protected work was affiliated with the primary user.") (cleaned up).

Moreover, importing an intent element into *Rogers* and allowing subjective intent to override the objective inquiry would be inimical to that decision's speech-protective purpose.[7] "Because overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values," the *Rogers* Court "construes the [Lanham] Act narrowly." 875 F.2d at 999 (citing *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. Trades Council*, 485 U.S. 568 (1988) ("[T]he Court will construe [a] statute to avoid [serious constitutional problems] unless such construction is plainly contrary to the intent of Congress.")). *Rogers* prevents the Lanham Act from chilling *noncommercial* speech—which, given this Court's determination that *MetaBirkins* are artistic expression, is precisely the kind of speech at stake here.

Applying *Rogers* requires a court to answer just two questions, both of which will often be readily determinable objectively on a review of the defendant's use of the plaintiff's mark. As a consequence, courts applying the *Rogers* test can vindicate—with limited or no discovery—the

---

[7] Trademark owners have regularly sued noncommercial speakers, targeting both high culture and low, and arguing that works' titles or contents imply some connection with the trademark owner. Plaintiffs know that without *Rogers*, they can force ruinously expensive litigation over whether small percentages of consumers were confused about the parties' relationship, even for obvious parodies and obviously immaterial confusion. Trademark owners and attorneys are also well aware of the coercive power of dubious trademark claims. In one survey of fifty attorneys who practice trademark and copyright law, many of the interviewed attorneys admitted to enforcing trademark claims they believed were weak through demand letters—because it works. *See* William T. Gallagher, *Trademark and Copyright Enforcement in the Shadow of IP Law*, 28 SANTA CLARA COMPUTER & HIGH TECH. L.J. 453, 478, 485–88 (2012).

First Amendment rights of defendants who meet that test. *See, e.g., Brown*, 724 F.3d at 1239

(affirming 12(b)(6) dismissal under *Rogers*); *Louis Vuitton Malletier S.A. v. Warner Bros. Ent.*

*Inc.*, 868 F. Supp. 2d 172, 183 (S.D.N.Y. 2012) (rejecting argument that *Rogers* cases cannot be

decided on the pleadings and granting dismissal); *Rebellion Devs. Ltd. v. Stardock Ent., Inc.*, No.

12-12805, 2013 WL 1944888, at *4, *6 (E.D. Mich. May 9, 2013) (same). In contrast, a

subjective inquiry into a defendant's intent would permit almost any plaintiff to plead bad intent

and survive a motion to dismiss. It would also, in many cases, permit a plaintiff to overcome a

motion for summary judgment by offering some minimal evidence that could support an

inference of an intent to confuse consumers.

Use of confusion evidence to prove subjective intent is inconsistent with *Rogers.* If the

*Rogers* Court had itself applied a subjective, intent-based test, Ginger Rogers might well have

pointed to the survey evidence showing 38% of consumers thinking that she had something to do

with the film as evidence that a defendant who created such significant confusion by (a) invoking

the world-famous name of actress Ginger Rogers in the title of a movie, (b) pairing her in that

title with her equally famous acting and dancing partner Fred Astaire, and (c) taking no steps in

the marketing of the movie or in the movie itself to disclaim such association, must have

anticipated and, therefore, *intended*, such confusion. If *Rogers* had licensed this kind of inquiry,

it is entirely possible a jury might have found that the defendant knew and therefore intended that

some consumers would believe the movie to be a Ginger Rogers biography, or that she somehow

was connected to the film—as apparently a not insubstantial number of consumers, as well as

several people involved in publicizing the movie, did in fact believe. The producers of Fellini's

film might have seen their First Amendment rights overridden and their noncommercial speech

suppressed in the same way Mr. Rothschild's rights were mishandled in this case.

14

*Rogers* licensed no such inquiry. Nor have the other courts that have dismissed trademark claims using the *Rogers* test, even in cases featuring evidence of confusion orders of magnitude stronger than anything Hermès was able to establish in this case—including survey evidence of levels of actual confusion high enough, if courts were to apply the same sort of improper intent test this Court applied, to support an inference not just of the existence of confusion in the marketplace but of defendant's *intent* to confuse. Evidence of confusion, in the absence of an *explicit* misstatement, simply does not support liability. *See AM Gen.*, 450 F. Supp. 3d at 480 ("no amount of evidence showing *only* consumer confusion can satisfy the 'explicitly misleading' prong of the *Rogers* test because such evidence goes only to the 'impact of the use' on a consumer") (emphasis in original); *Brown*, 724 F.3d at 1245–46 (affirming motion to dismiss: "Adding survey evidence changes nothing. The test requires that the use be *explicitly* misleading to consumers."); *id.* at 1245 (defining "explicitly misleading" as  an "explicit indication," "overt claim," or "explicit misstatement" that caused such consumer confusion"); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 937 & n.19 (6th Cir. 2003) (affirming grant of summary judgment to defendant though over 60% of respondents thought that artwork's subject was affiliated or connected with plaintiff or approved or sponsored it; "We disagree with the dissent's suggestion that a jury must decide where the balance should be struck and where the boundaries should be drawn between the rights conferred by the Lanham Act and the protections of the First Amendment.").

To be clear, Mr. Rothschild denies any intent to confuse (as he testified), and the other evidence does not establish that he had any such intent. Section II.C., *infra.* But re-fashioning *Rogers* to catch every last defendant harboring a secret intent to confuse is not worth the price

that will be paid going forward in terms of artistic speech that will be chilled by the prospect of extensive and ruinously expensive litigation *across many future cases* on the subject of intent.

*Rogers* is an *objective* test, and it was objectively clear from the outset both that the *MetaBirkins* title was artistically relevant to the *MetaBirkins* artworks, and that Hermès could identify no *explicitly* misleading use of their Birkin mark or trade dress.[8] Mr. Rothschild should be granted judgment in his favor as a matter of law on all of Hermès' claims.

### B. The Court's Intent Test Also Is at Odds With Second Circuit Law on the Use of Intent Evidence in Ordinary Trademark Cases.

In its Instruction No. 14, the Court instructed the jury that "if Hermès proves that Mr. Rothschild actually intended to confuse potential customers, he has waived any First Amendment protection." Oppenheim Decl., Ex. A at 21–22. This instruction largely overlapped the Court's instruction on bad faith as a factor in the *Polaroid* test. Specifically, in Instruction No. 11, the Court told the jury that it should determine "whether Hermès has shown that Mr. Rothschild acted in bad faith. In this context, bad faith goes to whether Mr. Rothschild used the MetaBirkins name and the visual appearance of the underlying images with the intention that consumers would believe that Hermès originated or endorsed the MetaBirkins NFTs, or whether Mr. Rothschild chose to purposely turn a blind eye to the likelihood that potential consumers would be confused." *Id.* at 16.

