# EXHIBIT B

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   HERMÈS INTERNATIONAL, et al.,

 4                Plaintiffs,

 5           v.                                22 Civ. 384 (JSR)

 6   MASON ROTHSCHILD,

 7                Defendant.           Trial

 8   ------------------------------x
                                              New York, N.Y.
 9                                            February 3, 2023
                                              9:35 a.m.
10
     Before:
11
                        HON. JED S. RAKOFF,
12
                                              District Judge
13                                             -and a Jury-

14

15                          APPEARANCES

16   BAKER & HOSTETLER LLP
          Attorneys for Plaintiffs
17   BY:  DEBORAH A. WILCOX
          OREN J. WARSHAVSKY
18        GERALD J. FERGUSON

19   HARRIS ST. LAURENT & WECHSLER LLP
          Attorneys for Defendant
20   BY:  ADAM B. OPPENHEIM
          JONATHAN A. HARRIS
21
     LEX LUMINA PLLC
22        Attorneys for Defendant
     BY:  RHETT O. MILLSAPS, II
23        CHRISTOPHER SPRIGMAN

24

25
```

1               THE WITNESS:  If I can just add one more response to
2    that question.
3               People could have said more than one category in
4    response -- in answering question 1.  So it's possible that
5    someone might -- that people gave -- in fact, a number of
6    people gave responses where they would have been counted in
7    multiple rows across that table.
8               THE COURT:  Go ahead, counsel.
9               MS. WILCOX:  Could we please turn to slide 19.
10   Q.   And describe for us what this chart shows, Dr. Isaacson.
11   A.   Sure.
12              This is counting the number of people who said Hermès
13   or Birkin in question 1, in question 4, and in question 7.  And
14   as I just mentioned, they might have said Hermès or Birkin and
15   said other things, they might have said Vogue, they might have
16   said Meta, they might have given a response that would have
17   fallen into another category as well; and, in fact, a number of
18   people did that.
19              But the survey, again, is designed to measure
20   confusion between metabirkins.com and Hermès or Birkin.  And
21   counting that level -- that type of confusion, in response to
22   question 1 we have 17.5 percent for the test and 1.9 percent
23   for the control.  We have, in response to question 4, an
24   additional 4.1 percent and one percent.  And then zero percent
25   in response to question 7.  And when you add up down the

1  column, you get to 21.6 percent for the test web page, and 2.9
2  percent for the control web page.  And there's a number there
3  that says net confusion.  And net confusion is simply the
4  difference if you subtract the control from the test, and the
5  difference is 18.7 percent.  That's the net confusion for this
6  web page with respect to Hermès or Birkin.
7  Q.  What does that net confusion percentage of 18.7 percent
8  tell you?
9  A.  That tells me the amount of confusion associated with the
10 use of the Birkin name, the use of the Hermès name, and the use
11 of the shape of that handbag.  And that number is of a
12 magnitude, of a size that I would typically interpret as
13 meaning that there's a substantial likelihood of confusion.
14 Q.  Why do you conclude that this means there's a substantial
15 likelihood of confusion?
16 A.  Because the number is big enough that I and, in my
17 experience, others would typically interpret this as meaning
18 that there's a substantial likelihood of confusion.
19 Q.  And when you say "others," who are you referring to?
20 A.  Other survey experts and other surveys that I've seen
21 evaluated.
22 Q.  Dr. Isaacson, you just told us about the survey of the NFT
23 purchasers you interviewed.  Was there any other group that you
24 also interviewed?
25 A.  Yes, I also conducted a survey among handbag purchasers.

1 the MetaBirkins NFTs?
2 A. Yes.
3 Q. And how does the press typically contact you?
4 A. Typically by e-mail.
5 Q. Did any press reach out to you about the MetaBirkins NFTs
6 after you heard about it from Mr. Malachi in November 2021?
7 A. Yes.
8 Q. Which press or media reached out to you?
9 A. The first media that reach out was Financial Times and two
10 or three days later was Business of Fashion.
11 Q. I would like to show the witness, the court and defense
12 counsel for identification Plaintiff's Exhibit 48.
13          Have you seen this document before?
14 A. Yes.
15 Q. If we can show the witness both pages of the document,
16 please.
17          Did you receive this e-mail at the time?
18 A. Yes.
19          MR. WARSHAVSKY:  OK.  Plaintiffs would offer this into
20 evidence, your Honor.
21          MR. HARRIS:  Your Honor, objection, hearsay.
22          MR. WARSHAVSKY:  Your Honor, can I respond to that?
23          THE COURT:  Well, I'm still looking at the exhibit.
24          MR. WARSHAVSKY:  All right.
25          THE COURT:  All right.  What's your response?

1     MR. WARSHAVSKY:  This isn't being offered for truth,
2  your Honor, it's just to tee up the fact that the request was
