# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

HERMÈS INTERNATIONAL and
HERMÈS OF PARIS, INC.,

                Plaintiffs,

      -against-

MASON ROTHSCHILD,

             Defendant.

CIVIL ACTION NO.

22-CV-00384 (JSR)

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION</u>

**BAKER & HOSTETLER LLP**

Gerald J. Ferguson, Esq.
Oren J. Warshavsky, Esq.
Jason S. Oliver, Esq.
Jessica H. Fernandez, Esq.
Francesca A. Rogo, Esq.
45 Rockefeller Plaza, 14th Floor
New York, NY 10111
Telephone:  212.589.4200
Facsimile:    212.589.4201

Deborah A. Wilcox, Esq. (*pro hac vice*)
Key Tower
127 Public Square
Cleveland, OH 44114
Telephone:  216.621.0200

Lisa Bollinger Gehman, Esq. (*pro hac vice*)
1735 Market Street
Philadelphia, PA 19103
Telephone:  215.568.3100

# TABLE OF CONTENTS

                                                                                                        **Page**

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND...................................................................2

    I.    The Verdict and Final Judgment............................................................................2

    II.   Trial Evidence and Jury Findings Relevant to this Motion ...................................2

        A.    Value of the BIRKIN Marks........................................................................2

        B.    Rothschild Sells and Promotes the METABIRKINS NFTs Without
            Hermès's Authorization, Causing Confusion ..............................................3

        C.    Rothschild's Credibility Was Impeached .....................................................5

        D.    Based on Rothschild's Infringing Conduct, Private
            Communications, and False Statements Made Under Oath, the Jury
            Found That Rothschild Intentionally Misled Potential Consumers............7

        E.    Rothschild's METABIRKINS NFTs interfered—and still
            interfere—with Hermès's NFT plans............................................................9

    III.   Rothschild And His Counsel Continue To Promote METABIRKINS
         NFTs Post-Verdict ..............................................................................................10

ARGUMENT ............................................................................................................................12

    I.    Legal Standard for Permanent Injunction ...........................................................12

    II.   Hermès Satisfies All Four Requirements for a Permanent Injunction..................12

        A.    Rothschild's Conduct Creates Irreparable Harm to Hermès......................12

        B.    Money Damages Are Inadequate to Compensate Hermès for the
            Irreparable Harm It Has Suffered and Is Suffering....................................14

        C.    The Balancing of the Hardships Weighs in Favor of Granting an
            Injunction ...................................................................................................16

        D.    Public Interest Concerns Weigh in Favor of Granting an Injunction ........17

    III.   The Relief Sought Should Be Granted..................................................................18

        A.    Rothschild Should Be Enjoined from Using the BIRKIN Marks Or
            Otherwise Misleading the Public ...............................................................18

B.  Rothschild Should Transfer the <METABIRKINS.com> Domain Name, Any ENS Domains and Social Media Accounts Containing the BIRKIN Mark to Hermès ..................................................... 19

C.  Rothschild Should Transfer any METABIRKINS NFTs in His Possession and the METABIRKINS NFTs Smart Contract ..................... 20

D.  Rothschild Should Notify Hermès of and Transfer Any Income Received from METABIRKINS NFTs ....................................................... 21

E.  Rothschild Should Notify Persons of the Relief Described in the Order .................................................................................................... 22

F.  Rothschild Should File a Declaration Stating He Has Complied with the Order .............................................................................. 23

G.  Rothschild Should Preserve Documents That Relate to This Lawsuit ................................................................................................. 23

H.  Hermès Voluntarily Undertakes to Maintain Materials Pending Resolution of Post-Trial Motions or Appeal ............................................... 24

CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beautybank, Inc. v. Harvey Prince LLP*,
    No. 10 CIV. 955 (KPF), 2014 WL 11429027 (S.D.N.Y. Apr. 22, 2014)..........................18, 20

*Casestry, LLC v. Caseful, LLC*,
    No. 6:19-CV-1255 (FJS/ML), 2020 WL 8673981 (N.D.N.Y. July 7, 2020) ..........................20

*Coach, Inc. v. O'Brien*,
    No. 10 CIV 6071 JPO JLC, 2011 WL 6122265 (S.D.N.Y. Nov. 28, 2011)............................15

*Diesel S.P.A. v. Does*,
    No. 14-CV-4592 (KMW), 2016 WL 96171 (S.D.N.Y. Jan. 8, 2016) ....................................20

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)..............................................................................................................12, 13

*Furnished Quarters, LLC v. Wright*,
    No. 3:12-CV-01163-VLB, 2013 WL 12290835 (D. Conn. Apr. 26, 2013) ............................23

*Gap, Inc. v. G.A.P Adventures Inc.*,
    No. 07 CIV. 9614 (AKH), 2011 WL 13262980 (S.D.N.Y. Aug. 24, 2011)............................24

*Gucci Am., Inc. v. Guess?, Inc.*,
    868 F. Supp. 2d 207 (S.D.N.Y. 2012)...................................................................................13

*Ideavillage Prod. Corp. v. Liuzhou Weimao Mobile Accessory Co.*,
    No. 20 CV 4997-LTS, 2021 WL 3621788 (S.D.N.Y. Aug. 16, 2021) ...................................19

*Int'l Council of Shopping Centers, Inc. v. Glob. Infotech LLC*,
    No. 18-CV-8856 (AJN), 2019 WL 2004096 (S.D.N.Y. May 7, 2019) ............................14, 16

*Kaisha v. Wholesale*,
    No. 17-CV-9419 (ALC), 2018 WL 11226749 (S.D.N.Y. Sept. 28, 2018)..............................17

*Kelly Toys Holdings, LLC v. alialialiLL Store*,
    606 F. Supp. 3d 32 (S.D.N.Y. 2022).....................................................................................12

*Mattel, Inc. v. www.fisher-price.online*,
    No. 21-CV-9608 (LJL), 2022 WL 2801022 (S.D.N.Y. July 18, 2022)............................19, 23

*N.Y.C. Triathlon, LLC v. v. NYC Triathlon Club, Inc.*,
    704 F. Supp. 2d 305 (S.D.N.Y. 2010)...............................................................................16, 17

*NES Baseball & Softball Facility, Inc. v. Ne. Angels Softball, LLC*,
No. 22-CV-9158 (NSR), 2022 WL 17370117 (S.D.N.Y. Dec. 2, 2022) ...............................17

*optionsXpress, Inc. v. optionsXpress Inc.*,
No. 14-CV-956 PKC, 2014 WL 3728637 (S.D.N.Y. July 28, 2014) .....................................12

*S. California Darts Ass'n v. Zaffina*,
762 F.3d 921 (9th Cir. 2014) ...........................................................................................24

*Samsonite IP Holdings S.ar.l. v. Shenzhen Liangyiyou E-Com. Co.*,
No. 19CV02564 (PGG) (DF), 2021 WL 9036273 (S.D.N.Y. Apr. 27, 2021).................21, 22

*Tecnimed SRL v. Kidz-Med, Inc.*,
763 F. Supp. 2d 395 (S.D.N.Y. 2011), *aff'd*, 462 F. App'x 31 (2d Cir. 2012).......................22

*U.S.A. Famous Original Ray's Licensing Corp. v. Famous Ray's Pizza Buffet Inc.*,
No. 12 CIV. 8753 JGK GWG, 2013 WL 5363777(S.D.N.Y. Sept. 26, 2013),
*report and recommendation adopted*, No. 12 CIV. 8753 JGK, 2013 WL
5664058 (S.D.N.Y. Oct. 17, 2013) ....................................................................................18

