# EXHIBIT I

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

HERMÈS INTERNATIONAL, et al.,

            Plaintiffs,

       v.                              22 Civ. 384 (JSR)

MASON ROTHSCHILD,

            Defendant.                 Trial
------------------------------x
                                       New York, N.Y.
                                       February 6, 2023
                                       9:30 a.m.
Before:

                    HON. JED S. RAKOFF,

                                       District Judge
                                         -and a Jury-


                         APPEARANCES

BAKER & HOSTETLER LLP
     Attorneys for Plaintiffs
BY:  DEBORAH A. WILCOX
     OREN J. WARSHAVSKY
     GERALD J. FERGUSON

HARRIS ST. LAURENT & WECHSLER LLP
     Attorneys for Defendant
BY:  ADAM B. OPPENHEIM
     JONATHAN A. HARRIS

LEX LUMINA PLLC
     Attorneys for Defendant
BY:  RHETT O. MILLSAPS, II
     CHRISTOPHER SPRIGMAN
```

1  BY MR. MILLSAPS:
2  Q.  If you could go on with what you were explaining about
3  this, Dr. Neal.
4  A.  Right.  So, going back to the test and the control, you've
5  seen the MetaBirkins website or the control, where he's removed
6  those elements that I've mentioned.  And you literally just
7  count up the number of people who mention the plaintiff as
8  either making or providing the items or sponsoring, approving,
9  or authorizing them.
10         In his analysis that he presented to you, he said that
11 in his test cell 21.6 percent of people identified the
12 plaintiff.  And in the control, it was only 2.9.  So what we do
13 is we subtract the control number from the test, and that we
14 call that number the net confusion number.  That's 18.7.
15         So, so far what I have done is I have just explained
16 to you what he did and how he reached that conclusion, and now
17 I am going to explain to you what was wrong with that.
18         MR. MILLSAPS:  Ashley, if you could go to the next
19 slide.
20 BY MR. MILLSAPS:
21 Q.  Dr. Neal, you mentioned this flaw No. 1, a
22 misclassification by Dr. Isaacson of respondents.
23         Could you explain that.
24 A.  Yes.  So the basic idea is that he counted a whole bunch of
25 people as confused who actually were not confused.  And the

1  reason for this is he ignored something called the playback
2  problem.  And this is a problem is that arises in particular
3  surveys, not all of them, but it arises any time when the
4  plaintiff and the defendant are using the same name, right?
5           So actually the originally case, the first one ever
6  done back in 1975 faced exactly this problem because it was one
7  company using the name and the other company using the name .
8           What does that mean?
9           It means that if you show people the defendant's
10 product, so here that would be the MetaBirkins website, and you
11 ask who puts this out, people are just going to read back the
12 name if that is on the screen, right?  And you don't know from
13 that whether they're really thinking about the plaintiff or
14 they're just reading back the word that you saw on the screen.
15          And I will give you an example to make it a bit more
16 concrete in a minute, but the critical point is there's a
17 solution to the playback problem, and ever since 1975 the
18 solution has been to add this extra question.  And
19 interestingly, Dr. Isaacson did include it.
20          So it's question 4 here, right?  "What other brands or
21 products do you think are made by whoever makes or provides the
22 items shown on the web page?"
23          So if we move to the next screen, I will show you how
24 this helps us solve that playback problem.
25          Okay.  So I just wanted to give you an example of

1    the stimulus, the MetaBirkins website that people saw, right?
2            Just to remind you, that there is a lot of information
3    on it, and there's a lot of brands popping up here, right?
4            So the word "MetaBirkins" appears.  The word "Birkins"
5    appears.  The word "Hermès" appears in I think three other
6    spots.  So do other names, like, "Forbes," "Twitter,"
7    "Preview."
8            Now, the problem is, if you put a stimulus like this
9    in front of a survey respondent and you say, who puts this out?
10   The survey respondent just wants to be helpful, and so they'll
11   start guessing.  They will be like, I don't know, Twitter or
12   Forbes.  Forbes is written here.
13           So you end up with a lot of answers like that that
14   don't really reflect confusion.  It is not really the person
15   thinking, oh, I think Forbes magazine puts out this NFT.
16   They're basically just parroting back, or playing back, the
17   names that are on the screen.
18           So if we can move on to the next slide, I'll show you
19   how we use the data from that extra question to solve this
20   problem.
