# Exhibit 63

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   HERMÈS INTERNATIONAL, et al.,

 4                    Plaintiffs,

 5            v.                           22 Civ. 384 (JSR)

 6   MASON ROTHSCHILD,

 7                    Defendant.           Trial

 8   ------------------------------x
                                           New York, N.Y.
 9                                         February 6, 2023
                                           9:30 a.m.
10
     Before:
11
                         HON. JED S. RAKOFF,
12
                                           District Judge
13                                           -and a Jury-

14

15                         APPEARANCES

16   BAKER & HOSTETLER LLP
          Attorneys for Plaintiffs
17   BY:  DEBORAH A. WILCOX
          OREN J. WARSHAVSKY
18        GERALD J. FERGUSON

19   HARRIS ST. LAURENT & WECHSLER LLP
          Attorneys for Defendant
20   BY:  ADAM B. OPPENHEIM
          JONATHAN A. HARRIS
21
     LEX LUMINA PLLC
22        Attorneys for Defendant
     BY:  RHETT O. MILLSAPS, II
23        CHRISTOPHER SPRIGMAN

24

25
```

 1             (Jury present)

 2   DAVID THOMAS NEAL, resumed.

 3             THE COURT:  Good morning, ladies and gentlemen.

 4             Welcome back.  I hope you had a good weekend, but now

 5   we have work to do.

 6             I should mention that, through no fault of his own in

 7   any respect, Mr. Rothschild is delayed this morning.  He will

 8   be with us later, but counsel have agreed we can proceed even

 9   in his absence.

10             So, counsel.

11   DIRECT EXAMINATION (Continued )

12   BY MR. MILLSAPS:

13   Q.  Good morning, Dr. Neal.

14   A.  Good morning.

15   Q.  When we left off on Friday afternoon, we had just gone

16   through an overview of your background and credentials.  Do you

17   recall testifying that you have published 26 peer-reviewed

18   papers?

19   A.  Yes, I do.

20   Q.  Have you also acted as a scientific peer reviewer for other

21   peoples' articles?

22   A.  I have.  In fact, I was a peer reviewer on many journals in

23   psychology and consumer behavior.

24   Q.  Has your previous work as an expert witness involved the

25   design and implementation of surveys to assess whether there is

1    a likelihood of confusion between two trademarks?

2    A.  Yes.  I have done that many times.  A rough estimate would

3    be 60 to 90 different surveys of that kind specifically.

4    Q.  And the jury heard Dr. Isaacson talk about his use of the

5    *Eveready* method for testing likelihood of confusion.  Have you

6    used that specific method in conduct surveys before?

7    A.  I have.  That's a common method, and I've probably used it

8    50 times I would say.

9    Q.  Before we get into the details of what you have to say,

10   have you heard of Dr. Isaacson before this case?

11   A.  I had.  We actually worked on the same side of a case a

12   couple of years ago.  So I was aware of him from that prior

13   case.

14   Q.  And on Friday afternoon, did Dr. Isaacson approach you here

15   in the courthouse?

16   A.  He did, yes.  I think just to say hello, since we had never

17   met in person before, despite having worked on that case.

18   Q.  Now, you testified on Friday about your assignment in this

19   case.  But would you just remind us of what your goals were.

20   A.  Sure.  Pretty simple.  To conduct a scientific review of

21   the two surveys that Dr. Isaacson did, and in particular to

22   look at his conclusion from the first survey, the one of the

23   NFT purchases, where he concluded that there was a likelihood

24   of confusion.  I looked very closely at that confusion to work

25   out if it was accurate or not.

1  Q.  Did you prepare some slides for your presentation today?

2  A.  I did.

3          MR. MILLSAPS:  Ashley, would you please put up the

4  first slide here.

5  BY MR. MILLSAPS:

6  Q.  Dr. Neal, could you explain your methodology for evaluating

7  Dr. Isaacson's surveys?

8  A.  Certainly.  This is pretty similar to the process you go

9  through in any scientific technical review of someone else's

10  work.  You begin by very carefully going through the

11  questionnaires themselves kind of line by line looking for any

12  biases or ambiguous language or any design flaws.

13          The second thing you do is you actually go into the

14  raw data.  So basically every single person's answer to every

15  single question, you look at that, and you reanalyze the data

16  to see if the person who analyzed it initially, so

17  Dr. Isaacson, did it correctly.

18          And then the final thing is you write up whatever you

19  find in a formal report.

20          MR. MILLSAPS:  And Ashley could we go to the next

21  slide.

22  BY MR. MILLSAPS:

23  Q.  At a high level, Dr. Neal, how would you summarize your

24  conclusions about Dr. Isaacson's surveys.

25  A.  Sure.  Perhaps the most important one thing is that NFT

1    say after me, that is a separate and independent reason for you

2    to find in favor of Mr. Rothschild on all of Hermès' claims.

