# Exhibit 65

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

HERMÈS INTERNATIONAL, et al.,

            Plaintiffs,

       v.                              22 Civ. 384 (JSR)

MASON ROTHSCHILD,

            Defendant.                 Trial
------------------------------x
                                       New York, N.Y.
                                       February 3, 2023
                                       9:35 a.m.
Before:

                 HON. JED S. RAKOFF,

                                       District Judge
                                        -and a Jury-


                      APPEARANCES

BAKER & HOSTETLER LLP
     Attorneys for Plaintiffs
BY:  DEBORAH A. WILCOX
     OREN J. WARSHAVSKY
     GERALD J. FERGUSON

HARRIS ST. LAURENT & WECHSLER LLP
     Attorneys for Defendant
BY:  ADAM B. OPPENHEIM
     JONATHAN A. HARRIS

LEX LUMINA PLLC
     Attorneys for Defendant
BY:  RHETT O. MILLSAPS, II
     CHRISTOPHER SPRIGMAN
```

1           MS. WILCOX:  Your Honor, I offer Plaintiff's
2    Exhibit 190 into evidence.
3           MR. HARRIS:  No objection.
4           THE COURT:  Received.
5           (Plaintiff's Exhibit 190 received in evidence)
6           MS. WILCOX:  Mr. Ferrer, could you please publish that
7    to the jury.
8    BY MS. WILCOX:
9    Q.  Dr. Isaacson, you are employed by MMR Strategy Group.
10          How many years have you spent there?
11   A.  A little more than 17 years since 2005.
12   Q.  What is your role at MMR?
13   A.  I'm president.
14   Q.  How many years have you been president?
15   A.  Since the time I arrived there 17 years ago.
16   Q.  What does MMR do?
17   A.  MMR conducts research primarily in the form of surveys, and
18   we use that research to help our customers, our clients,
19   understand what their customers are doing or what their
20   customers are thinking.
21          We work in three areas.  We call them practice areas.
22   One of them is we conduct litigation surveys like the survey
23   I'll talk about today.  I've testified previously about surveys
24   that I've conducted on behalf of a wide range of companies and
25   organizations, that include Hilton Hotels, Marriott Hotels,

1  Jeep, Monster Energy, the United States Postal Service.  In
2  fact, sometimes our clients for litigation surveys are agencies
3  of the federal government, so we've done a fair amount of work
4  for the Federal Trade Commission, for the patent and trademark
5  office, and also for the Department of Justice.
6           The second practice area in which we work is surveys
7  that we conduct so that companies can substantiate claims that
8  they want to make on packages and in advertising.
9           And then a third practice area is surveys and
10 marketing consulting that we provide for commercial companies
11 who want to introduce a new product to the marketplace, develop
12 a marketing strategy, or locate new customers.
13          And the last two areas are customers in recent years
14 have included companies like Nestle, Allstate Insurance, and
15 Remax, the real estate company.
16 Q.  How much of MMR's work involves conducting surveys?
17 A.  All of our work involves conducting some type of research
18 and almost all of our work involves the conducting survey.
19 Q.  Can what type of surveys are those?
20 A.  They are a wide range of surveys, but they include surveys
21 of consumers, and also sometimes they include surveys of
22 business customers as well.
23 Q.  How many surveys, that is, has MMR conducted since you've
24 been president?
25 A.  In those 17 years, we've conducted more than 1,000 surveys,

1  and I've been personally involved in almost all of them.
2  Q.  How many people work with you at MMR?
3  A.  14 including myself.
4  Q.  Could you briefly give us their backgrounds?
5  A.  Sure.  So among the 14 people, again, including myself, we
6  have five people who have Ph.D.s or doctorates, and then we
7  have seven people who have master's degrees.  Those graduate
8  degrees are in subjects like marketing, business, social
9  sciences, statistics, and even food science.
10 Q.  And you are here today to serve as an expert witness about
11 a likelihood of confusion survey that you conducted?
12 A.  That's correct.
13 Q.  How many times have you served as an expert witness before
14 and where?
15 A.  I've testified in more than 100 matters about a survey
16 either that I've conducted or that someone else has conducted
17 and I've testified in federal courts like this one, in state
18 courts, and a wide range of other venues and before a wide
19 range of other authorities.
20 Q.  How many matters have you worked on that involved trademark
21 likelihood of confusion surveys?
