**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

HERMÈS INTERNATIONAL and
HERMÈS OF PARIS, INC.,

                    Plaintiffs,

      -against-

MASON ROTHSCHILD,

                Defendant.

CIVIL ACTION NO.

22-CV-00384 (JSR)

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL

**BAKER & HOSTETLER LLP**

Gerald J. Ferguson, Esq.
Oren J. Warshavsky, Esq.
Jason S. Oliver, Esq.
Jessica H. Fernandez, Esq.
Megan A. Corrigan, Esq.
Francesca A. Rogo, Esq.
45 Rockefeller Plaza, 14th Floor
New York, NY 10111
Telephone:   212.589.4200
Facsimile:    212.589.4201

Deborah A. Wilcox, Esq. (*pro hac vice*)
Key Tower
127 Public Square
Cleveland, OH 44114
Telephone:  216.621.0200

Lisa Bollinger Gehman, Esq. (*pro hac vice*)
1735 Market Street
Philadelphia, PA 19103
Telephone:  215.568.3100

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ..............................................................................................................2

    I.      LEGAL STANDARD.........................................................................................2

    II.    ROTHSCHILD'S ARGUMENTS CONCERNING INSTRUCTION NO. 14 WERE WAIVED AND ARE NONETHELESS INSUFFICIENT ........................4

    III.   SUFFICIENT EVIDENCE SUPPORTS THE JURY'S VERDICT ON ALL OF HERMÈS'S CLAIMS....................................................................................11

        A.    There Was Sufficient Evidence Establishing That Rothschild Infringed on Hermès's BIRKIN Trademark .................................................11

            1.     Strength of the BIRKIN mark.......................................................11

            2.     Similarity of the BIRKIN mark and METABIRKINS mark.........12

            3.     Evidence of actual confusion ........................................................13

            4.     Likelihood that Hermès will "bridge the gap"..............................15

            5.     Competitive proximity of the products .........................................15

            6.     Rothschild's bad faith in adopting and using the BIRKIN mark...16

                 a.     Rothschild sought to capitalize on the goodwill associated with Hermès.....................................................16

                 b.     Rothschild falsely suggested he was partnering with Hermès ...............................................................17

                 c.     Rothschild used the false pretext that the METABIRKINS NFTs were commentary to avoid liability ..................................................................17

            7.     Consumer sophistication................................................................18

         B.    Rothschild Diluted Hermès's BIRKIN Trademark....................................19

            1.     Rothschild waived the noncommercial speech theory, which is unsupported by the evidence..........................................19

i

2. There was sufficient evidence establishing that Rothschild diluted Hermès's BIRKIN trademark ............................................20

   a. The BIRKIN mark is famous ...............................................20

   b. The BIRKIN mark became famous before Rothschild first sold any of the METABIRKINS NFTs ......................21

   c. Rothschild's use of the METABIRKINS name and the images associated with it are likely to dilute the distinctiveness of the BIRKIN mark ..................................21

C. There Was Sufficient Evidence Establishing That Rothschild Committed Cybersquatting ........................................................22

   1. The BIRKIN mark was distinctive at the time metabirkins.com was registered ................................................................22

   2. The metabirkins.com domain name is identical to, or confusingly similar to, Hermès's BIRKIN mark ..........................22

   3. Rothschild had a bad faith intent to profit from the BIRKIN mark ......................................................................23

IV. HERMÈS PRESENTED SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S FINDING THAT THE FIRST AMENDMENT DID NOT BAR ANY OF HERMÈS'S CLAIMS ............................................................23

A. Based on Rothschild's Infringing Conduct, Private Communications, and False Statements Made Under Oath, the Jury Properly Found that Rothschild Intentionally Misled Potential Consumers ............................24

B. Rothschild Was Engaged in Brand Building, Not Artistic Commentary ..............................................................................28

C. Rothschild Intended to Confuse Potential Consumers ..............................30

D. Hermès Presented Sufficient Evidence That There Was a Particularly Compelling Showing of Likelihood of Confusion ....................................31

V. DR. GOPNIK WAS PROPERLY EXCLUDED ........................................................34

A. The Court Did Not Misapply *Daubert* or *Kuhmo* ........................................34

B. Excluding Dr. Gopnik Was Not Prejudicial ...............................................35

VI. THE QUESTIONING OF DR. NEAL WAS NOT PREJUDICIAL ....................36

VII.  ROTHSCHILD'S BASELESS CLAIM THAT THE LANHAM ACT DOES
NOT APPLY TO DIGITAL GOODS SHOULD BE REJECTED FOR THE
REASONS THE COURT PREVIOUSLY REJECTED IT ..................................38

CONCLUSION ...........................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abel v. Town Sports Int'l, LLC*,
No. 09 CIV. 10388 DF, 2012 WL 6720919 (S.D.N.Y. Dec. 18, 2012) ...................................4

*Ali v. Kipp*,
891 F.3d 59 (2d Cir. 2018)..........................................................................................4

*AM Gen. LLC v. Activision Blizzard, Inc.*,
450 F. Supp. 3d 467 (S.D.N.Y. 2020)..................................................................24, 31, 33

*Amica Mut. Ins. Co. v. WHAC LLC*,
582 F. Supp. 3d 73 (W.D.N.Y. 2022) .............................................................................4

*Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*,
727 F. Supp. 2d 256 (S.D.N.Y. 2010).............................................................................5

*Azkour v. Little Rest Twelve, Inc.*,
645 F. App'x 98 (2d Cir. 2016) ...................................................................................37

*Azkour v. Little Rest Twelve*,
No. 10-CV-4132 RJS, 2015 WL 631377 (S.D.N.Y. Feb. 12, 2015) ......................................37

*Champion v. Moda Operandi, Inc.*,
561 F. Supp. 3d 419 (S.D.N.Y. 2021)...........................................................................40

*Charles Atlas, Ltd. v. DC Comics, Inc.*,
112 F. Supp. 2d 330 (S.D.N.Y. 2000)...........................................................................19

*In re Com. Fin. Servs., Inc.*,
350 B.R. 520 (Bankr. N.D. Okla. 2005) ........................................................................35

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003)..............................................................................................38, 39

*Diageo N. Am., Inc. v. W.J. Deutsch & Sons Ltd.*,
No. 17 CIV. 4259 (LLS), 2022 WL 4093752 (S.D.N.Y. Sept. 7, 2022) ...............................2, 3

*DLC Mgmt. Corp. v. Town of Hyde Park*,
163 F.3d 124 (2d Cir. 1998).........................................................................................4

*Ebony Media Operations, LLC v. Univision Commc'ns Inc.*,
No. 18 CIV. 11434(AKH), 2019 WL 8405265 (S.D.N.Y. June 3, 2019) ...........................8, 24

iv

*Energybrands, Inc. v. Beverage Marketing USA, Inc.*,
 No. 02 CIV. 3227(JSR), 2002 WL 826814 (S.D.N.Y. May 1, 2002) ....................................14

*Gordon v. Drape Creative, Inc.*,
 909 F.3d 257 (9th Cir. 2018) ...................................................................................................6

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*,
 365 F. Supp. 707 (S.D.N.Y.1973), *aff'd*, 523 F.2d 1331 (2d Cir.1975)...............................37

*Harley Davidson, Inc. v. Grottanelli*,
 164 F.3d 806 (2d Cir. 1999)...................................................................................................19

*Hermès Int'l v. Rothschild*,
 590 F. Supp. 3d 647 (S.D.N.Y. 2022)................................................................................38, 39

*Hermès Int'l v. Rothschild*,
 603 F. Supp. 3d 98 (S.D.N.Y. 2022)........................................................................23, 24, 38

*Hermès Int'l v. Rothschild*,
 No. 22-CV-384 (JSR), 2023 WL 1458126 (S.D.N.Y. Feb. 2, 2023)..................................7, 24

*Holmes v. United States*,
 85 F.3d 956 (2d Cir. 1996)........................................................................................................3

*Hope Organics LLC v. Preggo Leggings LLC*,
 No. 21-CV-2416 (TMR), 2021 WL 5919367 (S.D.N.Y. Dec. 15, 2021)..............................14

*Johnson v. City of New York*,
 593 F. Supp. 3d 58 (S.D.N.Y. 2022)..............................................................................3, 4, 19

*Juicy Couture, Inc. v. Bella Int'l Ltd.*,
 930 F. Supp. 2d 489 (S.D.N.Y. 2013)....................................................................................11

*Kelly-Brown v. Winfrey*,
 717 F.3d 295 (2d Cir. 2013)...................................................................................................40

*King v. Wang*,
 No. 14-CV-7694 (LJL), 2021 WL 5237195 (S.D.N.Y. Nov. 9, 2021)..................................34

*Knox v. John Varvatos Enters. Inc.*,
 512 F. Supp. 3d 470 (S.D.N.Y. 2021).......................................................................................3

*LiButti v. United States*,
 178 F.3d 114 (2d Cir. 1999).....................................................................................................4

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
 799 F.2d 867 (2d Cir. 1986)...................................................................................................31

*Louis Vuitton Malletier, S.A. v. Hyundai Motor Am.*,
   No. 10 CIV. 1611 PKC, 2012 WL 1022247 (S.D.N.Y. Mar. 22, 2012)..................................14

*Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.*,
   868 F. Supp. 2d 172 (S.D.N.Y. 2012)...............................................................................8

*Maureen Christensen v. Cnty. of Dutchess, N.Y.*,
   548 F. App'x 651 (2d Cir. 2013) ......................................................................................5

*McCardle v. Haddad*,
   131 F.3d 43 (2d Cir. 1997)................................................................................................3

*Museum of Mod. Art v. MOMACHA IP LLC*,
   339 F. Supp. 3d 361 (S.D.N.Y. 2018)...........................................................................14

*Newton v. City of New York*,
   171 F. Supp. 3d 156 (S.D.N.Y. 2016)..............................................................................3

*Ojeda v. Metro. Transp. Auth.*,
   477 F. Supp. 3d 65 (S.D.N.Y. 2020)................................................................................4

*Olin Corp. v. Lamorak Ins. Co.*,
   No. 84-CV-1968 (JSR), 2018 WL 1901634 (S.D.N.Y. Apr. 18, 2018) ................................35

*Perez v. Cnty. of Rensselaer, New York*,
   858 F. App'x 12 (2d Cir. 2021) .................................................................................5, 19

*Phoenix Entm't Partners v. J-V Successors, Inc.*,
   305 F. Supp. 3d 540 (S.D.N.Y. 2018)...........................................................................39

*Phoenix Entm't Partners v. Rumsey*,
   829 F.3d 817 (7th Cir. 2016) .........................................................................................39

*Polaroid Corp. v. Polaroid Elecs. Corp.*,
   287 F.2d 492 (2d Cir. 1961)................................................................................. *passim*

*Port Auth. Police Asian Jade Soc. of New York & New Jersey Inc. v. Port Auth. of New York & New Jersey*,
   681 F. Supp. 2d 456 (S.D.N.Y. 2010).............................................................................4

*Pulse Entm't Corp. v. David*,
   No. CV 14- 4732, Dkt. #19 (C.D. Cal. Sept. 17, 2014)..................................................39, 40

*In re Rezulin Prod. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004)...........................................................................36

*RJR Foods, Inc. v. White Rock Corp.*,
   603 F.2d 1058 (2d Cir. 1979)........................................................................................14

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989)..................................................................................*passim*

*Savin Corp. v. Savin Grp.*,
   391 F.3d 439 (2d Cir. 2004)...........................................................................................20

*Shepard v. Eur. Pressphoto Agency*,
   291 F. Supp. 3d 465 (S.D.N.Y. 2017)...........................................................................39

*Soter Techs., LLC v. IP Video Corp.*,
   523 F. Supp. 3d 389 (S.D.N.Y. 2021)...........................................................................40

