# Exhibit 1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   HERMÈS INTERNATIONAL, et al.,

 4                  Plaintiffs,

 5          v.                              22 Civ. 384 (JSR)

 6   MASON ROTHSCHILD,

 7                  Defendant.              Trial

 8   ------------------------------x
                                            New York, N.Y.
 9                                          February 6, 2023
                                            9:30 a.m.
10
     Before:
11
                       HON. JED S. RAKOFF,
12
                                            District Judge
13                                            –and a Jury–

14

15                         APPEARANCES

16   BAKER & HOSTETLER LLP
          Attorneys for Plaintiffs
17   BY:  DEBORAH A. WILCOX
          OREN J. WARSHAVSKY
18        GERALD J. FERGUSON

19   HARRIS ST. LAURENT & WECHSLER LLP
          Attorneys for Defendant
20   BY:  ADAM B. OPPENHEIM
          JONATHAN A. HARRIS
21
     LEX LUMINA PLLC
22        Attorneys for Defendant
     BY:  RHETT O. MILLSAPS, II
23        CHRISTOPHER SPRIGMAN

24

25
```

1           It is the use of the Birkin name and a slogan as part

2    of MetaBirkins of course, and that the actual designs of the

3    digital images copy the trade dress, those are the key

4    elements.  The fact that there was a disclaimer that mentioned

5    Hermès the company that puts out these products three times was

6    also very relevant to Dr. Isaacson.  He grouped all of those

7    things together because that is what the real world is.

8           The survey is meant to capture as much of the real

9    world as the purchaser sees things as possible.  So that's what

10   he did.

11          THE COURT:  So my view is this:  First, whatever may

12   have been said in the complaint throughout this case, it's been

13   the plaintiff's consistent position and the Court's

14   understanding that the mark that was being infringed allegedly

15   was the Birkin mark, as my instructions indicate, and that the

16   reference to Hermès was part of the overall picture, but was

17   not a separate claim.

18          So I don't see the basis at this very late stage for a

19   supplemental report from Dr. Neal.  I do think that for what

20   was just represented by defense counsel about what's in his

21   original report that he still then can make the argument that

22   different things are being globbed together and that that makes

23   the survey less useful, less valuable than it might otherwise

24   be or whatever he wants to conclude in that regard.

25          Someone should go tell Dr. Neal, since he's going to

1    be on the stand in ten minutes, that that's how we're going to

2    handle it.

3           Now, the other issue that I wanted to be sure to

4    reach, because we will be going into summations after

5    Dr. Neal's testimony, is Instruction No. 14, particularly the

6    third paragraph of it.

7           I spent a good deal of the weekend reflecting on the

8    various excellent arguments I have received from both sides at

9    the charging conference, and the instructions that I sent you

10   over the weekend reflect my rulings.

11          I will note one thing for the record, since it was one

12   of the issues that I was uncertain about, in the end I have put

13   the instructions regarding the three claims first, before the

14   instruction on First Amendment protection for several reasons.

15          One is I think that's the more logical way for the

16   jury to proceed.  If there's no infringement they don't reach

17   the First Amendment question.

18          Secondly, as we all know, the Supreme Court has taken

19   cert. in the *Jack Daniels* case, so it's possible the *Rogers*

20   test may not survive, though I personally hope it does.  In

21   that case, if they found infringement, but found that it was

22   barred by the First Amendment defense, the Court could then

23   reinstate the infringement conclusion without having to go

24   through a whole new trial.  We might still have to have a trial

25   of damages, but that would be a much more abbreviated matter.

1    But I did add to Instruction No. 9, where I am describing the

2    basic claims, a sentence to flag the First Amendment defense

3    was coming.  I think that was a fair resolution of the

4    competing arguments.

5           Now, the more I thought about the *Rogers* test and the

6    various cases not just in the Second Circuit but elsewhere that

7    have elaborated and expanded the *Rogers* test over the weekend,

8    the more I thought that on the facts of this case the real

9    question is the defendant's intent.

10          Because while both *Rogers* and the related cases speak

11   in, frankly, less than clear terms like "explicitly misleading"

12   or "artistically relevant" and the like, the real question

13   here, so far is the defense is concerned, is did Mr. Rothschild

14   intend to mislead?  In which case, of course, he has no First

15   Amendment protection, any more than a con man has First

16   Amendment protection from telling lies to the public to make

17   money.  Or did he not intend to mislead, in which case I think

18   there can be no question that there was at least some artistic

19   aspect to what he was offering.

20          As indicated in the instruction by his covering the

21   Birkin bags with fur, he says he covered it with fur to show

22   how ridiculous the consumer interest in Birkin bags was and the

23   plaintiff says, no, it was just part of his whole way to try to

24   sneak in as he sought to dupe the public.

25          They would be fair arguments to the jury, but that all

1  goes to his intent.  That's why I said I think the focus is

2  really on intent.

3          So I try to capture that, but I have added some

4  additional words since I sent this to you on Saturday to the

5  third paragraph of Instruction No. 14.  Everything else will

6  remain exactly as it is, and all objections thereto are

7  preserved.

8          But here is now what I have for 14:

9          "It is undisputed that the MetaBirkins NFTs, including

10  the associated images, are in at least some respects works of

11  artistic expression, such as, for example, the addition of the

12  total fur covering on the Birkin bag images.  Given that,

13  Mr. Rothschild is protected from liability on any of Hermès'

14  claims unless Hermès proves by a preponderance of the evidence

15  that Mr. Rothschild's use of the Birkin mark was not just

16  likely to confuse potential consumers, but was intentionally

17  designed to mislead potential consumers into believing that

18  Hermès was associated with Mr. Rothschild's MetaBirkin

19  projects.  In other words, if Hermès proves that Mr. Rothschild

20  actually intended to confuse potential customers, he has waived

21  any First Amendment protection."

22          I think, as will be obvious, that doesn't use some of

23  the buzzwords from *Rogers* and related cases, but I think the

24  whole *Rogers* issue in this case turns on his intent.

25          So let me hear any comments on the new version of

 1    paragraph 3 first from plaintiff's counsel and then from

 2    defense counsel.  Again gem thank you, your Honor.

 3              MS. WILCOX:  Thank you, your Honor.

 4              Thank you for that careful consideration and revised

 5    text, which we agree that the intent is key in this case.  We

 6    were trying to come up with our own way of bringing it back in

 7    and following your summary judgment discussion of the Second

