# Exhibit 2

N23VHER1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    HERMÈS INTERNATIONAL, et al.,

 4                    Plaintiffs,

 5           v.                              22 Civ. 384 (JSR)

 6    MASON ROTHSCHILD,

 7                    Defendant.             Trial

 8    ------------------------------x
                                            New York, N.Y.
 9                                          February 3, 2023
                                            9:35 a.m.
10
      Before:
11
                          HON. JED S. RAKOFF,
12
                                            District Judge
13                                          -and a Jury-

14

15                            APPEARANCES

16    BAKER & HOSTETLER LLP
              Attorneys for Plaintiffs
17    BY:   DEBORAH A. WILCOX
            OREN J. WARSHAVSKY
18          GERALD J. FERGUSON

19    HARRIS ST. LAURENT & WECHSLER LLP
              Attorneys for Defendant
20    BY:   ADAM B. OPPENHEIM
            JONATHAN A. HARRIS
21
      LEX LUMINA PLLC
22            Attorneys for Defendant
      BY:   RHETT O. MILLSAPS, II
23          CHRISTOPHER SPRIGMAN

24

25
```

1   irrelevant.

2           MR. FERGUSON:  I'll move on to the next question.

3           THE COURT:  Very good.

4   Q.  Have you published articles in the area of Web3 crypto and

5   NFTs?

6   A.  Yes.

7   Q.  Tell us about articles you've published in the area of Web3

8   crypto and NFTs.

9   A.  So, for example, Steve Kazinski and I coauthored the first

10  ever *Harvard Business Review* article about NFTs, in which we

11  talked about what NFTs are, how they create value, and how

12  brands can use them to drive value to a community of

13  enthusiasts.

14          I subsequently coauthored the first Harvard Business

15  School case study on NFTs, focusing on the Bored Ape Yacht

16  Club.  And more recently have just submitted a manuscript under

17  contract, also joint work with Steve Kazinski of a full-length

18  book to be published by Penguin Portfolio, focusing on how NFTs

19  create value.

20  Q.  Please summarize for us the opinions that you developed in

21  connection with your work in this matter.

22  A.  Certainly.

23          I see the slides are -- we'll just keep going.

24  Q.  You keep talking.  The technical people are sorting out the

25  slides.  We'll keep talking.

N23VHER1                         Kominers - Direct

1   A.  Great.  Sorry for the technical difficulties.

2           Certainly.

3           So I was asked, as I said, to look at the structure of

4   the NFT market and identify relevant submarkets.  I found two

5   relevant submarkets -- submarkets relevant to the case.  First

6   the art only submarket, in which NFTs simply convey ownership

7   and an associated digital or physical asset.  And the digital

8   brand submarket, in which the NFTs are -- not just convey

9   ownership in a digital asset, but are furthermore supplemented

10  with various forms of utility in order to build identity and

11  community around the brand.

12          I then was asked to look at the position of the Baby

13  Birkins and the MetaBirkins within the NFT market.  And I found

14  that the Baby Birkins had many of the characteristics of an art

15  only NFT, whereas the MetaBirkins were solidly within the

16  digital brand of the submarket.

17          Finally, I conducted an empirical analysis of the

18  MetaBirkins trading prices, sales dynamics over the early

19  period immediately following mint.  I found that they had

20  significantly outside prices, they were significant outliers

21  relative to the vast majority of the NFT projects that debuted

22  at that time.  And to the extent that they had patterns similar

23  to anything, it was mostly to large-scale digital brand

24  projects that had launched with significant support and often

25  even significant prior investment at the time -- in the time

1    period.

2              Finally, I concluded that the most likely association

3    for the MetaBirkins outlier position within the market was the

4    Hermès association.

5    Q.  Please describe the methodology that you employed in

6    developing these opinions.

7    A.  Certainly.

8              Just as in any other market design exercise,

9    especially when looking at a novel or nascent market, you

10   use -- I used a mixture of qualitative and quantitative

11   methods, starting with ethnography and case studies around the

12   market, followed by empirical analysis of the market data,

13   supplemented throughout by economic theory around the structure

14   of the market and the various use cases for NFTs.

15   Q.  Is this a methodology that you have employed before?

16   A.  Absolutely.

17   Q.  Describe how you've employed this methodology in prior

18   projects.

19   A.  Certainly.

20             So as I said, this is essentially the approach I apply

21   when entering any market design research exercise.  I used it

22   most recently prior to my work on NFTs in the context of

23   vaccine investment and distribution, in collaboration with a

24   team of economists that advise COVAX, the World Bank, and other

25   international agencies on vaccine investment and distribution.

1             THE COURT:  Overruled.

2             The objection the witness could not hear, which I

3    could hear, is overruled.

4             THE WITNESS:  I'm sorry.

5    BY MR. FERGUSON:

6    Q.  Would you please move to the next slide.

7             I'm asking you to look at Exhibit 255 which is in

8    evidence, and if you want to click again to highlight certain

9    text.

10            Is this a document that you considered in developing

11   your opinions in this case?

12   A.  Yes.

13   Q.  What is the significance of this document?

14   A.  So this is a post on the platform medium which Rothschild

15   posted immediately prior to the MetaBirkins mint called

16   MetaBirkins and beyond.  Digital brand NFT projects such as the

17   Bored Ape Yacht Club will typically make a statement about, you

18   know, one or a series of statements called a roadmap describing

19   the ways in which they intend to generate utility of the

20   driver's value back to holding the NFT.

21            This statement by Rothschild -- I'm sorry.  Is there

22   an objection?

23            This statement by Rothschild would be, you know, sort

24   of a beginning of a roadmap.  And explicitly what he said is

25   the Baby Birkin and MetaBirkins have all led up to this.  I'm

1    launching yet another NFT collection.  This is before the

2    MetaBirkins had even minted, and the first MetaBirkins Discord

3    server members and the top MetaBirkins holders are going to

4    receive preferential access to this new project.

5         He explicitly says, Your early support will be

6    rewarded.  This is, as I say, very consistent with other sorts

7    of, you know, early stage roadmaps announcing there will be,

8    you know, new NFTs down the line, holders of this collection

9    will get access to those, and we will continue to build value

10   rewarding our supporters.

11   Q.  Dr. Kominers, you had talked earlier about identification

12   as one of the characteristics of NFTs in the digital brand

13   submarket.

14        Can you go to the next slide and explain what you mean

15   by identification in this context?

16   A.  Certainly.

17        So this is a demonstrative I've prepared using four

18   Twitter profiles of members of the Bored Ape Yacht Club.  These

19   are people who hold the Bored Ape Yacht Club NFT and self-

20   identify as members of the Bored Ape community.

21        And the signifier of this self-identification is that

22   they are using their apes as their profile pictures.  And

23   you'll note they have hexagonal profile pictures, so they

24   didn't just upload these images.  They are using a feature from

25   Twitter where they connect their crypto wallet.  And the link,

1    you know, to the Twitter account to their Bored Ape NFT and it

2    pulls the image and loads it, and it puts it in this hexagon,

3    sort of as a verification that you, in fact, hold the NFT.

4            And so, you know, this is very common, actually, for

5    these digital brand NFTs to encourage people to represent

6    themselves as members of the community in digital spaces, like

7    on Twitter, and particularly to make use of these tools to

8    prove that they are a real holder of the NFT.

9    Q.  Please go the next slide.

10           What does this tell us about the identification, about

11   this identification function you were talking about?

12   A.  So here we see Mason Rothschild, who himself holds a Bored

13   Ape Yacht Club NFT, using that Bored Ape associated image as

14   his profile via that same, you know, verified profile method

15   that I was describing.

16           So as you can see, he's got a hexagonal profile

17   picture, he has linked his crypto wallet to Twitter, Twitter is

18   loading the picture from there as a direct utilization of the

19   NFT.

20           My understanding also is that he went after this

21   particular Bored Ape because it matched his, like, you know,

22   public Internet identity as a Web3 cowboy described in the

23   lower right.

24           MR. OPPENHEIM:  Objection and move to strike, your

25   Honor.

1          THE COURT:  Overruled.

2     BY MR. FERGUSON:

3     Q.  In developing your opinions in this case, did you consider

4     statements made by Mr. Rothschild in connection with

5     identification?

6     A.  Yes.

7     Q.  Please flip to the next slide, which is Exhibit 134 in

8     evidence.  Feel free to click again to highlight the text.

9          Please elaborate the significance of the statements

10    here in connection with identification which you were

11    describing.

12    A.  Certainly.

13         So as I mentioned, digital brands will often encourage

14    their holders of their NFTs to use those NFTs as their

15    representation in digital space.  Here, Rothschild is

16    recirculating, I believe, an Instagram post from Lana Rhoades

17    and says -- who had changed her profile picture to her

18    MetaBirkin.  Rothschild says, Do as Lana Rhoades does.  Change

19    your profile photo to your favorite #MetaBirkin.

20         You know, then later, the very bottom you'll see the

21    additional line #mintaMetaBirkinholdaMetaBirkin.  This, again,

22    is invoking, you know -- it's an invocation to community.

23    People who collect from, you know, individual NFT projects, you

24    know, think of themselves as collectors.  When you really

25    engage with a project and become part of it, you consist of a

1   brand, you change your self-identity to be a holder.

2                MR. OPPENHEIM:  Objection, move to strike.

3   A.  So, here, the inter- --

4                THE COURT:  Ground?

5                MR. OPPENHEIM:  The witness has no foundation to

6   testify as to the meaning of this hashtag, your Honor.

7                THE COURT:  Are you saying it was not part of his

8   report?

9                MR. OPPENHEIM:  I am, your Honor.  I don't believe --

10               THE COURT:  That's a yes-or-no question.

11               MR. OPPENHEIM:  I'm sorry.  Yes.

12               THE COURT:  I don't recall it being part of his

13  report, but if plaintiff's counsel wants to show me where it

14  is, I'll consider it.

15               MR. FERGUSON:  I don't recall it being part of the

16  report.

17               We'll move along, your Honor.

18               THE COURT:  The objection is sustained.  The jury will

19  disregard the last part of the witness's answer.

20  BY MR. FERGUSON:

21  Q.  Could you go to the next slide, please.

22  A.  Certainly.

23  Q.  You had also talked earlier about token gating as being a

24  feature of NFT and the digital brand, the NFT submarket.

25               Can you elaborate on what you mean by token gating?

1   A.   Certainly.

2            Token gating is a mechanism by which ownership of a

3   given NFT is, you know, used as effectively like a ticket.

4   Sort of gains you access to either a digital or physical space

5   or event.

6   Q.   Can you please go to the next slide.

7   A.   Yes.

8   Q.   Does this slide illustrate token gating?

9   A.   Yes.

10           So this a slide -- this is a slide illustrating the

11  Bored Ape Yacht Club's Ape Fest from 2022.  This is last year.

12  It was a four-day long music festival, and holding a Bored Ape

13  NFT acts as a ticket to the event.  Basically, you had access

14  to this music festival if you held, you know, you held the NFT

15  and access to the music festival is free.  All you needed to do

16  was hold a Bored Ape NFT.

17  Q.   In connection with developing your opinions in this matter,

18  did you consider whether Mr. Rothschild offered token gating?

19  A.   Yes.

20  Q.   What did you determine?

21  A.   Um, so he had made a variety of promises with regards to

22  events, especially associated to the, I Like You, You're Weird

23  project, which holders of MetaBirkins received preferential

24  access to and some received for free, including the opportunity

25  to attend, you know, a music event that he himself organized,

1    I believe, at Terminal 27 that was both, apparently, open to

2    I Like You, You're Weird token holders.

3    Q.  And let's go to the next slide.

4            Does this slide illustrate the event you're referring

5    to?

6    A.  Yes, indeed.

7    Q.  If you could go to the next slide.

8            You had also referred to AirDropping and claim as

9    features of NFTs in the digital brand submarketplace?

10   A.  Yes.

11   Q.  Could you go to the next slide and elaborate on what you

12   mean by AirDropping and claim?

13   A.  Certainly.

14           The AirDropping and claiming are two different

15   versions of essentially the same functionality where holders of

16   a given NFT received other assets, digital or physical or both,

17   simply for being a holder of the NFT.  You know, it's a little

18   bit as if, you know, if you went to a given concert, they give

19   you a free T-shirt or something like that.

20           Here, I prepared an illustration using, in fact, one

21   of my own NFTs or two of my own NFTs.  On the left you see a

22   SupDuck.  This is part of a collection of cartoon duck

23   characters created by the NFT creator, FrankyNines.  And very

24   early on in the SupDucks ecosystem, you know, one of the first

25   forms of utility they delivered was that everyone who had a

1    SupDuck was able to claim a pet.  You know, effectively a pet

2    for their duck, King Frog, pictured on the right.

3          I note in particular, that part of the way this

4    worked, was that your frog would get a bunch of the

5    similarities to your duck.  They would share the same color and

6    the same eye pattern and the same background.  And this is very

7    common, especially early on.

8          I'm sorry.  I couldn't hear if there was an objection.

9    Q.  No, there wasn't.

10   A.  No?

11         OK.  Sorry.  there is sometimes a little bit of a

12   scratchy noise and I can't tell whether someone is talking.

13         Anyway, as I was saying, the similarly between the

14   King Frog and the SupDuck is very common with digital brand

15   NFTs, especially early on.  You try to and -- you know, the

16   Airdrops or claims -- oh, sorry, I forgot.

17         AirDrop is it's sent to you via direct deposit.

18   Claim, you have to take an action to receive the new asset.

19         In any event, it's common for these digital brands to

20   sort of proliferate their iconography and imagery through

21   associated collections with similar traits and attributes as

22   you see here.

23   Q.  Could you move to the next slide and explain its

24   significance.

25   A.  Certainly.

1          So I mentioned that AirDrops and claims can be for

2     digital assets and they can also be for physical assets.

3          Here, again, referencing an NFT in my own collection

4     is a physical claim.  So the Badam Bomb Squad, which is part of

5     the Adam Bomb Squad NFT ecosystem created by the streetwear

6     brands The Hundreds, gave each holder of a Badam Bomb NFT the

7     right to claim a free T-shirt from their collection, which,

8     again, as you can see, you know, has the BBS logo.  It's a

9     Badam Bomb T-shirt to represent your ownership of this digital

10    asset in physical space.

11         You can see here that it was a claim.  This is from

12    the receipt, via Shopify, I think, it says NFT used Badam Bomb

13    Squad number 3037, price free.

14    Q.  In developing your opinions, did you consider whether

15    Mr. Rothschild discussed AirDropping in the context of the

16    MetaBirkins project?

17    A.  I did.

18    Q.  Would you please go to the next slide, which is Exhibit 144

19    in evidence, and explain the significance of this slide.

20    A.  Certainly.

21         So here is a tweet from Rothschild in January, early

22    January 2022, in which he says MetaBirkins are the key to

23    unlock all my future projects.  And among the, you know, sort

24    of the value, the endless value for the people who believe in

25    me and my work, and among the value he is promising, he is

1   explicitly promising guaranteed AirDrops for holders.

2   Q.  Please flip to the next slide, which is Exhibit 146 in

3   evidence.

4        Does this document have significant in connection with

5   your findings?

6   A.  Yes.

7   Q.  Please explain.

8   A.  So this is an Instagram post from the official MetaBirkins

9   account in December 2021, soon after the MetaBirkins minted.

10  And if you look at the very top, it says a gift for all first

11  collection holders, AirDropping soon.  And, you know, it shows

12  a picture of, you know, a horse charm.

13       In fact, it's an Hermès horse charm that's been made

14  like fluffy or fuzzy in the same way that the MetaBirkins are,

15  and the interpretation here is that the holders of the

16  MetaBirkins NFTs, you know, all first collection holders will

17  be receiving this as a digital asset, AirDropped soon.

18       Again, as I said, in the context of the SupDuck and

19  the King Frog, you can see here, you know, sort of building out

20  the product ecosystem, again, using a product, you know, a new

21  digital asset that is closely linked to the original digital

22  asset in terms of, you know, it's structure and iconography and

