# Exhibit 12

N1VsHER1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   HERMÈS INTERNATIONAL. et al.,

4                   Plaintiffs,

5             v.                        22 Civ. 384 (JSR)

6   MASON ROTHSCHILD,

7                   Defendant.

8   ------------------------------x
                                       New York, N.Y.
9                                      January 31, 2023
                                       9:30 a.m.
10
    Before:
11
                        HON. JED S. RAKOFF,
12
                                       District Judge
13                                     –and a Jury–

14

15                      APPEARANCES

16  BAKER & HOSTETLER LLP
         Attorneys for Plaintiffs
17  BY:  DEBORAH A. WILCOX
         OREN J. WARSHAVSKY
18       GERALD J. FERGUSON

19  HARRIS ST. LAURENT & WECHSCLER LLP
         Attorneys for Defendant
20  BY:  ADAM B. OPPENHEIM
         JONATHAN A. HARRIS
21
    LEX LUMINA PLLC
22       Attorneys for Defendant
    BY:  RHETT O. MILLSAPS, II
23

24

25

1    raised this, I need to think about it more.  I'm not sure that

2    that means that they can't argue that either there was no

3    artistic expression or that it was so trivial that it doesn't

4    overcome the alleged confusion.  So I'm not yet sure whether

5    that's a ground for excluding that witness.

6          When we get to the final charge to the jury, it's

7    possible that I may -- I'm certainly going to say the Rogers

8    test is the applicable test.  That is for sure.  But I might

9    add that if you find, however, that there was little or no

10   artistic expression involved from a standpoint of a consumer,

11   as far as something you can take account of in applying the

12   test, because it's a balancing test.

13         I mean this is, I think, something everyone agrees on.

14   Trademark law is about consumer confusion.  Totally different

15   from copyright law.  It's not a question of you're preserving

16   your monopoly over your creation, whereas artistic expression

17   is a matter of constitutional right.  So that doesn't mean that

18   there can't be a trademark claim where there is artistic

19   expression involved.  It's not an automatic total defense, but

20   what, as I indicated even in the preliminary instruction that I

21   gave to the jury, the plaintiff has to show in addition to

22   trademark infringement or dilution or whatever, has to show

23   that there was, either intentional or otherwise, the situation

24   was set up in such a way that a consumer would necessarily

25   think this was not artistic expression, but a product of Hermès

1    or maybe's artistic expression.

2            We'll work on the exact wording of that later.  But

3    I'm not yet sure why that doesn't mean that they can't

4    introduce someone who says this is perceived by the consumer as

5    having little or no artistic expression.  I mean, if that is

6    what that expert says.

7            MR. MILLSAPS:  Your Honor, that expert actually

8    testified at his deposition that he can't tell you what is or

9    is not art in the way that the world understands art.

10           THE COURT:  Oh, well, then he joins all the rest of

11   us.  No, but that's relevant.

12           Let me hear from plaintiff's counsel.

13           MR. WARSHAVSKY:  Your Honor, nothing has changed.

14   This motion should have been made and it should be briefed.

15   Because the problem is, we disagree with how Mr. Millsaps just

16   described this expert.  This expert is actually explaining that

17   the reason for the sale of the MetaBirkins was because, and the

18   reason they fetched the prices they did, was because they were

19   assumed to be branded NFTs.  He was explaining what that means.

20   That has nothing to do with art or not art.  So this expert is

21   not --

22           (Continued on next page)

23

24

25

N1vnher2

<table>
<tr><td>1</td><td>THE COURT:  Okay.  What you are saying is he's saying</td></tr>
</table>

1           THE COURT:  Okay.  What you are saying is he's saying

2     the way this was set up, the consumer or many consumers would

3     believe that they were purchasing whatever it was something

4     produced by Hermès?

5           MR. WARSHAVSKY:  Or a brand.  Because trademark you

6     have to think it comes from a source.  So whether it's

7     associated with Hermès, from Hermès, from somebody who is

8     associated with Birkin, they don't necessarily know that Hermès

9     makes Birkins, but they think it is a Birkin, it could be any

10    of those things.  I think the expert is going to drill down to

11    the whole idea.  When you talk about explicit misleadingness or

12    intent, sometimes we have an insight, but we usually do it

13    through indirect evidence.

14          THE COURT:  All right.

15          Let me ask you this:  When are we getting to this

16    expert?

