# Exhibit 19

N21nher1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    HERMÈS INTERNATIONAL, et al.,

 4                   Plaintiffs,

 5            v.                              22 Civ. 384 (JSR)

 6    MASON ROTHSCHILD,

 7                   Defendant.

 8    ------------------------------x
                                           New York, N.Y.
 9                                         February 1, 2023
                                           9:30 a.m.
10
      Before:
11
                          HON. JED S. RAKOFF,
12
                                           District Judge
13                                         -and a Jury-

14

15                        APPEARANCES

16    BAKER & HOSTETLER LLP
           Attorneys for Plaintiffs
17    BY:  DEBORAH A. WILCOX
           OREN J. WARSHAVSKY
18         GERALD J. FERGUSON

19    HARRIS ST. LAURENT & WECHSCLER LLP
           Attorneys for Defendant
20    BY:  ADAM B. OPPENHEIM
           JONATHAN A. HARRIS
21
      LEX LUMINA PLLC
22         Attorneys for Defendant
      BY:  RHETT O. MILLSAPS, II
23

24

25
```

1              (Jury present)

2    SONNY ESTIVAL, resumed.

3              THE COURT:  Please be seated.

4              Good morning, ladies and gentlemen.

5              Thank you very much for your promptness and we are

6    ready to proceed.

7              Counsel.

8              MR. HARRIS:  Thank you, your Honor.

9    DIRECT EXAMINATION (Continued)

10   BY MR. HARRIS:

11   Q.  Good morning, Mr. Rothschild.

12   A.  Good morning.

13   Q.  Mr. Rothschild, yesterday –– I just want to clarify one

14   thing.  I asked you a question about Virgil Abloh, and you said

15   he recently had a show at the Whitney Museum.

16   A.  I made a mistake.  It was actually the Brooklyn museum.

17   Q.  That was a show of his artistic works?

18   A.  Yes, as well as some of his work in, like, designing

19   fashion, architecture as well.

20             THE COURT:  Lean that microphone down a little bit.

21   Q.  When we left off yesterday, Mr. Rothschild, we were

22   discussing your "Do Not Sit" project.

23   A.  Yes.

24             MR. HARRIS:  Ashley, could you please put back up

25   Exhibit 523 in evidence.

N21nher1                         Estival - Direct

1   BY MR. HARRIS:

2   Q.  Mr. Rothschild, when we left off yesterday, I was asking

3   you if you created these images by yourself.

4   A.  No.

5   Q.  How were the images created?

6   A.  I'm sorry.  I couldn't hear you.

7   Q.  Sure.  How were the images created?

8   A.  The images were created in a 3D program called Houdini by

9   my assistant, Mark.

10  Q.  What is mark's name?

11  A.  Mark Berden.

12  Q.  Does he work for you or is he a freelancer?

13  A.  A freelancer.

14  Q.  How did you meet Mr. Berden?

15  A.  I met Mark through, like, a freelance website.  He had a

16  portfolio of other 3D works that he did.

17  Q.  What was Mr. Burden's role in the creation of the images?

18  A.  Pretty much to simulate these 3D images at my direction.

19  So I would come up with the concept, the subject matter,

20  composition, materials used, and he could kind of execute on

21  those.

22  Q.  In your experience does, hiring others to help execute an

23  art project something that artists sometimes do?

24  A.  Yes.  I mean, to my knowledge, my favorite artists

25  personally all have, like, massive teams.

1    Photoshop, where you just like overlay something.  Every single

2    one of those, like, furs is the color it is a supposed to be.

3    The way we sold it, you know, utilizing NFTs which was kind of

4    new and innovative technology at the time we utilized it to

5    sell art and it was just a vehicle for it.

6           THE COURT:  So now I think, forgive me, you are a

7    little too close to the microphone.  Just a little bit back.

8    That's good.

9           MR. HARRIS:  Can we -- we are going to put up, please,

10   Ashley, Exhibit 227, which is in evidence.

11   BY MR. HARRIS:

12   Q.  That, Mr. Rothschild, is the MetaBirkins website, is that

13   right?

14   A.  Correct.

15   Q.  I believe there is a date on this, which I may not be able

16   to see because my screen is a little fuzzy.  I see, "Access

17   December 1, 2021."

18          Do you see that up in the upper right-hand corner?

19   A.  Yes.

20   Q.  Okay.  When were the MetaBirkins themselves released?

21   A.  Like for sale?  Like, when you could buy them was December

22   2.

23   Q.  Okay.  So this is up before the MetaBirkins are actually

24   for sale?

25   A.  Yeah.

1   Q.  This is metabirkin.com, is that right?

2   A.  Yeah, metabirkins.com.

3   Q.  Is that a website that you set up?

4   A.  Yes.  I own the domain and I designed the website.

5   Q.  And you registered the domain?

6   A.  Correct.

7   Q.  Is there anything on this page -- again, it is just a

8   little blurry, but is there anything on this page indicating

9   that you are the creator of MetaBirkins?

10  A.  Yes.  It's says creator Mason Rothschild.

11  Q.  Where do I find that?

12  A.  The second paragraph it says creator Mason Rothschild began

13  working on MetaBirkins shortly after the success of Baby

14  Birkin.

15  Q.  And is there anything on this web page indicating that

16  Hermès was the source of the MetaBirkins?

17  A.  Not to me.  I said it was a tribute to Hermès, but never

18  said it was a collaborative artwork.

19  Q.  Were you interested in taking credit for the MetaBirkins

20  project?

21  A.  Yes, for sure.

22  Q.  Does this web page show -- by the way have you ever used

23  metabirkins.com for anything other than promoting the

24  MetaBirkins?

25  A.  No.

1    Q.  Have you ever offered to sell metabirkins.com to anyone?

2    A.  No.

3    Q.  Now, were you also previewing the images --

4          MR. HARRIS:  By the way could you put that back up for

5    one second, please, Ashley.

6          Thank you.

7          If we could see the one that's broader, if we could

8    scroll down a little.

9    BY MR. HARRIS:

10   Q.  Was this a preview of all 100 images?

11   A.  No, these are just kind of my favorites.

12   Q.  So if you take a look at these, let's take a look -- could

13   you -- is there any one of these that you would care to explain

14   to the jury what your thought process was behind it.

15   A.  The second row, the second one next to the really bright

16   colorful one is actually a Bob Ross inspired one.

17   Q.  Okay.  That's the second from the right?

18   A.  Yeah.  The second from the right.

19   Q.  The second from the right.  Who is Bob Ross?

20   A.  Bob Ross is a painter.  He's known for like the happy

21   little clouds and stuff like that, has the big afro.

22   Q.  Now, did you review these images at other places?

23   A.  Yes.  On Discord, which was where the majority of

24   communications went on for MetaBirkins.

25   Q.  What is Discord?

1    Q.  When you are creating your white list, you also make an

2    effort to make sure or try to get folks who you might think

