# Exhibit 33

N22sHER1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

HERMÈS INTERNATIONAL, et al.,

               Plaintiffs,

           v.                     22 Civ. 384 (JSR)

MARTIN ROTHSCHILD,

               Defendant.

------------------------------x

                              New York, N.Y.
                              February 2, 2023
                              9:30 a.m.

Before:

                 HON. JED S. RAKOFF,

                              District Judge
                              -and a Jury-

                        APPEARANCES

BAKER & HOSTETLER LLP
      Attorneys for Plaintiffs
BY:  DEBORAH A. WILCOX
     OREN J. WARSHAVSKY
     GERALD J. FERGUSON

HARRIS ST. LAURENT & WECHSCLER LLP
      Attorneys for Defendant
BY:  ADAM B. OPPENHEIM
     JONATHAN A. HARRIS

LEX LUMINA PLLC
      Attorneys for Defendant
BY:  RHETT O. MILLSAPS, II

1             THE COURT:  I think in light of what was just brought

2      to my attention, I think we'll even go today until 115 rather

3      than one.

4             (Jury present)

5             Good morning, ladies and gentlemen.

6             THE JURY:  Good morning.

7             THE COURT:  As you know, today we're not going to have

8      an afternoon session.  I think we will go, instead of going

9      until one, we will go to 1:15 just to make the most use we can

10     of today.

11            Tomorrow, by contrast, we will be sitting all the way

12     until 4:30.  But it's counsel's expectation, and mine, that

13     that will allow us to finish all the evidence in the case

14     tomorrow.

15            OK.  Counsel.

16            MR. WARSHAVSKY:  Thank you, your Honor.

17            Can I ask that we bring up Defense Exhibit 613, which

18     was offered yesterday.

19      SONNY ESTIVAL, resumed.

20     CROSS-EXAMINATION

21     BY MR. WARSHAVSKY:

22     Q.  Mr. Rothschild, yesterday you testified that in response to

23     the Birkin naming contest, you gave user *hectourc* in the middle

24     here a MetaBirkin for picking the name?

25            MR. HARRIS:  Objection, not his testimony.

1           THE COURT:  Well, rather than have a debate about

2    whether it was or was not, just if you have a transcript, you

3    can quote it.  If not, you can just ask him again the other

4    question the underlying question.

5           MR. WARSHAVSKY:  Sure.

6           THE COURT:  Give the page number and line number.

7           MR. WARSHAVSKY:  Sure.  I'm looking at pages number

8    291, starting from line 11 through page 292, line nine.

9           THE COURT:  Go ahead.  Read it.

10          MR. WARSHAVSKY:  Read it.

11          THE COURT:  Yes.

12          MR. WARSHAVSKY:  OK.

13   BY MR. WARSHAVSKY:

14   "Q.  And did, in fact, people -- did you post it just on the

15   contest, just on Instagram, or did you also post it on other

16   social media?"

17          MR. WARSHAVSKY:  I should note, this was when your

18   counsel was examining you.

19          You responded:

20   "A.  I posted it on Twitter.

21   "Q.  And did somebody suggest names?

22   "A.  Yes.  Actually, I got suggested MetaBirkins on Instagram

23   and on Twitter.

24   "Q.  If you look in the middle of this page, there is a

25   *hectourc*?

N22sHER1                              Estival – Cross

1    "A.   Correct.

2    "Q.   Suggesting MetaBirkins?

3    "A.   Yes.

4    "Q.   Did the contest -- you said there were two, there was

5    somebody on Instagram and also someone on Twitter.

6          Do you remember the name of the person that suggested

7    it on Twitter?

8    "A.   Makisa.  Her handle is *asiancryptogirl*.

9    "Q.   Do you know her actual name?

10   "A.   Makisa, that's just her display name.  I don't know her

11   real name.  It could be, but I'm not sure.

12   "Q.   Did, in fact, the contest winners receive anything?

13   "A.   One of them did.

14   "Q.   All right.  Who received something?

15   "A.   Instagram was the first one I saw, so Instagram winner."

16         THE COURT:  OK.  So you remember giving that

17   testimony?

18         THE WITNESS:  Correct.

19         THE COURT:  OK.  Put another question.

20   BY MR. WARSHAVSKY:

21   Q.   Is that testimony accurate?

22   A.   Not on MetaBirkin, but I allowed a spot for a MetaBirkin.

23   Q.   You gave this person *hectourc* a whitelist spot for a

24   MetaBirkin?

25   A.   Yes.

1             MR. WARSHAVSKY:  OK.  I would like to show the witness

2     and counsel defense Exhibit 387 for identification.  It's a

3     rebuttal exhibit.

4             MR. HARRIS:  Your Honor, I'm sorry.  I can't read

5     that.

