UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HERMÈS INTERNATIONAL and
HERMÈS OF PARIS, INC.,

          Plaintiffs,

     -against-

MASON ROTHSCHILD,

          Defendant.

---

22-cv-384 (JSR)

OPINION AND ORDER

---

JED S. RAKOFF, U.S.D.J.:

     After a nine-day trial, an eight-person civil jury returned a unanimous verdict against the defendant, "Mason Rothschild" (real name: Sonny Estival), finding him liable on all three counts of trademark violation and awarding the plaintiffs -- Hermès International and Hermès of Paris, Inc. (collectively, "Hermès") -- $133,000 in damages.[1] As the jury expressly found, Rothschild, a self-described "marketing strategist," purposely sought (with some success) to confuse consumers into believing that his non-fungible tokens ("NFTs"), labeled "MetaBirkins," and his associated website, "metabirkins.com," were affiliated with Hermès' iconic "Birkin" trademarks. While the Court instructed the jury that even the modest

---

[1] In its discussion of the post-trial motions, the Court assumes familiarity with the facts of this case as evidenced at trial and as described in detail in this Court's order denying the parties' cross-motions for summary judgment. *See Hermès v. Rothschild*, 2023 WL 1458126 at *1-3 (S.D.N.Y. Feb. 2, 2023). Also, all capitalized terms here used refer to the definitions set forth in that Order, unless otherwise specified. All internal quotation marks, alterations, omissions, emphases, and citations have been omitted from all cited sources.

elements of artistic expression contained in Rothschild's works entitled him to total First Amendment protection against Hermès' claims <u>unless</u> Hermès proved that Rothschild <u>intentionally</u> misled consumers into believing that Hermès was backing its products, the jury had no difficulty in concluding that Hermès had so proved. In effect, the jury found that Rothschild was simply a swindler.

This Opinion addresses the post-trial motions that the parties filed following the jury's verdict. The defendant asks that the Court enter judgment as a matter of law in his favor pursuant to Federal Rule of Civil Procedure 50(b), or, in the alternative, order a new trial pursuant to Federal Rule of Civil Procedure 59(a). In a separate motion, Rothschild also requests leave to interview the foreperson of the jury and up to four other jurors in light of what he claims to be "the substantial possibility that the jurors considered material, prejudicial, and erroneous information outside the record in reaching their verdict." Dkt. No. 170. Plaintiffs, in their sole motion, seek to personally enjoin Rothschild from taking certain actions that, in plaintiffs' view, have enabled him to continue infringing and diluting their trademarks.

The Court will first address Rothschild's request for a judgment of law in his favor or for a new trial; next, the plaintiffs' petition for a permanent injunction; and finally, the defendant's request to interview the jury. For the following reasons, the Court hereby denies both of the defendant's motions and enters a permanent injunction against the defendant, the terms of which are detailed in an order

filed simultaneously with this Opinion. ("The Court's Permanent Injunction Order").

I.   **The Defendant's Motion for Judgment as a Matter of Law or for a New Trial**

In his first motion, Rothschild asks this Court to declare judgment in his favor as a matter of law under Rule 50(b) or, in the alternative, to order a new trial under Rule 59(a). Judgment as a matter of law under Rule 50(b) is warranted only where there is "a complete absence of evidence supporting the verdict" such that "reasonable and fair minded [persons] could not arrive" at that verdict. *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008). To order a new trial under Rule 59(a), the Court "must conclude that the jury has reached a seriously erroneous result or . . . [that] the verdict is a miscarriage of justice" when viewed "against the weight of the evidence." *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003).

Both of these possibilities must, moreover, be weighed against the respect that our federal constitution gives to juries. Indeed, a hallmark of the American legal system is its entrusting to everyday citizens the primary responsibility of resolving not only criminal but also civil disputes -- on the theory (well-supported in this Court's view) that ordinary citizens are best suited to determine where justice lies in such disputes. It follows that a jury's verdict should not be lightly overturned.

A. <u>The Court's Instructions to the Jury Were Entirely Correct</u>

Rothschild's primary argument on his first motion is that the jury could not properly perform their function because the instructions they were given by the Court were legally deficient. However, jury instructions are legally deficient -- and thus may serve as the basis for judgment as a matter of law or a new trial -- only where the instructions, "viewed as a whole, either failed to inform the jury adequately of the law or misled the jury about the correct legal rule." *United States v. White*, 552 F.3d 240, 246 (2d Cir. 2009). Here, Rothschild argues, the Court's legal instructions to the jury were inconsistent with Second Circuit law, both in how they were structured and in their substance. But neither argument is remotely supported by the record in this case or by applicable law.

    *i.   The Structure of the Court's Instructions to the Jury Was Totally Proper*

Rothschild first posits that the sequencing of the Court's instructions -- which directed the jury to first determine whether Hermès had proved each of the essential elements of its three trademark claims *before* it considered whether Hermès had also proved that the First Amendment did not protect Rothschild from liability -- misled the jury into viewing the First Amendment as a "defense" or "excuse" to liability. In his view, the jury's determination that he had broken the law at the first step of the Court's instructions made them (he hypothesizes) "reluctant to find that the First Amendment . . . released [him] entirely from the consequences of what they viewed as

his unlawful conduct." *See* Def. Br. at 7. In actuality, as detailed below, the straightforward structuring of the Court's instructions was entirely proper.

Indeed, Hermès argues, this was so evident even to Rothschild's counsel that, at the charging conference, he expressly waived the structural argument on which he now relies. Specifically, after making this argument during the charging conference, defense counsel, in response to wording changes the Court then made, expressed his consent to the newly worded instruction, including its placement, stating that he was now "satisfied with [the instruction]." *See* Dkt. No. 159 at 901:14-21. Defendant, for his part, argues that he only agreed to the wording of the revised instruction, but not to the order of its placement. But the Court need not resolve this dispute because, even assuming that there was no waiver, the defendant's argument about structure has no merit.

This is because the most logical way to structure the instructions was precisely the way the Court did it. Specifically, the Court first instructed the jury about the essential elements of plaintiffs' trademark claims, then instructed the jury that, if plaintiffs failed to prove any of these elements, that alone was sufficient to deny plaintiffs' claims and that, even if plaintiffs did prove these elements, the plaintiffs, as part of their burden, must also prove that defendant's conduct was not shielded by First Amendment protection of artistic expression.

