UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HERMÈS INTERNATIONAL and HERMÈS OF PARIS, INC., <br><br> Plaintiffs, <br><br> -against- <br><br> "MASON ROTHSCHILD" a/k/a SONNY ESTIVAL, <br><br> Defendant. | 22-cv-384 (JSR) <br><br> OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

As the jury unanimously found, defendant "Mason Rothschild" (real name Sonny Estival) is a straightforward swindler, who attempted to cloak his fraud by posing as an "artist." Accordingly, on February 8, 2023, after a nine-day trial, a jury returned a unanimous verdict against the defendant, finding him liable for intentional (indeed, blatant) trademark infringement, trademark dilution, and cybersquatting, and awarding the plaintiffs -- Hermès International and Hermès of Paris, Inc. (collectively, "Hermès") -- $133,000 in damages.[1] Thereafter, on June 23, 2023, the Court issued a permanent injunction directed at Estival "and his associates, business partners, influencers, representatives, and all others in active concert or participation with him," ECF No. 190 ("Injunction Order"), at 1,

---

[1] The Court assumes the reader's familiarity with the record. For more context, the reader may consult the Court's Opinion and Order denying the parties' cross-motions for summary judgment, ECF No. 140, and the Court's Opinion and Order denying Estival's motion for judgment as a matter of law and explaining the reasons for the permanent injunction, ECF No. 191.

1

enjoining, inter alia, their "[m]anufacturing, minting, issuing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, renting, or otherwise disposing of [defendant's so-called] 'MetaBirkins' non-fungible tokens ('NFTs') and any merchandise related to the 'MetaBirkins' NFTs." Id. at 1-2. In addition, the injunction prohibited, inter alia, "[m]aking any statement or representation or performing any act that is likely to lead the public to believe that any 'MetaBirkins' NFTs or related merchandise are in any manner associated or connected with Hermès and/or its 'Birkin' trademark and/or trade dress." Id. at 2.

On January 26, 2024, Estival filed, with the Court's leave, a motion seeking "clarification regarding whether the Order of Permanent Injunction . . . in this case would prohibit [him] from providing permission to a Swedish museum to display MetaBirkins artworks in its upcoming exhibition on Andy Warhol and Business Art." ECF No. 213 ("Estival Mem."), at 1. Hermès filed an opposition on February 2, 2024, ECF No. 216 ("Hermès Opp."), and Estival filed a reply on February 7, 2024, ECF No. 220. On February 20, 2024, the Court held an evidentiary hearing at which it heard testimony from two witnesses, one of whom was affiliated with the Swedish museum and the other of whom had been asked to help prepare the exhibit. Having considered the parties' submissions and the testimony at the hearing, the Court hereby denies Estival's motion because the Court cannot conclude, based on the evidence before it, that Estival's requested permission comports with the injunction.

2

The Court begins by noting, as essential background to the Court's conclusion, the salient findings of the jury. "[T]he jury determined that Hermès had shown by a preponderance of the evidence that '[Estival's] use of the Birkin mark . . . was intentionally designed to mislead potential consumers into believing that Hermès was associated with Mr. [Estival's] MetaBirkins project.'" ECF No. 191 ("Injunction Op."), at 23-24 (quoting the Court's jury instructions). "[T]he words 'intentionally designed'" in the Court's instructions to the jury "represent the jury's determination that [Estival] labeled and designed his NFTs in the way that he did [for the express purpose of] exploit[ing] the goodwill and reputation of Hermès." Id. at 24. Indeed, "the jury verdict is unequivocal that [Estival] purposely intended to confuse the public into thinking there was an association between his project and Hermès," id. at 33, when, of course, there was none. "In effect, the jury found that [Estival] was simply a swindler." Id. at 2. To boot, Hermès showed that, even after the jury's verdict, Estival had carried on profiting from his fraud by "continu[ing] to market, sell, and collect royalties from the MetaBirkins NFTs." Id. at 32. Against this background of unapologetic and continuing fraud, the Court entered the permanent injunction at issue after concluding that Hermès had satisfied each of the relevant requirements that the Supreme Court elaborated in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006).

The validity of the permanent injunction is not here in question. Although Estival has appealed the adverse judgment against him in this

case, he seeks, in the instant proceeding, not to vacate or modify the injunction but to clarify its application to his proposed providing of permission to a Swedish museum to display his trademark-infringing MetaBirkins NFTs.