---

[8] In its Complaint, Hermès did not allege any explicit misleadingness other than Rothschild's depictions of imaginary Birkin bags and use of the *MetaBirkins* title and "Hermès" and "Birkin" marks, unaccompanied by any explicit misstatement regarding source. Oppenheim Decl., Ex. F at ¶¶ 81–133. Nor was Hermès able to identify any explicit misstatement after discovery; its witness admitted at trial that there wasn't one. Oppenheim Decl., Ex. E at 198:9–12 ("*Q. Mr. Martin, are you aware of any evidence that Mr. Rothschild ever told anyone that the MetaBirkins came from Hermès? A. No.*").

The Court's intent instruction was erroneous for at least two reasons. First, the Court made no attempt to distinguish between Mr. Rothschild's intent upon adopting the mark and whatever his state of mind might have been *after* adopting the mark. Under Second Circuit law, the only relevant intent is the intent at the time of adopting the mark: "In analyzing whether a defendant has acted in bad faith, the question is whether the defendant attempted to exploit the good will and reputation of a senior user *by adopting the mark with the intent to sow confusion between the two companies' products*." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 88 (2d Cir. 2020) (emphasis added; cleaned up). There is no Second Circuit precedent for the proposition that a defendant's failure to remedy confusion that only later becomes apparent is relevant to intent. Indeed, there is ample precedent holding that continued use of a mark even after receipt of a cease-and-desist letter does not amount to bad faith if there is no evidence the mark was adopted in bad faith.[9]

Second, the Court's instruction gives intent more weight than Second Circuit law gives it in an ordinary trademark case where there is no speech interest involved. In *Car-Freshner*, the Second Circuit considered the role of intent evidence in a case where the defendant adopted

---

[9] *See, e.g., Wonder Labs, Inc. v. Procter & Gamble Co.*, 728 F. Supp. 1058, 1064 (S.D.N.Y. 1990) (Failure to abort advertising campaign upon receipt of cease and desist letter "is absolutely no proof that the defendant acted in bad faith to capitalize on the plaintiff's trademark"); *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d 266, 285 (S.D.N.Y. 2006), judgment aff'd, 247 Fed. App'x. 232 (2d Cir. 2007) (Persisting in use of the challenged mark after receiving a cease and desist letter was not evidence of bad faith: "A reasonable belief that one is acting within one's rights may mitigate against a finding of bad faith." No infringement found.); *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 525 (S.D.N.Y. 2008) ("But a defendant's refusal to abandon a mark in the face of a cease and desist letter cannot demonstrate bad faith standing alone. If a defendant reasonably believes its mark does not infringe plaintiff's, she does not act 'with the [requisite] intention of capitalizing on plaintiff's reputation and goodwill.'") (finding no infringement upon motion for summary judgment); *Limited v. Macy's Merch. Grp. Inc.*, 15-CV-3645 KMW, 2016 WL 4094913, *11 (S.D.N.Y. 2016), *aff'd*, 695 Fed. Appx. 633 (2d Cir. 2017) (Launching product with the accused mark after receiving a cease and desist does not prove bad faith. No infringement found.).

several marks for car air fresheners that were very similar to plaintiff's marks, and the

defendants' internal documents suggested an intent for customers to mistake the marks. The

Court noted that even upon the "rare" revelation of explicit evidence of bad faith, that evidence

could not, in itself, be determinative of liability:

> In such circumstances, some might expect a court to accord that factor such significance as alone to require an adverse outcome for the alleged infringer. To do that, however, would be to punish the Defendants for bad faith, rather than to consider bad faith in an overall balance of factors. Bad faith and intent to deceive are relevant to the extent that they add to the likelihood that the accused infringer will achieve its objective of consumer confusion, but they do not alone determine likelihood of confusion *nor provide an occasion for imposing punishment*.

980 F.3d at 333 (emphasis added). Giving intent more weight in a case like this one, where First

Amendment interests are at stake, is exactly backwards.

### C. Even Applying this Court's Erroneous Intent Instruction, Hermès' Claims Must Fail—The Evidence Does not Support an Inference of Intent to Confuse.

Even under the Court's erroneous instruction, no reasonable jury could have found that

Mr. Rothschild had the intent to confuse that is necessary to support liability. Under Second

Circuit law, a finding of bad faith requires evidence that the defendant *adopted the mark with an*

*intent to confuse.* "In analyzing whether a defendant has acted in bad faith, the question is

whether the defendant attempted 'to exploit the good will and reputation of a senior user by

adopting the mark with the intent to sow confusion between the two companies' products.'"

*Tiffany & Co.*, 971 F.3d at 88. But none of the evidence that Hermès or this Court has identified

as relevant to Mr. Rothschild's supposed intent to sow confusion actually shows what the law in

the Second Circuit requires.

Specifically, neither the Court's instruction nor Hermès' supposed evidence of

"confusion" gave the jury any ground to distinguish between Mr. Rothschild's intent to *reference*

*artistically* the Birkin mark and trade dress, as opposed to using the mark and dress to confuse consumers. This Court found that *MetaBirkins* contained artistic expression. Oppenheim Decl., Ex. I at 1072:20–24 ("…I concluded in the end that there was at least an element of artistry involved from the outset and so instructed the jury.") It is undisputed that Mr. Rothschild's expression references the Birkin bag—indeed, this entire case would make no sense whatsoever if there were no such reference. Mr. Rothschild testified, in response to this Court's inquiry, that he adopted the *MetaBirkins* name in order to "reference" the Birkin bag.

> THE COURT: So maybe this has been answered, but at least to me it's unclear. The decision to use the term "MetaBirkins" was yours, yes?
>
> THE WITNESS: The final decision to actually use the term, yes.
>
> THE COURT: Okay. And you intended to associate – to indicate to the people who were accessing this that this was in some sense a reference to Birkin bags, yes?
>
> THE WITNESS: In some ways, yes, a reference.