3  made.
4     THE COURT:  No, I think this is not like other
5  situations we've had.  I think this is filled with statements
6  that would be taken for their truth even if the jury was
7  instructed otherwise.  I don't see much other relevance to it.
8     Sustained.
9  BY MR. WARSHAVSKY:
10 Q.  OK.  Do you remember who from the Financial Times e-mailed
11 Hermès?
12 A.  Yes.  Cristina Criddle, the reporter from the Financial
13 Times.
14 Q.  And who did Cristina Criddle send an e-mail to?
15 A.  She send it to Karen, the deputy director of communication
16 at Hermès.
17 Q.  Does Hermès ordinarily respond to these types of inquiries?
18 A.  No.  We don't usually answer to this kind of e-mail because
19 the communication department is pretty discrete, and we don't
20 usually comment what is in the press that is not directly
21 linked to Hermès activity.
22 Q.  Did Hermès respond to this inquiry from the Financial
23 Times?
24 A.  Yes.
25 Q.  Do you remember what the response was?

1   A.  Yes.  So we answered to the journalist that, no, Hermès
2   hadn't authorized any -- the creation or commercialization of
3   MetaBirkins, that there was no connection between Hermès and
4   the MetaBirkins and Mr. Rothschild, and that this was an
5   example of fake Hermès product.
6   Q.  Why did Hermès decide to respond to Ms. Criddle?
7   A.  Because we believed it was important to not leave room for
8   the misunderstanding we were observing and to clear up any
9   beliefs of a possible relationship or partnership between
10  Hermès and MetaBirkins and to avoid any confusion or
11  misunderstanding for the readers and the consumers linked to
12  possible belief in a partnership.
13  Q.  And did the fact that the communication or the request was
14  coming from the Financial Times factor into the decision to
15  respond?
16  A.  Yes.
17  Q.  How so?
18  A.  Because Financial Times has a broad scope and address broad
19  important number of readers as a broad audience, so we believed
20  it was a way to address a really wide net of people.
21  Q.  And do you know whether an article was eventually published
22  in the Financial Times?
23  A.  Yes.
24  Q.  All right.  And do you remember when that happened?
25  A.  December 10, 2021.

1  Q.  Did the Financial Times include the statement from
2  Hermès --
3  A.  Yes.
4  Q.  -- to your recollection?
5          Did Hermès receive other inquiries?
6          I think you said Hermès received another inquiry
7  around the same time?
8  A.  Yes, two days later, Business of Fashion.
9          MR. WARSHAVSKY:  OK.  Given the court's prior ruling,
10 I'm not going to ...
11 Q.  How did you receive --
12         THE COURT:  That seems very shrewd on your part.
13         MR. WARSHAVSKY:  I try to evolve.
14 Q.  Do you remember how you were contacted by Business of
15 Fashion?
16 A.  By e-mail.
17 Q.  Do you remember the name of the individual who e-mailed
18 you?
19 A.  Marc Bain.
20 Q.  And do you remember what, if anything, Mr. Bain was asking
21 Hermès to comment on?
22 A.  Yes.  Mr. Bain wanted to know if there was a connection
23 between us and the -- and Mr. Rothschild on the project.
24 Q.  Did Hermès respond to Mr. Bain?
25 A.  No.

1  Q.  What are the -- you spoke a little bit earlier about
2  important fashion magazines.
3        What are the most important fashion magazines from
4  Hermès' perspective?
5  A.  So fashion, I would say Vogue, Elle, Harper's Bazaar, and
6  L'Officiel.  And then business fashion, I would say Women's
7  Wear Daily and Business of Fashion.  And then the luxury and
8  fashion sections of Financial Times and *New York Times* for
9  sure.
10 Q.  After the Financial Times article was published, did other
11 press sources, to your knowledge, did other press continue to
12 publish articles about an association or possible association
13 between the MetaBirkins and Hermès?
14 A.  Yes.
15 Q.  Can you give some examples of the publications you're aware
16 of?
17 A.  Elle, L'Officiel, New York Post, and Challenges.
18 Q.  I would like to turn to Plaintiff's Exhibit 380 which has
19 been accepted and publish that for the jury.
20       Is this the Elle article you were referring to?
21 A.  Yes.
22 Q.  And when did you first see it?
23 A.  December 2021.
24 Q.  Do you know the full title of the article?
25 A.  Birkin NFT:  Everything you need to know about the handbag

1   of the future. Birkins for the digital age?
2   Q.  Do you know whether this was always the title of the Elle
3   article?
4   A.  No, it wasn't.
5   Q.  OK. The title, do you know -- was the title corrected from
6   something else?
7   A.  Yes.
8   Q.  And how do you know that the title was corrected?
9   A.  Because part of the monitoring was on Google, and when we
10  Googled Hermès NFT, we found another title for the Elle
11  article.
12             MR. WARSHAVSKY:  OK. And if we can turn to
13  Plaintiff's Exhibit 45. Again, this was previously admitted,
14  so it can be published.
15  Q.  Can you tell us what this document is?
16  A.  It's a Google research of the two keywords Hermès and NFT.
17  Q.  Is this a search that you did?
18  A.  Yes.