*Warner Bros. Entm't Inc. v. RDR Books*,
575 F. Supp. 2d 513 (S.D.N.Y. 2008).................................................................................15

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012) .............................................................16

**Statutes**

15 U.S.C. § 1118.......................................................................................................................20

15 U.S.C. § 1116.......................................................................................................................12

15 U.S.C. § 1116(a)...................................................................................................................12

15 U.S.C. § 1117.......................................................................................................................21

15 U.S.C. § 1125(c)(1)..............................................................................................................12

15 U.S.C. § 1125(d)(1)(C).........................................................................................................19

**Rules**

Fed. R. of Civ. P. 65(d)(2) ......................................................................................................18

**Other Authorities**

5 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:1
(5th ed. June 2022)...............................................................................................................12

Plaintiffs Hermès International and Hermès of Paris, Inc. (collectively, "Hermès") respectfully submit this memorandum of law in support of their motion for permanent injunction against defendant Mason Rothschild ("Rothschild"), a/k/a Sonny Estival.

## PRELIMINARY STATEMENT

It is now established Rothschild's "use of the Birkin mark was not just likely to confuse potential consumers but was intentionally designed to mislead potential consumers into believing that Hermès was associated with Mr. Rothschild's MetaBirkins project. In other words, . . . Hermès prove[d] that Mr. Rothschild actually intended to confuse potential customers . . . ." (The Ct.'s Instr. of Law to the Jury at 21, ECF No. 143). The Jury concluded that Rothschild engaged in trademark infringement, trademark dilution, and cybersquatting. Everyone witnessing the trial saw that Rothschild's relationship with the truth is a rocky one, and even his counsel acknowledged that he is less than candid.

Rather than treating the Jury Verdict as a final adjudication, Rothschild has continued acting as he has since November 2021—brazenly violating Hermès's intellectual property rights. Rothschild continues to promote the sale of infringing METABIRKINS NFTs while also seeking to collect a royalty for these sales. Shortly after the verdict was rendered, Rothschild promoted the METABIRKINS Instagram account on several occasions, retweeted from the METABIRKINS Twitter account, and posted tweets and articles on his METABIRKINS Discord server. Rothschild's counsel and expert started a publicity campaign challenging the findings and rulings in this case and arguing that the METABIRKINS NFTs did not infringe Hermès's trademark rights. METABIRKINS NFTs remain for sale on the LooksRare marketplace, where Rothschild maintains a 7.5% royalty for all sales. With his website and social media still intact, Rothschild continues to drive traffic to the METABIRKINS NFTs storefront on LooksRare through links on his METABIRKINS website, Twitter, and Instagram pages.

Rothschild will continue infringing; he has shown that he cannot be trusted. As the prevailing party in a trademark infringement suit, Hermès has the right to seek an injunction. Here, Hermès has no choice but to seek a permanent injunction. Hermès's request for injunctive relief is narrowly tailored and should be granted in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   THE VERDICT AND FINAL JUDGMENT

On February 8, 2023, after a six-day trial, a jury unanimously found Rothschild liable on Hermès's claims for trademark infringement, trademark dilution, and cybersquatting. (Verdict, ECF No. 144.) Having found Rothschild liable on all claims, the Jury further found that First Amendment protection did not bar liability. (*Id.*) The Jury unanimously awarded Hermès damages in the total amount of $133,000. (*Id.*) On February 14, 2023, the Court entered final judgment in favor of Hermès. (Final J., ECF No. 145.)

### II.   TRIAL EVIDENCE AND JURY FINDINGS RELEVANT TO THIS MOTION

#### A.   VALUE OF THE BIRKIN MARKS

There was no dispute at trial that the BIRKIN trademark and design mark (the "BIRKIN Marks")—and the goodwill associated therewith—is an extremely valuable asset. The BIRKIN handbag has become one of Hermès's most iconic products, if not its most iconic product. Jessica H. Fernandez's Declaration ("Fernandez Decl."), Ex. 1 at 154:23–155:11. Hermès owns significant trademark rights in its BIRKIN handbags, including a U.S. trademark registration that covers the word "BIRKIN" and the trade dress of the BIRKIN handbag. *Id.*, Exs. 2–3. As Hermès's CEO Robert Chavez testified, the BIRKIN trademark is "really invaluable to us" because "it's our most well-known and recognizable product." *Id.*, Ex. 4 at 11:11–14, 48:19–24. Mr. Chavez further testified that the BIRKIN handbags, which are comprised of the BIRKIN trade dress, are recognizable "[b]ecause of all the publicity, attention, media that's been given to the bag over the

many many decades, people recognize the bag from a distance. They recognize it in photographs. They recognize it on the street. It's just a very highly recognizable handbag." *Id.* at 48:25–49:8. Mr. Chavez also testified that Hermès spends "millions of dollars a year in advertising" including advertising the BIRKIN handbag. *Id.* at 72:22–73:4. When asked "[w]hat is the value of intellectual property to Hermès," Nicolas Martin, Hermès's general counsel, testified "intellectual property rights are very important for Hermès." *Id.*, Ex. 1 at 147:4–5, 151:12–14. Mr. Martin testified that Hermès considers its trademarks to be "one of [its] main assets." *Id.* at 151:15–16. The BIRKIN trademark is "invaluable." *Id.* at 151:17–152:1.

## B. ROTHSCHILD SELLS AND PROMOTES THE METABIRKINS NFTS WITHOUT HERMÈS'S AUTHORIZATION, CAUSING CONFUSION

Hermès brought this action because Rothschild was capitalizing on the very substantial goodwill of Hermès's BIRKIN trademarks. (Am. Compl., ECF No. 24.) Starting in November 2021, Rothschild promoted and sold NFTs under the name "METABIRKINS" with the goal to create a digital commodity. Fernandez Decl., Ex. 5 at 2; Ex. 6. Rothschild did so without Hermès's authorization. *Id.*, Ex. 7. The images linked to the METABIRKINS NFTs appropriate the design elements of the trade dress covering Hermès's BIRKIN handbags. *Id.*, Exs. 3, 8. Rothschild admitted that the METABIRKINS NFTs were meant as a reference to Hermès's BIRKIN handbags. *Id.*, Ex. 9 at 544:1–4. Rothschild divulged his intent by telling his business partners that, he does not "think people realize how much you can get away in art by saying 'in the style of.'" *Id.*, Ex. 10 at 26.

Rothschild sold the METABIRKINS NFTs through NFT marketplaces and promoted them through various social media channels, including the METABIRKINS Twitter and Instagram accounts, a METABIRKINS Discord server, a METABIRKINS website, and with METABIRKINS hashtags. *Id.*, Ex. 6; Ex. 11 at 407:21–408:6, 422:9–19, 423:6–11, 423:23–424:9,

426:11–20, 437:1–14; Exs. 12–13. In addition to improperly using the BIRKIN name and design marks, Rothschild further misled consumers into believing there was an association with Hermès by promising METABIRKINS purchasers an NFT of a horse charm that was copied from the Hermès Rodeo horse charm. *Id.*, Ex. 14 at 4, 9; Ex. 15.