21   Q.  We are about to move on to that slide, Dr. Neal.  I just
22   wanted to ask you about the slide we were just looking at.
23           We saw some little red dotted lines.
24           Did you add those to that?
25   A.  Yes.  Just to show where the marks Hermès, Birkin,

1  MetaBirkin were located on that screen.

2  Q.  And sorry, if you could just go back to that?

3  BY MR. MILLSAPS:

4  Q.  Dr. Neal, what is this that we are looking at now?

5  A.  This is basically the same thing, but from the desktop

6  version of his survey.  Some people went through on a smart

7  phone; some people went through on a desktop.  They saw the

8  same information, but it just looked a little bit different.

9             MR. MILLSAPS:  Okay.

10            Ashley, if we could go to the next slide.

11 BY MR. MILLSAPS:

12 Q.  So is there a way to fix this flaw?

13 A.  There is.  And it dates back to 1975.  So I want to explain

14 to you how we used the answer to that extra question that

15 fortunately Dr. Isaacson did include.  It's the Q4 one here.

16 But he ignored the data from it.

17            So let's look at example person 1.  These are real

18 people from Dr. Isaacson's data.  I didn't make up these

19 answers.  These are real actual respondents from his survey.

20            So person 1, when they got asked question 1, "Who

21 makes or provides the items shown on the web page?" they said

22 Birkin.

23            Okay.  And then at Q4 when they were asked, well,

24 "What other brands or products do you think are made by

25 Birkin?" because they just indicated Birkin, they said, "Birkin

1  makes real bags that are incredibly popular for people to own
2  and carry."  Right?
3          So that person is confused.  Dr. Isaacson was a
4  hundred percent correct to classify that person as confused,
5  because they said Birkin, and then they successfully identified
6  at least some good put out by Hermès.
7          The same cannot be said of person 2.  Person 2 also
8  said Birkins for question 1, but when they were asked, "What
9  other brands or products do you think are made by whoever makes
10 or provides Birkins?" they said Forbes.
11         Now, Forbes is a magazine.  Forbes was just one of the
12 other brands that was shown to them on the previous screen.  So
13 this person has failed that playback test.  They are obviously
14 just trying to be helpful, and they are writing in brand names
15 that they saw on the previous screen.  So that person should
16 not have been classified as confused.
17         The critical issue here is that Dr. Isaacson only got
18 to 18.7 percent by totally ignoring all of these Q4 answers,
19 right?  So what he did is he classified both of these people as
20 confused.
21         That was a mistake, because he ignored the playback
22 rule, and he ignored this time-honored method that dates back
23 right to the very first survey for dealing with this known
24 problem.  And because he misclassified a whole bunch of people,
25 that drove up his confusion number.  That's the only way he got

1    it up to 18.7 percent.
2            MR. MILLSAPS:  Ashley, if we could go to the next
3    slide.
4    BY MR. MILLSAPS:
5    Q.  Did you recode the data in a proper fashion?
6    A.  I did.  It is a little bit hard to see on this screen, but
7    basically what I did was I went through and found every single
8    person that Dr. Isaacson said was confused.  Then I looked at
9    their Q4 responses to see whether they really were confused or
10   not, right?  Did they identify Hermès or Birkin and then
11   successfully go on to identify some good put out by Hermès?
12           And the answer is that some do, but a whole bunch
13   don't, right?  So all the ones in green are people who
14   successfully passed the playback test.  And the ones in red,
15   those are the people he misclassified as confused who actually
16   are not.
17           MR. MILLSAPS:  Can we go to the next -- oh.
18   BY MR. MILLSAPS:
19   Q.  After accurately coding the data, what was your finding
20   again, Dr. Neal and what is the significance of that?
21           MS. WILCOX:  Objection.
22           THE COURT:  Well, it is a compound question.  Break it
23   down.
24           MR. MILLSAPS:  Okay.
25           Yes, I will do that, your Honor.

1             Thank you.
2  BY MR. MILLSAPS:
3  Q.  Dr. Isaacson, could you just tell us what the implications
4  of this first flaw were.
5  A.  Okay.  So the main implication is that when Dr. Isaacson
6  said he got 18.7 percent confusion, he was wrong.  He actually
7  got 9.3 percent confusion.  That's the first takeaway.
8  Q.  And what is the significance of that number, Dr. Neal,
9  again?
10 A.  As I said before, the kind of magic number, the minimum
11 threshold that most experts cite to, is 15 percent.  So it's
12 only if you get 15 percent or above that you can reach a