3          When we're done speaking with you, Judge Rakoff is

4    going to give you the set of instructions that I have been

5    referencing, and he'll explain to the law to you and your job

6    when you go back into the jury room to deliberate about all of

7    the evidence that you have seen over the last week.

8          Judge Rakoff is going to instruct you that

9    Mr. Rothschild's MetaBirkins are, at least in some respects,

10   works of artistic expression and so they are protected by the

11   First Amendment, unless Hermès can clear a very high bar in

12   this case.  Judge Rakoff will instruct you that the First

13   Amendment bars liability on all of Hermès' claims unless Hermès

14   has proved, again, unless Hermès has proved that

15   Mr. Rothschild's use of the Birkin mark was not just likely to

16   confuse potential consumers, but was intentionally designed to

17   mislead potential consumers into believing that Hermès was

18   associated with Mr. Rothschild's MetaBirkins project.  I'm

19   sorry.  It is a mouthful, and I am just reading it.

20          If anything is clear from the evidence that you have

21   seen and the testimony that you have heard, it's that

22   Mr. Rothschild had no intention to mislead anyone into

23   believing that MetaBirkins came from Hermès.  He made clear

24   that he was the creator everywhere he could because he wanted

25   the credit for his own artwork.  You saw him testify.  He was

1    proud of it.

2            Ashley, would you please put up Mr. Martin's

3    testimony.

4            You heard Hermès' representative, Mr. Martin, testify

5    that he has no evidence that Mr. Rothschild ever told anyone

6    that MetaBirkins came from Hermès.

7            Ashley, would you please show the MetaBirkins website.

8            You have seen that Mr. Rothschild identified himself

9    as the creator of MetaBirkins on the MetaBirkins website.  And

10   when Hermès sent him a cease and desist letter, he even put up

11   a disclaimer on the website to make clear, doubly clear that

12   Hermès was not affiliated with MetaBirkins.

13           Ashley, would you please show the MetaBirkins

14   Instagram page.

15           Mr. Rothschild identified himself on the MetaBirkins

16   social media pages like the MetaBirkins Instagram pages that

17   you see here.

18           Ashley, would you please show the MetaBirkins Rarible

19   page.

20           Mr. Rothschild also identified himself on auction

21   platforms where he was able to, like he did here on Rarible.

22   You can see it says, A digital art project by Mason Rothschild

23   living on the Ethereum blockchain.

24           Mr. Rothschild identified himself in media interviews

25   as the artist who created MetaBirkins.

 1          Ashley, would you please play the Yahoo Finance clip.

 2          (Video played)

 3          MR. MILLSAPS:  You saw that Mr. Rothschild ran a

 4   public channel on the Discord platform where he constantly

 5   interacted with his MetaBirkins audience.  Mr. Rothschild made

 6   clear in this public Discord channel --

 7          And, Ashley, could you put up the first.

 8          -- he made clear in the public Discord channel that he

 9   was the one behind MetaBirkins.  You can see here, when he

10   posted on December 22, 2021:  No, like every disclaimer says,

11   this is an art project and not associated with Hermès.

12          And everyone in that channel, as you heard, was able

13   to message him directly at any time.  He was in constant

14   communication with these people.

15          Ashley, would you go to the next Discord slide.

16          You saw that that he ran polls of his MetaBirkins

17   members to ask them what they wanted him to do next with his

18   MetaBirkins art project.

19          And you also heard from Mr. Rothschild that when he

20   became aware of articles, he or his publicist, Ken Loo, became

21   aware of articles that mistakenly attributed MetaBirkins to

22   Hermès, they reached out to correct them.

23          Ashley, would you show that bit of Mr. Rothschild's

24   testimony.

25          I want you to just ask yourself, why would

1   Mr. Rothschild have wanted to mislead people into thinking that

2   MetaBirkins came from Hermès?

3          It would be so he could make as much money as he

4   possibly could off of the sales of them, right?

5          But we know that he didn't do that.

6          He sold the MetaBirkins for just .1 ETH, the

7   equivalent of about $450 at the time.

8          Now, as you heard, there was a lot of excitement about

9   the MetaBirkins NFTs when they were released.  He'd been

10  building that excitement up by previewing them for weeks on

11  Discord on his social media pages on the website.

12         It's pretty clear that demand was high enough at that

13  point that he could have charged a lot more money than what he

14  did for those 100 MetaBirkins NFTs, but he didn't do that.

15         He didn't do that because that was part of his

16  artistic experiment, as you heard him explain, and as he

17  explained in the Yahoo Finance interview that you've seen clips

18  of, because he wanted to see what kind of value people would

19  ascribe to these two dimensional pictures of imaginary Birkin

20  bags once they were released out into the world.

21         Now, you have heard Mr. Warshavsky, my opposing

22  counsel, go on about the fact that MetaBirkins NFTs were

23  attached to the shrouded object for less than 24 hours when

24  they were being minted.