22 A.  I've worked on more than 70 matters that have involved
23 likelihood of confusion surveys.
24 Q.  How many times have you testified about a trademark
25 likelihood of confusion survey?

1  A.  I've testified either through a report or through oral
2  testimony like today in more than 45 matters involving
3  likelihood of confusion surveys.
4  Q.  How much time was your firm paid for conducting the
5  likelihood of confusion survey in this case?
6  A.  For the likelihood of confusion survey that my firm
7  conducted in this matter, up through the expert report, my firm
8  billed $130,000, and that includes the cost of designing and
9  conducting the survey and then writing up the results in an
10 expert report.
11 Q.  Did your firm engage in any additional work after
12 conducting the likelihood of confusion survey?
13 A.  Yes, and my time for that additional work is billed at $900
14 an hour.
15 Q.  Dr. Isaacson, before we talk more about your survey, let's
16 discuss a bit more about your background.
17         MS. WILCOX:  Mr. Ferrer, could you please turn to page
18 three.
19 Q.  Dr. Isaacson, walk us through your education briefly.
20 A.  Sure.  It's listed at the top of the page that's on the
21 screen now.
22         I have an undergrad degree which is a bachelor of
23 science in engineering.  That's from Northwestern University.
24 I have an MBA, which is a master of business administration
25 degree.  That's from Harvard Business School.  And I also have

1  showed them the *MetaBirkins.com* web page and asked questions to
2  understand whether they confused it either as coming from
3  Hermès or Birkin or as sponsored, authorized, or approved by
4  Hermès or Birkin.
5  Q.  Dr. Isaacson, did you prepare any slides for us to help us
6  walk through this testimony?
7  A.  Yes.
8          MS. WILCOX:  Mr. Ferrer, could you please pull up
9  Exhibit 193.
10 Q.  What is this document, please, Dr. Isaacson?
11 A.  These are the demonstrative exhibits that I prepared to
12 describe my survey.
13         MS. WILCOX:  Your Honor, I offer Plaintiff's Exhibit
14 193 into evidence.
15         MR. OPPENHEIM:  No objection, your Honor.
16         I'm sorry.  Excuse me.  I'm sorry.  Objection.
17         THE COURT:  OK.  Well, I will allow this to be shown
18 to the jury as an aid to following the witness's testimony, but
19 they will not be received in evidence.  They will not be
20 available to the jury during their deliberations, but they can
21 be viewed now as an aid to following his testimony.
22         MS. WILCOX:  Thank you, your Honor.
23         Mr. Ferrer, could you please go to slide two.
24 BY MS. WILCOX:
25 Q.  Dr. Isaacson, what are we looking at here?

1  A.  What we're looking at is a picture of the top part of the
2  web page that I showed in my survey.  In my survey, this looked
3  like an actual web page, but this is just the top part of what
4  people saw in the course of the survey.
5  Q.  Could we please go to the next slide.
6          What is this page?
7  A.  Some of the images that *MetaBirkins.com*, when you move your
8  mouse over them, text appears and then disappears.  When you
9  move your mouse again, and this shows the handbag at the top of
10 the web page with and without that text that is superimposed
11 when you move your mouse over the handbag.
12 Q.  And if we can go to the next slide, four, please.
13         What are we looking at?
14 A.  What we're seeing here is one of the rows of handbags
15 further down the web page and, again, superimposed text appears
16 when you move your mouse.
17         In this case, that text says Not Your Mother's Birkin,
18 and this shows those images with and without that text.
19 Q.  Why did you choose to measure the *MetaBirkins.com* web page?
20 A.  Well, because it's one of the places where the MetaBirkins
21 are advertised, and also because it has a disclaimer, and I
22 wanted my research to reflect the effect of the disclaimer as
23 well.
24         MS. WILCOX:  Mr. Ferrer, could you please pull up
25 Exhibit 192.

1   Q.   Is this a page where the disclaimer appears, Dr. Isaacson?
2   A.   It does.  This shows the whole web page that was in my
3   survey, including the disclaimer.
4   Q.   Could you please read what the disclaimer says?
5   A.   Sure.  It says, We are not affiliated, associated,
6   authorized, endorsed by, or in any way officially connected
7   with the Hermès, or any of its subsidiaries or its affiliates.
8   The official Hermès website can be found at
9   *http://www Hermès.com/.*
10            THE COURT:  I'm sorry, counsel.  I apologize, but I
11  think we need a quick sidebar.
12            (Continued on next page)