*Stouffer v. Nat'l Geographic Partners, LLC*,
   460 F. Supp. 3d 1133 (D. Colo. 2020), *appeal dismissed*, No. 20-1208
   (10th Cir. 2021)...............................................................................................................8

*The Sports Auth., Inc. v. Prime Hosp. Corp.*,
   89 F.3d 955 (2d Cir. 1996).............................................................................................15

*Tolbert v. Queens College*,
   242 F.3d 58 (2d Cir. 2001)...............................................................................................3

*Tri-Star Pictures, Inc. v. Unger*,
   14 F. Supp. 2d 339 (S.D.N.Y. 1998).......................................................................14, 37

*Triolo v. Nassau Cnty.*,
   24 F.4th 98 (2d Cir. 2022) ...............................................................................................2

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
   996 F.2d 1366 (2d Cir. 1993)...........................................................................23, 31, 33

*Union Carbide Corp. v. Ever-Ready Inc.*,
   531 F.2d 366 (7th Cir. 1976) .........................................................................................38

*United States v. Jones*,
   No. S4 15-CR-153 (VSB), 2018 WL 2684101 (S.D.N.Y. June 5, 2018), *aff'd*,
   965 F.3d 149 (2d Cir. 2020)...........................................................................................15

*Webadviso v. Bank of Am. Corp.*,
   448 F.App'x 95 (2d Cir. 2011) .......................................................................................22

*Webber v. Dash*,
   607 F. Supp. 3d 407 (S.D.N.Y. 2022)..............................................................................5

*Woods v. Start Treatment & Recovery Centers, Inc.*,
   No. 13 CIV 4719 (AMD)(SMG), 2016 WL 11469859
   (E.D.N.Y. Apr. 27, 2016)..................................................................................................6

**Rules**

Fed. R. Civ. P. 50(b) ...................................................................................3

Fed. R. Civ. P. 59 ........................................................................................3

Fed. R. Civ. P. 702 .....................................................................................34

New York Rule of Professional Conduct 3.6 .............................................10

**Other Authorities**

6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (5th
ed. 2023) ..............................................................................................33, 37

Swann, J.B. *"Likelihood of Confusion" in Trademark and Deceptive Advertising
Surveys: Law, Science, and Design* (Shari S. Diamond & Jerre B. Swann, ed.
2022) ........................................................................................................33

Plaintiffs Hermès International and Hermès of Paris, Inc. (collectively, "Hermès"), by and through its undersigned counsel, respectfully submits this memorandum of law in opposition to defendant Mason Rothschild's a/k/a Sonny Alexander Estival ("Rothschild") motion for judgment as a matter of law or for a new trial (the "Motion").

## PRELIMINARY STATEMENT

Rothschild's combined renewed JMOL/new trial motion presents an amalgam of new (and thus waived) arguments, unsubstantiated speculation, and meritless allegations. The Jury Verdict rests on a solid foundation of substantial evidence, and even if they were appropriate, Rothschild's arguments are unavailing.

Rothschild principally argues that Jury Instruction No. 14 was improper. But at trial, Rothschild's counsel stated that Rothschild was "satisfied with" the Instruction. Likewise, though now claiming that the Court's questioning of Dr. Neal was improper, Rothschild did not object at trial, and ignored the issue at JMOL. Rothschild's challenge to the dilution verdict—that the NFTs were not commercial—is both new and contradicted by the evidence.

Rothschild argues that Dr. Gopnik should have been allowed to testify concerning his opinion that the METABIRKINS NFTs were "business art." But the Court ruled that the METABIRKINS NFTs were art and removed that issue from Jury consideration. But Rothschild argues that Dr. Gopnik should have been allowed to testify about Rothschild's intent. At the same time Rothschild argues that his intent was irrelevant.

When Rothschild addresses the evidence, he creates straw men by cherry-picking snippets of evidence and argument and misrepresenting their impact. For example, when discussing his bad faith use of Hermès's trademark, Rothschild understates the impact of his lies to business associates, and then ignores a great deal of evidence, including that: he and the image creator (Mark Berden a/k/a Mark Design) used and copied a schematic of Hermès's trademarked BIRKIN

1

handbag; he repeatedly referred to the METABIRKINS NFTs as "BIRKINS;" he knowingly used (and expressed concerns about using) Hermès's trademarks and then tried to emulate the Hermès "Rodeo" horse charm, which he teased. And while Rothschild argues that lying about a potential relationship with Hermès was not "bad intent," (and one could fairly ask when lying to business associates about the subject of the matter would not be bad faith) he ignores context—Rothschild lied because others were discussing and questioning the use of Hermès's trademarks.

Rothschild argues that there was no evidence of actual confusion. Not only was ample evidence presented—including periodicals and social media—but Rothschild texted business associates admitting to that confusion. Indeed, even here, when arguing that he proceeded in good faith, Rothschild says that he and his publicist, Kenneth Loo, corrected confusion. The Jury was well within its rights to believe that Rothschild knew people were confused—why else admit it?— and disbelieve his uncorroborated testimony that he tried to correct that confusion.

Hermès produced substantial evidence supporting its three claims. Rothschild chose not to rebut most of that evidence, instead trying to poke holes while burnishing his credentials as an "artist." He failed on all grounds. The evidence all pointed in one direction: Rothschild was a willful trademark infringer, whose conduct also amounted to dilution and cybersquatting. The improper, new arguments he presents here, even if they had been properly made, do not alter that result. Rothschild's motion should be denied and the Jury Verdict should stand.

## ARGUMENT

## I.    LEGAL STANDARD

"Under Rule 50(b), '[a] district court may grant judgment as a matter of law only if it finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party.'" *Diageo N. Am., Inc. v. W.J. Deutsch & Sons Ltd.*, No. 17 CIV. 4259 (LLS), 2022 WL 4093752, at *2 (S.D.N.Y. Sept. 7, 2022) (quoting *Triolo v. Nassau Cnty.*, 24 F.4th 98,

105 (2d Cir. 2022)); *see also* Fed. R. Civ. P. 50(b). A court must "consider the evidence in the light most favorable to the party against whom the motion was made and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in [its] favor from the evidence." *Knox v. John Varvatos Enters. Inc.*, 512 F. Supp. 3d 470, 478 (S.D.N.Y. 2021) (quoting *Tolbert v. Queens College*, 242 F.3d 58, 70 (2d Cir. 2001)). "The movant's burden is particularly heavy where, as here, the jury has deliberated in the case and actually returned its verdict." *Diageo*, 2022 WL 4093752, at *2 (internal citations omitted).

When a motion for judgment as a matter of law "is renewed after a verdict under Rule 50(b), 'the movant may not add new grounds after trial. The posttrial motion is limited to those grounds that were specifically raised in the prior motion[.]'" *Johnson v. City of New York*, 593 F. Supp. 3d 58, 66 (S.D.N.Y. 2022) (quoting *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997)) (internal quotation marks and citation omitted). "To ensure that that opportunity is a *fair* one," courts have held that "Rule 50(a) [] provides that [t]he motion must specify the judgment sought and the law and facts that entitle the movant to the judgment." *Knox*, 512 F. Supp. 3d at 485 (internal quotation marks omitted and emphasis added). "[T]he specificity requirement is obligatory and [] its purpose is to ensure that the other party is made aware of any deficiencies in proof that may have been overlooked." *Holmes v. United States*, 85 F.3d 956, 962 (2d Cir. 1996).

A court may grant a new trial under Rule 59 only if "(1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury; or (4) damages are excessive." *Newton v. City of New York*, 171 F. Supp. 3d 156, 164 (S.D.N.Y. 2016); *see also* Fed. R. Civ. P. 59. "Although evidence may be weighed and need not be viewed in the light most favorable to the nonmoving party, [the Court] should only grant a new trial if [it]

conclude[s] the jury verdict is 'egregious.'" *Port Auth. Police Asian Jade Soc. of New York & New Jersey Inc. v. Port Auth. of New York & New Jersey*, 681 F. Supp. 2d 456, 462 (S.D.N.Y. 2010) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998)). "A trial court should not grant a motion for a new trial unless it is convinced that the jury . . . reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018) (quotation marks omitted). A new trial is particularly unwarranted when, "like the proverbial second bite at the apple, the losing party believes it can present a better case if afforded another chance." *LiButti v. United States*, 178 F.3d 114, 118–19 (2d Cir. 1999). In other words, "Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, [or] securing a rehearing on the merits." *Ojeda v. Metro. Transp. Auth.*, 477 F. Supp. 3d 65, 76 (S.D.N.Y. 2020).

## II.    ROTHSCHILD'S ARGUMENTS CONCERNING INSTRUCTION NO. 14 WERE WAIVED AND ARE NONETHELESS INSUFFICIENT

Rothschild now complains about an instruction he sought and with which he told the Court he agreed with. Having lost at trial, Rothschild predictably, if unattractively, challenges that very same instruction. Rothschild waived his right to object to that instruction under Rules 50(b) and 59. A Rule 50(b) post-trial motion is limited to the grounds specifically raised in the prior Rule 50(a) motion. *Johnson v. City of New York*, 593 F. Supp. 3d 58, 66 (S.D.N.Y. 2022). "Under Rule 51 of the Federal Rules of Civil Procedure, Plaintiff was required to raise any objections to the jury charge and verdict form before the case was submitted to the jury. Fed. R. Civ. P. 51(c)(2)." *Abel v. Town Sports Int'l, LLC*, No. 09 CIV. 10388 DF, 2012 WL 6720919, at *18 (S.D.N.Y. Dec. 18, 2012); *see also Amica Mut. Ins. Co. v. WHAC LLC*, 582 F. Supp. 3d 73, 77 (W.D.N.Y. 2022) (defendants "waived their right to challenge [the verdict form] by stipulating to it and by raising

no objection to it at trial.").[1]

When the Court presented Instruction No. 14, Hermès objected and Rothschild expressed approval. Declaration of Jessica H. Fernandez ("Fernandez Decl."), Ex. 1 at 899:8–901:17. Specifically, Christopher Sprigman responded: "[b]ut back to the instruction [No. 14] itself, we here at this table believe that the instruction gives the jury words they can use to actually apply the principle, and we are satisfied with it." *Id.* at 901:14–17. Similarly, when asked whether he was "otherwise satisfied with the verdict form," Rothschild's counsel responded, "we have no objection." *Id.* 949:7–12. Thus, Rothschild waived any argument concerning the language and structure of Instruction No. 14. Neither this Court nor the Second Circuit should waste time delving into waived arguments, including about Instruction No. 14 that Rothschild sought and agreed to.

Rothschild's speculation that the Jury Instructions somehow misled the Jury is unavailing. *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 727 F. Supp. 2d 256, 276 (S.D.N.Y. 2010) ("Because a trial court has considerable discretion in the formulation and style of jury instructions, . . . a new trial is only warranted if, taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law.") (internal citations omitted). The Jury Instructions were structured properly. As the Court explained:

> [The Court] put the instructions regarding the three claims first, before the instruction on First Amendment protection for several reasons. One is . . . that's the more logical way for the jury to proceed. If there's no infringement they don't reach the First Amendment question. Secondly, . . . it's possible the *Rogers* test may not survive . . . . In that case, if they found infringement, but

---

[1] This also applies to Rothschild's Rule 59 motion for new trial. "[A] challenge to the content of the verdict sheet, however, must be raised before the jury retires to deliberate." *Perez v. Cnty. of Rensselaer, New York*, 858 F. App'x 12, 15 (2d Cir. 2021) (internal citations omitted); *see also Webber v. Dash*, 607 F. Supp. 3d 407, 414–15 (S.D.N.Y. 2022) ("[h]aving failed to object to the verdict form before the jury's deliberations, Defendants waived the objection . . . ."); *Maureen Christensen v. Cnty. of Dutchess, N.Y.*, 548 F. App'x 651, 653 (2d Cir. 2013) (movant "did not object to the jury instructions and therefore waived any objections to their form.").