 8    Circuit law.  So I think that is a good rewrite with respect to

 9    that second prong.

10              We still have concern that the first prong seems to

11    have disappeared.

12              THE COURT:  I think the first prong, the defense has

13    shown and made enough that no reasonable juror could conclude

14    that there wasn't any artistic expression in Mr. Rothschild's

15    stuff.  That's why I didn't charge the first prong.

16              MS. WILCOX:  We might make a note of an objection

17    then.

18              THE COURT:  Yes.  I assume you would object to that,

19    so objection duly noted.

20              Let me hear from defense counsel.

21              MS. WILCOX:  If you wouldn't mind.

22              THE COURT:  Sorry.  Go ahead.

23              MS. WILCOX:  I am also considering whether this

24    revision deals with another issue that we were thinking about,

25    where the dilution cause of action has no requirement of

misleading conduct, but it does relate to an intent to

associate versus the intent to cause confusion.  I think you

might have addressed that with this.

THE COURT:  I use the word "associated" in the new

version, yes.

MS. WILCOX:  Okay.  Thank you.

MR. SPRIGMAN:  Your Honor, just in response to that

last quickly.  Yes, the dilution cause of action does require

an intent to associate, but in addition, it requires harm to

the mark.  It requires an impairment of the mark's

distinctiveness.  So we think that your instructions as they

stand make that clear to the jury, or at least clear enough.

These are lay people, and this is complicated.

But back to the instruction itself, we here at this

table believe that the instruction gives the jury words they

can use to actually apply the principle, and we are satisfied

with it.

That said, Judge, we do remain, we have remaining

arguments on the JMOL and in particular something that I think

is central to the relationship between *Rogers* and this case

that I would just like at some point to get to.

THE COURT:  If we had had more time right now, I was

going to hear the further argument on the Rule 50 motions, but

as I promise you, you will have that opportunity before I rule.

MR. SPRIGMAN:  Thank you, your Honor.

1    Q.  Did you prepare some slides for your presentation today?

2    A.  I did.

3         MR. MILLSAPS:  Ashley, would you please put up the

4    first slide here.

5    BY MR. MILLSAPS:

6    Q.  Dr. Neal, could you explain your methodology for evaluating

7    Dr. Isaacson's surveys?

8    A.  Certainly.  This is pretty similar to the process you go

9    through in any scientific technical review of someone else's

10   work.  You begin by very carefully going through the

11   questionnaires themselves kind of line by line looking for any

12   biases or ambiguous language or any design flaws.

13        The second thing you do is you actually go into the

14   raw data.  So basically every single person's answer to every

15   single question, you look at that, and you reanalyze the data

16   to see if the person who analyzed it initially, so

17   Dr. Isaacson, did it correctly.

18        And then the final thing is you write up whatever you

19   find in a formal report.

20        MR. MILLSAPS:  And Ashley could we go to the next

21   slide.

22   BY MR. MILLSAPS:

23   Q.  At a high level, Dr. Neal, how would you summarize your

24   conclusions about Dr. Isaacson's surveys.

25   A.  Sure.  Perhaps the most important one thing is that NFT

1  purchaser survey, where Dr. Isaacson told you that he found

2  evidence of confusion, that people would think the MetaBirkins

3  NFT is in -- that Hermès is involved in that NFT somehow, in

4  that survey, Dr. Isaacson misclassified a large number of

5  respondents as confused who actually were not confused.

6       I was able to fix that error, and I'll walk you

7  through how I did it.  Once you correct for that mistake, you

8  get 9.3 percent confusion, not the 18.7 percent number that he

9  reported.

10  Q.  And, Dr. Neal, why would it matter if confusion dropped

11  from what Dr. Isaacson reported, which was 18.7 percent, down

12  to 9.3 percent?

13  A.  Right.  So it seems like a small drop, right?  Just from

14  18.7 down to 9.  It is actually hugely consequential because

15  survey experts typically use a threshold of around 15 percent

16  as the minimum for deciding that there is a likelihood of

17  confusion, right?

18       So when Dr. Isaacson had a number like 18.7 percent,

19  he was just a little bit above that minimum number.  But when I

20  reanalyzed his data, his real number is 9.3, which falls well

21  below that typical minimum threshold for determining that

22  there's some confusion.

23       So when you get a number like that, like 9.3, the

24  proper conclusion is that there is no confusion.  Because it

25  doesn't have to be zero; it just has to be so small that it is

1    considered immaterial.  And 15 is that typical magic number, if

2    you like, for reaching that determination.

3              MR. MILLSAPS:  Ashley, would you go to the next.

4    BY MR. MILLSAPS:

5    Q.  Dr. Neal, were there other flaws in Dr. Isaacson's survey?

6    A.  Yes.  There were a couple of other flaws that -- like buyer

7    survey language, and I will talk you through that.

8              I wasn't able to fix those flaws by reanalyzing the

9    data, but I know that they pushed the confusion numbers up in

10   an artificial way, so I would say even that 9.3 percent number

11   is a bit high and the real number is no doubt a little bit

12   lower than that.

13   Q.  And, Dr. Neal, were you aware that Dr. Isaacson conducted a

14   survey as well among handbag purchasers?

15   A.  Yes.  So those first three conclusions are all about that

16   NFT purchaser survey, so people out there interested in buying

17   NFTs.

18             He also did a survey of people who spend a lot of

19   money on handbags, $10,000 or more.  In that survey, he found

20   no confusion whatsoever.  Inexplicably, it doesn't really show

21   up in his report, I think it's important for us to look at that

22   survey as well.

23             Being a good scientist means you look at all of the

24   data from all of the studies you run, and that second survey of

25   handbag purchasers tells us very clearly that likely purchasers

1    it up to 18.7 percent.

2            MR. MILLSAPS:  Ashley, if we could go to the next

3    slide.

4    BY MR. MILLSAPS:

5    Q.  Did you recode the data in a proper fashion?

6    A.  I did.  It is a little bit hard to see on this screen, but

7    basically what I did was I went through and found every single

8    person that Dr. Isaacson said was confused.  Then I looked at

9    their Q4 responses to see whether they really were confused or

10   not, right?  Did they identify Hermès or Birkin and then

11   successfully go on to identify some good put out by Hermès?

12           And the answer is that some do, but a whole bunch

13   don't, right?  So all the ones in green are people who

14   successfully passed the playback test.  And the ones in red,

15   those are the people he misclassified as confused who actually

16   are not.

17           MR. MILLSAPS:  Can we go to the next -- oh.

18   BY MR. MILLSAPS:

19   Q.  After accurately coding the data, what was your finding

20   again, Dr. Neal and what is the significance of that?

21           MS. WILCOX:  Objection.

22           THE COURT:  Well, it is a compound question.  Break it

23   down.

24           MR. MILLSAPS:  Okay.

25           Yes, I will do that, your Honor.

1          Thank you.

2    BY MR. MILLSAPS:

3    Q.  Dr. Isaacson, could you just tell us what the implications

4    of this first flaw were.

5    A.  Okay.  So the main implication is that when Dr. Isaacson

6    said he got 18.7 percent confusion, he was wrong.  He actually

7    got 9.3 percent confusion.  That's the first takeaway.

8    Q.  And what is the significance of that number, Dr. Neal,

9    again?

10   A.  As I said before, the kind of magic number, the minimum

11   threshold that most experts cite to, is 15 percent.  So it's

12   only if you get 15 percent or above that you can reach a

13   conclusion that confusion exists.

14          THE COURT:  Just so we're clear, that's not a rule

15   that's set by law.  It's just set by the convention among

16   people who do these kinds of surveys, yes?

17          THE WITNESS:  Yes, sir.

18          That's right.

19          THE COURT:  Very good.

20          Go ahead.

21          MR. MILLSAPS:  Can we go to the next slide Ashley.

22   BY MR. MILLSAPS:

23   Q.  Dr. Neal, you mentioned that there was also a second flaw

24   in the NFT purchaser survey.

25          Could you explain what that flaw is.

 1            Thank you.

 2   BY MR. MILLSAPS:

 3   Q.  Dr. Isaacson, you mentioned -- or, Dr. Neal, you mentioned

 4   Dr. Isaacson's handbag purchaser survey.

 5            Could you just, again, explain what you did to analyze

 6   the results of that survey.

 7   A.  Certainly.  So, as I mentioned, Dr. Isaacson ran this

 8   survey, but he didn't properly write up the results in his

 9   report.  He did have all the information there hidden in kind

10   of exhibits, and I could go in and calculate the confusion

11   number from this second survey, right?

12            Just as a reminder, this is the survey of the people

13   spending $10,000 or more on handbags, right?  So that would

14   include likely customers of Hermès goods.

15            The design was basically the same as the first survey.

16   What he found, there was a confusion level of 3.6 percent.  So

17   incredibly low, way below that 15 percent threshold.

18            What do we take away from this?  This very clearly

19   shows that Hermès customers are not at all likely to be

20   confused and think that Hermès is behind Mr. Rothschild's

21   MetaBirkins NFT.

22   Q.  Dr. Neal, in your opinion, was it proper for Dr. Isaacson

23   to ignore the results of his survey in reporting his opinions

24   about confusion over MetaBirkins?

25   A.  No, it wasn't, because the proper scientific method means

1   if you design two studies, you had a good reason to design two

2   studies, and you present the results from the two studies

3   regardless of whether they help you or hurt you.  That's the

4   neutral scientific way of doing things.

5          And I didn't find Dr. Isaacson's explanation for, you

6   know, running the study, getting, frankly, a bad result for

7   Hermès and then claiming the study was irrelevant, I did not

8   find that scientifically sound reasoning.

9   Q.  Thank you, Dr. Neal.  I just have a few more questions.  We

10  have just gone through a lot of information.  In closing I

11  would just like to ask you a hypothetical.

12         Let's say that Dr. Isaacson's survey was flawless,

13  there were no flaws, and you agreed with his 18.7 percent

14  conclusion.  How would you characterize a finding of 18.7

15  percent confusion?

16  A.  If it was a properly designed study, which you know I

17  believe this is not, a finding of 18.7 would suggest some level

18  of confusion, but it's barely above the minimum level.  It's

19  less than 4 percentage points above the minimum.

20  Q.  Have you found in your own confusion surveys results higher

21  than 18.7 percent?

22  A.  Yes, many times.

23  Q.  Have you found results higher than 25 percent?

24  A.  Yes, many times.

25  Q.  Have you found results higher than 35 percent confusion?

 1   A.  Yes, I have.

 2   Q.  So would it be accurate to describe Dr. Isaacson's

 3   purported finding of 18.7 percent confusion as meaning that

 4   there's substantial likelihood of confusion?

 5          THE COURT:  Sustained.

 6          MS. WILCOX:  Thank you, your Honor.

 7   BY MR. MILLSAPS:

 8   Q.  Dr. Neal, my last question:  Do you consider 18.7 percent

 9   confusion to be a substantial likelihood of confusion?

10   A.  No, I do not.  I would characterize it as barely above the

11   minimum.

12          MR. MILLSAPS:  Thank you.

13          No further questions, your Honor.

14          THE COURT:  Just so that I am clear, so the people who

15   run these kind of surveys, as I understand your testimony, have

16   decided among themselves that the cutoff point is 15 percent,

17   right?

18          THE WITNESS:  Well, I would probably characterize it

19   as partly driven by the experts and partly driven by courts,

20   because, of course, courts have accepted different numbers.

21          THE COURT:  Courts have accepted different numbers,

22   and the question of what the courts have decided is entirely

23   for the Court, not for a witness.

24          THE WITNESS:  Yes.  That's my understanding.

25          THE COURT:  So, going back to what is in your domain,

1    what the experts have chosen, so if the cutoff is 15 percent,

2    and you think that, well, even though this -- if the study had

3    been done properly that would have been above the cutoff, but

4    you say it's not really as good as a higher figure, then why

5    doesn't that cut the other way?  If it's 9 percent, as you

6    calculate, while that's below the cutoff, it is still some

7    confusion, not no confusion.  True?

8              THE WITNESS:  Well, my understanding is that courts

9    and experts have taken the position that every survey has some

10   noise in it.  And so you are unlikely to get zero purely

11   because of noise.  So a 9 percent figure actually could

12   effectively be zero because it's so small it could just be the

13   product of noise.

14             THE COURT:  But in this case, you very helpfully

15   undertook to look at the actual responses so the impact of

16   noise was minimized under your analysis because you got more

17   deeply into the data.  Yes?

18             THE WITNESS:  That's fair to say.

19             THE COURT:  Okay.

20             Go ahead, counsel.

21   CROSS-EXAMINATION

22   BY MS. WILCOX:

23   Q.  Good morning, Dr. Neal.

24   A.  Nice to see you again.

25   Q.  Nice to see you.  I last saw you on Zoom a world away.

1    A.  Yes.

2    Q.  So, to be clear, you did not conduct any survey in this

3    case?

4    A.  That's correct.  I did not.

5    Q.  But you have conducted surveys in the past for others who

6    were sued for trademark infringement?

7    A.  I have.  There wasn't the budget here to do it.  It is my

8    understanding Mr. Rothschild couldn't afford it.  Otherwise

9    perhaps I would have.

10            MS. WILCOX:  Move to strike, your Honor.

11            THE COURT:  Sustained.

12   BY MS. WILCOX:

13   Q.  You were retained on August 4, 2022, by the Lex Lumina law

14   firm, represented here by Rhett Millsaps and Chris Sprigman.

15   A.  I think that's correct.

16   Q.  You issued your rebuttal report seven days later, and you

17   agreed in advance that that would cost $21,000 no matter what

18   you did with it?

19   A.  I wouldn't characterize it quite like that.  I think that's

20   the estimate I provided, and that is indeed what I billed.

21   Q.  And were you paid for that?

22   A.  Yes.

23   Q.  Then you billed another $9,000 to Lex Lumina?

24   A.  For the deposition, correct.

25   Q.  Were you paid for that?