23  reference.

24       You know, it's, yet again, an Hermès asset that has

25  been, sort of, made fuzzy, you know, in the same way that the

1    MetaBirkins were, just as the King Frog sort of shares a lot of

2    similarity with the SupDuck.

3    Q.  Moving to the next slide.  Let's talk about the

4    significance of loyalty rewards in connection with digital

5    brand NFTs.

6         Why don't you move to the next slide --

7    A.  Certainly.

8    Q.  -- and elaborate for us what this illustrates.

9    A.  Certainly.

10        So it is very common also for digital brands to, sort

11   of, treat their long-time holders or multi-unit collectors or

12   something as sort of in terms of loyalty tiers in the same way

13   you might see with, like, frequent flyer miles or something of

14   the sort.

15        Pictured here is the, you know, the matrix or the most

16   recent Bored Ape Yacht Club release.  And, you know, the key

17   is, that if you held an ape and a Bored Ape kennel club, that

18   was the pet -- they also did a pet sort of like King Frog, the

19   pet dog associated to your ape, if you held both of these

20   assets, you got a higher tier for, you know, access to their

21   new game than if you just held an ape.  That's the sort of

22   first row versus the second row.  And similarly with the mutant

23   in a kennel club, which we'll talk about later.

24        And we see this, you know, both with classic brand,

25   with sort of modern, like, sort of, fully NFT native brands and

 1    classic brands.  Starbucks, for example, has recently built a
 2    loyalty rewards program on top of an NFT backbone as well.
 3    Q.  Could you move to the next slide, and we're looking again
 4    at Exhibit 255, which you have discussed before.
 5            Does this document have significance in connection
 6    with loyalty rewards?
 7    A.  Indeed.
 8            So, as I mentioned, this, you know, sort of early
 9    roadmap indication from Rothschild promised, you know, your
10    early support will be rewarded.  That's the bottom highlight.
11            But in particular, it promised a form of loyalty
12    reward.  The top ten longest MetaBirkin holders with the top
13    generative project minting will be gifted an item from the
14    collection.  I believe, in practice, it ended up being
15    implemented slightly differently.  He, in fact, ended up giving
16    it to the top holders, so the people that had the most
17    MetaBirkins.
18            But, you know, in the same way, it's, you know, sort
19    of promising rewards to the people who are engaged and, like,
20    sort of long-term participants in the brand.
21    Q.  Moving to the next slide, you also reference a
22    transformative as a feature of digital brand, the digital brand
23    NFT marketplace.
24            Could you go to the next slide and explain the
25    demonstrative you've prepared to illustrate this point?

1    A.   Indeed.

2              This one in particular may be a little bit harder

3    without the audio.  I'll explain it in detail.

4              So you're currently looking at a screen cap, and then

5    I'll show, you know, a clip of the video of Steve Aoki using

6    what's called a mutant serum.  I mentioned that one of the

7    AirDrops from the Bored Ape Yacht Club was the mutant serum.

8    This is a different NFT.  Everyone who held a Bored Ape on a

9    particular date received, direct deposited to their crypto

10   wallet, essentially just delivered to them, one of three

11   different types of NFT which, you know, you could then use in

12   what's almost a game.

13             In theory, it's sort of a game where you interact your

14   mutant serum with your ape to produce yet another NFT, which is

15   called a mutant ape.  So, basically, it is a piece of -- NFTs

16   are software.  They are sort of a piece of software on the

17   blockchain that interacts with the mutant serum NFT and your

18   ape NFT, deletes the mutant serum, like you consumed it, and

19   produces from it a mutant ape NFT.

20             So this is a video of -- oh, people did this, you

21   know, live.  They did it in live streams and it was, sort of, a

22   big event.  So here is Steve Aoki, who is a D.J. and NFT

23   collector and influencer, you know, using the mutant serum on

24   his ape.

25             May I play the demonstrative?

1    Q.  We're not going to hear it.  If you want to explain.

2            Please start, yes.

3            (Video played)

4    A.  We're going to mutate this right now using the M2 serum,

5    and he clicks drink it.  It says mutating.  It's produced

6    mutant ape yacht club 13735.  And here it is now -- he's

7    excited.  He's going, Wow, here it is.

8            But the point is he, in that process, when he clicks

9    drink it, it triggered a blockchain program, computer program,

10   that deleted the mutant serum, read the data of his ape, and

11   then it produced this associated mutant, which as you can see

12   shares some characteristics.  So his ape had these coins over

13   its eyes.  This had these melted coins over the eyes.  It is

14   designed, sort of, as a mutation that looks similar but more,

15   you know, mutated abstract.  You know, so this NFT was produced

16   and landed in his crypto wallet at the end of the software

17   program.

18   Q.  In developing your opinions, did you consider whether Mason

19   Rothschild discussed transformative -- this transformative

20   feature?

21   A.  I did.

22   Q.  Please move to the next slide, exhibit 239, pages five and

23   six in evidence.

24           Explain the significance.

25   A.  So I mentioned earlier that Rothschild had promised to

1    AirDrop this sort of fuzzy variant of the Hermès rodeo horse

2    charm.  He considered several different -- based on his sort of

3    communications, it's clear he considered several different

4    structures around what that AirDrop, what form that AirDrop

5    might take.

6             But here, he's discussing with Mark Design, his

7    designer, one in which they -- you know, that takes the same

8    form as the mutant serum.  So the idea is they were going to

9    AirDrop an all-white horse and you can, quote-unquote, burn.

10   That's the deletion operation.  You can delete the horse NFT to

11   get, he says, a fluffily horse to match their Birkin.

12            And so the idea would be you would have a MetaBirkin.

13   You know, it generates a horse charm that is sort of fluffified

14   and has the same pattern, you know, matching their Birkin, same

15   pattern as in your other NFT.

16            THE COURT:  Counsel, because we're having a lunch

17   break at noon today, I think we need to give the jury their

18   midmorning break sometime in the next few minutes.

19            MR. FERGUSON:  OK.  I think we've come to a good

20   breaking point real quick.

21            Want me to break now?

22            THE COURT:  No.  Go ahead.

23            MR. FERGUSON:  Is it OK if I go a few more minutes?

24            THE COURT:  Go ahead.

25            MR. FERGUSON:  Thank you.

1   BY MR. FERGUSON:

2   Q.  Go to the next slide, please.

3   A.  Certainly.

4   Q.  Why don't you go ahead to the next slide and describe to us

5   the demonstrative, the demonstrative you've created to

6   illustrate your testimony.

7   A.  Certainly.

8           So one other major category of utility that NFT

9   projects bring is what's called functional utility, which is

10  the ability to use the NFTs associated assets in various, you

11  know, sort of other activities, right.  It might be a game.  It

12  might be a metaverse platform.

13          Here, I've prepared a series of three brief

14  demonstratives illustrating these different forms of functional

15  utility.  The first one here, you can see in the upper left on

16  this screen, this is one of my crypto wallets.  I worked with,

17  you know, a blockchain developer that I've worked with

18  previously to produce an NFT with a generic image of a handbag,

19  but that otherwise has all of the simple functionalities as the

20  MetaBirkins NFTs.  In particular, it uses a version of the

21  MetaBirkins source code which itself was built from public

22  libraries.

23          Here, we have a handbag NFT.  What I'm going to show

24  you is how that NFT, you know, despite being just an image, can

25  be used in the metaverse platform on cyber.  I'm going to use

1    it and wear it at the metaverse platform, the on cyber Macy's

2    Thanksgiving Day parade, which was held this past November.

3    Macy's created a metaverse platform where you'll see parade

4    floats and so forth --

5            MR. OPPENHEIM:  Objection, your Honor.

6    A.   -- for which --

7            I'm sorry?

8            MR. OPPENHEIM:  Objection.

9            MR. FERGUSON:  Your Honor, may I approach?

10           THE COURT:  No, because we're going to give the jury

11   their midmorning break right now, and then I'll hear you at

12   that time.

13           MR. FERGUSON:  OK.

14           THE COURT:  The witness should plan to resume in

15   ten minutes, but you can disappear remotely until then.

16           Ladies and gentlemen.

17           THE WITNESS:  Thank you, your Honor.

18           THE COURT:  Ladies and gentlemen, because we're on a

19   tight schedule, if we can keep this break to ten minutes, that

20   would be appreciated.

21           (Continued on next page)

22

23

24

25

1              (Jury not present)

2              THE COURT:  Someone needs to disconnect the witness

3     for the next ten minutes.

4              Please be seated.

5              What was it you wanted to raise at the sidebar?

6              MR. OPPENHEIM:  As anyone initial matter, your Honor,

7     none of this testimony is reflected in the witness's -- either

8     the witness's report or --

9              THE COURT:  Yes.  I'm very concerned about that, too.

10             When I made my rulings on the defense motion to

11    exclude this report, the focus was on his report basically

12    saying that what the consumers were buying here had nothing to

13    do with artistic expression.  And I don't recall, having gone

14    back and read the report -- I'll try to do that during this

15    break -- but I don't recall a lot of what he's been testifying

16    here to today.

17             An expert under the federal rules is strictly limited

18    to what is in his report because otherwise it constitutes

19    unfair surprise.  So as I say, I'll go look at the report, but

20    do you want to point me as to where in his report there is the

21    stuff he's now been testifying to.

22             MR. FERGUSON:  The Macy's parade, NFT parade, which

23    he's about to discuss is in his report on page 21.

24             THE COURT:  That's what he's about to discuss.

25             We are talking about the stuff that he has discussed

 1    so far that there were objections to.

 2               MR. FERGUSON:  I could go through.  I've got

 3    references.  I prepared kind of a cheat sheet with references.

 4    It is throughout his report.

 5               THE COURT:  With that representation, I'll go look at

 6    the report and hold off on making any ruling until we finish

 7    the break in ten minutes.

 8               MR. FERGUSON:  Your Honor, could I apologize and raise

 9    one other issue?

10               THE COURT:  Yes.

11               MR. FERGUSON:  So under the pretrial order that the

12    parties jointly submitted and your Honor answered,

13    demonstratives were required to be submitted at 8:00 the day

14    before they were supposed to be used, and objections were

15    supposed to be made by nine o'clock, then the parties were

16    supposed to meet and confer.

17               These were provided on Tuesday night because there was

18    a hope or expectation at that point that Dr. Kominers may be

19    testifying by Wednesday.  We have never received any objection

20    to these demonstratives until now.

21               THE COURT:  Well, that's a good point, but not quite

22    as good as you think it is, because I never signed the pretrial

23    consent order in this case because I had problems with parts of

24    it.

25               Nevertheless, I think you could argue that even though

1   I did not order, therefore, anything in the pretrial consent

2   proposed order, nevertheless you had an agreement reflected in

3   that draft that your adversary has not adhered to.

4            MR. FERGUSON:  That is correct.

5            THE COURT:  It is still alive on that point.  So what

6   about that?

7            MR. OPPENHEIM:  Thank you, your Honor.

8            I am, to be clear, not objecting to the

9   demonstratives.  I am objecting to the witness's testimony,

10  specifically his most recent comments about the way in which

11  the subject NFTs are wearable and his plans for wearing them.

12  That is not in his report.

13           MR. FERGUSON:  I would have to look at the transcript

14  references.  I'm not sure what counsel is referring to anymore.

15           THE COURT:  All right.  Well, in any event, you asked

16  for an estimated 80 minutes on the direct.  He has gone

17  55 minutes.  I'm going to hold you to 80 minutes strictly.

18           MR. FERGUSON:  I would expect --

19           THE COURT:  So you might want to get on to some of the

20  other stuff that is clearly in his report.

21           MR. FERGUSON:  I would expect you to, your Honor, and

22  we will.  That's why it is so important, again, when we came up

23  with this time estimate was based on the agreement regarding

24  the demonstratives being honored.  As long as that is going to

25  be honored, we are going to hit this time limit.

1          THE COURT:  I'll think about all that.

2          We'll see you in five minutes.

3          (Recess)

4          I've taken a further look at the witness's --

5          how does he pronounce it, Kominers?

6          THE WITNESS:  Kominers, please, your Honor.

7          THE COURT:  Thank you.

8          All 103 pages, single space, but including some of it

9    as appendices, but he really offers three opinions which are

10   set forth on the first page of his report under the heading

11   Summary of Opinions.

12          The first opinion is that there are two broad

13   submarkets within the NFT market.  One is the art-only NFTs.

14   Second is the -- what he calls the digital brand NFTs.

15          I think he's finished everything he was going to say

16   on that, correct?

17          MR. FERGUSON:  Correct.

18          THE WITNESS:  Yes, your Honor.

19          THE COURT:  Second opinion was that while

20   Mr. Rothschild's Baby Birkin NFT had many of the attributes of

21   the art-only submarket, the MetaBirkins NFT project had

22   attributes more consistent with those of the digital brand

23   market.  Now, I'm not sure whether he's finished that or not.

24          MR. FERGUSON:  Five minutes at the most, less than

25   five minutes.

1          THE COURT:  And then the final opinion was that his

2     empirical analysis as an economist of the price and trading

3     history of the MetaBirkins tokens, as compared with other

4     similar markets, suggests that the most likely explanation for

5     the MetaBirkins market prices and trading volumes is the

6     connection that constitutes the brand, digital brand submarket,

7     which seemed to me, when I made my earlier rulings about all

8     this, the key thing that he was testifying about that

9     distinguished his report from certain objections that were made

10    by the defense and that also seemed to me relevant both to

11    liability and to damages.

12          So are we going to get to there, to the third opinion?

13          MR. FERGUSON:  I apologize, Judge.  Your Honor, I

14    didn't hear you.

15          THE COURT:  Are we going to get to the third opinion?

16          MR. FERGUSON:  I'm sorry?

17          THE COURT:  Are we going to get to the third opinion?

18          MR. FERGUSON:  We are getting there very quickly.

19          THE COURT:  All right.  I think while I haven't had a

20    chance to parse through enough to say for sure that each of the

21    statements he made is contained in his report, I will accept

22    from a quick review the representation of counsel that they

23    were, other than the one that I sustained the objection to

24    earlier.

25          But I do think it's important to keep him focused on

1    the fact that he's offering an opinion as an economist and not

2    as an art maven or anything of that sort.

3            Oh, here he is.  All right.  I'm sorry, I didn't

4    realize you were back.  I'm glad you heard that.  I'm sure you

5    have exquisite taste in art, but it's of no relevance to your

6    opinion here today.

7            Let's bring in the jury.

8            THE WITNESS:  Thank you, your Honor.  I am definitely

9    not an art maven.

10            THE DEPUTY CLERK:  Jury entering the courtroom.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             (Jury present)

2             THE COURT:  Thank you, ladies and gentlemen.

3             There was an important legal issue that I had to

4    resolve with counsel, but it's all resolved now.

5             So please continue.

6    BY MR. FERGUSON:

7    Q.  Dr. Kominers, I'm going to request that we very quickly go

8    through the three demonstratives you've created.  Just explain

9    what they are, their significance to your opinion, and then we

10   will have time to get to your concluded opinion.

11   A.  Certainly.  First of all --

12   Q.  We can't see the PowerPoint.

13   A.  Are you able to see the screen?

14   Q.  We aren't able to see the screen.

15            Can you share the screen again?

16   A.  Oh, goodness.  I am currently sharing the screen.

17            THE COURT:  We will have to call our expert.

18            MR. FERGUSON:  We see it.

19            THE COURT:  There we go.

20            MR. FERGUSON:  Happy day.

21            THE WITNESS:  Have you got it now?

22            THE COURT:  Yes.

23            THE WITNESS:  Thank you.

24   BY MR. FERGUSON:

25   Q.  Please quickly run through what these illustrate.

N23sHER2                        Kominers - Direct

1    A.  Certainly.

2              So as I said right before we broke, this is an

3    illustration of how one can use, you know, this demo NFT we

4    constructed as your identity in digital space, particularly in