17          MR. WARSHAVSKY:  The earliest would be tomorrow.

18          THE COURT:  All right.  What I think we should do is

19    have this expert along with counsel come in at 9:00 tomorrow,

20    and I will question the expert and get a better idea of exactly

21    what he is saying and not saying and what he can say and can't

22    say and I will make a ruling before he takes the stand.

23          MR. WARSHAVSKY:  Your Honor, just one point?

24          THE COURT:  Yes.

25          MR. WARSHAVSKY:  This is the expert who is appearing

N1vnher2                    Martin - Direct

1    Q.   Go ahead.

2    A.   Because of the transition from the car, which at that

3    time -- from the horse, sorry, which at that time was our main

4    client, we needed to switch to the car, so we started

5    manufacturing luggages, handbags.  And after that step by step

6    we expanded our activities to other products like jewelry

7    products, silk products.

8    Q.   How would you describe Hermès as a company today?

9    A.   I would say it's a house of creation and craftsmanship

10   focused on the idea of manufacturing and creating very

11   high-quality, lifestyle products.

12   Q.   What is the value of intellectual property to Hermès?

13   A.   We are a house of creation, so intellectual property rights

14   are very important for Hermès.

15   Q.   How does Hermès value its trademarks generally?

16   A.   Of course, we consider it's one of our main assets.

17   Q.   Does Hermès have a position on the value of the Birkin

18   trademark?

19   A.   The Birkin trademark is used to identify our best-selling

20   products.  So I would say after the Hermès trademark, it's

21   probably our most important trademark.

22   Q.   Does Hermès place a monetary value on the Birkin trademark?

23   A.   No.

24   Q.   Why not?

25   A.   Because we are never to have a specific figure.  For us it

N1vnher2                        Martin - Direct

1    is invaluable.

2    Q.  I'm sorry.  Did you say "unvaluable" or "invaluable"?

3    A.  Invaluable.  Sorry, sorry.

4    Q.  How many product does Hermès offer?

5    A.  I would say thousands.

6    Q.  And where do the Birkin products rate in terms of how they

7    sell?

8    A.  Where are they sold you mean?

9    Q.  No.

10   A.  Sorry.

11   Q.  No.  Not geographically.  Where do Birkin bags rank --

12   A.  Ah, sorry.

13   Q.  -- in the scheme of the product offered by Hermès?

14   A.  As I said, for us it's our best selling product.

15   Q.  Can you tell us a little bit about the customer demand for

16   the Birkin?

17   A.  It's very high.

18   Q.  What do you mean by that?

19   A.  I mean that it's so high that we are unable to satisfy all

20   the demand.

21   Q.  Does Hermès have a position on why the Birkin bag has been

22   successful?

23   A.  Of course, because of its design, because of its -- the raw

24   material that we use, which is a very high quality, because of

25   the craftsmanship that is used, the know-how that is used to

N1vnher2                          Martin - Direct

1   manufacture the same, and because it became like a status

2   symbol.

3   Q.  Does Hermès have an idea about how -- let me ask it

4   differently.  Does Hermès know how customers use their Birkin

5   bags?

6   A.  I mean, they are various ways that you use a bag.  Of

7   course, first it's a bag, so it's something that you can wear

8   you can put your items in it.  I think as I mentioned earlier,

9   the Birkin bag is more than a bag.  It is something that you

10  own, that you are proud to show, that you are engaged with, so

11  the way of living is also to own the same.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. WARSHAVSKY:

2   Q.   And yesterday we saw the testimony of Robert Chavez.

3        Do you remember that?

4   A.   Yes.

5   Q.   Did you hear Mr. Chavez talk about the wish list?

6   A.   Yes.

7   Q.   Does Hermès keep track of how many wish lists there are?

8   A.   No.

9   Q.   Can Hermès currently meet demand for the Birkin trademark?

10  A.   No.

11  Q.   Does Hermès create that scarcity?

12  A.   No.

13  Q.   So what explains that scarcity?

14  A.   The first point is the raw material we use.  We only use

15  very high-quality raw material.  And unfortunately we are

16  unable to find sufficient raw material to manufacture more

17  bags.

18       The second is linked to the knowhow that is requested

19  in order to manufacture a handbag.  And unfortunately, despite

20  the fact that we tried to open new manufacturing unit and to

21  train new craftsman, we are unable to have sufficient

22  experience, experienced craftsman to manufacture all the bags.

23  Q.   Does Hermès consider the Birkin handbag itself to be

24  famous?