3    would be important collectors or influencers on the white list?

4    A.  Sure.  Just like traditional art, you would want your art

5    to go to the best galleries or the best sculptors.

6              MR. WARSHAVSKY:  Objection, your Honor.

7              THE COURT:  Well, sustained as to form.

8    BY MR. HARRIS:

9    Q.  Do you make an effort, when you are creating the white

10   list, do you make an effort to get anybody on that white list?

11   A.  Yes.  I try to get it in the hands of good collectors.

12   Q.  Why would that be?

13   A.  Good collectors have kind of a pedigree for collecting in

14   this space.  So people who are known collectors of different

15   artworks, you know, utilizing NFTs, friends and family and

16   celebrities who have a big influence on people.

17   Q.  And when the folks purchased the MetaBirkin, they then

18   received -- what did they actually receive?

19   A.  Sorry.  Can you repeat the question?

20   Q.  Sure.  They are on the white list, you are not sure which

21   one you are going receive, it's randomized, and then on what

22   day did you release the MetaBirkins?

23   A.  So, I believe it was a day or two after where they were

24   revealed.  So they would wait -- everybody had a shroud over

25   it, and then everybody knew when the reveal date was.  They

1   would check, we would push the randomization, like, script, and

2   it randomizes who gets what and you refresh your, like, page on

3   like OpenSea or something like that, and then you would see

4   what you got.

5   Q.  Then you would have it?

6   A.  Yeah.  Then you would have it.

7   Q.  How much did you sell the MetaBirkins for when they were

8   minting?

9   A.   .1 Ethereum, which is the equivalent of like $450.

10  Q.  At the time?

11  A.  At the time.

12  Q.  The price of ether fluctuates?

13  A.  Yes, significantly.

14  Q.  Do you believe you could have sold them for more?

15  A.  For sure.  The demand was crazy, but that was part of the

16  experiment.

17  Q.  When you say that was part of the experiment, what do you

18  mean by that?

19  A.  I mean, Hermès Birkin bags are known to be sold for

20  $12,000, you know, minimum of $12,000, like they said.  So I

21  said, let me see if I can charge, like, almost nothing for

22  them, like $450, and see what the people do with them and see

23  what they value, is it the image or, like, the product.

24  Q.  And did the MetaBirkins -- when you minted the MetaBirkins,

25  did you keep any for yourself?

1   with you on social media.  So I ran a contest on Instagram and

2   Twitter, and the name was suggested.

3   Q.  Was this before or after they were released?

4   A.  Before.

5   Q.  Can I please put up what's for identification Defendant's

6   Exhibit 613.

7           Can you briefly describe for the court what this is?

8   A.  Um, it's an Instagram post of me, I think, on October 29,

9   2021, asking -- or saying the collection needs a name, share

10  this post, and comment your suggestion.

11  Q.  And is this your personal Instagram or the MetaBirkins

12  Instagram?

13  A.  This is mine, because it didn't have a name yet.

14  Q.  OK.  Got it.

15          MetaBirkins hadn't been created yet?

16  A.  No.

17  Q.  OK.  And the *MetaBirkins.com* website hadn't been created?

18  A.  Not yet.

19          MR. HARRIS:  OK.  Your Honor, I offer defense

20  Exhibit 613.

21          MR. WARSHAVSKY:  No objection.

22          THE COURT:  Received.

23          (Defendant's Exhibit 613 received in evidence)

24  Q.  Do you see that on the black part or that's next to the

25  picture down in the bottom there's a date.

1              Do you see that?

2   A.  Yes.

3   Q.  What is that date?

4   A.  October 29, 2021.

5   Q.  And up at the top, what are you doing here?

6   A.  I'm just previewing one.  This is, like, the caption of an

7   Instagram post saying what I'm doing.  I said, I guess I knew

8   what the price was at the time -- at the time already and, um,

9   just asking people that it needs a name and for people to share

10  it.

11  Q.  And did, in fact, people -- did you post it just on the

12  contest, just on Instagram, or did you also post it on other

13  social media?

14  A.  I posted it on Twitter.

15  Q.  And did somebody suggest names?

16  A.  Yes.  Actually, I got suggested MetaBirkins on Instagram

17  and on Twitter.

18  Q.  If you look in the middle of this page, there's a

19  *hectourc* --

20  A.  Correct.

21  Q.  -- suggested MetaBirkins?

22  A.  Yes.

23  Q.  Did the contest -- you said there were two, there was

24  somebody on Instagram and also someone on Twitter.

25              Do you remember the name of the person that suggested

1    it on Twitter?

2    A.   Makisa.  Her handle is *asiancryptogirl*.

3    Q.   Do you know her actual name?

4    A.   Makisa.  That's just her display name.  I don't know her

5    real name.  It could be, but I'm not sure.

6    Q.   OK.  Did, in fact, the contest winners receive anything?

7    A.   One of them did.

8    Q.   All right.  Who received something?

9    A.   Instagram was the first one I saw, so Instagram winner.

10   Q.   Did Makisa ever get anything from you?

11   A.   Not initially.  I didn't see her suggestion initially, but

12   I called her after the fact because she DMed me.  I saw the DM,

13   I told her to call me, and then promised her one on the next

14   collection.

15   Q.   Did you give Makisa one in the next collection?

16   A.   No.  We weren't able to launch that second collection.

17   Q.   Have you given Makisa anything else?

18   A.   Um, just asked her if she wanted, like, any of the other

19   art projects that are done, since then, that are not

20   MetaBirkins, but she's not as involved in crypto right now.

21   Q.   Does the title of MetaBirkins, why did you pick out of the

22   various suggestions, why did you pick MetaBirkins?

23   A.   Um, I thought it was a good name.  People were attaching

24   Meta before, like, describing what was -- what the artwork was

25   at the time.  You know, Facebook had named its, like,

1   metaverse, you know, Meta and they changed their whole company

2   name.

3           So it was just a common thing to put it before them.

4   I thought it represented what we were creating very well.  And

5   to me, Meta, like, I played a lot of video games and stuff, so

6   in video games, meta means, like, what's happening now, what

7   the best strategy is in a game, and I felt like it described

8   fur-free was what was happening now.  So it just felt like a

9   good pairing.

10  Q.  I may have asked you this before, but -- I think I did ask

11  you that question.

12          Did you hope to receive recognition for the work?

13  A.  Um, yes.

14  Q.  And why?

15  A.  I mean, I think everybody wants to receive recognition for

16  stuff that they do.  Artists come with the art that they

17  accomplish.  I love receiving the credit for work.

18  Q.  And did you make efforts to promote MetaBirkins?