6             THE COURT:  Yes.  I don't think it's legible.

7             Do you want to blow up?

8             MR. HARRIS:  There we go.

9             MR. WARSHAVSKY:  Scroll to the bottom just to show

10    this is a document produced by the witness and by

11    Mr. Rothschild in this case.  Go back to the top.

12    BY MR. WARSHAVSKY:

13    Q.  This is your Instagram direct message with this person,

14    *hectourc*, correct?

15    A.  Correct.

16    Q.  And *hectourc* is writing to you beginning, we go down to the

17    bottom, you actually write to hectourc --

18            THE COURT:  Wait a minute.  Are you offering this?

19            MR. WARSHAVSKY:  Sure.  We'll offer it into evidence.

20            THE COURT:  You can't quote from it if it's not in

21    evidence.

22            MR. WARSHAVSKY:  I understand.

23            THE COURT:  Any objection?

24            MR. HARRIS:  No objection, your Honor.

25            THE COURT:  Received.

1              (Plaintiff's Exhibit 387 received in evidence)

2              THE COURT:  Show it to the jury.

3              MR. WARSHAVSKY:  All right.

4              THE COURT:  Go ahead.

5   BY MR. WARSHAVSKY:

6   Q.  This is your direct message with *hectourc* on Instagram,

7   correct?

8   A.  Yes.

9   Q.  And the first from you is -- the first message is from you

10  at the bottom:  MetaBirkins, baby.  I got a Birkin with your

11  name on it.

12             That's from you, correct?

13  A.  Yes.

14  Q.  And then there is some back and forth.

15             And let's go to November 30.  *Hectourc* says, Hey, just

16  wanted to know if you guys need anything from me.

17             You didn't respond to that, right?

18  A.  No.

19  Q.  Let's go up to the emoji from December 3 at 1:39 p.m.

20  A.  Yes.

21  Q.  That's while the MetaBirkins were minting?

22  A.  Well, the day before.

23  Q.  It was 24-hour period, right?

24  A.  Yeah.

25  Q.  So this was while the minting process was going on still?

N22sHER1                              Estival - Cross

1   A.  Yes.

2   Q.  OK.  And this is an emoji of somebody with their head in

3   their hands?

4   A.  I think it is, like, prayer hands.

5   Q.  Prayer hands.  And then above that, later that day *hectourc*

6   writes, Hope you guys will see this, correct?

7   A.  Um, yes.

8   Q.  OK.  Let's go to December 4 at 12:05 p.m.

9           That's after the MetaBirkins had minted, right?

10  A.  Yes.

11  Q.  And *hectourc* writes, Hey, guys.  Hitting you guys up again

12  about my gifted Birkin.  Just want to make sure I'm not being

13  ignored?

14  A.  Yes.

15  Q.  And you didn't respond to that, right?

16  A.  No.

17  Q.  OK.  Above that we have two you guys on December 6.  I

18  don't know if that is you or yo, guys.  And then the second

19  one, I already missed out on the first release.

20          You don't respond to that, right?

21  A.  Yes.

22  Q.  OK.  And let's turn to Plaintiff's Exhibit 388.

23          Mr. Rothschild in this case -- just to the judge,

24  defense counsel, and the witness, please.

25          This is a Twitter direct message, correct?

N22sHER1                        Estival - Cross

1    A.  Yes.

2    Q.  That you produced in this case?

3    A.  Correct.

4            MR. WARSHAVSKY:  Offer into evidence, your Honor.

5            MR. HARRIS:  No objection, your Honor.

6            THE COURT:  Received.

7            (Plaintiff's Exhibit 388 received in evidence)

8    Q.  Hey MetaBirkins team.  Just trying to reach out about my

9    gifted MetaBirkin from the naming contest on Instagram a while

10   back.  My IG is *hectourc*.  Thanks.

11   A.  Yes.

12   Q.  Did you respond to this?

13   A.  No.

14   Q.  OK.  So *hectourc* is suggesting he didn't receive a

15   whitelist spot, correct?

16   A.  Yes.

17   Q.  So going back to your testimony of yesterday, did *hectourc*

18   receive a MetaBirkin?

19   A.  To my knowledge.  So *hectourc* is actually a friend of my

20   friend Love Menzi on Instagram, so he communicated that way.

21   Q.  OK.  So are you saying that *hectourc* received a whitelist

22   spot?

23   A.  To my knowledge, at the time, it was -- I looked into this

24   after the fact, but I did have these direct messages.

25   Q.  OK.  But your testimony yesterday was that you gifted --

1   that he received the gift.  You corrected me earlier and said

2   that he received a whitelist spot.  Here he is saying to you,

3   he didn't receive a whitelist spot, and you didn't respond,

4   correct?