Nowhere in these instructions did the Court refer to the First Amendment protection as a "defense" or "excuse" to liability. On the contrary, the Court -- at the insistence of Rothschild's counsel -- *revised* its instructions to clarify that the First Amendment was *not* a defense and that, as a result, the "burden remain[ed] with [Hermès] at all times" to prove that Rothschild's NFTs did not fall within the Amendment's scope. Dkt. No. 157 at 849:20-23. And it was after this change that defense counsel stated his consent to the instruction.

Other than rank speculation, defendant's only "evidence" that the jury nonetheless misinterpreted the Court's explicit instruction that the plaintiffs could not recover unless they proved that Rothschild's images were not entitled to First Amendment protection rests on his interpretation of the jury's first note -- in which the jury asked the Court whether Rothschild would be able to continue selling the NFTs if they found him non-liable on First Amendment grounds. The defendant interprets this note to mean that the jury was "reluctant" to find that the First Amendment protected his "law-breaking" behavior. Def. Br. at 1. But even putting aside for a moment the highly speculative nature of this argument, Rothschild only tells half of the story. Following receipt of the note, the Court -- with both sides' consent -- instructed the jury to focus exclusively on whether Hermès had proved that Rothschild's "MetaBirkins NFTs" were not entitled to First Amendment protection and to disregard any consequences that would attach to their determination. There is no reason to think that the jury did not heed this clear instruction.

The only other support Rothschild provides for his structural challenge to the jury instructions is a short comment made by a jury member on a social media platform following the verdict. In response to another user on the platform LinkedIn, one of the jurors opined that legitimate digital artists would have "no need to hide under the cloak of the 1st amendment" so long as they kept in mind "the goodwill of the brand and the consumer in mind." *See* Dkt. No. 174, Exh. D.

In so stating, the juror in effect accurately predicted what the Supreme Court would hold a few months later, in *Jack Daniel's Properties, Inc. v. VIP Products LLC*, No. 22-148 (U.S. June 8, 2023), where the Court, unanimously overruling the Ninth Circuit's conclusion that "the First Amendment compels a stringent threshold test when an infringement suit challenges a so-called expressive work," held that such a threshold inquiry "is not appropriate when the accused infringer has used a trademark to designate the source of its own goods -- in other words, has used a trademark as a trademark." *Jack Daniel's Properties*, No. 22-148, slip op. at 2. This, of course, is precisely what the defendant, with his "MetaBirkins" NFTs and "MetaBirkins" website, did here.

ii.  *The Substance of the Court's Jury Instructions Was Entirely Correct*

Rothschild, in addition to his challenge to the Court's sequencing of its instructions, also asserts that these instructions were substantively deficient because they misstated the law. Rothschild's

substantive challenge, however, is just as unpersuasive as his structural argument.

At the outset, here again, there is a substantial argument by plaintiffs that the defendant waived this objection at the charging conference by stating, after the Court had made certain changes requested by defendant, that it was now satisfied with the relevant instruction (Instruction No. 14). But, once again, the Court need not resolve the issue of waiver because, even if there were no waiver, the Court's instructions were, if anything, more favorable to the defendant than the law even required.

Specifically, under the Second Circuit's decision in *Rogers v. Grimaldi*, 875 F.3d 994 (2d Cir. 1989), the First Amendment requires dismissal of an infringement claim brought against a work containing some degree of "artistic expression" unless the challenged use of the mark "has no artistic relevance to the underlying work" or "explicitly misleads as to the source of or the content of the work." *Rogers*, 875 F.3d at 999.

Whether the *Rogers* test even properly applies to a case like this one has now been cast in doubt by the aforementioned recent decision of the U.S. Supreme Court in *Jack Daniel's Properties*, where the Court stated that: "Without deciding whether *Rogers* has merits in other contexts, we hold that it does not when an alleged infringer uses a trademark in the way the Lanham Act most cares about: as a designation of source for the infringer's own goods." *Jack Daniel's Properties*, slip op. at 10. This, of course, is precisely what Rothschild did

8

here, by using a website he labeled "metabirkins.com" to sell NFTs he labeled "MetaBirkins NFTs." The references to Hermès' registered "Birkin" trademarks were thus explicit and central to Rothschild's venture.

But not yet having the benefit of *Jack Daniels Properties*, this Court in the instant case not only applied *Rogers*, but also applied it in a way highly favorable to the defendant. Specifically, the Court first instructed the jury that the MetaBirkins NFTs were "in at least some respects" works of artistic expression as a matter of law. *See* Dkt. No. 167 at 14. Then, as to the alternative possibility that defendant's use of the Birkin trademarks was explicitly misleading, this Court went even further in defendant's favor than *Rogers* arguably required by defining "explicitly misleading" to mean not only objectively misleading but also intentionally misleading. Thus, the Court instructed the jury that Rothschild could not be found liable for any of Hermès' claims unless Hermès proved that the defendant "actually *intended* to confuse potential customers into believing that Hermès was associated" with his NFT project. *Id.*

In other words, by defining "explicitly misleading" to include an intent to mislead, the Court actually accorded Rothschild greater First Amendment protection that *Rogers* arguably required.[2] The defendant's arguments to the contrary express little more than his

---

[2] The Court based this extension of *Rogers* largely on its reading of the Second Circuit's post-*Rogers* decision in *Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993).

counsel's view that trademark infringement can never exist where any form of artistic expression is included. Even under *Rogers*, this was never the law, let alone under *Jack Daniel's Properties*. And this Court's jury instructions, if anything, went further in defendant's direction than the law required. His protestations to the contrary thus ring hollow.

It remains only to add that if the jury found -- as they did here -- that Rothschild did use Hermès' marks with an intent to deceive, any claim he might have to First Amendment protection was waived. For nothing could be better established than that the First Amendment does not eliminate liability for intentional fraud. *See Illinois ex rel. Madigan v. Telemarking Assocs.*, 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud."). Defendant's entire scheme here was to defraud consumers into believing, by his use of variations on Hermès' trademarks, that Hermès was endorsing his lucrative MetaBirkins NFTs. Nothing in the First Amendment insulates him from liability for such a scheme.