Estival avers that "[j]ust before Christmas last year, the Spritmuseum in Stockholm, Sweden . . . contacted [him] to ask for his permission to display [his] MetaBirkins artworks in an exhibition to open this year curated by Dr. Blake Gopnik that focuses on Andy Warhol and Business Art." Estival Mem. at 2.[2] In particular, Estival explains that "[t]he Museum intends to display MetaBirkins on a screen just as the images are available on the Internet." Id. at 3. Estival's counsel specifically represented that "[t]he museum intends to include mention of this lawsuit in the exhibit's description of the MetaBirkins artworks." Id. Estival disclaims that he would receive any royalties or payment from the Spritmuseum in exchange for his permission. He adds that "[t]he Museum would make no claim of any connection between MetaBirkins artworks and Hermès." Id. at 4. In fact, he asserts, "the exhibit text would identify Mr. Rothschild [Estival] as the artist responsible for MetaBirkins, explain that Hermès sued and won a trial

---

[2] The instant proceeding is not Dr. Gopnik's first entanglement with this case. Earlier in the litigation, Estival retained Dr. Gopnik as an expert witness to purportedly "show how the images and NFTs produced by [Estival] find their natural and obvious home among the artistic experiments carried out by modern artists over the last century." ECF No. 65-1 (expert report of Dr. Gopnik), ¶ 1. At trial, however, the Court excluded the testimony of Dr. Gopnik, finding it did not remotely comply with the requirements of Federal Rule of Evidence 702. See ECF No. 151, at 3; ECF No. 120, at 1-2.

against Mr. Rothschild [Estival] for trademark infringement, and further explain that Mr. Rothschild [Estival] is challenging that result on appeal." Id. Although Estival believed that there was no "reasonable way that the [injunction] can be read to prohibit [him] from giving his permission to a museum to display MetaBirkins artworks in an exhibition alongside other artworks," he conferred with Hermès's counsel to learn whether Hermès shared that understanding. Id. at 2. It did not. Hence, the instant motion.

Based on the evidence before it, the Court cannot conclude that Estival's request steers clear of the injunction's prohibitions. As Hermès points out, Estival's written "submission provides no details about the permission he would be granting -- such as the promotion of the exhibit or any merchandising." Hermès Opp. at 1. Indeed, Estival's counsel asserts that there are "no contracts or documents" reflecting any agreement he would have with the museum or the scope of the permission he would be granting. ECF No. 215 (declaration from Estival's counsel), at 6. "[E]ven if [Estival's] 'permission' will be oral, we still do not know basic details about the scope of that permission, like how the museum might advertise the exhibit or sell accompanying merchandise." Hermès Opp. at 4. "We do not know, for example, if the license will cover selling goods featuring MetaBirkins in the museum shop or elsewhere." Id. Estival's own motion alludes to that possibility, noting as somehow relevant that he "retains ownership of the copyrights in the MetaBirkins artworks." Estival Mem. at 2. Accordingly, there is a real risk that, in plain contravention of the

5

injunction, "[Estival] might be using the Spritmuseum's exhibit to promote his infringing MetaBirkins NFTs or cause further confusion" to consumers. Id. at 3.

Rather than assuage the Court's concerns, the evidentiary hearing -- at which the Court heard testimony from Dr. Gopnik and Mia Sundberg, a representative of the Spritmuseum who testified remotely from Sweden -- only compounded them. Indeed, the sworn testimony of both witnesses revealed that Estival's counsel had misrepresented key facts to the Court. In Estival's opening letter motion regarding the instant dispute, his counsel stated, without the slightest caveat or qualification, that "the exhibit text would . . . explain that Hermès sued and won a trial against Mr. Rothschild [Estival] for trademark infringement." Estival Mem. at 4; see id. at 5 ("[T]he artworks will be accompanied by an explanatory text about the litigation brought by Hermès.").

That appeared to have been news to Ms. Sundberg, curator of the Spritmuseum's art collection. She testified to the Court, "We have not yet decided whether we will discuss the lawsuit in text context, in text of the exhibition." ECF No. 228 ("Hearing Tr."), at 12:19-20. She added, "We have not at all each reached the point where we started to discuss, Dr. Blake [Gopnik] and I, what the context of the text around this artwork will be." Id. at 12:21-23. Dr. Gopnik responded similarly when asked by the Court whether the exhibit would provide information about the jury verdict in this case. See id. at 6:6-7 ("We haven't got to the stage yet of writing the wall text that go[es] with each

6

piece."). Moreover, Dr. Gopnik noted that any explanation of the lawsuit and the jury's findings, even if included in the exhibit, would necessarily be cursory. See id. at 6:9-11 ("Wall text is usually maximum a hundred words, so we're going to have to figure out a way of condensing the issues into a very short text.").