Oppenheim Decl., Ex. G at 543:21–544:4. An intent to reference artistically is not the same as an intent to confuse. Artistic reference is protected by the First Amendment under the *Rogers* test *even when it leads to confusion*. The only exception under *Rogers* is where the artist who makes the reference also makes an explicit statement misrepresenting the source. The failure to distinguish between reference and confusion is a pervasive problem with the use of intent evidence in this case. For example, on page 3 of its Memorandum of Law in Support of Plaintiffs' Motion for Permanent Injunction, Hermès stated that "Rothschild admitted that the METABIRKINS NFTs were meant as a reference to Hermès's BIRKIN handbags." Oppenheim Decl., Ex. H at 3. And then the very next sentence argues that "Rothschild divulged his intent by telling his business partners that, he does not 'think people realize how much you can get away in art by saying 'in the style of.'" *Id.* These statements are consistent with an intent to make an

artistic reference; they are inconsistent with an intent to confuse. In fact, the statements suggest the *opposite* of an intent to confuse. In the first statement, Mr. Rothschild explicitly states that he intended to make an artistic reference. In the second statement, Mr. Rothschild is opining that artistic reference is legal, especially if one states openly that the reference is done "in the style of" the original—*i.e.*, if one makes the artistic *reference* clear, so that people will not be confused about the source of the artwork.[10]

Other evidence that Hermès' counsel cited in closing as indicating bad intent likewise had nothing to do with an intent to confuse. Hermès' counsel focused on various statements that Mr. Rothschild made to potential business partners suggesting that he was trying to arrange a collaboration with Hermès. Oppenheim Decl., Ex. I at 974:5–975:22. There is ample evidence that in fact Mr. Rothschild was attempting to arrange a collaboration. Indeed, this Court noted as much in its summary judgment opinion, stating that "though Rothschild sought to partner with Hermès on the project, after his attempts failed to bear fruit he did not represent to others that Hermès had agreed to work with him." *Rothschild*, 2023 WL 1458126, at *6 (Rakoff, J.).

But even if the jury did not believe that Mr. Rothschild was trying to make those arrangements, and even if Mr. Rothschild's statements were, in fact, false, they simply are not evidence of an intent to confuse. In fact, again, the statements suggest the *opposite* intent. The statements indicate that Mr. Rothschild wanted to have Hermès' involvement; the logical corollary to that desire is that Hermès was *not involved* with the *MetaBirkins* as of the time the statements were made, and Mr. Rothschild's statements make that clear. Far from being evidence of Mr. Rothschild's supposed intent to confuse, these statements are evidence of

---

[10] Plaintiffs make a similar argument about a horse charm (Oppenheim Decl., Ex. H at 4), ignoring that the record showed: (i) that the charm was contemplated but never delivered (Oppenheim Decl., Ex. J at 311:19–24); (ii) no evidence that the charm caused confusion.

Mr. Rothschild's *intent to claim authorship* of his own work. The Court recognized that intent in its summary judgment opinion, when it noted that "after Hermès sent to Rothschild a cease and desist letter outlining its allegations, Rothschild placed a prominent disclaimer on the MetaBirkins website stating that his project was 'not affiliated, associated, authorized, endorsed by, or in any way officially connected with Hermès, or any of its subsidiaries or affiliates.'" *Rothschild*, 2023 WL 1458126, at *6 (Rakoff, J.). The Court further acknowledged that "when several publications mistakenly reported an affiliation between Hermès and the MetaBirkins project …the defendant's publicist, Kenneth Loo, reached out and asked that these publications issue corrections regarding the mistaken affiliation." *Id.* The Court noted that Hermès "has offered admissible evidence contradicting each of defendant's assertions and the evidence referenced above." *Id.* at *7. The Court explained, however, that "such evidence does little more than show that Rothschild's project was driven in part by pecuniary motives….". *Id*. Again, an intent to make money through a successful artistic reference is not the same as an intent to confuse, and none of the evidence cited suggests the latter intent. In other words, whereas there is ample evidence in this case showing that Mr. Rothschild *did not* have an intent to confuse, Hermès offered no evidence suggesting that he had such an intent.

Perhaps the most egregious example of intent-to-reference being mistaken for intent-to-confuse came out of the mouth of Hermès' counsel, who, while (selectively) quoting in his closing argument Mr. Rothschild's interview with Yahoo! News, told the jury that Mr. Rothschild showed his intent "to take the iconic Birkin handbag and bring it into the metaverse." Oppenheim Decl., Ex. I at 978:9–11. Hermès' counsel then asked the jury "Can there be any clearer evidence that Mr. Rothschild was trying to trade off of Hermès goodwill?" *Id.* at 978:12–13. In fact, Mr. Rothschild's statement is *not* evidence of bad intent, and the question Hermès'

21

counsel put to the jury illustrates exactly the problem here: counsel failed to distinguish between intent to reference artistically and intent to confuse. **Both can involve trading on a famous brand's goodwill.**

As Mr. Rothschild would have told the jury had this Court not wrongfully excluded Mr. Rothschild's expert art historian, *see* Section IV, *infra*, artists often leverage the cultural resonance of important brands to make their artistic intervention successful. Andy Warhol didn't just paint soup cans. He painted *Campbell's* soup cans because the Campbell's brand is an iconic element of American culture. In a very real way, Warhol was "trading on a famous brand's goodwill" by making an artistic reference, as Mr. Rothschild has done here. In doing so, neither Mr. Warhol nor Mr. Rothschild violated the law.[11]

## III. HERMÈS' CONFUSION EVIDENCE IS INSUFFICIENT AS A MATTER OF LAW

### A. If this Court Applies the *Twin Peaks* "Particularly Compelling" Evidence of Confusion Standard, Hermès' Claims Must Also Fail.

The Second Circuit's decision in *Twin Peaks Prod. v. Public. Int'l*, 996 F.2d 1366 (2d Cir. 1993), applies to "title-vs.-title" conflicts—*i.e.*, cases where one literary or artistic title is alleged to infringe another. This case does not involve such a conflict, and so it is *Rogers*, and

---

[11] In a part of Mr. Rothschild's Yahoo! News interview that Hermès' counsel didn't quote in his closing, Mr. Rothschild made the nature of his art project quite clear. He said that in making *MetaBirkins* he "wanted to see as an experiment … I could create that same kind of illusion that it has in real life as a digital commodity." Oppenheim Decl., Ex. K at 2. As the Court itself acknowledged in its summary judgment opinion, *see Rothschild*, 2023 WL 1458126 at *6-*7 (Rakoff, J.), Mr. Rothschild refers to a clearly artistic purpose: his "experiment" is meant to distinguish whether consumers value the Birkin bag principally as a physical object, or as an *image*. This statement has nothing to do with an intent to confuse. It is nonetheless trading on the Birkin bag's prominence—it is, to adopt the formulation of Hermès' counsel, "trying to trade off of Hermès' goodwill." But leveraging a famous brand's goodwill to make a successful artistic reference is noncommercial speech protected by the First Amendment.

not *Twin Peaks*, that governs. But even if this Court were to apply *Twin Peaks*, Mr. Rothschild would equally be entitled to judgment in his favor as a matter of law.

Judge Newman wrote the opinions in both *Rogers* (1989) and *Twin Peaks* (1993). In *Rogers*, Judge Newman specifically exempted title-versus-title conflicts from the protective *Rogers* rule, noting that "[t]his limiting construction would not apply to misleading titles that are confusingly similar to other titles. The public interest in sparing consumers this type of confusion outweighs the slight public interest in permitting authors to use such titles." 875 F.2d at 999 n.5. Four years later, Judge Newman was presented in *Twin Peaks* with precisely the title-versus-title conflict that he had envisioned in *Rogers* and exempted from the *Rogers* two-factor test. Judge Newman noted the different circumstances in the first line of his opinion in *Twin Peaks*: "This appeal requires *adjustment of the competing rights of authors* under circumstances where the work of a second author contains both comment on a well-known work of a first author and substantial portions of the normally protectable expression contained in the first work." 996 F.2d at 1370 (emphasis added).