19  Q.  And when did you do it?
20  A.  Last week on the 26 of January.
21  Q.  And where were you doing the search from?
22  A.  New York.
23  Q.  And what about this search caught your eye?
24  A.  So the second title is the Elle article, and the title is
25  Hermès Goes Virtual with Launch of Birkin Bags as NFTs.

1  the U.S., it's 50 million unique monthly readers.  And in the
2  U.S., Instagram, Facebook, I would say 12 million followers.
3  Q.  And the first number, I'm sorry, did you say 50, five zero,
4  or one five?
5  A.  50 million monthly unique visitors for *Elle.com* and
6  12 million followers for Elle USA Instagram and Facebook.
7  Q.  If we can turn to Plaintiff's Exhibit 253, which has
8  already been admitted.
9          Can you tell me what this document is?
10 A.  It's an article from the New York Post.
11 Q.  OK.  If we can turn to -- do you know the date of the
12 article?
13 A.  January 8, 2022.
14 Q.  If we could turn to page eight of the article, please.  If
15 you can read the caption below the images.
16 A.  The VR-only MetaBirkin bag, a Digital Version of the Hermès
17 fave, can sell for tens of thousands of dollars.
18 Q.  And do you know what the two images shown are, if we could
19 see that?
20 A.  Yes, two MetaBirkins.
21 Q.  And just to be clear, I think the jury knows, but does
22 Hermès make a VR bag?
23 A.  No.
24 Q.  OK.  If we could turn to the next page, page nine.
25          And do you see this statement?

1   A.   Even Hermès, the company responsible for the ridiculously
2   expensive Birkin bag, has entered the metaverse.  On December
3   17, the company unveiled the MetaBirkin -- a VR version of its
4   signature bag, created by LA artist, Mason Rothschild, and made
5   just for 100 of them.
6   Q.   And, once again, as part of your -- does the Hermès team
7   know how much -- what the -- I'm trying to use the words you
8   used before -- the commercial impressions are for the New York
9   Post?
10  A.   Yes.  Its unique monthly visitors is 71 million.
11  Q.   71 million unique visitors a month?
12  A.   Yeah, and --
13            THE COURT:  All of whom, I assume, are fashionistas.
14            MR. WARSHAVSKY:  Sports fans, too.
15  Q.   OK.  I want to turn to Plaintiff's 254, which has also been
16  admitted.
17            Have you seen this document before?
18  A.   Yes.
19  Q.   OK.  Can you tell us what this is?
20  A.   It's an article from Challenges.
21  Q.   OK.  And is Challenges one of the names you said before?
22  A.   Yes.
23  Q.   And do you see the date, do you know the date of the
24  article?
25  A.   It's 23 of May, 2022.

1  Q.  OK.  And so this was clearly after Hermès' statement to the
2  Financial Times, is that correct?
3  A.  Yes.
4  Q.  And the New York Post article we saw, that came out after
5  the Hermès' statement to the *New York Times*, is that correct?
6  A.  Yes.
7  Q.  And the Elle article we saw, did that come out after
8  Hermès' statement to the Financial Times?
9  A.  Yes.
10 Q.  If we can you go down to the first paragraph, and can you,
11 here -- can you read the part in bold?
12 A.  So, yeah.
13 Q.  Starting with even Hermès.
14 A.  Even Hermès, which unveils virtual bags under the name
15 MetaBirkin, then there is an erratum.
16 Q.  Do you know how Challenges got that erratum?
17 A.  Yes.
18 Q.  How did Challenges become aware of that?
19 A.  We asked for a correction.
20 Q.  OK.  Are you aware of other examples of confusion or other
21 statements affiliating Hermès with MetaBirkins?
22 A.  As I say, the monitoring is France mostly.  So considering
23 those article, I -- I think, yeah, there are other articles in
24 the press, especially globally.
25 Q.  All right.  Is it possible for Hermès to monitor every

1            Let me give a copy to our court reporter.  I know she
2   wants and autographed copy.  We'll just give her a plain copy
3   and a copy to my law clerk as well.
4            With respect to the general instructions which are
5   pretty much my normal Instructions One through Eight, any
6   objections or additions to those instructions?
7            I'll ask that first of plaintiff's counsel and then of
8   defense counsel.
9            MR. WARSHAVSKY:  No.  We had none, your Honor.
10           THE COURT:  OK.  Defense counsel?
11           MR. SPRIGMAN:  We have none, also, your Honor.
12           THE COURT:  Very good.
13           Now we get to more difficult matters.  With respect
14  to -- and the way I set this up, as you can see, I first said
15  that -- putting aside the First Amendment issues, we don't even
16  get there if they hasn't established confusion and so forth for
17  infringement, so we have that first.  Then we say, even if they
18  show that, we still lose if they haven't proven there is no
19  First Amendment.
20           I think I would reword the title of the 14th
21  instruction, which is now First Amendment defense, to First
22  Amendment protection.  I think that's to make clear that the
23  burden remains with the plaintiff at all times.
24           But now, taking these instructions one at a time, any
25  objection to instruction number nine from the plaintiffs?