Rothschild deceived friends and business associates concerning a potential collaboration with Hermès. As early as October 19, 2021, Rothschild falsely told Mark Berden, the creator of the images here, that Hermès might "help" with the METABIRKINS NFTs project. *Id.*, Ex. 16 at 5. A few days later, Rothschild misled a childhood friend and former business associate that "Hermes might partner [with him] with this" and that he was "[n]egotiating r[ight] n[ow]." *Id.*, Ex. 17 at 4. On October 28, 2021, a potential business associate, with whom Rothschild was looking to collaborate, asked Rothschild if "it's official with birkin?" to which Rothschild falsely responded, "Pushing for it." *Id.*, Ex. 18 at 4. Rothschild also dishonestly claimed to have people reaching out to Hermès, such as "different writers" at *Vogue*, whose names he could not remember, and a certain Mason Howell at Sotheby's who reached out to Rothschild. *Id.*, Ex. 9 at 515:2–13, 516:19–517:9; Ex. 10 at 47; Ex. 19 at 8. He also texted Lauren, a business associate at Basic Space, that he was going to be speaking to Hermès on December 7, 2021. *Id.*, Ex. 20 at 11. Rothschild testified that Mr. Clement Kwan, a fashion industry executive, would be speaking to his contact at "the New York PR department" of Hermès. *Id.*, Ex. 9 at 512:15–513:10. Yet, Hermès's associate Director of Corporate Communication testified she had never even heard of Mr. Kwan. *Id.*, Ex. 21 at 780:20–23; 795:4–6.

Substantial consumer confusion ensued. Rothschild admitted to the actual consumer confusion. After the seeds of confusion were sewn and after Hermès objected, Rothschild texted friends that: "to shed confusion between the Hermes Birkin and it's SUCCESSOR . . . [Rothschild]

4

made the decision to separate [METABIRKINS] from the old and make [them] known as the new 'MetaFurkins.'" *Id.*, Ex. 22 at 1. Various articles showed members of the press—including from *L'Officiel*, *Elle*, *New York Post*, and *Challenges*—were actually confused into believing Hermès was associated with the METABIRKINS NFTs. *Id.*, Ex. 21 at 789:1–794:24; Exs. 23–26. Rothschild admitted to such confusion in the media during a conversation with investors, stating "the word around the media world is that this is a press stunt by Herm[è]s and [I'm] like paid by Herm[è]s." *Id.*, Ex. 27. He also texted his business partners that "[L'Officiel] thought [that the MetaBirkins] was an official [H]erm[è]s thing." *Id.*, Ex. 22 at 13. He also claimed that he and his publicist, Kenneth Loo, were in communication with others as well. *Id.*, Ex. 11 at 303:25–304:5.

Some comments on Rothschild's social media showed that potential purchasers were confused, and a social media user commented that she was "scammed" by Rothschild because she thought she was getting a real purse. *Id.*, Ex. 28 at 8–9; Ex. 29 at 347–348. Dr. Bruce Isaacson, who has presented survey evidence in over 70 Lanham Act disputes, conducted a consumer survey and found that the net confusion among NFT purchasers was 18.7%. *Id.*, Ex. 21 at 734:20–23; Ex. 30 at 19. Based on this finding, he concluded there was a substantial likelihood of confusion. *Id.* at 757:7–13.

## C.    ROTHSCHILD'S CREDIBILITY WAS IMPEACHED

In his opening statement, Rothschild's counsel tried to blunt the impact of Rothschild's dishonesty by admitting to the Jury: "[y]ou will also learn that [Rothschild] sometimes exaggerates and embellishes the truth, especially which [sic] he's promoting himself and his projects." *Id.*, Ex. 31 at 49:23–50:1. This was quickly revealed as an understatement, as the Jury saw that Rothschild repeatedly made false statements in his business dealings and then under oath at trial. *Id.*

A central issue in this case, from its beginning, is Rothschild's adoption and use of the METABIRKINS name. Hermès's opening presented evidence showing Rothschild did not

conceive the METABIRKINS name. *Id.*, Ex. 32. Rather, a Twitter user MAKISA suggested the name "METABIRKINS" in response to Rothschild's naming contest. *Id.*, Ex. 31 at 34:18–35:11. Although Rothschild promised to gift a METABIRKINS NFT to the contest winner, he never gifted an NFT to MAKISA. *Id.* On direct examination, trying to rehabilitate his image, Rothschild testified that he instead provided a whitelist spot for the METABIRKINS NFT to Instagram user @hectourc, as the winner of the contest. *Id.*, Ex. 11 at 291:18–22, 292:6–9. Hermès later confronted Rothschild with his deposition testimony where he claimed to have come up with the METABIRKINS himself, prior to the suggestion from MAKISA. *Id.* at 410:4–24. Obviously, there was a tension, and Rothschild was forced to admit that his deposition "testimony was incorrect." *Id.* at 410:25–411:1. Hermès then confronted Rothschild with various documents showing that, contrary to Rothschild's new story about the METABIRKINS name on direct, Instagram user @hectourc never received this alleged whitelist spot. *Id.*, Ex. 9 at 469:22–476:17; Exs. 33–34. Rothschild then testified that to his "knowledge yesterday, that's what it was. That was my testimony. I didn't have these, um, Instagram messages yesterday." *Id.*, Ex. 9 at 476:7–11. The Instagram messages were, of course, from the METABIRKINS Instagram account.

The Court then provided Rothschild a chance to correct his testimony in light of the evidence. *Id.* at 476:15–477:6. Rothschild revised his testimony to the following: "we had our forms of communication through friends." *Id.* at 477:4–6. Rothschild then testified he had follow-up communications regarding this issue through friends, though admitted that no such communications were produced. *Id.* at 477:19–479:5.

Another issue in this case was Rothschild's prior project, Baby Birkin. Also at issue was the fact that Rothschild tried to "pump" prices. When asked whether he bid on the Baby Birkin, Rothschild testified that he "was the first bid." *Id.*, Ex. 11 at 406:8–21. Hermès submitted two

documents showing two different bids Rothschild placed on the Baby Birkin. *Id.*, Ex. 9 at 481:2–484:6; Exs. 35–36. When confronted that he placed two bids rather than the one bid he testified to, Rothschild sheepishly commented that he was placing bids for someone else but could not remember for whom he placed the bid. *Id.*, Ex. 9 at 483:11–23.

In the opening, Hermès presented a text message Rothschild sent to his business associates stating he does not "think people realize how much you can get away in art by saying 'in the style of.'" *Id.*, Ex. 10 at 26; Ex. 31 at 30:24–31:1. This text message shows Rothschild bragging about using art as a pretext to capitalize on the reputation and goodwill of Hermès's BIRKIN Marks. Hoping to rehabilitate his credibility, on direct, Rothschild testified: "when I said get away with, I was, kind of, referring to the situation. I was speaking about this situation that we're in today, where I should be able to get away with creating this artwork, um, because it's my artistic expression and, you know, a company like Hermès shouldn't be able to sue me for it." *Id.*, Ex. 11 at 297:21–298:7. Rothschild's testimony was not credible—Rothschild sent the text message to his associates 16 days *prior* to Hermès sending him the cease-and-desist letter. *Id.*, Ex. 7.

There were numerous other times Rothschild was confronted with being less than candid and trustworthy.