13 conclusion that confusion exists.
14            THE COURT:  Just so we're clear, that's not a rule
15 that's set by law.  It's just set by the convention among
16 people who do these kinds of surveys, yes?
17            THE WITNESS:  Yes, sir.
18            That's right.
19            THE COURT:  Very good.
20            Go ahead.
21            MR. MILLSAPS:  Can we go to the next slide Ashley.
22 BY MR. MILLSAPS:
23 Q.  Dr. Neal, you mentioned that there was also a second flaw
24 in the NFT purchaser survey.
25            Could you explain what that flaw is.

1  A.  Sure.  So Dr. Isaacson's job was to work out if people were
2  confused about who puts out the NFT, right?  That's really
3  important.  He needed to work out if people were confused about
4  who puts out the NFT.
5       The confusion questions he used don't even make
6  mention of an NFT.  Instead, he used vague language that I've
7  got here on the screen.  He says, "Who makes or provides the
8  items shown on the web page?" or "Who sponsors approves or
9  authorizes the items shown on the web page?"
10      That might seem like a subtle distinction, you know,
11 NFT versus items, but when you look at the answers that people
12 gave in the survey, it's quite obvious that multiple people
13 were confused by this, and they interpreted it as asking them
14 about who puts out the real-world handbags that are
15 artistically depicted, right?
16      So they didn't interpret it as being asked about who's
17 behind the NFT.  They interpreted it as who's behind the
18 real-world handbags that may be artistically depicted in the
19 NFT.
20      And so of course if a person, for example, was aware
21 of Birkin handbags and could see that this was an artistic
22 depiction of a Birkin, they might think, well, this is asking
23 me who puts out the real-world handbag.  And that answer would
24 be Hermès.  But that's not confusion about the source of the
25 NFT.  That's someone accurately saying Hermès puts out the

1    real-world handbag.
2            So this is a real problem for his survey, because his
3    survey had to establish that people were confused specifically
4    about the source of the NFT.  And as I said, it's obvious from
5    looking at people's answers that a bunch of people didn't
6    interpret it that way.  And that in turn would have inflated
7    the confusion rate even further.
8    Q.  Is there a way to correct for this flaw like you were able
9    to correct for flaw number 1?
10   A.  Unfortunately, not that I could think of.  There's no way
11   to reanalyze the data to fix this.  The only thing I can say is
12   that we know that it would have pushed up the confusion rate in
13   an artificial way.
14           MR. MILLSAPS:  Ashley, could we go to the next slide.
15   BY MR. MILLSAPS:
16   Q.  Actually, before we get to the next slide, Dr. Neal, you
17   mentioned there were some other flaws that you haven't included
18   in the slides here.  Is there any other flaw that you found
19   that you would say is consequential in some way here?
20   A.  Perhaps one more would be is that, as I understand it, only
21   the word "Birkin" and the trade dress and the word
22   "MetaBirkins" are accused of causing confusion.  But
23   Dr. Isaacson's design also included the word "Hermès" in the
24   test, and it missing in the control.
25           Now, what does that mean?

1  A.  Yes, I have.

2  Q.  So would it be accurate to describe Dr. Isaacson's

3  purported finding of 18.7 percent confusion as meaning that

4  there's substantial likelihood of confusion?

5           THE COURT:  Sustained.

6           MS. WILCOX:  Thank you, your Honor.

7  BY MR. MILLSAPS:

8  Q.  Dr. Neal, my last question:  Do you consider 18.7 percent

9  confusion to be a substantial likelihood of confusion?

10 A.  No, I do not.  I would characterize it as barely above the

11 minimum.

12          MR. MILLSAPS:  Thank you.

13          No further questions, your Honor.

14          THE COURT:  Just so that I am clear, so the people who

15 run these kind of surveys, as I understand your testimony, have

16 decided among themselves that the cutoff point is 15 percent,

17 right?

18          THE WITNESS:  Well, I would probably characterize it

19 as partly driven by the experts and partly driven by courts,

20 because, of course, courts have accepted different numbers.

21          THE COURT:  Courts have accepted different numbers,

22 and the question of what the courts have decided is entirely

23 for the Court, not for a witness.

24          THE WITNESS:  Yes.  That's my understanding.

25          THE COURT:  So, going back to what is in your domain,

1  what the experts have chosen, so if the cutoff is 15 percent,
2  and you think that, well, even though this -- if the study had
3  been done properly that would have been above the cutoff, but
4  you say it's not really as good as a higher figure, then why