25         All right.  I am not sure what he's getting at here.

1   If this were a case where the artworks were not previewed and

2   customers had no idea what they were buying, other than a

3   shrouded image called MetaBirkins, then maybe what he was

4   saying to you would be relevant.

5           But that's not what happened here.

6           Here, it is undisputed that Mr. Rothschild previewed

7   the MetaBirkins artworks before the NFTs were released.

8           Everybody who bought a MetaBirkins NFT knew that they

9   were going to get one of the 100 MetaBirkins artwork.  This

10  wasn't a secret.  Even Mr. Martin, Hermès representative,

11  admitted this in his testimony.

12          If anything is clear in this case, it is that

13  Mr. Rothschild never intentionally tried to mislead anyone into

14  believing that MetaBirkins came from Hermès.  He wanted to

15  conduct an artistic experiment, and he wanted the credit for

16  his own artwork.

17          After I sit down, Mr. Harris is going to talk with you

18  in more detail about the evidence of confusion in this case.

19  What I will say about it now is that the evidence that

20  potential consumers were likely to be confused into thinking

21  that MetaBirkins came from Hermès is weak.  You just heard

22  Dr. Neal testify about how weak it is.  It doesn't come close

23  to clearing the high bar of the First Amendment.

24          Now, there will always be people who are confused

25  about things, whether in a survey that you are giving them or

1    on social media.  But it is clear from Hermès' own survey

2    evidence that it is not exceptionally likely that potential

3    consumers, people who spend thousands of dollars on handbags or

4    NFTs, would be confused about whether MetaBirkins comes from

5    Hermès.

6         It is not surprising that the evidence of confusion is

7    so weak, because Mr. Rothschild, as you have seen, made clear

8    wherever he could that he created MetaBirkins.  He is the

9    artist.  He created them.  And he's proud of it.

10        He has a constitutional right to create his

11   MetaBirkins artwork, he has a constitutional right to promote

12   them, and he has a constitutional right to sell and make money

13   from his MetaBirkins artwork, so long as he doesn't explicitly

14   mislead people into believing that it came from Hermès and not

15   him.  That is the bottom line in this case.

16        But our Constitution doesn't enforce itself.  Our

17   Constitution gives you, as members of this jury, the power to

18   enforce it.  The rights that it guarantees, like the freedom of

19   speech and artistic expression that are protected by the First

20   Amendment, those rights are only guaranteed if we all uphold

21   them in moments like this.

22        I am confident that when you go back to the

23   deliberation room and you look at the totality of the evidence

24   in this case, you will see that the First Amendment bars

25   liability on all of Hermès' claims in this case.

1          Thank you so much for your time and attention.

2          I will turn this over to Mr. Harris now to discuss

3   with you confusion and Hermès' claims of dilution and

4   cybersquatting.

5          MR. HARRIS:  Mr. Warshavsky, would you mind if I

6   borrowed one of those bags?

7          MR. WARSHAVSKY:  Not at all.

8          MR. HARRIS:  I will take the black one.  Thank you.

9          MR. WARSHAVSKY:  You got it.

10          MR. HARRIS:  Good afternoon.

11          Let let's talk about confusion.  This is a Birkin bag.

12   It takes 18 to 24 hours to make.  It is a real handbag that can

13   hold real things.

14          This is Exhibit 506 in evidence.  These are

15   MetaBirkins you can photocopy.  They're two dimensional images.

16   You can cut one out and hold it up like this.

17          It is an art project.  This is one of the MetaBirkins

18   that was not actually made.  It is the one with the banana.

19   That's not a real banana.  You can't eat it.  You can't put it

20   in a MetaBirkin, and you can't even print it out 3D.

21          What you can do with a MetaBirkin, if you wish, is

22   print it out with your photocopier, put it in your pocket like

23   this, or you can look at it on your computer screen.

24          You heard Mr. Rothschild testify they are a 2D image.

25          Now, this is the example Mr. Rothschild used.

1              He took a water bottle.  This is a 3D object.  You can

2     take a 2D picture of it, you take a 2D picture of it, it's a 2D

3     image, and then you can photocopy it.  That's what you can do

4     with a MetaBirkin.  There is no confusion, and there's no

5     likelihood that a substantial number of consumers would be

6     confused.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. HARRIS:  Hermès spent a lot of money to hire three

2    expensive experts to come in here and testify.  You heard from

3    Dr. Kominers.  Smart fellow.  Well paid, to say the least.  But

4    you may find, you may find, that Dr. Kominers did not actually

5    say anything that matters to the claims in this case.

6          He had two main points.

7          The first had to do with segmenting the NFT mark.

8          Ashley, thank you.

9          And Dr. Kominers testified — my colleague tried to

10   draw this on the Elmo.  Testified that the NFT market has

11   different submarkets:  tickets, music, art only, digital brand,

12   other.

13         And if you go to the second slide, Dr. Kominers said

14   if you have an NFT that's attached to a painting, that's art

15   only.  If you have an NFT that's attached to a painting and it

16   offers some more functionality, like the ability to get on a

17   list for a future project, now it's a digital brand.