1           (At sidebar)
2           THE COURT:  So at the time I made my ruling a few
3  minutes ago saying that these would only be received to help
4  follow his testimony, it's because the label on them was
5  "demonstrative exhibits."  But what I'm now hearing is that
6  this is what he actually used in the survey; this is the actual
7  survey, in effect, which I think would be admissible.
8           Any objection?
9           MR. OPPENHEIM:  No, sir.
10           THE COURT:  Then we will now receive -- what's the
11  full number?  Well, when you get back, just read off the full
12  numbers and those will be received.
13           MS. WILCOX:  Thank you, your Honor.
14           MR. OPPENHEIM:  If I may, your Honor, it might be
15  appropriate to voice objections to the pages that were not part
16  of the marking.
17           THE COURT:  Yes.  I'll make that clear to the jury
18  that what is being received, and they will have access to the
19  actual survey, but not the other slides that don't relate to
20  the survey itself.
21           MR. OPPENHEIM:  Okay.  Thank you.
22           (Continued on next page)
23
24
25

1               (In open court)

2               THE COURT:  Ladies and gentlemen, I wanted to slightly

3    revise the ruling I made a few minutes ago, in light of the

4    testimony that's now being given.

5               Those are the slides that are the witness's actual

6    survey, will be received in evidence and you'll have them

7    available for you when you get to the jury room.

8               There are some other slides that are not part of the

9    survey; those are only being offered as aids to following

10   testimony.  You don't have to worry now about which is which

11   because they're going to give you when you get to the jury room

12   not only all the exhibits, lucky you, but an index to the

13   exhibits so you can find what you want.

14              Okay, counsel.

15              MS. WILCOX:  Thank you, your Honor.

16   BY MS. WILCOX:

17   Q.  Why did you want to include the disclaimer in your test

18   page of the likelihood of confusion survey?  Doesn't it

19   disclaim any relationship with Hermès?

20   A.  I wanted to include it so that I could have my survey

21   measure the effect of the disclaimer.  If we zoom back out to

22   see the whole web page, you can see there's three things that

23   can occur when someone comes to this web page.  They might see

24   the disclaimer and they might realize from the disclaimer that

25   Hermès or Birkin is not in any way connected with this web

1  page.  They might not notice the disclaimer at all; it is only
2  two faint lines on a very busy page.  And then they might see
3  the disclaimer and misread it and take away the mistaken
4  impression that the web page is connected with Hermès or
5  Birkin.  So I wanted to make sure that my survey reflected the
6  effect of the disclaimer.
7  Q.  So even with a disclaimer, there can still be a likelihood
8  of confusion?
9  A.  Absolutely.
10 Q.  Did your survey only measure this metabirkins.com web page?
11 A.  No, my surveyed measured this web page, which I call the
12 test web page; and then an altered version of this web page,
13 which I call the control web page.
14 Q.  Why did your survey include a control version of the
15 website?
16 A.  Well, this matter involves disputes over three very
17 specific things on this web page.  One is the use of the word
18 "Hermès"; the other is the use of the word "Birkin"; and then
19 the third is the shape or the look of the handbag on the page.
20         And by having -- my test web page includes those three
21 items.  My control web page does not include those three
22 elements.  And so by having one web page that does and one web
23 page that does not, I could compare the two web pages, and that
24 way I could measure the effect of those specific elements as
25 opposed to anything else that's happening on the web page.

1  Q.  In fact, let's walk through your control page.
2          MS. WILCOX:  Mr. Ferrer, please pull up Exhibit 193
3  again, slide 5.
4  Q.  What are the changes that you made, Dr. Isaacson?
5  A.  Well, I removed the word "Birkin," that's point number one,
6  and changed it to "Handbag."  And similarly in point number
7  two, I changed "MetaBirkins" to "Metahandbags."  I removed the
8  word "Hermès" and changed it to "Darcy."  And then I changed
9  the shape of the handbags so they would be less like the shape
10 of a Birkin bag.  In the control, they are more square, they
11 are less tapered, they don't have a padlock, and there are some
12 faint vertical metallic lines that I removed as well.