> found that it was barred by the First Amendment defense, the Court
> could then reinstate the infringement conclusion without having to
> go through a whole new trial . . . . But [the Court] did add to
> Instruction No. 9, where [the Court] describe[es] the basic claims, a
> sentence to flag the First Amendment defense was coming. [The
> Court] think[s] that was a fair resolution of the competing
> arguments.

Fernandez Decl., Ex. 1 at 897:12–898:4. Rothschild nonetheless argues that Instruction No. 14's

placement prejudiced Rothschild because it framed the First Amendment as "an excuse." Def.'s

Mem. of Law in Supp. of Def.'s Renewed Mot. for J. as a Matter of Law or New Trial , ECF No.

173 ("Def.'s Br.") at 8.[2] This is unsubstantiated sophistry—and wrong. The instruction explains

that the First Amendment provides protection "unless Hermès proves by a preponderance of the

evidence that Mr. Rothschild's use of the Birkin mark was not just likely to confuse potential

consumers but was intentionally designed to mislead potential consumers into believing that

Hermès was associated with Mr. Rothschild's MetaBirkins project."[3] The Ct.'s Instrs. of Law to

the Jury, ECF No. 143 ("Jury Instrs.") at 21. It should be presumed that the jurors followed the

Court's instructions. *Woods v. Start Treatment & Recovery Centers, Inc.*, No. 13 CIV 4719

(AMD)(SMG), 2016 WL 11469859, at *3 (E.D.N.Y. Apr. 27, 2016).

Relying solely on conjecture, Rothschild argues that a note from the Jury shows that the

Jury did not follow the instruction. Def.'s Br. at 7. The Court previously rejected that argument as

unsupported speculation. Fernandez Decl., Ex. 3 at 1094:9–17. Rothschild selectively, and

---

[2] Rothschild relies on the Ninth Circuit Model Jury Instructions. Def.'s Br. at 8–9. Not surprisingly,
Rothschild ignores the Ninth Circuit's opinion explaining that "the plaintiff claiming trademark
infringement bears a heightened burden—the plaintiff must satisfy not only the likelihood-of-
confusion test but also at least one of *Rogers*'s two prongs." *Gordon v. Drape Creative, Inc.*, 909
F.3d 257, 264 (9th Cir. 2018).

[3] Rothschild criticized the Court for making "only cosmetic changes to its instructions, removing
the word 'defense'." Def.'s Br. at 6. However, the Court changed the wording of Jury Instruction
14 from "First Amendment Defense" to "First Amendment Protection" to make clear that "the
burden remain[ed] with [Hermès] at all times." Fernandez Decl., Ex. 2 at 849:20–23.

improperly, points to the Jury Foreperson's post-trial statements as evidence that the Court's instructions misled the Jury. But those statements when viewed in their totality show that the First Amendment was given great weight and consideration. *Id.*, Ex. 4 ("I, personally, feel that our decision actually protects the 1st amend. from being soiled - since it is truly the bedrock of democracy. And it protects artists who freely express their works in a way that is in good faith.").

Despite having successfully argued to the contrary at trial, Rothschild now attacks Instruction No. 14's inclusion of language concerning intent, stating that the "jury never should have been asked about Rothschild's intent at all." Def.'s Br. at 12. As Rothschild conceded, the "explicitly misleading" prong in *Rogers* is subjective. Fernandez Decl., Ex. 2 at 818:2–12 (the subjective test "might be relevant, for example, on the second factor, which is explicit misleadingness."). But Mr. Sprigman was happy with that instruction when he thought it benefited Rothschild:

> Hermès must prove that Mr. Rothschild's use of the Birkin mark was not just likely to confuse potential consumers, but was intentionally designed to mislead potential consumers into believing that Hermès was associated with Mr. Rothschild's MetaBirkins project. ***Now, your Honor, we agreed to that instruction*** because we understood, we acknowledged based on last Friday's exchange that I had with you and based on the hypothetical that you offered to me that your concern was that someone who is just basically a scammer should not be taking advantage of First Amendment protection to perpetuate a scam.

Fernandez Decl., Ex. 1 at 1053:4–18 (emphasis added). Rothschild sought this heightened standard when he thought that it would inure to his benefit. Now, Rothschild wants to move the goalposts again and incorrectly argues that the Court's intent test is at odds with Second Circuit Law. But Rothschild seemed to argue for intent when he thought it helped him and this Court actually used *Rogers* and Second Circuit precedent, including application of the *Polaroid* factors, to fashion its instruction. *Hermès Int'l v. Rothschild*, No. 22-CV-384 (JSR), 2023 WL 1458126, at *8 (S.D.N.Y.

Feb. 2, 2023); *see e.g.*, *Ebony Media Operations, LLC v. Univision Commc'ns Inc.*, No. 18 CIV. 11434(AKH), 2019 WL 8405265, at *5 (S.D.N.Y. June 3, 2019) (in applying the *Polaroid* factors under *Rogers*, the Court looked at whether defendants intended to mislead consumers as to the source or sponsor of the accused work).[4]  Not only do the *Polaroid* factors include intent, but also "[t]he artistic relevance prong [of *Rogers*] ensures that the defendant intended an artistic—i.e., noncommercial—association with the plaintiff's mark, as opposed to one in which the defendant intends to associate with the mark to exploit the mark's popularity and good will." *Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.*, 868 F. Supp. 2d 172, 178 (S.D.N.Y. 2012); *see also Rogers v. Grimaldi*, 875 F.2d 994, 1001 (2d Cir. 1989) (finding that the defendant satisfied the artistic relevance prong where its use of the trademark was "not arbitrarily chosen just to exploit the publicity value of [the plaintiffs' mark] but instead ha[d] genuine relevance to the film's story").

Rothschild advocated other changes to the Jury Instructions, which the Court granted.[5] The Court, "recognizing the importance of the First Amendment issue in this case, [] made determinations in defendant's favor that might arguably have been avoided." Fernandez Decl., Ex. 1 at 1072:14–17. Hermès was precluded from making critical factual arguments to the Jury. The

---

[4] Courts struggling with First Amendment issues have turned to other tests which consider the defendant's intent. A recent case implemented a six-factor alternative that includes, among other factors, whether the defendant: (1) engaged in a use that "in any way suggest[s] a motive to capitalize on popularity of the [plaintiff's] mark," (2) "made any statement to the public . . . suggest[ing] a non-artistic motive," and (3) "made any statement in . . . private suggest[ing] a non-artistic motive." *Stouffer v. Nat'l Geographic Partners, LLC*, 460 F. Supp. 3d 1133, 1140 (D. Colo. 2020), *appeal dismissed*, No. 20-1208 (10th Cir. 2021).

[5] Other notable changes in Rothschild's favor included: changing the language in the Trademark Infringement claim from "consumers" to "potential purchasers;" adding language that consumers of expensive products are sophisticated; and, removing "so as to profit from Hermès' reputation" from the bad faith *Polaroid* factor. Fernandez Decl., Ex. 2 at 865:1–5, 866:10–20, 867:3–17.

Court's instructions to the Jury assumed both that the METABIRKINS NFTs were art and therefore, subject to the *Rogers* test, and that the "artistic relevance" prong of *Rogers* was met, even though Rothschild produced no evidence of such relevance. Jury Instrs. at 21. Hermès was only left to show that Rothschild's conduct was explicitly misleading under the second prong of the *Rogers* test.

Although the Court was aware of "a nonfrivolous argument that the defendant was not making use of the . . . Birkins mark or the Birkins design for artistic purposes and, therefore, would not satisfy the first prong of the *Rogers* test, [the Court] concluded in the end that there was at least an element of artistry involved from the outset and so instructed the jury." Fernandez Decl., Ex. 1 at 1072:19–24. The Jury was thus instructed that "the MetaBirkins NFTs, including the associated images, are in at least some respects works of artistic expression, such as, for example, in their addition of a total fur covering to the Birkin bag images." Jury Instrs. at 21. However, the Jury was presented with significant evidence which could have led to a finding that the METABIRKINS NFTs were simply a commercial product (a "digital commodity," as Rothschild said) and that Rothschild's use of the METABIRKINS name was branding, as also evidenced by his complaint about counterfeit METABIRKINS. Fernandez Decl., Ex. 5. Indeed, many METABIRKINS images were nearly identical to BIRKIN handbags commercialized by Hermès, incorporating the trademarked shape, the clochette, colors, handles, hardware, and other iconic and easily identifiable features. *See* discussion *infra* Section III.A.2. The Jury could have rightly found that adding fur to an existing product is insufficiently creative to be deemed "art."

As discussed *infra* Section IV.C, there was evidence that the title "METABIRKINS" was not artistically relevant, and no evidence that it was artistically relevant. The Jury could have found either that the METABIRKINS NFTs were not "works of artistic expression" or that the

9

"METABIRKINS" title was not artistically relevant. But, as a result of Rothschild's argument and support for Instruction No. 14, Hermès was required to meet the higher burden for the "explicitly misleading" prong of *Rogers*.

Finally, Rothschild's argument for a new trial has an additional wrinkle. The Rothschild team have continuously tried to try this case in the press. Prior to trial, Rothschild and his counsel participated in a *WWD* interview, in which they mischaracterized Hermès's arguments. Mr. Millsaps claimed that Hermès had made a "really absurd 11th-hour argument . . . that the court should pay no attention to the images," and that "Hermès has had shifting positions throughout this case, and now they're really shifting into absurd territory." Fernandez Decl., Ex. 6. But Hermès had not shifted positions and did not tell the Court to disregard the images. The Rothschild team's mischaracterizations continued post-verdict. On February 8, 2023, shortly after the Jury Verdict, Rothschild mischaracterized the Jury Verdict by tweeting, "Take nine people off the street right now and ask them to tell you what art is but the kicker is whatever they say will now become the undisputed truth. That's what happened today." *Id.*, Ex. 7. This was amplified in a retweet by Rothschild's counsel, Christopher Sprigman. *Id.*, Ex. 8. On February 24, 2023, Dr. Gopnik, penned an OpEd in *The Washington Post*, in which he stated that "the jury concluded that what Rothschild did, which was so very much like what artists have always done, did not count enough as 'artistic expression'." *Id.*, Ex. 9. Rothschild and his team continued to perpetuate that narrative that the Jury found the METABIRKINS NFTs were not art or "did not count enough as 'artistic expression.'" *Id.*, Exs. 7–9. However, the Jury made no such finding regarding whether the METABIRKINS NFTs were or were not art. In seeking a new trial notwithstanding his team's statements, Rothschild should explain how Hermès would not be prejudiced and the conduct is consistent with New York Rule of Professional Conduct 3.6.

10

**III.    SUFFICIENT EVIDENCE SUPPORTS THE JURY'S VERDICT ON ALL OF HERMÈS'S CLAIMS**

Rothschild's Motion should be denied because Hermès presented sufficient evidence to support the Jury Verdict that Rothschild was liable on Hermès's claims for (a) trademark infringement, (b) trademark dilution, and (c) cybersquatting.

**A.    There Was Sufficient Evidence Establishing That Rothschild Infringed on Hermès's BIRKIN Trademark**

Trademark infringement claims under the Lanham Act are evaluated under the *Polaroid* likelihood of confusion factors. *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 499 (S.D.N.Y. 2013) (citing *Polaroid Corp. v. Polaroid Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)). Rothschild conceded this when he argued his first motion for judgment as a matter of law. Fernandez Decl., Ex. 2 at 822:21–823:1. Hermès produced evidence showing that each factor weighs heavily in its favor—and that does not even take into account Rothschild's lack of credibility or drawing all inferences in Hermès's favor.  The Jury had more than sufficient evidence to find that a likelihood of confusion exists.