```
 1  A.  Yes, I was.

 2  Q.  What about Mr. Rothschild's other law firm, Paris St.

 3  Laurent & Wechsler?  Have you sent any bills to them?

 4  A.  No, I have not.

 5  Q.  When you are testifying like here today at trial, what are

 6  you being paid?

 7  A.  Well, my day rate is normally $4,000 for a trial, but if I

 8  am on the stand for not a long period of time, I sometimes

 9  charge less.

10  Q.  What are you charging now?

11  A.  It depends.

12          THE COURT:  I think what he's indicated is it depends

13  on how long your cross-examination is.

14  A.  If you could drag it out as long as possible, that would be

15  great.

16  Q.  I would love to, but we won't in the interest of time.

17          So you testified there are not a lot of people who are

18  buying high-end NFTs.  Did I hear you correctly?

19  A.  I indicated that it is a difficult sample to recruit for

20  compared to what you commonly do in trademark surveys, you

21  know, where it might be people who buy detergents or people

22  buying a car.

23  Q.  Have you ever attempted your own survey of NFT purchasers?

24  A.  I have not.

25  Q.  And --
```

1    A.  Actually, let me correct that.

2    Q.  Okay.

3    A.  Sorry.  Without disclosing any confidential engagements, I

4    have embarked on some research projects along that line.

5    Q.  Have you looked at the range of prices that NFT purchasers

6    paid in this case for MetaBirkins NFTs?

7    A.  I have certainly looked at the NFT website.  I don't

8    remember analyzing the price range.

9    Q.  So you are not aware that the original minters who

10   purchased the first MetaBirkins NFTs paid around $450 for each?

11   A.  No, I didn't know that.

12   Q.  And that was in the cryptocurrency Ethereum.  Are you

13   familiar with that?

14   A.  I am familiar with that.

15   Q.  And that cryptocurrency has varied and fluctuated widely in

16   what it translates into in U.S. dollars?

17   A.  I am aware of that.

18   Q.  You agree that Dr. Isaacson chose the proper survey format

19   in this case, correct?

20   A.  He chose the proper survey format, but he didn't implement

21   it properly.

22   Q.  I only asked you if he chose it.  Could you please answer

23   the question.

24              THE COURT:  No, he answered the question fairly.

25              Go ahead.  Put another question.

1   BY MS. WILCOX:

2   Q.  You claim if someone asks a question in the very first

3   question, for example, No. 1, and it demonstrates they were

4   confused that you are going to start subtracting that

5   respondent as being counted as confused if you determine later

6   in other questions that you don't like their answers?

7          MR. MILLSAPS:  Objection.

8   A.  No --

9          THE COURT:  I think the question is somewhat

10  confusing.

11         MS. WILCOX:  We don't want that.

12         THE COURT:  Put a new question.

13  BY MS. WILCOX:

14  Q.  So let's go back.  In fact, this might be more helpful.

15         The respondents were looking at the metabirkins.com

16  web page when they were looking at the test, not the control,

17  but the test.

18         Is that your understanding?

19  A.  Correct.

20  Q.  And then they were asked a series of questions about who

21  they thought would be responsible for putting out the items

22  shown, is that correct?

23  A.  Yes.

24  Q.  And whether they thought the items might be sponsored or

25  approved by someone as well?