5    the Macy's on cyber metaverse.

6              Here, this is the NFT.  As you see, it's associated to

7    a generic handbag image I constructed, and then here you're in

8    the Macy's metaverse.  My wallet is connected.  You load, you

9    know, choose NFT avatar, and select the handbag.  And, you

10   know, again, didn't upload an image or anything.  It loads it

11   directly out of your crypto wallet.  And now here you are

12   represented, you know, sort of exploring the Macy's

13   Thanksgiving Day parade.

14             There is a second quick clip here.  There is a second

15   type of avatar.  So the main avatar on cyber is these disks,

16   but there is a second person which is this particular humanoid

17   character.  And you'll see for the humanoid character --

18   whoops -- the shop was apparently too quick.  But for the

19   humanoid character, the NFT image manifests above it, sort of

20   in a bubble above their head, which is a common way to display

21   these metaverse assets.

22             Here, a second instance of functional utility I

23   acquire a Dolce & Gabbana disco drip NFT, which represented

24   an -- OpenSea is this, you know, sort of flat image that has a

25   little bit of an animated rotation or something to it.  But

1    when you load it into Decentraland, it immediately integrates

2    with a digital wearable.

3         Here, I am buying the NFT.  Complete purchase.  It now

4    shows up.  Here we are in Decentraland.  That's my avatar.  You

5    know, going through my avatar's different, sort of, outfits in

6    a menu called the backpack.  It will switch to the second page

7    in a moment where you'll see the Dolce & Gabbana outfit I just

8    purchased load in the bottom right corner.  And so you simply

9    click it.  It manifests on your avatar.  And then you hit done,

10   and now you're wearing this digital asset in Decentraland.

11        And then finally, I have one more Decentraland

12   demonstrative.  So here, you know, the character, again,

13   wearing the Dolce & Gabbana outfit I just purchased.  I'm now

14   going to purchase a digital handbag, this time from the

15   Decentraland marketplace, and I will show you how that

16   manifests here as well.

17        Again, these are all NFTs.  I should say, each of

18   these purchase processes, there are some clips to speed it up

19   for viewing, but each of the purchase processes takes fewer

20   than two minutes or so in total.

21        So I go to the Decentraland marketplace, I buy this

22   wearable diamond dragon handbag, that fox is the crypto

23   transaction processing.  You bought the handbag.  And now,

24   again, it manifests here under collectibles.  You click on the

25   handbag, the digital collectible, and then it manifests.  The

1   character is holding it.  And then, again, manifests directly

2   into the world.

3          So you see it swings around like a handbag, and so

4   this is an -- these are all examples of functional utility

5   associated to NFT assets of handbags and other digital fashion

6   items.

7   Q.  In developing your opinion that MetaBirkins were part of

8   the digital brand submarket, did you consider statements of

9   Mason Rothschild related to functional utility?

10  A.  Yes.

11  Q.  Please go to the next slide.  This is Exhibit 306 at

12  pages 27, 28 in evidence.

13         What is the significance of this statement for your

14  opinions?

15  A.  Um, so here, Rothschild in a text message conversation

16  described the MetaBirkins NFTs as "technically metaverse ready

17  cause fully 3D."  And, you know, thus -- you know, the

18  interpretation would be that you could use these assets in

19  platforms like Decentraland, you know, that I was just

20  illustrating.

21  Q.  Move forward, please, and sum up your conclusions with

22  respect to your second opinion regarding MetaBirkins NFTs.

23  A.  Certainly.

24         So as I mentioned, the two submarkets I had

25  identified, art only and digital brand, are separated by the

1    inclusion of utility features.  So in the art-only submarket,

2    you know, holding the NFT grants just ownership.  You know,

3    it's just a digital deed for a file.

4            Whereas, in the digital brand submarket, you know,

5    sort of the creators' attach many different forms of utility in

6    the hopes of building additional value and then eventually

7    identity and community around the NFTs.

8            As you see here, as we illustrated, Rothschild -- or

9    as I've illustrated, Rothschild engaged creating many different

10   types of utility around the MetaBirkins which match up with

11   different forms of utility that are standard in this space:

12   Identification and community, token-gated events, AirDrops,

13   loyalty rewards, transformative utility, and functional utility

14   as well.

15   Q.  Thank you very much.

16          Let's move to the market analysis that you conducted.

17   A.  Certainly.

18   Q.  The next slide.

19          So please explain the market analysis that you

20   conducted.

21   A.  Certainly.

22          So as I mentioned, I -- with the assistance of a

23   research assistant, one of my former students -- conducted an

24   empirical study of the price and trading patterns of the

25   MetaBirkins in comparison to other contemporaneous crypto --

1   these were projects, again, with significant support and, sort

2   of, a lot of, you know, product delivery when they launch.

3   Mobland, for example, launched with a fully functional game and

4   $8 million in investment collected to date.

5   Q.  Can you go to the next slide and give an analysis of the

6   projects that you saw as in the same range as MetaBirkins

7   during the time period that you've identified for the

8   MetaBirkins?

9   A.  Certainly.

10        Let me just quickly, you know, to make clear what is

11  going on here, you see I tagged some of the other projects that

12  were in the MetaBirkins rank.  Here, I'm summarizing

13  information about those projects in relation, you know, in

14  comparison to the MetaBirkins.

15        So these are the projects that were in the same sort

16  of range as MetaBirkins under a variety of different metrics.

17  First, as I mentioned, NeoTokyo Citizen, which is a, you know,

18  massive collection -- was and is a massive collective of NFT

19  collectors and creators and investors, launched by founders

20  with a combined 1.6 million YouTube following and roughly a

21  million Twitter followers.

22        Mobland, as I mentioned, launched with a fully

23  realized game.  You know, they are a metaverse crime game.

24  Apologies for talking about a metaverse crime game in a

25  courtroom, but that is what it is.  They launched with

1    $8 million in venture capital funding.

2           Subtraction is, I believe, an art-only project, but

3    launched by a creator with a long history of major works.  He

4    had sold work at Sotheby's, you know, a few weeks before.  In

5    2016 he did a major collaboration with Samsung and he had over

6    140,000000 Instagram followers at the time.

7           Synthetic Dreams was a collaboration with Google AI

8    Quantum, I think, as part of their, like, summer institute or

9    something, you know, created by, you know, Google in

10   collaboration with this creator with over 500,000 followers.

11          Mint Disk was a project of ARFKT, and spelled

12   A-R-F-K-T but it is pronounced artifact, which is a digital

13   street NFT-based streetwear brand that was acquired by Nike.

14   And this was the app that you used to get access to their

15   characters in their world called a CloneX.

16          And then X-Consoles was another gaming project.  This

17   one launched with, sort of, a white paper and plans to build a

18   series of what are called player-earned games.  And holders of

19   the tokens were at least, you know, sort of playing to receive

20   revenue from the game design.  This was backed by a number of

21   established creators and collectors in the space, including

22   Cosimo de' Medici, who is one of the most central tastemakers

23   of all NFTs.  And so all of these were projects with

24   established and very significant followings.  Most of them, you

25   know, themselves digital brands with fully functional products

N23sHER2                         Kominers - Direct

1      at the time of launch.

2              In comparison to that, the MetaBirkins NFT project was

3      created by Rothschild, who at the time had fewer than 10,000

4      followers -- I think it was more on the order of 8,000 -- and

5      had, you know, created the Baby Birkin previously, but had none

6      of the, you know, sort of public support or history of product

7      of these various NFT projects.

8              And in particular, you know, the fact that the

9      MetaBirkins were performing empirically on par with these

10     massive digital brands, you know, strongly suggested that, you

11     know, that something was giving value to the MetaBirkins over

12     and above.  And I concluded the Hermès association was the most

13     likely driver, both directly and indirectly.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. FERGUSON:

2   Q.  Would you go to the next slide, which is our last slide.

3   Talk about the price analysis, the sales analysis you

4   conducted, how it relates to your findings, and then give

5   your --

6   A.  Certainly.

7        So as I mentioned, we looked at the sales and trading

8   data under a variety of different forums.  Here is just one

9   more illustration.  So I've plotted first the reveal.  So the

10  MetaBirkins were originally sold unrevealed; there was just

11  like an image of a sheet over a pedestal.  And there was active

12  trading before that.  And then there was the reveal, when they

13  were replaced with what is currently the image associated with

14  the NFTs.

15       I'm also tagging -- we talked about the Lana Rhoades

16  tweet.  She's a crypto influencer who Rothschild -- or sorry,

17  Rhoades' post, who Rothschild re-tweeted.  And Future, another

18  crypto influencer, who was re-tweeted in that NFT trinity post.

19       And then finally, the *Financial Times* article in which

20  Hermès explicitly disclaimed involvement with the project.  And

21  so here, just a couple things to note looking at the trading

22  patterns.

23       So, first of all, you see a drop in trading prices

24  following the reveal.  There was sort of a bunch of activity at

25  high or medium prices, and it drops to medium, and then much

1    lower.  This is somewhat common in NFT projects, especially

2    digital brands, after their initial reveal.  But, in

3    particular, so it illustrates -- at least we don't see people,

4    like, going and grabbing the specific MetaBirkin that they

5    really wanted; it doesn't just seem as if they are choosing --

6    they were buying much more actively pre-reveal and post, and it

7    doesn't seem like they are choosing on the basis of the

8    individual item.

9           We see some uptick following the influencer tweets,

10   but then a steady downward trend following the *Financial Times*

11   article.  And I want to be very careful about making causal

12   claims here because I'm not making a causal statement, although

13   my guess is a regression discontinuity here would show

14   precisely these trends that I'm describing.

15          But certainly, especially here, you know, this decline

16   following the *Financial Times* article would not be consistent

17   with people actively valuing the MetaBirkins.  It would be hard

18   for this to be consistent with people actively valuing the

19   MetaBirkins because they were not associated with Hermès,

20   right.  Sort of, making the Hermès nonaffiliation clearer to

21   the market was not associated with an increase in price and, if

22   anything, seems to have been, you know, preceded a period of

23   significant price decline.

24   Q.  My final question, can you summarize your findings from

25   your empirical study?

1    A.  Certainly.

2            So as I described, we saw that the MetaBirkins had

3    significant -- they were outliers in the market with regards to

4    all the different, you know, trading price analyses -- trading

5    and price analyses we looked at.  To the extent that they were

6    outliers, their closest cousins, right, they were closest in

7    position to major NFT projects, most of them major digital

8    brand NFT projects produced with significant investment up

9    front and, sort of, fully functional, like fully realized

10   utility at launch.

11           And to the best of my ability to ascertain, the

12   clearest explanation for this or most likely explanation for

13   this outsized performance of the MetaBirkins relative to peer

14   projects is the Hermès brand association.

15           MR. FERGUSON:  No further questions.

16           THE COURT:  Cross-examination.

17   CROSS-EXAMINATION

18   BY MR. OPPENHEIM:

19   Q.  Good afternoon, Dr. Kominers.

20           Thank you very much for your time with us today.

21           My name is Adam Oppenheim.  I'm one of the lawyers

22   representing Mason Rothschild.

23           I'd actually like to start with the chart we were just

24   looking at a moment ago.

25           MR. OPPENHEIM:  Ashley, could you please put up page

1  measurement of relative price is the same.

2  Q.  How many standard deviations above the mean was NeoTokyo

3  Citizen?

4  A.  Many more than that.  I think something like 20.  I don't

5  remember the precise number off the top of may head.

6  Q.  And the X axis of this chart, that shows prices in dollars;

7  correct?

8  A.  The X axis, no.

9  Q.  I'm sorry, the horizontal -- I'm sorry.  Thank you.

10          The Y axis.

11 A.  The Y axis, yes.

12 Q.  Okay.  But these NFTs don't trade in dollars typically, do

13 they, Dr. Kominers?

14 A.  They trade in Ethereum.

15 Q.  Okay.  And the value of Ethereum changes over time as well,

16 correct?

17 A.  Yes, although it did not change that much in that sample

18 period.

19 Q.  Okay.  But certainly if we were to look beyond 17 days, say

20 to today, is the value of Ethereum today approximately the same

21 as it was in the 17 days in which MetaBirkins is first trading?

22 A.  No.

23 Q.  Your analysis looked at the price of these NFTs as they

24 traded over time; correct?

25 A.  Yes.

1    Q.  And so one of your conclusions was that the prices

2    reflected the fact that MetaBirkins NFTs were trading like a

3    brand; is that right?

4    A.  The conclusion was that the MetaBirkins were trading at

5    outlier prices.  And the other projects in those price ranges

6    were mostly large-scale digital brand NFT projects.

7    Q.  In your work, Dr. Kominers, you did not consider, for

8    example, whether those prices reflected that people liked the

9    art; is that right?

10   A.  No, that's not correct.

11   Q.  Okay.  Well, please tell me how it's not correct.

12   A.  So we did an extensive study.  My research assistant looked

13   at every single post, you know, in Twitter and in Discord that

14   we were able to see.  And I read a very large fraction of them

15   as well to look at the different ways in which people were

16   talking about and describing their reasons for wanting to

17   acquire MetaBirkins.

18          And, you know, over the course of this, we did not see

19   large numbers of people pointing to the, you know, visual

20   features or imagery much more, they were pointing to the

21   branded features, the various forms of promised utility, and

22   particularly the opportunity to use digital Birkin bags in the

23   metaverse.

24   Q.  Is that analysis, the analysis of things that people told

25   you, was that included in your report?

1    A.  Yes.  We do three types of activity, I would say.

2              First one is that we perform a technological watch,

3    meaning we explore new trends, new technologies, and try to

4    find which technologies could create value for the business

5    divisions of Hermès.

6    Q.  That's one.

7    A.  Next we make Hermès employees aware of those technologies,

8    especially the business division, that could be interested by

9    those technologies.

10   Q.  What's the third?

11   A.  And then when we have a match between a technology and

12   business division, we develop a solution, test it, and

13   eventually commercialize it.

14   Q.  And when you arrived at H Lab, was Hermès working on NFTs?

15   A.  Yes.

16   Q.  How so?

17   A.  We were working on an idea of digital certificates,

18   certificate that would involve in it.

19   Q.  And you joined in 2020, but do you know when Hermès started

20   working on NFTs?

21   A.  In December 2019.

22   Q.  Was H Lab working with any third parties for the digital

23   certificates?

24   A.  Yes.

25   Q.  Who were the third parties?

1   A.  Third party vendor called Arianee.

2   Q.  Can you spell that for the reporter?

3   A.  A-R-I-A-N-E-E.

4   Q.  And when did H Lab partner with Arianee?

5   A.  In December 2019.

6   Q.  Who is Arianee?

7   A.  Arianee is a leading NFT platform that works for brands and

8   especially for fashion and luxury industry.

9   Q.  Who was responsible for developing ideas on NFTs within

10  Hermès?

11  A.  Mainly the H Lab, in collaboration with business divisions,

12  and some functions at Hermès, like legal and communication.

13  Q.  When H Lab is working on a project like NFTs, does that

14  need to be approved by someone before H Lab can develop it?

15  A.  Yes.

16  Q.  And can you explain the approval process briefly.

17  A.  Yes.  Usually it's approved -- it has to be approved by top

18  management of the business division, and then by an executive

19  committee sponsor.

20  Q.  Okay.  And what use or uses does Hermès believe it has for

21  NFTs?

22  A.  We have five main uses.  The first one is the one I already

23  spoke about, digital certificates for different products.  Then

24  some uses would be NFTs as proof of attendance for private

25  events or for events within Hermès that could provide exclusive

1    services; the NFT could provide exclusive services and

2    products.  Then we consider use of an NFT as a virtual product

3    for virtual world, video games.  Then we also think of NFTs as

4    a product, a virtual product itself that could be a piece of

5    art, for example, as decorative purpose.  And finally, the last