25  A.   Yes.

N1VsHER3                          Martin - Direct

1    Q.   Why is that?

2    A.   Because it's our top-selling product, our most iconic bag,

3    and our bag, the product division where we the fame of Hermès

4    is more important.

5    Q.   Does Hermès consider the Birkin trademark to be a famous

6    trademark?

7    A.   Yes.

8    Q.   Why is that?

9    A.   Because it identifies our most iconic products and because

10   it is used in all the press and media to describe one of the

11   most iconic-owned bag.

12   Q.   I would like to now show you a few Birkin bags.

13              MR. WARSHAVSKY:  Your Honor, may I approach the

14   witness with the handbags?

15              THE COURT:  Yes.

16   Q.   So let's start with what's been marked as Exhibit 26, which

17   is the black Birkin handbag.  Can you maybe hold that up.

18              Is that in fact a Birkin handbag?

19   A.   Yes.

20              MR. WARSHAVSKY:  Your Honor, we would offer Exhibit 26

21   into evidence.

22              MR. MILLSAPS:  No objection, your Honor.

23              THE COURT:  Received.

24              (Plaintiff's Exhibit 26 received in evidence)

25   Q.   While you're holding the handbag, can you show us some of

1    Sorry.

2              So you have this very specific design, and it comes

3    from a scarf that has been designed by two artists, Octave

4    Narsal and Theo de Getz.

5    Q.  Are those two artists employees of Hermès?

6    A.  No, they are not.

7    Q.  And yesterday Mr. Chavez spoke about the typical time for a

8    Birkin bag.

9              Did you hear that?  Did you hear when he talked about

10   that?

11   A.  The what?  Sorry.

12   Q.  The typical time it takes a craftsman to make a Birkin bag?

13   A.  Yes.  Sorry.

14   Q.  OK.  And he spoke about generally being 18 to 24 hours.

15             How long does it take to make a bag like the Faubourg

16   tropical?

17   A.  I don't have the exact numbers, but Narsal and de Getz that

18   I referred to, because the embroidery takes a long time, I

19   don't have the exact number.

20   Q.  So you talked a little about the leather for the Birkin

21   bags.

22             From where does Hermès source the leather for its

23   Birkin bags?

24   A.  The large majority, I think it is 96 percent, of our

25   leather is actually a buyback from the food industry.

```
1    Q.  What do you mean by that?
2    A.  It means it's waste that we collect and that we give a
3    second life through -- through the leather and the use we make
4    of the same.
5    Q.  And that's about how much, what percentage?
6    A.  96.
7    Q.  I think you spoke a little bit about media coverage.  I
8    just want to go back over that.
9            Does the Birkin handbag get media coverage?
10   A.  Yes.
11   Q.  I can move those bags.  We don't have to...
12           MR. WARSHAVSKY:  Your Honor, is it OK if Ms. Damian
13   moves the bags?
14           THE COURT:  Yes.
15           Did you want to circulate the bags to the jury?
16           MR. WARSHAVSKY:  If they would like to see them, sure.
17           THE COURT:  Well, I don't know what is in their head,
18   but if I were them, I would like to see them.
19           MR. WARSHAVSKY:  OK.
20           THE COURT:  Why don't we circulate them to the jury.
21   Recognizing, of course, that there is no charge for just
22   looking.
23           (Pause)
24           All right.
25           MR. WARSHAVSKY:  Thank you.
```

1           I apologize.  I lost my place a little bit.  I'm just

2      going to -- I apologize if I asked a question a second time.

3      BY MR. WARSHAVSKY:

4      Q.   How often does the Birkin handbag get media coverage?

5      A.   Constantly.

6      Q.   Does Hermès pay for that media coverage?

7      A.   No.

8      Q.   Is unsolicited media coverage important to Hermès?

9      A.   Of course.

10     Q.   Why?

11     A.   Because it's genuine coverage, meaning we don't pay for the

12     same.

13     Q.   Why would that be important or valuable to Hermès?

14     A.   Because it shows that the magazines are interested in our

15     products and that they -- they -- they are placing the same in

16     their articles without us paying for that.