19  A.  Yes.

20  Q.  What did you do?

21  A.  Promoted it on my personal social media.  And after we had

22  the name, I promoted it on MetaBirkins' social media, promoted

23  in Discord, which is, like, this big chat.  I gifted it to --

24  not gifted it, but I white-listed different celebrities who had

25  influence who would, like, post it and share it also to, like,

1    you know, hundreds of thousands or millions of people.

2             Um, as well as, like, whales in the NFT space, which

3    are, like, big art collectors of -- collectors of NFTs.

4    Q.  As an artist, do you try to make an effort to build a

5    community of people who hold your work or know you?

6    A.  Yeah.  I feel, like, you know, there is collectors of Andy

7    Warhol.  They probably all chat with each other and hang out.

8    I think it's important, especially in this new, kind of, day

9    and age, to be able to garner the attention of a community and

10   keep them updated on everything that you're working on.

11            Like, for example, with me, people know I work on --

12   at Terminal, and they know I have Terminal.  And in return they

13   see everything that we're working on, and it gives them that

14   feel that we're kind of, like, all in it together.

15   Q.  Now, did you ever send any text messages about promoting

16   MetaBirkins?

17   A.  Um, I'm sure I did.

18   Q.  And why would you do that?

19   A.  Um, because that's how I communicate with help through text

20   message.

21   Q.  And did you hope that MetaBirkins would increase in value?

22   A.  Um, I could only hope so, but, I mean, I can't predict what

23   happened.

24   Q.  Did you tell people that you hoped it would increase in

25   value?

1  are, like, who collect NFTs or participate in Web3.  It's at

2  the very infancy stage right now, so it's very um, like, a frat

3  or, like, a very bro-ish type of talk.

4  Q.  And you were never a fraternity member, were you?

5  A.  No.

6  Q.  But very briefly for the jury, because I think it's the

7  first time the term came up, excuse me if I'm wrong, what is

8  Web3?

9  A.  Web3 is kind of what we're in right now.  So, like the

10  easiest way to describe it is Web1 is when you would log in

11  with your e-mail and password.

12       Web2 is kind of, like, the next evolution of that,

13  where you log in with, like, Google.  You know, it says sign in

14  with Google or sign in with Amazon.

15       Web3 is signing in with a wallet, which is, like, your

16  source of identification.  You have a seat phrase about, like,

17  self-custody.

18  Q.  When you say sign in with a wallet, your referring to like

19  a crypto wallet?

20  A.  Yeah, a crypto wallet.

21  Q.  And, Mr. Rothschild, do you think you can get away with

22  things in art by saying "in the style of?"

23  A.  Um, no, not necessarily.

24  Q.  All right.  Did you ever send a text message along those

25  lines?

1   A.  Um, yes.

2   Q.  What were you thinking when you sent that?

3   A.  Um, when I said get away with, I was, kind of, referring to

4   the situation.  I was speaking about this situation that we're

5   in today, where I should be able to get away with creating this

6   artwork, um, because it's my artistic expression and, you know,

7   a company like Hermès shouldn't be able to sue me for it.

8   Q.  Mr. Rothschild, is everything you did with MetaBirkins

9   public?

10  A.  Um, yes.  I mean, every communication is on Discord, which

11  is a public place.  Anybody could join and all my transactions

12  are public on the blockchain.

13  Q.  Did you have any ability to get away with anything in

14  secret with MetaBirkins?

15  A.  Um, I don't think so, especially not at this stage, you

16  know, of discovery.

17  Q.  Did you tell friends in text messages you might be

18  collaborating with Hermès?

19  A.  Yes, at some point.

20  Q.  And why?

21  A.  Um, I work in fashion, so I know a lot of people in

22  fashion.  And one of those people, um, was a high-ranking

23  member at a big, um, company called Yoox, said he had

24  connections at Hermès.  And numerous people told me this, and

25  they said that they would try to get them on the line with me.

1    the Discord server, you can see how many people have joined

2    your server.  There was 50,000 people going for 100 different

3    items, right.  Um, so, you know, it's a standard supply-and-

4    demand thing.  You know, there was only 100, but there was

5    50,000 people who wanted them.  What happens there, what do the

6    people do with it.

7    Q.  Take that down, please, Ashley.

8         Mr. Rothschild, who is Ken Loo?

9    A.  It's my publicist.

10   Q.  What is your current relationship with Mr. Loo?

11   A.  Um, he's currently still by publicist.

12   Q.  And did he work on the MetaBirkins project?

13   A.  He was my publicist for it, but he didn't, like, make

14   anything or do any part of the creative.

15   Q.  Did you ask Mr. Loo to make it known that you were the

16   creator of the MetaBirkins?

17   A.  Um, yes.

18   Q.  And what did you ask Mr. Loo to do?

19   A.  Honestly, we were fielding a bunch of, like, press requests

20   and stuff.  So Ken, as my publicist, is tasked with making sure

21   that I was credited for it, used the proper images, they don't

22   post, like, the wrong images -- there was a lot of fake

23   collections going on at the time -- and if they needed a quote

24   from me for the article.

25   Q.  And did Mr. Loo give any instructions as to how he was to

1  characterize the source of the MetaBirkins?

2  A.  Yeah.  It was always to make sure it was not, um, a

3  collaboration or done by Hermès.  We have corrected the press

4  on numerous occasions where they accidentally said it was

5  Hermès and we said, Hey, like, that's incorrect.

6          You know, I have Google alerts which tells me every

7  time something gets published by me or has my name or

8  MetaBirkins.  I was constantly monitoring it, making sure

9  nothing wrong was written in the press.

10 Q.  Did you ever become aware, Mr. Rothschild, that any

11 purchasers of MetaBirkins were confused as to whether you were

12 the creator?

13 A.  No.

14 Q.  Did you ever need to correct any purchaser of a MetaBirkins

15 as to the source of the goods?

16 A.  Um, no.

17 Q.  You testified just a little bit ago that you kept one

18 MetaBirkin for yourself, right?

19 A.  Correct.

20 Q.  And when the MetaBirkins were originally minted, how many

21 of them did you get?

22 A.  I minted one and then, um, one of my engineers had minted

23 one to test the contract.  And then my other one, I had two

24 engineers, and they minted two of them prior to me.  The first

25 three that get minted, I think, um, I forget the name of the

1            MR. HARRIS:  Can we please -- I believe this is in

2    evidence, Exhibit 146.  Could you just show it to me please

3    just for the judge and the witness.

4            Is that in evidence?