5   A.  To my knowledge, at the time when you asked me the

6   question, that's what I thought.

7   Q.  OK.  So but right now as we sit here today, I'm asking you,

8   was your testimony yesterday accurate?

9   A.  Um, so my knowledge yesterday, that's what it was.  That

10  was my testimony.  I didn't have these, um, Instagram messages

11  yesterday.

12  Q.  Well, you did have these Instagram messages, Instagram and

13  Twitter, because these came from you, correct?

14  A.  Correct, in discovery.

15  Q.  OK.  So I just want to make sure we're clear.

16      The testimony you gave yesterday was incorrect?

17  A.  It was based on what knowledge I had at the time.

18      MR. WARSHAVSKY:  Move to strike, your Honor.

19      THE COURT:  No, I'm not going to strike that.

20      But do you want to change now your response?

21      THE WITNESS:  Me?

22      THE COURT:  Yes.

23      THE WITNESS:  I don't.

24      THE COURT:  Now that you've seen these documents, are

25  you still adhering to the testimony you gave yesterday, or do

1    you now have a revised view?

2              THE WITNESS:  I have a revised view.

3              THE COURT:  What's your revised view?

4              THE WITNESS:  That these were the text messages that

5    *hectourc* sent, but we had our forms of communication through

6    friends.  Um, I -- that's my revised.

7              THE COURT:  All right.  Go ahead, counsel.

8    BY MR. WARSHAVSKY:

9    Q.  Mr. Rothschild, did you give *hectourc* a whitelist spot?

10   A.  To my knowledge at the time, yes.

11   Q.  OK.  Which MetaBirkin -- we have your wallet and all the

12   MetaBirkins here on.  We have the ETH wallets here.

13             Which one did he get?

14             We'll check into this and come back to it.

15             Which whitelist spot do you think you gave him?

16   A.  I'm not sure.

17   Q.  Which MetaBirkin did he get?

18   A.  I'm not sure.

19   Q.  So you had follow-up discussions with *hectourc*.  You didn't

20   respond to any of this.  You said you had follow-up discussions

21   through a friend?

22   A.  Yes.

23   Q.  Who is that friend?

24   A.  Love.

25   Q.  Did you produce anything of your discussions of Love in

1    this case?

2    A.  I'm not positive they were via DM or in person.  They all

3    live in Los Angeles.

4    Q.  You followed up with someone in person who is a friend of a

5    friend rather than responding to this person?

6    A.  Correct.

7    Q.  OK.  So it's your testimony still that you gave him a

8    whitelist spot?

9    A.  To my knowledge.

10   Q.  So the documents are wrong?

11   A.  These documents were just a small amount of time.  It's

12   been a year since then.

13   Q.  That wasn't my question.

14          Are these documents wrong?

15   A.  No.

16   Q.  They are right?

17   A.  Yes.

18   Q.  So *hectourc* is complaining that he doesn't get a whitelist

19   spot.

20          You're still saying you gave him one?

21   A.  To my knowledge, yes.

22   Q.  When you keep saying "to your knowledge," you either gave

23   the whitelist spot or you didn't.

24          THE COURT:  Counsel, your job is to put questions, not

25   to put statements.

 1                MR. WARSHAVSKY:  My apologies, your Honor.

 2     Q.  What evidence do you have that you gave *hectourc* a

 3     whitelist spot?

 4     A.  I looked into this prior to this trial to find more

 5     information, but I don't have these direct messages any longer.

 6     Q.  On Friday you had an Instagram story with a picture from an

 7     office building saying prepping, prepping, prepping, correct?

 8     A.  Correct.

 9     Q.  So you were preparing for this case?

10     A.  Um, as I think people do.

11     Q.  Yes?

12     A.  Yes.

13     Q.  OK.  And in preparing for this case, you were talking --

14     were you looking at the evidence and talking about this?

15     A.  Um, yes.

16     Q.  OK.  Because, in fact, throughout this case, that was the

17     first time -- yesterday on the stand was the first time you

18     said in this case that you gave a bag to *hectourc*, correct?

19     A.  Yes.

20     Q.  At your deposition when I asked you about it, you didn't

21     bring up *hectourc*, correct?

22     A.  I had to look into my direct messages then.  I can't

23     remember everything.

24                MR. WARSHAVSKY:  OK.  Your Honor, move to strike.

25                THE COURT:  No.

1   Q.  OK.  At your deposition, did you mention *hectourc*?

2   A.  No.

3   Q.  On summary judgment briefing in this case, did you

4   participate in that?