Rothschild nonetheless argues that the jury instructions were defective because they did not attempt to distinguish between "[Rothschild's] intent *upon adopting the mark* and whatever his [intent] might have been *after* adopting the mark." Def. Br. at 4. This permits the possibility, according to Rothschild, that the jury based its decision on Rothschild's developing his fraudulent intent only *after* he first incorporated Hermès' trademarks into his work. This argument is, however, doubly mistaken. To begin with, Hermès did not contend

at any time that any intent that Rothschild showed only after his adoption of its trademarks was relevant. Instead, even where the plaintiffs introduced evidence of events that took place after the creation of the NFTs -- including Rothschild's alleged failure to mitigate confusion among potential consumers -- they offered such evidence as corroboration of Rothschild's bad faith intent *at the time of the mark's adoption*. Likewise, Rothschild himself offered evidence of events that took place after adoption -- namely, his attempts to tell media outlets that there was no connection between Hermès and the MetaBirkins NFTs -- as evidence of his artistic intent *at the time of adoption*.

In any case, as far as trademark infringement and the First Amendment is concerned, there is little difference between an intent to confuse at the time of adoption of the mark and after its adoption. In the *Rogers* context, the relevant question is whether Rothschild intended to "induce members of the public to believe the [artwork] was prepared or otherwise authorized by [the trademark holder]." *See Twin Peaks,* 996 F.2d at 1379 (2d Cir. 1993). The object of the intent standard is to figure out if Rothschild used the mark to exploit the goodwill of Hermès or, instead, to advance an artistic purpose. It makes no difference if he had decided to exploit that goodwill at the time of adoption or, later on, when he realized that consumers were confused about an association between the parties. *See Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 333 (2d Cir. 2020) ("Bad faith and intent to deceive are relevant to the extent that they add to the

likelihood that the accused infringer will achieve its objective of consumer confusion."). In both cases, he is either using the marks to exploit Hermès' goodwill, or he is not.

B. A Reasonable Juror Could Find On this Record that Rothschild Was Liable for Hermès' Trademark Claims

Rothschild further argues that, even assuming he intended to deceive consumers into believing Hermès was endorsing his products, no reasonable jury could have found that he was liable on Hermès' trademark claims after applying the traditional *Polaroid* factors. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). Once again, the Court does not find this argument remotely persuasive.

To begin with, Rothschild challenges only the evidence that Hermès presented in support of its argument for actual confusion, neglecting most of the evidence that Hermès offered on the other *Polaroid* factors. This includes, for example, the similarities between the design of the Birkin handbag and the MetaBirkins NFTs; testimony that confirms the Birkin bag's distinctive place in American cultural life; and statements suggesting that Hermès intended to "bridge the gap" by entering the NFT space. Even assuming (contrary to fact) that the evidence of actual confusion in this case was insufficient, "actual confusion need not be shown to prevail under the Lanham Act," and a reasonable juror could have found him liable because the other *Polaroid* factors weighed heavily against him. *Lois Sportswear, U.S.A. Inc. v. Levi Strauss Co.*, 799 F.2d 867, 875 (2d Cir. 1996).

As to actual confusion, Rothschild seeks to avoid the fact that the study conducted by Hermès' expert, Dr. Bruce Isaacson, was itself sufficient to show *actual* confusion. *See e.g., Lon Tai Shing Co., Ltd. b. Koch-Lowy*, 1992 WL 18806, *3 (S.D.N.Y. Jan. 28, 1992) (finding that a survey showing at least 18% of respondents reflected actual consumer confusion "satisfies the necessary threshold for determining actual confusion in this Circuit."). The survey, moreover, was not the only item that Hermès submitted as evidence of actual confusion. In particular, Hermès also submitted evidence that several fashion magazines, such as *Elle* and *L'Officel*, mistook the MetaBirkins NFTs as Hermès' foray into the NFT market.[3]

Without multiplying examples further, it is clear that the jury had before them ample evidence of trademark infringement under the *Polaroid* factors.

C. Rothschild's Remaining Grounds For His Motion Fail

Rothschild's remaining grounds for judgment as a matter of law or a new trial are resolved against him as follows.

*First*, Rothschild raises no new arguments in his submission about the admissibility of Dr. Blake Gopnik's expert testimony and the Court reaffirms its decision to exclude the defendant's expert witness. In

---

[3] Though courts are in dispute over whether this sort of misattribution evidence can be asserted as evidence of *actual* confusion, it can -- with less controversy -- be introduced as *circumstantial* evidence of the likelihood of confusion, another related *Polaroid* factor. *See Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 295 (S.D.N.Y. 2018).

brief, Dr. Gopnik's deposition transcript revealed that he did not have a recognizable, describable methodology that he used to reach his conclusions. *See, e.g.*, Fernandez Decl. to Plfs. Motions in Limine Submission, Ex. 2 at 95:15-21 (providing excerpt in which Dr. Gopnik says, "[t]here's no consensus among art historians about anything, including whether the Mona Lisa is art, so there cannot be a consensus on fur-covered Birkin bags"); *id.* 98:25-28 (providing another excerpt in which Dr. Gopnik describes his methodology for determining whether a given piece of art falls within the Business Art tradition as looking at a "larger set of contextual clues that tell you, oh, this might be worth looking at as an artist activity.").

In any case, any error here was harmless since, as already noted, the Court instructed the jury as a matter of law that Rothschild's products contained an element of artistic expression.

*Second*, the Court also declines to reconsider its decision that the Supreme Court's *Dastar* decision does not bar Hermès' claim. The reasoning for that conclusion is laid out in detail in the Court's prior opinion in *Hermès Int'l v. Rothschild,* 590 F. Supp. 3d 647, 654-56 (S.D.N.Y. 2022). And, of note, the logic of the Court's decision has recently been adopted verbatim by a sister district court encountering the same issue involving NFTs. *See Yuga Labs, Inc. v. Ripps*, 2023 WL 3316748 (C.D. Cal. Apr. 2, 2023).