In light of such testimony, the Court has deep concerns that allowing Estival to provide permission to the Spritmuseum "is likely to lead the public to believe that . . . 'MetaBirkins' NFTs or related merchandise are in [some] manner associated or connected with Hermès and/or its 'Birkin' trademark and/or trade dress." Injunction Order at 2. Without a clear, concrete statement that, as the jury unanimously found, Estival designed the MetaBirkins NFTs to dupe the public into believing that Hermès was somehow behind the images, there is little reason to expect that those visiting the exhibit would understand that Estival's creation and distribution of MetaBirkins NFTs was a fraudulent endeavor in which Hermès had no part. To be sure, at the hearing, Sundberg testified that the Spritmuseum is "absolutely prepared to" include with the exhibit "a text saying that this has nothing to do with the brand of Hermès." Hearing Tr. 14:15-17. But this in some sense inaccurate, since Estival's purpose in making the images was, as the jury found, to generate confusion with Hermès. Moreover, Ms. Sundberg's proposed statement is far removed from expressly warning the public that Estival engaged in an intentional fraud designed to confuse the public as to his NFTs' bogus association with Hermès.

Other aspects of Sundberg's testimony confirm the Court's fear that the mandates of the injunction would not be honored. After stating that the exhibit text would be written in an "open[]-ended way," id. at 14:2, she flatly stated that "I would not be telling my public" that "this is an artist who is a fraud." Id. at 14:2-3; see also id. at 14:4-6 ("That would not be a way of expressing myself in a text in an exhibition."). In fairness, Sundberg herself was not even aware of the extent of Estival's deceptiveness. In fact, she only learned for the first time at the hearing that "Mason Rothschild," the name that Estival used to peddle his infringing NFTs, was entirely phony. See id. at 11:20-25.

Nor did Dr. Gopnik's testimony offer any countervailing assurances. In fact, in a Washington Post opinion piece published last year -- entitled, "A misguided jury failed to see the art in Mason Rothschild's MetaBirkins" -- Dr. Gopnik himself wrote that he "couldn't see any real difference between Rothschild and the many artists, good and bad, who made art about our culture's commerce." Blake Gopnik, Opinion: A misguided jury failed to see the art in Mason Rothschild's MetaBirkins, Wash. Post (Feb. 24, 2023), https://www.washingtonpost.com/opinions/2023/02/24/mason-rothschild-metabirkins-art-bad-jury-verdict/. Apparently, in the view of Dr. Gopnik -- who, it must be emphasized, is the person curating the exhibit at issue -- there is no "real difference" between an artist who fraudulently deceives the public and an artist who respects the law. Furthermore, Dr. Gopnik has made it no secret that he "hope[s]

8

an appeals court will realize that the jury was wrong about Rothschild's art." Id. Given the lack of any details whatsoever about how the exhibit will describe Estival's MetaBirkins NFTs to the public, and knowing full well that the person curating the exhibit is openly hostile to the jury's verdict, the Court cannot approve Estival's requested permission as compliant with the injunction.[3] Accordingly, the requested permission is hereby denied.

The Clerk is also respectfully directed to amend the caption of this case to conform to the caption listed on this Opinion and Order.

SO ORDERED.

---

[3] The Court recognizes that the relevant provisions of the trademark statute, the Lanham Act, do not apply extraterritorially. See Abitron Austria GmbH v. Hetronic Int'l, 600 U.S. 412, 419-21 (2023). But actions that include foreign conduct still fall within the Lanham Act's scope when they "involve domestic applications" of the statute. Id. at 421. The Supreme Court has explained that "if the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application of the statute, even if other conduct occurred abroad." Id. at 419. And there is no suggestion that Estival would provide the requested permission from anywhere outside the United States. Similarly, Dr. Gopnik testified that nearly all of his work curating the exhibit will occur in the United States. Hearing Tr. 9:11-16. Moreover, the question here is not whether Rothschild's permission to the Spritmuseum would independently be actionable under the Lanham Act. It is whether such permission would run afoul of the Court's injunction, which may properly sweep more broadly than the Lanham Act itself to deter future violations. See, e.g., Patsy's Italian Rest., Inc. v. Banas, 658 F.3d 254, 273 (2d Cir. 2011) ("A district court has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct."). "An obligation on the part of a previously adjudicated infringer to maintain a safe distance from infringing the plaintiff's marks has been found to serve a useful purpose in fashioning injunctions based on a finding of infringement, especially where," as here, "the infringement was abusive or in bad faith." PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc., 520 F.3d 109, 117 (2d Cir. 2008); accord 5 McCarthy on Trademarks and Unfair Competition § 30:4 (5th ed. 2023).

New York, NY
March 13, 2024

_____
JED S. RAKOFF, U.S.D.J.