Unlike in *Twin Peaks*, here there are no such "competing rights of authors." In this case, only Mr. Rothschild can claim rights in authorial expression; Hermès is selling a non-speech, commercial product. As such, the standard *Rogers* test applies. But even if this Court were to apply *Twin Peaks*, Mr. Rothschild would be entitled to a judgment in his favor as a matter of law. Because the *MetaBirkins* title and Rothschild's images are artistically relevant, Mr. Rothschild can be found liable only if Hermès establishes a "particularly compelling" likelihood of confusion. *Twin Peaks*, 996 F.2d at 1379 ("[T]he finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest recognized in *Rogers*.").

Evidence of likely confusion that would satisfy an ordinary *Polaroid* analysis is not "particularly compelling." *Id.*; *AM Gen.*, 450 F. Supp. 3d at 478.

No reasonable jury could have found that Hermès established a "particularly compelling" likelihood of confusion—indeed, the jury should not have found that Hermès established even the *ordinary* level of actionable confusion appropriate to a case that doesn't involve protected speech. For one thing, this Court erred in permitting Hermès to introduce and rely upon scattered statements by journalists and unidentified individuals on social media. *See, e.g.*, Oppenheim Decl., Ex. B at 785:5–790:11, 792:7–794:24; Oppenheim Decl., Ex. I at 971:4–8; Oppenheim Decl., Ex. G at 578:3–579:5. This kind of unreliable evidence does not reflect likely consumer confusion in a case where noncommercial speech is at issue. *See, e.g., MGFB Properties v. ViacomCBS Inc.*, No. 5:19-cv-257-RH-MJF, 2021 WL 4843905, at *7 (N.D. Fla. Sept. 22, 2021) (applying *Rogers* and holding that social media evidence was unpersuasive because actionable confusion requires that consumer decisions be affected); *Medici Classics Productions, LLC v. Medici Grp., LLC*, 683 F.Supp.2d 304, 312–13 (S.D.N.Y. 2010) (inquiries and media misattribution not probative of likely consumer confusion).

Indeed, these statements aren't evidence of confusion even in non-*Rogers* cases. *See Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 307 (S.D.N.Y. 2021) (inquiries and mistaken social "tagging" of plaintiff not probative of consumer confusion); *Reply All Corp. v. Gimlet Media, Inc.*, No. 15-CV-4950 (WFK)(PK), 2020 WL 13536220, at *6 (E.D.N.Y. Feb. 12, 2020) ("Misdirected social media posts and unsolicited emails praising Defendant's podcast are evidence of general confusion and not mistaken purchasing decisions, damage to goodwill, or loss of control of reputation."); *GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D. P.C.*, 769 F. Supp. 2d 630, 644-45 (S.D.N.Y. 2011) (statements from non-purchasers not probative); *W.W.W.*

*Pharm. Co. v. Gillette Co*., 808 F. Supp. 1013, 1020-21 (S.D.N.Y. 1992) (same); *Grubhub Inc. v. Kroger Co*., No. 1:21-cv-05312, 2022 WL 2774986, at *5 (N.D. Ill. May 25, 2022) (anonymous social media posts not evidence of actual confusion).

Hermès *failed to identify a single confused purchaser.* The only evidence they could point to were a few mistaken (and corrected) press reports and some random online comments from unidentified individuals. There was particular reason to bar this kind of evidence in this case. Birkin handbags are both outrageously expensive and a cultural symbol of wealth—and for those reasons many people who do not have the means to purchase a Birkin bag or any direct experience with them are still fascinated by, and like to chatter about, Birkin bags. An analogous observation must be made about Mr. Rothschild's *MetaBirkins*: they are priced (at least on the resale market) out of reach of most people and are difficult to access in the first-sale market even for those who have the means and the technical know-how to purchase them. This means that posts by unidentified people on social media are even less reliable than social media posts by unidentified individuals that concern products within the reach of most ordinary consumers.

This Court's mistaken decision to allow Hermès to introduce and rely on this kind of evidence clearly prejudiced Mr. Rothschild. That prejudice is apparent in a post-verdict LinkedIn comment by jury foreperson Jane Kramer:

> [S]eems [Rothschild's] goal was to try and imitate the customer and brand journey of a real world product in a digital world. Which is a cool idea. Only instead of being purely artistic about it he created an entire business and marketing plan (road map with attached utility) along with it, didn't disclaim the relationship to Hermes nor correct major media outlets published confusion that this was initiated by Hermes. He leveraged their trademarks to create hype and to profit. Then when busted, ignored a cease and desist and tried to hide under the 1st amendment. Which, IMO, sullies it for other people who are legally pursuing the outer boundaries of art in the digital world. He got greedy. It's sad. Now he is trying to use the entire premise of artistic freedom to play victim. Nobody questioned his actual artwork nor if he is or isn't an artist. It was how he used this art that waived his rights. Intent to mislead.

Oppenheim Decl., Ex. L. These statements are troubling in a number of ways,[12] principally in that they show that the jury forewoman ignored the evidence that Mr. Rothschild did in fact correct mistaken media outlets—Mr. Rothschild's uncontradicted testimony at trial was that he and his public relations representative Ken Loo corrected many of them. *See* Oppenheim Decl., Ex. J at 303:8–304:9. And even if there were articles that Mr. Rothschild did not correct, Mr. Rothschild's First Amendment rights cannot be negated by a failure to correct every mistaken press report. *See* section II.C., *supra*.

Nor is Dr. Isaacson's survey probative of confusion. Indeed, a reasonable jury should not have relied on that survey at all. As Dr. Neal's unrebutted testimony showed, the Isaacson survey is riddled with methodological mistakes that have the effect of cooking the books in Hermès' favor. Even if Dr. Isaacson's survey were fully credited, it actually undermines Hermès' claims. The survey purports to show only 18.7% confusion. Oppenheim Decl., Ex. B at 756:10–757:6. Some courts find that level of confusion insufficient even in ordinary confusion cases; others find it barely sufficient. *See* 4 McCarthy § 32:188 ("In the author's view, survey confusion numbers that go below 20% need to be carefully viewed against the background of other evidence weighing for and against a conclusion of likely confusion."). It is plainly insufficient under the heightened *Rogers* standard using a *Twin Peaks* analysis.