### D. BASED ON ROTHSCHILD'S INFRINGING CONDUCT, PRIVATE COMMUNICATIONS, AND FALSE STATEMENTS MADE UNDER OATH, THE JURY FOUND THAT ROTHSCHILD INTENTIONALLY MISLED POTENTIAL CONSUMERS

Rothschild's true colors were repeatedly made plain during trial. Indeed, in denying Rothschild's motion for judgment as matter of law, the Court (outside the presence of the Jury), explained on what it believed the Jury could have seen:

> [T]here is ample evidence from which a jury could conclude that Mr. Rothschild is a classic conman; it's just that he's not yet gotten good enough to avoid, for example, revealing what's really in his heart in emails that he believes are private at the time. But,

> nevertheless, there is ample evidence from which a rational juror could, if they wish — and there's certainly contrary evidence as well — conclude that he set out or very early came to the conclusion that he could fool people into believing that his product and his site and his NFTs were sponsored by Hermès.

Fernandez Decl., Ex. 37 at 1073:19–1074:3. The Court further explained that "[t]he First Amendment, even after [its] rulings in favor of the defense on so many aspects of the *Rogers* test, still leaves open the question, which is a classic jury question: What was really in the heart and mind of this defendant?" *Id.* at 1075:1–4. The Jury answered that question when it rendered the verdict in favor of Hermès. (Verdict, ECF No. 144.) And the Court explained the basis on which such a determination could be made; although

> it is critical that we leave room for social commentary, whether it comes verbally or in the form of art . . . none of that applies to a swindler, a fraudster who makes one pretense or another, but reveals in his emails and his behavior what is really in his heart, which is to cheat people. And I think the jury here could find either possibility, but certainly could find that Mr. Rothschild fit that pattern.

Fernandez Decl., Ex. 37 at 1075:16–23. The Jury did find that Rothschild fit that pattern.

Based on Rothschild's infringing conduct, his public conduct, his statements made in private to his friends and associates, and false testimony, the Jury fairly concluded that neither he nor his claims of artistic motive were credible. Instead, the Jury found that Rothschild intended to and did mislead potential consumers by adopting and using the BIRKINS mark and trade dress in connection with his METABIRKINS NFTs. Specifically, the Jury found that Rothschild was not protected from liability by the First Amendment because "Mr. Rothschild's use of the Birkin mark was not just likely to confuse potential consumers but was intentionally designed to mislead potential consumers into believing that Hermès was associated with Mr. Rothschild's MetaBirkins project." (The Ct.'s Instr. of Law to the Jury at 21, ECF No. 143; Verdict, ECF No. 144.)

8

## E.     ROTHSCHILD'S METABIRKINS NFTS INTERFERED—AND STILL INTERFERE—WITH HERMÈS'S NFT PLANS

At trial, Hermès presented evidence showing it was irreparably harmed by Rothschild's conduct. Rothschild's METABIRKINS NFTs interfered with Hermès's own NFT plans, which it has been developing since December 2019. Fernandez Decl., Ex. 21 at 700:19–21. Specifically, Mr. Martin testified that Hermès:

> [I]nvested a lot of time and money in order to have a trademark as famous as Birkin. As I mentioned earlier, NFT is probably part of the future of our company. The fact that our main trademark has been used by a third party without our authorization on the digital asset, which is similar to our product, if we are to enter into this new digital world, if we want to bring our most iconic handbag in this digital world, there would always be a reference to this MetaBirkin. And I think that being the first is a first, and we lost this opportunity of being the first on the market, which I think is really something very impactful for Hermès.

*Id.*, Ex. 1 at 197:1–12. Maximilien Moulin, head of Hermès's innovation laboratory, echoed Mr. Martin's statement when responding to the Court's inquiry into whether the METABIRKINS NFTs interfered with Hermès's NFT plans:

> THE COURT: . . . Exactly how did the MetaBirkins NFTs, which you say you have some familiarity with, interfere with Hermès' own NFT project?
> . . .
> THE WITNESS: . . . I would say the fact is that it could confuse people on whenever this entity gives them some advantages within Hermès. If we get out with NFTs, well, we will be always having questions and having people asking for some things thinking that MetaBirkin, it's, like, in the metaverse –
> THE COURT: So you're saying it interfered in a sense that it would potentially cause confusion that could impact, among other things, your own NFT project; is that what you're saying?
> THE WITNESS: Yes.

*Id.*, Ex. 21 at 697:11–15, 727:1–21.

## III.    ROTHSCHILD AND HIS COUNSEL CONTINUE TO PROMOTE METABIRKINS NFTS POST-VERDICT

Notwithstanding the verdict in Hermès's favor, Rothschild continues to promote METABIRKINS NFT sales through various social media channels, and he will obtain a royalty from any such sales. On February 8, 2023, the same day the verdict was rendered, Rothschild tweeted on his personal account, "[t]ake nine people off the street right now and ask them to tell you what art is but the kicker is whatever they say will now become the undisputed truth. That's what happened today . . .   What happened today will continue to happen if we don't continue to fight. This is far from over." Fernandez Decl., Ex. 38. The METABIRKINS Twitter account retweeted Rothschild's tweet. *Id.*, Ex. 6. When an Instagram user shared a *Vogue Business* article that quoted Rothschild's tweet and added the @METABIRKINS Instagram handle, Rothschild reposted the article on his personal Instagram account that same day. *Id.*, Ex. 39. Rothschild shared another Instagram story which tagged the @METABIRKINS Instagram handle. *Id.*, Ex. 40. Rothschild also shared his tweet and other posts on the METABIRKINS Discord server, through which he conducts business. *Id.*, Exs. 41–43.

Rothschild also retweeted a post which used the METABIRKINS name, stating that the "project was a play on Gunna's Baby Birkin song." *Id.*, Ex. 44. He also encouraged followers to share and retweet his statements as covered by *The New York Times* in support of his plea for "Freedom of Speech/Artistic Expression" and did so on his Twitter account and on the Discord server for his new NFT project, Gasoline. *Id.*, Exs. 45–46. Rothschild further reposted his counsel's Instagram stories featuring *The New York Times* article on Rothschild's Instagram account. *Id.*, Exs. 47–48.

On February 8, 2023, Rothschild's counsel responded to Rothschild's tweet with the statement, "My colleagues and I are going to continue to fight this case until free artistic expression

prevails. What happened today was wrong. Wrong on the law. And also just wrong." *Id.*, Ex. 49. Dr. Blake Gopnik, Rothschild's "Business Art" expert announced that he would be speaking on a podcast regarding "[his] defense of @MasonRothschild" noting that he was "spittin' mad," to which Rothschild's counsel responded: "I'm spittin' mad too." *Id.*, Ex. 50. Rothschild's counsel further tweeted, "That admission by Hermes should have been the end of the case. So, we'll take our arguments to the appellate court and see if we can vindicate the artist's first amendment right to make pictures of Birkin bags and to call them what they are—MetaBirkins." *Id.*

On February 24, 2023, Dr. Gopnik published an article entitled "A misguided jury failed to see the art in Mason Rothschild's MetaBirkins" in *The Washington Post*. *Id.*, Ex. 51. As part of their ongoing publicity campaign surrounding the METABIRKINS NFTs, Rothschild, his counsel, and Dr. Gopnik all shared this article on various social media channels. Mr. Millsaps and Rothschild posted this article on Instagram. *Id.*, Exs. 52–53. Mr. Sprigman, Rothschild, and Dr. Gopnik all retweeted the article on Twitter, with Dr. Gopnik adding #Metabirkins to his post. *Id.*, Exs. 54–56.