5  doesn't that cut the other way?  If it's 9 percent, as you
6  calculate, while that's below the cutoff, it is still some
7  confusion, not no confusion.  True?
8            THE WITNESS:  Well, my understanding is that courts
9  and experts have taken the position that every survey has some
10 noise in it.  And so you are unlikely to get zero purely
11 because of noise.  So a 9 percent figure actually could
12 effectively be zero because it's so small it could just be the
13 product of noise.
14           THE COURT:  But in this case, you very helpfully
15 undertook to look at the actual responses so the impact of
16 noise was minimized under your analysis because you got more
17 deeply into the data.  Yes?
18           THE WITNESS:  That's fair to say.
19           THE COURT:  Okay.
20           Go ahead, counsel.
21 CROSS-EXAMINATION
22 BY MS. WILCOX:
23 Q.  Good morning, Dr. Neal.
24 A.  Nice to see you again.
25 Q.  Nice to see you.  I last saw you on Zoom a world away.

1  pseudonymous individuals.  We have Mr. Rothschild's claims to
2  have interacted with some of these purchasers, and we don't
3  have a single piece of corroborating evidence.
4           And, Mr. Rothschild, he hasn't proved completely
5  trustworthy.  We do have Mr. Rothschild's other social media.
6  You will see here three separate entries across two pages where
7  potential purchasers were confused, and one purchaser clearly
8  thought she was getting a bag.
9           And while Mr. Rothschild's counsel might tell you that
10 we cannot trust these people, we know that Mr. Rothschild never
11 responded to them.
12          We also know that Mr. Rothschild was leaning into this
13 confusion.  Not only did he use the Birkin name, and not only
14 did Mark Design create these bags using the schematic and
15 Hermès Birkin bag, but before the cease and desist,
16 Mr. Rothschild actually teased a charm, and that was meant to
17 look like the rodeo charm, as we know.
18          We also know that there was a survey.  We have heard a
19 lot about that for the last few days.  And it was done by the
20 top survey expert, Dr. Isaacson.  Dr. Isaacson found that the
21 net confusion was 189.7 percent.  That means about one in five
22 people seeing Mr. Rothschild's website with the disclaimer were
23 confused.
24          If we are to listen to Dr. Neal, it is one in ten.
25 Again, this factor is not close.  People are confused.

1    three prior art projects are appropriated.  His first project

2    was the college shirts with the college logo.  He admits that

3    at least one of those schools, Parsons here in New York, sent

4    him a cease and desist letter.

5            This MetaBirkins project was going to be his biggest

6    and it wasn't even close.  Mr. Rothschild told his friends and

7    associates, some of whom were potential investors, that he was

8    planning to collaborate with Hermès.

9            We saw that on December 2, 2021.  Mr. Rothschild

10   texted Lauren from Basic.Space that he was going to be speaking

11   to Hermès on December 4, 2021.

12           He testified that Mr. Clement Quan, a fashion industry

13   executive -- I'm sorry this is December 7, 2021.  He testified

14   that Mr. Clement Quan, a fashion industry executive, was

15   planning to communicate with Hermès on his behalf.

16           You see no documents showing that Mr. Rothschild had

17   any discussions with Mr. Quan or Mr. Quan saying that he

18   called.  While Mr. Rothschild testified that Mr. Quan knew

19   people at Hermès, in Hermès' promotions department, he never

20   said whom he knew, and Mr. Rothschild claims he never followed

21   up with Mr. Quan.  And you heard Ms. Vittadini.  She said she

22   had never heard of Mr. Quan.

23           But there are internal inconsistencies here as well.

24   In between December 1 and December 7, Mr. Rothschild claimed to

25   have two other people reaching out to Hermès.  The first was

1  his contact at Vogue, whose name he could not remember.  That

2  was on December 1.  The second was another person at Sotheby's,

3  who he wanted to use to get to Hermès onboard on December 4.

4          If Mr. Quan was reaching out to Hermès, why would

5  Mr. Rothschild in two different discussions then suggest two

6  other lines of communication, both of which he couldn't --

7  well, sorry.

8          This gets even more -- we know that when

9  Mr. Rothschild approached Mark Berden, he said Hermès might be

10 involved with this project.  That was clearly before

11 Mr. Rothschild was talking with Mr. Quan, with Sotheby's, or

12 Vogue.

13         We also heard about Aaron Maresky.  We saw

14 Mr. Rothschild was hoping for a collaboration with Mr.

15 Mareksy's company.  And Mr. Maresky immediately asked whether

16 the relationship with Birkin was official.  And Mr. Rothschild