18         Now, we don't disagree, no one here disagrees that

19   MetaBirkins offered an image plus certain other things, like

20   what I just said, the ability to get on a list for a future

21   project.  Just don't know what that is relevant to.  You can

22   buy a Timex watch for maybe $20.  It will tell the time.  You

23   can buy a simple alarm, gets you up in the morning.  Or you can

24   buy a Timex watch with an alarm.  Those are both watches.  Now,

25   perhaps Dr. Kominers would call the watch with the alarm not

1   watch only.  Okay.

2          Dr. Kominers showed you a picture of an NFT frog.

3   That's the one over here on the left of the screen.  We found

4   some other pictures of frogs on the internet.  A frog with a

5   crown is still a frog, maybe not frog only.

6          So what Dr. Kominers does is argue that having utility

7   converts something into being a digital brand.  The things that

8   doctor -- the things that Dr. Kominers identifies are the

9   things that artists have been doing for ages, which people have

10  testified to here:  putting buyers on the list for future

11  projects, having a community, trying to promote their work and

12  promote the discussion.

13          Mr. Moulin, you may recall, one of Hermès's witness,

14  came in here to testify and brought a Power Point he created on

15  NFTs.  This is one of the things he wrote.  This is his slide:

16  NFTs allow for the establishment of a new more ethical and

17  decentralized relationship between owners of luxury items and

18  brands or between artists and their customers.  Mr. Moulin flew

19  in from France for that.  Or between item artists and their

20  customers.

21          So let's get back to Dr. Kominers.  Dr. Kominers did

22  some math and showed a bunch of charts.  Used his math to argue

23  that MetaBirkins are more akin to a digital brand than art

24  only.  Again, I don't know that that matters to any of the

25  claims in the case.  But even if it did, let's look at Dr.

1   Kominers's math and his charts.

2           Please put up slide 6, Ashley.

3           This is Dr. Kominers' market analysis chart.  And if

4   you see up at the top, NeoTokyo Citizen, which is 111,000,

5   isn't shown.  It's not shown because the number is too high.

6   It's kind of like the Russian judge and the figure skating to

7   throw out the data you don't like.  And so we did this chart

8   with the full data.  And when you see it with the full data,

9   MetaBirkins is much closer to the other group than the NeoTokyo

10  Citizens.  Again, I'm not 100 percent what the chart is trying

11  to show, but that's the actual chart.

12          By the way, also you heard — and Mr. Warshavsky said

13  in his own closing today — that these things were sold in

14  Ether.  And the price of Ether fluctuates against dollars.  Dr.

15  Kominers did his chart in dollars.  So we don't even know if it

16  accounts for the fluctuations in the price of Ether over time.

17  That's what the chart looks like.

18          So he did another chart.  Again, I'm not 100 percent

19  sure what this chart is supposed to show, but I do know one

20  thing:  Dr. Kominers threw out Mobland and threw out

21  X-Consoles, didn't put them on his chart.  Russian judge.

22          Let's see what the chart looks like with that data.

23          With that data, MetaBirkins, down towards the bottom

24  of that chart.

25          And by the way, also on Dr. Kominers' chart he put

1   MintDisc above -- he put MetaBirkins above MintDisc.  If you

2   look at the data, MintDisc is above MetaBirkins, not that it

3   matters.  All right.  That's the actual chart.

4        So let's take a look at another chart Dr. Kominers

5   showed you.  This is a chart that Hermès's counsel showed you

6   in closing this morning.  That's the chart Dr. Kominers showed

7   you.

8        Now, what's interesting about this chart -- Ashley, if

9   you could -- see that red box?  We printed this chart out.  We

10  printed this chart out on eight and a half by 11 paper and

11  measured it last night.  That red box -- the whole chart is

12  nine and a half inches.  That red box is eight inches.  That's

13  less than one month.  It's 23 days, maybe it's 24.  December 3

14  to December 26.  That's eight inches.

15       The next part, Ashley.

16       That little part now in blue or black, that's 11

17  months.  That's 1.5 inches.  Again, the chart is in dollars.

18  Chart doesn't account -- we know -- Mr. Warshavsky just said

19  that the price of Ether has declined from about 4500 to

20  about -- at the time of the minting to about 1600 yesterday,

21  when he looked on the internet.  We know Ether fluctuated.  We

22  know this stuff was sold in Ether.

23       This chart is in dollars.  It's no effort that I'm

24  aware to account for changes in the price of Ether.  And then

25  this time scale was used to create whatever impression the

1    intent was.

2             And finally, Dr. Kominers put up this summary chart,

3    right.  This chart Dr. Kominers was using to compare

4    MetaBirkins to the things you see on this page.  But there's

5    something really interesting about the things you see on this

6    page.  He put back in all the data he had excluded when he was

7    the Russian judge.  NeoTokyo, that wasn't on his other chart.