13         MS. WILCOX:  Please turn to slide 6.
14 Q.  And Dr. Isaacson, is this what you were just describing?
15 A.  That's correct.  You can see up at the top it says
16 "Metahandbags."  You can see that the shape of the handbag is
17 slightly different and it doesn't have the padlock on it.  And
18 if you look carefully at the disclaimer, you'll see it says
19 "Darcy" instead of saying "Hermès."
20         MS. WILCOX:  And the next slide, please.
21 Q.  What is this?
22 A.  This is more of the same page.  Again, you can see that the
23 shape of the handbag is changed.  This is the control web page
24 again.
25 Q.  And the next three of three, slide 8.  What is this?

THE WITNESS: If I can just add one more response to that question.

People could have said more than one category in response -- in answering question 1. So it's possible that someone might -- that people gave -- in fact, a number of people gave responses where they would have been counted in multiple rows across that table.

THE COURT: Go ahead, counsel.

MS. WILCOX: Could we please turn to slide 19.
Q. And describe for us what this chart shows, Dr. Isaacson.
A. Sure.

This is counting the number of people who said Hermès or Birkin in question 1, in question 4, and in question 7. And as I just mentioned, they might have said Hermès or Birkin and said other things, they might have said Vogue, they might have said Meta, they might have given a response that would have fallen into another category as well; and, in fact, a number of people did that.

But the survey, again, is designed to measure confusion between metabirkins.com and Hermès or Birkin. And counting that level -- that type of confusion, in response to question 1 we have 17.5 percent for the test and 1.9 percent for the control. We have, in response to question 4, an additional 4.1 percent and one percent. And then zero percent in response to question 7. And when you add up down the

1  column, you get to 21.6 percent for the test web page, and 2.9
2  percent for the control web page.  And there's a number there
3  that says net confusion.  And net confusion is simply the
4  difference if you subtract the control from the test, and the
5  difference is 18.7 percent.  That's the net confusion for this
6  web page with respect to Hermès or Birkin.
7  Q.  What does that net confusion percentage of 18.7 percent
8  tell you?
9  A.  That tells me the amount of confusion associated with the
10 use of the Birkin name, the use of the Hermès name, and the use
11 of the shape of that handbag.  And that number is of a
12 magnitude, of a size that I would typically interpret as
13 meaning that there's a substantial likelihood of confusion.
14 Q.  Why do you conclude that this means there's a substantial
15 likelihood of confusion?
16 A.  Because the number is big enough that I and, in my
17 experience, others would typically interpret this as meaning
18 that there's a substantial likelihood of confusion.
19 Q.  And when you say "others," who are you referring to?
20 A.  Other survey experts and other surveys that I've seen
21 evaluated.
22 Q.  Dr. Isaacson, you just told us about the survey of the NFT
23 purchasers you interviewed.  Was there any other group that you
24 also interviewed?
25 A.  Yes, I also conducted a survey among handbag purchasers.

1  Q.  And are there any differences in the design of the surveys?
2  A.  There are very similar surveys.  The only thing that
3  differed between the two surveys is one interviewed handbag
4  purchasers and one interviewed NFT purchasers.
5          MS. WILCOX:  Could we please turn to slide 20.
6  Q.  Could you walk us through what this slide shows.
7  A.  This slide shows the qualification criteria for people to
8  qualify for the survey of handbag purchasers.  And just to be
9  clear, you could be in one survey or the other, but not both.
10         So this is a separate group of people who had to be at
11 least 18 years old, had to indicate that they were likely to
12 purchase a handbag in the next 12 months, had to be willing to
13 spend $10,000 or more to purchase a handbag, and had to also
14 indicate that they read online content about fashion or
15 artwork.
16 Q.  Why did the handbag survey require qualifying someone as
17 someone who had purchased a handbag at $10,000 or more?
18 A.  Because I looked around online, and the lowest price that I
19 could find a Birkin handbag for which was on a resale website
20 was for $10,000.
21 Q.  What were the results for the survey among the expensive
22 handbags purchasers?
23 A.  I have a slide with that.  I believe that's the next slide.
24 Q.  Yes.  Please turn to slide 21.
25 A.  So this shows, again, questions 1, 4, and 7, again, with