**1.    Strength of the BIRKIN mark**

There was no dispute that the BIRKIN mark is strong. Hermès owns significant trademark rights in its BIRKIN handbags, including U.S. trademark registrations covering the "BIRKIN" mark and the trade dress of the BIRKIN handbag. *Id.*, Exs. 10–11. The BIRKIN handbag has become one of Hermès's most iconic products, if not its most iconic product. *Id.*, Ex. 12 at 154:23–155:11. Hermès's CEO, Robert Chavez, testified that the BIRKIN trademark is "invaluable" because "it's [Hermès's] most well-known and recognizable product." *Id.*, Ex. 13 at 11:11–14, 48:19–24. Mr. Chavez further testified that Hermès sold at least $100 million dollars of BIRKIN handbags per year for the last decade. *Id.* at 49:15–22. Rothschild explained that the BIRKIN is "Herm[è]s' most famous handbag," a "'holy grail' handbag," and that "there's nothing more iconic

than the Herm[è]s Birkin bag." *Id.*, Ex. 14; Declaration of Adam B. Oppenheim, ECF No. 174 ("Oppenheim Decl."), Ex. K at 2.

Hermès spends millions of dollars a year in advertising, including advertising the BIRKIN handbag. Fernandez Decl., Ex. 13 at 72:22–73:4. Without any solicitation from Hermès, the BIRKIN handbag and BIRKIN mark have been featured in numerous various media, magazines, television shows, and films. *Id.*, Exs. 15–18. Nicolas Martin, Hermès's group general counsel, testified that the media coverage for the BIRKIN handbag is unsolicited. *Id.*, Ex. 12 at 160:4–16.

### 2.    Similarity of the BIRKIN mark and METABIRKINS mark

The marks are similar ("BIRKIN" vs. "METABIRKINS") and Rothschild's METABIRKINS NFTs use Hermès's federally registered trade dress. *Id.*, Ex. 11. The two names—BIRKIN and METABIRKINS—are nearly identical. *Id.*, Ex. 10. METABIRKINS consists of the term "META" referring to the "metaverse" and Hermès's entire BIRKIN mark. *Id.*, Ex. 19 at 292:21–293:2. Rothschild and Berden intentionally incorporated all of Hermès's BIRKIN trade dress by using a BIRKIN schematic to create the images associated with the METABIRKINS NFT. *Id.*, Ex. 20 at 54–58. As shown below, the Jury observed a number of different Hermès BIRKIN bags, and it was clear that Rothschild copied Hermès's commercial implementation of the BIRKIN handbags.



Further, Rothschild explained that he "could create that same kind of illusion that it has in real life as a digital commodity" and bring "it into the digital world with this introduction of the metaverse . . . ." Oppenheim Decl., Ex. K at 2. Rothschild published a blog post explaining that his "goal is for MetaBirkins [sic] double as an investment for holders . . . ." Fernandez Decl., Ex. 14. Rothschild even described the METABIRKINS NFTs on his website as a "tribute to Herm[è]s' most famous handbag, the Birkin." *Id.*, Ex. 21.

### 3.   Evidence of actual confusion

Rothschild admitted to actual confusion. Rothschild texted his investors that: "to shed confusion between the Herm[è]s Birkin and it's [sic] SUCCESSOR . . . [Rothschild] made the decision to separate [METABIRKINS] from the old and make [them] known as the new 'MetaFurkins.'" *Id.*, Ex. 22 at 1. Rothschild also addressed confusion in the METABIRKINS Discord platform. *Id.*, Ex. 23. Various articles showed members of the press—including from *L'Officiel*, *Elle*, *New York Post*, and *Challenges*—were actually confused into believing Hermès was associated with the METABIRKINS NFTs. *Id.*, Ex. 2 at 789:1–794:24; Exs. 24–27; Ex. 28 at 8. When corresponding with investors, Rothschild wrote that "the word around the media world is that this is a press stunt by Herm[è]s and [I'm] like paid by Herm[è]s." *Id.*, Ex. 29. He texted the same investors that "[L'Officiel] thought [that the MetaBirkins was an official [H]erm[è]s thing." *Id.*, Ex. 22 at 13. Rothschild claimed that he and his publicist, Kenneth Loo, corrected other instances of confusion. *Id.*, Ex. 19 at 303:25–304:5.

Comments on Rothschild's social media showed that potential purchasers were confused. *Id.*, Ex. 30 at 8–9; Ex. 31. One person commented that she was "scammed" by Rothschild because she thought she was getting a real purse. *Id.*, Ex. 30 at 9. Rothschild argues that social media posts and journalists are not reliable evidence to show likelihood of confusion. Def.'s Br. at 24. The law is clear that "courts in this Circuit have accepted online customer reviews and comments on social

media as anecdotal evidence of actual confusion" in Lanham Act cases. *Hope Organics LLC v. Preggo Leggings LLC*, No. 21-CV-2416 (TMR), 2021 WL 5919367, at *8 (S.D.N.Y. Dec. 15, 2021); *see also Museum of Mod. Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361, 378–79 (S.D.N.Y. 2018) ("social media posts" and internet "comment[s]" were credible evidence of "actual confusion" in *Polaroid* analysis); *Louis Vuitton Malletier, S.A. v. Hyundai Motor Am.*, No. 10 CIV. 1611 PKC, 2012 WL 1022247, at *23 (S.D.N.Y. Mar. 22, 2012) (Twitter postings "reflect some actual confusion"). In *Tri-Star Pictures, Inc. v. Unger*, the Court explained that confusion "among journalists and film reviewers, who arguably are more sophisticated about motion pictures than ordinary consumers" was a significant factor. 14 F. Supp. 2d 339, 356 (S.D.N.Y. 1998). Thus, the social media comments and press are probative of confusion in this case.

Finally, Dr. Bruce Isaacson, who has presented survey evidence in over 70 Lanham Act disputes, conducted a survey and found that the net confusion among NFT purchasers was 18.7%. Fernandez Decl., Ex. 2 at 734:20–23; Ex. 32 at 19. Based on this finding, he concluded there was a substantial likelihood of confusion. *Id.*, Ex. 2 at 757:7–13. His finding is supported by case law in this district. *See RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (survey showing a 15-20% rate of confusion was part of the "substantial evidence" that supported the finding of likelihood of confusion); *Energybrands, Inc. v. Beverage Marketing USA, Inc.*, No. 02 CIV. 3227(JSR), 2002 WL 826814 (S.D.N.Y. May 1, 2002) (17% consumer confusion sufficient to support finding of likelihood of confusion).

Rothschild argues at length that Dr. Isaacson's survey is not probative of confusion and the Jury should not have relied on it. Def.'s Br. at 13–15, 26–28. This argument fails for two reasons. First, a survey is not required as evidence of actual confusion and, even absent survey evidence, "a trier of fact may still conclude that actual confusion exists in the absence of such evidence, so

long as there is other evidence of actual confusion." *The Sports Auth., Inc. v. Prime Hosp. Corp.*,

89 F.3d 955, 964 (2d Cir. 1996). Second, Rothschild proffered the testimony of Dr. Neal, who was

hardly a model of clarity and failed to conduct his own survey. Fernandez Decl., Ex. 1 at 925:2–

4. Determinations as to the weight of competing expert testimony are appropriately left to a jury.

*United States v. Jones,* No. S4 15-CR-153 (VSB), 2018 WL 2684101, at *11 (S.D.N.Y. June 5,

2018), *aff'd*, 965 F.3d 149 (2d Cir. 2020).

### 4. Likelihood that Hermès will "bridge the gap"

Hermès has concrete and realistic plans to produce and sell its own NFTs using the BIRKIN

mark since at least 2019. Fernandez Decl., Ex. 2 at 700:19–701:8. The Jury heard from Mr. Martin

and Maximilien Moulin, the head of Hermès's internal innovation lab, that Hermès is developing

various NFT projects, including attendance NFTs, NFTs linked to a specific Hermès product such

as a BIRKIN handbag, and NFTs serving to track or authenticate Hermès products. *Id.*, Ex. 12 at

173:7–174:10; Ex. 2 at 701:20–709:3. Hermès showed the Jury some of these projects, including

an NFT of a horse that was provided at an employee-only event. *Id.*, Ex. 2 at 717:10–718:18. Prior

to trial, these projects had not been revealed to the public because Hermès is extremely careful and

deliberate as to when it releases its products.

### 5. Competitive proximity of the products

The METABIRKINS NFTs and Hermès's products compete for the same consumers.

Hermès defines the BIRKIN handbag as a luxury product and a status symbol. *Id.*, Ex. 12 at

152:21–153:2. Rothschild intended the METABIRKINS NFTs to be a "[l]uxury product" and

sought to bring the luxury BIRKIN handbags into the metaverse. *Id.*, Ex. 19 at 429:17–21; Ex. 33

at 544:1–4; Ex. 34. As he explained in the *Yahoo! Finance* interview,

> this introduction of like Web3 and the metaverse is allowing us to
> actually own these commodities in this place where we can actually
> show them off. I was explaining to somebody before, there's not

much difference in between having the crazy car or the crazy handbag in real life because it's kind of just that, that showing of like wealth or that kind of explanation of success. And now you're able to bring that into the metaverse with these iconic NFTs that have fetched crazy amounts of money in that resale market for NFTs.

Oppenheim Decl., Ex. K at 3.

### 6.    Rothschild's bad faith in adopting and using the BIRKIN mark

There was ample evidence of Rothschild's bad faith adoption of the BIRKIN mark.

### a.    Rothschild sought to capitalize on the goodwill associated with Hermès

Rothschild saw a financial opportunity when major fashion brands entered the metaverse and sold branded digital products for significant prices. Rothschild was aware of this opportunity when he retweeted on the METABIRKINS Twitter: "Big brands are already experimenting with NFTs. Be early. @MetaBirkins . . . Minting soon." Fernandez Decl., Ex. 31. As discussed *supra* Section III.A.2, Rothschild promoted the METABIRKINS NFTs in a manner that capitalized on Hermès's reputation and goodwill. It was only *after* Hermès sent Rothschild a cease-and-desist letter that Rothschild included a disclaimer—and an ineffective one at that—on the METABIRKINS website. Fernandez Decl., Ex. 33 at 527:8–10.

Rothschild further demonstrated his intent to associate the METABIRKINS brand with Hermès by promising METABIRKINS purchasers a horse charm NFT that he copied from the Hermès Rodeo horse charm. *Id.*, Ex. 35 at 4, 9; Ex. 146. Rothschild explicitly expressed his commercial intent with creating the Rodeo horse charm, telling Berden "[t]hat way we can sell 25-50 more things [a]t .1 eth [to m]ake more money." *Id.*, Ex. 35 at 6. Dr. Kominers testified that the unusually high resale value of the METABIRKINS NFTs was the result of the NFTs' association with the Hermès brand. *Id.*, Ex. 2 at 19:2–6; 669:8–13; 672:2–14. This was evidenced by the decline of METABIRKINS NFTs prices after Hermès made a public statement in the *Financial*

*Times* that it was not affiliated with the METABIRKINS NFTs. *Id.* at 670:7–671:23.

          b.      <u>Rothschild falsely suggested he was partnering with Hermès</u>

Rothschild deceived investors and business associates that he was either partnering with or otherwise had approval from Hermès. As early as October 19, 2021, Rothschild told Berden, that "[w]e might be [sic] some help from Herm[è]s themselves." *Id.*, Ex. 37 at 5. A few days later, Rothschild misled a childhood friend and former business associate that "Herm[è]s might partner [with him] with this" and that he was "[n]egotiating r[ight] n[ow]." *Id.*, Ex. 38 at 4. On October 28, 2021, a potential business associate, with whom Rothschild was looking to collaborate on the METABIRKINS NFTs, asked Rothschild if "it's official with birkin?" and Rothschild replied "[p]ushing for it." *Id.*, Ex. 39 at 4. On December 2, 2021, Rothschild told another associate that he had a meeting planned with Hermès the following Tuesday. *Id.*, Ex. 40 at 11. On December 4, 2021, Rothschild told two investors that his goal was "to use [S]othebys to get [H]erm[è]s maybe on board" for a collaboration of "[H]erm[è]s/metabirkins." *Id.* Ex. 41 at 8. Rothschild also dishonestly claimed to have people reaching out to Hermès, such as "different writers" at *Vogue*, whose names he could not remember at trial. *Id.*, Ex. 33 at 515:2–13. Rothschild told investors that they needed to "make for a push with Herm[è]s" and that his "plug at vogue has direct line to laris [sic] Paris." *Id.*, Ex. 42 at 47. Rothschild also testified that Mr. Clement Kwan, a fashion industry executive, would be speaking to his contact at "the New York PR department" of Hermès. *Id.*, Ex. 33 at 512:15–513:10. Yet, Hermès's Associate Director of Corporate Communication testified she had never even heard of Mr. Kwan. *Id.*, Ex. 2 at 780:20–23, 795:4–6. There was no corroborating evidence, and Mr. Martin testified that Hermès never interacted with Rothschild. *Id.*, Ex. 12 at 191:2–7.

          c.      <u>Rothschild used the false pretext that the METABIRKINS NFTs were commentary to avoid liability</u>

Throughout the trial, Rothschild argued that his actions were protected under the First Amendment because his METABIRKINS NFTs were "commentary" on the BIRKIN handbag. However, Rothschild's intent was made clear to the Jury through Rothschild's statement to his investors when he said, "I don't think people realize how much you can get away in art by saying 'in the style of.'" *Id.*, Ex. 42 at 26. Rothschild was forced to admit that there was no evidence of him using the word "art" until after Hermès sent a cease-and-desist letter. *Id.*, Ex. 19 at 350:3-5, 351:7–14, 352:3–5.