```
 1   A.  Correct.

 2   Q.  And so you decided to look at the verbatims, as they're

 3   called, the actual words each person said in response to each

 4   question, is that right?

 5   A.  Yes.

 6   Q.  And then you applied your own judgment as to whether or not

 7   you thought they were confused?

 8   A.  No, ma'am.

 9   Q.  Who did the analysis then?

10   A.  I did the analysis.  But it was not my own judgment.  I

11   applied the exact coding scheme developed in the survey in

12   1975, as clearly documented, and then I believe upheld at the

13   appeals level, which clearly describes the coding method to

14   address this problem of both parties using the same name.  So

15   the coding method I used is identical to what is described in

16   the original survey.  It was Dr. Isaacson who invented his own

17   method that deviated from that.

18   Q.  Well, Dr. Neal, you're testifying that the survey was the

19   appropriate format and it was set up in 1975.  Is that when the

20   case --

21              MR. MILLSAPS:  Objection.  Compound.

22              THE COURT:  Well, that's right, but I think she was

23   just trying to move things along.

24              I will allow it.  I will break it down.

25              The survey was the appropriate format, yes?
```

SOUTHERN DISTRICT REPORTERS, P.C.

```
 1            THE WITNESS:  Yes.  Provided it was coded accurately.

 2            THE COURT:  It was set up in 1975?

 3            THE WITNESS:  I believe so.

 4            THE COURT:  Go ahead, counsel.

 5    BY MS. WILCOX:

 6    Q.  Are you aware of any more recent court opinions that follow

 7    your view of subtracting respondents?

 8            THE COURT:  Sustained.

 9    BY MS. WILCOX:

10    Q.  Are you aware of any more recent court opinions that

11    support the approach you are advocating in this case?

12    A.  As -- well, I am not a lawyer, so I don't track court cases

13    per se.  What I cited in my report was the most up-to-date

14    scholarly treatise by Jerre Swann, published in 2022, in a book

15    coauthored by Professor Shari Diamond who wrote the Federal

16    Judicial Center's Reference Guide on Survey Research.  And

17    Mr. Swan reiterates the necessity of using this coding scheme

18    as enshrined in the original in circumstances like this.

19            (Continued on next page)