6    one would be NFTs as a collectible to celebrate loyalty.

7              MR. WARSHAVSKY:  Can you please publish Plaintiffs'

8    Exhibit 27 which was just received.

9    Q.  Have you seen this document before?

10   A.  Yes.

11   Q.  Did you create this document?

12   A.  Yes.

13   Q.  And when did you create it?

14   A.  In June 2021.

15   Q.  And why did you create it?

16   A.  To explain NFTs internally, what it is and what are the

17   applications we could imagine for Hermès.

18             MR. WARSHAVSKY:  And if we could turn to page 28.

19   Q.  Can you tell me what this slide shows.

20   A.  A summary of different NFT applications.

21   Q.  And these are the cases you were just talking about?

22   A.  Yes.

23             MR. WARSHAVSKY:  Can we turn to page 29.

24   Q.  And can you explain what this slide shows?

25   A.  It's NFT digital certificate to combat fraud.

N23VHER3                    Moulin - Direct

1   Q.  And can you explain how a digital certificate would combat

2   fraud?

3   A.  Yes.  The idea that you go to one of our stores, you buy a

4   bag or a watch, for example.  It goes with a digital

5   certificate.  Digital certificate is there to authenticate the

6   bag or the watch.  And so you could declare it stolen if it has

7   been stolen, and it's also a way to combat counterfeiting.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. WARSHAVSKY:

2    Q.  Is Hermès working on this application?

3    A.  Yes.

4    Q.  And you're involved in this application?

5    A.  Yes.

6    Q.  Can we turn to page 30.

7            Can you explain what this is?

8    A.  It's the idea for NFT as a proof of that could provide

9    exclusive services for excluded products, for example.

10   Q.  Is Hermès working on this application?

11   A.  Yes.

12   Q.  Could we turn to page 31, please.

13           Can you explain what this slide shows?

14   A.  It's NFT as virtual product to be used in virtual worlds or

15   video games.

16   Q.  What types of products would that be?

17   A.  It would be any product.  It could be a scarf, a watch, a

18   bag, a clothing or shoe, that could be used to dress your

19   avatar in a virtual world.

20   Q.  Is this an application Hermès is currently considering?

21   A.  I'm sorry, yes.

22   Q.  Can we turn to page 32.

23           Can you explain what this slide shows?

24   A.  It's the idea of NFTs as a virtual product that could be

25   used as a proposed decorative purpose in your home or in your

1  virtual gallery.

2  Q.  Can you explain how that would work?

3  A.  You can imagine that you have a piece of art that is

4  delivered through an NFT, and that could be displayed on some

5  TVs compatible with NFTs in your home or could be displayed in

6  a virtual gallery on the wallet of a virtual gallery, like,

7  virtual world.

8  Q.  Has Hermès developed this application?

9  A.  Yes.

10  Q.  When did Hermès begin developing this application?

11  A.  We began discussing the project in November 2021 and began

12  the project itself in January 2022.

13  Q.  Did Hermès actually roll out the product?

14  A.  Internally, yes.

15  Q.  We'll come back to this in a minute.  Can you turn to

16  page 33, please.

17          Can you explain what this slide shows?

18  A.  It's NFTs as collectible that you could retrieve in any

19  touchpoint with a brand and that could celebrate loyalty.

20  Q.  Could we turn back to page 35.

21          Can you explain what this slide shows?

22  A.  It shows the idea of using NFTs as virtual products in

23  video games, virtual, that could be used in different types of

24  games.

25  Q.  Could you provide an example to explain what that means?

1    A.  Yeah.  It's, for example, you have virtual wardrobe or

2    virtual scarf or tie.  You could dress your avatar with it and

3    play in Roblox or Fortnite or whatever.

4    Q.  I see there are other brands on this slide.  Why did you

5    list them?

6    A.  To strengthen the argument that it was interesting for us

7    to investigate this space, and that we already did and already

8    entered this space.

9    Q.  Just to explain, when you're talking about things like

10   clothing or what's listed here, why would it need to be an NFT?

11   A.  Mainly because it's a way to get something that's

12   interpretable, meaning that you can use it in different video

13   games.  You can use the same clothes in Fortnite or in Roblox

14   or in SunBot or whatever virtual world is.  And also because

15   it's a way to own it and to have something that is unique as

16   our real physical products.  A Birkin bag, for example, is

17   unique.  It's uniquely made by craftman, and we would like to

18   have the same thing in the virtual world.

19   Q.  I would like to publish Exhibit 34, please.

20           Looking at this and if we can go to -- I see we're on

21   page two.

22           Have you seen this document before?

23   A.  Yes.

24   Q.  Can you tell us what this document is?

25   A.  It's an e-mail I sent to my team.  I forward it to my team.

1   It's coming from the CEO of Arianee.

2   Q.  If we can turn to page -- this is forwarding a

3   presentation, correct?

4   A.  Yes.

5   Q.  If we can turn to page five.

6           So who made this presentation?

7   A.  Arianee did.

8   Q.  Arianee.

9           And did you ask Arianee to prepare this presentation

10  as part of the work it was doing for Hermès?

11  A.  Yes.

12  Q.  Why did you ask Arianee to prepare this?

13  A.  Because at the time, in 2021, the NFT market was quite

14  booming and so cases were popping out.  Arianee was changing

15  its services, and I wanted a presentation of their services to

16  be able to update our presentation internally and give some

17  insight internally.

18  Q.  If we can turn to page seven.

19          Can you tell us what this page is showing?

20  A.  Different types of NFT applications for our products and

21  digital goods.

22  Q.  And, in particular, looking at the left side, can you

23  explain what that is?

24  A.  It's what we call a digital twin.  So it's the idea of

25  having a 3D replica of the physical product to use it as an

1   augmented reality filter or we use it in the virtual world.

2   Q.  And this is an NFT?

3   A.  Yes.

4   Q.  Is a digital twin related to a digital certificate?

5   A.  It would be embedded in a digital certificate.

6   Q.  How would the digital twin work?

7   A.  Well, the idea is you buy a bag, for example, a Birkin bag,

8   and you get out with a digital certificate.  You have inside

9   the digital certificate, you have a digital twin that is a

10  representation in 3D of this bag, or actually we can give

11  fancier presentation or creative one and this representation is

12  3D replica.  You can use it as an augmented reality fixture to

13  show yourself with it on social media or connect to video games

14  and dress your avatar with carry the bag.

15  Q.  Did you circulate this in Hermès?

16  A.  Yes.

17  Q.  Did Hermès do anything with respect to the digital twin

18  project?

19  A.  We did a prototype in October 2021.

20  Q.  What prototype was the digital twin made for?

21  A.  It was made for Kelly Birkin and Constance bags.

22  Q.  And when you did the digital twin, did the NFT have the

23  digital replica of those items?

24  A.  Yes.

25  Q.  Did you follow Arianee's advice on this project?

1   A.  Yes.

2   Q.  Is Hermès currently developing this project?

3   A.  Yes.

4   Q.  Did Hermès ever publish anything about this product

5   externally?

6   A.  No.

7   Q.  If we can turn to Plaintiff's Exhibit 28.

8           Can you tell us, did you create this document?

9   A.  Yes.

10  Q.  OK.  Generally speaking, what is this document about?

11  A.  It's an idea notebook about NFT applications for Hermès.

12  Q.  OK.  If we can go to page seven, please.

13          Can you tell me what page seven shows?

14  A.  It shows different -- different use cases.  Well, the use

15  case of virtual product used in video games and virtual worlds,

16  and it shows different brands that entered this field.

17  Q.  And why did you include a slide showing other fashion

18  brands?

19  A.  To strengthen this idea that others are going to this field

20  and we should we might be interested in going also exploring

21  also this field.

22  Q.  And these two images here, why did you choose these two?

23  A.  Well, to show that you can dress an avatar with a T-shirt

24  or even carry a bag.

25  Q.  Was it also to show Hermès what it could do?

1    A.  Yes, exactly.

2    Q.  And the image on the right, why did you include that one?

3    A.  To show that an avatar could also carry a bag in a virtual

4    world.  And so it could also carry a Birkin bag, for example,

5    whatever.

6    Q.  Thank you.  If we could publish Plaintiff's Exhibit 37.

7              Have you seen this document before?

8    A.  Yes.

9    Q.  Did you create this document?

10   A.  Yes.

11   Q.  When did you create it?

12   A.  In beginning 2022.

13   Q.  OK.  Can you tell us generally what this document is about?

14   A.  It's about an NFT project called silk division.

15   Q.  Let's turn to page six.

16             Can you explain this project?

17   A.  The silk division was created in 1937, so we imagined

18   creating 1997 unique physical ties that would be -- that would

19   be relating to 1937 NFTs.

20   Q.  And earlier you discussed a digital twin.

21             Would this be an example of a digital twin?

22   A.  Yes.

23   Q.  And this application, am I understanding correctly that

24   each person had purchased a tie would also receive an NFT?

25   A.  Yes.

1   Q.  OK.  When did you first start discussing this project?

2   A.  We first discussed this project in November 8, 2021, at the

3   innovation day.

4   Q.  And I think we heard about this before, but what is

5   innovation day?

6   A.  It's an internal event h Lab is organizing each year to

7   show new trends, new technologies and discuss projects we have

8   been developing in the past year.

9   Q.  When did H Lab first start developing this project?

10  A.  We started just after the early days, so in January 2022.

11  Q.  Let's briefly go through some of the slides of this, so

12  maybe start at page seven.

13          I'm going to want to stop.  Maybe start at page seven

14  and explain -- maybe show seven and eight -- and start by

15  explaining seven and eight quickly.

16  A.  Yes.  So the idea is that you purchase a tie, a physical

17  one, and you get an NFT that is not yet revealed.  The NFT is

18  going to your wallet.  It's a place where you store NFTs.  It's

19  an Hermès wallet in this case.  Then when you get the NFT

20  first, you have some media content about the know-how of the

21  silk division, how do you make a tie, how do you create it.

22  Q.  All right.  And then if we can turn to page nine.

23  A.  Then to reveal the true form of the NFT, you need to scan

24  with your phone the back of a tie or your Hermès logo.

25  Q.  And page ten.

1   A.   Then you reveal the NFT.  Here, it takes the form of a

2   rabbit because we were working on ties that show carrots and

3   rabbits.  So you have this little rabbit that is unique, and

4   you can use it as an augmented reality animation first.

5   Q.   And does the augmented reality work with a digital twin?

6   A.   Well, it's not exactly the exact twin of the tie, but it's

7   version, a digital version of the creative idea around the tie,

8   so it can be ...

9   Q.   If we can turn to page 11.

10           What is this one?

11  A.   Yeah, this the augmented reality filter so that you can

12  show yourself with the rabbit on your shoulder during -- on

13  social media preferable.

14  Q.   And if we go to page 12, please.

15  A.   Here, it's different types of interactions.  So the NFT

16  could be also a way to access different services and events.

17  Here, it would imagine private sales, tie-tying classes,

18  meeting with the artist who did the tie and worked on the tie

19  design.

20  Q.   And page 13?

21  A.   You could also access to exclusive, more exclusive events,

22  such as the Sout Hermès or a fashion show by burning your NFT

23  or giving it back.

24  Q.   Page 14.  Page 14?

25  A.   Here, the idea is if we have several NFTs, you could

1    imagine that you merge an NFT of silk division with an NFT of a

2    hat division, and that would get more unique NFT which would

3    have the hat and tie both.

4    Q.  Page 15?

5    A.  If you want to offer the tie itself, you could configure

6    the NFT so that you enter a message for the one you are

7    offering the tie, and the message would be delivered as an

8    augmented reality animation.

9    Q.  And page 16?

10   A.  And the last one is that when you come back to Hermès via

11   NFT back home, that it gets animated.

12   Q.  Is Hermès working on this project now?

13   A.  Yes.

14   Q.  Can we turn to 17 for a moment, actually, too.

15            Can you explain what's on this slide?

16   A.  It was more long-term ideas for this project.  You can see

17   at the bottom three well-known NFT projects, the Doodles, the

18   Bored Apes, and the World of Women.  And we were thinking at

19   one point to partner and maybe put a tie on -- or scarf on the

20   World of Women, for example.

21   Q.  Am I looking at this correctly, the one on the left is

22   Doodles, the one in the middle Bored Ape, and the one on the

23   right, was it World of Women, did you say?

24   A.  World of Women, yes.

25   Q.  OK.  And at the top you, once again, you note Gucci and

1    10KTF.  Why did you refer to those?

2    A.  Because, at this time, Gucci partnered with 10KTF, which is

3    a digital craftman that uses NFT to build digital products, and

4    we thought the idea was interesting to look at.

5    Q.  OK.  If you can turn to slide 18, please.

6            Can you just explain what this shows?

7    A.  It's other long-term ideas and, for example, the idea of

8    being able to resell your product on an NFT platform, like

9    OpenSea or Rarible, and also use an NFT in a virtual world,

10   such as Decentraland or Roblox, or even social media.

11   Q.  OK.  And slide 17 and 18 that we just saw, is Hermès still

12   considering those?

13   A.  Yes.

14   Q.  OK.  But they are not being used -- they are not being

15   developed yet?

16   A.  No.

17   Q.  There has been some testimony by you, and different

18   witnesses, about NFTs for certificate of employment.  I want to

19   talk a little bit about one.

20           I think you mentioned NFTs that Hermès employees

21   receive.  Can you explain that NFT project?

22   A.  Yes.  Actually, the followup of this project we've just

23   seen.  At one point of a project, we started to work with a

24   digital NFT artist, and we defined an experience where you

25   would be talking with virtual parts and that would -- and this

1   discussion would be unique.  And then at the end, you would get

2   a souvenir of this discussion as an NFT unique itself.

3   Q.  Has Hermès actually come out with this project?

4   A.  Yes.

5   Q.  Where has this project been offered?

6   A.  Internally, during internal event called Podium.

7   Q.  And why was this NFT project only released internally?

8   A.  Because when we work in digital, it's like when we work

9   with the physical project.  We try to reach the highest

10  standard of quality.  So we take the time to test internally

11  and have feedback before going public.

12  Q.  OK.  And was the NFT created?

13  A.  Yes.

14  Q.  I think you said it was released.  When was the Podium day

15  that it was released?

16  A.  Two weeks ago.

17  Q.  When did you first discuss the project?

18  A.  In November 2021, on November 8, 2021, during the

19  innovation day.

20  Q.  Was this created by an Hermès employee?

21  A.  No.

22  Q.  Who created it?

23  A.  The art itself was created by two artists, Dmitry

24  Kravchenko and Neil Beloufa.

25  Q.  All right.  Is this the first project you made --

1          THE COURT:  I'm sorry.  Just so I'm clear and the jury

2     is clear how this works, so if you are a consumer, how do you

3     find out about this NFT?

4          THE WITNESS:  It could be -- we didn't work on the way

5     we will interact directly with a client in the end.  But in the

6     idea, we had initially -- when you buy the tie, you could get

7     into an experience, physical experience, where at the end you

8     retrieve your NFT.  Like, I show --

9          THE COURT:  So are you paying anything additional for

10    the access to the NFT beyond what you're paying for the tie?

11         THE WITNESS:  No.  It would be offered with the tie.

12         THE COURT:  All right.  And then when you go, so you

13    just then sign up for the NFT, is that it?

14         THE WITNESS:  Yes.

15         THE COURT:  And when you go to the NFT, what do you

16    see?

17         What's the digital image associated with it?

18         THE WITNESS:  Today the form it took is a horse,

19    like -- you have to show it.  I should show it to you to

20    explain, but it's, like, a horse, but it's sticking out its

21    tongue as a little animation.

22         THE COURT:  So you see a kind of humorous art?

23         THE WITNESS:  Yes.  It's been created by the artist.

24         MR. WARSHAVSKY:  It's our next exhibit, your Honor.

25         THE COURT:  Excuse me?

1           MR. WARSHAVSKY:  It's our next exhibit.

2           THE COURT:  Well, I can't wait, but I just wanted to

3      make sure I understand how this works.

4           And then can you resell that?

5           THE WITNESS:  Today, we don't allow resell.

6           THE COURT:  OK.  All right.  Go ahead, counsel.

7      BY MR. WARSHAVSKY:

8      Q.  And before I get to the exhibit, I just wanted to ask you,

9      you mentioned the artist.

10          Was that the first project you made with Mr. Neil

11     Beloufa?

12     A.  Yes.

13     Q.  OK.  And did you personally receive this NFT?

14     A.  Yes.

15     Q.  OK.  I'm going to show you, can you please publish

16     Exhibit 385.

17          Before -- don't start the video yet, but can you tell

18     us what this video is going to show us?

19     A.  Yes.  It's actually recalled off my screen, my iPhone

20     screen.  And on it, you will see the Hermès wallet where you

21     have the NFT stored and the NFT itself we are talking about.

22     Q.  OK.  So I'm going to ask you to walk us through the video.

23          If you can start the video on the first screen.