17     Q.   And now we've looked at three Birkin handbags.

18          Have any of those three received press coverage?

19     A.   Yes.

20     Q.   We would like to show the witness, but not the jury,

21     Exhibit 16.  If you can look in the book.

22          Are you familiar with that document?

23     A.   Yes.

24     Q.   Did Hermès compile that document?

25     A.   Yes.

N1VsHER3                          Martin - Direct

1  Q.  Do you know the specific plans?

2  A.  No.

3  Q.  Who would?

4  A.  Ambre-Elise Binoche.

5  Q.  And she is scheduled to testify here at this trial?

6  A.  Yes.

7  Q.  Does Hermès have plans with respect to NFTs?

8  A.  Yes.

9  Q.  Can you briefly describe those plans?

10 A.  Yes.  As I said, I have a general view of the same.  There

11 is one which is related to what we call a digital twin.  The

12 idea being to have attached to a physical good an NFT which

13 would be the twin of the physical good, which in the NFT, you

14 could have all the detail of the bag.  So you can track the

15 same and secure the same to combat fraud.

16         That's one of the project I'm aware of, but I know we

17 have various other project.  I have seen NFT being used to

18 attend events.  So I think it's called attendance NFT.  So when

19 you attend an event, you can keep with you an NFT.  And I think

20 we showed one example in the opening.

21         And I also know that we are considering using NFT

22 associated to a physical good in order to enhance the

23 experience of our customers.  You can imagine, for instance,

24 you buy our scarfs and your NFT gives you access to a digital

25 file where your scarf is moving and you find the story and the

1    characters are moving.

2              That's the kind of project I'm aware of.

3    Q.  Do you know the specifics of those plans?

4    A.  No.

5    Q.  Who would?

6    A.  Maximilien Moulin.

7    Q.  And Mr. Moulin is an Hermès employee?

8    A.  Yes.

9    Q.  And he'll be here to testify as well?

10   A.  Yes.

11   Q.  And do you know any of the specifics of the developments of

12   those plans right now either for the NFTs or metaverse?

13   A.  No.

14   Q.  Is Hermès doing anything to protect its marks in the

15   metaverse or for NFTs?

16             Let me ask that question better.  Do you know whether

17   Hermès is doing anything to protect its trademarks either for

18   use in the metaverse or with respect to NFTs?

19   A.  Yes.

20   Q.  What is Hermès doing?

21   A.  I mentioned earlier that our trademarks are our main

22   assets.  So of course it is important for us to protect the

23   same on the digital web, so we applied for registration of our

24   marks to convert digital goods in order to avoid any third

25   party to try to register the same.

1    Q.  Does Hermès have an understanding of whether other fashion

2    brands have entered the metaverse?

3    A.  Yes.

4    Q.  Can you tell me what other brands Hermès is aware of

5    participating in the metaverse?

6    A.  I don't have of the specific projects, but I know most of

7    the luxury brands actually entered -- have a plan in relation

8    to NFT.  Gucci is probably the most -- one of the most famous.

9    Louis Vuitton did something to.  Prada, Balenciaga, and you

10   have other brands like Nike, Adidas.

11   Q.  Does Hermès look to what other brands are doing with either

12   luxury -- I'm sorry -- with either the metaverse or NFTs?

13   A.  Yes.

14   Q.  Why is that?

15   A.  I mean, some say that the Web3, the blockchain, the NFT,

16   and the metaverse is part of the future of the luxury industry.

17   We don't know, and only time will tell.  But as I said, we have

18   a very creative innovative company, thanks to the creativity

19   that we have been in this condition from the house to the car.

20   I'm not necessarily comparing the transition from the house to

21   the car as a transition that we face today.  But for sure, the

22   Web3, and all I mention, NFT blockchain is part of our future

23   and it's important for us to look at it and to protect our

24   brand in this universe.

25   Q.  Do you know whether other fashion brands have filed

1   trademark applications for NFTs?

2   A.  Yes.

3   Q.  How do you know?

4   A.  Because, as I mentioned earlier, we are looking at what the

5   industry is doing in this new territory.

6   Q.  Does that include in the United States?

7   A.  Yes.

8   Q.  Are you aware of whether other -- are you aware of whether

9   other fashion brands have faced a situation where third parties

10  have filed trademark applications for their trademarks?

11          MR. MILLSAPS:  Objection, foundation relevance, then

12  hearsay.