5            MR. WARSHAVSKY:  I believe so.  Yes, absolutely.

6            MR. HARRIS:  Please go ahead.

7    BY MR. HARRIS:

8    Q.  What is that image of?

9    A.  It's, like, a fuzzy horse.

10   Q.  And was that going to be a 2D or 3D image?

11   A.  Also 2D.

12   Q.  Could anyone have ridden their fuzzy horse in the

13   metaverse?

14   A.  No.

15   Q.  And what was the thought for the fuzzy horse?

16   A.  It was partially, you know, because Hermès makes this, kind

17   of, fuzzy horse charm.  And, two, it was kind of, like, at the

18   time, I have a couple horse tattoos.  I really like horses, and

19   I just like wanted to give people a gift for supporting me in

20   NFTs.  You know, everybody who owns your artwork by -- not by

21   name or anything, but by their wallet.  It's a common thing to

22   be able to AirDrop something into their wallet that is, like, a

23   surprise.

24   Q.  Since you raised the tattoos, you also have other art

25   tattoos?

1   A.  Yes.  I have a Damien Hirst skull on my arm, and I have a

2   couple Francisco de Goya etchings, a bullfighter, and I have

3   this one right here, horse tattoo.  I got a bunch.

4   Q.  Mr. Rothschild, you said the Hermès horse was fuzzy.

5        Is it fuzzy?

6   A.  Furry.

7   Q.  What?

8   A.  Furry.

9   Q.  Yours is furry.

10        Is Hermès'?

11  A.  I think it's just leather.

12  Q.  So you were making a -- I just want to understand.

13        You were making a fuzzy image of an Hermès that is a

14  leather?

15  A.  Yeah.  Pretty much, like, the MetaBirkins.

16  Q.  OK.  Did you ever release the additional MetaBirkins, the

17  banana one, to be minted?

18  A.  No.

19  Q.  Did you ever gift the horse image?

20  A.  No.

21  Q.  Why not?

22  A.  I had a cease and desist and eventually got sued, so I

23  didn't want to continue to push things out while there is

24  litigation happening.

25  Q.  What did you do after receiving the cease and desist?

1   A.  I got a lawyer, um, who are in this room right now to

2   handle the response, because I'm not a lawyer.

3   Q.  Did you ask that lawyer to reach out to Hermès?

4   A.  Yes.

5   Q.  Did there come a time where you were sued by Hermès?

6   A.  Yes.

7   Q.  And when was that?

8   A.  I think it was mid January.

9   Q.  Of?

10  A.  2021 or two -- 2022, sorry.

11  Q.  And how did you learn you were sued?

12  A.  In the press.

13  Q.  And were you served a lawsuit?

14  A.  Um, we accepted service via e-mail.  They had my e-mail.

15  They had my lawyer's e-mail.  They had my address.  Um, but

16  they -- I guess they decided that that wasn't enough, so they

17  decided to serve me at work a few different times.

18  Q.  When you say serve you at work a few different times, can

19  you describe that?

20  A.  They had their process server come to my store, Terminal 27

21  in Los Angeles, hold up a picture of me, and ask our customers

22  and employees if they knew me.

23  Q.  Had they just e-mailed it to you, would you have accepted

24  service?

25  A.  Oh, yes.  We told them we would accept this service by

1    Q.  Did there come a time when you did a project called, "I

2    Like You, You're Weird"?

3    A.  Yeah.

4    Q.  And what is that project?

5    A.  It's 10,000 kind of cartoon little, like, cartoons we

6    called Weirdos.

7            MR. HARRIS:  Ashley, could you put up for

8    identification Defendant's Exhibit 525.

9    BY MR. HARRIS:

10   Q.  Could you briefly describe for the Court and counsel what

11   Defendant's Exhibit 525 is.

12   A.  It's the OpenSea page of the "I Like You, You're Weird"

13   collection.

14           MR. HARRIS:  Your Honor, I offer Defendant's Exhibit

15   525.

16           MR. WARSHAVSKY:  No objection, your Honor.

17           THE COURT:  Received.

18           (Defendant's Exhibit 525 received in evidence)

19           MR. HARRIS:  Your Honor, may I have 30 seconds --

20   less, 10 seconds -- just to ask a question?

21           Thank you, your Honor.

22   BY MR. HARRIS:

23   Q.  Could you please describe for the jury what these images

24   represent and maybe pick one out.

25   A.  Yeah.  It was a character that me and my partner at the

1  time had created.  It's kind of like a way for people to

2  represent themselves like for their profile picture or anything

3  like that.  We kind of created a community around it.

4  Q.  When you said your partner, did you have a partner for this

5  project?

6  A.  Yes.

7  Q.  Who is that?

8  A.  Amber Park.

9  Q.  Who is Amber Park?

10  A.  She is a Korean-American artist both me and my fiancee have

11  known for about a decade and we decided to jump in to do a

12  project together.

13  Q.  Were these NFTs?

14  A.  Yes.

15  Q.  Can we just -- I am just picking a Weirdo on the right.

16  Weirdo 4100.

17  A.  Yeah.

18  Q.  Okay.  How was this Weirdo created?

19  A.  It was illustrated, and then we illustrate all the

20  different kind of traits and stuff and then we put them into a

21  randomizer and it will change the body.  It will give them a

22  different head, a different mouth, a different set of eyes, a

23  hat, and, like an ear.

24  Q.  So you create the base parts?

25  A.  Yeah.

1    Q.  Like you create the eyes?

2    A.  It's like Mr. Potato Head.

3    Q.  Okay.  All right.  And then they are put together.  Got it.

4    This Weirdo 4100, this is OpenSea.  OpenSea as we discussed

5    before somewhat in this trial, that's a site where you can buy

6    and sell --

7    A.  NFTs.

8    Q.  -- NFTs.

9         Did Weirdo 4100, was he sold?

10   A.  Yeah.  We sold 10,000 of these in less than 24 hours.

11   Q.  You sold 10,000 meaning yourself and Ms. Park --

12   A.  Correct.

13   Q.  -- sold 10,000 of them?

14   A.  Yes.

15   Q.  Was that the entire release?

16   A.  Yes.

17   Q.  What we are looking at here, would this be somebody

18   reselling it or thinking of reselling it?

19   A.  Yes.  They are reselling it.

20   Q.  So I would buy this Weirdo, but it wouldn't be from you?

21   A.  Yeah.  It would be from the person who owned it after

22   purchasing it.

23   Q.  And do you get a piece of the --

24   A.  We did initially, but we turned off the royalties on the

25   project.

1  Q.  So you do not get royalties on it?

2  A.  Not today.

3  Q.  You sold the 10,000.  How much did you sell them for?

4  A.  I think it was .08 Ethereum at the time.  I am not sure

5  what the equivalent was at the time.

6  Q.  Okay.  And you could have sold -- if you sold them out, you

7  said in 48 hours, is there a reason you didn't make more?

8  A.  We did make more.  That collection called "I Hate You,

9  You're Scary."  So you would be able to burn your artwork to

10 get the new one.

11 Q.  Okay.  Let's talk about that.

12         MR. HARRIS:  Would you please put up for

13 identification, please, Ashley, DX 527.

14 BY MR. HARRIS:

15 Q.  And could you please briefly describe for the Court and

16 counsel what it is we are looking at?