5            MR. HARRIS:  Objection, your Honor.

6            THE COURT:  Sustained.

7   Q.  When you were doing your prepping, prepping, prepping

8   Friday, were you focused on that Instagram post?

9            MR. HARRIS:  Objection, your Honor.

10           THE COURT:  As phrased, sustained.

11  Q.  Did you look at that Instagram post on Friday?

12  A.  What Instagram post?

13           MR. WARSHAVSKY:  Can you bring back up Exhibit 631.

14  Q.  This Instagram post.

15  A.  Um, did I look at it on Friday specifically?

16  Q.  Yes.

17  A.  I don't remember.

18  Q.  Did you look at it Saturday?

19  A.  I'm sure I've seen it through the trial prep.

20  Q.  I'm just asking if you saw it on Saturday?

21  A.  I'm not sure what day.

22           THE COURT:  I think he's fairly answering your

23  questions, counsel.  Put a new question.

24  Q.  OK.  Do you remember yesterday we talked about the Baby

25  Birkin?

1     A.  Yes.

2     Q.  And do you remember I asked you about whether or not you

3     bid on it?

4     A.  Yes.

5             MR. WARSHAVSKY:  OK.  And may I read the testimony,

6     your Honor, from yesterday?

7             THE COURT:  Yes.

8             MR. WARSHAVSKY:  OK.  This was questions from me

9     yesterday afternoon:

10    "Q.  By the way, did you bid on the Baby Birkin yourself?

11    "A.  No.

12    "Q.  Do you remember me asking you about this at your

13    deposition?

14    "A.  I was the first bid.

15    "Q.  So you did bid on it?

16    "A.  Yes.

17    "Q.  Had you won the bid, you would have bought it from

18    yourself?

19    "A.  For 100, yes.  It would be minted.

20    "Q.  OK.  Was that an effort to prop up the price?

21    "A.  No, it was just to -- I wanted to own my artwork.  So,

22    like, when you bid, it would have to be minted.  It wasn't

23    minted until somebody bid on it."

24    Q.  Was that testimony accurate?

25    A.  Pretty accurate.

1   Q.  OK.  What do you mean by "pretty accurate?"

2   A.  I mean, yeah, the testimony is accurate from the

3   transcript.

4   Q.  OK.  But were your answers accurate?

5   A.  Um, yes.  There is a little bit more, like, explanation

6   behind it, but if you're asking just about the testimony, then

7   yes.

8              MR. WARSHAVSKY:  OK.  I would like to show the

9   witness, the court, and counsel plaintiff's Exhibit 389 for

10  identification.

11             THE COURT:  Are you offering this?

12             MR. WARSHAVSKY:  I offer it into evidence.

13             THE COURT:  Any objection?

14             MR. HARRIS:  No objection, your Honor.

15             THE COURT:  Received.

16             (Plaintiff's Exhibit 389 received in evidence)

17             You can show it to the jury.

18             MR. WARSHAVSKY:  Thank you.

19  BY MR. WARSHAVSKY:

20  Q.  This was the bid you were referring to?

21  A.  Yes.

22  Q.  And you misremembered that, I assume when you said 100, you

23  just misremembered it was actually 300?

24  A.  Whatever the first -- I think it was the minimum bid, so I

25  assumed it was 100.

1              MR. WARSHAVSKY:  I would like to show the court,

2     defense counsel, and the witness Plaintiff's Exhibit 390.

3              Offer into evidence.

4              MR. HARRIS:  No objection, your Honor.

5              THE COURT:  Received.

6              (Plaintiff's Exhibit 390 received in evidence)

7              THE COURT:  Again once, it's received.  You need to

8     show it to the jury.

9              MR. WARSHAVSKY:  Publish to the jury, please.

10    BY MR. WARSHAVSKY:

11    Q.  So is this a second bid on a Baby Birkin by you?

12    A.  At the time there's people who didn't have the ability to

13    place bids, so that was me placing bids for them.

14    Q.  So you were placing a bid for somebody else here?

15    A.  Yes.  There was some instances where friends were bidding

16    as well.

17    Q.  Why wouldn't people have an ability to place a bid?

18    A.  Why?

19    Q.  Yes.

20    A.  Um, through the -- the Basic.Space website had a little bit

21    of a registration period.

22    Q.  So who did you place this bid for?

23    A.  I don't remember.

24    Q.  So yesterday you testified that you were willing to pay --

25    well, at least $300 to buy back the Baby Birkin, is that

N22sHER1                         Estival - Cross

1   correct?

2   A.  To --

3   Q.  To buy the Baby Birkin?

4   A.  To mint it.

5   Q.  You said that would be so you can own your own art?

6   A.  Um, yeah.  Just to own it.

7   Q.  OK.  Yesterday your counsel asked you if you owned a

8   MetaBirkin.

9             Do you remember that?

10  A.  Yes.

11  Q.  And you testified that you did, correct?

12  A.  Yes.

13  Q.  OK.  And I think you testified that the minting cost for

14  the MetaBirkins were less, correct, they were .1 ETH?