*Third*, the Court finds no error in the jury's decision to find Rothschild liable not just for trademark infringement, but also for trademark dilution and cyber-squatting. With respect to trademark

dilution, contrary to what the defendant says in his papers here, the *Rogers* test *does* apply to trademark dilution claims in this Circuit. *See AM General*, 450 F. Supp. 3d at 488. Indeed, until the defendant filed this motion, he agreed with this position. *See* Dkt. No. 27, Def. Br. in Support of Mot. to Dismiss at 22 ("*Rogers* applies to Hermès' dilution claims"). And here, the jury, applying the Court's very pro-defendant interpretation of *Rogers*, determined that Hermès had proved that Rothschild, by purposely intending to confuse consumers, did not qualify for any First Amendment protection under *Rogers*. Thus, Rothschild's use of Hermès' trademarks do not qualify as First Amendment protected speech that is exempt from anti-dilution laws, even as that term is described under the out-of-circuit precedent Rothschild cites. *See Mattel, Inc. v. MCA Recs., Inc.,* 296 F.3d 894, 903 (9th Cir. 2002).

Rothschild's request to invalidate the jury's verdict on cyber-squatting is even more quixotic. Rothschild denies liability on this count because he claims to have had "reasonable grounds to believe that the use of this domain name was lawful . . . and he was acting within his legal rights under the First Amendment in promoting his artwork" on his website. But, as the Court has already explained, the jury found that Rothschild *waived* his First Amendment protection, even assuming, arguendo, that he ever had such protection against a trademark claim of this kind -- a position subsequently rejected by the U.S. Supreme Court in *Jack Daniel's Properties*, No. 22-148 (U.S. 2023). Given that the jury in its verdict found that Rothschild used

Hermès' marks to exploit the goodwill associated with the plaintiffs' marks, it would be entirely reasonable for that same jury to also find that Rothschild knew using the domain name was unlawful.

In conclusion, for all the foregoing reasons, the Court declines to grant Rothschild judgment as a matter of law or grant him a new trial.

## II.  **The Plaintiffs' Motion for a Permanent Injunction**

Turning to Hermès' motion for a permanent injunction, Hermès alleges that Rothschild "continues to promote the sale of the" MetaBirkins NFTs "while also seeking to collect a royalty for these sales." Plfs. Br. at 5. His efforts, according to the plaintiffs, include promoting the MetaBirkins NFTs on social media platforms and continuing to list the NFTs for sale on different marketplaces. *Id.* These allegations are not disputed by any contrary evidence offered by defendant.

On the basis of these undisputed facts, the plaintiffs ask this Court to enjoin Rothschild from taking actions that have, in their view, enabled him to continue infringing and diluting their trademarks. Specifically, they request that the Court order Rothschild to do the following seven things. *First*, to discontinue his use of the "Birkin" marks and generally refrain from misleading the public about an association between his NFT project and Hermès. *Second*, to transfer the metabirkins.com domain name and related social media accounts featuring the Birkin mark to Hermès. *Third*, to transfer any MetaBirkins

NFTs in *his* possession, including the smart contracts associated with each NFT, to a "cryptocurrency wallet" designated by Hermès. *Fourth*, to notify Hermès of any income received from the MetaBirkins NFTs and transfer that income to Hermès. *Fifth*, to notify anyone who purchased a MetaBirkins NFT of the relief described in the permanent injunction, assuming one is issued. *Sixth*, to file a declaration confirming his compliance with the permanent injunction within thirty-one days of the Court's entry of its order. And *seventh*, to preserve documents that relate to this lawsuit.

To show that it is entitled to *any* form of injunctive relief, Hermès must first satisfy the four requirements set forth by the Supreme Court in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).[4] To wit, Hermès must clearly show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay*, 547 U.S. at 391. The Court finds that Hermès has carried this burden.

As to *eBay*'s first requirement, Hermès has proved that Rothschild's ongoing conduct would inflict irreparable injury on it absent injunctive relief. *Id.* at 391. Because of the Trademark

---

[4] Though *eBay* was decided in a patent infringement setting, it is well-established that the four-part test it sets forth is "the presumptive standard for injunctions in any context." *See Salinger v. Colting*, 607 F.3d 68, 78 (2d Cir. 2010).

Modernization Act of 2020 ("TMA") -- Hermès is entitled to "a rebuttable presumption of irreparable harm" by virtue of the jury verdict in its favor on its trademark infringement claim. *See* 15 U.S.C. § 1116(a) ("A plaintiff seeking [a permanent injunction] shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction."). Similarly, as to Hermès' dilution claim, courts have long assumed that success (as here) on the merits of such a claim implies that an irreparable harm has been and continues to be inflicted on the plaintiff, "based on the ensuing loss of goodwill and ability to control one's reputation." *Gucci America, Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 243 (2012).

Rothschild's primary response is that the TMA presumption only shifts the "burden of production" to him, and that he has met that burden, thereby shifting the "burden of persuasion" to Hermès -- a burden Rothschild claims Hermès has failed to satisfy. The meaning of the TMA presumption in trademark litigation is, indeed, a subject of lively debate among our fellow district courts and sister circuits. Some agree with Rothschild that this presumption "shifts [only] the evidentiary burden of production," leaving "the burden of persuasion" with the moving party. This position, championed by the Third Circuit, finds support in Federal Rule of Evidence 301, which provides that, absent statutory language to the contrary, presumptions are assumed to "not shift the burden of persuasion, which remains on the party who had it originally." Fed. R. Evid. 301; *Nichino Am., Inc. v. Valent*

*U.S.A. LLC*, 44 F.4th 180, 185 (3d Cir. 2022). This Court, however, joins the courts that have taken the opposite view, *see, e.g.*, *Guru Teg Holding, Inc. v. Maharaja Farmers Mkt., Inc.*, 581 F. Supp. 3d 460 (E.D.N.Y. 2021). This is because language from the statute's legislative history and a careful consideration of the context in which the statute was enacted both strongly suggest that Congress chose to place the burden of persuasion on the proven infringer.