---

[12] There was no evidence that Mr. Rothschild created a "road map" for *MetaBirkins* or that he "ignored" Hermès' cease and desist letter—the evidence plainly shows that upon receiving that letter, Mr. Rothschild retained counsel and quickly responded. The comment suggests that the jury considered Mr. Rothschild's assertion of his First Amendment rights as evidence of his intent to mislead. That is plainly improper. Additionally, the jury forewoman's comment disparaging Mr. Rothschild as "tr[ying] to hide under the First Amendment" reflects the problem created by the erroneous way in which this Court structured its instructions—the forewoman clearly regards the First Amendment as functioning in this case as an "excuse," which Mr. Rothschild, in her view, was not entitled to "hide under."

If this Court applies *Twin Peaks*, Hermès must provide "particularly compelling" evidence of confusion. It cannot remotely meet that standard. *See AM Gen.*, 450 F. Supp. 3d at 482 (finding "no evidence of actual confusion" despite plaintiff's survey showing 16% confusion as to AM General's association with the Call of Duty videogame, noting that "less than 20 percent confusion regarding association … does not hurdle" the requirement that evidence of confusion be particularly compelling).

But no reasonable jury could have given Hermès' survey that much credit. First, Dr. Isaacson counted as "confused" respondents who his own data showed did not actually believe that Hermès was connected to the *MetaBirkins* and were merely reading back the trademarks they saw on Dr. Isaacson's test stimulus. Oppenheim Decl., Ex. I at 911:21–917:13. Dr. Isaacson correctly included a follow-up question to account for this "reading back" problem, but he improperly ignored the data from this question, thereby materially inflating the level of confusion he purports to find. *Id*.

Once corrected for the failure to control for mere association and "reading back," Dr. Neal found that the level of confusion in Dr. Isaacson's survey falls to 9.3%. *See id.* at 917:3–7. That is below the level that nearly any court would find to be probative of confusion in an ordinary infringement case not involving artistic expression. It is utterly insufficient to meet the "particularly compelling" standard that *Twin Peaks* requires in a case, like this one, where the defendant's noncommercial speech interests are at stake.

The problems with Dr. Isaacson's survey go even deeper. As Dr. Neal's uncontradicted testimony at trial demonstrated, Dr. Isaacson's key confusion questions are worded in a way that cooks the books in favor of Hermès. Specifically, Dr. Isaacson asked "What company, companies, person, or people do you think makes or provides the items shown on the webpage

[that was used as the stimulus]?" *Id.* at 917:23–918:9. Because the survey was purportedly about NFTs, and the respondents were purportedly purchasers of NFTs, it would have been natural and logical to ask who makes or provides the NFTs. Instead, the survey asked about "the items shown on the webpage" (*id.*), which is inherently ambiguous since respondents could easily interpret that phrase to refer to the artworks themselves or the real-world handbags the artworks visually reference. To the extent that respondents interpreted the questions to refer to the latter, their answers would not reflect confusion about who puts out the *MetaBirkins* artworks; they would reflect an accurate understanding of who puts out the physical object visually referenced in the *MetaBirkins* artworks. *Id.* at 918:10–919:7.

Hermès introduced no evidence that would overcome these material flaws that Dr. Neal described. And the shortcomings of the Isaacson survey underscore the wisdom of *Rogers*' teaching that surveys purporting to find confusion from ambiguously labeled artworks should be ignored. But if *Twin Peaks* is the standard, then the Isaacson survey cannot possibly be used by a rational jury as evidence of a particularly compelling level of confusion—in fact, it is evidence that confusion is *unlikely*.

### B.   The Court Improperly and Prejudicially Intervened in Dr. Neal's Testimony.

Finally, this Court erred when it intervened in Dr. Neal's direct testimony in a way that unfairly prejudiced Mr. Rothschild by suggesting to the jury that they could use evidence of confusion below 10% as evidence of a likelihood of confusion. Given Dr. Neal's unrebutted testimony documenting the serious methodological and coding flaws that drove down Dr. Isaacson's confusion finding to below 10% (Oppenheim Decl., Ex. I at 917:3–13), and likely *well below* that number (*id.* at 919:8–13), no reasonable jury could have found that Isaacson's survey supported a finding of confusion.

Indeed, a reasonable jury could only have found that it did not. The Second Circuit has held that a 15-20% rate corroborates a finding of likely confusion. *See RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979). But courts have held that "when the percentage results of a confusion survey dip below 10%, they can become evidence which will indicate that confusion is not likely." McCarthy at § 32:189 (collecting cases). And yet this Court's intervention gave the jury license to find that even at a lower level of confusion—less than 10%—the jury could treat the survey as probative of a likelihood of confusion:

> THE COURT: Just so that I am clear, so the people who run these kind of surveys, as I understand your testimony, have decided among themselves that the cutoff point is 15 percent, right?
>
> THE WITNESS: Well, I would probably characterize it as partly driven by the experts and partly driven by courts, because, of course, courts have accepted different numbers.
>
> THE COURT: Courts have accepted different numbers, and the question of what the courts have decided is entirely for the Court, not for a witness.
>
> THE WITNESS: Yes. That's my understanding.
>
> THE COURT: So, going back to what is in your domain, what the experts have chosen, so if the cutoff is 15 percent, and you think that, well, even though this – if the study had been done properly that would have been above the cutoff, but you say it's not really as good as a higher figure, then why doesn't that cut the other way? If it's 9 percent, as you calculate, while that's below the cutoff, it is still some confusion, not no confusion. True?
>
> THE WITNESS: Well, my understanding is that courts and experts have taken the position that every survey has some noise in it. And so you are unlikely to get zero purely because of noise. So a 9 percent figure actually could effectively be zero because it's so small it could just be the product of noise.
>
> THE COURT: But in this case, you very helpfully undertook to look at the actual responses so the impact of noise was minimized under your analysis because you got more deeply into the data. Yes?
>
> THE WITNESS: That's fair to say.

Oppenheim Decl., Ex. I at 923:14–924:19. The Court's intervention invited the jury to ignore the entirety of Dr. Neal's testimony, which showed, with evidence virtually unrebutted by Hermès, that at most Dr. Isaacson had found less than 10% confusion, and that additional mistakes the effect of which could not be quantified, but that were serious—*i.e.*, Dr. Isaacson's ambiguous phrasing asking respondents to identify the source of "the items shown on the webpage," which respondents could interpret as asking either about the artwork, or about the real-world handbag that the artwork illustrates—further drove down the level of confusion.

Given how weak the other evidence of confusion was in this case, *see* Section III.A., *supra*, and given how this Court's erroneous intent instruction made First Amendment protection of Mr. Rothschild's artistic speech hinge on whether Mr. Rothschild purposely created confusion, this Court's license to the jury to find a likelihood of confusion based on Dr. Isaacson's flawed survey—a likelihood that they could shoehorn into a finding that Mr. Rothschild *intended* that confusion—was error.