In addition, Rothschild still promotes the sale of METABIRKINS NFTs on the METABIRKINS website and METABIRKINS Instagram and Twitter accounts. *Id.*, Exs. 6, 57–58. All platforms link to the METABIRKINS page on LooksRare where METABIRKINS NFTs can be purchased. *Id.*; *see also id.*, Ex. 8. Rothschild has set a 7.5% royalty for METABIRKINS NFTs sales on LooksRare. *See* Declaration of Kevin D. Mentzer, Ph.D. ¶ 3 ("Mentzer Decl."). In addition to royalties on sales, Rothschild will also receive a portion of the transaction fees collected by LooksRare (called protocol fees), and "trading reward" fees provided by LooksRare to NFT sellers on its platform. *Id.* ¶¶ 5-6.

## ARGUMENT

### I.     LEGAL STANDARD FOR PERMANENT INJUNCTION

When a plaintiff succeeds on the merits, the Court may enter a permanent injunction to prevent further trademark infringement and dilution if plaintiff has demonstrated: "that (1) it has suffered an irreparable injury; (2) remedies available at law are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be 'disserved' by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("*eBay*"); 15 U.S.C. § 1116; *see also optionsXpress, Inc. v. optionsXpress Inc.*, No. 14-CV-956 PKC, 2014 WL 3728637, at \*4 (S.D.N.Y. July 28, 2014) (applying the *eBay* factors in a trademark infringement action). A permanent injunction is particularly appropriate in cases of trademark infringement and dilution. *See* 15 U.S.C. § 1125(c)(1) (the owner of a mark found to have been diluted "shall be entitled to an injunction . . . regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury."); *see also* 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:1 (5th ed. June 2022) ("An injunction is the usual and standard remedy once trademark infringement has been found."); 15 U.S.C. § 1116. "The decision to grant or deny permanent injunctive relief is an act of equitable discretion, reviewable on appeal for abuse of discretion." *eBay*, 547 U.S. at 391.

### II.     HERMÈS SATISFIES ALL FOUR REQUIREMENTS FOR A PERMANENT INJUNCTION

#### A.     ROTHSCHILD'S CONDUCT CREATES IRREPARABLE HARM TO HERMÈS

With the enactment of the Trademark Modernization Act of 2020 ("TMA"), a plaintiff seeking permanent injunctive relief under the Lanham Act is entitled to a rebuttable presumption of irreparable harm on a finding of success on the merits. 15 U.S.C. § 1116(a); *see also Kelly Toys*

*Holdings, LLC v. alialialiLL Store*, 606 F. Supp. 3d 32, 52 (S.D.N.Y. 2022) ("Under the remedial provisions of the Lanham Act, a plaintiff who has established infringement is entitled to a rebuttable presumption of irreparable harm."). The TMA codified a long-standing presumption in trademark cases that some courts had concluded was eliminated by the *eBay* decision. A finding of dilution also gives rise to a presumption that plaintiff "suffered irreparable harm in that it has lost goodwill towards its unique brand as well as the ability to control its reputation in the marketplace." *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 255 (S.D.N.Y. 2012).

Here, in light of the Jury Verdict on Hermès's dilution and trademark infringement claims, the Court may presume irreparable harm. That presumption is further warranted because the Jury found that "Rothschild's use of the Birkin mark was not just likely to confuse potential consumers but was intentionally designed to mislead potential consumers into believing that Hermès was associated with Rothschild's MetaBirkins project." (The Ct.'s Instr. of Law to the Jury at 17, 21, ECF No. 143; Verdict at 1, ECF No. 144.)

The evidence at trial further confirmed that the METABIRKINS NFTs: (1) caused Hermès to lose control of the BIRKIN mark's reputation, and (2) diluted the distinctiveness of the BIRKIN Mark. For example, Hermès introduced evidence of: (i) a text from Rothschild admitting to actual confusion, (Fernandez Decl., Ex. 22 at 1); (ii) various press articles showing actual confusion concerning Hermès association with the METABIRKINS NFTs, including *L'Officiel*, *Elle*, *New York Post*, and *Challenges*, (*id.*, Ex. 21 at 789:1–794:24; Exs. 23–26); (iii) Rothschild admitting to such confusion to his business partners, (*id.*, Ex. 22 at 13; Ex. 27); (iv) comments on Rothschild's social media showing potential purchasers were confused, and a social media user complaining that she was "scammed" by Rothschild because she thought she was getting a real purse, (*id.*, Ex. 28 at 8–9; Ex. 29 at 347–348); and (v) Dr. Isaacson's consumer survey finding

there was a substantial likelihood of confusion among NFT purchasers. *Id.*, Ex. 21 at 734:20–23, 757:7–13; Ex. 30 at 19.

The association that Rothschild created between Hermès and the METABIRKINS NFTs injured the BIRKIN brand. The evidence presented at trial supported that finding. Hermès's employees testified that the BIRKIN Marks are among the most valuable assets to Hermès, which "invested a lot of time and money in order to have a trademark as famous as Birkin." Fernandez Decl., Ex. 1 at 151:12–152:1, 197:2–3; Ex. 4 at 48:19–24, 49:3–8. The METABIRKINS NFTs interfered with Hermès's effort to commercialize its own NFTs, which it has been developing since 2019. *Id.*, Ex. 21 at 700:19–21. As Mr. Martin testified, "[t]he fact that our main trademark has been used by a third party without our authorization on the digital asset, which is similar to our product, . . . we lost this opportunity of being the first on the market, which I think is really something very impactful for Hermès." *Id.*, Ex. 1 at 197:4–12. Mr. Moulin also affirmed that Rothschild "interfered in a sense that it would potentially cause confusion that could impact, among other things, [Hermès's] own NFT project . . . ." *Id.*, Ex. 21 at 727:17–21. Without an injunction preventing Rothschild's continued infringement of the BIRKIN Marks, Hermès will be unable to control its reputation and goodwill it worked so hard to achieve.

**B.      MONEY DAMAGES ARE INADEQUATE TO COMPENSATE HERMÈS FOR THE IRREPARABLE HARM IT HAS SUFFERED AND IS SUFFERING**

Rothschild's past and present conduct demonstrates he is likely to continue infringing Hermès's trademarks if a permanent injunction is not issued. In such circumstances, this Court has already held that "[t]he risk of this continued activity establishes the second element: a plaintiff has no adequate remedy at law if, absent an injunction, 'the defendant is likely to continue infringing' its intellectual property rights." *Int'l Council of Shopping Centers, Inc. v. Glob. Infotech LLC*, No. 18-CV-8856 (AJN), 2019 WL 2004096, at *5 (S.D.N.Y. May 7, 2019) (citing

*Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 553 (S.D.N.Y. 2008)); *see also Coach, Inc. v. O'Brien*, No. 10 CIV 6071 JPO JLC, 2011 WL 6122265, at *12 (S.D.N.Y. Nov. 28, 2011) ("The second *eBay* factor, no adequate remedy at law, 'is satisfied where the record contains no assurance against defendant's continued violation' of trademarks.") (citation omitted).

As described above, Rothschild has and continues to disregard Hermès's demand that he stops using "METABIRKINS." Since November 2021, Rothschild promoted the METABIRKINS NFTs on various social media channels and sold them on NFT platforms without Hermès's authorization. Fernandez Decl., Ex. 7; Ex. 11 at 407:21–408:6, 422:9–19, 423:6–11, 423:23–424:9, 426:11–20, 437:1–14. Rothschild teased a horse charm that looked similar to the Hermès rodeo charm. *Id.*, Ex. 14 at 4, 9; Ex. 15 at 1.