17 responded that he was pushing it for it.

18         We also know Mr. Rothschild told his childhood friend

19 Eric Ramirez that Hermès might partner with him, and that he

20 was negotiating with them.  But we know that Hermès has no

21 record of Mr. Rothschild reaching out, and has no record of

22 anyone reaching out on his behalf.

23         Simply put, Mr. Rothschild was misleading people.

24         The reason for bringing up these text messages isn't

25 to embarrass Mr. Rothschild.  Rather it is to show something

1  this disclaimer was after Hermès -- was not even after this
2  article. It was several days later, after Hermès actually sent
3  the cease and desist. And we know that the disclaimer didn't
4  remedy confusion.
5      And now at one point during this trial Judge Rakoff
6  asked Mr. Rothschild whether he was trying to reference Hermès'
7  Birkin bag. His response is that he was in some ways. We will
8  talk about that again.
9      But in Yahoo Finance he was a bit more plain about his
10 intentions. He wanted to take the iconic Birkin handbag and
11 bring it into the metaverse.
12     Can be there any clearer evidence that Mr. Rothschild
13 was trying to trade off of Mr. Hermès goodwill?
14     Perhaps Mr. Rothschild will argue that he tried to
15 correct mistakes, and if he did, it was clearly only after he
16 received the cease and desist letter from Hermès.
17     Mr. Chavez, Mr. Martin, Mr. Rothschild, Mr. Moulin,
18 and Dr. Kominers all told you that the metaverse is the future
19 or part of the future for fashion. Everyone knows this. They
20 all cited examples Gucci, Prada, Balanciaga, Nike, and Adidas,
21 among others.
22     Mr. Rothschild as a trend forecaster -- remember he
23 said he is a trend forecaster and a marketer -- clearly
24 understood that brands were entering the metaverse. It is
25 beyond question that he was trading off the two Birkin

1    people.  You know, if he'd done that, then he's done a very,
2    very bad job.
3            I think at the end of the day, your Honor, all this
4    evidence points in the same direction.  It points toward you
5    granting a JMOL on all these claims.  Thank you.
6            THE COURT:  Well, I am second to none in my admiration
7    for the eloquence of counsel for both sides.
8            I purposely held off ruling on this motion till I
9    heard summations from both sides, because, as I expected, that
10   was the occasion for counsel to draw my attention, as well as
11   the jury's, to specific items of evidence in this case.  And
12   it's very important because the First Amendment issue in this
13   case came down, as I've already indicated earlier today, to a
14   question of the defendant's intent.  I say that because
15   recognizing the importance of the First Amendment issue in this
16   case, I made determinations in defendant's favor that might
17   arguably have been avoided.
18           For example, even though I think there is a
19   nonfrivolous argument that the defendant was not making use of
20   the MetaBirkins -- excuse me, of the Birkins mark or the
21   Birkins design for artistic purposes and, therefore, would not
22   satisfy the first prong of the *Rogers* test, I concluded in the
23   end that there was at least an element of artistry involved
24   from the outset and so instructed the jury.
25           Similarly, even though I think there is an argument

1  that the use of the term "MetaBirkins" in the website and
2  throughout was explicitly misleading on its face and,
3  therefore, would satisfy the other prong of *Rogers*, I concluded
4  in the end that that was not a question that should go to the
5  jury in those terms because of the breadth that must be given
6  to artistic expression and constitutionally protected rights
7  under the First Amendment.
8        But I think now defense counsel goes too far in
9  suggesting that no rational juror could find for plaintiff.  In
10 the end, I found that Mr. Rothschild would be entitled to his
11 First Amendment protection unless plaintiff could prove that
12 his intent was to deceive the persons to whom he was
13 advertising his product and make them believe that it was an
14 Hermès product.  And if he did that, as I have already
15 indicated, and I think implicitly both counsel have agreed,
16 then he forfeited the First Amendment protection to which he
17 otherwise might be entitled.
18        Notwithstanding the excellent arguments just made by
19 defense counsel, I think there is ample evidence from which a
20 jury could conclude that Mr. Rothschild is a classic conman;
21 it's just that he's not yet gotten good enough to avoid, for
22 example, revealing what's really in his heart in emails that he
23 believes are private at the time.  But, nevertheless, there is
24 ample evidence from which a rational juror could, if they wish
25 — and there's certainly contrary evidence as well — conclude