8    It got excluded.  Mobland, that wasn't on his other chart.  It

9    got excluded.  X-Console wasn't on his other chart, that got

10   excluded.  But this chart, they included.

11            Now, what's left?  MetaBirkins, a project that

12   involves Samsung and Sotheby's, a project that involves Nike

13   and a company Nike bought, and a project that involves

14   apparently Google.  That's what's left.  That's Dr. Kominers.

15            Now, there are two types of groups of consumers who

16   could be potentially confused in this case, right.  And there's

17   potential confusions by handbag consumers and there's potential

18   confusion by NFT consumers.  You heard a lot of testimony on it

19   this morning from Dr. Neal, not going to repeat, right.

20            But quickly, Dr. Isaacson conducted a survey aimed at

21   confusion among purchase of handbags.  We heard that testimony.

22   And he found there was only 3.6 percent, percentage that was

23   too low to support a claim of confusion.

24            Can you put that transcript up?

25            This is from -- I can't see because of menu, but it's

transcript page, I think, 777.  Sorry, just can't see it on my

screen.

He was asked:  Have you ever formed an opinion -- this

is Dr. Isaacson was asked:  Have you ever formed an opinion

about whether or not that 3.6 percent number from the handbags

survey reflected confusion amongst handbag purchasers?

Answer:  I have expressed an opinion in this matter on

that 3.6 percent.

And what is that opinion, sir?

That number is below the number that would typically

be interpreted as indicating likelihood of confusion, 3.6

percent.

That's Dr. Isaacson's testimony.

Now, what's interesting is Dr. Isaacson didn't rely at

all on this number for his conclusions, he just tossed it out.

Russian judge.

And so can we put this back there?

There's no case here for confusion among handbag

consumers.  Not a case.  And you heard Dr. Neal talk about that

this morning, and you'll hear the judge.

So what does that leave us?  Potential confusion by

purchasers of NFTs.

I want to get this very correct.  The issue is whether

Mr. Rothschild's use of the Birkin name and/or the handbag's

distinct visual appearance is likely to confuse potential

1    consumers into thinking that the MetaBirkin NFTs are made and

2    sold or otherwise connected with, associated with, sponsored by

3    or approved by Hermès.  And then, in determining this,

4    determining whether consumers are likely to be confused, you

5    may draw on your own common experience.  You should take into

6    consideration the following factors.

7         I was reading that from the instructions.

8         Now, you heard Mr. Warshavsky go through these factors

9    at length.  Factors are, of course, not the ultimate question

10   you are being asked to decide.  The ultimate question you are

11   being asked to decide is whether, on balance, a likelihood of

12   confusion exists.  That was a partial sentence, but you'll get

13   the whole sentence.  Reading from the instructions.

14        So the factors are on a checklist; two factors for

15   Hermès, four factors for Rothschild, right.  The question is,

16   on balance, whether a likelihood of confusion exists.

17        Now, one of the factors as to whether there's any

18   actual confusion by any actual purchasers of the bag.  And we

19   would submit that this factor deserves substantial -- there's

20   no evidence in this case that any actual purchaser of an actual

21   MetaBirkin was confused.  No purchaser, no evidence that any

22   purchaser of a MetaBirkin reached out to Mason Rothschild and

23   Discord or through the MetaBirkin's web page or anywhere else,

24   upset, angry, asking for their money back, saying, Hey, where's

25   my Birkin bag?  There's simply none of that.  And why would

1   there be?  Because another factor on confusion is good faith,

2   especially intent.  And this was discussed at length by

3   Mr. Millsaps.  I'm not going to repeat it here.

4          But Mason Rothschild took every opportunity to

5   announce himself as the creator of the project, over 25,000

6   people on Discord he was speaking to.  He was on Instagram

7   publicly, he was on Twitter, he was on the MetaBirkins website.

8   He never, ever publicly claimed once to be associated with

9   Hermès.  The most he ever did was send some private text to

10  friends saying he was hoping to collaborate with Hermès, which

11  never happened.  And Hermès belittles those attempts, because

12  they say, We don't know who Clement Quan is, or maybe you don't

13  really know the person at *Vogue*, or maybe you don't really have

14  a relationship with Sotheby's.  They belittle the attempts.

15  Whatever.  That's the only -- he did try.  But the point is

16  those were private.  They were never -- those are in private

17  texts.

18          In public, the only evidence is that Mason Rothschild

19  is proud of what he did and took credit for it.  And when

20  Hermès complained and sent a cease and desist letter,

21  Mr. Rothschild put up a disclaimer on the website which you've

22  already seen.  He and his publicist, Ken Loo, reach out to make

23  corrections, which you've heard.  Why?  Because he was proud of

24  his project and wanted credit for it.  He wanted -- he wanted

25  to make some money from it, too.  Hermès belittles that.