### 7.    Consumer sophistication

The evidence at trial showed NFTs consumers are not particularly sophisticated—the NFT marketplace is immature and highly speculative. When consumers minted the METABIRKINS NFTs, they sold for about $450. *Id.*, Ex. 19 at 285:7–10; Ex. 33 at 484:13–20; Ex. 43 at 92:25–94:9. The NFTs were then resold for up to $42,193.20. *Id.*, Ex. 43 at 94:25–95:7; Ex. 44. Rothschild explained that certain images were more desirable than others, such as the Mona Lisa METABIRKINS NFT which was a "super in terms of, like, what people value it at." *Id.*, Ex. 19 at 385:9–386:1. However, the minting and most resales occurred while the METABIRKINS NFTs were associated with a shrouded image. *Id.*, Ex. 2 at 670:7–671:1; Ex. 43 at 97:1–16, 100:3–10, 100:23–101:15. These consumers purchased their NFT without even knowing the image they were purchasing! Dr. Kominers explained that "we don't see people, like, going and grabbing the specific MetaBirkin that they really wanted; it doesn't just seem as if they are choosing—they were buying much more actively pre-reveal and post, and it doesn't seem like they are choosing on the basis of the individual item." *Id.*, Ex. 2 at 671:3–8.

The speculative nature of the NFT market is also reflected in Rothschild's next project, which was generative (i.e., meaning that it was computer generated by algorithm). *Id.*, Ex. 19 at

321:1–323:2; Ex. 46. Rothschild testified that the minting price was about .08 Eth (or $360 as 1 Eth was trading at about $4,500 at that time). *Id.*, Ex. 19 at 324:3–5. At the time of trial, the bids for this project were valued at about $48 or 0.03 Eth (1 Eth was trading at under $1,600). *Id.*, Ex. 1 at 973:3–12. The 87% drop in price in under a year shows the lack of market maturity.

### B.   Rothschild Diluted Hermès's BIRKIN Trademark

#### 1.   Rothschild waived the noncommercial speech theory, which is unsupported by the evidence

Rothschild advances a theory, arguing that he is not liable for dilution because his speech was not commercial. Def.'s Br. at 38. Rothschild waived this argument by waiting to raise it now—it was not previously raised, including at JMOL, in discussing the Jury Instructions, etc. *Johnson*, 593 F. Supp. 3d at 66; *Perez*, 858 F. App'x at 15. Nevertheless, the evidence presented at trial made clear that Rothschild's METABIRKINS NFTs were a commercial product that he promoted for the purpose of making a profit.

Under Rothschild's theory, "[t]he noncommercial use exception does not employ *Rogers* or any other test: it is a pure exclusion of all speech that qualifies as noncommercial, that is, non-advertising (such as artistic) speech that does more than propose a commercial transaction." Def.'s Br. at 38. But Rothschild's speech was purely commercial, and his promotion was all commercial in nature. Moreover, not all expressive works are exempted from the dilution statute. *See, e.g.*, *Charles Atlas, Ltd. v. DC Comics, Inc.*, 112 F. Supp. 2d 330, 336 (S.D.N.Y. 2000) ("courts have found parodies to be subject to the Lanham Act when they are used to promote a competing product or service."); *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812–13 (2d Cir. 1999) (noting that while courts "have accorded considerable leeway to parodists whose expressive works aim their parodic commentary at a trademark or a trademarked product, [they] have not hesitated to prevent a manufacturer from using an alleged parody of a competitor's mark to sell a competing

product.") (internal citations omitted).

The use of BIRKIN in the METABIRKINS NFTs was purely commercial—Rothschild created a digital brand and was motivated by profits. As discussed *infra* Section IV.B, Dr. Kominers demonstrated that the METABIRKINS NFTs fit into the digital brand sub-market for NFTs as it offered various utilities to the NFT holders. Rothschild admitted that he wanted to make money from the sale of the METABIRKINS NFTs. Fernandez Decl., Ex. 12 at 227:2–4. As such, he sought to "pump" and "shill" to inflate the resale value of the METABIRKINS NFTs. *See* discussion *infra* Section IV.A–B.  Rothschild consistently regarded the METABIRKINS NFTs as a commercial product, calling them an "investment," a "digital commodity," and a "[l]uxury product." *Id.* Exs. 14, 34; Oppenheim Decl., Ex. K. He is extremely familiar with selling luxury products, as he does so at his store Terminal 27. Fernandez Decl., Ex. 12 at 254:19–23. Rothschild called himself a "marketing king" and noted that he and Berden were "sitting on a gold mine" when referring to the METABIRKINS NFTs. *Id.* Ex. 47 at 11.

### 2. There was sufficient evidence establishing that Rothschild diluted Hermès's BIRKIN trademark

To prevail on the claim for trademark dilution under the Lanham Act, the Court instructed the Jury that "Hermès must show by a preponderance of the credible evidence that: (1) the Birkin mark is famous; (2) the Birkin mark became famous before Mr. Rothschild first sold any of the MetaBirkins NFTs; and (3) Mr. Rothschild's use of the MetaBirkins name and the images associated with it are likely to dilute the distinctiveness of the Birkin mark." Jury Instrs. at 18; *see also Savin Corp. v. Savin Grp.*, 391 F.3d 439, 448–49 (2d Cir. 2004).

### a.   The BIRKIN mark is famous

As discussed *supra* Section III.A.1, the Jury considered extensive testimony and evidence that the BIRKIN mark has been famous well before the creation of the METABIRKINS NFTs.

20

b.      <u>The BIRKIN mark became famous before Rothschild first sold any of the METABIRKINS NFTs</u>

The fact that the BIRKIN mark became famous years before Rothchild first sold any of the METABIRKINS NFTs, as testified to by Mr. Chavez, (Fernandez Decl., Ex. 13 at 48:19–49:8; 49:15–22), is evident from Rothschild's acknowledgment of the fame of the BIRKIN mark when he promoted his just minted NFTs on *Yahoo! Finance*. Oppenheim Decl., Ex. K. Rothschild did not sell METABIRKINS NFTs until December 2, 2021, when the first NFT was minted (Fernandez Decl., Ex. 33 at 511:23–25), and at which time he said that, to him, there was "nothing more iconic" than a Birkin handbag. Oppenheim Decl., Ex. K at 2.

c.      <u>Rothschild's use of the METABIRKINS name and the images associated with it are likely to dilute the distinctiveness of the BIRKIN mark</u>

There was testimony and evidence to support the Jury's finding that Rothschild's use of the METABIRKINS name and images were likely to dilute the BIRKIN mark. Many of the factual allegations underlying the *Polaroid* factors also support dilution, as discussed *supra* Section III.A.1–7, the trademarks and images associated with them are highly similar; the BIRKIN mark is strong and distinct; the BIRKIN mark is widely recognized around the world; Rothschild acted in bad faith by adopting the METABIRKINS mark with the intent to create an association with Hermès and the BIRKIN mark; and there has been actual confusion as to the association by consumers of the METABIRKINS NFTs with the BIRKIN mark. Rothschild even admitted that the METABIRKINS NFTs were meant as a reference to Hermès's BIRKIN handbags. Fernandez Decl., Ex. 33 at 544:1–4. He also acknowledged the blurring effect of his NFTs in an interview with *Yahoo! Finance* stating, "[s]o I feel like the difference between the two is like getting a little bit blurred now because we have this new outlet, which is the metaverse, to showcase our product, showcase them in our virtual worlds, and even just show them online." Oppenheim Decl., Ex. K.

**C.     There Was Sufficient Evidence Establishing That Rothschild Committed Cybersquatting**

To prevail on its cybersquatting claim, the Court instructed the Jury that "Hermès must prove the following three elements: (1) that the Birkin mark was distinctive at the time the domain name <https://metabirkins.com> was registered; (2) that the <https://metabirkins.com> domain name is identical to, or confusingly similar to, Hermès's Birkin mark; and (3) that Mason Rothschild had a bad faith intent to profit from the Birkin mark." Jury Instrs. at 20; *see also Webadviso v. Bank of Am. Corp.*, 448 F.App'x 95, 97 (2d Cir. 2011). The Jury Instruction further directed "[i]f you find that Mr. Rothschild had reasonable grounds to believe that the use of this domain name was lawful, you must find that he did not act in bad faith." Jury Instrs. at 20. Rothschild consented to this instruction and his argument is therefore waived. Furthermore, Hermès produced sufficient evidence on all points—Mr. Rothschild produced none, and doesn't cite to any evidence now.

**1.     The BIRKIN mark was distinctive at the time metabirkins.com was registered**

The BIRKIN trademark and trade dress were registered in the United States in 2005 and 2011, respectively. Fernandez Decl., Exs. 10–11. As discussed at length, the BIRKIN mark and trade dress are strong and distinctive. *See* discussion *supra* Section III.A.1. Rothschild testified that he registered www.metabirkins.com years later, sometime in November 2021. *Id.*, Ex. 33 at 502:3–15.

**2.     The metabirkins.com domain name is identical to, or confusingly similar to, Hermès's BIRKIN mark**

The METABIRKINS website uses the full BIRKIN mark. *Id.*, Ex. 22. The website also makes repeated references to the Hermès BIRKIN mark. *Id.* Hermès conducted a survey which presented the METABIRKINS website along with a control website. The survey found 18.7%

22

confusion, and Hermès's expert Dr. Isaacson testified that this indicated a substantial likelihood of confusion. *Id.*, Ex. 2 at 756:9–757:13; Ex. 32 at 19.

### 3. Rothschild had a bad faith intent to profit from the BIRKIN mark

As discussed *supra* Section III.A.6.a, the evidence showed that Rothschild had a bad faith intent to profit from the BIRKIN mark. He used the METABIRKINS website to promote the sale of the infringing METABIRKINS NFTs. Fernandez Decl., Ex. 19 at 278:3–25. As the Jury found, Rothschild did this to intentionally mislead consumers into believing he was associated with Hermès.