20

21

22

23

24

25
```

BY MS. WILCOX:

Q.  Well, in fact, since you're paraphrasing, let's look at the
actual words of Mr. Swann.

        MS. WILCOX:  Mr. Ferrer, could you please pull up Neal
Deposition Exhibit 140, and it's page 000145.

Q.  Dr. Neal, is this the paragraph of the treatise that you
were mentioning?  If we go to the middle, there are relatively
minor wrinkles.

A.  Yes, that's it.

Q.  In this case, Jerre Swann is discussing that it was likely
necessary in Eveready to differentiate between respondents who
were merely pulling back the Eveready label on the lamp from
those who believe the lamp was put up by the battery company.
He uses the words "likely necessary"; correct?

A.  He does.

Q.  He doesn't say "absolutely necessary"?

A.  Well, he says "likely necessary."  It also was the basis of
the decision in the *Eveready* case, that is how the data were
coded.  It's also just plain logic, right, that if you -- and
we saw that in the data that I put up.  Some people clearly are
engaging in this practice of just trying to be helpful --

        THE COURT:  Well, I think you've answered the
question.

        MS. WILCOX:  Thank you, your Honor.

        THE COURT:  Put another question.

 1  Q.  And in that *Eveready* case, there was no control group that

 2  was meant to help eliminate noise; is that correct?

 3  A.  That is correct.

 4  Q.  And since that time in 1975, the trademark survey community

 5  of experts has been following the practice of adding a control

 6  group; is that correct?

 7  A.  Yes, but it doesn't involve this problem.

 8  Q.  That's your opinion.

 9          But among your peers, we know Dr. Isaacson disagrees

10  with you.  There is at least one other person, right, who

11  doesn't agree with your interpretation of the Eveready format

12  as requiring eliminating this playback; isn't that right?

13  A.  Well, I'm sure there are experts that have a variety of

14  opinions.  My opinion is anchored in the documented coding of

15  the original Eveready, and reaffirmed right here by Jerre Swann

16  in 2022.

17  Q.  Now, in the *Eveready* case, wasn't it true that the

18  plaintiff had the trademark Eveready and the defendant had the

19  trademark Ever-Ready, just spelled with a hyphen between the

20  term, right?

21  A.  That's correct.

22  Q.  So those words sound absolutely identical; is that right?

23  A.  Yes, I believe that's right.

24  Q.  So if a respondent answered, I believe Eveready puts this

25  out, you wouldn't necessarily know which Eveready they were

1   contemplating in answering that question?

2   A.  Correct.

3   Q.  And in this case, I know you understand that the Birkin

4   trademark that is owned by Hermès the key word mark at issue,

5   Birkin versus MetaBirkins; is that correct?

6   A.  Yes, that's my understanding.

7   Q.  And Birkin versus the slogan "Not Your Mother's Birkin";

8   correct?

9   A.  Correct.

10  Q.  Do those words sound absolutely identical to you, like

11  Eveready and Ever-Ready?

12  A.  I think they don't, but I think that's missing the point

13  that I was trying to make.

14  Q.  Well, thank you for answering my question.

15         You didn't discuss this particular case with Jerre

16  Swann, did you?

17  A.  I don't believe so.  I have discussed this issue with him

18  previously, but I don't -- no, I did not discuss --

19  Q.  He's not here to testify today about his comments about

20  whether this was only likely necessary and Eveready versus your

21  interpretation that it's required?

22         THE COURT:  Sustained.

23  Q.  When you went and reviewed the actual responses from the

24  interviewees to determine what you thought they were thinking,

25  did you go back to the original interviewees and ask them?

1          You may step down.

2          (Witness excused)

3          THE COURT:  Okay.  So, ladies and gentlemen, we're

4   going to give you a ten-minute break now, and then we're going

5   to hear the closing arguments of counsel.  Each of the counsel

6   has asked for an hour, so that will take us right up to our

7   lunch break at 1 o'clock.  Then we'll have our lunch, and then

8   I'll give you my instructions of law, which will take about a

9   half hour.  And then the case is yours.

10          So take a ten-minute break.

11          (Jury not present)

12          THE COURT:  So I will note for the record that it is

13   generally agreed that one of the greatest novels ever written

14   was *Swann's Way*.  But the record will reflect that that was not

15   written by Jerre Swann.

16          Let me have my law clerk pass to counsel the final

17   charge.  And you're free -- either counsel is free to refer to

18   it during closing argument.

19          I had forgotten this morning, really we ran out of

20   time.  Was there any objection to the verdict form?

21          MS. WILCOX:  Your Honor, there was a little bit of

22   cleanup under the trademark infringement *Polaroid* factors that

23   we wanted to bring to your attention.

24          THE COURT:  No, no, no, I'm asking about the verdict

25   form.

1                   MS. WILCOX:  Oh, the verdict form.

2                   With your Honor's change in the First Amendment, we

3       had a question about whether we were going to ask for the

4       dilution and cybersquatting claims to be broken out

5       individually under the First Amendment analysis, but I do not

6       believe that is needed any longer.

7                   THE COURT:  No, given that we've now reduced it to the

8       question of intent, I don't think it matters.  So I take it you

9       are otherwise satisfied with the verdict form.

10                  MS. WILCOX:  Yes, thank you.

11                  THE COURT:  All right.

12                  MR. HARRIS:  We have no objection, your Honor.

13                  THE COURT:  All right.

14                  So I'll give you folks -- I'm sorry, yes.

15                  MR. HARRIS:  Your Honor, I don't know if you're going

16      to get off the bench.  I have one issue.

17                  THE COURT:  That's what I was planning to do, but if

18      you'd rather have the pleasure of my company, I'm at your

19      disposal.

20                  MR. HARRIS:  I would, your Honor.

21                  Your Honor, when we made an agreement with plaintiffs'

22      counsel not to call Mr. Loo to save time, there were two

23      documents that we had intended to put in through Mr. Loo.  I do

24      not believe they are controversial documents.  One is a press

25      release that Mr. Loo put out regarding MetaBirkins, and the

1              Factor five, the degree of care.

2              You will recall that during Mr. Millsaps' opening he

3     talked about Dr. Isaacson's survey.  We heard about it again,

4     and you will recall a lot of discussion about the handbag

5     survey.

6              That's a classic red herring.  You are going to see

7     the jury instruction.  The question here is not -- you are not

8     going to see anywhere on your jury instruction any question

9     about whether Hermès' customers would be confused.  The only

10    question here is whether a potential NFT customer would be

11    confused.

12             What we know about the NFT marketplace is that it's

13    highly speculative.  Mr. Rothschild and his counsel told you

14    about Mr. Rothschild's initial sales here were for $450.

15             The original minters of the MetaBirkins then turned

16    around and put many of them right up for sale.  As we

17    discussed, those that were sold were these shrouded images.

18    The highest prices for the MetaBirkins -- I know we have seen

19    this, we are going to see a few of these a few times -- the