24     A.  On the top left of the Hermès wallet, I will click on it

25     and the video gets started.

1              (Video played)

2    A.  Here, you have two collections involved.  Two collections

3    that are the innovation day, because at the innovation day, we

4    issued also 20 different NFTs, and the Podium I was talking

5    about, which is this internal event of the divisions of Hermès

6    showed our new collections.

7              And if you play, I will click on Podium and there are

8    four NFTs inside.  They are all unique.  You can play.

9    Q.  Press play again.

10             (Video played)

11   A.  Here, you have four NFTs.  And when you click on the

12   first -- so it can play again -- you get the NFT that is going

13   to show up.

14             You can play.

15             (Video played)

16             Here is the horse sticking out his tongue, and you

17   have a little description of the NFT itself and why it's

18   special and why it is exclusive.

19             And you can pause.

20   Q.  OK.  Is this a unique NFT?

21   A.  Yes.

22   Q.  How can you tell this is a unique NFT?

23   A.  If you come back just a little bit earlier -- well, you can

24   see, but there was written --

25             MR. HARRIS:  If we can bring it back up, Humberto,

1   Jeep, Monster Energy, the United States Postal Service.   In

2   fact, sometimes our clients for litigation surveys are agencies

3   of the federal government, so we've done a fair amount of work

4   for the Federal Trade Commission, for the patent and trademark

5   office, and also for the Department of Justice.

6           The second practice area in which we work is surveys

7   that we conduct so that companies can substantiate claims that

8   they want to make on packages and in advertising.

9           And then a third practice area is surveys and

10  marketing consulting that we provide for commercial companies

11  who want to introduce a new product to the marketplace, develop

12  a marketing strategy, or locate new customers.

13          And the last two areas are customers in recent years

14  have included companies like Nestle, Allstate Insurance, and

15  Remax, the real estate company.

16  Q.   How much of MMR's work involves conducting surveys?

17  A.   All of our work involves conducting some type of research

18  and almost all of our work involves the conducting survey.

19  Q.   Can what type of surveys are those?

20  A.   They are a wide range of surveys, but they include surveys

21  of consumers, and also sometimes they include surveys of

22  business customers as well.

23  Q.   How many surveys, that is, has MMR conducted since you've

24  been president?

25  A.   In those 17 years, we've conducted more than 1,000 surveys,

1   and I've been personally involved in almost all of them.

2   Q.  How many people work with you at MMR?

3   A.  14 including myself.

4   Q.  Could you briefly give us their backgrounds?

5   A.  Sure.  So among the 14 people, again, including myself, we

6   have five people who have Ph.D.s or doctorates, and then we

7   have seven people who have master's degrees.  Those graduate

8   degrees are in subjects like marketing, business, social

9   sciences, statistics, and even food science.

10  Q.  And you are here today to serve as an expert witness about

11  a likelihood of confusion survey that you conducted?

12  A.  That's correct.

13  Q.  How many times have you served as an expert witness before

14  and where?

15  A.  I've testified in more than 100 matters about a survey

16  either that I've conducted or that someone else has conducted

17  and I've testified in federal courts like this one, in state

18  courts, and a wide range of other venues and before a wide

19  range of other authorities.

20  Q.  How many matters have you worked on that involved trademark

21  likelihood of confusion surveys?

22  A.  I've worked on more than 70 matters that have involved

23  likelihood of confusion surveys.

24  Q.  How many times have you testified about a trademark

25  likelihood of confusion survey?

1    A.  I've testified either through a report or through oral

2    testimony like today in more than 45 matters involving

3    likelihood of confusion surveys.

4    Q.  How much time was your firm paid for conducting the

5    likelihood of confusion survey in this case?

6    A.  For the likelihood of confusion survey that my firm

7    conducted in this matter, up through the expert report, my firm

8    billed $130,000, and that includes the cost of designing and

9    conducting the survey and then writing up the results in an

10   expert report.

11   Q.  Did your firm engage in any additional work after

12   conducting the likelihood of confusion survey?

13   A.  Yes, and my time for that additional work is billed at $900

14   an hour.

15   Q.  Dr. Isaacson, before we talk more about your survey, let's

16   discuss a bit more about your background.

17              MS. WILCOX:  Mr. Ferrer, could you please turn to page

18   three.

19   Q.  Dr. Isaacson, walk us through your education briefly.

20   A.  Sure.  It's listed at the top of the page that's on the

21   screen now.

22              I have an undergrad degree which is a bachelor of

23   science in engineering.  That's from Northwestern University.

24   I have an MBA, which is a master of business administration

25   degree.  That's from Harvard Business School.  And I also have

1            (In open court)

2            THE COURT:  Ladies and gentlemen, I wanted to slightly

3   revise the ruling I made a few minutes ago, in light of the

4   testimony that's now being given.

5            Those are the slides that are the witness's actual

6   survey, will be received in evidence and you'll have them

7   available for you when you get to the jury room.

8            There are some other slides that are not part of the

9   survey; those are only being offered as aids to following

10  testimony.  You don't have to worry now about which is which

11  because they're going to give you when you get to the jury room

12  not only all the exhibits, lucky you, but an index to the

13  exhibits so you can find what you want.

14           Okay, counsel.

15           MS. WILCOX:  Thank you, your Honor.

16  BY MS. WILCOX:

17  Q.  Why did you want to include the disclaimer in your test

18  page of the likelihood of confusion survey?  Doesn't it

19  disclaim any relationship with Hermès?

20  A.  I wanted to include it so that I could have my survey

21  measure the effect of the disclaimer.  If we zoom back out to

22  see the whole web page, you can see there's three things that

23  can occur when someone comes to this web page.  They might see

24  the disclaimer and they might realize from the disclaimer that

25  Hermès or Birkin is not in any way connected with this web

1   page.  They might not notice the disclaimer at all; it is only

2   two faint lines on a very busy page.  And then they might see

3   the disclaimer and misread it and take away the mistaken

4   impression that the web page is connected with Hermès or

5   Birkin.  So I wanted to make sure that my survey reflected the

6   effect of the disclaimer.

7   Q.  So even with a disclaimer, there can still be a likelihood

8   of confusion?

9   A.  Absolutely.

10  Q.  Did your survey only measure this metabirkins.com web page?

11  A.  No, my surveyed measured this web page, which I call the

12  test web page; and then an altered version of this web page,

13  which I call the control web page.

14  Q.  Why did your survey include a control version of the

15  website?

16  A.  Well, this matter involves disputes over three very

17  specific things on this web page.  One is the use of the word

18  "Hermès"; the other is the use of the word "Birkin"; and then

19  the third is the shape or the look of the handbag on the page.

20          And by having -- my test web page includes those three

21  items.  My control web page does not include those three

22  elements.  And so by having one web page that does and one web

23  page that does not, I could compare the two web pages, and that

24  way I could measure the effect of those specific elements as

25  opposed to anything else that's happening on the web page.

1   Q.  In fact, let's walk through your control page.

2            MS. WILCOX:  Mr. Ferrer, please pull up Exhibit 193

3   again, slide 5.

4   Q.  What are the changes that you made, Dr. Isaacson?

5   A.  Well, I removed the word "Birkin," that's point number one,

6   and changed it to "Handbag."  And similarly in point number

7   two, I changed "MetaBirkins" to "Metahandbags."  I removed the

8   word "Hermès" and changed it to "Darcy."  And then I changed

9   the shape of the handbags so they would be less like the shape

10  of a Birkin bag.  In the control, they are more square, they

11  are less tapered, they don't have a padlock, and there are some

12  faint vertical metallic lines that I removed as well.

13           MS. WILCOX:  Please turn to slide 6.

14  Q.  And Dr. Isaacson, is this what you were just describing?

15  A.  That's correct.  You can see up at the top it says

16  "Metahandbags."  You can see that the shape of the handbag is

17  slightly different and it doesn't have the padlock on it.  And

18  if you look carefully at the disclaimer, you'll see it says

19  "Darcy" instead of saying "Hermès."

20           MS. WILCOX:  And the next slide, please.

21  Q.  What is this?

22  A.  This is more of the same page.  Again, you can see that the

23  shape of the handbag is changed.  This is the control web page

24  again.

25  Q.  And the next three of three, slide 8.  What is this?

1    A.  This is more of the control.  And again, you can see that

2    the wording of that slogan has changed, and the shape of the

3    bags and the look of the bags has changed.

4    Q.  In the survey, did people see the control home page as

5    individual slides?

6    A.  No, they saw it as a web page, the same way that they saw

7    the test web page as a web page.

8    Q.  So what were the specific parts of the metabirkins.com web

9    page that your survey measured?

10   A.  It measures the use of the word "Hermès," the use of the

11   word "Birkin," and the use of that look and shape of the

12   handbag.

13   Q.  Did you test the elements individually or together as a

14   group?

15   A.  All together as a group.

16   Q.  Why?

17   A.  Because that's how someone would encounter them who came to

18   the web page.  They'd see them all together, not individually.

19   Q.  Did people taking your survey see both the test version and

20   the control version of the MetaBirkin web page?

21   A.  No, they would see one or the other, but not both.

22   Q.  Let's walk through the survey methodology that you used.

23        What steps did you take in your trademark likelihood

24   of confusion survey?

25   A.  The survey had three steps.

1          In the first step, I qualified people to make sure I

2   was interviewing the right people.

3          In the second step, I showed them either the control

4   web page or the test web page.

5          And then in the third step, I asked questions to

6   measure likelihood of confusion.

7          MS. WILCOX:  Let's turn back, please, to Exhibit 193,

8   and go to slide 9.

9   Q.  And let's talk about this likelihood of confusion survey

10  among the NFT purchasers.  Who did you interview?

11  A.  Sure.

12         So I interviewed a group of NFT purchasers.  And this

13  slide shows you the primary qualification criteria that I used

14  to select these people.  They had to be at least 18 years old;

15  they had to indicate that in the next 12 months they were

16  likely to purchase an NFT for digital artwork or for fashion

17  apparel or fashion accessories; they had to indicate that they

18  would be willing to spend $2500 or more to purchase an NFT; and

19  they had to indicate that they would consider using

20  cryptocurrency or a credit card to purchase something online.

21  Q.  Why did you qualify people as being willing to spend $2500?

22  A.  Well, the time I did my -- I designed my survey, the

23  MetaBirkins NFTs were advertised for sale on websites at a

24  price in a cryptocurrency called Ethereum, and that price

25  converted to $2500 in dollars.

1          THE WITNESS:  If I can just add one more response to

2     that question.

3          People could have said more than one category in

4     response -- in answering question 1.  So it's possible that

5     someone might -- that people gave -- in fact, a number of

6     people gave responses where they would have been counted in

7     multiple rows across that table.

8          THE COURT:  Go ahead, counsel.

9          MS. WILCOX:  Could we please turn to slide 19.

10   Q.  And describe for us what this chart shows, Dr. Isaacson.

11   A.  Sure.

12          This is counting the number of people who said Hermès

13   or Birkin in question 1, in question 4, and in question 7.  And

14   as I just mentioned, they might have said Hermès or Birkin and

15   said other things, they might have said Vogue, they might have

16   said Meta, they might have given a response that would have

17   fallen into another category as well; and, in fact, a number of

18   people did that.

19          But the survey, again, is designed to measure

20   confusion between metabirkins.com and Hermès or Birkin.  And

21   counting that level -- that type of confusion, in response to

22   question 1 we have 17.5 percent for the test and 1.9 percent

23   for the control.  We have, in response to question 4, an

24   additional 4.1 percent and one percent.  And then zero percent

25   in response to question 7.  And when you add up down the

1    column, you get to 21.6 percent for the test web page, and 2.9

2    percent for the control web page.  And there's a number there

3    that says net confusion.  And net confusion is simply the

4    difference if you subtract the control from the test, and the

5    difference is 18.7 percent.  That's the net confusion for this

6    web page with respect to Hermès or Birkin.

7    Q.  What does that net confusion percentage of 18.7 percent

8    tell you?

9    A.  That tells me the amount of confusion associated with the

10   use of the Birkin name, the use of the Hermès name, and the use

11   of the shape of that handbag.  And that number is of a

12   magnitude, of a size that I would typically interpret as

13   meaning that there's a substantial likelihood of confusion.

14   Q.  Why do you conclude that this means there's a substantial

15   likelihood of confusion?

16   A.  Because the number is big enough that I and, in my

17   experience, others would typically interpret this as meaning

18   that there's a substantial likelihood of confusion.

19   Q.  And when you say "others," who are you referring to?

20   A.  Other survey experts and other surveys that I've seen

21   evaluated.

22   Q.  Dr. Isaacson, you just told us about the survey of the NFT

23   purchasers you interviewed.  Was there any other group that you

24   also interviewed?

25   A.  Yes, I also conducted a survey among handbag purchasers.

1   Q.  And are there any differences in the design of the surveys?

2   A.  There are very similar surveys.  The only thing that

3   differed between the two surveys is one interviewed handbag

4   purchasers and one interviewed NFT purchasers.

5           MS. WILCOX:  Could we please turn to slide 20.

6   Q.  Could you walk us through what this slide shows.

7   A.  This slide shows the qualification criteria for people to

8   qualify for the survey of handbag purchasers.  And just to be

9   clear, you could be in one survey or the other, but not both.

10          So this is a separate group of people who had to be at

11  least 18 years old, had to indicate that they were likely to

12  purchase a handbag in the next 12 months, had to be willing to

13  spend $10,000 or more to purchase a handbag, and had to also

14  indicate that they read online content about fashion or

15  artwork.

16  Q.  Why did the handbag survey require qualifying someone as

17  someone who had purchased a handbag at $10,000 or more?

18  A.  Because I looked around online, and the lowest price that I

19  could find a Birkin handbag for which was on a resale website

20  was for $10,000.

21  Q.  What were the results for the survey among the expensive

22  handbags purchasers?

23  A.  I have a slide with that.  I believe that's the next slide.

24  Q.  Yes.  Please turn to slide 21.

25  A.  So this shows, again, questions 1, 4, and 7, again, with

N23sHER6                        Vittadini - Direct

1    outside.

2              THE DEPUTY CLERK:  Please remain standing.  Raise your

3    right hand.

4     LUISA MARIA VITTADINI,

5         called as a witness by the Plaintiff,

6         having been duly sworn, testified as follows:

7              State your name and spell it slowly for the record.

8              THE WITNESS:  Luisa Maria Vittadini.

9              THE DEPUTY CLERK:  Please spell your last name.

10             THE WITNESS:  V-i-t-t-a-d-i-n-i.

11             THE COURT:  The record will reflect that although the

12   witness speaks and understands English, the interpreter is here

13   in case she needs any clarification.

14             MR. WARSHAVSKY:  Thank you, your Honor.

15             Your Honor, again, in order to hasten the exhibits,

16   there are two exhibits counsel don't agree to, but the others I

17   would like to list to offer.

18             THE COURT:  Go ahead.

19             MR. WARSHAVSKY:  Exhibits 45, 253, 254, 315 and 380.

20             THE COURT:  Received.

21             (Plaintiff's Exhibits 45, 253, 254, 315 and 380

22   received in evidence)

23             MR. WARSHAVSKY:  Thank you, your Honor.

24   DIRECT EXAMINATION

25   BY MR. WARSHAVSKY:

1   Q.  Ms. Vittadini, good afternoon.

2           By whom are you employed?

3   A.  By Hermès.

4   Q.  When did you first start working at Hermès?

5   A.  In April 2019.

6   Q.  What was your title when you joined Hermès?

7   A.  Corporate communication manager.

8   Q.  Can you please describe your responsibilities as the

9   corporate communications manager?

10  A.  I was in charge of the global carpet communications

11  strategy of the company, meaning working on the message

12  regarding business carpet, social responsibility, values of the

13  company.  And in my scope, I also handled the relationship with

14  the business press.