13          THE COURT:  Well, clearly hearsay.

14          Sustained.

15  Q.  When did you first learn about the MetaBirkins NFTs?

16  A.  It was on November 30, 2021.

17  Q.  How did you learn about the MetaBirkins NFTs?

18  A.  I received a call.

19  Q.  From whom?

20  A.  It was a third-party individual.

21  Q.  Do you remember that individual's name?

22  A.  Yes.

23  Q.  What's that individual's name?

24  A.  Alexander Torkaman.

25  Q.  Do you know who Mr. Torkaman is?

1              (Plaintiff's Exhibit 20 received in evidence)

2   BY MR. WARSHAVSKY:

3   Q.  What is this document, if you know?

4   A.  It's a letter sent by our lawyer to Mr. Rothschild.

5              MR. WARSHAVSKY:  If we could turn to page 2.

6   BY MR. WARSHAVSKY:

7   Q.  Do you have an understanding of what Hermès was demanding

8   Mr. Rothschild do?

9   A.  Yes.

10  Q.  What was that?

11  A.  We were asking him to stop advertising, promoting, and

12  selling the Birkin NFT.

13  Q.  Did Mr. Rothschild stop using the NFTs you were concerned

14  about?

15  A.  No.

16  Q.  By that I mean did he stop promoting those NFTs?

17  A.  No.

18  Q.  What happened after you sent this letter?

19  A.  Despite the statement that we made at the Financial Times,

20  we had knowledge of actual cases of confusion in the media.

21             MR. MILLSAPS:  Objection, your Honor.  We would move

22  to strike the witness's testimony on the basis of hearsay.

23             THE COURT:  Sustained.  The jury will disregard the

24  last answer.

25             MR. WARSHAVSKY:  Okay.

N1vnher4                         Martin – Direct

1   BY MR. WARSHAVSKY:

2   Q.  Did you see other articles about the MetaBirkins?

3   A.  Yes.

4   Q.  Was there -- just yes or no so counsel can object -- was

5   there anything about those articles that concerned you?

6   A.  Yes.

7   Q.  Okay.  Without characterizing what the writer may have

8   thought, what about those articles concerned you?

9         MR. MILLSAPS:  Objection.

10        THE COURT:  Well, I think if phrased -- let me ask you

11  this:  As a result of viewing those articles, did you or Hermès

12  take further action?

13        THE WITNESS:  From one of them, yes.

14        THE COURT:  All right.

15        What further action did you take?

16        THE WITNESS:  We asked the corresponding media to

17  correct the statement that was made in the article.

18        THE COURT:  I think that then is admissible.  What was

19  the statement made in the article?

20        THE WITNESS:  The article was saying that the

21  MetaBirkin was made by or in partnership with Hermès.

22        THE COURT:  All right.

23        Go ahead, counsel.

24  BY MR. WARSHAVSKY:

25  Q.  Where was that article published?

1    A.   In Challenges.

2    Q.   Did Hermès interact with Mr. Rothschild before sending the

3    cease and desist letter?

4    A.   No.

5    Q.   Has Hermès interacted with Mr. Rothschild since he sent

6    that letter, since Hermès sent that letter?

7    A.   No.

8    Q.   Did Hermès ever publicize the cease and desist letter it

9    sent to Mr. Rothschild?

10   A.   No.

11   Q.   Did Hermès tell anybody in the media about the cease and

12   desist letter it sent Mr. Rothschild?

13   A.   Apart from asking the Challenge Media to correct the

14   article, no.

15   Q.   My question was whether Hermès ever sent the cease and

16   desist letter to the media?

17   A.   No.   Sorry.

18   Q.   Has Hermès been contacted to comment on this case?

19   A.   Yes.

20   Q.   Has Hermès ever commented on this case?

21   A.   No.

22   Q.   Yesterday during openings both sides referred to and I

23   think Mr. Millsaps showed a video, something called "The Baby

24   Birkin."

25             Have you ever seen that before?

N1vnher4                         Martin - Direct

1    A.  Yes.

2              MR. WARSHAVSKY:  We would move to admit the Baby

3    Birkin exhibit and show the video.

4              MR. MILLSAPS:  No objection.

5              THE COURT:  Received.

6              MR. WARSHAVSKY:  I think it's Exhibit 82.

7              (Plaintiff's Exhibit 82 received in evidence)

8              (video played)

9    BY MR. WARSHAVSKY:

10   Q.  When is the first time you saw that video?

11   A.  I think it was in June 2021.

12   Q.  Did Hermès send a cease and desist letter or otherwise

13   object to this video?

14   A.  No.

15   Q.  Why not?

16   A.  Because we looked at the surrounding circumstances of this

17   particular NFT and we considered that there was no risk of

18   confusion and no risk of brand dilution.

19   Q.  Is it common for Hermès to file lawsuits?

20   A.  No.

21   Q.  You have worked at Hermès for nearly 20 years, right?

22   A.  Yes.

23   Q.  In the legal department, right?  Always in the legal

24   department?