17 A.  This is the OpenSea page, "I Hate You, You're Scary."

18 Q.  Very briefly, what is "I Hate You, You're Scary"?

19 A.  They are like the anti-Weirdos.  We are telling a story

20 with this whole thing, you know, like, where these are kind of

21 like the antagonists of the Weirdos, so they're kind of a

22 little bit darker and scarier looking.

23         MR. HARRIS:  Your Honor, I offer DX 527.

24         MR. WARSHAVSKY:  No objection.

25         THE COURT:  Received.

1          (In open court)

2          THE COURT:  You may step down.

3          I wanted to put on the record, both my reasons for

4     previously granting the motion *in limine* to exclude the

5     testimony of Dr. Gopnik and also my ruling earlier this morning

6     to allow the testimony of Dr. Kominers.

7          Dr. Gopnik is offered as an expert on "business art,"

8     but both in his report and in his deposition he fails to

9     identify in any meaningful fashion what his methodology is for

10    he applied it in this case, which, of course, are the express

11    requirements, among others, of Rule 702 of the Federal Rules of

12    Evidence.

13         Now, for example, he testified in his deposition,

14    "There is no consensus among art historians about anything, so

15    there cannot be a consensus on fur-covered Birkin bags."

16         Okay.  Now, that's not the end of the subject because

17    experts can disagree, but it certainly means that there is not

18    a general acceptance of any particular approach to what is or

19    is not business art.

20         Then he goes on to say when specifically asked for his

21    methodology, he stated, that, well, he "looks at the larger set

22    of contextual clues that tell you, oh, this might be worth

23    looking at as an artist's activity."

24         When asked to define what that sentence meant, he

25    refused, or declined I should say, and never offered a

1   systematic definition for business art.

2          So basically this is just his personal opinion.  That

3   doesn't do it anymore.  There was a time before Rule 702 was

4   amended where arguably that may have been allowed, but 702 was

5   amended to require an expert to demonstrate as a precondition

6   of admissibility a reliable methodology.

7          I might also add, though I don't think it's necessary

8   to reach this, that under the *Kumho Tire* case and other

9   subsequent cases even nonscientific evidence from experts

10  should be viewed at least somewhat in light of the *Daubert*

11  factors.

12         His opinion, near as I can tell, wouldn't meet any of

13  the *Daubert* factors.  It not only hasn't been tested, it is on

14  its face untestable, unfalsifiable.  It has no known error

15  rate.  It has not been peer reviewed.  And it has not been

16  generally accepted.  In fact, it is as he explains it

17  essentially a hunch or a purely subjective opinion.

18         So that's why I excluded Dr. Gopnik.

19         Now, Dr. Kominers is giving an economic analysis based

20  on his background as a professor of business at Harvard

21  Business School, where, among other things, he studies the

22  economics and market design of NFTs.  His analysis and his

23  methodology are quite clear.  He does a comparison between how

24  NFTs that are associated with other brands operate in the

25  marketplace, the other brands being brands that expressly

1    entered into the NFT marketplace.  And he compares that to what

2    happened in the MetaBirkin marketplace, and he concludes that

3    the effect was, in his view, solely or wholly comparable to

4    what happens to those other brands and, therefore, reflected

5    the consumers' and the sellers' and purchasers' belief that

6    this was an Hermès Birkin bag product.

7        Now, there are lots of questions I am sure he will be

8    asked on cross-examination about that, but the methodology is

9    clear.  The relevance to numerous factors both under the

10   *Polaroid* factors and under the *Rogers* test is clear.  So

11   there's no comparison between him and Dr. Gopnik.

12       So those, without further elaboration, are the bases

13   for my rulings.  I will give you another ten minutes for the

14   break and then we will resume with cross-examination of

15   Mr. Rothschild.

16       Let me mention one other thing.  At the end of the

17   lunch break today, I am going to want you to give me who are

18   the remaining witnesses and a reasonably good idea of how long

19   each witness is going to be -- I know you can't predict that

20   with certainty at this point -- so that we can schedule things

21   like the charging conference and things like that.

22       Okay.  Real good.

23       (Recess)

24       MR. WARSHAVSKY:  May I raise one issue with the Court

25   before the jury comes in, your Honor.

N21nher3                          Estival - Cross

1  Q.  Here you start saying, "Let's do another series of

2  Birkins," correct?

3  A.  Yes.

4  Q.  Is this the first time you -- well, let me ask it

5  differently.  Were you referring to NFTs?

6  A.  Yes.

7  Q.  Was this the first time you discussed these NFTs?

8  A.  I am not sure.

9  Q.  And here, because the name hadn't come up yet, you were

10  just referring to them as Birkins, correct?

11  A.  Yes.

12  Q.  When you say "another series," what do you mean by

13  "another"?

14  A.  This is after Baby Birkin.

15          MR. WARSHAVSKY:  If we could turn to page 6.

16  BY MR. WARSHAVSKY:

17  Q.  Mark asks you, "NFTs?"

18          And you respond, "NFTs."

19          Do you know why that was the question and answer

20  there?

21  A.  Sorry.  Can you repeat the question.

22  Q.  Sure.  Do you know Mark used the word "NFTs"?

23  A.  Because it's Baby Birkin and an NFT.

24  Q.  Do you know why you use the word "NFTs"?

25          MR. WARSHAVSKY:  Scroll down.

1    A.  Because that's what Baby Birkin was.  When I said another

2    series, we referred to creating another NFT.

3    Q.  Throughout this discussion -- and you can look in your book

4    if you like -- did you ever use the word "art"?

5    A.  No.

6                MR. WARSHAVSKY:  If we could show the Court and the

7    other side Plaintiff's Exhibit 316.

8                Humberto, I'm not sure -- plaintiff's Exhibit 316,

9    Humberto.

10               Okay.  Thank you.

11   BY MR. WARSHAVSKY:

12   Q.  Mr. Rothschild, have you seen this before, this document

13   before?

14   A.  It looks to be a text message chain.

15   Q.  Who is the text exchange between?

16   A.  Me and Kenneth Loo.

17   Q.  Who is Kenneth Loo?

18   A.  My publicist.

19   Q.  And this is a document you produced in this case?

20   A.  I believe so, yes.

21   Q.  What was your primary way of communication with Kenneth

22   Loo?

23   A.  Text message.

24               MR. WARSHAVSKY:  I move it into evidence, your Honor.

25               MR. HARRIS:  Your Honor, I have no objection.

N21nher3                          Estival – Cross