15  A.  .1.

16  Q.  So they were actually -- so $450, is that right?

17  A.  At the time.

18  Q.  That's right, because ETH fluctuates.

19            Is that what you mean?

20  A.  Yes, like, on December 2, it was around $450.

21  Q.  Did you pay for your MetaBirkins?

22            Did you pay .1 ETH?

23  A.  Um, I believe so or -- I'm not sure.  We had the ability

24  to, like, mint it on our own price, but I could have paid .1.

25  I'm not sure.

N22sHER1                          Estival - Cross

1   Q.  Do you remember discussing this at your deposition?

2   A.  Um, I don't.  I don't.

3   Q.  You don't.

4          It's possible you didn't pay anything to mint the

5   MetaBirkin?

6   A.  There would have to be gas fees associated, at the very

7   least.

8          MR. WARSHAVSKY:  Can we have the witness's deposition

9   testimony available.

10         Please make sure it's just counsel, myself, and the

11  court.

12         If you like, we can come back to it.  Come back to it?

13  OK.

14  Q.  Now, yesterday you testified, when your counsel was talking

15  to you, just going to the substance here, that everything you

16  did with the MetaBirkin was public.

17         Do you remember that discussion?

18  A.  I believe so.

19  Q.  OK.  And that you didn't have, you couldn't do anything

20  secret because it was on the blockchain, is that right?

21  A.  Yes.

22  Q.  That didn't stop you from trying, though, did it?

23  A.  Trying what?

24  Q.  To do things that were secret?

25  A.  I feel, like, that's an opinion.

1    A.  Yes.

2    Q.  So, just so I understand the relationship and we can be

3    clear about that, NFT Kings gets a free whitelist spot for

4    doing the first post, correct, in exchange for doing a post?

5    A.  Yes, I gave a whitelist spot.

6    Q.  And then he pays $450 or so to mint, correct?

7    A.  Correct.

8    Q.  OK.  And that's because he's done the chill, correct?

9    A.  It's because -- yeah, he posted it, yes.

10   Q.  As soon as he minted, he can sell the MetaBirkin that he

11   bought for $450 at whatever the market's at, correct?

12   A.  Yeah, whatever he wants to sell it for.

13   Q.  And at that time you thought the top of the market would be

14   somewhere between 25 and $50,000?

15   A.  Approximately.

16   Q.  OK.  But that was speculative?

17   A.  Yes.

18   Q.  So is the idea that the MetaBirkin are kind of like an

19   investment?

20   A.  Um, I believe art is an investment.

21   Q.  And the more people you have chilling the MetaBirkins or

22   that art, the higher the value will go?

23   A.  Um, the more people who see it and like it gives it the

24   opportunity to be bought for more money.

25   Q.  The people who are chilling are compensated by getting the

1    NFT?

2    A.   Just the ones that I know and that I spoke to prior to the

3    launch.

4    Q.   Were there any rules about how long someone chilling a

5    MetaBirkin NFT had to hold it?

6    A.   I don't believe so.

7    Q.   And I think we've used words like pump and chill.

8            Are pump and chill the same thing?

9    A.   Um, sort of.

10   Q.   Is there a difference between the two of them?

11   A.   They both mean, like, promote.

12           MR. WARSHAVSKY:  Can we show Plaintiff's Exhibit 259,

13   please -- I don't think it's admitted -- for identification.

14   Q.   This is a tweet from your Twitter, correct?

15   A.   Correct.

16   Q.   And you did that?

17   A.   I did that.

18           MR. WARSHAVSKY:  OK.  Move into evidence.

19           MR. HARRIS:  No objection, your Honor.

20           THE COURT:  Received.

21           (Plaintiff's Exhibit 259 received in evidence)

22           MR. WARSHAVSKY:  You can furnish to the jury, please.

23   Q.   So your tweet talks about, well, it says NFTs in a

24   nutshell, and then you define pump and dump.

25           Do you see that?

1  A.  I'm not defining them.  I'm just saying what the state of

2  the market was at the time.

3  Q.  OK.  So this is what you understood the state of the market

4  to be?

5  A.  That's what was happening at the time, in my opinion.

6         MR. WARSHAVSKY:  OK.  If we can turn to Plaintiff's

7  Exhibit 313.

8         I'm not sure if it's been admitted, which I think has

9  already been received into evidence.

10 Q.  This is your communication with the Sacks brothers,

11 correct; we looked at this before?

12 A.  Yes, and Jesse Lee.

13 Q.  Jesse Lee.  If we can go to page 111.

14        All right.  And here, this is a text from you on the

15 upper right, correct, I told Noble that I would give him a bag

16 if he could get whales to sweep the floor?