Because the meaning of "presumption" in the statute is ambiguous, "we may consult" this "legislative history . . . to discern Congress's meaning." *See United States v. Gayle*, 342 F.3d 89; *see generally* Robert A. Katzmann, *Judging Statutes* (2014) (mapping the path judges should take to undertake a fair examination of legislative history in order to clarify ambiguous statutory language). The House Report accompanying the statute is particularly illuminating. Finding that, "[h]istorically, federal courts considering injunctive relief for trademark infringement claims had nearly uniformly held that success on the merits of a trademark claim . . . created a rebuttable presumption of irreparable harm that was sufficient to satisfy that prerequisite for relief," the statute aimed to restore that historical practice in the face of the "inconsistent and unpredictable approaches courts have taken in the post-*eBay* landscape." H.R. Rep. No. 116-645, at 37. Given that *eBay* had invalidated the Federal Circuit's presumption "that courts will issue permanent injunctions against patent infringement absent exceptional circumstances" -- a presumption that clearly modified the burden of persuasion, not just the burden

of proof -- the fact that Congress expressly aimed to reverse *eBay*'s ruling in the trademark context makes it reasonably clear that Congress intended the TMA presumption to apply with respect to the burden of persuasion, and not just the burden of production.

But even if only the burden of production were involved, Rothschild has not met the modest showing required to overcome that presumption. Specifically, Rothschild insists that the MetaBirkins NFTs did not interfere with Hermès' plans to launch its own project because the MetaBirkins NFTs -- unlike Hermès' planned NFTs -- are not products that could be used "as certificates of authenticity to customers who purchase physical Hermès products." Def. Br. at 11. But whether it is reasonable for consumers to confuse an association between Hermès' planned NFTs and the "MetaBirkins" NFTs, given the differences between the two products, is beside the point. For the purpose of demonstrating "irreparable harm," what matters is that consumers *did* mistake an association between Hermès and the MetaBirkins NFTs -- a position that Hermès supports with concrete evidence in the record -- and that the high likelihood of ongoing confusion generated by Rothschild's continued use of the Birkin mark would strip Hermès of the ability to leverage the "goodwill and reputation" of its marks to launch its own profitable NFT project. *See* Plfs. Br. at 13-14 (listing evidence); *see also Stern's Miracle-Gro v. Shark Products,* 823 F. Supp. 1077, 1094 (S.D.N.Y. 1993) ("The existence of likelihood of confusion in a trademark case is strong evidence of irreparable harm because damage to reputation is difficult to prove or quantify.");

*cf. id.* (finding that continued "appropriation of the [plaintiff's trade]mark could dilute and eventually dispel the distinctive quality of the [mark, and the goodwill and reputation consumers attached to it]," causing irreparable harm).

Equally fruitless are Rothschild's efforts to show an absence of harm by suggesting limitations in Hermès' evidence of actual confusion and likelihood of consumer confusion. As already noted, Hermès provided ample evidence of actual and likely consumer confusion, and this Court is not in the position to second-guess the reasoned judgment of the jury, which carefully weighed the evidence put forth by both parties -- including evidence of actual confusion by media outlets and social media users -- and found that there was a sufficiently high likelihood of confusion for Lanham Act liability to attach. And in response, Rothschild offers nothing but speculation.

As to *eBay*'s second requirement, the Court is convinced that "remedies at law, such as monetary damages, are inadequate to compensate [Hermès] for [these] injur[ies]." *eBay*, 547 U.S. 388, 390 (2006). "[A] plaintiff has no adequate remedy at law," if it can show that, "absent an injunction, the defendant is likely to continue infringing its [trademarks]." *Int'l Council of Shopping Centers, Inc. v. Glob. Infotech LLC*, No. 18-CV-8856 (AJN), 2019 WL 2004096, at *5 (S.D.N.Y. May 7, 2019). Rothschild appears to concede this point. Rather than identify remedies at law that he believes would compensate Hermès for the alleged harms it suffered, Rothschild argues that narrow injunctive relief in the form of a disclaimer would suffice to "avert"

whatever irreparable harm Hermès alleges. That request for limited
injunctive relief is addressed below. But, for now, the undisputed
evidence that Rothschild has continued to promote sales of the
MetaBirkins NFTs on social media platforms and to execute sales on a
cryptocurrency platform is dispositive of this *eBay* element. *See* Plfs.
Br. at 15. Monetary relief, Hermès has shown, would not fully
compensate Hermès for the ongoing harms it has suffered by Rothschild's
continued use of its trademarks.

As to *eBay*'s third requirement, the Court must consider whether
"a remedy in equity is warranted" after weighing the "hardships
[suffered by] the plaintiff and the defendant." *eBay*, 547 U.S. at 390.
Here, too, Hermès satisfies its burden. On one side of the "hardship"
ledger, Rothschild identifies supposed harms both to himself and to
the NFTs' third-party consumers. First, he claims that an order
enjoining him and anyone who purchased a MetaBirkins NFT from selling
or marketing the NFTs would "eviscerate [his and other owners]
prospective First Amendment right to promote and [sell their] . . .
artworks in a way that does not explicitly mislead as to their source."
Def. Br. at 15. And second, he contends that if the Court were to go
further and order Rothschild to transfer the NFTs' "smart contracts"
to Hermès, its injunction would "destroy the property rights of bona
fide, good faith purchasers of [the NFTs] who are not parties to this
case." *Id.* On the other end of the ledger, Hermès submits that the
Court's failure to grant it such injunctive relief would sanction the
irreparable harms described in the previous paragraph.

Because the Court has already found that Hermès would suffer irreparable harm absent injunctive relief, it need only evaluate the weight of Rothschild's hardships to complete the analysis. On this, the Court agrees with the plaintiffs that Rothschild has not identified any cognizable hardship. To begin with, Rothschild cannot claim as a hardship the "loss of [his and others'] ability to [sell an] infringing product." *Int'l Council of Shopping Centers, Inc.*, 2019 WL 2004096, at \*5 (S.D.N.Y. 2019). To be sure, Rothschild's claim here is slightly different. He contends that a blanket prohibition on his and others' use of Hermès' trademarks in these works of art -- one that applies even when the trademarks are used in a way that is not explicitly misleading -- violates his First Amendment right to free expression. So, he argues, any injunctive relief entered by the Court cannot, consistent with the First Amendment, broadly prohibit the use of Hermès' trademarks, but must be limited to preventing Rothschild and others from explicitly misleading the public as to the source of the MetaBirkins NFTs. A disclaimer to be displayed on the www.metabirkins.com website, social media accounts, and other platforms, and disseminated to purchasers of the NFTs would, in Rothschild's view, achieve just that.