## IV.     THE COURT ERRED IN EXCLUDING DEFENDANT'S EXPERT WITNESS BLAKE GOPNIK.

### A.      The Court Misapplied *Daubert* and *Kumho Tire*.

Federal Rule of Evidence 703 allows experts to base their opinions on the facts or data that the expert believes relevant "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject...." Rule 702 has been interpreted liberally in favor of the admission of expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993). Dr. Gopnik satisfied *Daubert* by relying on the kinds of facts and data on which art experts generally rely, including the aesthetic, conceptual, and representational aspects of the artworks in question and how those works fit into art history and artistic genres. Admissible expert evidence is not limited to "scientific" evidence, however such

evidence might be defined. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–51 (1999).

The *Daubert* reliability inquiry is "a flexible one" and there is no "definitive checklist or test."

*Id.* at 150. When an expert's testimony is not scientific or technical, the reliability of that

testimony need not be based on "a particular methodology or technical framework," but instead

can be found reliable based on the expert's knowledge and experience alone. *See Hangarter v.*

*Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004). For experts like Dr. Gopnik,

whose expertise is not based on experiments or tests, courts focus on two factors: (1) Is the

methodology commonly used? (2) Is the opinion based on sufficient "professional studies or

personal experience"? *Kumho Tire*, 526 U.S. at 150–52 ("[T]here are many different kinds of

experts, and many different kinds of expertise.").

　　"[T]he rejection of expert testimony is the exception rather than the rule," and "the

Second Circuit's standard for admissibility of expert testimony is especially broad." *Clarke v. LR*

*Sys.*, 219 F. Supp. 2d 323, 332 (E.D.N.Y. 2002). Indeed, "[a]lthough expert testimony should be

excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic

and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison,

other contentions that the assumptions are unfounded go to the weight, not the admissibility, of

the testimony." *Grand River Enters. Six Nations, Ltd. v. King*, 783 F. Supp. 2d 516, 526

(S.D.N.Y.2011) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996)).

"The judge should only exclude the evidence if the flaw is large enough that the expert lacks

'good grounds' for his or her conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d

256, 267 (2d Cir. 2002) (quoting *In re Paoli*, 35 F.3d 717, 746 (3d Cir. 1999)).

　　The Court wrongly excluded Dr. Gopnik's testimony even though it had a methodology

appropriate to the field and commonly used therein: historical and comparative, rather than

quantitative. Dr. Gopnik reviewed the history of business art, as critics and audiences have responded to it, and offered his opinion that Mr. Rothschild's work fit comfortably into this tradition, using multiple examples and points of comparison. *See Cohen v. G&M Realty L.P.*, No. 13-CV-05612 (FB) (RLM), 2017 WL 1208416, *3 (E.D.N.Y. March 31, 2017) (art expert admitted despite "some skepticism regarding the cogency of the relevant opinions, not only due to their premises but also their rigor," because it was not "junk science"; expert "used a variety of factors in reaching her conclusion" and "explained in detail which documents were reviewed, relevant industry customs and practices, and the general bases for her opinions. Having done so, the expert and the plaintiffs met the *Daubert* minimum, and any remaining problems with the expert are for the jury to decide.") (cleaned up); *Fahmy v. Jay Z*, No. 2:07-cv-05715-CAS (PJWx), 2015 WL 5680299, at *2-3 (C.D. Cal. Sept. 24, 2015) (admitting expert on popular music to place an individual work in a "larger context"; expert's methodology was informed by "lengthy and detailed analysis of relevant sources such as chart successes, marketing materials, and journalistic and historical evidence"; this methodology "stems from the apparently reasonable assumption that the success of a given work of music can best be understood within its cultural and historical context" and was reliable).

Disputes over methodology are common in every field; the gatekeeping question is whether Dr. Gopnik employed the kind of reasoning and evidence that experts in the field would consider reliable. *See, e.g.*, *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F.Supp.2d 269, 287–88 (S.D.N.Y. 2011) (experts "need not prove beyond a reasonable doubt that their conclusions are correct; they need only establish that they have reasonably applied reliable methods to sufficient facts."). As an Oklahoma Bankruptcy Court explained in *In re Com. Fin. Servs., Inc.*:

> In non-scientific disciplines ... where the use of professional judgment may produce a broad range of acceptable opinions, so long as the expert possesses at least one of the qualifying attributes listed in Rule 702 (specialized knowledge, skill, education, experience or training), has employed a methodology recognized in the profession or by the courts, and can identify the source of the facts and data underlying the opinion (demonstrating a connection of the opinion to the facts of the case), a probing cross-examination and presentation of opposing experts and evidence will permit the fact-finder to judge the soundness of the expert's judgment, as well as the expert's credibility and potential bias, in order to assess how much weight to accord the expert's opinion.

350 B.R. 520, 528–29 (Bankr. N.D. Okla. 2005).

In the context of art, the relevant considerations, which Dr. Gopnik stated throughout his expert report, are grounded in the history and experience of the field, including critics' and audiences' reactions. He appropriately explained the sources on which he relied and why they were relevant to business art. In particular, Dr. Gopnik explained that what counts and doesn't count as "art" often depends on historical and social context and the reaction of key audiences both inside and outside the artworld to particular work that may be proposed as art. He testified in this vein about the source of the recognition of Andy Warhol's early works as art:

> Q. Referring to page 5, paragraph 11 [of Dr. Gopnik's expert report]. The first sentence begins, By the end of the 1960s, Andy Warhol had filled New York galleries with any number of projects that were clearly art. Why were these projects clearly art? …
>
> A. Within the context of that moment, there are expectations about what art might be in that, you know, from let's say 1966, shall we say. There were expectations of what you'd see in an art gallery, and they fulfilled some of those expectations.
>
> Q. You used the passive voice there, "there were expectations." Whose expectations are you referring to?
>
> A. The expectations of the art world at that moment.
>
> Q. And what was the art world at that moment? …
>
> A. That's a very hard question to answer. I'm not sure I know the scope of it. Well, at that moment I'm referring specifically to a sophisticated audience within New York. That's the only people he was speaking to at that moment. So it would

33

be people who went to galleries, talked about art, bought art, wrote about art. He
would have been unknown to many other communities.

Oppenheim Decl., Ex. M at 95:24–97:5.

The definition of "art" is controversial in contemporary philosophy and aesthetic theory.
But the institutionalist view of what makes something art that Dr. Gopnik is advancing—*i.e.*, that
it is the perceptions and expectations of people and institutions making up an "artworld" that
confer on a work the status of a candidate for appreciation as art—is certainly a strand of the
modern understanding. *See, e.g.,* George Dickie, ART AND THE AESTHETIC: AN INSTITUTIONAL
ANALYSIS 34 (Cornell Univ. Press, 1974) ("A work of art in the classificatory sense is (1) an
artifact, (2) a set of the aspects of which has had conferred upon it the status of candidate for
appreciation by some person or persons acting on behalf of a certain social institution (the
artworld).").