Even after the Jury Verdict, Rothschild continues to promote sales of METABIRKINS NFTs on the METABIRKINS website, and the METABIRKINS Twitter and Instagram accounts. *Id.*, Exs. 6, 39–40, 57–58. All provide a link to the METABIRKINS page on LooksRare, where METABIRKINS NFTs can be purchased. *Id.*; *see also id.*, Ex. 8. Rothschild continues to set a royalty of 7.5% on LooksRare allowing him to generate revenue from sales. *See* Mentzer Decl. ¶ 3. Rothschild promotes the METABIRKINS NFTs with the @METABIRKINS Instagram handle on his personal account and he shares posts related to this lawsuit on the METABIRKINS Discord server. *Id.*, Exs. 39–40, 41–43 .

In addition, Rothschild's counsel and Dr. Gopnik—whether intentional or not—have helped promote the METABIRKINS NFTs by posting about METABIRKINS on Twitter and Instagram, including sharing articles from *The New York Times* and the *Washington Post*. *Id.*, Exs. 51–56. Rothschild has shown no evidence that he will cease his infringement. Rothschild's past and present conduct demonstrate that there is no adequate remedy at law.

## C. THE BALANCING OF THE HARDSHIPS WEIGHS IN FAVOR OF GRANTING AN INJUNCTION

The balance of hardships favors issuing the requested injunction because "'it is axiomatic that an infringer . . . cannot complain about the loss of ability to offer its infringing product.'" *Int'l Council of Shopping Centers, Inc.*, 2019 WL 2004096, at *5 (quoting *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012)). Here, Rothschild cannot complain about the loss of his ability to profit from infringing the BIRKIN Marks by further dealing in existing or future METABIRKINS NFTs, and or promoting the same.

Rothschild has also not identified any hardships for the Court to consider, nor could he. Courts recognize that where a defendant has other options available to it, the balancing of the hardships favors the plaintiff. *See, e.g.*, *N.Y.C. Triathlon, LLC v. v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 326–27 (S.D.N.Y. 2010) (finding that the balance of hardships tipped decidedly for plaintiff where defendant "has other names and marks available to it"). An injunction would not prevent Rothschild from selling NFTs. It would only prohibit him from exploiting and/or profiting from his infringement of the BIRKIN Marks. Rothschild has been involved in various commercial projects unrelated to the METABIRKINS NFTs, such as Gasoline, an art and web3 studio. Fernandez Decl., Ex. 11 at 316:16–317:1. Through Gasoline, Rothschild designed the NFT ticket for an art fair in Miami. *Id.*, Ex. 11 at 317:13–318:20; Ex. 59. He also recently worked for a Formula 1 driver, a crypto company, and an e-sports organization. *Id.*, Ex. 11 at 319:2–10; Ex. 60. There are also no hardships to Rothschild pending resolution of any post-trial motion or appeal as Hermès voluntarily undertakes to maintain materials. *See* Hermès's Proposed Order of Permanent Injunction ("Order") ¶ 7.[1] This undertaking ensures that nothing irreversible is done during the

---

[1] Hermès's Proposed Order of Permanent Injunction, dated March 3, 2023, is filed simultaneously with Hermès's Motion for Permanent Injunction. On February 27, 2023, Hermès's counsel provided a copy of such Order to Rothschild's counsel, who refused to consent to its entry.

pendency of any appeal and that Hermès is protected from further infringement of its BIRKIN Marks. For example, Rothschild could not—as he has done in the past—promote additional METABIRKINS NFTs on his social media. Fernandez Decl., Ex. 58.

On the other hand, Rothschild's continued use of the METABIRKINS name and the images associated with it are likely to "dilute" the distinctiveness of Hermès's BIRKIN Marks by eroding their distinctiveness in the mind of the public, which weighs in favor of granting a permanent injunction. *Kaisha v. Wholesale*, No. 17-CV-9419 (ALC), 2018 WL 11226749, at *5 (S.D.N.Y. Sept. 28, 2018) (granting a permanent injunction against defendants for using "the mark in a way that is likely to cause 'dilution by blurring' of the famous mark"). Rothschild's continued use of "METABIRKINS" would likely lead to more customer confusion and would prevent Hermès's ability to control its reputation and goodwill associated with the BIRKIN Marks. *See NES Baseball & Softball Facility, Inc. v. Ne. Angels Softball, LLC*, No. 22-CV-9158 (NSR), 2022 WL 17370117, at *13 (S.D.N.Y. Dec. 2, 2022) (finding that the balance of the equities was in plaintiff's favor for its trademark infringement claim where defendants' use of plaintiff's marks would likely cause customer confusion and prevent plaintiff from exercising control over the reputation and goodwill associated with them). Thus, the balancing of the hardships weighs in favor of Hermès.

### D. PUBLIC INTEREST CONCERNS WEIGH IN FAVOR OF GRANTING AN INJUNCTION

Finally, "the public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *N.Y.C. Triathlon*, 704 F. Supp. at 344. Where, as here, the Jury found there is a likelihood of confusion from the evidence set forth at trial, it is in the public interest to issue a permanent injunction. (Verdict, ECF No. 144.)

## III.    THE RELIEF SOUGHT SHOULD BE GRANTED

### A.    ROTHSCHILD SHOULD BE ENJOINED FROM USING THE BIRKIN MARKS OR OTHERWISE MISLEADING THE PUBLIC

As the Jury found that Rothschild was liable for trademark infringement, dilution, and cybersquatting, Hermès's proposed Order should be granted as it seeks to enjoin Rothschild from using the BIRKIN Marks, or any other variation of the marks or names, or otherwise misleading the public into believing that Hermès and Rothschild are in some way connected. *Beautybank, Inc. v. Harvey Prince LLP*, No. 10 CIV. 955 (KPF), 2014 WL 11429027, at *3 (S.D.N.Y. Apr. 22, 2014); *U.S.A. Famous Original Ray's Licensing Corp. v. Famous Ray's Pizza Buffet Inc.*, No. 12 CIV. 8753 JGK GWG, 2013 WL 5363777, at *6 (S.D.N.Y. Sept. 26, 2013), *report and recommendation adopted*, No. 12 CIV. 8753 JGK, 2013 WL 5664058 (S.D.N.Y. Oct. 17, 2013). In particular, Hermès seeks to enjoin and restrain Rothschild, and, in addition, his associates, business partners, influencers, representatives and other affiliates, and all others in active concert or participation with him who receive actual notice of this Order[2], from: (i) manufacturing, minting, issuing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, renting, or otherwise disposing of any products and/or merchandise, including NFTs, that use the BIRKIN trademark, BIRKIN trade dress or any confusingly similar METABIRKINS name or mark; (ii) making any statement or representation whatsoever or performing any act that is likely to lead the trade or public to believe that any NFTs, products or merchandise minted, manufactured, promoted, distributed or sold by Rothschild, including the

---

[2] Pursuant to Fed. R. of Civ. P. 65(d)(2), parties bound to an order for injunctive relief include "the following who receive actual notice of [the order] by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." Thus, Hermès may seek to refrain and enjoin not only Rothschild but also his associates, business partners, influencers, representatives and other affiliates, and all others in active concert or participation with him who receive actual notice of this Order.