1    Something improper about making money.  Like it's okay to spend

2    18 hours having a craftsman make a fancy handbag and sell

3    that -- those products for $100 million a year just in the U.S.

4    alone, but it's not okay to make a MetaBirkin art project and

5    make money from that.

6            All right.  So against this, what is the evidence of

7    likelihood of confusion?  What evidence does Hermès offer?

8    Well, offers some questions from journalists.  Questions from

9    journalists are not evidence of consumer confusion by potential

10   NFT purchasers.  Journalists are paid to ask questions.  That's

11   their job.  They're not a good proxy for people of $2500 or

12   more to spend for expensive NFTs or have a crypto wallet who

13   are interested in potentially buying a MetaBirkins.

14           And then they have some articles, they showed you some

15   articles; we saw them again today, right?  Well, the articles

16   were corrected again.  They are not evidence of confusion by

17   consumers.  Maybe some evidence of some confusion by

18   journalists, right, which is corrected, right, which is all

19   evidence of Mason Rothschild's desire to take credit, right.

20           So we've got that.  We've got a few newspaper articles

21   which are corrected.  We've got a few journalist inquiries,

22   that's their job.

23           So what have we got left on confusion?

24           Well, we got the testimony of Dr. Isaacson, based on

25   his -- not the handbag people, those people are gone.  We've

1    got the testimony of Dr. Isaacson based on his survey of

2    potential NFT purchasers.  Dr. Neal talked about this survey at

3    length this morning and I am going to hit this very quickly,

4    okay.

5         But here's something interesting:  The survey is based

6    on individuals who said in response to an online survey that

7    they would consider buying a $2500 NFT in the next 12 months.

8    There's no work done by Dr. Isaacson to determine if any of

9    those folks actually bought an NFT for $2500 or any other price

10   in the next 12 months.  There's no work done by Dr. Isaacson to

11   check whether they ever bought an NFT.  He has no knowledge if

12   they had a crypto wallet, if they owned any Ether.  There's no

13   questions about whether these folks follow NFTs on Discord or

14   anywhere else.

15        What does he have?  There's an online survey for folks

16   who say this is something they consider and they are willing to

17   do this in return for about 10 to 12 dollars in gift cards.

18   Since we've been talking about Starbucks this morning, that's

19   probably enough to buy about two cups of coffee at Starbucks.

20        And you may find that is not a representative sample

21   of folks who might mint a MetaBirkin NFT using a crypto wallet

22   paying in Ether.  And that's important for two reasons:

23        First, you may find Dr. Isaacson didn't sample the

24   right group to begin with.  Second, another factor you may

25   consider for likelihood of confusion is the sophistication of

1    the consumer.  Because folks paying $2500 for an NFT artwork,

2    paying a lot of money for anything, for that matter, are likely

3    to be going to pay attention, right, going to pay more

4    attention to buying a $2500 item than if you're buying

5    something for a buck 50 off of the shelf at the Walmart.

6    That's probably right.

7         Then you heard Dr. Neal's testimony which I'm not

8    going to repeat here, that, well, Dr. Isaacson asked the right

9    question to weed out folks with this issue over feedback issue.

10   Dr. Isaacson then ignored the answer to his own question.  Why

11   would Dr. Isaacson ignore the answer to his own question?

12   Didn't like the data.  Russian judge.  Just ignore it.

13        The combined effect of these flaws was to overstate

14   the amount of confusion from 18 percent or so to something

15   below ten percent.  By the way, survey is just one factor,

16   right?  But that is, that survey properly looked at is evidence

17   of a lack of confusion.  The actual confusion was below ten

18   percent.  And you heard Dr. Neal testify that below 15 percent,

19   15 percent, not ten percent, is generally considered not

20   sufficient to find confusion.  Again, just one factor, and

21   that's assuming Dr. Isaacson even was surveying the right

22   folks.

23        So we believe -- not we believe, you may find there is

24   no likelihood of confusion in this case.  Even if this were an

25   ordinary trademark case, without the First Amendment overlay,

1  given everything we have just discussed, the lack of any actual

2  confusion by any actual purchasers.

3       Mr. Rothschild's good faith and repeated efforts to

4  take credit and correct the record; the sophistication of the

5  purchasers, these are people spending a lot of money who need

6  to have a crypto wallet to do this; and all the issues Dr. Neal

7  discussed with Dr. Isaacson's survey.  So there is no

8  confusion.  Really, what more do we need than this?

9       Next issue is dilution, separate claim.  In order to

10  prevail, Hermès must prove the Birkin mark is famous and was

11  famous before Mr. Rothschild first sold any of the MetaBirkin

12  NFTs.  We don't dispute -- we don't dispute that the Birkin

13  mark is iconic among the wealthy.  It is.  That is different

14  than famous.  Famous, and you will read, "famous" means widely

15  recognized by the general consuming public as designated Hermès

16  as the source of goods bearing the mark.  General consuming

17  public, you may find, is not folks on Park Avenue carrying

18  Birkin bags; it's the general consuming public of the United

19  States, meaning folks all over the country, all income groups,

20  both men and women.