## IV. HERMÈS PRESENTED SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S FINDING THAT THE FIRST AMENDMENT DID NOT BAR ANY OF HERMÈS'S CLAIMS

In applying the *Rogers* test, the Court instructed the Jury that if they found Rothschild liable for any of the three claims, the Jury "must then consider whether, nonetheless, Mr. Rothschild is protected . . . by the First Amendment." Jury Instrs. at 21. The Court further instructed the Jury that Hermès was required to prove "by a preponderance of the evidence that Mr. Rothschild's use of the Birkin mark was not just likely to confuse potential consumers but was intentionally designed to mislead potential consumers into believing that Hermès was associated with Mr. Rothschild's MetaBirkins project. In other words, if Hermès proves that Mr. Rothschild actually intended to confuse potential customers, he has waived any First Amendment protection." *Id.*

Rothschild incorrectly argues that the *Polaroid* factors should not be considered because *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366 (2d Cir. 1993) only applies to "title-vs.-title" conflicts. Def.'s Br. at 2 n.1, 22. This Court already held that the *Polaroid* factors are generally applicable to Lanham Act claims against works of artistic expression and are not limited to title-versus-title disputes. *Hermès Int'l v. Rothschild*, 603 F. Supp. 3d 98, 105 (S.D.N.Y. 2022). The Second Circuit has consistently applied the "venerable *Polaroid* factors" to the explicitly

misleading prong of *Rogers*. *Id.*; *see also AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 478 (S.D.N.Y. 2020) (applying the *Polaroid* factors to depictions of a Humvee military vehicle in a video game)[6]; *see e.g., Ebony Media Operations*, 2019 WL 8405265, at *4–5(applying the *Polaroid* factors to parody magazine cover).

A work is "explicitly misleading" if the "likelihood of confusion" assessed under the *Polaroid* factors is "particularly compelling to outweigh the First Amendment interest." *Hermès Int'l*, 2023 WL 1458126, at *8. Contrary to Rothschild's assertion, Hermès presented sufficient evidence that it met this "particularly compelling" standard.

A.     **Based on Rothschild's Infringing Conduct, Private Communications, and False Statements Made Under Oath, the Jury Properly Found that Rothschild Intentionally Misled Potential Consumers**

Rothschild's true colors were repeatedly made plain during trial. Indeed, in denying Rothschild's motion for judgment as matter of law, the Court (outside the presence of the Jury), explained that:

> [T]here is ample evidence from which a jury could conclude that Mr. Rothschild is a classic conman; it's just that he's not yet gotten good enough to avoid, for example, revealing what's really in his heart in emails that he believes are private at the time. But, nevertheless, there is ample evidence from which a rational juror could, if they wish — and there's certainly contrary evidence as well — conclude that he set out or very early came to the conclusion that he could fool people into believing that his product and his site and his NFTs were sponsored by Hermès.

Fernandez Decl., Ex. 1 at 1073:19–1074:3. The Court further explained that:

> [I]t is critical that we leave room for social commentary, whether it comes verbally or in the form of art . . . none of that applies to a swindler, a fraudster who makes one pretense or another, but reveals

---

[6] Rothschild further contends that *AM Gen. LLC* supports the argument that "[e]vidence of confusion, in the absence of an *explicit* misstatement, simply does not support liability." Def.'s Br. at 15. The Court in *AM Gen. LLC*, however, considered all the *Polaroid* factors when analyzing the explicitly misleading prong of *Rogers*. 450 F. Supp. 3d at 480. The *AM Gen. LLC* Court at no point references nor requires an "explicit misstatement."

> in his emails and his behavior what is really in his heart, which is to
> cheat people. And I think the jury here could find either possibility,
> but certainly could find that Mr. Rothschild fit that pattern.

*Id.* at 1075:16–23. The Jury did find that Rothschild fit that pattern.

Before the Jury went on to deliberate, the Court properly instructed the Jury regarding

witness credibility. Jury Instrs. at 9. The Jury unequivocally took into consideration Rothschild's

credibility when it concluded that neither he nor his claims of artistic motive were credible. Not

only was Rothschild misleading, there was no contemporaneous evidence to support his

arguments—all contemporaneous evidence showed Rothschild to be a conman. Thus, it was no

surprise that the Jury found that Rothschild intended to and did mislead potential consumers by

adopting and using the BIRKIN mark and trade dress. Jury Instrs. at 21; Jury Verdict, ECF No.

144.

In an effort to blunt the impact of Rothschild's dishonesty, Rothschild's attorney, Mr. Rhett

Millsaps, told the Jury during his opening statement that "[y]ou will also learn that [Rothschild]

sometimes exaggerates and embellishes the truth, especially which [sic] he's promoting himself

and his projects." Fernandez Decl., Ex. 43 at 49:23–50:1. This was quickly revealed as an

understatement, as the Jury saw that Rothschild repeatedly made false statements in his business

dealings and then under oath at trial.

A central issue in this case, from its beginning, is Rothschild's adoption and use of the

METABIRKINS name. Hermès's opening presented evidence that Rothschild did not conceive

the METABIRKINS name. *Id.*, Ex. 43 at 34:18–35:11; Ex. 48. Rather, a Twitter user MAKISA

suggested the name "METABIRKINS" in response to Rothschild's naming contest. *Id.*, Ex. 43 at

34:18–35:11. Although Rothschild promised to gift a METABIRKINS NFT to the contest winner,

he never gifted an NFT to MAKISA. *Id.* On direct examination, trying to rehabilitate his image,

Rothschild testified that he instead provided a whitelist spot for the METABIRKINS NFT to

Instagram user @hectourc, as the winner of the contest. *Id.*, Ex. 19 at 291:18–22, 292:6–9. Hermès later confronted Rothschild with his deposition testimony where he claimed to have come up with the METABIRKINS himself, prior to the suggestion from MAKISA. *Id.* at 409:25–410:24. Obviously, there was a tension, and Rothschild was forced to admit that his deposition "testimony was incorrect." *Id.* at 410:25–411:1. Hermès then confronted Rothschild with various documents showing that, contrary to Rothschild's brand new story about the METABIRKINS name on direct, Instagram user @hectourc never received this alleged whitelist spot. *Id.*, Ex. 33 at 469:22–476:17; Exs. 49–50. Rothschild then testified that to his "knowledge yesterday, that's what it was. That was my testimony. I didn't have these, um, Instagram messages yesterday." *Id.*, Ex. 33 at 476:7–11. The Instagram messages were, of course, from the METABIRKINS Instagram account which Rothschild controls.

The Court then provided Rothschild a chance to correct his testimony in light of the evidence. *Id.* at 476:15–477:6. Rothschild revised his testimony to the following: "we had our forms of communication through friends." *Id.* at 477:4–6. Rothschild then testified he had follow-up communications regarding this issue through friends, though admitted that no corroborating evidence existed. *Id.* at 477:19–479:5.

Another issue in this case was Rothschild's prior project, Baby Birkin. Also at issue was the fact that Rothschild tried to "pump" prices. When asked whether he bid on the Baby Birkin, Rothschild testified that he "was the first bid." *Id.*, Ex. 19 at 406:8–21. Hermès submitted two documents showing two different bids Rothschild placed on the Baby Birkin. *Id.*, Ex. 33 at 481:2–484:6; Exs. 51–52. When confronted that he placed these two bids, Rothschild sheepishly commented that he was placing bids for someone else but could not remember for whom. *Id.*, Ex. 33 at 483:11–23. And again, there was no corroborating evidence.

In an effort to rehabilitate his credibility in his Motion, Rothschild points to his own testimony as evidence of his "intent to reference artistically" or "to claim authorship of his own work." Def.'s Br. at 18–21.[7] For example, he references his testimony that he and his publicist Kenneth Loo corrected confusion in the media. Def.'s Br. at 26. However, Rothschild offers no corroborating evidence for his statement. Rothschild also argues that he attempted to arrange a collaboration with Hermès. *Id.* at 20. Yet, Rothschild can point to no evidence for support other than the Court's summary judgment decision. *Id.* The evidence shows otherwise—Rothschild's personal communications showed that he frequently lied about his affiliation with Hermès, and Hermès had no direct interaction with Rothschild. *See* discussion *supra* Section III.A.6.b.

Rothschild also quotes from his testimony that he intended the METABIRKINS NFTs "[i]n some ways, yes, as a reference" to the BIRKIN bags. Def.'s Br. at 19. Contrary to Rothschild's assertion, his testimony does not show his "intent to reference artistically."[8] This is simply an interpretation fabricated by his counsel. And arguing that Dr. Gopnik could have testified to the Jury about this "intent" is meritless—that is not the provenance of experts and Dr. Gopnik was properly excluded. Def.'s Br. at 22.

In the opening, Hermès presented a text message Rothschild sent to his business associates stating he does not "think people realize how much you can get away in art by saying 'in the style

---

[7] This is the first time Rothschild makes a distinction between an "intent to *reference artistically* the Birkin mark and trade dress, as opposed to using the mark and dress to confuse consumers." Def.'s Br. at 18–19. Rothschild provides no support for this new distinction—likely because it, too, was contrived after trial—and like many of his other arguments, this, too, was waived.

[8] Rothschild further argues that "the most egregious example of intent-to-reference being mistaken for intent-to-confuse came out of the mouth of Hermès's counsel, who," selectively quoted Rothschild's interview during closing. Def.'s Br. at 21. This is incorrect and the Jury was instructed that "none of what the lawyers have said . . .  in their closing arguments, . . . is evidence." Jury Instrs. at 4. Further, there was no objection and Rothschild could have responded to it in closing. Also, the Jury had the full interview and could have reviewed it as well.

of.'" Fernandez Decl., Ex. 42 at 26; Ex. 43 at 30:24–31:1. This text message shows Rothschild bragging about using art as a pretext. Rothschild now argues he was opining "that artistic reference is legal, especially if one states openly that the reference is done 'in the style of' the original—*i.e.*, if one makes the artistic *reference* clear, so that people will not be confused about the source of the artwork." Def.'s Br. at 19–20. But that is not what Rothschild testified at trial. Rather, he stated: "when I said get away with, I was, kind of, referring to the situation. I was speaking about this situation that we're in today, where I should be able to get away with creating this artwork, um, because it's my artistic expression and, you know, a company like Hermès shouldn't be able to sue me for it." Fernandez Decl., Ex. 19 at 297:21–298:7. Rothschild's testimony was not credible—Rothschild sent the text message to his associates 16 days *prior* to Hermès sending him the cease-and-desist letter. *Id.*, Exs. 42, 53. Rothschild's counsel cannot now change these statements post-trial by interposing their own interpretation of Rothschild's "intent."

Rothschild proved to the Jury that he was not credible. The revisionist history offered in Rothschild's moving papers is unavailing and inappropriate. As noted by the Court, "[Rothschild's] credibility was clearly impeached. And the jury can, therefore, draw an adverse inference as to anything he said. Forgive me, but I think that's the law of evidence 101." Fernandez Decl., Ex. 2 at 811:7–10. The Jury likely realized that Rothschild was not credible.

## B. Rothschild Was Engaged in Brand Building, Not Artistic Commentary

Hermès proved at trial that the "commentary" was just a pretext and Rothschild was actually engaged in brand building for a commercial product. Dr. Kominers testified that the METABIRKINS NFTs fell squarely within the digital brand NFT submarket. *Id.*, Ex. 2 at 18:12–16. Consistent with building a digital brand NFT, Rothschild provided or promised various forms of utility to the METABIRKINS NFTs holders. For example, he provided a roadmap explaining that METABIRKINS NFT holders would get preferential access to his next project. *Id.*, Ex. 14.