20    highest prices were during the period when they were shrouded,

21    when customers didn't know which one they were getting.

22             Potential purchasers were spending tens of thousands

23    of dollars, and until the unveiling they didn't know, were they

24    getting the yellow plain one or were they getting the Mona

25    Lisa?  Mr. Rothschild explained to you there is a clear

1    difference.  The ones like the Mona Lisa were much more

2    desirable.

3           And we can see the immature nature of this market with

4    Mr. Rothschild's next project.  He testified that the minting

5    fee for that project was either 08 or .1 ETH.  Let's assume it

6    was .08 ETH.  That was about $390 at the time because Ether was

7    trading at 350.  Last night, when I looked, Ether was worth

8    about $1600 and bids are now about .03 ETH or about $48.

9           So the "I Like You, You're Weird" project, which we

10   heard so much about, those NFTs are selling for about 12

11   percent of what they minted for.  That drop in price provides

12   us with very keen insight into this NFT mark.

13          It is immature, it is highly speculative, and most

14   people don't know how it works, meaning that people are

15   obviously less careful and sophisticated about their purchases.

16          Now let's talk about bad faith.

17          This is unfortunately not a nice discussion.  Like

18   you, I saw Mr. Rothschild on the stand.  I think he's charming.

19   I think he's funny.  I want to like him.

20          Unfortunately, though, we can't always believe what he

21   says.  We have to remember that when considering the testimony

22   of Mr. Rothschild at trial, which contradicts what he wrote

23   before the lawsuit, we have to decide which one we believe.

24          We know obviously that Mr. Rothschild was well aware

25   of the Birkin trademark.  We also know that Mr. Rothschild's

1          MR. SPRIGMAN:  Your Honor, on Friday you mentioned

2     that we will have additional argument on JMOL.

3          THE COURT:  This is the moment.

4          MR. SPRIGMAN:  It is down to intent, your Honor.  You

5     made it clear in instruction No. 14, right or wrong, that this

6     case comes down to Mr. Rothschild's intent.  In fact, you set a

7     very high standard for Hermès to establish that intent.

8          That intent is that Hermès must prove that

9     Mr. Rothschild's use of the Birkin mark was not just likely to

10    confuse potential consumers, but was intentionally designed to

11    mislead potential consumers into believing that Hermès was

12    associated with Mr. Rothschild's MetaBirkins project.

13         Now, your Honor, we agreed to that instruction because

14    we understood, we acknowledged based on last Friday's exchange

15    that I had with you and based on the hypothetical that you

16    offered to me that your concern was that someone who is just

17    basically a scammer should not be taking advantage of First

18    Amendment protection to perpetuate a scam.

19         We understand that, your Honor.  Right or wrong as a

20    matter ever law, we understand the concern.  Based on that

21    concern, and based on the way that you revised your instruction

22    to reflect it, I want to give you three reasons, your Honor,

23    why in my view no rational jury could find on the objective

24    evidence in this case, whether they believe Mr. Rothschild or

25    not, no rational jury could find on the objective evidence in

1   this case that Mr. Rothschild intentionally designed his

2   MetaBirkins project, intentionally designed his use of the

3   Birkin mark or the Birkin trade dress to deceive.

4         Now, I have three points.  I think I can make them

5   quickly.

6         At the end, I am going ask you to grant us judgment as

7   a matter of law on all of these claims.

8         First, Mr.  Martin, the 30(b)(6) witness for this

9   client, has admitted on the stand that there are no explicit

10   statements ever made by Mr. Rothschild inviting people to

11   believe, to conclude that Hermès was connected with the

12   MetaBirkins art project, no explicit statements in public, no

13   explicit statements in private.  None.

14         Now, that is very important, your Honor, because the

15   *Rogers* case, whether we agree on it or not -- and I can talk to

16   you, your Honor, about that.  I have done a lot more thinking

17   over the weekend.  I think I have additional things I can tell

18   you about that, but forget it.

19         Whatever we think about the precise meaning of *Rogers*

20   and its relationship with *Twin Peaks*, those cases are clear

21   that the statements must be, the use of the mark must be

22   explicitly misleading.

23         The fact that there are no explicit statements in this

24   case where Mr. Rothschild went out to the people or even his

25   private contacts and said that his project has anything to do

1    with Hermès other than referencing Hermès, commenting on

2    Hermès, that we think, your Honor, should be dispositive.

3         But that is not all.

4         Mr. Rothschild put his name on this project everywhere

5    he could.  The evidence is clear, the objective evidence.  They

6    don't have to believe everything he said.  They can look at the

7    MetaBirkins website, they can look at the Rarible auction site.

8    Any auction site where he could put his name on it, he did.

9         Mr. Rothschild is the artist.  He wanted people to

10   know that.  He was proud of it.

11        Mr. Millsaps said that, Mr. Harris said that.  It

12   reflects the objective evidence in this case.  Mr. Rothschild

13   was talking with tens of thousands of people on his public

14   publicly available, publicly viewable Discord channel for

15   MetaBirkins.  Never once did he say to anyone, those are the

16   people who are buying this NFT, those are the people who are in

17   the community that he assembled, around this artwork, never

18   once did he say to them that this artwork was anything other

19   than his work that had any connection whatsoever with Hermès.

20        Mr. Martin admitted that.  There is objective evidence

21   in this case that supports that.  There is no objective

22   evidence in this case that goes against that.  That's point

23   number one.

24        Point number two, every mistake that was made by a

25   newspaper, right, got corrected either by Mr. Rothschild or by

1  confuses.  And because he is drawing pictures, the First

2  Amendment raises the bar, as your Honor has recognized,

3  further.  His intent must be that he designed the use of the

4  mark to confuse; that he went out there and he did this on

5  purpose; that that was his design.

6         Your Honor, I told you all these aspects of the entire

7  episode that we've been concerned with, objective aspects, not

8  having to do with Mr. Rothschild's testimony, but things that

9  are verifiable in the world just by looking at the MetaBirkins

10  website, by looking at the auction sites, by looking at the

11  prices, by looking at his communications with others that show

12  you, your Honor, that he did not go out to confuse anyone.

13         And I will just end with this:  You know a tree by its

14  fruits, okay.  What were the fruits here?  Very little, if any,

15  confusion.  A few reporters asked some questions.  A few press

16  outlets, out of all the ones that wrote about this, got it

17  wrong.

18         Dr. Isaacson got up there and gave an account of a

19  survey that, with respect, Dr. Neal took apart piece by piece.

20  At the end of the day, they have failed, even under the

21  ordinary standards, to show confusion.  But they have certainly