15  Q.  And when you say corporate communications, which channels

16  do you mean by that?

17  A.  The channel for the messages or for the press and

18  institutional communication moments.

19  Q.  Thank you.

20          Are you still the corporate communications manager

21  today?

22  A.  I've been promoted to associate director of carpet

23  communication.

24  Q.  When were you promoted?

25  A.  In January 2023.

1    Q.  What are the -- you spoke a little bit earlier about

2    important fashion magazines.

3            What are the most important fashion magazines from

4    Hermès' perspective?

5    A.  So fashion, I would say Vogue, Elle, Harper's Bazaar, and

6    L'Officiel.  And then business fashion, I would say Women's

7    Wear Daily and Business of Fashion.  And then the luxury and

8    fashion sections of Financial Times and *New York Times* for

9    sure.

10   Q.  After the Financial Times article was published, did other

11   press sources, to your knowledge, did other press continue to

12   publish articles about an association or possible association

13   between the MetaBirkins and Hermès?

14   A.  Yes.

15   Q.  Can you give some examples of the publications you're aware

16   of?

17   A.  Elle, L'Officiel, New York Post, and Challenges.

18   Q.  I would like to turn to Plaintiff's Exhibit 380 which has

19   been accepted and publish that for the jury.

20            Is this the Elle article you were referring to?

21   A.  Yes.

22   Q.  And when did you first see it?

23   A.  December 2021.

24   Q.  Do you know the full title of the article?

25   A.  Birkin NFT:  Everything you need to know about the handbag

1    of the future.  Birkins for the digital age?

2    Q.  Do you know whether this was always the title of the Elle

3    article?

4    A.  No, it wasn't.

5    Q.  OK.  The title, do you know -- was the title corrected from

6    something else?

7    A.  Yes.

8    Q.  And how do you know that the title was corrected?

9    A.  Because part of the monitoring was on Google, and when we

10   Googled Hermès NFT, we found another title for the Elle

11   article.

12           MR. WARSHAVSKY:  OK.  And if we can turn to

13   Plaintiff's Exhibit 45.  Again, this was previously admitted,

14   so it can be published.

15   Q.  Can you tell us what this document is?

16   A.  It's a Google research of the two keywords Hermès and NFT.

17   Q.  Is this a search that you did?

18   A.  Yes.

19   Q.  And when did you do it?

20   A.  Last week on the 26 of January.

21   Q.  And where were you doing the search from?

22   A.  New York.

23   Q.  And what about this search caught your eye?

24   A.  So the second title is the Elle article, and the title is

25   Hermès Goes Virtual with Launch of Birkin Bags as NFTs.

1    Q.  OK.  So just to be clear -- if you can scroll up little

2    bit, Humberto -- your search here was just for Hermès NFT on

3    Google?

4    A.  Yes.

5    Q.  If we could -- I'm sorry.

6            Obviously, does this title match the Elle article we

7    saw a moment ago?

8    A.  No.

9    Q.  OK.  If we can turn to plaintiff's Exhibit 315.

10           Have you seen this document before?

11   A.  Yes.

12   Q.  And what is it?

13   A.  It's the article from Elle.

14   Q.  OK.  And this one is taken from the page wall, is that

15   right?

16   A.  Yes.

17   Q.  OK.  And if we go to the bottom, can you see the title

18   there?

19   A.  So, yeah.  Hermès goes virtual --

20   Q.  Hang on.  If you can scroll down for the --

21   A.  Hermès Goes Virtual with Launch of Birkin Bag as NFTs.

22   Q.  Thank you.

23           As part of your job with Hermès, do you have any idea

24   about the circulation of Elle?

25   A.  At Elle, it's about, yes, several million readers.  And in

1    the U.S., it's 50 million unique monthly readers.  And in the

2    U.S., Instagram, Facebook, I would say 12 million followers.

3    Q.  And the first number, I'm sorry, did you say 50, five zero,

4    or one five?

5    A.  50 million monthly unique visitors for *Elle.com* and

6    12 million followers for Elle USA Instagram and Facebook.

7    Q.  If we can turn to Plaintiff's Exhibit 253, which has

8    already been admitted.

9              Can you tell me what this document is?

10   A.  It's an article from the New York Post.

11   Q.  OK.  If we can turn to -- do you know the date of the

12   article?

13   A.  January 8, 2022.

14   Q.  If we could turn to page eight of the article, please.  If

15   you can read the caption below the images.

16   A.  The VR-only MetaBirkin bag, a Digital Version of the Hermès

17   fave, can sell for tens of thousands of dollars.

18   Q.  And do you know what the two images shown are, if we could

19   see that?

20   A.  Yes, two MetaBirkins.

21   Q.  And just to be clear, I think the jury knows, but does

22   Hermès make a VR bag?

23   A.  No.

24   Q.  OK.  If we could turn to the next page, page nine.

25              And do you see this statement?

1   A.  Even Hermès, the company responsible for the ridiculously

2   expensive Birkin bag, has entered the metaverse.  On December

3   17, the company unveiled the MetaBirkin -- a VR version of its

4   signature bag, created by LA artist, Mason Rothschild, and made

5   just for 100 of them.

6   Q.  And, once again, as part of your -- does the Hermès team

7   know how much -- what the -- I'm trying to use the words you

8   used before -- the commercial impressions are for the New York

9   Post?

10  A.  Yes.  Its unique monthly visitors is 71 million.

11  Q.  71 million unique visitors a month?

12  A.  Yeah, and --

13          THE COURT:  All of whom, I assume, are fashionistas.

14          MR. WARSHAVSKY:  Sports fans, too.

15  Q.  OK.  I want to turn to Plaintiff's 254, which has also been

16  admitted.

17          Have you seen this document before?

18  A.  Yes.

19  Q.  OK.  Can you tell us what this is?

20  A.  It's an article from Challenges.

21  Q.  OK.  And is Challenges one of the names you said before?

22  A.  Yes.

23  Q.  And do you see the date, do you know the date of the

24  article?

25  A.  It's 23 of May, 2022.

1    Q.  OK.  And so this was clearly after Hermès' statement to the

2    Financial Times, is that correct?

3    A.  Yes.

4    Q.  And the New York Post article we saw, that came out after

5    the Hermès' statement to the *New York Times*, is that correct?

6    A.  Yes.

7    Q.  And the Elle article we saw, did that come out after

8    Hermès' statement to the Financial Times?

9    A.  Yes.

10   Q.  If we can you go down to the first paragraph, and can you,

11   here -- can you read the part in bold?

12   A.  So, yeah.

13   Q.  Starting with even Hermès.

14   A.  Even Hermès, which unveils virtual bags under the name

15   MetaBirkin, then there is an erratum.

16   Q.  Do you know how Challenges got that erratum?

17   A.  Yes.

18   Q.  How did Challenges become aware of that?

19   A.  We asked for a correction.

20   Q.  OK.  Are you aware of other examples of confusion or other

21   statements affiliating Hermès with MetaBirkins?

22   A.  As I say, the monitoring is France mostly.  So considering

23   those article, I -- I think, yeah, there are other articles in

24   the press, especially globally.

25   Q.  All right.  Is it possible for Hermès to monitor every

1  instance of press on any given topic?

2  A.  No.  No.

3  Q.  I have another question.

4          Have you ever heard of an individual named Clement

5  Quan?

6  A.  No.

7  Q.  And last night I asked you to ask others at Hermès if they

8  had ever heard of an individual named Clement Quan.

9          MR. HARRIS:  Objection, your Honor.

10         THE COURT:  Sustained.

11         MR. WARSHAVSKY:  Thank you.  I have no further

12 questions at this time.

13         THE COURT:  Cross-examination.

14 CROSS-EXAMINATION

15 BY MR. HARRIS:

16 Q.  Good afternoon, Ms. Vittadini.  I keep introducing myself,

17 but I know you've been sitting outside.  My name is John

18 Harris, and I'm an attorney for Mason Rothschild.

19 A.  Good afternoon.

20 Q.  Ms. Vittadini, I'm going to take these exhibits in the

21 order in the book, not the order you were asked.  OK.

22         So do you have an exhibit binder?

23 A.  Yes.

24 Q.  All right.  If you could turn to exhibit, Plaintiff's

25 Exhibit 45 in evidence that you were just shown by your

1          THE COURT:  First we will hear any motions that the

2    defense wants to make, and these will be deemed for all

3    purposes to be motions made both at the close of the

4    plaintiffs' case and at the close of all the evidence, even

5    though there's still more evidence to come, but we know what it

6    is.

7          MR. SPRIGMAN:  Your Honor, my name is Chris Sprigman.

8    I'm here on behalf of the defendant, Mason Rothschild.

9          So do we want to get to JMOL first or instructions?

10         THE COURT:  No, I want your motions first.

11         MR. SPRIGMAN:  Okay.

12         Your Honor, we have a motion on the application of

13   *Rogers*.  And in particular, we think at this point the evidence

14   has established to an extent that a reasonable jury couldn't

15   disagree, first, that Mr. Rothschild's use, as you have said in

16   your summary judgment opinion it must be, is not solely a

17   commercial use, not solely a use intended to profit from

18   confusion, but is, in fact, actuated, at least in part — and we

19   believe in large part — by an artistic intent, which we've

20   heard testified to by Mr. Rothschild, and we think --

21         THE COURT:  This will be an important matter when we

22   get to the charge, but I don't see how it's a matter for a

23   motion for a verdict in your favor when there clearly is

24   competing evidence on that issue.

25         MR. SPRIGMAN:  Your Honor, we think the evidence

that's come out at this trial will make it impossible for a

rational jury to credit the idea that Mr. Rothschild was

motivated solely on an intent to profit from Hermès's marks.

Mr. Rothschild has a record as a visual artist, both before and

after MetaBirkins; Mr. Rothschild testified as to his artistic

intent.  That testimony stands uncontradicted.

THE COURT:  First of all, the jury -- his credibility

was clearly impeached.  And the jury can, therefore, draw an

adverse inference as to anything he said.  Forgive me, but I

think that's the law of evidence 101.

MR. SPRIGMAN:  Well, your Honor, I would just say that

the evidence was clear that Mr. Rothschild attempted to correct

misimpressions when they did occur.  The evidence was clear

that Mr. Rothschild charged a relatively low price for the

MetaBirkins and sought to see what the community would do with

them.

THE COURT:  You know, those are all excellent

arguments for the jury.  And as you intuit, I could not award a

verdict in your behalf unless no rational juror could possibly

find that his sole motivation was to make a lot of money, or if

it's not even a lot of money, was commercial.

MR. SPRIGMAN:  Your Honor, I'm going to then move a

little bit laterally and just say that, with respect, your

Honor, we believe that that is not what *Rogers* requires.

*Rogers* requires, first, that the use be artistically relevant

 1   under the First Amendment for public figures or matters of
 2   public concern.
 3           THE COURT:  Never heard of that.
 4           MR. SPRIGMAN:  As you well know, your Honor.
 5           And so my concern here is that the way you seem to be
 6   applying the *Rogers* test, with all respect, is a way of
 7   applying it that does not take account of the structure of that
 8   test.  You're, in some sense, treating it as a free-form
 9   balancing test.  It is not.  It is a structured balancing test,
10   a gated balancing test that is designed to create breathing
11   room for artistic expression.
12           Your Honor, and if I may return to this case, what's
13   happened here is exactly the kind of thing that the test is
14   trying to prevent from happening, which is Hermès, in a sense,
15   whether they win or lose, has already won.  Because they've
16   made clear that a luxury goods company can hang up an artist
17   whose work they object to, for whatever reason, through motion
18   to dismiss, through summary judgment, through zillions of
19   dollars of discovery in lawyers and experts, to get to a
20   courtroom and fight it out in front of a jury.  And that is not
21   the situation the *Rogers* test is designed to promote.
22           The *Rogers* test is designed to promote and has, in
23   fact, promoted directly the opposite of that.  Cases have been
24   got rid of on motion to dismiss; cases have been gotten rid of
25   on summary judgment.  The only case where summary judgment was

1    granted and then reversed recently is *Gordon v. Drake*.  And

2    that case is like the case you're positing.  Judges and juries

3    can tell the difference; but if a case is a jump ball, if it's

4    not that screaming case of pretext like the one that you just

5    described for me, we should not be here.

6            THE COURT:  Let me ask you this.  And first off, I'm

7    glad you added "with all respect."  Whenever I hear counsel say

8    that, I need to find my microscope.

9            Is the test objective or subjective?

10           MR. SPRIGMAN:  The test is objective, your Honor.  It

11   is objective.  It is objective in the first factor, which is

12   artistic relevance.  You look at the use.  You ask, is the use

13   artistically relevant to the artwork?

14           Here, no reasonable jury could find that it's not for

15   the simplest possible reason:  The use describes the content.

16   You know, Ginger and Fred in *Rogers v. Grimaldi* described the

17   content of the film.  Regardless of whether people were

18   confused by that — and they were, by the way, there's evidence

19   in that case that the court saw 38 percent total confusion,

20   that is confusion about source, affiliation, licensing, 38

21   percent total confusion.  The court said, That's not the point.

22   The point is this use is artistically relevant.

23           And it didn't, to get to the second factor --

24           THE COURT:  Let's just stick with the first for a

25   minute.

1          MR. SPRIGMAN:  Yes, sir.

2          THE COURT:  So if the test is objective, not

3     subjective, then on your theory, the hypo I just gave, where we

4     have a tape-recording, where that artist says, I'm not going to

5     be an artist in this time, I'm going to be a fraudster, would

6     be irrelevant.

7          MR. SPRIGMAN:  No, your Honor.

8          THE COURT:  Or certainly not dispositive.

9          MR. SPRIGMAN:  No, your Honor.  I'm not saying it

10    would be irrelevant.  It might be relevant, for example, on the

11    second factor, which is explicit misleadingness.  And our

12    assessment of whether particular uses of the mark --

13         THE COURT:  So how do you define "artistically

14    relevant"?

15         MR. SPRIGMAN:  I define it the way *Rogers* and the

16    *Rogers* line of cases define it.  And that is simple in this

17    case, your Honor, because this, at least on that issue, is not

18    a complex case.  Is the use meaningful to the art.

19         So if the MetaBirkins had been named Banana Boat, I

20    would say, Well, I'm struggling to find the artistic relevance.

21    Banana Boat is actually a sunscreen; that's why I used that

22    example, it's a trademark for sunscreen.

23         So if the MetaBirkins --

24         THE COURT:  I'm here in New York in January.  That's

25    an apt analogy.

1          MR. SPRIGMAN:  Your Honor, I'm engaging in wishcasting

2     for spring.

3          But let me just say that Banana Boat is a trademark.

4     And if Mr. Rothschild had named the MetaBirkins Banana Boat, we

5     would not be struggling with artistic relevance either; we

6     would be saying actually there is none.  Maybe the one with the

7     banana on it, we would say it was relevant to that.  But

8     MetaBirkins was chosen the way most artistic titles are chosen.

9     Andy Warhol's Campbell's soup cans — and I hope I'll be able to

10    say that — were named that because they described what's in the

11    work.  And so too, MetaBirkins was named that because they

12    described, A, what's in the work --

13         THE COURT:  So if I understand your argument, you're

14    saying that any time a person uses a trademark to describe his

15    creation, it is automatically artistic expression.

16         MR. SPRIGMAN:  No, I'm not saying that.

17         THE COURT:  Okay.

18         MR. SPRIGMAN:  If it is artistic expression, *Rogers*

19    applies.  If there's some creative aspect to it, *Rogers*

20    applies.

21         Here, I'm sorry, but clearly there is, because I'm a

22    copyright expert, okay, first and foremost.  If I was a

23    copyright lawyer working at the copyright office and someone

24    sent me the MetaBirkin, I would grant it a copyright

25    registration.  It contains more than a modicum of creative

1    expression.  It qualifies.

2              THE COURT:  Are you planning to resign your current

3    position and apply to work at the copyright office?

4              MR. SPRIGMAN:  Your Honor, that would be a substantial

5    pay cut.  And except for some people I know, that rarely

6    happens.

7              But, in any event, back to artistic relevance.  We use

8    a trademark in a title.  The title describes the work.  That

9    element of the *Rogers* test, I think, we're done with.

10             The second element is the element we're left to

11   contend with.  The second element is that the use must be

12   explicitly misleading.  The examples given in the *Rogers* case,

13   for example, is a workout book that isn't from Jane Fonda.  And

14   it says it's titled "Jane Fonda's Workout Book."  That is

15   explicitly misleading.

16             Or to come back to this case, if Mason Rothschild

17   titled MetaBirkin, MetaBirkins by Hermès, that would be

18   explicitly misleading.  Any use of the mark that confuses

19   people not by directly misinforming them about the source, but

20   confuses people because it raises an inference that they might

21   draw that leads to a mistaken conclusion, that is not

22   explicitly misleading, that is just misleading.  That is the

23   difference between a regular trademark case and a *Rogers* case.

24   That is the difference the First Amendment makes.  And again,

25   with respect, your Honor, so far the decisions in this case

N23VHER7

have not tracked.