25   A.  Yes.

1   Q.  Why?

2   A.  Because I've been in this space for a while doing my own

3   art, visiting art galleries.  Today we sell art.  It's always

4   been a main staple in my life.

5   Q.  You say it's a main staple of your life.

6         How old are you, Mr. Rothschild?

7   A.  I'm 28.

8   Q.  And how about fashion, is that important to you?

9   A.  Yes.

10   Q.  All right.  Have you been involved in fashion?

11   A.  Yes.  Since I could remember, yeah.

12   Q.  And in your experience, Mr. Rothschild, do art and fashion

13   intersect?

14   A.  Definitely.

15   Q.  And how?

16   A.  I do believe fashion is a form of art, especially in the

17   field that I'm in right now.

18   Q.  And, Mr. Rothschild, what was your intent in doing the

19   MetaBirkins project?

20   A.  Um, the intent was, one, to create an art project, and two,

21   it was to see if this artistic kind of project could serve as

22   an experiment, you know, to, one, speak on the fur-free

23   initiative of fashion at the time which was going on

24   immediately after that, which was the inspiration for

25   MetaBirkins at first, and to see if people could create that

 1   same value.

 2   Q.  And did you hope to make money from the MetaBirkins

 3   project?

 4   A.  Yes.

 5   Q.  And did you promote the MetaBirkins project?

 6   A.  Yes, I did.

 7   Q.  Did you ever seek to mislead anyone to believe that the

 8   MetaBirkins came from Hermès?

 9              MR. WARSHAVSKY:  Objection.

10              THE COURT:  Overruled.

11   A.  Um, no.

12   Q.  Who did you ascribe the MetaBirkins project to,

13   Mr. Rothschild?

14   A.  Just myself.

15   Q.  Was that important to you?

16   A.  Yes.

17   Q.  And why?

18   A.  Since I came up with the idea and created the art, I feel

19   like it was important for me to tell people that it was me

20   behind it.

21   Q.  Are you aware of any purchaser of a MetaBirkins being

22   confused and thinking that the MetaBirkins came from Hermès?

23              MR. WARSHAVSKY:  Objection.

24              Actually, withdrawn.

25   A.  Not that I'm aware of.

1          THE COURT:  Received.

2          (Defendant's Exhibit 581 received in evidence)

3          MR. HARRIS:  Ashley, if you could go ahead and show it

4   to the jury.

5          Thank you.

6   BY MR. HARRIS:

7   Q.  I'm sorry.  You were saying this is the website for

8   Terminal 27?

9   A.  Correct.

10  Q.  And up at the top you can see it says "Shop, Events,

11  Gallery, Editorial."  Right?

12  A.  Correct.

13  Q.  We were talking before about a concept store.  Would it be

14  fair to describe Terminal 27 as a concept store?

15  A.  Yes.

16  Q.  What types of things -- by the way, when did Terminal 27

17  open?

18  A.  It opened in March 2021.

19  Q.  What types of things does -- sorry.  What types of things

20  does Terminal 27 do?

21  A.  We sell clothes, both emerging designers and luxury

22  designers.  We sell art, both digital and physical.  And we

23  throw some of the best parties in LA.

24  Q.  When you sell art, are there artists that have had shows at

25  Terminal 27?

1    A.  Yeah, a few.

2    Q.  And who would that include?

3    A.  Vera Colombo, Noah Dillon, and Lucas Abat who did Hot Mess,

4    and numerous others who have done stuff, like Korean designers

5    and everything.  We did 40 events last year, and I would say

6    half were artists.

7    Q.  How much dollars' worth of art do you think you sold since

8    Terminal 27 opened?

9    A.  Physical art, about a half million.  Digital art about

10   $250,000.

11   Q.  Excuse me?

12   A.  $250,000 in digital art.

13   Q.  What is your role at Terminal 27?

14   A.  I'm the CMO.

15   Q.  You are the what?

16   A.  Chief marketing officer.

17   Q.  What is Ericka's role?

18   A.  She's the CEO.

19   Q.  And did Terminal 27, does Terminal 27 receive press

20   coverage?

21   A.  Yes.

22        MR. HARRIS:  Ashley, if you could please show to the

23   witness and counsel and the Court Defendant's Exhibit 609.

24   BY MR. HARRIS:

25   Q.  Mr. Rothschild, did there come a time when Terminal 27 was