```
 1                THE COURT:  Received.

 2                (Plaintiff's Exhibit 316 received in evidence)

 3    BY MR. WARSHAVSKY:

 4    Q.  Please turn to page 2.  Can you read the last text you sent

 5    to Kenneth Loo?

 6    A.  "I'm making 13 Birkin NFTs."

 7    Q.  And in this text chain, which you also have in the book, do

 8    you ever refer to the project as "art"?

 9    A.  No, because I was creating NFTs that are attached to art.

10    Q.  That wasn't my question, Mr. Rothschild.

11                MR. WARSHAVSKY:  I will actually, your Honor, move to

12    strike.

13                THE COURT:  Well, I will strike everything after the

14    word "no."

15                MR. WARSHAVSKY:  Thank you, your Honor.

16                THE COURT:  So if a question can be answered simply

17    yes or no, just answer yes or no.  If it requires a further

18    explanation, of course, then you may answer, and I will

19    determine whether it's appropriate or not, but I think that

20    question could be answered yes or no.

21                Go ahead.

22                THE WITNESS:  Got it.

23    BY MR. WARSHAVSKY:

24    Q.  I'm sorry.  Looking through the document, the entire

25    document --
```

N21nher3                          Estival - Cross

1    A.  What number was that again?

2    Q.  This was 316.

3            My question is, do you say "art" anywhere in the

4    document?

5    A.  No.

6            MR. WARSHAVSKY:  Can you please show the Court and the

7    other side Exhibit 243, please.

8    BY MR. WARSHAVSKY:

9    Q.  Have you seen this document before?

10   A.  Yes.

11   Q.  Can you tell us what this is?

12   A.  Another text message chain.

13   Q.  Between whom?

14   A.  Myself and Mark.

15   Q.  You produced this in litigation?

16   A.  Yes.

17           MR. WARSHAVSKY:  Move it into evidence, your Honor.

18           MR. HARRIS:  Your Honor, it is going to be more than

19   three words.  Can we have a quick sidebar?

20           THE COURT:  All right.

21           (Continued on next page)

22

23

24

25

1              (At sidebar)

2              MR. HARRIS:  Your Honor, it is a very long chain.  My

3    guess is I won't object to the part that Mr. Warshavsky is

4    seeking to introduce, but I really don't have the ability to --

5              THE COURT:  So why don't I receive it without

6    prejudice to your raising objections as he goes through it to

7    specific items, and I will rule right then and there.

8              MR. HARRIS:  Okay.

9              THE COURT:  What is the nature of your objection?

10             MR. HARRIS:  It would be hearsay, your Honor.

11             MR. WARSHAVSKY:  Your Honor, can I respond to that as

12   long as we are at sidebar?

13             THE COURT:  Yes.

14             MR. WARSHAVSKY:  We heard from this witness that this

15   is an individual that he hired, that his communications were by

16   text, and they were stored on his cell phone, which would

17   suggest to me that is a business record between this witness

18   and his employee for these purposes.  Therefore, it comes

19   within the hearsay exception.

20             I don't think we are going to be offering most of this

21   for the truth of the matter asserted, but to avoid this

22   issue --

23             THE COURT:  I don't think you have established enough

24   to show this is a business record.  The mere fact that the

25   person was an employee doesn't mean that this is a business

1   BY MR. WARSHAVSKY:

2   Q.  So when he said he could get 40 to 50 out per day for two

3   to three days, that meant it took -- it would only get one out

4   in two to three days, is that what you just said?

5   A.  40 to 50 per day, as it says.

6   Q.  So he was talking about generating the MetaBirkins?

7   A.  Yes.

8   Q.  OK.  And he was saying here, he could generate 40 to 50 per

9   day?

10  A.  Yes.

11          MR. WARSHAVSKY:  Shrink out of that.  Turn to page

12  six, five and six so the witness can see it in context.

13          I think we just saw page four.  Now we can look at

14  page five and six.

15          Here, you're discussing --

16  Q.  Let me know when you've read it.

17  A.  Yes.

18  Q.  So here, you and Mark Design are talking about the profits

19  you expect to make from the second collection of MetaBirkins

20  NFTs, is that correct?

21  A.  Yes.

22  Q.  OK.  And then you're also talking about at the bottom here,

23  where it starts, yeah, I'll start on those specials ASAP.

24          Do you see that discussion?

25  A.  Yes.

```
 1   Q.  Do you want to see the following page seven to for context?

 2            MR. WARSHAVSKY:  If you can unzoom that, please, and

 3   go to the top of seven.

 4   Q.  Here you say, so Mark Design could hammer these out,

 5   correct; you're still talking about the MetaBirkins, right?

 6   A.  Second collection, yes.

 7   Q.  And so the goal here was to generate 50 images a day,

 8   correct?

 9   A.  Um, that wasn't a goal.  That is what Mark said he could

10   do.

11   Q.  OK.  So you had the plans for the second NFT collection,

12   correct, this is what this is all about, the second MetaBirkins

13   collection?

14   A.  Yes.

15   Q.  This is what this is all about?

16            MR. WARSHAVSKY:  Can we go to Plaintiff's 306.

17            Furnish to the court and the other side, not to the

18   jury.  I don't believe it's been admitted.

19   Q.  OK.  So this is a text exchange between you, Truman Sachs

20   and Alex Sachs, correct?

21   A.  Yes.

22   Q.  It was produced by the Sachs, Truman Sachs in this case,

23   right, if you know?