17 A.  Yes.

18 Q.  And who is Noble?

19 A.  Noble is just kind of an NFT influencer, also.

20 Q.  When you said you would give him a bag if he got whales to

21 sweep the floor, what did that mean?

22 A.  It's kind of, like, a chill promotion, same thing as NFT

23 Kings.

24 Q.  But what does sweeping the floor mean?

25 A.  To buy -- um, it's basically the same thing.  So basically

 1   it's just people buying them.
 2   Q.  OK.  So you're trying to get an influencer to get other
 3   people to raise the price, is that accurate?
 4   A.  Um, telling people to buy them which, in turn, would raise
 5   the price.
 6   Q.  All right.  Thank you.
 7            If we can turn to Plaintiff's Exhibit 255, which I'll
 8   offer for identification.
 9            This a blog post from you, correct?
10   A.  Yes.
11            MR. WARSHAVSKY:  And I'll offer into evidence.
12            MR. HARRIS:  Your Honor, sorry.  Just one second.
13            No objection, your Honor.
14            THE COURT:  Received.
15            (Plaintiff's Exhibit 255 received in evidence)
16   Q.  And when you say -- you say my goal is for MetaBirkins to
17   double as an investment.
18            Do you see that?
19   A.  Yes.
20   Q.  OK.  What did you mean by that?
21   A.  Art is an investment and they double as an investment for
22   the holders.
23   Q.  And then you say you're looking for the right holders.
24            Do you see that?
25   A.  Correct.

1    Q.  Is this a Twitter account you controlled at any or

2    partially controlled at any point?

3    A.  Partially controlled, yes.

4    Q.  Did you do this post?

5    A.  Um, prob -- most likely.

6              MR. WARSHAVSKY:  We would offer it into evidence.

7              MR. HARRIS:  No objection, your Honor.

8              THE COURT:  Received.

9              (Plaintiff's Exhibit 76 received in evidence)

10   Q.  Can you tell us what this is?

11             MR. WARSHAVSKY:  Furnish to the jury.

12   A.  What was that?

13   Q.  Can you tell us just very generally what this is?

14   A.  This is -- it's called a roadmap.  It just tells you what

15   you're doing with, um, a project.

16   Q.  Why did you issue this?

17   A.  To tell people what our project was about.

18             MR. WARSHAVSKY:  OK.  If we can turn to Plaintiff's

19   Exhibit 305 for identification.  Actually, let's get rid of

20   that.  I don't want to use that.

21             If we can go to Plaintiff's Exhibit 154 marked for

22   identification.  I'll skip this one to try to move quickly.

23   BY MR. WARSHAVSKY:

24   Q.  We spoke earlier about -- we spoke not earlier, I guess

25   yesterday -- about the website for the MetaBirkins NFTs.

1            Do you remember that?

2   A.  Yes.

3   Q.  And that website is *www.MetaBirkins.com*, correct?

4   A.  Yes.

5   Q.  And do you remember when you registered that name?

6   A.  Um, I guess it would be after I got the name suggested.

7   Q.  OK.  So sometime late October, early November 2021?

8   A.  I assume so.

9   Q.  That would have been before October 29, 2021?

10  A.  No, it would be after the name was suggested.

11  Q.  OK.  But before December 1, when the MetaBirkins were

12  minted?

13  A.  Yeah.

14  Q.  So sometime within the November 2021, probably?

15  A.  Correct.

16            MR. WARSHAVSKY:  I would like to show for

17  identification, switching a little bit here, Plaintiff's

18  Exhibit 323 marked for identification.

19  Q.  Have you seen this document before?

20  A.  Um, yes.

21  Q.  This is an e-mail that you're on, correct?

22  A.  Yes.

23  Q.  And it's you, someone named Kenneth Loo, and someone named

24  Cristina Criddle, correct?

25  A.  Correct.

1    A.  Pushing for it.

2    Q.  At this time, were you negotiating with Hermès?

3    A.  No, but that doesn't infer that.  I said, pushing for it,

4    which means I would try.  But then I say, but I have major

5    press.

6    Q.  So, I'm sorry, when you were saying pushing for it, that's

7    not meant to convey that you're pushing to negotiate with

8    Hermès?

9    A.  I said I would try, yes.

10   Q.  Saying that you're trying to negotiate?

11   A.  Trying to collaborate with Hermès.

12   Q.  OK.  If we can turn to Plaintiff's Exhibit 373 for

13   identification.

14          This is a text message between you and someone named

15   Lauren that you produced in discovery.

16          Do you know who Lauren is?

17   A.  Yes.

18          MR. WARSHAVSKY:  We would move subject to the same

19   objection and agreement.