The Court rejects this argument. It is at odds both with the jury's determination that Hermès proved that Rothschild had intentionally waived his First Amendment protection under *Rogers* and with Second Circuit caselaw on equitable remedies in the trademark context. It will be recalled that the jury determined that Hermès had

shown by a preponderance of the evidence that "Rothschild's use of the Birkin mark . . . was *intentionally designed* to mislead potential consumers into believing that Hermès was associated with Mr. Rothschild's MetaBirkins project." Dkt. No. 143 at 21 (emphasis added). Here, the words "intentionally designed" do considerable work. They represent the jury's determination that Rothschild labeled and designed his NFTs in the way that he did -- that is, through use of Hermès' marks -- intending to exploit the goodwill and reputation of Hermès. In other words, the MetaBirkins' very name and form are intertwined with his intent to confuse, and he thus "waived any First Amendment protection" as to the project itself, and not just as to the particular ways in which he marketed and sold the MetaBirkins NFTs.[5] Even if one were to suppose that there was some ambiguity in the jury's verdict that permits Rothschild to show that his continued use of the marks is not "explicitly misleading," it is not clear how he would meet this burden. Rothschild would somehow have to show that, though his purpose in using Hermès' marks stemmed from an intent to deceive, he has, on reflection, decided to use the marks as part of a communicative message. This strikes the Court as highly implausible. And so, with his First Amendment protection with respect to the project

---

[5] Of course, plaintiffs are correct to observe that Rothschild is free to sell or market NFTs that do not generate a likelihood of confusion among potential consumers. But, in their present form, the jury determined that the MetaBirkins NFTs were likely to confuse consumers as to that association.

waived, Rothschild cannot claim hardship through deprivation of a right to free expression.

To be sure, this logic does not apply to good faith purchasers of the MetaBirkins NFTs, who were not subject to the jury verdict. It is worth noting, however, that the third *eBay* factor (balancing of hardships) normally does not contemplate addressing the hardships borne by third parties: it demands that courts consider the propriety of injunctive relief in view of its potential impact on the parties alone. *See eBay*, 547 U.S. at 391 ("A plaintiff seeking a permanent injunction must [show] . . . that, considering the balance of hardships between *the plaintiff and defendant*, a remedy in equity is warranted." (emphasis added)).

But even putting this objection aside, Rothschild has not identified any cognizable hardship to third parties that would stem from the requested injunction. Hermès nowhere requests that the Court order these bona fide purchasers to transfer their NFTs to the company, but only that Rothschild so transfer his remaining NFTs. Nor do plaintiffs ask that the Court bar their purchasers from displaying their purchases. And in any event, the Court would not enter an injunction with these terms. The proposed order only asks that the Court order Rothschild and his associates to transfer their remaining NFTs (including related smart contracts) to Hermès and to refrain from misleading the public about an association between Hermès and the MetaBirkins NFT project.

Perhaps realizing this, Rothschild also argues that the third parties' First Amendment rights would be "eviscerate[d]" by a Court order directing Rothschild to transfer the "smart contract" of each NFT to the company.[6] This is because Hermès, if it were to receive a "smart contract" from Rothschild, would presumably alter the NFTs' smart contract so that the NFTs are not linked to digital images of Birkin bags. But Rothschild's concern is obviated by the fact that, for different reasons later discussed, the Court declines to order Rothschild to transfer the MetaBirkins NFTs and their smart contracts to Hermès. As for Rothschild's insistence that a disclaimer -- namely, "*MetaBirkins* are artworks by Mason Rothschild and are not affiliated with or endorsed or sponsored by Hermès," Dkt. No. 176 at 1 -- would remedy any irreparable harm suffered by Hermès, this argument flies in the face of settled caselaw and the jury's verdict. Indeed, the Supreme Court itself, in the recent *Jack Daniel's Products* case, found such a disclaimer insufficient to avoid confusion. *Jack Daniel's Products*, slip op. at 7. In this Circuit, "a defendant must justify the effectiveness of its proposed disclaimers at the remedy stage." *Hamilton Int'l Ltd. v. Vortic LLC*, 13 F.4th 264, 274 n.4 (2d Cir. 2021). Rothschild does not come close to meeting this burden. The

---

[6] As the Court explained in its summary judgment order, *see* Dkt. 140 at 5, a "smart contract" refers to a computer code that is also stored on the blockchain and that, among other things, determines the name of each of the NFTs, constrains how they can be sold or transferred, and controls which digital files are associated with each of the NFTs. Since the contract is distinct from the NFT with which it is associated, the contract and the NFT can therefore be owned by two unrelated people or entities.

defendant's proposed disclaimer is practically identical to the one that was displayed on the www.metabirkins.com website, the very same disclaimer that failed to convince jurors that he was not-liable under the Lanham Act. Still, knowing this, Rothschild makes no effort -- beyond stating, without evidence, that "[t]he use of a disclaimer  . . . would balance" the interests of Rothschild, Hermès, and the third parties -- to further defend this disclaimer. Def. Br. at 4.

Returning to the four *eBay* requirements, Hermès also satisfies the *fourth* and final requirement of that test, in that Hermès has shown that "the public interest would not be disserved by a permanent injunction." *eBay* at 391. The public has an interest -- one that is embodied in the Lanham Act -- "in not being confused" about the origin of an artwork, as much as it does with respect to a consumer product. *See N.Y.C. Triathlon, LLC v. v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 326-27 (S.D.N.Y. 2010). Although "[s]ecuring First Amendment rights" also serves a public interest, Rothschild, for the reasons already stated, cannot identify any First Amendment right that would be impaired by an injunction. *New York Progress and Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

Having failed to prevail on any of *eBay*'s four factors, Rothschild opposes the plaintiffs' request for a permanent injunction on one other ground: he argues that what he labels Hermès' "bad faith" and "dishonest" conduct bars any injunctive relief on an "unclean hands" theory. This argument is entirely meritless. The party asserting a defense of "unclean hands" bears a heavy burden. "A court may deny

injunctive relief based on the defense of unclean hands where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue." *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, 2014 WL 3874193, at *8 (S.D.N.Y. Aug. 5, 2014). Typically, only behavior that is "truly unconscionable and brazen" justifies this per se bar on injunctive relief. *Id.* This is especially true in this context. Because trademark law implicates the rights of the public *qua* consumers, "courts typically only bar recovery" under this theory "when a plaintiff's conduct was egregious, or clear, unequivocal, and convincing." P*atsy's Italian Rest., Inc. v. Banas*, 575 F. Supp. 2d 427, 461 (E.D.N.Y. 2008).