Dr. Gopnik's opinions are thus grounded in a recognized methodology. It does not matter
that his field, art history, contains several contending views of how to understand what is and
what is not art. *See Cohen*, No. 13-CV-05612 (FB) (RLM), 2017 WL 1208416, at *2-3 (art
experts are allowed to invoke "iconoclastic and disputable aesthetic theories," which can provide
"a legal basis for the plaintiffs' expert's chosen methodology"; even court's skepticism about
premises and rigor do not merit exclusion where experts used variety of relevant factors to reach
their conclusions; "any remaining problems with the expert are for the jury to decide"); *Baker v.
Buffenbarger*, No. 03-C-5443, 2006 WL 140548, at *5 (N.D. Ill. Jan. 13, 2006) (for non-
scientific expert historian, using a "standardized or generally accepted test" is not required for
reliable methodology; "experience alone may be enough," as expressly contemplated by Rule
702; "courtroom experience is not the relevant inquiry; rather, it is experience in the relevant
field that counts, and [the expert] unquestionably has plenty of that"); *Ke v. Liberty Mut. Ins.*

*Co.*, No. 20-1591, 2021 WL 5203150, at *2 (E.D. Pa. Nov. 9, 2021) (historical qualitative

methodology was reliable; although there was no "testable hypothesis or known error rate,"

"experts need not be scientists or mathematicians."); *see also U.S. v. Arthur*, 51 F.4th 560, 573-

74 (5th Cir. 2022) (expert compared the accused materials to "literature and art that is generally

accepted as having serious artistic or literary value"; testimony should have been admitted

because "[d]etermining whether a work has serious literary or artistic value is not a strictly

scientific inquiry," and the comparative method was sufficiently reliable); *U.S. v. Whorley*, 400

F. Supp. 2d 880, 884-85 (E.D. Va. 2005) (rejecting motion in limine and admitting literature

expert's testimony comparing accused works with "works of literary value"); Fed. R. Evid. 702,

advisory committee notes (recognizing that "[s]ome types of expert testimony will be more

objectively verifiable, and subject to the expectations of falsifiability, peer review, and

publication, than others.").

    **B.**    **The Court's Wrongful Exclusion of Dr. Gopnik Prejudiced Rothschild.**

    Especially in the context of the intent instruction, the exclusion of Dr. Gopnik's

testimony prevented the jury from understanding the larger context of business art—as

subsequent discussions of Andy Warhol, including by the jury foreperson, demonstrated. *See

e.g.*, Oppenheim Decl., Ex. N. Understanding the artistic tradition in which Mr. Rothschild

works would have given the jury guidance on Mr. Rothschild's own reasonable understanding of

his role and conduct and highlighted the need to protect First Amendment interests in artistic

freedom. *See Alcantar v. Foulk*, No. 1:14-cv-00747 LJO MJS (HC), 2016 WL 3001242, at *12

n.17 (E.D. Cal. May 25, 2016) ("There is an important difference between an expert's testimony

that a specific individual possessed a specific intent, and testimony that gives meaning to the

defendant's actions.") (cleaned up). Given that the jury was directed to decide whether Mr.

Rothschild was essentially a conman, Dr. Gopnik's testimony was vital to giving the artistic context in which he worked. That context would provide external referents so that the jury would not be left on its own to decide a swearing contest.

In other, related contexts where art is on trial, excluding testimony by art scholars has been deemed reversible error because contextualizing accused art alongside other, recognized works of art is important for the factfinder. *See*, *e.g.*, *Luke Records v. Navarro*, 960 F.2d 134, 138–139 (11th Cir. 1992) (reversible error to ignore expert testimony that a rap album had serious artistic value); *Yudkin v. State*, 182 A.2d 798 (Md. 1962) (reversible error to exclude experts who would have testified that the book Tropic of Cancer had literary merit); *see also Commonwealth v. United Books, Inc.*, 453 N.E.2d 406, 412 (Mass. 1983) (expert testimony on literary or artistic merit admissible in obscenity case) (quoting *Smith v. California*, 361 U.S. 147, 164–165 (1959) (Frankfurter, J., concurring) ("[T]o exclude such expert testimony is in effect to exclude as irrelevant evidence that goes to the very essence of the defense and therefore to the constitutional safeguards of due process.")).

Finally, this Court's exclusion of Dr. Gopnik was especially harmful in light of its decision to admit Dr. Kominers' testimony. Dr. Gopnik was the key witness needed by Mr. Rothschild to explain how *MetaBirkins* fit into a historical strand of artistic practice—specifically, how artists have referenced brands in their art and the reception of this work within the genre of Business Art. Dr. Gopnik's testimony would have helped the jury understand the difference between an intent to reference artistically versus an intent to confuse. In contrast, Dr. Kominers' testimony tended to blur this crucial distinction. Indeed, this Court was encouraged by Hermès' counsel to misunderstand the point of Dr. Kominers' testimony. This exchange from

36

the trial transcript, where the Court and counsel are discussing whether Dr. Kominers' testimony

should be admitted, is illustrative:

> THE COURT: …We'll work on the exact wording of that later. But I'm not yet
> sure why that doesn't mean that they [i.e., Hermès] can't introduce someone who
> says this is perceived by the consumer as having little or no artistic expression. I
> mean, if that is what that expert says.
>
> MR. MILLSAPS: Your Honor, that expert actually testified at his deposition that
> he can't tell you what is or is not art in the way that the world understands art.
>
> THE COURT: Oh, well, then he joins all the rest of us. No, but that's relevant.
> Let me hear from plaintiff's counsel.
>
> MR. WARSHAVSKY: Your Honor, nothing has changed. … [W]e disagree with
> how Mr. Millsaps just described this expert. This expert is actually explaining that
> the reason for the sale of the MetaBirkins was because, and the reason they
> fetched the prices they did, was because they were assumed to be branded NFTs.
> He was explaining what that means. That has nothing to do with art or not art. So
> this expert is not –
>
> THE COURT: Okay. What you are saying is he's saying the way this was set up,
> the consumer or many consumers would believe that they were purchasing
> whatever it was something produced by Hermès?
>
> MR. WARSHAVSKY: Or a brand. Because trademark you have to think it comes
> from a source. So whether it's associated with Hermès, from Hermès, from
> somebody who is associated with Birkin, they don't necessarily know that
> Hermès makes Birkins, but they think it is a Birkin, it could be any of those
> things. I think the expert is going to drill down to the whole idea. When you talk
> about explicit misleadingness or intent, sometimes we have an insight, but we
> usually do it through indirect evidence.
>
> THE COURT: All right.