METABIRKINS NFTs, are in any manner associated or connected with Hermès or its BIRKIN trademark or trade dress; (iii) using METABIRKINS or any BIRKIN-formed mark as a trade name or trademark to promote any products or business, including any NFT projects; (iv) registering, using or trafficking any domain names or social media or NFT platform usernames or handles that are identical or confusingly similar to the BIRKIN trademark, including METABIRKINS; and (v) providing any benefits to holders of METABIRKINS NFTs, such as airdrops, or otherwise creating incentives for third parties to purchase METABIRKINS NFTs. *See* Order ¶ 1 (a)–(e).

### B. ROTHSCHILD SHOULD TRANSFER THE <METABIRKINS.COM> DOMAIN NAME, ANY ENS DOMAINS AND SOCIAL MEDIA ACCOUNTS CONTAINING THE BIRKIN MARK TO HERMÈS

Rothschild should be ordered to transfer the <METABIRKINS.com> domain name and any ENS domains containing the BIRKIN mark to Hermès. Order ¶ 2(c). The Anti-Cybersquatting Consumer Protection Act allows the Court to "order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C); *see also Mattel, Inc. v. www.fisher-price.online*, No. 21-CV-9608 (LJL), 2022 WL 2801022, at *14 (S.D.N.Y. July 18, 2022) (granting the transfer of the domain name to plaintiff pursuant to 15 U.S.C. § 1125(d)(1)(C) because defendant is likely to continue using the infringing domain name absent injunctive relief); *Ideavillage Prod. Corp. v. Liuzhou Weimao Mobile Accessory Co.*, No. 20 CV 4997-LTS, 2021 WL 3621788, at *7, 10 (S.D.N.Y. Aug. 16, 2021) (same). Hermès's request should be granted because Rothschild was found liable for cybersquatting and continues to use the infringing domain name to promote sales of METABIRKINS NFTs on LooksRare. Fernandez Decl., Exs. 8, 57; Verdict, ECF No. 144.

Rothschild should also be ordered to transfer ownership and control of any social media account identified with the BIRKIN mark to Hermès, including the @METABIRKINS Twitter handle and feed, @ METABIRKINS Instagram handle and page, and METABIRKINS Discord

server/channel by providing the account log-in credentials to Hermès and taking any other steps necessary to transfer ownership and control. Order ¶ 2(d); *Casestry, LLC v. Caseful, LLC*, No. 6:19-CV-1255 (FJS/ML), 2020 WL 8673981, at *1 (N.D.N.Y. July 7, 2020) (where plaintiff stated a valid claim for, *inter alia*, trademark infringement and cybersquatting, the court ordered defendant to be permanently enjoined and restrained from using the infringing mark in "any social media reference or 'handle,'" including facebook, Instagram, twitter, and pinterest).

### C. ROTHSCHILD SHOULD TRANSFER ANY METABIRKINS NFTS IN HIS POSSESSION AND THE METABIRKINS NFTS SMART CONTRACT

Next, Hermès seeks the transfer of any METABIRKINS NFTs in Rothschild's possession, custody or control to a crypto wallet designated by Hermès. Order ¶ 2(a). Hermès also seeks the transfer of control of the METABIRKINS NFTs smart contract to Hermès and, if necessary, direct a smart contract engineer or developer to assist with the transfer of control of the smart contract. *Id.* ¶ 2(b). This Court routinely grants injunctive relief requiring defendant to deliver to plaintiff all infringing products. *See* 15 U.S.C. § 1118. For example, in *Diesel S.P.A. v. Does*, where plaintiff established its claims for, *inter alia*, trademark infringement, dilution, and cybersquatting, the Court ordered defendants to deliver to plaintiff for destruction all unauthorized products as well as any plates, molds, or other means of producing plaintiff's trademarks or imitations. No. 14-CV-4592 (KMW), 2016 WL 96171, at *11 (S.D.N.Y. Jan. 8, 2016). In *Beautybank, Inc.*, a jury found defendants liable for trademark infringement and specifically determined that the defendants acted willfully and in bad faith. 2014 WL 11429027, at *1. The Court required defendants to turn over to plaintiff for destruction all Eau Flirt Goods, "including the packaging, labels, bottles, wrappers, containers, molds, and any and all other articles containing the Eau Flirt name." *Id.* at *3.

Here, the Jury found that Rothschild intentionally misled potential consumers and Rothschild is continuing to do so through social media and LooksRare. (Verdict, ECF No. 144); Fernandez Decl. Exs. 6, 8, 39–45, 57–58. The METABIRKINS smart contract is the source of the infringing products—the METABIRKINS NFTs—because it allows for the creation of new infringing products and the means by which Rothschild can derive benefit and cause harm by intentionally misleading conduct. If Rothschild maintains control of the METABIRKINS NFT smart contract, he can: (i) mint new METABIRKINS NFTs (as he previously said he would do with the additional release of METABIRKINS NFTs); (ii) list the METABIRKINS NFTs in NFT marketplaces (as he is currently doing on LooksRare); (iii) set royalties (as he is currently doing with LooksRare); (iv) collect royalties (which he will do if there is a sale); (v) change the digital file to which the METABIRKINS NFTs are linked to; and (vi) enter into agreements with metaverse platforms to enable integration of the METABIRKINS NFTs into their platforms. Mentzer Decl. ¶ 8. Rothschild could also transfer or sell the METABIRKINS NFT smart contract to a third-party who could do the same. *Id.* ¶ 9. Thus, Hermès's request that Rothschild turnover the METABIRKINS smart contract and the METABIRKINS NFTs in Rothschild's possession, custody or control should be granted as Rothschild should not have tools to engage in further infringement and dilution of Hermès's intellectual property rights.

### D. ROTHSCHILD SHOULD NOTIFY HERMÈS OF AND TRANSFER ANY INCOME RECEIVED FROM METABIRKINS NFTS

Rothschild should be ordered to provide written notice to Hermès of any royalties, transfer income or other financial benefit received from METABIRKINS NFTs resales since the start of trial, and within 10 days after such notice, at Rothschild's expense, transfer such income to Hermès. Order ¶ 4. A plaintiff whose marks have been infringed may be awarded the defendant's profits as a remedy. 15 U.S.C. § 1117. In *Samsonite IP Holdings S.ar.l. v. Shenzhen Liangyiyou*

*E-Com. Co.*, where defendant admitted plaintiffs' allegations of infringement by virtue of its default, this Court awarded defendant's profits because plaintiffs made the threshold showing of entitlement under 15 U.S.C. § 1117. No. 19CV02564 (PGG) (DF), 2021 WL 9036273, at *11-12 (S.D.N.Y. Apr. 27, 2021). The court also noted that defendant's conduct was willful, knowing, and intentional. *Id.*

Here, the Jury found Rothschild liable for trademark infringement, dilution, and cybersquatting. (Verdict, ECF No. 144.) Rothschild's conduct was willful, knowing, and intentional as the Jury found "Rothschild's use of the Birkin mark . . . was intentionally designed to mislead potential consumers into believing that Hermès was associated with Mr. Rothschild's MetaBirkins project." (The Ct.'s Instr. of Law to the Jury at 21, ECF No. 143; Verdict, ECF No. 144.) As such, this Court should require an accounting and the transfer of Rothschild's profits received from METABIRKINS NFTs sales since the start of trial. Rothschild may still be receiving royalties, a portion of the protocol fees collected by LooksRare, and trading rewards because the METABIRKINS NFTs are still listed on LooksRare. Fernandez Decl., Ex. 8; Mentzer Decl. ¶¶ 2–3, 5–6. Rothschild and others could also sell METABIRKINS NFTs without using a marketplace, and the sale amount would be unknown to Hermès. *Id.* ¶ 7.