21       Ford Mustang is famous, widely recognized by the

22  general consuming public as coming from Ford.  Coca-Cola is

23  famous, Nike is famous, Walmart is famous.  There's plenty of

24  evidence in this case, which we don't dispute, of the Birkin

25  bag being featured in high-end fashion magazines like *Vogue* and

1   *Town & Country*, and being legendary among consumers of $12,000

2   handbags.  That is very different than evidence of the Birkin

3   bag being widely recognized by the general consuming public of

4   this country, like Coca-Cola.

5        Counsel for Hermès just stood up here not -- maybe not

6   half an hour ago, maybe a little more, and said Hermès only has

7   32 stores in the United States total.

8        The second thing Hermès would need to prove on this

9   dilution thing is that Mr. Rothschild's use of the MetaBirkins

10  name and the images associated with it are likely to dilute the

11  distinctiveness of the Birkin mark; that is, not that there is

12  an association, but that the association dilutes the

13  distinctiveness of the mark, that because of Mr.  -- because of

14  Mr. Rothschild's MetaBirkins, the Birkin mark has less power in

15  identifying Birkin bags to the wealthy consumers who covet them

16  and can afford them.

17        Really?

18        Does that sound right to you?

19        As counsel showed you pictures of bees, all right.

20  Mr. Rothschild is not responsible for the other bees.  He's not

21  responsible for somebody who's making a stone sculpture of the

22  Birkin bag.  He's not responsible for being singing about the

23  Birkin bag in a rap song.  Mr. Rothschild owns his conduct and

24  is responsible for his conduct.

25        Come to Hermès's third claim in this case, which is

1  for cybersquatting.  This isn't a case where Hermès owns

2  hermès.com and someone goes out and squats on hermès.org,

3  demands a ransom.  Judge Rakoff will tell you that bad faith is

4  one of the elements of cybersquatting that Hermès must prove.

5  There's no basis in this case to find Mr. Rothschild squatted

6  or squatted in bad faith on any web domain.

7       The uncontradicted evidence is Mr. Rothschild used

8  metabirkins.com only for the MetaBirkins project, and he never

9  attempted to sell the metabirkins.com site to anyone.  There's

10  no evidence he attempted to hold the metabirkins.com website

11  name hostage or he attempted to divert customers from Hermès's

12  own website.  The evidence is that Mr. Rothschild only used

13  metabirkins.com to sell the MetaBirkins he created.  In so

14  doing, he acted in good faith.  As my colleague covered, from

15  the start metabirkins.com website informed consumers that Mason

16  Rothschild was the creator.  And after Hermès sent a cease and

17  desist, Mr. Rothschild put up a disclaimer.  There's no claim

18  here for cybersquatting.

19       So we come to damages.  It's our part of the case for

20  us.  We hope you won't get to damages.  We're asking you not to

21  get to damages.  We're asking you to find Mr. Rothschild not

22  liable for trademark infringement, not liable for dilution or

23  cybersquatting, and to find his activities protected by the

24  First Amendment of the Constitution.

25       THE COURT:  Thank you very much.

1              I'm sorry, were you --

2              MR. HARRIS:  I have maybe -- I don't have a lot left.

3              THE COURT:  No, no, go ahead.  You have ten minutes

4    left.

5              MR. HARRIS:  I am going to do --

6              THE COURT:  I just misunderstood.

7              MR. HARRIS:  Thank you, your Honor.

8              Don't want to miss the grand finale.  Sorry.

9              But when you come to damages, there's the testimony of

10   Mr. Chavez, the head of Hermès in the United States.

11   Mr. Chavez testified that Birkin sales increased in 2021 and

12   '22.  And he testified, here is the bottom Q:  Are you aware of

13   loss of sales revenue in North America because of the

14   MetaBirkin?

15             No, I am not.

16             So Hermès, which has no damages, is asking instead for

17   the profits made by Mr. Rothschild.  You heard he minted 100

18   Birkin bags at 1.1 Ether each and got a small piece of resales.

19   You heard he got paid in Ether, which the testimony is it's now

20   gone down in price.  You heard that in total, the minting fees

21   amounted to about $45,000, and about $67,000 for resales.

22             Mr. Warshavsky, if you could do me a favor and put up

23   the chart you used from your expert, the damage chart.  I think

24   it's the last chart you used.

25             You'll see the chart is from Dr. Mentzer.  The minting

1    revenue is about $45,000.  That's converted from the Ether; the

2    Ether are worth less now.  The royalties are about 69,000.  We

3    talked about that.  Artists, when they do NFTs, are able to get

4    a share of royalties going forward.  That would be

5    Mr. Rothschild's share, it's about 17 and a half Ether,

6    $69,000.  Again, the price has gone down.