Rothschild promoted community identification by trying to get METABIRKINS community members to change their social media profile pictures to a METABIRKINS NFT. *Id.*, Ex. 54. Rothschild also promised the following utilities: (1) METABIRKINS NFT holders could get access to token-gated events which he hosted at his retail store, Terminal 27, (*id.*, Ex. 2 at 641:17–642:2); (2) guaranteed airdrops for METABIRKINS NFT holders among the "endless value" they would receive and teased the rodeo horse charm NFT, (*id.*, Exs. 36, 55); (3) rewards for loyalty from METABIRKINS NFT holders and community members, (*id.*, Ex. 14); and (4) transformative utility to METABIRKINS NFT holders as well in the form of "burning" their rodeo horse charm "to match their birkin." *Id.*, Ex. 35 at 3–6. Finally, Rothschild's plans to provide transformative utility were made clear when Rothschild told his investors that the METABIRKINS NFTs were "fully 3d" and "technically metaverse ready" when discussing plans to make the METABIRKINS NFTs wearable in the platforms such as "Decentraland." *Id.*, Ex. 42 at 27–28. Dr. Kominers illustrated how these utilities indicated that Rothschild was engaged in building a digital brand NFT. *Id.*, Ex. 2 at 636:13–663:14. Dr. Kominers observed that purchasers were not interested in the METABIRKINS NFTs for their visual features. *Id.* at 692:12–23. Rather, they were interested in the various forms of promised utility, "and particularly the opportunity to use digital Birkin bags in the metaverse." *Id.*

Rothschild understood that he had "a fucking gem on [his] hands" with these METABIRKINS NFTs (*id.*, Ex. 34 at 7), and wanted to maximize his profits. Rothschild thus engaged in pumping and shilling, seeking whales to sweep the floor, to inflate the market prices of the METABIRKINS NFTs. *Id.*, Ex. 19 at 408:7–15; Ex. 33 496:24–497:5. He explained that "sweeping the floor" meant people buying the NFTs "which, in turn, would raise the price." *Id.*, Ex. 33 at 496:24–497:5.

On December 1, 2021, Rothschild told his investors that the "best marketing is celebs/whales pump." *Id.*, Ex. 42 at 32. On the next day, Rothschild texted an influencer to promote the METABIRKINS NFTs by asking him for "one more shill post" and for "like ultimate shill post." *Id.*, Ex. 34 at 6–7. In exchange for "shilling," Rothschild told the influencer he could sell his METABIRKINS NFT for about $50,000. *Id.*, Ex. 19 at 451:5–9; Ex. 34 at 6–8. When the influencer hesitated to provide an additional free promotion, Rothschild pleaded, "I need the shill." *Id.*, Ex. 34 at 9.

On December 3, 2021, Rothschild texted his investors that he "need[ed] whales to sweep the floor." *Id.*, Ex. 41 at 16. The investor replied that "[a]t these prices [you] don't even need whales." *Id.* But Rothschild was greedy; seeking the maximum profit, he responded "def[initely] but they needa [sic] sweep the floor." *Id.* Rothschild told another influencer that he would "give him a bag if he could get whales to sweep the floor." *Id.* at 5. With these "whales," he was able to promote his digital brand.

### C.   Rothschild Intended to Confuse Potential Consumers

From the outset of the project, Rothschild referred to the NFTs merely as "Birkins." *Id.*, Ex. 48. As discussed *supra* Section IV.A, the METABIRKINS name was generic and suggested almost instantly by different social media users—on different platforms—in response to Rothschild crowd sourcing a name. Even after naming the collection METABIRKINS, Rothschild planned promotional campaigns for the second collection which omitted the generic prefix "meta" and encouraged consumers to refer to the NFTs simply as "Birkins." Fernandez Decl., Ex. 42 at 3. Further, Rothschild made numerous statements to investors and associates, deceiving them that he was collaborating with or otherwise had approval from Hermès. *See* discussion *supra* Section III.A.6.b. Rothschild's explicitly misleading conduct inevitably led to confusion. *See discussion supra* Section III.A.3. For example, Rothschild explicitly misled his followers when he tweeted

on the METABIRKINS Twitter: "Big brands are already experimenting with NFTs. Be early. @MetaBirkins . . . minting soon." Fernandez Decl., Ex. 31.

### D. Hermès Presented Sufficient Evidence That There Was a Particularly Compelling Showing of Likelihood of Confusion

*Twin Peaks* held that "the finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest recognized in *Rogers*." *Twin Peaks Prods., Inc.*, 996 F.2d at 1379. At trial, as set forth *supra* Section III.A.1–7, the Jury heard a particularly compelling case of likelihood of confusion with all relevant *Polaroid* factors weighing in Hermès's favor. Contrary to Rothschild's arguments, the Second Circuit has never held that *Rogers* requires evidence of actual confusion, which is a mere single factor in the multi-factor analysis, or survey evidence, which is only one form of evidence of actual confusion. *AM Gen. LLC*, 450 F. Supp. 3d at 480. Actual confusion is not required to prevail under a *Polaroid* factors analysis. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986).

Ignoring all of the compelling evidence of likelihood of confusion presented at trial, Rothschild asserts that Hermès cannot prevail as a matter of law because the survey presented by Dr. Isaacson "purports to show only 18.7% confusion . . . ." Def.'s Br. at 26. In making this argument, previously rejected by the Court on summary judgment, Rothschild disregards the testimony propounded at trial on Rothschild's behalf by Dr. Neal, who repeatedly testified that the minimum threshold of net confusion is 15% and specifically testified that "As I stated before, the kind of magic number, the minimum threshold that most experts cite to, is 15 percent. So it's only if you get 15 percent or above that you can reach a conclusion that confusion exists." Fernandez Decl., Ex. 1 at 906:10–22, 917:3–13, 921:15–17, 923:14–24.

Rothschild's argument does not just ignore the expert that Rothschild offered but also mischaracterizes the Second Circuit's analysis of the survey presented by the *Rogers* plaintiff. The

31

Second Circuit precisely described this survey as follows:

> The survey sampled 201 people who said they were likely to go to a movie in the next six months. Half of those surveyed were shown a card with the title "Ginger and Fred" on it; the other half were shown an actual advertisement for the movie. Of these 201, 38 percent responded "yes" to the question: "Do you think that the actress, Ginger Rogers, had anything to do with this film, or not?" Of these respondents, a third answered yes to the question: "Do you think Ginger Rogers was involved in any way with making this film or not?" In other words, about 14 percent of the total 201 surveyed found that the title suggested that Rogers was involved in making the film.

*Rogers*, 875 F.2d at 1001 n.8.

Rothschild falsely characterizes the 38 percent "yes" responses to the first question as "total confusion." Def.s Br. at 9 n.3. Looking at the first question actually asked, the 38 percent who said "yes" were merely saying that they thought Ginger Rogers had "anything to do" with the film, which could mean "anything," including that they thought the film was about her. *Rogers*, 875 F.2d at 1001 n.8. This explanation for these "yes" responses is particularly likely because half of the survey participants only saw the film title, and no other materials relating to the subject of the film. *Id.* They likely reasonably concluded that a film title that appeared to refer to her and her famous dance partner by name was about her. Only 14 percent of the people surveyed thought that Ginger Rogers was "involved in any way with making this film." *Id.* But, as described in *Rogers*, this survey did not include a control question. *Id.* Thus, we can only speculate as to what the net confusion level would have been if there were a control. It could have been 0 percent.

The survey conducted by Dr. Isaacson in this matter was conducted in accordance with the rigorous standards of the "EverReady format," including the use of open-ended non-leading questions and a "control" survey to screen out responses unrelated to the confusion claim at issue. Fernandez Decl., Ex. 2 at 744:14–746:7. The survey offered by the plaintiff in *Rogers* did not

satisfy the rigorous standards of the *Eveready* test because, among other things, the questions were leading and there was no "control" question so this was not a "net confusion" finding. 875 F.2d at 1001 n.8.; *see also* 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:174 (5th ed. 2023) (the "Eveready" format "does not inform survey respondents what the senior mark is, but assumes that they are aware of the mark from their prior experience" so questions cannot be "leading," i.e., stating one party's mark "several times in questions" and then asking about the other party's mark); Swann, J.B. *"Likelihood of Confusion" in Trademark and Deceptive Advertising Surveys: Law, Science, and Design* (Shari S. Diamond & Jerre B. Swann, ed. 2022) at 61 (the *Eveready* format "critically" requires "the use of a control methodology" to "filter for brand dominance"). Contrary to Rothschild's argument, *Rogers* does not discuss an *Eveready* survey and thus sets no minimum threshold of net confusion for *Eveready* surveys.

Nothing in *Rogers* requires that survey evidence to prove that the adoption of a trademark was expressly misleading. Certainly, no specific percentage is mandated.[9] Rather, as *Twin Peaks* makes clear, the relevant *Polaroid* factors should be considered in determining if there is a particularly compelling likelihood of confusion. *Twin Peaks*, 996 F.2d at 1379. Where, as here, the application of the *Polaroid* factors shows particularly compelling evidence of a likelihood of confusion, the Jury appropriately concluded that the Rothschilds adoption and use of the BIRKIN

---

[9] Rothschild also incorrectly points to *Am Gen. LLC* as authority a survey showing net confusion in excess of 20 percent is required to show "explicitly misleading" use of a trademark. Def.'s Br. at 27. But the *AM Gen. LLC* Court actually rejects the claim that any one *Polaroid* factor in isolation determines  whether the use of a trademark is expressly misleading. *AM Gen. LLC* , 450 F. Supp. 3d at 482. Specifically, a survey showing that 16 percent "association" between the defendant's products and plaintiffs' trademark did not establish that the use was "explicitly misleading" where the *Polaroid* factors otherwise weighed in favor of the Defendant and there was no evidence of actual market place confusion. *Am Gen. LLC* presented facts entirely different from this case where, in addition to the survey evidence showing a likelihood of consumer confusion, there was significant evidence of actual confusion in the marketplace and the *Polaroid* factors weighed heavily in finding a likelihood of confusion. *See* discussion *supra* Section IV.D.

mark was expressly misleading and not protected by First Amendment.

## V.     DR. GOPNIK WAS PROPERLY EXCLUDED

As detailed below, this is a red herring. Not only did the Court properly exclude Dr. Gopnik, but the Court made a determination that the METABIRKINS NFTS were "art" and that the title was artistically relevant, rendering any testimony Dr. Gopnik could have provided moot.

### A.     The Court Did Not Misapply *Daubert* or *Kuhmo*

The Court stated that: "Dr. Gopnik is offered as an expert on 'business art,' but both in his report and in his deposition he fails to identify in any meaningful fashion what his methodology is for he applied it in this case, which, of course, are the express requirements, among others, of Rule 702 of the Federal Rules of Evidence." Fernandez Decl., Ex. 19 at 335:3–12. The Court explained that "under the *Kumho Tire* case and other subsequent cases even nonscientific evidence from experts should be viewed at least somewhat in light of the *Daubert* factors." *Id.* at 336:8–11.

Rule 702 provides that a witness "qualified as an expert" may offer opinion testimony only if, *inter alia*: "(c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Rothschild argues that an expert's testimony need not be based on "a particular methodology or technical framework." Def.'s Br. at 31. However, that is not the standard in the Second Circuit. As the Court in *King v. Wang* held, "[ev]en '[i]f the witness is relying solely or primarily on experience, [he still] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" No. 14-CV-7694 (LJL), 2021 WL 5237195, at *10 (S.D.N.Y. Nov. 9, 2021) (citations omitted). But even the hodge-podge of cases cited by Rothschild explain, experts need to "employ[] a methodology recognized in the profession or by the courts." Def.'s Br. at 32–33 (citing *In re Com. Fin. Servs., Inc.*, 350 B.R. 520, 528-29 (Bankr. N.D. Okla. 2005)). "'*Daubert* and Rule

702 mandate the exclusion of [] unreliable opinion testimony' that is 'based on data [and] a methodology' that are 'simply inadequate to support the conclusions reached.'" *Olin Corp. v. Lamorak Ins. Co.*, No. 84-CV-1968 (JSR), 2018 WL 1901634, at *20 (S.D.N.Y. Apr. 18, 2018) (Rakoff, J.) (citations omitted).

Dr. Gopnik's opinions are personal and fail to meet *Daubert's* methodology requirement. Fernandez Decl., Ex. 19 at 336:2–18. When asked how he determines whether someone engages in "business art," Dr. Gopnik testified that he looks at the "larger set of contextual clues that tell you, oh, this might be worth looking at as an artistic activity[.]" *Id.*, Ex. 56 at 118:18–22; Ex. 19 at 335:20–23. The Court explained that "[w]hen asked to define what that sentence meant, [Dr. Gopnik] refused, or declined I should say, and never offered a systematic definition for business art." *Id.*, Ex. 19 at 335:24–336:1.