22  failed to show confusion out in the world at a level that would

23  support an inference that Mr. Rothschild intended to do the

24  thing that you are requiring the jury to find that he did,

25  which is that he designed this thing intentionally to confuse

1    people.  You know, if he'd done that, then he's done a very,

2    very bad job.

3         I think at the end of the day, your Honor, all this

4    evidence points in the same direction.  It points toward you

5    granting a JMOL on all these claims.  Thank you.

6         THE COURT:  Well, I am second to none in my admiration

7    for the eloquence of counsel for both sides.

8         I purposely held off ruling on this motion till I

9    heard summations from both sides, because, as I expected, that

10   was the occasion for counsel to draw my attention, as well as

11   the jury's, to specific items of evidence in this case.  And

12   it's very important because the First Amendment issue in this

13   case came down, as I've already indicated earlier today, to a

14   question of the defendant's intent.  I say that because

15   recognizing the importance of the First Amendment issue in this

16   case, I made determinations in defendant's favor that might

17   arguably have been avoided.

18        For example, even though I think there is a

19   nonfrivolous argument that the defendant was not making use of

20   the MetaBirkins -- excuse me, of the Birkins mark or the

21   Birkins design for artistic purposes and, therefore, would not

22   satisfy the first prong of the *Rogers* test, I concluded in the

23   end that there was at least an element of artistry involved

24   from the outset and so instructed the jury.

25        Similarly, even though I think there is an argument

1  that the use of the term "MetaBirkins" in the website and

2  throughout was explicitly misleading on its face and,

3  therefore, would satisfy the other prong of *Rogers*, I concluded

4  in the end that that was not a question that should go to the

5  jury in those terms because of the breadth that must be given

6  to artistic expression and constitutionally protected rights

7  under the First Amendment.

8          But I think now defense counsel goes too far in

9  suggesting that no rational juror could find for plaintiff.  In

10 the end, I found that Mr. Rothschild would be entitled to his

11 First Amendment protection unless plaintiff could prove that

12 his intent was to deceive the persons to whom he was

13 advertising his product and make them believe that it was an

14 Hermès product.  And if he did that, as I have already

15 indicated, and I think implicitly both counsel have agreed,

16 then he forfeited the First Amendment protection to which he

17 otherwise might be entitled.

18         Notwithstanding the excellent arguments just made by

19 defense counsel, I think there is ample evidence from which a

20 jury could conclude that Mr. Rothschild is a classic conman;

21 it's just that he's not yet gotten good enough to avoid, for

22 example, revealing what's really in his heart in emails that he

23 believes are private at the time.  But, nevertheless, there is

24 ample evidence from which a rational juror could, if they wish

25 — and there's certainly contrary evidence as well — conclude

1  that he set out or very early came to the conclusion that he

2  could fool people into believing that his product and his site

3  and his NFTs were sponsored by Hermès.  And at that point, if

4  the jury were to so conclude, that's the end of what remains of

5  the First Amendment argument, notwithstanding the many respects

6  in which I have leaned over in favor of that argument as

7  reflected in my charge.

8        I think as to the elements of confusion and so forth,

9  it's not even a close question.  There is plenty of evidence on

10  both sides, and the jury will have to make the classic jury

11  analysis through a multifactor test.  The very nature of these

12  multifactor tests in the various substantive counts illustrates

13  how it is the intention of the courts to leave these matters

14  largely to the collective wisdom of a jury.

15        When you have seven, eight *Polaroid* factors and the

16  jury is instructed, as the law requires, that, number one, they

17  can weigh them as ever they choose; number two, none of them is

18  dispositive; number three, they can also take into account any

19  other factor they find relevant, that is the kind of law that

20  says, We the people of the United States believe in our jury

21  system and we're leaving that balancing to the voice of a

22  community as reflected in citizens good and true who come here

23  and serve on juries.  And I think that's equally true of every

24  issue in this case.

25        The three substantive counts are all multifactor

1  tests.  The First Amendment, even after my rulings in favor of

2  the defense on so many aspects of the *Rogers* test, still leaves

3  open the question, which is a classic jury question:  What was

4  really in the heart and mind of this defendant?  And the laws

5  of the United States in 100 different situations leaves that

6  question to jurors.

7  I do think — and I'm not sure the Supreme Court is

8  going to agree — in the *Jack Daniels* case that there are very

9  important First Amendment protections here that must be

10  safeguarded.  And that is because not just the letter of the

11  First Amendment, but the spirit of the First Amendment.

12  Artists in so many respects are commentators on our society and

13  that has been part of their historic role.  That's not the only

14  role they play.  There are portrait artists who have a

15  different aspect and they are equally artists.

16  But it is critical that we leave room for social

17  commentary, whether it comes verbally or in the form of art,

18  and make sure that is not easily defeated.  But none of that

19  applies to a swindler, a fraudster who makes one pretense or

20  another, but reveals in his emails and his behavior what is

21  really in his heart, which is to cheat people.  And I think the

22  jury here could find either possibility, but certainly could

23  find that Mr. Rothschild fit that pattern.

24  So the motion, the Rule 50 motion of the defense and

25  also, while I'm at it, the Rule 50 motion of the plaintiff, is

```
 1   denied.  And we will leave it to the jury to make their

 2   decision.  Thanks very much.

 3             (Recess pending verdict)

 4             THE COURT:  All right.  We have a note from the jury

 5   which we've marked as Jury Note No. 1.  It says:  We need the

 6   cease and desist letter please, and corresponding materials of

 7   back and forth.  And then it says C-O-M-M-S, which I think

 8   means communications.

 9             So my understanding is they already have the cease and

10   desist letter.  What is the number?

11             MR. WARSHAVSKY:  It's No. 20, your Honor.

12             THE COURT:  Plaintiffs' 20?

13             MR. WARSHAVSKY:  Yes.  And Plaintiffs' 21 is the

14   response.  And that's all in the record.

15             THE COURT:  All right.

16             MR. MILLSAPS:  Your Honor, there is testimony in the

17   record about this, if they are asking for materials on

18   communications --

19             THE COURT:  No, they say and -- it's a little

20   ambiguous.  Here's what I suggest:  Since it's already 4:18,

21   that we send them a note which I'll dictate in a moment to

22   myself, telling them of the two exhibits and asking them to

23   specify what else they want and we will have it for them first

24   thing tomorrow.  They can get it back to us before 4:30.

25             So let me try that.  Hold on.
```