         Now, some courts in the Second Circuit will apply the
*Polaroid* factors.  We have maintained throughout that that is a
subset of cases, cases involving title versus title conflicts.
And why?  Because there, there are two parties with First
Amendment rights.  Both creative works have titles; both First
Amendment rights are at stake.  They are of equal dignity.  And
so the test is somewhat less protective.

         But here in this case, respectfully to Hermès, they
have no First Amendment rights.  The Birkin bag is not a speech
product.  The MetaBirkin is.  That is the difference.

         And so in assessing explicit misleadingness, the
*Polaroid* factors should be nowhere found.

         If, however, Judge, you are determined to apply them,
then the standard for applying them must be extraordinarily
careful, careful to show — as you note in your opinion, but I
don't yet see in the jury instructions, and we'll talk about
that separately — that the level of likelihood of confusion
shown must be so particularly compelling that it commands a
conclusion that the statements that were made with the use of
the mark have an explicitly misleading effect.

         The *Polaroid* factors in that sense are just used as a
way to inform the fact-finder about the nature of the
statements.  And what we're being informed about is not the
effect on the user; what we are being informed about is the

1    nature of the statements.

2              So, your Honor, just to kind of try to pull this all

3    together on the second factor, there is no explicitly

4    misleading statement here.  Mason Rothschild never used the

5    Birkin mark in a way that explicitly misleads.  If some

6    consumers were misled — and there is very poor evidence of

7    that, and we can get to that in a moment.  But if some

8    consumers were mislead, it's in the nature of the ordinary

9    drawing a misleading inference which the First Amendment

10   commands we must stay away from.  That's what the *Rogers* test

11   is about.

12             Now, again, I believe for any reasonable jury, given

13   that understanding of the *Rogers* test, the *Rogers* test compels

14   a finding of no liability on each and every claim in this case.

15   If you, on the other hand, decide, Well, I'm going to apply the

16   *Polaroid* factors, I still believe the Polaroid factors applied

17   within the confines of the *Rogers* test properly command a

18   finding of no liability with respect to each and every claim of

19   this case.  And the reason for that is, your Honor -- and we're

20   not done yet --

21             THE COURT:  Let me just -- I'm not clear why you say

22   the *Polaroid* factors don't apply.  Assuming for the sake of

23   argument that the *Rogers* test is satisfied by the plaintiffs,

24   the plaintiffs still have to show infringement under the

25   *Polaroid* factors, do they not?

1          MR. SPRIGMAN:  They do, your Honor.

2          Again, I do not think they've satisfied the Rogers

3     test.  I do not think they could satisfy the Rogers test.

4     Assuming for the moment counter-factually that that is true,

5     they have to show confusion.

6          Now, we're not done yet on this subject, but I think

7     what you're going to see is that their survey is entitled to no

8     credibility whatsoever.  The question they asked was wrong.

9     They failed to qualify the correct people.  The analysis was

10    done very poorly.

11         I'll give you just one enormous problem.  Their claim

12    in this case of trademark infringement involves the Birkin mark

13    and the trade dress.  It does not involve, your Honor, the

14    Hermès mark, and yet their survey expert included the Hermès

15    mark in their stimulus.  He is counting people as confused to

16    only mention the word Hermès.  That is not a part of their

17    claim, your Honor.  This survey simply does not fit the claim

18    that they have finally landed on after months and months and of

19    unclarity about what their claim was.  This survey is worth

20    precisely zilch.

21         That, we will get to tomorrow.  But I think, your

22    Honor, even if Rogers doesn't apply, they are nowhere on this

23    claim and this claim should be denied as a matter of law.

24    Maybe you'll hear Dr. Neal on that and you'll postpone a

25    decision until then.

1        But to return to what I think the headline is here,

2    the Rogers test, properly construed, properly applied, commands

3    a decision in this case.

4        THE COURT:  All right.  I'm glad to know that I have

5    no choice in this matter.

6        Let me hear nevertheless from plaintiff's counsel.

7        MR. SPRIGMAN:  Your Honor, I wanted to note one thing.

8    We have two other motions that we need to at least mention in

9    order to preserve them.

10        THE COURT:  OK.  What are they?

11        MR. SPRIGMAN:  First, your Honor, in the beginning of

12    this case, we made an argument that the Supreme Court's

13    decision in *Daystar* basically made the trademark claims in this

14    case not viable.

15        Why?  Because in that case, the Supreme Court faced a

16    situation where a World War II documentary, produced on

17    videotapes, the copyright had been allowed to lapse on that

18    documentary.  And the competitor took the documentary and kind

19    of edited it a bit and repackaged it and published that under a

20    different name without crediting the original producer.

21        The original producer brought a Lanham Act claim

22    saying this is passing off the documentary they produced as the

23    documentary produced by the competitor.  Justice Scalia, may he

24    rest in peace, said no.  In fact, the Lanham Act applies to

25    goods, and we do not understand goods to refer to intangibles

1            And this is great, because I was thinking I might be

2      bored this weekend, and now I'll have plenty to keep me busy.

3            MR. SPRIGMAN:  Glad to oblige.

4            MR. HARRIS:  Your Honor, one other very minor point.

5            When I was questioning Mr. Rothschild yesterday on

6      redirect, on several occasions I said defendant's exhibits

7      rather than plaintiff's exhibits.  I just misspoke.

8            THE COURT:  So you need to clarify that tomorrow on

9      the record, either in the presence of the jury or outside the

10     presence of the jury, I don't care, as long as we have it on

11     the record.

12            I'm so glad you raised that, because what you guys

13     need to do this weekend, aside from some minor things like

14     preparing your closing argument, is put together the full set

15     of exhibits and index, a joint index, you'll need to coordinate

16     on this.  And in the process of doing that, be sure you get the

17     right numbers of the exhibits.  Then we can put them on the

18     record, whatever clarifications are necessary.

19            MR. HARRIS:  Thank you, your Honor.

20            THE COURT:  OK.  Let's turn to the charge.

21            MR. WARSHAVSKY:  Your Honor, one point, too, is that

22     we have spoken, and I think both parties may stipulate to a few

23     additional exhibits that didn't make it in.

24            THE COURT:  That's fine.

25            OK.  With respect to --

1          Let me give a copy to our court reporter.  I know she

2    wants and autographed copy.  We'll just give her a plain copy

3    and a copy to my law clerk as well.

4          With respect to the general instructions which are

5    pretty much my normal Instructions One through Eight, any

6    objections or additions to those instructions?

7          I'll ask that first of plaintiff's counsel and then of

8    defense counsel.

9               MR. WARSHAVSKY:  No.  We had none, your Honor.

10              THE COURT:  OK.  Defense counsel?

11              MR. SPRIGMAN:  We have none, also, your Honor.

12              THE COURT:  Very good.

13         Now we get to more difficult matters.  With respect

14    to -- and the way I set this up, as you can see, I first said

15    that -- putting aside the First Amendment issues, we don't even

16    get there if they hasn't established confusion and so forth for

17    infringement, so we have that first.  Then we say, even if they

18    show that, we still lose if they haven't proven there is no

19    First Amendment.

20         I think I would reword the title of the 14th

21    instruction, which is now First Amendment defense, to First

22    Amendment protection.  I think that's to make clear that the

23    burden remains with the plaintiff at all times.

24         But now, taking these instructions one at a time, any

25    objection to instruction number nine from the plaintiffs?

1            And this assumes that we are dropping unfair

2    competition.

3            MR. WARSHAVSKY:  No objections in mine, your Honor.

4            THE COURT:  Any?

5            MR. SPRIGMAN:  None from us either.

6            THE COURT:  Very good.

7            Ten, same question.  Anything from plaintiff's

8    counsel?

9            MR. WARSHAVSKY:  Your Honor, from ten, the objection

10   which I think is resolvable is just about comporting the

11   language to the discussion you and Ms. Wilcox had to explain

12   the two marks --

13           THE COURT:  I'm sorry?

14           MR. WARSHAVSKY:  -- and the exhibits.

15           We're trying to do that here.

16           THE COURT:  See, this was really, again, part of why I

17   dropped the unfair competition.  I made clear to the jury, or

18   try to make clear to the jury in this instruction, that it's

19   both the word Birkin and the designs that are covered by the

20   registered trademark, which I point them to Exhibit 5 so they

21   can see what is covered.

22           So more generally, many of the witnesses have, in

23   fact, conflated those two on their testimony.  We had this

24   whole little back-and-forth earlier in the case about whether

25   NFT, MetaBirkins NFT meant technically just what was the

1   certificate of ownership or whether it also included the

2   underlying images.  And without objection from either side, I

3   instructed the jury that it was both.  One was technical, but

4   the other was also embraced.  That was through a question to

5   one of the witnesses.  I can't remember which one.

6            Anyway, before we get to defense counsel, anything

7   else?

8            MR. WARSHAVSKY:  Well, I think you would add the

9   exhibit that covers.  It says there is two exhibits.  I believe

10  it's 5 and 6.

11           THE COURT:  5 and 6.  I'm sorry?

12           MR. WARSHAVSKY:  I believe so.  I'm going to

13  double-check, because there were two exhibits.  And then I

14  think we would --

15           THE COURT:  OK.  Certainly if they were both

16  registrations and covered this, they should be included, I

17  agree.

18           MR. WARSHAVSKY:  I think we would say -- I think we

19  call, instead of the distinctive designs, we would call it the

20  Birkin handbag trade dress, just so it's not --

21           THE COURT:  I avoided the use of trade dress because I

22  think it's a nice legal term.  I didn't think the jury would

23  know necessarily what that meant.  That's why I used the term

24  designs.  If you want me to --

25           MR. WARSHAVSKY:  Maybe the shape of the bag or

1    configuration.  I just didn't want them to think it was the

2    designs on the bag --

3              THE COURT:  Oh, OK.

4              MR. WARSHAVSKY:  -- perhaps.

5              THE COURT:  Let me think of some synonym.

6              MR. WARSHAVSKY:  We could say the handbag, the Birkin

7    handbag configuration, or shape.

8              THE COURT:  How about the New York Post version,

9    ridiculously expensive?

10             MR. WARSHAVSKY:  I don't think we would like that,

11   your Honor, whether it's accurate or not.  I think we would say

12   because it's the shape and the features.

13             THE COURT:  All right.  I will work on some -- I'm

14   going to send you a revised verse of it Sunday night so you'll

15   have it before you have to give your closing arguments.  But

16   I'll work on some synonym there, more expressive.

17             Now let me hear from defense counsel.

18             MR. SPRIGMAN:  Your Honor, with respect to this

19   instruction, we have no particular issue with the instruction,

20   but I do think there is an issue here, which is the Hermès mark

21   has been mixed up in this.  And people do, on the jury, by now

22   associate the Hermès mark with the Birkin mark.  And it would

23   be helpful for the jury to know that the Hermès mark is not at

24   issue here because they've heard it many, many times.

25             THE COURT:  I'll think about that.  But here, of

you find that as to one or more of these claims, you still
can't find liability unless they survive the high bar of the
*Rogers* test.  What your colleague is arguing is we should
reverse the order, and I'm really thinking about that.

        MR. HARRIS:  Yes.

        THE COURT:  But all I'm saying so we can get through
tonight, assuming for the sake of argument I reverse the order,
do you have any other problems with instruction 11 which will
now become instruction 12, in effect?

        MR. SPRIGMAN:  We do.  When you reverse the order,
we'd like the *Polaroid* factors banished because it's not a
title versus title case.  But let's deal with that separately.

        But further on instruction 11, we have a couple of
issues.

        So first, in the second line -- well, first, starting
at the first, so we have context, you say:  Specifically,
Hermès asserts that Mr. Rothschild has infringed Hermès's
Birkin mark through his MetaBirkins NFT project.  Well, I want
to be specific there.  Because *Rogers* is about the use of the
mark.  So rephrase that to "has infringed Hermès's Birkin mark
through his use of the title MetaBirkins for the MetaBirkins
images."  That's the use.

        THE COURT:  That was similar really to what they were
saying; had to be changed in that sentence, it had to be
spelled out more fully and I will do that.

1           MR. SPRIGMAN:  So my colleague makes a point about

2      potential purchasers.  In the next sentence you say:  Is likely

3      to confuse consumers, it has to be potential purchasers of the

4      MetaBirkins NFT.

5           THE COURT:  I already agreed with him.

6           MR. SPRIGMAN:  Right.

7           And then, I'm going to go down further, you start

8      talking about the strength of the Hermès Birkin mark.  So this

9      illustrates a problem with the *Polaroid* factors.  So typically,

10     when it's an ordinary trademark case, it's handbag versus

11     handbag.  Yeah, a mark's strength tends to increase the

12     likelihood of confusion.  But when the accused product is an

13     image, is a picture, the mark's strength, which is associated

14     with its home, it's the handbag on which it sits, would be more

15     likely to inform a consumer that, in fact, the artwork is not

16     from Hermès, because Hermès hasn't been in the art business.

17     The Birkin trademark powerfully speaks of a thing made of

18     leather that costs five or six figures.  It doesn't speak of an

19     artwork.  And this is one of the reasons why *Polaroid*, applied

20     carelessly in a case like this, is dangerous.

21          So the strength points in the opposite direction here,

22     which is, you know, one of the reasons why we shouldn't be — at

23     least in the *Rogers* instruction — using it.  But if we're using

24     it in the general instruction, we should be careful about how

25     we use it.

1            So I would actually say that the stronger the mark,

2    the more distinctive it is, the less likely people are to

3    think -- because it's not used on a handbag, it's used on a

4    picture of a handbag.  And as McGreed would say, it's a

5    different thing, so we're in a different spot.

6            THE COURT:  All right.  Well, I hear you, but I

7    disagree.

8            MR. SPRIGMAN:  Okay.

9            THE COURT:  Anything else?

10           MR. SPRIGMAN:  Yes.

11           On the fifth factor, you say:  The more sophisticated

12   and careful the average consumer of a product is, the less

13   likely that consumers will be confused.  For expensive

14   products, there typically is a presumption that consumers are

15   sophisticated.  So for products more expensive than sneakers,

16   for example, these products are clearly in that category.  So

17   something about, you know, these are sophisticated consumers.

18           THE COURT:  Well, I think you're right about the

19   presumption and you're probably entitled to some language about

20   that.  So I'll add that.

21           MR. SPRIGMAN:  Okay.

22           On the sixth factor, you say starting on the third

23   line:  Consumers would associate his NFTs with Hermès so as to

24   profit from Hermès's reputation.  They've made some

25   interventions there.  But it's not to profit from their

1    reputation, it's to profit from confusion.  And that's a

2    different thing.

3            If, for example -- it's especially important in a case

4    like this where it's -- it may -- you know, from my perspective

5    it's entirely possible that consumers were attracted to the

6    MetaBirkins not because they were confused, but because they

7    valued the commentary.  So does he intend to profit from their

8    reputation?  Well, I guess, because he's commenting on a very

9    reputable article.  That is different from people being

10   confused about it.

11           You know, Andy Warhol didn't comment on Walmart soup,

12   he commented on Campbell's.  And Mason Rothschild didn't

13   comment on a handbag from, you know, Century 21, he commented

14   on a Birkin.

15           THE COURT:  Well, I think -- I'm not sure I agree with

16   adding language.  I think the way to do it is just take out the

17   words "so as to profit from Hermès's reputation."

18           MR. SPRIGMAN:  Okay.

19           Seventh -- the seventh factor.  This, again, is a

20   problem with the application of the *Polaroid* test in this

21   sphere.  All this evidence about bridging the gap, Hermès's

22   intent to enter the market for NFTs, if the MetaBirkins is a

23   First Amendment protected piece of noncommercial expression --

24   by "noncommercial," that doesn't mean not sold for money.  As

25   you know, Judge, that just means something other than a purely