24   A.  I don't know, but yeah.

25   Q.  But it is a text exchange between the three of you, only
```

1   Q.  OK.  Well done.  OK.

2         You start by saying there is going to be 500 meh ones.

3   What did you mean by that?

4   A.  Simple ones.

5   Q.  And what did you mean by simple ones; does that mean like

6   one color?

7   A.  Like, one color.

8   Q.  One color was meh, and then you said 300 all right ones.

9         What does all right ones mean?

10  A.  Just, like, working up the scale of, like, cool factor.

11  Q.  And then 90 cool ones, I guess is that further up that

12  scale?

13  A.  Yeah.  They are cooler.

14  Q.  Then ten super specials?

15  A.  Yeah.

16  Q.  And is a super special something like the Mona Lisa one, is

17  that what you mean by that?

18  A.  No.  This is, like, some that were, like, covered in slime

19  and some were, like, had, like, mammoth tusks coming out of

20  them.  There was, like, a lot of work done on them.

21  Q.  So where would the Mona Lisa one be in this range?

22  A.  It was different.  I mean, MetaBirkins, the original

23  collection of MetaBirkins was all, kind of, they didn't have

24  any additional, um, elements to them, like 3D elements to them,

25  like, tusks or anything.  They were all just simulated fur with

1    a graphic.

2              And for this next collection, we really wanted to,

3    like, go above and beyond.  So you saw the banana earlier today

4    duct-taped to the bag and, like, a bunch of different ones.

5    Q.  Let me stop you there.

6              Where would the banana be on this range?

7    A.  The cool ones.

8    Q.  That would be a cool one.

9              And so would Mona Lisa be an all right one or meh one?

10   A.  Can I explain a little bit more in depth?

11             It's not really yes or no.

12   Q.  We can pick a different one.  You showed a few.

13   A.  Yeah.  I mean, for the Mona Lisa one, the goal of that

14   first collection was -- you didn't know what you were going to

15   get.  So do people value the Mona Lisa one versus all red one,

16   you know, like, people attribute more value to the one that had

17   the Mona Lisa on it.  It's kind of the -- to the eye of the

18   beholder.  People are only willing to pay -- or they give a

19   price to whatever.  It's whatever somebody is willing to pay

20   for the one that they want.

21   Q.  OK.  I understood that.  I guess what I'm trying to

22   understand is what would count as, on this scale of coolness,

23   would the Mona Lisa rate anywhere on this one?

24   A.  It's hard to say because the ten supers are the ones that

25   have extra work.  90 cool ones, I would say the Mona Lisa, it

1    would be a super in terms of, like, what people value it at.

2    But in terms of the work put into it to create it, it would be

3    on, like, the all right scale.

4    Q.  It would be the all right one.  OK.  Thank you.

5             If we can turn to Plaintiff's Exhibit 235.  This is

6    another text message between you and Mark, correct?

7    A.  Um-hmm.

8    Q.  This was also produced in discovery by you?

9    A.  Yes.

10            MR. WARSHAVSKY:  Subject to the same objection, we

11   would offer into evidence, your Honor.

12            MR. HARRIS:  Same, your Honor.

13            THE COURT:  Same ruling.  Received.

14            (Plaintiff's Exhibit 235 received in evidence)

15            MR. WARSHAVSKY:  We can furnish to the jury.

16            And if we could turn to page -- well, pages one and

17   two, if you can show it to the witness.

18   Q.  Here you're talking about making more MetaBirkins, right?

19   A.  Yes.

20   Q.  And, once again, we're talking about the time scale and

21   what Mark can do, regardless of what the time scale is, you're

22   trying to understand how much Mark can make here?

23   A.  To a certain extent, yes.

24   Q.  Now, let me ask you a totally different question.

25            Have you heard of the term blue chip?

1   Q.  But he's not credited anywhere?

2   A.  No.

3   Q.  Just you and Eric Ramirez?

4   A.  Yes.

5   Q.  And this sold for much more, correct, ten times that

6   amount?

7   A.  Approximately.

8   Q.  And, by the way, did you bid on the Baby Birkin yourself?

9   A.  No.

10  Q.  No.  Do you remember me asking you about this at your

11  deposition?

12  A.  I was the first bid.

13  Q.  So you did bid on it?

14  A.  Yes.

15  Q.  So had you won the bid, you would have bought it from

16  yourself?

17  A.  For 100, yes.  It would be minted.

18  Q.  OK.  Was that an effort to prop up the price?

19  A.  No, it was just to -- I wanted to own my artwork.  So,

20  like, when you bid, it would have to be minted.  So it wasn't

21  minted until somebody bid on it.

22  Q.  OK.  And at that time, you didn't -- you didn't have a

23  *BabyBirkin.com* website, did you?

24  A.  No.

25  Q.  You didn't ask anybody to pump and chill for that, did you?

1   A.  Um, not that I recall.  But, I mean, like, people knew

2   about it, told people about it, and we did promote it to NFT

3   collectors at the time.

4   Q.  OK.  Well, in this case, again, I think we heard your

5   lawyer in opening statement say that you produced thousands of

6   text messages.

7           Were any of those text messages about pumping and

8   chilling the Baby Birkin?

9   A.  I'm not sure.

10  Q.  OK.  And you only made one, correct?

11  A.  Yeah.

12  Q.  And we'll get into it a little bit later.

13          For the MetaBirkins, you had to build a MetaBirkins

14  campaign, correct?

15  A.  It was a contest.

16  Q.  You didn't do that for Baby Birkin, did you?

17  A.  No.

18  Q.  Just to contrast, just to finish this thought, for the

19  MetaBirkins you made 100, correct?

20  A.  Yes.

21  Q.  You made a *MetaBirkins.com* website, correct?

22  A.  Yes.

23  Q.  You made social media accounts, including Twitter,

24  Instagram, and Discord, correct?

25  A.  Yes.

1    Q.  And that is something you didn't do for prior projects?

2    A.  No, because they were just one.

3    Q.  And in some of your promotion, you actually encouraged

4    others to make MetaBirkins with household items like the

5    MetaBirkins, like the build-your-own MetaBirkin, correct?

6    A.  Yes.

7    Q.  And as you discussed with counsel, we'll discuss in a

8    little bit, you actually asked influencers to pump and chill

9    for you for the MetaBirkins, correct?

10   A.  Yes.

11   Q.  And you sought whales to sweep the floor, am I saying that

12   correctly?

13   A.  Um-hmm.

14   Q.  And is that correct?

15   A.  Yes.

16          MR. WARSHAVSKY:  OK.  Let's talk a little about the

17   MetaBirkins name and slogan.

18          Now, Humberto, can you please bring up Exhibit 238,

19   just to the witness, the court and defense counsel, please.

20   Q.  OK.  Have you seen this document before?

21   A.  Yes.

22   Q.  Can you tell us generally what it is?

23   A.  It is the same post from Instagram announcing what was to

24   eventually be called MetaBirkins and then asking people to

25   suggest names.

N21sHER6                        Estival - Cross

1    Q.  OK.  But it's a Twitter post on your account?

2    A.  Yes.

3            MR. WARSHAVSKY:  Move into evidence, your Honor.

4            MR. HARRIS:  No objection.

5            THE COURT:  Received.

6            (Plaintiff's Exhibit 238 received in evidence)

7    Q.  OK.  So this is the contest, the other side of the contest

8    that you ran on Twitter, right?

9    A.  Yes.

10   Q.  And as you said, you were requesting names and --

11           MR. WARSHAVSKY:  Oh, I'm sorry.  Humberto, please

12   furnish to the jury.

13           Done?

14           OK.  One step ahead of me.

15   Q.  This is where you were requesting the names, and I think

16   earlier you noted that someone named Makisa had responded,

17   correct?

18   A.  Yes.

19   Q.  And actually, if we can go down, I guess, to the Makisa

20   response.  You see it on the page.  Can you maybe blow it up a