20          THE COURT:  Same objection, same ruling, received.

21          (Plaintiff's Exhibit 373 received in evidence)

22   Q.  Turn to page 11.

23          This is, by the way, December 2.  the MetaBirkins were

24   minting, correct?

25   A.  Yes.

1    Q.  If we can go to page 11, maybe top of page ten because of

2    how the text split.

3              So we see at the bottom of page ten, the top of

4    page 11, Lauren writes, How did the call go with Hermès?

5              Do you see that?

6    A.  Yes.

7    Q.  OK.  And you respond two things here.  Looks like you're

8    switching between conversations.  You say they can be used

9    against me, looks like if Hermès wants to be bad, and then the

10   next one, that's TBD next week, Tuesday.

11             Do you see your three texts?

12   A.  Correct.

13   Q.  Which one was responding to Lauren?

14   A.  What do you mean?

15   Q.  Lauren asks, How did the call go with Hermès?

16             Lauren asks, How did the call go with Hermès?

17             Did you have a call with Hermès at that time?

18   A.  No, but I was told from that same person I recommended -- I

19   mentioned yesterday that they would try to put me in touch with

20   somebody from New York.

21   Q.  And who was that person?

22   A.  It was a president of a former president of Yoox.

23   Q.  What's the name of the person?

24   A.  Can I --

25             Is that all right to say, like ...

1   Q.   Yeah.

2   A.   Clement Quan.

3   Q.   OK.  And Clement Quan told you that he was calling Hermès

4   on your behalf?

5   A.   He said he knew people and they would try to get me on the

6   line with somebody, so.

7   Q.   Who did he say he knew?

8   A.   Somebody from the New York PR department.

9   Q.   Does Hermès have a New York PR department?

10  A.   I don't know.  This is what somebody else is telling me.

11  Q.   OK.  And did Clement Quan make any calls on your behalf; do

12  you know?

13  A.   I'm not sure.

14  Q.   Did Clement Quan ever send you any texts about calls with

15  Hermès?

16  A.   We predominantly talked on the phone.

17  Q.   But you never had this call?

18  A.   No.

19  Q.   If we can turn -- by the way, who is Lauren?

20  A.   She worked for Basic.Space at the time.

21  Q.   OK.  Were you working with Basic.Space on --

22          Let me ask it differently.

23          Was Basic.Space a business partner of yours?

24  A.   Um, for Baby Birkin, yes.

25  Q.   And was Lauren also doing work for you in connection with

1    the MetaBirkins?

2    A.  Um, she did, like, PR for Basic.Space, and they were

3    supposed to help get press as well.

4    Q.  OK.  Weren't there other projects, like, did you ever

5    discuss maybe making bathrobes for the MetaBirkins?

6    A.  Um, I think so, yes.

7    Q.  And you had those discussions with Lauren?

8    A.  Yes.

9    Q.  And those were real world projects to wear?

10   A.  Just a bathrobe?

11   Q.  Yes.

12   A.  Yeah, a bathrobe.

13   Q.  And those would have a MetaBirkin' logo on it or a --

14              Let me ask it better.

15              Those bathrobes that you were talking about were going

16   to have a MetaBirkin logo on them?

17   A.  I don't believe so.  Maybe the name.

18   Q.  The name?

19   A.  But they were going to have their wallet addresses on them

20   to identify them.

21   Q.  OK.  Thank you.

22              If we could turn to Plaintiff's Exhibit 306, which has

23   already been introduced.  Page 47.  This is your discussion

24   with Truman and Alex Sacks.

25              You write -- so this is two days earlier, November 30?

N22sHER1                    Estival – Cross

```
 1   A.  Yes.
 2   Q.  And you say, We need to make a push with Hermès just to
 3   try.  My plug at Vogue has a direct line to Paris.
 4   A.  Correct.
 5   Q.  OK.  So two days earlier you're talking about your plug at
 6   Vogue?
 7   A.  Yes.
 8   Q.  Who was your plug at Vogue?
 9   A.  Just different writers at Vogue that were covering Baby
10   Birkin.
11   Q.  Which writer?
12           Which writer was that?
13   A.  Um, I don't have their name.
14   Q.  OK.  And you didn't mention Clement Quan here.
15           You mentioned Vogue?
16   A.  Yes.
17   Q.  If we could -- well, let's stay here for a minute.  If we
18   can go back to 46 and 47.
19           You talk about next projects being MetaParteks and
20   MeteMilles.
21           Do you see that?
22   A.  Correct.
23   Q.  Those were ideas you had?
24   A.  Just ideas.
25   Q.  And on the next page you say, I create watches and we pitch
```