A brief look at some of the cases in which courts denied injunctive relief on the basis of an "unclean hands" defense makes clear just how exacting this standard is. In *Goldstein v. Delgratia Min. Co.*, 176 F.R.D. 454, 458 (S.D.N.Y. 1997), the plaintiff made multiple misrepresentations to the court about the nature of the action and the existence of other proceedings, and the defendants moved for an unclean hands defense that barred injunctive relief based on these misrepresentations. In another case, *Estate of Lennon-by-Lennon v. Screen Creations*, Ltd., 939 F. Supp. 287, 293 (S.D.N.Y. 1996), the defendant's agent for purposes of negotiating the parties' license was, in fact, secretly an agent for the plaintiff, and the plaintiff issued the license to another party. Again, the Court granted the defendant's motion to bar enforcement of this license.

In the instant case, however, the Court finds no evidence whatsoever of bad faith on Hermès' part, let alone the kind of egregious conduct found in the foregoing cases. Indeed, the Court finds Rothschild's claims of Hermès' bad faith unsupported by any persuasive evidence. For the most part, Rothschild's "evidence" of bad faith consists of minor misstatements by Hermès' witnesses that were corrected soon after. Take, for instance, the testimony of Mr. Nicolas Martin, Hermès' global general counsel and Rule 30(b)(6) witness, which Hermès claims was perjurious. On cross-examination during trial, Mr. Martin clarified his earlier testimony that Hermès had not had any contact with Rothschild after sending its cease-and-desist letter by saying "that he meant only that he personally had no direct contact with Mr. Rothschild." Robinson Decl., Ex. B at 210:3-12. Rothschild offers no evidence that his clarification was, as he says, "disingenuous," and the Court has no reason to conclude that it was. Martin's later testimony that, he was "only aware of one [trademark infringement case brought by Hermès] more than 20 years ago," is also completely consistent with the fact that Hermès did, as a company, bring a trademark infringement claim in 2011. Mr. Martin made abundantly clear that he was drawing from his own knowledge in his testimony and was not making a global statement about Hermès' litigation history. Moreover, Mr. Martin quickly rectified his error once it had been raised. Without multiplying examples, it suffices to state that after careful review, this Court concludes that Rothschild's

assertions of bad faith rest wholly on speculation and conjecture, rather than concrete evidence.

Though Hermès has shown that a permanent injunction should issue as a general matter, the Court must still determine precisely what equitable relief is appropriate. It determines as follows:

*First*, given the likelihood that the continued sale and marketing of the MetaBirkins NFTs will generate confusion as to source among the public, Rothschild and any "other persons who are in active concert or participation with him," including his associates, business partners, and others he has commissioned to market the MetaBirkins NFTs, are enjoined from using the Birkin marks or otherwise misleading the public about the source of the MetaBirkins NFTs, as further detailed in the an accompanying Permanent Injunction Order. *See also* Fed. R. of Civ. P. 65(d)(2) ("[A permanent injunction] order binds . . . the parties, [its] officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participation [with them]."). The Court notes that neither this nor any other part of its Permanent Injunction Order applies to third parties that are not in "active concert or participation" with Mr. Rothschild.

*Second*, in light of the jury's determination that Rothschild was liable for cyber-squatting, the Court orders Rothschild to transfer the www.metabirkins.com domain name and related materials to the plaintiffs. Here, the Court exercises its statutory powers to "order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark" where a defendant is found

liable of cyber-squatting. *See* 15 U.S.C. § 1125(d)(1)(C). Though the Court declines to also compel Rothschild to transfer social media accounts related to the sale and marketing of the MetaBirkins NFTs, it does enjoin him from using the infringing mark to facilitate the sale or marketing of the MetaBirkins NFTs on these and other platforms. *See* Order ¶ 2(d); *Casestry, LLC v. Caseful, LLC*, 2020 WL 8673981, at *1 (N.D.N.Y. July 7, 2020) (stating that the defendant, who was deemed liable for cyber-squatting, is permanently enjoined from using the infringing mark in "any social media reference")

*Third*, the Court declines to order that Rothschild transfer any MetaBirkins NFTs in his possession, including the smart contract, to Hermès (in order to be destroyed). It is true that, where there is a significant and ongoing risk of irreparable harm to the plaintiff, courts have sometimes exercised their powers to "order that all [materials] in the possession of the defendant [that] bear[] the registered mark" to be "delivered up and destroyed." 15 U.S.C. § 1118. But, here, several factors make this remedy both unnecessary and potentially unwise. To begin with, the Court has already enjoined the defendant and associated parties from further infringement, including the collection of any royalties from the NFTs that have already been purchased. *See Audemars Piguet Holding S.A. v. Swiss Watch Intern., Inc.*, 46 F. Supp. 3d 255, 289 (S.D.N.Y. 2014) ("Where the Court is entering a permanent injunction against further infringement, the destruction of goods may not be necessary."). And, because the MetaBirkins NFTs are at least in some respects works of art, the Court,

out of an abundance of caution, chooses to enter a narrower injunction that would remedy continued consumer confusion while avoiding any potential constitutional problems. To be sure, Hermès has shown that Rothschild has continued to market, sell, and collect royalties from the MetaBirkins NFTs. But the fact that he has done so *before* an injunction has been entered does not necessarily suggest, as Hermès thinks it does, that he would violate the terms of an injunction once it has been entered. If he did so, Hermès would have recourse to remedies at law and equity, including asking this Court to hold Rothschild in civil or criminal contempt.

*Fourth*, the Court orders Rothschild to disgorge any profits he derived from the MetaBirkins NFTs since the beginning of trial to the present day, which includes royalties, transfer income, or other financial benefits that he received from resales of the NFTs. Of note, the jury already awarded Hermès $110,000 in net profits to be paid by Rothschild (plus $23,000 in statutory damages for cyber-squatting) in order to compensate Hermès for Rothschild's unlawful use of its trademarks through the first day before trial, January 30, 2023. So, here, the only issue left to resolve is whether Hermès is also entitled to net profits from the first day of trial -- January 31, 2023 -- to the present for Rothschild's continued violations of its trademarks.