Oppenheim Decl., Ex. E at 120:2–121:14. Dr. Kominers was billed to the Court as essentially a

confusion expert; certainly Hermès' counsel did nothing to dispel that incorrect impression. But

the point of Dr. Kominers' testimony was not that consumers would think that *MetaBirkins* were

coming from a brand, but rather that Mr. Rothschild was *using* "MetaBirkins" as a brand—*i.e.*,

by offering utilities characteristic of a "digital brand" NFT—and thus the *MetaBirkins* shouldn't

be considered to be "art-only" NFTs. Of course, Dr. Gopnik would have testified that

Mr. Rothschild's project appears to have been following in the historical practice of business

artists in imitating elements of the brand experience for artistic purposes, and that artists have

provided "utility" to collectors for ages. Dr. Gopnik's testimony would also have helped dispel

the idea that by imitating some elements of the Birkin brand, Mr. Rothschild intended to confuse

rather than pursue an artistic purpose. While Dr. Gopnik could not have testified directly about

Mr. Rothschild's intent, he could have helped the jury assess that intent by placing Mr.

Rothschild's art within the context of its historical forebears.

## V.  NONCOMMERCIAL SPEECH IS NOT ACTIONABLE AS DILUTION

The Court should grant judgment as a matter of law on dilution because the

noncommercial use exception applies. 15 U.S.C. § 1125(c)(3)(C). This Court found as a matter

of law that Mr. Rothschild's use was, at least in part, artistic. *Rothschild*, 2023 WL 1458126, at

*5 (Rakoff, J.). The commercial and noncommercial aspects are inextricably intertwined: the

artistic relevance of the title to the artwork cannot be separated from its commercial elements.

Under those circumstances, Mr. Rothschild cannot be liable for dilution. *See Mattel, Inc. v. MCA

Recs., Inc.*, 296 F.3d 894, 903 (9th Cir. 2002). The noncommercial use exception does not

employ *Rogers* or any other test: it is a pure exclusion of all speech that qualifies as

noncommercial, that is, non-advertising (such as artistic) speech that does more than propose a

commercial transaction. 15 U.S.C. § 1125(c)(3)(C); *see* Lee Ann W. Lockridge, *When Is A Use

in Commerce a Noncommercial Use?*, 37 Fla. St. U. L. Rev. 337 (2010) (examining text,

structure, and history of provision).

VI.   **THE SUPREME COURT'S HOLDING IN *DASTAR* DIRECTS THAT ROTHSCHILD'S *METABIRKINS* ARTWORKS ARE BEYOND THE SCOPE OF THE LANHAM ACT**

Hermès' claim in this case is about confusion regarding the source of the *MetaBirkins* NFTs, which the Court defined as "the NFTs and their associated digital images of fur-covered Birkin bags." Oppenheim Decl., Ex. A at 14. As the Court instructed the jury, "Hermès contends that Mr. Rothschild's use of the Birkin name and/or the handbag's distinct visual appearance is likely to confuse potential consumers into thinking that the MetaBirkins NFTs are made and sold or otherwise connected with, associated with, sponsored by or approved by Hermès." *Id.* at 15.

Mr. Rothschild is entitled to judgment as a matter of law on that claim because it is barred by the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, which unambiguously holds that only misrepresentations of the origin of tangible goods are actionable under the Lanham Act. 539 U.S. 23, 37 (2003). Other sorts of misrepresentations, including but not limited to misrepresentations of the origin of intangible images like the *MetaBirkins* artworks, are not actionable. *See id.* (holding that "origin of goods" as used in the Lanham Act refers only to "the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods").

No reasonable jury could have found Hermès' claims to relate to any tangible goods—the artworks are indisputably intangible works of art, and as the Court found, the NFTs are inseparable from the artworks. *Rothschild*, 2023 WL 1458126, at *5 (Rakoff, J.) ("[U]ndisputed evidence in the record indicates that consumers did in fact understand themselves to be purchasing exclusive ownership of the digital image alongside the NFT."). Any confusion regarding source, sponsorship, or affiliation of the *MetaBirkins* NFTs could only be attributable to the content and title of the intangible *MetaBirkins* artworks, or references to the name of that

39

art project. *See Phoenix Entm't Partners, LLC v. Rumsey*, 829 F.3d 817, 829 (7th Cir. 2016)

(rejecting plaintiff's claim of confusion over origin of digital copies of karaoke tracks based on

use of plaintiff's registered mark in the content of the copies; any confusion was "not about the

source of the tangible good sold in the marketplace"); *see also Phoenix Entm't Partners v. J-V

Successors, Inc.*, 305 F. Supp. 3d 540 (S.D.N.Y. 2018) (adopting the reasoning of *Rumsey*);

*Pulse Entm't Corp. v. David*, No. CV 14-4732 (C.D. Cal. Sept. 17, 2014) Dkt. #19 (*Dastar*

barred false designation of origin claim based on explicit misattribution to wrong creator;

hologram was creative work, like a cartoon).

## VII.   HERMÈS' CYBERSQUATTING CLAIM IS UNSUPPORTED BY EVIDENCE AND INCONSISTENT WITH THE FIRST AMENDMENT

Finally, this Court should rule that Hermès' cybersquatting claim fails as a matter of law.

Hermès' cybersquatting claims should fail under *Rogers* for the same reason as Hermès'

trademark infringement and dilution claims: none of these claims should succeed against

Mr. Rothschild's protected artistic speech. Moreover, there is no evidence in this case to support

a reasonable jury finding that Mr. Rothschild has engaged in any of the sort of conduct typically

associated with valid cybersquatting claims. There is no evidence that Mr. Rothschild was trying

to divert anyone from Hermès' own online location (especially since Hermès doesn't sell Birkin

bags online and appears not to own, let alone use, birkin.com or birkins.com). There is no

evidence that Mr. Rothschild ever sought to be paid to relinquish the metabirkins.com website.

And there is no evidence that Mr. Rothschild ever used or contemplated using the

metabirkins.com website for any purpose other than to promote the *MetaBirkins* artworks. In

short, Mr. Rothschild had reasonable grounds to believe that the use of this domain name was

lawful because he reasonably believed he was acting within his legal rights under the First

Amendment in promoting his artwork on a website bearing the title of that artwork.

Dated: March 14, 2023
      New York, New York

Respectfully Submitted,

 /s/ *Rhett O. Millsaps II*    
Christopher J. Sprigman
Rhett O. Millsaps II
Rebecca Tushnet
Mark P. McKenna (*pro hac vice*)
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
(646) 898-2055
rhett@lex-lumina.com

Jonathan Harris
Adam Oppenheim
Ashley Robinson
HARRIS ST. LAURENT & WECHSLER LLP
40 Wall Street, 53rd Floor
New York, NY 10005
jon@hs-law.com
(212) 397-3370

*Attorneys for Defendant Mason Rothschild*