### E. ROTHSCHILD SHOULD NOTIFY PERSONS OF THE RELIEF DESCRIBED IN THE ORDER

To the extent available to him, Rothschild should be ordered to contact by e-mail, text, or other written form of communication all persons to whom he gave, sold, issued, or distributed a METABIRKINS NFT or whitelist spot to mint a METABIRKINS NFT, provide each of those persons with a copy of the injunction, and airdrop to all METABIRKINS NFT holders a copy of the injunction to notify such persons of the relief described in the Order. Order ¶ 3(a)–(b); *see e.g., Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 417 (S.D.N.Y. 2011), *aff'd*, 462 F. App'x

31 (2d Cir. 2012) (ordering defendant that it "shall notify in writing each customer to whom it has sold or distributed the Kidz–Med non-contact thermometer in the confusing trade dress that the thermometer has been recalled pursuant to the order of this Court").

### F. ROTHSCHILD SHOULD FILE A DECLARATION STATING HE HAS COMPLIED WITH THE ORDER

Moreover, Rothschild should be ordered to file a declaration under penalty of perjury stating that he has complied with the requirements under paragraphs 1, 2, and 3 of the Order, including a list of all persons to whom Rothschild has sent the Order of injunction. Order ¶ 5. Rothschild should file this declaration within 31 days of the date of the Order entering the injunction. *Id.*; *see e.g., Furnished Quarters, LLC v. Wright*, No. 3:12-CV-01163-VLB, 2013 WL 12290835, at *3 (D. Conn. Apr. 26, 2013) (requiring defendant to "file with the Court and serve on counsel for Plaintiff within thirty (30) days after entry of any injunction issued by the Court in this action, a sworn written statement pursuant to 15 U.S.C. § 1116(a) setting forth in detail the manner and form in which Defendant has complied with the Default Judgment and Permanent Injunction.").

### G. ROTHSCHILD SHOULD PRESERVE DOCUMENTS THAT RELATE TO THIS LAWSUIT

Hermès further seeks to enjoin Rothschild and, in addition, his associates, business partners, influencers, representatives and other affiliates, and all others in active concert or participation with him who receive actual notice of the injunction Order, from destroying, hiding, dissipating, or altering any documents, including electronic records and social media posts, that relate in any way to this lawsuit. Order ¶ 6. The Court may "impose recordkeeping requirements ancillary to an injunction and to make injunctive relief effective." *Mattel, Inc.*, 2022 WL 2801022, at *12 (citation omitted). This relief should be granted because Rothschild took affirmative steps days before summary judgment papers were due to delete most of his @masonrothschild Twitter

history, including 829 Tweets. (Oct. 7, 2022 Decl. of Megan A. Corrigan, Ex. 94, ECF No. 72-112; *Id.*, Ex. 129, ECF No. 72-147; Mem. of Law in Supp. of Pls.' Mot. for Summ. J. at 12, n. 5, ECF No. 77.)  Yet again, on January 22, 2023, the eve of the motion in limine opposition filings, Rothschild deleted most of his @masonrothschild Twitter history, including 258 Tweets. (Jan. 23, 2023 Decl. of Jessica H. Fernandez, Exs. 1–2, ECF Nos. 127-1, 127-2.) Through his counsel, Rothschild has asserted his continuing right to delete social media posts during litigation. (Oct. 28, 2022 Decl. of Lisa Bollinger Gehman, Ex. 4, ECF No. 97-4.) If such request is not granted, Rothschild could destroy or alter documents that relate to this lawsuit. The preservation of these documents is crucial, especially because Rothschild intends "to continue to fight this case" and file an appeal. Fernandez Decl., Ex. 49.

## H.    HERMÈS VOLUNTARILY UNDERTAKES TO MAINTAIN MATERIALS PENDING RESOLUTION OF POST-TRIAL MOTIONS OR APPEAL

Lastly, Hermès seeks to maintain, pending the final disposition of any post-trial motion or appeal, the METABIRKINS NFT smart contract and any METABIRKINS NFTs transferred to it; archive the @METABIRKINS Twitter feed, @METABIRKINS Instagram page, and METABIRKINS Discord server/channel; and takedown the webpage that is currently posted on the METABIRKINS.com website. Order ¶ 7. Courts have allowed permanent injunctions, including the turnover of infringing products, pending appeal. *S. California Darts Ass'n v. Zaffina*, 762 F.3d 921 (9th Cir. 2014); *Gap, Inc. v. G.A.P Adventures Inc.*, No. 07 CIV. 9614 (AKH), 2011 WL 13262980, at *3 (S.D.N.Y. Aug. 24, 2011) (following a five-day bench trial finding in favor of plaintiffs on their federal trademark infringement claim, the Court denied defendant's motion to stay the permanent injunction pending appeal because, *inter alia*, "the public has an interest in avoiding further confusion as to source or deception as to affiliation."). Here, Hermès voluntarily undertakes to abstain from taking any action that would prevent the parties from restoring the

materials turned over after resolution of any post-trial motion or appeal to ensure that nothing irreversible occurs. This request also ensures that Hermès is protected from further infringement of its BIRKIN Marks. Thus, Hermès's request should be granted.

### CONCLUSION

For the foregoing reasons, Hermès respectfully requests that this Court grant its motion for permanent injunction and enter its Proposed Order of Permanent Injunction.

Dated: March 3, 2023
      New York, New York

**BAKER & HOSTETLER LLP**

**BAKER & HOSTETLER LLP**
Deborah A. Wilcox, Esq. (*pro hac vice*)
Key Tower
127 Public Square
Cleveland, OH 44114
Telephone: 216.621.0200

**BAKER & HOSTETLER LLP**
Lisa Bollinger Gehman, Esq. (*pro hac vice*)
1735 Market Street
Philadelphia, PA 19103
Telephone: 215.568.3100

By: /s/ *Gerald J. Ferguson*
    Gerald J. Ferguson, Esq.
    Oren J. Warshavsky, Esq.
    Jason S. Oliver, Esq.
    Jessica H. Fernandez, Esq.
    Francesca A. Rogo, Esq.
    45 Rockefeller Plaza, 14th Floor
    New York, NY 10111
    Telephone: 212.589.4200
    Facsimile: 212.589.4201

    *Attorneys for Plaintiffs*
    *Hermès International and*
    *Hermès of Paris, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of March, 2023, a true and correct copy of the foregoing

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR**

**PERMANENT INJUNCTION** was served on counsel for Defendant Mason Rothschild at their

email addresses of record:

      Lex Lumina PLLC
      Rhett O. Millsaps II
      rhett@lex-lumina.com
      Christopher J. Sprigman
      chris@lex-lumina.com
      Mark McKenna
      mark@lex-lumina.com
      Rebecca Tushnet
      rtushnet@lex-lumina.com

      Harris St. Laurent & Wechsler LLP
      Jonathan Harris
      jon@hs-law.com
      Adam Oppenheim
      aoppenheim@hs-law.com

                                */s/ Lisa Bollinger Gehman*
                                Lisa Bollinger Gehman