7            Then he comes to MetaBirkin NFT transfers.  And what

8    is that?  Well, that is that Mr. Mentzer took the position that

9    because Mr. Rothschild kept three MetaBirkins out of the first

10   100 that were minted, that the damage there is $120,000 based

11   on the highest price of MetaBirkin ever traded for.  I don't

12   really understand.  But the testimony is that Mr. Rothschild

13   gave away two of those MetaBirkins, and he only has one.

14   There's no evidence in this case that he intends to sell it or

15   that he could sell it for $40,000 right now.

16           So that's the damages.  I'd ask you to disregard

17   Mr. Mentzer's $120,000, and to bear in mind the price of Ether

18   has gone down.

19           Now, again, there was no harm to -- of course, we're

20   going to ask you not to find liability and no damages.

21           Again, there was no harm to Hermès, so why?  You may

22   find Hermès didn't like Mr. Rothschild's art; that Hermès

23   judged Mason Rothschild and his art and found him wanton.

24   Maybe that Hermès 150-year-old French fashion house thinks it's

25   better than Mason Rothschild, the self-made artist with no

1   formal art school training.  And upset that a 27-year-old — now

2   28-year-old — from L.A., who Hermès had never heard of, did

3   this.

4           We heard some interesting things in this case that

5   speak to Hermès's attitude.

6           Hermès's counsel showed you in opening and then showed

7   you again today and showed Mr. Rothschild a lot of texts, but

8   didn't ask for a lot of explanation, which is his right.  We

9   provided that explanation.  You might remember the -- was shown

10  today in closing, the Future tech, the Future posting.  That's

11  a post that Future made about the MetaBirkins, rap star.  And

12  Mr. Rothschild put on -- can you put that up, Ashley?  And

13  Mr. Rothschild put up on that -- okay, I'll just keep going.

14  Don't worry about it.  I'll keep going.  They'll remember.

15          Mr. Rothschild — there it is — put up on it

16  MetaBirkins2Pluto.  And Dr. Kominers got up there and said,

17  Well, that means the price going to the moon.  Didn't bother to

18  find out that Mr. Rothschild knows Future, and that that is

19  Future's nickname.  It's an interesting thing that a man named

20  Future has a nickname.  Okay.  Another nickname.

21          All right.  So then it happens again.  They put up --

22  if you could throw up, please, Ashley, Exhibit -- the one I

23  handed to you before, it's Exhibit 313.

24          Mr. Rothschild, on direct, was examined by this,

25  leaving the impression that when it was minted, it said "secure

1    the bag."  We had to bring out on cross, you can very clearly

2    see it says "press the button below to mint your MetaBirkin

3    now."  So that's just a couple of examples, all right.

4         Now, Mr. Martin, the general counsel of Oliver Mezz,

5    who's been sitting here the whole trial, testified on direct,

6    questions by his lawyer, that Hermès had no contact, no

7    contact, his words, with Mason Rothschild after sending the

8    cease and desist.

9         On cross, Mr. Martin had to correct that.  Because, in

10   fact, Mason Rothschild was respectful and his attorneys reached

11   out to Hermès's attorneys right away.  And then Mr. Rothschild

12   put a disclaimer on his website.  And he went on Discord and

13   told all those tens of thousands of people that he wasn't

14   affiliated with Hermès in any way, shape or form; this was his

15   project.  And then Hermès sued Mr. Rothschild anyway.  And then

16   even though Hermès could have sent the complaint to his lawyers

17   with whom they were in contact, Hermès chose to serve

18   Mr. Rothschild at his store showing pictures to his customers.

19   That's a lack of respect.

20        Mason Rothschild came from a good family, but he came

21   from nothing.  He made himself.  Designs now for Formula I.  He

22   did not -- he owns a boutique in Los Angeles with his fiancé.

23   He made himself an artist.  Mason Rothschild wasn't given

24   anything.  He started working at 16.  You saw our testimony

25   about how hard he's worked.

1     Hermès wants more than what they are entitled to here.

2   They want more than what the law gives them.  The law gives

3   Hermès the ability in certain circumstances to enforce their

4   trademark in the commercial market and to prevent consumer

5   confusion.

6     Here, there is no confusion.  There is no dilution.

7   There is no cybersquatting.  There is no valid claim.  And

8   Hermès still wants more.  They want control over how Mason

9   Rothschild makes a point or creates pictures.  And that is

10   protected by the First Amendment of our Constitution; that is

11   protected by you.  Thank you.

12     THE COURT:  Thank you very much.

13     Ladies and gentlemen, so we'll give you your lunch

14   break now and we'll get some medicine for our court reporter.

15   And we'll see you at 10 after 2.

16     (Jury not present)

17     THE COURT:  Just work out over the lunch break, as I

18   indicated, any remaining problems on the index of the exhibits

19   and the exhibits themselves.  But if there still is an issue,

20   I'll take it up when we get back at 10 after 2.

21     See you then.

22     (Luncheon recess)

23     (Continued on next page)

24

25