Not only was Dr. Gopnik's opinion untested, it was "on its face untestable, unfalsifiable. It has no known error rate. It has not been peer reviewed. And it has not been generally accepted. In fact, it is as [Dr. Gopnik] explains it essentially a hunch or a purely subjective opinion." *Id.* at 336:13–17. Dr. Gopnik agreed, conceding that there is no agreed upon methodology among art historians to determine whether a particular item is "art." *Id.*, Ex. 56 at 130:23–131:2. He admitted that such a dispute would be "irresolvable" among "most sophisticated art critics." *Id.* at 117:16–21. In fact, Dr. Gopnik testified that "[t]here is no consensus among art critics on pretty much any issue." *Id.* at 95:15–21; *see also* 130:23–131:2.

### B.      Excluding Dr. Gopnik Was Not Prejudicial

Rothschild argues that Dr. Gopnik's exclusion prevented the Jury from understanding the larger context of "business art." Def.'s Br. at 35. However, his testimony was rendered irrelevant when the Court instructed the Jury that the METABIRKINS NFTs were art and that the first prong of *Rogers*— whether the title was artistically relevant—was met. Jury Instrs. at 21. Dr. Gopnik's

testimony would thus provide no probative value to the only remaining prong of *Rogers*—the explicitly misleading prong—because an expert may not testify directly about a party's intent.

Rothschild betrays his real gripe: Rothschild wanted Dr. Gopnik to testify about intent. Def.'s Br. at 38. But expert testimony is inappropriate where it "propose[s] improperly to assume the role of advocates for the [party's] case by arguing as to the intent or motives underlying the conduct of [the party], a transgression that has resulted in the exclusion of 'expert' testimony as to the 'real motive' behind" certain actions. *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004).

Rothschild argues that Dr. Gopnik's exclusion was especially harmful in light of Dr. Kominers' testimony. Def.'s Br. at 36. But the two experts did not testify on the same subject, and Rothschild had a full and fair opportunity to cross examine Dr. Kominers.[10] Dr. Gopnik was not offered as a rebuttal expert to Dr. Kominers. And again, by finding the METABIRKINS NFTs as art, Dr. Gopnik's testimony was, at best, redundant.

## VI.   THE QUESTIONING OF DR. NEAL WAS NOT PREJUDICIAL

Grasping at straws, Rothschild claims the Court's questioning of Dr. Neal was prejudicial. Def.'s Br. at 28. This, too, was waived. Rothschild did not object to it during the proceedings, did not seek a sidebar, and did not raise this during his Rule 50(a) motion. Rothschild argues that the Court's questioning of Dr. Neal "gave the jury license to find" a likelihood of confusion based on a survey which found less than 10% confusion. *Id.* at 29. Rothschild failed to object to this

---

[10] Rothschild argues that Hermès encouraged the Court to misunderstand Dr. Kominers' testimony. Def's Br. at 36–37. Rothschild omits a key sentence in Hermès's counsel's response: "This motion should have [previously] been made and it should have been briefed. Because the problem is, we disagree with how Mr. Millsaps just described this expert." Fernandez Decl., Ex. 12 at 120:13–21. As Hermès's counsel properly stated, this issue had not been briefed on whether Dr. Kominers was not an "art expert." The cited testimony was not the argument; the Court said it would read Dr. Kominers' report and hear argument the following day. After the Court subsequently read Dr. Kominers' report, the Court denied the motion without argument.

questioning at the trial, when any purported defect could have been cured. Fernandez Decl., Ex. 1 at 923:12–924:20. This waiver alone is sufficient reason for rejecting this argument. *Azkour v. Little Rest Twelve*, No. 10-CV-4132 RJS, 2015 WL 631377, at *7 (S.D.N.Y. Feb. 12, 2015), aff'd sub nom. *Azkour v. Little Rest Twelve, Inc.*, 645 F. App'x 98 (2d Cir. 2016) (denying post-trial motions, *inter alia*, because "Plaintiff did not object to this testimony at trial, and so has waived any objections. In any event, in his post-trial briefing he mischaracterizes the record and the evidence adduced at trial."). Regardless, the Court was merely stating the law. Indeed, the McCarthy's section cited by Rothschild for the proposition that 18.7% is insufficient states: "Even results as low as 11% have been relied upon to support a finding of likely confusion. The lowest reported figure is 8.5%, which the court found to be 'strong evidence' of a likelihood of confusion where other evidence was also strongly supportive." 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:188 (5th ed. 2023). This Court has found varying percentages of survey evidence as sufficient for a finding of likelihood of confusion, including surveys which found below 9%. *See e.g., Tri-Star Pictures*, 14 F. Supp. 2d at 356 (finding that where defendant's survey found only 7.3% confusion, there was some evidence of actual confusion under both parties' surveys) (citing *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F. Supp. 707, 716 (S.D.N.Y.1973), *aff'd*, 523 F.2d 1331 (2d Cir.1975) (holding that a confusion level of 7.7% was sufficient to support a finding of a likelihood of confusion)).

Ignoring that the Jury may have believed Dr. Isaacson and not Dr. Neal—who did not conduct his own survey or do much beyond provide sparse details criticizing Dr. Isaacson— Rothschild substitutes his position for that of the Jury and argues that Dr. Isaacson's survey evidence should be discounted. Dr. Neal's reduction of the results from over 18% to under 10% came through criteria that he alone adopted. But Dr. Neal admitted that the criteria that he used to

reduce Dr. Isaacson's finding of 18.7% confusion is not applicable here, and thus cannot be a basis for retrial. Specifically, Dr. Neal testified that the re-coding he used to reduce the confusion finding should only be used when "both parties are using the same name"—such as the identical Eveready v. Ever-Ready marks in the original *Eveready* case[11]—yet Dr. Neal agreed, as is obvious to any observer, that BIRKIN and "Not Your Mother's Birkin" do not sound like METABIRKINS. Fernandez Decl., Ex. 1 at 927:18–933:13. Dr. Neal's re-coding of the survey data to get to 9.3% is thus not appropriate for this case. The Jury did not believe Dr. Neal. It was not error for the Jury to reject his testimony, and the Court's short questions to Dr. Neal's were not material, and certainly not prejudicial, to the outcome of this case.

## VII. ROTHSCHILD'S BASELESS CLAIM THAT THE LANHAM ACT DOES NOT APPLY TO DIGITAL GOODS SHOULD BE REJECTED FOR THE REASONS THE COURT PREVIOUSLY REJECTED IT

Rothschild again takes the unprincipled position that the Lanham Act does not apply to digital goods and services. "[N]either Dastar nor its progeny require that a defendant's goods be tangible for Lanham Act liability to attach." *Hermès Int'l v. Rothschild*, 590 F. Supp. 3d 647, 655 (S.D.N.Y. 2022); *Hermès Int'l*, 603 F. Supp. 3d at 107 n.7. The application of *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), is neither novel nor complex. Rothschild continues to intentionally misstate *Dastar*'s holding. Def.'s Br. at 39. In so doing, Rothschild ignores decades of the Lanham Act's application to virtual goods—and even longer application to services.

"*Dastar* 'addresses the interplay between copyright—which protects authors' rights in their creations—and unfair competition laws—which protect consumers from, *inter alia*, confusion as to the origin of goods.'" *Shepard v. Eur. Pressphoto Agency*, 291 F. Supp. 3d 465, 469 (S.D.N.Y.

---

[11] *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366 (7th Cir. 1976).

2017) (citation omitted). In rejecting an effort to use the Lanham Act to refashion a claim for copyright-like rights, *Dastar* differentiates between the origin of creative ideas (the provenance of copyright) and "tangible goods that are offered for sale." *See Dastar*, 539 U.S. at 37. The issue of whether the Lanham Act protects consumers of virtual goods and services was simply not before the *Dastar* Court. As the Court explained in previously rejecting this frivolous argument, "*Dastar* said nothing at all about the general applicability of the Lanham Act to intangible goods. Rather, the Supreme Court sought to underscore the subtle distinction between copyright -- with its focus on encouraging the production of creative content -- and trademark -- aimed principally at preventing confusion regarding consumer goods." *Hermès Int'l*, 590 F. Supp. 3d at 654. The cases cited by Rothschild are inapposite and offer no different explanation.

Rothschild disingenuously relies on two cases where, as in *Dastar*, the plaintiffs pursued copyright-type claims under the guise of the Lanham Act. Def's. Br. at 40. The Lanham Act did not apply in *Phoenix Entertainment Partners v. Rumsey* because the unauthorized copying of songs were properly copyright infringement claims. 829 F.3d 817, 825–26 (7th Cir. 2016). Although the court assumed the digital karaoke files to be "tangible goods" for purposes of the Lanham Act, any confusion did not involve the *origin* of the goods; the plaintiffs were really suing concerning authorship/performance of music. *Id.* at 829. The consumers never saw the digital karaoke files and the defendants neither sold them nor made representations about their source. *Id.*; *see also Phoenix Entm't Partners v. J-V Successors, Inc.*, 305 F. Supp. 3d 540, 543–44 (S.D.N.Y. 2018) (no Lanham Act claim for copying of digital karaoke tracks).

Rothschild also cites an unpublished order from *Pulse Entertainment Corp. v. David*, No. CV 14- 4732, Dkt. #19 (C.D. Cal. Sept. 17, 2014), which is equally unpersuasive. In *Pulse*, the plaintiff asserted that defendants infringed plaintiff's patents in creating a Michael Jackson

hologram and brought reverse passing off claims under the Lanham Act. *Id*. at 1–2. The court held that "the thrust of Pulse's complaint is that Defendants falsely designated themselves as the authors of an intangible communication," which supports Hermès' and the Court's interpretation of *Dastar*." *Id*. at 4. Here, unlike in *Pulse*, the question of authorship is not at issue. Rather, the issue is one of source: The Jury here found that Rothschild was marketing and selling NFTs under a name—METABIRKINS—which was confusingly similar to BIRKIN. Hermès never alleged that it was the author of the NFTs.

Caselaw within this district uniformly shows that the Lanham Act applies to digital goods. *See, e.g.*, *Kelly-Brown v. Winfrey*, 717 F.3d 295, 313 (2d Cir. 2013); *Soter Techs., LLC v. IP Video Corp.*, 523 F. Supp. 3d 389, 399–400 (S.D.N.Y. 2021); *Champion v. Moda Operandi, Inc.*, 561 F. Supp. 3d 419 (S.D.N.Y. 2021). Rothschild's argument is a knowing contrivance and should be rejected.

## CONCLUSION

For the foregoing reasons, Hermès respectfully requests that this Court denies Rothschild's Motion for judgment as a matter of law or for new trial.

Dated: March 28, 2023
New York, New York

**BAKER & HOSTETLER LLP**
Deborah A. Wilcox, Esq. (*pro hac vice*)
Key Tower
127 Public Square
Cleveland, OH 44114
Telephone:  216.621.0200

**BAKER & HOSTETLER LLP**
Lisa Bollinger Gehman, Esq. (*pro hac vice*)
1735 Market Street
Philadelphia, PA 19103
Telephone:  215.568.3100

**BAKER & HOSTETLER LLP**

By:  /s/ *Gerald J. Ferguson*
Gerald J. Ferguson, Esq.
Oren J. Warshavsky, Esq.
Jason S. Oliver, Esq.
Jessica H. Fernandez, Esq.
Megan A. Corrigan, Esq.
Francesca A. Rogo, Esq.
45 Rockefeller Plaza, 14th Floor
New York, NY 10111
Telephone:  212.589.4200
Facsimile:  212.589.4201

*Attorneys for Plaintiffs*
*Hermès International and*
*Hermès of Paris, Inc.*