```
 1      commercial form of speech.  Then Hermès has no right to oust --

 2      no presumptive right to oust someone from a speech market.  And

 3      that's what the seventh factor would purport to allow Hermès to

 4      do.

 5              There's authority that Hermès cannot oust -- not

 6      Hermès.  It's authority that trademark owner in a case

 7      involving noncommercial speech, First Amendment protected

 8      speech, has no right to bridge the gap in a way that would oust

 9      someone from a speech market.  So this factor should just

10      disappear.

11              THE COURT:  All right.  So let me hear from

12      plaintiffs' counsel.  Both sides are agreed they would need to

13      spell out the first sentence on instruction number 11 a little

14      bit more fully.  I will do that.

15              The other changes — and then I'll hear from

16      plaintiffs' counsel whether they object to any of those changes

17      — is first to add the word "potential" before "consumers" in

18      the second sentence.  Secondly, in the fifth factor, to add

19      something along the lines of "There is a presumption that

20      anyone who can buy a Birkin bag is sophisticated."  I mean,

21      that's not the right word, "presumption," but that's the gist

22      of it.  And therefore, less likely to be confused.

23              MR. SPRIGMAN:  Buy an NFT.

24              The only amendment, I would say buy an NFT, your

25      Honor, because the Birkin bag is, again, confusion among Birkin
```