21   little bit.

22           Clearly that same day she wrote back to you

23   MetaBirkin, correct?

24   A.  Yes.

25   Q.  And earlier when you spoke, you said the reason that you

1   didn't provide something to Makisa was because you received a

2   response on Instagram, is that correct?

3   A.  Yes.

4   Q.  Do you remember I asked you about this at your deposition?

5   A.  Yes.

6   Q.  OK.  And do you remember what you responded at your

7   deposition?

8   A.  Um, I think I responded incorrectly, but I looked after the

9   deposition to verify.

10  Q.  So at your deposition when you were testifying under oath,

11  what you did you say to us?

12  A.  I would have to get a reminder.  I think I said that --

13  Q.  We'll show it to you.

14          Can we furnish the witness and his counsel with his

15  deposition testimony.

16          So do you see where I'm looking at line 15 to 18?

17  A.  Yes.

18          MR. HARRIS:  Do you have a hard copy?

19          MR. WARSHAVSKY:  Do I have a hard copy?

20          MR. HARRIS:  I'm sorry.  What page is this, please?

21  BY MR. WARSHAVSKY:

22  Q.  What response did you give to me at your deposition?

23  A.  We ended up coming up with a name prior to this actually.

24  We had a few variations.

25  Q.  So now you're saying that that testimony was wrong?

1    A.  That testimony was incorrect.  I looked it up after.

2                MR. WARSHAVSKY:  OK.  If we can go back to the Twitter

3    post, please.

4                The Twitter post -- sorry.  If we can go to

5    *JessLozano*.  I don't know how to pronounce it.

6                Down a little.  There you go.

7                Can you please blow up the two November 3 ones.

8    Q.  This user -- I'm not sure how to say that -- wrote back and

9    in the first post on November 3 said Not Your Mom's Birkin.

10               Do you see that?

11   A.  Yes.

12   Q.  OK.  And ultimately you used Not Your Mother's Birkin as

13   your slogan on your website, correct?

14   A.  Yes.

15   Q.  Did you give this person a MetaBirkin?

16   A.  No, because it was not the name.

17   Q.  Oh, because it was Not Your Mother's Birkin rather than Not

18   Your Mom's Birkin?

19   A.  Yes.  And we also knew of this Slogan.  Tiffany's was using

20   it at the time to describe Not Your Mother's Tiffany.

21   Q.  I see.  So, well, all right.  We can close this exhibit.

22               So you used the same -- I'm sorry.

23               Who was using it?

24               What was the name of that person?

25   A.  Tiffany's.

1   Q.  You were using the Tiffany's logo, you just changed it to

2   Birkin?

3   A.  There was no logo.

4   Q.  I'm sorry.  Slogan?

5   A.  Um, the slogan is people attach not your mother's to a lot

6   of things, like, not your mother's cheesecake or not your

7   mother's cooking or something like that.  It's a common saying,

8   but I've seen the ads from Tiffany's most recently.

9   Q.  So Tiffany's doesn't an ad for itself Not Your Mother's

10  Tiffany?

11  A.  I think so.  It's something like that.

12  Q.  OK.  But you didn't say Not Your Mother's MetaBirkin, you

13  said Not Your Mother's Birkin, correct?

14  A.  Yes.

15          MR. WARSHAVSKY:  OK.  So let's take a look at your

16  website for a second.

17          You know what, if we can look at actually Plaintiff's

18  Exhibit 227.  I'm going to try to cut through a few of these.

19  If we can blow it up a little bit.

20          You know, I'm sorry.  Has this been admitted?  It has,

21  right?  OK.  So the jury should be able to see it.

22  BY MR. WARSHAVSKY:

23  Q.  This is the website we looked at before?

24  A.  Yes.

25  Q.  Can you tell me what this means where it says mint for

1          MR. WARSHAVSKY:  So if we could put back up the

2     redacted exhibit.

3     BY MR. WARSHAVSKY:

4     Q.  Who is NFT Kings?

5     A.  He's an NFT influencer.

6     Q.  This is a text exchange you produced in this, correct?

7     A.  Yes.

8          MR. WARSHAVSKY:  We would offer it into evidence

9     subject to the same restriction, your Honor.

10          MR. HARRIS:  No objection, your Honor.

11          MR. WARSHAVSKY:  Your Honor, can we refer it to the

12     jurors.

13          THE COURT:  Yes.

14          MR. WARSHAVSKY:  Could we turn please to page 4 of

15     this document.

16          THE COURT:  I should have said "received."

17          (Plaintiff's Exhibit 242 received in evidence)

18     BY MR. WARSHAVSKY:

19     Q.  I'm sorry, pages 3 and 4, so you can take a look at it.  So

20     here you are having a discussion with NFT Kings?

21     A.  Yes.

22     Q.  And are these generally discussions about how the

23     MetaBirkins are being received by whales?

24     A.  Can you ask a --

25     Q.  Maybe that is a tough one, since I don't know this.

1        MR. WARSHAVSKY:  Maybe let's look at page 4 and 5.

2   BY MR. WARSHAVSKY:

3   Q.  Here NFT Kings is asking about your royalty rate, is that

4   right?

5   A.  Yes.

6   Q.  And he asked you for after sale and you say seven and a

7   half percent, correct?

8   A.  Yes.

9   Q.  Then he asks you, "Personally or including OS fee?"

10       Is "OS" OpenSea?

11  A.  Yes.

12  Q.  You say, "Personally so 10," right?

13       So that means consumers pay a 10 percent royalty and

14  two and a half goes to OpenSea, and seven and a half goes to

15  you.

16  A.  Yes.

17  Q.  If we look at your last text here, can you read that?

18  A.  Oh, Luxury tax -- luxury product luxury tax, maybe.

19  Q.  Okay.  You are talking about the MetaBirkins there as a

20  luxury product?

21  A.  Yes.

22       MR. WARSHAVSKY:  Okay.

23       Can we turn to Plaintiff's Exhibit 100, please.

24       This is a very long exhibit, so I would ask to go to

25  page 502.

1    A.  Yes.

2            MR. WARSHAVSKY:  Okay.  If we keep going -- actually

3    let's leave it there.

4    BY MR. WARSHAVSKY:

5    Q.  You say you are a gonna make a big -- a big bag on

6    MetaBirkin?

7    A.  Yes.

8    Q.  What did you mean by "big bag"?

9    A.  He will sell it for a lot.

10   Q.  Okay.  When you're asking him, you say, "Can you do a shill

11   post for me?" what do you mean by that?

12   A.  To tell people about the project again.

13   Q.  What would he tell people?

14   A.  He did a post, like a link of the MetaBirkin.

15           MR. WARSHAVSKY:  Okay.  If we go to page 7.

16           THE WITNESS:  I'm sorry.  I just need the page.

17   BY MR. WARSHAVSKY:

18   Q.  Your second text, I realize we all use salty language

19   sometimes.  What did you mean by, "You have a gem on your

20   hands"?

21   A.  It was a good project.

22   Q.  And then your next text says, "Like ultimate shill post"?

23   A.  Yes.

24   Q.  What is an ultimate shill post as opposed to a regular

25   shill post?

1    A.  It's like an extra hyped one.

2    Q.  An extra hyped one.  Okay.

3          What would a shill post -- when you say a post, what

4    do you mean by a post?

5    A.  It kind of depends.  This person and this text message, or

6    in these text messages is like an NFT influencer.  He tells

7    people about cool projects, tells people like, you know, what

8    they should be trying to get, what they shouldn't or what they

9    should be buying and what they, you know, just like any

10   influencer.

11   Q.  Like a social media post by an influencer?

12   A.  Pretty much, yeah.

13   Q.  Could be on TikTok, Instagram, Twitter --

14   A.  Correct.

15   Q.  -- or whatever one of those social media posts?

16          Okay.  Your counsel asked you earlier why you wanted

17   the price to go high.  And you said because you just wanted

18   value to collectors?

19   A.  I'm sorry.  I didn't catch that.

20   Q.  Your counsel asked you why you want the price to be high,

21   you said you wanted the value to go up to provide value to

22   collectors.

23          Do you remember that?

24   A.  Yes.

25   Q.  But you also make royalties, correct?