1    Hermès thing.

2               Do you see that?

3    A.  Yes.

4    Q.  And you give a screenshot from *L'OfficielUSA.com*?

5    A.  Yes.

6    Q.  And and how did you get that?

7    A.  How did I get what?

8    Q.  Where did you take that screenshot from?

9    A.  Um, probably -- I mean, I think, maybe, Google.

10   Q.  So did you go to the *L'OfficielUSA.com* website to get it?

11   A.  No.  I went on Google.

12   Q.  You went on Google.

13              OK.  How did you find out about this?

14   A.  I have Google alerts.

15   Q.  OK.  So the Google alert told you about this, you think?

16   A.  Yes, yes.

17   Q.  And is this a picture of the MetaBirkins website, or is

18   this a picture of part of the MetaBirkins website?

19   A.  Um, yes.  This was also separate, so I don't know, um, if

20   it was from within the site or if it was taken as an image.

21   It's an image.

22   Q.  OK.  So if we go back to page seven of this, maybe six and

23   seven.

24              So you're responding to text messages with Moshe Sacks

25   and Truman Sacks.  And you say, you see, and then on to page, I

N22sHER1                        Estival – Cross

1    guess, page six and then page seven, you say, It's kinda

2    stupid.  The only time I use Hermès in the claimer?

3             Do you see that?

4    A.  Disclaimer.

5    Q.  Disclaimer, you're right.

6             Do you see that?

7    A.  Yes.

8    Q.  Isn't it true that the disclaimer was only put on your

9    website after you received the cease and desist letter?

10   A.  Yes.

11   Q.  If we can go to Exhibit 251 for identification.

12            This is a screenshot from the MetaBirkins Discord

13   server, correct?

14   A.  Correct.

15   Q.  And this is a post by you, correct?

16   A.  Yes.

17            MR. WARSHAVSKY:  Offer this into evidence.

18            MR. HARRIS:  What is this?

19            MR. WARSHAVSKY:  It was Exhibit 251.

20            MR. HARRIS:  251.

21            No objection, your Honor.

22            THE COURT:  Received.

23            (Plaintiff's Exhibit 251 received in evidence)

24            MR. WARSHAVSKY:  Can we publish to the jury, please.

25   Q.  This was a contest you were running on the MetaBirkins

1    Q.  And is this a post that you put out publicly?

2    A.  Yes, this went out on Twitter.

3    Q.  And this 24,000 number, that's right at the top of the

4    Discord?

5    A.  Yes, this is on December 15th.  And this would have been

6    the number that I saw at the top.  And everybody could see

7    publicly, so I couldn't, like, lie about it.

8            MR. HARRIS:  Your Honor, I offer Defendant's Exhibit

9    619.

10           MR. WARSHAVSKY:  Your Honor, I think this is -- I

11   think this is hearsay within hearsay, given the testimony.

12           THE COURT:  Let me ask the witness, this is something

13   you put together?

14           THE WITNESS:  This is my -- my tweet.

15           THE COURT:  Overruled.

16           MR. HARRIS:  Thank you.  Please publish that.

17           THE COURT:  This is, I think, fair rebuttal, and the

18   door was opened to this.  Received.

19           MR. HARRIS:  Thank you, your Honor.

20           (Defendant's Exhibit 619 received in evidence)

21           THE COURT:  So maybe this has been answered, but at

22   least to me it's unclear.  The decision to use the term

23   "MetaBirkins" was yours, yes?

24           THE WITNESS:  The final decision to actually use the

25   term, yes.

1          THE COURT:  Okay.  And you intended to associate -- to

2   indicate to the people who were accessing this that this was in

3   some sense a reference to Birkin bags, yes?

4          THE WITNESS:  In some ways, yes, a reference.

5          THE COURT:  Okay.  And just so I understand how the

6   purchasing went, they knew that when they purchase an NFT, even

7   though for 24 hours they would only see a shrouded image, that

8   what they were ultimately going to get was one of these --

9          THE WITNESS:  Yeah, one --

10         THE COURT:  -- MetaBirkin fur-covered MetaBirkin

11  images; correct?

12         THE WITNESS:  Yes.

13         THE COURT:  Go ahead.

14  BY MR. HARRIS:

15  Q.  In fact, Mr. Rothschild, did there come a point in time

16  where the Discord had more than 24,000 members?

17  A.  Yes, this was just on December 15th.

18         MR. HARRIS:  You can take that down, please, Ashley.

19  Q.  Mr. Warshavsky asked you some questions yesterday about a

20  community poll, do you recall that?

21  A.  Right.

22         MR. HARRIS:  If you could please put up in evidence,

23  Ashley, Exhibit 306, page 31.

24  Q.  And you were shown this yesterday, right?

25  A.  Yes.