Disgorgement under the Lanham Act is a type of compensatory award, "measured by the profits [gained by] the defendant [through] his infringement, the costs of the action, and damages." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 720 (1967);

*Lexington Furniture Indus. v. The Lexington Co.*, 19-cv-6239 at *18-19 (S.D.N.Y. Oct. 24, 2022); *George Basch Co. Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1539 (2d Cir. 1992). Bound only by the "principles of equity," courts may, largely at their discretion, decide whether to grant net profits under the Lanham Act to a victorious plaintiff. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1494-97 (2020); 15 U.S.C. § 1117(a).

This begs the question of what principles of equity should guide the Court's determination. For one, though a plaintiff need not show that the defendant acted with "willful deception" in his infringement, whether he did so "is a highly important consideration in determining whether an award of profits is appropriate." *Romag*, 140 S. Ct. at 1497. And here, the jury verdict is unequivocal that Rothschild purposely intended to confuse the public into thinking there was an association between his project and Hermès, more specifically, that he "intentionally designed [his NFTs] to mislead consumers" about their source. Dkt. No. 170 at 15.

Rothschild's only defense to this intent finding has already been rejected above. He argues that his continued use of Hermès' trademarks after he displayed his disclaimer was not explicitly misleading and that, accordingly, he has thus not since the start of trial engaged in the sort of "willful deception" that would justify an award of disgorgement for the period here in issue. *See* Def. Br. at 15. But, to reiterate, the jury found that his decision to use Hermès' trademarks in the name and design of the MetaBirkins NFTs -- and not

just his marketing and sales techniques -- was in itself explicitly misleading, and rejected his disclaimer defense. Rothschild thus cannot now argue that he intends to use these marks as part of a communicative message, rather than, as the jury found, to exploit the goodwill the public attaches to the Birkin marks.

In addition, all of the other equitable principles deemed relevant by the Second Circuit -- including "the availability and adequacy of other remedies" and "the degree of certainty that the defendant benefited from the unlawful conduct" -- cut in Hermès's favor for injunctive relief, including disgorgement. To this end, the Court further orders that, no later than June 30, 2023, Rothschild shall specify in writing any royalties, transfer income, or financial benefits that he has earned from the MetaBirkins NFTs from January 31, 2023 through June 30, 2023 and shall transfer those earnings to Hermès by no later than July 15, 2023.

Hermès' remaining requests for injunctive relief are either uncontested by Rothschild or, in the Court's view, uncontroversial. Thus, the Court orders Rothschild to communicate the details of the Court's order for a permanent injunction to purchasers of the NFTs and others, as detailed in its accompanying Order for Permanent Injunction and to provide Hermès written confirmation of Rothschild's compliance with the terms of the Court's Order within thirty-one (31) days of its entry. It also orders both parties to preserve any documents that relate to this lawsuit, once again, in accordance with the Order for Permanent Injunction.

III. **The Defendant's Request to Interview the Jury Foreperson and Other Members of the Jury**

Rothschild's final motion is perhaps his most frivolous. Rothschild requests leave to interview the jury's foreperson, and "up to four other . . . jurors" because of "the substantial possibility that the jurors considered material, prejudicial and erroneous information outside the record in reaching their verdict." *See* Dkt. No. 170 at 1. These are serious accusations, but made without the slightest support.

Earlier in this Opinion, the Court made clear that it finds the defendant's speculation about the meaning of a juror's post-trial statements totally unpersuasive. His other proffered suggestions are no better. For example, Rothschild asserts that the jury's verdict was tainted by prejudicial information outside the record because *one* of the jurors exhibited knowledge of the copyright disputes over Andy Warhol's work and mentioned the Second Circuit case of *Rogers v. Grimaldi* in her post-trial statements, even though she was never instructed on the *name* of the *Rogers* case. It would require a truly breathtaking leap of logic to view this as proof that "the jury appears to have relied upon [information] introduced from outside the courtroom" or "independent, outside research." Indeed, two alternate possibilities, at the very least, are equally plausible: one, this "out-of-court" information could not have impacted the verdict because the juror learned of it from research she conducted *after* the jury had completed its deliberations; or two, the juror knew of this information

during deliberations but did not allow it to motivate her decision on the verdict. Neither this juror in her post-verdict statements nor any other member of the jury ever intimated that any outside knowledge motivated their decisionmaking or, indeed, that they even possessed any extrinsic knowledge during their deliberations. The Court, in the absence of even a shred of concrete evidence, refuses to conclude that extraneous information poisoned the jury's verdict.

The absence of evidentiary support becomes even more clear when we compare this case to the few in which leave has been granted to investigate bias among the jury. Take, for instance, *Remmer v. United States,* a case that the defendant (incorrectly) cites for the proposition that, "[o]nce a party has shown reasonable grounds to suspect that the jury might have been tainted by information outside the record, a Court must conduct an inquiry into the jury's bias." 347 U.S. 227, 229-30 (1954). There, the Supreme Court vacated the jury's verdict and directed the lower court to investigate potential bias among the jury *only after* it discovered an unknown man had promised one of the jurors a substantial financial award if he found in favor of the petitioner. The difference in the quality of evidence that served as the basis of the moving party's request in this case and in *Remmer* could not be more stark.

Post-verdict jury inquiries are far from harmless: they risk "subjecting juries to harassment, . . . burdening courts with meritless applications, . . . and creating uncertainty in jury verdicts." *United States v. Vitale*, 459 F.3d 190, 197 (2d Cir. 2006). More fundamentally,

the specter of frequent investigations chills the honest exchange of views during jury deliberations, which take place with the understanding that the content of the deliberations will generally not become public if not divulged by the jurors themselves. Courts have granted leave for such motions only in the most extraordinary circumstances, where there is "clear, strong, substantial, and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial." *United States v. Stewart*, 433 F.3d 273, 302-03 (2d Cir. 2006). Nothing of this kind is remotely present here.

In conclusion, the Court hereby denies both of the defendant's motions in their entirety and enters a permanent injunction against the defendant, the terms of which are detailed in an order accompanying this Opinion.

SO ORDERED.

New York, NY
6/23, 2023

_____
JED S. RAKOFF, U.S.D.J.